**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **SUNEDISON, INC.**, *et al.*, | : **Case No. 16-10992 (SMB)** |
| | : |
| Debtors.[1] | : **(Joint Administration Pending)** |
| | : |
| | : |

**DECLARATION OF PATRICK M. COOK PURSUANT TO LOCAL**
**BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Patrick M. Cook, being duly sworn, deposes, and says:

1.      I am Vice-President – Capital Markets And Corporate Finance of

SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession in

the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor

affiliates, "SunEdison" or the "Company"),[2] and I am generally familiar with SunEdison's day-

to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors each commenced a

case by filing a petition for relief under chapter 11 of the United States Bankruptcy Code, 11

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number
are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE
Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings,
LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison
International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison
Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison
Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge
Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison
Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308);
SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr.,
Maryland Heights, Missouri 63043.

[2]   For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc. and
Terraform Global, Inc., and each of their respective direct and indirect subsidiaries, unless otherwise provided.

U.S.C. §§ 101– 1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (collectively, the "<u>Chapter 11 Cases</u>").   The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.   To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the Southern District of New York (the "<u>United States Trustee</u>").   No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

3.      To minimize the adverse effects of filing for chapter 11 on their businesses, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "<u>First Day Pleadings</u>").[3]   The First Day Pleadings seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.   I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estates and their creditors' interests.   The facts set forth in each First Day Pleading are incorporated herein by reference.

4.      I submit this declaration (the "<u>Declaration</u>"), pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Bankruptcy Rules</u>"), to provide an overview of the Debtors, their businesses, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and First Day Pleadings.   I have been with

---

[3]      Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

SunEdison for over five years and have been in charge of the Company's Capital Markets division for approximately three years. As a result of my time with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' senior management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein and all facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial conditions. In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration. I am authorized to submit the Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.     The Declaration is divided into three parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures, their restructuring efforts, and the events leading up to the filing of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings. Finally, Part III provides the specific information required by Local Bankruptcy Rule 1007-2.

## PART I

### I.     BACKGROUND

#### A.     Company History

6.     The Debtors are direct and indirect subsidiaries and affiliates of Debtor, SUNE, a renewable-energy development company that has its early roots tied to the Monsanto Company ("Monsanto"). Before SunEdison became the world's largest renewable-energy

developer, SunEdison was Monsanto Electronic Materials Company, which was founded in 1959 as the silicon wafer–manufacturing division of Monsanto.    In 1984, Monsanto Electronic Materials Company registered as a Delaware corporation and became formally known as MEMC Electronics Materials, Inc. ("MEMC").    MEMC's stock began trading on the New York Stock Exchange with an initial public offering ("IPO") in 1995.

7.    In 2006, MEMC entered into a long-term supply agreement to provide polysilicon to solar manufacturers and, shortly thereafter, began manufacturing solar wafers through joint ventures.    In November 2009, MEMC acquired privately-owned Sun Edison LLC. At the time of the acquisition, Sun Edison LLC was already one of North America's largest solar energy developers in the commercial and industrial market, developing, financing, building, operating, and monitoring large-scale photovoltaic ("PV")[4] plants since 2003.    After its acquisition of Sun Edison LLC, MEMC became a developer of solar power projects and one of North America's largest solar energy services providers, focusing on developing and acquiring advanced technologies used in the production of low-cost, high-performance solar panels and developing, owning, operating, and selling solar power projects.

8.    Thereafter, MEMC continued to expand its solar-energy business and ultimately determined to focus predominantly on this business line.    On May 30, 2013, MEMC changed its name to SunEdison, Inc. and changed its stock-market ticker from "WFR" to "SUNE," each to reflect SunEdison's shift to focus on renewable energy.    Subsequently, in May 2014, SUNE formally separated its semiconductor-wafer business from its solar-wafer and renewable energy businesses.    To effect the foregoing, the Company spun off SunEdison Semiconductor, Ltd., its semiconductor materials business segment, in an IPO on the NASDAQ

---

[4]    "Photovoltaic" refers to the conversion of sunlight (photons) to electrical energy (voltage).

(under the ticker "SEMI").   In June 2015, SunEdison announced its full divestiture of its semiconductor business, and sold off its remaining interest in the publicly-traded SunEdison Semiconductor, Ltd.[5]   The completion of the sell-off finalized SunEdison's transition into a dedicated renewable energy company.

9.     As part of this strategy, in March 2014, SUNE created a "yieldco" subsidiary – a dividend-oriented entity,[6] called TerraForm Power, LLC ("Power LLC").   On July 22, 2014, SUNE contributed Power LLC to a separate SUNE subsidiary, TerraForm Power, Inc. ("TERP"),[7] concurrently with the IPO of TERP.   Following the IPO, SUNE maintained a majority stake in both Power LLC and TERP (as described further below).   As part of the TERP IPO, many of SUNE's completed projects in developed countries (primarily North America, the UK, and Chile) were contributed to the capital of Power LLC.   In similar fashion, on August 5, 2015, SUNE completed the IPO of a second yieldco subsidiary, TerraForm Global, Inc. ("GLBL," and together with TERP, Power LLC, and Global LLC (as defined below), the "YieldCos"),[8] to own, through TerraForm Global, LLC  ("Global LLC"), many of SunEdison's completed renewable-energy projects in emerging markets such as Brazil, China, and India. Following the IPO, SUNE maintained a majority stake in both Global LLC and GLBL (as described further below).   The creation of the YieldCos was a significant step in SunEdison's growth as a global renewable-energy development company, as illustrated below.   However, as

---

[5]   SunEdison continues to own one Singapore-denominated share in SEMI.

[6]   A yieldco is akin to a master limited partnership elsewhere in the energy field, and  is essentially a collection of operating energy assets (e.g., wind farms and solar plants) that are expected to produce foreseeable economic returns.   The concept of a yieldco is to have a steady stream of predictable income – such as that from long-term PPAs (defined below) with power utilities – in order to fund a strong, sustainable dividend for the yieldco's investors.

[7]   TerraForm Power, Inc. currently trades on the NASDAQ under the ticker "TERP."

[8]   TerraForm Global, Inc. currently trades on the NASDAQ under the ticker "GLBL."

further described herein, the process required intensive capital in order to build the YieldCos' portfolios prior to their IPOs and grow them thereafter. ***Neither the YieldCos nor their direct and indirect subsidiaries are included as "Debtors" in the Chapter 11 Cases.***

SunEdison Timeline



As described below, SunEdison's rapid evolution from a silicon wafer-manufacturing company to the largest global renewable-energy company has resulted in operational and liquidity constraints. Despite various restructuring efforts, the Debtors have no choice but to commence the Chapter 11 Cases to implement a court-supervised restructuring of their debt obligations, as explained in greater detail herein.

**B.      SunEdison's Businesses**

10.      SunEdison – the largest global renewable-energy development company – develops, finances, installs, owns, and operates renewable energy power plants, while also serving as a renewable energy asset manager. In its capacity as asset manager, SunEdison provides asset management, operations and maintenance, monitoring, and reporting services to safeguard and maximize the performance of its customers' renewable energy assets. SunEdison's operations are organized in the following four business segments, each discussed in turn below: (i) Renewable Energy Development Segment; (ii) Renewable Energy Operating Systems Segment; (iii) TerraForm Power Segment; and (iv) TerraForm Global Segment.

## 1.    The Renewable Energy Development Segment

11.    The Renewable Energy Development Segment develops, constructs, and finances solar, wind, and other renewable energy systems for contribution or sale to the Renewable Energy Operating Systems Segment, TerraForm Power Segment, TerraForm Global Segment, strategic partners, or unaffiliated third-party buyers.  This segment also includes a solar materials business (the "Solar Materials Business Unit")[9] that manufactures polysilicon and silicon wafers, and subcontracts the assembly of solar modules to support SunEdison's businesses, and to sell to third-party customers.

12.    As of December 31, 2015, the Renewable Energy Development Segment had interconnected[10] over 1,197 renewable energy systems representing 3.4 gigawatts ("GW")[11] of renewable energy generating capacity.  For purposes of classifying the Company's projects, a solar, wind, or other energy system project (a "Project") is deemed in "pipeline" when SunEdison (i) has a signed or awarded privately negotiated long-term power purchase agreement (a "PPA")[12] or other similar sales agreement, such as a feed-in tariff ("FiT") with respect to the Project,[13] or (ii) has achieved each of the following three benchmarks: (a) site control; (b) an identified interconnection point with an estimate of the interconnection costs; and (c) an

---

[9]    The Solar Materials Business Unit is in the process of being divested and/or shut down.

[10]    Interconnection occurs when a completed Project that is generating electricity and meets certain federal and state standards is connected to a previously identified and approved interconnection point and begins to transmit power to the utility grid.

[11]    A "gigawatt" is a unit of electric power equal to one billion watts and is commonly used as a unit of measurement for large-scale power plants.

[12]    A "PPA" is a contract pursuant to which power is sold, typically in the power industry over long periods of time and at stated prices.  The predictable revenue governed by a PPA is financeable, and developers often finance the construction of power plants on the basis of selling power generated by the constructed plant pursuant to a PPA.

[13]    The Company will often refer to the subset of pipeline Projects that have executed PPAs as "backlog" Projects.

executed energy off-take agreement or the determination that there is a reasonable likelihood that an energy sales agreement will be signed. "Under construction" refers to Projects within pipeline that are in various stages of completion, but are not yet operational.

13.     SunEdison's business model is to develop renewable-energy Projects in select markets throughout North America, South America, Europe, the Middle East, Australia, Africa, and Asia and to either operate or eventually sell these Projects to a YieldCo or other third-party purchaser.  For each Project, SunEdison typically creates a special purpose entity either prior to developing and constructing the renewable energy Project (or a group of related Projects) or prior to selling or financing the Project (a "Project Co.").  A typical U.S. solar utility scale and commercial & industrial Project Co. will have land rights, permits, and contractual arrangements to construct, finance, operate, and sell power generated by the particular Project(s) it was formed to develop and own.  The Project Co. will often rely on its affiliates, NVT Licenses, LLC or Team-Solar, Inc., to construct and later operate the Projects.[14]

14.     Once a Project Co. determines that a PPA is or may be available (or concurrently with the process of making such a determination), it will work on other key elements of its Project.  Those elements include: obtaining land rights, permits, grid interconnection and transmission, construction contracts, financing and operating arrangements. Construction of a Project is typically governed by an engineering, procurement, and construction ("EPC") contract ("EPC Contract").[15]  Operation and maintenance of a Project once constructed

---

[14]   For foreign solar Projects, generally, the Company will rely on alternative subsidiaries (other than NVT Licenses or Team Solar, Inc.) to construct and operate Projects in accordance with local licensing and jurisdictional requirements.

[15]   The EPC Contract is often, but not always, entered into with a SUNE subsidiary (an "EPC Entity").  Indeed, with respect to wind Projects, SunEdison is not typically the construction service provider under wind construction  agreements, typically referred to as balance of plan agreements ("BOPs") and turbine supply agreements ("TSAs").

is often governed by an operations and maintenance ("O&M") agreement ("O&M Agreement").[16]  For SunEdison and Yieldco Projects, one or more SunEdison subsidiaries are often the service providers under the EPC Contract and the O&M Agreement.  In order for a Project to be financeable, the EPC Contract and the O&M Agreement must be with, or performance thereof guaranteed by, a creditworthy counterparty, or liquid collateral must be posted to ensure performance.  SunEdison often provides guarantees, letters of credit, and/or performance bonds to backstop its EPC Contracts and O&M Agreements.

15.    Once a Project Co. has reached the development stage, it proceeds with construction of the Project.  Construction is generally financed on a non-recourse or limited recourse basis, with the Project lenders lending against the contractual arrangements put in place by the Project Co.  Construction financing may convert to long-term financing upon completion of construction, or the Project Co. may seek alternative long-term debt and/or tax equity financing.[17]

16.    Below is an illustration of how a renewable Project is customarily structured.

---

[16]    The O&M Agreement  is often, but not always, entered into with a SUNE subsidiary (an "O&M Entity").

[17]    Tax equity "financing" refers to equity investments by third parties that primarily earn returns through federal and state tax incentives associated with the development and operation of an eligible clean energy Project.



17.    The Renewable Energy Development Segment business units generally fall into the following business units, each discussed in turn below: (i) residential and small commercial ("RSC"); (ii) large commercial and industrial ("C&I"); (iii) utility scale ("Utility"); (iv) global asset management ("GAM"); and (v) the Solar Materials Business Unit.

18.    RSC Business Unit.  SunEdison's RSC business unit is an international, multi-channel operation selling PV solar systems and equipment in the United States, as well as in Latin America and Australia, to residential and small commercial customers.  RSC sells solar energy systems (including, in the United States, by extending vendor financing) to customers through direct sales, sales only partners and marketing alliances, and a network of partners and dealers.  In the United States and Australia, RSC has also established a network of "SunEdison Authorized Installers" for installing solar energy systems for its customers.

19.    <u>Commercial & Industrial Business Unit</u>.  The C&I business unit primarily develops distributed generation community solar projects and sells the output of those projects under multiple PPAs to large commercial and industrial organizations, including, among others, municipalities, school districts, and housing authorities.  C&I also develops on-site behind-the-meter projects such as installations on rooftops, carports, or small ground mounts systems at the host site, where the host then purchases the output directly from the system.  SunEdison's C&I customers are primarily large companies that typically have certain attributes that make them good candidates for SunEdison's services, such as multiple locations with large rooftops, parking canopies, or unused land, strong credit quality, large electricity consumption requirements, and requisite load usage.

20.    <u>Utility Business Unit.</u>    The Utility business unit builds large-scale renewable energy facilities, and sells power and other attributes produced thereby to utility and other customers.  It also sells completed Projects to the YieldCos and other parties.

21.    <u>GAM Business Unit.</u>  The GAM business unit services the renewable-energy assets of its customers, which, in addition to SunEdison's own assets, include renewable-energy assets that are neither owned nor installed by SunEdison.   The GAM business unit includes renewable operations centers ("<u>ROCs</u>") that provide monitoring of renewable energy systems and measure such systems' outputs in minute-level increments. SunEdison personnel (or subcontractors) may be responsible for corrective and preventive maintenance of Projects, as well as maintaining the renewable-energy assets in good working order (including vegetation abatement and module washing).

22.    <u>Solar Materials Business Unit.</u>  In support of SunEdison's downstream solar business (<u>i.e.</u>, Project development and installation of renewable energy systems), the Solar

Materials Business Unit manufactures polysilicon, silicon wafers, and solar modules. The Solar Materials Business Unit sells solar modules to third parties, as well as to related entities. SunEdison, certain of its subsidiaries, and joint-venture partners manufacture the solar cells used in its modules, which are assembled by contract manufacturers in Malaysia, Taiwan, Korea, and China.

### 2.    Renewable Energy Operating Systems Segment

23.    SunEdison's Renewable Energy Operating Systems Segment owns and operates contracted clean power generation Projects developed and constructed by the Renewable Energy Development Segment (as described above) or acquired from third parties. The primary business strategy of the Renewable Energy Operating Systems Segment is to operate renewable energy systems in a capital efficient manner, and to return cash generated from such systems to the system owner. The SunEdison-owned portion of Renewable Energy Operating System's current portfolio consists of solar and wind projects located in North America, South America, Africa, Asia, and Europe that typically have long-term PPAs.

### 3.    TerraForm Power Segment[18]

24.    The TerraForm Power Segment is a dividend growth-oriented business for which the primary business strategy is to generate and pay cash dividends to equity holders, primarily through owning and operating contracted clean power generation assets located in established markets and acquired from SunEdison and unaffiliated third parties. As of December 31, 2015, Power LLC had outstanding debt obligations of approximately $4.48 billion. The TerraForm Power Segment's current portfolio consists of solar and wind Projects located in the United States, Canada, the United Kingdom, and Chile, with total nameplate capacity (rated

---

[18]    There are no Debtor entities that operate as part of the TerraForm Power Segment.

capacity adjusted for Power LLC's economic interest) of 2,978 MW and which generally have long-term PPAs.

25.    SunEdison holds a total of 48,202,310 Class B shares of TERP and 48,202,310 Class B units[19] of Power LLC.[20]  Pursuant to the limited liability company agreement of Power LLC, SunEdison is also entitled to certain incentive distribution rights ("IDRs").[21] SunEdison's position represents 100% of the Class B shares of TERP and Class B units of Power LLC outstanding.  In the aggregate, SunEdison holds approximately 35% of the economic interests and 84% of the voting interests in TERP, with the securities held indirectly through two SunEdison subsidiaries – SunEdison Holdings Corporation and SUNE ML 1, LLC.  As of the Petition Date, TERP had 91,280,208 Class A shares outstanding, all of which are publicly tradable shares and represent approximately 65% of the economic interests of TERP.[22]

### 4.    TerraForm Global Segment[23]

26.    The TerraForm Global Segment is a dividend growth-oriented business for which the primary business strategy is to generate and pay cash dividends to equity holders, largely through owning and operating contracted clean power generation assets located in emerging markets and acquired from SunEdison and unaffiliated third parties.  As of December 31, 2015, Global LLC had total outstanding debt obligations of approximately $1.27 billion.  The

---

[19]    Class B units are economic units and Class B shares are voting, non-economic shares (10 votes per share).

[20]    One Class B share, together with one Class B unit, is exchangeable for one Class A share of TERP.

[21]    The IDRs entitle SunEdison to preferential dividends in the event certain dividend thresholds are achieved for other shareholders.  SunEdison holds all of the IDRs of Power LLC.

[22]    In December 2015, Appaloosa Management LP ("Appaloosa") (as further discussed herein) announced that it had acquired a more than 9% stake in TERP.  Furthermore, on April 1, 2016 , Appaloosa announced that it had increased its stake in TERP to 10.88%.

[23]    There are no Debtor entities that operate as part of the TerraForm Global Segment.

TerraForm Global Segment's current portfolio consists of solar Projects located in China, Brazil, India, South Africa, Malaysia, and Thailand, and wind Projects located in China and India. As of the December 31, 2015, the Global LLC Projects have a total combined capacity of approximately 797 MW, and are generally supported by PPAs with a weighted average (based on MW) remaining life of 17 years.

27.    SunEdison holds a total of 61,343,054 Class B shares of GLBL and 61,343,054 Class B units[24] of Global LLC.[25]  SunEdison's position represents 100% of the Class B shares of GLBL and Class B units of Global LLC outstanding.[26]  In the aggregate, SunEdison holds approximately 36% of the economic interests and 98% of the voting interests in GLBL, with the securities held indirectly through a subsidiary, SunEdison Holdings Corporation. As of the Petition Date, GLBL had 116,710,351 Class A shares outstanding, all of which are publicly tradable shares and represent approximately 64% of the economic interests of GLBL.

C.    **The Debtors' Workforce**

28.    The Debtors currently employ approximately 1,610 employees in the United States and Singapore (the "Employees").[27]  Approximately 1,270 of these Employees are

---

[24]    Class B units are economic units and Class B shares are voting, non-economic shares (100 votes per share).

[25]    As is the case with Power LLC, SunEdison holds all of the IDRs of Global LLC.

[26]    One Class B share, together with one Class B unit, is exchangeable for one Class A share of GLBL.

[27]    Overall, the Company employs approximately 3,105 people globally. Of that global workforce, approximately 1,495 employees support the Company's businesses at non-debtor affiliates either within or outside the United States (the "Non-Debtor Employees"). On average, the Company's global annual payroll, which includes the Non-Debtor Employees, is approximately $240.5 million. Moreover, the Company's global workforce includes approximately 100 employees – employed by both Debtor and non-Debtor affiliates – that provide various levels and types of services to TERP, pursuant to a certain Management Services Agreement, dated July 23, 2014, and GLBL, pursuant to a certain Management Services Agreement, dated August 5, 2015. According to recent public filings, TERP and GLBL do not have any employees and all personnel that manage TERP's and GLBL's operations are employees of SunEdison.

paid on a salaried basis, with the remainder being paid on an hourly basis. This includes approximately 94 unionized Employees (such unionized Employees, the "Union Employees").[28]

29.    The Employees provide a variety of services to support the Debtors' operations. The salaried Employees are engaged in activities such as project development, human resources, research and development, sales, marketing, and administration. The hourly Employees are largely engaged in manufacturing, repair and maintenance, and sales.

30.    To supplement its workforce, the Company has approximately 335 individuals who provide a range of services to the Debtors on a contractual basis (collectively, the "Contract Workers"), which is comprised of approximately 205 independent contractors (the "Independent Contractors") and approximately 130 temporary workers (the "Temporary Workers"). Sourcing and management of, as well as payroll for, the majority of the Temporary Workers is outsourced to a single entity, KellyOCG, which currently engages with the approximately eighteen staffing agencies that provide certain Temporary Workers (collectively, the "Staffing Providers," and together with the Employees and the Contract Workers, the "Workforce").[29]

### D.    The Debtors' Corporate and Capital Structure

31.    SUNE is the ultimate parent company of hundreds of domestic and foreign subsidiaries. This includes Debtor and non-Debtor subsidiaries and affiliates that operate throughout the world, including in the United States, Canada, Mexico, Latin America, Europe, India, Malaysia, Singapore, Africa, the Middle East, Australia, and Asia. A corporate

---

[28]    The Debtors are party to three active collective bargaining agreements (collectively, the "CBAs") governing the Union Employees.

[29]    Nothing herein should be interpreted or construed as creating an employer/employee relationship between the Debtors and any of the Staffing Providers or Contract Workers.

organization chart of the Debtors and certain non-Debtor affiliates is attached hereto as <u>Exhibit A</u>.

32.    As of the Petition Date, the Debtors' principal funded debt obligations are as follows:

| | Pro Forma[30] ($ millions) | Interest Rate | Maturity |
|---|---|---|---|
| **Secured Recourse Debt** | | | |
| $750 million Letter of Credit Facility | 688 | 3.75% | Feb-2017 |
| A1 Tranche 2L Term Loan | 500 | L + 10% | Jul-2018 |
| A2 Tranche 2L Term Loan | 225 | L + 10% | Jul-2018 |
| A3 Tranche 2L 5.0% Senior Notes | 225 | 5.00% | Jul-2018 |
| **Total Secured Recourse Debt** | **$1,638** | | |
| **Unsecured Recourse Debt** | | | |
| Exchangeable Notes due 2020[31] | 215 | 3.75% | Jan-2020 |
| 2018 Convertible Senior Notes | 256 | 2.00% | Oct-2018 |
| 2020 Convertible Senior Notes | 488 | 0.25% | Jan-2020 |
| 2021 Convertible Senior Notes | 289 | 2.75% | Jan-2021 |
| 2022 Convertible Senior Notes | 347 | 2.38% | Apr-2022 |
| 2023 Convertible Senior Notes | 279 | 2.63% | Jun-2023 |
| 2025 Convertible Senior Notes | 320 | 3.38% | Jun-2025 |
| **Total Unsecured Recourse Debt** | **$2,194** | | |
| **SUNE Project-Level Non-recourse Debt** | | | |
| First Reserve Warehouse Term Loan | 460 | 5.25% | May 2020 |
| TERP Private Warehouse Term Loan | 280 | 4.50% | June 2022 |
| Other Credit Facilities | 3,807 | 4.47% | Various |
| **Unsecured Non-Recourse Debt** | | | |
| Trade Debt[32] | 357 | N/A | N/A |
| **Total SunEdison Debt** | **$8,736** | | |

---

[30]    As of April 14, 2016.

[31]    The Exchangeable Notes due 2020, issued by Seller Note (as defined below) and guaranteed by SUNE, were secured by a first priority lien on certain shares of TERP Class B common stock and certain Power LLC Class B units (as more fully described below).

[32]    The Debtors believe that there may be additional amounts not reflected in this the total trade debt, which does not includes goods and services that have been received, but not yet invoiced in the Debtors' books and records. In addition, the Debtors estimate they have outstanding trade claims totaling approximately $357 million as of April 13, 2016, based on invoices actually entered in the Debtors' books and records.

### 1.   Secured Recourse Debt

33.   <u>Prepetition First Lien Facility</u>.  On February 28, 2014, SUNE entered into a credit agreement with the lenders and letter of credit issuers party thereto from time to time (the "<u>Prepetition First Lien Lenders</u>"), Wells Fargo Bank, N.A., as administrative agent (as amended from time to time, the "<u>Prepetition First Lien Facility</u>"). The Prepetition First Lien Facility provided for a senior secured letter of credit facility in an aggregate principal amount of up to $750 million and has a term ending February 28, 2017.  As of April 14, 2015, SUNE had $678 million of outstanding third-party letters of credit backed by the Prepetition First Lien Facility, of which approximately $145 million was on account of drawn and unreimbursed amounts in respect of the letters of credit as of the Petition Date (the "<u>Drawn L/C Borrowings</u>").

34.   SUNE's obligations under the Prepetition First Lien Facility are guaranteed by certain of its domestic subsidiaries (such subsidiaries that have provided a guaranty, the "<u>Prepetition Guarantors</u>").  SUNE's obligations and the guaranty obligations of the Prepetition Guarantors under the Prepetition First Lien Facility are secured by first priority liens on, and security interests in, substantially all present and future assets of SUNE and the Prepetition Guarantors, including a pledge of the capital stock of certain of their respective domestic and foreign direct subsidiaries.

35.   <u>Prepetition Second Lien Facility</u>.  On January 11, 2016, SUNE entered into a Second Lien Credit Agreement (the "<u>Prepetition Second Lien Facility</u>") among SUNE, as borrower, each lender from time to time party thereto (the "<u>Prepetition Second Lien Lenders</u>"), Wilmington Savings Fund Society, FSB, as successor administrative agent to Deutsche Bank AG New York Branch, pursuant to which term loans in a principal amount of $725 million were made, consisting of $500 million aggregate principal amount of Tranche A-1 term loans and $225 million aggregate principal amount of Tranche A-2 term loans.

36.      SUNE's obligations under the Prepetition Second Lien Facility are guaranteed by the Prepetition Guarantors. SUNE's obligations and the guaranty obligations of the Prepetition Guarantors under the Prepetition Second Lien Facility are secured by second priority liens on, and security interests in, all present and future assets of SUNE and the Prepetition Guarantors that secure the Prepetition First Lien Facility, including a pledge of the capital stock of certain of their respective domestic and foreign direct subsidiaries.

37.      <u>Prepetition Second Lien Notes</u>.  On January 11, 2016, in connection with the Convertible Notes Exchange Transactions (defined below), SUNE issued $225 million aggregate principal amount of second lien senior secured convertible notes due 2018 (the "<u>Prepetition Second Lien Notes</u>," and together with the Prepetition Second Lien Facility, the "<u>Prepetition Second Lien Debt</u>," and the Prepetition Second Lien Debt together with the Prepetition First Lien Facility, the "<u>Prepetition Secured Debt</u>") under an indenture, dated as of January 11, 2016, among SUNE, as borrower, the Prepetition Guarantors, as guarantors, and Wilmington Trust, National Association, as trustee.

38.      SUNE's obligations and the guaranty obligations of the Prepetition Guarantors under the Prepetition Second Lien Notes are secured by the same second priority liens on, and security interests in, all present and future assets of SUNE and the Prepetition Guarantors that secure the Prepetition Second Lien Facility, including a pledge of the capital stock of certain of their respective domestic and foreign direct subsidiaries.

**2.      Unsecured Recourse Debt**

39.      <u>Exchangeable Notes</u>.  On January 29, 2015, Seller Note, LLC ("<u>Seller Note</u>"), a wholly-owned subsidiary of SUNE, issued $336 million aggregate principal amount of 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "<u>Exchangeable Notes</u>") in a private placement pursuant to an indenture agreement among Seller Note, SUNE, as guarantor,

and Wilmington Trust, N.A., as exchange agent, registrar, paying agent, and collateral agent (the "Exchangeable Notes Trustee").

40.     In connection with the issuance of the Exchangeable Notes, Seller Note also entered into a pledge agreement with the Exchangeable Notes Trustee, in its capacity as collateral agent, providing for the pledge of certain shares of TERP Class B common stock and Power LLC's Class B units contributed to and held by the subsidiary (the "Class B Securities").[33]  In addition, the Exchangeable Notes are fully and unconditionally guaranteed by SUNE.  The Exchangeable Notes and the guarantees are pari passu in right of payment to the SUNE's obligations under its outstanding convertible debt.

41.     On December 29, 2015, SUNE, Seller Note, and certain wholly-owned SUNE subsidiaries entered into a purchase and sale agreement (the "D. E. Shaw Purchase Agreement") with certain holders of the Exchangeable Notes – i.e. affiliates of the D.E. Shaw Group, Madison Dearborn Capital Partners IV, L.P., and Northwestern University (collectively, the "D.E. Shaw Buyers") – pursuant to which the D.E. Shaw Buyers accepted Power LLC shares serving as collateral securing the Exchangeable Notes in satisfaction of $121 million of  principal owed under the Exchangeable Notes and agreed to take Project transfers from SunEdison in lieu of cash to satisfy the remaining $215 million of principal owed under the Exchangeable Notes. In the event that any of the Project transfers could not be completed, specified amounts (in the aggregate not to exceed $215 million) of the Exchangeable Notes would become due in cash.

42.     Convertible Senior Notes.  The 2018 Notes, 2020 Notes, 2021 Notes, 2022 Notes, 2023 Notes, and 2025 Notes (collectively referred to as the "Convertible Notes" and

---

[33]    The Class B Securities were converted to Class A shares of TERP common stock in connection with the transfer of the Class B Securities to the holders of the Exchangeable Notes.

individually referred to as defined below) are: (i) general unsecured obligations of SUNE (there are no guarantees) and rank senior in right of payment to any of SUNE's future indebtedness that is expressly subordinated in right of payment to the Convertible Notes; (ii) equal in right of payment to SUNE's existing and future unsecured indebtedness that is not so subordinated; (iii) structurally subordinated in right of payment to any of SUNE's secured indebtedness to the extent of the value of the assets securing such indebtedness; and (iv) effectively subordinated to all existing and future indebtedness (including trade payables) incurred by SUNE's subsidiaries. More specifically, the Convertible Notes are as follows:

- Convertible Senior Notes Due 2018 and 2021.  On December 20, 2013, SUNE issued $600 million in aggregate principal amount of 2.00% convertible senior notes due 2018 (the "2018 Notes") and $600 million aggregate principal amount of 2.75% convertible senior notes due 2021 (the "2021 Notes") in a private placement offering. On May 12, 2015, SUNE entered into privately negotiated exchange agreements (the "2018/2021 Exchange Agreements") with a limited number of holders of its outstanding 2018 Notes and 2021 Notes. Pursuant to the 2018/2021 Exchange Agreements, SUNE exchanged $600 million aggregate principal amount of outstanding 2018 Notes and 2021 Notes ($300 million of the 2018 Notes and $300 million of the 2021 Notes) for 41 million shares of common stock underlying the 2018 Notes and 2021 Notes to be exchanged and $63 million in cash.

- Convertible Senior Notes Due 2020.  On June 10, 2014, SUNE issued $600 million in aggregate principal amount of 0.25% convertible senior notes due 2020 (the "2020 Notes") in a private placement offering.

- Convertible Senior Notes Due 2022.  On January 27, 2015, SUNE issued $460 million in aggregate principal amount of 2.375% convertible senior notes due 2022 (the "2022 Notes") in a private placement offering.

- Convertible Senior Notes Due 2023 and 2025.  On May 20, 2015, SUNE issued $450 million in aggregate principal amount of 2.625% convertible senior notes due 2023 (the "2023 Notes") and $450 million aggregate principal amount of 3.375% convertible senior notes due 2025 (the "2025 Notes") in a private placement offering.

43.    Convertible Notes Exchange.  On January 7, 2016, SUNE entered into a series of exchange agreements with certain holders of the 2018 Notes, the 2020 Notes, the 2021 Notes, the 2022 Notes, the 2023 Notes, the 2025 Notes (collectively, the "Existing Convertible

Notes") and its 6.75% Series A Perpetual Convertible Preferred Stock (the "Preferred Stock"),
pursuant to which SUNE agreed to issue in exchange for Existing Convertible Notes and
Preferred Stock, new notes and common stock (the "Convertible Notes Exchange Transactions").

44.     Pursuant to the Convertible Notes Exchange Transactions, SUNE issued a
total of approximately 51.9 million shares of common stock in exchange for approximately
$244.3 million aggregate principal amount of the Existing Convertible Notes and approximately
$158.3 million of the Preferred Stock.   SUNE issued the Prepetition Second Lien Notes in
exchange for approximately $335.9 million aggregate principal amount of the Existing
Convertible Notes.

### 3.     Project-Level Non-Recourse Debt

45.     Non-Recourse Obligations.   The Company's renewable-energy systems,
and the related short-term and long-term debt and financing obligations, are generally included in
separate legal entities.   This debt has recourse to those separate legal entities but no or limited
recourse to the Debtors under the terms of the applicable agreements.   These finance obligations
are fully collateralized by the related renewable energy system assets and may also include
limited guarantees by the Debtors related to equity commitments, operations, maintenance,
certain indemnities, and other "sponsor" commitments negotiated on a deal-by-deal basis.

### 4.     Unsecured Non-Recourse Debt

46.     Non-Recourse Trade Debt.   The Debtors estimate that they have
outstanding prepetition trade claims totaling approximately $357 million,[34] which represents
estimated trade accounts payable as of April 13, 2016.   The Debtors' estimate of outstanding

---

[34]   The Debtors believe that there are additional amounts  not reflected in this the total  trade debt, which does not
includes goods and services that have been received, but not yet invoiced in the Debtors' books and records.

prepetition accounts payable reflects only invoices actually entered in the Debtors' books and records.

### 5.   Equity Interests

47.   <u>6.75% Series A Perpetual Convertible Preferred Stock</u>.   On August 18, 2015, SunEdison entered into an underwriting agreement relating to the sale of 650,000 shares of 6.75% Series A Perpetual Convertible Preferred Stock, par value $0.01 per share, at a price to the public of $1,000 per share, in a registered offering.

48.   <u>Common Stock</u>.   SUNE is a publicly-traded company listed on the New York Stock Exchange under the symbol "SUNE."   As of April 20, 2016, there were approximately 436 million shares of common stock in SUNE outstanding, with approximately 214 holders of record and a trading price of $0.34/share.

### E.   Events Leading to Debtors' Chapter 11 Filing

49.   At its core, the Debtors' business is a "deal-making" one.   As set forth above, the Debtors develop and sell renewable-energy projects ranging in size and scale from utility, to commercial and industrial, to residential.   To develop their projects, the Debtors have relied on the capital markets through various debt and equity raises and procurement of non-recourse financing or equity injections at relevant project-level corporate entities.   However, the inability to raise funds from the capital markets hurt SunEdison's ability to close deals (and get new deals), which has contributed to a decline in SunEdison's liquidity position, ultimately making the filing of these Chapter 11 Cases a necessary step for SunEdison to de-lever its balance sheet and implement a restructuring plan with the tools available to it under the Bankruptcy Code.   The following forces have contributed to SunEdison's need to file these Chapter 11 Cases:

- **Significant Investment.**  In the last two years, SunEdison has made significant investments and taken other measures to expand its role throughout the global renewable-energy sector, including, but not limited to: (i) the Power LLC IPO (July 2014) and associated investments; (ii) the $2.4 billion acquisition of First Wind Holdings, LLC (January 2015); (iii) the $525 million acquisition of 521 MW of wind projects from Atlantic Power Transmission, Inc. (June 2015); (iv) the Global LLC IPO (July 2015) and associated investments; and (v) the nearly $2.2 billion commitment (at announcement) to purchase Vivint Solar, Inc.

- **Constrained Liquidity.**  SunEdison invested in Power LLC and Global LLC on the expectation that these entities would serve as buyers of Projects developed by SunEdison.  These entities' costs of capital have proven higher than expected, reducing these entities' capacity to acquire Projects from SunEdison and fundamentally changing SunEdison's business plan.  In addition, the inability to raise funds from the capital markets, coupled with litigation exposure, has limited SunEdison's ability to invest in its global business and resulted in additional pressure on SunEdison's liquidity.

50.     More specifically, from December 2013 to January 2016, SunEdison experienced a period of significant growth as it transformed from a leader in the semiconductor industry to the largest renewable-energy development company in the world.  During that growth period – in which SunEdison spun-off its legacy semiconductor business and formed and took public the YieldCos – the Company committed to in excess of $18 billion in acquisitions (including acquisitions by the YieldCos).  Such growth required capital investments; and to fund these investments, from 2013 to 2016, SunEdison raised $24 billion through debt and equity offerings.

51.     SunEdison's need for capital started in late 2013 when it began preparing for the eventual IPO of its first YieldCo, TERP.  The expectation of SunEdison and the underwriters of the TERP IPO was that a successful IPO would benefit from Power LLC, and TERP through its ownership of Power LLC, having a large and diverse portfolio of Projects.  To achieve this goal, SunEdison contributed to Power LLC the majority of its North American, UK,

and Chilean operating Projects.  In addition, SUNE contractually agreed to support Power LLC (the "Power LLC Intercompany Contracts").[35]

52.    After the TERP IPO, SunEdison determined in late 2014 that it would create a second Yieldco, Global LLC.  The main difference between Power LLC and Global LLC was to be the geographies in which the Projects they owned were located:  Power LLC was to own Projects in Organization for Economic Cooperation and Development ("OECD") markets, and Global LLC was to own Projects in non-OECD markets.  Similar to its approach with Power LLC, SunEdison contributed operating Projects to Global LLC, albeit those located in emerging markets.  Also, like it did for Power LLC, SunEdison spent capital to seed the Global LLC portfolio pre-IPO, and also contractually undertook to support Global LLC (the "Global LLC Intercompany Contracts")[36] for three years following the GLBL IPO.

53.    The capital expenditure leading up to the GLBL IPO occurred concurrently with the capital expenditure by SunEdison and Power LLC designed to grow Power LLC's operating fleet of Projects and SunEdison's pipeline of Projects to be developed.  In November 2014, SunEdison and Power LLC jointly entered into an agreement to acquire First Wind Holdings, LLC ("First Wind"), the largest wind power developer in the United States, for $2.4 billion from D.E. Shaw Composite Holdings, LLC and Madison Dearborn Capital Partners IV, L.P.  As between SunEdison and Power LLC, Power LLC acquired fully constructed,

---

[35]    The Debtors intend to continue to perform under the Power LLC Intercompany Contracts in the ordinary course of business on a postpetition basis; provided, however, any such continued performance shall not constitute an assumption of the Power LLC Intercompany Contracts under Bankruptcy Code section 365.  For the avoidance of doubt, the Debtors reserve any and all rights under Bankruptcy Code section 365 with respect to the Power LLC Intercompany Contracts.

[36]    The Debtors intend to continue to perform under the Global LLC Intercompany Contracts in the ordinary course of business on a postpetition basis; provided, however, any such continued performance shall not constitute an assumption of the Global LLC Intercompany Contracts under Bankruptcy Code section 365.  For the avoidance of doubt, the Debtors reserve any and all rights under Bankruptcy Code section 365 with respect to the Global LLC Intercompany Contracts.

operating projects – while SunEdison acquired "pipeline" Projects under development that would require significant additional capital to build. The acquisition, which was completed on January 29, 2015, expanded SunEdison's renewable energy capabilities by adding wind energy to SunEdison's generation capacity, and made SunEdison the largest renewable energy development company in the world. Notwithstanding the potential upside, the acquisition of First Wind required a significant capital raise in 2015.

54.     SunEdison funded its $1.5 billion portion of the purchase price from the proceeds of: (i) the issuance by non-Debtor Seller Note, LLC (a wholly-owned special purpose subsidiary of SUNE) of $336.5 million aggregate principal amount of the Exchangeable Notes which were guaranteed by SUNE and secured by 12.1 million of equity interests in Power LLC owned by SUNE; (ii) the issuance by SunEdison ML 1, LLC of $410 million in margin term loans which were guaranteed by SUNE and secured by 32.2 million of equity interests in Power LLC owned by SUNE (the "Margin Loan"); and (iii) the issuance by SUNE of $350 million in unsecured convertible notes. On top of the consideration paid by SUNE at the closing of the acquisition, SunEdison also had agreed to pay earnout payments in excess of $510 million to First Wind's owners based on the future successful development of the assets it acquired. After the First Wind acquisition, the stock prices of SunEdison and TERP increased.

55.     As noted above, substantially all of the assets purchased by SunEdison in the First Wind acquisition were development Projects in need of construction capital in order to realize their full value. Given the capital needs for the First Wind development pipeline, SunEdison determined that construction capital for the First Wind development pipeline would need to be raised on a non- or limited-recourse basis. To accomplish this, in May 2015 SunEdison negotiated $500 million in equity commitments from affiliates of First Reserve Corp.

("First Reserve"), an energy-focused private equity firm, and approximately $1 billion in debt commitments from a syndicate of commercial banks, all intended to be used to construct Projects in the First Wind development pipeline.  This debt and equity arrangement was commonly known as the "First Reserve Warehouse," and was premised on Power LLC committing to acquire Projects financed by the First Reserve Warehouse prior to those Projects receiving funding.  Under this arrangement, SunEdison was to make available Projects in development at-cost, with the debt and equity investors earning specified returns upon sale of completed Projects to Power LLC (with any remaining margin, if any, accruing to SunEdison).

56.    To date, the First Reserve Warehouse has funded only one Project – Comanche Solar.  Following its commitment to acquire the Comanche Solar Project, Power LLC was no longer was willing to acquire Projects from the First Reserve Warehouse.  SunEdison engaged in "warehouse" transactions with debt and equity investors in an effort to realize value in the First Wind development pipeline.  Notwithstanding these efforts, construction of the First Wind development pipeline has proven difficult and costly for SunEdison to finance, and SunEdison has ultimately earned smaller returns that it had expected when the First Wind acquisition closed.

57.    In May 2015, SunEdison sought to acquire renewable-energy developer Latin American Power ("LAP") from BTG Pactual SA, the Brazilian investment bank, and Patria Investimentos, a Brazilian firm that is backed by U.S. private-equity firm Blackstone Group LP. (the "LAP Acquisition") for a maximum aggregate consideration of $677 million.  At the time of the announcement, LAP had 119 MWs of hydroelectric and wind-energy plants operating in Peru and Chile, and was building 214 MWs of wind and hydroelectric projects in Chile.  The LAP Acquisition was set to close on September 30, 2015, but SunEdison declined to make a roughly

$335 million upfront cash payment after SunEdison alleged that LAP did not satisfy certain conditions required for deal's completion. LAP shareholders sued SunEdison for failure to close the LAP Acquisition (the "LAP Litigation").

58.    In July 2015, SunEdison and Vivint Solar, Inc. ("Vivint") entered into an Agreement and Plan of Merger, dated as of July 20, 2015 (as amended from time to time, the "Vivint Merger Agreement"), by and among SUNE, SEV Merger Sub Inc., a Delaware corporation and a wholly-owned subsidiary of SUNE, and Vivint, pursuant to which SunEdison would acquire Vivint for total consideration payable in a combination of cash, shares of SUNE common stock, and SUNE convertible notes to be issued in connection with the merger. In connection with its entry into the Vivint Merger Agreement, SUNE entered into a purchase agreement with Power LLC, pursuant to which SUNE was to sell to Power LLC the equity interests in certain Vivint subsidiaries that hold renewable assets constituting Vivint's fully-constructed rooftop solar portfolio.

59.    After SunEdison's announcement of the Vivint transactions, the stock price of both SUNE and TERP declined. Shortly following the announcement of the Vivint transactions, in August 2015, SUNE completed the IPO of GLBL (as discussed herein). However, there was insufficient demand to close the GLBL IPO on its offered terms, thus, SUNE agreed to acquire $30 million of Class A common stock of GLBL that had been expected to be purchased by public shareholders. Moreover, SunEdison continued to have substantial acquisition-related obligations it had incurred on behalf of the YieldCos.

60.    The terms of the Margin Loan incurred in connection with the First Wind acquisition were integral to SunEdison's liquidity position. The Margin Loan, which was scheduled to mature on January 29, 2017, included provisions requiring cash collateralization

and/or prepayments if the share price of TERP dropped below certain thresholds.  Beginning in September 2015, the share price of TERP fell below all of these thresholds, and in October 2015 the entire Margin Loan became mandatorily prepayable.  This prepayment, which amounted to $439 million, drained SunEdison's cash reserves and fundamentally changed its and the YieldCos' financial outlook.

61.    Concurrently, stock prices of SUNE and the YieldCos continued to fall, and the ability of SUNE and the YieldCos to access the equity markets was curtailed.  Without access to the equity markets, the YieldCos' cost of capital increased, and plans to acquire Projects from SunEdison and its arranged "warehouses" – which were critical to SunEdison's core business plan – were put on hold.  Subsequently, SunEdison announced a global workforce reduction.[37]  Despite the Company's workforce reduction and other operational cuts, the combination of inadequate capital to fund further investment and the evaporation of planned dispositions to the YieldCos left SunEdison facing significantly difficult financial prospects.

62.    As discussed above, SunEdison had agreed to pay the owners of First Wind certain earnout payments if Projects it acquired as part of the First Wind portfolio were successfully developed.  In connection with and in an attempt to resolve a dispute with respect to certain earnout payments, on December 29, 2015, SUNE, Seller Note, and certain other wholly-owned subsidiaries of SUNE entered into the D. E. Shaw Purchase Agreement with the D.E. Shaw Buyers.

63.    Pursuant to the D. E. Shaw Purchase Agreement, the D.E. Shaw Buyers effectively brought up the maturity of the Exchangeable Notes from 2020 to 2016.  In addition,

---

[37]    From around September 2015 through March 2016, the Debtors reduced their Workforce by approximately 27%, and during that same period, the Company reduced its total global workforce (which includes employees of non-Debtor affiliates) by approximately 40%.

the settlement effectively removed all conditions to the remaining $231 million in earnout payments payable under the First Wind transaction, and established a payment schedule for those amounts. SunEdison's obligations arising from the D. E. Shaw Purchase Agreement and ancillary agreements escalated the Company's liquidity and operational constraints and was another catalyst driving the Company towards a chapter 11 reorganization

64.    On January 12, 2016, Appaloosa filed suit against SunEdison in a Delaware Court for alleged "breaches of fiduciary duty" in relation to SunEdison's plans to acquire Vivint and require Power LLC to acquire Vivint's projects in turn under what Appaloosa alleged were "unfavorable" take-or-pay arrangements (the "Appaloosa Complaint"). SunEdison vigorously denied the allegations in the Appaloosa Complaint and on February 25, 2016, the Delaware court denied Appaloosa's motion for a preliminary injunction on SunEdison's plans to acquire Vivint, but left open the possibility of the case going to trial. Thereafter, Appaloosa sought an expedited trial against SunEdison in a further attempt to block the acquisition of Vivint. However, the issue became moot when Vivint cancelled the Vivint Merger Agreement. Shortly thereafter, Vivint filed suit against SunEdison for failure to consummate the deal.

65.    On February 12, 2016, a New York court issued a temporary restraining order ("TRO") up on SunEdison and TERP prohibiting the companies from "concealing, transferring or removing their assets, accounts or other property" without "fair consideration" in order to protect an "eventual international arbitration award" against SunEdison with respect to the LAP Litigation. SunEdison's shares dipped below $2.00 with the announcement of the LAP TRO. Shortly thereafter, SunEdison reached a settlement with LAP and pledged to pay $28.5 million in installments over the next year.

66.    On February 29, 2016, SunEdison announced that it was unable to file its 2015 financial results on time, due in part to an internal investigation, which was launched late in 2015 and tied to allegations former executives at SunEdison made about the company's financial position.

67.    On March 16, 2016, SunEdison announced that it had to delay releasing its financials again due to "material weaknesses" in its internal controls tied to "deficient information technology."

68.    On March 28, 2016, SunEdison received a subpoena from the Department of Justice ("DOJ") seeking information and documentation relating to: (i) certain financing activities in connection with the Company's previously proposed acquisition of Vivint, (ii) an investigation by the audit committee for the Debtors' board of directors, (iii) intercompany transactions involving TERP and GLBL, and (iv) the financing of the Company's Uruguay projects.

69.    On April 2, 2016, SunEdison received a notice of default and reservation of rights from the lenders under the Prepetition First Lien Facility, which, among other things, provided notice that SunEdison's failure to deliver its financials by March 31, 2016 constituted an event of default under the Prepetition First Lien Facility.

70.    On April 4, 2016, GLBL initiated a lawsuit against SUNE in Delaware state court.  The lawsuit alleges, among other things, breach of fiduciary duty, breach of contract, and unjust enrichment, regarding GLBL's $231 million payment to SUNE with respect to the completion of certain renewable-energy Projects in India and transfer of SUNE's equity interests in such Projects to GLBL.

71.    In sum, the pivotal events preceding the filing of these Chapter 11 Cases are as follows:



72.    In short, these events impaired SunEdison's ability to close existing deals or generate new deals, which created a liquidity crunch – making operating in chapter 11 necessary to restructure and rebuild the confidence that is the lifeblood of SunEdison's "deal-making" engine.

73.    Accordingly, the Debtors set up a comprehensive electronic data room and initiated discussions with its existing Prepetition First Lien Lenders and the ad hoc group of certain Prepetition Second Lien Lenders and Prepetition Second Lien Noteholders holding approximately 90% of the aggregate principal amount of Prepetition Second Lien Debt (the "Ad Hoc Group") to (i) explore a path for an out-of-court restructuring and (ii) solicit a proposal for debtor-in-possession financing.  The Prepetition First Lien Lenders and Ad Hoc Group accepted the Debtors' invitation to conduct due diligence, including review of the information provided in the data room, attending management presentations, and engaging in discussions with SunEdison's senior management team and advisors.  Ultimately, after considering different

structures offered by both certain Prepetition First Lien Lenders and the Ad Hoc Group, SunEdison determined that the DIP financing package (the "DIP Financing") with Deutsche Bank AG New York Branch, as administrative agent (in such capacity, the "DIP Agent") and jointly provided by both the Prepetition First Lien Lenders and the Ad Hoc Group (the "DIP Facilities") represented the best proposal available to the Debtor.[38]   The DIP Financing will enhance SUNE's liquidity with $300 million in new capital – such new capital offered in the form of a senior secured, priming, superpriority $300 million debtor-in-possession term loan facility (the "New Money DIP Facility") and allow the Debtors to continue selling near-term projects on schedule and meeting other working capital needs, in accordance with an approved budget (the "DIP Budget"), and reinvest proceeds back into the development platform to the extent permitted under the DIP Credit Agreement.

74.    Therefore, after securing $300 million in DIP Financing, the Debtors determined it was time to enter into chapter 11 and implement a restructuring that would result in a de-levered balance sheet and a sustainable capital structure.

## PART II

## I.    FIRST DAY PLEADINGS

75.    In furtherance of these objectives, the Debtors expect to file, and respectfully request that this Court approve, the First Day Pleadings.  I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth

---

[38]    Concurrently herewith, the Debtors' filed their Motion For Interim And Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant To Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), And 364(e) and (B) To Utilize Cash Collateral Pursuant To Bankruptcy Code Section 363, (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To Bankruptcy Code Sections 361, 362, 363 And 364 And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b) And (c) (the "DIP Motion") authorizing, but not directing, the Debtors to, *inter alia*, enter into a Senior Secured Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement").

therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.  The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

### A.   Administrative and Procedural First Day Pleadings

76.   **Joint Administration Motion**.  The Debtors request entry of an order consolidating the Chapter 11 Cases for procedural purposes only.  Many, if not most, of the motions, applications, and other pleadings filed in these Chapter 11 Cases will relate to relief sought jointly by all of the Debtors.  For example, virtually all of the relief sought by the Debtors in the First Day Pleadings is sought on behalf of all of the Debtors.  Joint administration of the Chapter 11 Cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of several independent chapter 11 cases.  In addition, the Debtors have requested that any future filing of any affiliate of the Debtors also be jointly administered (for procedural purposes only) with these Chapter 11 Cases, <u>provided</u>, <u>however</u>, the Debtors will file notice with the Court identifying the cases of such affiliates that are to be jointly administered with these Chapter 11 Cases.

77.   **Consolidated Creditors Motion**.  The Debtors request authority to file a single consolidated list of their top 40 creditors (the "<u>Consolidated Top 40 List</u>"). Federal Rule of Bankruptcy Procedure 1007(d) requires a debtor to file a list containing information on its twenty largest unsecured creditors, excluding insiders (a "<u>Top 20 List</u>").  The Top 20 List is

33

intended to facilitate the appointment of a creditors' committee by the United States Trustee.  If a creditors' committee is appointed, the Consolidated Top 40 List will be sufficient to aid in the United States Trustee's appointment of a creditors' committee.  In this context, requiring each Debtor to file a Top 20 List would impose an unnecessary administrative burden on the Debtors, without conferring any benefit upon the Debtors' estates or the United States Trustee.

78.     The Debtors also request authority to establish certain procedures for providing notice to parties of the commencement of these Chapter 11 Cases and of the meeting of creditors pursuant to Bankruptcy Code section 341 (the "Notice of Commencement"). Bankruptcy Rule 2002(a) provides that the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of the meeting of creditors under Bankruptcy Code sections 341 or 1104(b).  Furthermore, Bankruptcy Rule 2002 provides that notice of the order for relief shall be sent by mail to all creditors and shareholders.  The Debtors request authority for their claims and noticing agent to serve by regular mail the Notice of Commencement to creditors and shareholders in accordance with Bankruptcy Rule 2002. Bankruptcy Rule 2002(l) permits the Court to order "notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice." Fed. R. Bankr. P 2002(1).  In addition to mailing the Notice of Commencement, the Debtors propose to publish, as soon as reasonably practicable, (i) the Notice of Commencement on the website maintained by the Debtors' claims and noticing agent, and (ii) a modified, condensed version of the Notice of Commencement in a relevant periodical. These proposed Procedures will ensure that the Debtors' creditors and shareholders receive prompt notice of the commencement of these Chapter 11 Cases and of the meeting of creditors.

79.    **Case Management Motion**.  The Debtors request authority to establish certain notice, case management, and administrative procedures in these Chapter 11 Cases (the "Case Management Procedures").  Specifically, the Case Management Motion seeks entry of an order approving Case Management Procedures that, among other things, (i) establish streamlined requirements for filing and serving notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other documents filed in these Chapter 11 Cases (collectively, the "Court Filings"); (ii) delineate less burdensome standards for notices of hearings and agenda letters; (iii) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines; and (iv) limit matters that are required to be heard by the Court.

80.    Numerous Court Filings will be filed in these Chapter 11 Cases. Moreover, these Chapter 11 Cases will involve thousands of parties in interest, hundreds of which will likely file requests for service of filings pursuant to Bankruptcy Rule 2002.  Given the size and scope of these Chapter 11 Cases, I believe that the Case Management Procedures will facilitate service of Court Filings in a manner that will be less burdensome and costly than serving such Court Filings on every potentially interested party.  For instance, the burdens that would arise absent adoption of the proposed Case Management Procedures include those associated with multiple hearings per month, plus the costs associated with copying, mailing, delivering, or otherwise serving paper copies of all Court Filings.  Such burdens would impose significant economic and administrative burdens on the Debtors' estates and the Court.

81.    Therefore, I believe that adoption of the Case Management Procedures will maximize the efficiency and orderly administration of these Chapter 11 Cases, while at the same time ensuring that appropriate notice is provided.

82.    **Extensions and Waivers Motion.**  The Debtors seek entry of an order (i) granting the Debtors (a) an additional thirty (30) days to file their schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") and (b) additional time to file financial information reports pursuant to Bankruptcy Rule 2015.3(a) or, alternatively, a motion with the Court seeking appropriate modifications of such reporting requirements, for cause, to and including the thirtieth (30th) day after the first meeting of creditors to be held pursuant to Bankruptcy Code section 341 (the "341 Meeting"), (ii) authorizing the Debtors to file their required monthly operating reports by consolidating the information required for each Debtor in one report, and (iii) waiving the requirement to (a) file a list of equity security holders (the "List") within fourteen (14) days of the Petition Date and (b) provide notice to all equity security holders of the Notice of Commencement.

83.    To prepare their Schedules and Statements, the Debtors will have to compile information from voluminous books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor.  Further, the Debtors have numerous foreign subsidiaries and affiliates that did not file for relief under chapter 11 of the Bankruptcy Code (the "Non-Debtor Affiliates").  Much of the information and documentation evidencing the Debtors' assets and liabilities, creditors, and contracts are consolidated with that of the Non-Debtor Affiliates.  It will take a substantial amount of time to clearly identify and separate which information relates to the Debtors and not to the Non-Debtor Affiliates.

84.    Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees and

advisors, which would distract attention from the Debtors' business operations at a critical juncture. Therefore, I believe that the extensions requested in the Extensions and Waivers Motion will enable the Debtors to continue operating their businesses in chapter 11 without disruption.

85.    I also believe that permitting the Debtors to file their monthly operating reports by consolidating the information required for each Debtor in one report that tracks and breaks out all of the specific information (e.g., receipts, disbursements, etc.) on a debtor-by-debtor basis  and waiving the requirements to file the List and provide the Notice of Commencement to equity security holders will further administrative economy and efficiency in the Debtors' Chapter 11 Cases, while not prejudicing any party in interest. Accordingly, I believe that the relief requested in the Extensions and Waivers Motion is in the best interests of the Debtors, their estates, creditors, stakeholders, and other parties in interest.

86.    **Prime Clerk LLC Retention as Claims and Noticing Agent**. The Debtors seek authority to employ and retain Prime Clerk LLC ("Prime Clerk") as claims and noticing agent in the Chapter 11 Cases in accordance with the terms and conditions of that certain Engagement Agreement, dated as of March 11, 2016, by and between SunEdison and Prime Clerk (the "Prime Clerk Agreement"). I understand that such appointment is required by the rules of this Court. Moreover, such relief is prudent in light of the thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent. Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Cases is to engage Prime Clerk, an independent third party with significant experience in this role to act as an agent of the Court. I believe the Debtors' selection of Prime Clerk to serve as their Claims and Noticing Agent has satisfied the Court's Protocol for the

Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c). Specifically, the Debtors have obtained and reviewed engagement proposals from three other claims and noticing agents to ensure selection through a competitive process.

87.    I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise. Appointing Prime Clerk as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

**B.    Operational First Day Pleadings**

88.    **Wages and Benefits Motion.** As set forth above, the Debtors' Workforce includes approximately 1,665 Employees employed by the Debtors, as well as various Independent Contractors and Temporary Workers. Substantially all of the Debtors' Employees are full-time employees. Approximately 1,280 of these Employees are paid on a salaried basis, with the remainder being paid on an hourly basis.

89.    I believe that to ensure that the Debtors can continue to operate their businesses without interruption, to preserve value for the estates, and to maximize the value of the businesses, it is important to continue to pay their Employees, Independent Contractors, and Temporary Workers certain prepetition wages, salaries, other cash and non-cash compensation, employee benefits, and reimbursable expenses. I further believe that the majority of the Debtors' Workforce rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.

Moreover, it is my opinion that loss of valuable members of the Debtors' Workforce and the recruiting and training efforts that would be required to replace such members would be distracting at a time when the Debtors should be focusing on maintaining their business operations.

90.    For these reasons, the Debtors have filed a motion (the "Employee Wages Motion") seeking permission to (a) pay and/or otherwise honor or perform, as applicable, prepetition obligations to or for the benefit of the Workforce, including accrued prepetition wages, salaries, and other cash and non-cash compensation claims (collectively, the "Unpaid Compensation"); (b)(i) honor and continue in the ordinary course of business until further notice various employee benefit plans, programs, practices, policies, and procedures (but not assume under Bankruptcy Code section 365(a) any of the plans, programs, practices, policies, procedures, or any related employment or service agreement) and (ii) make prepetition contributions and pay any prepetition amounts associated with the Debtors' employee benefit plans, programs, practices, policies, and procedures and to pay all fees and costs in connection therewith (collectively, the "Employee Benefit Obligations"); (c) pay over to the appropriate party all prepetition withholdings, deductions, and payroll-related taxes from the Workforce associated with the Unpaid Compensation and the Employee Benefit Obligations (collectively, the "Employee Withholdings"); (d) reimburse the Workforce for prepetition expenses that the Workforce incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations," and, together with the Unpaid Compensation, the Employee Benefit Obligations, and the Employee Withholdings, the "Prepetition Employee Obligations").

91.    The Debtors estimate that they owe approximately $21,060,000 on account of all of the Prepetition Employee Obligations.

92.    **Wages and Salaries.**  In the ordinary course of their business, the Debtors pay the Employees on a biweekly basis.  All Employees are paid every other Friday, with salaried and hourly Employees being paid for the two weeks prior to the week of payment.  The aggregate gross amounts for the biweekly salaried and hourly payroll are approximately $7,350,000.

93.    The Debtors estimate that as of the Petition Date, they owe approximately $5,195,000 on account of accrued and unpaid wages and salaries (the "Employee Wage Claims").  By the Employee Wages Motion, the Debtors request authorization, but not direction, to pay any Employee Wage Claims up to the $12,850 priority cap provided for under Bankruptcy Code section 507(a)(4) pursuant to an interim order, and, pursuant to a final order, to pay such claims in the ordinary course of business, including any amounts that were not paid under the interim order on account of the $12,850 priority cap.

94.    In addition to the wages and salaries paid to the Employees, the Debtors pay various staffing agencies (collectively, the "Staffing Providers"), who refer approximately 130 Temporary Workers.  The Debtors estimate that they pay approximately $800,000 a month to the Staffing Providers and that, as of the Petition Date, approximately $3,285,000 is accrued and unpaid on account of the Staffing Providers.  If the Staffing Providers are not paid, the Staffing Providers may withdraw the Temporary Workers or refuse to provide the Debtors with replacement workers.  Although the Debtors could replace the Temporary Workers over time, the abrupt departure of the Temporary Workers could significantly disrupt the Debtors' business. Accordingly, pursuant to the Employee Wages Motion, the Debtors request authorization, but not direction, to pay prepetition amounts owing to the Staffing Providers on account of the Temporary Workers, provided that no Temporary Worker will be paid more than the $12,850

priority cap imposed by Bankruptcy Code section 507(a)(4) prior to the entry of the final order on the Employee Wages Motion.

95.      Moreover, the Independent Contractors are compensated by the Debtors in a variety of ways including, but not limited to, (i) an hourly basis, (ii) upon the completion of projects or purchase orders, (iii) on a fixed fee arrangement, or (iv) on an invoice-by-invoice basis.  As of the Petition Date, the Debtors estimate that the Independent Contractors are owed approximately $2,400,000.  The Debtors will not pay any of the Independent Contractors more than the $12,850 priority cap imposed by Bankruptcy Code section 507(a)(4) prior to the entry of the Final Order.

96.      **Commissions.**  In addition to fixed compensation, in the ordinary course of business, the Debtors pay various commissions to certain Employees to motivate them to develop and foster customer relationships, which are crucial to the continued success of the Debtors' business. The commissions represent a percentage of the value of sales made by a qualifying Employee and are either paid on a biweekly basis (at the same time as the biweekly payroll schedule) or on a quarterly basis.   The biweekly commissions generally apply to Employees that serve as energy consultants and solar advisors in the Company's residential and small commercial business unit, while the quarterly commissions generally apply to the Company's large commercial and industrial business unit's salesforce.   Approximately 125 Employees receive commission-based compensation, including Employees in the Debtors' call centers and sales personnel.

97.      Based on the average biweekly commissions paid out in 2015, the Debtors estimate they pay an average of approximately $65,000 per pay period for their biweekly commission programs, with the next payment coming due on April 15, 2016 with the biweekly

41

payroll.  In addition, the Debtors expect to pay approximately $646,000 per quarter under the quarterly commission programs, and seek authority to honor prepetition obligations of approximately $272,000 based on commissions earned during the first quarter of 2016 and payable in May of 2016.  The commissions are an important component of an Employee's overall compensation and provide substantial value to the Debtors' estates because they encourage Employees to achieve important performance targets.  I believe that, although commission amounts vary widely, the commissions make up a substantial percentage of the Employees' overall compensation and, indeed, are essential to their livelihood.

98.    By the Employee Wages Motion, the Debtors request authority, but not direction, to pay biweekly commissions to qualifying Employees up to the $12,850 priority cap provided for under Bankruptcy Code section 507(a)(4) pursuant to the Interim Order, and, pursuant to the Final Order, to pay such biweekly commissions in the ordinary course of business, including any amounts that were not paid under the Interim Order on account of the $12,850 priority cap.  Further, given that the payments of the quarterly commissions are not currently due, the Debtors seek the authority, but not the direction, to continue to pay the quarterly commissions under the Final Order in accordance with prepetition procedures, including any amounts that are determined to have accrued prepetition.

99.    **Personal Time Off.**  In addition to salaries, wages, commissions, and bonuses, the Debtors provide eligible Employees with paid time off ("PTO"), which is available for use for, among other things, vacation time and sick days.  Generally, length of employment determines the amount of the PTO available to each eligible Employee, with a maximum limit of 280 accumulated hours.  Employees are only permitted PTO pay for unused vacation days in lieu

42

of taking PTO for reason of termination, layoff, resignation, death, retirement, long-term disability, or extreme circumstances.

100.    Employees are only permitted vacation pay in lieu of taking vacation for reason of termination, layoff, resignation, death, retirement, long-term disability, or extreme circumstances.  By the Employee Wages Motion, the Debtors seek authority, but not direction, to honor in the ordinary course of business all liabilities to the Employees that arose under the PTO policy prior to the Petition Date.  The Debtors also seek to pay, pursuant to the Final Order, accrued but unused PTO obligations to former employees who were terminated prior to the Petition Date.  The Debtors estimate that $898,000 is outstanding based on unpaid PTO obligations to 80 former employees.

101.    **Severance**.  In the ordinary course of their business, the Debtors maintain informal severance policies that were available to the Employees upon termination (the "Severance Obligations").    Currently, there are approximately 70 former non-insider Employees[39] who are receiving payments due under the Severance Obligations.    The approximate aggregate amount of such Severance Obligations is $1,756,000.  I believe that honoring the Severance Obligations owed to the former Employees who have already been terminated prior to the Petition Date will minimize disruptions to the Company and smooth their transition into bankruptcy.    Accordingly, by the Employee Wages Motion, the Debtors are requesting the authority, but not the direction, under the Final Order to pay the Severance Obligations to former Employees.

102.    **Additional Non-Insider Compensation Programs**.    In the ordinary course of business, the Debtors offer various bonus and incentive programs (collectively, the

---

[39]    Approximately 37 of these former non-insider Employees are Union Employees that are covered CBAs.

"Non-Insider Additional Compensation Programs") to their non-insider Employees. Each of the Non-Insider Additional Compensation Programs are consistent with industry practices and use a variety of benchmarks to determine the various non-insider participants' eligibility for payments from, among others, performance, safety, sales volume, loyalty, and financial metrics. Under the Non-Insider Additional Compensation Programs, approximately 1,575 non-insider Employees were eligible or qualified to receive payment in 2015. I believe that these programs are an important component of an Employee's overall compensation and provide substantial value to the Debtors' estates because they encourage Employees to achieve certain performance targets. By the Employee Wages Motion, the Debtors are not seeking authority at this time to pay any prepetition obligations under any such Non-Insider Additional Compensation Program, however, the Debtors expressly reserve the right to do so at a future time.

103. **The Health Benefits**. An important element of the Employee Benefits is the medical, dental, vision, and prescription drug insurance, which the Debtors provide for all their current Employees – and certain former Employees – primarily through a number of premium-based insurance plans (collectively, the "Health Plans"), as described more fully below.[40]

(a)    *Medical Plan*: The Debtors provide medical and prescription benefit plans (the "Medical Plan") for their Employees by a self-insured plan administered by CIGNA. Employees may elect from various options, such as high-deductible or traditional plans. The

---

[40]    In addition, Debtor SunEdison Products Singapore Pte. Ltd., a Singaporean Company, has approximately 55 Employees that are covered under a separate set of health, insurance and other employee benefit programs (the "Foreign Benefits"). The Debtors estimate the cost of maintenance of the Foreign Benefits policies to be approximately $290,000 annually in the aggregate. As of the Petition Date, the Debtors estimate that approximately $92,000 is outstanding on account of the Foreign Benefits. For the avoidance of doubt, by the Employee Wages Motion, the Debtors seek authority, but not direction, to, at their sole discretion, pay any prepetition amounts outstanding in connection to and continue the Foreign Benefits in the ordinary course.

Debtors pay a monthly average of approximately $105,000 to CIGNA for administration of the Medical Plan, and reimburse an average of approximately $1,600,000 of claims per month, with approximately $400,000 of claims paid out each Monday, on average. The Debtors estimate that approximately $115,000 of prepetition claims against the Medical Plan may be outstanding as of the Petition Date. The Debtors are requesting authority to pay these claims when due, as well as the $167,200 owing on account of outstanding administrative costs related to the Medical Plan, and to continue to operate the Medical Plan in the ordinary course of business.

(b)    *Hawaii Medical Plan*: The Debtors also maintain a fully-insured health plan administered by Hawaii Medical Service Association HMSA for a small number of Employees from a previous business acquisition (the "Hawaii Medical Plan"). The Hawaii Medical Plan covers approximately 23 Employees at an average monthly cost of approximately $14,000. By the Employee Wages Motion, the Debtors seek authority, but not direction, to pay approximately $15,700 that is outstanding under the Hawaii Medical Plan and to continue to make monthly premium payments in the ordinary course of business.

(c)    *COBRA Plans*: Pursuant to the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), the Debtors provide temporary continuation of healthcare benefits to former Employees and eligible dependents. The Debtors pay all costs for these former Employees (the "COBRA Payments") for a specified period of time and permit continued access to the applicable Health Plans. In order to comply with COBRA requirements, the Debtors request authorization, but not direction, to maintain coverage for these former Employees and to pay, in their sole discretion, any obligations arising under such plans, regardless of when such obligations accrued. The Debtors estimate that the total COBRA

Payments outstanding are approximately $5,340,000 for approximately 500 former employees, with $653,000 expected to come due during the Interim Period.

(d)     *Dental Plan*:  The Debtors provide a dental plan (the "<u>Dental Plan</u>") for their Employees through Delta Dental of Missouri.  Dental coverage is self-insured by the Debtors, with Employees submitting claims to Delta Dental of Missouri, which are then paid by the Debtors.  Employees may elect from various options, such as high-deductible or traditional plans.  The Debtors pay $8,000 monthly to Delta Dental of Missouri for administration of the Dental Plan, and expect to reimburse an average of $106,000 per month over the next year.  The Debtors estimate that, as of the Petition Date, approximately $16,000 is outstanding on account claims payable under the Dental Plan and $6,800 is outstanding on account of administration fees related thereto.

(e)     *Vision Plan*:  The Debtors provide a vision plan (the "<u>Vision Plan</u>") for their Employees through Vision Service Plan.  The Vision Plan is fully funded by the Employees, including the administrative fees thereunder.  Therefore, no amounts attributable to the Debtors are currently outstanding, and the Debtors seek authority to continue the Vision Plan in the ordinary course of business.

(f)     *HSA*:  The Debtors offer a health savings account program ("<u>HSA</u>") to which Employees enrolled in high-deductible plans can contribute on a pre-tax basis.  Contributions to the HSA are held in an account that is property of the Employee and are not property of the Debtors' estates, and thus, no amounts are currently outstanding under the HSA.

104.    The Employee Insurance Benefits.

(a)     *Life Insurance and Disability Benefits*:  The Debtors provide Employees life insurance, accidental death and dismemberment coverage, and short- and long-term

46

disability benefits (the "Life Insurance," "AD&D Coverage," and "Disability Benefits," respectively) through Life Insurance Company of North America.[41]  The Life Insurance provides all active, full-time Employees of the Debtors with up to two times their annual compensation. Additional coverage is available to the Employees at their own cost.  The AD&D Coverage provides coverage to Employees upon serious injury.  Finally, the Debtors pay up to 100% of an Employee's salary for covered disabilities for a maximum of six months under a self-insured program, and pay premiums for a long-term disability program thereafter at 66.67% of base salary as Disability Benefits.  On average, the Debtors pay approximately $77,000 per month for administration of the Life Insurance, AD&D Coverage, and Disability Benefits.  As of the Petition Date, the Debtors estimate that approximately $75,000 is outstanding for premiums owed and claims asserted under these programs.

(b)      *Business Travel Accident Insurance*:  The Debtors also provide business travel accident coverage (the "Business Travel Insurance") through Aetna.  The Debtors pay approximately $44,000 per year on account of the Business Travel Insurance.  This amount has been paid for 2016, so no amounts are currently outstanding; however, the Debtors are requesting authority to continue the program in the ordinary course of business.

105.      By the Employee Wages Motion, the Debtors seek authority to continue the Life Insurance, AD&D Coverage, the Disability Benefits, the Business Travel Insurance (collectively, the "Employee Insurance Benefits") and to pay outstanding premium amounts and

---

[41]      In addition, the Debtors provide certain Employees, as required by applicable law, with disability benefits coverage for off-the-job injury or illness (the "NY Disability Benefits").  The Debtors pay nominal amounts on account of the NY Disability Benefits coverage, which is administered by Arch Insurance Group, and estimate that approximately $340 is outstanding.

claim amounts relating to the Employee Insurance Benefits to the extent they remain unpaid on the Petition Date.[42]

106.    The Other Employee Benefits.

(a)    *Flexible Spending Accounts*:  The Debtors also offer Employees the opportunity to use tax-advantaged flexible spending accounts ("FSA") to use pre-tax dollars toward the payment of medical or dependent care expenses.  At the beginning of each calendar year, the FSA participants commit a set amount of funds for the FSA, and the Debtors collect a pro-rated amount at each payroll period and pay claims as they come due (up to the pre-committed amount).  The participant submits claims to the claims administrator, and the claims administrator reimburses the Employee for the claimed amount and seeks reimbursement from the Debtors.  The Debtors pay an administrative fee of approximately $2,500 per month for the FSA.  As of the Petition Date, approximately $40,000 is outstanding on account of administrative fees and claims under the FSA, and the Debtors are seeking authority to pay such amount and continue the FSA program in the ordinary course of business.

(b)    *Employee Education Programs*:  The Debtors offer the Employees educational benefits, including a tuition reimbursement program (collectively, the "Employee Education Programs").  The Employee Education Programs are offered on a case-by-case basis to certain of the Debtors' Employees at no cost to the Employee.  As of the Petition Date, the Debtors owe approximately $315,500 for the Employee Education Programs, representing payments to approximately 12 individual Employees.  Of the total Employee Education Programs obligations, $75,000 is due during the Interim Period.

---

[42]    In addition, there are various services providers that provide administrative assistance in connection to various Employee Benefits (the "Administrative Benefits Assistants").  The Debtors seek authority, but not direction, to honor prepetition obligations of approximately $18,000 in the aggregate owed to such Administrative Benefits Assistants.

(c)    *Employee Assistance Program*:  The Debtors maintain an employee assistance program (the "EAP") to provide support and counseling to their Employees both in the United States and abroad.  The Debtors pay an average of $20,000 per quarter to maintain the EAP, with approximately $20,000 outstanding on the Petition Date.  The Debtors request authority pursuant to this Motion to continue making payments to maintain the EAP in the ordinary course of business.

(d)    *Employee Stock Purchase Program*:  The Debtors maintain an employee stock purchase program under Section 423 of the Internal Revenue Code of 1986, as amended (the "ESPP," and, together with FSA, the Employee Assistance Program, and the EAP, the "Other Employee Benefits").  In this program, Employees contribute funds through payroll withholding to purchase stock of the Debtors at a discount.  The terms of the Employee stock Purchase Program allow the Program to be terminated at any time and, in light of the Chapter 11 Cases, the Debtors have decided to terminate the ESPP.  Accordingly, the Debtors seek authority to return Employee contributions to the Employees participating in the ESPP.

(e)    *401(k) Plan*:  The Debtors offer their current Employees the opportunity to participate in a 401(k) savings plan (the "401(k) Plan" or "Retirement Benefits"), which is Administered by Transamerica Corporation.  The Employees may contribute up to 50% of their base pay, subject to regulatory limits.  The Debtors provide matching contributions on a sliding scale, commensurate with the employee contributions, up to a maximum of 4.2% of the Employee's base pay, which for 2016 is expected to total, in the aggregate, approximately $255,000 per biweekly pay period.  In addition to the matching contributions, the Debtors also make a 2% contribution to each qualifying Employee, averaging approximately $162,000 per biweekly pay period.  Administration and investment fees for the Retirement Benefits are paid

49

by the Employees and the Debtors do not believe they owe any prepetition amounts related to the Retirement Benefits, but are requesting permission to continue their matching program in the ordinary course as payday dates occur.

107. I believe that performing their obligations under the above-described Employee Benefits is important for preserving the value of the Debtors' estates. Any disruption in the benefits under such programs will call into question the Debtors' commitment to their Employees, who are essential to continuing the operations of the Debtors.

108. **Payroll Taxes and Non-Tax Related Deductions**. In connection with paying the Unpaid Compensation and the Employee Benefit Obligations, the Debtors routinely deduct and/or withhold from the Employees' paychecks amounts that the Debtors are required to transmit to third parties. For example, the Debtors may deduct from the Employees' earnings, among other things, (a) payroll taxes related to federal, state, and local income taxes, FICA, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority; (b) employee contributions for health benefits and health care and dependent care spending accounts; (c) employee contributions to employee life insurance, long-term care insurance, long-term disability insurance, voluntary property and casualty insurance, and personal accident insurance; (d) employee contributions to 401(k) plans and 401(k) loan repayments; (e) legally ordered deductions, such as child support and garnishments; (f) voluntary contributions to the charitable organizations; (g) employee parking and public transportation costs; and (h) union dues (collectively, the "Employee Withholdings"). The Debtors then forward amounts equal to the Employee Withholdings from general operating accounts to appropriate third-party recipients.

50

109.   As of the Petition Date, the Debtors do not owe any amounts for unremitted Employee Withholdings, including payroll-related taxes and other withheld amounts. These funds were deducted from Employee earnings, but due to the commencement of the Chapter 11 Cases, may not have been forwarded to the appropriate third-party recipients.  I am informed that such withheld funds, to the extent they remain in the Debtors' possession, constitute moneys held in trust and therefore are not property of the Debtors' estates.  Out of an abundance of caution, however, by the Employee Wages Motion, the Debtors seek authority, in their discretion, to forward the Employee Withholdings to the appropriate parties.

110.   **The Employee Expense Obligations**.  Prior to the Petition Date, and in the ordinary course of their business, the Debtors pay for approved, reasonable Employee Expense Obligations incurred in the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies, miscellaneous business expenses, and relocation expenses.[43]  These expenses are largely charged to a credit card maintained by American Express and paid directly by the Debtors (the "Corporate Credit Card"), though some are paid by the Employee with the expectation of reimbursement by the Debtors.  I believe that the Debtors' ability to pay the Employee Expense Obligations has a significant effect, in particular, on the Debtors' sales force, which is on the road incurring expenses in the course of doing work to benefit the Debtors' businesses.

111.   There is a lag time between the time expenses are incurred and the time an expenses is processed and reimbursed.  Consequently, it is difficult for the Debtors to determine

---

[43]   Moreover, the Debtors offer employee relocation assistance (the "Relocation Assistance Program").  Benefits under the Relocation Assistance Program include reimbursement of certain expenses related to home sale, new home search, new home purchase, and household goods shipment, as well as payment of a cost-of-living allowance once the relocation is complete.  The Debtors estimate that the average annual cost of the Relocation Assistance Program (administered through a third-party administrator) is approximately $450,000 in the aggregate, and no prepetition amounts are currently outstanding.

with precision the actual amount of incurred but not reported reimbursable expenses as of any particular time.  Typically, however, the average aggregate monthly amount expended by the Debtors for the Employee Expense Obligations varies between $3,000,000 and $4,000,000.  As of the Petition Date, approximately $742,000 is outstanding on the Corporate Credit Card.  The Debtors are seeking authority, but not direction, to make payments to the Corporate Credit Card in order to ensure continued payment of the Employee Expense Obligations.

112.    I believe that it would be inequitable to require the Employees to personally bear any approved business-related expenses they incurred in furtherance of their responsibilities to the Debtors.  Accordingly, to avoid harm to the Employees, the Debtors seek to be authorized, but not required, to pay the prepetition Employee Expense Obligations and continue such policies, including the Relocation Assistance Program, on a post-petition basis, in accordance with prepetition practice, in the ordinary course of business.

113.    For the reasons set forth above, I believe that the relief requested in the Employee Wages Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

114.    **<u>Cash Management Motion.</u>**    The relief requested in the Cash Management Motion will help ensure the Debtors' orderly entry into chapter 11 and avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these Chapter 11 Cases.

**1.    The Cash Management System**

115.    To facilitate the efficient operation of their businesses, the Debtors and their non-Debtor affiliates use an integrated, centralized cash management system (the "<u>Cash Management System</u>") to collect, transfer, and disburse funds generated by their operations.  The

Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds, and allows the Debtors to administer approximately forty-eight (48) bank accounts (collectively, the "Bank Accounts") held by the Debtors that are maintained with banks and other financial institutions (collectively, the "Banks") reflected on the diagram of the Cash Management System attached to the Cash Management Motion as Exhibit D.  It is my understanding that if the Debtors are unable to continue using its Cash Management System, the operations of the Debtors as well as the Company more broadly will be severely impeded.  The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising postpetition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) are paid by the Debtors.

116.    The Bank Accounts are primarily utilized to pay operating expenses, although the Debtors do maintain a single investment account, which has been idle for six months.  The Debtors routinely deposit, withdraw, and otherwise transfer money to, from, and between certain of the Bank Accounts by various methods (collectively, the "Ordinary Transfer Methods"), including by wires, automated clearing house transfers, and other electronic funds transfers.  In the aggregate, on a monthly basis, the Debtors' business generates roughly 10,000 deposits, withdrawals or transfers to, from and between the Bank Accounts, using various Ordinary Transfer Methods.

117.    Finally, certain non-Debtor affiliated entities (particularly the Project Cos. and Warehouses) maintain bank accounts and associated cash management systems which are separate and independent from the Cash Management System.  As the bank accounts and cash management systems for Project Cos. and Warehouses are independent from the Debtors' Bank

Accounts and Cash Management System, and as much of the cash in such bank accounts is not property of the Debtors, SunEdison intends to maintain such independent bank accounts and cash management systems and continue the operations of the Project Cos. and Warehouses in the ordinary course.

118.    The Debtors utilize the Bank Accounts to centrally manage deposited cash.  The Bank Accounts serve dedicated functions and include the following Debtor-owned and -controlled accounts:

119.    *Operating Accounts*.    The Debtors maintain a number of operating accounts (collectively the "Operating Accounts"), both in the United States and abroad.  The majority of the Operating Accounts are located in the United States and used for U.S. dollar denominated transactions.  However, one of the Operating Accounts belonging to Debtor entity NVT Licenses, LLC is located in the United Kingdom and used for transactions denominated in British pounds, and two other Operating Accounts belonging to NVT Licenses, LLC are located in Spain and used for transactions denominated in Euros and transactions denominated in British pounds.  Furthermore, five of the Operating Accounts belonging to Debtor entity SPS are located in Singapore and utilized for transactions denominated in U.S. dollars, Singapore dollars, Euros, Canadian dollars, and Taiwanese dollars.  The Operating Accounts receive funds from various internal and external sources, including, among others: (a) funds from external financings and completion of asset sales; (b) dividends from subsidiary holding companies upon the completion and transfer of projects owned by special purpose vehicles; (c) funds from affiliated EPCs; (d) funds from intercompany loans and cash advances; and (e) funds from subsidiary suppliers. Operating Accounts belonging to the RSC unit and RSC's affiliated EPCs also receive funds from dealers who are partners in the sales and distribution network for the RSC businesses, as

well as de minimis rebates from utilities companies.  Direct wire transfers from the Operating Accounts are made to directly fund various non-Debtor accounts, including accounts belonging to (i) Cigna and Transamerica, certain of the Debtors' third-party benefits administrators, (ii) ADP, to fund the Debtors' payroll and associated tax obligations, (iii) third party vendors,[44] (iv) subsidiary holding companies, and (v) with respect to the RSC Operating Accounts, dealers.[45]

120.    *Controlled Disbursement Accounts*.    The Debtors maintain three controlled disbursement accounts (collectively, the "CD Accounts"), which are associated with corresponding Operating Accounts.  Funds are transferred from Operating Accounts to CD Accounts as needed for immediate payment of the Debtors' obligations which are due and owing, specifically obligations payable to external vendors, reimbursements and other non-payroll obligations owed to employees, and obligations payable to internal, wholly-owned EPCs.  The CD Accounts are each swept to the associated Operating Accounts on a daily basis.  The CD Accounts transfer funds to non-affiliates via ACH or checks, and transfer funds to affiliates via book transfers, wire transfers, or ACH.

121.    *Investment and Other Dormant Accounts*.  The Debtors maintain a single idle investment account (the "Investment Account") with Wells Fargo Bank.  The Debtors have not maintained funds in the Investment Account in approximately six months, and do not intend to utilize the Investment Account during the pendency of these Chapter 11 Cases.  In addition, the Debtors maintain five dormant accounts with zero balances, including three collateral accounts (the "Collateral Accounts") with Wells Fargo Bank.

---

[44]    In connection with such payments to third party vendors, the Debtors may assign their ability to issue purchase orders, or previously issued and outstanding purchase orders, to Project companies.

[45]    The two Operating Accounts belonging to SunEdison DG LLC held at Wells Fargo Bank are pass-through accounts routinely swept to Operating Accounts within the Cash Management System.

122.    *Non-Debtor Accounts*.    The non-Debtor entities, foreign and domestic, maintain numerous bank accounts at various institutions around the world.    Furthermore, the Debtors hold beneficial interests in numerous trust accounts which are legally owned by special purpose vehicles associated with ongoing projects.    Title in these trust accounts are held by non-Debtor entities, and the Debtors do not have access to these trust accounts.

### 2.    DIP Financing Changes to the Cash Management System[46]

123.    *DIP Lockbox Account*.    In connection with the DIP Term Loans, SunEdison has opened a deposit account (the "<u>DIP Facilities Blocked Account</u>"), subject to a blocked account control agreement, in form and substance reasonably satisfactory to Deutsche Bank, in its role DIP Agent and the Tranche B Advisors.    Subject to the terms and conditions set forth in the DIP Credit Agreement, proceeds of the DIP Term Loans, Budgeted Asset Sale Proceeds and certain specified Net Insurance/Condemnation Proceeds shall be deposited in the DIP Facilities Blocked Account, and such proceeds shall be disbursed, in each case, in accordance with the DIP Budget (subject to any cushion or additional amount permitted in accordance with the DIP Credit Agreement).    In addition, the DIP Agent shall have established a blocked account (the "<u>Collateral Proceeds Account</u>") under the sole dominion and control of the DIP Agent.    All Non-Budgeted Asset Sale Proceeds and all Net Insurance/Condemnation Proceeds, unless otherwise specified in the DIP Credit Agreement, shall be deposited in the Collateral Proceeds Account, and such proceeds shall be applied by the DIP Agent to repay the Obligations in accordance with the terms and conditions set forth in the DIP Credit Agreement.

---

[46]    Capitalized terms used but not otherwise defined in this section shall have the meaning ascribed to them in the Interim DIP Order or the DIP Credit Agreement.

Furthermore, the Debtors' Cash Management System shall be maintained in accordance with the terms of the DIP Credit Agreement and the DIP Financing Orders.

124.    The DIP Loan Documents also permit the Project Cos. to continue to access and draw down upon available non-recourse indebtedness (as scheduled in the DIP Loan Documents) in order to fund ongoing Project development and construction subject to the terms and conditions set forth in the DIP Credit Agreement.   Specifically, the Project Cos. will continue to utilize proceeds from available Project financing to pay Project vendors in the ordinary course subject to the terms and conditions set forth in the DIP Credit Agreement.  In the event that the Company undertakes to develop a new Project (either from its existing development pipeline or another source), and to the extent that the Company requires new Project financing in connection with such new Project, the incurrence of such new Project financing shall be subject to lender approval as set forth in the DIP Loan Documents and subject to the terms and conditions of the DIP Credit Agreement.  Such new Project financing, as well as continued draws upon existing Project financing, shall be subject to any of the applicable terms and conditions set forth in the DIP Loan Documents and the DIP Financing Orders, as applicable.

### 3.    Business Forms and Investment and Deposit Practices

125.    In the ordinary course of business, the Debtors may use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms").  They do not include references to the Debtors' current status as debtors in possession.  Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

126.    Historically, the Debtors have invested excess cash in accordance with clearly established internal policies (the "Investment and Deposit Practices").  As of the Petition Date, the only account maintained by the Debtors for these purposes is the Investment Account, which has been idle for six months.  The Debtors do not intend to maintain their excess cash in the Investment Account during the pendency of the Chapter 11 Cases.

### 4.    The Debtors' Intercompany Transfers

127.    In the ordinary course of business, the Debtors have engaged in various intercompany financial transactions with Debtors and non-Debtor affiliates, both foreign and domestic (collectively, the "Intercompany Transactions").  The Intercompany Transactions include, but are not limited to, the following:

- Payments or transfers from a Debtor to another Debtor or a non-Debtor affiliate giving rise to claims ("Intercompany Claims");

- Loans among Debtors and other Debtors or non-Debtors ("Intercompany Loans"); and

- Capital contributions and other investments made by Debtors with respect to other Debtors and non-Debtors ("Intercompany Investments").

128.    Each payment from a Debtor on account of a postpetition Intercompany Transaction (each, a "Postpetition Intercompany Transaction") is an essential component of the Cash Management System.  The Debtors maintain records of transfers of cash to trace and account for these Intercompany Transactions.  The Debtors, moreover, will continue to maintain such records after the Petition Date.

129.    *Intercompany Claims*.    The Debtors maintain ordinary business relationships with their non-Debtor affiliates, involving routine transfers of cash to and from each entity's Bank Accounts.  Intercompany Claims arise from such transfers, which may be completed in connection with the following illustrative list of transactions:

- *Payroll*.  The Debtors process payroll on behalf of the Debtors and other non-Debtor affiliates.  In certain cases, the Debtors fund payroll for certain non-Debtor affiliates as well (for example, payroll obligations for certain wholly-owned foreign entities is funded by certain Debtor entities).  In the ordinary course of business, in accordance with the Debtors' bi-weekly payroll periods, the Debtors fund payroll, payroll taxes, and other benefit amounts from the Operating Accounts to ADP.

- *Intercompany goods and services*.  Certain of the Debtors (such as NVT Licenses, LLC and Team-Solar, Inc.) as well as additional non-Debtor affiliates, serve as EPCs providing goods and services to projects under construction.  These affiliated EPCs will acquire modules, trackers, and other materials, enter into interconnection agreements, and/or enter into subcontracting agreements, in each case for materials or services ultimately utilized by other Debtors and non-Debtor affiliates.  Such goods and services are generally utilized by project-owning entities, such as special purpose vehicles.  The EPC receives the purchase order or invoice from vendors and subcontractors in connection with such goods or services, and the relevant affiliated entity transfers free cash to the EPC.  The Debtors' records of accounts payable reflect intercompany amounts owed among EPC and non-EPC affiliated entities.

- *Centralized corporate and operational expenses*.  The Debtors also incur centrally-billed expenses in various regions where they operate, including internal administrative functions, insurance coverage, advertising, compliance, and tax, as well as other costs incurred for the benefit of Debtor and non-Debtor entities  In addition, the Debtors provide certain services, including day-to-day management, accounting, administrative, and other services to TerraForm Power, Inc., TerraForm Global, Inc., and certain of their affiliates pursuant to that certain Management Services Agreement dated as of July 23, 2014 with TerraForm Power, Inc., and that certain Management Services Agreement dated as of August 5, 2015 with TerraForm Global, Inc. (both agreements, including all exhibits, schedules, amendments, and other related documents thereto, respectively, collectively referred to as the "MSAs"), in exchange for payment of certain management fees as set forth in the MSAs.

130.    *Intercompany Loans*.  In addition to the Intercompany Claims, the Debtors also utilize a system of Intercompany Loans to facilitate the flow of cash among the Debtors and their non-Debtor affiliates.  For example, the Debtors and certain non-Debtor affiliates may loan cash to Project Cos. in order to assist those entities in proceeding with project construction and conducting other operations in the ordinary course.  One of the Company's core businesses of constructing and selling renewable energy projects is dependent upon the ready availability of cash sufficient to meet operating expenses at the project level and the corporate level.  Although the Company frequently obtains financing from lenders, partners, and other sources in order to

fund the construction of specific projects, such financing is often disbursed in segments after the project meets certain milestones.  Accordingly, the Project Cos. may require additional cash between the dates of such disbursements in order to ensure that construction continues to progress on schedule.  These ongoing cash needs are fulfilled from time to time by Intercompany Loans or Intercompany Investments, as appropriate, from Debtors or non-Debtor affiliates to Project Cos.

131.    Furthermore, Debtors and non-Debtor affiliates may also loan cash to corporate-level entities in order to fund general corporate expenditures in the ordinary course.  Borrower entities typically will reimburse the applicable lender entities in the ordinary course of business from available free cash.  Going forward, the Debtors and non-Debtor affiliates will engage in Intercompany Loans as necessary in order to preserve the value of the Debtors' business enterprises during the pendency of these Chapter 11 Cases.

132.    *Intercompany Investments*.  Finally, the Debtors periodically make investments in other Debtors and in non-Debtor affiliates in the form of direct capital contributions in order to ensure that such entities have sufficient cash to continue operations in the ordinary course.

133.    *First*, certain Debtors – including SUNE – periodically make capital contributions to provide the other Debtors and their non-Debtor affiliates with the cash necessary to make capital improvements, including capital improvements mandated by law.  Absent the ability to make Intercompany Investments on a postpetition basis, certain Debtors and non-Debtor affiliates would be unable to comply with legal and regulatory requirements and would potentially be forced to needlessly shutter their facilities, thereby negatively affecting the Debtors' creditors and other stakeholders.

134.    ***Second***, certain Debtors make capital contributions to other Debtors and non-Debtor affiliates to fund working capital or post cash collateral to assist their subsidiaries in conducting business operations in the ordinary course.  The Debtors make capital contributions to enable their Debtor and non-Debtor affiliates to comply with collateral requirements that these entities otherwise could not satisfy.

135.    ***Finally***, certain Debtors periodically make such capital contributions to provide other Debtors and their non-Debtor affiliates with the financial resources necessary to grow their businesses for the benefit of the Debtors' stakeholders where alternative sources of equity financing are unavailable.  The commencement of any project requires that the Company make a capital contribution to a newly formed special purpose vehicle which will own, construct, and ultimately divest the completed project.  Such capital contributions are often funded by the Debtors, either directly or indirectly, and may pass through several intermediary levels of holding companies before ultimately vesting in the newly created vehicle.  Project lenders often require evidence that the capital contribution has been made by the Company before consummating and disbursing project financing.   It is imperative that these Intercompany Investments continue following the Petition Date to ensure the continuing growth of the Debtors and their subsidiaries, and to preserve the value of the Debtors' business enterprise during these Chapter 11 Cases.

136.    Accordingly, the relief requested in the Cash Management Motion is narrowly tailored to facilitate the Debtors' restructuring efforts.  By contrast, the progress of these Chapter 11 Cases would be severely impeded absent the relief requested in the Cash Management Motion, and so I submit that the continued operation of the Cash Management

System is a sound exercise of business judgment and necessary to preserve the value of the Debtors' businesses.

137.    **Critical Vendor Motion**.    The Debtors seek authority to pay the prepetition claims of certain critical vendors and service providers (collectively, the "Critical Vendors") in an interim amount not to exceed $20 million, and an aggregate amount not to exceed $52 million, on the terms described in the Critical Vendor Motion, and authority to implement procedures to address any vendors that repudiate or otherwise refuse to honor contractual obligations to the Debtors.

138.    The Debtors are mindful of their fiduciary duties to preserve and maximize the value of their estates for the benefit of all stakeholders in these Chapter 11 Cases. To that end, the Debtors have carefully examined the Critical Vendors' claims as of the Petition Date (the "Critical Vendor Claims") and have determined that payment thereof is absolutely necessary.    The Critical Vendor Claims that the Debtors seek to pay represent approximately 14.6% of the Debtors' over $357 million of estimated aggregate unsecured trade debt, as of April 13, 2016.

139.    Specifically, the Debtors' senior management and advisors have determined that continued timely delivery of goods and services by the Critical Vendors is essential to the Debtors' continued operations because the Critical Vendors: (a) are sole- or limited-source providers; (b) provide customized products related to pre-approved design specifications for pending projects that alternative sources could not provide within a reasonable timeframe; (c) provide specialized services necessary to the continued construction and eventual sale of pending projects or the Debtors' corporate operations; and/or (d) hold prepetition claims

less than or equal to estimated replacement costs (including pricing, transition expenses, professional fees, and loss or delay of future revenue).

140.    For any vendor meeting one or more of the above characteristics, the Debtors then considered whether failure to pay the vendor's prepetition claims would result in a substantial risk that the vendor would refuse to provide goods or services to the Debtors postpetition, thereby creating a risk of significant disruption to the Debtors' businesses.  The Debtors' analysis considered, among other things: (a) whether a vendor is a sole- or limited-source supplier of materials, parts, or other services for continued development of a pending project, including whether such vendor supplies materials or parts tailored to pre-approved designs for such pending projects; (b) whether alternative vendors are available that can provide requisite volumes, specifications, customization, and expedited delivery of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operations and ongoing construction without interruption while transitioning business thereto; (c) the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim; (d) whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms; (e) whether certain specifications, customization, location, or other relevant characteristics of ongoing projects (which designs and specifications are already pre-approved by the Debtors' customers) prevent the Debtors from obtaining goods or services from alternative sources; and (f) whether SunEdison is scheduled to achieve cash inflows from the project for which that particular supplier provided goods or services, either from project funding based upon achievement of milestones, or from net cash proceeds resulting from the sale or contribution of

the project.  This analysis and screening process ultimately resulted in the exclusion of the vast majority of the Debtors' vendors (and vendor claims) from the Critical Vendors.

141.    According to the Debtors' books and records, the Debtors may owe prepetition amounts in connection with over 20,000 open invoices.  Of this amount, the Debtors currently estimate that over 20% percent of the total trade payables would be owed to Critical Vendors.  Additionally, the Debtors believe that certain of the Critical Vendors hold claims on account of goods received by the Debtors in the ordinary course of their business during the twenty-day period before the Petition Date, with such claims totaling approximately $6.4 million.  The Debtors' ability to continue their operations in the aftermath of their commencement of these Chapter 11 Cases will largely depend upon the continued provision of goods and services by the Critical Vendors.  Moreover, to further ensure that the Debtors' business operations will be minimally impacted during these Chapter 11 Cases, only those Critical Vendors who agree to provide reasonable and customary payment terms postpetition will be paid all or a portion of their prepetition claims.

142.    The Debtors' Critical Vendors are comprised of, among others, (a) material and equipment vendors, (b) development providers, (c) providers of interconnection services, and (d) non-affiliate EPCs and other service providers.  Specifically, material and equipment vendors provide customized modules, inverters, trackers, and turbines which are made to specifications for each project.  The Debtors are obligated to construct projects which meet the specifications established in advance of beginning construction, and order custom-made or made-to-order materials and equipment from vendors in order to meet these strict delivery requirements.  The Debtors also work with numerous sole-supply Vendors to obtain necessary raw materials, such as graphite rods, for the construction of solar materials products for sale to

third parties.  Although the Debtors may have master supply agreements in place with certain of these vendors, continued supply under the MSAs is governed by individually-placed purchase orders.  Failure to pay amounts due in connection with a fulfilled purchase order may lead to a vendor's refusal to accept future purchase orders from the Company.

143.    In addition, development providers take on much of the planning and pre-construction work before transferring a project to the Debtors for construction and sale; failure to pay such providers would jeopardize the Debtors' ability to complete their pending projects. Once a project is completed the Debtors need the participation of interconnection vendors to provide specialized services and permission to link the project to such vendor's nearby electrical grid.  In many instances, the interconnection vendor associated with the project owns and operates the only adjacent electrical grid, making such vendor impossible to replace.  Without an interconnection, the Debtors are unable to complete and ultimately sell a pending project.

144.    Finally, the Debtors rely on third-party vendors to provide design, engineering, procurement, construction, and other services in connection with pending projects or the Debtors' corporate operations, and absent the continuation of such services (which frequently require specialized experience and know-how), the Debtors would suffer costly construction delays or would accrue excessive costs while attempting to replace such vendors. The Debtors seek to pay all or part of the Critical Vendor Claims to ensure that the Critical Vendors provide necessary goods and services to the Debtors on a postpetition basis.

145.    In addition, prior to the Petition Date, and in the ordinary course of business, the Debtors ordered goods and supplies necessary to operate their businesses, the delivery of which will occur on or after the Petition Date.  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods and supplies, certain vendors may

refuse to transport or supply such goods and supplies unless the Debtors issue substitute purchase orders postpetition. I believe that in order to prevent any disruption to the Debtors' operations it is necessary that all undisputed obligations of the Debtors arising from the acceptance of goods ordered prepetition but delivered postpetition be granted administrative expense priority under section 503(b) of the Bankruptcy Code.

146.    The Debtors are also parties to certain executory contracts with contract counterparties (the "<u>Contract Counterparties</u>"), pursuant to which such Contract Counterparties have continuing contractual obligations to supply the Debtors with critical goods and services. Notwithstanding the terms of such contracts, and the Debtors' ability to compel performance thereunder, I believe that certain Contract Counterparties may seek to stop shipment or supply of such critical goods or services based on outstanding prepetition balances.  In order to minimize disruption to the Debtors' continuing business operations, the Debtors seek this Court's approval of the repudiating vendor procedures set forth in the Critical Vendors Motion.

147.    Accordingly, the relief requested in the Critical Vendors Motion is narrowly tailored to facilitate the Debtors' restructuring efforts.  By contrast, the harm suffered by the estates if essential goods and services provided by the Critical Vendors are withheld would be irreparable to the Debtors' reorganization efforts and the successful emergence from these Chapter 11 Cases, and so I submit that payment of the Critical Vendors' claims is a sound exercise of business judgment and necessary to preserve the value of the Debtors' businesses.

148.    **Lien Claimants Motion.**    The Debtors seek authority to pay the prepetition claims of certain third party logistics providers (the "<u>Third Party Logistics Providers</u>"), and third party contractors, vendors, and manufacturers who may assert mechanics', artisans', materialmen's and other possessory liens against the Debtors' or their customers'

property (the "Miscellaneous Lien Claimants") in an interim amount not to exceed $8 million, and an aggregate amount not to exceed $17 million.

149.    The Debtors contract with various Third Party Logistics Providers to provide various logistics services in order to timely deliver raw materials, supplies, and equipment to the Debtors' polysilicon manufacturing facilities and renewable energy project sites.  The Debtors rely extensively on the Third Party Logistics Providers not only for their vast network of freight delivery, but also to receive and store the Debtors' inventory held in the Third Party Logistics Providers' warehouses.  More specifically, the services provided by the Third Party Logistics Providers include freight brokerage, consolidation and forwarding of road, rail, air and ocean freight, trucking, transportation, customs brokerage, customs clearance, vendor consolidation, cargo insurance, order management, warehousing, distribution, inbound logistics, after-sales logistics, reverse logistics, and other related services.  In the ordinary course of business, the Debtors spend approximately $41,000,000 annually on logistics expenditures.  The Debtors estimate that the value of inventory currently in the possession of Third Party Logistics Providers is approximately $94 million.

150.    In the event that the Debtors fail to pay or reimburse the Third Party Logistics Providers for charges incurred in connection with the transport and storage of materials or panels, various state laws permit Third Party Logistics Providers to assert a statutory lien against goods in their possession that is the subject of any delinquent charges, securing such charges and potentially blocking the Debtors' access to the stored and transported goods. To maintain access to the stored and transported goods that is essential to the continued viability of the Debtors' operations and preserve the value of the goods, the Debtors seek authority to honor outstanding invoices related to the shipping and warehousing services provided to the Debtors by

the Third Party Logistics Providers prior to the Petition Date.  As of the Petition Date, the Debtors estimate that the Third Party Logistics Providers are owed approximately $9 million in prepetition claims

151.    The Debtors also routinely contract with a number of Miscellaneous Lien Claimants to assist with managing the development of renewable energy projects, as well as the engineering and construction of the renewable energy power plants.  My understanding is that the Miscellaneous Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens and materialman's liens (the "Miscellaneous Lien Claims") against the Debtors' property for amounts the Debtors owe to the Miscellaneous Lien Claimants, and that certain Miscellaneous Lien Claimants have already asserted, or have threatened to assert, such Miscellaneous Lien Claims.  I believe that if the Debtors are unable to pay these Miscellaneous Lien Claims, they risk losing access to materials, equipment, and maintenance and repair services that are critical to the continued operation of the Debtors' businesses.  The Debtors estimate that there are approximately $8 million of Miscellaneous Lien Claims as of the Petition Date.

152.    Both the Third Party Logistics Providers and the Miscellaneous Lien Claimants may be able to assert mechanics', repairmen's, contractors', materialmen's and other possessory liens (the "Liens") against the Debtors' properties or assets.  In addition, certain of the Miscellaneous Lien Claimants may be able to assert Liens against the projects themselves. Such Liens must be cleared before SunEdison is able to sell the projects and achieve the scheduled cash inflows from such sales.  Accordingly, the relief requested in the Lien Claimants Motion is narrowly tailored to facilitate the Debtors' restructuring efforts and to ensure the achievement of projected cash inflows by the Debtors and their non-Debtor affiliates.  By

contrast, the harm suffered by the estates if the Third Party Logistics Providers or the Miscellaneous Lien Claimants assert Liens against or withhold goods from the Debtors would be irreparable to the Debtors' reorganization efforts and the successful emergence from these Chapter 11 Cases, and so I submit that payment of the Lien Claimants' claims is a sound exercise of business judgment and necessary to preserve the value of the Debtors' businesses.

153.    **Taxes Motion**.   In the ordinary course of business, the Debtors incur various taxes, fees, and related obligations (the "Taxes") and other similar charges and assessments necessary to operate their businesses and remit such Taxes to various federal, state, county, and city taxing and licensing authorities (the "Taxing Authorities") in the jurisdictions in which the Debtors operate.  I understand that the Debtors' failure to pay the Taxes could have a material adverse effect on their ability to operate.  Specifically, in the aggregate, the Debtors estimate that approximately $9,340,000.00 in prepetition Taxes will become due and payable following the Petition Date.

154.    It is my understanding that the Debtors must continue to pay the Taxes to continue operating in certain jurisdictions, and the payment of the Taxes avoids costly distractions in these Chapter 11 Cases.  Specifically, should the Debtors' fail to pay the Taxes, I understand that the Taxing Authorities could, among other things, suspend the Debtors' operations, conduct audits, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the Debtors' estates.   In addition, certain Taxing Authorities may take precipitous actions against the Debtors' directors and officers for unpaid Taxes, which would undoubtedly distract those key employees from their duties related to the Debtors' restructuring.

155.    **Equity Trading Procedures Motion**.  The Debtors have generated, and are currently generating, a significant amount of net operating loss carryforwards ("NOLs" and,

collectively with any capital losses, unrealized built-in losses, and certain other tax and business credits, the "Tax Attributes") for U.S. federal income tax purposes. As of December 31, 2015, the Debtors had approximately $1.7 billion of unlimited NOLs that were available to offset taxable income. These NOLs and other tax attributes could translate into potential future federal income tax savings for the Debtors. The Debtors' NOLs are a valuable asset because the Debtors generally can carry forward their NOLs to offset future taxable income and tax liability, thereby potentially freeing up funds to meet working capital requirements and service debt. In particular, the NOLs may be available to the Debtors to offset taxable income generated by transactions completed during the course of the Chapter 11 Cases.

156.    It is my understanding that the Debtors' ability to use their tax attributes, however, could be severely limited under Section 382 of title 26 of the United States Code as a result of the trading and accumulation of their equity securities prior to consummation of a chapter 11 plan. The Debtors thus seek to establish procedures for continuously monitoring the trading of their equity securities, so that the Debtors can preserve their ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of their NOLs under Section 382. Therefore, I submit that the relief requested in the Equity Trading Procedures Motion is necessary and in the best interests of the Debtors' estates, their creditors and other parties in interest.

157.    **Insurance Motion**.  In connection with the operation of their businesses, the Debtors maintain various insurance policies (the "Insurance Policies") that provide coverage for, among other things, workers' compensation liability, the Debtors' property, general liability, automobile liability, solar property, marine cargo, pollution liability, trip travel liability, umbrella coverage, excess liability, and directors and officers liability.  As of the Petition Date, the

70

Debtors owe approximately $7.41 million with respect to outstanding premiums on account of the Insurance Policies.  Prior to the Petition Date, the Debtors also entered into three Premium Financing Agreements to finance premiums totaling approximately $13,566,361.  The Premium Financing Agreements include provisions granting security interests in all proceeds from the respective Insurance Policies to the premium finance companies that are parties to the Premium Financing Agreements.  As of the Petition Date, the aggregate amount of outstanding obligations under the Premium Financing Agreements is approximately $400,404.

158.   I believe that continuation of the Insurance Policies, and thus, the continued payment under the Premium Financing Agreements, as well as the ability to enter into new Insurance Policies, are essential to preserving the value of the Debtors' businesses, properties, and assets.  Additionally, in many cases, the coverage provided by the Insurance Policies is required by applicable regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements set forth in the United States Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees.  I believe that if the Debtors do not continue to perform their obligations under the Insurance Policies and the Premium Financing Agreements, the Debtors' coverage under the Insurance Policies could be voided.  I believe this would cause serious and irreparable harm to the Debtors' businesses and restructuring efforts, as the Debtors would likely be exposed to increased costs and risks of loss.

159.   Accordingly, I believe that the relief sought through the Insurance Motion is necessary for the Debtors to continue operating their businesses in chapter 11 without disruption and is in the best interest of the Debtors, their estates, creditors, stakeholders, and other parties in interest.

160.   **Customer Programs Motion**.   The Debtors seek authority to honor prepetition obligations related to certain customer programs and practices (the "Customer Programs") that the Debtors provide in the ordinary course of business.  The Customer Programs generally represent present practices that are common in the Debtors' industry, and the Debtors would be at a disadvantage in a competitive marketplace if the Debtors are not permitted to honor the Customer Programs.  Additionally, the Debtors' customers would lose confidence in the Debtors, which could result in the alienation of a proven customer base.  Finally, the costs of honoring the Customer Programs and the prepetition obligations related thereto will be more than offset by the revenue from sales made because the Customer Programs are in place. Therefore, I believe that it is in the best interests of the Debtors, their estates, stakeholders, and creditors to allow the Debtors to honor prepetition obligations pursuant to the Customer Programs and continue the Customer Programs as the Debtors see fit in the ordinary course of business.

161.   **Utilities Motion.**   The Debtors incur expenses for water, sewer, electricity, gas, telephone, waste disposal, and similar utility products and services provided by various utility providers (the "Utility Providers").  The Debtors operate facilities at a number of locations and have over 39 utility accounts.   On average, the Debtors spend approximately $125,000.00 each month, or approximately $62,500.00 every two weeks, on utility costs.

162.   I believe that uninterrupted utility services are essential to the Debtors' ongoing operations.  Additionally, any interruption of utility services, even for a brief period of time, likely would negatively affect the Debtors' reorganization efforts.  Therefore, it is critical that utility services continue uninterrupted during the Chapter 11 Cases.

163.    I believe that the procedures proposed in the Utilities Motion are necessary because, if such procedures are not approved, the Debtors could be forced to address numerous requests by the Utility Providers for adequate security in a disorganized manner during the critical first weeks of these Chapter 11 Cases.  Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding – on or after the 20th day following the Petition Date – that it is not adequately protected and threaten to discontinue service or make an exorbitant demand for payment to continue service.  Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could put the Debtors' reorganization in jeopardy.

164.    **Motion to Reject Certain Contracts**.  The Debtors seek authority to reject certain executory contracts or arrangements with the counterparties effective *nunc pro tunc* to the Petition Date.  As part of their comprehensive restructuring strategy, the Debtors are conducting a detailed review of their businesses and contractual arrangements with a particular focus on the long-term viability of these arrangements.  As part of this process, the Debtors have identified certain highly burdensome arrangements that do not fit into the Debtors' long-term business plans and cannot be restructured to do so (the "Contracts") and should be rejected immediately:

(a)    **PCS Supply Agreement**.  SUNE is party to an amended silicon tetrafluoride ("STF") supply agreement with PCS Phosphate Company, Inc. and PCS Sales (USA), Inc. (collectively, "PCS"), dated as of April 30, 2007, and as subsequently amended on June 30, 2012 (the "Second Amended and Restated STF Supply Agreement"), relating to the installation, operation, and maintenance of STF plants. The Second Amended and Restated STF Supply Agreement is a take-or-pay agreement under which SUNE agreed to purchase specified amounts of STF produced by PCS for usage at a plant that SUNE is in the process of closing.[47]

---

[47]    On February 18, 2016, SunEdison announced that it would permanently shut down its polysilicon manufacturing plant in Pasadena, Texas (the "Pasadena Facility").  The Pasadena Facility, which had operated for more than 20 years,  manufactured polysilicon, a primary building block of solar panels.  However, China    *(cont'd)*

Accordingly, the Debtors have determined that it is no longer necessary or desirable to maintain the Second Amended and Restated STF Supply Agreement since they no longer have any use for the STF. The Debtors estimate that rejection of the Second Amended and Restated STF Supply Agreement will save the Debtors approximately $121 million by the end of 2019.

(b) **Polysilicon Supply Agreement**. SunEdison Products Singapore Pte. Ltd. is party to a polysilicon supply agreement with SMP Ltd. ("SMP"), dated as of February 27, 2015 (the "Polysilicon Supply Agreement"), relating to the purchase of polysilicon products. The Polysilicon Supply Agreement is an off-take agreement under which SunEdison Products Singapore Pte. Ltd. agreed to purchase and off-take 65% of the polysilicon products manufactured by SMP's facility. The Debtors have determined that it is no longer necessary or desirable to maintain the Polysilicon Supply Agreement. Based on current cost and pricing assumptions, the Debtors estimate that rejection of the Polysilicon Supply Agreement will save the Debtors approximately $52.96 million to $81.48 million by the end of 2017 (depending on, among other things, the performance of SMP and SUNE's varying sales commitments to third parties). Any savings thereafter will depend on then-current cost estimates and assumptions.

165.    I believe that rejecting the Contracts is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

166.    **Contract Rejection and Assumption Procedures Motion**. The Debtors seek authority to establish expedited procedures for rejecting and assuming executory contracts and unexpired leases effective *nunc pro tunc* to the Petition Date. Bankruptcy Code section 365(a) allows Debtors to assume or reject executory contracts or unexpired leases, subject to the bankruptcy court's approval. In these Chapter 11 Cases, the Debtors are party to thousands of executory contracts and unexpired leases. As a part of their restructuring efforts, the Debtors are evaluating whether these executory contracts and unexpired leases should be rejected as

_____
*(cont'd from previous page)*

recently imposed a 53.6 percent tariff on SunEdison's polysilicon, pricing the American-made polysilicon out of the market. SunEdison received a notice of termination of the Second Amended and Restated STF Supply Agreement from PCS dated March 29, 2016, but in abundance of caution, the Debtors are rejecting the Second Amended and Restated STF Supply Agreement to minimize any and all remaining obligations and expenses under the Contract.

unfavorable or assumed (or assumed and assigned) as beneficial to their estates. Establishing uniform, expedited procedures would streamline the process of rejection, assumption, or assumption and assignment of the Debtors' executory contracts and unexpired leases and would protect counterparties by providing notice, an opportunity to object, and a hearing for resolution of any unresolved objections. Absent the relief requested in the Contract Rejection and Assumption Procedures Motion, the Debtors would be required to file separate motions to reject or assume individual executory contracts and unexpired leases, resulting in substantial costs to, and administrative burdens on, the Debtors' estates – not to mention the attendant burden on the Court's docket.

167.    I believe that the proposed expedited procedures are appropriate and consistent with the sound exercise of the Debtors' business judgment and are appropriate and necessary to minimize costs and burdens on the Debtors and the Court's docket. Accordingly, on behalf of the Debtors, I respectfully submit that the Contract Rejection and Assumption Procedures Motion should be approved.

168.    **Ordinary Course Professionals Motion**. The Debtors seek authority to retain and employ professionals utilized by the Debtors in the ordinary course of business and to pay compensation and reimbursement of expenses of such professionals. The Debtors customarily retain the services of various legal professionals (the "Ordinary Course Professionals") to represent them in matters arising in the ordinary course of their business. The Ordinary Course Professionals will not play central roles in the administration of these Chapter 11 Cases and render a wide range of services to the Debtors in a variety of unrelated matters, including litigation, transactional, regulatory, labor and employment, intellectual property, and

general corporate matters, as well as other services for the Debtors in relation to issues that have a direct and significant impact on the Debtors' day-to-day operations.

169.    Due to the number of Ordinary Course Professionals that are regularly retained by the Debtors, I believe it would be unwieldy and burdensome to both the Debtors and the Court to request each such Ordinary Course Professional apply separately for approval of its employment and compensation.  While I believe that some Ordinary Course Professionals may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise, and familiarity that the Ordinary Course Professionals have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations.  Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.

170.    I believe that the continued retention and payment of the Ordinary Course Professionals in accordance with the proposed procedures will allow the Debtors to continue to utilize and benefit from the Ordinary Course Professionals' services.  I believe that the continued retention and compensation of the Ordinary Course Professionals is in the best interests of the Debtors' estates, creditors, and other parties in interest.

171.    **Interim Compensation Motion.**  The Debtors seek entry of an order establishing procedures for interim compensation and reimbursement of professional expenses during these Chapter 11 Cases.  I believe that establishing orderly procedures for addressing issues related to the payment of professionals in these Chapter 11 Cases will enable efficient

payment of professional fees and expenses, while ensuring all interested parties can monitor such costs.  I also believe that these procedures will allow the Debtors to more accurately forecast cash flows and better administer their cash position.  Additionally, these procedures will permit the Court and key parties in interest, including the United States Trustee, to more easily assess the reasonableness of the requested compensation and reimbursements.

## II.    PROFESSIONALS' RETENTION FIRST DAY PLEADINGS

172.    **Prime Clerk LLC Retention as Administrative Agent**.  The Debtors seek authority to employ and retain Prime Clerk as administrative agent in these Chapter 11 Cases in accordance with the terms of the Prime Clerk Agreement, effective *nunc pro tunc* to the Petition Date.  Prime Clerk specializes in solicitation, balloting, and other administrative tasks necessary to operate these Chapter 11 Cases effectively.  It is my understanding that Prime Clerk is fully equipped to assist in the preparation of the schedules of assets and liabilities and statements of financial affairs and to solicit, ballot, and tabulate votes as required in support of the confirmation of a chapter 11 plan in these Chapter 11 Cases and, therefore, I believe that the Debtors' estates and creditors will benefit from Prime Clerk's services.

## PART III

## III.    INFORMATION REQUIRED  BY LOCAL BANKRUPTCY RULE 1007-2

173.    Jurisdiction and venue before this Court is proper.  The principal place of business, books and records, and substantially all of the assets of SunEdison DG, LLC, one of the Debtors in these Chapter 11 Cases, are located in the State of New York.  Specifically, SunEdison DG, LLC is lessee under an office lease for property located at 250 Vesey Street, 26th Floor, New York, NY 10080 that expires on December 31, 2021.  This location is its principal place of business. Further, Patrick M. Cook, the Company's Vice President of Capital

77

Markets and Corporate Finance, the declarant hereunder, and an officer of SunEdison DG, LLC, resides in New York and his office is at SunEdison DG, LLC's principal place of business. Moreover, through its non-Debtor affiliates, SunEdison owns substantial assets in New York primarily used in connection with the Debtors' C&I business unit.

174.    Local Bankruptcy Rule 1007-2 requires that the Debtors provide certain information, which is set forth below.[48]

175.    As required under Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, the committees organized prior to the Petition Date are as follows: (1) the steering committee of unaffiliated holders of (i) the Prepetition Second Lien Notes and (ii) indebtedness under the Second Lien Credit Facility, represented by Akin Gump Strauss Hauer & Feld LLP, (2) the Ad Hoc Group of holders of Convertible Notes, represented by White & Case LLP, and (3) the unofficial committee of lenders under the Prepetition First Lien Facility, represented White & Case LLP.

176.    As required under Local Bankruptcy Rule 1007-2(a)(4), Exhibit B lists the following information with respect to each of the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent,

---

[48]    The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

unliquidated, disputed or partially secured.  In each case, the claim amounts listed on Exhibit B are estimated and subject to verification.  In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

177.    As required under Local Bankruptcy Rule 1007-2(a)(5), Exhibit C provides the following information with respect to each of the holders of the five (5) largest secured claims against the Debtors on a consolidated basis: the creditor's name and address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description  and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.  In each case, the claim amounts listed on Exhibit C are estimated and subject to verification. In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

178.    As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtors submit that as of December 31, 2015 the Debtors' unaudited consolidated financial statements, as prepared in accordance with U.S. generally accepted accounting principles ("GAAP"), aggregated $22,558,901,863 in total assets and $17,938,469,411 in total liabilities.[49]

179.    As required under Local Bankruptcy Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, as of April 1, 2016, 357,726 shares of preferred stock and 405,478,651 shares of common stock were outstanding.  Exhibit D lists those shares indirectly held by the Debtors' officers and directors through companies wholly owned by the respective directors and officers and the amounts held by those persons.

---

[49]    Total assets and total liabilities include the consolidated assets and liabilities of non-Debtors TerraForm Power, Inc. and TerraForm Global, Inc., as is consistent with prior public reporting by SUNE.

180.    As required under Local Bankruptcy Rule 1007-2(a)(8), Exhibit E provides a list of all the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

181.    As required under Local Bankruptcy Rule 1007-2(a)(9), Exhibit F provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

182.    As required under Local Bankruptcy Rule 1007-2(a)(10), Exhibit G provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of assets held by the Debtors outside the territorial limits of the United States.

183.    As required under Local Bankruptcy Rule 1007-2(a)(11), Exhibit H provides a list of the nature and present status of actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of the Debtors' property may be imminent.

184.    As required under Local Bankruptcy Rule 1007-2(a)(12), Exhibit I provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

185.    As required under Local Bankruptcy Rule 1007-2(b)(1)-2(A) and (C), Exhibit J provides the estimated weekly payroll amount, on a consolidated basis, to be paid to the Debtors' employees (exclusive of officers, directors, and stockholders) and the estimated

amounts proposed to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the thirty-day period following the Petition Date.

186.    As required under Local Bankruptcy Rule 1007-2(b)(3), <u>Exhibit K</u>, the Debtors' cash collateral budget, provides a list of estimated cash receipts and disbursements, and net cash gain or loss other than professional fees, on a consolidated basis for the 4-week period following the Petition Date.

I swear under penalty of perjury that the foregoing is true and correct.

Dated:        April 21, 2016

By: */s/  Patrick M. Cook*
Name: Patrick M. Cook
Title:  Vice President – Capital Markets And
Corporate Finance

## EXHIBIT A

**Corporate Organizational Charts**



SunEdison, Inc. is the borrower, issuer and guarantor of approximately $3.822 billion in debt, including (i) 1L L/C facility - $678mm issued and outstanding; (ii) 2L term loan facility - $725mm; (iii) 2L convertible notes - $225mm; (iv) exchangeable notes - $215mm and (iv) $1.98 billion in unsecured convertible notes

Notes
1  Holds approximately (i) 2 million TerraForm Global, Inc. shares; (ii) 61.3 million TerraForm Global, LLC units; (iii) 16 million TerraForm Power, Inc. shares; and (iv) 16 million TerraForm Power, LLC units, each of which have been pledged as collateral for 1L and 2L debt
2  Owns Texas manufacturing facility (currently winding down operations)
3  Silicon wafer business
4  Equity owner of Atlantic Power warehouse joint venture
5  Holds approximately (i) 32.2 million TerraForm Power, Inc. shares and (ii) 32.2 million TerraForm Power, LLC units, pledged as collateral for 1L and 2L debt
6  Indirect owner of most foreign affiliates
7  Joint venture with Riverstone; SUNE obligations to Riverstone ($37.5mm) secured by SUNE's 50% ownership in joint venture
8  Owns SMP, Ltd. (Korea) and certain other foreign projects and affiliates; Flextronics obligor; SUNE guarantees; $320mm working capital facilities backstopped by 1L L/C
9  Obligor on 2020 Exchangeable Notes issued to DE Shaw guaranteed by SunEdison, Inc.
10 First Reserve warehouse joint venture
11 Equity owner of service business entities for Canadian projects; party to O&M contracts and Master Service Agreements
12 Indirect owner of all North American utility projects
13 Holding company of Residential Services business
14 Direct and indirect owner of foreign projects and other foreign affiliates; 2/3 equity interests pledged as collateral for 1L and 2L debt
15 Equity owner of JPMorgan warehouse
*  Service business entity party to O&M contracts and Master Service Agreements

Legend



Filing Entity

Non-Filing Entity

1288398/NY03A



**Legend**

Domestic Entities

Foreign Entities

Denotes Multiple Entities

Notes
1  Owns ~65% interest in SMP Ltd. (remainder held by Samsung and former semiconductor affiliate) and 100% of Asia-Pacific subsidiaries; party to (i) $200 mm UOB working capital facility backstopped by $135M Wells Fargo Conditional LC and (ii) $130 mm OCBC working capital facility backstopped by $17 mm Wells Fargo Conditional LC and $103M  RBC Conditional LC
2  Korean solar materials manufacturing plant
3  China, India, Korea, Malaysia, Taiwan
4  Holds 50% of equity in Riverstone joint venture, equity serves as collateral for SUNE obligations to Riverstone ($37.5mm); underlying projects in Bulgaria, India, Italy
5  Service business entities for Canadian projects; party to O&M contracts and Master Service Agreements for Canadian projects
6  Australia, Japan, Korea, New Zealand, Singapore, United Kingdom
7  Netherlands, Philippines
8  Cayman Islands, India, Malaysia, Singapore, Thailand
9  Belgium, Bulgaria, Egypt, France, Germany,  Greece, Israel, Italy, Jordan, Spain (owner of Colombia, Mexico and Uruguay subsidiaries), Turkey, UK
10  Australia, China, Hong Kong, India, Taiwan
11  Brazil, Chile , Honduras, Mexico, Panama, (Uruquay and Colombia are held through Spain)
12  China, Egypt, France, Hong Kong), Jordan, Mexico, Panama, Peru, Philippines), South Africa, Turkey, UAE, UK
13  Germany, Korea, UK

1299228.01A

SunEdison, Inc. is the borrower, issuer and guarantor of approximately $3.822 billion in debt, including (i) 1L L/C facility - 909.8mm issued and outstanding; (ii) 2L term loan facility - $725mm; (iii) 2L convertible notes - $225mm; (iv) exchangeable notes - $215mm and (iv) $1.98 billion in unsecured convertible notes

**Legend**

| | |
|---|---|
| Borrower of 1L, 2L debt and issuer of unsecured convertible notes | |
| Guarantor of 1L or 2L debt | |
| Publicly Traded | |

SunEdison, Inc.

SunEdison Holdings Corporation[1]

TerraForm Warehouse, LLC

TerraForm Power, LLC — 35% economic interest

TerraForm Power, Inc. — 0% economic interest / 84.08% voting interest

TerraForm Global, LLC — 34% economic interest

TerraForm Global, Inc. — 0% economic interest / 98.16% voting interest

65% economic interest

TerraForm Power Operating, LLC

SunEdison Yieldco UK HoldCo 2, LLC

66% economic interest

TerraForm Global Operating, LLC

**Notes**

1   Holds approximately (i) 2 million TerraForm Global, Inc. shares; (ii) 61.3 million TerraForm Global, LLC shares; and (iii) 48.2 million TerraForm Power, Inc. and LLC shares, each of which have been pledged as collateral for 1L and 2L debt

## EXHIBIT B

### List of Creditors Holding 40 Largest Unsecured Claims

The following is a list of those creditors holding the 40 largest unsecured claims against the Debtors, on a consolidated basis, as of April 14, 2016. This list has been prepared from the books and records of the Debtors, and in accordance with Local Bankruptcy Rule 1007-2(a)(4), for filing in the Debtors' Chapter 11 Cases. This list does not include (1) persons who come within the definition of "insider" set forth in section 101 of the Bankruptcy Code, (2) secured creditors or (3) claims held by the Debtors' employees.

The information set forth herein shall not constitute an admission of liability by, nor is binding on, the Debtors and the failure to list a claim as contingent, disputed or subject to set off shall not be a waiver of any of the Debtors' rights relating thereto.

| Fill in this information to identify the case: |
| --- |
| Debtor Name <u>SunEdison, Inc.</u> |
| United States Bankruptcy Court for the: <u>Southern District of New York</u> |
| Case number (if known): _____ |

• Check if this is an amended filing

## <u>Official Form 204</u>
### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 40 Largest Unsecured Claims and Are Not Insiders    12/15

**A list of creditors holding the 40 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Wilmington Trust, National Association Corporate Trust Office, 2020 Convertible Senior Notes 1100 North Market St Wilmington, DE 19890 | Wilmington Trust, National Association Corporate Trust Office, 2020 Convertible Senior Notes PHONE: 302-651-1000 FAX: 302-636-4145 EMAIL: tmorris@wilmingtontrust.com | 2020 Convertible Notes | | | | $488,500,000.00 |
| 2 | Wilmington Trust, National Association Corporate Trust Office, 2022 Convertible Senior Notes 1100 North Market St Wilmington, DE 19890 | Wilmington Trust, National Association Corporate Trust Office, 2022 Convertible Senior Notes PHONE: 302-651-1000 FAX: 302-636-4145 EMAIL: tmorris@wilmingtontrust.com | 2022 Convertible Notes | | | | $347,000,000.00 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 3 | Wilmington Trust, National Association Corporate Trust Office, 2025 Convertible Senior Notes 1100 North Market St Wilmington, DE 19890 | Wilmington Trust, National Association Corporate Trust Office, 2025 Convertible Senior Notes PHONE: 302-651-1000 FAX: 302-636-4145 EMAIL: tmorris@wilmingtontrust.com | 2025 Convertible Notes | | | | $320,125,000.00 |
| 4 | Wilmington Trust, National Association Corporate Trust Office, 2021 Convertible Senior Notes 1100 North Market St Wilmington, DE 19890 | Wilmington Trust, National Association Corporate Trust Office, 2021 Convertible Senior Notes PHONE: 302-651-1000 FAX: 302-636-4145 EMAIL: tmorris@wilmingtontrust.com | 2021 Convertible Notes | | | | $289,500,000.00 |
| 5 | Wilmington Trust, National Association Corporate Trust Office, 2023 Convertible Senior Notes 1100 North Market St Wilmington, DE 19890 | Wilmington Trust, National Association Corporate Trust Office, 2023 Convertible Senior Notes PHONE: 302-651-1000 FAX: 302-636-4145 EMAIL: tmorris@wilmingtontrust.com | 2023 Convertible Notes | | | | $279,022,000.00 |
| 6 | Wilmington Trust, National Association Corporate Trust Office, 2018 Convertible Senior Notes 1100 North Market St Wilmington, DE 19890 | Wilmington Trust, National Association Corporate Trust Office, 2018 Convertible Senior Notes PHONE: 302-651-1000 FAX: 302-636-4145 EMAIL: tmorris@wilmingtontrust.com | 2018 Convertible Notes | | | | $255,674,000.00 |
| 7 | D. E. Shaw & Co., L.P. Attn: Martin Lebwohl 1166 Avenue of the Americas, 6th Floor New York, NY 10036 | D. E. Shaw & Co., L.P. Attn: Martin Lebwohl PHONE: 212-478-0000 FAX: 212-478-0100 EMAIL: martin.lebwohl@deshaw.com | Contractual Payment Claim; co-claimant with Madison Dearborn Capital Partners IV, L.P. | Contingent, Unliquidated, Disputed | | | $231,000,000.00 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 7 | Madison Dearborn Capital Partners IV, L.P. Attn: Matt Raino, Mark Tresnowski Three First National Plaza, Suite 4600 Chicago, IL 60603 | Madison Dearborn Capital Partners IV, L.P. Attn: Matt Raino, Mark Tresnowski PHONE: 213-895-1000 FAX: 312-895-1041 EMAIL: mraino@MDCP.com; mtresnowski@MDCP.com | Contractual Payment Claim; co-claimant with D.E. Shaw & Co., L.P. | Contingent, Unliquidated, Disputed | | | $231,000,000.00 |
| 8 | Wilmington Trust, National Association Corporate Trust Office, Exchangeable Notes due 2020 1100 North Market St Wilmington, DE 19890 | Wilmington Trust, National Association Corporate Trust Office, Exchangeable Notes due 2020 PHONE: 302-651-1000 FAX: 302-636-4145 EMAIL: tmorris@wilmingtontrust.com | Exchangeable Notes due 2020 | Contingent | | | $215,000,000.00 |
| 9 | Renova Energia Cristiano C. Barros, CEO Avenida Roque Petroni 999- 40 andar Villa Gertrudes Sao Paulo, SP 04707-910 Brazil | Renova Energia Cristiano C. Barros, CEO PHONE: 55 (11) 3509-1100 FAX: 55 (11) 3509-111300 | Contractual Payment Claim | Contingent, Unliquidated, Disputed | | | $200,000,000.00 |
| 10 | PCS Phosphate Company, Inc. and PCS Sales (USA), Inc. Attn: Troy Erny, VP Industrial Sales 1101 SKOKIE BLVD STE 400 Northbrook, IL 60062 | PCS Phosphate Company, Inc. and PCS Sales (USA), Inc. Attn: Troy Erny, VP Industrial Sales PHONE: 847-849-4200 FAX: 847-849-4695 EMAIL: tlerny@potashcorp.com | Litigation | Contingent, Unliquidated, Disputed | | | $185,000,000.00 |
| 11 | R/C US Solar Investment Partnership, L.P. Attn: General Counsel c/o Riverstone Holdings LLC 712 Fifth Avenue, 36th Floor New York, NY 10019 | R/C US Solar Investment Partnership, L.P. Attn: General Counsel PHONE: 212-993-0076 FAX: 212-993-0077 | Contractual Payment Claim | Contingent, Unliquidated, Disputed | $140,000,000.00 | $37,500,000.00 | $102,500,000.00 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 12 | Flextronics International Attn: Michael M. McNamara, Chief Executive Officer 847 Gibraltar Dr Bldg 5 Milpitas, CA 95035 | Flextronics International Attn: Michael M. McNamara, Chief Executive Officer PHONE: 408-576-7000 FAX: 408-576-7454 EMAIL: rachael.serafini@flextronics.com | Trade | Contingent, Unliquidated, Disputed | | | $44,460,971.00 |
| 13 | Atlantic Specialty Insurance Co. Attn:  General Counsel 605 Highway 169 North Suite 800 Plymouth, MN 55441 | Atlantic Specialty Insurance Co. Attn:  General Counsel PHONE: 781-332-7000 FAX: 781-332-7969 | Litigation | Contingent, Unliquidated, Disputed | | | $31,000,000.00 |
| 14 | BTG Pactual Brazil Infrastructure Fund II, LP; P2 Brasil Private Infrastructure Fund II, LP, et al. Attn: Tai-Heng Cheng Quinn Emanuel Urquhart & Sullivan, LLP 51 Madison Avenue, 22nd Floor New York, NY 10010 | BTG Pactual Brazil Infrastructure Fund II, LP; P2 Brasil Private Infrastructure Fund II, LP, et al. Attn: Tai-Heng Cheng PHONE: 212-849-7000 FAX: 212-849-7100 EMAIL: taihengcheng@quinnemanuel.com; michaelcarlinsky@quinnemanuel.com; johnchun@quinnemanuel.com | Contractual Payment Claim | Contingent, Unliquidated, Disputed | | | $20,000,000.00 |
| 15 | Jinneng Clean Energy Technology Ltd. Attn: Dr. Liyou Yang, General Manager No.1 Wenshui Economic Development Zone Lvliang City , Shanxi 032100 China | Jinneng Clean Energy Technology Ltd. Attn: Dr. Liyou Yang, General Manager PHONE: 86-358-3300916 EMAIL: zhongping.mao@jinergy.com | Trade | Contingent, Unliquidated, Disputed | | | $16,237,805.45 |
| 16 | Taimax And Woongjin Energy Co. Ltd. Attn: Jaekyun Lee, Chief Executive Officer 37, Gwanpyeong-Dong) Techno 2-RO Yuseong-Gu Daejoen,  305-509 Korea | Taimax And Woongjin Energy Co. Ltd. Attn: Jaekyun Lee, Chief Executive Officer PHONE: 82-42-939-8114 FAX: 82-42-939-8098 EMAIL: bjkim@woongjinenergy.com | Litigation | Contingent, Unliquidated, Disputed | | | $15,400,000.00 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 17 | Solarpark Korea Co., Ltd. Attn: Hyunwoo Park, Chief Executive Officer 855-1, Dunsan-Ri, Bongdong-Wup Wanju-Gun Jeollabuk-Do , 565-902 Korea | Solarpark Korea Co., Ltd. Attn: Hyunwoo Park, Chief Executive Officer PHONE: 82-(0)63-710-3000 FAX: 82-(0)63-710-3001 EMAIL: hyunwoo.park@solarpark-korea.com | Trade | Contingent, Unliquidated, Disputed | | | $14,837,500.31 |
| 18 | PricewaterhouseCoopers LLC Attn: General Counsel 800 MARKET ST SAINT LOUIS,  63101 | PricewaterhouseCoopers LLC Attn: General Counsel PHONE: 314-206-8514 FAX: 314-206-8500 | Trade | Contingent, Unliquidated, Disputed | | | $14,708,878.49 |
| 19 | Akuo Energy Attn: General Counsel 140, avenue des Champs Elysees Paris,  75008 France | Akuo Energy Attn: General Counsel PHONE: 33(0)1 47 66 09 90 FAX: 33(0)1 47 55 10 51 EMAIL: contact@akuoenergy.com | Litigation | Contingent, Unliquidated, Disputed | | | $13,017,216.00 |
| 20 | Chint Solar (Hong Kong) Co., Ltd. Attn: Mr. Yongcai Wang, President 1335 Binan Road, Binjian District Hangzhou,  310053 China | Chint Solar (Hong Kong) Co., Ltd. Attn: Mr. Yongcai Wang, President PHONE: 86-571-5810-7219 FAX: 86-571-5675-3388 EMAIL: amity.hu@astronergy.com | Trade | Contingent, Unliquidated, Disputed | | | $11,257,752.44 |
| 21 | Trina Solar Inc. Attn: Jifan Gao, Chief Executive Officer No.2 Tian He Road, Electronics Park, New District Chang Zhou, Jiangsu 213031 China | Trina Solar Inc. Attn: Jifan Gao, Chief Executive Officer PHONE: 86-519-8548-5801 FAX: 86-519-8548-5936 EMAIL: Huafeng.Jin@Trinasolar.Com | Trade | Contingent, Unliquidated, Disputed | | | $10,518,107.40 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 22 | Hefei JA Solar Technology Co Ltd Attn: Baofang Jin, Chief Executive Officer No.1, Jianhua Road, Bali Town, Economic Development Zone Yangzhou, Jiangsu 225000 China | Hefei JA Solar Technology Co Ltd Attn: Baofang Jin, Chief Executive Officer PHONE: 86-514-8554-8123 FAX: 86-514-8554-8191 EMAIL: yinghg@jasolar.com | Trade | Contingent, Unliquidated, Disputed | | | $10,380,370.86 |
| 23 | Eastern Maine Electric Cooperative, Inc. Attn: John McVeigh Preti, Flaherty, Beliveau & Pachios, LLP One City Center PO Box 9546 Portland, ME 04112-9546 | Eastern Maine Electric Cooperative, Inc. Attn: John McVeigh PHONE: 207-791-3000 FAX: 207-791-3111 EMAIL: jmcveigh@preti.com | Litigation | Contingent, Unliquidated, Disputed | | | $10,000,000.00 |
| 24 | Marathon Capital LLC Attn: Richard Mooney Rimon PC One Embarcadero Center, Ste 400 San Francisco, CA 94111 | Marathon Capital LLC Attn: Richard Mooney PHONE: 415-683-5472 FAX: 415-683-5472 EMAIL: richard.mooney@rimonlaw.com | Litigation | Contingent, Unliquidated, Disputed | | | $8,750,000.00 |
| 25 | PCS SALES INC Attn: Troy Erny, VP Industrial Sales 1101 SKOKIE BLVD STE 400 Northbrook, IL 60062 | PCS SALES INC Attn: Troy Erny, VP Industrial Sales PHONE: 847-849-4200 FAX: 847-849-4695 EMAIL: tlerny@potashcorp.com | Trade | Contingent, Unliquidated, Disputed | | | $8,642,214.00 |
| 26 | KIRKLAND & ELLIS LLP Attn: Jeffrey Bossert Clark 655 15th St NW Washington, DC 20005-5793 | KIRKLAND & ELLIS LLP Attn: Jeffrey Bossert Clark PHONE: 202-8795960 FAX: 202-879-5200 EMAIL: jeffrey.clark@kirkland.com | Trade | Contingent, Unliquidated, Disputed | | | $6,552,339.00 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 27 | Fortis Advisors LLC; Khosla Ventures II LP; Khosla Ventures III LP; Sigma Assocs. 8, L.P.; Sigma Partners 8, L.P.; Sigma Investors 8, L.P.; & Energy & Environment First Investment L.P. Attn: Hayes P. Hyde Goodwin Procter LLP Three Embarcadero Center, 24th Floor San Francisco, CA 94111-9991 | Fortis Advisors LLC; Khosla Ventures II LP; Khosla Ventures III LP; Sigma Assocs. 8, L.P.; Sigma Partners 8, L.P.; Sigma Investors 8, L.P.; & Energy & Environment First Investment L.P. Attn: Hayes P. Hyde PHONE: 415-733-6044 FAX: 415-733-3220 EMAIL: hhyde@goodwinprocter.com | Litigation | Contingent, Unliquidated, Disputed | | | $5,968,702.00 |
| 28 | Ecka Granules of America Attn: General Counsel 500 Prosperity Drive Orangeburg, SC 29115 | Ecka Granules of America Attn: General Counsel PHONE: 919-287-9815 FAX: 803-928-5102 EMAIL: info@ecka-granules.com | Litigation | Contingent, Unliquidated, Disputed | | | $5,100,000.00 |
| 29 | Tata America International Corporation Attn: General Counsel 101 Park Ave, Fl 26 New York, NY 10178-0002 | Tata America International Corporation Attn: General Counsel PHONE: 212 867 8652 FAX: 212 557 8038 EMAIL: srai@memc.com | Trade | Contingent, Unliquidated, Disputed | | | $4,927,178.95 |
| 30 | Inelsa UK, LTD Veronica Miguez Magdalena 3 More London Riverside London,  SE1 2RE United Kingdom | Inelsa UK, LTD Veronica Miguez Magdalena PHONE: 34 986 727024 FAX: 34 986 724379 EMAIL: vmiguez@grupohedomin.com; inelsa@inelsa.com | Trade | Contingent, Unliquidated, Disputed | | | $4,815,654.95 |
| 31 | MOTECH Industries Inc. Attn: General Counsel No. 2, Dashun 9th Rd Xinshi District Tainan City,  74145 Taiwan | MOTECH Industries Inc. Attn: General Counsel PHONE: 886-6-5050789 EMAIL: info@motech.com.tw | Trade | Contingent, Unliquidated, Disputed | | | $3,809,702.04 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 32 | Pro Tech Energy Solutions LLC Attn: General Counsel 215 Executive Drive Moorestown, NJ 08057 | Pro Tech Energy Solutions LLC Attn: General Counsel PHONE: 856-437-6220 FAX: 856-437-6501 EMAIL: info@protechenergysolutions.com | Trade | Contingent, Unliquidated, Disputed | | | $3,682,876.76 |
| 33 | ZHONGHUAN HONG KONG HOLDING LIMITED Attn: General Counsel No. 12 East Haitai Road Huayuan Industrial Park Hi-tech Industrial Zone Tianjin, China | ZHONGHUAN HONG KONG HOLDING LIMITED Attn: General Counsel PHONE: 86-022-23789766 EMAIL: tjsc@tjsemi.com | Trade | Contingent, Unliquidated, Disputed | | | $3,276,644.00 |
| 34 | Ameresco Inc Attn: Dominic Palma 111 Speen St, Ste 410 Framingham, MA 01701-2000 | Ameresco Inc Attn: Dominic Palma PHONE: 508-661-2200 FAX: 508-661-2201 EMAIL: dpalma@ameresco.com | Trade | Contingent, Unliquidated, Disputed | | | $3,001,259.97 |
| 35 | Dashiell Corporation Todd Clark 12301 Kurland Dr Fourth Floor Houston, TX 77034-4812 | Dashiell Corporation Todd Clark PHONE: 817-358-0270 FAX: 713-558-6600 EMAIL: todd.clark@dashiell.com | Trade | Contingent, Unliquidated, Disputed | | | $2,750,672.10 |
| 36 | Ernst & Young, LLP Attn: General Counsel One Commerce Square 2005 Market Street Ste 700 Philadelphia, PA 19103 | Ernst & Young, LLP Attn: General Counsel PHONE: 215-448-5000 FAX: 215-448-4069 | Trade | Contingent, Unliquidated, Disputed | | | $2,724,829.66 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| 37 | TSMC Solar North America, Inc. Attn:  General Counsel 2595 Junction Ave., Suite 202 San Jose, CA 95134 | TSMC Solar North America, Inc. Attn:  General Counsel PHONE: 408-678-2816 FAX: 408-678-2800 EMAIL: solarna@tsmc.com | Trade | Contingent, Unliquidated, Disputed | | | $2,658,182.80 |
| 38 | Borrego Solar System, Inc. Attn: General Counsel 5005 Texas Street, Suite 400 San Diego, CA 92108 | Borrego Solar System, Inc. Attn: General Counsel PHONE: 888-898-6273 FAX: 888-898-6778 EMAIL: | Trade | Contingent, Unliquidated, Disputed | | | $2,534,630.10 |
| 39 | Appaloosa Investment Limited Partnership I Attn:  David J. Margules and Elizabeth A. Sloan Ballard Spahr LLP 919 North Market Street, 11th Floor Wilmington, DE 19801-3034 | Appaloosa Investment Limited Partnership I Attn:  David J. Margules and Elizabeth A. Sloan PHONE: 302-252-4466 FAX: 302-252-4432 EMAIL: margulesd@ballardspahr.com; sloane@ballardspahr.com | Litigation | Contingent, Unliquidated, Disputed | | | Undetermined |
| 40 | Vivint Solar, Inc. Attn: William B. Chandler, III; Bradley D. Sorrels 222 Delaware Avenue Ste 800 Wilmington, DE 19801 | Vivint Solar, Inc. Attn: William B. Chandler, III; Bradley D. Sorrels PHONE: 302-304-7600 FAX: 866-974-7329 EMAIL: wchandler@wsgr.com; bsorrels@wsgr.com; sgerman@wsgr.com; iliston@wsgr.com | Litigation | Contingent, Unliquidated, Disputed | | | Undetermined |

## EXHIBIT C

**List of Creditors Holding 5 Largest Secured Claims**

The following is a list of those creditors holding the 5 largest secured claims against the Debtors, on a consolidated basis, as of April 14, 2016. This list has been prepared from the books and records of the Debtors, and in accordance with Local Bankruptcy Rule 1007-2(a)(5), for filing in the Debtors' Chapter 11 Cases.

The information set forth herein shall not constitute an admission of liability by, nor is binding on, the Debtors and the failure to list a claim as contingent, disputed or subject to set off shall not be a waiver of any of the Debtors' rights relating thereto. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name and Address of Creditor | Amount of Claim | Collateral Description and Value |
|---|---|---|
| Wilmington Trust, NA<br>Global Capital Markets<br>W. Thomas Morris II<br>1100 North Market St<br>Wilmington, DE 19801-3034 | $950,000,000.00 | Collateral Description: Substantially all of the assets of certain of the Debtors<br>Value: Unknown |
| Wells Fargo Bank, NA<br>Attn:  SunEdison Administrator<br>101 North Phillips Avenue<br>One Wachovia Center<br>Sioux Falls, SD 57104 | $731,000,000.00 | Collateral Description: Substantially all of the assets of certain of the Debtors<br>Value: Unknown |
| R/C US Solar Investment Partnership, L.P.<br>Attn: General Counsel<br>c/o Riverstone Holdings LLC<br>712 Fifth Avenue, 36th Floor<br>New York, NY 10019 | $37,500,000.00 | Collateral Description: Equity interests in Silver Ridge Power, LLC<br>Value: Approximately $37,500,000.00 |

| Name and Address of Creditor | Amount of Claim | Collateral Description and Value |
|---|---|---|
| Expeditors International, Inc.<br>Attn:  Joseph Markus<br>610 Lambert Pointe Dr<br>Hazelwood, MO 63042 | $5,037,861.00 | Collateral Description: Certain assets such as solar modules, equipment, turbines, and/or substation materials<br>Value: Unknown |
| XCEL Energy<br>Attn:  Scott Wilensky, EVP and General Counsel<br>414 Nicollet Mall<br>Minneapolis, MN 55401 | $2,513,450.00 | Collateral Description: Certain assets such as solar modules, equipment, turbines, and/or substation materials<br>Value: Unknown |

## EXHIBIT D

### List of Officers' and Directors' Share Holdings

| Name | Position | Number of Common Shares Held |
|------|----------|------------------------------|
| Stephen Cerrone | Executive Vice President and Chief Human Resources Officer | 80,000 |
| Ahmad Chatila | President, Chief Executive Officer and Director | 214,282 |
| Clayton C. Daley Jr. | Director | 21,100 |
| Emmanuel T. Hernandez | Director | 49,000 |
| Georganne C. Proctor | Director | 1,000 |
| James B. Williams | Director | 30,000 |
| Brian Wuebbels | Executive Vice President, Chief Administration Officer and Chief Financial Officer | 50,000 |
| Randy H. Zwirn | Director | 25,000 |

## <u>EXHIBIT E</u>

### List of Property Pledged or Held by Third Party

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), Exhibit E provides a list of all the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

In the ordinary course of business, certain property of the Debtors is likely to be in the possession of various third parties, including, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledgees, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. Because of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## <u>EXHIBIT F</u>

**List of Premises Owned, Leased or Held Under Other Arrangement From Which
the Debtors Operate their Businesses**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| **<u>Premises Location</u>** | **<u>Interest in Property</u>** | **<u>Usage</u>** |
|---|---|---|
| 1040 Whipple St.<br>Prescott, AZ 86305 | Lease | Office |
| 1039-B North McDowell Boulevard<br>Petaluma, CA 94954 | Lease | Office |
| 600 B Street<br>San Diego, CA 92101 | Lease | Office |
| 3526 Brian Way<br>Bakersfield, CA 93305 | Lease | Office/Warehouse |
| 600 Clipper Drive<br>Belmont, CA 94002 | Lease | Office |
| 31570 Railroad Canyon Road<br>Canyon Lake, CA 92587 | Lease | Office |
| 590 Levy Road<br>Folsom, CA 95630 | Lease | Storage |
| 1654 Illinois Ave, Unit 9<br>Perris, CA 92571 | Lease | Office/Warehouse |
| 44 Montgomery Street<br>San Francisco, CA 94104 | Lease | Office |
| 42015 Remington Ave<br>Temecula, CA 92590 | Lease | Office/Warehouse |
| 1875 Lawrence Street<br>Denver, CO 80202 | Lease | Office |
| 1099 Alakea Street<br>Honolulu, HI 96813 | Lease | Office |
| 179 Lincoln Street<br>Boston, MA 02111 | Lease | Office |
| 305 Foster Street<br>Littleton, MA 01460 | Lease | Office |
| 7550 Wisconsin Avenue<br>Bethesda, MD 20814 | Lease | Office |
| 7551 Wisconsin Avenue<br>Bethesda, MD 20814 | Lease | Office |
| Lafayette Center<br>2 Chabot St.<br>Kennebunk, ME 04043 | Lease | Office |
| 129 Middle Street<br>Portland, ME 04101 | Lease | Office |
| 21900 Minnetonka Blvd<br>Suite 210<br>Excelsior, MN 55331 | Lease | Office |
| 13736 Riverport Drive<br>Riverport, MO 63043 | Lease | Office |

| **Premises Location** | **Interest in Property** | **Usage** |
|---|---|---|
| 3199 Riverport Tech Center Drive<br>Riverport, MO 63043 | Lease | Warehouse |
| 76 Stirling Road<br>Warren, NJ 07059 | Lease | Office |
| 6965 Speedway Boulevard<br>Las Vegas, NV 89115 | Lease | Storage |
| 4910 Camp Rd.<br>Hambug, NY 14075 | Lease | Office/Warehouse |
| 250 Vesey Street<br>New York, NY 10080 | Lease | Office |
| 1414 Radcliffe St.<br>Bristol, PA 19007 | Lease | Office |
| 1095 Evergreen Circle, Suite 200<br>Houston, TX 77380 | Lease | Office |
| 700 Lavaca<br>Austin, TX 78701 | Lease | Office |
| 1426 E. 750 N<br>Orem, UT 84097 | Lease | Office |
| Jackson Square<br>11 Lorong 3 Toa Payoh<br>Singapore 319579 | Lease | Office |

## EXHIBIT G

### Location of Debtors' Substantial Assets, Books and Records

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

The Debtors, in addition to their non-Debtor affiliates, have significant assets worldwide, including significant assets held outside the United States through direct and indirect subsidiaries of the Debtors.

The Debtors' books and records, stock certificates and substantial assets are located in their executive offices as set forth below.

|    | **Debtor Name** | **Office Address** |
|----|----|----|
| 1  | SunEdison, Inc. | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 2  | SunEdison Holdings Corporation | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 3  | SunEdison Utility Holdings, Inc. | 179 Lincoln Street, Suite 500 Boston, MA 02111 |
| 4  | SunEdison International, Inc. | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 5  | SUNE ML 1, LLC | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 6  | MEMC Pasadena, Inc. | 3000 North South Street Pasadena, Texas 77503 |
| 7  | Solaicx | 7832 N Leadbetter Road Portland, OR 97203 |
| 8  | SunEdison Contracting, LLC | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 9  | NVT, LLC | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 10 | NVT Licenses, LLC | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 11 | Team-Solar, Inc. | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 12 | SunEdison Canada, LLC | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 13 | Enflex Corporation | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |

|    | **Debtor Name** | **Office Address** |
|----|-----------------|--------------------|
| 14 | Fotowatio Renewable Ventures, Inc. | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 15 | Silver Ridge Power Holdings, LLC | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 16 | SunEdison International, LLC | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 17 | SunEdison LLC | 7550 Wisconsin Ave, 9th Floor Bethesda, MD 20814 |
| 18 | SUNE Wind Holdings, Inc. | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 19 | SUNE Hawaii Solar Holdings, LLC | 179 Lincoln Street, Suite 500 Boston, MA 02111 |
| 20 | First Wind Solar Portfolio, LLC | 179 Lincoln Street, Suite 500 Boston, MA 02111 |
| 21 | First Wind California Holdings, LLC | 179 Lincoln Street, Suite 500 Boston, MA 02111 |
| 22 | SunEdison DG, LLC | 250 Vesey Street, 26th Floor New York, NY 10080 |
| 23 | SunEdison Products Singapore Pte. Ltd. | 9 Battery Road #15-01 Straits Trading Building Singapore 049910 |
| 24 | SunEdison Residential Services, LLC | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 25 | PVT Solar, Inc. | 13736 Riverport Drive, Maryland Heights, MO 63043 |
| 26 | SEV Merger Sub Inc. | 13736 Riverport Drive, Maryland Heights, MO 63043 |

## EXHIBIT H

### Litigation

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following provides a list of the nature and present status of actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of the Debtors' property may be imminent.

| Debtor | Plaintiff | Nature of Claim | Status | Court and Jurisdiction |
|---|---|---|---|---|
| SunEdison, Inc. | Renova Energia S.A. | Contract dispute | Demand letter received. | N/A |
| SunEdison, LLC | Fortis Advisors LLC, Khosla Ventures II LP, Khosla Ventures III LP, Sigma Assocs. 8, L.P., Sigma Partners 8, L.P., Sigma Investors 8, L.P., and Energy & Environment First Investment L.P. | Contract dispute | Court entered writ of attachment for $5,968,702 against SunEdison, LLC on 4/14. Answer due on 4/21. | San Francisco, California Superior Court |
| SunEdison, Inc. | MSSA S.A.S. and MSSA Company Corporation | Claim for past due amounts | Court issued TRO, which will be extended for 14 days. MSSA seeks writ of attachment for $1,720,316. | District Court of Harris County, Texas |
| SunEdison, Inc. | MSSA S.A.S. and MSSA Company Corporation | Claim for past due amounts | Arbitration notice has been delivered to SunEdison, Inc. Deadline to answer was April 14. | International Chamber of Commerce |
| SunEdison, Inc., SunEdison Holdings Corporation | BTG Pactual Brazil Infrastructure Fund II, P2 Brasil Private Infrastructure Fund II, L.P., P2 Fund II LAP Co-Invest, L.P., P2 II LAP Co-Invest UK, L.P., GMR Holding B.V., Roberto Sahade | Contract dispute | Pending lawsuit revived after SunEdison failed to make second settlement payment. | New York State Court |

| Debtor | Plaintiff | Nature of Claim | Status | Court and Jurisdiction |
|--------|-----------|-----------------|--------|------------------------|
| SunEdison, Inc. | Employee/Former Employee | ERISA claim | Awaiting ruling on motion to reconsider. | Eastern District of Missouri and St. Louis County, Missouri State Court |
| SunEdison, Inc. | Meridian | Payment dispute | Writ of attachment denied. Answer due on 4/18. | Massachusetts State Court |
| SunEdison, Inc. and SunEdison Holdings Corporation | Appaloosa Investment Limited Partnership I | Claims allege breach of fiduciary duties | Answer to amended complaint due in May. | Delaware Chancery Court |
| SunEdison LLC | Cream Hill Clean Energy | Contract dispute | Answer filed on 4/15. | U.S. District Court, District of Connecticut |
| SunEdison, Inc. | Solomonedwardsgroup, LLC | Contract dispute | 60 day extension to answer complaint. | St. Louis, Missouri State Court |
| SunEdison, Inc. | Supplysource DC, LLC | Contract dispute | Deadline to respond to complaint on 4/18. | Virginia State Court |
| SunEdison, Inc., NVT Licenses LLC, NVT LLC | Atlantic Speciality Insurance Co. | Contract dispute | Deadline to respond to complaint forthcoming. | Eastern District of Missouri |
| SunEdison, Inc. | ECKA Granules of America | Contract dispute | Deadline to respond to complaint on 4/18. | District of South Carolina |
| SunEdison, Inc. and SEV Merger Sub Inc. | Vivint Solar, Inc. | Contract dispute | Deadline to respond to complaint on 4/20. | Delaware Chancery Court |
| SunEdison, Inc. | Packaging Specialties, Inc. | Contract dispute | Deadline to respond to complaint on 4/21. | Ohio State Court |
| Soliax, Inc. | Shin-Etsu Quartz Products Co. LTD | Contract dispute | Deadline to respond to complaint on | Oregon State Court |

| Debtor | Plaintiff | Nature of Claim | Status | Court and Jurisdiction |
|---|---|---|---|---|
| | | | 4/30. | |
| SunEdison, LLC | Valley Home Improvement, Inc. | Contract dispute | Deadline to respond to complaint on 4/21. | Massachusetts State Court |
| SunEdison, Inc. | Former employee | Arbitration demand | Deadline to respond to arbitration demand was 4/10. | N/A |
| SunEdison, Inc. and SunEdison Holdings Corporation | TerraForm Global, Inc. | Contract dispute | Deadline to respond to complaint on 4/25. | Delaware Chancery Court |
| SunEdison, LLC | Kern Solar | Contract dispute | Deadline to respond to complaint forthcoming. | Pennsylvania state court |
| SunEdison, Inc. | Aerotek | Contract dispute | Deadline to respond to complaint on 4/27. | Eastern District of Missouri |

## EXHIBIT I

### The Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name | Position |
| --- | --- |
| Ahmad R. Chatila | President, Chief Executive Officer and Director |
| Brian Wuebbels | Executive Vice President, Chief Administration Officer and Chief Financial Officer |
| Ilan Daskal | Executive Vice President and Chief Financial Officer Designee |
| Stephen Cerrone | Executive Vice President and Chief Human Resources Officer |
| Martin H. Truong | Senior Vice President, General Counsel and Secretary |

Mr. Chatila has served as President, Chief Executive Officer and as a director since March 2, 2009. Prior to joining SunEdison, Mr. Chatila served as Executive Vice President, Memory and Imaging Division of Cypress Semiconductor Corporation from July 2005 to February 2009. From September 2004 to June 2005, Mr. Chatila was the Vice President of Operations of the Cypress Memory and Imaging Division, and before that he served as Managing Director of the low power memory business unit in the Memory and Imaging Division from January 2003 to September 2004. Mr. Chatila initially joined Cypress in 1991 and held a number of management roles in wafer technology development, manufacturing and sales since that time, including the positions described above. From November 1997 to December 1999, Mr. Chatila worked for Taiwan Semiconductor Manufacturing Company (TSMC) as Senior Account Manager, before rejoining Cypress in January 2000.

Mr. Wuebbels became SunEdison's Executive Vice President and Chief Financial Officer in May of 2012 and in December 2014 was given the additional role of Chief Administration Officer. Previously, Mr. Wuebbels served as SunEdison's Vice President and General Manager - Balance of System Products. At SunEdison, he has also served as Vice President, Solar Wafer Manufacturing, Vice President of Financial Planning and Analysis, and Vice President Operations Finance. Before joining SunEdison in 2007, Mr. Wuebbels was Vice President and CFO of Honeywell's Sensing and Controls Business. Prior to Honeywell, Mr. Wuebbels spent 10 years at the General Electric Company in various senior finance and operations roles in multiple businesses around the world.

Mr. Daskal was appointed as SunEdison's Chief Financial Officer Designee and Executive Vice President on April 1, 2016.  Prior to joining SunEdison, Mr. Daskal served as the interim chief financial officer of Aricent Inc., a product engineering services company, and a board member and chairman of the audit committee of Ixia, a leading provider of network testing, visibility and security solutions.  Mr. Wuebbels will

remain SunEdison's Chief Financial Officer until Mr. Daskal and SunEdison agree to remove the designee title.

Mr. Cerrone became SunEdison's Executive Vice President and Chief Human Resources Officer in January 2016. Previously, Mr. Cerrone served as SunEdison's Senior Vice President and Chief Human Resources Officer. Prior to joining SunEdison in 2015, Mr. Cerrone led his own consulting firm, focused on HR strategy development, organizational culture change, HR analytics, and executive coaching. Prior to that, Stephen was EVP of HR for Sara Lee Corporation, leading HR strategy for more than 44,000 employees in 40 countries. Before joining Sara Lee, he served as EVP, Human Resources, Retail Financial Services at JPMorgan/Bank One Corporation, and has held prior executive positions at Bank One, Diageo/Burger King and General Foods Worldwide.

Mr. Truong became SunEdison's Vice President, General Counsel and Secretary in April of 2013 and was promoted to Senior Vice President in April of 2014. Mr. Truong joined SunEdison in February 2008 and has held various roles of increasing responsibility and most recently served as SunEdison's Assistant General Counsel with legal responsibilities for Emerging Markets, Solar Materials and intellectual property licensing and monetization.

## EXHIBIT J

**Debtors' Payroll for the 30 Day Period Following the Filing of the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $3,640,242 (weekly) |
| Payments to officers, directors, and stockholders | $196,731 |
| Payments to financial and business consultants | $3,000,000 |

## EXHIBIT K

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day
Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Net Operating Receipts | $112M |
| Net Operating Disbursements | $215M |
| Net Operating Cash Loss | ($103M) |
| Unpaid Obligations (excluding professional fees) | $49.3M |
| Unpaid Receivables (excluding professional fees) | $7.7M |