**Hearing Date: Apr. 22, 2016 at 11:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: Apr. 22, 2016 at 11:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (*pro hac vice pending*)
Louis S. Chiappetta (*pro hac vice pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **SUNEDISON, INC.,** *et al.*, | : Case No. 16-10992 (SMB) |
| | : |
| Debtors.[1] | : (Joint Administration Pending) |
| | : |
| | : |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
BANKRUPTCY CODE SECTIONS 105, 345, 363, 364, 503, 1107, AND 1108 AND
BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING CONTINUED USE OF
EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, BUSINESS FORMS,
AND PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) WAIVING
CERTAIN DEPOSIT REQUIREMENTS, AND (III) AUTHORIZING CONTINUANCE
OF INTERCOMPANY TRANSACTIONS AND HONORING CERTAIN RELATED
PREPETITION OBLIGATIONS**

SunEdison, Inc. ("SunEdison") and certain of its affiliates, the debtors and debtors

in possession in the above-captioned cases (collectively, the "Debtors" and, together with their

non-Debtor affiliates, the "Company"),[2] hereby move (the "Motion") this Court for entry of an

interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") and a

final order substantially similar to the Interim Order, but on a final basis and substantially in the

form attached hereto as Exhibit B (the "Final Order"), pursuant to sections 105, 345, 363, 364,

503, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules

6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a)

authorizing, but not directing, the Debtors to continue using their existing cash management

system, bank accounts, and business forms, and to pay related prepetition obligations,

(b) waiving any applicable deposit requirements, and (c) authorizing the continuance of

intercompany transactions and honoring certain related prepetition obligations including, to the

extent applicable, granting administrative expense status to postpetition intercompany claims

between and among the Debtors pursuant to Bankruptcy Code section 503(b)(1). In support of

the Motion, the Debtors rely upon and incorporate by reference the Declaration of Patrick M.

Cook, Vice-President – Capital Markets And Corporate Finance of SunEdison, Inc., in Support

of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed with the

---

[2]    For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc. and
Terraform Global, Inc., and each of their respective direct and indirect subsidiaries, unless otherwise provided.

Court concurrently herewith. In further support of the Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The predicates for the relief requested herein are Bankruptcy Code sections 105, 345, 363, 364, 503(b), 1107, and 1108.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors have requested that the Chapter 11 Cases be jointly administered.

4.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

5.      To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the Southern District of New York (the "United States Trustee"). No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

6.      SunEdison is one of the world's leading developers of renewable-energy solutions. In addition to its development business, SunEdison owns, operates and/or provides maintenance services for clean power generation assets. SunEdison's renewable-energy

development business is a global enterprise with substantial development activities on six continents.

7.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.[3]

## RELIEF REQUESTED

8.      By this Motion, the Debtors request entry of Interim and Final Orders (a) authorizing the Debtors to continue using their existing cash management system, bank accounts, and business forms, in each case subject to changes that they may make thereto in their sole discretion, and to pay related prepetition obligations, (b) waiving any applicable deposit requirements imposed by Bankruptcy Code section 345(b), the Region 2 United States Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (Nov. 27, 2013) (the "U.S. Trustee Guidelines"), or otherwise, and (c) authorizing the Debtors to continue their Intercompany Transactions (as defined herein) in the ordinary course of business and to honor certain prepetition amounts related thereto including, to the extent applicable, granting administrative expense status to postpetition intercompany claims between and among the Debtors pursuant to Bankruptcy Code section 503(b)(1).

9.      The Debtors propose to serve a copy of any Interim Order granting this Motion within three (3) business days after entry thereof. The Debtors further request that the

---

[3]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration or in the Interim Order (I) Authorizing Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(b) and (c) (the "Interim DIP Order" and, together with any related final orders, the "DIP Financing Orders"), as applicable.

Court (a) set a deadline for filing objections to the Motion and entry of the Final Order, (b) set a final hearing on the Motion within forty-five (45) days of the entry of the Interim Order, and (c) enter the Final Order on this Motion at or after such final hearing.

10.    For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders, and other parties in interest, and therefore, should be granted.

## BASIS FOR RELIEF

11.    To support their global operations and their renewable-energy development business, the Debtors maintain a complex and comprehensive cash management system (the "Cash Management System"). The Cash Management System facilitates the efficient flow and management of funds involved in the Debtors' operations, and is a critical component of the comprehensive system for managing cash that supports the Debtors' overall business enterprise.

12.    In connection with the Cash Management System, the Debtors maintain forty-eight (48) bank accounts (collectively, the "Bank Accounts") at various banks in the United States, the United Kingdom, Spain, and Singapore (collectively, the "Banks"). A list of the Bank Accounts (the "Account List") is attached hereto as Exhibit C.[4] The Account List identifies the type of account and indicates the owner of each Bank Account.

13.    The Bank Accounts are primarily utilized to pay operating expenses, although the Debtors do maintain a single investment account, which has been idle for six months. The Debtors routinely deposit, withdraw, and otherwise transfer money to, from, and

---

[4]    The Debtors believe that Exhibit C is a complete list of their Bank Accounts. To the extent that any Bank Account has been omitted from that list, the Debtors request that the order granting the relief sought herein apply to any and all Bank Accounts actually in, or linked to, the Cash Management System.

between certain of the Bank Accounts by various methods (collectively, the "Ordinary Transfer Methods"), including by wires, automated clearing house transfers, and other electronic funds transfers. In the aggregate, on a monthly basis, the Debtors' businesses generate roughly 10,000 deposits, withdrawals, or transfers to, from and between the Bank Accounts, using various Ordinary Transfer Methods.

14.    A chart reflecting the flow of funds through the Bank Accounts in the Cash Management System (the "Chart") is attached hereto as Exhibit D. The amount of funds that flow through the Cash Management System on a monthly basis fluctuates greatly.

15.    Finally, certain non-Debtor affiliated entities maintain bank accounts and associated cash management systems which are separate and independent from the Cash Management System. For example, as described in the First Day Declaration, the Company creates a special purpose entity (a "Project Co.") to develop and construct each renewable energy project (each a "Project") (or a group of related Projects). Each Project Co. has its own independent project financing to fund the development of its Project(s), including payments for goods provided and services rendered in connection with the Project(s). In many cases, an affiliated entity (such as Debtors NVT Licenses, LLC and Team-Solar, Inc.) acts as the general contractor and engineering, procurement, and construction provider ("EPCs") for a Project Co.'s Projects under development, resulting in cash payments from Project Co. to the EPC.

16.    In addition, the Company, particularly the Renewable Energy Operating Systems Segment, utilizes warehouse vehicles and other similar partnerships ("Warehouses") to finance the acquisition of operating renewable energy systems from the Renewable Energy Development segment or third parties. Warehouses typically have independent ownership and capital structures, and may provide funding for the construction of Projects which are designated

6

for sale to those Warehouses following completion. As the bank accounts and cash management systems for Project Cos. and Warehouses are independent from the Debtors' Bank Accounts and Cash Management System, and as much of the cash in such bank accounts is not property of the Debtors, SunEdison intends to maintain such independent bank accounts and cash management systems and continue the operations of the Project Cos. and Warehouses in the ordinary course.

## A.    Cash Management System

17.    The Debtors' Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds, and administers the Bank Accounts. In addition, the Debtors' Cash Management System is integrated into the cash management systems utilized by hundreds of affiliated non-Debtor entities globally. As described below, if the Debtors are unable to continue using its Cash Management System, the operations of the Debtors as well as the Company more broadly will be severely impeded. Upon the funding of the DIP Term Loans, the Debtors' cash shall be managed through a newly-implemented DIP Facilities Blocked Account (as defined below). The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising postpetition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) will be paid by the Debtors.

18.    **Operating Accounts**. The Debtors maintain thirty-eight (38) operating accounts (collectively the "Operating Accounts"), both in the United States and abroad. The majority of the Operating Accounts are located in the United States and used for U.S. dollar denominated transactions. However, one of the Operating Accounts belonging to Debtor NVT Licenses, LLC is located in the United Kingdom and used for transactions denominated in British pounds, and two other Operating Accounts belonging to NVT Licenses, LLC are located

7

in Spain and used for transactions denominated in Euros and transactions denominated in British pounds. Furthermore, five of the Operating Accounts belonging to Debtor SPS are located in Singapore and utilized for transactions denominated in U.S. dollars, Singapore dollars, Euros, Canadian dollars, and Taiwanese dollars. The Operating Accounts receive funds from various internal and external sources, including, among others: (a) funds from external financings and completion of asset sales; (b) dividends from subsidiary holding companies upon the completion and transfer of Projects owned by special purpose vehicles; (c) funds from affiliated EPCs (including payments from Project Cos. to EPCs as described above); (d) funds from intercompany loans and cash advances; and (e) funds from subsidiary suppliers. Operating Accounts belonging to the residential and small commercial business unit ("RSC") and RSC's affiliated EPCs also receive funds from dealers who are partners in the sales and distribution network for the RSC businesses, as well as *de minimis* rebates from utilities companies. Direct wire transfers from the Operating Accounts are made to directly fund various non-Debtor accounts, including, *inter alia*, accounts belonging to (i) Cigna and Transamerica, certain of the Debtors' third-party benefits administrators, (ii) ADP, to fund the Debtors' payroll and associated tax obligations, (iii) third party vendors,[5] (iv) subsidiary holding companies, and (v) with respect to the RSC Operating Accounts, dealers.[6]

19.    **Controlled Disbursement Accounts**. The Debtors maintain three (3) controlled disbursement accounts (collectively, the "CD Accounts"), which are associated with corresponding Operating Accounts. Funds are transferred from Operating Accounts to CD

---

[5]    In connection with such payments to third party vendors, the Debtors may assign their ability to issue purchase orders, or previously issued and outstanding purchase orders, to Project companies.

[6]    The two Operating Accounts belonging to SunEdison DG LLC held at Wells Fargo Bank are pass-through accounts routinely swept to Operating Accounts within the Cash Management System.

Accounts as needed for immediate payment of the Debtors' obligations which are due and owing, specifically obligations payable to external vendors, reimbursements and other non-payroll obligations owed to employees, and obligations payable to internal, wholly-owned EPCs. The CD Accounts are each swept to the associated Operating Accounts on a daily basis. The CD Accounts transfer funds to non-affiliates via ACH or checks, and transfer funds to affiliates via book transfers, wire transfers, or ACH.

20.     **Investment and Other Dormant Accounts**.   The Debtors maintain a single idle investment account (the "Investment Account") with Wells Fargo Bank. The Debtors use the Investment Account to invest excess funds pursuant to its Investment and Deposit Practices (as described below). The Debtors have not maintained funds in the Investment Account in approximately six months, and do not intend to utilize the Investment Account during the pendency of these Chapter 11 Cases. In addition, the Debtors maintain five dormant accounts with zero balances, including three collateral accounts (the "Collateral Accounts") with Wells Fargo Bank. The Collateral Accounts were recently opened in January 2016, but have remained dormant.

21.     **Non-Debtor Accounts**.   As noted in the First Day Declaration, the Debtors represent only a small segment of the hundreds of legal entities which collectively compose the complex corporate structure of the Company. The non-Debtor entities, foreign and domestic, maintain numerous bank accounts at various institutions around the world. As set forth in greater detail below, intercompany transfers from the Bank Accounts maintained by the Debtors to those maintained by the non-Debtor entities are critical to both the operation of the Company's global business and the preservation of the Debtors' going-concern value. Furthermore, the Debtors hold beneficial interests in numerous trust accounts which are legally

owned by special purpose vehicles associated with ongoing Projects. Given that title in these trust accounts are held by non-Debtor entities, and that the Debtors do not have access to these trust accounts, such accounts are omitted from <u>Exhibit C</u> hereto.

22.      As the foregoing overview reflects, the Cash Management System is specifically designed for administering the Debtors' Project development business, and cannot be altered without disruption to the Debtors' business operations. The Debtors therefore request that the Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System using the Ordinary Transfer Methods in accordance with the agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements, bank account terms and conditions, or treasury services agreements (collectively, the "<u>Bank Account Agreements</u>").

23.      The Debtors further request that they be authorized to implement any changes to the Cash Management System that they deem appropriate in their sole discretion, including, without limitation, closing Bank Accounts or opening new bank accounts, subject to the terms and conditions as set forth in the Bank Account Agreements. The Debtors request that the applicable Banks be authorized to honor the Debtors' directions with respect to the opening or closing of any bank account.

**B.      The DIP Financing[7]**

24.      **<u>DIP Facilities Blocked Accounts</u>**. In connection with the DIP Term Loans, SunEdison has opened a deposit account (the "<u>DIP Facilities Blocked Account</u>"), subject to a blocked account control agreement, in form and substance reasonably satisfactory to

---

[7]      Capitalized terms used but not otherwise defined in this section shall have the meaning ascribed to them in the Interim DIP Order or the DIP Credit Agreement.

Deutsche Bank, in its role DIP Agent and the Tranche B Advisors.  Subject to the terms and conditions set forth in the DIP Credit Agreement, proceeds of the DIP Term Loans, Budgeted Asset Sale Proceeds and certain specified Net Insurance/Condemnation Proceeds shall be deposited in the DIP Facilities Blocked Account, and such proceeds shall be disbursed, in each case, in accordance with the DIP Budget (subject to any cushion or additional amount permitted in accordance with the DIP Credit Agreement).  In addition, the DIP Agent shall have established a blocked account (the "Collateral Proceeds Account") under the sole dominion and control of the DIP Agent.  All Non-Budgeted Asset Sale Proceeds and all Net Insurance/Condemnation Proceeds, unless otherwise specified in the DIP Credit Agreement, shall be deposited in the Collateral Proceeds Account, and such proceeds shall be applied by the DIP Agent to repay the Obligations in accordance with the terms and conditions set forth in the DIP Credit Agreement.  Furthermore, the Debtors' Cash Management System shall be maintained in accordance with the terms of the DIP Credit Agreement and the DIP Financing Orders.

> 25.     The DIP Loan Documents also permit the Project Cos. to continue to access and draw down upon available non-recourse indebtedness (as scheduled in the DIP Loan Documents) in order to fund ongoing Project development and construction subject to the terms and conditions set forth in the DIP Credit Agreement.  Specifically, the Project Cos. will continue to utilize proceeds from available Project financing to pay Project vendors in the ordinary course subject to the terms and conditions set forth in the DIP Credit Agreement.  In the event that the Company undertakes to develop a new Project (either from its existing development pipeline or another source), and to the extent that the Company requires new Project financing in connection with such new Project, the incurrence of such new Project

11

financing shall be subject to lender approval as set forth in the DIP Loan Documents and subject

to the terms and conditions of the DIP Credit Agreement. Such new Project financing, as well as

continued draws upon existing Project financing, shall be subject to any of the applicable terms

and conditions set forth in the DIP Loan Documents and the DIP Financing Orders, as applicable.

## C.    Business Forms and Investment and Deposit Practices

26.    In the ordinary course of business, the Debtors may use a number of

checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and

other business forms and correspondence (collectively, the "Business Forms"). Given that the

Business Forms were used prepetition, they do not include references to the Debtors' current

status as debtors in possession. Most parties doing business with the Debtors undoubtedly will

be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding

these Chapter 11 Cases and the notice of commencement of these Chapter 11 Cases that has been

or will soon be provided to parties in interest. As is the case with the existing Cash Management

System, requiring the Debtors to change existing Business Forms would unnecessarily distract

the Debtors from their restructuring efforts and impose needless expenses on the estates, without

any meaningful corresponding benefit.

27.    Historically, the Debtors have invested excess cash in accordance with

clearly established internal policies (the "Investment and Deposit Practices"). As of the Petition

Date, the only account maintained by the Debtors for these purposes is the Investment Account,

which has been idle for six months. The Debtors do not intend to maintain their excess cash in

the Investment Account during the pendency of the Chapter 11 Cases, and therefore the Debtors

are not seeking a waiver of the requirements of Bankruptcy Code section 345(b) with respect to

the Investment Account.

**D.    Intercompany Transactions**

28.    In the ordinary course of business, the Debtors have engaged in various intercompany financial transactions with Debtors and non-Debtor affiliates, both foreign and domestic (collectively, the "Intercompany Transactions"). The Intercompany Transactions include, but are not limited to, the following:

- Payments or transfers from a Debtor to another Debtor or a non-Debtor affiliate giving rise to claims ("Intercompany Claims");

- Loans among Debtors and other Debtors or non-Debtors ("Intercompany Loans"); and

- Capital contributions and other investments made by Debtors with respect to other Debtors and non-Debtors ("Intercompany Investments").

29.    The Debtors maintain records of transfers of cash to trace, and account for, these Intercompany Transactions. The continuance of these transactions postpetition (each a "Postpetition Intercompany Transaction") is an essential component of the Cash Management System, particularly in light of the Company's complex corporate and operational structure. The Debtors will continue to maintain records of such Postpetition Intercompany Transactions, and respectfully request, pursuant to Bankruptcy Code sections 364(b) and 503(b), that postpetition payments on account of such Postpetition Intercompany Transactions among Debtors be granted administrative expense status.

30.    **Intercompany Claims**. The Debtors maintain ordinary business relationships with their non-Debtor affiliates, involving routine transfers of cash to and from each entity's Bank Accounts. Intercompany Claims arise from such transfers, which may be completed in connection with the following illustrative list of transactions:

- *Payroll*. The Debtors process payroll on behalf of the Debtors and other non-Debtor affiliates. In certain cases, the Debtors fund payroll for certain non-Debtor affiliates as well (for example, payroll obligations for certain wholly-owned foreign entities is funded by certain Debtor entities). In the ordinary course of business, in accordance with the

13

Debtors' bi-weekly payroll periods, the Debtors fund payroll, payroll taxes, and other benefit amounts from the Operating Accounts to ADP.

- *Intercompany goods and services.* As described further in the First Day Declaration, certain of the Debtors (such as NVT Licenses, LLC and Team-Solar, Inc.) as well as additional non-Debtor affiliates, serve as EPCs providing goods and services to Projects under construction. These affiliated EPCs will acquire modules, trackers, and other materials, enter into interconnection agreements, and/or enter into subcontracting agreements, in each case for materials or services ultimately utilized by other Debtors and non-Debtor affiliates. Such goods and services are generally utilized by Project-owning entities, such as special purpose vehicles. The EPC receives the purchase order or invoice from vendors and subcontractors in connection with such goods or services, and the relevant affiliated entity transfers free cash to the EPC. The Debtors' records of accounts payable reflect intercompany amounts owed among EPC and non-EPC affiliated entities.

- *Centralized corporate and operational expenses.* The Debtors also incur centrally-billed expenses in various regions where they operate, including internal administrative functions, insurance coverage, advertising, compliance, and tax, as well as other costs incurred for the benefit of Debtor and non-Debtor entities. In addition, the Debtors provide certain services, including day-to-day management, accounting, administrative, and other support services to TerraForm Power, Inc., TerraForm Global, Inc., and certain of their affiliates pursuant to that certain Management Services Agreement dated as of July 23, 2014 with TerraForm Power, Inc., and that certain Management Services Agreement dated as of August 5, 2015 with TerraForm Global, Inc. (both agreements, including all exhibits, schedules, amendments, and other related documents thereto, respectively, collectively referred to as the "MSAs"), in exchange for payment of certain management fees as set forth in the MSAs.

31.     **Intercompany Loans**. In addition to the Intercompany Claims, the Debtors also utilize a system of Intercompany Loans to facilitate the flow of cash among the Debtors and their non-Debtor affiliates. For example, the Debtors and certain non-Debtor affiliates may loan cash to Project Cos. in order to assist those entities in proceeding with Project construction and conducting other operations in the ordinary course. One of the Company's core businesses of constructing and selling Projects is dependent upon the ready availability of cash sufficient to meet operating expenses at the Project level and the corporate level. Although the Company frequently obtains financing from lenders, partners, and other sources in order to fund the construction of specific Projects, such financing is often disbursed in segments after the

Project meets certain milestones. Accordingly, the Project Cos. may require additional cash between the dates of such disbursements in order to ensure that construction continues to progress on schedule. These ongoing cash needs are fulfilled from time to time by Intercompany Loans or Intercompany Investments, as appropriate, from Debtors or non-Debtor affiliates to Project Cos.

32.     Furthermore, Debtors and non-Debtor affiliates may also loan cash to corporate-level entities in order to fund general corporate expenditures in the ordinary course. Borrower entities typically will reimburse the applicable lender entities in the ordinary course of business from available free cash. Going forward, the Debtors and non-Debtor affiliates will engage in Intercompany Loans as necessary in order to preserve the value of the Debtors' business enterprises during the pendency of these Chapter 11 Cases.

33.     **Intercompany Investments**. Finally, the Debtors periodically make investments in other Debtors and in non-Debtor affiliates in the form of direct capital contributions in order to ensure that such entities have sufficient cash to continue operations in the ordinary course. As described in further detail in the First Day Declaration, the commencement of any Project requires that the Company make a capital contribution to a newly formed special purpose vehicle which will own, construct, and ultimately divest the completed Project. Such capital contributions are often funded by the Debtors, either directly or indirectly, and may pass through several intermediary levels of holding companies before ultimately vesting in the newly created vehicle. Project lenders often require evidence that the capital contribution has been made by the Company before consummating and disbursing Project financing. Without the ability to continue making such capital contributions, the Company's ability to continue operations, complete the development of existing Projects, and develop new Projects would be

15

severely impaired, placing the Company's future cash flows and operations in jeopardy to the detriment of the Company and all of its stakeholders. In addition, the Debtors and non-Debtor affiliates continue to make periodic capital contributions to other Debtors and non-Debtor affiliates on an as-needed basis, to fund working capital, post cash or other collateral to promote ongoing business operations, or support expansion and further investment in various new Projects. As noted above, the completion and subsequent divestiture of completed Projects is an important source of cash inflow to certain Operating Accounts, particularly the Operating Accounts of those Debtors (including SunEdison Inc., SunEdison Holding Corporation, and SunEdison International, Inc., among others) which do not otherwise engage in EPC or manufacturing-related activities. Without continued Intercompany Investments, the Project-level entities may lose an important source of cash to meet their ongoing cash needs, which would in turn put the continued construction of pending Projects at risk, ultimately endangering the Company's, and the Debtors', future cash flows, and impairing the value of the Company's, and the Debtors', business enterprises.

## APPLICABLE AUTHORITY

**A.    The Court Should Authorize Continued Use of the Existing Cash Management System and Related Bank Accounts in the Ordinary Course of Business**

34.    The Cash Management System and applicable procedures employed by the Debtors constitute ordinary, usual, and essential business practices and are similar to those used by other major corporate enterprises. The Cash Management System affords the Debtors significant benefits, including, among other things, the ability to: (a) control corporate funds centrally; (b) ensure the availability of funds when necessary; and (c) minimize administrative expenses by facilitating a more efficient movement of funds and monitoring of balance and presentment information. It would be unduly difficult and expensive for the Debtors to establish

a new cash management system.  The Debtors therefore request permission to use their existing Cash Management System.

35.    Allowing the existing Cash Management System to remain in place will facilitate a smoother transition into chapter 11 and will aid the Debtors' restructuring efforts. The Debtors are requesting, in this Motion and other motions filed concurrently herewith, authority, but not direction, to pay certain prepetition obligations.  With respect to certain of these obligations, the Debtors may have issued checks prior to the Petition Date that have yet to clear the relevant accounts.  Given the global scope of the Company's operations and the complex corporate structure of the Debtors' operating entities as described in the First Day Declaration, preservation of the Cash Management System and other relief requested herein will enable the Debtors and other parties in interest to ensure that transactions are readily ascertainable and adequately documented.

36.    In order to effectuate the purposes of this Motion, the Debtors request that all Banks be authorized to: (a) continue administering the Bank Accounts in the usual and ordinary course of business in accordance with the Debtors' instructions and pursuant to the Bank Account Agreements; (b) pay any and all checks, drafts, wires, or electronic funds transfers presented, issued, or drawn on the Bank Accounts on account of any claims arising prepetition or postpetition so long as sufficient funds are available in such Bank Accounts unless the Debtors specifically issue "stop payment" instructions with respect to such items in accordance with the terms of the Bank Account Agreements; (c) honor the Debtors' directions with respect to the opening or closing of any Bank Account; and (d) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions.

17

37.     The Debtors propose that such Banks be allowed to rely on any order entered on this Motion and on the Debtors' representations and instructions as to the payments and transfers that may be honored or dishonored in accordance with the terms of the Bank Account Agreements. The Debtors further propose that the Banks not be liable to any party on account of (a) following the Debtors' instructions or representations as to any order of the Court, and (b) honoring any checks, drafts, wires, or electronic funds transfers presented in a good faith belief that this Court has authorized the honoring of such checks, drafts, wires, or electronic funds transfers.

38.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtors in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of Bankruptcy Code section 363(c)(1) is to provide debtors in possession with the flexibility to engage in ordinary course transactions required to operate their businesses, without unneeded oversight by its creditors or the Court. See, e.g., Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997); In re Enron Corp., No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003); Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.), 207 B.R. 406, 409 (S.D.N.Y. 1997).

39.     The Debtors' ability to continue using the Cash Management System and engaging in related "routine transactions" falls within the parameters of Bankruptcy Code section 363(c). See Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1453 (10th Cir. 1996); Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.), 778 F.2d 617, 621 (11th Cir. 1985) (holding that a debtor's request for authority to continue using its existing cash management system is consistent with Bankruptcy Code section 363(c)(1)).

18

40.     To the extent that use of the existing Cash Management System is beyond the ordinary course of the Debtors' business, such use is permitted by Bankruptcy Code sections 363(b)(1) and 105(a). Bankruptcy Code section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) further provides that the Court may "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a).

41.     As another court in this District has previously stated, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Where there is a valid business justification for using property outside the ordinary course of business, the law presumes that, "'in making a business decision the directors of a corporation acted on an informed basis, in good faith[,] and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

42.     Under the circumstances and in light of the Debtors' belief that continued use of the Cash Management System is in the best interests of the estates, the Debtors request that the Court authorize the Debtors to continue using the Cash Management System, including related Bank Accounts.

**B.      The Court Should Authorize Continued Use of the Bank Accounts and the Business Forms**

43.      The U.S. Trustee Guidelines, among other restrictions and requirements, prohibit disbursements other than by numbered checks, which checks must bear the applicable debtor's case name and case number, a "debtor in possession" designation, and an indication of the account type. However, rigid adherence to the U.S. Trustee Guidelines would require, among other things, closure of prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtors in Possession" designation on them. Thus, enforcement of the U.S. Trustee Guidelines in these Chapter 11 Cases would disrupt the Debtors' business operations, impose burdensome expenses on the estates, and unnecessarily distract the Debtors from their reorganization efforts.

44.      In the ordinary course of business, the Debtors may also use other various Business Forms, including, but not limited to, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence. To minimize expenses, the Debtors seek authority to continue using the Business Forms, substantially in the forms existing immediately before the Petition Date and without any reference in such forms to the Debtors' status as debtors in possession. As with the Bank Accounts, requiring the Debtors to change their existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expense.

45.      Here, authorizing continued use of both the Bank Accounts and the Business Forms will make the Debtors' transition into chapter 11 smoother, less costly, and more orderly. Accordingly, the Debtors request that the Court exercise its equitable powers under Bankruptcy Code section 105(a) to waive compliance with the U.S. Trustee Guidelines and to authorize the Debtors to continue using their existing Bank Accounts and existing Business

20

Forms in the ordinary course of business on an interim basis for a period of forty-five (45) days and, ultimately, on a final basis. Notwithstanding this waiver, the Debtors will make reasonable best efforts to include a reference to their status as debtors in possession on the Business Forms.

## C.    The Court Should Authorize the Debtors to Honor Certain Prepetition Obligations Related to the Cash Management System

46.     In connection with the Cash Management System, the Debtors incur fees and other charges in connection with Bank services (the "Service Charges"), dishonored or returned checks, and other obligations under the Bank Account Agreements (collectively, all such fees and charges, the "Bank Account Claims"). Over the past four (4) months, monthly bank account charges have averaged approximately $10,000.

47.     As with the Cash Management System, payment of the Bank Account claims will minimize disruption to the Debtors' operations and is therefore in the best interests of the estates. Absent payment of the Bank Account Claims, the Banks might assert offset rights against the funds in the Bank Accounts on account of the Bank Account Claims, freeze the Bank Accounts, and/or refuse to provide services to the Debtors. The payment of Bank Account Claims will not prejudice unsecured creditors given that, as noted above, the Banks may have setoff rights with respect to the Bank Account Claims.

48.     Accordingly, pursuant to Bankruptcy Code sections 105(a) and 363(b), the Debtors seek authority, in their sole discretion, to pay and/or reimburse the Banks in the ordinary course of business for any Bank Account Claims arising prior to or after the Petition Date. The Debtors further request that the Bank Account Claims be granted administrative expense priority status pursuant to Bankruptcy Code section 503(b).

**D.      Cause Exists to Waive the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis**

49.      Section 345(a) of the Bankruptcy Code authorizes deposits or investments of estate money in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," Bankruptcy Code section 345(b) provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety, "unless the court for cause orders otherwise." Id. at 345(b).

50.      To help debtors comply with this section of the Bankruptcy Code, the U.S. Trustee has promulgated the U.S. Trustee Guidelines as well as a list of authorized depositories (the "Authorized Depositories") at which debtors may maintain bank accounts. Under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at an Authorized Depository.

51.      As noted above, however, courts may waive compliance with Bankruptcy Code section 345(b), and ultimately the U.S. Trustee Guidelines, for "cause." In evaluating whether "cause" exists, courts have considered a number of factors, including, among others, the sophistication and size of a debtor's business, the amounts of the investments involved, bank ratings, the complexity of the case, the debtor's safeguards for the funds, the debtor's ability to reorganize in the face of failure of one or more of the financial institutions, the benefit to the debtor of a waiver of the section 345(b) requirements, the potential harm to the estate, and the

22

reasonableness of such a waiver under the circumstances.   See In re Serv. Merch. Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

52.   The Debtors submit that the Company's corporate structure relies on a complex Cash Management System implicating multiple Bank Accounts on a daily basis.   All but two of the Debtors' domestic and foreign Bank Accounts are maintained with financial institutions on the U.S. Trustee's list of Authorized Depositories.   The Debtors' forty-eight accounts are located across four jurisdictions, maintained with five different financial institutions, and hold funds in six different currencies.   Nearly all of the Bank Accounts are maintained with Authorized Depositories, namely Citibank, Banco Popular, Silicon Valley Bank, TD Bank, and Wells Fargo; in fact, only two Bank Accounts are maintained with a non-Authorized Depository, Deutsche Bank, which is an internationally-recognized and highly rated financial institution. One Deutsche Bank account is located in the United Kingdom and maintains funds in British pounds, and the other is a lockbox account required under the DIP Loan Documents. Furthermore, the Debtors maintain only a single Investment Account with an Authorized Depository (Wells Fargo), which has had a zero balance for six months, and as set forth above, the Debtors do not intend to utilize the Investment Account during the pendency of these Chapter 11 Cases.

53.   Because these Bank Accounts are vital to the Debtors' Cash Management System, the Debtors submit that requiring the Debtors to transfer these funds to other banks would be unduly burdensome to the Debtors' operations, which must seamlessly operate across multiple jurisdictions and across multiple currencies.   Furthermore, the vast majority of the Bank Accounts are maintained with Authorized Depositories, and therefore the Debtors request that

ample cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts.

54.     Courts in this District have authorized debtors in other chapter 11 cases to maintain cash management systems and use their existing depository accounts, even when such accounts are located at foreign banks. See, e.g., In re Nautilus Holdings Ltd. et al., No. 14-22885 (Bankr. S.D.N.Y. June 23, 2014) (allowing debtors to maintain existing cash management system, including foreign bank accounts, for 45 days, subject to further extension); In re Excel Maritime Carriers LLC, No. 13-23060 (Bankr. S.D.N.Y. July 2, 2013) (allowing maintenance of several dozen bank accounts in overseas banks); In re Marco Polo Seatrade B.V. et. al., No. 11-13634 (Bankr. S.D.N.Y. Aug. 12, 2012) (allowing debtors to maintain existing cash management system without modification for over 120 days); In re B+H Carriers Ltd. et. al., No. 12-12356 (Bankr. S.D.N.Y. June 28, 2012) (allowing debtors to maintain existing cash management system containing many foreign bank accounts without modification for over 65 days); In re Gen. Mar. Corp., No. 11-15285 (Bankr. S.D.N.Y. Nov. 18, 2011) (allowing debtors to maintain existing cash management system containing many foreign bank accounts without modification for at least 40 days, including over 40 accounts at Nordea in the Cayman Islands); The Great Atlantic & Pacific Tea Co., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2011) (granting waiver of section 345 guidelines for investments with banks that are an authorized depository); In re Satelites Mexicanos, S.A. de C.V., No. 06-11868 (Bankr. S.D.N.Y. Oct. 26, 2006) (allowing maintenance of over a dozen foreign bank accounts, particularly several Mexican bank accounts).

55.     The Debtors further request that they be authorized, on an interim basis for forty-five (45) days and thereafter on a final basis, in their sole discretion, to close Bank

Accounts and open new bank accounts on notice to parties, if such action becomes necessary for any reason. In connection therewith, the Debtors request that the applicable Banks be authorized to honor the Debtors' directions with respect to the opening or closing of any bank account. The Debtors further request that any and all accounts opened by the Debtors on or after the Petition Date at any Bank be deemed a Bank Account (as if it had been opened prior to the Petition Date and included in the Account List) and that any and all Banks at which such accounts are opened similarly be subject to the rights and obligations of any order on this Motion.

**E.      The Court Should Authorize the Debtors to Continue to Engage in the Intercompany Transactions in the Ordinary Course of Business**

56.      The Debtors have routinely engaged in the Intercompany Transactions in the ordinary course of business, and submit that the continuation of the Postpetition Intercompany Transactions would be within the ordinary course of business. However, in an abundance of caution, the Debtors seek authority to enter into such Postpetition Intercompany Transactions in the ordinary course of business; provided, however, that any intercompany transfers, payments, or contributions made by the Debtors to, or on behalf of, or for the benefit of any non-Debtor affiliates, including, without limitation, TerraForm Power, Inc., TerraForm Power, LLC, TerraForm Global, Inc., and TerraForm Global, LLC, other than a secured guarantor under the DIP Facility shall be made subject to the DIP Budget. If the Debtors are permitted to continue entering into the Postpetition Intercompany Transactions in the ordinary course, the Debtors will continue to maintain records of Postpetition Intercompany Transactions, including records of intercompany accounts receivable and accounts payable.

57.      As noted above, pursuant to Bankruptcy Code section 363(b)(1), debtors in possession are authorized to use property of the estate other than in the ordinary course of business after notice and a hearing. The Intercompany Transactions facilitate the Debtors' day-

to-day operations, as well as the day-to-day operations of the non-Debtor affiliates, which continue to develop, construct, and complete various Projects, for the ultimate benefit of the Debtors and their stakeholders. Payments associated with the Intercompany Transactions received by the Debtors from their non-Debtor affiliates are important sources of liquidity for the Debtors. Without the ability to continue supporting the non-Debtor affiliates through the Intercompany Transactions, the Debtors' future cash flows and ongoing operations may be jeopardized, to the detriment of the Debtors and their estates. Thus, the Debtors submit that such relief under Bankruptcy Code section 363(b)(1) is appropriate, as entrance into Postpetition Intercompany Transactions is well within the sound business judgment of the Debtors.

58.    Additionally, the Debtors request that the Court authorize the Debtors, in their sole business judgment, to pay prepetition Intercompany Claims and Intercompany Loans in order to preserve the value of the Company as a whole and to preserve and enhance the value of the Debtors' estates. The Debtors, as debtors in possession with fiduciary duties towards their respective stakeholders, are under an obligation to "protect and preserve the estate, including an operating business's going-concern value." In re CoServe, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). In some instances, the Debtors may fulfill its fiduciary duty "by the preplan satisfaction of a prepetition claim," if the payment "is the only means to effect a substantial enhancement of the estate." Id.

59.    The Debtors engaged in ordinary course transactions giving rise to Intercompany Claims and Intercompany Loans in order to support the continued construction of ongoing Projects, among other things. To preserve the value of the Company worldwide, it is imperative that the non-Debtor affiliates continue to conduct their business in the ordinary course, and that the Debtors support such efforts, which will ultimately result in the enhancement of the

Debtors' estates upon completion and sale of the pending Projects by the non-Debtor affiliates. Accordingly, the Debtors should be authorized, in their discretion, to pay prepetition Intercompany Claims and Intercompany Loans, upon notice of any such payments to the U.S. Trustee and any official committee appointed in the Chapter 11 Cases.

60.     Finally, the Debtors request that claims arising from Postpetition Intercompany Transactions among Debtors be granted administrative expense priority status pursuant to Bankruptcy Code sections 364(a) and 503(b)(1). Such treatment is consistent with Bankruptcy Code section 364(a), which provides that, unless the Court orders otherwise, the Debtors are authorized to incur unsecured debt in the ordinary course of business allowable as an administrative expense under Bankruptcy Code section 503(b)(1). The requested relief is also an appropriate exercise of this Court's equitable powers under Bankruptcy Code section 105(a) and is further appropriate under Bankruptcy Code section 363. See, e.g., In re Gen. Growth Props., 412 B.R. 609, 610 (Bankr. S.D.N.Y. 2009) (holding that debtors were authorized to continue prepetition cash management practices, including intercompany transactions, under Bankruptcy Code sections 105(a) and 363(c)).

61.     Courts in this and other jurisdictions have routinely granted similar relief in other chapter 11 cases. See, e.g., In re Relativity Fashion, LLC et al., No. 15-11989 (Bankr. S.D.N.Y. July 30, 2015) (allowing debtors to continue intercompany transactions and granting administrative expense priority to intercompany claims arising postpetition); In re Genco Shipping & Trading Ltd., et al., No. 14-11108 (Bankr. S.D.N.Y. Apr. 21, 2014) (same); In re Exide Tech., No. 13-11482 (Bankr. D. Del. June 10, 2013) (authorizing debtor to pay certain prepetition intercompany claims and continue intercompany transactions, and granting administrative expense priority to intercompany claims arising postpetition); In re MF Global

27

Holdings, Ltd., No. 11-15059 (Bankr. S.D.N.Y. Apr. 4, 2012) (allowing debtors to continue

intercompany transactions and granting administrative expense priority to intercompany claims

arising postpetition).

63.    For the reasons set forth above, the Debtors submit that the relief

requested in this Motion is in the best interests of the Debtors, their estates, creditors,

stakeholders, and other parties in interest, and therefore should be granted.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

63.    Bankruptcy Rule 6003 provides that the relief requested in this Motion

may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R.

Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla.

2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on interim basis to

avoid irreparable harm). The Second Circuit has interpreted the language "immediate and

irreparable harm" in the context of preliminary injunctions.  In that context, the Second Circuit

instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by

final relief on the merits' and for which 'money damages cannot provide adequate

compensation.'" Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) (quoting N.Y.

Pathological & X-Ray Labs., Inc. v. INS, 523 F.2d 79, 81 (2d Cir. 1975)).  Further, the "harm

must be shown to be actual and imminent, not remote or speculative." Id.; see also Rodriguez v.

DeBuono, 175 F.3d 227, 234 (2d Cir. 1998). The Debtors submit that, for the reasons already set

forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable

harm.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

64.     The Debtors also request that the Court waive the stay imposed by
Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of
property other than cash collateral is stayed until the expiration of 14 days after entry of the order,
unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief
that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption
and to preserve value for their estates. Accordingly, the Debtors respectfully request that the
Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of
the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

65.     Nothing contained herein is or should be construed as: (a) an admission as
to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any
claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any
executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise
affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory
contract with any party subject to this Motion.

## NOTICE

66.     Notice of this Motion shall be given to (a) the Office of the United States
Trustee for the Southern District of New York; (b) counsel to the administrative agent under the
Debtors' prepetition first lien credit agreement; (c) counsel to the Tranche B Lenders (as defined
in the debtor-in-possession credit agreement) and the steering committee of the second lien
creditors (the "Steering Committee"); (d) counsel to the administrative agent under the Debtors'
prepetition second lien credit agreement; (e) counsel to the collateral trustee under the Debtors'

29

prepetition second lien credit agreement; (f) counsel to the indenture trustee under each of the Debtors' outstanding bond issuances; (g) the U.S. Attorney for the Southern District of New York; (h) counsel to the administrative agent under the proposed postpetition debtor-in-possession financing facility; (i) the parties listed in the consolidated list of forty (40) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; and (l) any such other party entitled to notice pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York. The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

67.    No previous request for the relief sought herein has been made to this Court or any other court.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter orders, substantially in the forms annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: New York, New York
      April 21, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:   _/s/ Jay M. Goffman_____
      Jay M. Goffman
      J. Eric Ivester
      Four Times Square
      New York, New York 10036-6522
      Telephone: (212) 735-3000
      Fax: (212) 735-2000

      -and-

      James J. Mazza, Jr. (*pro hac vice pending*)
      Louis S. Chiappetta (*pro hac vice pending*)
      155 N. Wacker Dr.
      Chicago, Illinois 60606-1720
      Telephone: (312) 407-0700
      Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

### PROPOSED INTERIM ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| SUNEDISON, INC., *et al.*, | : Case No. 16-10992 (SMB) |
| | : |
| Debtors.[1] | : (Joint Administration Pending) |
| | : |

### INTERIM ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 345, 363, 364, 503, 1107, AND 1108 AND BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, BUSINESS FORMS, AND PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) WAIVING CERTAIN DEPOSIT REQUIREMENTS, AND (III) AUTHORIZING CONTINUANCE OF INTERCOMPANY TRANSACTIONS AND HONORING CERTAIN RELATED PREPETITION OBLIGATIONS

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this

"Order") under sections 105, 345, 363, 364, 503, 1107, and 1108 of title 11 of the United States

Code (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") (i) authorizing the Debtors, for a period of forty-five (45)

days, to continue using their existing cash management system, bank accounts, and business

forms, and to pay related prepetition obligations, (ii) waiving any applicable deposit

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the First-Day Declaration.

requirements, and (iii) authorizing the continuance of intercompany transactions and honoring

certain related prepetition obligations including, to the extent applicable, granting administrative

expense status to postpetition intercompany claims between and among the Debtors pursuant to

Bankruptcy Code section 503(b)(1); and upon the First Day Declaration; and due and sufficient

notice of the Motion having been given under the particular circumstances; and it appearing that

no other or further notice need be provided; and it appearing that the relief requested by the

Motion is in the best interests of the Debtors, their estates, their creditors, their stakeholders, and

other parties in interest; and after due deliberation thereon, and sufficient cause appearing

therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED solely to the extent set forth herein on an

interim basis.

2.      The Debtors are authorized to continue using the Cash Management

System, the Bank Accounts (including, without limitation, the Bank Accounts identified in

Exhibit C to the Motion), and to the extent such practices and/or Bank Accounts do not comply

with applicable requirements under the U.S. Trustee Guidelines or otherwise, such requirements

under the U.S. Trustee Guidelines or otherwise are waived. Notwithstanding the U.S. Trustee

Guidelines or any other applicable constraint, the Debtors are authorized to continue using the

Business Forms in the ordinary course of business. Subject to paragraph 6 hereof, the Debtors

may transfer funds in, out of, and through the Cash Management System using the Ordinary

Transfer Methods in accordance with the agreements governing the Bank Accounts, including,

without limitation, any Bank Account Agreements. In connection with the ongoing utilization of

their Cash Management System, the Debtors shall continue to maintain accurate and detailed

2

records with respect to all transfers of cash, including, without limitation, Postpetition Intercompany Transactions, so that all transactions are adequately documented and readily ascertainable.

3.      The Debtors are further authorized to implement any changes to the Cash Management System that they deem appropriate subject to the reasonable consent of the Required Consenting Parties (as defined in the DIP Credit Agreement), including, without limitation, closing Bank Accounts or opening new bank accounts, subject to the Bank Account Agreements and on five (5) days' notice to the Office of the United States Trustee for the Southern District of New York, the official committee of unsecured creditors, if any, the DIP Agent, and the Required Consenting Parties, consistent with any other orders that the Court has entered.

4.      Those certain existing Bank Account Agreements between the Debtors and their existing depository and disbursement banks shall continue to govern the postpetition cash management relationship between the Debtors and the Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect. The Debtors and the Banks may, without further Order of this Court, agree to and implement changes to the cash management systems and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts, subject to the reasonable consent of the Required Consenting Parties.

5.      The Debtors are authorized to continue using their existing Business Forms without reference to the Debtors' status as debtors in possession; provided, however that the Debtors will make reasonable best efforts to include a reference to their status as debtors in possession on any Business Form.

3

6.     The Debtors are authorized to enter into and engage in the Postpetition Intercompany Transactions and to take any actions and to pay prepetition obligations related thereto; provided, however, that any intercompany transfers, payments, or contributions made by the Debtors to, or on behalf of, or for the benefit of any non-Debtor affiliates, including, without limitation, TerraForm Power, Inc., TerraForm Power, LLC, TerraForm Global, Inc., and TerraForm Global, LLC, other than a secured guarantor under the DIP Credit Agreement shall be made subject to the DIP Budget (as defined below). All postpetition payments from a Debtor to another Debtor related to or in connection with any Postpetition Intercompany Transaction are hereby accorded administrative expense status.

7.     The Debtors are authorized and directed to pay and/or reimburse the Banks in the ordinary course of business for any claims arising prior to, on, or after the Petition Date in connection with Bank Account Claims. The Bank Account Claims are granted administrative expense priority status pursuant to Bankruptcy Code section 503(b).

8.     The Banks are authorized to (a) continue administering the Bank Accounts in the usual and ordinary course of business in accordance with the Debtors' instructions and pursuant to the Bank Account Agreements, (b) pay any and all checks, drafts, wires, or electronic funds transfers presented, issued, or drawn on the Bank Accounts on account of any claims arising prepetition or postpetition so long as sufficient funds are available in such Bank Accounts unless the Debtors specifically issue "stop payment" instructions with respect to such items in accordance with the terms of the Bank Account Agreements, (c) honor the Debtors' directions with respect to the opening or closing of any Bank Account, and (d) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions. Without limiting the foregoing, each of the Debtors' Banks is authorized to debit the Debtors' accounts in the ordinary course of

4

business without the need for further order of this Court for: (i) all checks drawn on the Debtors' accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System.

9.      Such Banks may rely on this Order and on the Debtors' representations and instructions as to the payments and transfers that may be honored or dishonored in accordance with the terms of the Bank Account Agreements.  The Banks shall not be liable to any party on account of (a) following the Debtors' instructions or representations as to any order of the Court and (b) honoring any checks, drafts, wires or electronic funds transfers presented in a good faith belief that the Court has authorized the honoring of such checks, drafts, wires, or electronic funds transfers.  Without limiting the foregoing, any of the Debtors' Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of this Court, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

10.      This Order shall apply to any and all Bank Accounts actually in, or linked to, the Cash Management System, even if such Bank Accounts do not appear on the list attached as Exhibit C to the Motion.  Any and all accounts opened by the Debtors on or after the Petition Date at any Bank shall be deemed a Bank Account (as if it had been opened prior to the Petition

5

Date and listed on Exhibit C to the Motion) and any and all Banks at which such accounts are opened shall similarly be subject to the rights and obligations of this Order.

11.    To the extent any other order is entered by the Court directing Banks to honor checks, drafts, automated clearing house transfers, or other electronic funds transfers or any other withdrawals made, drawn, or issued in payment of prepetition claims, the obligation to honor such items shall be subject to this Order.

12.    Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to any applicable requirements imposed on the Debtors under the Interim Order (I) Authorizing Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(b) and (c) (the "Interim DIP Order") and any related final order (together, the "DIP Financing Orders") and the other DIP Loan Documents (as defined therein), and any such payments shall be in accordance with the DIP Budget (as defined in the DIP Financing Orders) in effect in connection with such orders (subject to Permitted Budget Variances, as defined in the DIP Credit Agreement).

13.    The Final Hearing, if necessary, on the Motion is scheduled for _____, 2016 at _____ (prevailing Eastern time), and any objections or responses to the Motion (each, an "Objection") shall be filed and served upon the Notice Parties so that the Objection is actually received by 4:00 p.m. (prevailing Eastern time) on the day that is fourteen (14) days following the Petition Date.

14.    If no Objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

15.    The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

16.    Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

17.    This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an Objection, pending the entry of the Final Order by this Court.

18.    The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

19.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

20.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated: New York, New York
_____, 2016

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

## PROPOSED FINAL ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **SUNEDISON, INC.**, *et al.*, | : Case No. 16-10992 (SMB) |
| | : |
| **Debtors.**[1] | : (Joint Administration Pending) |
| | : |
| | : |

**FINAL ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 345, 363, 364, 503, 1107, AND 1108 AND BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, BUSINESS FORMS, AND PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) WAIVING CERTAIN DEPOSIT REQUIREMENTS, AND (III) AUTHORIZING CONTINUANCE OF INTERCOMPANY TRANSACTIONS AND HONORING CERTAIN RELATED PREPETITION OBLIGATIONS**

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order") under sections 105, 345, 363, 364, 503, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing the Debtors, for a period of forty-five (45) days, to continue using their existing cash management system, bank accounts, and business forms, and to pay related prepetition obligations, (ii) waiving any applicable deposit

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the First-Day Declaration.

requirements, and (iii) authorizing the continuance of intercompany transactions and honoring certain related prepetition obligations including, to the extent applicable, granting administrative expense status to postpetition intercompany claims between and among the Debtors pursuant to Bankruptcy Code section 503(b)(1); and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, their stakeholders, and other parties in interest; and after due deliberation thereon, and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is GRANTED solely to the extent set forth herein.

2.     The Debtors are authorized to continue using the Cash Management System, the Bank Accounts (including, without limitation, the Bank Accounts identified in Exhibit C to the Motion), and to the extent such practices and/or Bank Accounts do not comply with applicable requirements under the U.S. Trustee Guidelines or otherwise, such requirements under the U.S. Trustee Guidelines or otherwise are waived. Notwithstanding the U.S. Trustee Guidelines or any other applicable constraint, the Debtors are authorized to continue using the Business Forms in the ordinary course of business. Subject to paragraph 6 hereof, the Debtors may transfer funds in, out of, and through the Cash Management System using the Ordinary Transfer Methods in accordance with the agreements governing the Bank Accounts, including, without limitation, any Bank Account Agreements. In connection with the ongoing utilization of their Cash Management System, the Debtors shall continue to maintain accurate and detailed records with respect to all transfers of cash, including, without limitation, Prepetition

Intercompany Transactions, so that all transactions are adequately documented and readily ascertainable.

        3.    The Debtors are further authorized to implement any changes to the Cash Management System that they deem appropriate subject to the reasonable consent of the Required Consenting Parties (as defined in the DIP Credit Agreement), including, without limitation, closing Bank Accounts or opening new bank accounts, subject to the Bank Account Agreements and on five (5) days' notice to the Office of the United States Trustee for the Southern District of New York, the official committee of unsecured creditors, if any, the DIP Agent, and the Required Consenting Parties, consistent with any other orders that the Court has entered.

        4.    Those certain existing Bank Account Agreements between the Debtors and their existing depository and disbursement banks shall continue to govern the postpetition cash management relationship between the Debtors and the Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect. The Debtors and the Banks may, without further Order of this Court, agree to and implement changes to the cash management systems and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts, subject to the reasonable consent of the Required Consenting Parties.

        5.    The Debtors are authorized to continue using their existing Business Forms without reference to the Debtors' status as debtors in possession; provided, however that the Debtors will make reasonable best efforts to include a reference to their status as debtors in possession on any Business Form.

6.      The Debtors are authorized to enter into and engage in the Postpetition Intercompany Transactions and to take any actions and to pay prepetition obligations related thereto; provided, however, that any intercompany transfers, payments, or contributions made by the Debtors to, or on behalf of, or for the benefit of any non-Debtor affiliates, including, without limitation, TerraForm Power, Inc., TerraForm Power, LLC, TerraForm Global, Inc., and TerraForm Global, LLC, other than a secured guarantor under the DIP Credit Agreement shall be made subject to the DIP Budget (as defined below). All postpetition payments from a Debtor to another Debtor related to or in connection with any Postpetition Intercompany Transaction are hereby accorded administrative expense status.

7.      The Debtors are authorized and directed to pay and/or reimburse the Banks in the ordinary course of business for any claims arising prior to, on, or after the Petition Date in connection with Bank Account Claims. The Bank Account Claims are granted administrative expense priority status pursuant to Bankruptcy Code section 503(b).

8.      The Banks are authorized to (a) continue administering the Bank Accounts in the usual and ordinary course of business in accordance with the Debtors' instructions and pursuant to the Bank Account Agreements, (b) pay any and all checks, drafts, wires, or electronic funds transfers presented, issued, or drawn on the Bank Accounts on account of any claims arising prepetition or postpetition so long as sufficient funds are available in such Bank Accounts unless the Debtors specifically issue "stop payment" instructions with respect to such items in accordance with the terms of the Bank Account Agreements, (c) honor the Debtors' directions with respect to the opening or closing of any Bank Account, and (d) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions. Without limiting the foregoing, each of the Debtors' Banks is authorized to debit the Debtors' accounts in the ordinary course of

4

business without the need for further order of this Court for: (i) all checks drawn on the Debtors'
accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the
payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of
Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or
returned unpaid for any reason, together with any fees and costs in connection therewith, to the
same extent the Debtor was responsible for such items prior to the Petition Date; and (iii) all
undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as
service charges for the maintenance of the Cash Management System.

9.      Such Banks may rely on this Order and on the Debtors' representations
and instructions as to the payments and transfers that may be honored or dishonored in
accordance with the terms of the Bank Account Agreements. The Banks shall not be liable to
any party on account of (a) following the Debtors' instructions or representations as to any order
of the Court, and (b) honoring any checks, drafts, wires or electronic funds transfers presented in
a good faith belief that the Court has authorized the honoring of such checks, drafts, wires, or
electronic funds transfers. Without limiting the foregoing, any of the Debtors' Banks may rely
on the representations of the Debtors with respect to whether any check or other payment order
drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or
any other order of this Court, and such Bank shall not have any liability to any party for relying
on such representations by the Debtors as provided for herein.

10.     This Order shall apply to any and all Bank Accounts actually in, or linked
to, the Cash Management System, even if such Bank Accounts do not appear on the list attached
as Exhibit C to the Motion. Any and all accounts opened by the Debtors on or after the Petition
Date at any Bank shall be deemed a Bank Account (as if it had been opened prior to the Petition

5

Date and listed on <u>Exhibit C</u> to the Motion) and any and all Banks at which such accounts are opened shall similarly be subject to the rights and obligations of this Order.

11.     To the extent any other order is entered by the Court directing Banks to honor checks, drafts, automated clearing house transfers, or other electronic funds transfers or any other withdrawals made, drawn, or issued in payment of prepetition claims, the obligation to honor such items shall be subject to this Order.

12.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to any applicable requirements imposed on the Debtors under the Interim Order (I) Authorizing Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(b) and (c) (the "<u>Interim DIP Order</u>") and any related final order (together, the "<u>DIP Financing Orders</u>") and the other DIP Loan Documents (as defined therein), and any such payments shall be in accordance with the DIP Budget (as defined in the DIP Financing Orders) in effect in connection with such orders (subject to Permitted Budget Variances, as defined in the DIP Credit Agreement).

13.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

14.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

15.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

16.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated: New York, New York
_____, 2016

_____
UNITED STATES BANKRUPTCY JUDGE

7

## <u>EXHIBIT C</u>

**LIST OF BANK ACCOUNTS**

| Entity | Country | Bank Name | Account Type | Last 4 Digits of Account Number | Currency | Balance at 4/19/16 |
|---|---|---|---|---|---|---|
| MEMC Pasadena Inc | US | Wells Fargo | Operating | 5394 | USD | 148,730.39 |
| MEMC Pasadena Inc | US | Wells Fargo | Controlled Disbursement | 330 | USD | - |
| NVT Licenses LLC | US | Wells Fargo | Operating | 9156 | GBP | - |
| NVT Licenses LLC | US | Wells Fargo | Operating | 5402 | USD | 1,591.66 |
| NVT Licenses, LLC | Spain | Banco Popular | Operating | 6061 | EUR | 16,445.49 |
| NVT Licenses, LLC | Spain | Banco Popular | Operating | 1849 | GBP | 716,866.97 |
| NVT Licenses, LLC | UK | Deutsche Bank | Operating | 9500 | GBP | 177,548.00 |
| NVT Licenses, LLC | US | Banco Popular | Operating | 1947 | USD | 15.90 |
| NVT LLC | US | Wells Fargo | Operating | 7846 | USD | 450,721.80 |
| NVT LLC | US | Wells Fargo | Operating | 5580 | USD | 417,892.82 |
| NVT LLC | US | Wells Fargo | Operating | 7278 | USD | 335,681.39 |
| NVT LLC | US | Wells Fargo | Operating | 6796 | USD | 29,269.00 |
| NVT LLC | US | Wells Fargo | Operating | 5421 | USD | - |
| NVT LLC | US | Wells Fargo | Operating | 1521 | USD | - |
| NVT LLC | US | Wells Fargo | Operating | 441 | USD | - |
| PVT Solar, Inc. | US | Wells Fargo | Operating | 1129 | USD | 243,666.80 |
| PVT Solar, Inc. | US | SVB | Operating | 1389 | USD | 33,000.00 |
| PVT Solar, Inc. | US | SVB | Operating | 6814 | USD | 32,559.24 |
| PVT Solar, Inc. | US | Wells Fargo | Dormant | 5598 | USD | - |
| PVT Solar, Inc. | US | SVB | Operating | 9437 | USD | - |
| PVT Solar, Inc. | US | SVB | Operating | 7740 | USD | - |
| PVT Solar, Inc. dba EchoFirst | US | Wells Fargo | Dormant | 1625 | USD | - |

| Entity | Country | Bank Name | Account Type | Last 4 Digits of Account Number | Currency | Balance at 4/19/16 |
|---|---|---|---|---|---|---|
| Silver Ridge Power Holdings LLC | US | Wells Fargo | Operating | 7026 | USD | - |
| Solaicx Inc | US | Wells Fargo | Controlled Disbursement | 5410 | USD | 36,363.37 |
| Solaicx Inc | US | Wells Fargo | Operating | 348 | USD | - |
| SunE Wind Holdings, Inc. | US | Citibank | Operating | 4683 | USD | - |
| SunEdison DG LLC | US | TD Bank | Operating | 1711 | USD | 45,000.00 |
| SunEdison Holdings Corporation | US | Wells Fargo | Operating | 5254 | USD | - |
| SunEdison International LLC | US | Wells Fargo | Operating | 5378 | USD | - |
| SunEdison International, Inc. | US | Wells Fargo | Operating | 5262 | USD | 32,722.03 |
| SunEdison LLC | US | Wells Fargo | Operating | 5403 | USD | - |
| SunEdison Products Singapore Pte. Ltd | Singapore | CITIBANK | Operating | 1042 | CAD | 17,095.00 |
| SunEdison Products Singapore Pte. Ltd | Singapore | CITIBANK | Operating | 1034 | EUR | 378.00 |
| SunEdison Products Singapore Pte. Ltd | Singapore | CITIBANK | Operating | 1018 | SGD | 835,810.00 |
| SunEdison Products Singapore Pte. Ltd | Singapore | CITIBANK | Operating | 0019 | TWD | 3,112,336.00 |
| SunEdison Products Singapore Pte. Ltd | Singapore | CITIBANK | Operating | 1026 | USD | 355,349.00 |
| Sunedison Utility Holdings Inc | US | Wells Fargo | Operating | 7034 | USD | - |
| SunEdison, Inc. | US | Wells Fargo | Operating | 5444 | USD | 2,095,108 |
| SunEdison, Inc. | US | Wells Fargo | Operating | 5856 | USD | 499,418.68 |
| SunEdison, Inc. | US | Wells Fargo | Operating | 5864 | USD | 80,590.44 |
| SunEdison, Inc. | US | Deustche Bank | DIP Lockbox Account | N/A | USD | - |
| SunEdison, Inc. | US | Wells Fargo | Controlled Disbursement | 433 | USD | - |
| SunEdison, Inc. | US | Wells Fargo | Investment Account | 7693 | USD | - |
| SunEdison, Inc. | US | Wells Fargo | Cash Collateral Account | 3172 | USD | - |

| Entity | Country | Bank Name | Account Type | Last 4 Digits of Account Number | Currency | Balance at 4/19/16 |
|---|---|---|---|---|---|---|
| SunEdison, Inc. | US | Wells Fargo | Cash Collateral Account | 5826 | USD | - |
| SunEdison, Inc. | US | Wells Fargo | Cash Collateral Account | 5834 | USD | - |
| Team-Solar, Inc. | US | Wells Fargo | Operating | 6670 | USD | - |
| Team-Solar, Inc. | US | Wells Fargo | Operating | 1313 | USD | - |

3

## **EXHIBIT D**

**CASH MANAGEMENT SYSTEM**

# Cash Management System
# (Utility and Commercial & Industrial)



# Cash Management System (Residential)



773878-LACSR02A - MSW