Hearing Date: June 2, 2016 at 10:30 a.m. (Prevailing Eastern Time)
Objection Deadline: At Hearing On June 2, 2016 at 10:30 a.m. (Prevailing Eastern Time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **SUNEDISON, INC.,** *et al.*, | : Case No. 16-10992 (SMB) |
| | : |
| Debtors.[1] | : (Jointly Administered) |
| | : |
| | : |

**NOTICE OF DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 363(f), 363(m), 1107, AND 1108 AND BANKRUPTCY RULES 2002, 6004, 9006, AND 9019 AUTHORIZING AND APPROVING ENTRY INTO COMMITMENT LETTER FOR CERTAIN PROJECT SALES AND GRANTING <u>RELEASES IN CONNECTION THEREWITH</u>**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**PLEASE TAKE NOTICE** that SunEdison, Inc. and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby file *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(A), 363(B), 363(F), 363(M), 1107, and 1108 and Bankruptcy Rules 2002, 6004, 9006, and 9019 Authorizing and Approving Entry Into Commitment Letter for Certain Project Sales and Granting Releases in Connection Therewith* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 723, New York, New York 10004 (the "Bankruptcy Court"), on **June 2, 2016 at 10:30 a.m. (Prevailing Eastern Time)** (the "Hearing"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion and the relief requested therein, if any, must be made at the Hearing.

Dated: May 20, 2016
 New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/ Jay M. Goffman*
 Jay M. Goffman
 J. Eric Ivester
 Four Times Square
 New York, New York 10036-6522
 Telephone: (212) 735-3000
 Fax: (212) 735-2000

 -and-

 James J. Mazza, Jr. (admitted *pro hac vice*)
 Louis S. Chiappetta (admitted *pro hac vice*)
 155 N. Wacker Dr.
 Chicago, Illinois 60606-1720
 Telephone: (312) 407-0700
 Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

**Hearing Date: June 2, 2016 at 10:30 a.m. (Prevailing Eastern Time)**
**Objection Deadline: At Hearing On June 2, 2016 at 10:30 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors*
 *and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10992 (SMB)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| | : | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE
SECTIONS 105(a), 363(b), 363(f), 363(m), 1107, AND 1108 AND BANKRUPTCY RULES
2002, 6004, 9006, AND 9019 AUTHORIZING AND APPROVING ENTRY INTO
COMMITMENT LETTER FOR CERTAIN PROJECT SALES AND GRANTING
RELEASES IN CONNECTION THEREWITH**

SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "SunEdison" or the "Company")[2] hereby move (the "Motion") this Court for entry of an order (the "Order") substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b), 363(f), 363(m), 1107, and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 9006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Company to sell or transfer its interests in the 104MW renewable energy project located in North Dakota known as Sunflower (the "Sunflower Project") to Novatus Project Holdings I, LLC ("Novatus Holdings") in accordance with that certain Commitment Letter, dated as of May 19, 2016 (the "Commitment Letter"), by and between SUNE and Novatus Holdings, free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens") with such Liens attaching to the proceeds with the same validity, extent, and priority as had attached to the assets immediately prior to the sale or transfer; (ii) granting to Novatus Holdings the exclusive right to enter into one or more agreements to purchase the Remaining Projects for a limited period of time and subject to conditions set forth in the Commitment Letter (including higher and better offers); and (iii) approving the release of all causes of action against Novatus Holdings and its affiliates (including, without limitation, Terra Nova Renewable Partners, LLC ("Terra Nova")) and their

---

[2]   For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc. ("TERP") and Terraform Global, Inc., and each of their respective direct and indirect subsidiaries, unless otherwise provided.

respective members, partners, limited partners, equityholders, managers, officers, directors, employees, principals, attorneys-in-fact, agents, and duly authorized representatives (collectively, the "Released Parties") solely with respect to the transactions consummated under or contemplated by the MIPSA (as defined below) (any such cause of action, an "Action"). In support of the Motion, the Debtors rely upon and incorporate by reference the Declarations of (i) Patrick M. Cook, Vice-President – Capital Markets And Corporate Finance of SunEdison, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed with the Court on the Petition Date, and (ii) Tim Derrick of SunEdison, Inc., in Support of the Motion (the "Derrick Declaration"), filed contemporaneously herewith. In further support of the Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:[3]

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), 1107, and 1108 and Bankruptcy Rules 2002, 6004, 9006, and 9019.

---

[3]    The Debtors have actively engaged with the advisors to the lenders (the "DIP Lenders") under the Debtors' debtor in possession financing facilities and the advisors to the Committee in connection with the relief requested herein. Specifically, the Debtors provided drafts of the Commitment Letter and this Motion to advisors to the DIP Lenders and the Committee and included various comments received from such advisors. The Debtors also held due diligence sessions with respect to the Sunflower Project, the Initial Projects, and the other Remaining Projects, whereby the Debtors provided information to, and answered questions from, advisors to the DIP Lenders and the Committee, including with respect to the expedited timing of the sale of the Sunflower Project.

3

## BACKGROUND

### A.    The Chapter 11 Cases

3.    On April 21, 2016 (the "<u>Petition Date</u>"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

4.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

5.    On April 29, 2016 an official creditors' committee (the "<u>Committee</u>") was appointed for these Chapter 11 Cases by the Office of the United States Trustee for the Southern District of New York (the "<u>United States Trustee</u>").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

6.    SunEdison is one of the world's leading developers of renewable-energy solutions.  In addition to its development business, SunEdison owns, operates and/or provides maintenance services for clean power generation assets.  SunEdison's renewable-energy development business is a global enterprise with substantial development activities on six continents.

7.    Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.[4]

---

[4]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

**B.        Prepetition Transactions Under the MIPSA**

8.        Prior to the Petition Date, the Company sold certain interests in renewable energy systems ("Projects") to Terra Nova, a Delaware limited liability company formed in October 2015.  Terra Nova is jointly owned by the Company, through its non-Debtor affiliate SunE Utility Partner I, LLC ("SunE Utility"), and Novatus Energy, LLC ("Novatus Energy"), a third party unaffiliated with the Company.  Novatus Energy owns 99% of the equity of Terra Nova while SunE Utility owns 1%.  Pursuant to that certain Master Membership Interest Purchase and Sale Agreement, dated as of October 26, 2015, by and among Blue Sky West Capital, LLC, First Wind Oakfield Portfolio, LLC, First Wind Panhandle Holdings III, LLC, DSP Renewables, LLC, and Hancock Renewables Holdings, LLC (collectively, the "Initial Project Sellers"), and Terra Nova, as amended and restated on March 25, 2016 (as amended from time to time, the "MIPSA"), the Initial Project Sellers agreed to sell certain Projects to Terra Nova upon the terms and subject to the conditions set forth therein.

9.        The Projects transferred by the Initial Project Sellers pursuant to the MIPSA include four wind Projects and a 33% interest in a portfolio of solar Projects (collectively, the "Initial Projects") totaling over 1,000 MW and generating gross proceeds of approximately $526 million with net proceeds of approximately $234 million received by the Company (the "Initial Projects Proceeds").  Specifically, the Initial Project Sellers sold the following Projects to Terra Nova in December 2015 and January 2016:  (1) Bingham, a 185MW wind Project located in Maine, (2) Oakfield, a 148MW wind Project located in Maine, (3) South Plains II, a 300MW wind Project located in Texas, (4) a 33% interest in Varsity, a 404MW

portfolio of solar Projects,[5] and (5) Hancock, a 51MW wind Project located in Maine. The Initial Project Sellers also previously held a call right allowing them to repurchase the Initial Projects from Terra Nova. The Initial Project Sellers sold the call right, and certain non-debtor affiliates of SUNE sold two development projects, in each case to Terra Nova in early 2016 for gross proceeds of approximately $15 million and the sales thereof together with the sales of the Initial Projects, the "Initial Project Sales"). To complete each Initial Project sale, the applicable Initial Project Seller and Terra Nova entered into MIPSA supplements that set forth additional salient terms of the sale, including any Project-specific terms.

## C.    Remaining Projects Under the MIPSA

10.    Under the MIPSA, the Company granted Novatus Holdings the right to negotiate exclusively to purchase five additional Projects. Specifically, the MIPSA provided Novatus Holdings with the right to purchase the following Projects: (1) Sunflower, a 104MW wind Project located in North Dakota, (2) Castle Gap, a 116MW solar Project located in Texas, (3) Rocksprings, a 149MW wind Project located in Texas, (4) Buckthorn, a 150MW solar Project located in Texas, and (5) Comanche, a 156MW solar Project located in Colorado (collectively, other than the Comanche Project, the "Remaining Projects" and, the sellers thereof, the "Remaining Project Sellers").[6]

---

[5]    The Varsity transaction was structured as an acquisition by the Company of a 33% interest in the Varsity Projects portfolio from affiliates of Dominion Energy, Inc. ("Dominion") and follow-on sale of such interest to Terra Nova. In exchange for completing the Varsity transaction, the Company received valuable interests and/or commitments from Dominion in connection with the Company's joint venture with Dominion.

[6]    The Initial Project Sellers and the Remaining Project Sellers are not Debtors in these Chapter 11 Cases. However, in the event that any Initial Project Seller or Remaining Project Seller seeks protection under the Bankruptcy Code, the Debtors intend to seek the joint administration of any such case with the Debtors' Chapter 11 Cases for procedural purposes only.

Novatus Holdings' exclusive right under the MIPSA to purchase the Remaining Projects (other than Comanche) expired on April 30, 2016.

11.     For several months prior to the Petition Date, the Company and Novatus Holdings worked in good faith with the key Project and financing counterparties necessary to consummate the purchase and sale of the Remaining Projects.  However, due to the Company's distressed financial position and concerns regarding perceived risks associated with purchasing assets from the Company, the Company has been unable to finalize the necessary Project and financing arrangements and meet the necessary financing conditions precedent.

12.     The delay in closing the sales of the Remaining Projects has resulted in progress on each Remaining Project coming to a standstill.  Vendors, contractors and service providers, many of whom have current exposure relating to one or more of the Remaining Projects, have sought assurances regarding a near-term sale in respect of the Remaining Projects in which they have involvement and taken steps to manage their exposure (including, in some instances, by terminating contracts).  As a result, incremental development work and the restructuring of certain key Project and financing arrangements will be necessary to achieve sales of the Remaining Projects with arranged traditional Project-level project financing ("Financed Project Sales").  Continued delay in achieving a near-term Financed Project Sale increases the risk of cost increases and schedule delays in respect of the Remaining Projects.  If costs continue to increase, the value to the Company of the Remaining Projects decreases.  Schedule delays also result in increased risk of missing key construction milestones (which makes project financing more difficult, and possibly more expensive, to obtain) or result in further cost increases (due to construction acceleration).

13.     The Remaining Project most at risk of significant value decline on a near-term basis is the Sunflower Project.  Due to its location in North Dakota, construction on the Sunflower Project is not possible during the winter months.  In particular, wind turbines cannot

be delivered to the Project site during the winter due to road restrictions.  As further discussed in the Derrick Declaration, if turbine deliveries slip beyond July or August of 2016, the Sunflower Project will no longer be viable because major construction could not commence until approximately June 2017, making achievement of commercial operation by the September 2017 PPA termination date virtually impossible.  Therefore, if the Sunflower Project sale is not consummated in the immediate future, the Company believes that it will become impossible to sell the Sunflower Project as a Financed Project Sale and the Project's value would be irreversibly degraded.  Given these exigencies, the centerpiece of the Commitment Letter for which Court approval is sought here is the Sunflower Project.

### RELIEF REQUESTED

14.    By this Motion, the Debtors seek entry of an order, pursuant to Bankruptcy Code sections 105(a), 363(b), 363(f), and 363(m) and Bankruptcy Rules 2002, 6004, 9006, and 9019, (i) authorizing the Company to enter into the Commitment Letter for the sale of the Sunflower Project to Novatus Holdings free and clear of all Liens, (ii) authorizing the Company to grant to Novatus Holdings the exclusive right to purchase certain Remaining Projects for a limited period of time and subject to conditions set forth in the Commitment Letter, and (iii) approving the release of all Actions against the Released Parties solely with respect to the transactions consummated under or the contemplated by the MIPSA.

15.    For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

### BASIS FOR RELIEF

16.    The Debtors seek this Court's approval of the Commitment Letter, pursuant to which Novatus Holdings has committed to purchase a 104MW renewable energy

wind project located in North Dakota—the Sunflower Project—upon the execution of, and subject to the terms of, a customary purchase and sale agreement (the "PSA").[7]  Pursuant to the Commitment Letter, Novatus Holdings will, subject to satisfaction of the conditions precedent in the PSA, purchase the Sunflower Project for cash consideration calculated utilizing a customary levered after-tax discounted cash flow analysis and an outside bounded discount rate equal to 12.0%.  While there are a number of moving pieces in the ultimate delivery of the Project that can affect liquidity available, the Debtors project that the sale of the Sunflower Project as proposed under the Commitment Letter will result in approximately $23 million in net liquidity to their estates (the "Sunflower Project Proceeds").

17.    As a condition, the Commitment Letter provides that the Debtors and their estates will release any and all claims against the Released Parties in connection with the MIPSA, including the Initial Project Sales (the "Releases").  Although Novatus Holdings' obligations under the Commitment Letter are subject to its satisfactory completion of confirmatory due diligence, the Releases do not become effective until the PSA is executed and this Court enters an order approving the relief requested herein.  As a subsidiary of an infrastructure fund with multiple investors and pooled Projects, the Releases are critical to Novatus Holdings' ability to obtain its own capital commitments and ultimately consummate its purchase of the Sunflower Project as a Financed Project Sale.  Specifically, Novatus Holdings has indicated that without the Releases the investment committee of its parent infrastructure fund will refuse to approve entry into the PSA because of the perceived risk that the Initial Project Sales could be subject to attack, thereby placing this portfolio at risk.

---

[7]    The Debtors intend to file a copy of the PSA with this Court promptly following the execution thereof (subject to redaction of commercially sensitive terms).

18.     As discussed above and in the Derrick Declaration, it is critical that the Debtors move forward quickly to close a transaction for the Sunflower Project. The Commitment Letter lays the groundwork to allow the Debtors to preserve estate value and to deliver the critical capital needed to complete the Sunflower Project and monetize the Sunflower Project for the benefit of the Debtors and their estates.

19.     Given the exigencies of the situation, the Debtors are not seeking to market the Sunflower Project to parties outside of Novatus Holdings. Novatus Holdings has already spent several months conducting due diligence with respect to the Sunflower Project pursuant to the MIPSA. As further described in the Derrick Declaration, another party unfamiliar with the Sunflower Project simply would not be able to conduct due diligence, negotiate necessary project documents, and close the sale of the Sunflower Project in time to prevent the estate from losing substantial value. Specifically, if the Company is required to sell the Sunflower Project to an alternative buyer, that buyer would need to perform due diligence from scratch with respect to all aspects of the Sunflower Project, including, among other things, with respect to land, offtake, interconnection, permitting, equipment supply and EPC arrangements, a process that typically takes several weeks if not months.

20.     Conversely, Novatus Holdings has already completed nearly all due diligence and has indicated that it is prepared to move forward immediately to complete due diligence. The likely alternative to the sale to Novatus Holdings pursuant to the Commitment Letter is the sale of the Sunflower Project as a riskier, less complete, less valuable Project without in-place financing, and ultimately a materially worse return to the Company due to the increased risk of losing key Project and financing counterparties, delaying the schedule and other

10

risks associated with the Sunflower Project and increasing the likelihood of the sale of the

Sunflower Project as a less complete, less valuable Project without in-place financing.

21. The Commitment Letter further provides that, <u>upon the execution of the</u>

<u>PSA</u>, Novatus Holdings will be provided with a limited exclusive right to purchase the

Remaining Projects (other than Sunflower). Specifically, upon the execution of the Commitment

Letter, Novatus Holdings received exclusivity with respect to the Buckthorn Project until the

earlier of (i) the date that is thirty (30) days after the execution and delivery of the PSA and (ii)

the date that is forty-five (45) days after the date of the Commitment Letter (the "<u>Exclusivity</u>

<u>Period</u>"), and, subject to the terms of the Commitment Letter Novatus Holdings and SUNE are to

utilize their respective commercially reasonable efforts to negotiate a transaction with a mutually

acceptable price for the Buckthorn project.

22. Novatus Holdings may also receive exclusivity with respect to the Castle

Gap Project and the Rocksprings Project for the Exclusivity Period, but only if SUNE and

Novatus Holdings negotiate a purchase price for each such Project that is reasonably acceptable

to SUNE. Given the significant due diligence already performed by Novatus Holdings and the

timelines associated with each Remaining Project, the Debtors believe exclusivity under the

terms of the Commitment Letter is the best means to preserve estate value. Importantly, in the

event that the Debtors and Novatus Holdings enter into a purchase and sale agreement for the

Buckthorn Project, the Castle Gap Project, or the Rocksprings Project during the Exclusivity

Period, the Debtors shall have the right to actively solicit higher and better offers for those

Remaining Projects. In other words, the exclusivity periods contemplated by the Commitment

Letter will allow the Debtors and Novatus Holdings to complete due diligence, negotiate

purchase agreements, and agree to other material terms of stalking horse arrangements for such Remaining projects that will merely set a floor for potentially higher and better offers.

23.     The Debtors believe that entry into the Commitment Letter offers the best means for their estates to ensure that the value of the Sunflower Project is maximized.  Without the Commitment Letter, there is real and imminent risk that the value of the Sunflower Project would be significantly degraded or lost entirely.  Furthermore, the commitment of the Debtors to provide the Releases upon entry into the PSA is well within the Debtors' sound business judgment and the range of reasonableness required under Bankruptcy Rule 9019(b) and is in the best interests of the Debtors and their estates.

24.     The Debtors' therefore seek the following authority and findings with respect to the Sunflower Project, the other Remaining Projects, and the MIPSA (including the Initial Project Sales):

(a)     The Commitment Letter and the PSA are in the best interests of the Debtors' estates and are hereby authorized, approved, and ratified in all respects;

(b)     The Debtors are authorized to sell or transfer the Sunflower Project pursuant to the terms of the Commitment Letter and the PSA and to provide any corporate consent or authorization and to take any other action (including as the personal representative of a member of any Debtor that is a limited liability company) necessary or advisable to consummate the transactions contemplated by the Commitment Letter and the PSA;

(c)     Novatus Holdings shall be granted the exclusive right to purchase the Remaining Projects (other than Sunflower) subject to the terms of the Commitment Letter;

(d)     The Releases are approved pursuant to Bankruptcy Rule 9019; provided, that in the event that the PSA is terminated by SUNE (or its applicable affiliates) solely as a result of fraud or willful and intentional misconduct under the PSA by Novatus Holdings or its affiliates (it being understood that willful and intentional misconduct includes the failure by Novatus Holdings or its affiliates to deliver the purchase price for the Sunflower Project pursuant to the PSA upon the satisfaction or waiver by Novatus Holdings of the closing conditions set forth therein), then the Releases shall immediately cease to be effective;

12

(e)    From and after the effectiveness of the Releases, the Company is authorized to indemnify and hold harmless the Released Parties against all demands, losses, actions, damages, costs, and expenses (including reasonable and documented attorneys' fees and disbursements) imposed upon or incurred by the Released Parties arising from, or as a result of, an Action;

(f)    The sale of the Sunflower Project pursuant to the terms of the Commitment Letter and the PSA shall constitute a sale for reasonably equivalent value;

(g)    The sale of the Sunflower Project to Novatus Holdings pursuant to the terms set forth in the Commitment Letter and the PSA shall be free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; and

(h)    The sale of the Sunflower Project to Novatus Holdings pursuant to the terms set forth in the Commitment Letter and the PSA shall be deemed an arm's-length transactions and Novatus Holdings and its designees shall be entitled to the protections afforded to good-faith purchasers under Bankruptcy Code section 363(m).

25.    The Debtors submit that the relief requested herein is desirable and in the best interests of the Debtors' estates, their creditors, and other parties in interest in the Chapter 11 Cases.

## EXTRAORDINARY PROVISIONS

26.    As required by the Amended Guidelines for the Conduct of Asset Sales adopted in this District pursuant to General Order M-383, this Motion contains the following provisions:

(a)    <u>Private Sale/No Competitive Bidding</u>.  The sale of the Sunflower Project pursuant to the Commitment Letter does not contemplate an auction or other competitive bidding process.  As described in more detail herein and in the Derrick Declaration, the Debtors believe that an expedited sale of the Sunflower Project to Novatus Holdings provides the best opportunity to maximize value of the Sunflower Project.  Due to the near-term risk of missing critical construction milestones in the absence of an imminent sale, the Debtors believe that the delay resulting from an auction or bidding process would result in value degradation and the

13

failure to achieve a higher and better offer for the Sunflower Project from any other potential purchaser.

(b)    Deadlines that Effectively Limit Notice.  The Debtors propose to schedule a hearing to consider the Motion on shortened notice.  As described in more detail herein, in the Derrick Declaration, and in the Ivester Declaration, the Debtors believe that approval of the relief requested herein on shortened notice is critical to maximizing the value of the Sunflower Project.

(c)    Relief from Bankruptcy Rule 6004(h).  The Debtors seek relief from the fourteen day stay imposed by Bankruptcy Rule 6004(h).  As described in more detail herein, in the Derrick Declaration, and in the Ivester Declaration, the Debtors believe that any delay in consummating the sale of the Sunflower Project pursuant to the terms of the Commitment Letter would result in value degradation and the inability to maximize the value of the Sunflower Project.

**APPLICABLE AUTHORITY**

**A.    The Sale of the Sunflower Project Is Within the Debtors' Sound Business Judgment.**

27.    As noted above, the Debtors believe that the sale of the Sunflower Project constitutes a sale in the ordinary course of the Debtors' or their non-Debtor affiliates' business. Therefore, under Bankruptcy Code section 363(c), court approval is not required for the sale of the Sunflower Project.  The Debtors nevertheless submit that application of the section 363(b) standard for sales outside of the ordinary course of a debtor's business is also met here and warrants this Court's approval.

28.    Specifically, Bankruptcy Code section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The use, sale, or lease of

14

property of the estate, other than in the ordinary course of business, is authorized when there is an "articulated business justification" for the action to be taken. See Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991) (citation omitted). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re  Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).

29.     Furthermore, Bankruptcy Code 363(b) applies to private sales consummated in the absence of competitive bidding. See, e.g., In re Wieboldt Stores, Inc., 92 B.R. 309, 312 (N.D. Ill. 1988) ("Section 363(b) is not limited to sales involving competitive bidding. Bankruptcy Rule 6004, which sets forth procedures for Section 363(b) transfers, expressly provides for private sales."). In this District, General Order M-383 requires that, if a debtor moves to sell assets in the absence of an auction or if the debtor has not otherwise sought higher or better offers, the movant must state and explain why such sale is likely to maximize the sale price. Amended Guidelines for the Conduct of Asset Sales, General Order M-383, 1.D.3 ("General Order M-383").

30.     The Debtors have articulated a clear business justification for entering into the Sunflower Project sale. As set forth in the Derrick Declaration, the sale to Novatus Holdings provides the Debtors with a market rate of return that is commensurate with rates of return received from similarly situated Project sales. Completing the Sunflower Project sale to Novatus Holdings also obviates the need to expend the further time delay and expense that would be

15

required if an alternative buyer were to conduct due diligence from scratch. Specifically, Novatus Holdings has already conducted substantial due diligence with respect to the Sunflower Project and has indicated a willingness and ability to close the Sunflower Project sale quickly. It is well within the Debtors' business judgment to determine that the sale of the Sunflower Projects to Novatus Holdings is the proper course of action likely to result in the best value for the Debtors under the circumstances.

31.    Moreover, Bankruptcy Rule 6004(f)(1) explicitly permits a debtor to enter into transactions outside of the ordinary course of business through private sales. As discussed above, the sale to Novatus Holdings provides the Debtors' the best opportunity to maximize the sale price of the Sunflower Project and prevent value loss by further delaying Sunflower Project construction and missing key construction and operation milestones. A sale to other parties would result in substantial delay and prohibitively expensive costs. Specifically, each day that the Sunflower Project remains unsold increases the likelihood that vendors may terminate Sunflower Project contracts, jeopardizing the ability to achieve commercial operation. Courts in this District have approved private sales in accordance with General Order M-383 where the benefit of the private sale outweighs the delay and expense of conducting a public auction. See In re Hawker Beechcraft, Inc., Case No. 12-11873 (SMB) (Bankr. S.D.N.Y. Nov. 29, 2012) [Docket No. 857] (authorizing private sale under Rule 6004(f)(1) where public auction would require estate to incur substantial additional costs, but would result in no additional value to the estate); In re Dewey & Leboeuf LLP, 2012 Bankr. LEXIS 5116 at *17-18 (Bankr. S.D.N.Y. Nov. 1, 2012) (finding a good business reason to sell assets pursuant to a private sale where a public sale would be more costly); In re Chemtura Corp., Case No. 09-11233 (REG), 2010 Bankr. LEXIS 5349 (Bankr. S.D.N.Y. July 23, 2010) (approving private sale of debtor's business

pursuant to an asset purchase agreement where prior purchase right would stifle third party interest in the business and purchaser was uniquely positioned to operate the business); In re Sonix Med. Res. Inc., Case No. 09-77781 (DTE), 2010 Bankr. LEXIS 5471 (Bankr. E.D.N.Y. March 19, 2010) (authorizing private sale of debtors' assets and approving asset purchase agreement where there was a substantial risk that value of the assets would deteriorate if the sale was not consummated and the purchase agreement was the best opportunity to realize the value of the assets on a going-concern basis and avoid decline and devaluation of the debtors' business); see also In re Wieboldt Stores, Inc., 92 B.R. 309, 312 (N.D. Ill. 1988) ("Section 363(b) is not limited to sales involving competitive bidding. Bankruptcy Rule 6004, which sets forth procedures for Section 363(b) transfers, expressly provides for private sales."); Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.), 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court order approving private sale by debtor).  Completing the sale of the Sunflower Project to Novatus Holdings is therefore an exercise of the Debtors' sound business judgment, is permitted by the Bankruptcy Code and Bankruptcy Rules, and is in the best interests of the Debtors' estates and creditors.

32.     Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  11 U.S.C. § 363(f).  Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale.  See Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace

Chalet Apts., Ltd.), 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as *one* of the five specified exceptions applies).

33.    The sale of the Sunflower Project to Novatus Holdings pursuant to the terms set forth in the Commitment Letter and the PSA is appropriate under section 363(f) of the Bankruptcy Code.    The Debtors propose to sell the Sunflower Project in a commercially reasonable manner and expect that the value of the proceeds from such sales or transfers will fairly reflect the value of the property sold.    The Debtors further propose that any party with an interest in the Sunflower Project pursuant to this Motion shall have a corresponding security interest in the proceeds of such sale.    As such, the requirements of section 363(f) of the Bankruptcy Code would be satisfied for the Sunflower Project sale free and clear of all Liens.

34.    Bankruptcy Code section 363(m) provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a purchaser who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. See 11 U.S.C. § 363(m). "Although the Bankruptcy Code does not define the meaning of 'good-faith purchaser,' most courts have adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'" Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997) (citation omitted). The Third Circuit has held that: "'The requirement that a purchaser act in good faith . . . speaks to the integrity of [purchaser's] conduct in the course of the sale proceedings.'" In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) (citation omitted). Typically, the misconduct that would destroy a purchaser's good faith status involves "fraud, collusion between the purchaser and

other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

Hoese Corp. v. Vetter Corp. (In re Vetter Corp.), 724 F.2d 52, 56 (7th Cir. 1983) (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule

805, the precursor to section 363(m)).   In addition, section 363(m) protection applies in the

context of private sales. See In re Wieboldt Stores, Inc., 92 B.R. at 312.  The Debtors submit that

the Sunflower Project sale is an arm's-length transaction entitled to the protections of

Bankruptcy Code section 363(m) negotiated by sophisticated parties with their own legal and

other advisors.

**B.    The Initial Projects Proceeds and the Sunflower Project Proceeds Constitute
        Reasonably Equivalent Value for the Projects Transferred**

35.    A debtor receives reasonably equivalent consideration when "the debtor's

net worth has been preserved" following a transfer of its assets. Harrison v. N.J. Cmty. Bank (In

re Jesup & Lamont, Inc.), 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014); see also Mellon Bank,

N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 646-47 (3d Cir. 1991) ("The touchstone is whether

the transaction conferred realizable commercial value on the debtor reasonably equivalent to the

realizable commercial value of the assets transferred.").   A finding of reasonably equivalent

value does not require an exact equivalent exchange of consideration; rather, the benefits that a

debtor receives from the transfer must approximate its costs. Harrison, 507 B.R. at 472 ("[I]f [the

value received] approximates the value of what the debtor transferred, there will be reasonably

equivalent value[.]").   Further, transactions between a debtor and a third-party on an arms' length

basis are presumptively for reasonably equivalent value. See Mishkin v. Ensminger (In re Adler,

Coleman Clearing Corp.), 247 B.R. 51, 109 (Bankr. S.D.N.Y. 1999) ("[W]hen there is an arms-

length transaction by parties that have equal knowledge, a court should not substitute its own

19

view of a fair market price.") (citing <u>Cooper v. Ashley Comm., Inc., (In re Morris Communications NC, Inc.)</u>, 914 F.2d 458, 465, 474-75 (4th Cir. 1990)).

36.     Here, the Initial Project Sales and the Sunflower Project sale constitute arms'-length transactions between the Company and unaffiliated third parties (other than the Company's nominal 1% ownership in Terra Nova with respect to the Initial Project Sales).  The Company received approximately $526 million in gross proceeds in exchange for the Initial Projects.  For the Sunflower Project, the Company and Novatus Holdings agreed to a purchase price based on a market standard discounted cash flow formula with an outside bounded discount rate equal to 12.0%, expected to generate net proceeds of $23 million.  The discounted cash flow formula provides the Company with certainty that it will receive the agreed upon value for the Sunflower Project—even if the Company is required to expend additional costs and expenses prior to the closing of the PSA.  The return agreed by Novatus Holdings is comparable to the Company's returns on Projects of similar size and scope sold as Financed Project Sales to a creditworthy, experienced equity sponsor willing to take construction risk, including the Initial Projects Proceeds.  The Debtors have kept their primary creditor constituencies apprised of the Commitment Letter negotiations and analysis regarding the Initial Project Sales and expect to continue to work with such creditor groups leading up to the hearing to consider the relief requested herein.

**C.     The Releases Are Appropriate Under Bankruptcy Rule 9019.**

37.     Given that the Releases are part and parcel of the Commitment Letter, the Debtors also seek approval thereof under Bankruptcy Rule 9019 as a settlement of claims. Compromises are "a normal part of the process of reorganization." <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968) (quoting <u>Case v. Los Angeles Lumber Prods. Co.</u>, 308 U.S. 106, 130 (1939)). The decision to approve a particular

compromise lies within the sound discretion of the bankruptcy court. See <u>Nellis v. Shugrue</u>, 165 B.R. 115, 123 (S.D.N.Y. 1994). A settlement must not "fall below the lowest point in the range of reasonableness." <u>Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Grp.)</u>, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); <u>see also</u> <u>Cosoff v. Rodman (In re W.T. Grant Co.)</u>, 699 F.2d 599, 608 (2d Cir. 1983); <u>In re Spielfogel</u>, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Discretion may be exercised by the court "in light of the general public policy favoring settlements." <u>In re Hibbard Brown & Co., Inc.</u>, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." <u>In re Best Products</u>, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

38.     The following factors are considered in determining whether a settlement should be approved: (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion. See <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.</u>, 390 U.S. at 424; <u>In re Ashford Hotels, Ltd.</u>, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); <u>In re Best Prods. Co.</u>, 168 B.R. at 50.

39.     While a court must "evaluate. . .all. . .factors relevant to a fair and full assessment of the wisdom of the proposed compromise," <u>Anderson</u>, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, <u>W.T. Grant Co.</u>, 699 F.2d at 608, or conduct a full independent investigation. <u>In re Drexel Burnham Lambert Group</u>,

134 B.R. at 505. "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact….The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." Nellis, 165 B.R. at 123 (internal citations omitted).

40.    The court may give weight to the "informed judgments of the … debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." In re Drexel Burnham Lambert Group, 134 B.R. at 505 (internal citations omitted); see also In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993); accord In re Ashford Hotels Ltd., 226 B.R. at 802 ("Significantly, that test does not contemplate that [the court] substitute [its] judgment for the Trustee's, but only that [the court] test his choice for reasonableness . . . . If the Trustee chooses one of two reasonable choices, [the court] must approve that choice, even if, all things being equal, [the court] would have selected the other.").

41.    There is no requirement that "the value of the compromise … be dollar-for-dollar the equivalent of the claim." In re Ionosphere Clubs, Inc., 156 B.R. 414, 427 (S.D.N.Y. 1993). While not the settlement at bar, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." Id. at 427-28 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974)).

42.    The Releases form a crucial component of the overall consideration provided to Novatus Holdings in exchange for the Sunflower Project Proceeds.  Specifically, without the Releases, Novatus Holdings has informed the Company that it will not be able to obtain capital commitments from its investors to fund the acquisition of the Sunflower Project. Given the exigencies of the situation, if the Sunflower Project is not sold to Novatus Holdings,

the only viable alternative will be to sell the Sunflower Project assets for a fraction of the Sunflower Project Proceeds. Moreover, based on the analysis conducted by the Debtors on the previous sales to Terra Nova and/or Novatus Holdings', the granting of the Releases in exchange for the commitment to purchase the Sunflower Project is beneficial to the estate. Each Initial Project was sold for valuable consideration at favorable implied rates of return. There is no doubt that the Initial Projects were sold for reasonably equivalent value and therefore any potential Actions related thereto, which would require time, money, and litigation to pursue, are not worth preserving in this instance. See Derrick Declaration ¶ 9. Therefore the transactions contemplated by the Commitment Letter and the PSA, including the Releases, fall well within the range of reasonableness and should be approved.

43.    Accordingly, the Court should approve the proposed Sunflower Project sale and the Releases as set forth herein.[8]

## SHORTENED NOTICE SCHEDULING HEARING ON MOTION

44.    Simultaneously with the filing of this Motion, the Debtors have submitted (i) the Declaration of J. Eric Ivester Pursuant to Local Bankruptcy Rule 9077-1(a) in Support of Order to Show Cause Scheduling Hearing on Shortened Notice for Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), 363(f), 363(m), 1107, and 1108 and Bankruptcy Rules 2002, 6004, 9006, and 9019 Authorizing and Approving Entry Into

---

[8]    To the extent that the relief requested herein covers non-Debtors, courts have entered orders authorizing a debtor to cause its non-debtor affiliates to enter into transactions for the benefit of a debtor's estate. See, e.g., In re Haggen Holdings, LLC, Case No. 15-11874 (KG), ECF No. 1832 (Bankr. D. Del. Apr. 26, 2016); In re Variant Holding Company, LLC, Case No. 14-12021 (BLS), ECF No. 381 (Bankr. D. Del. June 5, 2015); In re Savient Pharmaceuticals, Inc., Case No. 13-12680 (MFW), ECF No. 109 (Bankr. D. Del. Nov. 4, 2013); In re Arcapita Bank B.S.C.(c), Case No. 12-11076 (SHL), ECF No. 726 (Bankr. S.D.N.Y. Dec. 18, 2012); In re Tribune Company, Case No. 08-13141 (KJC), ECF No. 8150 (Bankr. D. Del. Feb. 25, 2011); In re Calpine Corp., Case No. 05-60200 (BRL), ECF No. 926 (Bankr. S.D.N.Y. Mar. 1, 2006); In re Enron Corp., Case No. 01-16034 (AJG), ECF No. 520 (Bankr. S.D.N.Y. Dec. 28, 2001).

Commitment Letter for Certain Project Sales and Granting Release in Connection Therewith (the "Ivester Declaration") and (ii) the proposed Order to Show Cause Scheduling Hearing on Shortened Notice for Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), 363(f), 363(m), 1107, and 1108 and Bankruptcy Rules 2002, 6004, 9006, and 9019 Authorizing and Approving Entry Into Commitment Letter for Certain Project Sales and Granting Release in Connection Therewith (the "Order to Show Cause").

45.    Bankruptcy Rule 2002(a)(1) provides that this Court may, "for cause shown," shorten the required notice period for and direct another method of giving notice of a motion. Fed. R. Bankr. P. 2002(a)(1). As set forth more fully in the Ivester Declaration, the Debtors respectfully submit that sufficient "cause" exists for expedited consideration of the relief sought under the Motion. Specifically, the imminent sale of the Sunflower Project is necessary to prevent schedule delays that could result in a failure to meet relevant construction and project milestones, which would irreversibly degrade the value of the Sunflower Project.

46.    Accordingly, for the reasons set forth herein and in the Ivester Declaration, the Debtors request that this Court enter an Order to Show Cause, substantially in the proposed form filed by the Debtors concurrently herewith, scheduling consideration of the relief requested under the Motion for the next hearing in these Chapter 11 Cases, which shall be held on June 2, 2016 at 10:30 a.m. (Prevailing Eastern Time).

47.    The Debtors propose to give notice of the Motion, the Ivester Declaration, and the Order to Show Cause in accordance with the provisions set forth in the Order to Show Cause, as entered by the Court.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

48.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

24

property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to maximize value of the Sunflower Project and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

49.    Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Motion.

## NOTICE

50.    Notice of this Motion shall be given to (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the administrative agent under the Debtors' prepetition first lien credit agreement; (c) counsel to the Required Tranche B Term Lenders (as defined in the Debtors' postpetition credit agreement) and the steering committee of the prepetition second lien lenders; (d) counsel to the administrative agent under the Debtors' prepetition second lien credit agreement; (e) counsel to the indenture trustee under each of the Debtors' outstanding bond issuances; (f) the U.S. Attorney for the Southern District of New York; (g) counsel to the administrative agent under the proposed debtor-in-possession financing facility; (h) counsel to the Committee; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) any such other party entitled to notice pursuant to Local

Bankruptcy Rule 9013-1(b).   The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

51.    No previous request for the relief sought herein has been made to this Court or any other court.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: New York, New York
         May 20, 2016

SKADDEN, ARPS, SLATE, MEAGHER  & FLOM LLP

By:  */s/ Jay M. Goffman*
     Jay M. Goffman
     J. Eric Ivester
     Four Times Square
     New York, New York 10036-6522
     Telephone: (212) 735-3000
     Fax:(212) 735-2000

     -and-

     James J. Mazza, Jr. (admitted *pro hac vice*)
     Louis S. Chiappetta (admitted *pro hac vice*)
     155 N. Wacker Dr.
     Chicago, Illinois 60606-1720
     Telephone: (312) 407-0700
     Fax: (312) 407-0411

     *Counsel for Debtors and Debtors in Possession*

# **EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **SUNEDISON, INC.,** *et al.*, | : **Case No. 16-10992 (SMB)** |
| | : |
| **Debtors.**[1] | : **(Jointly Administered)** |
| | : |
| | : |

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 363(f), 363(m), 1107, AND 1108 AND BANKRUPTCY RULES 2002, 6004, 9006, AND 9019 AUTHORIZING AND APPROVING ENTRY INTO COMMITMENT LETTER FOR CERTAIN PROJECT SALES AND GRANTING RELEASES IN CONNECTION THEREWITH**

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order") pursuant to sections 105(a), 363(b), 363(f), 363(m), 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 9006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing the Company to sell or transfer its interests in the 104MW renewable energy project located in North Dakota known as Sunflower (the "Sunflower Project") to Novatus Project Holdings I, LLC ("Novatus Holdings") in accordance with that certain Commitment Letter, dated as of May 19, 2016 (the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

"Commitment Letter"), by and between SUNE and Novatus Holdings, free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens") with such Liens attaching to the proceeds with the same validity, extent, and priority as had attached to the assets immediately prior to the sale or transfer; (ii) granting to Novatus Holdings the exclusive right to enter into one or more agreements to purchase the Remaining Projects for a limited period of time and subject to conditions set forth in the Commitment Letter (including higher and better offers); and (iii) approving the release of all Actions against the Released Parties solely with respect to the transactions consummated under or contemplated by the MIPSA, all as more fully set forth in the Motion; and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, their stakeholders, and other parties in interest; and after due deliberation thereon, and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED that**:

1.    The Motion is GRANTED as set forth herein.

2.    The Commitment Letter and the PSA are in the best interests of the Debtors' estates and are hereby authorized, approved, and ratified in all respects.  The Commitment Letter and the PSA constitute the highest and best offer for the Sunflower Project, and will provide a greater recovery for the Debtors' estate than would be provided by any other available alternative.  The Debtors' determination that the Commitment Letter and the PSA constitute the highest or best offer for the Sunflower Project constitutes a valid and sound exercise of the Debtors' business judgment.

2

3.    The Debtors, Novatus Holdings, and their respective affiliates are authorized to execute, deliver, implement and fully perform under the Commitment Letter, the PSA, and any and all other obligations, instruments, documents, and papers, and to take any and all actions, reasonably necessary or appropriate to consummate the Sunflower Project sale to Novatus Holdings as contemplated by the Commitment Letter and the PSA and to grant to Novatus Holdings the exclusive right to purchase the Remaining Projects solely on the terms set forth in the Commitment Letter.  Upon entry of this Order, the Commitment Letter and the PSA shall become enforceable and binding on the Debtors, the Debtors' estates, and all parties in interest.

4.    The Releases are critical to the sale of the Sunflower Project pursuant to the Commitment Letter and the PSA, are supported by fair and reasonable consideration, are in the best interests of the Debtors' estates, and, accordingly, are hereby approved pursuant to Bankruptcy Rule 9019; _provided_, that in the event that the PSA is terminated by SUNE (or its applicable affiliates) solely as a result of fraud or willful and intentional misconduct under the PSA by Novatus Holdings or its affiliates (it being understood that willful and intentional misconduct includes the failure by Novatus Holdings or its affiliates to deliver the purchase price for the Sunflower Project pursuant to the PSA upon the satisfaction or waiver by Novatus Holdings of the closing conditions set forth therein), then the Releases shall immediately cease to be effective.

5.    From and after the effectiveness of the Releases, the Company is authorized to indemnify and hold harmless the Released Parties against all demands, losses, actions damages costs, and expenses (including reasonable and documented attorneys' fees and disbursements) imposed upon or incurred by the Released Parties arising from, or as a result of, an Action.

3

6.      The sale of the Sunflower Project pursuant to the terms of the Commitment Letter and the PSA shall constitute a sale for reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

7.      The sale of the Sunflower Project to Novatus Holdings pursuant to the terms set forth in the Commitment Letter and the PSA shall be free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code.

8.      The sale of the Sunflower Project to Novatus Holdings pursuant to the terms set forth in the Commitment Letter and the PSA shall be deemed an arm's-length transaction and Novatus Holdings and its designees shall be entitled to the protections afforded to good-faith purchasers under Bankruptcy Code section 363(m).

9.      Any objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled on the merits and denied with prejudice.

10.      This Order shall apply to the cases of any of the Debtors' affiliates that file for relief under the Bankruptcy Code and that are jointly administered with these Chapter 11 Cases, including any Initial Project Seller and any Remaining Project Seller.

11.      With respect to all sale transactions consummated pursuant to this Order, including the Remaining Project sales, this Order shall be sole and sufficient evidence of the transfer of title to any particular buyer, and the sale transactions consummated pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or

4

insure any title or state of title in or to any of the property sold pursuant to this Order, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state and federal, state, and local officials, and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

12.     Nothing contained herein shall prejudice the rights of the Debtors to seek authorization for the sale of any asset under 11 U.S.C. § 363.

13.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

14.     Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

15.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

16.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

17.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:  New York, New York
             _____, 2016


_____
The Honorable Stuart M. Bernstein
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Commitment Letter**

Novatus Project Holdings I, LLC
c/o Novatus Management, LLC
1095 Avenue of the Americas
25th Floor, Suite A
New York, NY 10036

May 19, 2016

SunEdison, Inc.
13736 Riverport Drive
Maryland Heights, Missouri  63043

Ladies and Gentlemen:

Reference is hereby made to that certain Master Membership Interest Purchase and Sale Agreement, dated as of October 26, 2015, by and among Blue Sky West Capital, LLC, First Wind Oakfield Portfolio, LLC, First Wind Panhandle Holdings III, LLC, DSP Renewables, LLC and Hancock Renewables Holdings, LLC (collectively, the "Sellers"), Terra Nova Renewable Partners, LLC ("Terra Nova"), Novatus Project Holdings I, LLC ("Novatus") (for the limited purposes set forth therein) and SunEdison, Inc. ("SUNE") (for the limited purposes set forth therein), as amended and restated on March 25, 2016 (the "MIPSA"), pursuant to which, among other things, Novatus was granted the right to acquire from the Sellers or their affiliates certain renewable energy projects, as more fully described on Annex 1 hereto (collectively, the "Remaining Projects").

1.    Purchase Commitment.  Pursuant to this letter agreement (this "Letter Agreement"), Novatus hereby commits (the "Commitment"), subject to the terms and conditions set forth herein, to purchase (by sale of equity, assets, merger or other similar transaction) all of the assets related to or associated with the 104 MW wind power project under development in Morton and Stark Counties, North Dakota, known as the Sunflower project ("Sunflower") from SUNE or its affiliates (the "Sunflower Transaction") for cash consideration calculated utilizing a customary levered after-tax discounted cash flow analysis, based upon assumptions mutually agreeable to SUNE and Novatus, and a discount rate equal to 12.0% (the "Purchase Consideration").

2.    Purchase and Sale Agreement.  Novatus and SUNE (and SUNE's affiliates) agree to use their reasonable best efforts to expeditiously negotiate and execute a definitive purchase and sale agreement governing the Sunflower Transaction on terms and conditions mutually acceptable to Novatus and SUNE (the "PSA").  The closing of the transactions contemplated by the PSA will be subject to customary closing conditions for transactions of this type, where the seller's parent entity is a debtor in a chapter 11 case; provided, that, for the avoidance of doubt, the closing of the transactions contemplated by the PSA shall not be subject to the completion of due diligence or obtaining financing for the payment by Novatus of the Purchase Consideration (it being understood that with respect to financing, the closing of the transactions contemplated by the PSA shall be conditioned upon obtaining tax equity and project financing, in each case on terms and conditions

SunEdison, Inc.
May 19, 2016
Page 2

reasonably satisfactory to Novatus, and Novatus shall reasonably cooperate with SUNE to obtain such tax equity and project financing).

3.     Bankruptcy Court Filings.

(a)     Novatus acknowledges that on April 21, 2016 (the "Petition Date"), SUNE and certain of its affiliates (the "Debtors") filed cases (the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") before the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

(b)     Promptly following the execution of this Letter Agreement and in accordance with the debtor-in-possession financing facilities obtained by the Debtors in the Chapter 11 Cases, the Debtors shall file a motion (the "PSA Motion") in the Chapter 11 Cases seeking entry of an order (the "Order") from the Bankruptcy Court in form and substance reasonably acceptable to Novatus, which, among other matters, (1) authorizes the Debtors to sell (or to cause their non-Debtor affiliates to sell) Sunflower to Novatus pursuant to the terms set forth in this Letter Agreement and (2) approves the release (the "Release") by the Debtors (including the Sellers) of all causes of action against Novatus and its affiliates (including, without limitation, Terra Nova) and their respective members, partners, limited partners, equityholders, managers, officers, directors, employees, principals, attorneys-in-fact, agents, and duly authorized representatives (collectively, the "Released Parties") solely with respect to the transactions consummated under or contemplated by the MIPSA (any such cause of action, an "Action"), including all transactions under or contemplated by the MIPSA consummated on or prior to the Petition Date; provided, however, that the effectiveness of the Release shall be conditioned upon the mutual execution and delivery by Novatus and SUNE (and its applicable affiliates) of the PSA and the entry of an order of the Bankruptcy Court approving such Release; provided, further, that in the event that the PSA is terminated by SUNE (or its applicable affiliates) solely as a result of fraud or willful and intentional misconduct under the PSA by Novatus or its affiliates (for the avoidance of doubt, willful and intentional misconduct includes the failure by Novatus or its affiliates to deliver the Purchase Consideration pursuant to the PSA upon the satisfaction or waiver by Novatus of the closing conditions set forth therein), then the Release shall immediately cease to be effective.  From and after the effectiveness of the Release, SUNE shall indemnify and hold harmless the Released Parties against all demands, losses, actions, damages, costs and expenses (including reasonable and documented attorneys' fees and disbursements) imposed upon or incurred by the Released Parties arising from, or as a result of, an Action.

4.     Conditions.  Novatus' Commitment and its other obligations hereunder, including the negotiation and execution of the PSA, are subject to and conditioned upon (a) the satisfactory completion by Novatus and its representatives of confirmatory diligence of Sunflower as determined by Novatus in its sole discretion, which shall include a review

SunEdison, Inc.
May 19, 2016
Page 3

and analysis of applicable legal, commercial, technical, financial, environmental, regulatory, operational, tax and accounting matters in respect of Sunflower, (b) the negotiation, execution and delivery of the PSA, (c) the satisfaction in full, or waiver by Novatus, of each of the conditions precedent to Novatus' obligations to consummate the Sunflower Transaction, as set forth in the PSA (other than any conditions that by their nature are to be satisfied at the closing, but subject to the substantially concurrent satisfaction or waiver by Novatus of such conditions), and (d) entry of the Order.

5.    <u>Termination</u>.  This Letter Agreement shall terminate upon the earliest to occur of (a) the consummation of the Sunflower Transaction under the PSA, (b) the termination of the PSA in accordance with its terms, and (c) the date that Novatus notifies SUNE, or that SUNE notifies Novatus (with respect to subclause (ii) below), in writing that it does not intend to continue to pursue the Sunflower Transaction due to (i) adverse due diligence results, (ii) the failure of SUNE and Novatus to reach an agreement on the terms and conditions of the PSA on or prior to the date that is twenty (20) days after the date of this Letter Agreement, subject to the terminating party's compliance with Section 2 hereof or (iii) the failure of the Bankruptcy Court to enter the Order on or prior to June 15, 2016 or such other date as may be mutually agreed between SUNE and Novatus; <u>provided</u>, that the termination of this Letter Agreement shall not terminate the obligations of the signatory parties under Sections 7 through 11 hereof which shall remain in effect.

6.    <u>Sunflower Exclusivity</u>.  From and after the date of this Letter Agreement, (a) Novatus shall have the exclusive right to purchase, by sale of equity, assets, merger or other similar transaction, Sunflower and (b) SUNE shall not (and shall cause its affiliates and its and their representatives not to) take any action that would prevent, prohibit or impair Novatus' exclusive rights under this Section 6, and the PSA shall include the foregoing; <u>provided</u>, that Novatus' exclusive right to purchase Sunflower shall terminate immediately upon the termination of the PSA by SUNE (or its applicable affiliates) solely as a result of fraud or willful and intentional misconduct under the PSA by Novatus or its affiliates (for the avoidance of doubt, willful and intentional misconduct includes the failure by Novatus or its affiliates to deliver the Purchase Consideration pursuant to the PSA upon the satisfaction or waiver by Novatus of the closing conditions set forth therein).

7.    <u>Exclusivity on Remaining Projects</u>.

(a)    From the date of this Letter Agreement until the earlier of (i) the date that is thirty (30) days after the execution and delivery of the PSA by the parties thereto and (ii) the date that is forty five (45) days after the date of this Letter Agreement (the "<u>Exclusivity Period</u>"), Novatus shall have the exclusive right to purchase, by sale of equity, assets, merger or other similar transaction, (1) the Buckthorn project (as described on <u>Annex 1</u> hereto), (2) the Castle Gap project (as described on <u>Annex 1</u> hereto); <u>provided</u>, <u>however</u>, that the Exclusivity Period with respect to the Castle Gap project shall not become effective until the date that SUNE and Novatus have agreed in principal to a purchase price for the Castle Gap project reasonably acceptable to SUNE, and (3) the Rocksprings project (as described on

SunEdison, Inc.
May 19, 2016
Page 4

Annex 1 hereto); provided, however, that the Exclusivity Period with respect to the Rocksprings project shall not become effective until the date that SUNE and Novatus have agreed in principal to a purchase price for the Rocksprings project reasonably acceptable to SUNE, in each case pursuant to a definitive purchase and sale agreement with respect to the applicable Remaining Project on terms and conditions mutually acceptable to Novatus and SUNE (each, an "Additional PSA").   During the Exclusivity Period, Novatus and SUNE shall utilize their respective commercially reasonable efforts to negotiate a transaction with a mutually acceptable price for the Buckthorn project, it being understood that (i) Novatus and its representatives have not completed due diligence of the Buckthorn project and (ii) the sole and exclusive remedy for SUNE and its affiliates for a breach of this Section 7(a) by Novatus (after notice and a reasonable opportunity to cure) shall be termination of the Exclusivity Period for the Buckthorn project (and any such breach shall in no way affect the effectiveness of the Release or the exclusivity for the other Remaining Projects).

(b)    During the Exclusivity Period, SUNE shall not (and shall cause its affiliates and its and their representatives not to) take any action that would prevent, prohibit or impair Novatus' exclusive rights under Section 7(a) hereof; provided, that the Exclusivity Period shall terminate immediately upon the termination of the PSA by SUNE (or its applicable affiliates) solely as a result of fraud or willful and intentional misconduct under the PSA by Novatus or its affiliates (for the avoidance of doubt, willful and intentional misconduct includes the failure by Novatus or its affiliates to deliver the Purchase Consideration pursuant to the PSA upon the satisfaction or waiver by Novatus of the closing conditions set forth therein), or upon the date that the Bankruptcy Court makes a final determination not to approve the PSA Motion.

(c)    Upon the due execution and delivery of an Additional PSA, SUNE will promptly seek Bankruptcy Court approval of customary stalking horse protections for Novatus.  Upon such approval, SUNE would have the right to actively solicit higher and/or better offers to purchase the applicable Remaining Project and respond to any inquiries or offers to purchase the applicable Remaining Project, including supplying information relating thereto to prospective purchasers, for a customary period of time taking into consideration the schedules and milestone dates for the applicable Remaining Project.

8.    Entire Agreement; Assignment; Amendments; Enforceability.  This Letter Agreement constitutes the entire agreement between the signatory parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between such parties with respect to the subject matter hereof.  This Letter Agreement shall not be assignable by either SUNE or Novatus, and no provision in this letter agreement may be amended or waived, except by an instrument signed in writing by such parties.  This Letter Agreement shall solely inure to the benefit of and be binding upon the signatory parties and their respective successors and permitted assigns; provided, however, that the signatory parties agree that (a) the Sellers and any of their

affiliates that enter into the PSA and (b) the Released Parties are express third party beneficiaries hereto.

9.    <u>Governing Law; Submission to Jurisdiction; Jury Trial Waiver</u>.  This Letter Agreement and the rights of the signatory parties shall be construed in accordance with the laws of the State of New York (without giving effect to the principles of conflict of laws thereof that would require the application of the laws of a different jurisdiction).  With respect to any suit, action or proceedings relating to this Letter Agreement, each of the signatory parties irrevocably (a) submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in the Borough of Manhattan and of the United States District Court for the Southern District of New York, and any appellate court therefrom, and (b) waives any objection that it may have at any time to the laying of venue of any such suit, action or proceeding brought in any such court, waives any claim that any such suit, action or proceeding has been brought in an inconvenient forum and further waives the right to object, with respect to any such suit, action or proceeding, that such court does not have any jurisdiction over such party.  **EACH SIGNATORY PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

10.    <u>Counterparts; Severability; Headings</u>.  This Letter Agreement may be executed in any number of counterparts with the same effect as if all the signatory parties had signed the same document.  All counterparts may be delivered electronically via PDF or facsimile and shall be construed together and shall constitute one instrument.  In case any provision in or obligation under this Letter Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  The captions and paragraph headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Letter Agreement.

11.    <u>Due Authorization</u>.  Each signatory party warrants that its signatory is a duly authorized representative.

12.    <u>Fiduciary Duty</u>.  Pending entry of the Order by the Bankruptcy Court, nothing in this Letter Agreement shall be deemed to prevent the exercise by the Debtors of their fiduciary duties at any time.

[*Remainder of Page Intentionally Left Blank*]

Sincerely,


NOVATUS PROJECT HOLDINGS I, LLC

By: _____
      Name:  Steve Doyon
      Title:  Authorized Signatory


Acknowledged and Accepted
as of the date first above written:


SUNEDISON, INC.


By: _____
      Name:
      Title:

Sincerely,


NOVATUS PROJECT HOLDINGS I, LLC


By: _____
    Name:
    Title:


Acknowledged and Accepted
as of the date first above written:


SUNEDISON, INC.


By: _____
    Name:  Martin Truong
    Title:  Senior Vice President, General Counsel
           & Secretary

SunEdison, Inc.
May 19, 2016
Page 7

<u>Annex 1</u>
<u>Remaining Projects</u>

- All of the assets related to or associated with the 153 MW solar power project under development in Pecos County, Texas, known as the Buckthorn project

- All of the assets related to or associated with the 116 MW solar power project under development in Upton County, Texas, known as the Castle Gap project

- All of the assets related to or associated with the 149 MW wind power project under development in Val Verde County, Texas, known as the Rocksprings project

- All of the assets related to or associated with the 104 MW wind power project under development in Morton and Stark Counties, North Dakota, known as the Sunflower project

## EXHIBIT C

**Derrick Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **SUNEDISON, INC.**, *et al.*, | : | **Case No. 16-10992 (SMB)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |

---

**DECLARATION OF TIM DERRICK IN SUPPORT OF DEBTORS'**
**MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 105(a), 363(b), 363(f), 363(m), 1107, AND 1108 AND**
**BANKRUPTCY RULES 2002, 6004, 9006, AND 9019 AUTHORIZING AND**
**APPROVING ENTRY INTO COMMITMENT LETTER FOR CERTAIN**
**PROJECT SALES AND GRANTING RELEASES IN CONNECTION**
**THEREWITH**

I, Tim Derrick, being duly sworn, deposes, and says:

1.        I am the President and General Manager, North America Utility of SunEdison,

Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession in the above-

captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates,

"SunEdison" or the "Company").

2.        I joined SunEdison in 2011 following its acquisition of Axio Power, where I was

CEO and co-founder, a utility-scale project development company which has delivered over 150

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number
are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE
Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings,
LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison
International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison
Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison
Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge
Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison
Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308);
SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr.,
Maryland Heights, Missouri 63043.

MW of solar projects in the U.S. and Canada.  Prior to my current position, I led the Advanced Solutions team at SunEdison, which deploys energy storage solutions and technologies complementary to solar and wind projects.  Prior to leading SunEdison Advanced Solutions, I was President and General Manager of SunEdison's North American solar development business.  I have 14 years of experience in wind and solar, serving in project development roles at Enron, General Electric, and 3 Phases Energy.  I hold a BA from Dartmouth College and an MBA from the University of Michigan.

3.    I submit this declaration (this "Declaration") in support of the Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 363(c) and Bankruptcy Rules 2002, 6004, and 9019 Authorizing and Approving the Sale of the Sunflower Project to Novatus Project Holdings I, LLC and Granting Related Relief (the "Motion"),[2] filed contemporaneously herewith by the Debtors.  Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

4.    In my capacity as General Manager of North America Utility, I have expertise with respect to the Company's development and disposition of large-scale utility renewable energy projects in North America.  I am generally familiar with the Projects identified in the Motion as the Initial Projects, the Sunflower Project, and the Remaining Projects.

5.    I believe that it is in the best interests of the Debtors to consummate the sale of the Sunflower Project to Novatus Holdings on the terms set forth in the Commitment Letter for several reasons.  First and foremost is that the sale provides the best, and perhaps the only, chance for the Company to monetize the Sunflower Project through a Financed Project Sale.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

This is primarily due to the fact that, as a result of its familiarity with and prior involvement in the Sunflower Project, Novatus Holdings is likely the only purchaser that can close a sale quickly enough to preserve construction viability.   In addition, I believe that the Sunflower Project Proceeds and the Initial Projects Proceeds represent fair consideration in exchange for the Sunflower Project and the Initial Projects, and are generally commensurate with consideration received for similarly situated Projects.

6.    Currently, the Sunflower Project is in a stalled state that is rapidly losing viability. This means that contractors and vendors continue to accrue contractual fees, expenses, and in some cases liquidated damages, but are not making progress on construction of the Sunflower Project.  The longer vendors and contractors go without being paid, the more likely they are to redeploy crucial equipment (such as turbines) and other assets from the Sunflower Project to other uses.  Obtaining replacement equipment is expensive and increases the risk that milestones under the applicable PPA will be missed.  From a timing perspective, due to its location in North Dakota, construction on the Sunflower Project is not possible during the winter months.  For example, wind turbines cannot be delivered to the Sunflower Project site during the winder due to road restrictions.  If turbine deliveries slip beyond August 2016, the Sunflower Project will no longer be viable because major construction could not commence until approximately June 2017, making achievement of commercial operation by the September 2017 PPA termination date impossible.  Therefore, if the Sunflower Project sale is not consummated in the immediate future, it will become impossible to sell the Sunflower Project pursuant to a Financed Project Sale and the Sunflower Project's value would be irreversibly and exponentially degraded.

7.    I believe that a sale to Novatus Holding provides the best opportunity to close the sale of the Sunflower Project in a Financed Project Sale.  Due to the fact that Novatus Holdings

has already conducted substantial due diligence with respect to the Sunflower Project, I believe that the Sunflower Project sale could be consummated in a matter of weeks following the execution of the Commitment Letter.  However, if the Sunflower Project was to be sold to an alternative buyer, such alternative buyer would need to complete due diligence from scratch with respect to all aspects of the Sunflower Project, including, among other things, with respect to land, offtake, interconnection, permitting, equipment supply and EPC arrangements.  I believe that the intervening time delay associated with completing a sale to an alternative buyer would cause the Sunflower Project to become a riskier, less complete, less valuable Project without in-place financing which would likely result in the deterioration of estate value as the Company would likely lose substantial anticipated liquidity.

8.      In addition, I believe that the Sunflower Project Proceeds will provide the Debtors with a market return that is fair and unlikely to be exceeded by alternative purchasers. Specifically, the Commitment Letter contemplates that Novatus will purchase the Sunflower Project for cash consideration calculated utilizing a customary levered after-tax discounted cash flow analysis, based upon assumptions mutually agreeable to SUNE and Novatus Holdings, and an outside bounded discount rate equal to 12.0%.  The Sunflower Project Proceeds is fair, reasonable, and generally commensurate with the return and proceeds received by the Debtors for the sale of similarly situated Projects, including the Initial Projects pursuant to the MIPSA.

9.      The Initial Projects Proceeds also constitute fair market value for the transfer of the Initial Projects.  Specifically, the Company received gross proceeds of approximately $526 million and net proceeds of approximately $234 million in exchange for the Initial Projects.  I also analyzed the implied, blended levered after-tax internal rate of return with respect to the Initial Projects Sales.  Based on my experience and understanding of the Initial Projects, I

believe that the consideration received by the Company for the Initial Projects is reasonable and fair under the circumstances and the rate of return represents a market return for the Initial Project Sales.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, information, and belief, and after reasonable inquiry, the foregoing is true and correct.


Dated:  May 20, 2016

/s/ *Timothy Derrick*

By:     Timothy Derrick