SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors*
*and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC., *et al.*,** | : | **Case No. 16-10992 (SMB)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| | : | |

## NOTICE OF FILING OF PURCHASE AND SALE AGREEMENT IN CONNECTION WITH DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 363(f), 363(m), 1107, AND 1108 AND BANKRUPTCY RULES 2002, 6004, 9006, AND 9019 AUTHORIZING AND APPROVING ENTRY INTO COMMITMENT LETTER FOR CERTAIN PROJECT SALES AND GRANTING RELEASES IN CONNECTION THEREWITH

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**PLEASE TAKE NOTICE** that, on May 20, 2016, SunEdison, Inc. and certain of

its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") filed *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a),*

*363(b), 363(f), 363(m), 1107, and 1108 and Bankruptcy Rules 2002, 6004, 9006, and 9019*

*Authorizing and Approving Entry Into Commitment Letter for Certain Project Sales and*

*Granting Releases in Connection Therewith* [Docket No. 374] (the "Motion").[2]

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a copy of the

PSA, executed on May 31, 2016, attached hereto as Exhibit A.


Dated:  New York, New York
        May 31, 2016

                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                        By:   */s/ Jay M. Goffman*
                              Jay M. Goffman
                              J. Eric Ivester
                              Four Times Square
                              New York, New York 10036-6522
                              Telephone: (212) 735-3000
                              Fax: (212) 735-2000

                              -and-

                              James J. Mazza, Jr. (admitted *pro hac vice*)
                              Louis S. Chiappetta (admitted *pro hac vice*)
                              155 N. Wacker Dr.
                              Chicago, Illinois 60606-1720
                              Telephone: (312) 407-0700
                              Fax: (312) 407-0411

                              *Counsel for Debtors and Debtors in Possession*

---

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

## EXHIBIT A

**Purchase and Sale Agreement**

**EXECUTION VERSION**

**MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT**

DATED AS OF MAY 31, 2016

BY AND BETWEEN

SUNFLOWER RENEWABLE HOLDINGS 1, LLC,

AS SELLER,

AND

NOVATUS PROJECT HOLDINGS I, LLC,

AS PURCHASER

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND RULES OF INTERPRETATION ......................................... 1

    Section 1.1    Defined Terms ...................................................................... 1

    Section 1.2    Rules of Interpretation ...................................................... 15

    Section 1.3    Drafting of Documents ..................................................... 16

    Section 1.4    Disclosure Schedules ....................................................... 16

ARTICLE 2 SALE OF MEMBERSHIP INTEREST ..................................................... 16

    Section 2.1    Purchase and Sale of the Sunflower Project ..................... 16

    Section 2.2    Purchase Price ................................................................... 16

    Section 2.3    No Set-Off ......................................................................... 17

    Section 2.4    Closing .............................................................................. 17

    Section 2.5    Closing Deliverables by Seller.......................................... 17

    Section 2.6    Closing Deliverables by Purchaser ................................... 17

    Section 2.7    Conditions Precedent to the Closing.................................. 18

    Section 2.8    Tax Treatment ................................................................... 20

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER................................. 20

    Section 3.1    Organization...................................................................... 20

    Section 3.2    Organizational Documents................................................. 21

    Section 3.3    Authorization and Enforceability....................................... 21

    Section 3.4    Violation; Conflicts........................................................... 22

    Section 3.5    Consents and Approvals .................................................... 22

    Section 3.6    Brokers .............................................................................. 23

    Section 3.7    Litigation........................................................................... 23

    Section 3.8    Compliance with Law ....................................................... 23

    Section 3.9    Tax Matters ....................................................................... 23

    Section 3.10    Project Group .................................................................... 25

    Section 3.11    Nature of Business ............................................................ 27

    Section 3.12    Absence of Certain Changes ............................................. 27

    Section 3.13    Banking Relationships ....................................................... 28

    Section 3.14    Unlawful Payments; Anti-Money Laundering and Sanctions ................. 28

    Section 3.15    Contracts ........................................................................... 29

Section 3.16    Permits ................................................................................................ 29

Section 3.17    Land Contracts; Utilities ................................................................... 30

Section 3.18    Project Assets ..................................................................................... 31

Section 3.19    Environmental Matters........................................................................ 31

Section 3.20    Regulatory Status ............................................................................... 31

Section 3.21    Affiliate Interests ............................................................................... 32

Section 3.22    Intellectual Property........................................................................... 32

Section 3.23    Credit Support Obligations ................................................................ 33

Section 3.24    Board Members, Managers and Officers ........................................... 33

Section 3.25    Books and Records ............................................................................. 33

Section 3.26    Land Contracts ................................................................................... 33

Section 3.27    Upwind Array Events ......................................................................... 33

Section 3.28    Insurance ............................................................................................ 34

Section 3.29    No Other Warranties .......................................................................... 34

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................ 35

Section 4.1     Organization........................................................................................ 35

Section 4.2     Authorization and Enforceability ....................................................... 35

Section 4.3     Violation; Conflicts............................................................................. 35

Section 4.4     Consents and Approvals ..................................................................... 36

Section 4.5     Litigation............................................................................................. 36

Section 4.6     Brokers ................................................................................................ 36

Section 4.7     Regulatory Status ............................................................................... 36

Section 4.8     Accredited Investor; Investment Purpose .......................................... 36

Section 4.9     Bankruptcy.......................................................................................... 37

Section 4.10    Financial Ability ................................................................................ 37

Section 4.11    No Other Warranties .......................................................................... 37

ARTICLE 5 NON-DISCLOSURE ............................................................................ 37

Section 5.1     Confidentiality Regarding this Agreement ........................................ 37

ARTICLE 6 COVENANTS AND AGREEMENTS OF THE PARTIES .................................. 38

Section 6.1     Covenants Pending the Closing ......................................................... 38

Section 6.2     Regulatory and Other Authorizations, Consents and Filings.................. 41

Section 6.3     Books and Records ............................................................................. 41

Section 6.4     Further Assurances.............................................................................. 41

Section 6.5    Allocation of Certain Taxes ......................................................... 42

Section 6.6    Notice of Developments ............................................................. 42

Section 6.7    Landowner Estoppels ................................................................. 42

Section 6.8    Bankruptcy Matters ................................................................... 43

Section 6.9    Insurance ................................................................................... 43

ARTICLE 7 TERMINATION ................................................................................. 44

Section 7.1    Termination ............................................................................... 44

Section 7.2    Effect of Termination ................................................................ 45

ARTICLE 8 MISCELLANEOUS ........................................................................... 45

Section 8.1    No Survival ............................................................................... 46

Section 8.2    Assignment; No Third Party Beneficiaries ............................... 46

Section 8.3    Notices ...................................................................................... 46

Section 8.4    Choice of Law; Venue; Jurisdiction ......................................... 47

Section 8.5    Entire Agreement; Hierarchy of Agreements; Amendments and
               Waivers ..................................................................................... 47

Section 8.6    Severability ............................................................................... 48

Section 8.7    Time of Essence ........................................................................ 48

Section 8.8    Multiple Counterparts ............................................................... 48

Section 8.9    Expenses .................................................................................... 48

Section 8.10   Burden and Benefit .................................................................... 48

Section 8.11   No Recourse ............................................................................... 48

Section 8.12   Cumulative Remedies ................................................................ 49

Section 8.13   No Partnership or Joint Venture ................................................ 49

Section 8.14   Public Announcements .............................................................. 49

Section 8.15   Specific Performance ................................................................ 50

<u>Annexes</u>

A                         Purchaser Guaranties

<u>Exhibits</u>

A                         Form of Assignment of Membership Interest
B                         Purchaser Parent Guarantee
C                         Form of Sale Order
D                         FIRPTA Certificate

<u>Seller Disclosure Schedules</u>

1.1(a)                    Seller's Knowledge
3.4                       Violation; Conflicts
3.5                       Consents and Approvals
3.8                       Compliance with Law
3.10                      Project Group
3.13                      Banking Relationships
3.15                      Contracts
3.16                      Permits
3.17                      Land Contracts
3.19                      Environmental Matters
3.22(b)                   Registered Project Group Intellectual Rights
3.23                      Credit Support Obligations
3.24                      Board Members; Managers; Officers
3.28                      Insurance

## MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT

This Membership Interest Purchase and Sale Agreement is dated as of May 31, 2016 (the "Effective Date"), by and between Novatus Project Holdings I, LLC, a Delaware limited liability company ("Purchaser") and Sunflower Renewable Holdings 1, LLC, a Delaware limited liability company ("Seller").

RECITALS

A.      Seller owns all of the Equity Interests of Sunflower Renewable Holdings 2, LLC, a Delaware limited liability company ("Sunflower Renewable 2"), which owns all of the Equity Interests of Sunflower Renewables, LLC ("Sunflower Renewables"), which owns all of the Equity Interests of Sunflower Wind Holdings, LLC ("Sunflower Wind Holdings"), which owns all of the Equity Interests of Sunflower Wind Project, LLC (the "Project Company", and each of Sunflower Renewable 2, Sunflower Renewables, Sunflower Wind Holdings and the Project Company, individually, a "Sunflower Company"), which owns all of the assets related to or associated with the 104 megawatt wind power project under development in Morton and Stark Counties, North Dakota (the "Sunflower Project").

B.      In accordance with the terms and conditions of this Agreement, Seller, which will be a debtor in the jointly administered cases filed by SunEdison and certain of its Affiliates on April 21, 2016 under the Bankruptcy Code (the "Bankruptcy Cases") pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), intends, in the context of a sale under section 363 of the Bankruptcy Code, to sell and irrevocably and unconditionally transfer to Purchaser, and Purchaser desires to purchase from Seller, one hundred percent (100%) of the membership interests Seller owns directly or indirectly in Sunflower Renewable 2 (the "Membership Interest") and each other Sunflower Company in exchange for, on the Closing Date, the Purchase Price.

C.      Concurrently with the execution hereof, Purchaser has delivered to Seller the Purchaser Parent Guarantee pursuant to which Novatus is providing Seller with credit support in respect of Purchaser's obligations to pay the Purchase Price under Section 2.2.

D.      Prior to or concurrently with the execution hereof, SOLAS, NVT LLC and SunEdison have entered into that certain Secondment Agreement relating to the secondment of employees of NVT LLC and SunEdison to SOLAS.

In consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND RULES OF INTERPRETATION

**Section 1.1      Defined Terms**.  For purposes of this Agreement, the following terms shall have the following meanings:

"Action" means any suit, claim, proceeding, arbitration, audit, examination or investigation by or before any Governmental Entity or arbitral tribunal.

"Affiliate" means, as to a Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with such Person.

"Ancillary Agreements" means, collectively, (i) the Project Administrative Services Agreement to be entered into on the Closing Date by and between E.ON Energy Services, LLC and the Project Company, (ii) the Project BOP O&M Agreement to be entered into on the Closing Date by and between E.ON Energy Services, LLC and the Project Company and (iii) the Construction Management Agreement.

"Agreement" means this Membership Interest Purchase and Sale Agreement, including all Annexes, Exhibits and Schedules hereto, as the same may be modified, amended or supplemented from time to time in accordance with Section 8.5.

"Alternative Transaction" means a transaction or series of related transactions (whether by asset sale, equity purchase, merger, plan of reorganization, plan of liquidation or otherwise), pursuant to which Seller or any of its Affiliates (including SunEdison) proposes to enter into an agreement to sell, transfer or otherwise dispose of all or any non-de minimis portion of the Sunflower Project and/or the Project Assets (whether in combination with other assets of SunEdison or its Affiliates or otherwise) to a Person other than Purchaser, excluding the transactions contemplated by the Tax Equity Agreements.

"Assignment of Membership Interest" means an Assignment of Membership Interest between Seller and Purchaser, in the form attached hereto as Exhibit A.

"Balance Sheet" has the meaning set forth in Section 3.10(d).

"Balance Sheet Date" has the meaning set forth in Section 3.10(d).

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Books and Records" means any and all (i) accounting records, Tax records (other than income Tax records and work papers of Seller or any of its Affiliates other than each Sunflower Company) and ledgers and (ii) maps, surveys (including any Survey) relating to the Sunflower Project or the Project Group and Engineering Documents, in each case, that are, or have been, generated or commissioned by the Project Group, Seller or its Affiliates, or are otherwise in their possession or control, prior to the Closing and not otherwise primarily related to the business of Seller's Affiliates (other than the Sunflower Companies).

"Business" has the meaning set forth in Section 3.11(a).

"Business Day" means any day other than Saturday, Sunday or a holiday, on which banks are generally open for business in New York City, New York.

"Closing" has the meaning set forth in Section 2.4.

"Closing Date" has the meaning set forth in Section 2.4.

"Code" means the Internal Revenue Code of 1986, as the same may be amended from time to time, including any amendments or any substitute or successor provisions thereto.

"Commercially Reasonable Efforts" means reasonable efforts by a Party to accomplish the result contemplated and to cooperate with the other Party in endeavoring to accomplish such result, but shall not include the payment of fees not otherwise contemplated by this Agreement or the making of financial or other concessions as a condition to accomplishing the result contemplated, other than providing any customary and usual non-financial accommodation typically granted by sellers or buyers in transactions similar to the transactions contemplated hereby.

"Commitment Letter" means that certain commitment letter dated May 19, 2016, between SunEdison and Purchaser.

"Company Benefit Plans" means any Employee Benefit Plans, or any other programs, policies, practices, agreements or other arrangements providing for compensation, severance, termination pay or benefits, performance, equity-based compensation, deferred compensation, including any Contract under which any Sunflower Company or any of its respective Subsidiaries has any present or future Liability.

"Construction Management Agreement" means that certain Construction Management Agreement to be entered into on the Closing Date by and between SOLAS and the Project Company.

"Contract" means any agreement, contract, lease, consensual obligation, promissory note, evidence of Indebtedness, purchase order, letter of credit, license, promise or undertaking of any nature (whether written or oral and whether express or implied).

"Contracting Parties" has the meaning set forth in Section 8.11.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by Contract or otherwise, and specifically with respect to a corporation, partnership or limited liability company, means direct or indirect ownership of more than fifty percent (50%) of the voting securities in such corporation or of the voting interest in a partnership or limited liability company.

"Effective Date" has the meaning set forth in the preamble.

"Employee Benefit Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA (29 U.S.C. § 1002(3)), as amended, and the rules and

3

regulations promulgated thereunder, and any material bonus, incentive compensation, deferred compensation, stock purchase, stock option, stock ownership, stock appreciation rights, phantom stock, layoff, severance or other benefit plan, practice, policy or arrangement of any kind, whether written or oral, whether or not tax-qualified within the meaning of Section 401 of the Code.  For purposes of this Agreement, "Employee Benefit Plan" shall mean those plans (i) that are established or maintained by any Sunflower Company or an ERISA Affiliate (and any predecessor, firm, corporation, or other organization or any Third Party) and are or were in existence at the Closing Date or at any time within the six (6) year period prior thereto, or (ii) to which any Sunflower Company or an ERISA Affiliate contributes or has contributed, in each case, on behalf of any employee, former employee, manager, officer or director (or any beneficiary thereof) within the six (6) year period preceding the Closing Date.

"Engineering Documents" means the drawings, surveys, designs, diagrams, and technical specifications, scopes of work, project schedules, geotechnical reports, construction and turbine related reports, and other engineering documents related primarily to Sunflower Project that are generated, produced or obtained by any Sunflower Company, Seller or its Affiliates prior to the Closing.

"Environmental Claim" means any written notice received by, or any Action against, any member of the Seller Group relating to, or affecting in any way, the Project Group alleging potential Liability for violation of or Liability under an Environmental Law (including potential Liability for investigatory costs, cleanup costs, response or remediation costs, natural resources damages, property damages, personal injuries, fines or penalties) arising out of, based on or resulting from (i) the presence or Release of or the exposure of any Person to any Hazardous Substances on any area of the Project Site or any area of the Property that is utilized in the construction, ownership, operation or maintenance of the Facilities or any other location; (ii) circumstances forming the basis of any violation, or alleged violation, of or Liability under any Environmental Law or Environmental Permit, including with respect to the Sunflower Project or any area of any Property that is utilized in the construction, ownership, operation or maintenance of the Facilities or any other location or (iii) circumstances forming the basis of any claim at common law arising out of any violation, or alleged violation, of any Environmental Law or the presence, Release or exposure of any Person to, Hazardous Substances.

"Environmental Laws" means any and all Laws, each as amended, regulating, relating to or imposing Liability or standards of conduct concerning (i) pollution or protection of the environment or natural resources; (ii) the Handling of Hazardous Substances; (iii) the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources and (iv) as such relates to exposure to Hazardous Substances, the health and safety of Persons or property, including protection of the health and safety of employees. Environmental Laws shall include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund), 42 U.S.C. § 9601, et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq.; the Clean Air Act of 1970, 42 U.S.C. § 7401, et seq.; the Federal Water Pollution Control Act of 1977, 33 U.S.C. § 1251, et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701, et seq.; the Toxic Substances and Control Act of 1976, 15 U.S.C. § 2601, et seq.; the Emergency Planning & Community Right-To-Know Act of 1986, 42 U.S.C. § 11011, et seq.; the Safe Drinking Water Act of 1974, 42 U.S.C. § 300f, et seq.; the Pollution Prevention Act of 1990, 42 U.S.C. § 13101, et seq.; the Hazardous Materials

Transportation Act of 1975, 49 U.S.C. § 5101, et seq.; the Occupational Health and Safety Act of 1970, 29 U.S.C. § 651, et seq.; the Endangered Species Act of 1973, 7 U.S.C. § 136, 16 U.S.C. § 1531 et seq.; the Migratory Bird Treaty Act of 1918, 16 U.S.C. §§ 703–712; the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.; the Bald Eagle Protection Act, 16 U.S.C. 668-668d; and any equivalent state and local Laws, each as amended as of the Closing Date.

"Environmental Permit" means any Permit required or issued by any Governmental Entity under or in connection with any Environmental Law.

"Equity Interest" means any share capital, capital stock, partnership or limited liability company interest or other equity or voting interest or any security or evidence of Indebtedness convertible into or exchangeable for any share capital, capital stock, partnership interest or limited liability company interest or other equity interest, or any right, warrant or option to acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to Seller or any Sunflower Company, any member (other than a Sunflower Company) of a controlled group of corporations, group of trades or businesses under common control or affiliated service group that includes a Sunflower Company (as defined for purposes of Section 414(b), (c) and (m) of the Code).

"EWG" means an "exempt wholesale generator," as such term is defined in Section 1262(6) of PUHCA and the implementing regulations of FERC at 18 C.F.R. § 366.1 (2015).

"Facilities" means the wind power electric generating facilities (including the foundations, towers, wind turbine generators, electrical collection system, access roads and other equipment, materials and improvements associated therewith), located or to be located on the Project Site in connection with the Sunflower Project.

"FERC" means the Federal Energy Regulatory Commission.

"Financing Agreement" means the Construction Loan Financing Agreement to be entered into on the Closing Date by and among the Project Company, Norddeutsche Landesbank Girozentrale, New York Branch, as the mandated lead arranger, the administrative agent, and the issuing bank thereunder and the financial institutions from time to time party thereto.

"Financing Documents" means the "Financing Documents" as defined in the Financing Agreement.

"FPA" means the Federal Power Act, as amended, and the regulations of FERC issued thereunder.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied in accordance with past practice.

"Governmental Approvals" means all permits (including the Permits), licenses, approvals, consents and authorizations of any Governmental Entity.

"Governmental Entity" means any federal, regional, state, municipal or local government, any political subdivision thereof, or any governmental, judicial, public or statutory instrumentality, tribunal, agency, authority, body or entity, having legal jurisdiction over the matter, market or Person (or its assets) in question, including FERC, the PSC, and any governmental, quasi-governmental, or non-governmental body administering, regulating or having general oversight over electricity, power or other markets, including transmission, such as NERC, SPP or WAPA.

"Guaranties" means all guaranties, letters of credit, reimbursement agreements, bonds, deposits, prepayment amounts and other credit assurances of a comparable nature.

"Handling" or "Handled" means the production, use, treatment, storage, transportation, handling, generation, manufacture, processing, distribution, disposal, emission, discharge, Release or threatened Release.

"Hazardous Substances" means any substance, material or waste or constituent or pollutant or contaminant that, pursuant to any applicable Environmental Law, has been determined to be hazardous, toxic or dangerous to human health or the environment, including (i) any "hazardous substance" as defined pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended; (ii) any "pollutant or contaminant" as defined in 42 U.S.C. § 9601(33); (iii) any "hazardous waste" as defined pursuant to 40 C.F.R. Part 261; (iv) any petroleum, including crude oil and any fraction thereof; (v) natural or synthetic gas usable for fuel; (vi) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (vii) any asbestos, polychlorinated biphenyl, radium, or isomer of dioxin, or any material containing or composed of such substance or substances or (viii) any "hazardous material" as defined pursuant to 49 C.F.R. § 171.8.

"Hedge Agreements" means any agreement entered into by any Sunflower Company relating to non-speculative power or capacity transactions intended to hedge the basis risk in respect of the energy produced by the Sunflower Project.

"Indebtedness" means, with respect to any Person, any of the following:  (i) any indebtedness for borrowed money; (ii) any obligations evidenced by bonds, debentures, notes, mortgages, or other debt securities or similar instruments; (iii) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current Liabilities arising in the Ordinary Course of Business; (iv) any obligations as lessee under capitalized leases; (v) any obligations, contingent or otherwise, under letters of credit or similar facilities; (vi) any obligations under any hedge agreements (including the Hedge Agreements), including with respect to futures, swaps, collars, puts, calls, floors, caps, options or other similar agreements (including any option to enter into the foregoing) and (vii) any Guaranty of any of the foregoing, including any associated interest obligations, success fees, penalties, fees, charges, expenses and indemnities in respect of the items referred to in clauses (i) through (vi) (inclusive) above.

6

"Insurance Policies" has the meaning set forth in Section 3.28(a).

"Intellectual Property Rights" has the meaning set forth in Section 3.22(a).

"Interconnection Agreement" means the interconnection agreement for the Sunflower Project.

"Interim Period" has the meaning set forth in Section 6.1(a).

"Involvement Date" means April 2, 2015.

"IRS Notices" means IRS Notice 2013-29, IRS Notice 2013-60, IRS Notice 2014-46, IRS Notice 2015-25, and IRS Notice 2016-31.

"Knowledge" means the knowledge, after reasonable due inquiry, of any of the Persons listed on Schedule 1.1(a).

"Land Contracts" means all Leases, licenses, easements, subleases and other occupancy agreements relating to the Sunflower Project, and options to acquire any of the foregoing, to which one or more members of the Project Group are a party (or expects to become a party prior to the Closing Date).

"Laws" means any law, statute, rule, regulation, common law, ordinance, standard, code, order, judgment, decision, writ, injunction, decree, certificate of need, award or other legally binding governmental restriction of any Governmental Entity.

"Leases" means the lease easement agreements by and between one or more members of the Project Group and the respective owners of the land that is the subject of such lease easement agreements.

"Liabilities" means any and all direct or indirect liability, Indebtedness, obligation, commitment, losses, damages, expense, claim, deficiency, guaranty or endorsement of any type, whether accrued, absolute, contingent, matured, or unmatured.

"Lien" means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, restriction or limitation of any kind, charge or other encumbrance of any kind, or the interest of a vendor, lessor or other similar party under any conditional sale agreement, capital lease or other title retention agreement relating to any asset or any other Contract to give any of the foregoing, in any case, arising by Contract, operation of Law, statute or otherwise.

"Made Available" means, with respect to any specified documentation, that the documentation referred to was posted in legible form and made available to Purchaser in the Seller Dataroom at least three (3) Business Days prior to the Effective Date, it being understood that any modifications or supplements to such documentation made after the third (3rd) Business Day prior to the Effective Date were not Made Available.

"Material Contract" means (a) any Contract to which any Sunflower Company is a party, or by the terms of which any Sunflower Company is bound, that is material to the Sunflower

7

Project or such Sunflower Company or its business and operations, taken as a whole, and as to which the expected annual cost of performing such Contract by such Sunflower Company, or the annual revenue expected to be received under such Contract by such Sunflower Company, exceeds five hundred thousand dollars ($500,000), (b) any Contract that provides for nonmonetary obligations on the part of, or rights in favor of, any Sunflower Company, the non-performance or loss of which would have a Project Group Material Adverse Effect, (c) any Contract between any Sunflower Company and any Affiliate of any Sunflower Company, including, for the avoidance of doubt, any member of the Seller Group and any of such member's Affiliates, (d) to the extent not included in the foregoing, the Project Documents for the Sunflower Project and (e) with respect to each Sunflower Company, to the extent not included pursuant to clause (a) through (d), any and all of the following to which a Sunflower Company is a party or by which it is bound:

(i)     any and all Contracts for the purchase, exchange, transmission or sale of electric power in any form, including energy, capacity or any ancillary services and interconnection Contracts (including the Interconnection Agreement);

(ii)    other than Contracts of the nature addressed by subclause (i) above, Contracts for the purchase or sale of any material Project Assets or that grant a right or option to purchase or sell any material Project Assets;

(iii)   Contracts under which it has created, incurred, assumed or guaranteed any outstanding Indebtedness, or under which it has imposed a security interest on any of its Project Assets, tangible or intangible, which security interest secures outstanding Indebtedness;

(iv)    collective bargaining or other union Contracts or other employment or consulting Contracts;

(v)     Contracts that limit its freedom to compete in any line of business or in any geographic area;

(vi)    Contracts with any Governmental Entity;

(vii)   Contracts the principal purpose of which is for any Sunflower Company to indemnify any Third Party;

(viii)  partnership, joint venture, limited liability company or trust agreements or other similar arrangements;

(ix)    Real Property leases and any ground leases relating to the Real Property or other Contracts for the ownership, use, operation or maintenance of any portion of the Real Property or any rights appurtenant thereto;

(x)     any and all Ancillary Agreements; and

(xi)    Contracts relating to any equity or other securities of any Sunflower Company or rights in connection therewith (including the Tax Equity Agreements).

8

"MBR Authority" means authority conferred by FERC under Section 205 of the FPA to make wholesale sales of electric energy, capacity and certain ancillary services at negotiated or market-based rates, acceptance by FERC of a tariff under Section 205 of the FPA providing for such sales, and granting such waivers of FERC regulations and accounting requirements and granting blanket authorizations under the FPA as are customarily held by holders of market-based rate authority, including blanket authorization under Section 204 of the FPA and Part 34 of FERC's regulations for future issuances of securities or assumption of liabilities.

"Membership Interest" has the meaning set forth in the recitals.

"NERC" means the North American Electric Reliability Corporation and any regional entity exercising delegated authority therefrom.

"Non-Party Affiliates" has the meaning set forth in Section 8.11.

"Novatus" means Novatus Energy, LLC.

"Ordinary Course of Business" means, with respect to any Person, its ordinary course of business consistent with its past practice (not taking into account any financial distress of such Person), including such actions as may be required or advisable in connection with obtaining Sunflower Project financing under the Financing Documents or Tax Equity Agreements.

"Organizational Documents" means, with respect to any Person, all charter, organizational and other documents by which such Person (other than an individual) establishes its legal existence or which govern its internal affairs, and shall include: (i) in respect of a corporation, its certificate or articles of incorporation or association and/or its by-laws; (ii) in respect of a limited partnership, its certificate of limited partnership and its limited partnership agreement and (iii) in respect of a limited liability company, its certificate of formation and operating or limited liability company agreement.

"Owned Land" means the real property owned in fee by the Project Company.

"Parties" means Purchaser and Seller collectively.

"Party" means Purchaser or Seller individually.

"Permit Applications" means any application, petition or request made to any Governmental Entity on or before the Closing Date in order to obtain a Permit.

"Permits" means all licenses, consents, certificates (including permanent unconditional certificates of occupancy, if any), approvals, permits and any authorizations of any sort whatsoever by or from any Governmental Entity required under applicable Law for the development, construction, ownership, operation and maintenance of the Sunflower Project, all as described on Schedule 3.16. The Permits do not include the Permit Applications except in each case where a Permit Application is incorporated into a Permit.

"Permitted Liens" means (i) Liens for Taxes of a Sunflower Company and installments of assessments and charges with respect to the Project Assets imposed by any Governmental Entity,

9

in each case, not yet due and payable as of the Closing Date and for which adequate reserves have been maintained in accordance with GAAP (but only to the extent reflected as a current Liability), (ii) the Liens listed as exceptions to the Title Policy, solely to the extent that such Liens do not have a Project Group Material Adverse Effect, are not judgment or Tax Liens, and do not materially interfere with the operation of the Sunflower Project or the Project Assets as currently contemplated, (iii) Liens granted pursuant to the Financing Documents and "Permitted Liens" or "Permitted Encumbrances" as defined in the Financing Documents, (iv) any inchoate mechanics Liens for which no Lien or claim of Lien has been filed for record, and which arises out of Liabilities incurred in the Ordinary Course of Business in connection with the construction of the Sunflower Project; provided, that if any such Lien or claim of Lien has been filed for record, it shall constitute a Permitted Lien if a statutory bond that complies with applicable state Law has been filed in the applicable real property records bonding over such Lien or claim of Lien, (v) Liens that will be released on the Closing Date upon the payment of the obligations secured by such Liens with proceeds of the Purchase Price and (vi) any other matters affecting title to the Project Assets which are created by or with the prior written consent of Purchaser.

"Person" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, decedent's estate, organization, entity, or unincorporated organization or any Governmental Entity.

"Power Purchase Agreement" means any Contract entered into by any Sunflower Company for the purchase or sale of electric power, including energy, capacity or ancillary services.

"Pre-Closing Period" means any taxable period ending on or before the Closing Date and, for any taxable period that includes but does not end on the Closing Date, the portion thereof that ends on the Closing Date.

"Project Assets" means all assets, privileges, claims, properties, rights (including contractual rights), Contracts and interests of every kind and description, real and personal, tangible and intangible, absolute and contingent, wherever situated and of whatever kind and nature, whether or not reflected on the Books and Records (including interests in the real property pursuant to the Land Contracts and personal property interests), that are (i) owned or leased by any Sunflower Company, (ii) held in easement by any Sunflower Company, (iii) primarily used in connection with the ownership, operation and maintenance of the Sunflower Project or the Business and/or (iv) materially required for the ownership, construction, operation, or maintenance of the Sunflower Project or the Business.

"Project Company" has the meaning set forth in the recitals.

"Project Documents" means the Financing Documents, Power Purchase Agreements, Hedge Agreements, the applicable principal balance of plant or EPC Contract, the principal turbine supply and turbine service agreements, the Ancillary Agreements, the Interconnection Agreement and the Tax Equity Agreements.

"Project Group" means, collectively, all of the Sunflower Companies.

"Project Group Intellectual Property Rights" has the meaning set forth in Section 3.22(a).

"<u>Project Group Material Adverse Effect</u>" means any effect, change, condition, event or circumstance that, when taken individually or together with other effects, conditions, changes, events or circumstances, has or would reasonably be expected to have a material adverse effect on (a) the business, assets, Liabilities, financial condition or results of operations of the Sunflower Project or the Project Group taken as a whole, or (b) the ability of Seller or any Sunflower Company to perform its obligations and to consummate the transactions contemplated by this Agreement, excluding any effect, change, condition, event or circumstance resulting from (i) any change in the economy, interest rates, or financial markets (including any event or condition generally applicable to the electric generating, transmission or distribution industries, the wholesale or retail markets for electricity, natural gas and natural gas liquid prices, or the transmission system), (ii) the outbreak of hostilities, terrorist activities or war, (iii) earthquakes, hurricanes, tornadoes, floods or other natural disasters, (iv) any change in applicable Law or regulatory policy, (v) loss of wind, (vi) the announcement of the transactions contemplated hereby or (vii) the filing of SunEdison or any of its Affiliates of the Bankruptcy Cases; <u>provided</u>, that any of the effects, changes, conditions, events or circumstances referred to in clauses (i) through (v) inclusive shall not exclude any such item from the determination of whether a Project Group Material Adverse Effect has occurred to the extent such item has a disproportionate effect on the Sunflower Project or the Project Group as compared to other similarly situated participants in the electric power generation industry.

"<u>Project Permit</u>" means, as of any applicable date, any material Permit necessary as of such date for the ownership, development, construction, operation or maintenance of the Sunflower Project.

"<u>Project Site</u>" means the portion of the Property of the Sunflower Project on which the Facilities will be located.

"<u>Property</u>" means the real property interests of the Sunflower Project.

"<u>PSC</u>" means the North Dakota Public Service Commission.

"<u>Public Official</u>" means (i) any executive, official, officer, employee or other Representative of, or any Person acting in an official capacity for or on behalf of, any Governmental Entity, government department, government agency, government-controlled entity or public international organization (such as the World Bank or International Monetary Fund), (ii) any political party or party official or candidate for political office or (iii) any company, business, enterprise or other entity owned or controlled by any Person described in the foregoing clause (i) or (ii) of this definition.

"<u>PUHCA</u>" means the Public Utility Holding Company Act of 2005 and all rules and regulations adopted thereunder.

"<u>Purchase Price</u>" means $22,556,033.39.

"<u>Purchaser</u>" has the meaning set forth in the preamble.

"Purchaser Documents" means this Agreement, the Purchaser Parent Guarantee and each other agreement, document or instrument to be executed and delivered by Purchaser on the Closing Date pursuant to the terms of this Agreement.

"Purchaser Fundamental Representations" means the representations and warranties of Purchaser set forth in Section 4.1 (Organization), Section 4.2 (Authorization and Enforceability), Section 4.3 (Violation; Conflicts) and Section 4.6 (Brokers).

"Purchaser Guaranty" means each Guaranty made or issued by or for the account of Purchaser in connection with the financing of the Sunflower Project, all as set forth on Annex A.

"Purchaser Material Adverse Effect" means any effect, change, event or circumstance that, when taken individually or together with other effects, changes, events or circumstances, has, or would reasonably be expected to have, a material adverse effect on the ability of Purchaser or Novatus to perform their respective obligations and to consummate the transactions contemplated by this Agreement or the Purchaser Parent Guarantee, as applicable.

"Purchaser Parent Guarantee" means the guarantee executed by Novatus in favor of Seller attached hereto as Exhibit B.

"Real Property" means the Owned Land of the Sunflower Project and all interests in all other Property that is the subject of a Land Contract of the Sunflower Project, including all those Contracts or agreements listed on Schedule 3.17.

"Registered Project Group Intellectual Property Rights" has the meaning set forth in Section 3.22(a).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching or dumping of any Hazardous Substance.

"Representative" means, with respect to any Person, any member, partner, limited partner, equityholder, manager, officer, director, employee, principal, attorney-in-fact, agent, duly authorized representative of such Person or any other Person acting on behalf of any of the foregoing.

"Required Consents" means, in respect of the Closing, collectively, those consents set forth on the applicable part of Schedule 3.5 setting forth consents for the transactions being consummated at the Closing; provided, that if any such consent amends or modifies any Contract set forth in the applicable part of Schedule 3.15, or any right thereunder, imposes any condition on Purchaser or any of its Affiliates after the Closing Date, or requires Purchaser or any of its Affiliates to provide representations or warranties, then such consent shall be in form and substance reasonably satisfactory to Purchaser.

"Sale Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit C (with such changes as are acceptable to each Party) approving the sale of the Membership Interest to Purchaser in accordance with the terms of this Agreement and the Commitment Letter.

"Sanctions" has the meaning set forth in Section 3.14(b).

"Secured Parties" means "Secured Parties" as defined in the applicable Financing Documents.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" has the meaning set forth in the preamble.

"Seller Control Group" has the meaning set forth in Section 3.14(b).

"Seller Dataroom" means the dataroom maintained by Merrill Corporation on behalf of Seller or any successor dataroom maintained on behalf of Seller, to the extent related to the Sunflower Project or the Project Group.

"Seller Disclosure Schedules" means the Schedules delivered by Seller to Purchaser in connection with the execution and delivery of, and forming a part of, this Agreement.

"Seller Documents" means this Agreement and each other agreement, document or instrument to be executed and delivered by any member of the Seller Group on the Closing Date pursuant to the terms of this Agreement.

"Seller Fundamental Representations" means the representations and warranties of Seller set forth in Section 3.1 (Organization), Section 3.2 (Organizational Documents), Section 3.3 (Authorization and Enforceability), Section 3.4 (Violation; Conflicts), Section 3.6 (Brokers), Section 3.10 (Project Group) and Section 3.14 (Unlawful Payments; Anti-Money Laundering and Sanctions).

"Seller Group" means Seller and each Sunflower Company (excluding, on and after the Closing, any Sunflower Company).

"Senior Political Control Figure" means a current or former (i) senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government, (ii) a current or former senior official of a major non-U.S. political party or (iii) senior executive of a non-U.S. government-owned commercial enterprise.

"SOLAS" means SOLAS Energy Consulting U.S. Inc.

"SPP" means the Southwest Power Pool, Inc.

"Subsidiary" means, with respect to any Person, any other Person directly or indirectly Controlled by the first Person.

"SunEdison" means SunEdison, Inc.

"Sunflower Company" has the meaning set forth in the recitals.

"Sunflower Project" has the meaning set forth in the recitals.

"<u>Sunflower Renewable 2</u>" has the meaning set forth in the recitals.

"<u>Sunflower Renewables</u>" has the meaning set forth in the recitals.

"<u>Sunflower Wind Holdings</u>" has the meaning set forth in the recitals.

"<u>Survey</u>" means the most recently produced ALTA/ACSM survey of the Property (including the Lease parcels and all easements) that exists as of the Closing Date, without any requirement for any further update or supplement.

"<u>Tax Equity Agreements</u>" means, collectively, (i) the Equity Capital Contribution Agreement with respect to Sunflower Wind Holdings to be entered into on the Closing Date by and among Special Situations Investing Group II, LLC, Sunflower Renewables and Sunflower Wind Holdings (the "<u>ECCA</u>") and (ii) the Amended and Restated Limited Liability Company Agreement of Sunflower Wind Holdings, to be entered into in the form of Exhibit A to the ECCA.

"<u>Tax Returns</u>" means any report, form, return (including information return), statement, estimated tax filing or other information supplied or required to be supplied to a Governmental Entity with respect to Taxes, any amendments thereof or schedules or attachments thereto, and any documents with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information.

"<u>Taxes</u>" means all federal, state, local, foreign and other net income, gross income, estimated, gross receipts, sales, use, *ad valorem*, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, excise, escheat, unclaimed property, energy, unemployment, workmen's compensation, severance, stamp, occupation, premium, property taxes and assessments, windfall profits, value added, commercial rent, customs duties, capital gain, social security, royalty, documentary or other taxes, abatements, assessments, duties or charges in the nature of a tax, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, whether imposed directly or indirectly as a transferee or successor, pursuant to Law, by Contract or otherwise, and the term "<u>Tax</u>" means any one of the foregoing Taxes.

"<u>Terra Nova</u>" means Terra Nova Renewable Partners, LLC.

"<u>Third Party</u>" means, with respect to either Party, any Person that is not an Affiliate of such Party.

"<u>Title Policy</u>" means the existing title policy insuring that the Project Company has good and valued leasehold interests in the Project Site.

"<u>Transfer Taxes</u>" means any and all sales, use, transfer, real property transfer, recording, documentary, stamp, registration, stock transfer and other similar Taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated by this Agreement (including recording and escrow fees and any real property or leasehold interest transfer or gains tax and any similar Tax).

14

"WAPA" means the Western Area Power Administration, a federal agency organized under the United States Department of Energy.

**Section 1.2**    **Rules of Interpretation**.  Unless otherwise expressly provided or unless required by the context in which any term appears:

(a)    capitalized terms used in this Agreement have the meanings specified in Section 1.1 or elsewhere in this Agreement;

(b)    the singular shall include the plural and the plural shall include the singular;

(c)    references to "Articles," "Sections," "Annexes," "Schedules" or "Exhibits" shall be to articles or sections of, or annexes, schedules or exhibits to, this Agreement;

(d)    the words "herein," "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement;

(e)    all accounting terms not specifically defined herein shall be construed in accordance with GAAP;

(f)    references to this Agreement shall include a reference to all schedules, exhibits and annexes hereto, as this Agreement and such schedules, exhibits and annexes may be amended, modified, supplemented or replaced from time to time;

(g)    references to any agreement shall include such agreement as amended, modified, supplemented or replaced from time to time;

(h)    whenever a Person is permitted or required under this Agreement to make a decision in its "sole discretion" or "discretion," such Person (i) will be entitled to make such decision on the basis of any reason or for no reason at all, (ii) will be entitled to consider such interests (including its own interests) and factors as such Person desires, and (iii) will have no duty or obligation to give any consideration to any interest of or factors affecting any other Person, in each case (i), (ii), and (iii), to the fullest extent permitted by Law;

(i)    the use of the word "including" in this Agreement to refer to specific examples shall be construed to mean "including, without limitation" or "including but not limited to" and shall not be construed to mean that the examples given are an exclusive list of the topics covered;

(j)    the use of the word "or" is not intended to be exclusive;

(k)    each gender-specific term used in this Agreement has a comparable meaning whether used in a masculine, feminine or gender-neutral form;

(l)    relative to the determination of any period of time, "from" means "including and after," "to" means "to but excluding" and "through" means "through and including";

(m)     references to Laws shall mean a reference to such Laws as the same may be amended, modified, supplemented or restated and be in effect as of the date of the relevant warranty or representation (if any) given hereunder, and shall include rules and regulations promulgated thereunder; and

(n)     the titles, captions or headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to, and shall not, be a part of or affect the meaning or interpretation of this Agreement.

**Section 1.3    Drafting of Documents**.  The Parties collectively have prepared this Agreement, and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this Agreement or any part hereof.

**Section 1.4    Disclosure Schedules**.  Notwithstanding anything to the contrary contained in this Agreement, any information or disclosure contained in any Schedule or section of a Schedule of the Seller Disclosure Schedules shall be deemed to be disclosed and incorporated by reference in any other Schedule or section of a Schedule of the Seller Disclosure Schedules, as though fully set forth in such other Schedule or section of a Schedule for which such information is applicable, but solely to the extent that the content of such information or disclosure makes its applicability to such other Schedule or section of a Schedule of the Seller Disclosure Schedules reasonably apparent on its face.  No reference to or disclosure of any item or other matter in any Section of this Agreement, including any Schedule or section of a Schedule of the Seller Disclosure Schedules, shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Agreement.  Without limiting the foregoing, no such reference to or disclosure of a possible breach or violation of any Contract or Law shall be construed as an admission or indication that a breach or violation exists or has actually occurred. At any time prior to the Closing Date by delivery of written notice to Purchaser, Seller may supplement and amend the Schedules for any information or disclosure of any additional Material Contract or amendment to any additional Material Contract that has been approved in writing by Purchaser or that has been entered into between the Project Company and any Affiliate of Purchaser or arranged by Purchaser or its Affiliates and the Schedules shall be deemed to have included any such information or disclosure for all purposes of this Agreement, including Section 2.7(a)(ii).

## ARTICLE 2
## SALE OF MEMBERSHIP INTEREST

**Section 2.1    Purchase and Sale of the Sunflower Project**.  On the basis of the representations, warranties and agreements contained herein and subject to the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, all of Seller's right, title and interest in and to the Membership Interest, free and clear of all Liens.

**Section 2.2    Purchase Price**.  In consideration of the purchase and sale of the Membership Interest, Purchaser shall pay the Purchase Price on the Closing Date to Seller.

**Section 2.3**    **No Set-Off**.    Any payment to be made by a Party under this Agreement shall be made in immediately available funds paid by wire transfer to the applicable Party to such account as such Party shall have specified in writing without any deduction, setoff, counterclaim or withholding.

**Section 2.4**    **Closing**.    The consummation of the sale of the Membership Interest by Seller to Purchaser as contemplated by this Agreement (the "Closing") shall take place at the offices of Milbank, Tweed, Hadley & McCloy LLP located at 28 Liberty Street, New York, New York, 10038 (or such other location as shall be mutually agreed upon by Seller and Purchaser) on the Business Day on which all the conditions set forth in Section 2.7 (including those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions) have been satisfied or waived in accordance with this Agreement expressly in writing (the "Closing Date"); provided, that the time and date at which the Closing will be deemed to be effective shall be 12:01 a.m., New York City time, on the Closing Date.

**Section 2.5**    **Closing Deliverables by Seller**.    On the Closing Date, Seller shall deliver, or cause to be delivered, to Purchaser each of the following:

(a)    Assignment of Membership Interest.    A counterpart of the Assignment of Membership Interest in respect of the sale by Seller of all of its right, title and interest in the Membership Interest to Purchaser, duly executed by Seller.

(b)    Required Consents.    Evidence, in form and substance reasonably satisfactory to Purchaser, that the applicable Required Consents for the transactions being consummated on the Closing Date have been received and are in full force and effect.

(c)    Resignation Letters.    Resignation letters executed by each of the directors, officers, managers and other executives of the members of the Project Group.

(d)    Officer's Certificates.    A certificate duly executed by an authorized officer of Seller certifying as of the Closing Date that each of the conditions set forth in Section 2.7(a)(ii) have been satisfied and attaching thereto (i) a true, correct and complete copy of the certificate of formation of Seller, as amended; and (ii) the authority and incumbency of the officers of Seller executing this Agreement and the other Sellers Documents to which it is a party required to be delivered pursuant to this Section 2.5(d).

(e)    FIRPTA Certificate.    A duly executed certificate of non-foreign status, complying with the requirements of Treasury Regulations Section 1.1445-2(b)(2) and in the form attached hereto as Exhibit D, in respect of the transfer of the Membership Interest.

**Section 2.6**    **Closing Deliverables by Purchaser**.    On the Closing Date, Purchaser shall deliver, or cause to be delivered, to Seller each of the following:

(a)    Assignment of Membership Interest.    A counterpart of the Assignment of Membership Interest in respect of the sale by Seller of all of its right, title and interest in the Membership Interest to Purchaser, duly executed by Purchaser.

(b)    <u>Payment of Purchase Price</u>.  The Purchase Price, in immediately available funds paid by wire transfer to Seller to such account as Seller shall have specified in writing at least three (3) Business Days prior to the Closing Date.

(c)    <u>Authorized Signatory's Certificate</u>.    A certificate duly executed by an authorized signatory of Purchaser certifying as of the Closing Date that each of the conditions set forth in <u>Section 2.7(b)(ii)</u> have been satisfied and attaching thereto (i) a true, correct and complete copy of the certificate of formation of Purchaser, as amended; and (ii) the authority and incumbency of the authorized signatories of Purchaser executing this Agreement and the other Purchaser Documents to which it is a party required to be delivered pursuant to this <u>Section 2.6(c)</u>.

**Section 2.7    <u>Conditions Precedent to the Closing</u>.**

(a)    <u>Conditions Precedent to Obligations of Purchaser</u>.    The obligation of Purchaser to effect the Closing is subject to the satisfaction or waiver by Purchaser on or prior to the Closing Date of all of the following conditions:

(i)    Seller shall have delivered to Purchaser each of the documents and instruments set forth in <u>Section 2.5</u> in the manner described therein;

(ii)    (A) solely for purposes of the closing condition set forth in this subclause (a)(ii)(A), each of the representations and warranties contained in <u>Article 3</u>, other than Seller Fundamental Representations (disregarding all qualifications set forth therein relating to "materiality" or Project Group Material Adverse Effect) shall be true and correct as of the Closing Date (except to the extent such representations and warranties are, by their terms, made as of a specified date, in which case such representations and warranties shall be true and correct as of such specified date), except, in each case, where the failure of such representations and warranties to be true and correct would not have a Project Group Material Adverse Effect; (B) each of the Seller Fundamental Representations shall be true and correct as of the Closing Date (except to the extent the Seller Fundamental Representations are, by their terms, made as of a specified date, in which case such representations and warranties shall be true and correct as of such specified date); and (C) the covenants and agreements contained in this Agreement to be complied with by Seller on or before the Closing shall have been complied with in all material respects;

(iii)    the Required Consents for the transactions to be consummated on the Closing Date shall have been obtained and are in full force and effect;

(iv)    since the Effective Date, no Project Group Material Adverse Effect shall have occurred;

(v)    no preliminary or permanent injunction or other order or decree by any Governmental Entity which prevents the consummation of the sale of the Membership Interest shall have been issued and remain in effect and no Law shall have been enacted by any Governmental Entity since the Effective Date which prohibits the sale of the Membership Interest;

(vi)    (A) the "Closing Date" (as defined under the Financing Documents) shall have occurred or is occurring simultaneously, and Purchaser shall have received evidence reasonably satisfactory to it that each of the conditions precedent thereto shall have been or are being satisfied without waiver or other consent that would have an adverse impact on the Sunflower Project or the Project Group in any material respect and (B) the ECCA shall have been executed and delivered or is being executed and delivered simultaneously by all of the parties thereto and is or will be in full force and effect, and each of the conditions precedent to the signing thereof have been or are being satisfied without waiver or other consent that would have an adverse impact on the Sunflower Project or the Project Group in any material respect; provided, that (w) the Financing Documents and the ECCA, (x) any Material Contracts that remain under negotiation or otherwise unexecuted as of the Effective Date and are executed on or prior to the Closing Date, (y) any waivers or amendments to any Material Contracts executed or delivered on or after the Effective Date and on or prior to the Closing Date, and (z) any Material Contract, Land Contract or Project Permit that has not been Made Available to Purchaser and is executed or received on or prior to the Closing Date shall in each case be in form and substance reasonably acceptable to Purchaser;

(vii)    Purchaser shall have received evidence reasonably satisfactory to it demonstrating the payment by Seller or its Affiliates to each counterparty under each Material Contract (including each Land Contract) of all material payments due and payable to such counterparty under such Material Contract on or prior to the Closing Date;

(viii)    Purchaser shall have received a copy of each Ancillary Agreement, duly executed by each of the parties thereto; and

(ix)    the Bankruptcy Court shall have entered the Sale Order.

(b)    <u>Conditions Precedent to Obligations of Seller</u>.  The obligation of Seller to effect the Closing is subject to the satisfaction or waiver by Seller on or prior to the Closing Date of all of the following conditions:

(i)    Purchaser shall have delivered to Seller each of the documents and instruments set forth in <u>Section 2.6</u> in the manner described therein;

(ii)    (A) solely for purposes of the closing condition set forth in this subclause (b)(ii)(A), each of the representations and warranties contained in <u>Article 4</u>, other than the Purchaser Fundamental Representations (disregarding all qualifications set forth therein relating to "materiality" or Purchaser Material Adverse Effect) shall be true and correct as of the Closing Date (except to the extent such representations and warranties are, by their terms, made as of a specified date, in which case such representations and warranties shall be true and correct as of such specified date), except where the failure of such representations and warranties to be true and correct would not have a Purchaser Material Adverse Effect; (B) each of the Purchaser Fundamental Representations shall be true and correct as of the Closing Date (except to the extent such representations and warranties are, by their terms, made as of a specified date, in which case such representations and warranties shall be true and correct as of such specified date); and (C) the covenants and agreements contained in this Agreement to be complied with by Purchaser on or before the Closing shall have been complied with in all material respects;

19

(iii)    the Required Consents for the transactions to be consummated on the Closing Date shall have been obtained and are in full force and effect;

(iv)    no preliminary or permanent injunction or other order or decree by any Governmental Entity which prevents the consummation of the sale of the Membership Interest shall have been issued and remain in effect and no Law shall have been enacted by any Governmental Entity which prohibits the sale of the Membership Interest;

(v)    Purchaser shall have provided all Purchaser Guaranties and such Purchaser Guaranties shall be in full force and effect and the SunEdison letter of credit dated August 20, 2015, in favor of Basin Electric Power Cooperative shall have been terminated and the original thereof returned by the counterparty to SunEdison; and

(vi)    the Bankruptcy Court shall have entered the Sale Order.

Section 2.8    **Tax Treatment**.  For U.S. federal and relevant state and local income Tax purposes, the Parties intend and agree to treat the purchase and sale of the Membership Interest as a purchase by Purchaser (or any entity from which Purchaser is disregarded as separate for U.S. federal income tax purposes) and a sale by Seller (or any entity from which Seller is disregarded as separate for U.S. federal income tax purposes) in each case of the assets of each Sunflower Company, for an amount equal to the Purchase Price plus any assumed Liabilities (as applicable to the purchase of the Membership Interest).  Purchaser shall, within seventy-five (75) days following the Closing Date, prepare and deliver to Seller a statement allocating the Purchase Price (including any assumed Liabilities or other amounts treated as purchase price for U.S. federal income tax purposes) among the assets purchased in accordance with Code Section 1060 and the Treasury Regulations promulgated thereunder, which statement shall be conclusive absent manifest error.  The Parties intend and agree that Purchaser and Seller (and its Affiliates) will treat and report for all such purposes the purchase and sale of the Membership Interest on or after the Closing Date as described in this Section 2.8 (and the purchase price allocation statement prepared pursuant hereto) unless otherwise required by applicable Law or final determination by any taxing authority; provided, that each Party shall promptly inform the other of any proposed audit or contest of the treatment described in this Section 2.8 and shall use commercially reasonable efforts to have the treatment agreed to pursuant to this Section 2.8 upheld.

# ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as of the Effective Date and as of the Closing Date (except to the extent such representations and warranties are otherwise, by their terms, made as of a specified date), as follows:

Section 3.1    **Organization**.

(a)    Seller (i) is a limited liability company, duly formed, validly existing and in good standing under the Laws of the State of Delaware and (ii) is duly qualified to do business and in good standing in all jurisdictions in which the character of the properties owned or held

under lease by it or the nature of the business transacted by it makes qualification necessary, except where failure to so qualify would not have a Project Group Material Adverse Effect; and

(b)    Each Sunflower Company (i) is a limited liability company, duly formed, validly existing and in good standing under the Laws of the State of Delaware and (ii) is duly qualified to do business and in good standing in all jurisdictions in which the character of the properties owned or held under lease by it or the nature of the business transacted by it makes qualification necessary, except where failure to so qualify would not have a Project Group Material Adverse Effect.

### Section 3.2    Organizational Documents.

(a)    The Organizational Documents of Seller are in full force and effect.  Seller is not in violation of its Organizational Documents or in violation of any Law where such violation would have a Project Group Material Adverse Effect.  Seller has Made Available to Purchaser true, correct and complete copies of its Organizational Documents, as then in effect; and

(b)    The Organizational Documents of each Sunflower Company are in full force and effect.  No Sunflower Company is in violation of its respective Organizational Documents or is in violation of any Law where such violation would have a Project Group Material Adverse Effect.  Seller has Made Available to Purchaser true, correct and complete copies of the respective Organizational Documents of each Sunflower Company as then in effect.

### Section 3.3    Authorization and Enforceability.

(a)    Seller has taken all action necessary to execute and deliver this Agreement and the other Seller Documents to which it is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder, and no other action on the part of Seller is necessary to authorize this Agreement or the other Seller Documents and the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by Seller and, assuming due authorization, execution and delivery by Purchaser, and subject to the Bankruptcy Court's entry of the Sale Order, constitutes the legally valid and binding obligations of Seller, enforceable against Seller in accordance with its terms, except as the enforceability thereof may be limited by equitable principles (whether considered in a proceeding in equity or at law).  Each of the other Seller Documents to which Seller is a party has been duly executed and delivered by Seller, and, assuming due authorization, execution and delivery by the other parties thereto, and subject to the Bankruptcy Court's entry of the Sale Order, constitutes the legally valid and binding obligations of Seller, as applicable, enforceable against Seller in accordance with its terms, except as the enforceability thereof may be limited by equitable principles (whether considered in a proceeding in equity or at law); and

(b)    Each Sunflower Company has taken all action necessary to execute and deliver any Seller Documents to which it is a party and to consummate the transactions contemplated thereby and to perform its obligations thereunder, and no other action on the part of any Sunflower Company is necessary to authorize any Seller Documents and the transactions contemplated hereby and thereby.  Each Seller Document to which any Sunflower Company is a

party has been duly executed and delivered by such Sunflower Company, and assuming due authorization, execution and delivery by the other parties thereto, constitutes the legally valid and binding obligations of such Sunflower Company in accordance with its terms, except as the enforceability thereof may be limited by equitable principles (whether considered in a proceeding in equity or at law).

Section 3.4    <u>Violation; Conflicts</u>.

(a)    Neither the execution, delivery or performance by Seller of this Agreement or the other Seller Documents, nor the transfer of rights and consummation of the transactions contemplated hereby or thereby, will result in (i) a violation of or a conflict with any provision of any Organizational Document of Seller; (ii) except as set forth on <u>Schedule 3.4</u>, a breach or violation of, a conflict with, a default under, or the creation of any right of any Person to accelerate, terminate or cancel, any Material Contract or any Seller Documents, or give rise to any fees or penalties thereunder; (iii) subject to the Bankruptcy Court's entry of the Sale Order, a violation by Seller of any Laws or Permits applicable to it in any material respect; or (iv) an imposition of any Lien on the Membership Interest, any Sunflower Company's Equity Interests or the Project Assets (other than any interest of Purchaser therein created under this Agreement); and

(b)    Neither the execution, delivery or performance by any Sunflower Company of any Seller Documents to which any such Sunflower Company is a party, nor the transfer of rights and consummation of the transactions contemplated hereby or thereby, will result in (i) a violation of or a conflict with any provision of any Organizational Document of any such Sunflower Company; (ii) except as set forth on <u>Schedule 3.4</u>, a breach or violation of, a conflict with, a default under, or the creation of any right of any Person to accelerate, terminate or cancel, any Material Contract or any Seller Documents, or give rise to any fees or penalties thereunder; (iii) a violation by any Sunflower Company or the Sunflower Project of any Laws or Permits applicable to any of them in any material respect; or (iv) an imposition of any Lien on the Membership Interest, any Sunflower Company's Equity Interests or the Project Assets (other than any interest of Purchaser therein created under this Agreement).

Section 3.5    <u>Consents and Approvals</u>.    Except as set forth on <u>Schedule 3.5</u>:

(a)    Assuming the accuracy of the representations and warranties of Purchaser set forth herein, and receipt of the Required Consents and subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval or authorization of, Permit from, declaration, filing or registration with, or notice to, any Governmental Entity, any Third Party or any other Person is necessary to be made or obtained by Seller in connection with the execution, delivery and validity of the Seller Documents or the consummation of the transactions contemplated thereby; and

(b)    Assuming the accuracy of the representations and warranties of Purchaser set forth herein, and receipt of the Required Consents, no consent, approval or authorization of, Permit from, declaration, filing or registration with, or notice to, any Governmental Entity, any Third Party payer or any other Person is necessary to be made or obtained by any Sunflower Company in connection with the execution, delivery and validity of the Seller Documents to

which any such Sunflower Company is a party or the consummation of the transactions contemplated thereby.

**Section 3.6    Brokers**.

(a)    Neither Seller nor any of its Affiliates has any Contract, arrangement or understanding with any broker, finder, agent or other intermediary or Person or with any predecessor owner of the Project Group with respect to the transactions contemplated by this Agreement for which the Project Group, Purchaser or any Non-Party Affiliate of Purchaser is or could be liable; and

(b)    None of the Sunflower Companies, nor any of their respective Affiliates, has any understanding with any broker, finder, agent or other intermediary or Person or with any predecessor owner of the Project Group with respect to the transactions contemplated by this Agreement for which the Project Group, Purchaser or any Non-Party Affiliate of Purchaser is or could be liable.

**Section 3.7    Litigation**.  There are no Actions pending or, to the Knowledge of Seller, threatened in writing against or affecting (i) the Sunflower Project, the Project Assets, any Sunflower Company or any of their respective Equity Interests (including the Membership Interest) or (ii) the consummation of the transactions contemplated by this Agreement.  To the Knowledge of Seller, no event has occurred or circumstances exist that would reasonably be expected to give rise to, or serve as a basis for, any such Action that would reasonably be expected to have a Project Group Material Adverse Effect.

**Section 3.8    Compliance with Law**.  Except as set forth on Schedule 3.8, each Sunflower Company is and has been and maintains such Books and Records as is required to demonstrate that it is and, since the Involvement Date, has been in compliance, in all material respects, with all applicable Laws and Permits (including the NERC reliability standards and FERC, SPP and WAPA rules, regulations and orders, in each case as applicable, and excluding Environmental Permits, which are covered in Section 3.19) insofar as they relate to the Sunflower Project, the Project Site, each Sunflower Company, the Project Assets and the Equity Interests of the Sunflower Companies (including the Membership Interest).  Except as set forth on Schedule 3.8, no notice, charge, claim, Action or assertion has been filed or commenced, and since the Involvement Date, neither Seller nor any of its Affiliates has received any written notification currently in effect indicating or alleging any material violation of or material non-compliance with any applicable Law, license, franchise, Permit, authorization or concession, in each case as such would apply to the Equity Interests of the Sunflower Companies (including the Membership Interest), the Project Group, the Project Assets, the Sunflower Project or the transactions contemplated hereby, which has not been cured.

**Section 3.9    Tax Matters**.

(a)    Since the Involvement Date, all U.S. federal and state income, state franchise and other material Tax Returns required to be filed by or with respect to the Equity Interests of the Sunflower Companies (including the Membership Interest), the Sunflower Project, the Project Assets and each member of the Project Group have been timely filed (giving

effect to any extensions). All such Tax Returns are accurate and complete in all material respects. All material Taxes due and payable by each member of the Project Group, whether or not shown or reportable on any such Tax Return, have been paid in full. There are no Liens for Taxes (other than Taxes not yet due and payable) on the Project Assets other than Permitted Liens. There are no ongoing or pending Actions with respect to Taxes relating to the Sunflower Project, the Project Group or the Project Assets, and, to the Knowledge of Seller, no such Actions are threatened. There are no matters the outcome of which would have a Project Group Material Adverse Effect under discussion with any Governmental Entity with respect to Taxes relating to the Sunflower Project, the Project Group or the Project Assets. No extensions or waivers of any statute of limitations have either been requested or been granted with respect to Taxes relating to the Sunflower Project, the Project Group or the Project Assets.

(b) Since the Involvement Date, no claim is being asserted or has been asserted in writing by any Governmental Entity in a jurisdiction where any member of the Project Group does not file Tax Returns that such member is or may be subject to taxation by that jurisdiction with respect to the Project Group, the Sunflower Project or the Project Assets.

(c) No Sunflower Company is a party to any Tax allocation, Tax indemnity or Tax sharing agreement or similar arrangements (other than agreements and arrangements entered into in the Ordinary Course of Business the principal purpose of which is not the allocation or sharing of Taxes) pursuant to which Purchaser, the Project Group or any of their respective Affiliates would be bound after the Closing or may have any obligation to make payments after the Closing. No Sunflower Company has any Liability for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by Contract or otherwise.

(d) For U.S. federal income Tax purposes, the owner of each Sunflower Company is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code and/or United States Treasury Regulations Section 1.1445-2(b). At all times since their formation, each Sunflower Company is and has been either a partnership or an entity disregarded as separate from any of the other Sunflower Companies for U.S. federal income Tax purposes.

(e) No grants (including a grant under Section 1603 of the American Recovery and Reinvestment Act of 2009) have ever been provided in connection with, or with respect to, the Sunflower Project or the Project Assets and no tax-exempt bonds, subsidized energy financing or federal credits of the type described in Section 45(b)(3) of the Code (other than the renewable energy production tax credits provided for pursuant to Section 45 of the Code) has ever been provided in connection with, or with respect to, the Sunflower Project or any of the Project Assets.

(f) No power of attorney is currently in effect, and since the Involvement Date, no Tax ruling has been requested from or entered into with any Governmental Entity, with respect to any Tax matter relating to the Project Group, the Sunflower Project or the Project Assets.

(g) None of the Project Assets is tax-exempt bond financed property within the meaning of Section 168(g)(5) of the Code or "public utility property" within the meaning of

24

Section 168(f)(2) of the Code.  Seller is not a "tax-exempt entity" within the meaning of Section 168(h)(2) of the Code, and Seller is not a "tax-exempt controlled entity" within the meaning of Section 168(h)(6)(F)(iii) of the Code.  None of the Project Assets is treated as leased to a tax-exempt entity (within the meaning of Section 168(h)(2) of the Code).  No election under Section 168(g)(7) of the Code has been made with respect to any Project Asset.  Section 168(g)(1)(D) of the Code does not apply to any Project Asset.  The Sunflower Project is located within the United States within the meaning of Section 638(1) of the Code.

(h)     The Project Assets are comprised of not more than ten percent (10%) used property or components for U.S. federal income tax purposes.

(i)     To the Knowledge of Seller, each power purchase or sale contract associated with the Sunflower Project (but not any hedge) is treated as a service contract for U.S. federal income tax purposes.

(j)     Each Sunflower Company is disregarded as an entity separate from its owner for U.S. federal income tax purposes.

(k)     To the Knowledge of Seller, construction of the Sunflower Project did not commence, within the meaning of the Section 45(d)(1) of the Code and the IRS Notices, prior to January 1, 2013.

### Section 3.10    Project Group.

(a)     (i)     Subject to the Bankruptcy Court's entry of the Sale Order, Seller has good and valid title to, and full power and authority to sell, convey and assign legal and beneficial ownership, of the Membership Interest, free and clear of any Liens except Permitted Liens.

(ii)     Sunflower Renewable 2 owns all of the Equity Interests of Sunflower Renewables, and has good and valid title to such Equity Interests, free and clear of any Liens except Permitted Liens.  Sunflower Renewables owns all of the Equity Interests of Sunflower Wind Holdings, and has good and valid title to such Equity Interests, free and clear of any Liens except Permitted Liens.  Sunflower Wind Holdings owns all of the Equity Interests of the Project Company, and has good and valid title to such Equity Interests, free and clear of any Liens except Permitted Liens.   None of Sunflower Renewable 2, Sunflower Renewables, Sunflower Wind Holdings or the Project Company own any Equity Interests in any Person other than as described in this Section 3.10(a)(ii).

(iii)     All such Equity Interests in clauses (i) and (ii) above have been duly authorized by all necessary limited liability company action, have been duly issued and are fully paid and non-assessable.

(iv)     Upon delivery of the Purchase Price as provided herein, subject to the Bankruptcy Court's entry of the Sale Order, Seller shall have sold, conveyed and assigned to Purchaser good and valid title to the Membership Interest, free and clear of any Liens (other than Permitted Liens or those created by Purchaser or any of its Affiliates).

25

(b)    Except for (i) the rights created in favor of Purchaser under this Agreement, (ii) the Liens in favor of the Secured Parties pursuant to the Financing Documents, (iii) the rights of the Persons party to the Tax Equity Agreements, and (iv) as set forth in Schedule 3.10(b), Seller has not created, or committed to create, or allowed the creation of, any of the following, and none of the following exist as a result of any actions taken by or on behalf of Seller:  (A) any authorized or outstanding subscription, warrant, option, convertible security, or other right (contingent or otherwise) to purchase or otherwise acquire from Seller, or any Sunflower Company, Equity Interests in any Sunflower Company; (B) any commitment on the part of Seller or any Sunflower Company to issue any Equity Interests; (C) any reservation for issuance of Equity Interests in any Sunflower Company; (D) any obligation (contingent or otherwise) on the part of the Project Group to purchase, redeem or otherwise acquire any Equity Interests of any member of the Project Group; (E) any voting trust or agreement, members' agreement, pledge agreement, buy-sell agreement, right of first refusal, preemptive right or proxy relating to any Equity Interests of Seller or any Sunflower Company; or (F) subject to the Bankruptcy Court's entry of the Sale Order, any restrictions on the transfer of the Membership Interest.  None of the Equity Interests in any Sunflower Company was issued in violation of any preemptive right of first offer or other similar rights of any Person.

(c)    (i)    The Project Group does not currently have and has not at any time since the Involvement Date had any employees or any Liability or contingent Liability under any federal, state or local employment Law.

(ii)    No Sunflower Company or ERISA Affiliate thereof has any Liability or contingent Liability in respect to any Company Benefit Plan under Title IV of ERISA.

(iii)    Each Sunflower Company is in compliance with, in all material respects, all applicable Laws regarding employment and employment practices, including with respect to terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, workers' compensation, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment and affirmative action (to the extent applicable).  No Sunflower Company is a party to any collective bargaining agreement and no collective bargaining agreement is being negotiated by them; to the Knowledge of Seller, there are no current labor union organizing activities related to any Sunflower Company; there is no charge or complaint pending or, to the Knowledge of Seller, threatened against any Sunflower Company before the Equal Employment Opportunity Commission or any similar state, local or foreign agency responsible for the prevention of unlawful employment practices; no Sunflower Company is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Entity with respect to employees or employment practices; all individuals who perform services for such Sunflower Company have been properly classified as employees or independent contractors.

(d)    As of the Effective Date, Seller has Made Available to Purchaser accurate and complete copies of the unaudited consolidated balance sheet of the Project Company that was provided to the applicable lenders under the Financing Documents (the date of such balance sheet, the "Balance Sheet Date" and such balance sheet, the "Balance Sheet").  The Balance

26

Sheet (including any notes thereto) was prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, was based on the books and records of the Project Company, and fairly presents, in all material respects, the consolidated financial position of the Project Company as of the Balance Sheet Date.

(e)    Except as set forth on Schedule 3.10(e), no Sunflower Company has any Liabilities to Seller or any of its Affiliates.  No Sunflower Company has any Liabilities, obligations or commitments (whether absolute or contingent), of a nature that would be required by GAAP to be reflected in a consolidated balance sheet of the Project Group, other than:

(i)    Permitted Liens or the requirements of applicable Laws (excluding any violation thereof); or

(ii)    Liabilities since the Balance Sheet Date incurred in the Ordinary Course of Business and consistent with past practices, including for avoidance of doubt Liabilities incurred or permitted under the Financing Documents or Tax Equity Agreements; or

(iii)    Liabilities set forth on the Balance Sheet.

(f)    There is no Action by any Governmental Entity with respect to the Project Group or the Project Assets that is pending or, the Knowledge of Seller, threatened, nor has any Governmental Entity advised Seller in writing of an intention to conduct any such Action, in each case, except as does not have a Project Group Material Adverse Effect.

(g)    No Sunflower Company is the subject of any written claim for indemnification under any Material Contract, except as would not have a Project Group Material Adverse Effect.

Section 3.11    **Nature of Business**.  Since the Involvement Date:

(a)    the Project Company has engaged solely in the business of developing, constructing, and owning the Sunflower Project (the "Business");

(b)    subject to the Tax Equity Agreements, each of Sunflower Renewables and Sunflower Wind Holdings has engaged solely in the business of directly or indirectly owning the Equity Interests in the Project Company;

(c)    Sunflower Renewable 2 has engaged solely in the business of owning the Membership Interest; and

(d)    no Sunflower Company has engaged in any other business, incurred any capital expense or acquired any real or personal property other than specifically related to the Business.

Section 3.12    **Absence of Certain Changes**.  As of the Closing Date, since the Balance Sheet Date, (a) no member of the Project Group has (i) conducted its business other than in the Ordinary Course of Business, (ii) changed its accounting methods or practices in any

material respect or (iii) agreed or committed to do any of the foregoing; and (b) there has not been a Project Group Material Adverse Effect.

Section 3.13    **Banking Relationships**.    Schedule 3.13 sets forth the names, account numbers and locations of all banks, trust companies and other financial institutions in which any Sunflower Company has accounts, lines of credit or safety deposit boxes and, with respect to each account, line of credit or safety deposit box, the numbers thereon, and the names of all Persons authorized to draw thereon or to deliver instructions or otherwise have access thereto.

Section 3.14    **Unlawful Payments; Anti-Money Laundering and Sanctions**.

(a)    None of Seller, any member of the Project Group, nor to the Knowledge of Seller, their respective Affiliates and Representatives (provided, that the aforementioned "Knowledge qualifier" shall not apply to the officers, directors or employees of any member of the Project Group in connection with this Section 3.14) directly or indirectly, in connection with any Sunflower Company or the Business (i) has made, authorized, promised or offered or is making, authorizing, promising or offering any contributions, gifts, entertainment or payments of money or anything of value or other expenses related to political activity in violation of any applicable Laws, (ii) has made, authorized, promised or offered or is making, authorizing, promising or offering any payments, including gifts or anything else of value, to any Public Official or employee, political party or official thereof, candidate for political office, or any Person acting in any capacity for or on behalf of any of the foregoing, in violation of any applicable Laws, (iii) has established or maintained, or is maintaining, any fund of corporate monies or other properties or assets in violation of any applicable Laws, (iv) has made, authorized, promised or offered or is making, authorizing, promising or offering any payments, including gifts or anything else of value, to any Person, while knowing or believing that all or some portion of the money or value will be offered, given or promised to a Public Official or other Person for the purposes of obtaining or retaining business or securing any improper advantage or in other circumstances when such offer, payment or promise would be in violation of applicable Laws, (v) has made any gift, bribe, rebate, payoff, influence payment, kickback or any other payment of any nature in violation of any applicable Laws, (vi) has been subject to any investigation by any Governmental Entity authorities or regulators with regard to any actual or alleged breach of any relevant anti-corruption Law or (vii) has violated or is violating any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable Laws or any conventions to which any Sunflower Company is subject relating to corruption, bribery, money laundering, political contributions or gifts and gratuities.

(b)    Seller, all beneficial owners of Seller, and each Person, directly or indirectly, Controlling or Controlled by Seller (collectively, the "Seller Control Group"; provided, for purposes of this Section 3.14(b), references to the Seller Control Group as relating to TerraForm Power, Inc. and TerraForm Global, Inc. and their respective Subsidiaries shall be qualified to the Knowledge of Seller) is in compliance with all anti-money laundering Laws related to the prevention of money laundering and terrorist financing in the jurisdictions in which the Seller Control Group operates.  Seller is not a Person that is, or is owned or Controlled by Persons that are:    (i)   the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, the

United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions") or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions. None of the transactions contemplated by this Agreement will violate Sanctions applicable to Seller. No member of the Seller Control Group is a Senior Political Control Figure, an immediate family member of a Senior Political Control Figure, or a close associate of a Senior Political Control Figure. No member of the Seller Control Group is a shell bank.

**Section 3.15    Contracts**.    Schedule 3.15 contains a true, correct and complete list of all Material Contracts.    Seller has Made Available to Purchaser a true, correct and complete copy of each Material Contract.    With respect to each Material Contract:

(a)    except as set forth on Schedule 3.15, such Contract is the legal, valid and binding obligation of the applicable Sunflower Company and, other than in respect of the Ancillary Agreements, to the Knowledge of Seller, in full force and effect and enforceable against each other party thereto in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and equitable principles (whether considered in a proceeding in equity or at law); and

(b)    with respect to such Contract, (i) no Sunflower Company is in material breach or default, (ii) other than in respect of the Ancillary Agreements, to the Knowledge of Seller, no other party is in material breach or default, and (iii) other than in respect of the Ancillary Agreements, no event has occurred and no circumstance exists that with notice or lapse of time or both would constitute a material breach or default, or permit termination, modification, or acceleration of such Contract by any party thereto, or which would result in any loss of any material Sunflower Company right thereunder.

**Section 3.16    Permits**.    Schedule 3.16 contains a true, correct and complete list of all Project Permits.    No material Permits (excluding Environmental Permits which are covered in Section 3.19) are required for the ownership, development, construction, operation or maintenance of the Sunflower Project, other than the Project Permits.    Seller has Made Available to Purchaser a true, correct and complete copy of each Project Permit required to have been obtained as of the Closing Date.    With respect to each Project Permit:

(a)    with respect to any Project Permits required to have been obtained as of the Closing Date, such Project Permit is legal, valid, binding and enforceable in accordance with its terms and is in full force and effect as of the Closing Date;

(b)    with respect to any Project Permits not required to have been obtained as of the Closing Date, to the Knowledge of Seller, no facts or circumstances exist that make it reasonably likely that any such Project Permit will not be so obtainable in due course prior to the time that such Project Permit becomes required for the development, construction and operation of the Sunflower Project;

(c)    the consummation of the transactions contemplated by this Agreement will not affect the legality, validity, binding nature, enforceability or force and effect of such Project Permit; and

(d)    the Project Group is in compliance in all material respects with the terms and conditions of such Project Permit, and, except as set forth in <u>Schedule 3.16(d)</u>, to the Knowledge of Seller, no event has occurred that with notice or lapse of time would constitute material non-compliance with such terms and conditions.

**Section 3.17    <u>Land Contracts; Utilities</u>**.

(a)    <u>Schedule 3.17</u> contains a true, correct and complete list of all Land Contracts.  All such Land Contracts are included in the Project Assets and have been Made Available to Purchaser.  With respect to each Land Contract listed in <u>Schedule 3.17</u>:

(i)    each Land Contract is legal, valid, binding, and enforceable against the parties thereto in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and equitable principles (whether considered in a proceeding in equity or at law), and, to the Knowledge of Seller, in full force and effect and, except as set forth in <u>Schedule 3.17</u>, has not been amended or modified; and

(ii)    Seller is not, and to the Knowledge of Seller no other party to such Land Contract is, in breach or default, and, to the Knowledge of Seller, no event has occurred that with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under the Land Contracts, except to the extent that any such breach or default does not have a Project Group Material Adverse Effect.

(b)    except for the Owned Land set forth in <u>Schedule 3.17</u>, no Sunflower Company holds any fee interest in any real property.

(c)    the Project Group has good and valid leasehold and easement interests, as applicable, in the Property described in the Land Contracts listed on <u>Schedule 3.17</u>.  There are no Liens, other than Permitted Liens, on the leasehold and easement interests of the Project Group under the Land Contracts listed on <u>Schedule 3.17</u>.  Except as set forth in the Land Contracts on <u>Schedule 3.17</u>, and excepting any Financing Documents, there are no outstanding Contracts to which any member of the Seller Group is a party, and, to the Knowledge of Seller, no outstanding Contracts to which a member of the Project Group is not a party, for the sale of, or purchase options, rights of first refusal, subleases, licenses, concessions or any other Contract affecting any of the Project Group's interest in a Land Contract listed on <u>Schedule 3.17</u>, or granting any other Person any right which could interfere with any Sunflower Company's possession, use, occupancy or enjoyment of its interest in real property pursuant to a Land Contract.  To the Knowledge of Seller, no Property that is the subject of a Land Contract listed on <u>Schedule 3.17</u> is subject to any pending or threatened condemnation proceeding by any Governmental Entity.

(d)     there have been no changes to the Property or the Project Site since the date of the Survey that are, or could reasonably be expected to be, materially adverse to the Sunflower Project.

(e)     with respect to Owned Land, the applicable Sunflower Company possesses good and marketable title thereto, free and clear of any Lien, other than Permitted Liens.

**Section 3.18    Project Assets**.  With respect to each Project Asset, the Project Group possesses good and marketable title in and to each material Project Asset purported to be owned by it and has a valid leasehold interest in each material Project Asset that it leases, in each case, free and clear of any Liens, other than Permitted Liens.

**Section 3.19    Environmental Matters**.  Except as set forth in Schedule 3.19, (i) the Project Group is, and, since the Involvement Date, has been, in material compliance with applicable Environmental Laws, and has no material Liability under applicable Environmental Laws (other than for Liabilities suffered or incurred in the Ordinary Course of Business in maintaining compliance with such Environmental Laws); (ii) the Project Group has obtained and holds all material Environmental Permits required in all material respects for the ownership, construction and operation of the Sunflower Project, and is in material compliance with such Environmental Permits; (iii) no member of the Project Group has received or been subject to any Environmental Claims since the Involvement Date that have not been cured or resolved; (iv) except as provided in any assessment, report or audit Made Available to Purchaser as provided in the last sentence of this Section 3.19 or which has been cured or remediated, there has not been since the Involvement Date a Release of Hazardous Substances on or otherwise affecting any area of the Project Site or any of the Property that is utilized in the construction and installation of the Facilities that would reasonably be expected to result in a material Liability or material obligation to any of the Project Companies under any Environmental Law; (v) since the Involvement Date, no portion of the Project Site has been used for treatment, storage or disposal of Hazardous Substances, or contains or has contained any underground storage tank or surface impoundment used for the management of wastewater that contains or contained regulated levels or concentrations of Hazardous Substances which has or would reasonably be expected to result in a material Environmental Claim against any member of the Project Group; (vi) no Sunflower Company has entered into any Contract whereby it is assuming any Liability for or has agreed to indemnify any Person with respect to any known or reasonably likely Environmental Claims or any violations of, or Liability under, Environmental Laws; and (vii) neither the Project Group nor, to the Knowledge of Seller, any predecessors of any member of the Project Group has Handled any Hazardous Substance at any off-site location which has or would reasonably be expected to result in a material Environmental Claim against any member of the Project Group. Seller has Made Available to Purchaser a copy of all material written environmental assessments, reports, and audits in Seller's possession or under its control that relate to the Project Site or compliance by the Sunflower Companies with Environmental Laws.

**Section 3.20    Regulatory Status**.

(a)    No Sunflower Company is an "investment company," a company "controlled" by an investment company or an "investment advisor" within the meaning of the Investment Company Act of 1940.

(b)    No Sunflower Company is currently subject to regulation under PUHCA or the FPA, or regulation by the PSC with respect to the rates of public utilities or the financial or organizational regulation of public utilities.  Upon the earlier of the initial generation of electric energy from the Sunflower Project and the filing of a notice of self-certification as an EWG by the Project Company with FERC, (i) the Project Company will be an "electric utility company" and a "public-utility company" under PUHCA, but so long as the Project Company is an EWG, the Project Company will be exempt from regulation under PUHCA other than regulation relating to obtaining and maintaining its EWG status, pursuant to 18 C.F.R. § 366.7(e), and (ii) each of Sunflower Renewable 2, Sunflower Renewables and Sunflower Wind Holdings will be a "holding company" under PUHCA, but so long as the Project Company is an EWG, each of Sunflower Renewable 2, Sunflower Renewables and Sunflower Wind Holdings will be exempt from regulation under PUHCA to the extent set forth in 18 C.F.R. § 366.3(a).  The Project Company will be a "public utility" as such term is defined in Section 201(e) of the FPA upon the earlier of the initial generation of electric energy from the Sunflower Project and the issuance by FERC of an order granting MBR Authority to the Project Company.  Purchaser will be solely responsible for all Governmental Approvals required to obtain and maintain such EWG status and MBR Authority for the Project Company following the Closing.

(c)    Seller is not aware of any reason that the Project Company cannot obtain EWG status and MBR Authority prior to the initial generation of electric energy by the Sunflower Project.

(d)    No approval is required by FERC or the PSC for the consummation of the transactions contemplated by this Agreement, or for the execution and delivery of the Financing Documents (or the consummation of the transactions contemplated thereby).

**Section 3.21    Affiliate Interests**.  Neither Seller nor any of its Affiliates (other than the Project Group) nor any officer, director or equity holder of Seller, or any of their respective Affiliates (other than the Project Group) (a) has any agreement with any Sunflower Company for the provision of goods or services or (b) has any pending or, to the Knowledge of Seller, threatened claim or cause of action against the Project Group, except for expenses incurred in the Ordinary Course of Business.

**Section 3.22    Intellectual Property**.

(a)    The Project Company owns or possesses licenses or valid rights (free and clear of all Liens (other than Permitted Liens)) to use all material:  (i) trademarks, service marks, trade names, Internet domain names, and all goodwill associated therewith and symbolized thereby, and registrations and applications therefor, including renewals; (ii) copyrights in published and unpublished works of authorship including computer software programs, applications, source code and object code, and databases and other compilations of information, and registrations and applications therefor, including extensions, renewals, and restorations; (iii) to the Knowledge of Seller, as applicable, patents and pending patent applications; and

32

(iv) confidential and/or proprietary information, trade secrets and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, the "Intellectual Property Rights"), in the case of each of (i) through (iv), that are used or held for use in the conduct of the Business as currently conducted (collectively, the "Project Group Intellectual Property Rights"), in each case except as does not have a Project Group Material Adverse Effect. Part (b) of Schedule 3.22 sets forth all registrations and applications for registration included in the Project Group Intellectual Property Rights that are owned by the Project Company (collectively, the "Registered Project Group Intellectual Property Rights").

(b)    To the Knowledge of Seller, the operation of the Business does not infringe upon or otherwise violate any Intellectual Property Rights of any Third Party except as does not have a Project Group Material Adverse Effect. Neither Seller nor any of its Affiliates has received any written notice with respect to the Sunflower Project that the operation of the Business infringes upon or otherwise violates the Intellectual Property Rights of any Person. To the Knowledge of Seller, no Third Party is infringing or otherwise violating any of the rights of the Project Group in or to any of its owned and material Project Group Intellectual Property Rights. To the Knowledge of Seller, all the material Registered Project Group Intellectual Property Rights are valid and in good standing. All registration, maintenance and renewal fees (as applicable) currently due in connection with the material Registered Project Group Intellectual Property Rights have been timely paid except as does not have a Project Group Material Adverse Effect. None of the material Registered Project Group Intellectual Property Rights has been terminated or impaired or has become terminable or impaired, or will be terminated or impaired, in whole or in part, as a result of the transactions contemplated by this Agreement.

Section 3.23    **Credit Support Obligations**.    Other than the Purchaser Guaranties, there are no credit support obligations required under the Project Documents or otherwise related to the ownership, financing, construction or operation of the Sunflower Project, other than those listed on Schedule 3.23 on the Effective Date. Other than the Purchaser Guaranties and as set forth on Schedule 3.23, no such credit support obligations listed on Schedule 3.23 are an obligation of any Person other than the Project Company. There are no credit support obligations required under any Material Contract that are not shown on either Schedule 3.23 or Annex A.

Section 3.24    **Board Members, Managers and Officers**.    Schedule 3.24 is a correct and complete list of the board members, managers and officers of each Sunflower Company, and indicates any independent managers thereof.

Section 3.25    **Books and Records**.    True and correct copies of the Books and Records of each Sunflower Company have been Made Available to Purchaser.

Section 3.26    **Land Contracts**.    The Land Contracts shall be sufficient for the Project Group to conduct the Business as contemplated in the Project Documents.

Section 3.27    **Upwind Array Events**.    There has not been an "Upwind Array" event in respect of the Sunflower Project (as such term is defined in the applicable Financing

33

Document).  To the Knowledge of Seller, there are no (a) existing occurrences or developments that are reasonably expected to give rise to an "Upwind Array" event or (b) planned developments or other activities by Seller or its Affiliates that are reasonably expected to result in the erection of a wind turbine within a radius of forty (40) rotor diameters from a wind turbine generator in operation by a Sunflower Company.

Section 3.28  **Insurance**.  As of the Effective Date and as of immediately prior to the Closing:

(a)  the businesses or properties of the Sunflower Companies are insured under the master insurance policies of Seller and its Affiliates to the extent specified under the insurance policies listed on Schedule 3.28(a) (the "Insurance Policies");

(b)  all premiums with respect to the Insurance Policies have been paid to the extent due and payable;

(c)  no written notice of cancellation or termination has been received by any member of the Seller Group with respect to any Insurance Policy that have not been replaced on substantially similar terms prior to the date of such cancellation or termination; and

(d)  neither Seller or any of its Affiliates (including the applicable Sunflower Company) is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any of the Insurance Policies.

Section 3.29  **No Other Warranties**.    EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 3 OR IN ANY OFFICER'S CERTIFICATE DELIVERED TO PURCHASER PURSUANT TO SECTION 2.5(D), SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE MEMBERSHIP INTEREST, ANY SUNFLOWER COMPANY, THE PROJECT ASSETS, THE SUNFLOWER PROJECT OR THE PROJECT SITE, THE DEVELOPMENT, CONSTRUCTION, OWNERSHIP, OPERATION OR MAINTENANCE OF THE SUNFLOWER PROJECT, OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE SUNFLOWER PROJECT, THE PROJECT ASSETS, THE PROJECT SITE OR ANY SUNFLOWER COMPANY, INCLUDING WITH RESPECT TO WHETHER THE SUNFLOWER PROJECT WILL PRODUCE POWER AT ANY PARTICULAR LEVEL OR FOR ANY PERIOD OF TIME.

WITHOUT LIMITING THE FOREGOING, AND EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 3 OR IN ANY OFFICER'S CERTIFICATE DELIVERED TO PURCHASER PURSUANT TO SECTION 2.5(D), SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, USAGE OR SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE SUNFLOWER PROJECT, THE PROJECT ASSETS, THE PROJECT SITE OR ANY PART THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, OR COMPLIANCE OF SUCH PROPERTIES OR ASSETS WITH ANY LAWS OR

AS TO THE CONDITION OF THE PROJECT GROUP, THE SUNFLOWER PROJECT, THE PROJECT ASSETS, THE PROJECT SITE OR ANY PART THEREOF.   ANY SUCH REPRESENTATIONS AND WARRANTIES ARE EXPRESSLY DISCLAIMED.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the Effective Date and as of the Closing Date (except to the extent such representations and warranties are, by their terms, made as of a specified date), as follows:

**Section 4.1    Organization**.  Purchaser is a limited liability company validly existing and in good standing under the Laws of the State of Delaware.  Purchaser is duly qualified to do business and in good standing in all jurisdictions in which the character of the properties owned or held under lease by it or the nature of the business transacted by it makes qualification necessary, except where failure to so qualify does not have a Purchaser Material Adverse Effect.  Purchaser's Organizational Documents are in full force and effect.

**Section 4.2    Authorization and Enforceability**.  Purchaser has taken all limited liability company action necessary to execute and deliver this Agreement and each other Purchaser Document to which it is a party, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder, and no other limited liability company action on the part of Purchaser is necessary to authorize this Agreement or the other Purchaser Documents and the transactions contemplated hereby and thereby.   This Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by Seller, and subject to the Bankruptcy Court's entry of the Sale Order, constitutes the legally valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and equitable principles (whether considered in a proceeding in equity or at law).  Each of the other Purchaser Documents to which Purchaser is a party has been duly executed and delivered by Purchaser, and, assuming due authorization, execution and delivery by the other parties thereto, and subject to the Bankruptcy Court's entry of the Sale Order, constitutes the legally valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and equitable principles (whether considered in a proceeding in equity or at law).

**Section 4.3    Violation; Conflicts**.   Neither the execution, delivery or performance of this Agreement or the other Purchaser Documents nor the transfer of rights and consummation of the transactions contemplated hereby and thereby will result in (a) a violation of or a conflict with any provision of Purchaser's Organizational Documents, (b) a breach or violation of, a conflict with, a default under, or the creation of any right of any Person to accelerate, terminate or cancel, any Purchaser Document, (c) a violation by Purchaser of any Laws or (d) an imposition of any Lien on the Membership Interest (other than any interest of Seller or Purchaser created under this Agreement).

35

**Section 4.4**     **Consents and Approvals**.

(a)     Assuming the accuracy of the representations and warranties of Seller set forth herein, and receipt of the Required Consents, and subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval or authorization of, Permit from, declaration, filing or registration with, or notice to, any Governmental Entity, any Third Party or any other Person is required to be made or obtained by Purchaser in connection with the execution, delivery, performance and validity of the Purchaser Documents or the consummation of the transactions contemplated thereby.

(b)     There are no investigations of Purchaser or its Affiliates by any Governmental Entity that would have a Purchaser Material Adverse Effect.

**Section 4.5**     **Litigation**.     There are no Actions pending or, to Purchaser's knowledge, threatened, affecting the acquisition of the Membership Interest by Purchaser or the consummation of the transactions contemplated hereby, at law or in equity, before or by any Governmental Entity or instrumentality or before any arbitrator of any kind.

**Section 4.6**     **Brokers**.     Neither Purchaser nor any of its Affiliates has any Contract, arrangement or understanding with any broker, finder, agent or other intermediary with respect to the transactions contemplated by this Agreement for which Seller or its Affiliates could be liable.

**Section 4.7**     **Regulatory Status**.     Upon and following the Closing, Purchaser will be a "holding company", as defined in 18 C.F.R. Part 366, solely with respect to one or more exempt wholesale generators, foreign utility companies, qualifying facilities, or local distribution companies that are not regulated as "natural gas companies" pursuant to Sections 1(b) or 1(c) of the Natural Gas Act.     Purchaser is not an "investment company" within the meaning of the Investment Company Act of 1940.

**Section 4.8**     **Accredited Investor; Investment Purpose**.

(a)     Purchaser is an "accredited investor" within the meaning of Regulation D under the Securities Act.     Purchaser understands that the Membership Interest has not been registered under the Securities Act in reliance on an exemption therefrom, and that neither Seller nor any Sunflower Company is under any obligation to register the Membership Interest.

(b)     Purchaser is purchasing the Membership Interest for investment purposes and not with a view toward, or for sale in connection with, any distribution thereof, or with any present intention of distributing or selling the Membership Interest.     Purchaser is familiar with investments of the nature of the investment in the Membership Interest contemplated under this Agreement and is familiar with the risks that may be encountered by developers of wind energy power production projects, such that it is capable of evaluating, and has evaluated, the merits and risks inherent in purchasing the Membership Interest contemplated under this Agreement, and is able to bear the economic risks of such investment.     Purchaser acknowledges that any financial projections that may have been provided to it are based on assumptions of future operating results based on assumptions about certain events (many of which are beyond the control of Seller or the Sunflower Companies).     Purchaser understands that no assurances or

36

representations can be given that the actual results of the operations of the Sunflower Project or the Sunflower Companies will conform to the projected results for any period. Other than the representations, warranties, covenants and other agreements contained in this Agreement and the other Seller Documents, Purchaser has relied solely on its own legal, tax and financial advisers and other consultants for its evaluation of an investment in the Membership Interest and not on the advice of Seller, the Seller Group or any of their respective legal, tax or financial advisers or other consultants.

Section 4.9   **Bankruptcy**.   There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by Purchaser or threatened against Purchaser.

Section 4.10   **Financial Ability**.   Purchaser has, or at the Closing will have, sufficient cash, available lines of credit or other sources of immediately available funds to pay in cash at the Closing the entire amount of the Purchase Price due and payable at the Closing, and to pay any other amounts to be paid by it under this Agreement.

Section 4.11   **No Other Warranties**.   EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES OF PURCHASER EXPRESSLY SET FORTH IN ARTICLE 4 OR IN ANY CERTIFICATE DELIVERED PURSUANT TO SECTION 2.6(C), PURCHASER MAKES NO OTHER REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, AND WHETHER BY COMMON LAW, STATUTE, OR OTHERWISE. ANY SUCH REPRESENTATIONS AND WARRANTIES ARE EXPRESSLY DISCLAIMED.

## ARTICLE 5
## NON-DISCLOSURE

Section 5.1   **Confidentiality Regarding this Agreement**.

(a)   The Parties each acknowledge and agree that the terms of this Agreement and all Annexes, Exhibits and Schedules hereto shall be considered confidential and shall not be disclosed by any Party to any Third Party without the prior written consent of the other Party (other than to the Representatives of the lenders under the debtor-in-possession financing facilities extended in connection with the Bankruptcy Cases, the Representatives of the Official Committee of Unsecured Creditors appointed by the Bankruptcy Court in the Bankruptcy Cases, any Party's Representatives, Affiliates, actual or potential financing parties, or direct or indirect investors or potential investors and then only on a need to know basis and subject to such recipient's agreement to keep such information confidential); provided, that the Parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court at any time prior to the hearing in connection with obtaining the Sale Order.

(b)   The Parties (and each Affiliate and Person acting on behalf of any Party) agree that any Party (and each employee, Representative, and other agent of such Party) may disclose to any and all Persons, without limitation of any kind, (i) the Tax treatment and Tax structure (as such terms are used in Treasury Regulations promulgated under Section 6011 of the Code) of the transactions contemplated by this Agreement, (ii) information required by

applicable Law to be included in any regulatory filings, (iii) information required or requested to be disclosed pursuant to valid legal process, including if required or requested by oral question or request for information or documents in legal proceedings, deposition, interrogatories, subpoena, civil investigation demand or similar process or by law, governmental proceeding, governmental or administrative body, professional standards committee or judicial or administrative court order, and only after the other Party is notified in writing (unless such requirement or request prohibits such Party from providing such notice), (iv) high-level information regarding key transaction terms as required to be disclosed pursuant to the disclosing Party's investor relations procedure; provided, that to the extent practicable, the other Party is provided in advance a copy of the information to be disclosed and a reasonable opportunity to consult with the disclosing Party, and (v) information required to be disclosed by the applicable rules and regulations of any securities exchange to which the disclosing Party is subject, provided, however, that disclosure permitted by clause (i) above may not be made until the earlier of date of (x) public announcement of discussions relating to the transaction, (y) public announcement of the transaction, or (z) execution of an agreement (with or without conditions) to enter into the transaction.  This authorization is not intended to permit disclosure of any other information including (1) any portion of any materials to the extent not related to the exception permitting disclosure under this Section 5.1(b), (2) in disclosure permitted by clause (i) above, the identities of participants or potential participants, (3) in disclosure permitted by clause (i) above, the existence or status of any negotiations, (4) any pricing or financial information (except to the extent such pricing or financial information is related to the transaction's Tax treatment or Tax structure or is otherwise specifically required to be disclosed pursuant to an exception permitting disclosure under this Section 5.1(b)), or (5) any other term or detail not relevant to the transaction's Tax treatment or the Tax structure or the applicable exception permitting disclosure under this Section 5.1(b).

       (c)     Notwithstanding anything contained in this Agreement to the contrary, no Party nor any other Person shall be required to inform or notify the other Party or any Person of any disclosure made to or requested by a bank examiner, regulatory examiner or self-regulatory examiner in the course of such examiner's examination, inspection or audit, and any such disclosure shall not be deemed a breach of this Article 5; provided, that the disclosing Party shall request that such disclosure be afforded confidential treatment by the receiving examiner if such treatment is available.

## ARTICLE 6
## COVENANTS AND AGREEMENTS OF THE PARTIES

**Section 6.1**　　**Covenants Pending the Closing**.

       (a)     With respect to the Project Group and the Sunflower Project, during the period beginning on the Effective Date and ending on the earlier to occur of (x) the termination of this Agreement in accordance with Section 7.1 or (y) the Closing Date (such period the "Interim Period"), Seller covenants that, except as otherwise provided in this Agreement or consented to in writing by Purchaser, Seller shall, and shall cause the Project Group and the Sunflower Project to, use Commercially Reasonable Efforts to maintain and preserve intact the current organization, business and franchise of the Project Group and the Sunflower Project and to preserve the rights, franchises, goodwill and relationships of their respective customers,

lenders, suppliers, regulators and others having business relationships with the Project Group and the Sunflower Project. Without limiting the foregoing, during the Interim Period, Seller shall:

    (i)  cause the Project Group and the Sunflower Project to preserve and maintain all of their respective Project Permits, including to renew any Project Permits that come up for renewal in the Ordinary Course of Business of the Project Group and the Sunflower Project;

    (ii)  cause the Project Group and the Sunflower Project to pay their respective debts, Taxes and other obligations when due;

    (iii)  cause the Project Group and the Sunflower Project to preserve in all material respects the properties and Project Assets owned, leased, operated or used by the Project Group and the Sunflower Project in the same condition as they were on the Effective Date, subject to reasonable wear and tear;

    (iv)  cause the Project Group and the Sunflower Project to continue in full force and effect without material modification all Insurance Policies, except as required by applicable Law;

    (v)  cause the Project Group and the Sunflower Project to perform all of their respective material obligations under all Material Contracts relating to or affecting their respective properties, Project Assets or business; and

    (vi)  cause the Project Group and the Sunflower Project to comply in all material respects with all applicable Laws.

    (b)  With respect to the Project Group and the Sunflower Project, during the Interim Period, Seller covenants that, other than as contemplated or required by the Financing Documents or Tax Equity Agreements and except with the prior written consent of Purchaser, Seller shall not, and shall not permit the Project Group and the Sunflower Project to:

    (i)  issue, sell, redeem or otherwise acquire or dispose of any Equity Interests of any Sunflower Company (or other ownership or profits interests), or securities convertible into or exchangeable for, or options, warrants, calls, commitments or rights of any kind to acquire, Equity Interests of any Sunflower Company;

    (ii)  permit or allow any Lien (other than Permitted Liens) to be imposed on or against any Equity Interests of any Sunflower Company, the Sunflower Project or any of the Project Assets;

    (iii)  grant any waiver of any material term under, exercise any material option under, give any material consent with respect to, amend any material term or terminate any Material Contract;

    (iv)  sell, transfer, convey or otherwise dispose of any material Project Asset of the Project Group or the Sunflower Project;

(v)    enter into any Material Contract;

(vi)    amend or modify any Organizational Documents of the Project Group, except as necessary to consummate the transactions contemplated hereby;

(vii)    except as may be required to meet the requirements of applicable Laws or GAAP, change any accounting method or practice applicable or related to the Project Group and the Sunflower Project in a manner that is inconsistent with past practice;

(viii)    liquidate, dissolve, recapitalize, reorganize or otherwise wind up the business or operations of the Project Group and the Sunflower Project;

(ix)    other than accounts payable incurred in the Ordinary Course of Business, permit or cause the Project Group or the Sunflower Project to incur, create, assume or otherwise become liable for any Indebtedness, other than Indebtedness existing on the Effective Date and any interest incurred pursuant to the Contracts governing such Indebtedness;

(x)    cancel any Indebtedness payable to any member of the Project Group or the Sunflower Project in an aggregate amount in excess of seventy-five thousand dollars ($75,000), or waive any claims or rights with respect thereto;

(xi)    make any new, or change any existing, material election with respect to Taxes (including claiming any U.S. federal income tax credit or cash grant), change an annual accounting period, adopt or change any accounting method in respect of Taxes, file any amended Tax Return, settle any material Tax Liability, surrender any right to claim a material refund of Taxes or consent to any waiver or extension of the limitation period applicable to any Tax claim or assessment that, in each case, would have the effect of increasing the Tax Liability of (A) Purchaser (or any of its Affiliates), the Project Group or the Sunflower Project for any period ending after the Closing Date, or (B) any Person that is a party to the Tax Equity Agreements if Purchaser (or any of its Affiliates), the Project Group or the Sunflower Project could reasonably be expected to have any Liability to such Person for such increased Tax Liability;

(xii)    settle any dispute or claim or compromise or settle any material Liability which, in each case, results in (A) a material non-current Liability becoming due from the Project Group or the Sunflower Project after the Closing or (B) limitations that materially and adversely affect the ability of the Project Group or the Sunflower Project to conduct business after the Closing; or

(xiii)    take any action outside the Ordinary Course of Business of the Project Group or the Sunflower Project.

(c)    Each Party agrees to use Commercially Reasonable Efforts to satisfy the conditions to the Closing set forth in this Agreement. Purchaser agrees to use Commercially Reasonable Efforts to arrange for the entering into of the Ancillary Agreements by non-Affiliate service providers on terms reasonably acceptable to Purchaser and the financing parties under the Financing Documents and the ECCA.

**Section 6.2    Regulatory and Other Authorizations, Consents and Filings**. Each Party shall use Commercially Reasonable Efforts to obtain all authorizations, consents, orders, and approvals of, and give all notices and make all filings with, all Governmental Entities and Third Parties that may be or become necessary for such Party's execution and delivery of, and the performance of its obligations under, this Agreement.  Without limiting the obligations of the Parties pursuant to the preceding sentence, each Party will use Commercially Reasonable Efforts to assist the other Party in obtaining all authorizations, consents, orders, and approvals of, and give all notices and make all filings with, all Governmental Entities and Third Parties that may be or become necessary for any Party's execution and delivery of, and the performance of its obligations under, this Agreement.

**Section 6.3    Books and Records**.  Seller agrees to deliver (in hard copy format, electronic format or by uploading to the Seller Dataroom) to Purchaser promptly, but in any event within eight (8) days after the Closing Date, all Books and Records relating to the members of the Project Group (and any other Books and Records that are readily available to Seller or any of its Affiliates other than the Project Group) that have not been delivered to Purchaser at or prior to the Closing.

**Section 6.4    Further Assurances**.

(a)    Following the Closing, each Party agrees to furnish or cause to be furnished to the other Party, upon request, as promptly as practicable, such information and assistance (including access to Books and Records and any additional documents) relating to the Sunflower Project or the members of the Project Group as is reasonably necessary for:  (i) the preparation of any Tax Return or the prosecution of any Action with respect to Taxes; or (ii) the defense of any Action to which the requesting Party is a party or is subject; provided, that no such obligation shall exist with respect to any Action in which the Parties (or their Affiliates) are adverse to one another.   If after the Closing Date, there are any documents necessary in connection with any Action or any other matter requiring any such Books and Records, or it is discovered that any rights or interests in any property (whether real or personal, tangible or intangible) relating to the Sunflower Project that should have been included in the Project Assets have not been conveyed or transferred to the appropriate member of the Project Group, each Party will make available to the other Party, during normal business hours after reasonable advance notice, all Books and Records retained and remaining in existence and cooperate with the other Party to convey or transfer such property rights or interests to the appropriate member of the Project Group.  If Seller is the requesting Party, it shall bear all of the out-of-pocket costs and expenses (including attorneys' fees) reasonably incurred in connection with the provision of any such Books and Records by Purchaser.

(b)    In addition, if after the Closing any further action is reasonably necessary to carry out the purposes of this Agreement and the transactions contemplated hereby, each of the Parties will take such further reasonable actions (including the execution and delivery of such further instruments and documents) as the other Party may reasonably request in writing; provided, that the requesting Party shall be required to pay any out-of-pocket Third Party expenses incurred by the other Party in complying with such request; and provided, further, that no Party will be required to take any action that, in the opinion of counsel, would constitute a violation of any applicable Law.

**Section 6.5**    **Allocation of Certain Taxes**.  In the case of Taxes relating to the Sunflower Project or any Sunflower Company arising in a taxable period that includes, but does not end on, the Closing Date, except as provided in the next sentence, the allocation of such Taxes between the Pre-Closing Period and the remainder of the taxable period shall be made on the basis of an interim closing of the books as of the end of the Closing Date.  In the case of any real property, personal property or similar ad valorem Taxes that are payable in respect of the Sunflower Project or any Sunflower Company for a taxable period that includes, but does not end on, the Closing Date, the portion of such Tax which relates to the portion of such taxable period ending on the Closing Date shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on (and including) the Closing Date and the denominator of which is the number of days in the entire taxable period.

**Section 6.6**    **Notice of Developments**.  During the Interim Period:

(a)    Seller will promptly provide Purchaser with copies of all material documents, written reports, written status updates and similar materials that are prepared by Third Parties for the benefit of, or concerning, the Project Group and the Sunflower Project.

(b)    Seller will promptly provide Purchaser copies of any material written notice or other material written communication from any Governmental Entity received by Seller, their Affiliates or any member of the Project Group in connection with the transactions contemplated by this Agreement in respect of the Sunflower Project.

(c)    Seller will promptly notify Purchaser in writing of any fact, circumstance, event or action the existence, occurrence or taking of which (i) has had, or could reasonably be expected to have, individually or in the aggregate, a Project Group Material Adverse Effect, (ii) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (iii) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions relating to the Closing to be satisfied.

(d)    Seller will promptly provide Purchaser with written notice of any material Action initiated, filed, commenced or to the Knowledge of Seller, threatened in writing, against or directly or indirectly relating to the Project Group and the Sunflower Project.

(e)    Purchaser's receipt of information pursuant to this Section 6.6 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement and shall not be deemed to amend or supplement the Seller Disclosure Schedules.

**Section 6.7**    **Landowner Estoppels**.  Prior to the Closing Date, Seller shall use Commercially Reasonable Efforts to procure landowner estoppel certificates in form and substance reasonably satisfactory to Purchaser from the owners of any Owned Land and all interests in all other real property that is the subject of a Land Contract; provided, that in lieu of the foregoing, Seller may deliver to Purchaser any such estoppel certificates delivered to the Third Party counterparties to the Tax Equity Agreements or Financing Documents pursuant to

42

the terms thereof or any such estoppel certificates that have been delivered to Seller dated not later than twenty-four (24) months prior to the Effective Date.

### Section 6.8   **Bankruptcy Matters**.

(a)    From the Effective Date until the termination of this Agreement in accordance with <u>Section 7.1</u> (if applicable), (i) Purchaser shall have the exclusive right to purchase the Sunflower Project (including any portion thereof or any of the Project Assets) and (ii) (x) Seller shall, and shall instruct and direct its Affiliates and its and their respective Representatives to, immediately cease and terminate any ongoing solicitation, discussions and negotiations with respect to any Alternative Transaction and (y) Seller shall not, and shall not permit or cause its Affiliates and its and their respective Representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, or provide any non-public information to, any Person (other than Purchaser and its Affiliates and Representatives) in connection with any Alternative Transaction.

(b)    Seller shall use its reasonable best efforts to cause the Bankruptcy Court to enter the Sale Order as soon as reasonably practicable following the Effective Date in accordance with the terms and conditions hereof, and Seller shall provide notice of the Sale Order to all Persons reasonably calculated to provide Purchaser with the benefits and protections set forth in the Sale Order (including notice to all applicable taxing authorities). Seller shall cooperate with Purchaser and its Representatives in connection with obtaining the Sale Order and the bankruptcy proceedings in connection therewith. Such cooperation shall include, but not be limited to, consulting with Purchaser at Purchaser's reasonable request concerning the status of the Sale Order and related proceedings and providing Purchaser with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings in connection with obtaining the Sale Order as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

(c)    In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from or stay request in respect of the Sale Order, and Seller and Purchaser shall use their respective Commercially Reasonable Efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

(d)    After entry of the Sale Order, Seller shall not, and shall cause its Affiliates and Representatives not to, take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

(e)    No later than June 1, 2016, Seller shall, and shall cause the Sellers (as defined in the Commitment Letter) to, file voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court.

### Section 6.9   **Insurance**.

(a)      Immediately prior to the Closing, the businesses or properties of the Sunflower Companies are insured under the Insurance Policies.  Purchaser acknowledges that effective on the Closing Date, Seller and its Affiliates will initiate cancellation of the coverage of the Sunflower Project under the Insurance Policies, and following the cancellation thereof, such Insurance Policies will exclude coverage of the Sunflower Project and all Sunflower Companies, and Purchaser will be required to provide or arrange for replacement or substitute insurance coverage that satisfies all insurance requirements set forth in any applicable Material Contract and Financing Documents.  Any and all returned premium in respect of any replaced or substituted insurance coverage shall be for Seller's account and, if any such premium is received by Purchaser or its Affiliates, shall be paid by wire transfer of immediately available funds to such account as Seller shall specify in writing to Purchaser.

(b)      From and after the Closing Date until (i) one (1) year after the Closing Date (in the case of clause (x) immediately below); provided, that such one (1)-year limitation shall not apply in connection with any event that could not have been reasonably discoverable by the Sunflower Companies within such one (1)-year period and (ii) the applicable statute of limitations (in the case of clause (y) immediately below), the Sunflower Companies shall have the right to (x) file claims and (y) continue to pursue claims, in each case to recover proceeds under and pursuant to the terms of the Insurance Policies to the extent such claims arise out of or relate to (1) an event occurring prior to the replacement or substitution of such Insurance Policies pursuant to this Section 6.9, to the extent it would be clear to a reasonable person that the event occurred prior to such time, or (2) an act, error or omission occurring prior to the replacement or substitution of such Insurance Policies that forms the basis of a claim made against any of the Sunflower Companies and reported to any insurance carrier, in each case, to the fullest extent that the terms and conditions of such Insurance Policies and agreements relating thereto so allow (and Seller and its Affiliates shall use commercially reasonable efforts to assist the Sunflower Companies in filing and pursuing such claims) and Seller or its Affiliates will pay over the proceeds of any related insurance recovery to any such Sunflower Company to the extent received by Seller or its Affiliates; provided, that (A) all reasonable, out-of-pocket costs and expenses of Seller and its Affiliates (excluding the Sunflower Companies) incurred in connection with assisting in filing or pursuing a claim, shall be paid by Purchaser and (B) Seller and its Affiliates will not bear any liability for the failure of an insurance carrier to pay any claim under any such Insurance Policies.

## ARTICLE 7
## TERMINATION

Section 7.1      Termination.  This Agreement may be terminated as follows:

(a)      by either Seller or Purchaser if there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by the other Party pursuant to this Agreement such that a condition to either Party's obligation to effect the Closing would not be satisfied, which termination shall be effective on the earlier of (i) if such breach is curable, upon the breaching Party's failure to cure within five (5) Business Days after notice of such breach has been given, and (ii) if such breach is incurable, upon the giving of such notice;

(b)    by either Seller or Purchaser (i) if any Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Law, injunction, order, decree or ruling or taken any other action (including the failure to have taken an action) which has the effect of making the consummation of the transactions contemplated hereby illegal or otherwise preventing or prohibiting consummation of such transactions, and such Law, injunction, order, decree, ruling or action has not been vacated or stayed within twenty (20) days following the enactment, issuance, promulgation, enforcement or entry thereof or (ii) if the Closing Date shall not have occurred on or before June 15, 2016;

(c)    by Purchaser if (i) the Bankruptcy Cases are converted prior to the Closing to cases under chapter 7 of the Bankruptcy Code or dismissed, (ii) the Bankruptcy Court enters an order for the appointment of a trustee or examiner with managerial powers, and such trustee or examiner takes any action to interfere with or impair the transactions contemplated by this Agreement or (iii) the Sale Order is modified in any respect without the prior written consent of Purchaser;

(d)    by Purchaser, if any secured creditor of Seller or its Affiliates obtains relief from the stay to foreclose on the Membership Interest or any other Equity Interest of any Sunflower Company; or

(e)    by the mutual written consent of the Parties;

provided, however, that the right to terminate this Agreement under Section 7.1 shall not be available to any Party which, at the time of the occurrence of the events described therein, is in material breach of any obligation, representation or warranty under this Agreement such that any of the conditions set forth in Article 2 would not be satisfied.

Section 7.2    **Effect of Termination**.    In the event either Party desires to terminate this Agreement pursuant to Section 7.1, written notice thereof shall promptly be given by the terminating Party to the other Party, and this Agreement shall cease to have force and effect and shall terminate effective as of the later of five (5) Business Days after the date such notice is received (or such later effective date as may be set forth therein) or the expiration of any applicable cure period and there shall be no further Liability or obligation on the part of Seller or Purchaser; provided, that the provisions of this Section 7.2 and Section 5.1, Section 8.4, Section 8.9 and Section 8.11 shall continue to apply following any such termination.  In addition, the provisions of this Section 7.2 shall not relieve any Party from Liability for fraud or any knowing and intentional breach of this Agreement occurring prior to such termination.  If this Agreement is terminated as provided in Section 7.1, all applicable filings, applications and other submissions made to any Governmental Entity with respect to the transactions contemplated by this Agreement (other than any filings, applications and other submissions made by Seller that do not involve Purchaser) shall, to the extent practicable, be withdrawn from the Governmental Entity to which they were made.

# ARTICLE 8
## MISCELLANEOUS

45

Section 8.1    **No Survival**.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, covenants or agreements of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(d) or Section 2.6(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 8.2    **Assignment; No Third Party Beneficiaries**.  No Party may assign any of its rights or obligations under this Agreement without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of the other Party; provided, however, that so long as the Purchaser Parent Guarantee is in full force and effect, Purchaser may assign its right and obligations under this Agreement to any of its Affiliates (other than Terra Nova) without the prior written consent of Seller or any of its Affiliates so long as any such Affiliate confirms its assumption of all such obligations pursuant to a written agreement in favor of Seller, which shall include any such Affiliate making the representations in Article 4 as to itself.  Other than as provided in Section 8.11, nothing in this Agreement is intended to or shall confer upon any other Person except the Parties any rights or remedies hereunder or create any third-party beneficiary rights in any Person.

Section 8.3    **Notices**.  All notices, requests, demands and other communications that are required or may be given under this Agreement, including all documents delivered pursuant to this Agreement, shall be in writing and shall be deemed to have been duly given (a) when received if personally delivered, (b) on the date transmitted or delivered via electronic transmission (including electronic mail) if transmitted during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, (c) the day after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., Federal Express or UPS) and (d) on the third (3rd) day after the date mailed, if sent by certified or registered mail, return receipt requested, postage prepaid.  In each case, notice shall be sent to:

If to Seller:

c/o SunEdison Utility Holdings, Inc.
179 Lincoln Street
Boston, Massachusetts 02111
Attention:  General Counsel
Facsimile:  (617) 960-2889

With copy to:

Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
Attention:   Robert S. Goldberg, Esq.
Facsimile:  (713) 238-4650
Email:  rgoldberg@mayerbrown.com

If to Purchaser:

46

1095 Avenue of the Americas, 25th Floor, Suite A
New York, New York 10036
Attention:  Steve Doyon
Facsimile:  (646) 829-3901
Email:  sdoyon@novatusenergy.com

With copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
26 Liberty Street
New York, New York 10005
Attention:  John D. Franchini, Esq.
Facsimile:  (212) 822-5491
Email:  JFranchini@milbank.com

or to such other place and with such other copies as a Party may designate as to itself by written notice to the other Party.

### Section 8.4     Choice of Law; Venue; Jurisdiction.

(a)     This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York.  Each Party irrevocably agrees that any Action with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other Party or its successors or assigns, shall be brought and determined exclusively in the Bankruptcy Court.  Each Party hereby irrevocably submits with regard to any such Action for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the Bankruptcy Court and agrees that it will not bring any Action relating to this Agreement in any court other than the Bankruptcy Court.  Each Party hereby irrevocably waives, and agrees not to assert in any Action with respect to this Agreement, (i) any claim that it is not personally subject to the jurisdiction of the Bankruptcy Court for any reason, (ii) any claim that it or its property is exempt or immune from jurisdiction of the Bankruptcy Court or from any legal process commenced in the Bankruptcy Court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) to the fullest extent permitted by applicable legal requirements, any claim that (A) the Action in the Bankruptcy Court is brought in an inconvenient forum, (B) the venue of such Action is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by the Bankruptcy Court.

(b)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUCH ACTION.

### Section 8.5     Entire Agreement; Hierarchy of Agreements; Amendments and Waivers.  This Agreement and all Annexes, Exhibits and Schedules hereto, together with the Commitment Letter, shall constitute the entire understanding of the Parties with respect to the subject matter hereof and thereof and fully supersede all prior oral and written agreements and

47

understandings between the Parties with respect to such subject matter.  No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby, no waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

Section 8.6    **Severability**.  If any provision of this Agreement is held invalid, illegal or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid, illegal or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid, illegal or unenforceable to the maximum extent permitted by Law.  Upon a determination that any provision of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

Section 8.7    **Time of Essence**.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 8.8    **Multiple Counterparts**.  This Agreement may be executed in two (2) or more counterparts (including through the transmission of signature pages by facsimile or electronic mail, each of which shall constitute an original for all purposes), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 8.9    **Expenses**.

(a)    Except as set forth below or as otherwise specified herein, each Party shall pay its own legal, accounting, out-of-pocket and other expenses incident to this Agreement and to any action taken by such Party in preparation for carrying this Agreement into effect.

(b)    The Liability for paying any Transfer Taxes imposed by applicable Law by reason of the transfer of the Membership Interest to Purchaser as provided herein and any deficiency, interest, penalty or addition asserted with respect thereto shall be borne fifty percent (50%) by Seller and fifty percent (50%) by Purchaser.  Seller shall file all necessary documentation and Tax Returns with respect to such Transfer Taxes and Purchaser shall (i) provide such cooperation in connection with the preparation and filing of such documentation and Tax Returns as may be reasonably requested by Seller and (ii) promptly reimburse Seller for the portion of Transfer Taxes for which Purchaser is responsible hereunder.

Section 8.10    **Burden and Benefit**.  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective successors and permitted assigns.

Section 8.11    **No Recourse**.  All Actions (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement, the Purchaser Documents or the Seller Documents may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").  In

no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any Representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or Affiliates) for any Action or Liabilities arising under, out of, in connection with or related in any manner to this Agreement, the Purchaser Documents or the Seller Documents or based on, in respect of, or by reason of this Agreement, the Purchaser Documents or the Seller Documents or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Actions and Liabilities against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, demands, or Actions that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement, the Purchaser Documents or the Seller Documents or any representation or warranty made in, in connection with, or as an inducement to this Agreement, the Purchaser Documents or the Seller Documents.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 8.11.

Section 8.12    **Cumulative Remedies**.  Except as otherwise set forth in this Agreement, the rights and remedies of each Party are cumulative of each other and of every other right or remedy such Party may otherwise have at law or in equity, and the exercise of one or more rights or remedies by such Party shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies by such Party.

Section 8.13    **No Partnership or Joint Venture**.  The Parties do not intend to create a partnership or joint venture by virtue of this Agreement.  No Party shall owe any fiduciary duty to the other Party by virtue of this Agreement or any other Seller Document or Purchaser Document or otherwise.

Section 8.14    **Public Announcements**.  No Party shall issue, or cause to be issued, any public announcement or other statement with respect to this Agreement, or the transactions contemplated hereby, without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed or, if such public announcement or statement refers to the other Party or its Affiliates or Representatives, which consent may be withheld in such other Party's sole discretion, unless, in each case, such statement is required, based upon the reasonable advice of counsel, (a) by applicable Law, (b) by order of a court of competent jurisdiction, including the Bankruptcy Court, (c) by applicable Law to be included in any regulatory filings, (d) with respect to high-level information regarding key transaction terms as required to be disclosed pursuant to the disclosing Party's investor relations procedure; provided, that to the extent practicable, the other Party is provided in advance a copy of the information to be disclosed and a reasonable opportunity to consult with the disclosing Party, or (e) by any applicable rule or regulation of any stock exchange that is applicable to, or by

49

requirement of any Governmental Entity having regulatory or other supervisory jurisdiction over, the Party or any Affiliate or Representative thereof issuing such announcement or statement; provided, that for any public announcements made pursuant to clauses (a)-(c) hereunder, the announcing Party shall, to the extent legally permissible, (x) give the other Party written notice of such public announcement as far in advance as practicable and (y) consider in good faith the other Party's suggestions concerning the nature and scope of the public announcement.  In the event of a breach of this Section 8.14, in addition to and not in lieu of any legal or equitable remedies that may otherwise be available, the non-breaching Party may issue public announcements that such Party shall deem to be appropriate in its sole discretion to supplement or correct the announcement or statement made by the breaching Party.  The Parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 8.15  **Specific Performance**.  In the event of any actual or threatened breach by any of the Parties of any of the covenants, obligations or agreements in this Agreement, the Party who is or is to be thereby aggrieved shall have the right to seek specific performance and injunctive relief giving effect to its rights under this Agreement, in addition to any other rights and remedies at law or in equity.  The Parties agree that any such breach or threatened breach could cause irreparable injury, that the remedies at law for any such breach or threatened breach, including monetary damages, are inadequate compensation for any loss and that any defense in any Action for specific performance that a remedy at law would be adequate is waived.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed on their respective behalf, by their respective Representatives thereunto duly authorized, all as of the day and year first above written.

**NOVATUS PROJECT HOLDINGS I, LLC**

By: _____

Name:  Amanda Wallace

Title:  Authorized Signatory

*[Signature page to Membership Interest Purchase and Sale Agreement]*

**SUNFLOWER RENEWABLE HOLDINGS 1, LLC**

By: _____
Name:    Vanessa Kwong
Title:    Assistant Secretary

*[Signature page to Membership Interest Purchase and Sale Agreement]*

<u>Annex A</u>

<u>Purchaser Guaranties</u>

- Cash Diversion Guaranty to be issued on the Closing Date for the benefit of MUFG Union Bank, N.A. pursuant to that certain Back-Leverage Financing Agreement, by and among Sunflower Renewables, LLC, Norddeutsche Landesbank Girozentrale, New York Branch, MUFG Union Bank, N.A. and the lenders from time to time party thereto, to be entered into on the Closing Date.

- Sponsor Member Guaranty to be issued on the Closing Date for the benefit of Special Situations Investing Group II, LLC pursuant to the ECCA.

<u>Exhibit A</u>

<u>Assignment of Membership Interest</u>

## ASSIGNMENT OF MEMBERSHIP INTEREST (SUNFLOWER)

This Assignment of Membership Interest (this "Assignment") is made effective as of June 3, 2016, by Sunflower Renewable Holdings 1, LLC, a Delaware limited liability company ("Seller"), for the benefit of Novatus Project Holdings I, LLC, a Delaware limited liability company ("Purchaser"). Seller and Purchaser are referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms used but not defined herein shall have the meanings given to them in the MIPSA (as defined below).

**WHEREAS**, Seller and Purchaser are parties to that certain Membership Interest Purchase and Sale Agreement, dated as of May 31, 2016 (the "MIPSA"), pursuant to which Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, 100% of the membership interests (the "Membership Interest") that Seller owns in Sunflower Renewable Holdings 2, LLC (the "Company"); and

**WHEREAS**, Seller is the current owner of the Membership Interest.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein and in the MIPSA, for payment by Purchaser to Seller of the Purchase Price and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    **Assignment**.  Seller does hereby sell, convey, assign, transfer and deliver to Purchaser all of its right, title, interest and obligations in and to the Membership Interest and all rights of Seller under the Organizational Documents of the Company, in each case free and clear of all Liens, and Purchaser hereby accepts such right, title, and interests in, under and to such Membership Interest, and assumes all obligations of Seller under such Organizational Documents, in each case in accordance with and subject to the terms and conditions of the MIPSA.

2.    **Membership**.  The Parties hereby agree that upon the execution and delivery hereof, Purchaser shall be the sole member of the Company and shall hold the Membership Interest on the books and records of the Company and for all other purposes.  The Parties waive any other requirements for transfer found in the Organizational Documents of the Company.

3.    **Further Assurances**.  The Parties each further agree (i) to take, or cause to be taken, all actions reasonably necessary, proper or advisable to consummate and make effective the transactions contemplated by this Assignment, (ii) to execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder and (iii) to cooperate with the other Party in connection with the foregoing.

4.    **Other Provisions**.  The provisions of Article 8 of the MIPSA are hereby incorporated into this Assignment, *mutatis mutandis*.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties have caused this Assignment to be duly executed as of the day and year first above written.

**SELLER:**

SUNFLOWER RENEWABLE HOLDINGS 1, LLC

By: _____

Name:

Title:

**PURCHASER:**

NOVATUS PROJECT HOLDINGS I, LLC

By: _____
Name:
Title:  Authorized Signatory

Exhibit B

Purchaser Parent Guarantee

EXECUTION COPY

---

# PURCHASER PARENT GUARANTEE

between

## NOVATUS ENERGY, LLC
(Guarantor)

and

## SUNFLOWER RENEWABLE HOLDINGS 1, LLC,
(Seller)

## Dated as of May 31, 2016

---

#4816-6843-7554

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS ................................................................................................. 1

    1.1    Defined Terms ............................................................................................. 1
    1.2    Rules of Interpretation ................................................................................ 2

ARTICLE II. GUARANTEE................................................................................................. 2

    2.1    Guarantee .................................................................................................... 2
    2.2    Guaranteed Obligation Absolute and Unconditional................................. 2
    2.3    Defenses ...................................................................................................... 3
    2.4    Conditions ................................................................................................... 4
    2.5    Expenses ..................................................................................................... 4

ARTICLE III. REPRESENTATIONS AND WARRANTIES .............................................. 4

    3.1    Guarantor Representations and Warranties ............................................... 4

ARTICLE IV. SUBORDINATION; SUBROGATION; ETC. ............................................. 5

    4.1    Taxes .......................................................................................................... 5
    4.2    Subordination ............................................................................................. 5
    4.3    Waiver........................................................................................................ 5
    4.4    Subrogation ................................................................................................ 6
    4.5    Reinstatement ............................................................................................. 7
    4.6    Termination ................................................................................................ 7

ARTICLE V. MISCELLANEOUS ...................................................................................... 7

    5.1    Successions or Assignments ...................................................................... 7
    5.2    Other Waivers ............................................................................................ 7
    5.3    Headings .................................................................................................... 8
    5.4    Remedies Cumulative ................................................................................ 8
    5.5    Severability ................................................................................................ 8
    5.6    Amendments .............................................................................................. 8
    5.7    Jurisdiction................................................................................................. 8
    5.8    Governing Law .......................................................................................... 9
    5.9    Integration of Terms .................................................................................. 9
    5.10    Notices ..................................................................................................... 9
    5.11    Interest; Collection Expenses................................................................ 10
    5.12    Counterparts ............................................................................................ 10

i

This PURCHASER PARENT GUARANTEE, dated as of May 31, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Guarantee"), is entered into by and between NOVATUS ENERGY, LLC, a Delaware limited liability company ("Guarantor") and SUNFLOWER RENEWABLE HOLDINGS 1, LLC ("Seller").

RECITALS

A.    Concurrently herewith, Novatus Project Holdings I, LLC, a Delaware limited liability company ("Purchaser") is entering into a Membership Interest Purchase and Sale Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "MIPSA"), dated as of the date hereof, by and between Purchaser and Seller, pursuant to which Purchaser is agreeing to purchase one hundred percent (100%) of the outstanding membership interests of Sunflower Renewable Holdings 2, LLC, a Delaware limited liability company ("Sunflower Renewable 2").  Capitalized terms used but not otherwise defined in this Guarantee have the meanings provided in the MIPSA.

B.    Guarantor has agreed to, among other things, guarantee the Guaranteed Obligation, as set forth herein.

C.    Guarantor owns all of the equity interests of Purchaser and may derive substantial indirect benefit from the transactions contemplated by the MIPSA.

AGREEMENT

NOW, THEREFORE, in consideration of the premises, and to induce Seller to enter into the MIPSA and to consummate the transactions contemplated thereby, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor hereby agrees with Seller as follows:

ARTICLE I.
DEFINITIONS

1.1    Defined Terms.  The following terms (whether or not underscored), when used in this Guarantee, including its preamble and recitals, shall have the following meanings:

"Default Rate" means the per annum rate equal to two percent (2%).

"Guarantee" has the meaning given in the preamble to this Guarantee.

"Guaranteed Obligations" has the meaning given in Section 2.1 of this Guarantee.

"Guarantor" has the meaning given in the preamble to this Guarantee.

"MIPSA" has the meaning given in the recitals to this Guarantee.

"Purchaser" has the meaning given in the recitals to this Guarantee.

"Seller" has the meaning given in the preamble to this Guarantee.

"Sunflower Renewable 2" has the meaning given in the recitals to this Guarantee.

1.2     Rules of Interpretation.   Unless otherwise provided herein, the rules of interpretation set forth in the MIPSA shall apply to this Guarantee, including its preamble and recitals.

ARTICLE II.
GUARANTEE

2.1     Guarantee.    Subject to the terms and conditions of this Guarantee, Guarantor, as a primary obligor and not merely as surety, hereby unconditionally and irrevocably guarantees to Seller the prompt and complete payment in full of the Purchase Price under the MIPSA (the "Guaranteed Obligation"), in immediately available funds in accordance with the terms thereof, by acceleration or otherwise, without offset or deduction.  Guarantor shall make payment of the Guaranteed Obligation due and payable pursuant to the terms and conditions of this Guarantee directly to Seller.

2.2     Guaranteed Obligation Absolute and Unconditional.

(a)     The obligations of Guarantor hereunder are primary obligations of Guarantor and are an absolute, unconditional, continuing and irrevocable guarantee of payment of the Guaranteed Obligation and not of collectability, and are in no way conditioned on or contingent upon any attempt to enforce in whole or in part Purchaser's liabilities and obligations to Seller.  Each failure by Guarantor to pay any portion of the Guaranteed Obligation or otherwise perform its other obligations hereunder shall give rise to a separate cause of action herewith, and separate suits may be brought hereunder as each cause of action arises.

(b)     Seller may, at any time and from time to time without the consent of or notice to Guarantor, without incurring responsibility to Guarantor, and without affecting, impairing or releasing the obligations of Guarantor hereunder, upon any terms or conditions and in whole or in part:

(i)     change the manner, place and terms of payment of, or performance of, or renew or alter, any portion of the Guaranteed Obligation, or any obligations and liabilities (including any of those hereunder) incurred in respect thereof or hereof, or in any manner modify, amend or supplement the terms of the MIPSA or any documents, instruments or agreements executed in connection therewith, and the guarantee herein made shall apply to the Guaranteed Obligation or such other obligations as changed, extended, renewed, modified, amended, supplemented or altered in any manner;

(ii)     exercise or refrain from exercising any rights against Purchaser or others (including any guarantor of any part of the Guaranteed Obligation);

2

(iii)      add or release any other guarantors from its obligations;

(iv)      settle or compromise the Guaranteed Obligation or any obligations and liabilities (including any of those hereunder) incurred in respect thereof or hereof in a commercially reasonable manner, and subordinate the payment of all or any part thereof to the payment or performance of any obligations and liabilities which may be due to Seller or others;

(v)      apply any sums by whomsoever paid or howsoever realized to any obligations and liabilities of Purchaser to Seller under the MIPSA in the manner provided therein regardless of what obligations and liabilities remain unpaid;

(vi)      consent to or waive any breach of, or any act, omission or default under, the MIPSA or otherwise amend, modify or supplement the MIPSA in accordance with its terms; and/or

(vii)      act or fail to act in any manner in accordance with this Guarantee which may deprive Guarantor of its right to subrogation against Purchaser to recover full indemnity for any payments made pursuant to this Guarantee or of its right of contribution against any other party.

(c)      No invalidity, irregularity or unenforceability of the Guaranteed Obligation shall affect, impair or be a defense to this Guarantee.

(d)      This is a continuing guarantee and the Guaranteed Obligation to which this Guarantee applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by the MIPSA and that the waivers set forth in this Guarantee are knowingly made in contemplation of such benefits. In the event that, notwithstanding the provisions of Section 2.2(a) above, this Guarantee shall be finally determined by a court of competent jurisdiction to be revocable in accordance with any Law, then any such revocation shall become effective only upon receipt by Seller of written notice of revocation signed by Guarantor and in accordance with such Law. To the extent permitted by any Law, no revocation hereof shall affect, in any manner, rights arising under this Guarantee with respect to the Guaranteed Obligation (i) arising prior to receipt by Seller of written notice of such revocation or (ii) arising as a result of a breach under the MIPSA occurring by reason of the revocation of this Guarantee or the breach by Guarantor of its obligations hereunder.

2.3      Defenses. Guarantor reserves the right to assert any defenses which Purchaser expressly has available to it under the MIPSA with respect to the Guaranteed Obligation, other than defenses arising from the bankruptcy, insolvency, dissolution or liquidation of Purchaser, the power or authority of Purchaser to enter into the MIPSA and to perform its obligations thereunder, and the lack of validity or enforceability of the MIPSA or any other documents executed in connection with the MIPSA.

2.4    <u>Conditions</u>.    Notwithstanding anything to the contrary set forth in this Guarantee, the rights of Seller and the obligations of Guarantor under this Guarantee are subject to the satisfaction or waiver by Purchaser of the conditions precedent to the obligations of Purchaser to effectuate the Closing set forth in the MIPSA.

2.5    <u>Expenses</u>.    Should either Seller or Guarantor seek to enforce or defend any claims against the other arising from or out of this Guarantee in any Action pursued in courts of competent jurisdiction, then the non-prevailing party in any such Action pursued in courts of competent jurisdiction shall pay to the prevailing party all reasonable costs and expenses, including, without limitation, reasonable fees and expenses of legal counsel, expended or incurred by the prevailing party, in immediately available funds.

ARTICLE III.
<u>REPRESENTATIONS AND WARRANTIES</u>

3.1    <u>Guarantor Representations and Warranties</u>.    Guarantor makes the following representations and warranties to and in favor of Seller, as of the date hereof.

(a)    Guarantor (i) is a limited liability company duly constituted, validly existing and in good standing under the Laws of the State of Delaware and (ii) is duly qualified, authorized to do business and in good standing in each other jurisdiction where the character of its properties or the nature of its activities makes such qualification necessary, except where the failure to be so duly qualified would not result in a material adverse effect.  Guarantor has all requisite power to carry on its business as now being conducted and as proposed to be conducted by it, and has the requisite power and authority to execute, deliver and perform this Guarantee.

(b)    Guarantor has duly authorized, executed and delivered this Guarantee, and neither Guarantor's execution and delivery of this Guarantee nor its compliance with the terms hereof (i) conflicts with or constitutes a default under or results in the violation of (x) any Law applicable to or binding on Guarantor or any of its properties, or (y) the Organizational Documents of Guarantor; (ii) constitutes a default under or results in the violation of the provisions of any indenture, mortgage, deed of trust, or agreement or other instrument, in each case, to which Guarantor is a party or by which it or any of its properties or assets is bound; (iii) results in or requires the creation or imposition of (or the obligation to create or impose) any lien upon any of its property or assets under this Guarantee; or (iv) results in the acceleration of any of its debt or obligations.  The execution, delivery and performance by Guarantor of this Guarantee does not require the approval or consent of any holder or trustee of any debt or other obligations of Guarantor which has not been obtained, except where the failure to so obtain would not result in a material adverse effect.

(c)    This Guarantee is a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equitable principles.

4

ARTICLE IV.
SUBORDINATION; SUBROGATION; ETC.

4.1    Taxes.  Except as otherwise required by applicable Law, each payment required to be made by Guarantor hereunder shall be made without deduction or withholding for or on account of Taxes and shall not be less than the amounts otherwise specified to be paid under this Guarantee.  If any deduction or withholding is required by applicable Law, Guarantor shall, upon notice thereof to Seller, pay the amount required to be deducted or withheld to the appropriate authorities in accordance with applicable Law and in the case of any such deduction or withholding which would not have been required to be made by Purchaser if Purchaser had made the payment to Seller, forthwith pay to Seller such additional amount as may be necessary to ensure that the net amount actually received by Seller is free and clear of such Taxes on such additional amount, and is equal to the amount that such Seller would have received had there been no such deduction or withholding.

4.2    Subordination.  Except as otherwise specifically provided in this Guarantee, all existing and future indebtedness of, or other obligations owed by Purchaser to Guarantor, is hereby subordinated to the Guaranteed Obligation.  Without the prior written consent of Seller, any outstanding subordinated indebtedness (including interest thereon) owed by Purchaser to Guarantor shall not be paid or withdrawn in whole or in part, nor shall Guarantor accept any payment of or on account of any such indebtedness, while any amount is owed to Seller under the MIPSA.  Any payment by Purchaser in violation of this Guarantee shall be received by Guarantor in trust for Seller, and Guarantor shall cause the same to be paid to Seller promptly upon demand by Seller on account of the Guaranteed Obligation.  Guarantor shall not assign all or any portion of such indebtedness while this Guarantee remains in effect except upon prior written notice to Seller by which and pursuant to an agreement under which the assignee of any such indebtedness agrees that the assignment is made subject to the terms of this Guarantee, and that any attempted assignment of such indebtedness in violation of the provisions hereof shall be void.

4.3    Waiver.  Guarantor hereby unconditionally and irrevocably waives and relinquishes, to the maximum extent permitted by applicable Law, all rights and remedies accorded to sureties or guarantors and agrees not to assert or take advantage of any such rights or remedies including:

(a)    any right to require Seller to proceed against Purchaser or any other Person or to pursue any other remedy in Seller's power before proceeding against Guarantor;

(b)    any defense that may arise by reason of the incapacity, lack of power or authority, death, dissolution, merger, termination or disability of Guarantor, Purchaser or any other Person or the failure of Seller to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of Purchaser or any other Person;

(c)    promptness, diligence, demand, presentment, protest and notice of any kind (except as specifically required pursuant to this Guarantee or the MIPSA)

including notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Purchaser or Seller;

(d)    any defense based upon an election of remedies by Seller, including an election to proceed by non-judicial rather than judicial foreclosure, which destroys or otherwise impairs the subrogation rights of Guarantor, the right of Guarantor to proceed against Purchaser or another Person for reimbursement, or both;

(e)    any defense based on any offset against any amounts which may be owed by any Person to Guarantor for any reason whatsoever;

(f)    any defense based on any failure to act, delay or omission whatsoever on the part of Purchaser or any of its Affiliates or the failure by Purchaser or any of its Affiliates to do any act or thing or to observe or perform any covenant, condition or agreement to be observed or performed by it under the MIPSA;

(g)    any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal;

(h)    any defense, setoff or counterclaim which may at any time be available to or asserted by Purchaser or any of its Affiliates against Seller or any other Person under the MIPSA solely based on or related to the bankruptcy or insolvency of Purchaser or any of its Affiliates;

(i)    any defense based on any change in the time, manner or place of any payment or performance under, or in any other term of, the MIPSA, or any other amendment or waiver of or any consent or departure from the terms of the MIPSA;

(j)    the fact that Guarantor may at any time in the future dispose of its indirect ownership interest in Sunflower Renewable 2;

(k)    any right to assert the bankruptcy or insolvency of Purchaser or any other Person as a defense hereunder or as the basis for rescission hereof and any defense arising because of Seller's election, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code; and

(l)    any defense based upon any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code.

4.4    Subrogation.

(a)    Guarantor shall not exercise any right of subrogation or enforce any remedy which Seller now may have or may hereafter have against Purchaser.

(b)    Guarantor shall not enforce any claim, right or remedy which Guarantor may now have or may hereafter acquire against Purchaser that arises

6

hereunder, from the existence or enforcement of this Guarantee or from the performance by Guarantor hereunder (including any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification or participation in any claim, right or remedy of Seller against Purchaser, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise).

4.5    Reinstatement.    This Guarantee and the obligations of Guarantor hereunder shall continue to be effective or be automatically reinstated, as the case may be, if and to the extent that for any reason any payment by or on behalf of Guarantor in respect of any portion of the Guaranteed Obligation is rescinded or otherwise restored to Guarantor or Purchaser, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, in each case as if such payment had not been made, and Guarantor agrees that it will indemnify Seller and its respective successors and assigns, on demand for all reasonable costs and expenses (including reasonable fees of counsel) incurred by Seller and its successors and assigns in connection with any such rescission or restoration.

4.6    Termination.    This Guarantee shall terminate on the first to occur of (a) Seller having received a replacement guarantee in form and substance reasonably satisfactory to Seller (provided that a guarantee in the form of this Guarantee shall be deemed to be satisfactory) and from a Person whose creditworthiness is at least equivalent to the creditworthiness of Guarantor on the date of this Guarantee and otherwise acceptable to Seller (in its discretion), and Seller shall provide such acknowledgements reasonably requested by Guarantor acknowledging such termination, (b) the date on which Purchaser has paid in full all of the Guaranteed Obligation and (c) the date of any termination of the MIPSA.

ARTICLE V.
MISCELLANEOUS

5.1    Successions or Assignments.

(a)    This Guarantee shall inure to the benefit of the successors or permitted assigns of Seller who shall have, to the extent of their interest, the rights of Seller hereunder.

(b)    This Guarantee is binding upon Guarantor and its successors and permitted assigns.    Guarantor may not assign any of its obligations hereunder without the prior written consent of Seller in its sole discretion (and any purported assignment in violation of this Section shall be void).

5.2    Other Waivers.

(a)    No partial or single exercise on the part of Seller of any of its rights hereunder or in connection herewith, with or without notice to Guarantor or any other Person, shall constitute a waiver of any rights or shall affect or impair this Guarantee.

(b)    SELLER AND GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY

7

HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS GUARANTEE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF SELLER OR GUARANTOR.   THIS PROVISION IS A MATERIAL INDUCEMENT FOR SELLER TO ACCEPT THIS GUARANTEE AND ENTER INTO THE MIPSA.

(c)     Guarantor hereby irrevocably waives, to the extent it may do so under applicable Law, any defense based on the adequacy of a remedy at law that may be asserted as a bar to the remedy of specific performance in any action brought against Guarantor for specific performance of this Guarantee by Seller or for its benefit by a receiver, custodian or trustee appointed for Guarantor or in respect of all or a substantial part of its assets under the bankruptcy or insolvency Laws of any jurisdiction to which Guarantor or its respective assets are subject.

5.3     Headings.  Paragraph headings and a table of contents have been inserted in this Guarantee as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Guarantee and shall not be used in the interpretation of any provision of this Guarantee.

5.4     Remedies Cumulative.   Each and every right and remedy of Seller hereunder shall be cumulative and shall be in addition to any other right or remedy given hereunder or under the MIPSA, or now or hereafter existing at law or in equity.

5.5     Severability.  In case any one or more of the provisions contained in this Guarantee should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and the parties hereto shall enter into good faith negotiations to replace the invalid, illegal or unenforceable provision.

5.6     Amendments.   Notwithstanding anything to the contrary herein, this Guarantee may be amended, waived or otherwise modified only with the written consent of the parties hereto and otherwise in accordance with the MIPSA.

5.7     Jurisdiction.  Guarantor agrees that any Action against Guarantor or with respect to or arising out of this Guarantee may be brought in or removed to the courts of the State of New York, in and for the County of New York, or of the United States of America for the Southern District of New York, as Seller may elect.   By execution and delivery of this Guarantee, Guarantor accepts, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.   Guarantor irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified airmail, postage prepaid, to Guarantor at its address for notices as specified herein and that such service shall be effective five (5) Business Days after such mailing.   Nothing herein shall affect the right to serve process in any other manner permitted by applicable Law or the right of Seller to bring any Action in any other competent jurisdiction.   Guarantor hereby waives any right to stay or dismiss any Action

8

under or in connection with this Guarantee or the MIPSA brought before the foregoing courts on the basis of forum non-conveniens.

5.8     Governing Law.  THIS GUARANTEE SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE LAWS OF THE STATE OF NEW YORK, APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE AND WITHOUT REFERENCE TO CONFLICTS OF LAWS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

5.9     Integration of Terms.  This Guarantee and any agreement, document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof.  In the event of any conflict between the terms, conditions and provisions of this Guarantee and any such agreement, document or instrument, the terms, conditions and provisions of this Guarantee shall prevail.

5.10    Notices.  All notices required or permitted under the terms and provisions hereof shall be in writing and any such notice shall be effective if given in accordance with the provisions of Section 8.3 of the MIPSA.  Notices to Guarantor may be given at the following address (or such other address as notified by Guarantor to Seller in writing):

| | |
|---|---|
| If to Guarantor: | c/o Novatus Management, LLC |
| | 1095 Avenue of the Americas, 25th Floor, Suite A |
| | New York, New York 10036 |
| | Attention:  Steve Doyon |
| | Facsimile:  (646) 829-3901 |
| | Email:  sdoyon@novatusenergy.com |
| | |
| With copy to: | Milbank, Tweed, Hadley & McCloy LLP |
| | 28 Liberty Street |
| | New York, New York 10005 |
| | Attention:  John D. Franchini, Esq. |
| | Facsimile Number:  (212) 822-5491 |
| | Email:  JFranchini@milbank.com |
| | |
| If to Seller: | c/o SunEdison Utility Holdings, Inc. |
| | 179 Lincoln Street |
| | Boston, MA 02111 |
| | Attention:  General Counsel |
| | Facsimile Number:  (617) 960-2889 |
| | |
| With copy to: | Mayer Brown LLP |
| | 700 Louisiana Street, Suite 3400 |
| | Houston, TX 77002 |
| | Attention:  Robert S. Goldberg, Esq. |
| | Facsimile Number:  (713) 238-4650 |

9

5.11    Interest; Collection Expenses.    If any amounts required to be paid by Guarantor under this Guarantee remain unpaid after such amounts are due, Guarantor shall pay interest on the aggregate, outstanding balance of such amounts from the date due until those amounts are paid in full at the Default Rate (or the maximum rate permitted by applicable Law, whichever is less); provided, however, that Guarantor shall have no obligation to pay such interest in duplication of any interest that has accrued on the Guaranteed Obligation.  Seller shall give notice to Guarantor that such fees or other amounts remain unpaid after same are due, but the failure to give such notice shall not affect either the accrual of interest on such amounts at the Default Rate (or the maximum rate permitted by applicable Law, whichever is less) nor Guarantor's obligation to pay such amounts and such interest.

5.12    Counterparts.    This Guarantee may be executed in one or more counterparts and by facsimile and when signed by all of the parties listed below shall constitute a single binding agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto, by their officers or authorized persons duly authorized, intending to be legally bound, have caused this Guarantee to be duly executed and delivered as of the date first above written.

**NOVATUS ENERGY, LLC**
as Guarantor

By: _____

Name: Amanda Wallace

Title:  Authorized Signatory

**SUNFLOWER RENEWABLE HOLDINGS 1, LLC**

By: _____

Name: Vanessa Kwong

Title:  Assistant Secretary

<u>Exhibit C</u>

<u>Form of Sale Order</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : **Chapter 11** |
| | : |
| **SUNEDISON, INC.,** *et al.*, | : **Case No. 16-10992 (SMB)** |
| | : |
| **Debtors.**[1] | : **(Jointly Administered)** |
| | : |
| | : |

## ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 363(f), 363(m), 1107, AND 1108 AND BANKRUPTCY RULES 2002, 6004, 9006, AND 9019 AUTHORIZING AND APPROVING ENTRY INTO COMMITMENT LETTER FOR CERTAIN PROJECT SALES AND GRANTING RELEASES IN CONNECTION THEREWITH

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order") pursuant to sections 105(a), 363(b), 363(f), 363(m), 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 9006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing the Company to sell or transfer its interests in the 104MW renewable energy project located in North Dakota known as Sunflower (the "Sunflower Project") to Novatus Project Holdings I, LLC ("Novatus Holdings") in accordance with that certain Commitment Letter, dated as of May 19, 2016 (the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

"Commitment Letter"), by and between SUNE and Novatus Holdings, free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens") with such Liens attaching to the proceeds with the same validity, extent, and priority as had attached to the assets immediately prior to the sale or transfer; (ii) granting to Novatus Holdings the exclusive right to enter into one or more agreements to purchase the Remaining Projects for a limited period of time and subject to conditions set forth in the Commitment Letter (including higher and better offers); and (iii) approving the release of all Actions against the Released Parties solely with respect to the transactions consummated under or contemplated by the MIPSA, all as more fully set forth in the Motion; and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, their stakeholders, and other parties in interest; and after due deliberation thereon, and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED that**:

1.      The Motion is GRANTED as set forth herein.

2.      The Commitment Letter and the PSA are in the best interests of the Debtors' estates and are hereby authorized, approved, and ratified in all respects.  The Commitment Letter and the PSA constitute the highest and best offer for the Sunflower Project, and will provide a greater recovery for the Debtors' estate than would be provided by any other available alternative.  The Debtors' determination that the Commitment Letter and the PSA constitute the highest or best offer for the Sunflower Project constitutes a valid and sound exercise of the Debtors' business judgment.

3.      The Debtors, Novatus Holdings, and their respective affiliates are authorized to execute, deliver, implement and fully perform under the Commitment Letter, the PSA, and any and all other obligations, instruments, documents, and papers, and to take any and all actions, reasonably necessary or appropriate to consummate the Sunflower Project sale to Novatus Holdings as contemplated by the Commitment Letter and the PSA and to grant to Novatus Holdings the exclusive right to purchase the Remaining Projects solely on the terms set forth in the Commitment Letter.  Upon entry of this Order, the Commitment Letter and the PSA shall become enforceable and binding on the Debtors, the Debtors' estates, and the parties thereto.

4.      The Releases are critical to the sale of the Sunflower Project pursuant to the Commitment Letter and the PSA, are supported by fair and reasonable consideration, are in the best interests of the Debtors' estates, and, accordingly, are hereby approved pursuant to Bankruptcy Rule 9019; provided, that in the event that the PSA is terminated by SUNE (or its applicable affiliates) solely as a result of fraud or willful and intentional misconduct under the PSA by Novatus Holdings or its affiliates (it being understood that willful and intentional misconduct includes the failure by Novatus Holdings or its affiliates to deliver the purchase price for the Sunflower Project pursuant to the PSA upon the satisfaction or waiver by Novatus Holdings of the closing conditions set forth therein), then the Releases shall immediately cease to be effective.

5.      From and after the effectiveness of the Releases, the Company is authorized to indemnify and hold harmless the Released Parties against all demands, losses, actions damages costs, and expenses (including reasonable and documented attorneys' fees and disbursements) imposed upon or incurred by the Released Parties arising from, or as a result of, an Action.

6.      The sale of the Sunflower Project pursuant to the terms of the Commitment Letter and the PSA shall constitute a sale for reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

7.      The sale by Sunflower Renewable Holdings 1, LLC of all of the equity interests of Sunflower Renewable Holdings 2, LLC to Novatus Holdings pursuant to the terms set forth in the Commitment Letter and the PSA shall be free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code.

8.      The sale of the Sunflower Project to Novatus Holdings pursuant to the terms set forth in the Commitment Letter and the PSA shall be deemed an arm's-length transaction and Novatus Holdings and its designees shall be entitled to the protections afforded to good-faith purchasers under Bankruptcy Code section 363(m).

9.      Any objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled on the merits and denied with prejudice.

10.      This Order shall apply to the cases of any of the Debtors' affiliates that file for relief under the Bankruptcy Code and that are jointly administered with these Chapter 11 Cases, including any Initial Project Seller and any Remaining Project Seller.

11.      With respect to all sale transactions consummated pursuant to this Order, including the Remaining Project sales, this Order shall be sole and sufficient evidence of the transfer of title to any particular buyer, and the sale transactions consummated pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or

otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Order, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state and federal, state, and local officials, and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

12.    Nothing in this Order, the Commitment Letter, or the PSA releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including, but not limited to, environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order, the Commitment Letter, or the PSA shall in any way diminish the obligation of any entity, including the Debtors, to comply with environmental laws.  Nothing in this Order, the Commitment Letter, or the PSA authorizes the transfer to Novatus Holdings (or its affiliates, or any other entity) of any licenses, permits, registrations, or governmental authorizations and approvals without Novatus Holdings' (or its affiliates', or any other entity's) compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

13.    Nothing contained herein shall prejudice the rights of the Debtors to seek authorization for the sale of any asset under 11 U.S.C. § 363.

14.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

15.     Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

16.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

17.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

18.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:  New York, New York
            _____, 2016


            _____
            The Honorable Stuart M. Bernstein
            UNITED STATES BANKRUPTCY JUDGE

<u>Exhibit D</u>

<u>FIRPTA Certificate</u>

## CERTIFICATE OF NON-FOREIGN STATUS

### June ___, 2016

This certificate is being furnished by SunE Wind Holdings II, LLC ("**Transferor**") pursuant to that certain Membership Interest Purchase and Sale Agreement dated as of May ___, 2016 (the "**Agreement**") by and between Novatus Project Holdings I, LLC, a Delaware limited liability company ("**Purchaser**") and Sunflower Renewable Holdings 1, LLC, a Delaware limited liability company ("**Seller**"), pursuant to which Seller has agreed to sell, and Purchaser has agreed to purchase, one hundred percent (100%) of the Membership Interest owned directly or indirectly by Seller. Capitalized terms used but not defined in this certificate shall have the meaning given to them in the Agreement.

Section 1445 of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. Where applicable, the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not such disregarded entity for U.S. tax purposes (including Section 1445 of the Code). To inform Purchaser that U.S. federal income tax withholding is not required under Section 1445 of the Code upon the disposition of the Membership Interest by Seller, the undersigned hereby certifies as follows:

1.      Transferor indirectly owns the Membership Interest.

2.      Each entity in the chain of ownership between Transferor and Seller is a disregarded entity as defined in Treasury Regulations § 1445-2(b)(2)(iii), and Transferor is treated as owning all of the assets of Seller for U.S. federal income tax purposes.

3.      Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and Treasury Regulations promulgated thereunder).

4.      Transferor is not a disregarded entity as defined in Treasury Regulations § 1.1445-2(b)(2)(iii).

5.      Transferor's U.S. federal tax identification number is: 47-4222761.

6.      Transferor's office address is:

> c/o SunEdison Utility Holdings, Inc.
> 179 Lincoln Street, Suite 500
> Boston, MA 02111

The undersigned understands that this certificate may be disclosed to the Internal Revenue Service and any false statement contained herein could be punished by fine, imprisonment, or both.

*[signature page follows]*

Under penalties of perjury I declare that I have examined this certificate and to the best of my knowledge and belief it is true, correct and complete, and that I have the authority to sign this certificate on behalf of Transferor.

SunE Wind Holdings II, Inc.

By: _____

Name: _____

Title: _____