**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | : | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10992 (SMB)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

**DECLARATION OF HY MARTIN IN SUPPORT OF DEBTORS'
MOTION FOR (I) AN ORDER AUTHORIZING AND APPROVING
PRIVATE SALE OF EQUITY INTERESTS IN IMPERIAL VALLEY
SOLAR 2, LLC AND 88FT 8ME LLC; OR, (II) IN THE ALTERNATIVE,
FOR
(1) AN ORDER (A) AUTHORIZING CERTAIN DEBTORS' ENTRY INTO
THE STALKING HORSE AGREEMENT, (B) APPROVING BIDDING
PROCEDURES AND STALKING HORSE BID PROTECTIONS IN
CONNECTION WITH SALE OF ASSETS OF THE DEBTORS, (C)
SCHEDULING AUCTION AND SALE HEARING, AND (D) GRANTING
RELATED RELIEF;
AND (2) THEREAFTER, AN ORDER (A) APPROVING THE SALE OF
EQUITY INTERESTS IN IMPERIAL VALLEY SOLAR 2, LLC AND 88FT
8ME LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, AND
<u>ENCUMBRANCES AND (B) GRANTING RELATED RELIEF</u>**

I, Hy Martin, being duly sworn, deposes, and says:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

1.      I am a Director of Strategy and Mergers & Acquisitions of SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "SunEdison" or the "Company").[2]

2.      I joined SunEdison in 2015. Prior to my current position, I was a Vice President at Nollen Group, an energy and infrastructure development and investment fund. In that role, I led project finance and principal investing activities primarily for renewable energy assets, including large-scale development projects. I have also worked at NRG Energy and the United States Department of the Treasury. I have seven years of experience in the renewable energy/infrastructure development and investment industry. I hold a BS from the University of Virginia, an MPA from Harvard Kennedy School and an MBA from Harvard Business School.

3.      I submit this declaration (this "Declaration") in support of the Debtors' Motion for (I) an Order Authorizing and Approving a Private Sale of Equity Interests in Imperial Valley Solar 2, LLC and 88FT 8ME LLC; Or, (II) in the Alternative, for (1) an Order (A) Authorizing and Approving Certain Debtors' Entry into the Stalking Horse Agreement, (B) Approving Bidding Procedures and Stalking Horse Bid Protections in Connection with Sale of Assets of the Debtors, (C) Scheduling Auction and Sale Hearing, and (D) Granting Related Relief, and (2) Thereafter, an Order (A) Approving The Sale Of Equity Interests in Imperial Valley Solar 2, LLC and 88FT 8ME LLC Free and Clear of All Liens, Claims, and Encumbrances, and (B) Granting Related Relief (the "Motion"),[3] filed contemporaneously herewith by the Debtors.

---

[2] For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc. ("TERP") and Terraform Global, Inc., and each of their respective direct and indirect subsidiaries, unless otherwise provided.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or my discussions with other representatives of the Debtors and, if called as a witness, I would testify competently thereto.

4. In my capacity as Director, I have expertise with respect to the Company's development and disposition of large-scale utility renewable energy projects in North America. I am generally familiar with the Mt Signal 2 Project identified in the Motion.

## I. The Mt Signal 2 Project

5. SunEdison, in the ordinary course of its development business, is in the process of developing two interrelated projects, known as the Mt Signal 2 Project and the Mt Signal 3 Project, respectively. The Mt Signal 2 Project is a 201 megawatt photovoltaic energy project, and the Mt Signal 3 Project is a 245 MW photovoltaic energy project; both are located in Imperial Valley, California. Both Projects were originally developed by 8minutenergy Renewables, and the Mt Signal 2 Project was sold to SunEdison. While certain assets relating to the Mt Signal 2 Project are owned by IVS2 and 88FT, certain assets relating to the Mt Signal 3 Project are owned by other subsidiaries of SUNE. The two Projects are currently under development, although the progress of development has greatly slowed since the commencement of these Chapter 11 Cases, requiring any buyer to expend significant funds in order to proceed with construction and complete the Projects.

6. The Debtors' ability to preserve and monetize value in the Mt Signal 2 Project faces significant and imminent challenges. The most immediate threat to the Mt Signal 2 Project is the risk that critical interconnection rights granted pursuant to the California Independent System Operator Corporation's ("CAISO") tariff will expire on August 22, 2016 (the ten year anniversary of the underlying interconnection agreement) unless an extension is granted by

3

CAISO prior to such date.[4] Without valid interconnection rights, the owner of the Mt Signal 2 Project has no ability to sell the power such project will generate, thus rendering the project much less valuable without the ability to generate the same amount of revenue as originally envisioned. CAISO generally requires up to 60 days to process an extension request, but is unlikely to process an extension request in less than approximately 30 days. Unlike with respect to the Mt Signal 3 Project, the Debtors can start the process of obtaining an extension prior to closing of the sale of the Equity Interests, however, the Buyer and the Seller Parties believe CAISO is unlikely to grant the extension unless the transferee is identified prior to the August 22, 2016 deadline.[5]

7. Second, certain conditional use permits and building permits for the Mt Signal 2 Project must also be renewed with the County of Imperial, California by August, 2016. Like the CAISO extension process, the project owner must begin the process of renewing these permits by mid-July, 2016, at the latest. Without such renewals, the Mt Signal 2 Project will be significantly delayed.[6]

8. Third, the Mt Signal 2 Project shares complex co-tenancies, shared infrastructure, rights of way and transmission facilities with the Mt Signal 3 Project that need to be addressed with the current Mt Signal 3 Project owner/developer, 8ME, to preserve and maximize the value of the Mt Signal 2 Project. For example, a local governmental entity, the Imperial Irrigation

---

[4] In September, 2015, CAISO granted the Debtors an extension for the Projects through and including October 31, 2016. However, the validity of this extension is unclear since the governing tariff in effect at that time only permitted an extension through August 22, 2016.

[5] Under the governing CAISO tariff currently in effect, the project owner seeking an extension must be deemed "creditworthy" by CAISO to be eligible for an extension. The Debtors believe that the Buyer should be able to satisfy this requirement.

[6] While it is theoretically possible to obtain new conditional use permits and building permits, it is not practical. The process to obtain the original conditional use permits and building permits took over 3 years, including a settlement of litigation.

4

District (the "IID"), has placed a limit on the transmission capacity of the line (referred to as the "gen-tie") which links the Mt Signal 2 and Mt Signal 3 Projects to the CAISO grid that will prevent the Mt Signal 2 and 3 Projects from delivering and selling their full output. Because the Mt Signal 2 Project is not expected to be operational until more than a year after the Mt Signal 3 Project, the Mt Signal 2 Project bears the risk that its output (and thus revenue-generating ability) will be limited absent an amendment to the IID restriction or agreement with 8ME. The owner of the Mt Signal 2 Project also requires cooperation from 8ME to use various portions of the gen-tie and corresponding transmission equipment. The Buyer has been working closely with 8ME as business partners and proposed joint bidders for the Projects for approximately nine months to resolve these issues and develop a strategy to obtain a suitable amendment to the shared capacity limit.[7]

9.  Fourth, development of the Mt Signal 2 Project is secured by approximately $10 million in letters of credit constituting DIP Obligations under the Final DIP Order that will be fully drawn if the project does not get built or the project's power purchase agreement is terminated. Accordingly, without a sale of the Mt Signal 2 Project to a creditworthy owner such as the Buyer, recoveries to creditors in these Chapter 11 Cases may be reduced by the amount of such letters of credit.

---

[7] 8ME and D. E. Shaw Renewable Investments ("DESRI"), an affiliate of the Buyer, have been working together for more than 6 months to acquire certain assets from SunEdison. Indeed until recently they were participants in a joint bid to purchase a large portfolio of assets that included the Equity Interests. 8ME and DESRI expect to continue their cooperative efforts with respect to the Projects and other existing and potential renewable energy opportunities in the future, and in connection therewith, have entered into (or intend to enter into in the future) various contractual and commercial arrangements with respect to the Projects, including, but not limited to, arrangements to continue to work exclusively with each other on the Projects and to sell the respective Projects and related assets to each other in the future once the parties have completed certain development activities for each Project.

10. Fifth, the Mt Signal 2 Project owes Imperial Valley Solar Holdings, LLC (a third-party entity unaffiliated with either the Buyer or the Seller Parties) a substantial earn out payment, though the governing documentation is unclear regarding the owed amounts and timing for payment. The Buyer and its affiliates have made progress towards resolving these ambiguities with Imperial Valley Solar Holdings, LLC over the last three months. Another potential buyer would require additional time to negotiate terms with Imperial Valley Solar Holdings, LLC, which may slow down progress towards closing an alternative transaction.

11. After reviewing all of the bids submitted for the Mt Signal 2 Project during both the pre- and post-petition competitive bidding processes, I believe that the private sale of the Equity Interests pursuant to the PSA represents the Debtors' best opportunity to achieve a certain and timely closing to ensure that the Debtors are able to preserve and maximize the value of the Equity Interests for the benefit of all of the Debtors' stakeholders. For the reasons set forth above, it is critical that the Debtors move forward expeditiously to close a transaction for the Mt Signal 2 Project. The PSA provides a monetary incentive, in the form of a $10 million increased purchase price, for the Debtors to move quickly towards a closing with the Buyer under a private sale transaction structure. Furthermore, given the imminent expiration of the CAISO interconnection rights, the consummation of a sale transaction would help ensure that the application to renew or extend those rights is timely considered and granted by CAISO. Absent a timely application submission and the renewal or extension of the CAISO interconnection rights, it is my belief that the Mt Signal 2 Project would suffer significant value degradation and a failure to achieve a higher or better price from any other party, to the detriment of the Debtors and their estates.

**II.     The Proposed Private Sale**

12.     I believe that it is in the best interests of the Debtors to consummate the sale of the Mt Signal 2 Project to the Buyer via a private sale for various reasons.  First, the Company has been marketing the Mt Signal 2 Project since the third quarter of 2015, and given the various bids received to date, I believe that the sale transaction set forth in the PSA represents the highest or otherwise best bid received for the Mt Signal 2 Project.  In addition, I believe that the proposed net sale proceeds represent fair consideration in exchange for the Mt Signal 2 Project, and are generally commensurate with consideration received for similarly situated projects.

13.     Prior to the Petition Date, the Company engaged in a comprehensive sale process for the Mt Signal 2 Project in late 2015.  At least fifteen (15) qualified bidders of recognized standing in the solar power industry executed non-disclosure agreements and conducted due diligence on the Mt Signal 2 Project, and the Company received nine (9) non-binding bids for the Mt Signal 2 Project.  Ultimately, on December 29, 2015, SUNE and certain of its affiliates entered into a purchase and sale agreement with certain affiliates of the Buyer who were holders of the Exchangeable Notes – i.e. affiliates of the D.E. Shaw Group, Madison Dearborn Capital Partners IV, L.P., and Northwestern University (collectively, the "D.E. Shaw Buyers") – pursuant to which the D.E. Shaw Buyers agreed, among other things, to take project transfers from SUNE in lieu of cash to satisfy $215 million of principal owed under the Exchangeable Notes (such transaction, the "D.E. Shaw Sale").

14.     Among the twelve projects to be transferred in the D.E. Shaw Sale were the Mt Signal 2 Project and the Mt Signal 3 Project.  The D.E. Shaw Buyers designated affiliates of D.E. Shaw and 8ME as the purchasers for the Mt Signal 2 and Mt Signal 3 Project assets, with the intention of forming a joint venture to continue the development of the Projects.  However, prior to consummation of the D.E. Shaw Sale, the Debtors commenced the Chapter 11 Cases.

7

15. Given the severe time pressures presented by the potential expirations of these key rights, the extended marketing process which has already been undertaken by the Company, and the uncertainty with respect to the realization of sale proceeds, I believe that the proposed private sale transaction provides the best opportunity to close the sale of the Mt Signal 2 Project in a timely manner, providing closing certainty, a clear path to realizing sale proceeds, and optimal timing for the benefit of the Debtors and their estates. It is my understanding that both the Seller Parties and the Buyer are highly motivated to proceed to an expeditious closing following entry of orders approving the sale transaction. Other interested parties would be unable to close in a timely manner, potentially jeopardizing the value of the Mt Signal 2 Project to the detriment of the Debtors. Similarly, the requirement to conduct a further marketing and auction process would not only require the Debtors to expend additional resources on additional marketing, but would also result in significant value degradation due to the material interconnection permit timing issues described above.

16. However, should this Court deny the Debtors' request for authorization to consummate the transactions set forth in the PSA in a private sale, I believe that a sale of the Equity Interests pursuant to an Auction under the Bidding Procedures will provide the Debtors with the next-best option to maximize the value received through the sale.

17. Finally, regardless of whether this Court approves a sale of the Equity Interests pursuant to the PSA as a private sale, or approves the PSA as a stalking horse bid, I believe that the net sales proceeds associated with either a private sale or a public auction process are fair, reasonable, and generally commensurate with the return and proceeds received by the Debtors for the sale of similarly situated projects. Based on my experience and understanding of the Mt Signal 2 Project, I believe that the total cash and non-cash consideration received by the

Company for the Mt Signal 2 Project pursuant to either the Private Sale Purchase Price or the Auction Purchase Price is reasonable and fair under the circumstances and the rate of return represents a competitive return for the Mt Signal 2 Project.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, information, and belief, and after reasonable inquiry, the foregoing is true and correct.

Dated: July 5, 2016

                                      */s/ Hy Martin*
                                By:    Hy Martin