UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X
                                  :

In re:                               :      Case No. 16-10992 (SMB)
                                  :

SUNEDISON, INC. *et al.*[1]     :      Chapter 11
                                  :

          Debtors.        :      (Jointly Administered)
-----------------------------------------------X

## MEMORANDUM DECISION AND ORDER DENYING APPOINTMENT OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

**A P P E A R A N C E S :**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for the Debtor and Debtor-in-Possession*
Four Times Square
New York, New York 10036

      Jay M. Goffman, Esq.
      J. Eric Ivester, Esq.
      George A. Zimmerman, Esq.
          Of Counsel

      --and--

155 N. Wacker Dr.
Chicago, Illinois 60606-1720

      James J. Mazza, Jr., Esq.
      Louis S. Chiappetta, Esq.
         Of Counsel

---

[1]     The Debtors in these chapter 11 cases include SunEdison, Inc.; SunEdison DG, LLC; SUNE Wind Holdings, Inc.; SUNE Hawaii Solar Holdings, LLC; First Wind Solar Portfolio, LLC; First Wind California Holdings, LLC; SunEdison Holdings Corporation; SunEdison Utility Holdings, Inc.; SunEdison International, Inc.; SUNE ML 1, LLC; MEMC Pasadena, Inc.; Solaicx; SunEdison Contracting, LLC; NVT, LLC; NVT Licenses, LLC; Team-Solar, Inc.; SunEdison Canada, LLC; Enflex Corporation; Fotowatio Renewable Ventures, Inc.; Silver Ridge Power Holdings, LLC; SunEdison International, LLC; Sun Edison LLC; SunEdison Products Singapore Pte. Ltd.; SunEdison Residential Services, LLC; PVT Solar, Inc.; SEV Merger Sub Inc.; Sunflower Renewable Holdings 1, LLC; Blue Sky West Capital, LLC; First Wind Oakfield Portfolio, LLC; First Wind Panhandle Holdings III, LLC; DSP Renewables, LLC; Hancock Renewables Holdings, LLC; EverStream Holdco Fund I, LLC; Buckthorn Renewables Holdings, LLC; Greenmountain Wind Holdings, LLC; Rattlesnake Flat Holdings, LLC; Somerset Wind Holdings, LLC; SunE Waiawa Holdings, LLC; SunE MN Development, LLC; SunE MN Development Holdings, LLC; SunE Minnesota Holdings, LLC.  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

WEIL, GOTSHAL & MANGES LLP
*Counsel to the Official Committee of Unsecured Creditors*
767 Fifth Avenue
New York, New York 10153

      Matthew S. Barr, Esq.
      Joseph H. Smolinsky, Esq.
      Jill Frizzley, Esq.
          Of Counsel

BROWN RUDNICK LLP
*Counsel to Certain Equity Holders*
One Financial Center
Boston, MA  02111

      Steven D. Pohl, Esq.
      Sunni P. Beville, Esq.
      Rebecca M. Mitchell, Esq.
          Of Counsel

WAYNE GREENWALD, P.C.
*Counsel to the Investor Recovery Charitable Trust*
475 Park Avenue South – 26th Floor
New York, New York 10016

      Wayne M. Greenwald, Esq.
          Of Counsel

WHITE & CASE LLP
*Attorneys for BOKF, N.A., as Convertible Notes Indenture Trustee*
1155 Avenue of the Americas
New York, NY 10036

      Glenn M. Kurtz, Esq.
      J. Christopher Shore, Esq.
      Harrison L. Denman, Esq.
      Michele J. Meises, Esq.
      Thomas MacWright, Esq.
          Of Counsel

      --and--

Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131

      Thomas E Lauria, Esq.
          Of Counsel

FOLEY & LARDNER LLP
*Attorneys for BOKF, N.A., as Convertible Notes Indenture Trustee*
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313

> Harold L. Kaplan, Esq.
> Mark F. Hebbeln, Esq.
> Lars A. Peterson, Esq.
>    Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Following submission of several letters requesting the appointment of a committee to represent the shareholders of Debtor SunEdison, Inc. ("SunEdison"), the Court issued an order on May 20, 2016, directing interested parties to show cause why an official committee of equity security holders ("Equity Committee") should not be appointed. The Court conducted an evidentiary hearing on July 14, 2016 at which two *ad hoc* groups of shareholders, represented by counsel, examined two witnesses. Based upon the evidence adduced at the hearing, the Court concludes that the appointment of an Equity Committee is not necessary at this time to assure the adequate representation of equity security holders. Should circumstances change, the shareholders may renew the motion.

## BACKGROUND

SunEdison is a holding company that, along with approximately two thousand direct and indirect debtor and non-debtor affiliates (the "SunEdison Group"), is in the business of developing renewable energy projects. SunEdison and twenty-five affiliates filed chapter 11 petitions on April 21, 2016 (the "Petition Date"), and since then, several

other affiliates have commenced chapter 11 cases in this Court.[2]  Two of SunEdison's

principal assets are its interests in TerraForm Power, Inc. ("TERP") and TerraForm

Global, Inc. ("GLBL," and collectively with TERP, the "Yieldcos").  As of the Petition

Date, the Debtors indirectly held approximately 35% of the economic interests and 84%

of the voting interests in TERP through ownership of 100% of TERP's Class B shares

and approximately 36% of the economic interests and 98% of the voting interests in

GLBL through ownership of 100% of GLBL's Class B shares.  (*Declaration of Patrick M.*

*Cook Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions*

*and First Day Pleadings*, dated April 21, 2016 ("*Cook Declaration*"), at ¶¶ 25, 27 (ECF

Doc. # 4).)  The Yieldcos are not debtors, and their shares are publically traded.

The common stock of SunEdison is or was also publically traded, and is or was

listed on the New York Stock Exchange under the symbol "SUNE."  (*Id.* at ¶ 48.)  As of

April 20, 2016, one day before the Petition Date, there were approximately 436 million

shares of SunEdison common stock outstanding, with approximately 214 holders of

record.  The common stock was then trading at $0.34/share.  (*Id.*)

According to certain financial information issued by SunEdison, the SunEdison

Group appeared to be solvent on a consolidated basis as of the Petition Date.  The last

set of *unaudited* consolidated financial statements contained in SunEdison's Form 10-Q

for the period ended September 30, 2015, listed total assets of $20.714 billion and

---

[2]        The current universe of debtors is identified in footnote 1.

shareholders' equity of $4.504 billion,[3] (Movant's Exhibit ("MX") 1, at 4), but the reliability of this data was open to question.  On March 16, 2016, SunEdison issued a Form 8-K.  It reported that its auditors were unable to finalize their audit for the calendar year 2015 "due to the identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems."  (MX 4, Tab 1.)  It also reported that SunEdison's audit committee had not completed its investigation of SunEdison's previously disclosed financial condition.  (*Id.*)  Another Form 8-K, dated Mar. 31, 2016, stated that SunEdison had received a subpoena from the United States Department of Justice ("DOJ") relating to SunEdison's financing activities concerning its proposed acquisition, subsequently terminated, of Vivint Solar, Inc. ("Vivint"), the alleged wrongdoing of a former employee in connection with the Vivint termination negotiations, investigations by SunEdison's audit committee, intercompany transactions between SunEdison and the Yieldcos and the financing of projects in Uruguay.  (MX 4, Tab 2.)  The Form 8-K also revealed that SunEdison had received an informal, nonpublic inquiry from the Securities and Exchange Commission ("SEC") covering similar areas.  (*Id.*)

SunEdison issued a third Form 8-K on April 14, 2016, (MX 2, Tab 3), in which it reported the results of the audit committee's investigation.  The audit committee did not identify material misstatements in SunEdison's historical financial statements or

---

[3]    Exhibit A to SunEdison's chapter 11 petition indicated the same assets and greater shareholder equity in the sum of $4.57 billion.  The exhibit contained a footnote, however, stating that the totals included the consolidated assets and debts of the Yieldcos.

substantial evidence of willful misconduct of management (other than the conduct of one former employee with respect to the Vivint negotiations). However, the audit committee identified several specific issues regarding SunEdison's cash forecasting and liquidity management practices, including, among other things, that cash forecasting efforts lacked sufficient controls and processes, the cash forecasts were overly optimistic and SunEdison lacked sufficient controls and processes to manage cash flows, including the extension of accounts payable and the use of cash committed to projects.

Filings on the Petition Date and thereafter also raised questions regarding SunEdison's financial condition and the reliability of its previously published financial data. According to Patrick M. Cook, SunEdison's Vice President – Capital Markets and Corporate Finance, the SunEdison Group owed secured and unsecured funded debt in the amount of $3.832 billion and trade debt of at least $357 million. (*Cook Declaration* at ¶ 32 & n. 32.) Cook also reported falling stock prices for SunEdison and the Yieldcos, (*id.* at ¶ 61), recounted the details of litigation against SunEdison, (*id.* at ¶¶ 64-65, 70), and repeated the issues relating to the financial statements discussed in the Forms 8-K, including the DOJ investigation. (*Id.* at ¶¶ 67-68.)

A number of shareholders wrote to the Court stating that they had purchased SunEdison stock at higher prices prior to the Petition Date based on rosier financial information. Focusing primarily on the published information indicating shareholder equity in excess of $4 billion, and understandably concerned about the loss of their investments, they asked the Court to appoint an Equity Committee. As a result, the Court issued the aforementioned order to show cause.

A few parties opposed the proposed appointment. [4]  In the main, they contended

that the Creditors' Committee and SunEdison's new management team could

adequately represent the shareholders' interests, SunEdison appeared to be hopelessly

insolvent, and the shareholders, as parties in interest, could still participate and be

heard in the case.  They argued that it would be improper to force the estate, and hence,

the creditors, to finance the Equity Committee's professionals given the substantial

likelihood that the creditors would not receive payment in full on their claims.

Two sets of counsel subsequently appeared representing two *ad hoc* groups of

equity holders.  (*See The Investor Recovery Charitable Trust's Response to the Order to*

*Show Cause for Why Order Should Not Be Entered, Pursuant to 11 U.S.C. § 1102(a)(2),*

*Directing the United States Trustee to Appoint an Official Committee of Equity*

*Security Holders and Supporting the Appointment of a Committee*, dated June 2, 2016

("*IRCT Response*") (ECF Doc. # 452); *Equity Holders' Statement in Support of*

*Appointment of an Official Committee of Equity Security Holders*, dated June 5, 2016

("*Brown Rudnick Response*") (ECF Doc. # 470).)  They mainly argued that equity lacked

reliable information about the Debtors' financial condition, (*Brown Rudnick Response*

at ¶¶ 45-52), the public data was untrustworthy, (*id.* at ¶¶ 53-60), and the corporate

structure and intercompany transactions, and their effect on value, was "virtually

---

[4]      *See Email from James E. Hodges*, dated May 20, 2016 (ECF Doc. # 377); *Objection of BOKF,
N.A., as Convertible Notes Indenture Trustee, to Appointment of Official Committee of Equity Security
Holders*, dated May 31, 2016 (ECF Doc. # 424); *Response of Official Committee of Unsecured Creditors
to Order to Show Cause Why Order Should Not Be Entered Pursuant to 11 U.S.C. § 1102(a)(2) Directing
United States Trustee to Appoint an Official Committee of Equity Security Holders*, dated June 2, 2016
(ECF Doc. # 448); *Debtors' Omnibus Response to Requests to Appoint an Official Committee of Equity
Security Holders*, dated June 2, 2016 ("*Debtors' Response*") (ECF Doc. # 450); *Debtors' Omnibus
Supplemental Response to Equity Holders' Statement in Support of an Official Committee of Equity
Security Holders*, dated June 14, 2016 ("*Debtors' Supplemental Response*") (ECF Doc. # 553).

unknowable.  (*Id.* at ¶ 61.)  At the same time, another *ad hoc* group of equity holders pointed to the same data and argued that the Debtors' pre-petition unaudited consolidated financials showing $4 billion in shareholder equity had not been discredited or contradicted by other valuation evidence.  (*IRCT Response* at ¶¶ 9-10, 32-35.)  Finally, the *ad hoc* committees argued that pre-petition mismanagement of the Debtors cast substantial doubt on management's willingness and ability to "zealously advocate for the interests of Equity Holders," (*Brown Rudnick Response* at ¶ 21; *see IRCT Response* at ¶¶ 59-69), and they questioned whether the Creditors' Committee had the motive to investigate allegations of pre-petition misconduct or act in the interests of equity holders.[5]  (*Brown Rudnick Response* at ¶¶ 25-32; *IRCT Response* at ¶¶ 36-37.)

The submissions raised factual issues, especially regarding SunEdison's solvency. As a result, the Court conducted an evidentiary hearing at which it heard the testimony of two witnesses, Cook and Homer Parkhill, Managing Director at Rothschild Inc., the Debtors' financial advisor and investment banker.  The Court initially received the *Cook Declaration* and two declarations executed by Parkhill in connection with the application for debtor-in-possession financing and the pending motion.[6]  Parkhill had

---

[5]      The *Brown Rudnick Response* also questioned the loyalty of the Creditors' Committee's proposed investment banker, Lazard Freres & Co. LLC ("Lazard").  It stated that Lazard had rendered pre-petition services to TERP and employed a former partner of Skadden, Arps, Meagher & Flom LLP, the Debtors' counsel.  (*Brown Rudnick Response* at ¶¶ 26-29.)  The Court subsequently approved Lazard's retention. (*See Order Pursuant to 11 U.S.C. §§ 328(a) and 1103(a), Bankruptcy Rule 2014 and Local Rule 2014-1 for Entry of an Order Authorizing the Employment and Retention of Lazard Frères & Co. LLC as Investment Banker to Official Committee of Unsecured Creditors Nunc Pro Tunc to May 3, 2016*, dated July 28, 2016 (ECF Doc. # 734).)  Neither Brown Rudnick nor any shareholder objected to the retention.

[6]      *Supplemental Declaration of Homer Parkhill in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant To Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) and (B) to Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363 and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)*, dated May 18, 2016 ("*Parkhill Supplemental DIP Declaration*") (ECF Doc. # 327); *Declaration of Homer Parkhill in Support of Debtors' Omnibus*

earlier conservatively estimated that the Debtors would realize proceeds of approximately $850 million, net of the new money portion of the debtor in possession financing,[7] through the liquidation of their assets over the course of the bankruptcy cases.  (*Parkhill Supplemental DIP Declaration* at ¶¶ 10-12; *Parkhill Declaration* at ¶¶ 5-6.)  This included an estimate of $650 million from the sale of the Debtors' interests in the Yieldcos based on the average public trading price of shares in those entities over a month-long period.  (*Parkhill Supplemental DIP Declaration* at ¶ 10; *Parkhill Declaration* at ¶ 5.)  In addition, Parkhill estimated that the Debtors would be able to realize at least another $200 million from the liquidation of other assets. (*Parkhill Supplemental DIP Declaration* at ¶ 11; *Parkhill Declaration* at ¶ 5.)

Parkhill revised his estimates upwards at the hearing.  First, the prices of the publicly traded shares of the Yieldcos had risen, and the value of SunEdison's interest had increased by approximately $150 million.  (*Transcript of July 14, 2016 Hearing* ("Tr.") at 69:23-70:10.)  In addition, this estimate did not include a control premium that SunEdison's Yieldco shares might command, and the control premium might enhance their value by an additional 20% to 30%, or $250 million.  (Tr. at 71:13-72:1.) As result, SunEdison's Yieldco stock might be worth as much as $1.1 billion.  (Tr. at 71:21-72:1.)  Second, the Debtors had received greater indications of interest than

---

*Response to Requests to Appoint an Official Committee of Equity Security Holders*, dated June 2, 2016 ("*Parkhill Declaration*") (ECF Doc. # 451).

[7]      The Debtors were authorized to borrow $300 million in debtor in possession financing.  (*See Final Order (I) Authorizing Debtors to (A) Obtain Senior Secured, Superpriority, Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363 and 364*, dated June 9, 2016, at 2 (ECF Doc. # 523); *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated Apr. 26, 2016, at p. 7 of 220 (ECF Doc. # 523-3).)

anticipated from potential purchasers of other assets, and their expectation of the realizable value from those assets had risen significantly.  (Tr. at 69:8-22.)  In sum, Parkhill conservatively estimated that the Debtors would be able to realize as much as $1.5 billion from the orderly sale of their various assets.  (Tr. at 69:8-22)

The Debtors' debts, however, greatly exceeded $1.5 billion.  The Debtors owed approximately $4.2 billion in secured and unsecured debt, and its contingent liabilities could exceed another $1.2 billion.[8]  (*Parkhill Declaration* at ¶ 6 & n. 3.)  Furthermore, SunEdison's debt was trading at around $.06 or less on the dollar as of late May, 2016, (*Debtors' Response*, Ex. A, at 17-28 of 28), and no evidence was offered at trial to show that the trading price had increased.

## DISCUSSION

Bankruptcy Code § 1102(a)(2) authorizes the Court to appoint an equity committee.  It provides, in relevant part, that

> [o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders.  The United States trustee shall appoint any such committee.

11 U.S.C. § 1102(a)(2).  The statute does not define "adequate representation," and a bankruptcy court "court retains the discretion to appoint an equity committee based on the facts of each case."  *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002); *accord Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 68 B.R. 155, 159 (S.D.N.Y. 1986); *In re Beker Indus.*, 55 B.R. 945, 948 (Bankr. S.D.N.Y.

---

[8]    The bulk of the contingent debt appears to arise from Vivint's claim for breach of the merger agreement.

1985).  The decision is committed to the Court's discretion, and the factors courts consider include "the number of shareholders, the complexity of the case, and whether the cost of the additional committee significantly outweighs the concern for adequate representation." *Williams*, 281 B.R. at 220; *see also In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071, at *1 (Bankr. S.D.N.Y. June 28, 2012) (listing relevant considerations including "the complexity of the case; the likely cost of an additional committee to the estate; whether equity is adequately represented by stakeholders already at the table; the timing of the motion relative to the status of the chapter 11 case; and whether there appears to be a substantial likelihood that equity will receive a meaningful distribution in the case").

The cost concerns center on the fact that the appointment of an Equity Committee is "closely followed by applications to retain attorneys and accountants." *In re Saxon Indus., Inc.*, 39 B.R. 945, 947 (Bankr. S.D.N.Y. 1984); *accord Williams*, 281 B.R. at 220.  The fees and expenses incurred by the Equity Committee's professionals, if allowed by the Court, *see* 11 U.S.C. § 330(a), are administrative claims, 11 U.S.C. §§ 503(b)(2), 507(a)(2), and must be paid no later than the effective date of a confirmed plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Payments to professionals generally reduce the amount available for distribution.[9]  If the debtor is solvent, those payments tend to lessen the distribution to shareholders, but if the debtor is insolvent, the creditors ultimately pay the fees.

---

[9]    One of the *ad hoc* groups of shareholders and several individual shareholders argued that the fees and expenses of the existing professionals are already high, and in substance, a little more won't hurt. (*See, e.g., Brown Rudnick Response* ¶¶ 39-42.)  This is a reason for limiting future fees, not adding to them with the appointment of an Equity Committee.

The question of solvency is intertwined with the concept of adequate representation because it defines the extent of the interests that require adequate representation. Under an unwritten corollary to the absolute priority rule, "a senior class cannot receive more than full compensation for its claims." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001); *accord In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003). Debt is senior to equity. If the debtor is solvent or appears to be solvent, the concern is that a creditors' committee will negotiate a plan based on a conservative estimate of the debtor's worth that captures all of the value of the reorganized entity, including value possibly in excess of the unsecured claims, through the issuance of new stock to the creditors at the expense of old equity whose shares will be cancelled. *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 2119 (Bankr. N.D. Tex. 2009) (equity is as optimistic as creditors are pessimistic in valuing the debtor). Conversely, the stockholders of a "hopelessly insolvent" estate have no economic interest in the case, and under the absolute priority rule, are not entitled to any distribution under a plan absent the consent of the unsecured creditors. *See* 11 U.S.C. § 1129(b)(2)(B). In that circumstance, the estate should not have to bear the expense of negotiating with an Equity Committee over what amounts to a gift. *Williams*, 281 B.R. at 220; *In re Emons, Indus.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985). In addition, the Creditors' Committee in an insolvent case will "adequately represent" any interest equity has in maximizing the value of the estate and insuring that it is properly managed.

The party seeking the appointment of an official equity committee bears the burden of proof. *Eastman Kodak*, 2012 WL 2501071, at *4; *In re Ampex Corp.*, No. 08-11094 (AJG), 2008 WL 2051128, at *2 (Bankr. S.D.N.Y. May 14, 2008); *Johns-Manville,*

68 B.R. at 158.  The proponents must demonstrate that appointment of an official committee is "necessary" to adequately represent equity's interests, "a high standard that is far more onerous than if the statute merely provided that a committee be useful or appropriate." *Eastman Kodak*, 2012 WL 2501071, at *2; *accord In re Oneida Ltd.*, No.06–10489, 2006 WL 1288576, at *1 (Bankr. S.D.N.Y. May 4, 2006); *see Victor v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.)*, No. Civ. A. No. 96-177-SLR, 1996 WL 534853, at *4 (D. Del. Sept. 17, 1996) ("[T]he statutory focus of § 1102(a)(2) is not whether shareholders are "exclusively" represented, but whether they are "adequately" represented.").  On the issue of solvency, a court need not conduct an exhaustive valuation; rather, the relevant inquiry is whether a debtor *appears to be* hopelessly insolvent.  *Eastman Kodak*, 2012 WL 2501071, at *3 ("One of the goals of chapter 11 was the avoidance of the time and expense of a valuation battle, which was a feature of practice under old chapter X.  Thus, the cases generally do not require exhaustive evidence on solvency before a decision on a motion to appoint an equity committee." (citation omitted)); *Williams*, 281 B.R. at 221 ("[T]his Court has not made a valuation, nor is one necessary at this stage.  Instead, it has reached a practical conclusion, based on a confluence of factors, that the Debtors *appear to be* hopelessly insolvent."); *cf. In re Nw. Corp.*, No. 03-12872 (CGC), 2004 WL 1077913, at *2-3 (Bankr. D. Del. May 13, 2004) (holding that, due to the movants' failure to satisfy requirement of a "substantial likelihood" of a meaningful distribution to shareholders, an evidentiary hearing would unjustifiably "shift the cost of this valuation dispute from the Movants to the estate").

Bankruptcy Judge Lifland succinctly summarized the considerations that inform the exercise of the Court's discretion in the following manner:

- 13 -

> The appointment of official equity committees should be the rare exception. Such committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee. The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case.

*Williams*, 281 B.R. at 223.

Here, the shareholders failed to sustain their burden. Notwithstanding the admitted complexities of the Debtors' cases and the number of outstanding common shares and holders of record, the evidence showed that SunEdison appears to be hopelessly insolvent, and it is substantially unlikely that equity will receive a distribution. At the outset, the Court concludes that SunEdison's prepetition financial statements, which show shareholders' equity of roughly $4 billion, are unreliable, a conclusion with which many of the proponents agree. (*See, e.g.*, *Brown Rudnick Response* at ¶¶ 53-60.) First, the last published *unaudited* balance sheet spoke as of September 30, 2015. The Forms 8-K published after that date and discussed earlier indicated that SunEdison's internal controls over financial reporting suffered from material weaknesses and SunEdison's auditors, KPMG LLP, could not finalize their audit for the year ended December 31, 2015. Second, many of the financial statements contained in that Form 10-Q (MX 1) were consolidated statements that included TERP and GLBL financial information. (*See, e.g.*, Tr. at 47:16-24, 55:9-11, 56:16-57:10, 57:11-59:1.) That financial data does not differentiate between assets and income attributable to the Debtors and assets and income attributable to TERP and GLBL. (*See, e.g.*, Tr. at 48:3-6, 55:12-16, 56:16-57:10, 57:11-59:1.)

- 14 -

Third, the test for insolvency turns on a comparison between the debtor's debts and the "fair valuation" of its property.  11 U.S.C. § 101(32).  "Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."  *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 35 (2d Cir. 1996).  Balance sheets, on the other hand, reflect book value, which does not ordinarily equate to market value.  *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 995 (2d Cir. 1981) ("The market value of particular property may of course differ substantially from its book value . . . ."); *DeRosa v. Buildex Inc. (In re F & S Cent. Mfg. Corp.)*, 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985) ("Asset values carried on a balance sheet, even if derived in accordance with 'generally accepted accounting principles,' do not necessarily reflect fair value: 'Generally accepted accounting principles' are not synonymous with any specific [valuation] policy.'") (quoting *Pittsburgh Coke & Chem. Co. v. Bollo*, 560 F.2d 1089, 1092 (2d Cir. 1977)).  I recognize that many shareholders may have relied on these financial statements and other statements published by SunEdison in deciding to invest in SunEdison or retain those investments.  Not surprisingly, shareholder class actions have been commenced relating to the losses they have suffered.  (Tr. at 109:9-13.)  The fraudulent or nonfraudulent nature of any statements or omissions attributable to SunEdison regarding its financial condition and prospects will presumably be tested in those class actions, but for the reasons stated, SunEdison's balance sheet does not provide dependable evidence of the fair market value of its property.

This is not to say that there was no evidence of market value.  According to

Parkhill, the maximum fair market value of the Debtor's assets is $1.5 billion net of the

new money portion of the debtor in possession financing.  This is $2.5 billion less than

the undisputed funded debt and trade debt totaling over $4 billion.  Even if Parkhill's

conservative estimate of value is doubled, the Debtors are still $1 billion short, and the

contingent debt may add an additional $1.2 billion of red ink.  Furthermore, the trading

price of the SunEdison debt is roughly $.06, and this steep discount, though not

conclusive, indicates that SunEdison is insolvent.  *Williams*, 281 B.R. at 221.  The equity

holders note that two courts have rejected the use of claims trading prices to prove

value.  *E.g., U.S. Bank, N.A. v. Wilmington Trust Co.* (*In re Spansion, Inc.*), 426 B.R.

114, 130 (Bankr. D. Del. 2010); *In re Mirant Corp.,* 334 B.R. 800, 832 (Bankr. N.D. Tex.

2005).  While claims trading data is no substitute for expert testimony in proving

valuation, *Spansion*, 426 B.R. at 130,  the motion to appoint an equity committee is not

a valuation hearing, and the Court may consider any available evidence that informs its

discretion.  Trading at six cents on the dollar does not imply solvency.

The record also shows that equity's interests will be adequately represented

without an Equity Committee.  The Creditors' Committee shares equity's interest in

maximizing value and keeping management honest.  In addition, shareholders may still

be heard individually or as one or more *ad hoc* committees because they are parties in

interest in the case,[10] 11 U.S.C. § 1109(b), and may recover some or all of their

professional fees and expenses if they make a substantial contribution in the case.  11

U.S.C. § 503(b)(3)(D).  I recognize this may be a heavy financial burden to shoulder

---

[10]        In fact, two such *ad hoc* committees participated in the briefing and the argument of this motion.

depending on the degree to which shareholders choose to participate in the case, but the law does not require the creditors of an insolvent estate to bear this additional financial burden because the shareholders cannot.

The case law cited by equity in support of the appointment of an official committee is inapposite.  For example, the *Brown Rudnick Response* contends that *In re Pilgrim's Pride Corp.*, 407 B.R. 211 (Bankr. N.D. Tex. 2009), supports the argument that (1) an Equity Committee is essential to represent shareholders' interests and (2) the debtor's failure to publish financial information can justify appointment of an equity committee.  (*Brown Rudnick Response* at ¶¶ 20-21, 34, 49.)  The *Pilgrim's Pride* court agreed that the appointment of an Equity Committee should be denied where there was no doubt about the debtor's solvency.  407 B.R. at 217 n. 15.  There, however, the debtors' schedules, operating reports and post-petition SEC filings, all of which provided a "rough outline of value," indicated that the debtors were solvent.  *Id.* at 217. In addition, the Debtors' chief restructuring officer testified that the debtors were "not even close to 'hopeless insolvency.'"  *Id..*  Accordingly, equity was not adequately represented by a creditors' committee that would advocate a conservative estimate of reorganization value or a debtor who might agree to the low estimate in order to obtain the creditors' committee's consent to a plan.  *Id.* at 217-19.

SunEdison's equity holders' cite similar authority where Courts appointed an equity committee after finding that the debtor was actually or arguably solvent in deciding to appoint an equity committee.  *See Exide Techs. v. State of Wisconsin Invest. Bd.*, No. 02-11125-KJC, 2002 WL 32332000, at *2 (D. Del. Dec. 23, 2002) ("[T]he appellee 'presented credible evidence of equity value of the Debtors . . . .'"); *In re Kalvar*

- 17 -

*Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996) ("[T]here is at this stage a good

faith dispute as to the insolvency of the debtors."); *In re Wang Labs., Inc.*, 149 B.R. 1, 3

(Bankr. D. Mass. 1992) ("[T]he debtor . . . is not *hopelessly* insolvent . . . ."); *Beker

Indus.*, 55 B.R. at 950-51 ("Here the Debtors are solvent or, at least, claim to be, and the

widespread holders of stock and Debentures need representation. . . . Debenture holders

and stockholders have significant interests in these cases and negotiation with

representatives of all of them will be required."); *cf. Oneida*, 2006 WL 1288576, at *2-3

(appointing equity committee in a prepackaged chapter 11 where the valuation evidence

was "extensive and conflicting" and value would be determined at the confirmation

hearing, the proposed plan cancelled old equity, there was reason to doubt under the

facts of the case that the board would pay due regard to the interests of equity, and it

was unlikely that a creditors' committee would challenge the *status quo* because the

plan proposed to pay unsecured creditors in full).  Moreover, the debtor's solvency is

still no guarantee that an equity committee should be appointed. *Edison Bros.*, 1996

WL 534853, at *5 (declining to appoint an equity committee in a solvent case where

management held 35% of the equity, there was no basis to question their loyalty to

creditors and shareholders, and the debtor's capital structure was not complex.)

The *Brown Rudnick Response* also relies on *In re Mansfield Ferrous Castings,

Inc.*, 96 B.R. 779 (Bankr. N.D. Ohio 1988), but the facts of that case were "unique."  The

debtor's employees moved for the appointment of an official *employees'* committee.

The debtor was owned by an Employee Stock Option Plan and Trust ("ESOP"), and 141

current and former employees were participants and beneficiaries of the ESOP.  In

addition, the employees claimed to be creditors (accounting for more than 10% of the

total debt) based on a loan made through the ESOP.  *Id.* at 780.

Although the debtor was insolvent, the Court nonetheless appointed an official employees' committee.  The employees wore three hats and were in a "unique" position; they were employees, and through the ESOP, creditors and shareholders.  *Id.* at 781. When these three roles were combined, "it is apparent that the Employees, who number 141 and lack the resources to protect their interests individually, are not adequately represented in the debtor's bankruptcy proceedings."  *Id.*

The SunEdison cases are not unique, they are typical.  SunEdison appears to be hopelessly insolvent.  Equity's interests in good management are adequately represented by the Creditors' Committee and equity does not have any economic interest that requires representation at a cost to be borne by the creditors.  To the extent that *Mansfield* supports an argument that a Court should appoint an equity committee even when the debtor is hopelessly insolvent, *Mansfield* is inconsistent with the case law from this district discussed above, and I must respectfully disagree with its conclusion.

Finally, the Court is not persuaded by equity's reliance on the bench decision appointing an equity committee in *In re Horsehead Holding Corp.*, Case No. 16-10287 (Bankr. D. Del.).  There, the bankruptcy court appointed an equity committee notwithstanding the evidence of the debtors' insolvency, but observed that its decision was contrary to the weight of legal authority.  (*See* Transcript of May 2, 2016 Oral Argument  at 100:17-19, (ECF Case No. 16-10287 Doc # 862).) (". . . I'm going, frankly, out on a limb here from a standpoint of where the law puts me, which is to make some sort of determination that there is a reasonable or substantial likelihood of recovery to

equity here.").)  The bankruptcy court reached its decision because it was unable to determine whether there was a reasonable or substantial likelihood that equity would receive any value in the case, *id.* at 88:4-16, and it had significant doubts as to the credibility of the valuation information presented by the debtors.  (*Id.* at 101:8-18 (noting a "sufficient amount of ambiguity as to what's right and who's right").)

The bench decision in *Horsehead* captures the Court's quandary on a motion to appoint an equity committee early in a case.  It must determine whether the debtor is or appears to be solvent or insolvent based on the evidence placed before it.  Where the evidence is unreliable or equivocal, and the other factors support the appointment of an official equity committee, a bankruptcy court may, in the exercise of its discretion, direct the appointment.  Here, however, the evidence, including the testimonial evidence which I credit, indicates that the SunEdison appears to be hopelessly insolvent and an Equity Committee is not needed to adequately represent equity's interests.

I accept as a given that shareholders genuinely believe that they need an official committee.  They have lost money on their investments, and hope that an official committee will capture value for them in the end.  The appointment of an Equity Committee, however, will not create value where it does not exist.  Everyone hopes that these cases will prove to be solvent and return money to the shareholders, but based on where these cases appear to be and where they appear to be headed, this is substantially unlikely.  If the facts change, the shareholders can renew their motions.  For now, however, and for the reasons stated, the shareholders have not shown that their

interests are not "adequately represented."  Accordingly, the Court denies its motion to appoint an Equity Committee without prejudice.

      So ordered.

Dated: New York, New York
      August 11, 2016

           /s/ *Stuart M. Bernstein*
           STUART M. BERNSTEIN
           United States Bankruptcy Judge