WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
Thomas E Lauria, Esq.

1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore
Harrison L. Denman
Michele J. Meises

*Attorneys for BOKF, N.A.,*
*as Convertible Notes Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | Chapter 11 |
| **SUNEDISON, INC.,** *et al.*, | : | Case No. 16-10992 (SMB) |
| **Debtors.**[1] | : | (Jointly Administered) |

------------------------------------------------------------------ x

## OBJECTION TO PROOFS OF CLAIM NOS. 1490 AND 3555

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (2211); Somerset Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Buckthorn Renewables Holdings, LLC (7616); SunE Waiawa Holdings, LLC (9757); Greenmountain Wind Holdings, LLC (N/A); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5338); SunE Minnesota Holdings, LLC (8926).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, MO 63043.

BOKF, N.A., solely in its capacity as Indenture Trustee (the "**Convertible Notes Trustee**") with respect to the (i) 2.00% convertible unsecured notes due 2018, (ii) 0.25% convertible unsecured notes due 2020, (iii) 2.75% convertible unsecured notes due 2021, (iv) 2.375% convertible unsecured notes due 2022, (v) 2.625% convertible unsecured notes due 2023, and (vi) 3.375% convertible unsecured notes due 2025 (collectively, the "**Convertible Unsecured Notes**"), issued by SunEdison, Inc. ("**SunEdison**"), by and through its undersigned counsel, files this omnibus objection (the "**Objection**")[2] to (a) Proof of Claim No. 3555 (the "**Second Lien Loans Claim**") filed by Wilmington Savings Fund Society, FSB, as Prepetition Second Lien Administrative Agent, and (b) Proof of Claim No. 1490 (the "**Second Lien Notes Claim**") filed by Wilmington Trust, National Association, as Trustee for the 5% Guaranteed Convertible Senior Secured Notes due July 2, 2018 (the Second Lien Loan Claim together with the Second Lien Notes Claim, the "**Second Lien Claims**").  In support of this Objection, the Convertible Notes Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      As trustee for approximately $2 billion in Convertible Unsecured Notes, BOKF represents the single largest creditor constituency of SunEdison, Inc. ("**SunEdison**").  Any recovery on its holders' claims in SunEdison's chapter 11 case is a simple function of two variables:  (a) the value available for distributions to SunEdison's creditors and (b) the quantum of claims entitled to share in such distributions.

2.      With respect to the first variable, BOKF has cooperated extensively with the above-captioned debtors and debtors in possession (the "**Debtors**") and the Official Committee of Unsecured Creditors (the "**Committee**") to facilitate a robust marketing and sale process

---

[2] Capitalized terms not otherwise defined herein have the meaning ascribed thereto in the Final DIP Order (defined below).

intended to maximize the value of SunEdison's assets. BOKF expects to continue such cooperation going forward, to the extent possible.

3.      This Objection focuses exclusively on the second variable, seeking disallowance of approximately $200 million of the principal amount of claims asserted in the Second Lien Claims. As discussed herein, the claims subject to this Objection consist of three separate components, each of which constitutes "unmatured interest" that must be disallowed in accordance with section 502(b)(2) of title 11, United States Code (the "**Bankruptcy Code**"). The relief requested herein, if granted, would reduce the allowed principal amount of the Second Lien Claims by $200 million and correspondingly increase the expected distributable value available for SunEdison's general unsecured creditors, including BOKF and the holders of Convertible Unsecured Notes.

## BACKGROUND

### A.    The Second Lien Transactions

4.      On January 11, 2016, SunEdison completed two financing transactions pursuant to which it (a) entered into a second lien credit agreement providing for a two-tranche loan in a principal amount of approximately $725 million (the "**Second Lien Loans**"), and (b) entered into a private notes exchange with substantially the same creditors that provided the Second Lien Loans, whereby it issued approximately $225 million of new second lien notes in exchange for approximately $336 million in face amount of existing unsecured convertible notes (the "**Second Lien Notes Exchange**").

5.      In connection with Tranche A-1 of the Second Lien Loan, SunEdison received $480 million of actual funding in exchange for $500 million aggregate principal amount of Tranche A-1 term loans – decreasing the financing package's proceeds to approximately $705 million – and thereby creating $20 million of original issuance discount (the "**Tranche A-1**

Loan OID").[3]  At the same time, SunEdison issued 28.7 million warrants (the "**Warrants**") to the Prepetition Second Lien Lenders, which were immediately exercisable for a strike price of $0.01 per share.  The Warrants had a fair market value of approximately $84 million at issuance, based on the first ten days of trading following the issuance.  The Tranche A-1 Loans, the Tranche A-2 Loans, and the Warrants were all issued by SunEdison at the same time, meaning that the consideration received by SunEdison in exchange for the Second Lien Loans was allocated among all three, resulting in the creation of an additional $84 million in original issue discount on the Second Lien Loans (the "**Warrant OID**").

6.      In connection with the Second Lien Notes Exchange, SunEdison issued Prepetition Second Lien Notes with a face value of $225 million and a market value of approximately $177 million, in exchange for Convertible Unsecured Notes with a face value of $336 million and a market value of approximately $132 million.  In other words, SunEdison received old notes worth approximately $132 million, but issued new notes with a face value of $225 million, thereby creating original issue discount on the Second Lien Notes in the amount of approximately $93 million (the "**Exchange OID**").

### B.      The Second Lien Claims

7.      On June 9, 2016, the Court entered the Final DIP Order,[4] which contains certain stipulations by the Debtors regarding the validity, extent, and priority of the claims of the Prepetition Second Lien Secured Parties (the "**Subject Stipulations**").  Specifically, the Subject Stipulations provide that as of the Petition Date, the Debtors were indebted and liable to (a) the

---

[3] Prepetition Second Lien Credit Agreement ¶¶ 2.01(a), 2.09(a).

[4] *Final Order (I) Authorizing Debtors to (A) Obtain Senior Secured, Superpriority, Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363 and 364* (ECF No. 523) (the "**Final DIP Order**").

Americas 92119002

Prepetition Second Lien Lenders in the aggregate principal amount of $725,000,000 with respect

to the Prepetition Second Lien Credit Facility and (b) the Prepetition Second Lien Noteholders

under the Prepetition Second Lien Note Documents in the aggregate principal amount of

$225,000,000 with respect to the Prepetition Second Lien Indenture.  Final DIP Order ¶ G(ii)(a).

8.    Consistent with the Subject Stipulations, SunEdison scheduled the Second Lien

Loans Claim in the amount of $725,000,000 and the Second Lien Notes Claim in the amount of

$225,000,000.  *See* Debtors' Schedule D: Creditors Who Have Claims Secured by Property at

44-46, dated July 20, 2016 (ECF No. 821).  Thereafter, in September 2016, (a) Wilmington

Savings Fund Society, FSB filed the Second Lien Loans Claim in an unliquidated amount for all

amounts arising under the Prepetition Second Lien Loan Documents and the DIP Loan

Documents, and (b) Wilmington Trust, National Association filed the Second Lien Notes Claim

in the aggregate amount of not less than $228,125,000.00 for all principal and prepetition interest

on the Prepetition Second Lien Notes, plus unliquidated principal and/or interest due.  *See* Proofs

of Claim Nos. 3555, 1490.

9.    The Subject Stipulations became binding upon the Debtors and third parties, other

than the Committee and BOKF, upon seventy-five days after the entry of the Final DIP Order,

i.e., August 23, 2016.  Final DIP Order ¶ 9.  The deadline for the Committee and BOKF to

challenge the Subject Stipulations was extended by consent to October 20, 2016.  (ECF No.

1317).   The filing of this Objection to the Second Lien Claims constitutes a challenge to the

Subject Stipulations, and BOKF reserves all rights to file a motion seeking standing on behalf of

the Debtors' estates to challenge the Subject Stipulations to the extent required by the Court.

5

## OBJECTION

10.    Section 502(b)(2) of the Bankruptcy Code requires the Court to disallow any portion of a proof of claim asserting a right to "unmatured interest." 11 U.S.C. § 502(b)(2) ("[I]f [an] objection to a claim is made, the court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim, except to the extent that . . . such claim is for unmatured interest.").

11.    "Unmatured interest" is not defined in the Bankruptcy Code.  But Congress has indicated that the term should encompass unmatured economic benefits received by lenders substantively similar to unmatured interest payments, such as original issue discount ("**OID**"). *See* H.R. Rep. No. 95-595, at 354 (1977) (disallowed interest shall include "postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of the bankruptcy"). Courts including the Second Circuit in *Chateaugay*, have held that OID constitutes "unmatured interest" for purposes of claims disallowance.  *LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378, 380 (2d Cir. 1992).

### A.    The Court Must Disallow the OID on the Second Lien Loans

12.    Here, it is undisputed that the Prepetition Second Lien Lenders under Tranche A-1 provided $480 million of funding for $500 million aggregate principal face amount of debt. Courts have consistently held that the difference between the amount advanced and the face amount of the newly issued debt constitutes OID that must be disallowed to the extent unamortized as of the borrower's petition date.  *See, e.g., Chateaugay*, 961 F.2d at 380 ("The discount, which compensates for a stated interest rate that the market deems too low, equals the difference between a bond's face amount (stated principal amount) and the proceeds, prior to issuance expenses, received by the issuer."); *Tex. Commerce Bank, N.A. v. Licht (In re Pengo*

6

*Indus., Inc.)*, 962 F.2d 543, 546 (5th Cir. 1992) ("The term 'unmatured interest,' which is not

defined by the Bankruptcy Code, encompasses OID.   The economic reality of original issue

discounting bolsters this conclusion."); *see also In re Allegheny Int'l, Inc.*, 100 B.R. 247, 250

(Bankr. W.D. Pa. 1989) ("We hold that original issue discount is unmatured interest, as that term

is used in section 502(b)(2)."). Accordingly, the Court must disallow the Tranche A-1 Loan OID

under section 502(b)(2) of the Bankruptcy Code.

13.      Also as discussed, the Prepetition Second Lien Lenders received Warrants in

addition to their stated interest rate in exchange for making the Second Lien Loans.   The

Warrants thus constitute a form of interest intended to provide additional compensation to the

Second Lien Lenders in exchange for their extension of funds.   In fact, the issuance of the

Warrants was so material to the Second Lien Lenders that it was required by an affirmative

covenant in the Second Lien Credit Agreement (¶ 6.19).  *See Custom Chrome, Inc. v. Comm'r of

Internal Revenue*, 217 F.3d 1117, 1121-22 (9th Cir. 2000) (warrants granted to lender in

connection with loan were OID in part because the warrants were issued as part of an entire loan

transaction (as opposed to in return for services) and "were clearly intended to compensate the

Bank for its additional risk, thereby raising the effective interest rate of the loan and resulting in

OID"); *Monarch Cement Co. v. United States*, 634 F.2d 484, 484 (10th Cir. 1980) (affirming

judgment that warrants issued as part of loan transaction were equivalent to additional interest

charge).

14.      This Court reached a similar conclusion in *In re Solutia Inc.*, 379 B.R. 473

(Bankr. S.D.N.Y. 2007).   The financing at issue in *Solutia* also involved the issuance of notes

and the granting of warrants.   The Court there held that every $1,000 of principal debt included

$185.15 of original issue discount.   *Id*. at 476-77.   As the face amount of the debt was $223

7

million, the Court's ruling implied approximately $41.2 million of original issue discount, representing the sum of the fair value of the warrants when issued (approximately $19 million), plus the "traditional OID" consisting of the difference between the face amount of the debt and the gross proceeds received for the financing package (approximately $22.3 million).  *Id.*

15.    The same calculation used by the Court in *Solutia* applies here.    The approximately $84 million fair value of the Warrants must be added to the $20 million difference between the $725 million face amount of the debt financing package and the approximately $705 million proceeds received on account of the debt financing package, for a sum of approximately $104 million.    This $104 million constitutes OID embedded in the claims of the Prepetition Second Lien Lenders, which must be disallowed under section 502(b)(2) of the Bankruptcy Code.

### B.    The Court Must Disallow the OID on the Second Lien Notes

16.    As discussed above, the plain text of section 502(b) requires the Court to disallow "unmatured interest" as of the Petition Date.  11 U.S.C. § 502(b)(2).  Legislative history "makes inescapable the conclusion that OID is interest within the meaning of section 502(b)(2)." *Chateaugay*, 961 F.2d at 380 (citing H.R. Rep. No. 95-595, at 354).    As a result, Courts, including the Second Circuit, have uniformly held that unamortized OID arising from a new debt issuance constitutes "unmatured interest" and must be disallowed.  *See generally* COLLIER ON BANKRUPTCY ¶ 502.03 (16th ed. 2011) ("Based on the legislative history's direct reference to 'original discounting,' which gives as an example a typical OID scenario, courts have held that OID that is unamortized as of the petition date constitutes 'unmatured interest.'"); *Chateaugay*, 961 F.2d at 380-81; *In re Solutia*, 379 B.R. at 486.

8

17. That construction of the plain language of section 502(b)(2) of the Bankruptcy Code applies equally here to require the disallowance of OID arising from the Second Lien Notes Exchange. Those notes arose from a "fair value" exchange, whereby holders of Convertible Unsecured Notes exchanged such Notes for a lower face amount of Prepetition Second Lien Notes, thereby increasing the noteholders' collateral coverage and fundamentally changing "the character of the underlying debt." *Chateaugay*, 961 F.2d at 382. At the same time, the Second Lien Notes Exchange substantially reduced "the corporation's overall debt obligations." *Id*.

18. The Exchange OID is unmatured interest. In disallowing "unmatured interest," Congress did not distinguish OID generated from a new debt issuance from OID generated from a debt exchange in section 502(b)(2). Thus, as *Chateaugay* recognized, the plain meaning of "unmatured interest" in section 502(b)(2) includes OID. *Id*. at 380-81 ("We conclude that . . . [a]s a matter of economic definition, OID constitutes interest . . . . OID is interest within the meaning of section 502(b)(2).").

19. Indeed, the Second Circuit explicitly ruled in *Chateaugay* that unamortized OID from a debt-for-debt exchange is unmatured interest as the "application of the definition of OID" and "logic" to exchange offers seems "irrefutable." 961 F.2d at 382. Nevertheless, the Court ultimately resorted to its right as an appellate court to foster "bankruptcy policy," refusing to disallow the unamortized OID from the debt-for-debt exchange on the ground that it could disincentivize creditors to cooperate with "debtors seeking to avoid bankruptcy," reward holdouts who refuse to cooperate in consensual out-of-court workouts to avoid bankruptcy, and ultimately make it less likely that a debtor would avoid bankruptcy. *Id*. at 381-82 ("While [the bankruptcy court's] application of the definition of OID to exchange offers may seem irrefutable

9

at first glance, we believe the bankruptcy court's logic . . . does not make sense if one takes into account the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition.").

20.    Notably, subsequent to the *Chateaugay* decision, the Supreme Court has made clear that "'when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  In fact, the Supreme Court expressly considered and rejected "soften[ing] the import of the Congress' chosen words even if [it] believe[s] the words lead to a harsh outcome" or to favor "a theory . . . desirable as a matter of policy." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015).

21.    The conclusion that the Exchange OID is unmatured interest that is disallowed under section 502(b)(2) is not "absurd."  As such, the Second Circuit's ultimate conclusion in *Chateaugay*, which was based on policy considerations overriding the text of the statute, is questionable in light of subsequent Supreme Court decisions.

22.    Even if the policy driven holding in *Chateaugay* stands despite the Supreme Court's subsequent decisions, the policy concerns that motivated the Second Circuit's ruling do not apply here, as demonstrated by examining the following three perspectives.  <u>First</u>, from the Debtors' perspective, the Debtors were not attempting to execute an out-of-court restructuring. The Second Lien Notes Exchange occurred in tandem with the funding of the Second Lien Loans, all of which appear to have been the result of a long running fraud perpetrated by the Debtors and their officers and directors.  For this reason, the Committee is commencing an

Americas 92119002

adversary proceeding to avoid the Second Lien Transactions as actual fraudulent transfers. The Second Circuit did not intend to encourage participation in actually fraudulent transactions.

23.    <u>Second</u>, from the perspective of the noteholders, the Second Lien Notes Exchange was never understood to be an attempt to achieve the salutary objective of a negotiated out-of-court workout that would forestall a bankruptcy filing. On the contrary, the Debtors provided them with financial statements and disclosures that were created in a way to excite them about participating in the Second Lien Notes Exchange, which turned out to be materially misleading. *See* Apr. 22, 2016, Hr'g Tr. 41:14-20 ("[B]efore the transaction closed, the debtors . . . provided the new second lien lenders presentations and materials to get them excited about doing the new loans. It appears now -- and thankfully, now, we're going to have, hopefully, an examiner who's going to investigate this -- that those presentations may have contained material and misleading information."). The holders of the Second Lien Notes were never placed in the "position of choosing whether to cooperate with a struggling debtor" when "such cooperation might make the creditor's claims in the event of a bankruptcy smaller." 961 F.2d at 381. There is no bankruptcy policy that rewards exchanging noteholders for participating in an exchange when the prospect of bankruptcy is not a substantial part of their calculus. As such, the Second Lien Notes Exchange does not resemble the typical distressed bond exchange that *Chateaugay* sought to encourage.

24.    <u>Third</u>, from the perspective of the "holdouts," there were no holdouts here who elected not to participate in the Second Lien Notes Exchange. The Second Lien Notes Exchange was not offered to all holders of Convertible Unsecured Notes. Rather, it appears to only have been offered to a select few as an enticement for them to advance the Second Lien Loan. Today's holders of Convertible Unsecured Notes — who were not given the opportunity to

11

participate in the Second Lien Notes Exchange, and who were left with Convertible Unsecured

Notes trading at pennies on the dollar — cannot be characterized as beneficiaries of a "windfall"

upon disallowance of the Exchange OID.

25.    Thus, the facts here do not support the policy considerations by which the Second

Circuit chose to override the plain meaning of section 502(b)(2).  Rather, the facts here are in

line with dicta from the Second Circuit's decision in *Chateaugay*.  Specifically, the "fair value"

exchange here resulted in a fundamental change to the underlying nature of the subject debt, and

therefore, the Exchange OID should be disallowed as "unmatured interest."   As the Second

Circuit observed, disallowing OID arising from a debt exchange:

> *might make sense in the context of a fair market value exchange,*
> *where the corporation's overall debt obligations are reduced.*  In a
> face value exchange such as LTV's, however, it is unsupportable. .
> . . The bankruptcy court, by finding that the exchange created new
> OID, reduced LTV's liabilities based on an exchange which,
> *because it was a face value exchange*, caused no such reduction on
> LTV's balance sheet.

*Id.* (emphasis added).  Other Circuit Courts have likewise recognized that OID arising from a fair

value debt exchange could constitute unmatured interest for purposes of section 502(b) of the

Bankruptcy Code.   *See Pengo*, 962 F.2d at 546, 548-49 (endorsing the Second Circuit's

reasoning in *Chateaugay* on the ground that it involved a face value exchange and that it

"strongly disfavor[s] a judicial interpretation of the Bankruptcy Code that contravenes the

substantial Congressional policy favoring out-of-court consensual workouts," while noting that it

was "expressing no opinion as to whether a fair market value exchange creates OID not allowed

under § 502(b)").[5]  Although such statements from the Second and Fifth Circuits constitute non-

binding dicta, they are persuasive.  *See, e.g., Gee v. Lucky Realty Homes, Inc.*, 210 F. Supp. 2d

---

[5] Moreover, any such holding would be consistent with tax authority, which treats distressed fair value
exchanges as creating OID for tax purposes.  *See* Omnibus Budget Reconciliation Act of 1990, Pub. L.
No. 101-508 § 11325, 104 Stat. 1388-466 (1990).  .

732, 735 (D. Md. 2002) (district courts within a circuit should treat that circuit's *dicta* as "presumptively correct."); *Lee v. Coughlin*, 643 F. Supp. 546, 549 (W.D.N.Y. 1986) (circuit court dictum is "worthy of great weight and respect from the lower courts of this Circuit.").

26.     The Convertible Notes Trustee is only aware of one reported decision in which a Bankruptcy Court disregarded this dicta from the Second and Fifth Circuits to allow OID arising from a "fair value" exchange – *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 587 (Bankr. S.D.N.Y. 2013).    There, the Court construed the Second Circuit's ruling in *Chateaugay* as concluding that "unamortized OID is 'unmatured interest' within the meaning of section 502(b)(2)," but noted that, "[n]evertheless, the Second Circuit found that debt-for-debt 'face value exchanges offered as part of a consensual workout do not generate OID that is disallowable as unmatured interest for purposes of section 502(b)(2)." *Id.* at 585-86.  Notably, that decision concluded that the fair value bond exchange at issue generated "unamortized OID," but that, because it was bound by *Chateaugay*, it would not be disallowed.  *Id.* at 587.   In so ruling, *ResCap* sought to further *the same public policy concerns* that motivated the Second Circuit's determination with respect to OID created by "face value" bond exchanges, which, as discussed above, are questionable in light of the Supreme Court's subsequent decisions.   And even if elevating public policy concerns above the plain language of the Bankruptcy Code were appropriate, such policy concerns are inapplicable here, as discussed above.

**CONCLUSION**

WHEREFORE, the Convertible Notes Trustee respectfully requests entry of an order (i) granting the relief requested herein, (ii) disallowing the OID encompassed in the Second Lien

13

Loans Claim, (iii) disallowing the OID encompassed in the Second Lien Notes Claim, and

(iv) granting such other and further relief as is just.

Dated: October 20, 2016
      New York, New York

          WHITE & CASE LLP

By:  */s/ J. Christopher Shore*
     J. Christopher Shore
     Harrison L. Denman
     Michele J. Meises
     1155 Avenue of the Americas
     New York, NY 10036
     Telephone:  (212) 819-8200
     Facsimile:  (212) 354-8113

     Thomas E Lauria
     WHITE & CASE LLP
     Southeast Financial Center, Suite 4900
     200 South Biscayne Blvd.
     Miami, FL 33131
     Telephone:  (305) 371-2700
     Facsimile:  (305) 358-5744

     *Attorneys for BOKF, N.A.,*
     *as Convertible Notes Trustee*

14