Hearing Date: December 6, 2016 at 10:00 a.m. (Eastern Time)
Objection Deadline: November 29, 2016 at 4:00 p.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SUNEDISON, INC., *et al.*, | Case No. 16-10992 (SMB) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE YIELDCOS TO THE MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR (I) LEAVE, STANDING AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF DEBTORS' ESTATES AND (II) SETTLEMENT AUTHORITY**

TerraForm Power, Inc. ("**TERP**") and TerraForm Global, Inc. ("**GLBL**", and together with TERP, the "**Yieldcos**"), parties-in-interest in the above-captioned bankruptcy case, file this objection to the *Motion of Official Committee of Unsecured Creditors for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of Debtors' Estates and (II) Settlement Authority* [Docket No. 1557] (the "**Standing Motion**")[1] and respectfully state as follows:

A. **Granting Standing at This Time Will Disrupt an Ongoing Sale Process and Settlement Negotiations.**

1. In September, each Yieldco separately announced that it is exploring strategic alternatives, including a sale of all or part of its business as well as its continued operation as a stand-alone company. Each Yieldco has sought to engage with SunEdison[2] to maximize the value realized from its strategic review process. For its part, SunEdison has publicly stated that

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Standing Motion.

[2] "**SunEdison**" means SunEdison, Inc. and its direct and indirect subsidiaries, but excluding the Yieldcos and their respective subsidiaries.

it is participating in these processes because, as fiduciary for all of its creditors, SunEdison must do everything in its power to maximize the value of its interests in TERP and GLBL.

2. With respect to any full or partial sale transaction, each Yieldco strongly believes that the value received by its shareholders, including SunEdison, will be increased if the sale transaction is accompanied by a settlement of intercompany claims between each Yieldco and SunEdison. Accordingly, SunEdison and each Yieldco have commenced arm's-length settlement discussions to resolve TERP's and GLBL's claims against SunEdison (which, as set forth in the Yieldcos' proofs of claim, include unsecured claims against SunEdison estimated to be in excess of $3 billion), SunEdison's alleged claims and defenses against each of TERP and GLBL (which include the alleged fraudulent and preferential transfer claims that are the subject of the Standing Motion), and a variety of related matters involving the transferability of SunEdison's interests in the Yieldcos. These are complicated matters and the effectiveness of a global settlement between SunEdison and each Yieldco is currently anticipated to be a contractual condition to any full or partial sale of TERP or GLBL. While it is unknown whether settlement discussions will ultimately prove successful, these discussions should be permitted to conclude over the next few months without disruption from unnecessary litigation.

3. Settlement discussions with respect to TERP are more advanced, and in furtherance of these discussions, TERP earlier this month circulated a draft settlement agreement to all key stakeholders in SunEdison's chapter 11 cases. While there is much work to do, stakeholders continue to engage in active settlement discussions because of a shared belief that a global resolution would be in the best interests of SunEdison's estates and all of its stakeholders.

4. In light of the foregoing, the Official Committee of Unsecured Creditors (the "**UCC**") has not met, nor could it meet, its burden of demonstrating that the benefits of

prosecuting the proposed causes of action against the Yieldcos now outweigh the costs. It is a debtor's prerogative to manage the estate's legal claims. *See* 11 U.S.C. § 1107(a); *In re Adelphia Commc'ns Corp.*, 544 F. 3d 420, 424 (2d Cir. 2008) (holding that the availability of derivative standing does not "undermine either the debtor's central role in handling the estate's legal affairs or the court's responsibility to monitor for abuses by the parties"). Like most debtors, SunEdison has numerous stakeholders with differing—and often conflicting—interests. The Yieldcos have been able to work constructively with SunEdison in pursuing strategic alternatives, and to negotiate at arm's-length with SunEdison in pursuit of a global settlement, because SunEdison is a fiduciary for substantially all of its various stakeholders.

5.  Ordinarily, there would be little harm to the estate from the pursuit of meritless litigation. However, here the UCC's unfounded assertions could do real damage. If the Court were to grant standing to the UCC to litigate alleged avoidance actions against the Yieldcos now, TERP and GLBL would need to reassess the entire joint sale process. The prosecution of unfounded avoidance actions against the businesses being sold would confuse buyers and be inconsistent with the premise of mutual cooperation to maximize transaction value for all shareholders, including SunEdison. If the UCC were to be given standing to sue the Yieldcos, the Yieldcos may decide to terminate the collaborative process (including the voluntary provision of strategic information to SunEdison) on the assumption that SunEdison itself had lost the ability to resolve matters with the Yieldcos and, accordingly, litigation and non-consensual paths were now more likely than a settlement. Buyers may take the same view and stop investing in the competitive process currently underway.

6.  The Yieldcos recognize that the UCC's input is important to a global resolution between SunEdison and the Yieldcos. The Yieldcos have included the UCC in the multi-party

settlement discussions. The UCC, however, sets forth no legitimate basis for its conclusion that, at this point in these cases, granting the UCC standing to litigate one small part of the claims being considered as part of a global settlement would benefit the estates. In any event, to the extent that the Court is willing to entertain the UCC's Standing Motion now—which it should not—the Court should nonetheless reject the UCC's improper attempt to obtain exclusive settlement authority. Settlement authority must remain with the estate's only fiduciary, SunEdison.

### B. The UCC's Alleged Avoidance Claims Are Not Colorable.

7. When determining whether to confer derivative standing on a creditors' committee to recover property for the estate, courts in the Second Circuit require that "the committee present[] a colorable claim or claims for relief that on appropriate proof would support a recovery." *In re Sabine Oil & Gas Corp.*, Case No. 16-cv-2561, 2016 WL 3554995, at *1 (S.D.N.Y. June 24, 2016) (quoting *In re STN Enters.*, 779 F. 2d 901, 905 (2d Cir. 1985). Setting aside the negative impact from granting the Standing Motion, the UCC must be denied standing because its alleged avoidance actions are not colorable.

8. The UCC's alleged claims are not in reality claims at all, but rather exercises in hindsight. There are no allegations that there was any wrongdoing at the time of the transactions, but rather simply allegations that, looking back, the transactions did not work out as well as anticipated. For example, the UCC states that, even though the creation of the Yieldcos was considered to be a "significant step in SUNE's growth as a global renewable energy development company," contrary to expectations, "the Yield[c]os' costs of capital were much *higher than had been anticipated*, limiting their ability to obtain funding to acquire SUNE projects." (Standing Motion at 9 (emphasis added).) Likewise, the adversary complaint appended to the UCC's

Standing Motion states that SunEdison's investment in the Yieldcos "was based on the expectation (*which, in hindsight, was incorrect*) that those entities would serve as buyers of projects developed by SUNE." (Standing Motion Ex. A at 7 (emphasis added).) With respect to TERP, the UCC disregards approximately a year of successful operation prior to SunEdison's collapse, where TERP's low cost of capital enabled TERP to purchase several valuable projects from SunEdison.

9. However, it is black letter law that the operative date for determining "reasonably equivalent value" is the value on the date of transfer. *See, e.g.*, *BFP* v. *Resolution Trust Corp.*, 511 U.S. 531, 538-39 (1994) (construing Bankruptcy Code § 548 to require "judicial inquiry into whether the foreclosed property was sold for a price that approximated its worth at the time of sale"); *In re NextWave Personal Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999) ("It is uncontested that the question of reasonably equivalent value is determined by the value of the consideration exchanged between the parties *at the time of the conveyance or incurrence of debt* which is challenged.") (emphasis in original) (internal citation omitted); *In re S.W. Bach & Co.*, 435 B.R. 866, 888-89 (Bankr. S.D.N.Y. 2010) ("Still, it is worth noting that for purposes of evaluating whether a transfer of a 'wasting asset' was for 'less than a reasonable equivalent value,' courts look to the time the assets were transferred, not the current value at the time the trustee or another party in interest asserts a fraudulent conveyance claim."). There is no basis to permit a party, as the UCC seeks to do here, to challenge transfers that were valued reasonably and fairly at the time they were made because those assessments of value turned out to be wrong in hindsight due to subsequent market or other intervening events.

10. Contrary to the UCC's baseless allegations, the value that SunEdison received at the time of the respective IPOs was both reasonable and fair. The UCC asserts, without

particularity, that "the delta between the value of the contributed projects, services and payments [to each Yieldco], on the one hand, and the value of the equity that SUNE received in exchange, on the other hand, is in the hundreds of millions of dollars, if not more." (Standing Motion at 3.) But the UCC misunderstands the structure of the IPOs: every dollar of value that SunEdison contributed to the Yieldcos at or prior to the IPOs simply increased the value of SunEdison's equity interests in the Yieldcos by an equivalent amount. The UCC cannot maintain avoidance claims premised on the theory that SunEdison, in hindsight, struck a bad deal—much yet, a bad deal *with itself*.

11. In any event, SunEdison's diluted economic interest in the Yieldcos following the consummation of the IPOs represents only a portion of the integrated bargain between the Yieldcos and SunEdison, which also included that SunEdison would provide comprehensive services and leadership (as memorialized in Management Services Agreements (the "**MSAs**") and various corporate-level support agreements and project-level service agreements) in exchange for an equity promote. In addition to the value of converting its existing economic interests in the Yieldcos into "B units" in the limited liability company for each Yieldco, SunEdison received, as part of its equity promote, two items of great value that the UCC ignores: (i) incentive distribution rights in the limited liability company for each Yieldco, as well as (ii) high-vote stock of the Yieldco itself, through which SunEdison exerted corporate control.

12. It is not surprising that the Standing Motion disregards the latter component of the bargain because, in light of that fact, the UCC's theory defies common sense. At all times SunEdison either transacted with virtually wholly-owned subsidiaries (pre-IPO), or maintained operational and voting control over the Yieldcos (post-IPO) through the MSAs, high-voting securities and project-level control through various asset management and operations and

maintenance agreements. As a general matter, the Yieldcos had no employees that were separate and apart from those provided by SunEdison. By virtue of SunEdison's control over almost all aspects of the Yieldcos' businesses, SunEdison maintained significant negotiating leverage; as a result, the Yieldcos could not have possibly been the recipient of asset transfers from SunEdison for less than reasonably equivalent value.

13.    Moreover, the IPOs were structured and implemented solely by SunEdison, and they were priced by third party experts and the market. The Yieldcos issued new equity to public shareholders, who have suffered heavy losses. Thus, the terms of the IPO transactions and any asset transfers could not have been overly favorable to the Yieldcos. After the IPOs, the Yieldcos' respective Conflicts Committees were charged with negotiating asset dropdowns at arm's-length from SunEdison, but these committees were in no position to dictate terms to SunEdison. In fact, after the one instance in which the GLBL Conflicts Committee declined to pursue a dropdown initiated by SunEdison, SunEdison exercised its voting control over GLBL to replace the Conflicts Committee.

14.    The UCC asserts no viable causes of action for fraudulent or preferential transfers, and the purported claims would be subject to dismissal pursuant to a motion to dismiss, rendering them not colorable. As a result, the Standing Motion should be denied.

| | |
|---|---|
| Dated: November 29, 2016 | /s/ Andrew G. Dietderich |
| | Andrew G. Dietderich |
| | John L. Hardiman |
| | David R. Zylberberg |
| | Veronica W. Ip |
| | SULLIVAN & CROMWELL LLP |
| | 125 Broad Street |
| | New York, New York  10004 |
| | Telephone:   (212) 558-4000 |
| | Facsimile:   (212) 558-3588 |
| | E-mail:   dietdericha@sullcrom.com |
| |    hardimanj@sullcrom.com |
| |    zylberbergd@sullcrom.com |
| |    ipvw@sullcrom.com |

Counsel for TerraForm Power, Inc. and TerraForm Global, Inc.