```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
                                                 :
In re:                                           :   Case No. 16-10992 (SMB)
                                                 :
SUNEDISON, INC. et al.¹                          :   Chapter 11
                                                 :
         Debtors.                                :   (Jointly Administered)
-------------------------------------------------X
```

## MEMORANDUM DECISION AND ORDER REGARDING APPLICATION FOR A RULE 2004 EXAMINATION

**A P P E A R A N C E S:**

McCARTER & ENGLISH, LLP
*Counsel for CSI Leasing, Inc. and CSI Leasing*
  *Malaysia Sdn. Bhd.*
245 Park Ave., 27th Floor
New York, New York 10167

      Daniel R. Seaman, Esq.
           Of Counsel

TOGUT, SEGAL & SEGAL LLP
*Co-Counsel for the Debtors and*
  *Debtors-in-Possession*
One Penn Plaza, Suite 3335
New York, New York 10119

      Frank A. Oswald, Esq.
      Brian F. Moore, Esq.
           Of Counsel

---

[1] The Debtors in these chapter 11 cases include SunEdison, Inc.; SunEdison DG, LLC; SUNE Wind Holdings, Inc.; SUNE Hawaii Solar Holdings, LLC; First Wind Solar Portfolio, LLC; First Wind California Holdings, LLC; SunEdison Holdings Corporation; SunEdison Utility Holdings, Inc.; SunEdison International, Inc.; SUNE ML 1, LLC; MEMC Pasadena, Inc.; Solaicx; SunEdison Contracting, LLC; NVT, LLC; NVT Licenses, LLC; Team-Solar, Inc.; SunEdison Canada, LLC; Enflex Corporation; Fotowatio Renewable Ventures, Inc.; Silver Ridge Power Holdings, LLC; SunEdison International, LLC; Sun Edison LLC; SunEdison Products Singapore Pte. Ltd.; SunEdison Residential Services, LLC; PVT Solar, Inc.; SEV Merger Sub Inc.; Sunflower Renewable Holdings 1, LLC; Blue Sky West Capital, LLC; First Wind Oakfield Portfolio, LLC; First Wind Panhandle Holdings III, LLC; DSP Renewables, LLC; Hancock Renewables Holdings, LLC; EverStream Holdco Fund I, LLC; Buckthorn Renewables Holdings, LLC; Greenmountain Wind Holdings, LLC; Rattlesnake Flat Holdings, LLC; Somerset Wind Holdings, LLC; SunE Waiawa Holdings, LLC; SunE MN Development, LLC; SunE MN Development Holdings, LLC; SunE Minnesota Holdings, LLC and TerraForm Private Holdings, LLC.

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Applicants CSI Leasing, Inc. ("CSILI") and CSI Leasing Malaysia Sdn. Bhd. ("CSIM" and, together with CSILI, "CSI") seek authorization to examine the Debtors pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004"). The proposed examination broadly relates to the sale of assets by a non-Debtor, who owes money to CSI, and the upstreaming of the sales proceeds to the Debtors. The Debtors opposed the application, and the Court held a hearing on November 17, 2016 and reserved decision. For the reasons that follow, the application is denied except to the limited extent noted below.

## BACKGROUND[2]

On June 7, 2011, SunEdison Kuching Sdn. Bhd. ("SEK") — a non-Debtor wholly-owned subsidiary of the Debtor SunEdison Products Singapore Pte. Ltd. ("SEPS") (*Schedule A/B* at 23 of 31 (ECF/SEPS Doc. # 5) — entered into an equipment lease with CSIM, which incorporated an equipment schedule dated July 1, 2011 (the "Equipment Lease"). (*Application on Presentment of Creditor CSI Leasing, Inc. for Entry of an Order Pursuant to Fed. R. Bankr. P. 2004 Authorizing and Directing the Examination of the Debtors*, dated Aug. 23, 2016 ("*Application*"), at ¶ 2 (ECF Doc. # 1048).) SEPS guaranteed the Equipment Lease. (*Application* at ¶ 3.) SEPS is a direct subsidiary of SunEdison International, Inc., which, in turn, is a direct subsidiary of SunEdison, Inc.

---

[2] The following conventions are used in citing to the record. "ECF Doc. # ___" refers to documents filed on the docket of the main chapter 11 case, *In re SunEdison, Inc., et al.*, case no. 16-10992. "ECF/SEPS Doc. # ___" refers to documents filed in the chapter 11 case, *In re SunEdison Products Singapore PTE Ltd.*, case no. 16-11014. "# of #" refers to the page number and total number of pages placed by the CM/ECF filing system at the top of every page of a filed document. "Tr." refers to the transcript of the hearing held in the main chapter 11 case on November 17, 2016 (ECF Doc. # 1646).

("SUNE"). (*See Corporate Ownership Statement of SunEdison Products Singapore Pte Ltd.* at 7 of 18 (ECF/SEPS Doc. # 1).) SEK defaulted on the Equipment Lease, and SEPS defaulted on the guarantee. (*Application* at ¶ 4.) As a result, each owes CSI approximately $2.5 million. (*Id.*)

In March 2016, SEK entered into an asset purchase agreement (the "APA") to sell substantially all of its assets to XiAn LONGi ("LONGi"), a Chinese company, for approximately $63 million. (*Id.* at ¶ 5.) There is no evidence that any Debtor was a party to the APA. LONGi apparently paid all but $18 million (the "$18 Million Holdback") at the closing to SEK, with the balance to be paid in the future upon the satisfaction of certain conditions. (*Id.*) In the meantime, SEK transferred the sale proceeds paid at the closing to the Debtors (the "Upstream"), "namely SunEdison, Inc.*,*" leaving little to no assets in SEK to pay its creditors. (*Id.* at ¶ 6.) CSI has expressed concern that if SEK receives any part of the $18 Million Holdback, it will upstream those sums (the "Future Upstreams") as well. (*Id.* at ¶ 7.)

Most of the Debtors, including SEPS and SUNE, commenced chapter 11 cases on April 21, 2016. In September 2016, CSI filed Proof of Claim No. 2879 against SEPS in the amount of $2,496,611.09, and Proof of Claim No. 2234 against SUNE in the amount of $51,144.47. The Debtors have reviewed the claims and determined that they should be allowed. (*Debtors' Objection to the Application of CSI Leasing, Inc. for Entry of an Order Pursuant to Fed. R. Bankr. P. 2004 Authorizing and Directing the Examination of the Debtors*, dated Nov. 10, 2016 ("*Debtors' Objection*"), at ¶ 13 (ECF Doc. # 1577).)

The actual value of CSI's claims is, however, uncertain. During earlier proceedings in connection with the Court's motion relating to the appointment of an official equity committee, the Court found that the Debtors owed $4.2 billion in pre-petition secured and unsecured debt, and its contingent debt could exceed an additional $1.2 billion. *In re SunEdison, Inc.*, 556 B.R. 94, 101 (Bankr. S.D.N.Y. 2016). Furthermore, the Debtors were authorized to borrow $300 million after the petition date. *Id.* at 101 n.7. In contrast, the projected value of its assets was no more than $1.5 billion, net of the debtor-in-possession financing. *Id.* at 101. The Court concluded that the Debtors appeared to be hopelessly insolvent, and declined to appoint an official equity committee. *Id.* at 107. It looks like CSI's potential distribution in the chapter 11 cases, if any, will be only a small percentage of the face amount of its claims.

One other point is the status of SEK. The Debtors have informed the Court that SEK is currently the subject of a Malaysian insolvency proceeding, and a liquidator was appointed on October 4, 2016. (*Debtors' Objection* at 4.) According to CSI, it may be the largest creditor in that proceeding. (*See Memorandum of Law in Further Support of the Application [Docket Document No. 1048] of Creditor CSI Leasing, Inc. for Entry of an Order Pursuant to Fed. R. Bankr. P. 2004 Authorizing and Directing the Examination of the Debtors*, dated Nov. 14, 2016 ("*Supplemental Memorandum*"), at ¶ 5 (ECF Doc. # 1596).) The parties have not informed the Court whether the Malaysian liquidator has standing and intends to pursue the transfer by SEK to the Debtors.

### A.    CSI's Rule 2004 Application

After most of the Debtors, including SEPS and SUNE, had commenced chapter 11 cases, CSI filed the *Application* seeking Rule 2004 discovery. The *Application* included

sixteen paragraphs requesting the production of "documents," and in most cases "communications" as well, relating to the subject matter of the specific request (the "Requests").[3]  I have renumbered the Requests and placed them into the following three categories:

**i.    Documents and Communications relating to the Upstream and Future Upstreams**

1.    All documents "that relate to the Upstream."

2.    All documents "that relate to the Future Upstream."

3.    "All documents and communications related to the Debtor's anticipated receipt of the Future Upstream."

4.    "All documents and communications related to the Debtor's intended uses of the Upstreamed Funds as part of the Debtor's plan of reorganization."

5.    "All documents and communications related to the Debtor's intended uses of the Future Upstreams as part of the Debtor's plan of reorganization."

---

[3]    The Requests include broad definitions of "documents and "communications." "'Document' or 'documents' means any writing or record of any type or description, including but not limited to the original, any non-identical copy or any draft, regardless of origin or location, of any paper, electronically-stored file, book, pamphlet, computer printout, newspaper, magazine, periodical, letter, memorandum, telegram, report, record, study, inter-office or intra-office communication, handwritten or other note, diary, invoice, purchase order, bill of lading, computer print-out, transcript of telephone conversations and any other retrievable data, working paper, chart, deed, survey, notes, map, graph, index, disc, data sheet or data processing card, or any other written, recorded, transcribed, punched, taped, magnetically recorded, filmed or graphic matter, however produced or reproduced to which You have, or have had, access." (Requests, Ex. A, Definitions and Instructions at ¶ 13.)  'Communication' means any transfer of information, oral or written, be it in the form of facts, ideas, inquiries, opinions, or otherwise, by any means, at any time or place, under any circumstances, and is not limited to transfers between persons, but includes other transfers, such as records and memoranda to the file." (*Id.* at ¶ 14.)  I use the words "documents' and "communications" as a short hand to refer to all of the things in the definitions.

The Requests also impose certain onerous obligations with respect to the production of documents.  For example, the "Debtors have a duty to search for responsive documents and things in all media and sources in their possession, custody or control where paper or electronic files are kept or stored, including floppy disks, hard drives on or for personal computers, computer servers, mainframe storage tapes or disks, archive facilities and backup facilities," (*id.* at ¶ 7), they are deemed "to be in control of a document if you have the right to secure the document or a copy thereof from another person having actual possession thereof," and "shall identify and provide the location of all responsive documents of which you are aware but which are not in your custody, possession or control." (*Id.* at ¶ 6.)

6. "All documents and communications reflecting any opinion or analysis that the Upstream or Future Upstreams did aid or will aid the Debtors' ability to reorganize."

### ii. Documents and Communications relating generally to the Debtors' Chapter 11 Cases

7. "All documents and communications related to the sources of funds which the Debtor may use to fund the Debtor's plan of reorganization."

8. "All documents and communications related to the projected income and expenses of the Debtors during this bankruptcy proceeding."

9. "All documents and communications upon which the Debtors may rely to argue that the interests of CSI are adequately protected."

### iii. Documents and Communications relating to SEK, the Malaysian proceeding and CSI's recovery in that proceeding

10. Documents "that relate to the APA."

11. "All documents related to why SEK did not seek bankruptcy protection via the SunEdison Bankruptcy."

12. "All documents related to SEK directors, officers, or employees who went to work for (or consult for) LONGi after (or around the time that) the APA was entered into."

13. "All documents and communications reflecting any lawsuits, proceedings, mediations, or actions that [the Debtors] are aware of relating to SEK's debts to creditors in Malaysia or elsewhere."

14. "All documents and communications relating to any direction or consultation the Debtors gave to SEK for the time period of the one-year period prior to the APA up to the present."

15. "All documents and communications reflecting any claims, demand letters, lawsuits, proceedings, mediations, or actions that [the Debtors] are aware of where it is asserted or referenced that the Upstream or Future Upstreams damaged or will damage a creditor's ability to recovery from SEK or SEPS or any of the Debtors."

16. "All documents and communications reflecting any lawsuits, proceedings, mediations, or actions that [the Debtors] are aware of relating to SEPS's debts to creditors in Malaysia or elsewhere."

(Requests, Ex. A, Documents Requested.)

**B.      The Informal Discovery**

After CSI filed the *Application*, the Debtors began providing responsive information on a rolling basis and the parties agreed to adjourn the hearing on the *Application* to a later date.  (*Debtors' Objection* at 3.)  On September 29, 2016, the Court entered an order further authorizing and directing the Debtors to produce to CSI "the APA and certain related supply agreements, and the closing binder for the same." (*Order Authorizing and Directing the Initial Production of Documents of the Debtors*, dated Sep. 29, 2016 (the "*Initial Order*"), Ex. A, at 5 (ECF Doc. # 1284).)  The *Initial Order* was entered without prejudice to CSI's rights to seek additional relief demanded in the *Application*, (*Initial Order* at 2), and the *Application* was subsequently set for hearing on November 17, 2016.  (*Notice of Rescheduling of Application on Presentment of Creditor CSI Leasing, Inc. for Entry of an Order Pursuant to Fed. R. Bankr. P. 2004 Authorizing and Directing the Examination of the Debtors*, dated Oct. 13, 2016 (ECF Doc. # 1385).)

**C.      Subsequent Proceedings Relating to CSI's 2004 Application**

The informal discovery efforts did not satisfy CSI.  Consequently, the Debtors filed a formal objection to the *Application*, characterizing it as premature, overly broad, speculative and unduly burdensome.  (*Debtors' Objection* at 2, ¶¶ 8-9.)  The Debtors argue that they have agreed to allow CSI's claims, and CSI does not need the information to frame its claims.  (*Id.* at ¶ 13.)  In addition, authorizing discovery at this point in these chapter 11 cases might set an unwieldy precedent and open the floodgates for similar requests by other claimants.  (*Debtors' Objection* at ¶ 8.)  Furthermore, CSI's requests exceeded the scope of Rule 2004, (*id.* at ¶ 10), CSI had not demonstrated good

cause, (*Debtors' Objection* at ¶¶ 12-13), the Debtors had already provided information about the Malaysian proceeding and CSI should make any further requests in that proceeding, (*id,* at ¶ 14), and CSI could get information relating to the Debtors' financial history by reviewing the Debtors' publicly available Schedules of Assets and Liabilities, Statement of Financial Affairs and Monthly Operating Reports. (*Debtors' Objection* at ¶¶ 11, 15.)

CSI responded largely reiterating its arguments made in the *Application*. In contrast to the Debtors' characterization that the Request was overly broad and speculative, CSI submitted that they were "narrowly tailored." (*Supplemental Memorandum* at ¶ 10 (footnote omitted).) CSI also acknowledged based upon its own due diligence that the Future Upstreams would probably never be tendered, (*id.* at ¶ 6), and characterized their requests simply as "directing the Debtors to provide oral testimony and produce documents related to the Upstream." (*Id.* at ¶ 8 (footnotes omitted).) CSI further argued that its requests would not cause undue cost or disruption to the Debtors because it was not seeking discovery of any documents that the Debtors had already provided or documents that did not exist. (*Id.* at ¶ 10.) Furthermore, good cause existed because the Rule 2004 examination was necessary to effectively enforce their rights in the United States and in Malaysia. (*Id.* at ¶ 12.) Finally, CSI disputed the Debtors' claim that it should first seek the documents and communications from the Malaysian liquidator. The Debtors had already admitted they had responsive documents, and the possible existence of such documents elsewhere did not relieve the Debtors of their obligations under Rule 2004. (*Id.* at ¶ 14.)

## DISCUSSION

Rule 2004 provides in relevant part that the Court may authorize the examination of any entity relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate." FED. R. BANKR. P. 2004(b). In chapter 11 cases, the examination may extend to matters relating "to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan." *Id.* The party seeking Rule 2004 discovery has the burden to show good cause for the examination it seeks, and relief lies within the sound discretion of the Bankruptcy Court. *Picard v. Marshall* (*In re Bernard L. Madoff Inv. Secs. LLC*), Adv. Pro. No. 08-01789, 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014); *see In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001) (Rule 2004 gives the Court "significant" discretion).

A party seeking to conduct a Rule 2004 examination typically shows good cause by establishing that the proposed examination "'is necessary to establish the claim of the party seeking the examination, or . . . denial of such request would cause the examiner undue hardship or injustice.'" *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004) (quoting *In re Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993)); *accord In re AOG Entm't, Inc.*, 558 B.R. 98, 109 (Bankr. S.D.N.Y. 2016); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991). In evaluating a request to conduct a Rule 2004 examination, the Court must "balance the competing interests of the parties,

weighing the relevance of and necessity of the information sought by examination. That documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production." *Drexel Burnham*, 123 B.R. at 712; *accord In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991); *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989) ("While the scope of Rule 2004 examination is very broad, it is not limitless. The examination should not be so broad as to be more disruptive and costly to the party sought to be examined than beneficial to the party seeking discovery.")

In the past, courts have referred to the expansive reading of Rule 2004 comparing it to a "fishing expedition," *Drexel Burnham Lambert Grp., Inc.*, 123 B.R. at 711, a concept generally attributed to an old case that described the examination of the bankrupt as a "fishing examination." *In re Foerst*, 93 F. 190, 190 (S.D.N.Y. 1899). But the cost of compliance has increased substantially since then. The era of paper discovery in relatively small cases has given way to the discovery not only of paper but also of vast amounts of electronically stored information ("ESI"), possibly stored on outdated systems, on numerous personal computers and servers located throughout the world. SHIRA A. SCHEINDLIN, MOORE'S FEDERAL PRACTICE, E-DISCOVERY: THE NEWLY AMENDED FEDERAL RULES OF CIVIL PROCEDURE 3 (2006). Discovery has become an increasingly expensive aspect of civil litigation.

The proliferation of information and the costs associated with retrieving, reviewing and producing discovery in civil litigation have led to the 2015 amendments to the Federal Rules of Civil Procedure which emphasize the concept of proportionality. Under Rule 26, the scope of discovery extends to any matter relevant to a party's claim

or defense and "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  FED. R. CIV. P. 26(b)(1).  In addition, a party need not provide discovery of ESI from sources "that the party identifies as not reasonably accessible because of undue burden or cost," but the party from whom discovery is sought has the burden of showing "that the information is not reasonably accessible because of undue burden or cost," and even it meets that burden, "the court may nonetheless order discovery from such sources if the requesting party shows good cause."  Fed. R. Civ. P. 26(b)(2)(B).

Rule 2004 has not been similarly amended but the spirit of proportionality is consistent with the historic concerns regarding the burden on the producing party and is relevant to the determination of cause.  The Requests provide a good illustration.  CSI's claims, while significant in face value, are small when viewed in the context of chapter 11 cases involving over $5 billion in debt with little prospect of anything more than a small recovery for unsecured creditors.  By the November 17, 2016 hearing, the Debtors had already produced over 1,200 pages of information responsive to Requests as well as supplemental requests not included in the *Application*.  (*Debtors' Objection* at 3-4.) These documents covered, among other things, the APA, (*id.* at 4; *Initial Order*), information showing the flow of funds, (Tr. at 56:6-13), and the Malaysian insolvency proceeding.  (*Debtors' Objection* at ¶ 14.)  CSI wants more, but the cost of retrieving,

- 11 -

reviewing and producing "all documents and communications" relating to[4] each of the sixteen specific requests may exceed CSI's distribution in the Debtors' cases, and some of the requests could be made by every creditor and equity interest holder in these cases. Moreover, the Debtors have determined to allow CSI's two claims, and the additional discovery does not appear to be necessary to resolve any material issues in these chapter 11 cases between CSI and the Debtors.

Turning to the Requests, CSI has not established cause for most of the information it seeks. The cause it is required to demonstrate must relate to these cases. Although many of the requests are ostensibly relevant to the subject matter of the Debtors' cases, the primary focus of the *Application* is the need for information to use in the Malaysian insolvency proceeding.

CSI makes no secret of this purpose. CSI has implied that the Upstream was a fraudulent transfer by SEK. The *Application* argued that the Upstream left "little to no assets and little to no money to pay the just claims of SEK's creditors," (*Application* at ¶ 6), and the Debtors have information and knowledge regarding the Upstream, the $18 Million Holdback, and "other potential future expectant interests from SEK and/or LONGi." (*Id.* at ¶ 7.) Most telling, CSI argued that it needed the Rule 2004 discovery immediately to support its request for relief in the Malaysian insolvency proceeding:

> It also appears the Debtors are pursuing certain courses that are calculated, at least in part, to circumvent existing obligations and defeat Malaysian creditors (including but not limited to CSI) that may have rights to proceeds under the APA or otherwise. *With possible legal actions that*

---

[4] "The term 'relating to' (including any variant thereof), includes referring to, alluding to, responding to, pertaining to, concerning, connected with, commenting on or in respect of, analyzing, touching upon, constituting and being, and is not limited to contemporaneous events, actions, communications or documents. (Requests, Ex. A, Definitions and Instructions at ¶ 15.)

- 12 -

> *CSI could take in Malaysia (including, but not limited to, injunctive relief)*, and with three months having transpired since CSI's Application was filed with this Court, it is imperative that CSI immediately obtain the information it has requested in the Application and without further delay so that it may effectively enforce its rights here and in Malaysia.

(*Supplemental Memorandum* at ¶ 12 (emphasis added).)

CSI confirmed the reason why it needed the information at oral argument. In response to the Court's question on that point, CSI's counsel stated "[w]e need discovery because of the related claims that exist in this case related to our Malaysian enterprise." (Tr. at 49:1-3.) He also stated that the Upstream "directly affects our claims and rights in Malaysia," (Tr. at 49:24-50:1), and "a debtor was used as a conduit to commit the overall transaction, which denied all the Malaysian creditors any recovery from SEK nondebtor and SPS debtor." (Tr. at 53:13-16.) I do not mean to minimize the possible grievance of or the potential remedies available to SEK's creditors and/or the Malaysian liquidator as a result of the Upstream, although I draw no conclusions. Nevertheless, the party seeking Rule 2004 discovery must show a need or undue hardship relating to the bankruptcy case in which the information is sought, not in some other, foreign proceeding.

While the Upstream may be germane to these cases because it arguably stripped SEPS of assets to pay CSI's claim in that case,[5] the extent of the discovery that CSI demands pertaining to the Upstream and other requests within the scope of Rule 2004 is disproportionate. Part of the problem may be CSI's misperception of its own

---

[5]    On the other hand, CSI implies that the sale proceeds were fraudulently transferred and should be recovered for the benefit of SEK's creditors. This is inconsistent with the argument that the proceeds could or should be used to satisfy CSI's claims in these cases.

Requests. It has described the Requests as "narrowly tailored," (*Supplemental Memorandum* at ¶ 10), and "surgical," (Tr. at 54:24), but they are quite the opposite. First, CSI has not placed reasonable limits on the sources or types of information that the Debtors must search for and retrieve. The Requests generally ask for "all documents and communications" that "relate to" the subject matter of the specific request. The Court has noted the breadth of these terms. CSI will accept nothing less. It placed only two limits on the Debtors' duty to disclose that are meaningless: the Debtors do not have to produce any documents and communications they have already produced, and they don't have to produce any documents and communications that don't exist, at least while they don't exist. (*Supplemental Memorandum* at ¶ 10.) But for these limits, CSI insists that the Debtors must produce everything.

CSI has not articulated a rationale for compelling the production of all documents and communications relating to the Upstream. The Debtors have not disputed the Upstream, and it should be sufficient for CSI if the Debtors produce information showing how the money moved from SEK to SEPS and beyond. The Debtors should not be required to search every document, email and byte of data located on the servers and computers of its far-flung affiliates.[6]

Second, other requests are premature, unnecessary or overly broad. For example, CSI has acknowledged that Future Upstreams are unlikely. Nevertheless, it insists on compliance with three separate requests devoted entirely to Future Upstreams and a fourth request that includes both Upstreams and Future Upstreams. CSI also

---

[6] Nothing herein relieves the Debtors of the duty to produce the APA-related documents that were the subject of the earlier order described above.

seeks discovery of all "documents and communications" related to (1) the possible sources of plan funding, (2) the Debtors' projected income and expenses and (3) documents and communications the Debtors "may" use "to argue that the interests of CSI are adequately protected." Given the broad duty to produce documents and communications "relating to" possible sources of plan funding and the Debtors' projected income and expenses, these two requests could conceivably cover every document and communication that exists. Moreover, the request for plan funding documents is premature; there is no plan and, as far as I can tell, no funding. In any event, this is the type of information that would be disclosed in a disclosure statement.

The request relating to the adequate protection of CSI's interests is the most perplexing. To begin with, CSI has not requested adequate protection. More importantly, it is not entitled to adequate protection. Adequate protection must be provided to protect against the decline in value to a non-debtor's interest in property of the estate resulting from the imposition of the automatic stay, 11 U.S.C. § 362(d)(1), the use, sale or lease of that property, 11 U.S.C. 363(e), or the granting of a priming lien on that property to secure post-petition financing. 11 U.S.C. § 364(d)(1)(B); *see also* 11 U.S.C. § 361; *In re Garland Corp.*, 6 B.R. 456, 462 (B.A.P. 1st Cir. 1980) (Cyr, J.) Unsecured creditors like CSI do not have an interest in property of the estate that merits adequate protection, and there is no express statutory requirement that unsecured creditors receive adequate protection. *Garland Corp.*, 6 B.R. at 462; *In re R.F. Cunningham & Co.*, 355 B.R. 408, 412 (Bankr. E.D.N.Y. 2006) ("There is no statutory requirement that unsecured creditors receive adequate protection, and the lack of adequate protection does not entitle an unsecured creditor to relief from the stay.").

Accordingly, the *Application* is denied except to the extent that the Debtors are directed to provide sufficient information to identify the flow of funds that comprise the Upstream.

So ordered.

Dated: New York, New York
January 18, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge