WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
Andrew Goldman, Esq.
Charles Platt, Esq.
Benjamin Loveland, Esq. (admitted *pro hac vice*)
Lauren Lifland, Esq.

*Counsel for Wilmington Trust, N.A., in its
capacity as Trustee and Collateral Trustee*

AKIN GUMP STRAUSS HAUER &
FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
David M. Zensky, Esq.
Erik Preis, Esq.
Deborah J. Newman, Esq.

*Counsel to the Tranche B Lenders/Steering
Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SUNEDISON, INC., *et al.*, | Case No. 16-10992 (SMB) |
| Debtors.[1] | (Jointly Administered) |

## WILMINGTON TRUST, N.A.'S, AS
## TRUSTEE, AND THE TRANCHE B LENDERS/STEERING
## COMMITTEE'S RESPONSE TO (I) BOKF, N.A.'S, AS INDENTURE
## TRUSTEE, OBJECTION TO PROOFS OF CLAIM NOS. 1490 AND 3555, AND
## (II) THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OID OBJECTION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

RELEVANT UNDISPUTED FACTS ............................................................................ 3

       A.     SUNE's Financial Condition In The Months Preceding January 2016 ....... 3

       B.     The January Financing, Which Included The Notes Exchange .................. 5

       C.     The Second Lien Noteholders' Claim .......................................................... 6

RESPONSE ................................................................................................................... 7

  I.     The Notes Exchange Did Not Generate OID For Purposes Of Section
       502(b)(2) ..................................................................................................... 7

       A.     Fair Value Debt Exchanges In Consensual Workouts Do Not
              Generate Disallowable Unmatured Interest For Bankruptcy Purposes ....... 7

       B.     The January Financing Was In The Context Of A Consensual
              Workout ..................................................................................................... 11

       C.     Supreme Court Decisions Do Not Overrule Chateaugay ......................... 15

  II.    The OID Objections Improperly Calculate the Amount of OID Generated by
       the Notes Exchange .................................................................................... 16

CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Chateaugay Corp.*,
    109 B.R. 51 (Bankr. S.D.N.Y. 1990), *aff'd sub. nom. LTV Corp. v. Valley
    Fidelity Bank & Trust Co.* (*In re Chateaugay Corp.*), 130 B.R. 403
    (S.D.N.Y. 1991), *aff'd in part and rev'd in part*, 961 F.2d 378 (2d Cir.
    1992) ...........................................................................................................................13

*LTV Corp. v. Valley Fidelity Bank & Trust Co.* (*In re Chateaugay Corp.*),
    961 F.2d 378 (2d Cir. 1992)........................................................................ *passim*

*Marblegate Asset Management, LLC v. Education Management Finance Corp.*,
    No. 15-2124-cv, 2017 WL 164318 (2d Cir. Jan. 17, 2017)................................14

*Official Committee of Unsecured Creditors v. UMB Bank, N.A.* (*In re Residential
    Capital, LLC*),
    501 B.R. 549 (Bankr. S.D.N.Y. 2013)...................................................... *passim*

*Tex. Commerce Bank, N.A. v. Licht* (*In re Pengo Indus., Inc.*),
    962 F.2d 543 (5th Cir. 1992) ...........................................................7, 9, 12, 15

## STATUTES AND REGULATIONS

11 U.S.C. § 502........................................................................................................ *passim*

26 U.S.C. § 1273(a) .....................................................................................................17

26 C.F.R. § 1.1273-2....................................................................................................17

## OTHER AUTHORITIES

Robert W. Sawdey, *Out-of-Court Workouts*, 45-JUN Fed. Law. 46 (1998) .................................12

Bowman Brown, Brian Nordwall & Michael L. Ashner, *Corporate, Securities and
    Banking Law Aspects of Workouts*, 32 U. Miami L. Rev. 979 (1978)...............................12

Wilmington Trust, N.A., solely in its capacity as Trustee under that certain indenture dated as of January 11, 2016 for certain 5% Guaranteed Convertible Senior Secured Notes due 2018 issued by SunEdison, Inc. ("Wilmington Trust"),[2] and the Tranche B Lenders/Steering Committee (together with Wilmington Trust, the "Respondents"),[3] respectfully submit this response to (i) BOKF, N.A.'s ("BOKF") *Objection to Proofs of Claim Nos. 1490 and 3555* [Docket No. 1455] (the "BOKF Objection"), and (ii) the Official Committee of Unsecured Creditors' (the "Committee") objection to Proof of Claim No. 1490 (the "Committee Objection," and together with the BOKF Objection, the "OID Objections").[4]

## PRELIMINARY STATEMENT

1.    The OID Objections seek to disallow a portion of the Second Lien Notes' Proof of Claim on the basis that "original issue discount" ("OID") purportedly generated by the Notes Exchange constitutes "unmatured interest" that is disallowable pursuant to Bankruptcy Code section 502(b)(2).[5]

2.    The OID Objections should be denied as a matter of law.  The Notes Exchange is precisely the type of consensual workout that does *not* generate OID disallowable as

---

[2] Wilmington Trust is also the Collateral Trustee under, *inter alia*, that certain Collateral Trust Agreement dated as of January 11, 2016 relating to that certain Second Lien Credit Agreement dated as of January 11, 2016 under which SunEdison, Inc. is the borrower.

[3] "The Tranche B Lenders/Steering Committee" consists of the lenders referenced in the *Verified Statement Pursuant to Bankruptcy Rule 2019* dated December 22, 2016 [Docket No. 1977].

[4] The Committee Objection was raised by the Committee as the First Cause of Action in its Amended Adversary Complaint [Docket No. 12] (the "Amended Complaint") filed in the adversary proceeding captioned *Official Committee of Unsecured Creditors v. Wells Fargo Bank, N.A., et al.*, Adv. Pro. No. 16-01228 (the "Adversary Proceeding" or "Adv. Pro."). Pursuant to the *Stipulation and Agreed Order (I) Setting Briefing Schedule and Hearing Date on Defendants' Motion to Dismiss Amended Complaint; and (II) Granting Leave with Respect to Page Limitations* [Adv. Pro. Docket No. 8], the parties agreed that the Committee Objection would be consolidated with the BOKF Objection and proceed as a contested matter.  In this Response, Respondents respond only to the portions of the OID Objections relating to the Second Lien Notes and the Second Lien Notes' Proof of Claim.

[5] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings given to them in the Relevant Undisputed Facts section of this Response.

unmatured interest under section 502(b)(2), based on the Second Circuit's clearly-articulated

reasoning in *LTV Corp. v. Valley Fidelity Bank & Trust Co.* (*In re Chateaugay Corp.*), 961 F.2d

378, 382 (2d Cir. 1992) ("*Chateaugay*") and Judge Glenn's further clarification in *Official*

*Committee of Unsecured Creditors v. UMB Bank, N.A.* (*In re Residential Capital, LLC*), 501

B.R. 549, 588-89 (Bankr. S.D.N.Y. 2013) ("*ResCap*").

3.       The Second Circuit ruled in *Chateaugay* that exchanging debt in consensual

out-of-court workouts does not generate OID that constitutes disallowable unmatured interest.

The Second Circuit recognized that a contrary holding would discourage lenders from entering

into consensual workouts, and thus would not comport with the Bankruptcy Code policy of

encouraging lenders to cooperate with struggling debtors.  The undisputed facts here show that

the Notes Exchange was part of a consensual workout: the workout occurred at a time when

SUNE was struggling with a severe liquidity crisis; the resulting Notes Exchange reduced

SUNE's debt on its balance sheet by hundreds of millions of dollars and resulted in a net interest

reduction; and the overall transaction infused $725 million into the Debtors' enterprise.

4.       In an attempt to circumvent this clearly-articulated reasoning, BOKF argues

principally that, in hindsight, SUNE committed fraud in order to induce lenders to participate in

the Notes Exchange, which in turn should retroactively render the Notes Exchange "not a

workout."  But *Chateaugay* turned on an objective assessment of whether the purpose of the

consensual workout was to assist a financially-distressed debtor in order to help it avoid default

and increase its chances of surviving as a going concern.  The *Chateaugay* ruling is not driven by

a post-hoc subjective evaluation of the debtor's state of mind.  Nor does it rest on the business

wisdom of the workout itself to determine the amount of a claim created pursuant to a debt-for-

debt exchange.  The perverse result proposed by the Committee and BOKF would essentially

- 2 -

penalize defrauded lenders, and would undermine the Bankruptcy Code policy of encouraging

lenders to participate in out-of-court workouts, thereby increasing the likelihood that struggling

companies will be forced to file for bankruptcy.  Respondents thus respectfully submit that they

are entitled to judgment as a matter of law under the policy announced in *Chateaugay* and

*ResCap*.

## <u>RELEVANT UNDISPUTED FACTS</u>

5.      The following facts, which are derived from the Committee's Amended

Complaint dated November 21, 2016 and from facts in the public record, are not in dispute for

purposes of this response.

### A.      SUNE's Financial Condition In The Months Preceding January 2016

6.      Prior to the April 21, 2016 (the "<u>Petition Date</u>"), SunEdison, Inc. ("<u>SUNE</u>")

aggressively expanded its operations worldwide through the use of borrowed money and equity

raises.  In fact, between December 2013 and January 2016, SUNE committed to over $18 billion

in acquisitions funded by approximately $24 million of capital raised through debt and equity

offerings to finance such projects.  Amended Complaint ¶ 116.  Each project required cash or

additional leverage, putting strain on SUNE's liquidity position.  *Id.*

7.      Ultimately, several of these investments "proved disastrous," requiring

intensive capital commitments and consequently limiting SUNE's capacity to acquire additional

projects due to its unwillingness or inability to pay for the same in cash.  *Id.* ¶ 117-18.  As a

result of these failed projects, SUNE's stock price dropped by approximately two-thirds between

July 20, 2015 and August 31, 2015, and continued to trend downward thereafter.  *Id.* ¶ 119.

8.      Further exacerbating SUNE's strained liquidity position, in August of 2015,

SUNE was forced to make an unexpected outlay of cash to acquire $30 million in Class A

- 3 -

common stock of one of its two "YieldCo" subsidiaries, TerraForm Global, Inc. ("GLBL") in

order to complete GLBL's IPO. *Id.* This unexpected outlay of cash put further strain on

SUNE's liquidity. *Id.* Shortly thereafter, in October 2015, share prices of SUNE's other

YieldCo subsidiary, TerraForm Power, Inc., fell below a critical threshold for a margin loan that

SUNE had entered into to finance one of its acquisitions, and as a result SUNE was required to

repay the $439 million balance of the loan. *Id.* ¶¶ 119-20. This prepayment obligation further

depleted SUNE's remaining cash reserves. *Id.*

9.      Each of these developments curtailed SUNE's ability to access the equity

markets, which left SUNE facing significantly difficult financial prospects, and led to SUNE

reducing its workforce and putting projects on hold. *See Declaration of Patrick M. Cook*

*Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day*

*Pleadings* [Docket No. 4] ¶ 61. SUNE's resulting inability to raise funds from the capital

markets also hurt its ability to close deals, which further contributed to a decline in SUNE's

liquidity position. *Id.* ¶ 49.

10.     By the end of December 2015, SUNE's public filings demonstrated that,

without the infusion of funds, it would have run out of cash in the near term. *See SunEdison,*

*Inc. Current Report* (Form 8-K) (Dec. 24, 2015) (the "12/24/15 8-K"), citing presentation titled

*Business Update – December 2015* at 16 (slide titled "Expected Liquidity Analysis"

demonstrating SUNE's strained liquidity position).[6] Market information confirmed SUNE's

financial extremis at the time. For example, SUNE's unsecured convertible notes (the

---

[6] A copy of the 12/24/15 8-K and the *Business Update – December 2015* presentation are attached as Exhibits A and
B, respectively, to the *Declaration of Andrew Goldman in Support of Wilmington Trust, N.A.'s as Trustee, and the*
*Tranche B Lenders/Steering Committee's Response to (I) BOKF, N.A.'s, as Indenture Trustee, Objection to Proofs*
*of Claim Nos. 1490 and 3555, and (ii) the Official Committee of Unsecured Creditors' OID Objection* filed
contemporaneously herewith (the "Goldman Declaration").

"Unsecured Notes") were trading at significant discounts to par.  *See, e.g.,* Bloomberg L.P. Bond

Price Graphs for SunEdison Unsecured Convertible Notes, retrieved Jan. 30, 2017 from

Bloomberg Database; S&P Capital IQ Bond Price Graph for SunEdison 12/16/15 to 1/15/16,

retrieved Jan. 31, 2017.[7]  And financial analysts recognized the market's lack of confidence in

SUNE's business.  *See, e.g.,* "SunEdison, Inc.—Model Update" (Jan. 4, 2016).[8]  Even the new

secured notes issued in the Notes Exchange immediately traded at a discount to par.  *See*

Amended Complaint ¶ 143 n.7.

### B.    The January Financing, Which Included The Notes Exchange

11.    In early January 2016, in the face of this severe financial distress, SUNE

partially recapitalized its debt and obtained a significant infusion of new money, through a series

of transactions (the "January Financing"): (i) it entered into a second lien credit agreement (the

"Second Lien Term Loan") with the lenders thereunder (the "Second Lien Term Loan Lenders")

providing for a two-tranche loan in a principal amount of approximately $725 million, itself

consisting of a $500 million Tranche A-1 Second Lien Term Loan and a $225 million Tranche

A-2 Second Lien Term Loan; and (ii) its noteholders agreed to exchange (the "Notes Exchange")

$336 million in Unsecured Notes for $225 million of second lien secured notes (the "Second

Lien Notes" and the holders thereof, the "Second Lien Noteholders," and together with the

Second Lien Term Loan Lenders, the "Second Lien Lenders").  Amended Complaint ¶¶ 135,

---

[7] Copies of the "Bloomberg L.P. Bond Price Graphs for SunEdison Unsecured Convertible Notes" and the "S&P Capital IQ Bond Price Graph" are attached as Exhibit C to the Goldman Declaration.

[8] A copy of the "SunEdison, Inc.—Model Update" analyst report is attached as Exhibit D to the Goldman Declaration.

- 5 -

140; BOKF Objection at ¶¶ 4-6; SunEdison, Inc. Current Report (Form 8-K) (Jan. 7, 2016) (the "1/7/16 8-K").[9]

12.     As part of the Notes Exchange, the exchanging noteholders also agreed to exchange an additional $245 million in Unsecured Notes in exchange for common stock.  The January Financing thus resulted in an aggregate reduction in SUNE's outstanding debt of $356 million, and an infusion of $725 million in new money.  *See* Goldman Decl., Ex. E (1/7/16 8-K).

### C.      The Second Lien Noteholders' Claim

13.     Following SUNE's fall into chapter 11, Wilmington Trust filed a proof of claim for $228,125,000.00 (plus other unliquidated amounts) on account of "(a) principal on the [Second Lien Notes] in the amount of not less than $225,000,000.00 as of the Petition Date; and (b) accrued but unpaid interest in the amount of not less than $3,125,000.00 as of the Petition Date."  Proof of Claim No. 1490 (the "Second Lien Notes' Proof of Claim").

14.     BOKF and the Committee thereafter filed their OID Objections, which seek to reduce the Second Lien Notes' Proof of Claim by approximately $93 million.  They allege that the approximately $93 million amount constitutes OID that is disallowable under Bankruptcy Code section 502.

---

[9] A copy of the 1/7/16 8-K is attached as Exhibit E to the Goldman Declaration.

## RESPONSE

### I.    The Notes Exchange Did Not Generate OID For Purposes Of Section 502(b)(2)

#### A.    Fair Value Debt Exchanges In Consensual Workouts Do Not Generate Disallowable Unmatured Interest For Bankruptcy Purposes

15.    The basic legal principles underlying this dispute are straightforward.  OID can be generated when a bond is issued for less than its face value.  *Chateaugay*, 961 F.2d at 380.  OID "equals the difference between a bond's face amount (stated principal amount) and the proceeds … received by the issuer" of the bond.  *Id.*  OID can result in interest income under the Internal Revenue Code for tax purposes.

16.    However, tax considerations are not controlling in determining whether OID exists, or creates disallowable unmatured interest under Bankruptcy Code section 502. *Chateaugay*, 961 F.2d at 382; *see also id.* at 383 ("The tax treatment of debt-for-debt exchanges derives from the tax laws' focus on realization events, and suggests that an exchange offer may represent a sensible time to tax the parties.  The same reasoning simply does not apply in the bankruptcy context."); *ResCap*, 501 B.R. at 587 (taxable OID arising from debt exchange does not dictate that disallowable unmatured interest is created); *Tex. Commerce Bank, N.A. v. Licht* (*In re Pengo Indus., Inc.*), 962 F.2d 543, 550 (5th Cir. 1992) (holding that "the tax treatment of original issue discounting does not control our inquiry, which is placed firmly within the bankruptcy framework").[10]

17.    Instead, the Second Circuit held in *Chateaugay* that a face value debt exchange did *not* create OID disallowable as unmatured interest for purposes of Bankruptcy

---

[10] It is unclear whether the Debtors even viewed the Notes Exchange as creating OID for tax purposes.  But in any event, because the tax treatment of a transaction does not control the determination of whether the transaction gives rise to disallowable unmatured interest from a Bankruptcy Code policy perspective, nor can the manner in which a debtor records or reports a transaction dictate the treatment of that transaction in bankruptcy.

Code section 502(b)(2), even though that transaction created OID for tax purposes, based on fundamental policy considerations embedded in the Bankruptcy Code.

18.     In *Chateaugay*, the debtor—LTV—consummated a face value debt-for-debt exchange with certain of its lenders; the exchange permitted lenders to exchange $1000 in principal of old debentures for $1000 in principal of new notes plus 15 shares of LTV stock. *Chateaugay*, 961 F.2d at 380.  The new notes had different maturities and a different interest rate than the old debentures.  *Id.*  The LTV debt-for-debt exchange was not sufficient to save it from a chapter 11 filing, which was commenced a mere 47 days later.  *Id.* at 379–80.  In the bankruptcy proceeding, the debtor argued that because the debentures were trading at a discount at the time of the exchange, the exchange created OID under the Internal Revenue Code, which should be treated as disallowable unmatured interest under Bankruptcy Code section 502(b) and deducted from the exchanging lenders' claim against the debtor.  *Id.* at 380.

19.     The Second Circuit disagreed, and held that the lenders' claims should be allowed in full notwithstanding Bankruptcy Code section 502(b).  In reaching this conclusion, the Second Circuit articulated the circumstances that often give rise to debt exchanges involving distressed companies.  Specifically, the Second Circuit noted that "[a] debtor in financial trouble may seek to avoid bankruptcy through a consensual out-of-court workout," which "often takes the form of a debt-for-debt exchange."  *Id.* at 381.  In a consensual debt exchange, the debtor hopes that the exchange, "by changing the terms of the debt, will enable the debtor to avoid default," while the debtholders hope to increase the likelihood of payment on their bonds.  *Id.* Thus, "[t]he debtor and its creditors share an interest in achieving a successful restructuring of the debtor's financial obligations in order to avoid the uncertainties and daunting transaction costs of bankruptcy."  *Id.*

- 8 -

20.    Based on these observations, the Second Circuit reasoned that treating such consensual exchanges as generating OID that constitutes disallowable unmatured interest "does not make sense if one takes into account the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes" that is often accomplished through out-of-court consensual workouts. *Id*. at 382  The Second Circuit explained that "[i]f unamortized OID is unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy." *Id*.  That in turn would "likely result in fewer out-of-court debt exchanges and more Chapter 11 filings," while creating "a disincentive for creditors to cooperate with a troubled debtor" and "a corresponding windfall both to holdouts who refuse to cooperate and to an issuer that files for bankruptcy subsequent to a debt exchange." *Id*.; *see also Pengo Indus.*, 962 F.2d at 549 ("strongly disfavor[ing]" an application of the Bankruptcy Code "that contravenes the substantial Congressional policy favoring out-of-court consensual workouts," and holding that a face value exchange did not create OID disallowable in bankruptcy).

21.    The Notes Exchange, which presents very similar circumstances to the exchange at issue in *Chateaugay*, falls squarely within the Second Circuit's reasoning in *Chateaugay*, and that reasoning applies equally to the Notes Exchange.  The undisputed facts show that SUNE was in significant financial distress in late December 2015, and was in the midst of a liquidity crisis that put all of SUNE's creditors at risk of non-payment.  SUNE sought to address that serious financial concern in early January 2016 by entering into a workout in which SUNE recapitalized its debt and obtained a significant infusion of new money, and in exchange, the lenders improved the likelihood of repayment on their existing debt.  There are no

allegations of any collusion or coercion by the lenders that would make the workout anything but consensual.

22.     The only relevant difference between this case and *Chateaugay* is that *Chateaugay* involved a face value debt exchange, whereas the Note Exchange was a fair value exchange.[11]  The Second Circuit declined to address whether that distinction would compel a different result.[12]  However, Judge Glenn's subsequent decision in *ResCap* emphatically concluded that it did not, holding that the rationale underlying the Second Circuit's holding in *Chateaugay* also applies in equal measure to fair value exchanges.

23.     In *ResCap*, the exchanging noteholders had exchanged unsecured notes for secured notes with a lower face amount, effectively de-levering the borrower in return for security for the lenders.  *ResCap*, 501 B.R. at 588.  Because the new notes had a market value that was less than the face amount of the new notes, the exchange created OID *for tax purposes*. *Id.* at 587.  In the later chapter 11, the creditors' committee sought disallowance of that tax OID, arguing that (a) the change in principal amount of the debt differentiated the *ResCap* notes exchange from the Second Circuit's ruling in *Chateaugay*, (b) under such an exchange, the taxable OID which had not matured as of the petition date should be disallowed as unmatured interest, and (c) treating taxable OID as "unmatured interest" would not lead to an "absurd"

---

[11] A fair value exchange occurs where "an existing debt instrument is exchanged for a new one with a reduced principal amount, determined by the market value at which the existing instrument is trading."  *Chateaugay*, 961 F.2d at 381.

[12] Similarly, in *Pengo Indus.*, 962 F.2d at 550, the Fifth Circuit, which adopted the Second Circuit's rationale in *Chateaugay*, holding that OID is not generated for bankruptcy purposes in a face value exchange, also left open the question of whether fair value exchanges should be treated differently.

result because even if that OID were disallowed, the exchanging noteholders' recovery would

still exceed the recovery of the holdout noteholders.  *Id.* at 587-88.

24.    Judge Glenn disagreed, holding that the exchange did not generate

disallowable unmatured interest.  After recounting the policy underpinnings of *Chateaugay*,

Judge Glenn held that "there is no commercial or business reason, or valid theory of corporate

finance, to justify treating claims generated by face value and fair value exchanges differently in

bankruptcy."  *Id.* at 588.  In reaching this conclusion, Judge Glenn noted the following

similarities in both types of exchanges: "First, the market value of the old debt is likely

depressed in both a fair value and face value exchange.  Second, OID is created for tax purposes

in both fair value and face value exchanges.  Third, there are concessions and incentives in both

fair value and face value exchanges."[13]  *Id.*.  Based on the foregoing, Judge Glenn denied the

creditors' committee's request to disallow the tax OID generated by the fair value exchange.

### B.    The January Financing Was In The Context Of A Consensual Workout

25.    The OID Objections do not claim that there are any material facts in dispute

that would distinguish the fair value Notes Exchange in this case and the fair value exchange in

*ResCap,* or that would cause the reasoning in *Chateaugay* with respect to face value exchanges

not to apply equally to the fair value Notes Exchange here.  Instead, BOKF and the Committee

argue that the Notes Exchange did not constitute a consensual, out-of-court workout of the sort

envisioned by *Chateaugay* and *ResCap*, and thus any tax OID generated by the Notes Exchange

must be disallowed under Bankruptcy Code section 502(b)(2).

---

[13] Those concessions and incentives included:  "(1) granting of security in the issuer's collateral; (2) interest rate;
(3) maturity date; (4) payment priorities; (5) affiliate guarantees; (6) other lending covenants; (7) redemption
features; (8) adding or removing a sinking fund or conversion feature; and (9) offering stock with the new debt."  *Id.*
at 588.

26.     BOFK and the Committee are wrong.  As described above, the undisputed

facts in this case demonstrate that SUNE was facing the same liquidity constraints that were

faced by the debtors in *Chateaugay* and *ResCap*, and the Second Lien Lenders agreed to provide

a lifeline to SUNE that benefitted both sides.  Like the exchanges in *Chateaugay* and *ResCap*,

the Notes Exchange helped SUNE de-lever (by forgiving a net $111 million of debt and

converting an additional $245 million of unsecured debt to SUNE equity).  The January

Financing went even a step further, by enabling the Debtors to raise $725 million of new money.

*Supra* ¶ 12; *ResCap*, 501 B.R. at 578.  In exchange therefor, the Debtors provided the Second

Lien Noteholders with liens securing their existing debt.

27.     These facts in the public record show that the Notes Exchange was a

"consensual workout" that involved exactly the sort of lender cooperation with a troubled debtor

that the Second Circuit recognized in *Chateaugay* and that the Bankruptcy Code is designed to

encourage.  *See Pengo Indus.*, 962 F.2d at 549 (referring to bankruptcy policy strongly favoring

out-of-court workouts, described as the "speedy, inexpensive, negotiated adjustment of creditor-

company relations") (citing *Chateaugay*, 961 F.2d at 382) (internal quotation marks omitted);

Robert W. Sawdey, *Out-of-Court Workouts*, 45-JUN Fed. Law. 46, 46 (1998) ("Simply stated …

an out-of-court workout is a mechanism whereby a financially troubled corporate debtor

contracts with its creditors for a full or partial resolution of its debt in order to avoid seeking

formal relief under Chapter 11 of the Bankruptcy Code."); Bowman Brown, Brian Nordwall &

Michael L. Ashner, *Corporate, Securities and Banking Law Aspects of Workouts*, 32 U. Miami

L. Rev. 979, 979 (1978) ("[A] workout is defined as any arrangement involving a voluntary

restructuring of a debtor-creditor relationship for the purpose of avoiding foreclosure or

bankruptcy.").  Moreover, there are no allegations in the OID Objections that the Second Lien

Noteholders colluded with, or coerced, SUNE in a way that would make the workout "non-consensual."  Thus, the Notes Exchange fits easily under the Second Circuit's announced policy of protecting lenders in those circumstances.[14]

28.     BOKF suggests that a different result should apply despite these undisputed facts, because the Second Lien Noteholders allegedly never cooperated with "a struggling debtor," but rather were duped by an issuer (SUNE) who provided these lenders with false and misleading financial information.  BOKF Objection ¶ 23.  On this basis, BOKF argues that (i) SUNE was more interested in obscuring alleged financial improprieties than in rehabilitation, and (ii) the Second Lien Noteholders must not have viewed the Notes Exchange as a workout.  In other words, BOKF proposes that this Court create an exception to *Chateaugay* that would require the Court to engage in an after-the-fact, retroactive assessment of a debtor's undisclosed motives and/or the extent of anticipated benefits of the proposed workout before allowing (or disallowing) the unaccreted tax OID component of a claim by a lender that had engaged in a pre-petition workout.

29.     But that is not the law, and cannot be the litmus test.  *Chateaugay* turned on an *objective* view of the facts and circumstances at the time of the debt exchange, not on whether the debtor "turned out" to be engaged in some fraud.  *See Chateaugay,* 961 F.2d at 382.  *ResCap* similarly focused only on objective indicia of the debtor's financial condition at the time of the

---

[14] That the January Financing ultimately did not rescue SUNE from bankruptcy is of no moment to the conclusion that it was a workout.  Indeed, that was also the case in *Chateaugay,* where the company filed for bankruptcy 47 days after the exchange.  *In re Chateaugay Corp*., 109 B.R. 51, 52 (Bankr. S.D.N.Y. 1990), *aff'd sub. nom. LTV Corp. v. Valley Fidelity Bank & Trust Co*. (*In re Chateaugay Corp*.), 130 B.R. 403 (S.D.N.Y. 1991), *aff'd in part and rev'd in part*, 961 F.2d 378, (2d Cir. 1992).

- 13 -

exchange.  *See ResCap*, 501 B.R. at 588-89.  Indeed, in *ResCap*, Judge Glenn expressly rejected

any post-hoc test in favor of affording predictability to issuers and creditors:

> And whatever rules are adopted by courts should provide predictability
> to parties in planning transactions. The outcome—whether a transaction
> results in disallowed OID for bankruptcy purposes—*should not hinge
> on whether, with the benefit of hindsight, noteholders that exchanged
> their notes did better than those that did not exchange.  Determining
> whether the transaction created disallowable OID should not depend
> on if the noteholders or the debtors got a "good deal" in bankruptcy*.
> That rule would create confusion in the market and would likely
> complicate a financially distressed company's attempts to avoid
> bankruptcy with the cooperation of its creditors.

*ResCap*, 501 B.R. at 588-89 (emphasis added).

30.    The need for predictable rules also weighs heavily against a standard for

determining allowance of a claim that is based on an issuer's undisclosed motives.  Indeed, just

this month, the Second Circuit in *Marblegate Asset Management, LLC v. Education

Management Finance Corp.*, No. 15-2124-cv, 2017 WL 164318, at *11 (2d Cir. Jan. 17, 2017),

rejected an interpretation of the Trust Indenture Act that would require courts to evaluate the

"subjective intent of the issuer or the majority [of the] bondholders" in order to determine the

validity of an out-of-court distressed workout.

31.    Moreover, as this Court has recognized, a rule that would allow taxable OID

for lenders who assist struggling debtors by engaging in consensual workouts, but would

disallow such taxable OID if it turned out that the cooperating lenders were defrauded by the

debtors respecting its financial prospects, "doesn't make a lot of sense."  Hr'g Tr. 24:1-3 Jan. 10,

2017 ("If you're saying that [the bondholders] were defrauded and therefore as a matter of policy

their claim should be reduced, that doesn't make a lot of sense.").  Such a rule would also

undoubtedly render lenders increasingly wary of participating in consensual workouts, which is

precisely the result that the *Chateaugay* decision and its progeny were intended to avoid. *See Chateaugay*, 961 F.2d at 382 ("We must consider the ramifications of a rule that places ***a creditor in the position of choosing whether to cooperate with a struggling debtor***, when such cooperation might make the creditor's claims in the event of bankruptcy smaller than they would have been had the creditor refused to cooperate.") (emphasis added); *Pengo Indus.*, 962 F.2d at 549 ("A rule that a debt-for-debt face value exchange in a consensual out-of-court workout creates OID concomitantly reduces the likelihood ***that creditors will 'cooperate with a struggling debtor'*** because such a rule lowers the exchanging creditors' claims in bankruptcy.") (emphasis added).

32.    BOKF also points to the absence of any "holdouts" that opted out of the Notes Exchange as further support for its assertion that *Chateaugay*'s holding should not apply to the case at bar. BOKF Objection ¶ 24. As discussed above, the Second Circuit in *Chateaugay* held that OID generated by a face value exchange should not be disallowed under Bankruptcy Code section 502(b)(2) due to the court's primary concern that disallowing such OID would discourage creditors from cooperating in consensual workouts with financially struggling companies, leading to "fewer out-of-court debt exchanges and more Chapter 11 filings." *Chateaugay*, 961 F.2d at 382. While the *Chateaugay* court did note that refusing to disallow OID resulting from debt exchanges would prevent a "windfall" to holdouts in that case, there is no indication in the decision, and no basis therein to conclude, that the absence of holdouts would have altered its conclusion.

### C.    Supreme Court Decisions Do Not Overrule *Chateaugay*

33.    Finally, BOKF argues that the Second Circuit's policy in *Chateaugay* is "questionable" in light of recent Supreme Court decisions because it did not apply the "plain

- 15 -

meaning" of Section 502(b)(2).  The same argument was raised before Judge Glenn in *ResCap*, to no avail.  *See ResCap*, 501 B.R. at 588.  In fact, allowing the Second Lien Notes' Proof of Claim in full in no way requires the Court to vary the express terms or plain meaning of the Bankruptcy Code.  The Bankruptcy Code does not anywhere (a) define unmatured interest, (b) explain when tax OID should be disallowed as unmatured interest, or (c) provide that disallowable unmatured interest is created when an issuer engages in a distressed debt-for-debt exchange.  In fact, when Section 502(b)(2) was enacted, debt-for-debt exchanges did not give rise to OID even for tax purposes.  *See ResCap*, 501 B.R. at 587.  As such, there is nothing in the "plain meaning" of Section 502(b)(2) mandating, or even suggesting, that tax OID generated by an exchange should be treated as disallowable interest.

## II.    The OID Objections Improperly Calculate the Amount of OID Generated by the Notes Exchange

34.    Respondents believe, for the reasons articulated above, that the Court should conclude as a matter of law that no disallowable unmatured interest was generated as a result of the Notes Exchange for purposes of Bankruptcy Code section 502(b)(2).  But should the Court determine otherwise, the Court should reject BOKF's and the Committee's erroneous calculation of the amount of OID generated.

35.    The OID Objections assert that the Notes Exchange generated $93 million in OID.  The $93 million figure is based on the alleged *market* value of the Unsecured Notes and the *face* amount of the Second Lien Notes.  The foregoing calculation is irrelevant to the issue at hand.  In the first instance, the Second Lien Noteholders gave SUNE $336 million of value in the form of the *face* amount of the Unsecured Notes canceled in the Notes Exchange, plus an additional $245 million of debt in exchange for equity.  More important, to the extent tax OID

was created in the Notes Exchange, based on the facts alleged in the OID Objections, the amount of tax OID created would only be about half of the $93 million claimed by BOKF and the Committee.[15]

36.     To accurately determine the amount of OID generated by the Notes Exchange under tax rules, one must calculate the excess (if any) of the stated redemption price at maturity of the Second Lien Notes over the issue price of the Second Lien Notes.  26 U.S.C. § 1273(a). Because the OID Objections assert that the notes were traded on an established market, Amended Complaint ¶ 143 n. 6-7, the issue price of the Second Lien Notes is equal to their fair market value (measured by their trading price) immediately after the time of the exchange, or, as alleged by the OID Objections, $177 million.  26 C.F.R. § 1.1273-2.  Accordingly, any tax OID generated as a result of the Notes Exchange would equal the difference between the Second Lien Notes' redemption price at maturity ($225 million) and their issue price ($177 million)—$48 million (subject to further reduction for accretion as of the Petition Date).

---

[15] Respondents accept the factual averments contained in the OID Objections only for the purposes of their request for judgment on the pleadings on the OID Objections.  Respondents reserve all rights and defenses with respect to these issues and otherwise as they relate to the proper calculation of the OID generated as a result of the Notes Exchange.

## CONCLUSION

For the reasons stated herein, Respondents respectfully request that the Court (i) overrule

the OID Objections; and (ii) grant such other and further relief as is just and proper.

Dated:    January 31, 2017              WILMER CUTLER PICKERING
          New York, New York            HALE AND DORR LLP

                                        By:    */s/ Andrew Goldman*
                                               Andrew Goldman
                                               Charles C. Platt
                                               Benjamin Loveland (admitted *pro hac vice*)
                                               Lauren Lifland
                                               7 World Trade Center
                                               250 Greenwich Street
                                               New York, New York 10007
                                               (212) 230-8800 (Telephone)
                                               (212) 230-8888 (Facsimile)
                                               andrew.goldman@wilmerhale.com
                                               charles.platt@wilmerhale.com

                                        *Counsel for Wilmington Trust, N.A.,*
                                        *as Trustee and Collateral Trustee*


                                        AKIN GUMP STRAUSS HAUER & FELD LLP

                                        By:    */s/ David M. Zensky*
                                               David M. Zensky
                                               Erik Preis
                                               Deborah J. Newman
                                               Akin Gump Strauss Hauer & Feld LLP
                                               One Bryant Park
                                               New York, New York 10036
                                               (212) 872-1000 (Telephone)
                                               (212) 872-1002 (Facsimile)
                                               dzensky@akingump.com
                                               apreis@akingump.com
                                               djnewman@akingump.com

                                        *Counsel to the Tranche B Lenders/ Steering*
                                        *Committee*

- 18 -