**Hearing Date: February 7, 2017 at 10:00 a.m. (ET)**

PILLSBURY WINTHROP SHAW PITTMAN LLP
Leo T. Crowley
Daniel S. Brown
1540 Broadway
New York, NY 10036
Telephone: (212) 858-1000
Fax:  (212)858-1500
Email:  leo.crowley@pillsburylaw.com
Email:  daniel.brown@pillsburylaw.com

*Counsel for Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent under the Second Lien Credit Agreement*

AKIN GUMP STRAUSS
   HAUER & FELD LLP
David M. Zensky, Esq.
Erik Preis, Esq.
Deborah J. Newman, Esq.
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

*Counsel to the Tranche B Lenders/Steering Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
In re:                                                                           :
                                                                                       : Chapter 11
SUNEDISON, INC., *et al.*,                                          : Case No. 16-10992 (SMB)
                                                                                       : (Jointly Administered)
                                                                                       :
                                    Debtors.                                  :
------------------------------------------------------------- x

# WILMINGTON SAVINGS FUND SOCIETY, FSB'S RESPONSE TO OBJECTIONS TO PROOF OF CLAIM NO. 3555

4824-4488-1984.v11

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ............................................................................................................................ 2

ARGUMENT ................................................................................................................................. 4

    I.   The Tranche A-1 Closing Fee Should Not be Recharacterized as Original Issue Discount.................................................................................................. 4

    II.  No Law or Credit Agreement Term Supports Treating the Value of the Warrants as Original Issue Discount. ........................................................ 5

CONCLUSION ............................................................................................................................ 12

4824-4488-1984.v11

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Am. Express Bank Ltd. v. Uniroyal, Inc.*,
    164 A.D. 2d 275 (1st Dept. 1960) ..................................................................................5

*LTV Corp. v. Valley Fidelity Bank & Trust Co.* (*In re Chateaugay Corp.*),
    961 F.2d 378 (2d Cir. 1992) ................................................................................. *passim*

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996) .........................................................................................5

*In re Pengo Indus., Inc.*,
    962 F.2d 543 (5th Cir. 1992) ........................................................................................6

*In re Residential Capital, LLC*,
    501 B.R. 549 (Bankr. S.D.N.Y. 2009) ...............................................................8, 9, 11

*In re Solutia, Inc.*,
    379 B.R. 473 (Bankr. S.D.N.Y. 2007) (03-17949) ...................................................7, 8

*Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n*,
    322 F.3d 1039 (9th Cir. 2002) ...................................................................................4, 8

## Statutes and Codes

United States Bankruptcy Code
    Title 11, Section 502(b) ..................................................................................... *passim*
    Title 11, Section 502(b)(2) ................................................................................3, 4, 5, 8

United States Internal Revenue Code
    Title 26, Section 1271 ...................................................................................................7

## Rules and Regulations

Federal Rules of Bankruptcy Procedure
    Rule 3007 .......................................................................................................................4
    Rule 9014 .......................................................................................................................4

4824-4488-1984.v11

Wilmington Savings Fund Society, FSB ("WSFS"), in its capacity as successor administrative agent under the Second Lien Loan (defined below) and the Tranche B Lenders/Steering Committee[1] respectfully submit this response to BOKF, N.A.'s ("BOKF") Objection to Proof of Claim No. 3555 (the "BOKF Claim Objection") and to the Second and Third Causes of Action in the Complaint filed by the Official Committee of Unsecured Creditors ("Committee") in Adversary Proceeding No. 16-01228 (the "Committee's Claim Objection," and with the BOKF Claim Objection, the "Claim Objections"). The facts relied on herein are taken from the Claim Objections and matters of which the Court may properly take judicial notice.

**PRELIMINARY STATEMENT**

BOKF and the Committee rely on tax principles to argue that a claim in bankruptcy should be disallowed in part based on the inclusion of unmatured interest because, for tax law purposes, the underlying credit transaction would be characterized as embodying original issue discount ("OID"). The Court should overrule the Claim Objections for this reason alone: Tax law does not dictate the treatment of a claim in bankruptcy. There also is no controlling precedent that would support characterizing a fully earned closing fee or fully paid equity kicker as unmatured interest, or treating the value of warrants as OID despite the plain terms of the Credit Agreement (defined below). In fact, in the lead authority in this area, *LTV Corp. v. Valley Fidelity Bank & Trust Co.* (*In re Chateaugay Corp.*), 961 F.2d 378 (2d Cir. 1992) ("*Chateaugay*"), noteholders simultaneously received stock in connection with the notes at issue, and yet their claim in bankruptcy was not deemed to include unmatured interest on account of such stock. The Second Circuit also cautioned against an interpretation of "unmatured interest"

---

[1] The Tranche B Lenders/Steering Committee consists of the lenders referenced in the Verified Statement Pursuant to Bankruptcy Rule 2019 dated December 22, 2016. *See* Doc. 1977.

1

and Section 502(b) of the Bankruptcy Code that would deter lenders from cooperating with distressed companies in an effort to avoid bankruptcy, ultimately ruling that relying on the Tax Code to determine the allowance of a claim would result in just such an outcome. The same result is warranted here. The Credit Agreement should be enforced as written, and the Claim Objections should be overruled.

## BACKGROUND[2]

1. On September 22, 2016, WSFS filed the Claim on account of the $725 million loan (the "Second Lien Loan") made by certain lenders to SunEdison, Inc. ("SunEdison") pursuant to the Second Lien Credit Agreement dated January 11, 2016 (the "Credit Agreement").[3] The Second Lien Loan consists of a $500 million Tranche A-1 loan ("Tranche A-1") and a $225 million Tranche A-2 loan, and was issued with approximately 28.7 million warrants to acquire SunEdison common stock (the "Warrants"). *See* Credit Agreement § 6.19. The Second Lien Loan was part and parcel of a complex workout that included an exchange for private notes whereby SunEdison issued approximately $225 million of new second lien notes (to some of the same creditors that provided the Second Lien Loan) in exchange for approximately $336 million of existing unsecured convertible notes (the "Notes Exchange," and with the Second Lien Loan, the "January Workout"). *See* Compl. ¶ 140. Additionally, the January Workout included exchanges of other debt into equity, and preferred stock into common.

---

[2] Citations to docket entries in the main bankruptcy case, No. 16-10992 (SMB), are cited as "Doc. __." Citations to docket entries in Adversary Proceeding No. 16-01228 (SMB) are cited as "AP Doc. __." Citations to the BOKF Claim Objection are cited as "BOKF Br. __" and citations to the Committee's Claim Objection are cited as "Compl. ¶ __."

[3] The Credit Agreement is attached hereto as Exhibit 1. Because the attachments to the Credit Agreement are voluminous, only Exhibit C-1 and C-2 to the Credit Agreement (*i.e.*, the form of the Tranche A-1 and Tranche A-2 Notes) are included in Exhibit 1. The Amendment to the Second Lien Credit Agreement dated as of June 9, 2016 is attached as Exhibit 2.

2

*See* Sun Edison Inc., Current Report (Form 8-K) (Jan. 7, 2016) ("1/7/16 8-K").[4] Through the January Workout, SunEdison creditors allowed the debtors to eliminate $355 million of debt, and reduce their net annual interest expense. *See id.*

2.  On October 20, 2016, BOKF objected to the Claim because of alleged OID associated with the Second Lien Loan. *See* Doc. 1455. BOKF argues that two aspects of the Second Lien Loan should be recharacterized as embodying OID and therefore "unmatured interest" that should be disallowed under Section 502(b)(2) of the Bankruptcy Code. First, BOKF argues that Tranche A-1 is subject to $20 million of OID (the "Tranche A-1 OID") because, after paying $20 million upfront fees to the Tranche A-1 lenders, SunEdison received $480 million in exchange for a $500 million principal obligation. The purported basis for BOKF's Tranche A-1 OID argument is Section 2.09(a) of the Credit Agreement, which obligated SunEdison to pay a 4.00% fee (*i.e.*, $20 million) on the Tranche A-1 loan (the "Tranche A-1 Closing Fee"). Second, BOKF alleges that the Warrants issued to the Tranche A-1 and Tranche A-2 lenders collectively generated $84 million of OID, based on the market value of the Warrants at issuance (the "Warrant OID").[5] On October 20, 2016, the Committee filed a complaint against WSFS and others seeking various forms of relief, including disallowance of the Claim on account of OID. Specifically, the Committee objected to the Warrant OID in Count 2 of the Complaint and to the Tranche A-1 OID in Count 3 of the Complaint for substantially the same reasons articulated in the BOKF Claim Objection. *See* Compl. ¶¶ 158–171. At the Committee's request, WSFS and the Tranche B Lenders/Steering Committee agreed to treat Counts 2 and 3 of the Complaint as claim objections that commenced a contested matter in

---

[4] The 1/7/16 8-K is attached hereto as Exhibit 3.
[5] If in fact $84 million of OID was created and if such OID constituted unmatured interest under the Bankruptcy Code, then $9 million of such unmatured interest accreted before the petition date, leaving a net $75 million of alleged unmatured interest.

3

accordance with Rules 3007 and 9014 of the Federal Rules of Bankruptcy Procedure. *See* AP Doc. 8.

## ARGUMENT

**I.    The Tranche A-1 Closing Fee Should Not be Recharacterized as Original Issue Discount.**

3.    The Claim Objections must be overruled with respect to the Tranche A-1 Closing Fee because the Credit Agreement makes clear that the Second Lien Loan was not issued with $20 million of OID (*i.e.*, unmatured interest). The plain language of Section 2.09(a) of the Credit Agreement obligated SunEdison to pay a "closing fee" equal to 4.00% of the principal amount of the Tranche A-1 loan at closing (*i.e.*, $20 million):

> <u>*Borrower agrees to pay*</u> on the Closing Date to each Lender party to this Agreement as a Lender of Tranche A-1 Term Loans on the Closing Date, as fee compensation for the funding of such Lender's Tranche A-1 Term Loan, <u>*a closing fee in an amount equal to 4.00% of the stated principal*</u> amount of such Lender's Tranche A-1 Term Loan, payable to such Lender from the proceeds of its Tranche A-1 Term Loan as and when funded on the Closing Date. <u>*Such closing fee will be*</u> in all respects <u>*fully earned, due and payable on the Closing Date*</u> and non-refundable and non-creditable thereafter.

Credit Agreement § 2.09 (emphasis added).

4.    Unmatured interest is interest that is not yet due and payable. *See Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2002). By the express terms of the Credit Agreement, the 4.00% fee that was "fully earned" and "due and payable on the Closing Date" is not unmatured interest that can be disallowed under Section 502(b)(2) of the Bankruptcy Code.

5. Further, BOKF and the Committee provide no basis for why the Court should recharacterize the closing fee as creating a form of unmatured interest,[6] rather than enforce the clear terms of the Credit Agreement as written. Under New York law, which governs the Credit Agreement, clear and unambiguous contracts must be enforced as written. *See, e.g.*, *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("[I]n interpreting a contract, the intent of the parties governs, and therefore a contract should be construed so as to give full meaning and effect to all of its provisions. . . . [W]ords and phrases are given their plain meaning." (internal quotation marks, alterations and citations omitted)); *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D. 2d 275, (1st Dept. 1960) (resort to extrinsic facts is inappropriate where language is plain and unambiguous); *see also* Credit Agreement § 10.14(a) (governing law).

**II.    No Law or Credit Agreement Term Supports Treating the Value of the Warrants as Original Issue Discount.**

6. The Claim Objections allege that the Second Lien Loan generated $84 million of OID based on the market value of SunEdison shares (and thus the Warrants) when the Warrants were issued. Consequently, BOKF and the Committee assert that the unaccreted alleged OID generated by the Warrants constitutes "unmatured interest" that should be disallowed under Section 502(b)(2). The Court should overrule the Claim Objections with respect to the Warrant OID for several reasons.

7. To begin with, as with the Tranche A-1 Closing Fee, the Warrants were fully earned and paid at Closing. BOKF alleges that "the Warrants thus constitute a form of interest intended to provide additional compensation to the Second Lien Lenders in exchange for their

---

[6] Any reliance on tax law by BOKF and the Committee as a basis for recharacterizing the closing fee as OID should be disregarded because, as discussed further below, tax law does not dictate the treatment of a transaction in bankruptcy. *See* Part II *supra*.

5

extension of funds." BOKF Br. ¶ 13. But even if the Warrants are viewed as a form of interest, it does not follow that their value should be disallowed under the Bankruptcy Code. To the contrary, the plain language of Section 502(b) provides that only *unmatured* interest shall be disallowed. If the warrants are viewed as interest, then they must be viewed as interest that matured at closing, when they were issued.

8. The fact that the Warrants may be treated as generating OID for *tax* purposes does not alter this analysis. The Second Circuit has expressly stated that the tax treatment of a transaction does not dictate its treatment under the Bankruptcy Code. *See Chateaugay*, 961 F.2d at 383 (citing *In re PCH Assocs.,* 55 B.R. 273 (Bankr. S.D.N.Y. 1985) (agreement structured as ground lease for tax benefits treated as joint venture under Bankruptcy Code)). In *Chateaugay*, the Second Circuit held that a debt exchange did not create OID that resulted in disallowable unmatured interest, notwithstanding that the exchange resulted in OID under the Tax Code. *See id.* (reversing bankruptcy court and explaining that "The cases upon which the bankruptcy court relied in reaching a contrary conclusion are distinguishable. The court found support . . . by looking to tax cases, because under the Internal Revenue Code, for purposes of determining taxable income, an exchange offer generates new OID." (emphasis added)). Other cases have similarly held that the bankruptcy treatment and tax treatment of a transaction need not be the same. *See, e.g.*, *In re Pengo Indus., Inc.*, 962 F.2d 543, 550 (5th Cir. 1992) ("[T]his is not a tax case. We stress that the tax treatment of original issue discounting does not control our inquiry, which is placed firmly within the bankruptcy framework.").

9. Neither BOKF nor the Committee provide any basis for disregarding the Second Circuit's holding that tax law does not determine the allowance of a claim in bankruptcy. In fact,

6

the two circuit cases cited by BOKF apply tax law in non-bankruptcy, non-Section 502(b) cases outside of this Circuit.

10. The sole bankruptcy case cited by BOKF is *In re Solutia, Inc.*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007) (03-17949). In *Solutia*, lenders provided the debtors with $200.7 million in return for $223 million in notes (the "Solutia Notes") and certain warrants exercisable for common stock. *Id.* at 476. The Solutia Notes bore the following legend: "THIS SECURITY IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR THE PURPOSES OF SECTION 1271 *et seq*. OF THE INTERNAL REVENUE CODE. FOR EACH $1,000 PRINCIPAL AMOUNT AT MATURITY OF THIS SECURITY, THE ISSUE PRICE IS $814.85 AND THE AMOUNT OF ORIGINAL ISSUE DISCOUNT IS $185.15. THE ISSUE DATE OF THIS SECURITY IS JULY 9, 2002 AND THE YIELD TO MATURITY IS 15.751%." *Id.* at 477. The $41.30 of OID reflected in the legend appears to have been calculated by deducting from the Solutia Notes' face value the $22.3 million that exceeded the loan proceeds received by the debtor, plus an additional $19 million.

11. The Indenture Trustee for the Solutia Notes (which were oversecured) submitted a claim for the full face value of the Solutia Notes of $223 million. *Id.* at 480. The debtors and the creditors' committee objected to that claim, arguing that the amount of unaccrued OID as of the effective date should be disallowed. *Id.* The court granted the objection, noting, based on the legend on the Solutia Notes, that "[o]f the proceeds received by Solutia, by simple mathematical calculation $181,771,550 represented the discounted issue price for the 2009 Notes." *Id.* at 477.

12. *Solutia* is not determinative of whether the Warrants create tax OID that should be treated as disallowable unmatured interest under Section 502(b). Solutia did not involve a rescue financing into a distressed borrower and so the court had no reason to consider the potential

7

applicability of *Chateaugay*. Rather, the court unquestioningly accepted, without analysis, that for purposes of Section 502(b), the *Solutia* Notes included the legended OID and such triggered unmatured interest. *Id.* at 486. The court then addressed only whether the *Solutia* noteholders were entitled to recover the <u>entire balance</u> of the $223 million face value, even if it included OID, because the indenture defined the "principal" amount of the Solutia Notes as $223 million, the debtors were solvent, and the lenders were oversecured and the debtors were solvent. *Solutia*, 379 B.R. at 487. Moreover, the Tranche A-1 and Tranche A-2 notes associated with the Credit Agreement do not contain the legend borne by the *Solutia* notes.

13. Finally, the Claim Objections should be overruled for the additional reason that treatment of the Warrants as OID that creates disallowable unmatured interest is inconsistent with the policy rationales articulated by the Second Circuit in *Chateaugay* and later by this Court in *In re Residential Capital, LLC*, 501 B.R. 549 (Bankr. S.D.N.Y. 2009). As explained by the Ninth Circuit, courts do not base their determinations as to whether a claim includes unmatured interest for Section 502(b)(2) purposes "on economic theories of interest." *Thrifty Oil Co.*, 322 F.3d at 1047. Instead, courts look to the *policies* underlying Section 502(b)(2) and the Bankruptcy Code generally, and the cases "often turn on whether allowance or disallowance will contravene bankruptcy policy, unfairly prejudice other creditors or provide a windfall to the debtor" *Id.*; *accord Chateaugay*, 961 F.2d at 382–83 (citing bankruptcy policy as the key determining factor in the application of Section 502(b)(2)).

14. In both *Chateaugay* and *ResCap*, the courts refused to disallow alleged unamortized OID generated by distressed debt exchanges because it could "disincentive [] creditors to cooperate with a troubled debtor" and reward holdouts who refuse to cooperate in consensual out-of-court workouts. *Chateaugay*, 961 F.2d at 382; *see also ResCap*, 501 B.R. at

588. In *Chateaugay*, the Second Circuit explained that given "Congress's intent to encourage consensual workouts and the obvious desirability of minimizing bankruptcy filings," the Court had to consider the "ramifications of a rule that places a creditor in the position of choosing whether to cooperate with a struggling debtor, when such cooperation might make the creditor's claims in . . . bankruptcy smaller than they would have been had the creditor refused to cooperate." *Chateaugay*, 961 F.2d at 382–83. *ResCap* extended *Chateaugay*'s holding to fair value exchanges, because it found that like the face value exchange in *Chateaugay*, fair value exchanges "offer companies the opportunity to restructure out-of-court, avoiding the time and costs—both direct and indirect—of a bankruptcy proceeding." *See ResCap*, 501 B.R. at 588.

15. Significantly, in *Chateaugay*, the "face value" exchange included stock in addition to the new face value debt securities. The bondholders received a new note with a face amount equal to the face amount of the old note, plus 15 shares of common stock for each $1,000 of notes. *See Chateaugay*, 961 F.2d at 380. In the month the exchange occurred the stock trading price ranged from $5.50 to $7.25 a share,[7] so that in rough approximation the bondholders received a new note with a face amount of $1,000 plus $100 month of equity. Yet the case did not treat the new notes as having $100 of imbedded OID and unmatured interest attributable to the equity.

16. The principles that guided the *Chateaugay* and *ResCap* courts apply equally, if not more so (because of the infusion of $725 million of new money) here. At the time of the January Workout, SunEdison was distressed; indeed, as the Committee acknowledges it was suffering a "liquidity crisis." *See* Compl. ¶¶ 110, 135. The January Workout was a comprehensive restructuring that included an exchange (*i.e.*, the Notes Exchange), new money

---

[7] Bloomberg L.P. "Historical Price Table for LTV Corporation 5/16/86 to 6/16/86," attached hereto as <u>Exhibit 4</u>.

lending (*i.e.*, the Second Lien Loan) with an equity kicker (*i.e.*, the Warrants), a debt for equity exchange, and an exchange of preferred stock into common stock. As the transaction documents and public filings demonstrate, the January Workout was a collective effort by existing lenders and others through a series of intertwined transactions to provide SunEdison with rescue financing and allow it to restructure existing debt and equity. For example, the Credit Agreement provides that the loan proceeds were to be used to "pay fees and expenses related to . . . the issuance of the Second Lien Convertible Notes and the transactions related thereto." *See, e.g.*, Credit Agreement at Recitals ¶ 2. A single lien was granted to secure both the Second Lien Loan and the new notes issued under the Notes Exchange. *See* Second Lien Pledge and Security Agreement § 2.1.[8] SunEdison's public filings also reveal the interrelated nature of the Notes Exchange, the Second Lien Loan and the Warrants:

> ***In conjunction with the exchange transactions, [SunEdison] and certain parties have also agreed to enter into a new $725 million second lien credit facility*** pursuant to which such parties will fund a new credit facility. . . . A1 lenders under the new credit facility ***will also receive warrants*** exercisable at any time for an aggregate of 19.8 million shares of common stock at an exercise price of $0.01 (the "warrant shares"). A2 lenders under the new credit facility will also receive warrants exercisable at any time for an aggregate of 8.9 million shares of common stock at an exercise price of $0.01 (the "warrant shares"). The net proceeds from the new credit facility will be used to repay all of the approximately $170 million of outstanding indebtedness under SunEdison's existing second lien credit facility, interest, transaction costs, and for general corporate purposes. The remaining net proceeds will be used for general corporate purposes. . . .
> . . . .
> ***The exchange transactions, SunEdison's entry into the new credit facility and the <u>related</u> issuance of warrants are expected to close on January 11, 2016*** . . . .

---

[8] The relevant excerpt of the Second Lien Pledge and Security Agreement is attached as Exhibit C to the Declaration of Deborah J. Newman in Support of Second Lien Defendants' Motion to Dismiss. *See* AP Doc. 26-3. The Collateral Trust Agreement dated January 11, 2016 is attached as <u>Exhibit 5</u> (without the accompanying exhibits).

10

*See* 1/7/16 8-K (emphasis added). Neither BOKF nor the Committee can dispute that the Notes Exchange, Second Lien Loan and the Warrants were part of a holistic workout.

17. Disallowing a portion of the Claim because of alleged OID generated by the Warrants will discourage workouts, like the January Workout, that use equity kickers to induce an infusion of new money. Equity kickers, like the Warrants, are in the tool kit of consideration available to be offered by distressed borrowers to entice existing lenders into workouts. An equity kicker was successfully deployed in *Chateaugay* to effectuate an attempted out of court restructuring, without resulting in imputed OID. Indeed, the equity kicker in *Chateaugay* resembled that present here—in *Chateaugay*, it was actual stock, and here it was cashless exercise warrants that were immediately exercisable. If those equity kickers have the real risk of reducing a creditor's claim in bankruptcy (for new money lending), then creditors will increasingly refuse to accept warrants or other equity kickers as a form of consideration and insist on other terms less advantageous to the distressed borrower, e.g., higher coupons, tougher covenants, lower loan to value ratios. Or, more simply, available capital providers may simply insist on providing capital, or different terms on existing capital, only in the form of a DIP financing. Borrowers will be stripped of a powerful workout tool, consensual workouts will be less accessible and bankruptcy filings will inevitably increase—exactly what *Chateaugay* and *ResCap* sought to avoid, and what SunEdison sought to avoid here. For these reasons, the Court should apply the principles of *Chateaugay* and *ResCap*, and refuse to disallow the Claim on account of any unamortized OID.

4824-4488-1984.v11

## CONCLUSION

18. WHEREFORE, WSFS and the Tranche B Lenders/Steering Committee respectfully request that the Court overrule the Claim Objections, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 31, 2017

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

*/s/ Leo T. Crowley*
Leo T. Crowley
Daniel S. Brown
1540 Broadway
New York, NY 10036
Telephone: (212) 858-1000
Fax: (212) 858-1500
Email: leo.crowley@pillsburylaw.com
Email: daniel.brown@pillsburylaw.com

*Counsel for Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent under the Second Lien Credit Agreement*

AKIN GUMP STRAUSS HAUER & FELD LLP

*/s/ David M. Zensky*
David M. Zensky, Esq.
Erik Preis, Esq.
Deborah J. Newman, Esq.
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Tranche B Lenders/Steering Committee*