**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **SUNEDISON, INC.**, *et al*., | : **Case No. 16-10992 (SMB)** |
| | : |
| Debtors.[1] | : **Jointly Administered** |
| | : |

# JOINT PLAN OF REORGANIZATION OF SUNEDISON, INC. AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000

James J. Mazza, Jr.
Louis S. Chiappetta
155 N. Wacker Dr.
Chicago, Illinois 60606-1720

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

Telephone: (312) 407-0700

Anthony W. Clark
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000

*Attorneys for Debtor and Debtor-in-Possession*

Dated:          March 28, 2017

# TABLE OF CONTENTS

**Page**

Article I

DEFINITIONS, RULES OF
INTERPRETATION, AND COMPUTATION OF TIME

A.    Scope of Definitions ...................................................................................3
B.    Definitions...................................................................................................3
C.    Rules of Interpretation ..............................................................................30
D.    Computation Of Time ...............................................................................30
E.    References to Monetary Figures ...............................................................30
F.    Exhibits .....................................................................................................31

Article II

ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1    Administrative Claims ..............................................................................31
2.2    DIP Facility Claims ..................................................................................32
2.3    Professional Claims ..................................................................................33
2.4    Priority Tax Claims...................................................................................34

Article III

CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1    Classification of Claims and Interests......................................................34

Article IV

PROVISIONS FOR TREATMENT
OF CLAIMS AND INTERESTS

4.1    Second Lien Secured Claims ....................................................................36
4.2    Other Secured Claims ...............................................................................37
4.3    Other Priority Claims................................................................................38
4.4    General Unsecured Claims ........................................................................39
4.5    Convenience Claims .................................................................................39
4.6    Intercompany Claims ................................................................................39
4.7    Other Subordinated Claims.......................................................................40
4.8    Interests in Debtor Subsidiaries (Classes 8B – 8E) .................................40
4.9    Interests in SUNE (Class 9A) ..................................................................41

i

## Article V

## ACCEPTANCE

5.1    Classes Entitled to Vote ........................................................................41
5.2    Acceptance by Impaired Classes ...........................................................41
5.3    Elimination of Classes ..........................................................................41
5.4    Deemed Acceptance if No Votes Cast....................................................41
5.5    Cramdown ..............................................................................................42

## Article VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.1    General Settlement of Claims and Interests............................................42
6.2    No Substantive Consolidation................................................................43
6.3    Restructuring Transactions. ...................................................................43
6.4    Sources of Cash for Plan Distribution ...................................................43
6.5    Reinstated Second Lien Claims. .............................................................44
6.6    Conversion and Distribution of Continuing TERP Class A Shares.....................44
6.7    Administration of Repatriated Cash, Earnout Assets, and Residual Assets ..........45
6.8    Certain Transfers Between SUNE and Other Debtors............................45
6.9    Authorization and Issuance of New SUNE Common Stock ...................45
6.10   GUC/Litigation Trust Initial Funding Determination............................45
6.11   Exemptions from Securities Act Registration Requirements .................46
6.12   Cancellation of Old SUNE Securities and Agreements..........................46
6.13   Issuance and Distribution of New Securities; Execution of Plan
       Documents..............................................................................................47
6.14   Continued Corporate Existence ..............................................................47
6.15   Certificate of Incorporation and Bylaws................................................47
6.16   Directors and Officers of Reorganized Debtors......................................48
6.17   Corporate Action....................................................................................48
6.18   Effectuating Documents; Further Transactions .....................................48
6.19   Employment, Retirement, Indemnification and Other Agreements and
       Employee Compensation Programs.........................................................48
6.20   Preservation Of Causes Of Action .........................................................49
6.21   Reservation of Rights..............................................................................49
6.22   Exemption from Certain Transfer Taxes and Recording Fees................50
6.23   Insured Claims ........................................................................................50
6.24   Intercompany Account Settlement..........................................................50
6.25   Private Company.....................................................................................50

## Article VII

## LITIGATION TRUST

7.1    GUC/Litigation Trust Agreement ...........................................................50
7.2    Tax Treatment.........................................................................................51

7.3     GUC/Litigation Trust Assets ................................................................52
7.4     GUC/Litigation Trust Causes of Action ...............................................52
7.5     General Unsecured Claims Resolution ..................................................53
7.6     Transition Services................................................................................53
7.7     Indemnification and Exculpation ..........................................................53
7.8     Preservation of Privilege and Defenses ................................................54
7.9     No Bonding of GUC/Litigation Trust Claims .......................................54
7.10    Service of the Indenture Trustees .........................................................54
7.11    Delivery of Distributions on Account of Second Lien Senior Notes
        Deficiency Claims and Convertible Senior Notes Claims.....................55

## Article VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

8.1     Rejection of Executory Contracts and Unexpired Leases.......................55
8.2     Assumption of Executory Contracts and Unexpired Leases...................56
8.3     Indemnification Obligations.. ...............................................................57
8.4     Insurance Policies .................................................................................58
8.5     Cure Procedures and Payments Related to Assumption of Executory
        Contracts and Unexpired Leases...........................................................59
8.6     Contracts, Intercompany Contracts, and Leases Entered into After the
        Petition Date.........................................................................................61
8.7     General Reservation of Rights ..............................................................61

## Article IX

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

9.1     Determination Of Claims and Interests.................................................61
9.2     Claims Administration Responsibility ...................................................62
9.3     Objections to Claims..............................................................................62
9.4     Disallowance of Claims ........................................................................62
9.5     Estimation of Claims.............................................................................63
9.6     No Interest on Disputed Claims ............................................................63
9.7     Amendments to Claims..........................................................................63

## Article X

## PROVISIONS GOVERNING DISTRIBUTIONS

10.1    Distributions of GUC/Litigation Trust Interests to Holders of Second Lien
        Deficiency Claims, Allowed General Unsecured Claims, and Allowed
        Convertible Senior Notes Claims..........................................................63
10.2    Time of Distributions.............................................................................64
10.3    Distribution Agent ................................................................................64
10.4    Currency.................................................................................................64
10.5    Distributions on Account of Claims Allowed as of the Effective Date .................64
10.6    Distributions on Account of Claims Allowed After the Effective Date ...............65

iii

10.7    Delivery Of Distributions ................................................................66
10.8    Accrual of Dividends and Other Rights ...........................................67
10.9    Surrender of Securities or Instruments ............................................67
10.10   Compliance Matters ........................................................................68
10.11   Claims Paid or Payable by Third Parties .........................................68
10.12   Setoffs………………………………………………………….....    69
10.13   Allocation of Plan Distributions Between Principal and Interest .........69

Article XI

EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

11.1    Vesting of Assets .............................................................................70
11.2    Discharge of the Debtors .................................................................70
11.3    Discharge of Liabilities Related to General Unsecured Claims,
        Convertible Senior Notes Claims......................................................71
11.4    Compromises and Settlements ..........................................................71
11.5    Release by Debtors ...........................................................................71
11.6    Release by Holders of Claims and Interests .....................................71
11.7    Exculpation and Limitation of Liability ............................................72
11.8    Exclusions and Limitations on Exculpation, Indemnification, and Releases ........73
11.9    Injunction ........................................................................................73
11.10   Subordination Rights .......................................................................73
11.11   Protection Against Discriminatory Treatment ..................................74
11.12   Recoupment .....................................................................................74
11.13   Release of Liens...............................................................................74
11.14   Reimbursement or Contribution .......................................................74

Article XII

CONDITIONS PRECEDENT

12.1    Conditions to Confirmation .............................................................75
12.2    Conditions to the Effective Date of the Plan ....................................75
12.3    Waiver of Conditions Precedent ......................................................76
12.4    Notice of Effective Date ..................................................................76
12.5    Effect of Non-Occurrence of Conditions to Consummation ..............76

Article XIII

RETENTION OF JURISDICTION

Article XIV

MISCELLANEOUS PROVISIONS

14.1    Binding Effect..................................................................................79
14.2    Payment of Statutory Fees ...............................................................79
14.3    Payment of Certain Additional Professional Fees .............................79

iv

14.4    Modification and Amendments.................................................................79
14.5    Confirmation of the Plan.....................................................................80
14.6    Additional Documents .......................................................................80
14.7    Dissolution of Creditors' Committee....................................................80
14.8    Revocation, Withdrawal, or Non-Consummation .................................80
14.9    Notices ...........................................................................................81
14.10   Term of Injunctions or Stays..............................................................82
14.11   Governing Law .................................................................................82
14.12   Entire Agreement .............................................................................83
14.13   Severability .....................................................................................83
14.14   No Waiver or Estoppel......................................................................83
14.15   Conflicts..........................................................................................83

## EXHIBITS[2]

**Exhibit 2.1**          **Administrative Claim Request Form**

**Exhibit 6.4**          **Rights Offering Term Sheet**

**Exhibit 6.5**          **Reinstated Second Lien Claim Modification Terms**

**Exhibit 6.12**         **Certificate of Incorporation and Bylaws**

**Exhibit 6.17**         **Retained Causes of Action**

**Exhibit 7.3**          **GUC/Litigation Trust Causes of Action**

**Exhibit 8.1**          **Assumed Executory Contracts and Unexpired Leases**

---

[2]    The Exhibits will be filed with the Plan Supplement.

# INTRODUCTION

SunEdison, Inc. ("<u>SUNE</u>") and certain of its affiliates, the debtors and debtors in possession (collectively, the "<u>Debtors</u>" and, together with their non-Debtor affiliates, "<u>SunEdison</u>" or the "<u>Company</u>") in the above-captioned cases (the "<u>Chapter 11 Cases</u>"), hereby propose this joint plan (this "<u>Plan</u>") for the resolution of the outstanding Claims and Interests. Capitalized terms used herein shall have the meanings ascribed to them in <u>Article I.B</u> of this Plan.

The Plan contemplates a chapter 11 reorganization resulting in two distinct corporate structures upon consummation: (1) Reorganized SUNE and its subsidiaries and (2) the GUC/Litigation Trust. The Plan incorporates, and is primarily funded by, the Debtors' sale, distribution or transfer of all of their interests in the YieldCos, either pursuant to the Jointly Supported Transactions or pursuant to the Plan immediately following the completion of the Jointly Supported Transactions.  With respect to TERP, pursuant to the TERP Merger Agreement and the TERP Settlement Agreement, and in exchange for the Debtors' Class B shares of TERP Inc. common stock and Class B units of TERP LLC, the Debtors will receive Class A shares of TERP Inc. common stock, and with respect to each Class A share of TERP Inc. common stock held by them (as of immediately prior to the consummation of the merger contemplated by the TERP Merger Agreement), either (1) elect to retain one Continuing TERP Class A Share (the "<u>TERP Share Election Alternative</u>") and receive $[●] in Cash or (2) elect to receive $[●] in Cash and retain zero Continuing TERP Class A Shares, subject to the election terms set forth in the TERP Merger Agreement (the "<u>TERP Cash Election Alternative</u>").  The Debtors will only elect the TERP Cash Election Alternative in the event that they do not receive a commitment to fully backstop the Rights Offering (the "<u>Backstop Commitment</u>") prior to the Debtors needing to make their election.

Plan distributions will be made from a combination of equity in Reorganized SUNE, interests in the GUC/Litigation Trust, Cash on hand, and Cash from proceeds received through a combination of the Rights Offering (in the TERP Share Election Alternative only) and the Jointly Supported Transactions.

In addition to the overall plan structure, the Plan also proposes or incorporates four settlements:

- First, the Plan is dependent on settlements of Claims and Causes of Action between the Debtors and each of the YieldCos.  The YieldCo Settlements, negotiations of which were first announced in late January 2017, were entered into as of March 6, 2017 and the YieldCo Settlement Motion was filed with the Bankruptcy Court on March 10, 2017.  As of the date hereof, the YieldCo Settlement Motion is pending before the Bankruptcy Court, and a hearing with regard thereto is scheduled for April 4, 2017.  As set forth herein, the value of the Debtors' settled Claims and Causes of Action will be distributed to the Debtors' creditors.

- Second, the YieldCo Settlement Motion also includes a specific allocation of the consideration received pursuant to the Jointly Supported Transactions attributable to

1

Avoidance Actions claimed by the Debtors against the YieldCos. This amount, after payment of administrative expenses other than the DIP Facility, is available for distribution to unsecured creditors as set forth herein.

- Third, the Plan includes a settlement of the Estates' Causes of Action currently being prosecuted by the Creditors' Committee against the Prepetition Secured Parties (with respect to both rolled up and non-rolled up prepetition secured debt). Generally, these Causes of Action consist of challenges or claims of avoidance with respect to certain liens and guarantees claimed by the prepetition secured lenders and to the amount and allowance of such lenders' claims. Although the Creditors' Committee continues to prosecute such Causes of Action in the Bankruptcy Court, the Debtors, in the exercise of their business judgment and in an effort to put an end to this costly litigation, have determined, based on their analysis of the strengths and weaknesses of these Causes of Action, to settle such litigation in the Plan by distributing the GUC-Settlement Consideration to the GUC/Litigation Trust for the benefit of general unsecured creditors or directly to such creditors as set forth in the Plan. The Plan therefore serves as the Debtors' motion to approve the settlement of such litigation under Bankruptcy Rule 9019, and Confirmation of the Plan shall be deemed approval of such settlement. The Bankruptcy Rule 9019 settlements proposed by the Debtors in the Plan also include a settlement of any outstanding issues (either currently brought or that could be brought in the future) regarding the validity of the Tranche B Roll-Up Loans.

- Fourth, the Plan includes a settlement of any disputes between the Creditors' Committee and the Prepetition Secured Parties regarding the total amount of the Excess Non-Prepetition 1L/2L Obligor Sale Proceeds, as determined by the Debtors. The Debtors, in their business judgment and in an effort to avoid needless and costly litigation, have determined to settle the dispute as set forth in the Plan.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. The distributions to be made to Holders of Claims are set forth herein. The Debtors' non-Debtor subsidiaries are not subject to the Chapter 11 Cases. **None of the YieldCos (defined below) nor their respective direct and indirect subsidiaries are included as "Debtors" in these Chapter 11 Cases.**

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a Holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests. The Disclosure Statement relating to this Plan was approved by the Bankruptcy Court on [●], 2017 and has been distributed simultaneously with this Plan to all parties whose votes are being solicited. The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, a summary and analysis of the settlements contained in the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIV of this Plan, the Debtors, with the consent of the Supporting Second Lien Parties (such consent not to be unreasonably withheld), expressly reserve their rights to alter, amend, modify, revoke, or withdraw this Plan, one or more times, prior to this Plan's substantial consummation.

## ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope of Definitions

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

1.1    "**2018 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2018 Convertible Senior Notes Indenture, bearing interest at a rate of 2.00% per annum and issued in an aggregate principal amount of $600 million.

1.2    "**2018 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of December 20, 2013, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2018 Convertible Senior Notes.

1.3    "**2020 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2020 Convertible Senior Notes Indenture, bearing interest at a rate of 0.25% per annum and issued in an aggregate principal amount of $600 million.

1.4    "**2020 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of June 10, 2014, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2020 Convertible Senior Notes.

1.5    "**2021 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2021 Convertible Senior Notes Indenture, bearing interest at a rate of 2.75% per annum and issued in an aggregate principal amount of $600 million.

3

1.6    "**2021 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of December 20, 2013, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2021 Convertible Senior Notes.

1.7    "**2022 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2022 Convertible Senior Notes Indenture, bearing interest at a rate of 2.375% per annum and issued in an aggregate principal amount of $460 million.

1.8    "**2022 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of January 27, 2015, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2022 Convertible Senior Notes.

1.9    "**2023 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2023 Convertible Senior Notes Indenture, bearing interest at a rate of 2.625% per annum and issued in an aggregate principal amount of $450 million.

1.10    "**2023 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of May 20, 2015, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2023 Convertible Senior Notes.

1.11    "**2025 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2025 Convertible Senior Notes Indenture, bearing interest at a rate of 3.375% per annum and issued in an aggregate principal amount of $450 million.

1.12    "**2025 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of May 20, 2015, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2025 Convertible Senior Notes.

1.13    "**Accredited Investor**" has the meaning set forth in section 230.501(a) of title 17 of the Code of Federal Regulations.

1.14    "**ACE Policy**" has the meaning ascribed to such term in Article 8.4(c).

1.15    "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Section 503(b)(9) Claims, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court (under section 546(c)(2)(A) of the Bankruptcy Code or otherwise).

**1.16**    "**Administrative Claims Bar Date**" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to DIP Facility Claims and Professional Claims, which shall be subject to the provisions of Articles 2.2 and 2.3 hereof, as applicable.

**1.17**    "**Affiliates**" has the meaning ascribed to such term by section 101(2) of the Bankruptcy Code; provided, however, that, for purposes of this Plan, the term "Affiliates" with reference to Affiliates of the Debtors or Reorganized Debtors shall not include any of the YieldCos.

**1.18**    "**Allowed**" means, for distribution purposes, a Claim or Interest, or any portion thereof, or a particular Class of Claims or Interests (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as the Reorganized Debtor and the Holder of such Claim or Interest agree may adjudicate such Claim or Interest and objections thereto), (b) which is not the subject of a proof of Claim timely filed with the Bankruptcy Court and is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent, (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or (d) that is expressly allowed in a liquidated amount pursuant to this Plan.

**1.19**    "**Assumption and Rejection Procedures**" means the expedited procedures for the Debtors to assume or reject Executory Contracts and Unexpired Leases pursuant to the Bankruptcy Court's order dated May 13, 2016 (Docket No. 280).

**1.20**    "**Available D&O Insurance Proceeds**" means the proceeds allocable to any Estate Causes of Action against the Debtors' current or former directors or officers, whether pursuant to the Mediation or otherwise.  Disposition of Available D&O Insurance Proceeds shall be subject to the provisions of the DIP Facility Order.

**1.21**    "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors and their recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under section 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code.

**1.22**    "**Backstop Commitment**" has the meaning ascribed to such term in the Introduction of this Plan.

**1.23**    "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect

on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

1.24    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

1.25    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

1.26    "**Bar Date**" means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Orders or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.

1.27    "**Bar Date Orders**" means the orders entered by the Bankruptcy Court on August 10, 2016 [Docket No. 948] and March 22, 2017 [Docket No. 2627] and any subsequent order supplementing such orders or relating thereto.

1.28    "**BOKF Objection**" means the objection filed by BOKF, N.A., as indenture trustee for certain convertible unsecured notes issued by SunEdison, Inc. (Docket No. 1455).

1.29    "**Brookfield**" means Brookfield Asset Management, Inc. or one or more of its subsidiaries that are party to the Jointly Supported Transactions.

1.30    "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

1.31    "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.32    "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable, in contract or in tort, directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by any Debtor, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the

Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.33    "**Certificate**" means any instrument evidencing a Claim or an Interest.

1.34    "**Chapter 11 Cases**" means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court under Case No. 16-10992 (SMB).

1.35    "**Claim**" means a claim against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

1.36    "**Claims and Solicitation Agent**" means Prime Clerk LLC, 830 Third Avenue, 9th Floor, New York, New York 10022, Attention: SunEdison Case Administration.

1.37    "**Claims Estimation Motion**" means any motion filed by the Debtors seeking determination or estimation, for the purpose of setting a reserve, of the validity, priority, status, and/or amount of any Claims.

1.38    "**Claims Objection Deadline**" means, as applicable (except for Administrative Claims), (a) the day that is the later of the first Business Day that is at least 180 days after the Effective Date or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.

1.39    "**Class**" means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in Article III of this Plan.

1.40    "**Committee DIP Settlement**" means the Committee Settlement Annex as incorporated as Annex II to the DIP Facility Order.

1.41    "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, subject to all conditions specified in Article 12.1 having been satisfied or waived, in accordance with the terms herein.

1.42    "**Confirmation Date**" means the date on which Confirmation occurs.

1.43    "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters as such hearing may be adjourned or continued from time to time.

1.44    "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code in form and substance reasonably satisfactory to the Supporting Second Lien Parties.

1.45    "**Continuing TERP Class A Shares**" means the Class A shares of TERP Inc. common stock to be retained by the Debtors pursuant to the Jointly Supported Transactions.

1.46    "**Convenience Claim**" means any Claim that otherwise would be a General Unsecured Claim, but, with respect to each such Allowed Claim, the aggregate amount of such Allowed Claim is less than $[100,000].

1.47    "**Convenience Claim Distribution**" means $[●] in Cash.

1.48    "**Convertible Senior Noteholder**" means a Holder of Convertible Senior Notes.

1.49    "**Convertible Senior Notes**" means, collectively, the 2018 Convertible Senior Notes, the 2020 Convertible Senior Notes, the 2021 Convertible Senior Notes, the 2022 Convertible Senior Notes, the 2023 Convertible Senior Notes, and the 2025 Convertible Senior Notes.

1.50    "**Convertible Senior Notes Claim**" means any and all Claims held by the Convertible Senior Noteholders against SUNE arising under or related to the Convertible Senior Notes which shall be Allowed for all purposes under this Plan.

1.51    "**Convertible Senior Notes Indenture Trustee**" means BOKF, N.A. or its successor or successors, in its or their capacity as indenture trustee for the Convertible Senior Notes pursuant to the Convertible Senior Notes Indentures.

1.52    "**Convertible Senior Notes Indentures**" means the 2018 Convertible Senior Notes Indenture, the 2020 Convertible Senior Notes Indenture, the 2021 Convertible Senior Notes Indenture, the 2022 Convertible Senior Notes Indenture, the 2023 Convertible Senior Notes Indenture, and the 2025 Convertible Senior Notes Indenture.

1.53    "**Creditor**" has the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.54    "**Creditors' Committee**" means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on April 29, 2016, as may be reconstituted from time to time.

1.55    "**Cure**" means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption or assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

8

**1.56** "**Cure Notice**" means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Article 8.5 of the Plan.

**1.57** "**Cure Objection Deadline**" means the deadline for filing objections to a Cure Notice or proposed Cure, which shall be on or before fourteen (14) days after the applicable counterparty was served with a Cure Notice.

**1.58** "**D&O Insurance**" means insurance maintained by the Debtors which covers, among others, current or former directors and officers of the Debtors or any of them, including any runoff policies or tail coverage, including, but not limited to, those insurance policies set forth in Exhibit 1 to the *Order Granting Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 362, Bankruptcy Rule 4001, and Local Bankruptcy Rule 4001-1 Authorizing Modification of the Automatic Stay, to the Extent Applicable, to Allow for Reimbursement and/or Payment of Defense Costs Under Directors' and Officers' Insurance Policies* [Docket No. 368]

**1.59** "**Debtor Group**" has the meaning ascribed to such term in Article 3.1.

**1.60** "**Debtor Subsidiaries**" means each Debtor that is a direct or indirect subsidiary of SUNE.

**1.61** "**Debtor-Adjusted Pro Rata**" means [●].

**1.62** "**Debtors**" means, collectively, SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993).

**1.63** "**DIP Agent**" means Deutsche Bank AG New York Branch, in its capacity as administrative agent for the DIP Lenders pursuant to the DIP Credit Agreement.

**1.64** "**DIP Credit Agreement**" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, between SunEdison, Inc., the lenders

9

party thereto, the administrative agent thereunder and the other parties thereto, dated as of April 26, 2016, as has been or may be amended, restated, supplemented or otherwise modified from time to time.

**1.65** "**DIP Facility**"[3] means the debtor-in-possession secured financing facility, consisting of a letter of credit facility and a term loan facility, provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement as authorized by the Bankruptcy Court pursuant to the DIP Facility Order, as may be amended or modified from time to time.

**1.66** "**DIP Facility Claim**" means any Claim arising under, derived from, based upon, or as a result of the DIP Facility, including, without limitation, any DIP L/C Claim and any DIP Term Loan Claim. For the avoidance of doubt, Claims arising under the Tranche A Roll-Up Loans (as defined in the DIP Facility Order) and Tranche B Roll-Up Loans (as defined in the DIP Facility Order) shall constitute DIP Facility Claims.

**1.67** "**DIP Facility Order**" means, collectively, (a) the interim order that was entered by the Bankruptcy Court on April 26, 2016 (Docket No. 87), (b) the final order that was entered by the Bankruptcy Court on June 9, 2016 (Docket No. 523), authorizing and approving the DIP Facility and the agreements related thereto, and (c) any and all orders entered by the Bankruptcy Court authorizing and approving amendments or modifications to the DIP Credit Agreement or either of the orders described in the foregoing clauses (a) and (b). The term "DIP Facility Order" includes any and all annexes, exhibits, etc. attached thereto.

**1.68** "**DIP L/C Claim**" means any DIP Facility Claim arising on account of the letter of credit facility under the DIP Credit Agreement.

**1.69** "**DIP Lenders**" means the banks and other financial institutions or entities from time to time party to the DIP Credit Agreement as lenders and the Holders of DIP Facility Claims.

**1.70** "**DIP Term Loan Claim**" means any DIP Facility Claim arising on account of the term loan under the DIP Credit Agreement.

**1.71** "**Disallowed**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date

---

[3]    The DIP Facility matures on April 26, 2017. The Debtors are currently in the process of negotiating and finalizing an amended and restated DIP Facility that will be in an amount necessary to refinance the DIP Term Loan Claims, the Tranche A-1 Roll-Up Loan Claims, the Tranche A-2 Roll-Up Loan Claims, and the portion of the Tranche B Roll-Up Claims that are *pari passu* with the Tranche A-1 Roll-Up Loan Claims. This amended and restated DIP Facility will likely have a one-year maturity and a slightly lower interest rate than the current DIP Term Loan Claims.

has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.72    "**Disclosure Statement**" means the disclosure statement or any supplements thereto (including the Plan Supplement and all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time in accordance with the terms therein, and in form and substance reasonably satisfactory to the Supporting Second Lien Parties, all as approved by an order of the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.73    "**Disclosure Statement Order**" means the Order entered by the Bankruptcy Court approving the Disclosure Statement, in form and substance reasonably satisfactory to the Supporting Second Lien Parties, as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

1.74    "**Disputed**" means with respect to a Claim, (a) any Claim as to which any Debtor or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by any Debtor, or other parties-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.75    "**Distribution Agent**" means [●], or any Entity selected by the Reorganized Debtors, in their sole discretion, to make or facilitate distributions pursuant to this Plan.

1.76    "**Distribution Date**" means the date selected by the Reorganized Debtors, in their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

1.77    "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court.

1.78    "**District Court**" means the United States District Court for the Southern District of New York.

1.79    "**DTC**" means the Depository Trust Company, and its successors and assigns.

1.80    "**Earnout Asset**" means any contract, agreement, right or other asset that gives rise to the right to receive Cash or non-Cash proceeds, including conditional or contingent

11

consideration, in connection with the Debtors' or Reorganized Debtors' or their respective subsidiaries' disposition of any asset.

1.81    "**Earnout Proceeds**" means the Cash or non-Cash proceeds received directly or indirectly by any Debtor or Reorganized Debtor on account of any Earnout Asset.

1.82    "**Effective Date**" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan specified in Article 12.2, have been satisfied, or, if capable of being waived in accordance with the terms herein, waived, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court.

1.83    "**Eligible Holder**" means a Holder of an Allowed Claim who is an Accredited Investor**.**

1.84    "**Employee Compensation Plans**" means, collectively, the KEIP, the KERP, the Utility Project Incentive Plan, the RSC Deal Incentive Plan, the C&I Deal Incentive Plan, and any other employee compensation plan implemented by the Debtors in the ordinary course of business.

1.85    "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.86    "**EPL Policy**" means insurance maintained by the Debtors related to certain employment-related claims which covers, among others, current or former directors and officers of the Debtors or any of them, including any runoff policies or tail coverage, including, but not limited to, Continental Casualty Company's Employment Practices Liability Solutions Insurance Policy Number 596411042.

1.87    "**Equity Security**" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

1.88    "**ERISA**" means the Employee Retirement Income Security Act of 1974.

1.89    "**Estates**" means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

1.90    "**Event**" means any event, development, occurrence, circumstance or change.

1.91    "**Excess Non-Prepetition 1L/2L Obligor Sale Proceeds**" has the meaning set forth in the DIP Facility Order, which amount for purposes of this Plan, and as part of the settlement described in the Plan and the Disclosure Statement, shall be deemed to be $[●] million in Cash.

**1.92** "**Exchange Act**" means the Securities Exchange Act of 1934, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

**1.93** "**Exculpated Claim**" means any claim (as defined in section 101(5) of the Bankruptcy Code ) or Legal Proceeding against any Entity related to any act or omission in connection with, relating to, or arising out of the Debtors' restructuring, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Rights Offering, the Jointly Supported Transaction Agreements, the YieldCo Avoidance Allocation, the settlement of the Creditors' Committee's claims and Causes of Action against the Prepetition Secured Parties as proposed by the Debtors in the Plan, the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases, the negotiation of the Plan, the DIP Credit Agreement, the GUC/Litigation Trust Agreement, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration, consummation, and implementation of the Plan, including the issuance of Plan securities, the distribution of property under the Plan, the Jointly Supported Transactions or any other transaction contemplated by the Plan or Disclosure Statement, or in furtherance thereof; provided, that, for the avoidance of doubt, the term "Exculpated Claim" shall not include any Claim arising in connection with the January 2016 second lien financing transactions, the Second Lien Credit Agreement, and the Second Lien Senior Notes, or that is being prosecuted as part of the Second Lien Litigation, which has not already been settled by the plaintiffs to the Second Lien Litigation.

**1.94** "**Exculpated Parties**" means, collectively, each of the following solely in their respective capacities as such: (a) the Debtors, and each of their successors and assigns, (b) the Reorganized Debtors, (c) the Rights Offering Backstop Purchasers, (d) the Supporting Second Lien Parties, (e) the DIP Lenders, (f) the DIP Agent, (g) the Creditors' Committee and each of its members, (h) the Indenture Trustees, (i) TERP Inc., TERP LLC, and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after April 21, 2016), (j) GLBL Inc., GLBL LLC, and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after April 21, 2016), and (k) with respect to each of the foregoing parties in clauses (a) through (h), such parties' subsidiaries, Affiliates, officers, directors, principals, members, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other representatives and professionals; provided, that, solely with respect to the Debtors' directors and officers, this clause (k) shall apply only to (i) the Existing Directors (and their counsel) and (ii) the Debtors' officers who continued to serve in such roles as of March, 28, 2017 (the initial filing of this Plan).

**1.95** "**Executory Contract**" means any contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.96** "**Exhibit**" means an exhibit annexed either to this Plan, contained in the Plan Supplement, or annexed as an appendix to the Disclosure Statement.

13

1.97    "**Existing Directors**" means Antonio R. Alvarez, Clayton C. Daley, Jr., Claire Gogel, Emmanuel T. Hernandez, Georganne C. Proctor, James B. Williams and Randy H. Zwirn, each in his or her respective capacity as a director of the SUNE prior to the Effective Date.

1.98    "**Face Amount**" means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any proof of Claim, or amendment thereof in accordance with applicable law, timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, or the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to an Allowed Claim or Allowed Interest, the allowed amount of such Claim or Interest.  If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

1.99    "**Fee Examiner**" means [●], in its capacity as the Fee Examiner appointed pursuant to [●].

1.100    "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

1.101    "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

1.102    "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Second Lien Secured Claim, Convenience Claim, Other Secured Claim, Other Priority Claim, Intercompany Claim, or Other Subordinated Claim.  Without limiting the foregoing, General Unsecured Claims include all Rejection Damages Claims that are not Allowed Section 503(b)(9) Claims.

1.103    "**GLBL**" means, collectively, GLBL Inc., GLBL LLC, and their direct and indirect subsidiaries.

1.104    "**GLBL Inc.**" means TerraForm Global, Inc.

1.105    "**GLBL LLC**" means TerraForm Global, LLC.

**1.106** "**GLBL Merger Agreement**" means the Agreement and Plan of Merger, dated as of March 6 2017, by and among GLBL Inc. and certain affiliates of Brookfield.

**1.107** "**GLBL Settlement Agreement**" means the Settlement Agreement, dated as of March 6, 2017, by and among SUNE, GLBL Inc., and certain of their respective affiliates. A copy of the GLBL Settlement Agreement was filed as an attachment to the YieldCo Settlement Motion.

**1.108** "**GLBL Voting and Support Agreement**" means that certain Voting and Support Agreement, dated as of March 6, 2017, by and among SUNE, SunEdison Holdings Corporation, GLBL Inc., and certain affiliates of Brookfield. A copy of the GLBL Voting and Support Agreement was filed as an attachment to the Voting and Support Motion.

**1.109** "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**1.110** "**GUC-Settlement Consideration**" means the payments, distributions, or other benefits to be transferred to or for the benefit of Holders of Allowed General Unsecured Claims in settlement of the UCC Challenge Litigation as set forth in Article 6.1.

**1.111** "**GUC/Litigation Trust**" means the "SunEdison GUC/Litigation Trust" established pursuant to the GUC/Litigation Trust Agreement and the DIP Facility Order.

**1.112** "**GUC/Litigation Trust Agreement**" means the GUC/Litigation Trust Agreement, as may be amended, supplemented, restated, or otherwise modified from time to time pursuant to the terms thereof, by and between the Debtors and the GUC/Litigation Trust Trustee, the then-current form of which shall be included in the Plan Supplement.

**1.113** "**GUC/Litigation Trust Assets**" means (i) the GUC-Settlement Consideration, (ii) the GUC/Litigation Trust Initial Funding, subject to deduction thereof from time to time in accordance with the DIP Facility Order and this Plan, (iii) the GUC/Litigation Trust Causes of Action that have not already been settled as of the Effective Date, (iv) the Available D&O Insurance Proceeds, solely to the extent such proceeds (x) do not constitute collateral of the Tranche B Roll-Up Lenders and (y) are not required to be used by virtue of a Bankruptcy Court order to satisfy Tranche B Roll-Up Loan Claims, (v) the Excess Non-Prepetition 1L/2L Obligor Sale Proceeds, (vi) the YieldCo Avoidance Allocation, and (vii) any other assets transferred to the GUC/Litigation Trust in accordance with this Plan. Except as otherwise prescribed by this Plan or the GUC/Litigation Trust Agreement, the GUC/Litigation Trust Assets shall be transferred to the GUC/Litigation Trust by the Debtors or by any other Person then in possession of GUC/Litigation Trust Assets, as applicable, on the Effective Date.

**1.114** "**GUC/Litigation Trust Beneficiaries**" means the holders of GUC/Litigation Trust Interests.

**1.115** "**GUC/Litigation Trust Causes of Action**" mean the Causes of Action set forth in Exhibit 7.3 (which exhibit shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties), in any case to the extent such Causes of Action are not released pursuant to Article 11.5 of this Plan, settled pursuant to this Plan or released or settled

15

pursuant to an order of the Bankruptcy Court.   <u>Exhibit 7.3</u> will be filed with the Plan Supplement.

       **1.116 "GUC/Litigation Trust Initial Funding"** means the $10,000,000 initial funding contributed by the Debtors to the GUC/Litigation Trust pursuant to the GUC/Litigation Trust Agreement and subject to the credits, reservations, and reimbursement rights set forth in the DIP Facility Order.  The Debtors shall file the amount of the GUC/Litigation Trust Initial Funding in the Plan Supplement.

       **1.117** "**GUC/Litigation Trust Interests**" means beneficial interests in the GUC/Litigation Trust.

       **1.118 "GUC/Litigation Trust Oversight Board"** means the oversight board created by the Creditors' Committee to oversee the GUC/Litigation Trust, the members of which shall be set forth in the Plan Supplement.  Any compensation to be paid to the members of the GUC/Litigation Trust Oversight Board shall be paid, first, from the GUC/Litigation Trust Initial Funding and, then, after such funding is exhausted, from other GUC/Litigation Trust Assets.

       **1.119 "GUC/Litigation Trust Trustee"** means the Person selected pursuant to the GUC/Litigation Trust Agreement to serve as trustee of the GUC/Litigation Trust from time to time.  Any compensation to be paid to the GUC/Litigation Trust Trustee shall be paid, first, from the GUC/Litigation Trust Initial Funding and, then, after such funding is exhausted, from other GUC/Litigation Trust Assets.

       **1.120** "**Holdback Escrow Account**" means the interest-bearing escrow account into which Cash equal to the Holdback Escrow Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims (as Allowed pursuant to the terms of this Plan) to the extent not previously paid or disallowed.

       **1.121** "**Holdback Escrow Amount**" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to <u>Article 2.3(c)</u> of the Plan attributable to fees incurred as of the Confirmation Date; <u>provided</u>, <u>however</u>, that if a Professional does not provide an estimate pursuant to <u>Article 2.3(c)</u>, the Debtors (with the consent of the Supporting Second Lien Parties) may estimate the unbilled fees of such Professional incurred as of the Confirmation Date, and the sum of provision (a) above and the total amount so estimated shall comprise the Holdback Escrow Amount.

       **1.122** "**Holder**" means a holder of a Claim against or Interest in the Debtors.

       **1.123** "**Impaired**" means impaired within the meaning of section 1124 of the Bankruptcy Code.

       **1.124** "**Indemnitee**" means an Existing Director or a Person employed by a Debtor or serving as a director or officer of a Debtor immediately prior to the Effective Date and who, acting in their respective capacities as such immediately prior to the Effective Date, are entitled to assert Indemnification Obligations.

1.125  "**Indemnification Obligations**" means obligations of a Debtor, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to such Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtor.

1.126  "**Indenture Trustees**" means the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee.

1.127  "**Indentures**" means the Convertible Senior Notes Indentures and the Second Lien Senior Notes Indenture.

1.128  "**Insurance Contract**" has the meaning ascribed to it in Article 8.4 of this Plan.

1.129  "**Insured Claims**" has the meaning ascribed to it in Article 8.4 of this Plan.

1.130  "**Intercompany Claim**" means a Claim or a Cause of Action by SUNE or any direct or indirect subsidiary of SUNE against SUNE or any direct or indirect subsidiary of SUNE, in each case other than (i) any Claim or Cause of Action by or against any YieldCo, (ii) any Claim or Cause of Action by a non-Debtor against another non-Debtor, and (iii) any Claim or Cause of Action by a Debtor against a non-Debtor.  For the avoidance of doubt, any Intercompany Claim of a Debtor or a non-Debtor guarantor of the DIP Facility, the Second Lien Loans, or the Second Lien Senior Notes constitutes collateral for such DIP Facility Claims or Second Lien Claims.

1.131  "**Interest**" means any Equity Security of a Debtor existing immediately prior to the Effective Date.

1.132  "**Jointly Supported Transaction Agreements**" means any and all agreements entered into by and between any of the Debtors, any of the YieldCos, and/or one or more purchasers in connection with a Jointly Supported Transaction, including any asset purchase agreements, stock purchase agreements, merger agreements, or other agreements effectuating and consummating a Jointly Supported Transaction, and any exhibits, attachments, annexes, or schedules to any of the foregoing, the form(s) of which shall be included in the Plan Supplement.  The Jointly Supported Transaction Agreements include the Voting and Support Agreements, the YieldCo Settlement Agreements, and the Merger Agreements.

1.133  "**Jointly Supported Transactions**" means one or more transactions, each structured as a merger, sale, or other business combination, pursuant to which the Debtors or the YieldCos, as applicable, will transfer a material part of the equity or assets of the YieldCos, in each case that TERP or GLBL, as applicable, and SunEdison have agreed in writing.  The Jointly Supported Transactions include the transactions pursuant to which Brookfield is to acquire 51% of TERP Inc.'s outstanding stock in a sponsorship merger transaction and 100% of GLBL Inc.'s outstanding stock in a whole company cash merger, in each case as more fully described in the YieldCo Settlement Motion and the Jointly Supported Transaction Agreements.

1.134 "**KEIP**" means the Key Employee Incentive Plan for certain of the Debtors' officers and management adopted by the Debtors and approved by the Bankruptcy Court on September 16, 2016 (Docket No. 1205).

1.135 "**KERP**" means the Key Employee Retention Plan for certain of the Debtors' officers and management adopted by the Debtors and approved by the Bankruptcy Court on July 29, 2016 (Docket No. 871) and on August 3, 2016 (Docket No. 903).

1.136 "**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

1.137 "**Legal Proceeding**" means legal, governmental, administrative, judicial, or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, notices of noncompliance or violation, or proceedings.

1.138 "**Letter of Credit Issuer**" means the issuer of a Letter of Credit under the DIP Credit Agreement.

1.139 "**Letter(s) of Credit**" means any letter of credit (singularly or collectively as the case may be) issued pursuant to the DIP Credit Agreement.

1.140 "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

1.141 "**MDL Litigation**" means the centralized and consolidated actions against SUNE, the YieldCos, the Debtors' and the YieldCos' current and former directors and officers, the underwriters of certain securities and debt offerings of the Debtors or the YieldCos, and SUNE's independent auditor pending before the Honorable P. Kevin Castel in the District Court (MDL No. 2742).

1.142 "**Mediation**" means the private mediation process initiated pursuant to the Mediation/Stay Order.

1.143 "**Mediation/Stay Order**" means the order (as may be amended, modified, or supplemented, from time to time) entered by the District Court on December 19, 2016 directing the parties in the MDL Litigation and certain other shareholder lawsuits to participate in a private mediation and granting a limited stay of all such actions through March 31, 2017.

1.144 "**Merger Agreements**" means the GLBL Merger Agreement and TERP Merger Agreement.

1.145 "**New Boards**" means the initial boards of directors of the Reorganized Debtors, which shall as of the Effective Date consist of members selected by the Supporting Second Lien Parties and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing.

18

**1.146** "**New SUNE Common Stock**" means the shares of new common stock of Reorganized SUNE.

**1.147** "**Non-Eligible Holder**" means any Holder of an Allowed Claim that is not an Eligible Holder.

**1.148** "**Non-Eligible Holder Second Lien Distribution**" means $[●] in Cash.

**1.149** "**Old SUNE Common Stock**" means shares of common stock of SUNE that are authorized, issued, and outstanding prior to the Effective Date.

**1.150** "**Old SUNE Securities**" means, collectively, the Second Lien Senior Notes (other than Second Lien Senior Notes that constitute Reinstated Second Lien Claims), the Convertible Senior Notes, and Old SUNE Common Stock, and all options, warrants, rights and other instruments evidencing an ownership interest in SUNE (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

**1.151** "**Ordinary Course Professionals Order**" means the Bankruptcy Court's Final Order Pursuant to Bankruptcy Code Sections 105(a), 327, 330, and 331 Authorizing Debtors to Employ and Pay Professionals Utilized in the Ordinary Course of Business (Docket No. 517).

**1.152** "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a) of the Bankruptcy Code.

**1.153** "**Other Secured Claim**" means any Secured Claim other than the following: (a) a DIP Facility Claim or (b) a Second Lien Secured Claim.

**1.154** "**Other Subordinated Claim**" means any Claim against the Debtors that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security, except that if such security is Old SUNE Common Stock, such Claim has the same priority as Old SUNE Common Stock.

**1.155** "**Periodic Distribution Date**" means, as applicable, (a) the Distribution Date, as to the first distribution made by the Distribution Agent, and (b) thereafter, such Business Days selected by the Reorganized Debtors in their reasonable discretion, which shall be no less frequent than once every three (3) months unless otherwise determined by the New Board.

**1.156** "**Person**" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

**1.157** "**Petition Date**" means (i) April 21, 2016 with respect to the following Debtors only: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A), (ii) June 1, 2016 with respect to the following Debtors only: Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A), (iii) July 20, 2016 with respect to the following Debtor only: EverStream HoldCo Fund I, LLC (9564), (iv) August 9, 2016 with respect to the following Debtors only: Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757), (v) August 10, 2016 with respect to the following Debtors only: SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926), and (vi) December 16, 2016, with respect to the following Debtor only: TerraForm Private Holdings, LLC (5993).

**1.158** "**Plan**" means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as may be modified in accordance with the Bankruptcy Code, Bankruptcy Rules, and the terms herein, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules, and in form and substance reasonably satisfactory to the Supporting Second Lien Parties.

**1.159** "**Plan Supplement**" means the supplement or supplements to the Plan containing certain Exhibits and documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, and in form and substance reasonably satisfactory to the Supporting Second Lien Parties.

**1.160** "**Plan Supplement Filing Date**" means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice.

**1.161** "**Plan Transaction Documents**" means all definitive documents and agreements to which the Debtors will be a party as contemplated by the Plan, each of which shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties, including (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings in support of entry thereof, (c) the Disclosure Statement, the solicitation materials in respect of the Plan, the motion to approve the Disclosure Statement, and the Disclosure Statement Approval Order, and (d) all documents that will comprise the Plan Supplements.

**1.162** "**Prepetition Indemnification Basket**" has the meaning set forth in Article 8.3.

**1.163** "**Prepetition Indemnification Obligations**" has the meaning set forth in Article 8.3.

**1.164** "**Prepetition Secured Parties**" has the meaning set forth in the DIP Credit Agreement.

**1.165** "**Priority Tax Claim**" means a Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.166** "**Pro Rata**" means, with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes at issue.

**1.167** "**Professional**" means any Entity (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order.

**1.168** "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date; provided, however, that, other than as may have already been paid, and subject to the interim fee order entered by the Bankruptcy Court on December 1, 2016 (Docket No. 1711) and the DIP Facility Order, none of the fees and expenses incurred by the Professionals of the Creditors' Committee with regard to the investigation or prosecution of the UCC Challenge Litigation shall constitute Professional Claims or otherwise be paid in Cash or otherwise pursuant to this Plan or otherwise and shall not be required to be paid in Cash or otherwise by any Court order or otherwise; and, provided, further, however, that none of the fees and expenses incurred by the Professionals of the Creditors' Committee with regards to actions reimbursed by, or paid out of, the GUC/Litigation Trust Initial Funding, shall constitute Professional Claims or otherwise be paid in cash pursuant to this Plan or otherwise.

**1.169** "**Professional Fee Order**" means the order entered by the Bankruptcy Court on May 12, 2016, authorizing the interim payment of Professional Claims subject to the Holdback Escrow Amount (Docket No. 258).

**1.170** "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind

21

specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

   **1.171** "**Reinstated Second Lien Claim Amount**" means an amount, as reasonably agreed to by the Supporting Second Lien Parties, equal to the approximate value of the Earnout Assets, Repatriated Cash, Residual Assets and any other of the Debtors' assets as of the Effective Date.

   **1.172** "**Reinstated Second Lien Claim Modification Terms**" means the terms upon which the Second Lien Claims that constitute Reinstated Second Lien Claims and the Second Lien Documents shall be modified, amended, supplemented or otherwise restated, in form and substance reasonably satisfactory to the Supporting Second Lien Parties. A summary of the Reinstated Second Lien Claim Modification Terms, in form and substance reasonably satisfactory to the Supporting Second Lien Parties, will be set forth on Exhibit 6.5. Exhibit 6.5 will be filed with the Plan Supplement.

   **1.173** "**Reinstated Second Lien Claims**" means Second Lien Claims in an aggregate amount equal to the Reinstated Second Lien Claim Amount which shall be reinstated in accordance with this Plan and subject to the Reinstated Second Lien Claim Modification Terms.

   **1.174** "**Rejection Damages Claim**" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

   **1.175** "**Released Parties**" means, collectively, in each case, solely in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' current and former officers and directors, principals, employees, agents, current and former Affiliates, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals; (b) the DIP Agent, (c) the DIP Lenders, (d) the Supporting Second Lien Parties, (f) all Professionals (to the extent not duplicative of the Entities covered by clauses (a) and (l) of this definition), (g) the Creditors' Committee and each of its members, (h) the Indenture Trustees, (i) the Second Lien Administrative Agent, and (j) with respect to each of the above-named Entities described in subsections (b) through (i), such Entity's current and former affiliates, subsidiaries, advisors, principals, partners, managers, members, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals,

in each case to the extent a claim arises from actions taken or omissions by any such person in its capacity as a related person of one of the parties listed in clauses (b) through (i) and is released as against such party.  For the avoidance of doubt, none of the current or potential defendants to the Second Lien Litigation shall be deemed "Released Parties" under this Plan for purposes of the Second Lien Litigation.

   1.176  "**Releasees**" has the meaning set forth in the DIP Facility Order.

   1.177  "**Releasing Parties**" means, collectively, in each case, in their respective capacities as such, (a) the DIP Lenders, (b) the DIP Agent, (c) the Holders of Convertible Senior Notes Claims who vote to accept the Plan, (d) the Holders of Second Lien Senior Notes Claims who vote to accept the Plan, (e) the Holders of Second Lien Loan Claims who vote to accept the Plan, (f) the Creditors' Committee and each of its members, (g) the Indenture Trustees, (h) the Second Lien Administrative Agent, (i) to the fullest extent permitted by law, all Holders of Claims entitled to vote for or against the Plan that do not vote to reject the Plan, (j) all Holders of Claims and Interests to the maximum extent permitted by law, and (k) with respect to each of the foregoing clauses (a) through (j), to the fullest extent permitted by law, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.  For the avoidance of doubt, none of the Second Lien Creditors shall provide a release under this Plan or otherwise to any current or potential defendant in the Second Lien Litigation.

   1.178  "**Reorganized Debtors**" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

   1.179  "**Reorganized SUNE**" means SUNE or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

   1.180  "**Repatriated Cash**" means Cash received, directly or indirectly, by any Debtor or Reorganized Debtor from any of the Debtors' or Reorganized Debtors' non-U.S. subsidiaries.

   1.181  "**Residual Assets**" means assets of the Reorganized Debtors other than Repatriated Cash, Earnout Assets, and/or interests in the YieldCos, including, but not limited to, inventory, equipment, contractual rights, intellectual property, real property, fixtures, goods, and equity interests in subsidiaries.

   1.182  "**Residual Assets Proceeds**" means the Cash or non-Cash proceeds received by any Debtor or Reorganized Debtor on account of any Residual Asset.

   1.183  "**Restructuring Transactions**" has the meaning set forth in Article 6.3.

   1.184  "**Rights Holders**" means Holders of Second Lien Secured Claims and Holders of General Unsecured Claims, except the Rights Holders shall not include any Non-Eligible Holder or Holders of Second Lien Deficiency Claims.

**1.185** "**Rights Offering**" means, in the TERP Share Election Alternative, that certain rights offering pursuant to which the Rights Holders are entitled to receive Rights Offering Subscription Rights.

**1.186** "**Rights Offering Amount**" means $[●] million to be raised pursuant to the Rights Offering.

**1.187** "**Rights Offering Backstop Commitment**" means the commitment provided by the Rights Offering Backstop Purchasers pursuant to the Rights Offering Commitment Letter to purchase the number of Rights Offering Common Stock necessary to fund the Plan with the Rights Offering Amount.

**1.188** "**Rights Offering Backstop Purchasers**" means the Entities set forth on Schedule I to the Rights Offering Commitment Letter.

**1.189** "**Rights Offering Backstop Standby Fee**" means the standby fee to be paid to the Rights Offering Backstop Purchasers pursuant to the Rights Offering Term Sheet.

**1.190** "**Rights Offering Commitment Letter**" means that certain Commitment Letter, dated as of [●], 2017, by and among the Debtors and the Rights Offering Backstop Purchasers.

**1.191** "**Rights Offering Common Stock**" means the shares of Continuing TERP Class A Shares purchased and distributed pursuant to the Rights Offering upon the exercise of the Rights Offering Subscription Rights.

**1.192** "**Rights Offering Procedures**" means those certain rights offering procedures with respect to the Rights Offering, which shall be in form and substance reasonably satisfactory to the Rights Offering Backstop Purchasers, and which shall be included in the Plan Supplement.

**1.193** "**Rights Offering Record Date**" means the date to be established in the Rights Offering Procedures as of which a Holder of Second Lien Secured Claims or General Unsecured Claims must be an Eligible Holder for purposes of participating in the Rights Offering.

**1.194** "**Rights Offering Subscription Rights**" means subscription rights to acquire [●]% of the Continuing TERP Class A Shares and [●]% of the New SUNE Common Stock to be distributed on the Effective Date pursuant to the Rights Offering in accordance with the Rights Offering Procedures.  Participants in the Rights Offering shall be offered the opportunity to reinstate their Second Lien Claims in the same proportion as the percentage set forth in the previous sentence is in relation to the total amount of the Second Lien Claims being reinstated.

**1.195** "**Rights Offering Term Sheet**" means the term sheet for the Rights Offering attached hereto as <u>Exhibit 6.4</u>.  <u>Exhibit 6.4</u> will be filed with the Plan Supplement.

**1.196** "**RSC Deal Incentive Plan**" means the RSC Deal Incentive Plan for certain of the Debtors' employees adopted by the Debtors and approved by the Bankruptcy Court on September 16, 2016 (Docket No. 1205).

**1.197** "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

**1.198** "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

**1.199** "**Second Lien Administrative Agent**" means Wilmington Savings Fund Society, FSB (as successor to Deutsche Bank AG New York Branch), its successors and assigns as "Administrative Agent" pursuant to the Second Lien Credit Agreement.

**1.200** "**Second Lien Claims**" means the Second Lien Loan Claim and the Second Lien Senior Notes Claim.

**1.201** "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of January 11, 2016, by and among SUNE, the Second Lien Administrative Agent, and the various lenders party thereto from time to time, as it may be amended, supplemented, amended and restated or otherwise modified from time to time.

**1.202** "**Second Lien Creditors**" means the Second Lien Lenders and Second Lien Senior Noteholders.

**1.203** "**Second Lien Deficiency Claims**" means the Second Lien Loan Deficiency Claims and the Second Lien Senior Notes Deficiency Claims, as may be modified by Section 6.1.

**1.204** "**Second Lien Documents**" means the Second Lien Credit Agreement, the Second Lien Senior Notes Indenture, and the related loans, notes, guarantees, pledges, security agreements, and other agreements and documents given or issued pursuant to or in connection with the Second Lien Claims.

**1.205** "**Second Lien Lender**" means a lender under the Second Lien Credit Agreement.

**1.206** "**Second Lien Litigation**" means any and all direct and indirect Causes of Action that the Holders of Second Lien Claims have against any Person relating to the transactions giving rise to the Second Lien Loans and the Second Lien Senior Notes (including, without limitation, any directors and officers of the Debtors, and any arrangers of such transactions). The Second Lien Litigation is being prosecuted by Kasowitz Benson Torres & Friedman LLP.

**1.207** "**Second Lien Litigation Proceeds**" any amount paid to Holders of Second Lien Claims resulting from the compromise, settlement, or judgment of the claims asserted pursuant to the Second Lien Litigation.

**1.208** "**Second Lien Loans**" means the loans under the Second Lien Credit Agreement.

**1.209** "**Second Lien Loan Claims**" means any and all Claims held by the Second Lien Lenders against the Debtors arising under or related to the Second Lien Credit Agreement, including any Second Lien Loan Deficiency Claim and Second Lien Secured Claim, which shall be Allowed for all purposes under this Plan. For the avoidance of doubt, the Second Lien Loan Claim shall not include any Claim on account of the Tranche B Roll-Up Loans (as defined in the DIP Facility Order).

**1.210** "**Second Lien Loan Deficiency Claims**" means the portion of the Second Lien Loan Claims that are unsecured pursuant to section 506(a) of the Bankruptcy Code, which shall be Allowed for all purposes under this Plan in the amount of $[●] million or such other amount as determined by the Bankruptcy Court.

**1.211** "**Second Lien Loan Secured Claims**" means the portion of the Second Lien Loan Claims that are Secured Claims, which shall be Allowed for all purposes under this Plan in the aggregate amount of $[●] million in principal, and interest accrued as of the Petition Date.

**1.212** "**Second Lien Secured Claim Distribution**" means, (A) in the TERP Share Election Alternative, (i) [●]% of the New SUNE Common Stock and (ii) [●]% of the Continuing TERP Class A Shares, and, (B) in the TERP Cash Election Alternative, (i) [●]% of the New SUNE Common Stock and (ii) $[●] in Cash.

**1.213** "**Second Lien Secured Claims**" means the Second Lien Loan Secured Claims and the Second Lien Senior Notes Secured Claims.

**1.214** "**Second Lien Senior Noteholder**" means a Holder of Second Lien Senior Notes.

**1.215** "**Second Lien Senior Notes**" means the Guaranteed Convertible Senior Secured Notes issued by SUNE under the Second Lien Senior Notes Indenture, bearing interest at a rate of 5.00% per annum and issued in an aggregate principal amount of $225 million.

**1.216** "**Second Lien Senior Notes Claims**" means any and all Claims held by the Second Lien Senior Noteholders against the Debtors arising under or related to the Second Lien Senior Notes, including any Second Lien Senior Notes Deficiency Claim and Second Lien Senior Notes Secured Claim, which shall be Allowed for all purposes under this Plan. For the avoidance of doubt, the Second Lien Senior Notes Claim shall not include any Claim on account of the Tranche B Roll-Up Loans (as such term is defined in the DIP Facility Order).

**1.217** "**Second Lien Senior Notes Deficiency Claims**" means the portion of the Second Lien Senior Notes Claims that are unsecured pursuant to section 506(a) of the

26

Bankruptcy Code, which shall be Allowed for all purposes under this Plan in the amount of $[●] million or such other amount as determined by the Bankruptcy Court.

      1.218  "**Second Lien Senior Notes Indenture**" means that certain Indenture, dated as of January 11, 2016, by and among SUNE, the guarantors named therein, and the Second Lien Senior Notes Indenture Trustee (as may be amended or supplemented from time to time).

      1.219  "**Second Lien Senior Notes Indenture Trustee**" means Wilmington Trust, National Association or its successor, in its capacity as indenture trustee for the Second Lien Senior Notes pursuant to the Second Lien Senior Notes Indenture.

      1.220  "**Second Lien Senior Notes Secured Claims**" means the portion of the Second Lien Senior Notes Claims that are Secured Claims, which shall be Allowed for all purposes under this Plan in the aggregate amount of $[●] million in principal, and interest accrued as of the Petition Date.

      1.221  "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtors within 20 days before the Petition Date in which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

      1.222  "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

      1.223  "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

      1.224  "**Security**" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

      1.225  "**Servicer**" means any indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors. The Debtors recognize Wilmington Trust, National Association, in its capacity as the Senior Notes Indenture Trustee, as a Servicer.

      1.226  "**SUNE Certificate of Incorporation and Bylaws**" means the amended and restated certificate of incorporation and bylaws of Reorganized SUNE, the form and substance of which shall be included in the Plan Supplement.

      1.227  "**Supporting Second Lien Parties**" means those Holders of Second Lien Claims who are, or who become, party to the Backstop Commitment.

      1.228  "**TERP**" means, collectively, TERP Inc., TERP LLC, and their direct and indirect subsidiaries.

1.229    "**TERP Cash Election Alternative**" has the meaning ascribed to such term in the Introduction.

1.230    "**TERP Inc.**" means TerraForm Power, Inc.

1.231    "**TERP LLC**" means TerraForm Power LLC.

1.232    "**TERP Merger Agreement**" means the Merger and Sponsorship Transaction Agreement, dated as of March 6, 2017, by and among TERP Inc. and certain affiliates of Brookfield.

1.233    "**TERP Settlement Agreement**" means the Settlement Agreement, dated as of March 6, 2017, by and among SUNE, TERP Inc., and certain of their respective affiliates. A copy of the TERP Settlement Agreement was filed as an attachment to the YieldCo Settlement Motion.

1.234    "**TERP Share Election Alternative**" has the meaning ascribed to such term in the Introduction.

1.235    "**TERP Voting and Support Agreement**" means that certain Voting and Support Agreement, dated as of March 6, 2017, by and among SUNE, SunEdison Holdings Corporation, SUNE ML1, LLC, TERP Inc., and certain affiliates of Brookfield.  A copy of the TERP Voting and Support Agreement was filed as an attachment to the Voting and Support Motion.

1.236    "**Tranche A-1 Roll-Up Lender**" has the meaning set forth in the DIP Credit Agreement.

1.237    "**Tranche A-1 Roll-Up Loan**" has the meaning set forth in the DIP Credit Agreement.

1.238    "**Tranche A-1 Roll-Up Loan Claims**" means any and all Claims held by the Tranche A-1 Roll-Up Lenders against the Debtors arising under or related to the DIP Credit Agreement on account of the Tranche A-1 Roll-Up Loans, which shall be Allowed for all purposes under this Plan.

1.239    "**Tranche A-2 Roll-Up Lender**" has the meaning set forth in the DIP Credit Agreement.

1.240    "**Tranche A-2 Roll-Up Loan**" has the meaning set forth in the DIP Credit Agreement.

1.241    "**Tranche A-2 Roll-Up Loan Claims**" means any and all Claims held by the Tranche A-2 Roll-Up Lenders against the Debtors arising under or related to the DIP Credit Agreement on account of the Tranche A-2 Roll-Up Loans, which shall be Allowed for all purposes under this Plan.

1.242    "**Tranche B Roll-Up Lender**" has the meaning set forth in the DIP Credit Agreement.

1.243    "**Tranche B Roll-Up Loan**" has the meaning set forth in the DIP Credit Agreement.

1.244    "**Tranche B Roll-Up Loan Claims**" means any and all Claims held by the Tranche B Roll-Up Lenders against the Debtors arising under or related to the DIP Credit Agreement on account of the Tranche B Roll-Up Loans, which shall be Allowed for all purposes under this Plan.

1.245    "**Transition Services Agreement**" has the meaning ascribed to such term in Article 7.6.

1.246    "**UCC Challenge Litigation**" means Adversary Proceeding No. 16-01228 commenced by the Creditors' Committee in connection with the Chapter 11 Cases. For the avoidance of doubt, this Plan serves as a motion to settle the UCC Challenge Litigation in accordance with the terms herein, and Confirmation of the Plan shall be deemed approval of such settlement.

1.247    "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.248    "**Unexpired Lease**" means a lease of nonresidential real property to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.249    "**Unimpaired**" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

1.250    "**Utility Project Incentive Plan**" means the Utility Project Incentive Plan for certain of the Debtors' employees adopted by the Debtors and approved by the Bankruptcy Court on July 29, 2016 (Docket No. 871).

1.251    "**Voting and Support Agreements**" means, together, (1) the TERP Voting and Support Agreement and (2) the GLBL Voting and Support Agreement.

1.252    "**Voting and Support Motion**" means the motion filed by the Debtors on March 14, 2017 seeking this Court's approval of the Voting and Support Agreements (Docket No. 2580).

1.253    "**Voting Deadline**" means [●], 2017 at 4:00 p.m. prevailing Eastern time.

**1.254** "**YieldCo Avoidance Allocation**" means the dollar amount allocated to certain Avoidance Actions in connection with the YieldCo Settlements.

**1.255** "**YieldCo Settlement Agreements**" means, together, (1) the TERP Settlement Agreement and (2) the GLBL Settlement Agreement.

**1.256** "**YieldCo Settlement Motion**" means the motion filed by the Debtors on March 10, 2017 seeking this Court's approval of the YieldCo Settlement Agreements (Docket No. 2570) as supplemented on March 24, 2017 (Docket No. 2641).

**1.257** "**YieldCos**" means, collectively, GLBL and TERP.

## C.    Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (j) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (k) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court; and (l) to the extent that any right of any Entity (other than the Debtors or Reorganized Debtors) to consent to a matter, action or otherwise is unqualified, it shall be implied that such consent right may not be unreasonably withheld.

## D.    Computation Of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## E.    References to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    **Exhibits**

        All Exhibits are incorporated into and are a part of this Plan as if set forth in full
herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy
Court on or before the Plan Supplement Filing Date.  After the Plan Supplement Filing Date,
copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher &
Flom LLP, Four Times Square, New York, New York 10036 (Att'n: J. Eric Ivester), or Skadden,
Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, Illinois
60606 (Att'n: James J. Mazza, Jr. and Louis S. Chiappetta), counsel to the Debtors, or by
downloading    such    exhibits    from    the    Debtor's    informational    website    at
https://cases.primeclerk.com/sunedison/.  To the extent any Exhibit is inconsistent with the terms
of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the
Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall
control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

        **2.1    Administrative Claims**.  Except to the extent that the Debtors (or the
Reorganized Debtors) and a Holder of an Allowed Administrative Claim agree to less favorable
treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which
shall be subject to Article 2.3 of the Plan) shall receive, in full satisfaction, settlement, release,
and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid
portion of such Allowed Administrative Claim either (a) on the Distribution Date; (b) on the first
Periodic Distribution Date occurring after the later of (i) 30 days after the date when an
Administrative Claim becomes an Allowed Administrative Claim or (ii) 30 days after the date
when an Administrative Claim becomes payable pursuant to any agreement between the Debtors
(or the Reorganized Debtors) and the Holder of such Administrative Claim, or (c) if the Allowed
Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of
their business after the Petition Date, in the ordinary course of business in accordance with the
terms and conditions of the particular transaction giving rise to such Allowed Administrative
Claims, without any further action by the Holders of such Allowed Administrative Claims;
provided, however, that other than Holders of (i) DIP Facility Claims, (ii) Professional Claims,
(iii) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the
Effective Date, or (iv) Administrative Claims that are not Disputed and arose in the ordinary
course of business and was paid or are to be paid in accordance with the terms and conditions of
the particular transaction giving rise to such Administrative Claim, the Holder of any
Administrative Claim shall have filed a proof of Claim form no later than the Administrative
Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise
provided herein and as set forth in Articles 2.2 or 2.3 of this Plan, all requests for payment of an
Administrative Claim must be filed, in substantially the form of the Administrative Claim
Request Form contained in Exhibit 2.1, with the Claims Agent and served on counsel for the
Debtors or the Reorganized Debtors (and, if filed after the Confirmation Order is entered,
counsel to the Supporting Second Lien Parties) by no later than the Administrative Claims Bar
Date.  Any request for payment of an Administrative Claim pursuant to this Article 2.1 that is not
timely filed and served shall be Disallowed automatically without the need for any objection

31

from the Reorganized Debtors.  The Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  For the avoidance of doubt, none of the fees and expenses incurred by the Creditors' Committee's Professionals with regard to the investigation or prosecution of the UCC Challenge Litigation shall constitute Allowed Administrative Claims or otherwise be paid in Cash or otherwise pursuant to this Plan or otherwise.

**2.2**     **DIP Facility Claims**.

(a)     **DIP Term Loan Claims**.  On the Effective Date, the DIP Term Loan Claims shall be Allowed in full, in the amount of $[●] plus accrued postpetition interest in an amount to be determined.  Except to the extent that a Holder of a DIP Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of DIP Term Loan Claims.

(b)     **Tranche A-1 Roll-Up Loan Claims**.  On the Effective Date, the Tranche A-1 Roll-Up Loan Claims shall be Allowed in full, in the amount of $[●] plus accrued postpetition interest in an amount to be determined.  Except to the extent that a Holder of a Tranche A-1 Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche A-1 Roll-Up Loan Claim, Holders of Tranche A-1 Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of Tranche A-1 Roll-Up Loan Claims.

(c)     **Tranche A-2 Roll-Up Loan Claims**.  On the Effective Date, the Tranche A-2 Roll-Up Loan Claims shall be Allowed in full, in the amount of $[●] plus accrued postpetition interest in an amount to be determined.  Except to the extent that a Holder of a Tranche A-2 Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche A-2 Roll-Up Loan Claim, Holders of Tranche A-2 Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of Tranche A-2 Roll-Up Loan Claims.

(d)     **Tranche B Roll-Up Loan Claims**.  On the Effective Date, the Tranche B Roll-Up Loan Claims shall be Allowed in full, in the amount of $[●] plus accrued postpetition interest in an amount to be determined.  Except to the extent that a Holder of a Tranche B Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche B Roll-Up Loan Claim, Holders of Tranche B Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of Tranche B Roll-Up Loan Claims.

(e)     Upon the Effective Date, all Liens and security interests granted to secure the DIP Facility shall be deemed discharged, cancelled, and released and shall be of no

further force and effect. To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests.

### 2.3    Professional Claims.

(a)    **Final Fee Applications**. All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than sixty (60) days after the Effective Date. The Fee Examiner shall have thirty (30) days to review all such applications and make a recommendation to the Bankruptcy Court for the Bankruptcy Court to consider at the hearing with regard to such final requests. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, and after such thirty (30) day period has passed, the Allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court. The Bankruptcy Court shall be permitted to, but does not have to, consider the analysis, conclusion, and recommendation of the Fee Examiner.

(b)    **Payment of Interim Amounts.** Subject to the Holdback Escrow Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed (and as to which there is no then-existing prohibition on making payment). In order to receive payment on the Effective Date for such unbilled fees and expenses incurred through the Effective Date, no later than two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors' Committee, shall only be permitted to take the actions set forth in Article 14.7 after the Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors and the Supporting Second Lien Parties. Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period.

(c)    **Holdback Escrow Account**. On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals. The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates. The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to Reorganized SUNE to be used by the Reorganized Debtors in accordance with the Plan, or distributed to holders of New SUNE Common Stock.

(d)    **Post-Confirmation Date Retention**.    Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).  The Creditors' Committee's Professionals may only be paid for services rendered after the Confirmation Date if such services are permitted pursuant to Article 14.7 below.

2.4    **Priority Tax Claims**.  On the Distribution Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1    **Classification of Claims and Interests**.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b)    For administrative convenience, the Plan organizes the Debtors into groups (each a "Debtor Group") and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group.  Notwithstanding this organizing principle, the Plan is a separate plan of reorganization or liquidation for each Debtor.  Claims and Interests belonging to a Debtor Group consisting of more than one Debtor shall be deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting.  To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor

34

Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group.  For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each Debtor Group.  Claims and Interests are classified as follows:

| Letter | Debtor Group |
|--------|--------------|
| A | **Parent**<br>SunEdison, Inc. |
| B | **DIP and Second Lien Secured Guarantors**<br>Buckthorn Renewables Holdings, LLC<br>Everstream HoldCo Fund I, LLC<br>Greenmountain Wind Holdings, LLC<br>Rattlesnake Flat Holdings, LLC<br>Somerset Wind Holdings, LLC<br>SunE Minnesota Holdings, LLC<br>SunE MN Development, LLC<br>SunE MN Development Holdings, LLC<br>SunE Waiawa Holdings, LLC<br>Sunflower Renewables Holdings 1, LLC<br>Enflex Corporation<br>Fotowatio Renewable Ventures, Inc.<br>MEMC Pasadena, Inc.<br>NVT Licenses, LLC<br>NVT, LLC<br>Solaicx<br>SunE ML 1, LLC<br>SunEdison Canada, LLC<br>SunEdison Contracting, LLC<br>SunEdison DG, LLC<br>SunEdison Holdings Corporation<br>SunEdison International, Inc.<br>SunEdison International, LLC<br>Sun Edison LLC<br>SunEdison Utility Holdings, Inc.<br>Team-Solar Inc. |
| C | **DIP-only Secured Guarantors**<br>Blue Sky West Capital, LLC<br>DSP Renewables, LLC<br>First Wind California Holdings, LLC<br>First Wind Oakfield Portfolio, LLC<br>First Wind Panhandle Holdings III, LLC<br>First Wind Solar Portfolio, LLC<br>Hancock Renewables Holdings, LLC |

| # | Designation |
|---|-------------|
| 1 | Second Lien Secured Claims |
| 2 | Other Secured Claims |
| 3 | Other Priority Claims |
| 4 | General Unsecured Claims |
| 5 | Convenience Claims |
| 6 | Intercompany Claims |
| 7 | Other Subordinated Claims |
| 8 | Interests in Debtor Subsidiaries |
| 9 | Interests in SUNE |

|   | |
|---|---|
|   | PVT Solar, Inc.<br>SunE Hawaii Solar Holdings, LLC<br>SunE Wind Holdings, Inc.<br>SunEdison Residential Services, LLC |
| D | **DIP-only Unsecured Guarantor**<br>Silver Ridge Power Holdings, LLC<br>TerraForm Private Holdings, LLC |
| E | **Not Obligated on DIP or Second Lien Claims**<br>SunEdison Products Singapore Pte. Ltd<br>SEV Merger Sub Inc. |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below.

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1A – 1B | Second Lien Secured Claims | Impaired | Entitled to Vote |
| 2A – 2E | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3A – 3E | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4A – 4E | General Unsecured Claims | Impaired | Entitled to Vote |
| 5A – 5E | Convenience Claims | Impaired | Entitled to Vote |
| 6A – 6E | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 7A – 7E | Other Subordinated Claims | Impaired | Deemed to Reject |
| 8B – 8E | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 9A | Interests in SUNE | Impaired | Deemed to Reject |

**ARTICLE IV**

**PROVISIONS FOR TREATMENT
OF CLAIMS AND INTERESTS**

**4.1     Second Lien Secured Claims (Classes 1A and 1B)**

(a)     Classification: Classes 1A and 1B consist of all Allowed Second Lien Secured Claims.

36

(b)      Allowance:  The Second Lien Secured Claims shall be Allowed in the amount of $[●].

(c)      Treatment: Except to the extent that a Holder of an Allowed Second Lien Secured Claim agrees to a less favorable treatment and subject to Article 6.1, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Secured Claim (except as otherwise set forth herein with respect to the Reinstated Second Lien Claims), on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Second Lien Secured Claim shall (i) receive its Pro Rata portion of the Second Lien Secured Claim Distribution and (ii) have its Allowed Second Lien Secured Claim reinstated subject to the Reinstated Second Lien Modification Terms.

In addition to the foregoing and subject to Article 6.1, in the TERP Share Election Alternative, each Holder of an Allowed Second Lien Secured Claim shall receive, (A) if such Holder is an Eligible Holder, its Pro Rata portion of the Rights Offering Subscription Rights and, (B) if such Holder is a Non-Eligible Holder, its Pro Rata portion of the Non-Eligible Holder Second Lien Distribution.

(d)      Voting: Classes 1A and 1B are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan.

### 4.2      Other Secured Claims (Classes 2A – 2E)

(a)      Classification: Classes 2A, 2B, 2C, 2D, and 2E consist of all Allowed Other Secured Claims.

(b)      Treatment: Except as otherwise provided in and subject to Article 10.6 of this Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable:

(i)      have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default;

(ii)      be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the first Periodic Distribution Date occurring after the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim;

(iii)    receive the collateral securing its Allowed Other Secured Claim free and clear of Liens, Claims, and encumbrances on the first Periodic Distribution Date occurring after the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Other Secured Claim; provided that such collateral, as of the day prior to the Effective Date, was property of the Estates; or

(iv)    receive such other less favorable treatment as to which the Debtors (with the consent of the Supporting Second Lien Parties) or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing.

provided, that Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors (with the consent of the Supporting Second Lien Parties) or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in this Article 4.2 or elsewhere in this Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim.

(c)    Voting: Classes 2A, 2B, 2C, 2D, and 2E are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

## 4.3    Other Priority Claims (Classes 3A – 3E)

(a)    Classification: Classes 3A, 3B, 3C, 3D, and 3E consist of all Allowed Other Priority Claims.

(b)    Treatment:  Except as otherwise provided in and subject to Article 10.6 of this Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall, at the option of the Debtors, with the consent of the Supporting Second Lien Parties, (x) be paid in full in Cash on the first Periodic Distribution Date occurring after the later of (i) the Effective Date and (ii) the date such Other Priority Claim becomes an Allowed Claim or (y) otherwise be left Unimpaired; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)    Voting: Classes 3A, 3B, 3C, 3D, and 3E are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 4.4 General Unsecured Claims (Classes 4A – 4E)

(a)     Classification: Classes 4A through 4E consist of all Allowed General Unsecured Claims.

(b)     Allowance:  (i) the Convertible Senior Notes Claims with respect to the 2018 Convertible Senior Notes shall be Allowed in the amount of $256 million, (ii) the Convertible Senior Notes Claims with respect to the 2020 Convertible Senior Notes shall be Allowed in the amount of $488 million, (iii) the Convertible Senior Notes Claims with respect to the 2021 Convertible Senior Notes shall be Allowed in the amount of $289 million, (iv) the Convertible Senior Notes Claims with respect to the 2022 Convertible Senior Notes shall be Allowed in the amount of $347 million, (v) the Convertible Senior Notes Claims with respect to the 2023 Convertible Senior Notes shall be Allowed in the amount of $279 million, (vi) the Convertible Senior Notes Claims with respect to the 2025 Convertible Senior Notes shall be Allowed in the amount of $320 million, and (vii) the Second Lien Deficiency Claims shall be Allowed in the amount of $[●] million.[4]

(c)     Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Debtor-Adjusted Pro Rata portion of the GUC/Litigation Trust Interests.

(d)     Voting: Classes 4A, 4B, 4C, 4D, and 4E are Impaired and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.5 Convenience Claims (Classes 5A – 5E)

(a)     Classification: Classes 5A through 5E consist of all Allowed Convenience Claims.

(b)     Treatment:  Except to the extent that a Holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Convenience Claim, on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Convenience Claim shall receive its Pro Rata portion of the Convenience Claim Distribution.

(c)     Voting: Classes 5A through 5E are Impaired and Holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

### 4.6 Intercompany Claims (Classes 6A – 6E)

(a)     Classification:  Classes 6A through 6E consist of all Allowed Intercompany Claims.

---

[4]   Allowed General Unsecured Claims also include certain General Unsecured Claims in addition to the Convertible Senior Notes Claims.

(b)    Treatment: On the Effective Date, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion with the consent of the Supporting Second Lien Parties.  For the avoidance of doubt, all Allowed Intercompany Claims held by any Debtor constitutes collateral of the DIP Lenders, Second Lien Lenders, and Second Lien Senior Noteholders.

(c)    Voting: Classes 6A, 6B, 6C, 6D, and 6E are either:

(i)    Impaired, and Holders of Allowed applicable Class 6 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan; or

(ii)    Unimpaired, and Holders of Allowed applicable Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

### 4.7    Other Subordinated Claims (Classes 7A – 7E)

(a)    Classification:  Classes 7A through 7E consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.

(b)    Treatment: Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.

(c)    Voting: Classes 7A, 7B, 7C, 7D, and 7E are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan.

### 4.8    Interests in Debtor Subsidiaries (Classes 8B – 8E)

(a)    Classification:  Classes 8B through 8E consist of all Allowed Interests in Debtor Subsidiaries.

(b)    Treatment:  On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion with the consent of the Supporting Second Lien Parties.  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.

(c)    Voting: Classes 8B, 8C, 8D, and 8E are either:

(i)    Impaired, and Holders of Allowed applicable Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code

and, therefore, such Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan; or

(ii)     Unimpaired, and Holders of Allowed applicable Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

### 4.9    Interests in SUNE (Class 9A)

(a)     Classification:  Class 9A consists of all Interests in SUNE.

(b)     Treatment: On the Effective Date, Allowed Class 9A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.

(c)     Voting: Class 9A is Impaired, and Holders of Allowed Class 9A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 9A Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE

**5.1    Classes Entitled to Vote.**  Classes 1A − 1B, 4A − 4E, and 5A and 5B are entitled to vote to accept or reject this Plan.  By operation of law, Classes 2A − 2E, 3A − 3E, 6A − 6E, 7A − 7E, 8B − 8E, and 9A are either deemed to have accepted this Plan or to have rejected this Plan and are not entitled to vote.

**5.2    Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

**5.3    Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**5.4    Deemed Acceptance if No Votes Cast.**  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

    **5.5**    **Cramdown.**    To the extent necessary, the Debtors shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

    **6.1**    **General Settlement of Claims and Interests**.

    (a)    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

    (b)    In consideration for the compromises and settlements contained herein, including the distribution of the GUC/Litigation Trust Interests for the benefit of Holders of General Unsecured Claims and including the transfer of the GUC-Settlement Consideration to the GUC/Litigation Trust or the Holders of Allowed General Unsecured Claims, as applicable, and as more fully set forth in the Disclosure Statement, on the Effective Date the UCC Challenge Litigation and BOKF Objection shall be dismissed with prejudice; provided, that a total amount of approximately $18 million of the Second Lien Deficiency Claims shall be Disallowed as unmatured interest as addressed by count 3 as set forth in the UCC Challenge Litigation and the BOKF Objection.

    (c)    In addition to the foregoing and as additional consideration for the settlement of the UCC Challenge Litigation and the BOKF Objection:

    (i)    10% of the Second Lien Secured Claim Distribution to be provided to Holders of Allowed Second Lien Secured Claims in accordance with Article 4.1 shall be transferred to the GUC/Litigation Trust for the benefit of the GUC/Litigation Trust Beneficiaries (other than GUC/Litigation Trust Beneficiaries that receive GUC/Litigation Trust Interests on account of Second Lien Deficiency Claims),

    (ii)    10% of the Rights Offering Subscription Rights to be provided to Holders of Allowed Second Lien Secured Claims in accordance with Article 4.1 shall be provided to Holders of Allowed General Unsecured Claims that are Eligible Holders on a Pro Rata basis, and

    (iii)    the GUC/Litigation Trust Trustee shall pay to the GUC/Litigation Trust Beneficiaries (other than GUC/Litigation Trust Beneficiaries that receive GUC/Litigation Trust Interests on account of Second Lien Deficiency Claims) their Pro Rata amount of an amount equal to 10% of each payment that would otherwise be payable to

GUC/Litigation Trust Beneficiaries that receive GUC/Litigation Trust Interests on account of Second Lien Deficiency Claims. This Plan shall be deemed a motion to settle the UCC Challenge Litigation and BOKF Objection pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and Confirmation of the Plan shall be deemed approval of such settlement.

**6.2    No Substantive Consolidation**. The Plan is being proposed as a joint plan of reorganization or liquidation of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan. The GUC/Litigation Trust Agreement shall not treat creditors of the various Debtors on a substantively consolidated basis.

**6.3    Restructuring Transactions**.

(a)    On or after the Confirmation Date, the Debtors (with the reasonable consent of the Supporting Second Lien Parties) shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "Restructuring Transactions"). In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations.

(b)    In effecting the Restructuring Transactions, the Debtors (with the reasonable consent of the Supporting Second Lien Parties) shall be permitted to (i) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

**6.4    Sources of Cash for Plan Distribution**. All Cash required for payments to be made under the Plan on the Effective Date shall be obtained from Cash on hand, proceeds

of the Jointly Supported Transactions and, in the TERP Share Election Alternative only, proceeds of the Rights Offering.

(a)    **Rights Offering**. In the TERP Share Election Alternative, prior to the Effective Date and without the need for any further corporate action and without further action by the Holders of Claims or Interests, SUNE shall commence the Rights Offering pursuant to the Rights Offering Procedures. On the Effective Date, if the TERP Share Election Alternative shall have occurred, Reorganized SUNE shall distribute the Rights Offering Common Stock to the Rights Holders that participate in the Rights Offering as of the Rights Offering Record Date pursuant to the Rights Offering Term Sheet, the Rights Offering Procedures, and the Rights Offering Commitment Letter. The Rights Offering shall be fully backstopped by the Rights Offering Backstop Purchasers such that the Rights Offering results in the funding of Reorganized SUNE with the Rights Offering Amount on the terms and conditions set forth in the Rights Offering Backstop Commitment. In exchange for providing the Rights Offering Backstop Commitment for the Rights Offering, on the Effective Date, the Rights Offering Backstop Parties will receive payment of the Rights Offering Backstop Standby Fee to the extent earned and payable pursuant to the Rights Offering Term Sheet. For the avoidance of doubt, the Rights Offering Backstop Standby Fee is a necessary expense of the Debtors' Estates and shall be deemed an Allowed Administrative Expense Claim pursuant to the order approving the Debtors' entry into the Rights Offering Commitment Letter.

(b)    **Jointly Supported Transactions**. The Debtors or Reorganized Debtors may enter into, support, or otherwise effectuate one or more Jointly Supported Transactions pursuant to which the Debtors or Reorganized Debtors sell or otherwise dispose of some or all of their equity interests in the YieldCos to a third party purchaser. The Debtors or Reorganized Debtors are authorized to enter into and perform under the Jointly Supported Transaction Agreements and such other documents as may be required or appropriate.

**6.5**    **Reinstated Second Lien Claims**. On the Effective Date, the Reinstated Second Lien Claims shall be reinstated as modified pursuant to the Reinstated Second Lien Claim Modification Terms. The Debtors and Reorganized Debtors are authorized to take all actions necessary to amend the Second Lien Documents in accordance with the Reinstated Second Lien Claim Modification Terms and such amendments shall be deemed to be effective on the Effective Date. All Liens granted in connection with the Second Lien Claims and that exist over property of the Debtors (and, to the extent applicable, non-Debtors) immediately prior to the Effective Date shall remain in full force and effect following the Effective Date to the extent that the Debtors or Reorganized Debtors have not otherwise disposed of such property free and clear of such Liens in connection with this Plan.

**6.6**    **Conversion and Distribution of Continuing TERP Class A Shares**. In accordance with the Jointly Supported Transaction Agreements, the Debtors or Reorganized Debtors are authorized to exercise any exchange or conversion rights with respect to their interests in the YieldCos, including the exchange or conversion of their Class B shares in TERP Inc. and/or Class B Units in TERP LLC into Class A shares in TERP Inc. in respect of which they may elect to retain Continuing TERP Class A Shares through the TERP Share Election Alternative. The Debtors or Reorganized Debtors are authorized without further corporate or other action or approval to distribute the Continuing TERP Class A Shares to Holders of

Allowed Second Lien Secured Claims in accordance with this Plan, including the Rights Offering, free and clear of all Liens.

**6.7    Administration of Repatriated Cash, Earnout Assets, and Residual Assets**.  Reorganized SUNE shall employ employees and maintain systems and back-office capabilities reasonably necessary to administer the Earnout Assets and the Residual Assets and to collect the Repatriated Cash, and shall use commercially reasonable efforts to (a) generate Earnout Proceeds and Residual Assets Proceeds therefrom and to maximize the recovery of Repatriated Cash and (b) to transfer such assets to Reorganized SUNE if not otherwise applied to the Reinstated Second Lien Claims.

**6.8    Certain Transfers Between SUNE and Other Debtors**.  Following the Effective Date, the Reorganized Debtors may transfer in their sole discretion the right to receive any Earnout Proceeds, Residual Assets Proceeds, and the Repatriated Cash to Reorganized SUNE, free and clear of any Lien, except for the Liens securing the Reinstated Second Lien Claims.  The Confirmation Order shall authorize the Debtors to effectuate the transfer of the right to receive Earnout Proceeds, the Residual Assets Proceeds, and Repatriated Cash in accordance with the terms of the Plan as part of the settlements and compromises contained in the Plan.  All matters and transactions necessary to effectuate the transfer of the right to receive Earnout Proceeds, the Residual Assets Proceeds, or the Repatriated Cash, and any partnership, membership, or shareholder action required by the applicable Debtors in connection with such transfer will be deemed to have occurred and will be in effect, without any requirement of further action by those authorized to act on behalf of the applicable Debtors.  Upon entry of the Confirmation Order, subject to the terms of the DIP Facility the appropriate officers or managing members of each Debtor shall be authorized and directed to issue, execute, deliver, file, and/or record any contracts, agreements, instruments, or other documents contemplated by, or necessary or desirable to effect, the transfer of the right to receive the Earnout Proceeds, the Residual Assets Proceeds, and the Repatriated Cash in accordance with the terms of the Plan, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the transfer of the right to receive the Earnout Proceeds, the Residual Assets Proceeds, and the Repatriated Cash, in each case in the name of and on behalf of the applicable Debtor.  The authorizations contained in this Article 6.6 apply on a continuing basis to any Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash received by any Debtor (in such case, subject to the terms of the DIP Facility) or Reorganized Debtor following the entry of the Confirmation Order.

**6.9    Authorization and Issuance of New SUNE Common Stock**.  On the Effective Date, Reorganized SUNE shall authorize and issue the New SUNE Common Stock. Distribution of New SUNE Common Stock hereunder shall constitute issuance of 100% of such New SUNE Common Stock and in each case shall be deemed issued on the Effective Date.  The issuance of New SUNE Common Stock by Reorganized SUNE is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the shares of New SUNE Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

**6.10    GUC/Litigation Trust Initial Funding Determination**.  Subsequent to filing the Plan, the Debtors will negotiate in good faith with the Creditors' Committee and the

DIP Lenders to reach a consensual resolution with respect to the credits, reservations, and reimbursement rights that are properly deductible from the GUC/Litigation Trust Initial Funding as contemplated in the DIP Facility Order. The amount of the GUC/Litigation Trust Initial Funding as determined in accordance with the preceding sentence will be filed with the Plan Supplement, or, if the parties are unable to consensually determine such amount, the Debtors shall file their proposed amount for such funding in the Plan Supplement and, if there are objections to such proposed amount, the Court shall determine the amount of the GUC/Litigation Trust Initial Funding in connection with Confirmation of the Plan.

**6.11    Exemptions from Securities Act Registration Requirements**. Except as otherwise set forth in this Plan and consistent with the Jointly Supported Transaction Agreements (if applicable), the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities (other than the Continuing TERP Class A Shares) issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, (2) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the GUC/Litigation Trust Agreement (if applicable), and (3) any other applicable regulatory approval. Except as otherwise set forth in this Plan, in reliance upon these exemptions, the offer, issuance, and distribution of Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder. Accordingly, the Securities may be subject to restrictions on transfer as set forth in the governing documents to such Securities.

**6.12    Cancellation of Old SUNE Securities and Agreements**.    On the Effective Date, except as otherwise specifically provided for herein (including with respect to the Reinstated Second Lien Claims), (a) the Old SUNE Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in SUNE (including the Indentures) shall be cancelled and (b) the obligations of, Claims against, and/or Interests in SUNE under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old SUNE Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of SUNE shall be released and discharged and cancelled; provided, however, that any agreement (including the Indentures) that governs the rights of a Holder of a Claim that is otherwise released, discharged, and cancelled and that is administered by a Servicer

46

shall continue in effect solely for the purposes of allowing such Servicer to make the distributions on account of such Claims under this Plan as provided for in Article 10.5(c) of this Plan. Notwithstanding the foregoing, in no event shall any such cancellation, release, or discharge affect the rights of the Second Lien Creditors to recover the full amounts of their claim against the Debtors, as against any non-Debtor party, including, without limitation, as part o the Second Lien Litigation.

**6.13    Issuance and Distribution of New Securities; Execution of Plan Documents**. Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan and shall amend the Second Lien Documents to implement the Reinstated Second Lien Claim Modification Terms, in form and substance reasonably satisfactory to the Supporting Second Lien Parties.

**6.14    Continued Corporate Existence**.

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation under applicable law in the jurisdiction in which each respective Debtor is incorporated and pursuant to its respective certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organization documents are amended and restated by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b)    Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in Article 11.1 of this Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.

**6.15    Certificate of Incorporation and Bylaws**. The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnership, or other forms of Entity) of the Debtors shall be amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (and which shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties) and the form and substance of which shall be included in the Plan Supplement. After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnership, or other forms of Entity) as permitted by applicable state corporation law and their respective charters and bylaws or other organizational documents.

47

**6.16    Directors and Officers of Reorganized Debtors**.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors and each of the initial officers of the Reorganized Debtors (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing.  The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Supporting Second Lien Parties.

**6.17    Corporate Action**.  Each of the matters provided for under this Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of the Debtors or the Reorganized Debtors.  Such actions may include, (a) the adoption and filing of the SUNE Certificate of Incorporation and Bylaws, (b) the appointment of the New Boards, and (c) the issuance and distribution of New SUNE Common Stock and (d) the distribution of Continuing TERP Class A Shares.

**6.18    Effectuating Documents; Further Transactions**.  On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**6.19    Employment, Retirement, Indemnification and Other Agreements and Employee Compensation Programs**.

(a)    **Employment Agreements**.  To the extent that the Debtors intend for any employment, retirement, indemnification or other agreement with its respective directors, officers, managing members and employees to remain in place after the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, will list such agreement on the list of  "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan, and such agreement will be assumed as of the Effective Date.  If the Debtors do not list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1, such agreement shall be deemed rejected.  The Debtors, with the reasonable consent of the Supporting Second Lien Parties, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.

48

(b)    **Other Incentive Plans and Employee Benefits**.  Unless otherwise specified in this Plan, and except in connection and not inconsistent with Article 6.19(a), on and after the Effective Date, the Reorganized Debtors shall have the discretion, with the reasonable consent of the Supporting Second Lien Parties, to (a) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided herein, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including the Employee Compensation Plans, any incentive plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

6.20    **Preservation Of Causes Of Action**.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not (a) released pursuant to Article 11.5 of this Plan or an order of the Bankruptcy Court or (b) GUC/Litigation Trust Causes of Action, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.20, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

6.21    **Reservation of Rights**.  With respect to Avoidance Actions that are transferred to the GUC/Litigation Trust in accordance with Article 7.3 of this Plan, the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the transferred Avoidance Actions as a basis to object to all or any part of a claim against any of the Estates asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**6.22    Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.23    Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and, (b) solely for the portion of such Claim that is not subject to coverage by the applicable insurance policy, receive the treatment provided for in this Plan for Allowed General Unsecured Claims.

**6.24    Intercompany Account Settlement.** The Debtors and the Reorganized Debtors, and their respective Affiliates, with the reasonable consent of the Supporting Second Lien Parties, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  For the avoidance of doubt, because Intercompany Claims are the collateral of the DIP Facility, the Second Lien Loans, and the Second Lien Senior Notes, such transfers or settlements shall not affect distributions under the Plan.

**6.25    Private Company.** It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the Securities Exchange Commission or list such equity on an exchange; *provided, however*, that, to the extent applicable, the Reorganized Debtors may implement procedures to facilitate trading of such equity, *e.g.*, providing investors with access (on a secure website) to current information concerning the Reorganized Debtors and their subsidiaries on a consolidated basis.

## ARTICLE VII

## LITIGATION TRUST

**7.1    GUC/Litigation Trust Agreement**.  The GUC/Litigation Trust shall be governed and administered in accordance with the GUC/Litigation Trust Agreement and this Plan, including, but not limited to (a) distributions to GUC/Litigation Trust Beneficiaries, (b) authority and appointment of the GUC/Litigation Trust Trustee, (c) authority and appointment of the GUC/Litigation Trust Oversight Board, (d) compensation of the GUC/Litigation Trust Trustee, (e) vesting of GUC/Litigation Trust assets, and (f) payment of costs and expenses of the GUC/Litigation Trust, all of which shall be consistent with the terms of this Plan and the GUC/Litigation Trust Agreement.  For the avoidance of doubt, any amounts required for sub-clauses (d) or (f) shall come, first, from the GUC/Litigation Trust Initial

Funding and, then, to the extent the GUC/Litgation Trust Initial Funding is exhausted, from other GUC/Litigation Trust Assets.  In addition and for the avoidance of doubt, the GUC/Litigation Trust shall be structured to ensure that any distributions to be made therefrom, and any proceeds derived from GUC/Litigation Trust Assets, shall be separated by appropriate Debtor entity and distributed according to Debtor-by-Debtor recoveries set forth in this Plan and there shall be no substantive consolidation of Debtor-entity recoveries.  The GUC/Litigation Trust shall be administered on a Debtor-by-Debtor basis, effectively as a separate trust for each Debtor entity. This principle may not be changed in the GUC/Litigation Trust Agreement by anything less than 100% consent of the GUC/Litigation Trust Beneficiaries.

   **7.2 Tax Treatment.**  It is intended that the GUC/Litigation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business. In furtherance of this objective, the GUC/Litigation Trust Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the GUC/Litigation Trust. All assets held by the GUC/Litigation Trust on the Effective Date shall be deemed for federal income tax purposes (i) to have been distributed (subject to any obligations relating to such assets) by the Debtors or Reorganized Debtors on a Pro Rata share basis to the GUC/Litigation Trust Beneficiaries (other than the assets allocable to any disputed ownership fund) in partial satisfaction of Allowed Claims and (ii) immediately thereafter contributed by such GUC/Litigation Trust Beneficiaries to the GUC/Litigation Trust in exchange for their GUC/Litigation Trust Interests.  The Debtors and all GUC/Litigation Trust Beneficiaries shall use the valuation of the assets transferred to the GUC/Litigation Trust as established by the GUC/Litigation Trust Trustee for all federal income tax purposes. The GUC/Litigation Trust Beneficiaries will be treated as the deemed owners of the GUC/Litigation Trust (other than the assets allocable to any disputed ownership fund). The GUC/Litigation Trust will be responsible for filing information on behalf of the GUC/Litigation Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

   Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the GUC/Litigation Trust Trustee of a private letter ruling if the GUC/Litigation Trust Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC/Litigation Trust Trustee), the GUC/Litigation Trust Trustee may (A) timely elect to treat any disputed claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the GUC/Litigation Trust Trustee, the Debtors and the GUC/Litigation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

   The GUC/Litigation Trust Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the GUC/Litigation Trust Beneficiaries.  All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such GUC/Litigation Trust Beneficiaries for all purposes of the GUC/Litigation Trust Agreement.  The GUC/Litigation

Trust Trustee shall be authorized to collect such tax information from the GUC/Litigation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the GUC/Litigation Trust Agreement.  In order to receive distributions under the Plan, all GUC/Litigation Trust Beneficiaries will need to identify themselves to the GUC/Litigation Trust Trustee and provide tax information and the specifics of their holdings, to the extent the GUC/Litigation Trust Trustee deems appropriate.  This identification requirement may, in certain cases, extend to holders who hold their securities in street name.  The GUC/Litigation Trust Trustee may refuse to make a distribution to any GUC/Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a GUC/Litigation Trust Beneficiary, the Liquidation Trustee shall make such distribution to which the GUC/Litigation Trust Beneficiary is entitled, without interest; and, provided, further, that, if the GUC/Litigation Trust Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the GUC/Litigation Trust Trustee is later held liable for the amount of such withholding, such holder shall reimburse the GUC/Litigation Trust Trustee for such liability.

### 7.3    GUC/Litigation Trust Assets.

(a)    On the Effective Date, or on such other date as is set forth in the GUC/Litigation Trust Agreement, pursuant to section 1123(b)(3) of the Bankruptcy Code, the GUC/Litigation Trust Assets shall be transferred by the Debtors (and deemed transferred) to the GUC/Litigation Trust free and clear of all Claims, Liens, charges, encumbrances, rights, and interests, without the need for any Entity to take any further action or obtain any approval and the GUC/Litigation Trust shall be authorized as the representative of the Estates to pursue GUC/Litigation Trust Causes of Action.

(b)    For the avoidance of doubt, Causes of Action transferred, assigned, and delivered to the GUC/Litigation Trust shall not include any Causes of Action (i) against the YieldCos or otherwise released in the YieldCo Settlement Agreements, (ii) against any or all of the Prepetition Secured Parties in their capacities as such, or (iii) against any of the DIP Secured Parties in their capacities as such (as such terms are defined in the DIP Facility Order).  For the avoidance of doubt, the Second Lien Litigation will not be transferred to the GUC/Litigation Trust.

### 7.4    GUC/Litigation Trust Causes of Action.

(a)    GUC/Litigation Trust Causes of Action shall exclude any action released or settled by the Debtors pursuant to this Plan or an order of the Bankruptcy Court.

(b)    The GUC/Litigation Trust, with the consent of the Reorganized Debtors to the extent such GUC/Litigation Trust Causes of Action interfere with (i) the Reorganized Debtors' collection of Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash or (ii) the continuing operations of TERP, shall determine whether to bring, settle, release, compromise, or enforce such GUC/Litigation Trust Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The GUC/Litigation Trust or any successors may pursue such litigation claims in

accordance with the best interests of the GUC/Litigation Trust or any successor holding such rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any GUC/Litigation Trust Cause of Action against them as any indication that the GUC/Litigation Trust will not pursue any and all available GUC/Litigation Trust Causes of Action against them. The GUC/Litigation Trust expressly reserves all rights to prosecute any and all GUC/Litigation Trust Causes of Action against any Entity, except as otherwise provided in the Plan.** Unless any GUC/Litigation Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the GUC/Litigation Trust expressly reserves all GUC/Litigation Trust Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such GUC/Litigation Trust Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

7.5     **General Unsecured Claims Resolution**. Prior to the Effective Date, the Debtors and, following the Effective Date, GUC/Litigation Trust Trustee (with funds from the GUC/Litigation Trust Initial Funding), shall be responsible for (a) all aspects of the General Unsecured Claims reconciliation process, and (b) all of the costs associated with such reconciliation. Prior to the Effective Date, the Debtors shall consult with the Creditors' Committee on a periodic basis as is reasonably requested by the Creditors' Committee regarding the Claims reconciliation process. The Debtors or the GUC/Litigation Trust Trustee, as applicable, shall (x) object to General Unsecured Claims (other than General Unsecured Claims Allowed by court order) and shall provide the Creditors' Committee (until the Effective Date) with notice and an opportunity to object to all Claims that the Debtors seek to resolve for an amount greater than $[25,000], and (y) use commercially reasonable efforts in administering all aspects the Claims reconciliation process. Prior to the Effective Date, if the Creditors' Committee cannot agree with the Debtors with respect to resolution of any Claim greater than $[25,000], then the Debtors shall be permitted to resolve such Claim. All costs necessary to fund the General Unsecured Claims reconciliation process shall be paid from the GUC/Litigation Trust Initial Funding.

7.6     **Transition Services.** The GUC/Litigation Trust and Reorganized SUNE will enter into an agreement (the "Transition Services Agreement") pursuant to which Reorganized SUNE will provide services, which may include personnel, systems, and access to books and records, to the GUC/Litigation Trust in connection with the administration of the GUC/Litigation Trust Assets, including claims administration and the prosecution of the GUC/Litigation Trust Causes of Action. The Transition Services Agreement shall include customary indemnities and limitations of liability to Reorganized SUNE and its representatives that provide services to the GUC/Litigation Trust. A copy of the Transition Services Agreement will be filed with the Plan Supplement. The GUC/Litigation Trust shall compensate Reorganized SUNE for its services under the Transition Services Agreement, and such compensation shall first be paid from the GUC/Litigation Trust Initial Funding and, to the extent the GUC/Litigation Trust Initial Funding is exhausted, from other GUC/Litigation Trust Assets.

7.7     **Indemnification and Exculpation**. The GUC/Litigation Trust Trustee or the individuals comprising the GUC/Litigation Trust Trustee, as the case may be, and the

GUC/Litigation Trust Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the GUC/Litigation Trust Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the GUC/Litigation Trust Trustee, except for any actions or inactions involving willful misconduct or gross negligence.    Any indemnification claim of the GUC/Litigation Trust Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied first from the GUC/Litigation Trust Initial Funding and, then, to the extent the GUC/Litgation Trust Initial Funding is exhausted, from other GUC/Litigation Trust Assets.  The GUC/Litigation Trust Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

        **7.8**      **Preservation of Privilege and Defenses**.  No action taken by the Debtors or Reorganized Debtors in connection with this Plan, shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or Reorganized Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).    The Confirmation Order shall provide that notwithstanding the Reorganized Debtors' providing any privileged information to the GUC/Litigation Trust Trustee, the GUC/Litigation Trust, or any party or person associated with the GUC/Litigation Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estates and shall remain privileged.    The Confirmation Order shall provide that the GUC/Litigation Trust shall have no right to waive the attorney-client privilege, work product or other protection of any information received from the Reorganized Debtors.  The Debtors (or the Reorganized Debtors) retain the right to waive their own privileges.  The GUC/Litigation Trust shall have no right to any privileged information or analysis of the Debtors or the Reorganized Debtors.

        **7.9**      **No Bonding of GUC/Litigation Trust Claims**.    There shall be no bonding of the GUC/Litigation Trust Trustee.

        **7.10**      **Service of the Indenture Trustees**.  The applicable Indenture Trustees and their respective agents, successors and assigns, and the GUC/Litigation Trust Trustee shall facilitate the making of the Plan Distributions to the Holders of the Second Lien Senior Notes Deficiency Claims and the Convertible Senior Notes Claims, to the extent applicable, in accordance with the Plan.  The GUC/Litigation Trust Trustee shall be obligated to calculate the distributions to be made to Holders of Allowed Second Lien Senior Notes Deficiency Claims and Allowed Convertible Senior Notes Claims, as applicable, and shall provide such distribution calculations and related information to the applicable Indenture Trustees at least five (5) business days in advance of the GUC/Litigation Trust Trustee making distributions on account of Allowed Second Lien Senior Notes Deficiency Claims or Convertible Senior Notes Claims, as applicable.    The applicable Indenture Trustees shall only be required to act and make distributions in accordance with the Plan, shall not be required to independently verify or review the calculations prepared by the GUC/Litigation Trust Trustee with respect to distributions to be made to Holders of Second Lien Senior Notes Deficiency Claims or to Holders of Convertible Senior Notes Claims, as applicable, and shall have no liability for actions taken in accordance with the Plan or in reliance upon distribution information and distribution calculations provided

by the GUC/Litigation Trust Trustee, except solely for actions or omissions arising out of such Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct. Further, the Indenture Trustees shall have no obligation or liability for distributions under the Plan to any party who does not (i) hold a Claim against the Debtors as of the Distribution Record Date or (ii) otherwise comply with the terms of the Plan, except solely for actions or omissions arising out of such Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct.

**7.11    Delivery of Distributions on Account of Second Lien Senior Notes Deficiency Claims and Convertible Senior Notes Claims**.    Upon the occurrence of the Effective Date, the Claims of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee for the Second Lien Senior Notes Deficiency Claims and the Convertible Senior Notes Claims, as applicable, shall be, for purposes under the Plan, including without limitation, the right to receive Plan distributions, substituted for all Claims of individual Holders of Allowed Second Lien Senior Notes Deficiency Claims and Convertible Senior Notes Claims, as applicable.    Plan Distributions on account of such Second Lien Senior Notes Deficiency Claims and Convertible Senior Notes Claims, as applicable, shall be made by the GUC/Litigation Trust Trustee to (i) the applicable Indenture Trustee or (ii) with the prior written consent of the applicable Indenture Trustee, by means of book-entry exchange through the facilities of DTC in accordance with DTC's customary practices.    If a Plan Distribution is made to the Second Lien Senior Notes Indenture Trustee or the Convertible Senior Notes Indenture Trustee, the applicable Indenture Trustee, in its capacity as a distribution agent, shall administer the Plan distribution in accordance with the Plan and the applicable Indenture.

## ARTICLE VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**8.1    Rejection of Executory Contracts and Unexpired Leases**.

(a)    **Automatic Rejection**.    Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan; (b) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim; or (e) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.    Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.

(b)      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**.  To the extent not inconsistent with the YieldCo Settlement Agreements, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary and to the extent consistent with the YieldCo Settlement Agreements, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

(c)      **Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases**.  Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection.  Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)      **Reservation of Rights**.  Notwithstanding anything to the contrary herein, prior to sixty (60) days after the Effective Date, the Debtors (or the Reorganized Debtors), both with the consent of the Supporting Second Lien Parties, may amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease, and any amended decision shall be binding on the contract counterparty.

8.2      **Assumption of Executory Contracts and Unexpired Leases**.  Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease (other than Executory Contracts or Unexpired Leases that (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court or have been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date or (b) are the subject of a motion to reject pending as of the Effective Date) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in Exhibit 8.1 of the Plan shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  With respect to each such Executory Contract and Unexpired Lease, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure.  The Confirmation Order shall constitute an order of the Bankruptcy

Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(a)      **Modifications, Amendments, Supplements, Restatements, or Other Agreements**. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)      **Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed**.  Any and all proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

**8.3      Indemnification Obligations**.  From and after the Effective Date, the Reorganized Debtors will indemnify each Indemnitee to the same extent of any Indemnification Obligation in effect immediately prior to the Effective Date.  The Reorganized Debtors' Indemnification Obligations shall remain in full force and effect, shall not be modified, reduced, discharged under section 1141 of the Bankruptcy Code, impaired, or otherwise affected in any way, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, or after the Petition Date; provided, however, that the Reorganized Debtors shall have no Indemnification Obligations to an Indemnitee for any losses, liabilities, or expenses arising out of conduct determined by a Final Order to have constituted fraud, gross negligence, bad faith, or willful misconduct.  Notwithstanding anything contained in this Section 8.3 or in any Assumed Executory Contracts and Unexpired Leases to the contrary, the Reorganized Debtors' indemnification liability under this Section 8.3 arising out of any losses, liabilities, or expenses relating to events giving rise to Indemnification Obligations that occurred prior to the Petition Date ("Prepetition Indemnification Obligations") shall be capped at an amount of $8 million in the aggregate for all Indemnitees and shall be  net of and in excess of available insurance for all such Prepetition Indemnification Obligations.  The treatment of Indemnification Obligations in this Section 8.3 shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation of the Debtors.  In accordance with the foregoing, the Debtors and the Reorganized Debtors shall cooperate with Indemnitees in relation to Indemnification Obligations, including, but not limited to, responding to reasonable requests for information and providing access to attorneys, financial advisors,

accountants and other professionals with knowledge of matters relevant to any such claim covered by an Indemnification Obligation.

### 8.4    Insurance Policies.

(a)    Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Documents, the Plan Supplement, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release, including, but not limited to, the injunctions set forth in Article 11.9 of the Plan): (a) on the Effective Date, the Reorganized Debtors shall reject all insurance policies except for the D&O Insurance, the EPL Policy, and those specific insurance policies (and all agreements related thereto) that are set forth in the Plan Supplement, which will be assumed as such insurance policies may be amended or modified (such assumed insurance policies and related agreements, collectively, the "Insurance Contracts"); (b) other than as expressly set forth in this Section 8.4, nothing in the Disclosure Statement, the Plan, the Plan Documents, the Plan Supplement or the Confirmation Order alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Contracts, provided, however that the Debtors or Reorganized Debtors, as applicable, shall retain the right to challenge any amounts owed under the Insurance Contracts in accordance with their terms, and the rights and obligations of the parties under the Insurance Contracts, whether or not such Insurance Contracts are executory or were in effect before or after the Petition Date, shall remain fully enforceable by the parties after the Effective Date of this Plan; (c) nothing in the Disclosure Statement, the Plan, the Plan Documents, Plan Supplement, the Confirmation Order, any prepetition or administrative claim bar date order (or notice) or claim objection order alters or modifies the duty, if any, that the insurers and/or third party administrators have to pay claims covered by the Insurance Contracts and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) in accordance with the terms of the Insurance Contracts; and (d) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 11.9 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid claims covered by any of the Insurance Contracts ("Insured Claims") to proceed with their claims; (B) insurers and/or third party administrators to administer, handle, defend, settle, and/or pay, in the ordinary course of business and subject to the terms of the Insurance Contracts, without further order of the Bankruptcy Court, (i) all Insured Claims, and (ii) all costs in relation to each of the foregoing; and (C) the insurers and/or third party administrators to (i) cancel any policies under the Insurance Contracts, and (ii) take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, each in accordance with the terms of the Insurance Contracts.

(b)    The Debtors or the Reorganized Debtors, as the case may be, shall maintain D&O Insurance and the EPL Policy providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

(c)    Notwithstanding anything to the contrary contained herein or in the D&O Insurance, which polices shall be assumed pursuant to this Plan, the Existing Directors shall be deemed to be the independent directors of the Reorganized Debtors solely with respect to the D&O Insurance, including, but not limited to, with respect to the rights referred to in Endorsement 12 of ACE American Insurance Company's ACE Advantage Management Protection Policy Number DON G23652389009 (the "ACE Policy") and any other provision in the D&O Insurance that permits independent directors to direct an insurer to delay any payment of Loss (as defined in the ACE Policy) otherwise due and owing to or on behalf of the Company (as defined in the ACE Policy).  Notwithstanding anything to the contrary herein or contained in any organizational or governance document of the Reorganized Debtors, the New Board shall have no rights to terminate, reduce or otherwise impair the D&O Insurance or the EPL Policy and any of the rights of the Existing Directors thereunder that existed immediately before the Effective Date, including, but not limited to, by retracting any notice sent pursuant to Endorsement 12 of the ACE Policy or any similar provision of any other D&O Insurance policy, and any such attempt by the New Board to do so shall be deemed void *ab initio*.

**8.5    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases**.    With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors, with the reasonable consent of the Supporting Second Lien Parties, shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure.  Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties, with the reasonable consent of the Supporting Second Lien Parties, to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.  Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.  If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, with the reasonable consent of the Supporting Second Lien Parties, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors, with the reasonable consent of the Supporting Second Lien Parties, or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any

assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(a)     **Cure Notices**.  Prior to the Confirmation Hearing, and pursuant to the Assumption and Rejection Procedures, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (i) list the applicable Cure, if any, (ii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iii) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (iv) explain the process by which related disputes will be resolved by the Bankruptcy Court.  If no objection is timely received, (x) the non-Debtor party to the Assumed Contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease and shall be forever barred from asserting any objection with regard to such assumption, and (y) the proposed Cure Amount shall be controlling, notwithstanding anything to the contrary in any applicable Executory Contract or Unexpired Lease or other document as of the date of the filing of the Plan, and the non-Debtor party to an applicable Executory Contract or Unexpired Lease shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors or the Reorganized Debtors, or the property of any of them.

(b)     **Cure Objections**.  If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.  Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served in hard-copy form so that they are actually received by the Cure Objection Deadline.

(c)     **Hearing with Respect to Objections**.  If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Article 8.5(b), and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors.  Objections to the proposed Cure Amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(d)     **Reservation of Rights**.  Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice, subject to the Assumption and Rejection Procedures.  In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure Objection which has not been resolved prior to the Effective Date, the Debtors, with the

60

reasonable consent of the Supporting Second Lien Parties, may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

**8.6     Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date**.  Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms of such Executory Contract or Unexpired Lease.

**8.7     General Reservation of Rights**.  Neither the exclusion nor inclusion of any contract or lease on Exhibit 8.1 of the Plan, in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of its Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

## ARTICLE IX

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**9.1     Determination Of Claims and Interests**.  After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article 6.20, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this Article 9.1 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

**9.2    Claims Administration Responsibility**.  Except as otherwise specifically provided for in the Plan, including with respect to the administration of and making distributions with respect to General Unsecured Claims in accordance with Article 7.5 of the Plan, after the Effective Date, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors, including, without limitations, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (b) making distributions (if any) with respect to all Claims and Interests.

**9.3    Objections to Claims**.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

**9.4    Disallowance of Claims**.  EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC/Litigation Trust Trustee after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.  Nothing in this Plan shall preclude amendments to timely filed proofs of Claim to the extent permitted by applicable law.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the

Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**9.5     Estimation of Claims**.  Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and the GUC/Litigation Trust Trustee after the Effective Date, may (but is not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**9.6     No Interest on Disputed Claims**.  Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**9.7     Amendments to Claims**.   On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### ARTICLE X

### <u>PROVISIONS GOVERNING DISTRIBUTIONS</u>

**10.1     Distributions of GUC/Litigation Trust Interests to Holders of Second Lien Deficiency Claims, Allowed General Unsecured Claims, and Allowed Convertible Senior Notes Claims**.  The provisions of this <u>Article X</u> shall not apply to distributions from the GUC/Litigation Trust to Holders of Allowed Second Lien Deficiency Claims, Allowed General

Unsecured Claims, and Allowed Convertible Senior Notes Claims.  Distributions from the GUC/Litigation Trust to Holders of such Allowed Claims shall be subject to, as applicable, the terms of the GUC/Litigation Trust Agreement and Article 4 of this Plan.

**10.2   Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on the later of (a) the Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; provided, however, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date.

**10.3   Distribution Agent**.  The Distribution Agent shall make all distributions required under this Plan except (a) as set forth in Article 10.5 below and (b) with respect to any Holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer, as applicable, who shall deliver such distributions to the Holders of Claims in accordance with the provisions of this Plan and the terms of any governing agreement.

**10.4   Currency**.  Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

**10.5   Distributions on Account of Claims Allowed as of the Effective Date**.

(a)   **Delivery of Distributions in General**.  Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Initial Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; provided, however, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(c) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

(b)   **Delivery of Distributions to Servicers**.  In the case of a Holders of Claims whose Claims are governed by an agreement and administered by a Servicer, the respective Servicer shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder.  The Distribution Agent shall make all distributions on account of such Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion.  The

Servicers shall hold or direct such distributions for the benefit of Holders of such Allowed Claims, as applicable; provided, however, the Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to Claim Holders; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article X shall be deemed satisfied upon delivery of distributions to each Servicer or the entity or entities designated by the Servicers.

(c)     **Fees and Expenses of Servicers**.  The Reorganized Debtors shall reimburse in Cash any Servicer for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under this Plan to Holders of Allowed Claims and the Servicer's further performance of its duties under the Indentures until all such Allowed Claims are paid in full and a Final Decree is entered, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties shall report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses.  Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

**10.6    Distributions on Account of Claims Allowed After the Effective Date**.

(a)     **No Distributions Pending Allowance**.    No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)     **Distributions After Allowance**.  Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such Holder of a Claim.  On the first Periodic Distribution Date that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

(c)     **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the

relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or this Plan.

### 10.7    Delivery Of Distributions.

(a)    **Record Date for Distributions**. On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)    **Allowed Claims**. Distributions to Holders of Allowed Claims shall be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)    **Undeliverable Distributions**. If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or the appropriate Servicer is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.

(d)    **Reversion**. Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors free of any restrictions thereon, and to the extent such Unclaimed Distribution is New SUNE Common Stock, shall be deemed cancelled. Upon

vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(e)    **De Minimis Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $[250,000]; underline{provided} that the Reorganized Debtors shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $[250,000] if the Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $[50.00].

(f)    **Fractional Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make partial distributions or distributions of fractional shares of New SUNE Common Stock, Continuing TERP Class A Shares, or distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fractional share of New SUNE Common Stock or Continuing TERP Class A Shares under the Plan would otherwise be called for, such fraction shall be deemed zero.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**10.8    Accrual of Dividends and Other Rights**.  For purposes of determining the accrual of dividends or other rights after the Effective Date, New SUNE Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; <u>provided</u>, <u>however</u>, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New SUNE Common Stock actually take place.

**10.9    Surrender of Securities or Instruments**.  As soon as practicable after the Effective Date, each Second Lien Senior Noteholder and Convertible Senior Noteholder shall surrender its note(s) to the relevant Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, The Depository Trust Company, the Reorganized Debtors shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustees.  No distributions under the Plan shall be made for or on behalf of such Holder unless and until  such note(s) is received by the Indenture Trustees or the loss, theft or destruction of such note(s) is established to the reasonable satisfaction of the applicable

Indenture Trustee, which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Indenture Trustees, harmless in respect of such note and distributions made thereof.  Upon compliance with this Article 10.9 by a Second Lien Senior Noteholder or Convertible Senior Noteholder, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such Claim.  Any Holder that fails to surrender such Second Lien Senior Note or Convertible Senior Note or satisfactorily explain its non-availability to the applicable Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property), or the Indenture Trustees in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the applicable Indenture Trustee, and any such security shall be cancelled.  Notwithstanding the foregoing, if the record Holder of a Second Lien Senior Noteholder or a Convertible Senior Noteholder is DTC or its nominee or such other securities depository or custodian thereof, or if a Second Lien Senior Notes Claim or a Convertible Senior Notes Claim is held in book-entry or electronic form pursuant to a global security held by DTC or such other securities depository or custodian thereof, then the beneficial Holder of such an Allowed Second Lien Senior Notes Claim or Allowed Convertible Senior Notes Claim shall be deemed to have surrendered such Holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

**10.10  Compliance Matters**.  In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

**10.11  Claims Paid or Payable by Third Parties**.

(a)  **Claims Paid by Third Parties**.  The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim

from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)  **Claims Payable by Insurance Carriers**.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the claims register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)  **Applicability of Insurance Policies**.  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**10.12  Setoffs**.  Except as otherwise expressly provided for in the Plan and except with respect to any DIP Facility Claims, Second Lien Claim (including any Second Lien Senior Notes Deficiency Claim, Second Lien Loan Deficiency Claim, Second Lien Senior Notes Secured Claim, and Second Lien Loan Secured Claim), Convertible Senior Notes Claim, and any distribution on account thereof, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**10.13  Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount

of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE XI

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**11.1    Vesting of Assets**.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Causes of Action, but excluding the GUC/Litigation Trust Assets and property that has been abandoned pursuant to an order of the Bankruptcy Court) shall vest in the Reorganized Debtors which, unless otherwise indicated in the Plan, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.  As of and following the Effective Date, the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

## 11.2    Discharge of the Debtors.

(a)    **Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or the Confirmation Order, and effective as of the Effective Date: (a) the distributions and rights that are provided in this Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted this Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to**

70

**the occurrence of the Effective Date.  Notwithstanding the foregoing, nothing herein shall prevent the Second Lien Lenders and the Second Lien Noteholders from asserting and collecting from third parties the full amount of any of their Claims in the Second Lien Litigation, to the extent such Claims are not paid in full in Cash pursuant to this Plan.**

(b)    **Without limiting the foregoing, the discharge granted to the Debtors as provided herein shall not discharge liability to the Holders of Second Lien Claims, if any, of non-Debtor third-parties, including those named in the Second Lien Litigation and nothing herein shall prevent the Second Lien Lenders and the Second Lien Noteholders from asserting and collecting from third parties the full amount of any of their Claims in the Second Lien Litigation or otherwise.**

**11.3    Discharge of Liabilities Related to General Unsecured Claims, Convertible Senior Notes Claims, and Second Lien Deficiency Claims.**  The transfer to, vesting in, and assumption by the GUC/Litigation Trust of the GUC/Litigation Trust Assets as contemplated by this Plan, among other things, shall discharge the Debtors, the Reorganized Debtors, and their representatives for and in respect of all General Unsecured Claims, Convertible Senior Notes Claims, and Second Lien Deficiency Claims.

**11.4    Compromises and Settlements**.  This Plan is intended to incorporate the agreements reached in the GUC/Litigation Trust Agreement and the settlement described in the Plan and Disclosure Statement regarding the UCC Challenge Litigation and BOKF Objection.  In accordance with Article 9.2 of this Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to and including the Effective Date.  After the Effective Date, any such right shall pass to the Reorganized Debtors and/or the GUC/Litigation Trust, pursuant to the terms of the GUC/Litigation Trust Agreement, and as contemplated in Article 11.1 of this Plan, without the need for further approval of the Bankruptcy Court.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, its Estate, and Holders of Claims and Interests, and is fair, equitable, and reasonable.  Notwithstanding the foregoing, nothing herein shall prevent the Second Lien Lenders and the Second Lien Noteholders from asserting and collecting from third parties the full amount of any of their Claims in the Second Lien Litigation, to the extent such Claims are not paid in full in Cash pursuant to this Plan.

**11.5    Release by Debtors.  [To come].**

**11.6    Release by Holders of Claims and Interests.  As of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Debtors, the Reorganized**

Debtors, their Estates, non-Debtor Affiliates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or capable of being asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering, the GUC/Litigation Trust Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, willful misconduct, or intentional fraud. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**11.7    Exculpation and Limitation of Liability.** Subject to **Article 11.8** of this Plan, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; **provided**, **however**, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with regard to the distributions of the New SUNE Common Stock and Continuing TERP Class A Shares, as applicable, pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything to the contrary contained herein, subject to **Article 11.8** of this Plan, the YieldCos and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after the Petition Date) shall neither have, nor incur any liability to any Entity for any Exculpated Claim; **provided**, **however**, that the foregoing exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law.

**11.8    Exclusions and Limitations on Exculpation, Indemnification, and Releases**.  Notwithstanding anything in this Plan to the contrary, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated hereunder or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.  In the event that any exculpation or release provision in this Plan conflicts with Section 4 of a YieldCo Settlement Agreements, Section 4 of such YieldCo Settlement Agreement shall govern with respect to the applicable YieldCo.

**11.9    <u>Injunction</u>.  Subject to <u>Article 11.8</u> of this Plan, the satisfaction, release, and discharge pursuant to this <u>Article XI</u> shall act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, including any Exculpated Claim, or discharged under this Plan or pursuant to the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

**11.10    Subordination Rights**.

(a)    Except as otherwise provided in the Plan, the allowance, classification and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise and all Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date.  Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan (including Plan Exhibits), the Confirmation Order or an order of the Bankruptcy Court, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination; <u>provided</u>, <u>however</u>, that the Debtors and the Reorganized Debtors shall not seek subordination of any DIP Facility Claim or Second Lien Claim, and such Claims are Allowed in full and not subject to any subordination of any kind.  Unless the Plan (including Plan Exhibits)

or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this Article 11.10(b) unless ordered by the Bankruptcy Court.

(c)    This Plan shall be deemed compliant with all of the provisions of that certain Collateral Trust Agreement, dated January 11, 2016, between and among SunEdison, Inc., the guarantors and additional *pari passu* lien representatives from time to time party thereto, the Second Lien Administrative Agent, the Second Lien Senior Notes Indenture Trustee, and the Collateral Trustee.  Upon entry of the Confirmation Order, and provided that distributions under the Plan are made in accordance with the Plan and the Confirmation Order, no party shall have any further rights to enforce the Collateral Trust Agreement or the provisions thereof.

**11.11    Protection Against Discriminatory Treatment**.  Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom such the Reorganized Debtors has been associated, solely because the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**11.12    Recoupment**.  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**11.13    Release of Liens**.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

**11.14    Reimbursement or Contribution**.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

# ARTICLE XII

## CONDITIONS PRECEDENT

**12.1    Conditions to Confirmation**.  The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order;

(b)    in the TERP Share Election Alternative, the Bankruptcy Court shall have entered an Order, in form and substance reasonably satisfactory to the Supporting Second Lien Parties, approving the Debtors' entry into the Rights Offering Commitment Letter;

(c)    the Confirmation Order shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties.

**12.2    Conditions to the Effective Date of the Plan**.  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

(c)    all Plan Transaction Documents shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties;

(d)    in the TERP Share Election Alternative, the Rights Offering shall have been consummated on terms and conditions reasonably satisfactory to the Supporting Second Lien Parties;

(e)    the Jointly Supported Transactions shall have closed, the terms and conditions of which Jointly Supported Transactions (including, without limitation, purchase price) shall be reasonably satisfactory to the Supporting Second Lien Parties; provided, that the Jointly Supported Transactions embodied by the YieldCo Settlement Agreements, Voting and Support Agreements, and Merger Agreements (in the forms required to be supported by the Supporting Second Lien Parties) are deemed to be reasonably satisfactory to the Supporting Second Lien Parties;

(f)    the organizational documents of the Reorganized Debtors as contemplated herein shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

(g)    all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors;

(h)    each of Reorganized SUNE and the GUC/Litigation Trust shall have been established in a manner consistent with this Plan and on terms and conditions reasonably satisfactory to the Supporting Second Lien Parties;

(i)    the New Boards and senior management shall have been selected as contemplated by this Plan;

(j)    all other documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred in form and substance and in a manner reasonably satisfactory to the Supporting Second Lien Parties;

(k)    the Fee Examiner shall have been appointed;

(l)    the Debtors shall have filed the GUC/Litigation Trust Initial Funding amount in the Plan Supplement and, if there are objections to such proposed funding amount, the Court shall have made a determination with respect thereto; and

(m)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

**12.3    Waiver of Conditions Precedent**.  The conditions set forth in Articles 12.1 and 12.2 may be waived, in whole or in part, by agreement of both (a) the Debtors and (b) the Supporting Second Lien Parties, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

**12.4    Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 12.2 of this Plan have been satisfied or waived pursuant to Article 12.3 of this Plan.

**12.5    Effect of Non-Occurrence of Conditions to Consummation**.  If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

# ARTICLE XIII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)    resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)    adjudicate any and all adversary proceedings and contested matters that may be commenced and maintained by the GUC/Litigation Trust or any other matters concerning administration of the GUC/Litigation Trust or any actions taken or contemplated to be taken by the GUC/Litigation Trust;

(d)    ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)    allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(f)    hear and determine or resolve any and all matters related to Causes of Action;

(g)    enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(h)      issue and implement orders in aid of execution, implementation, or consummation of this Plan;

(i)      consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)      hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(k)      determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(l)      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(m)      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(n)      hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(o)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(p)      resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(q)      hear any other matter not inconsistent with the Bankruptcy Code;

(r)      hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(s)      enter a Final Decree closing the Chapter 11 Cases;

(t)      enforce all orders previously entered by the Bankruptcy Court;

(u)      hear and determine all matters relating to any Bankruptcy Code section 510(b) Claims;

(v)      hear and determine all disputes and issues arising from the GUC/Litigation Trust, the GUC/Litigation Trust Agreement, the assets and Causes of Action

granted and/or assigned to the GUC/Litigation Trust, and any other related matters in connection therewith;

(w)    hear and determine all disputes regarding the out-of-pocket costs and expenses of the Debtors and Reorganized Debtors in connection with cooperating with the GUC/Litigation Trust Trustee with respect to GUC/Litigation Trust Causes of Actions.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of this Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement.  Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.1    Binding Effect**.  Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**14.2    Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree.

**14.3    Payment of Certain Additional Professional Fees**.  To the extent not paid prior to the Effective Date, on the Effective Date, the Reorganized Debtors shall pay all obligations required to be paid under paragraph 2(a) of the DIP Facility Order in Cash until such obligations are satisfied in full.

**14.4    Modification and Amendments**.  Subject to the terms and conditions of the GUC/Litigation Trust Agreement, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, with the consent of (a) the Supporting Second Lien Parties and (b) the Creditors' Committee (but solely to the extent it affects the GUC/Litigation Trust Agreement), in each of clauses (a) and (b), such consent not to be unreasonably withheld or delayed, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**14.5    Confirmation of the Plan**.  The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan, with the reasonable consent of the Supporting Second Lien Parties, to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**14.6    Additional Documents**.  On or before the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

**14.7    Dissolution of Creditors' Committee**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be released from any further duties, responsibilities, and liabilities in the Chapter 11 Cases and under the Bankruptcy Code; provided, that obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases shall remain in full force and effect according to their terms; provided, further, that, following the Confirmation Date, the Creditors' Committee shall continue in existence solely for the following limited purposes: (a) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) responding to creditor inquiries for thirty (30) days following the Confirmation Date.  The Professionals retained by the Creditors' Committee and the respective members of the Creditors' Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Confirmation Date; provided, however, notwithstanding the foregoing, the Professionals retained by the Creditors' Committee shall be entitled to submit invoices for compensation and reimbursement of expenses for time spent with respect to applications for the allowance of compensation and reimbursement of expenses filed after the Confirmation Date.

**14.8    Revocation, Withdrawal, or Non-Consummation**.

(a)    **Right to Revoke or Withdraw**.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    **Effect of Withdrawal, Revocation, or Non-Consummation**.  If the Debtors revoke or withdraws this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise approved as part of this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void in all respects.  In such event,

80

nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

    **14.9    Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

    **If to the Debtors:**

    c/o SunEdison, Inc.
    13736 Riverport Dr.
    Maryland Heights, MO 63043
    Attn.: Martin H. Truong (mtruong@sunedison.com)
    Senior Vice President, General Counsel and Secretary

    with a copy to:

    Skadden, Arps, Slate, Meagher &
      Flom LLP
    Four Times Square
    New York, New York 10036
    Att'n:  Jay M. Goffman
        J. Eric Ivester

    – and –
    Skadden, Arps, Slate, Meagher &
      Flom LLP
    155 North Wacker Drive, Suite 2700
    Chicago, Illinois 60606
    Att'n:  James J. Mazza, Jr.
        Louis S. Chiappetta

    – and –

    One Rodney Square
    P.O. Box 636
    Wilmington, Delaware 19899
    Att'n:  Anthony W. Clark

    **If to the DIP Agent:**

    White & Case LLP
    1155 Avenue of the Americas

New York, New York 10036
Att'n:  Scott Greissman
          Elizabeth Feld

**If to the Second Lien Lenders:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
Att'n:  Arik Preis
          Yochun Katie Lee

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of New York
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York   10014
Att'n:  Paul Schwartzberg

**If to the Creditors' Committee:**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Att'n:  Matt Barr
          Jill Frizzley

– and –

Morrison & Foerester LLP
250 West 55th Street
New York, New York 10019
Att'n:  Elizabeth Sluder

**14.10   Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or
in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to
sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing
on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the
Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions
or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in
accordance with their terms.

**14.11   Governing Law**.  Unless a rule of law or procedure is supplied by federal
law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically
stated, the laws of the State of New York shall govern the construction and implementation of
this Plan, any agreements, documents, and instruments executed in connection with this Plan

82

(except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state of incorporation of the Reorganized Debtors.

**14.12    Entire Agreement**. Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**14.13    Severability**. If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

**14.14    No Waiver or Estoppel**. Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**14.15    Conflicts**. In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern. In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

Dated: March 28, 2017

Respectfully submitted,

SUNEDISON, INC. AND ITS AFFILIATE
DEBTORS

By: _____
Name:  John S. Dubel
Title:  Chief Executive Officer of
SunEdison, Inc. and Chief Restructuring
Officer of all Debtors

*Joint Plan of Reorganization of SunEdison, Inc., et al.*