**Hearing Date: April 25, 2017 at 2:00 p.m. (Prevailing Eastern Time)**
**Objection Deadline: April 18, 2017 at 4:00 p.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10992 (SMB)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**NOTICE OF DEBTORS' MOTION FOR ORDER (I) AUTHORIZING DEBTORS (A) TO
OBTAIN REPLACEMENT POSTPETITION FINANCING PURSUANT TO
BANKRUPTCY CODE SECTIONS 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),
AND 364(e), (B) TO UTILIZE CASH COLLATERAL PURSUANT TO BANKRUPTCY
CODE SECTION 363, AND (C) TO REPAY EXISTING POSTPETITION FINANCING
PURSUANT TO BANKRUPTCY CODE SECTION 363(b), (II) GRANTING ADEQUATE
PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO
BANKRUPTCY CODE SECTIONS 361, 362, 363 AND 364 AND (III) SCHEDULING
HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

**PLEASE TAKE NOTICE** that SunEdison, Inc. and certain of its affiliates, the

debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors")

hereby file the *Debtors' Motion For Order (I) Authorizing Debtors (A) To Obtain Replacement

Postpetition Financing Pursuant To Bankruptcy Code Sections 105, 361, 362, 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), And 364(e), (B) To Utilize Cash Collateral Pursuant To

Bankruptcy Code Section 363, And (C) To Repay Existing Postpetition Financing Pursuant To

Bankruptcy Code Section 363(b), (II) Granting Adequate Protection To Prepetition Secured

Parties Pursuant To Bankruptcy Code Sections 361, 362, 363 And 364 And (III) Scheduling

Hearing Pursuant To Bankruptcy Rules 4001(b) And (c)* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the

Motion and the relief requested therein, if any, must be made in writing and (a) filed with the

Bankruptcy Court no later than **4:00 p.m. (Prevailing Eastern Time) on April 18, 2017** (the

"Objection Deadline") and (b) served so as to be actually received by the following parties by the

Objection Deadline:

      (i)      the Debtors, SunEdison, Inc., 13736 Riverport Dr., Maryland Heights,
Missouri 63043;

      (ii)      counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four
Times Square, New York, NY 10036, Attn: Jay M. Goffman (Jay.Goffman@skadden.com), J.
Eric Ivester (Eric.Ivester@skadden.com), and 155 North Wacker Dr., Chicago, IL 60606, Attn:
James J. Mazza, Jr. (James.Mazza@skadden.com) and Louis S. Chiappetta
(Louis.Chiappetta@skadden.com);

(iii)    the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Paul Schwartzberg (Paul.Schwartzberg@usdoj.gov);

(iv)    counsel to the administrative agent under the Debtors' prepetition first lien credit agreement, Latham & Watkins, 330 North Wabash Avenue, Suite 2800, Chicago, IL, Attn: Richard Levy (richard.levy@lw.com) and Brad Kotler (brad.kotler@lw.com);

(v)    counsel to the Tranche B Lenders (as defined in the debtor-in-possession credit agreement) and the steering committee of the second lien creditors, Akin Gump Strauss Hauer & Field, LLP, One Bryant Park, Bank of America Tower, New York, NY, 10036, Attn: Arik Preis (apreis@akingump.com) and Naomi Moss (nmoss@akingump.com);

(vi)    counsel to the administrative agent under the Debtors' prepetition second lien credit agreement, Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY 10036, Attn: Daniel S. Brown (daniel.brown@pillsburylaw.com);

(vii)    counsel to the collateral trustee under the Debtors' prepetition second lien credit agreement and the indenture trustee under each of the Debtors' outstanding bond issuances, WilmerHale, 7 World Trade Center, New York, NY  10007, Attn: Andrew Goldman (andrew.goldman@wilmerhale.com);

(viii)    the Office of the United States Attorney for the Southern District of New York, 86 Chambers Street, 3rd Floor, New York, NY 10007;

(ix)    counsel to the administrative agent under the postpetition debtor-in-possession financing facility, White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036-2787, Attn: Scott Greissman (sgreissman@whitecase.com) and Elizabeth Feld (efeld@whitecase.com);

(x)    counsel to the ad hoc group of certain holders of the Debtors' convertible senior notes, White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036-2787, Attn: Tom Lauria (tlauria@whitecase.com);

(xi)    counsel to the official committee of unsecured creditors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Matthew S. Barr, David J. Lender, Jonathan D. Polkes, Joseph H. Smolinsky and Jill Frizzley (SunEWeilBFR@weil.com) and Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Lorenzo Marinuzzi (lmarinuzzi@mofo.com), Jennifer Marines (jmarines@mofo.com) and Jonathan I. Levine (jonlevine@mofo.com);

(xii)    counsel to TerraForm Power, Inc. and TerraForm Global, Inc., Sullivan & Cromwell, 125 Broad Street, New York, NY 10004, Attn: Michael H. Torkin (torkinm@sullcrom.com), Andrew G. Dietderich (dietdericha@sullcrom.com), John L. Hardiman (hardimanj@sullcrom.com) and David R. Zylberberg (zylberbergd@sullcrom.com);

        (xiii)   the Internal Revenue Service, 290 Broadway, New York, NY 10007, Attn: District Director; and

        (xiv)   the Securities and Exchange Commission, 200 Vesey Street, Suite 400, New York, NY 10281, Attn: Bankruptcy Department.

        **PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 723, New York, New York 10004 (the "<u>Bankruptcy Court</u>"), on **April 25, 2017 at 2:00 p.m. (Prevailing Eastern Time)** (the "<u>Hearing</u>"), or as soon thereafter as counsel may be heard.

        **PLEASE TAKE FURTHER NOTICE** that unless a written objection to the Motion, with proof of service, is filed with the Bankruptcy Court and a courtesy copy delivered to the Honorable Stuart M. Bernstein's chambers by the Objection Deadline, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order attached to the Motion, which order may be entered with no further notice or opportunity to be heard.

        **[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated:  April 4, 2017
New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:  /s/ J. Eric Ivester
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10922 (SMB)** |
| | : | |
| **Debtors.**[1] | : | **Jointly Administered** |
| | : | |
| | : | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**DEBTORS' MOTION FOR ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN
REPLACEMENT POSTPETITION FINANCING PURSUANT TO BANKRUPTCY CODE
SECTIONS 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e), (B) TO
UTILIZE CASH COLLATERAL PURSUANT TO BANKRUPTCY CODE SECTION 363,
AND (C) TO REPAY EXISTING POSTPETITION FINANCING PURSUANT TO
BANKRUPTCY CODE SECTION 363(b), (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES PURSUANT TO BANKRUPTCY CODE SECTIONS
361, 362, 363 AND 364 AND (III) SCHEDULING HEARING PURSUANT TO
BANKRUPTCY RULES 4001(b) AND (c)**

SunEdison, Inc. ("SUNE" or the "Borrower") and certain of its affiliates, the debtors

and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together

with their non-Debtor affiliates, "SunEdison" or the "Company")[2] hereby move (the "Motion") this

Court for entry of an order (the "Replacement DIP Order" and, together with the Original Interim

DIP Order[3] and the Original Final DIP Order,[4] as such orders are amended, superseded or modified

by the Replacement DIP Order, the "DIP Orders"), under sections 105, 361, 362, 363(b), 363(c)(2),

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 4001, and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District

of New York (the "Local Bankruptcy Rules") (i) authorizing, but not directing, the Debtors to (a)

amend and restate that certain Senior Secured Superpriority Debtor-In-Possession Credit

Agreement, dated as of April 26, 2016 (as amended, restated, supplemented, or otherwise modified

---

[2]   For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc.
("TERP") and Terraform Global, Inc. ("GLBL") and each of their respective direct and indirect subsidiaries
(collectively, the "YieldCo(s)").

[3]   "Original Interim DIP Order" means the Interim Order (I) Authorizing Debtors to (A) Obtain Senior Secured,
Superpriority, Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(C)(1), 364(C)(2),
364(C)(3), 364(D)(1), and 364(E)(1) and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, (II)
Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363
and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c), entered on April 26,
2016 [Docket No. 87].

[4]   "Original Final DIP Order" means the Final Order (I) Authorizing Debtors to (A) Obtain Senior Secured,
Superpriority, Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(C)(1), 364(C)(2),
364(C)(3), 364(D)(1), and 364(E)(1) and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, and
(II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362,
363 and 364, entered on June 9, 2016 [Docket No. 523].

immediately prior to the Closing Date (as defined below), the "Existing DIP Credit Agreement," and the lenders party thereto from time to time prior to the Closing Date, the "Existing DIP Lenders"),[5] among the Borrower, Deutsche Bank AG New York Branch, as Administrative Agent, and the other financial institutions party thereto from time to time (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and the terms of the Replacement DIP Order, the "Replacement DIP Credit Agreement," and the lenders party thereto from time to time, the "Replacement DIP Lenders"), and execute and deliver all other agreements, documents, instruments, and/or amendments executed and/or delivered from time to time in connection therewith (collectively with the Replacement DIP Credit Agreement, all exhibits thereto, and all other "Loan Documents" (as defined in the Replacement DIP Credit Agreement), and the DIP Orders, the "DIP Documents"), in order to pay off, in full in cash (except for the Remaining Second Lien Obligations (as defined in Annex I to the Original Final DIP Order)), the existing debtor-in-possession financing facilities (the "Existing DIP Facility") extended pursuant to the Existing DIP Credit Agreement and cash collateralize existing letters of credit outstanding under the Existing DIP Facility, (b) obtain postpetition financing on a senior secured superpriority basis as contemplated by the DIP Documents, (c) perform all such other and further acts as may be required in connection with the DIP Documents, and (d) use cash collateral and the proceeds of the loans and other credit extensions under the DIP Documents; (ii) granting adequate protection to prepetition secured parties in a manner substantially consistent with the Existing DIP Credit Agreement (as modified pursuant to the terms herein); (iii) scheduling a hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (iv) granting related relief.

---

[5]  Except as otherwise indicated, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing DIP Credit Agreement.

In support of the Motion, the Debtors rely upon and incorporate by reference (1) the Declaration of Patrick M. Cook, Vice-President – Capital Markets and Corporate Finance of SunEdison, Inc., in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 4] (the "First Day Declaration"), (2) the Declaration of Philip Gund, Chief Financial Officer of SunEdison, Inc., in support of the Motion  (the "Company Declaration"), filed concurrently herewith, and (3) the Declaration of Homer Parkhill, Managing Director of Rothschild, Inc. the Debtors' investment banker, in support of the Motion (the "Rothschild Declaration"), filed concurrently herewith.  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.      These cases have reached a critical inflection point.  Last week, the Debtors filed a joint plan of reorganization (the "Plan") that lays the groundwork for the Debtors' emergence from chapter 11.[6]  That Plan is premised on the Debtors' recently struck Yieldco settlement agreements, which are subject to Court approval,[7] and the underlying Jointly Supported Transactions (as defined in the Settlement Agreements) that will deliver substantial value to the Debtors' estates upon their consummation.  The Plan contemplates a to-be negotiated backstop commitment from certain financing sources who will commit to providing the additional capital required to fund the Plan.

2.      The Plan also proposes to settle certain matters pursuant to Bankruptcy Rule 9019, including without limitation the ongoing lien challenge litigation (and OID claims objections)

---

[6]    On March 28, 2017, the Debtors filed their proposed Joint Plan of Reorganization [Docket No. 2671] (the "Plan") and accompanying Disclosure Statement [Docket No. 2672]

[7]    See Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105, 362, 363(B), And 365(A), Bankruptcy Rules 6004, 6006, And 9019, And Local Bankruptcy Rule 6006-1 Authorizing And Approving Certain Settlement Agreements Among The Debtors And The Yieldcos [Docket No. 2570], seeking approval of the settlement agreements (the "Settlement Agreements") entered into by SunEdison and the Yieldcos as of March 6, 2017.

between the Committee and the Debtors' secured prepetition lenders, by providing that: (i) the

holders of prepetition second lien claims will waive approximately $18 million (in the aggregate) of

their deficiency claims as OID, (ii) the holders of prepetition second lien claims will give up (a)

10% of their potential recovery on account of their prepetition secured claims and (b) 10% of the

distributions they would receive from the GUC/Litigation Trust (as defined below) on account of

their deficiency claims to general unsecured creditors on a Debtor-by-Debtor basis, and (iii) 10% of

the subscription rights given to holders of prepetition secured claims on account of their prepetition

secured claims in the rights offering under the Plan will be given to eligible holders of general

unsecured claims, each of which delivers additional value to general unsecured creditors that would

not otherwise be available to them.  Further, the Plan preserves the value to be provided to the

Debtors' general unsecured creditors as a result of the original settlement between the Committee

and the Existing DIP Lenders by establishing a litigation trust (the "GUC/Litigation Trust") that

will be funded consistent with the Existing DIP Credit Agreement and with the trustee empowered

to prosecute certain estate causes of action for the benefit of unsecured creditors on a Debtor-by-

Debtor basis.

    3.  To bridge the gap period between the Debtors' projected timeline for

confirmation of their proposed Plan and consummation of the Jointly Supported Transactions that

are the bedrock of that Plan, the Debtors have also had to address the impending April 26, 2017

maturity (the "Maturity Date") of their Existing DIP Facility.  In this regard, the Debtors and their

advisors engaged in a comprehensive outreach and negotiation process with various potential

debtor-in-possession ("DIP") financing sources over the course of nearly 12 weeks, and ultimately

coalesced around the senior secured superpriority debtor-in-possession term loan facilities (the

"Replacement DIP Facilities") that are the subject of this Motion.  The Replacement DIP Facilities,

which will provide a new maturity date of up to one year[8] from the Closing Date (as defined below),

will be comprised of (i) new money term loans (the "Replacement New Money DIP Loans") in an

aggregate principal amount not to exceed $640 million, the proceeds of which will be used, among

other things, to pay off the Existing DIP Facility in full as of the Closing Date (other than the

Remaining Second Lien Obligations – i.e., approximately $300 million of the Tranche B Roll-Up

Loans (excluding any payment-in-kind ("PIK") interest) that are not *pari passu* with the Tranche A-

1 Roll-Up Loans), and (ii) term loans in an aggregate principal amount equal to the aggregate

outstanding principal amount of the Remaining Second Lien Obligations, which shall be deemed

"rolled-up" and outstanding in their entirety as loans under the Replacement DIP Credit Agreement

(the "Second Lien Roll-Up Loans").[9]  In addition to their payoff of the vast majority of the Debtors'

outstanding obligations under the Existing DIP Facility, the Replacement DIP Facilities will provide

the Debtors with the necessary liquidity to drive these Chapter 11 Cases toward Plan confirmation

and, ultimately, emergence.

4.      Moreover, the Replacement DIP Facilities contain a number of favorable

terms as compared to the Existing DIP Facility.  Among other things, the Replacement DIP

Facilities will eliminate existing DIP milestones; ease certain  reporting and mandatory cash

sweep/prepayment requirements under the Existing DIP Credit Agreement; simplify the lender

consent process; and provide certain relief with respect to the financial covenants and Budget

variance covenants under the Existing Credit Agreement, thus alleviating the need for the Debtors

to obtain regular DIP amendments or waivers.  Importantly, the Replacement DIP Facilities

---

[8]     For the avoidance of doubt, although the Replacement DIP Facilities have an up to one-year maturity, the Debtors do not currently anticipate that the Chapter 11 Cases will last the full year – it being their intent to emerge from chapter 11 upon the closing of the Jointly Supported Transactions with Brookfield Asset Management, Inc. ("Brookfield"), which are expected to close in the second half of 2017.

[9]     It shall be a condition to closing that the Second Lien Roll-Up Loans go effective simultaneously with the closing of the Replacement New Money DIP Loans.

preserve, and take no position with respect to, the original DIP settlement between the Committee

and the Existing DIP Lenders.[10]

5.      Without access to the Replacement DIP Facilities, the Debtors do not believe

they would be able to refinance or otherwise extend the Existing DIP Facility's impending Maturity

Date – which would require 100% lender consent – and would not have access to sufficient funds to

operate their business as they forge a path toward Plan confirmation.  Further, going outside of the

Debtors' capital structure to bring in replacement DIP financing of the size needed to pay off the

Existing DIP Facility in full and the Prepetition Second Lien Debt is not a viable option.  Based on

the available value for distribution to creditors in these Chapter 11 Cases as a result of the Yieldco

transactions with Brookfield and other asset sale processes, there is no equity cushion to allow for

priming of the Prepetition Second Lien Debt.  Thus, given the obvious benefits of the Replacement

DIP Facilities, in contrast to the severe value degradation that would undoubtedly occur if the

Debtors could not replace the Existing DIP Facility, this Court should approve the Replacement DIP

Facilities and it is critical that the Debtors obtain such approval prior to the Maturity Date.

6.      While the Debtors and the Commitment Parties[11] have reached an agreement

on the indicative term sheet for the Replacement DIP Facilities, a substantially final version of

which is attached hereto as Exhibit A (the "Term Sheet"),  the terms of the Replacement DIP Credit

Agreement and Replacement DIP Order are still being negotiated and will be filed with the Court as

soon as they are finalized, and in any event, at least two weeks in advance of the hearing to approve

this Motion on April 25, 2017, consistent with Bankruptcy Rule 4001.  In sum, for the reasons set

---

[10]    As set forth in the Term Sheet attached as Exhibit A hereto, the rights and claims of the relevant parties to Annex II of the Existing DIP Facility are reserved with respect to whether the Maturity Date under the Existing DIP Facility has occurred, or will occur, for purposes of the original DIP settlement between the Committee and the Existing DIP Lenders.

[11]    References herein to "Commitment Parties" and "Required Commitment Parties" shall have the meanings ascribed to such terms under the Commitment Letter (as defined herein) upon execution thereof.

forth herein, the relief sought herein is appropriate and the Debtors believe entry into the

Replacement DIP Facilities represents the best option to maximize value and is in the best interests

of their estates.

## CONCISE SUMMARY OF THE DIP FINANCING TERMS[12]

| | |
|---|---|
| **DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The Commitment Parties, the holders of the Second Lien Roll-Up Loans and their successors and permitted assigns as lenders (collectively, the "Lenders").<br><br>See Term Sheet, "LENDERS". |
| **Agent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | A financial institution determined by the Required Commitment Parties and reasonably acceptable to the Borrower (in such capacity, the "DIP Agent").<br><br>See Term Sheet, "ADMINISTRATIVE AND COLLATERAL AGENT". |
| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | SunEdison, Inc., a Delaware corporation.<br><br>See Term Sheet, "BORROWERS". |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Substantially the same guarantors that guarantee the Existing DIP Credit Agreement and such additional entities that otherwise become guarantors (subject to exceptions substantially similar to the Existing DIP Credit Agreement) (collectively with the Borrower, the "DIP Loan Parties").<br><br>See Term Sheet, "GUARANTORS". |
| **Commitment**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(1)* | Commitments for non-amortizing new money term loans (the "New Money DIP Loans") in an aggregate principal amount not to exceed $640 million to be made available to the Borrower in a single draw on the Closing Date.[13]<br><br>See Term Sheet, "DIP FACILITY". |
| **Term/Maturity**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The earliest of (a) the first anniversary of the Closing Date (the "Stated Maturity Date"), (b) the effective date of a plan of reorganization or liquidation for any Debtor, (c) a sale of all or substantially all of the assets of the Borrower and its subsidiaries, and (d) the acceleration of the loans in accordance with the Replacement DIP Credit Agreement.<br><br>At the option of the Borrower, the Stated Maturity Date may be extended up to an additional 60 days subject to (a) absence of any Default and Event of Default, (b) payment by the Borrower of an extension fee of 1.00% of the aggregate principal amount of all then |

---

[12]    This Concise Summary of the DIP Financing Terms (the "Summary Chart") is provided for the benefit of the Court and other parties in interest and is qualified in its entirety by reference to the applicable provisions of the Term Sheet, the Replacement DIP Credit Agreement or the Replacement DIP Order. A copy of the Term Sheet is attached hereto as Exhibit A and incorporated herein by reference. The terms and conditions set forth in this Summary Chart are based on current expectations of the Debtors and certain general documentary intentions described in the Term Sheet. To the extent this summary, on the one hand, conflicts with the Commitment Letter, the Term Sheet, the Replacement DIP Credit Agreement and/or the proposed Replacement DIP Order, on the other hand, the terms of such other document shall govern.

[13]    References herein to "Closing Date" shall mean the date on which the Replacement DIP Credit Agreement becomes effective and the Replacement New Money DIP Loans are funded.

|  | outstanding loans under the Replacement DIP Credit Agreement, (c) approval of an Acceptable Plan (as defined below) by the Bankruptcy Court and (d) to the extent not yet consummated, definitive documentation related to a sale of the YieldCos in form and substance reasonably satisfactory to each Commitment Party remaining in full force and effect (it being acknowledged by the Commitment Parties that, if in effect at such time, the documents listed on Annex C to the Term Sheet are satisfactory to the Commitment Parties, together with amendments, supplements or modifications thereto reasonably acceptable to the Commitment Parties (the "Specified YieldCo Documents")), and there being no continuing event or occurrence that would constitute a breach or default thereunder, which breach or default would give rise to a right of termination by any party thereto. |
|---|---|
|  | "Acceptable Plan" means a plan of reorganization or liquidation for the Debtors (or substantially all of them) in form and substance reasonably satisfactory to the Commitment Parties, which plan will be deemed acceptable by the Commitment Parties if it provides for Payment in Full (as defined in the Replacement DIP Credit Agreement, which definition shall be substantially similar to the definition thereof in the Existing DIP Credit Agreement) of all obligations under the DIP Documents on or prior to the effective date of such plan. |
|  | See Term Sheet, "MATURITY". |
| **Interest Rates** *Bankruptcy Rule 4001(c)(1)(B)* | Interest shall accrue at the applicable rate specified below and, for New Money DIP Loans, shall be paid in cash.  Interest on the Second Lien Roll-Up Loans shall be paid-in-kind (and increase the principal amount thereof) and shall not be paid in cash until the payment in full of the New Money DIP Loans and related obligations. |

| **Class of Loans:** | **For any Eurocurrency Rate Loans (subject to 1.00% LIBOR floor):** | **For any Base Rate Loans:** |
|---|---|---|
| New Money DIP Loans | Eurocurrency Rate + 7.50% | Base Rate + 6.50% |
| Second Lien Roll-Up Loans | Eurocurrency Rate + 12.00% | Base Rate + 11.00% |

|  | See Term Sheet, "INTEREST RATE". |
|---|---|
| **Expenses and Fees** *Bankruptcy Rule 4001(c)(1)(B)* *Local Bankruptcy Rule 4001-2(a)(3)* | Fees payable pursuant to the Term Sheet. See Term Sheet, "OTHER FEES". |
| **Default Rate:** *Bankruptcy Rule 4001(c)(1)(B)* *Local Bankruptcy Rule 4001-2(a)(3)* | 2 percentage points above the otherwise applicable rate. See Term Sheet, "DEFAULT INTEREST". |
| **Use of Proceeds** *Bankruptcy Rules 4001(b)(1)(B), (c)(1)(B)* | The proceeds of the New Money DIP Loans shall be used (a) to repay in full and in cash the aggregate outstanding principal amount of (and all accrued and unpaid interest, fees and other amounts related to) the Tranche A Term Loans, Tranche B Term Loans, Tranche A-1 Roll-Up Loans, Tranche A-2 Roll-Up Loans and L/C Borrowings, in each case, under the Existing DIP Credit Agreement, in each case, as of the Closing Date, (b) to cash collateralize all issued and undrawn Letters of Credit as of the Closing Date in an aggregate amount equal to 105% of the amount available to be drawn under all then outstanding |

| | |
|---|---|
| | Letters of Credit, (c) to repay in full and in cash the aggregate outstanding principal amount of (and all accrued and unpaid interest, fees and other amounts related to) the Specified Second Lien Obligations (as defined in the Replacement Intercreditor Annex (as used in this Summary Chart, as defined in the Replacement DIP Order)) as of the Closing Date (clauses (a), (b) and (c) collectively, the "<u>Refinancing</u>"), and (d) for such other purposes as are consistent with the Term Sheet.<br><br>See Term Sheet, "USE OF PROCEEDS". |
| **13-Week Budget**<br>*Bankruptcy Rules 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001(2)(a)(2)* | The Replacement Budget to be delivered pursuant to the Replacement DIP Credit Agreement shall be a 13-week forecast with respect to the DIP Loan Parties and their Subsidiaries in effect from time to time after the effective date of the Replacement DIP Credit Agreement pursuant thereto, in any such case, set forth on a weekly basis, in acceptable form pursuant to the Replacement DIP Credit Agreement. A proposed Replacement Budget shall be delivered by the Borrower bi-weekly, which shall be subject to the approval of the Required Lenders[14].<br><br>See Term Sheet, "BUDGET COVENANT". |
| **Liens and Priorities Other Than Adequate Protection Liens**<br>*Bankruptcy Rule 4001(c)(1)(B)(i), (xi),*<br>*Local Bankruptcy Rules 4001-2(a)(4)* | Substantially similar to the Original Final DIP Order and the Existing DIP Credit Agreement, modified as required to conform to the transactions contemplated by the Term Sheet. Notwithstanding anything to the contrary contained in any DIP Document, the liens and superpriority claims in respect of the New Money DIP Loans shall be senior and prior to any lien or superpriority claim in respect of the Second Lien Roll-Up Loans in accordance with the Replacement Intercreditor Annex.<br><br>See Term Sheet, "DOCUMENTATION", "COLLATERAL", "SUPERPRIORITY ADMINISTRATIVE CLAIMS" and "INTERCREDITOR ARRANGEMENTS". |
| **Adequate Protection**<br>*Bankruptcy Rule 4001(b)(1)(B)(iv),*<br>*(c)(1)(B)(ii)* | Substantially similar to the Original Final DIP Order and the Existing DIP Credit Agreement, modified as required to conform to the transactions contemplated by the Term Sheet.<br><br>See Term Sheet, "ADEQUATE PROTECTION". |
| **Carve Out**<br>*Local Bankruptcy Rule 4001-2(a)(5)* | Substantially similar to the Original Final DIP Order and the Existing DIP Credit Agreement.<br><br>See Term Sheet, "SUPERPRIORITY ADMINISTRATIVE CLAIMS". |
| **Cross Collateralization**<br>*Local Bankruptcy Rule 4001-2(a)(6)* | Substantially similar to the Existing DIP Credit Agreement, the Prepetition Second Lien Secured Parties will be granted liens and claims on substantially similar terms provided in Sections 6.17 and 6.27 of the Existing DIP Credit Agreement.<br><br>See Term Sheet, "AFFIRMATIVE COVENANTS". |
| **Roll Up** | Subject to the terms and applicable conditions set forth in the Existing DIP Credit |

---

[14] "<u>Required Lenders</u>" shall mean, as at any time of determination (i) prior to the Payment in Full of the New Money DIP Loans, (x) if the Commitment Parties collectively hold at least 50% of the principal amount of the New Money DIP Loans at such time, the Commitment Parties holding at least a majority of the principal amount of the commitments held by the Commitment Parties as of the Closing Date in the amounts set forth on Schedule I to the Commitment Letter, and (y) if the Commitment Parties collectively hold less than 50% of the principal amount of the New Money DIP Loans at such time, the Lenders holding at least a majority of the principal amount of the New Money DIP Loans at such time, and (ii) thereafter, the Lenders holding at least a majority of the principal amount of the Second Lien Roll-Up Loans at such time.

| | |
|---|---|
| *Local Bankruptcy Rule 4001-2(a)(7)* | Agreement and in the Original Final DIP Order, an aggregate principal amount of $350 million of Prepetition Second Lien Loans and Prepetition Second Lien Notes were authorized to be substituted and exchanged for (and prepaid by) and deemed to be loans issued and outstanding under the Existing DIP Credit Agreement as Tranche B Roll-Up Loans, which shall become effective substantially concurrently with the Closing Date. To the extent not repaid as part of the Refinancing, such Tranche B Roll-Up Loans shall constitute Second Lien Roll-Up Loans under the Replacement DIP Credit Agreement.<br><br>See Term Sheet, "DIP FACILITY". |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(10)* | Substantially similar to the Existing DIP Credit Agreement, modified as required to conform to the transactions contemplated by the Term Sheet and otherwise reasonably satisfactory to the Commitment Parties and shall, in any event, include an event of default for (i) any lien purported to be created under the DIP Documents on any portion of the equity interests in the YieldCos held by any DIP Loan Party (the "Specified DIP Collateral") shall, in either case, cease to be, or shall be asserted in writing by any DIP Loan Party not to be, a valid and perfected (to the extent so required by the DIP Documents) lien, in any such case, except as a result of any sale or other disposition thereof in a transaction permitted under the DIP Documents, and (ii) certain other events impairing the liens, rights or remedies of the DIP Agent and/or the Lenders relating to the Specified DIP Collateral (and the terms of the Specified YieldCo Documents shall not in and of themselves constitute such an impairment under clause (ii) above).<br><br>See Term Sheet, "EVENTS OF DEFAULT". |
| **Affirmative and Negative Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(8)* | Substantially similar to the Existing DIP Credit Agreement, modified as required to conform to the transactions contemplated by the Term Sheet and otherwise reasonably satisfactory to the Commitment Parties; provided that (i) the reporting covenants may be amended in a manner reasonably satisfactory to the Commitment Parties (but not more burdensome in any material respect than the reporting covenants under the Existing DIP Credit Agreement), (ii) no milestones or delivery of historical financial statements shall be required and (iii) the Borrower shall deliver a monthly cash flow projection covering the period of the immediately following month through the Stated Maturity Date.<br><br>See Term Sheet, "AFFIRMATIVE COVENANTS" and "NEGATIVE COVENANTS". |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)(vi)*<br>*Local Bankruptcy Rule 4001-2(a)(10), (12)* | None.<br><br>See Term Sheet, "AFFIRMATIVE COVENANTS". |
| **Financial Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Minimum Liquidity: Minimum liquidity covenant to be tested as of the end of each week and be set at a level of $25 million. The liquidity covenant shall test domestic cash balances (including the Borrower DIP Facilities Blocked Account).<br><br>Budget Compliance: Covenant to comply with the Replacement Budget, subject to variances not exceeding the greater of 15% of forecasted net cash flow for the relevant period and $20 million. Testing for permitted variances shall be a two-week cumulative test on an aggregated basis (and not by business segment).<br><br>See Term Sheet, "FINANCIAL COVENANT" and "BUDGET COVENANT". |
| **Borrowing Conditions**<br>*Bankruptcy Rule* | Conditions precedent substantially similar to the applicable provisions of the Existing DIP Credit Agreement and the following conditions: |

| | |
|---|---|
| *4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(2)* | (a)   consummation of the Refinancing, including the Cash Collateralization;<br><br>(b)   occurrence of the Tranche B Roll-Up Effective Date;<br><br>(c)   filing of an Acceptable Plan be filed with the Bankruptcy Court ;<br><br>(d)   delivery of an initial Replacement Budget in form and substance reasonably satisfactory to the Commitment Parties;<br><br>(e)   definitive documentation related to the sale of the YieldCos remaining in full force and effect and there being no continuing event or occurrence that would constitute a breach or default thereunder giving rise to termination rights;<br><br>(f)   satisfactory list DIP Loan Parties and Debtors as of the Closing Date;<br><br>(g)   material accuracy of representations;<br><br>(h)   compliance with the Commitment Letter and payment of fees and expenses;<br><br>(i)   the execution and delivery of the DIP Documents, which shall be in form and substance substantially consistent with the Term Sheet and otherwise on terms reasonably acceptable to the Commitment Parties;<br><br>(j)   the conditions precedent set forth in the DIP Documents;<br><br>(k)   the entry of the Replacement DIP Order, which shall be (y) be in full force and effect and unstayed and (z) not be modified in any manner materially adverse to the rights or interests of the Commitment Parties without their consent;<br><br>(l)   collateral and guaranty matters;<br><br>(m)   receipt of KYC and similar information for the DIP Loan Parties; and<br><br>(n)   governmental and material third party consents, and compliance with laws.<br><br><u>See</u> Term Sheet, "CONDITIONS PRECEDENT". |
| **Joint Obligations**<br>*Local Bankruptcy Rule*<br>*4001-2(a)(14)* | Joint and several liability, similar to the guaranty of the Existing DIP Credit Agreement.<br><br><u>See</u> Term Sheet, "GUARANTORS". |
| **Funding of Non-Debtor Affiliates**<br>*Local Bankruptcy Rule*<br>*4001-2(a)(15)* | Non-Debtor affiliates of the Borrower will be funded in accordance with the Replacement Budget.<br><br><u>See</u> Term Sheet, "BUDGET COVENANT" and "NEGATIVE COVENANTS". |
| **Material Terms, Including Duration and Use of Cash Collateral**<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(iii)* | Substantially similar to the Original Final DIP Order and the Existing DIP Credit Agreement.<br><br><u>See</u> Term Sheet, "DOCUMENTATION" and "VOLUNTARY AND MANDATORY PREPAYMENTS". |
| **Waiver of Automatic Stay**<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(iv)* | Substantially similar to the Original Final DIP Order, with other appropriate modifications to the automatic stay as necessary in connection with the Replacement L/C Arrangements and the other transactions contemplated by the Term Sheet.<br><br><u>See</u> Term Sheet, "DOCUMENTATION" and "VOLUNTARY AND MANDATORY PREPAYMENTS". |
| **Indemnification** | Substantially similar to the Existing DIP Credit Agreement.  All indemnification, |

| *Bankruptcy Rule 4001(c)(1)(B)(ix)* | reimbursement and any other contingent obligations of the DIP Loan Parties that may be owed to any parties to the Existing DIP Credit Agreement (solely in such respective capacities) pursuant to provisions thereof expressly stated to survive any repayment thereunder or termination thereof shall survive the transactions contemplated by Replacement DIP Credit Agreement.  Without relinquishing any party's rights under any other agreement, the terms of the Commitment Letter shall not give rise to any additional indemnification or reimbursement rights arising out of any Prepetition Debt Documents.<br><br>See Term Sheet, "USE OF PROCEEDS" and "INDEMNITY AND EXPENSE". |
|---|---|
| **Debtor's Stipulations**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)* | Substantially similar to the Original Final DIP Order.<br><br>See Term Sheet, "DOCUMENTATION". |
| **Effect of Debtor's Stipulations**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)* | Consistent with the Original Final DIP Order, the stipulations remain subject to the Committee's challenge rights.<br><br>See Term Sheet, "DOCUMENTATION". |
| **Section 506(c) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)(x)*<br>*Local Bankruptcy Rule 4001-2(a)(i)(C)* | Substantially similar to the Original Final DIP Order.<br><br>See Term Sheet, "DOCUMENTATION". |
| **Section 552(b) Waiver**<br>*Local Bankruptcy Rule 4001-2(a)(i)(H)* | Substantially similar to the Original Final DIP Order.<br><br>See Term Sheet, "DOCUMENTATION". |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | Similar to the Existing DIP Credit Agreement, the DIP Collateral shall not include any Avoidance Actions or the proceeds thereof.<br><br>See Term Sheet, "CLOSING DATE" and "COLLATERAL". |

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider the Motion under 28 U.S.C.  §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases and the Motion in this district is proper under 28 U.S.C.  §§ 1408 and 1409.

8.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rule 4001-2.

## BACKGROUND

**A.      The Chapter 11 Cases**

9.      On April 21, 2016,[15] twenty-six of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code in this Court, with additional Debtors filing voluntary petitions on June 1, July 20, August 9, August 10 and December 16, 2016 (collectively, the "Chapter 11 Cases").  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

10.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11.      On April 29, 2016, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

12.      At the time of the initial Chapter 11 Cases, SunEdison was one of the world's leading developers of renewable-energy solutions.  In addition to its development business, SunEdison owned, operated, and/or provided maintenance services for clean power generation assets.  SunEdison's businesses are global enterprises with substantial development activities on six continents at the time of filing.

13.      Additional factual background information regarding the Debtors when these cases were commenced, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

---

[15]      Except as otherwise indicated, references herein to the "Petition Date" shall mean April 21, 2016.

B.       **The Debtors' Existing DIP Facility And Existing DIP Credit Agreement**

14.      On the Petition Date, the Debtors sought this Court's approval of the Existing

DIP Facility jointly provided by the Prepetition First Lien Lenders and an ad hoc group of Second

Lien Lenders and holders of Second Lien Senior Notes (the "Tranche B Lenders/Steering

Committee").  The Existing DIP Facility provided the Debtors with access to $300 million new

money term loans (the "DIP Term Loans") and a replacement letter of credit facility (the "DIP L/C

Facility").  The Existing DIP Facility also consists of a roll-up of the outstanding drawn and

unreimbursed amounts in respect of letters of credit (the "Drawn L/C Borrowings") under the

Prepetition First Lien Facility (the "Tranche A Roll-Up Loans"), as well as a roll-up of Prepetition

Second Lien Debt in an initial aggregate principal amount of $350 million (the "Tranche B Roll-Up

Loans") that was approved by the Court on June 9, 2016, and shall go effective substantially

concurrently with the Closing Date of the Replacement New Money DIP Loans.  On June 9, 2016

the Bankruptcy Court entered the Original Final DIP Order on the terms set forth in the Existing

DIP Credit Agreement.  As amended, approximately 160 subsidiaries of the Company are

guarantors of the Existing DIP Facility, including most of the Debtors.

15.      The Existing DIP Facility provided the Company with valuable liquidity in

the early stages of these Chapter 11 Cases to continue funding the development of near-complete

projects and to meet operational expenses, including the payment of certain postpetition vendors

and certain permitted prepetition claims.[16]  Entering into initial postpetition financing arrangements

with the majority of its prepetition secured lenders avoided a potential intercreditor dispute between

the Debtors' first and second lien creditors, thereby allowing the Debtors to enter the chapter 11

---

[16]    This financing also permitted the Company to continue to renew and extend issued and outstanding letters of credit
originally issued under the Prepetition First Lien Facility.  These letters of credit enable the Debtors to secure,
among other things, power purchase agreements, project financings, and other material contracts for the
development of the projects – items that were critical to the Debtors' renewable-energy development business (that
has now largely been wound-down).

operating environment without the overhang of litigation between the Debtors' two largest secured

creditor constituencies.  The Debtors' first and second lien creditors settled their intercreditor

dispute on the terms set forth in Annex I to the Original Final DIP Order.

16.    Notably, the Original Final DIP Order also incorporated a settlement (as set

forth in Annex II thereto) between the Committee and the Existing DIP Lenders (the "Committee

DIP Settlement").  The Committee DIP Settlement contemplates, among other things, the eventual

creation of a trust for the benefit of the Debtors' general unsecured creditors that would be funded

with $10 million for the purpose of pursuing certain enumerated causes of action.[17]  Additionally,

under the terms of the Committee DIP Settlement, Avoidance Actions (as defined under the

Original Final DIP Order) were not encumbered by the liens securing the Existing DIP Facility.

17.    Since entry of the Original Final DIP Order, the Debtors have executed

seventeen formal amendments to the Existing DIP Credit Agreement (and numerous lender

consents have been provided thereunder), which, among other things, extended certain milestones,

modified certain reporting requirements, amended parameters for certain intercompany transactions

(including applicable subordination terms), addressed collateral and guaranty matters, approved

certain sales transactions, revised the process for the Debtors' use of proceeds from the Existing

DIP Facility and certain asset sales with respect to certain blocked accounts, and provided various

covenant relief.

18.    As of March 31, 2017, and as a result of various mandatory prepayments and

other agreements among the Existing DIP Lenders, the various tranches of the Existing DIP Facility

have approximate outstanding principal balances as follows: (a) $239 million of existing new

money DIP Term Loans (approximately $61 million repaid to date); (b) $145 million of Tranche A-

---

[17]    The $10 million in funding is subject to reduction for any amounts expended during the Chapter 11 Cases to pursue
certain causes of action, in accordance with and pursuant to the terms of the Original Final DIP Order.

1 Roll-Up Loans; (c) $90 million of Tranche A-2 Roll-Up Loans (approximately $95 million repaid

to date); (d) $77 million of undrawn Letters of Credit;[18] and (e) $87 million of L/C Borrowings.

Tranche B Roll-Up Loans in an initial aggregate principal amount of $350 million (excluding any

PIK interest) were previously authorized pursuant to the Original Final DIP Order and are

anticipated to go effective substantially concurrently with the Closing Date of the Replacement New

Money DIP Loans; approximately $50 million of these Tranche B Roll-Up Loans (plus accrued and

unpaid PIK interest thereon) will be immediately repaid given their *pari passu* ranking with the

Tranche A-1 Roll-Up Loans (in accordance with the Original Final DIP Order), leaving

approximately $300 million in aggregate principal amount of the Tranche B Roll-Up Loans (plus

accrued and unpaid PIK interest thereon) to remain outstanding (which, with accrued interest,

comprises the Remaining Second Lien Obligations) and deemed outstanding under the Replacement

DIP Credit Agreement.  Further, as of March 31, 2017, the balance of the Collateral Proceeds

Account is $0, and the balance of the DIP Facilities Blocked Accounts is approximately $35.1

million.

## RELIEF REQUESTED

19.     By this Motion, the Debtors respectfully request entry of the Replacement

DIP Order that amends and supersedes the Original Final DIP Order and grants, among other things,

the following relief:

(a)     authorization for SUNE to obtain, and the other DIP Loan Parties[19] to guaranty, a
non-amortizing senior secured superpriority debtor-in-possession term loan facility,
comprised of (i) Replacement New Money DIP Loans in an aggregate principal
amount not to exceed $640 million (to be made available to the Borrower in a single
draw on the Closing Date), and (ii) Second Lien Roll-Up Loans in an aggregate

---

[18]   With respect to Letters of Credit not denominated in U.S. dollars, the undrawn face amount thereof for purposes of
this paragraph has been adjusted for changes in FX rates as of March 15, 2017 based on Deutsche Bank notification
received by the Borrower.  FX rates for individual currencies may vary depending on the FX rate provided to
Deutsche Bank by the relevant L/C Issuer.

[19]   "DIP Loan Parties" include Debtor and non-Debtor entities.

principal amount equal to the aggregate outstanding principal amount of the Remaining Second Lien Obligations, which shall be deemed "rolled-up" and outstanding in their entirety as loans under the Replacement DIP Credit Agreements as of the Closing Date;

(b)     authorization for SUNE and the other DIP Loan Parties to execute and enter into the Replacement DIP Credit Agreement and the other DIP Documents to which they are required or contemplated to be parties to from time to time and to perform all such other and further acts as may be required or advisable in connection with the DIP Documents;

(c)     authorization for the guarantors under the Existing DIP Credit Agreement (collectively, the "Existing Guarantors") and such additional entities that are agreed to by the Borrower pursuant to the Commitment Letter[20] or the Replacement DIP Credit Agreement) (collectively, the "Additional Guarantors," and together with the Existing Guarantors, the "Guarantors") to serve as Guarantors under the Replacement DIP Facilities, to execute and enter into the DIP Documents to which they are required or contemplated to be party to from time to time and to perform all such other and further acts as may be required or advisable in connection with the DIP Documents;

(d)     authorization for the Borrower (i) to cash collateralize (x) all issued and undrawn Letters of Credit as of the Closing Date (collectively, the "Existing L/Cs") and related obligations in an aggregate amount equal to up to 105% of the amount available to be drawn under such Existing L/Cs and (y) all fees related thereto (and, with respect to any such Existing L/C denominated in a currency other than U.S. dollars, to provide such additional cash collateral as may be reasonably required by the issuer thereof (each, an "Applicable Issuer") from time to time in connection with potential or actual fluctuations in the applicable exchange rate or to provide cash collateral in such other currency), (ii) to provide such other cash collateral arrangements relating to the obligations supported by the Existing L/Cs as may be permitted under the Replacement DIP Credit Agreement (clauses (i) and (ii) collectively, the "Cash Collateralization"), (iii) to extend, renew, amend or otherwise modify (other than to increase the amount available to be drawn thereunder) any Existing L/C at the Applicable Issuer's sole discretion (and without any obligation to do so) and/or replacement Cash Collateralization arrangements, provided that no such extension or renewal shall provide for an expiry date applicable to any Existing L/C that extends beyond the date for such purposes permitted pursuant to the Replacement DIP Credit Agreement, (iv) to establish one or more cash collateral accounts in connection with the Cash Collateralization (including, as applicable, accounts with the issuers of the Existing L/Cs), and (v) to execute and enter into a

---

[20]    The Debtors will make a supplemental filing with a fully executed commitment letter (the "Commitment Letter") and a blackline showing any changes to the Term Sheet attached to this Motion as soon as the executed Commitment Letter is available, and in any event, at least two weeks in advance of the hearing to approve this Motion on April 25, 2017.

reimbursement and cash collateral agreement (or similar agreement) with each of the Applicable Issuers of any Existing L/C (and, as applicable, the beneficiaries thereof in connection with any replacement Cash Collateralization arrangements) and certain related documentation, and to perform all such other and further acts as may be required or advisable in connection with the foregoing (including the payment of fees and expenses in connection therewith) (collectively, the "Replacement L/C Arrangements");

(e)     authorization for the Debtors to immediately use proceeds of the Replacement DIP Facilities to pay in full all obligations under the Existing DIP Facility (except for the Remaining Second Lien Obligations) in accordance with the DIP Orders and the other DIP Documents, and to otherwise use proceeds of the Replacement DIP Facilities, and to continue to use Cash Collateral and the Prepetition Collateral (as such terms are defined in the Replacement DIP Order), in each case in accordance with the DIP Orders and the other DIP Documents, including the budget to be provided in connection with (and defined under) the Replacement DIP Credit Agreement (the "Replacement Budget");

(f)     authorization for the Borrower and such other Debtors that are Guarantors (the "Debtor DIP Loan Parties") and the other DIP Loan Parties to grant, or cause to be granted, adequate protection to the Prepetition Second Lien Secured Parties (as defined in the Original Final DIP Order) in a manner substantially consistent with the Existing DIP Credit Agreement and the DIP Orders, including in the form of (i) administrative expense claims, (ii) replacement and additional adequate protection liens for the benefit of the Prepetition Second Lien Secured Parties and (iii) guaranties from the Guarantors that are not Existing Guarantors, in each case of the foregoing, as set forth in the DIP Orders with respect to, *inter alia*, such use of their Cash Collateral (as defined in the Replacement DIP Order) and all use and diminution in the value of the Prepetition Second Lien Secured Parties' respective interests in such Cash Collateral and the Prepetition Collateral (as such terms are defined in the Replacement DIP Order);

(g)     approval of certain stipulations by the Debtors with respect to the Existing DIP Facility and Prepetition Secured Debt[21] documents and the liens and security interests arising therefrom;

(h)     the granting of superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties (as defined in the Replacement DIP Order) and each Applicable Issuer (with respect to the Specified L/C Collateral (as defined in the Replacement DIP Order)) payable from, and secured by liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Debtor DIP Loan Parties' estates and all proceeds thereof, which claims and liens shall have the relative priorities set forth in the Replacement DIP Order and the

---

[21]   "Prepetition Secured Debt" shall mean the Debtors' Prepetition First Lien Facility, Prepetition Second Lien Facility, and Prepetition Second Lien Notes."

Replacement Intercreditor Annex defined under and attached to the Replacement DIP Order;

(i)    modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Replacement DIP Order, the other DIP Documents, and the Replacement L/C Arrangements;

(j)    the limitation of the Debtors' rights to surcharge against DIP Collateral (as defined in the Replacement DIP Order) pursuant to section 506(c) of the Bankruptcy Code; and

(k)    a waiver of any applicable stay with respect to the effectiveness and enforceability of the Replacement DIP Order (including under Bankruptcy Rule 6004).

20.    In addition, the Committee's lien challenge rights under the Original Final DIP Order[22] shall be preserved, to the extent such rights exist under the Existing Original Interim and Final DIP Orders immediately prior to the Closing Date. To that end, the proposed Replacement DIP Order shall provide that, notwithstanding the fact that the Tranche A Roll-Up Loans and the Tranche B Roll-Up Loans were approved on a final basis pursuant to the Original Final DIP Order (and the Debtors seek further approval on a final basis under the Replacement DIP Order of the satisfaction of the Tranche A Roll-Up Loans and a portion of the Tranche B Roll-Up Loans with the Replacement DIP Facilities), any prepetition liens and claims of any Prepetition Secured Parties that have been deemed exchanged for the respective Roll-Up Loans which have been satisfied by the Replacement DIP Facilities shall remain subject to any validly and timely commenced challenge during the Challenge Period (as defined in the Original Final DIP Order), and any such successful challenge thereof may result in the invalidity of the corresponding liens and claims under the respective Replacement DIP Facilities, as applicable, provided that all stipulations and admissions contained in the DIP Orders, including the Claims Stipulation (defined therein), shall remain binding and preclusive on the Committee and any other Person (as defined in the Prepetition Debt Documents) or party in these Chapter 11 Cases, including any Trustee, except as to

---

[22]    Original Final DIP Order § 9.

any such findings and admissions that are expressly and successfully challenged in accordance with the Original Final DIP Order.[23]

21.    The proposed Replacement DIP Order and the Replacement DIP Credit Agreement and other applicable DIP Documents shall also provide that (i) the DIP Secured Parties (as defined in the Original Final DIP Order) shall retain all of their indemnification and expense reimbursement rights under the Original Final DIP Order and the Existing DIP Credit Agreement and other applicable DIP Documents (in each case as in effect immediately prior to the effectiveness of the Replacement DIP Credit Agreement), including, to the extent provided therein, their respective rights for indemnification and expense reimbursement in respect of any timely commenced challenge during the Challenge Period (as defined in the Original Final DIP Order), and such indemnification and expense reimbursement rights (as well as the Debtors' obligation to maintain the requisite level of cash-collateralization of the Existing L/Cs) shall have the highest priority in the waterfall provisions of the Replacement DIP Credit Agreement and other applicable DIP Documents (other than with respect to such rights of the Tranche B Roll-Up Lenders, which shall be *pari passu* with such rights of the holders of the Second Lien Roll-Up Loans under the Replacement DIP Credit Agreement), and (ii) in the event the cash collateral posted for any Existing L/Cs is subject to  disgorgement in connection with any such challenge, then the applicable LC Issuer shall not be required to disgorge such cash collateral, but instead the disgorgement remedy shall be effected by requiring each Existing DIP Lender who had a participation interest in such Existing L/C immediately prior to the incurrence of the Replacement New Money DIP Loans to pay the estate of the applicable Debtor such Existing DIP Lender's ratable share of the cash collateral subject to disgorgement, and the respective participation interests and obligations of the

---

[23]    Under the Plan, the Debtors have proposed to settle certain lien avoidance claims brought by the Committee with respect to the Prepetition Secured Debt pursuant to Bankruptcy Rule 9019.

Existing DIP Lenders in respect of the Existing L/Cs shall survive the closing of the Replacement

DIP Facilities (it being understood, however, such Existing DIP Lenders, in their capacities as such,

shall not constitute lenders party to the Replacement DIP Credit Agreement).

## BASIS FOR RELIEF

**A.      The Debtors' Need For Replacement DIP Financing**

22.      Despite successfully entering into seventeen formal amendments to the

Existing DIP Credit Agreement to date and obtaining numerous other lender consents thereunder

that have alleviated some of the Debtors' liquidity and operational constraints, the Debtors must

now address the impending April 26th Maturity Date of the Existing DIP Facility.

23.      Accordingly, after conducting a comprehensive outreach and negotiation

process (as detailed below), the Debtors and their advisors have determined that it is in the best

interests of the estates to enter into the Replacement DIP Credit Agreement, which will be an

amendment and restatement of the Existing DIP Credit Agreement, with the Commitment Parties

and certain of the Existing DIP Lenders (or affiliates, related funds and/or managed accounts

thereof).  In addition to exploring refinancing alternatives, the Debtors and their advisors engaged in

robust negotiations with key groups of the Existing DIP Lenders and their respective advisors with

respect to a Maturity Date extension under the Existing DIP Facility.  An extension of the Maturity

Date, however, would have required 100% lender consent under the Existing DIP Credit

Agreement,[24] and certain of the Existing DIP Lenders staunchly opposed any extension or

expressed that any such extension would be for a short period and subject to payment of sizeable

consent fees.  Moreover, obtaining and implementing such an extension would likely result in

significant lender consent fees, professional fees, and other expenditures, while providing limited

utility for the Debtors since any such extension would likely be in the range of a 30 or 60-day

---

[24]      Existing DIP Credit Agreement § 10.01(c).

extension that would only provide temporary breathing room before reverting the Debtors to the status quo, which includes the various provisions in the Existing DIP Facility that the Debtors now seek to change pursuant to the Replacement DIP Facilities.

24.    The Replacement DIP Credit Agreement, which will provide for a new maturity date of up to one year from the Closing Date,[25] will address the Debtors' near-term liquidity needs by providing the Debtors with non-amortizing senior secured superpriority debtor-in-possession Replacement DIP Facilities, comprised of (i) Replacement New Money DIP Loans in an aggregate principal amount not to exceed $640 million to be made available to the Borrower in a single draw on the Closing Date, the proceeds of which will be used, among other things, to pay off the Existing DIP Facility in full (as of the Closing Date), other than the Remaining Second Lien Obligations, and (ii) Second Lien Roll-Up Loans in an aggregate principal amount equal to the aggregate outstanding principal amount of the Remaining Second Lien Obligations (which include accrued and unpaid PIK interest), which shall be deemed "rolled-up" and outstanding in their entirety as loans under the Replacement DIP Credit Agreement.  Further, the Replacement DIP Facilities will provide the following benefits, among others:

- allow the Debtors to carry out their restructuring goals by bridging the gap between the impending Maturity Date under the Existing DIP Facility and the Debtors' anticipated emergence from chapter 11 (in fall 2017) by providing a new maturity date of up to one year from the Closing Date;

- ensure adequate liquidity for the Debtors immediately upon consummation of the refinancing for approved payments in accordance with the Replacement Budget;

- provide a simplified DIP facility structure by combining up to six different tranches under the Existing DIP Facility into a single tranche, while also providing that a portion of the obligations under the Existing DIP Facility

---

[25]    For the avoidance of doubt, although the Replacement DIP Facilities have an up to one-year maturity, the Debtors do not currently anticipate that the Chapter 11 Cases will last the full year – it being their intent to emerge from chapter 11 upon the closing of the Jointly Supported Transactions with Brookfield, which are expected to close in the second half of 2017.

will continue to accrue PIK interest under the Replacement DIP Facilities to preserve liquidity through the pendency of the case;

- eliminate existing DIP milestones and ease some of the reporting requirements under the Existing DIP Credit Agreement, which will serve to reduce administrative expenses for the estates;

- simplify (i) the lender consent process for regular business operations (e.g., Budget and cash forecast approvals), and (ii) the treatment of repatriated cash in foreign jurisdictions, thus limiting adverse impacts to the Company's domestic liquidity; and

- provide certain relief with respect to the financial covenants and Budget variance covenants under the Existing Credit Agreement.

25.    The proceeds of the Replacement New Money DIP Term Loans will be used in accordance with the terms of the Replacement DIP Credit Agreement and the Replacement Budget, including to pay in full all obligations under the Existing DIP Facility (except for the Remaining Second Lien Obligations) and for the Cash Collateralization pursuant to definitive documentation for the Replacement L/C Arrangements.

**B.    The Marking And Negotiation Of The Replacement DIP Facilities**

26.    As described in more detail in the Rothschild Declaration, the Replacement DIP Facilities are the product of an extensive arms'-length process.  To obtain the necessary financing, the Debtors, with the assistance of Rothschild and their other advisors, undertook an almost 12-week process that involved extensive discussions with certain of the Tranche A Lenders under the Existing DIP Facility (including Deutsche Bank and Goldman Sachs), certain members of the Tranche B Lenders/Steering Committee, and J.P. Morgan Securities LLC[26] (collectively, the "Interested Financing Parties").  Each of the Interested Financing Parties was already subject to a confidentiality agreement that was sufficiently broad enough to cover the refinancing process or the Borrower entered into new or additional confidentiality agreements in connection with potential

---

[26]    The group with whom the Debtors communicated at J.P. Morgan Securities LLC is a different group than those advising the Tranche B Lenders/Steering Committee in connection with the Yieldco transactions.

financing arrangements.  Ultimately, the Debtors and their advisors determined that it was in the

best interests of the Debtors and their estates for the refinancing to be effectuated pursuant to terms

jointly proposed and negotiated by the Commitment Parties.

27.    Over the course of the aforementioned outreach and negotiation process, it

became evident to the Debtors that the Commitment Parties were the only viable candidates to

provide replacement DIP financing in a consensual construct and in an appropriate timeframe.  As

noted above, the Debtors and their advisors also explored extending the Maturity Date under the

Existing DIP Facility; such extensions, however, would have required 100% lender consent.[27]

Further, going outside of the Debtors' capital structure to bring in replacement DIP financing of the

size needed was not a viable option – with the Existing DIP Facility's impending Maturity Date,

outside lenders would need to pay off the entire Existing DIP Facility and all of the Debtors'

Prepetition Second Lien Debt, a total of approximately $1.6 billion.  Moreover, based on the

available value for distribution to creditors in these Chapter 11 Cases as a result of the Yieldco

transactions with Brookfield and other asset sale processes, there is no equity cushion to allow for

priming of the Prepetition Second Lien Debt.

28.    The Existing DIP Lenders have also agreed to keep in place the Committee

DIP Settlement, pursuant to which Avoidance Actions (as defined under the Original Final DIP

Order) are left unencumbered for the benefit of the applicable Debtor estates, including the payment

of administrative expenses and, to the extent available, to pay unsecured creditors.  The Debtors

believe that no other financing party would be willing to replace the Existing DIP Facility in the

absence of an expanded collateral package that would include liens on Avoidance Actions (or their

---

[27]    Existing DIP Credit Agreement § 10.01(c).

proceeds) because any other financing party would not get the benefit of the "priming" liens on the Debtors' other assets.

## APPLICABLE AUTHORITY

**I.      The Replacement DIP Facilities Should Be Approved**

29.      Preserving the value of the Debtors' estates, as well as the Debtors' ability to carry out their restructuring goals and emerge from chapter 11, hinges upon the refinancing of the Existing DIP Facility and the Debtors' continued access to liquidity.  Without approval of the Replacement DIP Facilities, the Debtors' obligations under the Existing DIP Facility may become due and payable on April 26, 2017, disrupting or potentially ending the Debtors' restructuring efforts.  Importantly, the Replacement DIP Facilities: enable the Debtors to bridge the gap between the impending Maturity Date and the Debtors' anticipated emergence from chapter 11 in the fall of 2017 by providing a new maturity date that is up to one year from the Closing Date; provide Replacement New Money DIP Loans that afford the Debtors the liquidity needed to navigate the Plan process, pay off the Existing DIP Facility in full (other than the Remaining Second Lien Obligations) and effectuate the Cash Collateralization; facilitate the Replacement L/C Arrangements that will allow the Debtors to potentially continue to renew, extend, amend and/or replace issued and outstanding Letters of Credit, which are essential to the Debtors' ongoing sales of their remaining development platform assets; and eliminate or otherwise ease various reporting obligations and covenants under the Existing DIP Credit Agreement that have burned significant estate resources.

**A.      The Terms of the DIP Documents Are Fair, Reasonable and Appropriate**

30.      For the reasons set forth herein, the terms and conditions of the DIP Documents are fair, reasonable and appropriate in the circumstances presented, and were negotiated by the parties in good faith and at arms'-length.

31.    Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve the debtor's request to obtain postpetition financing. See, e.g., In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); In re Ames Dep't Stores, Inc., 115 B.R. at 40 (The court should defer to debtor's "reasonable business judgment . . . so long as the financing agreement does not . . . leverage the bankruptcy process" and its purpose is to benefit the estate rather than another party-in-interest.).

32.    As provided under the Existing DIP Facility, the Commitment Parties and other Replacement DIP Lenders have required that the Debtor DIP Loan Parties and certain non-Debtor affiliates of the Borrower grant the liens and superpriority claims contemplated by the Replacement DIP Order and the DIP Documents upon the terms and conditions set forth therein. The Replacement DIP Facilities will contain a carve-out that is substantially consistent with that in the Existing DIP Facility.  In particular, the liens and claims granted under the Replacement DIP Order and any liens or claims in respect of Prepetition Secured Debt will be subject and subordinate to the Carve-Out, which includes (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (ii) all reasonable and documented fees and expenses of up to $250,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, (iii) the Litigation Trust Funds (as defined in the Committee Settlement Annex to the Original DIP Order), and (iv) to the extent allowed at any time, all accrued and unpaid reasonable fees, costs and expenses (the "Professional Fees") incurred by persons or forms retained by the Debtors or the Committee, pursuant to section 327, 328, or 363 of the Bankruptcy Code (x) at any time before or on the day of delivery by the DIP Agent of a delivery of

a written notice that an Event of Default (as defined in the Replacement DIP Credit Agreement) has occurred and that the Carve-Out has been triggered (the "Carve-Out Trigger Notice"), and (y) after the date on which the DIP Agent provides the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, up to $3 million in Professional Fees incurred after the Trigger Date. Such carve-outs generally "preserve the adversary system" by ensuring that the debtor's estate are adequately assisted by counsel. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that courts generally "insist on a carve out" for professional fees, and that "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that assets remain for the payment of United States Trustee fees and professional fees of the Debtors and the Committee, notwithstanding the grant of superpriority and administrative liens and claims under the Replacement DIP Facilities.

33. Here, the Debtors have exercised their reasonable business judgment in determining that the Replacement DIP Facilities are the best financing option available under the present circumstances, and the Debtors have satisfied the legal requirements to incur the obligations under the Replacement DIP Facilities on the terms and conditions set forth in the DIP Documents. After thorough analysis by the Debtors and their advisors, and for the reasons set forth herein, the Debtors believe that the DIP Documents contain terms that are fair, reasonable, and in the best interests of the Debtors and their estates, and were negotiated by the parties in good faith and at arms'-length. Accordingly, the Debtors respectfully submit that the Debtor DIP Loan Parties should be authorized to enter into the DIP Documents and obtain access to the Replacement DIP Facilities on the terms described herein.

**B.**     **The Debtors Should Be Authorized to Obtain Postpetition Financing On a Senior Secured Superpriority Basis**

34.     Section 364 of the Bankruptcy Code allows a debtor to obtain

(a) unsecured credit in the ordinary course of business, (b) unsecured credit outside the ordinary

course of business, (c) credit with specialized priority or with certain security interests, and

(d) secured credit by granting a senior or *pari passu* lien on already encumbered property.  In other

words, section 364 is "structured with an escalating series of inducements . . ." that may be offered

to attract postpetition financing.  Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs.,

Inc.), 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989).  Accordingly, if a

debtor cannot obtain postpetition financing on an unsecured basis under sections 364(a) and (b), the

bankruptcy court may authorize a debtor to obtain postpetition financing on a superpriority

administrative expense basis pursuant to section 364(c), secured by a senior lien on unencumbered

property or secured by a junior lien on encumbered property.

35.     Here, the Debtors could not obtain replacement postpetition financing

without the liens and superpriority claims contemplated under the Replacement DIP Credit

Agreement.  Courts consider various factors in determining whether a debtor may obtain

postpetition financing under section 364(c) of the Bankruptcy Code, including whether (i) the

debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is necessary

to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable and adequate

given the circumstances of the debtor-borrower and the proposed lender, (iv) entry into the

financing constitutes an exercise of the debtor's sound and reasonable business judgment, and (v)

the financing was negotiated in good faith and at arms'-length between the debtor and the lender.

In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003).

36.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on

an unsecured or administrative expense basis. Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

37.    Notably, a Maturity Date extension under the Existing DIP Credit Agreement would require 100% lender consent – thus precluding such extension as a viable option for the Debtors.  Thus, as explained herein, pursuing the refinancing of the Existing DIP Facility was the Debtors' only option.  And given that substantially all of the Debtors' assets are encumbered by prepetition liens and the DIP Liens (as defined in the Original Final DIP Order), the Debtors were unable to procure financing in the form of unsecured credit under Bankruptcy Code sections 364(a) or (b), solely in exchange for the grant of an administrative expense or superpriority administrative expense claim.  Any other replacement DIP financing lender may well have required a lien on unencumbered assets, including Avoidance Actions, thus impacting a potential source of recovery for unsecured creditors.  Moreover, any proposal other than one supported by the Commitment Parties would have likely involved added costs and risks associated with litigation on nonconsensual priming as well as other intercreditor disputes.  Based on the foregoing, the Debtors believe that the Replacement DIP Facilities offer the Debtors the best option under the current

circumstances, and in particular, in an appropriate timeframe given the impending Maturity Date.

See, e.g., Bray v. Shenandoah Fed. Savs. & Loan Ass'n, 789 F.2d at 1088 (Section 364 "imposes no

duty to seek credit from every possible lender before concluding that such credit is unavailable.").

**C.    The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Priming Liens**

38.    If the incentives available under Section 364(c) are insufficient to attract

postpetition financing, a bankruptcy court may authorize postpetition credit under section 364(d)

secured by a senior or *pari passu* lien on encumbered property (i.e., a "priming" lien) without

consent from the affected lienholders if (i) the debtor cannot otherwise obtain credit and (ii) the

interests of the existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1); In re 495

Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992); In re Aqua Assocs., 123 B.R.

192, 196 (Bankr. E.D. Pa. 1991) (listing the above factors and also requiring that the "credit

transaction" be "necessary to preserve assets of the estate").

39.    Here, the Commitment Parties, comprised of holders of certain of the

Debtors' Prepetition Secured Debt, were the only members of the Debtors' capital structure that

could consent to a priming replacement DIP financing. Subject to granting adequate protection to

the Prepetition Second Lien Secured Parties, the Commitment Parties are consenting to the

refinancing contemplated under the Replacement DIP Credit Agreement.

40.    As described herein, the Debtors conducted arms'-length negotiations with

various potential financing sources that culminated in the Replacement DIP Facilities. The

Replacement DIP Facilities address the impending Maturity Date under the Existing DIP Facility,

provide the Debtors with postpetition financing on terms that are either substantially similar to, or

improvements on, the terms of the Existing DIP Facility that was previously approved by this Court,

and largely maintain the collateral package under the Existing DIP Facility. Thus, despite its

priming features, the Debtors' entry into the Replacement DIP Facilities is in the best interest of all

of their stakeholders, is necessary to preserve the value of the estates, and is a sound exercise of the

Debtors' reasonable business judgment.

**D.    The Debtors Should be Authorized to Use Prepetition Collateral, Including Cash Collateral**

41.    Bankruptcy Code section 363(c)(2) provides that the Debtors may not use,

sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral

consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance

with the provisions of this section." 11 U.S.C. § 363(c)(2). Further, section 363(e) provides that

"on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by

the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as

is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Here, the Debtors

require use of Cash Collateral in order to, among other things, permit and avoid disruptions to, the

orderly continuation of the Plan negotiation and confirmation process and ongoing sale transactions

that are critical to maximizing value (in particular, the Jointly Supported Transactions), to make

capital expenditures, and to satisfy other working capital and operational needs. And, again, the

Commitment Parties are consenting to the refinancing contemplated under the Replacement DIP

Credit Agreement.

42.    The Debtors have satisfied the requirements of sections 363(c)(2) and 363(e),

and should be authorized to use Prepetition Collateral, including Cash Collateral. Here, the

Commitment Parties and other initial Replacement DIP Lenders have consented to the Debtors' use

of Prepetition Collateral, including Cash Collateral, on the terms and conditions set forth in the

Replacement DIP Order and in other DIP Documents. Further, as described in more detail below,

solely to the extent of any postpetition diminution in value of the Prepetition Second Lien Secured

Parties' respective interests in the Prepetition Collateral, the Debtor DIP Loan Parties are providing,

or causing to be provided, the Prepetition Second Lien Secured Parties with (i) replacement liens on

the Prepetition Collateral, (ii) additional liens on the DIP Collateral of the DIP Loan Parties not

constituting Prepetition Collateral, (iii) guaranties from the Additional Guarantors that are not

Prepetition Guarantors and (iv) administrative expense claims.

   43. Accordingly, based upon the foregoing, the Debtors respectfully request that

the Court authorize the Debtors to use Prepetition Collateral, including Cash Collateral, in

accordance with the terms set forth in the Replacement DIP Order.

**E. The Debtors Should be Authorized to Provide Adequate Protection to Prepetition
Second Lien Secured Parties**

   44. While, as noted above, the Replacement DIP Facilities' priming features are

consensual, the Replacement DIP Order also provides adequate protection for diminution in value

of collateral held by the Prepetition Second Lien Secured Parties.  Parties with an interest in cash

collateral or collateral that may be used to secure debtor-in-possession financing are entitled to

adequate protection in order to protect them from any diminution in value to their interest in their

collateral.  11 U.S.C. §363(e).  Adequate protection is evaluated on a case-by-case basis and may be

provided in various forms, including payment of adequate protection fees, payment of interest, or

granting of replacement liens or administrative claims. See In re Mosello, 195 B.R. 277, 289 (Bankr.

S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact specific inquiry . . . left to the

vagaries of each case . . . .") (citation and quotation omitted).  As detailed in the Replacement DIP

Order and DIP Documents, the Replacement DIP Facilities provide a multi-faceted package of

adequate protection that is substantially consistent with the adequate protection provided under the

Original Final DIP Order to ensure that the Prepetition Second Lien Secured Parties will continue to

be compensated to the extent of any diminution in the value of their respective interests in the

Prepetition Collateral.

   45. Obtaining the Replacement DIP Facilities is critical to the Debtors' ongoing

restructuring efforts and their ability to confirm and consummate the proposed Plan to the benefit of

all stakeholders. In order to secure such financing and be able to continue to use Prepetition

Collateral, including Cash Collateral, the Debtor DIP Loan Parties are required to provide the

adequate protection liens and claims set forth above and in the Replacement DIP Order.

Accordingly, the adequate protection package described above is reasonable, necessary, and should

be granted.

**F.      The Debtors Should Be Authorized to Repay the Portion of the Existing DIP Facility Contemplated to be Refinanced and Effectuate the Cash Collateralization and other Replacement L/C Arrangements**

46.      Under Bankruptcy Code section 363(b)(1), a debtor in possession "after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property

of the estate." In determining whether to authorize a debtor to use property under this statute, courts

require the debtor to demonstrate that a sound business purpose justifies its actions. See Lionel

Corp., 722 F.2d at 1071.

47.      Once the debtor has articulated a valid business purpose, courts consider

whether relief is justified under the business judgment rule. See id. at 1071. "The business

judgment rule 'is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action was taken in the

best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van

Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has "vitality" in chapter 11

cases and presumes that a debtor's management decisions are reasonable. See Integrated

Resources, 147 B.R. at 656; Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-

Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he

Code favors the continued operation of a business by a debtor and a presumption of reasonableness

attaches to a debtor's management decisions.").

48.     The Debtors, in their sound business judgment, believe that the transactions, settlements, and compromises contemplated under the Settlement Agreements with the Yieldcos, the sale of their interests in the Yieldcos pursuant to the Jointly Supported Transactions, and the proposed Plan that they continue to negotiate with constituents, are in the best interest of all stakeholders.  The success of the foregoing will be jeopardized if the Debtors cannot execute the Replacement DIP Credit Agreement and thereby enable the Debtors to bridge the gap between the impending Maturity Date under the Existing DIP Facility and the Debtors' anticipated emergence from chapter 11 in the fall of 2017.  Importantly, the Original Final DIP order requires repayment of the Existing DIP Facility in full or the consent of the DIP Agent in accordance with the Existing DIP Credit Agreement in order to incur the obligations contemplated under the Replacement DIP Facilities.  Thus, the Debtors request authorization, pursuant to section 363(b) of the Bankruptcy Code to (i) repay the Existing DIP Facility in full (other than the Remaining Second Lien Obligations, which shall be deemed outstanding in their entirety as loans under the Replacement DIP Credit Agreement), and (ii) effectuate the Cash Collateralization (with proceeds of the Replacement DIP Facilities) and the other Replacement L/C Arrangements.

## II.     The Commitment Parties and Replacement DIP Lenders are Entitled to the Protections Under Section 364(e) of the Bankruptcy Code

49.     Bankruptcy Code section 364(e), which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal."  Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)).  See also

White Rose Food v. General Trading (In re Clinton St. Food Corp., 170 B.R. 216, 220 (S.D.N.Y. 1994) (noting that section 364(e)'s purpose "is to overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

50.     The Debtors believe that the terms and conditions of the Replacement DIP Facilities are fair and reasonable and are the best possible terms on which the Debtors could obtain postpetition financing under the circumstances.  Further, the terms and conditions of the DIP Documents were negotiated in good faith and at arms'-length with all parties represented by experienced counsel.  Accordingly, the Commitment Parties and the Replacement DIP Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the Replacement DIP Facilities are later modified, vacated, stayed, or terminated by subsequent order of this or any other Court, the Commitment Parties and Replacement DIP Lenders will be fully protected with respect to any amounts previously disbursed and other extensions of credit previously made under the Replacement DIP Facilities.

**III.    The Payment of Fees to the DIP Secured Parties, the L/C Issuers, and Certain of the Prepetition Secured Parties is Appropriate**

51.     Pursuant to the Term Sheet (and as will be set forth in the Replacement DIP Credit Agreement), the Debtor DIP Loan Parties have agreed to pay certain fees and expenses described in the DIP Documents (and in any related fee letters) and reasonable fees, costs, and expenses to the DIP Agent, the Commitment Parties, and the Replacement DIP Lenders, including without limitation, fees and expenses of the professionals retained by each of the foregoing in accordance with the terms of the DIP Documents and the Replacement DIP Order, without the

necessity of filing retention applications or fee applications.  Payment of fees and expenses of the

parties' retained professionals will be consistent with the authorization granted by this Court

pursuant to the Original Interim and Final DIP Orders.[28]

52.    The fees and other obligations under the DIP Documents were negotiated in

good faith and at arms'-length and represent the most favorable terms to the Debtors on which the

Commitment Parties would agree to refinance the Existing DIP Facility and make the Replacement

DIP Facilities available. The Debtors considered the fees described above when determining in their

sound business judgment that the DIP Documents constitute the best terms on which the Debtors

could obtain the replacement postpetition financing necessary to continue their operations, and that

paying these fees in order to obtain the Replacement DIP Facilities is in the best interests of the

Debtors' estates, creditors, and other parties in interest.  These fees are reasonable and appropriate

under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit

liens and rights specified in section 364 of the Bankruptcy Code.[29]

**IV.    The Automatic Stay Should Be Modified on a Limited Basis**

53.    The relief requested herein contemplates a modification of the automatic stay

to permit the Debtors to grant the liens and superpriority claims described herein to the DIP Agent

and other DIP Secured Parties, to permit the DIP Agent or other DIP Secured Parties (as permitted

under the DIP documents) to perform such acts as may be requested to assure the perfection and

priority of such liens, and to permit the Debtors and the DIP Agent and other DIP Secured Parties to

take any other actions necessary and appropriate to implement the terms of the Replacement DIP

---

[28]    In addition to the fees, costs and expenses of the DIP Agent, the Commitment Parties, and the Replacement DIP
Lenders, as adequate protection, the Debtors shall also pay the fees and expenses of certain of the Prepetition
Secured Parties (as provided under the Replacement DIP Order), including, without limitation, the fees, costs and
expenses of the applicable professionals retained by each of the foregoing.

[29]    See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving extension of financing
facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

Facilities. Stay modifications of this kind are standard features for access to DIP financing, and in the Debtors' business judgment, are reasonable under the circumstances.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

54.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

55.    Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Motion.

## NOTICE

56.    Notice of this Motion shall be given to (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the administrative agent under the Debtors' prepetition first lien credit agreement and the L/C Issuers; (c) counsel to the Tranche B Lenders/Steering Committee; (d) counsel to the administrative agent under the Debtors' prepetition second lien credit agreement; (e) counsel to the collateral trustee under the Debtors' prepetition

second lien credit agreement; (f) counsel to the indenture trustee under each of the Debtors'

outstanding bond issuances; (g) the U.S. Attorney for the Southern District of New York;

(h) counsel to the DIP Agent and DIP Arrangers; (i) counsel to the Committee in these Chapter 11

Cases; (j) counsel to TerraForm Power, Inc. and TerraForm Global, Inc.; (k) the Internal Revenue

Service; (l) the Securities and Exchange Commission; (m) all other parties asserting a lien on, or a

security interest in, the assets of the Debtors to the extent reasonably known to the Debtors; and (n)

any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b) (collectively,

the "Notice Parties").  Under the circumstances, such notice of the hearing and the relief requested

in the Motion constitutes due, sufficient and appropriate notice and complies with section 102(1) of

the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and the Local Bankruptcy

Rules.  The Debtors submit that no other or further notice need be provided.

**NO PRIOR REQUEST**

57.    No previous request for the relief sought herein has been made to this Court

or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form annexed hereto, granting the relief requested in the Motion and such other

and further relief as may be just and proper.

Dated:  New York, New York
        April 4, 2017

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:  */s/ J. Eric Ivester* _____
      Jay M. Goffman
      J. Eric Ivester
      Four Times Square
      New York, New York 10036-6522
      Telephone: (212) 735-3000
      Fax: (212) 735-2000

      -and-

      James J. Mazza, Jr. (admitted *pro hac vice*)
      Louis S. Chiappetta (admitted *pro hac vice*)
      155 N. Wacker Dr.
      Chicago, Illinois 60606-1720
      Telephone: (312) 407-0700
      Fax: (312) 407-0411

      *Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

**Term Sheet**

SUNEDISON, INC.
Senior Secured Superpriority Debtor-In-Possession Credit Facility
Summary of Principal Terms and Conditions

BORROWER:

SunEdison, Inc., a Delaware corporation (the "Borrower"), as a debtor and debtor-in-possession, in the chapter 11 cases (the "Chapter 11 Cases") captioned In re SunEdison, Inc., et al. (jointly administered under Case No. 16-10992 (SMB)) pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

GUARANTORS:

(a) Substantially the same guarantors that guarantee the obligations under that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of April 26, 2016, among the Borrower, Deutsche Bank AG New York Branch, as Administrative Agent, and the other financial institutions party thereto from time to time (as amended, restated, supplemented or otherwise modified, the "Existing Credit Agreement"), including, without limitation, SE Warehouse1, LLC, Terraform Private Holdings LLC, SunEdison Residential Services, LLC, SunEdison Energy Holding B.V, SunEdison Energy Holdings (Singapore) Pte Ltd., SunE Solar B.V. and SUNE Wind Holdings II, Inc. (collectively, the "Existing Guarantors") and (b) such additional entities that are agreed to by the Borrower and the Required Commitment Parties (as defined below) (collectively, the "Additional Guarantors," and together with the Existing Guarantors, the "Guarantors").

COMMITMENT PARTIES:

Certain lenders under the Existing Credit Agreement and/or one or more of their respective affiliates, related funds and/or managed accounts (collectively, the "Commitment Parties").

For purposes of this Term Sheet, the "Required Commitment Parties" shall mean the Commitment Parties holding a majority of the commitments to provide a portion of New Money DIP Loans under the DIP Facility (the "Commitments") to be set forth on Schedule I to a definitive commitment letter relating to the DIP Facility (the "Commitment Letter").

All obligations of the Commitment Parties (and their respective lending affiliates, if any) are several and not joint.

ADMINISTRATIVE AND
COLLATERAL AGENT:

A financial institution, determined by the Required Commitment Parties and reasonably acceptable to the Borrower, will act as sole and exclusive administrative agent and collateral agent (in such capacities, the "DIP Agent").

LENDERS:

(i) As of the Closing Date, the Commitment Parties (or affiliates thereof) and the holders of the Second Lien Roll-Up Loans (as

defined below) and (ii) after the Closing Date, the Commitment Parties (or affiliates thereof), the holders of the Second Lien Roll-Up Loans and certain other financial institutions and investors from time to time party to the DIP Facility (each, a "<u>Lender</u>" and collectively, the "<u>Lenders</u>").

DIP FACILITY:

A non-amortizing senior secured superpriority debtor-in-possession term loan facility (the "<u>DIP Facility</u>"), comprised of (i) new money term loan (the "<u>New Money DIP Loans</u>") in an aggregate principal amount not to exceed $640,000,000 to be made available to the Borrower in a single draw on the Closing Date (as defined below), and (ii) term loans in an aggregate principal amount equal to the aggregate outstanding principal amount of the Remaining Second Lien Obligations (as defined in the Post-Petition Intercreditor Arrangements (as defined in the Existing Credit Agreement) on the Closing Date plus all accrued interest paid-in-kind thereon in accordance with the Existing Credit Agreement (including, without limitation, giving effect to the Tranche B Roll-Up Interest Reduction) (as defined in the Existing Credit Agreement)), which shall be deemed outstanding in their entirety as loans under the DIP Facility (the "<u>Second Lien Roll-Up Loans</u>") as of the Closing Date (as defined below).

USE OF PROCEEDS:

The proceeds of the New Money DIP Loans shall be used (a) to repay in full and in cash the aggregate outstanding principal amount of (and all accrued and unpaid interest, fees and other amounts related to) the Tranche A Term Loans, Tranche B Term Loans, Tranche A-1 Roll-Up Loans, Tranche A-2 Roll-Up Loans and L/C Borrowings, in each case, under, and as defined in, the Existing Credit Agreement, in each case, as of the Closing Date, (b) to cash collateralize all issued and undrawn Letters of Credit (as defined in the Existing Credit Agreement) as of the Closing Date in an aggregate amount equal to 105% of the amount available to be drawn under all then outstanding Letters of Credit, pursuant to definitive documentation that is reasonably satisfactory to the applicable L/C Issuers (as defined in the Existing Credit Agreement) and the Required Commitment Parties (the "<u>LC Cash Collateralization</u>"), (c) to repay in full and in cash the aggregate outstanding principal amount of (and all accrued and unpaid interest, fees and other amounts related to) the Specified Second Lien Obligations (as defined in the Post-Petition Intercreditor Arrangements) as of the Closing Date (clauses (a), (b) and (c), as further set forth in <u>Annex A</u> hereto, collectively, the "<u>Refinancing</u>"), (d) to pay fees, costs, and expenses related to the DIP Facility and the Refinancing and (e) if any proceeds of the New Money DIP Loans remain following application thereof as described in clauses (a) through (d) above, for such other purposes as are consistent with the budget (subject to mechanics substantially consistent with this Term Sheet and otherwise consistent with the Existing Credit Agreement).

The relative priorities of certain obligations under the Existing Credit Agreement are as set forth on <u>Annex B</u> hereto.  Following the consummation of the Refinancing, the relative priorities of certain obligations (including the Remaining Second Lien Obligations (as defined in the Post-Petition Intercreditor Arrangements)) in relation to the New Money DIP Loans shall be as set forth on <u>Annex B</u> hereto, in all cases, in a manner and on terms consistent with the Post-Petition Intercreditor Arrangements, which shall be modified on the Closing Date (i) to conform to the transactions contemplated by this Term Sheet and (ii) consistent with the entry into the DIP Facility and all new facts and circumstances relating thereto and to the Chapter 11 Cases, in each case, in a manner reasonably satisfactory to the Commitment Parties.

Notwithstanding the Refinancing, it is understood and agreed that all indemnification and reimbursement obligations (including, without limitation, with respect to any claims or any pending litigation or other proceedings against any Agent, any Lenders and/or any L/C Issuers (each as defined in the Existing Credit Agreement, and solely in such respective capacities)) and any other contingent obligations of the Borrower and the other Loan Parties that may be owed to any such parties (solely in such respective capacities) under the express terms of the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement), in each case, pursuant to provisions expressly stated to survive any repayment thereunder or termination thereof shall survive the transactions (including, without limitation, the Refinancing) contemplated by this Term Sheet.

| | |
|---|---|
| DOCUMENTATION: | The credit agreement governing the DIP Facility (together with all other definitive documentation related to the DIP Facility (including the DIP Order (as defined below)), collectively, the "<u>Definitive Financing Documentation</u>") shall be substantially consistent with the Existing Credit Agreement modified (1) to reflect the express terms and conditions set forth in this Term Sheet and to be set forth in the Commitment Letter and (2) as otherwise agreed by the Borrower and the Commitment Parties (including modifications required to conform to the transactions contemplated by this Term Sheet).  The DIP Facility shall be documented pursuant to an amendment and restatement of the Existing Credit Agreement. |
| CLOSING DATE: | The first Business Day on which all of the conditions precedent set forth (or referenced) in the Commitment Letter, this Term Sheet and the Definitive Financing Documentation (including entry of an order by the Bankruptcy Court approving the DIP Facility on a final basis which order shall be in form and substance reasonably satisfactory to the Commitment Parties (the "<u>DIP Order</u>"), it being agreed that the Committee Settlement (as defined in the Existing Credit Agreement) shall, as applicable, survive and be given effect |

with respect to the DIP Facility, subject to modifications consistent with this Term Sheet and the DIP Facility (it being understood and agreed that all parties' rights with respect to the Committee Settlement are reserved, and that, for the avoidance of doubt, nothing in this Term Sheet or the DIP Facility or the DIP Order will be deemed to be a determination regarding whether or not the "Maturity Date" under the Existing Credit Agreement has occurred) (the "<u>Closing Date</u>").

For the avoidance of doubt, the Closing Date must occur on or prior to the Maturity Date under, and as defined in, the Existing Credit Agreement.

DISBURSEMENT OF DIP FACILITY PROCEEDS:

Disbursement of the DIP Facility proceeds (after giving effect to the Refinancing) and all other amounts in the DIP Facilities Blocked Account (as defined in the Existing Credit Agreement) to the Borrower will be subject to budgetary and other provisions substantially consistent with those set forth in the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet.

MATURITY:

The maturity date of the DIP Facility will be, and all obligations of the Borrower and the Guarantors under the DIP Order and the other Definitive Financing Documentation (the "<u>DIP Obligations</u>") are to be Paid in Full (to be defined in a manner substantially consistent with the definition thereof in the Existing Credit Agreement) on the earliest of:

(i) the first anniversary of the Closing Date (the "<u>Stated Maturity Date</u>"), subject to the Extension Option (as defined below);

(ii) the effective date of a plan of reorganization or liquidation for the Borrower and/or its affiliated debtors (or substantially all of them) that is in form and substance reasonably satisfactory to the Required Commitment Parties and is confirmed by an order of the Bankruptcy Court, which order also shall be in form and substance reasonably satisfactory to the Required Commitment Parties;

(iii) the consummation of a sale (in one transaction or a series of one or more transactions) of all or substantially all of the assets of the Borrower and its subsidiaries under section 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"); and

(iv) the acceleration of the loans or the termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default under the DIP Facility (any such date in clauses (i) through (iv) above, the "<u>Maturity Date</u>").

At the option of the Borrower, the Stated Maturity Date may be extended up to an additional 60 days (such date, the "<u>Extended</u>

4

Maturity Date") subject to (a) absence of any Default and Event of Default, (b) payment by the Borrower of an extension fee of 1.00% of the aggregate principal amount of all then outstanding loans under the DIP Facility, (c) approval of an Acceptable Plan (as defined below) by the Bankruptcy Court and (d) to the extent not yet consummated, definitive documentation related to a sale of the YieldCos in form and substance reasonably satisfactory to each Commitment Party remaining in full force and effect (it being acknowledged by the Commitment Parties that, if in effect at such time, the documents listed on Annex C hereto are satisfactory to the Commitment Parties, together with amendments, supplements or modifications thereto reasonably acceptable to the Commitment Parties (the "Specified YieldCo Documents")), and there being no continuing event or occurrence that would constitute a breach or default thereunder, which breach or default would give rise to a right of termination by any party thereto (the "Extension Option").

AMORTIZATION:                    None.

INTEREST RATE:                   All New Money DIP Loans and Second Lien Roll-Up Loans shall bear interest, at the option of the Borrower, at either (i) the Applicable Margin (as defined below) plus the Base Rate (as defined in the Existing Credit Agreement) or (ii) the Applicable Margin plus the Eurocurrency Rate (as defined in the Existing Credit Agreement).

"Applicable Margin" means (i) (a) with respect to New Money DIP Loans bearing interest at the Base Rate, 6.50% *per annum* and (b) with respect to New Money DIP Loans bearing interest at the Eurocurrency Rate, 7.50% *per annum* and (ii) (a) with respect to Second Lien Roll-Up Loans bearing interest at the Base Rate, 11.00% *per annum* and (b) with respect to Second Lien Roll-Up Loans bearing interest at the Eurocurrency Rate, 12.00% *per annum*.

In no event shall the Eurocurrency Rate be less than 1.00% or the Base Rate be less than 2.00%.

All interest accruing on the New Money DIP Loans shall be paid in cash. All interest accruing on the Second Lien Roll-Up Loans shall be paid-in-kind (and increase the principal amount thereof) and shall not be paid in cash until after the payment in full of the New Money DIP Loans and all other obligations under the DIP Facility and the definitive credit agreement related thereto (other than the Second Lien Roll-Up Loans and accrued and unpaid interest thereon).

DEFAULT INTEREST:                Substantially consistent with the Existing Credit Agreement.

OTHER FEES:

| Commitment Fees | OID/Upfront Fees |
|---|---|
|  |  |

| | |
|---|---|
| [●]% of the aggregate Commitments of the Commitment Parties to provide New Money DIP Loans as of the date of the Commitment Letter (payable on the Closing Date pro rata to each Commitment Party) | [●]% of the aggregate amount of New Money DIP Loans actually provided to the Borrower by the Commitment Parties on the Closing Date (payable on the Closing Date pro rata to each Lender making a New Money DIP Loans on the Closing Date) |

VOLUNTARY AND MANDATORY PREPAYMENTS

Substantially consistent with the Existing Credit Agreement, except that any proceeds required to be deposited into the Collateral Proceeds Account (as defined in the Existing Credit Agreement) pursuant to the terms of the Existing Credit Agreement shall instead be deposited into the DIP Facilities Blocked Accounts (as defined in the Existing Credit Agreement) and amounts on deposit in the Collateral Proceeds Account as of the Closing Date shall be transferred to the Borrower DIP Facilities Blocked Account; provided that, notwithstanding the foregoing, (i) on April 28, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $125,000,000, (ii) on May 31, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $100,000,000, (iii) on June 30, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $75,000,000, (iv) on July 31, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $75,000,000, (v) on August 31, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $75,000,000, (vi) on September 29, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $75,000,000, (vii) on October 31, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $75,000,000, (viii) on November 30, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP

Facilities Blocked Accounts as of such date in excess of $75,000,000, (ix) on December 29, 2017, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $25,000,000, (x) on January 31, 2018, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $25,000,000, (xi) on February 28, 2018, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the aggregate amount of cash contained in the DIP Facilities Blocked Accounts as of such date in excess of $25,000,000 and (xii) within one (1) business day after receipt thereof, the Borrower shall make a mandatory prepayment of New Money DIP Loans and, subject to the relative priorities set forth in Annex B hereto, the Second Lien Roll-Up Loans in an amount equal to the net cash proceeds of the sale of the Borrower's equity interests in the YieldCos.  To the extent any amounts on deposit in a Foreign DIP Facilities Blocked Account are subject to repatriation, trapped cash or similar issues of the type referred to in Section 2.05(k) or 6.22 of the Existing Credit Agreement, such amounts shall not be included in the mandatory prepayment calculation referred to in clauses (i) – (xi) above.  Any monetary threshold set forth in clauses (i) – (xi) above may be increased by an additional amount of up to $15,000,000 with the consent of the Required Lenders at any time and from time to time, and so long as the New Money DIP Loans remain outstanding, any other increases shall be subject to the consent of Lenders holding more than 85% of the outstanding aggregate principal amount of the New Money DIP Loans (or, if Paid in Full, the Second Lien Roll-Up Loans) on the applicable date of measurement (the "Supermajority Lenders").  Notwithstanding anything to the contrary herein, if, on October 31, 2017, after giving effect to the mandatory prepayment described in clause (vii) above, an aggregate principal amount of New Money DIP Loans in excess of $585,000,000 (the "Paydown Balance") remains outstanding, the Borrower shall make a mandatory prepayment of New Money DIP Loans in an amount equal to the amount of such excess on October 31, 2017; provided, that the Paydown Balance shall be reduced on a dollar-for-dollar basis by the amount of net cash proceeds received by the Borrower (and used to prepay New Money DIP Loans) prior to October 31, 2017 from the sale or other disposition of the Specified DIP Collateral (as defined below).

For the avoidance of doubt, after the occurrence and during the continuation of an event of default, no proceeds from the sale or other disposition of any collateral securing the DIP Facility may be used for any purpose other than to pay in full and in cash all obligations owing to the Lenders under the DIP Facility (in

accordance with the relative priorities set forth in Annex B), subject to notice requirements and exceptions substantially similar to those set forth in the Existing Credit Agreement.

**SUPERPRIORITY ADMINISTRATIVE CLAIMS:** Subject and subordinate to the Carve-Out (to be defined in a manner that is substantially consistent with the Existing Credit Agreement and the Financing Orders (as defined in the Existing Credit Agreement)) in all respects, the DIP Obligations (including the guarantee obligations of the Guarantors under the Definitive Financing Documentation) shall constitute allowed superpriority administrative expenses and shall in each case have priority over all other allowed chapter 11 and chapter 7 administrative expense claims, including expenses of a chapter 11 and chapter 7 trustee, under Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.

**COLLATERAL:** The DIP Facility will be secured by (i) senior superpriority priming liens on substantially the same basis as, and with the same collateral securing the Borrower and the Existing Guarantors' obligations under, the Existing Credit Agreement (including, without limitation, all equity interests owned by the Borrower and the Guarantors in YieldCo, YieldCo II, YieldCo Intermediate and YieldCo II Intermediate (each as defined in the Existing Credit Agreement) (such entities, collectively, the "YieldCos")) and (ii) senior superpriority priming liens on such assets and equity of the Additional Guarantors that are agreed to by the Borrower and the Required Commitment Parties (subject to exceptions and limitations substantially similar to those applicable to the Existing Guarantors pursuant to the Existing Credit Agreement) (collectively, the "DIP Collateral")..

**INTERCREDITOR ARRANGEMENTS:** Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet and other modifications to be made to the existing intercreditor arrangements as a result of the YieldCo transactions, current facts of the Chapter 11 Cases, and in form and substance satisfactory to each Commitment Party (which consent may not be unreasonably withheld, delayed or conditioned) prior to the execution of the Definitive Financing Documentation, in all cases, taking into account the relative priorities set forth in Annex B hereto.  It is understood and agreed that the Second Lien Roll-Up Loans shall have the relative priority set forth in Annex B hereto.

**ADEQUATE PROTECTION:** The Definitive Financing Documentation shall contain adequate protection provisions substantially consistent with the Existing Credit Agreement and the Financing Orders (as defined therein), subject to modifications as required to conform to the transactions contemplated by this Term Sheet, which modifications shall be in form and substance reasonably satisfactory to each Commitment Party that will receive adequate protection under the Definitive

Financing Documentation and/or the DIP Order.

BUDGET COVENANT:

On a bi-weekly basis, deliver to the DIP Agent, for distribution to the Lenders (subject to applicable provisions in the Definitive Financing Documentation relating to confidentiality and material non-public information, which provisions shall be substantially similar to those set forth in the Existing Credit Agreement), a 13-week budget, in form substantially consistent with the budget previously delivered under the Existing Credit Agreement, which bi-weekly budget shall be subject to the approval of the Required Lenders in a manner substantially consistent with the Existing Credit Agreement (it being understood and agreed that the Definitive Financing Documentation shall provide that such approval shall be sought through "negative consent" procedures reasonably satisfactory to the DIP Agent and the Borrower consistent with procedures currently used under the Existing Credit Agreement), subject to modifications (i) to reflect the express terms of this Term Sheet and otherwise as required to conform to the transactions contemplated by this Term Sheet, and (ii) reasonably satisfactory to the Commitment Parties. Projections for disbursements set forth in the budget shall be made in a manner substantially consistent with past practices for such projections under the Existing Credit Agreement. Testing for permitted budget variances shall be a two-week cumulative test on an aggregated basis (and not by business segment). Permitted negative variances shall not exceed the greater of 15% of forecasted net cash flow for the relevant period and $20 million.

CONDITIONS PRECEDENT:

The Closing Date and the making of the New Money DIP Loans will be subject to conditions precedent substantially similar to the applicable provisions of the Existing Credit Agreement and shall include satisfaction (or waiver by the Commitment Parties) of the following conditions:

(i)     that the Refinancing shall have been consummated substantially concurrently with the funding of the New Money DIP Loans in accordance with the Commitment Letter and this Term Sheet and otherwise in a manner reasonably satisfactory to the Commitment Parties;

(ii)    that the Tranche B Roll-Up Effective Date (as defined in the Existing Credit Agreement) shall have occurred substantially concurrently with the Closing Date;

(iii)   that a plan of reorganization or liquidation for the Borrower and/or its affiliated debtors (or substantially all of them) in form and substance reasonably satisfactory to the Commitment Parties (an "Acceptable Plan") be filed with

the Bankruptcy Court[1];

(iv)     that the Commitment Parties shall have received an initial budget in form and substance reasonably satisfactory to the Commitment Parties;

(v)      that the LC Cash Collateralization shall have been consummated substantially concurrently with the funding of the New Money DIP Loans;

(vi)     that definitive documentation related to the sale of the YieldCos remains in full force and effect and there being no continuing event or occurrence that would constitute a breach or default thereunder, which breach or default would give rise to a right of termination by any party thereto;

(vii)    that the other Definitive Financing Documentation to be entered into in connection with the transactions contemplated by this Term Sheet shall be in form and substance reasonably satisfactory to the Commitment Parties;

(viii)   that the Commitment Parties shall be reasonably satisfied with the list of the Guarantors and the Debtors (as defined in the Existing Credit Agreement) as of the Closing Date (and such list shall be deemed to be satisfactory to the Commitment Parties so long as, (x) with respect to the Guarantors, it includes all guarantors of the Obligations under the Existing Credit Agreement as of the Closing Date and (y) with respect to the Debtors, it includes all Debtors as of the Closing Date);

(ix)     the accuracy and completeness in all material respects (or, with respect to any representation that is itself modified or qualified by materiality or a "Material Adverse Effect" standard, such representation shall be true and correct in all respects) of all representations that the Borrower makes to the Commitment Parties in connection with the Commitment Letter and the Definitive Financing Documentation as of the Closing Date (or, to the extent any such representation expressly relate to an earlier date, as of such earlier date);

(x)      the Borrower's compliance in all material respects with its obligations under the Commitment Letter, including without limitation, the payment in full when due of all fees, expenses and other amounts (to the extent invoiced at least two (2) calendar days prior to the Closing Date) payable under the

---

[1]   For the avoidance of doubt, an Acceptable Plan will be deemed acceptable by the Commitment Parties if it provides for Payment in Full of all outstanding loans and other obligations under the DIP Facility on or prior to the effective date of such plan.

Commitment Letter;

(xi)    the execution and delivery by the Borrower and the Guarantors (collectively, the "Loan Parties"), as applicable, of Definitive Financing Documentation, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise on terms reasonably acceptable to the Commitment Parties;

(xii)    the conditions precedent set forth in the DIP Order and in the Definitive Financing Documentation;

(xiii)    the entry of the DIP Order in form and substance reasonably satisfactory to the Commitment Parties, authorizing the Debtors to pay the fees and expenses set forth in the Commitment Letter and otherwise authorizing the Debtors to accept, and incur their obligations under, the Commitment Letter, and the DIP Order shall (x) provide that the right to receive all amounts that may become due and owing to each of the Commitment Parties pursuant to the terms of the Commitment Letter shall be entitled to priority as administrative expense claims under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, (y) be in full force and effect after entry thereof and unstayed and (z) not be modified in any manner materially adverse to the rights or interests of the Commitment Parties (in their capacities as such) except with the consent of the Commitment Parties;

(xiv)    all documents and instruments necessary or reasonably required by the DIP Agent to create and perfect the DIP Agent's liens on and security interest in the DIP Collateral (free and clear of all other liens and security interests, subject to customary and limited exceptions consistent with this Term Sheet) shall have been executed (if applicable) and delivered by the Loan Parties, as applicable, and, if applicable, be in proper form for filing in form and substance reasonably satisfactory to the Commitment Parties;

(xv)    execution and delivery by the Guarantors of guarantees of the Loan Parties' obligations under the DIP Facility in form and substance reasonably satisfactory to the Commitment Parties, which shall be in full force and effect (it being agreed that, with respect to any Guarantor that is a guarantor under the Existing Credit Agreement, any foreign law limitations applicable to such guarantees that are substantially similar to any such limitations applicable to such Guarantor's guarantee of the obligations under the Existing Credit Agreement shall be deemed to be reasonably satisfactory to the Commitment Parties);

(xvi)    at least two (2) days prior to the Closing Date (or such shorter period agreed to by any applicable requesting

11

Commitment Party), each Commitment Party having received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations with respect to the Borrower and the Guarantors party to the Definitive Financing Documentation as of the Closing Date, to the extent requested at least ten (10) days prior to the Closing Date;

(xvii) any and all governmental and material third party consents and approvals necessary in connection with the funding of the New Money DIP Loans and the execution and delivery by the Loan Parties of the Definitive Financing Documentation shall have been obtained and shall remain in effect, in each case, in form and substance reasonably satisfactory to the Commitment Parties; and

(xviii) the transactions contemplated by this Term Sheet and the Commitment Letter shall have been consummated in all material respects in accordance with applicable laws, rules and regulations.

| | |
|---|---|
| REPRESENTATIONS AND WARRANTIES: | Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet and otherwise reasonably satisfactory to the Commitment Parties. |
| AFFIRMATIVE COVENANTS: | Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet and otherwise reasonably satisfactory to the Commitment Parties; provided that (i) the reporting covenants (other than the budget covenant which is governed by the section of this Term Sheet entitled "BUDGET COVENANT") may be amended in a manner reasonably satisfactory to the Commitment Parties (but not more burdensome in any material respect than the reporting covenants under the Existing Credit Agreement), (ii) no milestones or delivery of historical financial statements shall be required and (iii) the Borrower shall deliver a monthly cash flow projection covering the period of the immediately following month through the Stated Maturity Date, which projection shall be in form and scope substantially similar to that certain SunEdison Cash Projection dated February 21, 2017. The Commitment Parties will negotiate in good faith with the Borrower to streamline the reporting covenants to eliminate redundant reports and rationalize frequency. |
| NEGATIVE COVENANTS: | Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet (including to permit consummation of the transactions under the Specified YieldCo Documents) and otherwise reasonably satisfactory to the |

Commitment Parties.

FINANCIAL COVENANT:    The DIP Facility will contain a minimum liquidity covenant to be agreed between the Commitment Parties and the Borrower, which covenant shall be tested as of the end of each week and be set at a level of $25 million. The liquidity covenant shall test domestic cash balances (including the Borrower DIP Facilities Blocked Account).

EVENTS OF DEFAULT:    Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet and otherwise reasonably satisfactory to the Commitment Parties and shall, in any event, include an event of default for (i) any lien purported to be created under the Definitive Financing Documentation or the DIP Order on any portion of the equity interests in the YieldCos held by the Borrower or any Guarantor (the "Specified DIP Collateral") shall, in either case, cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected (to the extent so required by the Definitive Financing Documentation) lien, in any such case, except as a result of any sale or other disposition thereof in a transaction permitted under the Definitive Financing Documentation, (ii) any filing by a Loan Party of a motion, pleading or proceeding that challenges the rights and remedies of any of the DIP Agent or the Lenders under the Definitive Financing Documentation with respect to the Specified DIP Collateral in any of the Chapter 11 Cases or that is inconsistent with the Definitive Financing Documentation, in any such case, to the extent the relief sought thereby or such determination could reasonably be expected to result in a material impairment of the rights or remedies of the DIP Agent or the Lenders with respect to the Specified DIP Collateral, (iii) a determination by a court with respect to any such motion, pleading or proceeding described in clause (ii) above which results in such a material impairment of the rights or remedies of the DIP Agent or the Lenders with respect to the Specified DIP Collateral, or (iv) any other material impairment of the rights and remedies of the DIP Agent and/or the Lenders to realize the benefits of such security interests in the Specified DIP Collateral during an Event of Default (it being understood that the terms of the Specified YieldCo Documents shall not in and of themselves constitute such an impairment under clause (ii), (iii) or (iv) above). The events of default described in clauses (i), (ii), (iii) and (iv) above are referred to herein individually as a "Collateral Event of Default" and collectively as "Collateral Events of Default".

REMEDIES:    Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet and otherwise reasonably satisfactory to the Commitment Parties; provided that, in the event the DIP Agent is not diligently pursuing an enforcement of its rights with respect to the DIP Collateral or any material portion

thereof on or after the Stated Maturity Date or, in the event that the Extension Option shall have been exercised, the Extended Maturity Date, Lenders holding more than 15% of the aggregate principal amount of New Money DIP Loans then outstanding shall have the right to cause the DIP Agent to enforce its rights with respect to any DIP Collateral on and after the Stated Maturity Date or the Extended Maturity Date, as applicable; provided, further, that, with respect to any such direction from Lenders holding more than 15% of the aggregate principal amount of New Money DIP Loans then outstanding but that do not constitute the Required Lenders (the "Specified Minority Lenders"), the Required Lenders shall have the option to cause the DIP Agent not to follow such direction from such Specified Minority Lenders by causing the New Money DIP Loans outstanding under the DIP Facility held by such Specified Minority Lenders (and all related obligations owed to such Specified Minority Lenders under the DIP Facility) to be Paid in Full within a reasonable number of days to be agreed after the Specified Minority Lenders have directed the DIP Agent to enforce its rights with respect to any DIP Collateral.

REQUIRED LENDERS: "Required Lenders" means, as at any time of determination (i) prior to the Payment in Full of the New Money DIP Loans, (x) if the Commitment Parties collectively hold at least 50% of the aggregate outstanding principal amount of the New Money DIP Loans at such time, the Commitment Parties holding at least a majority of the aggregate outstanding principal amount of the Commitments held by the Commitment Parties as of the Closing Date in the amounts to be set forth on Schedule I to the Commitment Letter, and (y) if the Commitment Parties collectively hold less than 50% of the aggregate outstanding principal amount of the New Money DIP Loans at such time, the Lenders holding at least a majority of the aggregate outstanding principal amount of the New Money DIP Loans at such time, and (ii) after the Payment in Full of the New Money DIP Loans, the Lenders holding at least a majority of the aggregate outstanding principal amount of the Second Lien Roll-Up Loans at such time.

ASSIGNMENTS AND PARTICIPATIONS: Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet and otherwise reasonably satisfactory to the Commitment Parties.

GOVERNING LAW: New York and (to the extent applicable) the Bankruptcy Code.

INDEMNITY AND EXPENSE REIMBURSEMENT: Substantially consistent with the Existing Credit Agreement, subject to modifications as required to conform to the transactions contemplated by this Term Sheet and otherwise reasonably satisfactory to the Commitment Parties.

## ANNEX A

## SOURCES AND USES

[*TO COME*]

## ANNEX B

## RELATIVE PRIORITIES OF CERTAIN OBLIGATIONS

| Priority | Existing Credit Agreement | DIP Facility |
|---|---|---|
| *First* | Tranche A Term Loans* and Tranche B Term Loans* (pro rata) | New Money DIP Loans |
| *Second* | L/C Borrowings* | Remaining Second Lien Obligations** |
| *Third* | Issued and undrawn Letters of Credit*** | N/A |
| *Fourth* | Tranche A-2 Roll-Up Loans* | N/A |
| *Fifth* | Tranche A-1 Roll-Up Loans* and Specified Second Lien Obligations* (pro rata) | N/A |
| *Sixth* | Remaining Second Lien Obligations** | N/A |

Unless otherwise defined in the Term Sheet to which this Annex B is attached, capitalized terms shall have the meanings assigned to such terms in the Existing Credit Agreement or the Post-Petition Intercreditor Arrangements, as applicable.

* Obligations that will be paid in full with the proceeds of the New Money DIP Loans.

** Obligations that will not be paid in full with the proceeds of the New Money DIP Loans and will be deemed outstanding under the DIP Facility. With respect to the Remaining Second Lien Obligations, the amount outstanding under the DIP Facility on the Closing Date shall include all accrued interest paid-in-kind thereon in accordance with the Existing Credit Agreement (including, without limitation, giving effect to the Tranche B Roll-Up Interest Reduction).

*** Obligations with respect to issued and undrawn Letters of Credit shall be cash collateralized in an amount equal to 105% of the aggregate amount available to be drawn under all then outstanding Letters of Credit.

## ANNEX C

## CERTAIN TRANSACTION DOCUMENTS RELATING TO THE YIELDCOS

1. Settlement Agreement, dated as of March 6, 2017, among TerraForm Power, Inc., a Delaware corporation, TerraForm Power, LLC, a Delaware limited liability company, TerraForm Power Operating, LLC, a Delaware limited liability company, the TERP Subsidiary Parties party thereto from time to time, SunEdison, Inc., a Delaware corporation, and the other SunEdison Parties party thereto from time to time.

2. Merger and Sponsorship Transaction Agreement, dated as of March 6, 2017, by and among TerraForm Power, Inc., Orion US Holdings 1 L.P. and BRE TERP Holdings Inc.

3. Voting and Support Agreement, dated as of March 6, 2017, by and among Orion US Holdings 1 L.P., a Delaware limited partnership, BRE TERP Holdings Inc., a Delaware corporation, SunEdison, Inc., a Delaware corporation, SunEdison Holdings Corporation, a Delaware corporation, SUNE ML1, LLC, a Delaware limited liability company, and TerraForm Power, Inc., a Delaware corporation.

4. Incentive Distribution Rights Transfer Agreement, dated as of March, 2017, by and between TerraForm Power, LLC, a Delaware limited liability company, TerraForm Power, Inc., a Delaware Corporation, SunEdison, Inc., a Delaware corporation, SunEdison Holdings Corporation, a Delaware corporation, SunE ML 1, LLC, a Delaware limited liability company, and BRE Delaware Inc., a Delaware corporation.

5. Settlement Agreement, dated as of March 6, 2017, among TerraForm Global, Inc., a Delaware corporation, TerraForm Global, LLC, a Delaware limited liability company, TerraForm Global Operating, LLC, a Delaware limited liability company, the GLBL Subsidiary Parties party thereto from time to time, SunEdison, Inc., a Delaware corporation, and the other SunEdison Parties party thereto from time to time.

6. Agreement and Plan of Merger, dated as of March 6, 2017, by and among TerraForm Global, Inc., Orion US Holdings 1 L.P. and BRE GLBL Holdings Inc.

7. Voting and Support Agreement, dated as of March 6, 2017, by and among Orion US Holdings 1 L.P., a Delaware limited partnership, BRE GLBL Holdings Inc., a Delaware corporation, SunEdison, Inc., a Delaware corporation, SunEdison Holdings Corporation, a Delaware corporation, and TerraForm Global, Inc., a Delaware corporation.