**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10992 (SMB)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

_____

## ORDER AUTHORIZING AND APPROVING (I) (A) ENTRY INTO THE BACKSTOP COMMITMENT LETTER, (B) EQUITY COMMITMENT AGREEMENT, (C) PAYMENT OF THE FEES AND EXPENSES AND (II) THE RIGHTS OFFERING PROCEDURES AND RELATED FORMS

Upon the motion (the "Motion")[2] of the Debtors for an Order, pursuant sections

105(a), 363(b), 503(b), and 1125 of title 11 of the United States Code (the "Bankruptcy Code")

and rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

(i) authorizing and approving the Debtors to (a) enter into that certain Backstop Commitment

Letter attached hereto as Exhibit 1 (as may be amended, supplemented, or otherwise modified

from time to time, the "Backstop Commitment Letter"), by and among the Debtors and the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1

Backstop Purchasers, (b) enter into that certain Commitment Agreement attached hereto as

Exhibit 2 (as may be amended, supplemented, or otherwise modified from time to time, the

"Equity Commitment Agreement") between the Debtors and Backstop Purchasers, and (c) pay

the Fees and Expenses, and (ii) approving certain procedures and related materials in connection

with the Rights Offering to be consummated pursuant to the Plan; and upon the supporting

Declarations; and due and sufficient notice of the Motion having been given under the particular

circumstances; and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the

Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in

interest; and the Debtors having provided appropriate notice of the Motion and the opportunity

for a hearing on the Motion under the circumstances and no other or further notice need be

provided; and the Court having reviewed the Motion; and the Court having held a hearing (the

"Hearing") on May 19, 2017 to consider the relief requested in the Motion; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and for the reasons stated on the record of the Hearing; and upon all of the

proceedings had before the Court; after due deliberation and sufficient cause appearing therefor,

it is hereby

**FOUND AND DETERMINED that:**[3]

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings
of fact, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

A.    The Court has jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  Consideration of the Motion and the

requested relief is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this

District pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The notice given by the Debtors of the Motion and the Hearing constitutes

proper, timely, adequate, and sufficient notice thereof and complies with the Bankruptcy Code,

the Bankruptcy Rules, and applicable local rules, and no other or further notice is necessary.

C.    The ~~terms and conditions~~ **entry into** ~~of~~ the Backstop Commitment Letter

and the Equity Commitment Agreement ~~are incorporated as if fully set forth herein in the first~~

~~instance; and~~ reflect**s** the Debtors' exercise of prudent business judgment **for the reasons stated**

**on the record, and is in the best interests of the Debtors and their estates.** ~~consistent with~~

~~their fiduciary duties, are based on good, sufficient, and sound business purposes and~~

~~justifications, and are supported by reasonably equivalent value and consideration.  The~~

~~Backstop Commitment Letter and the Equity Commitment Agreement were negotiated in good~~

~~faith and at arm's-length among the Debtors, the Backstop Purchasers, and their respective~~

~~professional advisors.~~ **[SMB: 6/6/17]**

~~D.    The Fees and Expenses constitute actual and necessary costs and expenses~~

~~to preserve the Debtors' estates and are reasonable and warranted on the terms set forth in the~~

~~Backstop Commitment Letter and Equity Commitment Agreement in light of, among other~~

~~things, (i) the significant benefit to the Debtors' estates of having a definitive and binding equity~~

~~commitment to fund the Debtors' proposed chapter 11 plan from holders of a significant~~

~~percentage of the Debtors' pre-petition Non-Rolled Up Second Lien debt, (ii) the absence of any~~

~~other parties similarly situated who are able to make a comparable equity commitment at any~~

~~time prior to entry of this Order, (iii) the substantial time, effort, and costs incurred by the~~

~~Backstop Purchasers in negotiating and documenting the Backstop Commitment Letter and~~

~~Equity Commitment Agreement and reserving the funds to make the equity investment pending~~

~~confirmation and effectiveness of a chapter 11 plan (which could be 4 to 5 months), and (iv) the~~

~~risk to the Backstop Purchasers that the Debtors may ultimately enter into an Alternative~~

~~Transaction in accordance with the terms of the Backstop Commitment Letter and Equity~~

~~Commitment Agreement.~~ **[SMB: 6/6/17]**

E.    The amounts and terms and conditions of the **Breakup Fee and Equity
Commitment** ~~Fees and Expenses~~ are reasonable and customary for this type of transaction ~~and
constitute actual and necessary costs and expenses to preserve the Debtors' estates.  The Fees
and Expenses are bargained-for and integral parts of the transactions specified in the Backstop
Commitment Letter and, without such inducements, the Backstop Purchasers would not have
agreed to the terms and conditions of the Backstop Commitment Letter and the Equity
Commitment Agreement.  Accordingly, the foregoing transactions are reasonable and enhance
the value of the Debtors' estates~~. **[SMB: 6/6/17]**

F.    All parties in interest have been afforded a reasonable opportunity to
object and be heard with respect to the Motion and the transactions set forth within the Backstop
Commitment Letter and the Equity Commitment Agreement and all of the relief granted herein.

~~G.    The Backstop Commitment Letter and the Equity Commitment Agreement
and all accompanying relief requested in the Motion serve to maximize estate value for the
benefit of all the Debtors' stakeholders and parties in interest, and are otherwise in the best~~

~~interests of the Debtors, their estates, shareholders, creditors, and all other parties in interest.~~

**[SMB: 6/6/17]**

**BASED ON THE FOREGOING, IT IS ORDERED, ADJUDGED AND DECREED that:**

1. The Motion is GRANTED to the extent set forth herein.

2. All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled with prejudice.

~~3. The Backstop Commitment Letter and the Equity Commitment Agreement, and the transactions contemplated therein, represent a valid exercise of the Debtors' business judgment.~~ **[SMB: 6/6/17]**

~~4.~~ The Debtors are authorized to execute, deliver, and implement the Backstop Commitment Letter**.**~~, as may be amended from time to time in accordance with the terms thereof, the terms of which are hereby approved, and to take all actions necessary to perform their obligations thereunder. The Backstop Commitment Letter and the terms and provisions included therein are approved in their entirety. The Backstop Commitment Letter is binding and enforceable against the Debtors and the Backstop Purchasers in accordance with its terms.~~ **[SMB: 6/6/17]**

~~5.~~ The Debtors are authorized to execute, deliver, and implement the Equity Commitment Agreement, as may be amended from time to time in accordance with the terms thereof, the terms of which are hereby approved, and to take all actions necessary to perform their obligations thereunder. ~~The Equity Commitment Agreement and the terms and provisions included therein are approved in their entirety. The Equity Commitment Agreement is binding~~

~~and enforceable against the Debtors and the Backstop Purchasers in accordance with its terms.~~
**[SMB: 6/6/17]**

~~6.   The fees and expenses provided for or permitted by the Backstop~~
~~Commitment Letter and the Equity Commitment Agreement (including, without limitation, the~~
~~Fees and Expenses) are hereby approved as reasonable, allowed as an administrative expense~~
~~under section 503(b) of the Bankruptcy Code, and shall be non-refundable, and shall not be~~
~~subject to any avoidance, disgorgement, reduction, setoff, recoupment, offset, recharacterization,~~
~~subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims,~~
~~defenses, disallowance, impairment, or any other challenges under any theory at law or in equity~~
~~by any person or entity.~~ **[SMB: 6/6/17]**

~~7.   The Debtors are authorized and directed to pay the fees and expenses~~
~~provided for or permitted by the Backstop Commitment Letter (including, without limitation, the~~
~~Fees and Expenses) each in accordance with its terms and as and when required by the Backstop~~
~~Commitment Letter, without further application to or order of the Court.~~ **[SMB: 6/6/17]**

~~8.   The Debtors are authorized and directed to provide and perform their~~
~~indemnification and contributions as set forth in the Backstop Commitment Letter and Equity~~
~~Commitment Agreement and in accordance with the terms and conditions thereof, without~~
~~further application to or order of the Court.~~ **[SMB: 6/6/17]**

9.   To the extent the automatic stay provisions of section 362 of the
Bankruptcy Code would otherwise apply, such provisions are vacated and modified to effectuate
all of the terms and provisions of the Backstop Commitment Letter, the Equity Commitment
Agreement, and this Order, including, without limitation, permitting the Backstop Purchasers to
exercise all rights and remedies under the Backstop Commitment Letter and Equity Commitment

Agreement in accordance with their terms, terminate the Backstop Commitment Letter and

Equity Commitment Agreement in accordance with their terms, and deliver any notice

contemplated thereunder, in each case, without further order of the Court.

~~10.    This Order, including all findings herein, shall be effective and binding~~

~~upon all parties in interest in the Chapter 11 Cases, including, without limitation, all creditors of~~

~~any of the Debtors, the Committee, any other committee appointed in the Chapter 11 Cases, and~~

~~the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11~~

~~trustee hereinafter appointed or elected for any of the Debtors, any examiner appointed pursuant~~

~~to section 1104 of the Bankruptcy Code, a responsible person, officer, or any other party~~

~~appointed as a legal representative or designee of any of the Debtors or with respect to the~~

~~property of the estate of any of the Debtors) whether in the Chapter 11 Cases, in any successor~~

~~chapter 11 or chapter 7 cases (the "Successor Cases"), or upon any dismissal of this chapter 11~~

~~cases or any Successor Cases, and shall inure to the benefit of the Backstop Purchasers and the~~

~~Debtors and their respective successors and assigns.~~ **[SMB: 6/6/17]**

~~11.    The Debtors irrevocably waive any right to seek any modification, stay,~~

~~vacatur, or amendment to this Order without the prior written consent of the Requisite~~

~~Purchasers, and no consent shall be implied by any other action, inaction, or acquiescence of any~~

~~of the Requisite Purchasers.~~ **[SMB: 6/6/17]**

~~12.    The failure of any Backstop Purchaser to seek relief or otherwise exercise~~

~~its rights and remedies under this Order, the Backstop Commitment Letter, or applicable law, as~~

~~the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or~~

~~otherwise of any of the Backstop Purchasers.~~ **[SMB: 6/6/17]**

13.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any of the Chapter 11 Cases or Successor Cases, or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and conditions of this Order, and all terms and conditions of the Backstop Commitment Letter, notwithstanding the entry of any order referenced in the immediately prior sentence, shall continue in full force and effect in accordance with the terms hereunder and thereunder in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases.

14.    The Rights Offering Procedures attached hereto as Exhibit 3 are hereby approved.

15.    The Rights Offering Materials, including the Rights Exercise Form, annexed to the Rights Offering Procedures are hereby approved.

16.    The Debtors are authorized to use Prime Clerk, LLC as Subscription Agent in connection with the Rights Offering.

17.    ~~Notwithstanding anything contained herein, the Disclosure Statement or the Plan to the contrary, the Debtors, with the reasonable consent of the Requisite Purchasers, may amend or modify these Rights Offering Procedures, or adopt additional procedures consistent with the provisions of these Rights Offering Procedures and the Commitment Agreement, as applicable, to effectuate the Rights Offering or more efficiently administer the Rights Offering or make such other changes to the Rights Offering, including the criteria for eligibility to participate in the Rights Offering, as necessary in the Debtors' or Reorganized~~

~~Debtors' business judgment; provided that such modifications or additional procedures do not~~

~~result in a material adverse effect on the Debtors, their estates or the Backstop Purchasers.~~
**[SMB: 6/6/17]**

~~18.    For the avoidance of doubt, all questions concerning the timeliness,~~

~~viability, form, and eligibility of any exercise of Rights shall be determined by the Debtors, with~~

~~the reasonable consent of the Requisite Purchasers, in accordance with the terms of the Rights~~

~~Offering Procedures.  Pursuant to the Rights Offering Procedures, the Debtors, with the~~

~~reasonable consent of the Requisite Purchasers may waive any defect or irregularity, or permit a~~

~~defect or irregularity to be corrected within such times as they may determine, or reject the~~

~~purported exercise of any rights.~~  **[SMB: 6/6/17]**

~~19.    The Debtors are authorized to take all actions necessary to effectuate the~~

~~relief granted pursuant to this Order in accordance with the Motion.~~ **[SMB: 6/6/17]**

20.    **In the event of any inconsistency between this Order and** ~~Nothing in~~

~~this Order is intended to or shall supersede~~ the Equity Commitment Agreement, the Rights

Offering Procedures, or the Rights Offering Materials, **the terms of this Order shall govern.**~~and~~

~~any inconsistency with this Order or such documents will be controlled by the terms of the~~

~~Equity Commitment Agreement, the Rights Offering Procedures, or the Rights Offering~~

~~Materials, as applicable.~~ **[SMB: 6/6/17]**

21.    **Without further order of this Court,** ~~T~~this Order shall, in all respects, be

vacated and all parties shall revert to the status quo prior to the entry of this Order if, by October

31, 2017, the proposed global settlement, the material terms of which were announced on the

record before the Court on May 16, 2017 (as documented by the final term sheet to be agreed to

by the parties thereto, the "Global Settlement"), among the Debtors, the Committee, the Tranche

B Roll Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders, and BOKF N.A., is not approved by the Court, or a plan of reorganization incorporating the terms of the Global Settlement is not confirmed by the Court. **[SMB: 6/6/17]**

22.     All parties' rights with respect to any matter reserved by the Court on the record of the Hearing are reserved.

23.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

24.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

25.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated: New York, New York
       June 6, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

# EXHIBIT 1

**Backstop Commitment Letter**

**EXECUTION VERSION**

THIS COMMITMENT LETTER IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES
OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE
MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR
SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR
PROVISIONS OF THE BANKRUPTCY CODE

April 27, 2017

SunEdison, Inc.
13736 Riverport Drive
Maryland Heights, MO 63043
Attn:   John S. Dubel, Chief Executive Officer
        and Chief Restructuring Officer

   **Re:     In re SunEdison, Inc., et al., Case No. 16-10992 (SMB)**

Ladies and Gentlemen:

        We understand that SunEdison, Inc., a Delaware corporation ("you" or the
"Company"), and certain of its subsidiaries (the "Debtor Subsidiaries", and together with
Company, the "Debtors") are debtors under jointly administered cases (the "Chapter 11 Cases")
under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy
Code"), in the United States Bankruptcy Court for the Southern District of New York (together
with any other court having jurisdiction over the Chapter 11 Cases from time to time, the
"Bankruptcy Court"), which cases have been consolidated for procedural purposes only and are
being jointly administered under the lead case, In re SunEdison, Inc., Case No. 16-10992
(SMB).

        In connection with the foregoing, you have informed the parties listed on Schedule I
hereto ("us", "we" or the "Backstop Purchasers") that the Debtors are contemplating a
restructuring through a chapter 11 plan of reorganization to be proposed by the Debtors in the
Chapter 11 Cases (a "Chapter 11 Plan" and, to the extent such Chapter 11 Plan is in form and
substance reasonably satisfactory to the Requisite Purchasers, the "Approved Plan," as may be
amended, supplemented, waived or otherwise modified from time to time, in each case in form
and substance reasonably satisfactory to Backstop Purchasers who have committed at least a
majority of the Equity Commitment (the "Requisite Purchasers")), and that the Company seeks
to obtain certain financing, the proceeds of which will be used, among other things, to repay or
retire the extensions of credit and other outstanding obligations under that certain Senior
Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of April 26, 2016 (as
replaced (including by the Replacement DIP Financing Facility anticipated to close on April 28,
2017, amended, restated, supplemented, modified, extended and/or refinanced (other than in
connection with the effectiveness of a plan of reorganization) from time to time, the "DIP Credit

1

Agreement"), among the Company, each lender from time to time party thereto and Deutsche Bank AG New York Branch, as administrative agent.[1]

In connection therewith, and in connection with such a proposed Chapter 11 Plan, the Backstop Purchasers understand that it is proposed that (i) reorganized SunEdison Inc. (for purposes hereof, the "Issuer") would conduct an offering of rights ("Rights") to purchase new common stock of the Issuer, par value $0.01 per share ("New SunE Common Stock"), and new Class A shares of TerraForm Power, Inc. ("TERP") common stock ("New TERP Common Stock") received by the Issuer in connection with the consummation of the proposed Chapter 11 Plan (such offering, collectively, the "Rights Offering"), (ii) the Rights would be exercisable for each share of New SunE Common Stock and each share of New TERP Common Stock at the prices as described in the Rights Offering Term Sheet (together, the "Subscription Price"), (iii) Issuer would offer the Backstop Purchasers additional New SunE Common Stock and New TERP Common Stock on terms consistent with the Rights Offering (such offering, the "Direct Equity Offering"), (iv) Issuer would offer the Backstop Purchasers the right (the "Incremental TERP Share Right") to require the Issuer to modify its consideration election in connection with the merger of TERP to increase the New TERP Common Stock to be received by the Issuer, in exchange for an increased Equity Commitment (as defined below), (v) the aggregate gross proceeds resulting from the exercise of such Rights at the Subscription Price would be expected to be approximately $213.75 million, subject to increase (i) to $225 million in accordance with the Rights Offering Term Sheet and (ii) in connection with the Incremental TERP Share Right (the "Rights Offering Amount"), and (vi) the aggregate gross proceeds resulting from the purchase of New SunE Common Stock and New TERP Common Stock in the Direct Equity Offering would be expected to be approximately $71.25 million, subject to increase (i) to $75 million in accordance with the Rights Offering Term Sheet and (ii) in connection with the Incremental TERP Share Right (the "Direct Offering Amount").  Further, the Backstop Purchasers understand that in order to pursue such a Chapter 11 Plan, the Debtors are seeking to secure commitments from the Backstop Purchasers to (a) backstop, on a fully committed basis, the Rights Offering of any New SunE Common Stock and New TERP Common Stock that is not purchased by the holders of Rights in the Rights Offering, up to the Rights Offering Amount, at the Subscription Price (the "Backstop Commitment"), and (b) purchase all New SunE Common Stock and New TERP Common Stock offered in the Direct Equity Offering, up to the Direct Offering Amount, at the Subscription Price (the "Direct Equity Commitment," and together with the Backstop Commitment, the "Equity Commitment").

To provide assurance that the Rights Offering shall be fully subscribed and the Direct Equity Offering shall be completed, each of the Backstop Purchasers hereby commit, severally and not jointly, to backstop the Rights Offering and participate in the Direct Equity Offering in the respective percentages set forth on Schedule I hereto, on the terms and conditions (including

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the currently existing DIP Credit Agreement or the *Final Order (I) Authorizing Debtors to (A) Obtain Senior Secured, Superpriority, Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363 and 364* [Docket No. 523] (including any annexes thereto, as modified from time to time in accordance with the DIP Credit Agreement, the "Final DIP Order"), as applicable.

applicable premiums and fees) described (i) herein, (ii) in the Approved Plan, and (iii) in the term sheet attached hereto as Exhibit A (the "Rights Offering Term Sheet"). Each of the Backstop Purchasers and the Debtors will use its commercially reasonable efforts to prepare, negotiate and finalize definitive documentation for the Equity Commitment in good faith as contemplated by the Rights Offering Term Sheet. However, the obligations of each individual Backstop Purchaser to fund the Equity Commitment is conditioned upon satisfaction or waiver of, inter alia, each of the conditions set forth herein, in the Approved Plan and in the Rights Offering Term Sheet. For the avoidance of doubt: (1) each Backstop Purchaser is entering into this Equity Commitment directly with the Company and not with any other Backstop Purchaser, (2) no other Backstop Purchaser shall have any right to bring any action against any other Backstop Purchaser with respect this letter or the Equity Commitment (or any breach thereof) and (3) no Backstop Purchaser shall act, nor shall any action taken by a Backstop Purchaser pursuant to this Equity Commitment be deemed to be acting, in concert with any other Backstop Purchaser with respect to the Equity Commitment or this letter and (4) the Equity Commitment and this letter shall not create a presumption that the Backstop Purchasers are in any way acting as a group. All rights under this Equity Commitment are separately granted to each Backstop Purchaser by the Company, and the use of a single document is for the convenience of the Company. The decision to commit to enter into this Equity Commitment has been made independently of any other Backstop Purchaser.

Our view expressed above is based on (a) our desire to support the Approved Plan as previously discussed with you and on terms and conditions described herein, in the Approved Plan and in the Rights Offering Term Sheet, and (b) our understanding of the Issuer's operations and assets immediately after giving effect to the Approved Plan. Our view expressed above is also subject to (i) agreement on the terms and conditions of the Equity Commitment (in accordance with the immediately preceding paragraph), (ii) our reasonable satisfaction (in accordance with the immediately preceding paragraph) with (x) definitive documentation evidencing the Equity Commitment (y) the terms and conditions of the Approved Plan, and (z) other customary aspects of these types of Equity Commitments and (iii) execution of such definitive documentation evidencing the Equity Commitment, in each case, reasonably satisfactory to us.

In connection with this letter, we have relied without independent verification upon the accuracy and completeness of all of the information provided to us by the Debtors. In addition, please note that we do not provide, and nothing herein shall be construed to be, accounting, tax or legal advice.

Whether or not the transactions contemplated hereby are consummated, but subject to the last sentence of this paragraph, the Debtors agree to: (i) pay within 20 days of demand the reasonable and documented fees, expenses, disbursements and charges of each of the Backstop Purchasers (including the fees and expenses of counsel) incurred relating to (x) the exploration and discussion of this Equity Commitment (or any alternative financing structures) and (y) the preparation and negotiation of this Commitment Letter, the Equity Commitment Agreement (as defined in the Rights Offering Term Sheet), the Approved Plan (and any ancillary documents thereto), and the proposed documentation of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented fees and expenses of counsel, financial advisors, and consultants retained to assist in any of the foregoing; and (ii) indemnify

3

and hold harmless each of the Backstop Purchasers and their affiliates and each of their respective general partners, members, managers and equity holders, and the respective officers, employees, affiliates, advisors, agents, attorneys, accountants, financial advisors and consultants of each such entity (each an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, which any such person or entity may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this Commitment Letter, the matters referred to herein, the Equity Commitment Agreement, the proposed Equity Commitment contemplated hereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons upon 20 days of demand for any legal or other expenses incurred in connection with any of the foregoing; <u>provided</u>, <u>however</u>, that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross negligence of such Indemnified Person.  Notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall be liable for and the Debtors shall hold any such Indemnified Person harmless and indemnify them for any special, indirect, consequential or punitive damages in connection with its activities related to the Equity Commitment, the Rights Offering and the Direct Equity Offering. The terms set forth in this paragraph survive termination of this Commitment Letter and shall remain in full force and effect regardless of whether the documentation for the transactions contemplated hereby are executed and delivered; provided that the terms set forth in this paragraph shall be superseded by the execution of the Equity Commitment Agreement.  The obligations of the Debtors set forth in this paragraph are subject to entry by the Bankruptcy Court of an order in form and substance reasonably satisfactory to the Requisite Purchasers authorizing and approving the Debtors' performance thereof.

In consideration for the Equity Commitment, the Backstop Purchasers shall be entitled to the Break Fee and the Put Premium (in each case, as defined in the Rights Offering Term Sheet), which shall be earned and payable on the terms and conditions set forth in the Rights Offering Term Sheet. The Debtors agree that such premiums and fees, and all other fees and costs payable hereunder, are reasonable and shall be nonrefundable and shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense, counterclaim or tax.

This Commitment Letter is not assignable by the Debtors and is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

The obligation of each and every Backstop Purchaser to fund its Equity Commitment shall terminate upon the giving of written notice of termination by the Requisite Purchasers concurrently with or at any time following the occurrence of any of the following (the giving of such notice being a "<u>Termination Event</u>"), in the event that (it being understood that the list contained herein is in addition to the list in the Rights Offering Term Sheet and not in lieu of):

(i) the Debtors have failed to accept this Commitment Letter on or before 5:00 p.m. (New York time) on the date that is 2 business days after delivery of the Commitment Letter to the Debtors;

4

(ii) the Debtors have failed to execute the Equity Commitment Agreement in form and substance reasonably satisfactory to the Requisite Purchasers on or before 5:00 p.m. (New York time) on the date that is 15 days after delivery of the Commitment Letter to the Debtors; provided that the Backstop Purchasers negotiate the Equity Commitment Agreement with the Debtors on an expeditious basis in good faith;

(iii) the Debtors have failed to file (x) an Approved Plan and (y) procedures pursuant to which the Rights Offering will be conducted in form and substance reasonably satisfactory to the Requisite Purchasers, in each case on or before the date that is 5 business days after the date of this Commitment Letter;

(iv) the Debtors have materially breached their obligations under this Commitment Letter or the Equity Commitment Agreement and such breach has not been cured within 3 business days;

(v) the Requisite Purchasers reasonably determine that any of the conditions precedent to the closing of the Rights Offering and the Direct Equity Offering contained in the Rights Offering Term Sheet (or the Equity Commitment Agreement, as the case may be) become incapable of being satisfied by the September 30, 2017;

(vi) a court of competent jurisdiction or other competent governmental or regulatory authority declares this Commitment Letter unenforceable or making illegal or otherwise restricting, preventing or prohibiting the consummation of the Approved Plan or the Rights Offering and the Direct Equity Offering;

(vii) the Bankruptcy Court enters an order authorizing the Debtors to enter into a capital raising transaction that does not contemplate or is inconsistent with the Rights Offering and the Direct Equity Offering described in this Commitment Letter, including, without limitation, the identity of the Backstop Purchasers;

(viii) the termination of the Company's exclusive right to file a plan, dismissal or conversion of the Debtors' bankruptcy cases or appointment of a trustee or examiner; provided, that it shall not constitute a Termination Event pursuant to this clause (viii) in the event that the Company continues to prosecute the Approved Plan;

(ix) the Bankruptcy Court has not entered an order, in form and substance satisfactory to the Backstop Purchasers, confirming the Approved Plan on or prior to August 1, 2017; or

(x) the Approved Plan has not been consummated or the Rights Offering and the Direct Equity Offering have not closed by September 30, 2017.

The obligations of the Debtors to pay the reimbursable expenses and satisfy their indemnification obligations as set forth herein shall survive the termination of this Commitment Letter.

THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Commitment Letter may not be amended or waived except in writing signed by the Debtors and the Requisite Purchasers; provided, however, that any amendment, modification or waiver (i) to an individual Backstop Purchaser's Equity Commitment, or (ii) that disproportionately and adversely impacts (including, without limitation, the respective allocations set forth herein or on Schedule I with respect to the Equity Commitment, the Breakup Fee or the Put Premium), including without limitation by the withholding of a benefit, an individual Backstop Purchaser in its capacity as such, shall require the consent of such Backstop Purchaser.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of this Commitment Letter by facsimile or portable document format (PDF) shall be effective as delivery of a manually executed counterpart of this Commitment Letter.

Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Commitment Letter and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Commitment Letter.

Notwithstanding anything contained herein, each Backstop Purchaser acknowledges that its decision to enter into this Commitment Letter has been made by such Backstop Purchaser independently of any other Backstop Purchaser.

No agreement is made on behalf of any fiduciary affiliate of a Backstop Purchaser to the extent such agreement would be prohibited by the fiduciary duties of such fiduciary affiliate.

Until the occurrence of a Termination Event, each Backstop Purchaser and each of their respective affiliates holding Subject Debt (defined below) or serving as the nominee, investment manager, or advisor for holders thereof that is signatory hereto (each such affiliated holder, an "Affiliated Holder"), severally and not jointly, hereby agrees that it shall, (a) subject to the prior entry by the Bankruptcy Court of an order approving the disclosure statement in respect thereof as complying with the requirements of Section 1125, and the proper solicitation by the Debtors thereof, and the absence of any modifications to the Approved Plan (except such modifications that are reasonably acceptable to the Backstop Purchasers), vote (or cause the beneficial holder of such Subject Debt to vote) in favor of the Approved Plan to the extent it holds any Subject Debt and in accordance with the procedures set forth in the solicitation materials applicable to the Approved Plan, and timely return a duly executed ballot in connection therewith prior to the applicable voting deadline, (b) support the Approved Plan and the related disclosure statement, the Rights Offering and the Direct Equity Offering and not withdraw or revoke its vote with respect to the Approved Plan, except as otherwise expressly permitted pursuant to this Commitment Letter or the Equity Commitment Agreement; (c) not object to the Approved Plan, the Rights Offering or the Direct Equity Offering or to any efforts to obtain acceptance of, and to confirm and implement, the Approved Plan; (d) not vote for, consent to, support or participate in the formulation of any plan of reorganization for the Debtors other than the Approved Plan; and (e) not encourage or support in any fashion any person or entity to vote against the Approved Plan (collectively (a) through (e), the "Plan Support Covenants"); provided, however, that

nothing contained herein shall limit the ability of any Backstop Purchaser or Affiliated Holder to consult with the Debtors, or to appear and be heard, or to file objections, concerning any other matter arising in the Chapter 11 Cases, so long as such consultation, appearance or objection is not inconsistent with such Backstop Purchaser's or Affiliated Holder's obligations hereunder and the terms of the Plan, the Rights Offering and the Direct Equity Offering.

Each Backstop Purchaser and each Affiliated Holder represents and warrants, severally and not jointly, to the Company and each other Backstop Purchaser and Affiliated Holder that as of the date of this Commitment Letter it has the right to vote the principal amount of (i) Company's 5.00% guaranteed convertible senior secured notes due 2018 (excluding any Tranche B Roll-Up Obligations (as defined in the DIP Credit Agreement) ("Relevant 2018 Notes")) (ii) loans under that certain Second Lien Credit Agreement dated as of January 11, 2016, by and among the Company, the Prepetition Second Lien Administrative Agent (as defined in the DIP Credit Agreement, "Relevant Second Lien Credit Agreement Loans"), and the various lenders party thereto from time to time (excluding any Tranche B Roll-Up Obligations), and (iii) Tranche B Roll-Up Obligations (as defined in the DIP Credit Agreement) set forth on Schedule II hereto (collectively "Subject Debt").

Each Backstop Purchaser and Affiliated Holder hereby agrees, severally and not jointly, for so long as the Plan Support Covenants shall remain in effect, not to transfer, sell, assign, participate, hypothecate or otherwise dispose (each, a "Transfer") of any Subject Debt unless such transferring Backstop Purchaser or Affiliated Holder acknowledges, in writing, that such Transfer shall not amend, modify, change, terminate or otherwise affect such Backstop Purchaser's obligations under this Commitment Letter to fund its portion of the Equity Commitment and/or to perform the Plan Support Covenants with respect to its remaining Subject Debt, as applicable, and (a) if such transferring Backstop Purchaser or Affiliated Holder desires to transfer only Subject Debt, but not any portion of its Equity Commitment, then the transferee of such Subject Debt agrees, in writing, to be bound by the Plan Support Covenants as if such transferee was an original signatory hereto (as an "Affiliated Holder"), by executing a joinder agreement in the form attached hereto as Exhibit B, (b) if such transferring Backstop Purchaser or Affiliated Holder desires to transfer both Subject Debt and a portion of its Equity Commitment, the transferee of such Subject Debt and Equity Commitment agrees, in writing, to be bound by  the Plan Support Covenants and the obligations of the transferring Backstop Purchaser with respect to the portion of the transferor's Subject Debt and Equity Commitment Transferred (as applicable), as if such transferee was an original signatory hereto (as a "Backstop Purchaser"), by executing a joinder agreement in the form attached hereto as Exhibit C, or (c) if such Backstop Purchaser desires to transfer only its Equity Commitment, but not any portion of its Subject Debt (if any), then the transferee of such Equity Commitment agrees, in writing, to be bound by  the obligations of the transferring Backstop Purchaser with respect to the portion of the transferor's Equity Commitment Transferred, as if such transferee was an original signatory hereto (as a "Backstop Purchaser"), by executing a joinder agreement in the form attached hereto as Exhibit D; provided that (x) a Backstop Purchaser or an Affiliated Holder may Transfer Subject Debt, to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker execute a joinder hereto, so long as (1) such Qualified Marketmaker Transfers such right, title or interest in such Subject Debt within 3 business days and (2) any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Subject Debt is to a transferee that executes a joinder in accordance

with this sentence; and (y) to the extent that a Backstop Purchaser or an Affiliated Holder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in Subject Debt that such Qualified Marketmaker acquires from a holder of Subject Debt that is not a Backstop Purchaser or an Affiliated Holder without the requirement that the transferee execute a joinder hereto. "Qualified Marketmaker" means an entity that holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors and is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt). Any Transfer of Subject Debt or Equity Commitment or interest in Subject Debt or Equity Commitment that does not comply with the procedures set forth in this Commitment Letter shall be deemed void ab initio. This Commitment Letter shall in no way be construed to preclude any Backstop Purchaser from acquiring additional Subject Debt; provided, that such additional Subject Debt is subject to the Plan Support Covenants.

For the avoidance of doubt, the term "Commitment Letter," wherever referenced herein or in any of the exhibits hereto, shall always include this letter, the Approved Plan, as well as the Rights Offering Term Sheet.

This letter may not be disclosed by you to any other person without our prior written consent (not to be unreasonably withheld), except that you may disclose this letter, the Rights Offering Term Sheet and the contents hereof and thereof (a) to your affiliates and your and your affiliates' respective officers, directors, employees, attorneys, accountants, agents and advisors on a confidential and need-to-know basis, (b) to the extent required in any legal, judicial or administrative proceeding or as otherwise required by law, regulation or compulsory legal process or by governmental, judicial and/or regulatory authorities (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof and provide us with an opportunity to consult and collaborate with you to prevent any such disclosure), (c) in connection with any public filing requirement that you and we agree that you are required to satisfy, (d) as may be reasonably required to obtain court approval in connection with (i) any acts or obligations to be taken pursuant to the transactions contemplated hereby, (ii) the Approved Plan (as defined in the Rights Offering Term Sheet), and (iii) the related disclosure statement, in each case which may be accomplished through the attachment or incorporation of this letter, the Rights Offering Term Sheet, the Equity Commitment Agreement and the contents hereof and thereof to or into pleadings, the Approved Plan, or the related disclosure statement to be filed with any such court, or otherwise to the extent reasonably required in the Chapter 11 Cases (including disclosure to the Office of the United States Trustee for the Southern District of New York); (e) to the extent such information becomes publicly available other than by reason of improper disclosure by you or any person or entity to whom you disclosed such information, and (f) to the extent required in connection with the enforcement of rights hereunder. Nothing herein, express or implied, is intended or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this letter.

This Commitment Letter constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject

matter hereof.   If the foregoing is in accordance with your understanding of our agreement, please sign this Commitment Letter in the space indicated below and return it to us.

*               *               *

BACKSTOP PURCHASERS:

CANARY SC FUND, L.P.

By:  Cyrus Capital Partners, L.P., its investment manager

By: _____
Name:  Jennifer M. Pulick
Title:   Authorized Signatory

BACKSTOP PURCHASERS:

CYRUS OPPORTUNITIES MASTER FUND II, LTD.

By:  Cyrus Capital Partners, L.P., its investment manager

By: _____

      Name:  Jennifer M. Pulick
      Title:   Authorized Signatory

BACKSTOP PURCHASERS:


CRESCENT 1, L.P.

By:  Cyrus Capital Partners, L.P., its investment manager


By:  _____
     Name:  Jennifer M. Pulick
     Title:   Authorized Signatory

BACKSTOP PURCHASERS:


CYR FUND, L.P.

By:  Cyrus Capital Partners, L.P., its investment manager


By: _____

Name:  Jennifer M. Pulick
Title:  Authorized Signatory

BACKSTOP PURCHASERS:


CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.

By:  Cyrus Capital Partners, L.P., its investment manager


By: _____
       Name:  Jennifer M. Pulick
       Title:   Authorized Signatory

AFFILIATED HOLDERS:

CANARY SC MASTER FUND, L.P.

By:  Cyrus Capital Partners, L.P., its investment manager

By: _____

Name:  Jennifer M. Pulick
Title:   Authorized Signatory

AFFILIATED HOLDERS:


CYRUS HEARTLAND, L.P.

By:  Cyrus Capital Partners, L.P., its investment manager


By:  _____
      Name:  Jennifer M. Pulick
      Title:   Authorized Signatory

AFFILIATED HOLDERS:

CRS MASTER FUND, L.P.

By:  Cyrus Capital Partners, L.P., its investment manager

By:      _____
         Name:  Jennifer M. Pulick
         Title:   Authorized Signatory

BACKSTOP PURCHASERS:

**Strategic Value Master Fund, Ltd.**
By: Strategic Value Partners, LLC
Its Investment Manager

By: _____
    Name:    James Dougherty
    Title:    Fund Chief Financial Officer

BACKSTOP PURCHASERS:

**Strategic Value Opportunities Fund, L.P.**
By: SVP Special Situations III-A LLC
Its Investment Manager

By: _____
Name:    James Dougherty
Title:    Fund Chief Financial Officer

BACKSTOP PURCHASERS:

**Strategic Value Special Situations Master Fund III, L.P.**
By: SVP Special Situations III LLC
Its Investment Manager

By: _____
     Name:
     Title:     James Dougherty
           Fund Chief Financial Officer

AFFILIATED HOLDERS:

**SVP Acquisitions, LLC**

By: _____

Name:
Title:

James Dougherty
Authorized Signatory

BACKSTOP PURCHASERS:

Tennenbaum Heartland Co-Invest, LP

Tennenbaum Senior Loan Fund II, LP

Tennenbaum Senior Loan Fund V, LLC

Tennenbaum Special Situations Fund IX-S, L.P.

Tennenbaum Special Situations  Fund IX, LLC

Tennenbaum Special Situations IX-C, L.P.

Tennenbaum Special Situations IX-O, L.P.

By: _____

Name:  Rajneesh Vig
Title:    Managing Partner

BACKSTOP PURCHASERS:


STONEHILL MASTER FUND LTD.
By: Stonehill Capital Management LLC, its advisor

By: _____

Name:  Paul Malek
Title: General Counsel, Authorized Signatory


AFFILIATED HOLDERS:


[ENTITY]


By: _____

Name:
Title:

BACKSTOP PURCHASERS:

STONEHILL INSTITUTIONAL PARTNERS, L.P.
By: Stonehill Capital Management LLC, its advisor

By:  _____

Name:  Paul Malek
Title: General Counsel, Authorized Signatory

AFFILIATED HOLDERS:

[ENTITY]

By:  _____

Name:
Title:

AFFILIATED HOLDER:

**Bank of America, N.A.**

By: _____
Name:
Title:    SETH DENSON
          DIRECTOR

BACKSTOP PURCHASERS:

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

By:  _____
Name:
Title:
        SETH DENSON
        DIRECTOR

BACKSTOP PURCHASER:

**Investment Partners IV (A), LLC**
By: BlackRock Financial Management Inc.,
its investment manager

By: _____
    Name: David N. Barenborg
    Title: Managing Director

BACKSTOP PURCHASER:

**Sainsbury's Credit Opportunities Fund, Ltd.**
By: BlackRock Financial Management Inc.,
its investment manager

By: _____

    Name: David N. Barenborg
    Title: Managing Director

BACKSTOP PURCHASER:

**K Special Opportunity Fund L.P.**
By: BlackRock Financial Management Inc.,
its investment manager

By: _____
       Name: David N. Barenborg
       Title: Managing Director

BACKSTOP PURCHASER:

**Cadbury Hedge Fund Alternatives Portfolio**
By: BlackRock Financial Management Inc.,
its investment manager

By:

    Name: David N. Barenborg
    Title: Managing Director

BACKSTOP PURCHASERS:

Castlelake III, L.P.
By Castlelake III GP, L.P.
Its General Partner

By: _____

Name: _____
Title: _____

                Kevin Hiniker
                Vice President

AFFILIATED HOLDERS:

CL III Solutions LLC

By: _____

Name: _____
Title: _____

                Kevin Hiniker
                Vice President

BACKSTOP PURCHASERS:

Castlelake IV, L.P.
By Castlelake IV GP, L.P.
Its General Partner

By: _____
Name:
Title:                    Kevin Hiniker
                          Vice President

AFFILIATED HOLDERS:

CL IV Solutions LLC

By: _____
Name:
Title:                    Kevin Hiniker
                          Vice President

[Signature Page – Rights Offering Commitment Letter]

BACKSTOP PURCHASERS:

Each of Centerbridge Credit Partners, L.P. and
Centerbridge Credit Partners Master, L.P. in their
individual capacities as purchasers

SmV    By: _____

Name:
Title:    **Susanne V. Clark**
**Authorized Signatory**

SUNE
[Backstop Purchaser Signature Page – Rights Offering Commitment Letter]

BACKSTOP PURCHASERS:

Centerbridge Special Credit Partners III, L.P. in its
capacity as a purchaser

By: _____

Name: Susanne V. Clark

Title: Authorized Signatory

Cc:      Mr. Philip J. Gund
           Eric Ivester, Esq.
           Mr. Homer Parkhill
           Arik Preis, Esq.
           Mr. Xander Hector

AGREED AND ACCEPTED:

SunEdison, Inc.

By:
Name:  John S. Dubel
Title:      CEO & CRO

**<u>Schedule I</u>**

Backstop Purchasers

| Backstop Purchaser | Allocation (%) | Allocation ($) |
|---|---|---|
| Bank of America Merrill Lynch | ■■■■■ | ■■■■■ |
| BlackRock | ■■■■■ | ■■■■■ |
| Castlelake | ■■■■■ | ■■■■■ |
| Centerbridge | ■■■■■ | ■■■■■ |
| Cyrus | ■■■■■ | ■■■■■ |
| Stonehill | ■■■■■ | ■■■■■ |
| SVP | ■■■■■ | ■■■■■ |
| Tennenbaum | ■■■■■ | ■■■■■ |
| **Total** | ■■■■■ | ■■■■■ |

**Schedule II**

Holdings of Subject Debt (as of the date hereof)

| Backstop Purchaser/Affiliated Holder | Tranche B Roll-Up | Remaining Prepetition Second Lien Debt |
|---|---|---|
| Bank of America Merrill Lynch | ███ | ███ |
| BlackRock | ███ | ███ |
| Castlelake | ███ | ███ |
| Centerbridge | ███ | ███ |
| Cyrus | ███ | ███ |
| Stonehill | ███ | ███ |
| SVP | ███ | ███ |
| Tennenbaum | ███ | ███ |
| **Total** | ███ | ███ |

## Schedule I

Backstop Purchasers

| Backstop Purchaser | Allocation (%) | Allocation ($) |
|---|---|---|
| Bank of America Merrill Lynch | ▮ | ▮ |
| BlackRock | ▮ | ▮ |
| Castlelake | ▮ | ▮ |
| Centerbridge | ▮ | ▮ |
| Cyrus | ▮ | ▮ |
| Stonehill | ▮ | ▮ |
| SVP | ▮ | ▮ |
| Tennenbaum | ▮ | ▮ |
| **Total** | ▮ | ▮ |

**Schedule II**

Holdings of Subject Debt (as of the date hereof)

| Backstop Purchaser/Affiliated Holder | Tranche B Roll-Up | Remaining Prepetition Second Lien Debt |
|---|---|---|
| Bank of America Merrill Lynch | ████████ | ████████ |
| BlackRock | ████████ | ████████ |
| Castlelake | ████████ | ████████ |
| Centerbridge | ██ | ████████ |
| Cyrus | ████████ | ████████ |
| Stonehill | ████████ | ████████ |
| SVP | ████████ | █████████ |
| Tennenbaum | ████████ | ████████ |
| **Total** | █████████ | █████████ |

**Exhibit A**

Rights Offering Term Sheet

[see attached]

## Term Sheet for Proposed Rights Offering

Capitalized terms used but not defined herein have the meanings set forth in that certain Commitment Letter, dated April 27, 2017 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Commitment Letter") among SunEdison, Inc. (the "Company") and the Backstop Purchasers party thereto, to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | Reorganized SunEdison Inc. ("Issuer"), with respect to the new common stock of the Issuer, par value $0.01 per share (the "New SunE Common Stock"). |
| Offering: | The "Rights Offering" shall be effected by offering (a) the Non-Roll Up Second Lien Secured Parties (as defined below) and (b) holders of allowed unsecured claims (the "Unsecured Creditors") against the Debtors, in each case, that are accredited investors (as defined in section 230.501(a) of title 17 of the Code of Federal Regulations) (collectively, the "Rights Holders") the right (the "Rights") to (i) purchase the New SunE Common Stock, (ii) purchase new Class A shares ("New TERP Class A Shares") of TerraForm Power, Inc. ("TERP") available as a result of the merger of TERP and BRE TERP Holdings Inc. (the "TERP Merger") and (iii) reinstate a portion of their respective prepetition secured claims against SunEdison, Inc. as new debt of the Issuer and its subsidiaries[1].  The number of shares of New SunE Common Stock and New TERP Class A Shares (the "Rights Offering Shares") issuable upon the exercise of each Right at the Subscription Price (as defined below) shall be determined such that the exercise of all Rights would result in gross cash proceeds of $213.75 million, subject to increase in connection with the Incremental TERP Share Right (the "Rights Offering Amount"); provided, that, subject to the Section entitled "Break Up Fee" the Company may request, and the Backstop Purchasers shall have the right (but not the obligation) to agree to increase the Rights Offering Amount to no greater than $225 million (the "Maximum Rights Offering Amount") to the extent the Pre-Emergence Cash Need (as defined below) exceeds $285 million[2].  The "Subscription Price" for each share of Rights Offering Shares shall be calculated such that the New TERP Common Stock and New SunE Common Stock distributed or issued, as applicable, pursuant to the Rights Offering and the Direct Equity Commitment together constitute 90% of the aggregate New TERP Common Stock and New SunE Common Stock distributed or issued, as applicable, under the Approved Plan (with the number of shares of New SunE Common Stock issued thereunder to be |

---

[1] Reinstatement right only open to Non-Roll Up Second Lien Secured Parties; provided, that participating Unsecured Creditors will receive equivalent economics as the Non-Roll Up Second Lien Secured Parties receive in the Rights Offering, to be consistent with the settlement set forth in the Approved Plan.

[2] The procedures for this request and ability to consent shall be as set forth in the Equity Commitment Agreement.

| | |
|---|---|
| | equal to (as close as is practicable) the number of New TERP Class A Shares received by Issuer in the TERP Merger).  To the extent set forth in the Approved Plan, each holder of allowed unsecured claims against the Debtors shall have the right to subscribe for its *pro rata* portion of the Rights Offering Shares that is allocable to the Unsecured Creditors based on such holder's allowed unsecured claim amount as a percentage of all allowed unsecured claims, as set forth in the Approved Plan.  Each Non-Roll Up Second Lien Secured Party shall have the right to subscribe for its *pro rata* portion of the Rights Offering Shares (to the extent not allocable to the Unsecured Creditors) based on such holder's allowed Prepetition Second Lien Obligations claim amount as a percentage of all allowed Prepetition Second Lien Obligations claim amounts. For the avoidance of doubt, no Non-Roll Up Second Lien Secured Party shall have the right to subscribe for any of the Rights Offering Shares allocable to Unsecured Creditors.<br><br>"Non-Roll Up Second Lien Secured Parties" means, collectively, the holders of (i) the Company's 5.00% guaranteed convertible senior secured notes due 2018 (excluding any Tranche B Roll-Up Obligations (as defined in the DIP Credit Agreement))[3] and/or (ii) the loans under that certain Second Lien Credit Agreement dated as of January 11, 2016, by and among the Company, the Prepetition Second Lien Administrative Agent (as defined in the DIP Credit Agreement), and the various lenders party thereto from time to time (excluding any Tranche B Roll-Up Obligations). |
| TERP Merger Consideration Election | No less than five business days prior to the date (the "Election Deadline") that the Company's consideration election is required to be made in respect of the TERP Merger, the Company shall (i) deliver written notice to the Backstop Purchasers, including appropriate backup documentation and calculations, of its best estimate of the appropriate consideration mix for the Company to elect in the TERP Merger to ensure that, based upon the Company's reasonable assumption of the elections of other TERP Class A stockholders and assuming the Company's consideration election is prorated in accordance with the terms of the TERP Merger, the Company will have sufficient funds, when combined with the Rights Offering Amount and all other available sources of funds, to satisfy its cash obligations under the Approved Plan, and (ii) offer each Backstop Purchaser the right (the "Incremental TERP Share Right") to require the Company to increase the proportion of New TERP Class A Shares it elects to receive or retain in the TERP Merger, in exchange for an increase to the Equity Commitment in an amount sufficient to purchase such additional New TERP Class A Shares, at a price equal to the Subscription Price.<br><br>Each Backstop Purchaser shall be entitled to exercise the Incremental |

---

[3] All references to the existing DIP Credit Agreement and terms thereunder shall be modified in the Equity Commitment Agreement to refer to the Replacement DIP Credit Agreement.

| | |
|---|---|
| | TERP Share Right until 5:00 p.m. Eastern Time on the date that is one business day prior to the Election Deadline, by written notice to the Company. |
| | The Company shall make its consideration election in respect of the TERP Merger in accordance with the notice provided to the Backstop Purchasers, as adjusted for any exercises as a result of the Incremental TERP Share Right (i.e. an increase may only be elected in an amount equal to the aggregate amount of all Incremental TERP Share Rights exercised by any Backstop Purchasers); provided, however, that, subject to the consent of the Requisite Purchasers, and subject to the provisions of this Rights Offering Term Sheet (including, without limitation, the section entitled "Breakup Fee"), the Company shall have the ability to adjust its consideration election based upon projected cash needs in order to have sufficient funds to satisfy its cash obligations under the Approved Plan. |
| | Upon receipt by the Issuer of the New TERP Class A Shares in the TERP Merger, (a) any additional New TERP Class A Shares resulting from the Incremental TERP Share Right shall be allocated between Rights Offering Shares and the Direct Equity Commitment Shares 75/25; and (b) the Equity Commitments of the Backstop Purchasers exercising their Incremental TERP Share Right shall be increased accordingly. To the extent that the Company, acting solely based on the exercise of the Incremental TERP Share Right by one or more of the Backstop Purchasers, increases the amount of the Rights Offering, the Company will solicit the rights associated with such Incremental TERP Share Right in the same manner as above, at that time. |
| <u>Effective Date Issuances and Distributions</u>: | On the effective date of the Chapter 11 Plan (the "<u>Effective Date</u>"), the Issuer shall (a) issue the New SunE Common Stock in accordance with the Approved Plan, (b) distribute the New TERP Class A Shares in accordance with the Approved Plan and (c) provide for the reinstatement in respect of debt or claims of Non-Roll Up Second Lien Secured Parties against the Company in connection with the election of the Non-Roll Up Second Lien Secured Parties to participate in the Rights Offering.[4] |
| | The New SunE Common Stock shall be issued in one class, and each share of New SunE Common Stock will have one vote per share. |
| | The Reinstated Debt shall be issued pursuant to the terms of the Chapter 11 Plan. |
| <u>Transferability of Rights</u>: | To the extent permitted by applicable securities law and not requiring the preparation of any disclosure documents, the Rights shall be fully transferable in accordance with the terms and conditions of the |

---

[4] Reinstatement subject to footnote 1 on page 1.

3

| | Commitment Letter, the Equity Commitment Agreement, and any Rights Offering Procedures, which shall be in form and substance reasonably satisfactory to the Backstop Purchasers. |
|---|---|
| Backstop Purchasers: | The Non-Roll Up Second Lien Secured Parties set forth on Schedule I to the Commitment Letter. |
| Rights Offering Backstop Commitment: | The Backstop Purchasers shall, pursuant to the Commitment Letter and the Equity Commitment Agreement, severally and not jointly, in accordance with the percentages set forth on Schedule I of the Commitment Letter, as adjusted as contemplated hereby, backstop the Rights Offering on a fully committed basis by purchasing from the Issuer, at the Subscription Price, the Rights Offering Shares that are not purchased by the Rights Holders in the Rights Offering. |
| Direct Equity Commitment | In addition to the Backstop Commitment, the Backstop Purchasers shall, severally and not jointly, in accordance with the percentages set forth on Schedule I of the Commitment Letter, as adjusted as contemplated hereby, purchase at a price per share equal to the Subscription Price, an additional number of shares of New SunE Common Stock and New TERP Class A Shares (the "Direct Equity Commitment Shares") that results in gross proceeds to the Company of $71.25 million, subject to increase (on an individual basis) in connection with the Incremental TERP Share Right (the "Direct Equity Commitment" and, together with the Backstop Commitment, the "Equity Commitment"); provided, that, subject to the section entitled "Breakup Fee," the Company may request, and the Backstop Purchasers shall have the right (but not the obligation) to agree to, increase the Direct Equity Commitment to no greater than $75 million (the "Maximum Direct Equity Commitment" and, together with the Maximum Rights Offering Amount, the "Maximum Equity Commitment") to the extent the Pre-Emergence Cash Need (defined below) exceeds $285 million[5]. The Direct Equity Commitment shall close concurrently with the closing of the Rights Offering and with the issuance of any other equity securities to be issued under the Approved Plan. |
| Put Premium: | As consideration for the Backstop Purchasers providing the various commitments contemplated hereby, including the rights of the Company to put certain Rights Offering Shares and Direct Equity Commitment Shares to the Backstop Purchasers pursuant to the Equity Commitment, the Backstop Purchasers shall receive an aggregate premium (the "Put Premium") equal to 7% of the Maximum Equity Commitment (without giving effect to the Incremental TERP Share Right) payable in additional New SunE Common Shares and New TERP Shares (valued at the Subscription Price, in the manner set forth above) on the effective date of the Approved Plan; provided that (1) the Put Premium will be deemed |

---

[5] The procedures for this request, and ability to consent, shall be as set forth in the Equity Commitment Agreement.

| | |
|---|---|
| | fully earned upon Bankruptcy Court approval of the Commitment Letter (or Equity Commitment Agreement, as the case may be) on the terms of this Rights Offering Term Sheet and (2) such Put Premium shall be payable upon consummation of the Rights Offering and the Direct Equity Commitment. For the avoidance of doubt, no Put Premium shall be payable upon exercise, or relating to, the Incremental TERP Share Right. |
| Company Budget: | Within three business days hereof, the Company shall deliver to the Backstop Purchasers and their advisors a budget (in form and substance reasonably satisfactory to the Requisite Purchasers, the "Initial Budget") setting forth, in detail sufficient and in form and substance reasonably satisfactory to the Backstop Purchasers and/or their advisors, (i) the Company's expected total cash need as of September 30, 2017 (the "Pre-Emergence Cash Need") and (ii) the present value of the Company's cumulative post-emergence net cash flows, discounted at no more than 15% (the "Post-Emergence Cash Flows").  The Company shall thereafter deliver monthly budgets (each, a "Monthly Budget") to the Backstop Purchasers and their advisors, each setting forth the Company's then-current (i.e. updated) calculations of the Pre-Emergence Cash Need and the Post-Emergence Cash Flows, on the same time frames that govern the Company's delivery of monthly cash flow projections under the Company's debtor-in-possession financing facility (as such facility may be amended, restated, modified and/or replaced from time to time); provided, that, in addition to the Monthly Budget delivery requirements set forth above, the Company shall (x) deliver a Monthly Budget no later than three days prior to the Election Deadline (the "Pre-Election Budget") and, (y) in the event that the Effective Date has not occurred within fourteen days following delivery of the Pre-Election Budget, deliver a Monthly Budget no later than three days prior to the projected Effective Date.<br><br>The underlying assumptions in the Monthly Budgets shall not be altered from the Initial Budget unless there is a specific change in the circumstances related thereto.  The Monthly Budget shall be delivered in a form, and on terms, reasonably acceptable to the Backstop Purchasers and their advisors, as will be further set forth in the Equity Commitment Agreement and either the CFO or the CRO in their capacity as such, but not individually or in their respective firm capacity shall represent on behalf of the Company that the Monthly Budget was prepared in good faith and consistent with prior practice; provided, however, that only the Company shall have any obligation or liability with respect to such representation or related budget items and neither the individual CFO or the CRO making such representations nor their respective firms or affiliates, or equity holders shall have any obligation or liability with respect to such representation or related budget items. |
| Breakup Fee: | Once the Debtors and the Backstop Purchasers have executed the Commitment Letter, the Debtors will promptly file a motion (in form and |

substance reasonably satisfactory to the Requisite Purchasers and their advisors) seeking approval of their entry into the Equity Commitment Agreement (a draft of which shall be filed within approximately one week of the filing of such motion) and the terms of this Rights Offering Term Sheet including, among other things:

(a) The Put Premium described above and on the terms described above;

(b) a breakup fee equal to 3% (or such lesser amount as set forth herein) of the Maximum Equity Commitment (without giving effect to the Incremental TERP Share Right) (the "Breakup Fee") payable to the Backstop Purchasers on the terms set forth herein; and

(c) other mutually agreeable protections for the Backstop Purchasers.

The Breakup Fee will be entitled to administrative expense priority under Section 503(b) of the Bankruptcy Code, pursuant to the order (in form and substance satisfactory to the Requisite Purchasers (as defined herein)) (the "Approved Order") approving the Debtors' entry into the Equity Commitment Agreement.  The Breakup Fee will be immediately payable to the Backstop Purchasers, in cash, if:

(a) the Company consummates an Alternative Transaction.  For purposes of this subsection, "Alternative Transaction" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring of the Debtors other than pursuant to the Approved Plan;

(b) the Company shall (i) have withdrawn the Approved Plan or (ii) otherwise ceased to diligently and in good faith pursue confirmation of the Approved Plan, in each case without the consent of the Requisite Purchasers;

(c) the Bankruptcy Court shall have failed to enter the Approved Order prior to June 15, 2017;

(d) the Commitment Letter (or the Equity Commitment Agreement, as the case may be) is terminated by the Company in accordance with its terms;

(e) the Commitment Letter (or the Equity Commitment Agreement, as the case may be) is terminated by the Requisite Purchasers following an order of the Bankruptcy Court authorizing the

6

Debtors to enter into a capital raising transaction that does not contemplate or is inconsistent with the Rights Offering described herein or in the Equity Commitment Agreement, including, without limitation, the identity of the Backstop Purchasers;

(f) the Commitment Letter (or the Equity Commitment Agreement, as the case may be) is terminated by the Requisite Purchasers on account of the Company's material breach of its obligations thereunder;

(g) the Commitment Letter (or the Equity Commitment Agreement, as the case may be) is terminated by the Requisite Purchasers because (1) the Bankruptcy Court has not entered an order, in form and substance reasonably satisfactory to the Requisite Purchasers, confirming the Approved Plan on or prior to August 1, 2017 or (2) the Debtors have not consummated the Approved Plan on or prior to September 30, 2017;

(h) if (1) the Company has submitted a Monthly Budget that reflects a Pre-Emergence Cash Need equal to an amount greater than $285 million less the Pre-Emergence Cash Flows (defined below) and (2) the Requisite Purchasers do not agree to increase the Rights Offering Amount up to an amount equal to the then-updated Pre-Emergence Cash Need (which cannot be greater than the Maximum Rights Offering Amount); or

(i) the Company has submitted a Monthly Budget reporting Post-Emergence Cash Flows that are less than the Deviation Threshold; provided, that, for purposes of the foregoing, if the Company has received cash flows pre-emergence on account of any Post-Emergence Cash Flows as reported in the Initial Budget (the "Pre-Emergence Cash Flows"), such Pre-Emergence Cash Flows will be added back to the Post-Emergence Cash Flows set forth in such Monthly Budget. For purposes of this clause (i), the term "Deviation Threshold" shall mean a 15% reduction of the Post-Emergence Cash Flows as reported in the Initial Budget.

provided, that to the extent the Breakup Fee is payable pursuant to any of foregoing clauses (c), (g), (h) or (i), the Breakup Fee shall be equal to 1.5% of the Maximum Equity Commitment (without giving effect to the Incremental TERP Share Right). For the avoidance of doubt, if an event occurs or fails to occur that triggers the payment of the Breakup Fee, the Backstop Purchasers shall have the right to terminate the Equity Commitment.

| | |
|---|---|
| Conditions Precedent to the | The obligations of the Backstop Purchasers to purchase New SunE Common Shares and the New TERP Class A Shares pursuant to the Equity |

7

| Closing: | Commitment and to perform their obligations under the Equity Commitment Agreement shall be conditioned upon satisfaction or waiver by the Requisite Purchasers of conditions precedent customarily found in equity commitment agreements for similar backstop commitments of this size and duration and other conditions precedent deemed by the Backstop Purchasers to be appropriate to the specific transaction, including, without limitation: |
|---|---|
| | (a)    execution and delivery of the Equity Commitment Agreement, which shall be in form and substance substantially consistent with the Commitment Letter and this Rights Offering Term Sheet and otherwise reasonably acceptable to the Requisite Purchasers. For the avoidance of doubt, this Term Sheet is a summary of certain of the terms of the rights offering, and does not include all terms. Additional terms will be included in the Equity Commitment Agreement; |
| | (b)    the settlement of all material outstanding issues as between the debtors, TERP, TerraForm Global, Inc. ("GLBL") and each of their affiliates shall have occurred and been approved by the Bankruptcy Court by no later than August 15, 2017 (such settlement, any settlement agreement, and any order of the Bankruptcy Court approving such settlement, including any allocation (the "Avoidance Action Allocation") of settlement proceeds to Unsecured Creditors (including the allocation among various estates) thereunder or on account of avoidance actions against TERP and GLBL), in form and substance reasonably satisfactory to the Requisite Purchasers; provided, that the settlements embodied in the TERP and GLBL Settlement Agreements filed by the Debtors on March 10, 2017 [Docket No. 2570], including any amendment or modification thereto that is reasonably satisfactory to the Requisite Purchasers, shall be deemed satisfactory to the Requisite Purchasers); |
| | (c)    any resolution (or settlement, if any) of outstanding issues as between the Debtors, the Debtors' prepetition secured creditors and the Official Committee of Unsecured Creditors and the documentation related thereto shall have been approved by the Bankruptcy Court by no later than August 1, 2017 (such settlement, including any settlement consistent with the Approved Plan, any documentation therefore, and any order of the Bankruptcy Court approving the same, in form and substance reasonably satisfactory to the Requisite Purchasers); |
| | (d)    any transaction regarding the disposition of interests in TERP and GLBL (the "Acquisitions") shall have been effectuated in a manner and with documents in form and substance reasonably |

satisfactory to the Requisite Purchasers, and any Bankruptcy Court order approving such disposition shall have been entered in form and substance reasonably satisfactory to the Requisite Purchasers (including any Bankruptcy Court order approving the same); provided that the Backstop Purchasers acknowledge and agree that the definitive documentation (but not including any amendments, modifications or waivers thereof that are material and adverse to the Backstop Purchasers) entered into on March 6, 2017, shall be reasonably acceptable to the Requisite Purchasers;

(e)     shareholder votes approving the terms of the Acquisitions shall have occurred by no later than September 22, 2017;

(f)     the Company shall have made its consideration election in the TERP Merger consistent with its obligations under this Rights Offering Term Sheet and the Equity Commitment Agreement;

(g)     the Chapter 11 Plan shall be in form and substance reasonably satisfactory to the Requisite Purchasers and consistent with this Rights Offering Term Sheet (the "Approved Plan," it being understood and agreed that the Chapter 11 Plan, in a form and substance reasonably satisfactory to the Requisite Purchasers, filed with the Bankruptcy Court in accordance with the timeline set forth in the Commitment Letter, and attached hereto (or to the Equity Commitment Agreement) is an "Approved Plan," but not any modifications, amendments or supplements thereto that are not reasonably acceptable to the Requisite Purchasers), and shall have been approved by the Bankruptcy Court pursuant to a confirmation order in form and substance reasonably satisfactory to the Requisite Purchasers, which order is in full force and effect and has not been stayed;

(h)     the related disclosure statement shall be in form and substance reasonably satisfactory to the Requisite Purchasers (it being understood and agreed that the disclosure statement in a form and substance reasonably satisfactory to the Requisite Purchasers, filed with the Bankruptcy Court in accordance with the timeline set forth in the Commitment Letter and attached hereto (or to the Equity Commitment Agreement) shall be reasonably satisfactory to the Requisite Purchasers, excluding any modifications, amendments or supplements thereto that are not reasonably acceptable to the Requisite Purchasers), and shall have been approved by the Bankruptcy Court pursuant to an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Requisite Purchasers, which order is in full force and effect and has not been stayed;

(i)    the entry of an order by the Bankruptcy Court, in form and substance reasonably satisfactory to the Requisite Purchasers, which is in full force and effect and has not been stayed, approving the Equity Commitment and the Equity Commitment Agreement, and the payment by the Company of all of the premiums and fees that are provided for in, and the other terms of, the Equity Commitment Agreement;

(j)    following the consummation of the Rights Offering and the Approved Plan, Rights Offering Shares and Direct Equity Commitment Shares (excluding any New SunE Common Stock issued pursuant to the Put Premium) shall constitute 90 percent of the Issuer's outstanding equity.

(k)    Following the execution of the Equity Commitment Agreement, there has not been (i) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other fact, event, change, effect, development, circumstance or occurrence, has had or could reasonably be expected to have a material and adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Company and its subsidiaries taken as a whole, (ii) anything that could reasonably be expected to prevent, materially delay or materially restrict or impair the Company and its subsidiaries from consummating the transactions contemplated in the Approved Plan, or (iii) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other  fact, event, change, effect, development, circumstance or occurrence that, has had or could reasonably be expected to have a material and adverse effect on (A) the ability of the Company or its subsidiaries to perform their respective obligations under the Equity Commitment Agreement, or (B) the ability of the Backstop Purchasers to enforce their rights and remedies under the Equity Commitment Agreement;

(l)    the transactions contemplated by the Rights Offering Term Sheet shall be consummated pursuant to the Equity Commitment Agreement in accordance with applicable laws, rules and regulations and in a manner reasonably acceptable to the Requisite Purchasers and the Company;

(m)    all fees and reasonable, documented out-of-pocket costs, fees, premiums, expenses (including, without limitation, legal and financial advisory fees and expenses, including, without limitation, any such fees of Houlihan Lokey Inc. and JPMorgan Securities, Inc. pursuant to their respective engagement letters and subject to any required court approvals) and other compensation

10

<table>
<tr><td></td><td></td><td>payable to the Backstop Purchasers pursuant to the Commitment Letter or otherwise payable pursuant to the Equity Commitment Agreement and the Approved Plan, shall, in each case, have been paid to the extent due or shall have been provided for in the flow of funds in connection with the consummation of the Approved Plan;</td></tr>
</table>

|  | (n) | the Backstop Purchasers shall have received, among other things, (i) evidence of authorization of the Issuer to execute, deliver and perform its obligations under the Definitive Backstop Documentation, (ii) customary officer's and secretary's certificates, and (iii) customary corporate documents of Reorganized SunEdison, Inc., in each case, in form and substance reasonably satisfactory to the Requisite Purchasers; |
|---|---|---|
|  | (o) | accuracy of the representations and warranties set forth in the Definitive Backstop Documentation in all material respects; |
|  | (p) | any and all governmental and third party consents and approvals necessary in connection with the Rights Offering and the Equity Commitment, the execution and filing where applicable, of any customary corporate documents of Reorganized SunEdison, Inc., and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect; |
|  | (q) | the entry of an order by the Bankruptcy Court, in form and substance reasonably satisfactory to the Requisite Purchasers, which is in full force and effect and has not been stayed, confirming the Approved Plan on or prior to August 1, 2017; |
|  | (r) | the effective date of the Approved Plan shall have occurred prior to September 30, 2017; and |
|  | (s) | Company shall not have withdrawn the Approved Plan. |
|  | | For the avoidance of doubt, neither the Put Premium nor the Breakup Fee shall be payable as a result of the failure to satisfy any condition precedent except as otherwise expressly set forth herein. |
| Company Termination: | | Subject to the Debtors' obligation to pay the Breakup Fee, the Company shall have the right to terminate the Commitment Letter, this Rights Offering Term Sheet and/or the Equity Commitment Agreement and the transactions contemplated hereunder and thereunder if the Company reasonably determines that continued support of the Approved Plan and performance under the Equity Commitment Agreement would be inconsistent with the Debtors' fiduciary obligations; provided, that prior to the Bankruptcy Court's entry of an order approving the Debtors' entry into the Equity Commitment Agreement the Debtors shall not solicit, directly |

|  | or indirectly, an Alternative Transaction. If Debtors receive any proposals regarding an Alternative Transaction prior the Bankruptcy Court's entry of an order approving the Debtors' entry into the Equity Commitment Agreement, Debtors must notify the Backstop Purchasers and promptly (and in any event within one business day) share any and all information (written or oral) received regarding the Alternative Transaction with the Backstop Purchasers. |
|---|---|

\*     \*     \*

**Exhibit B**

**Form of Joinder –  Subject Debt Only**

**Joinder Agreement**

The undersigned is executing and delivering this Joinder Agreement pursuant to the Commitment Letter dated April [__], 2017, as amended and/or modified from time to time in accordance with its terms (the "Commitment Letter") by and among SunEdison, Inc. (the "Company") and certain of the Company's claims holders signatory thereto.  Capitalized terms used in this Joinder Agreement and not otherwise defined herein shall have the meanings provided in the Commitment Letter.

By executing and delivering this Joinder Agreement to the Company, the Backstop Purchasers and the Affiliated Holders, the undersigned hereby agrees to be bound by the Commitment Letter solely for the purpose of being bound by and complying with the Plan Support Covenants as if it were an "Affiliated Holder" (as such term is defined in the Commitment Letter) on the terms and conditions set forth in the Commitment Letter.  The undersigned further agrees that it shall cause any subsequent transferee to which it Transfers any of the Subject Debt held by it to execute and deliver a Joinder Agreement in the form attached as Exhibit C to the Commitment Letter.

The undersigned represents and warrants to the Company, the Backstop Purchasers and the Affiliated Holders that as of the date hereof (i) prior to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement, it held and had the power to vote the Subject Debt set forth in row (i) of the table below, and (ii) pursuant to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement, it will acquire and will hold the power to vote the additional Subject Debt set forth in row (ii) of the table below:

| | Relevant 2018 Notes | Relevant Second Lien Credit Agreement Loans | Tranche B Roll-Up Obligations |
|---|---|---|---|
| (i) prior to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement | | | |
| (ii) pursuant to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement | | | |

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of [_____] [___], 20[17].

[_____]

By: _____
Name:
Title:

16

## Exhibit C
## Form of Joinder – Subject Debt and Equity Commitment
## Joinder Agreement

The undersigned is executing and delivering this Joinder Agreement pursuant to the Commitment Letter dated April [__], 2017, as amended and/or modified from time to time in accordance with its terms (the "Commitment Letter") by and among SunEdison, Inc. (the "Company") and certain of the Company's claims holders signatory thereto. Capitalized terms used in this Joinder Agreement and not otherwise defined herein shall have the meanings provided in the Commitment Letter.

By executing and delivering this Joinder Agreement to the Company, the Backstop Purchasers and the Affiliated Holders, the undersigned hereby agrees to be bound by the Commitment Letter for the purpose of being bound by and complying with the Plan Support Covenants and the Equity Commitment as if it were a "Backstop Purchaser" (as such term is defined in the Commitment Letter) on the terms and conditions set forth in the Commitment Letter. The undersigned further agrees that it shall cause any subsequent transferee to which it Transfers any of the Subject Debt and/or the Equity Commitment held by it to execute and deliver a Joinder Agreement in the form attached as Exhibit C or Exhibit D to the Commitment Letter, as applicable.

The undersigned represents and warrants to the Company, the Backstop Purchasers and the Affiliated Holders that as of the date hereof (i) prior to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement, it held and had the power to vote the Subject Debt, and held the Equity Commitment, set forth in row (i) of the table below, and (ii) pursuant to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement, it will acquire and will hold the power to vote the Subject Debt, and is accepting an Equity Commitment, in each case, as set forth in row (ii) of the table below:

| | Relevant 2018 Notes | Relevant Second Lien Credit Agreement Loans | Tranche B Roll-Up Obligations | Equity Commitment |
|---|---|---|---|---|
| (i) prior to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement | | | | |
| (ii) pursuant to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement | | | | |

For the avoidance of doubt, the undersigned acknowledges and agrees that any determination of holders of Equity Commitment required by the Equity Commitment Letter (or the Equity Commitment Agreement) shall be made, in respect of the Equity Commitment Transferred hereby, by the Backstop Purchaser who made such Equity Commitment on the date of the Equity Commitment Letter, notwithstanding the Transfer contemplated hereby, or any prior or subsequent Transfer.

17

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of [_____] [____], 20[17].

[_____]

By: _____
Name:
Title:

**Exhibit D**

**Form of Joinder – Equity Commitment Only**

**Joinder Agreement**

The undersigned is executing and delivering this Joinder Agreement pursuant to the Commitment Letter dated April [__], 2017, as amended and/or modified from time to time in accordance with its terms (the "Commitment Letter") by and among SunEdison, Inc. (the "Company") and certain of the Company's claims holders signatory thereto. Capitalized terms used in this Joinder Agreement and not otherwise defined herein shall have the meanings provided in the Commitment Letter.

By executing and delivering this Joinder Agreement to the Company, the Backstop Purchasers and the Affiliated Holders, the undersigned hereby agrees to be bound by the Commitment Letter for the purpose of being bound by and complying with the Equity Commitment as if it were a "Backstop Purchaser" (as such term is defined in the Commitment Letter) on the terms and conditions set forth in the Commitment Letter. The undersigned further agrees that it shall cause any subsequent transferee to which it Transfers any of the Equity Commitment held by it to execute and deliver a Joinder Agreement in the form attached as Exhibit C, Exhibit D or Exhibit E to the Commitment Letter, as applicable.

The undersigned represents and warrants to the Company, the Backstop Purchasers and the Affiliated Holders that as of the date hereof (i) prior to the transfer of the Equity Commitment which resulted in the execution of this Joinder Agreement, it held and had the power to vote the Subject Debt and held the Equity Commitment set forth in row (i) of the table below, and (ii) pursuant to the transfer of Equity Commitment which resulted in the execution of this Joinder Agreement, it is accepting an additional Equity Commitment set forth in row (ii) of the table below:

| | Relevant 2018 Notes | Relevant Second Lien Credit Agreement Loans | Tranche B Roll-Up Obligations | Equity Commitment |
|---|---|---|---|---|
| (i) prior to the transfer of Equity Commitment which resulted in the execution of this Joinder Agreement | | | | |
| (ii) pursuant to the transfer of Equity Commitment which resulted in the execution of this Joinder Agreement | | | | |

For the avoidance of doubt, the undersigned acknowledges and agrees that any determination of holders of Equity Commitment required by the Equity Commitment Letter (or the Equity Commitment Agreement) shall be made, in respect of the Equity Commitment Transferred hereby, by the Backstop Purchaser who made such Equity Commitment on the date of the Equity Commitment Letter, notwithstanding the Transfer contemplated hereby, or any prior or subsequent Transfer of such Equity Commitment.

19

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of [_____] [____], 20[17].

[_____]

By: _____

Name:

Title:

## **EXHIBIT 2**

**Equity Commitment Agreement**

## <u>EXHIBIT 2</u>

**Equity Commitment Agreement**

**EXECUTION VERSION**

**COMMITMENT AGREEMENT**

**by and between**

**SUNEDISON, INC.**

**and**

**THE BACKSTOP PURCHASERS SET FORTH HEREIN**

**Dated as of May 19, 2017**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Section 1. | The Rights Offering | 3 |
| (a) | Rights Exercise Period; Expiration Time | 3 |
| (b) | Issuance and Distribution of New Units | 3 |
| (c) | Commitment Notice; Satisfaction Notice; Payment Notice; Notice of Effective Date | 3 |
| (d) | Increase to Total Commitment Amount Upon Company Request | 4 |
| Section 2. | The Purchase Commitments | 4 |
| (a) | Purchase Commitments | 4 |
| (b) | Put Premium | 6 |
| (c) | Transaction Expenses | 7 |
| (d) | Deliverables on the Effective Date | 8 |
| (e) | Taxes | 8 |
| (f) | Backstop Purchaser Affiliates | 8 |
| Section 3. | [RESERVED] | 8 |
| Section 4. | Incremental TERP Share Right | 9 |
| (a) | Notice, Offer and Election | 9 |
| (b) | Application of New TERP Class A Shares | 9 |
| Section 5. | Representations and Warranties of the Company | 9 |
| (a) | Incorporation and Qualification | 9 |
| (b) | Corporate Power and Authority | 10 |
| (c) | Execution and Delivery; Enforceability | 10 |
| (d) | Authorized Capital Stock | 11 |
| (f) | Issuance | 11 |
| (g) | No Conflict | 11 |
| (h) | Consents and Approvals | 12 |
| (i) | Arm's Length | 12 |
| (j) | Initial Budget | 13 |
| (k) | No Undisclosed Liabilities | 13 |
| (l) | Disclosure Statement; Other Information | 13 |
| (m) | Absence of Certain Changes | 13 |

i

(n) No Violation or Default ........................................................................... 13

(o) Legal Proceedings .................................................................................. 14

(p) No Broker's Fees ................................................................................... 14

(q) Material Contracts ................................................................................. 14

(r) Ownership of TERP and GLBL Shares ....................................................... 15

(s) No Additional Representations and Warranties ............................................ 15

Section 6. Representations and Warranties of the Backstop Purchasers ...................... 15

(a) Organization ...................................................................................... 15

(b) Power and Authority ............................................................................ 15

(c) Execution and Delivery ......................................................................... 16

(d) Securities Laws Compliance .................................................................... 16

(e) Accredited Investor .............................................................................. 16

(f) No Conflict ........................................................................................ 16

(g) Consents and Approvals ........................................................................ 16

(h) Legal Proceedings ................................................................................ 17

(i) Sufficiency of Funds ............................................................................. 17

(j) No Broker's Fees ................................................................................. 17

(k) No Violation or Default ......................................................................... 17

(l) No Reliance ........................................................................................ 17

(m) No Additional Representations and Warranties ............................................ 18

Section 7. Additional Covenants of the Company ................................................. 18

(a) Approval Order .................................................................................... 18

(b) Plan and Disclosure Statement; Confirmation Order and Sanction Order ............ 18

(c) Rights Offering .................................................................................... 19

(d) Notification ........................................................................................ 19

(e) Backstop Shares ................................................................................... 19

(f) Antitrust Approvals .............................................................................. 19

(g) Conduct of Business ............................................................................. 19

(h) Ancillary Agreements ........................................................................... 21

(i) Confidentiality Obligations ..................................................................... 21

(j) Financial Information ............................................................................ 21

(k) Amendments to Organizational Documents .................................................. 21

(l) Competing Proposals ............................................................................. 21

(m)     Disclosure ................................................................................22

(n)     Notice of Changes ......................................................................22

(o)     Further Assurances ....................................................................22

(p)     RESERVED ...............................................................................22

(q)     TERP and GLBL Documents......................................................23

(r)     Monthly Budgets........................................................................23

(s)     Obligations in the Event of Backstop Purchaser Default...............23

(t)     Indemnity Claims .......................................................................23

Section 8.    Additional Covenants of the Backstop Purchasers ...............23

(a)     Support of the Plan.....................................................................23

(b)     Support of Yieldco Transactions .................................................25

(c)     Transfers....................................................................................26

(d)     Information ................................................................................27

(e)     Antitrust Approvals ....................................................................27

(f)     Further Assurances ....................................................................28

(g)     Company ...................................................................................28

Section 9.    Conditions to the Obligations of the Parties .......................28

(a)     Conditions to the Obligations of the Backstop Purchasers ...........28

(b)     Conditions to the Obligations of the Company.............................31

Section 10.    Indemnification ................................................................32

(a)     Indemnification Generally ..........................................................32

(b)     Certain Procedures .....................................................................33

(c)     Limitations ................................................................................33

(d)     Indemnitor of First Resort...........................................................34

Section 11.    No Survival of Representations and Warranties ..................34

Section 12.    Termination ......................................................................34

(a)     Automatic Termination ...............................................................34

(b)     Termination by Mutual Consent ..................................................34

(c)     Termination by Backstop Purchasers ...........................................34

(d)     Termination by the Company.......................................................36

(e)     Effect of Termination .................................................................36

(f)     Breakup Fee ..............................................................................36

Section 13.    Notices ........................................................................................................37

Section 14.    Assignment; Third Party Beneficiaries ..................................................38

Section 15.    Prior Negotiations; Entire Agreement ....................................................38

Section 16.    GOVERNING LAW; VENUE ...............................................................38

Section 17.    Counterparts ...................................................................................................39

Section 18.    Waivers and Amendments ...............................................................................39

Section 19.    Interpretation and Construction ..........................................................39

Section 20.    Headings ...................................................................................................40

Section 21.    Specific Performance ..................................................................................40

Section 22.    Damages ...................................................................................................40

Section 23.    Severability ...................................................................................................40

Section 24.    Certain Information ...................................................................................40

Section 25.    Backstop Purchasers Acting Directly ....................................................40

Section 26.    No Recourse ...................................................................................................41


Schedule I       Backstop Purchasers
Schedule II      [RESERVED]
Schedule III     Index of Defined Terms
Schedule IV      Disclosure Schedule
Schedule V       Conduct of Business
Schedule VI      Subject Debt


Exhibit A        [RESERVED]
Exhibit B        [RESERVED]
Exhibit C        Rights Offering Procedures
Exhibit D        Joinder Agreement for Transfer of Subject Debt
Exhibit E        Joinder Agreement for Transfer of Subject Debt and Equity Commitment
Exhibit F        Joinder Agreement for Transfer of Equity Commitment

## COMMITMENT AGREEMENT

This Commitment Agreement (this "<u>Agreement</u>"), dated as of May 19, 2017, is made by and between SunEdison, Inc., a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "<u>Company</u>") and the Backstop Purchasers identified on Schedule I hereto (the "<u>Backstop Purchasers</u>").

## RECITALS

WHEREAS, the Company and certain of its direct and indirect subsidiaries (together with the Company, the "<u>Debtors</u>") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and the Debtors' cases (the "<u>Bankruptcy Cases</u>") are being jointly administered under Case No. 16-10992 (SMB);

WHEREAS, the Company and the Backstop Purchasers previously entered into a commitment letter and term sheet, dated as of April 27, 2017, regarding their respective rights and obligations with respect to matters set forth herein (the "<u>Commitment Letter</u>");

WHEREAS, the Debtors shall file (i) an amended Chapter 11 plan of reorganization (the "<u>Plan</u>") and (ii) an amended disclosure statement that will accompany the Plan (the "<u>Disclosure Statement</u>");

WHEREAS, the Company will retain certain Class A shares ("<u>New TERP Class A Shares</u>") of TerraForm Power, Inc. ("<u>TERP</u>") following the merger of TERP and BRE TERP Holdings Inc. (the "<u>TERP Merger</u>");

WHEREAS, the Plan will propose, among other things, to offer rights (the "<u>Rights</u>" and such offering, the "<u>Rights Offering</u>") to purchase up to (i) 67.5% of the total number of shares of new common stock, par value $0.01 per Share, of the Company (the "<u>New SunE Common Stock</u>") to be issued under the Plan and (ii) 67.5% of all of the New TERP Class A Shares held by the Company immediately following the TERP Merger (each share of New SunE Common Stock, together with a pro rata amount of New TERP Class A Shares is referred to herein as a "<u>New Unit</u>", and the aggregate amount of such New Units being offered in the Offering being the "<u>Rights Offering Shares</u>" and the aggregate price of the Rights Offering Shares, the "<u>Rights Offering Amount</u>");

WHEREAS, the "<u>Purchase Price</u>" for each New Unit (and if applicable, any reinstated prepetition secured claims) shall be an amount equal to the Pre-Emergence Cash Need (as defined below) (up to $285 million, as such amount may be increased in accordance with this Agreement the "<u>Total Commitment Amount</u>") divided by the aggregate number of Total Commitment Shares (defined below);

WHEREAS, the Rights Offering will be conducted pursuant to the rights offering procedures in the form to be filed with the Bankruptcy Court in connection with the Disclosure Statement and attached hereto as <u>Exhibit C</u> (the "<u>Rights Offering Procedures</u>");

WHEREAS, in connection with the Rights Offering, the Company will offer to Non-Roll Up Second Lien Secured Parties who are Accredited Investors (the "2L Stub Claimholders") (i) Rights to purchase their pro rata share (based on the amount of such claims) of the New Units being offering pursuant to the Rights Offering (i.e., 67.5% of the total number of New Units to be issued under the Plan) at a price per New Unit equal to the Purchase Price and (ii) the right to reinstate a portion of their respective prepetition secured claims against the Debtors as new debt of the Company and its subsidiaries as described herein;

WHEREAS, in order to facilitate the consummation of the Plan, pursuant to the terms of this Agreement, and subject to the terms, conditions and limitations set forth herein, each of the Backstop Purchasers have agreed to purchase their pro rata amount (based on its Backstop Purchaser's Commitment Percentage) of, and the Company agrees to sell (the "Direct Equity Offering") 22.5% of the total number of New Units to be issued under the Plan (the "Direct Commitment Shares", and together with the Rights Offering Shares, the "Total Commitment Shares") at a price per New Unit equal to the Purchase Price (such total amount, including any increase thereto, the "Direct Commitment Amount");

WHEREAS, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, the Backstop Purchasers have agreed to purchase, and the Company agrees to sell, for a price per Share equal to the Purchase Price, an aggregate number of New Units equal to the number of New Units that were not validly subscribed for and purchased pursuant to the Rights Offering by the Eligible Claimholders (the "Backstop Shares" and, together with the Put Premium Shares (defined below) and the Direct Commitment Shares, the "Backstop Purchaser Shares");

WHEREAS, pursuant to the Plan the Company will, if the Rights Offering is consummated pursuant to the terms and conditions set forth herein, issue a number of New Units equal to 7% of the Total Commitment Shares (the "Put Premium Amount", such New Units being the "Put Premium Shares" and such payment or issuance, as applicable, the "Put Premium") to each of the Backstop Purchasers on a pro rata basis (based on its Backstop Purchaser's Commitment Percentage); and

WHEREAS, in order to facilitate the consummation of the Plan, pursuant to the terms of this Agreement, and subject to the terms, conditions and limitations set forth herein, the Company will offer to each Backstop Purchaser a right to require the Company to increase the proportion of New TERP Class A Shares it elects to receive or retain in the TERP Merger, in exchange for increases to (i) the number of Rights Offering Shares (pro rata to 2L Stub Claimholders, with corresponding increases to the obligation of such Backstop Purchaser(s) obligation to purchase Backstop Shares) and (ii) the Direct Commitment Shares to be purchased by such Backstop Purchaser (with corresponding increases to the number of Direct Commitment Shares being sold to such Backstop Purchaser) (items (i) – (ii) above being referred to as the "Incremental TERP Merger Increases"), in amounts sufficient to purchase the additional New Units to be included in the Rights Offering and the Direct Equity Offering as a result of such change in the Company's election, at a price equal to the Purchase Price.

2

In consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Backstop Purchasers agree as follows:

Section 1.     The Rights Offering.

(a)     Rights Exercise Period; Expiration Time.  In connection with the Plan, the Company shall issue Rights to (i) purchase 67.5% of the shares of New SunE Common Stock to be issued under the Plan and 67.5% of the shares of New TERP Class A Shares it holds immediately following the TERP Merger to the Eligible Claimholders for a price per New Unit equal to the Purchase Price, and (ii) in the case of Non-Roll Up Second Lien Secured Parties only, reinstate a portion of their respective prepetition secured claims against SunEdison, Inc. as new debt of the Company and its subsidiaries.  The Rights Offering shall be conducted in accordance with the terms of the Rights Offering Procedures, as follows: Each Eligible Claimholder may exercise Rights during a period (the "Rights Exercise Period") commencing on the date on which the solicitation of votes to approve the Plan is commenced (the "Commencement Date") and ending on the deadline specified in the Rights Offering Procedures (together with any extensions thereto, as specified in the Rights Offering Procedures, the "Expiration Time") by returning to the Subscription Agent, a duly executed Subscription Form electing to exercise all or a portion of such Eligible Claimholder's Rights and delivering to the Subscription Agent, an amount equal to the product of the Purchase Price and the number of New Units such Eligible Claimholder elects to purchase pursuant to this Section 1(a), by wire transfer of immediately available funds which amount shall be held in escrow by the Subscription Agent until the earlier of the effective date of the Plan (the "Effective Date") or the termination of this Agreement.  Notwithstanding the foregoing or anything else to the contrary herein or otherwise, upon funding of their respective Prefunding Amounts in accordance with Section 2(a)(ii), each Backstop Purchaser shall be deemed to have exercised all of such Backstop Purchaser's Rights, and to have delivered to the Subscription Agent, the related funds, in each case, as required by this Section 1(a) and in accordance with the Rights Offering Procedures.

(b)     Issuance and Distribution of New Units.  On the Effective Date: (i) the Company will issue the New SunE Common Stock and distribute the New TERP Class A Shares to the Eligible Claimholders (including the Backstop Purchasers) that validly exercised, and paid in full the Total Exercise Price for such New Units in connection with their respective Rights, and (ii) solely with respect to the Backstop Purchasers, issue the New SunE Common Stock and distribute the New TERP Class A Shares comprising the Backstop Shares (if any), the Direct Commitment Shares and the Put Premium Shares.  If the exercise of a Right or the issuance or distribution of a Direct Commitment Share or a Put Premium Share would result in the issuance or distribution of a fractional share of the New SunE Common Stock or New TERP Class A Shares, then the number of shares of New SunE Common Stock or New TERP Class A Shares to be issued or distributed in respect of such Right, Direct Commitment Share or Put Premium Share will be rounded down to the nearest whole share.

(c)     Commitment Notice; Satisfaction Notice; Payment Notice; Notice of Effective Date.  The Company will provide to each Backstop Purchaser (in accordance with the notice provisions set forth in Section 13) a certificate of a duly authorized officer of the Company setting forth either (i) the number of Rights Offering Shares, Backstop Shares and Direct

Commitment Shares required to be purchased by such Backstop Purchaser and the aggregate purchase price for such New Units equal to the product of the Purchase Price and the aggregate number of such New Units (such certificate, a "Commitment Notice"), or (ii) in the absence of any Backstop Shares, (A) the number of Rights Offering Shares and Direct Commitment Shares required to be purchased by such Backstop Purchaser and the aggregate purchase price for such New Units equal to the product of the Purchase Price and the aggregate number of such New Units, and (B) the fact that there are no Backstop Shares and that the Backstop Commitment is terminated (such certificate, a "Satisfaction Notice"), one Business Day after the Expiration Time. The Company will provide notice to the Backstop Purchasers of the Effective Date at least three Business Days prior to the Effective Date.

(d)     Increase to Total Commitment Amount Upon Company Request.  Subject to Section 12(c) (*Termination by Backstop Purchasers*), the Company may request, prior to the Commencement Date, and the Requisite Purchasers shall have the right (but not the obligation) to agree to increase the Total Commitment Amount to no greater than $300 million (the "Maximum Rights Offering Amount") to the extent the Pre-Emergence Cash Need exceeds $285 million.  For the avoidance of doubt, any such increases to the Total Commitment Amount shall be funded solely through an increase to the Purchase Price.

Section 2.     The Purchase Commitments.

(a)     Purchase Commitments.  On the basis of the representations and warranties contained herein, and subject to the conditions set forth in Section 9:

(i)     Commitments; Commitment Percentage.  Each Backstop Purchaser agrees, severally and not jointly, to subscribe for and purchase on the Effective Date, and the Company agrees to sell and issue, at a price per New Unit equal to the Purchase Price, a number of New Units equal to: the sum of (A) the product of (x) such Backstop Purchaser's Commitment Percentage and (y) the total number of Backstop Shares (with respect to each Backstop Purchaser, its "Backstop Commitment") and (B) the product of (x) such Backstop Purchaser's Commitment Percentage and (y) the total number of Direct Commitment Shares (e.g., 22.5% of the total number of New Units to be issued under the Plan) (with respect to each Backstop Purchaser, its "Direct Equity Commitment" and together with the Backstop Commitment, the "Equity Commitment"). For purposes of this Agreement, a Backstop Purchaser's "Commitment Percentage" shall mean the percentage next to such Backstop Purchaser's name set forth on Schedule I, which percentage represents such Backstop Purchaser's purchase obligations hereunder, subject to any adjustment in accordance with this Agreement.

(ii)     Prefunding Obligations.

(A)     Promptly following the execution of this Agreement, the Company and the Backstop Purchasers shall cooperate in good faith to identify an escrow agent reasonably acceptable to them (the "Escrow Agent") and negotiate and enter into an escrow agreement (the "Escrow Agreement") among the Company, the Escrow Agent and the Backstop Purchasers, pursuant to which the Escrow Agent shall receive, hold and disburse certain funds related to the

Equity Commitment as contemplated by this Section 2(a)(ii). The fees and expenses of the Escrow Agent shall borne 100% by the Company.

(B)    On the day that is five (5) Business Days prior to the Confirmation Hearing, if it is able, the Company shall deliver a certificate (the "Prefunding Certificate"), in form and substance reasonably satisfactory to the Backstop Purchasers, certifying that as of such date, the Company reasonably believes, in good faith, that the conditions to the obligations of the Backstop Purchasers and the Company set forth in Section 9 will be satisfied.

(C)    If the Company has delivered the Prefunding Certificate, then, on or prior to the day that is two (2) days prior to the Confirmation Hearing (such date, the Prefunding Date), each Backstop Purchaser shall, by wire transfer of immediately available funds, pay to the Escrow Agent an amount (such amount, a Backstop Purchaser's "Prefunding Amount") equal to the product of (a) $300 million and (b) such Backstop Purchaser's Commitment Percentage (as of such date). If a Backstop Purchaser's Commitment Percentage is adjusted at any point prior to the Effective Date, such Backstop Purchaser shall have 7 days to fund any difference (or if shorter, two days prior to the Effective Date).

(D)    Pursuant to the Escrow Agreement, the Escrow Agent shall (I) hold amounts funded pursuant to Section 2(a)(ii)(C) until the earlier of the Effective Date or the termination of this Agreement, (II) at the Effective Date, fund the portion of the aggregate Prefunding Amounts set forth in the Commitment Notice or the Satisfaction Notice to the Subscription Agent and return any excess to the Backstop Purchasers in accordance with their Commitment Percentages, in each case, by wire transfer of immediately available funds and/or (III) upon termination of this Agreement, return all Prefunding Amounts to the applicable Backstop Purchasers by wire transfer of immediately available funds.

(iii)    Default Purchase Right.

(A)    If and to the extent that any of the Backstop Purchasers does not fully and timely satisfy its obligations in respect of its Equity Commitment as required under Section 2(a)(ii)(C) (a "Backstop Purchaser Default" and each such Backstop Purchaser, a "Defaulting Backstop Purchaser"), then each of the remaining Backstop Purchasers (the "Non-Defaulting Backstop Purchasers") individually shall have the right (the "Default Purchase Right") but not the obligation, to purchase on the Effective Date all or a portion of the New Units that were to be purchased by such Defaulting Backstop Purchaser (the "Default Shares") at a price per New Unit equal to the Purchase Price. To the extent that the Non-Defaulting Backstop Purchasers (in the aggregate) desire to purchase more than the total number of Default Shares, such Default Shares shall be allocated between the Non-Defaulting Backstop Purchasers pro rata, based on their respective Commitment Percentages. In the event of a Backstop Purchaser Default in accordance with this Section 2(a)(iii)(A), the consummation of the Rights Offering and the Effective Date will be deferred for a period of time, not to exceed 20 days, in order to determine any reallocation of the Backstop Commitments and the Put Premium and, if necessary, replace the commitment of the Defaulting Backstop Purchaser. As soon as practicable after a Backstop Purchaser Default and in any event within one Business Day following such Backstop Purchaser Default, the Company will send a notice (in accordance with the notice provisions set forth in Section 13) to each Non-Defaulting Backstop Purchaser, specifying the number of

5

Default Shares.  Each Non-Defaulting Backstop Purchaser will have 5 days from receipt of such notice to elect to exercise the Default Purchase Right by notifying the Company of its election to purchase up to 100% of the Default Shares or find a third-party satisfactory to the Backstop Purchasers reasonably acceptable to the Company not then in default to replace the commitment of the Defaulting Backstop Purchaser.  At the conclusion of such 5 day period, if the Non-Defaulting Backstop Purchasers have not elected to exercise the Default Purchase Right in its entirety or not found a third-party to replace the commitment of the Defaulting Backstop Purchaser, the Company will have an additional 15 days to find a third-party reasonably acceptable to the Backstop Purchasers to replace any remaining commitment of the Defaulting Backstop Purchaser (after taking into account any New Units acquired pursuant to the Default Purchase Right or by a third-party identified by the Backstop Purchasers).  Any Person agreeing to fund any portion of the Equity Commitment in lieu of a Defaulting Backstop Purchaser in accordance with this Section 2(a)(iii) shall, to the extent not already party thereto, execute a joinder to this Equity Commitment Agreement and the escrow agreement with the Escrow Agent in form and substance reasonably satisfactory to the parties thereto and hereto, and fund any necessary amounts to the Escrow Agent in immediately available funds as contemplated by Section 2(a)(ii). If at the conclusion of such 15 day period, the Company has been unable to find a third-party reasonably acceptable to the Backstop Purchasers to replace the remaining commitment of the Defaulting Backstop Purchaser, then the Company may terminate this Agreement and each Non-Defaulting Backstop Purchaser may terminate its respective obligations under this Agreement (and for the avoidance of doubt, any such terminating Backstop Purchaser will not be considered to be a Defaulting Backstop Purchaser or to otherwise be in breach of this Agreement).

(B)     Notwithstanding anything to the contrary in this <u>Section 2(a)(iii)</u>, the parties agree that a Defaulting Backstop Purchaser will be liable to the Company for the consequences of its breach and that the Company can enforce its rights pursuant to <u>Section 21</u> immediately upon such Defaulting Backstop Purchaser's failure to fully and timely satisfy its obligations in respect of its Commitment Percentage as required under <u>Section 2(a)(i)</u>. For the avoidance of doubt, no Backstop Purchaser shall have any right to bring any action against any Defaulting Backstop Purchaser with respect the Equity Commitment or this Agreement (or any breach hereof).

(iv)     <u>Adjustment of Commitment Percentage</u>.  The Commitment Percentage for any Defaulting Backstop Purchaser shall be reduced to zero.  The Commitment Percentage for the Non-Defaulting Backstop Purchasers exercising the Default Purchase Right shall be increased proportionately to reflect the reallocation of the Defaulting Backstop Purchaser's Commitment Percentage among the Non-Defaulting Backstop Purchasers exercising the Default Purchase Right (such that the total Commitment Percentage for the Non-Defaulting Backstop Purchasers, plus the percentage of Default Shares, if any, allocated to a third party in accordance with <u>Section 2(a)(iii)(A)</u>, shall always equal 100%).

(b)     <u>Put Premium</u>.

(i)     On the basis of the representations and warranties herein contained, but subject to the entry of an order of the Bankruptcy Court (such order, in form and substance

reasonably satisfactory to the Backstop Purchasers, the "Approval Order")[1] approving this Agreement and the form and manner of the Rights Offering, the Company shall, if the Rights Offering is consummated pursuant to the terms and conditions set forth herein, issue and distribute the Put Premium Shares to the Non-Defaulting Backstop Purchasers.

(ii)    The Put Premium Shares shall be issued or distributed, as applicable, upon the Effective Date, provided, however, that no Put Premium will be payable to a Backstop Purchaser that is in material breach of its obligations under this Agreement, including a Defaulting Backstop Purchaser.  The Put Premium shall be allocated between and paid to each Non-Defaulting Backstop Purchaser in accordance with its Commitment Percentage.

(iii)    For the avoidance of doubt, (1) the Put Premium will be deemed earned upon the issuance of the Approval Order by the Bankruptcy Court and (2) such Put Premium shall be payable upon consummation of the Rights Offering and the Direct Equity Commitment. For the avoidance of doubt, no Put Premium shall be payable upon exercise, or relating to, the Incremental TERP Share Right and the Put Premium shall not be payable solely as a result of the failure to satisfy any condition precedent except as otherwise expressly set forth herein.

(c)    Transaction Expenses.  Except as otherwise provided herein, subject to the entry of the Approval Order, the Company will reimburse or pay, as the case may be, the documented fees and expenses reasonably incurred by the Backstop Purchasers with respect to the negotiation, documentation and execution of the transactions and agreements contemplated by this Agreement, the Ancillary Agreements and the Plan (the "Transactions") and the enforcement, attempted enforcement or preservation of any rights or remedies contemplated hereunder and by the Bankruptcy Cases, including the filing fee, if any, required by the HSR Act and expenses related thereto, any other merger control filings and approvals required by Law related to the placement of New Units with the Backstop Purchasers and expenses related thereto, all Bankruptcy Court and other judicial and regulatory proceedings related to the Transactions, including all reasonable and documented fees and expenses of (i) Akin Gump Strauss Hauer & Feld LLP, (ii) Houlihan Lokey Inc., and (iii) other counsel and other professionals to be retained by Backstop Purchasers with the prior approval of the Company, not to be unreasonably withheld (which for the avoidance of doubt, may include conflicts counsel, if necessary, for the Backstop Purchasers); in each case in connection with the Transactions, including but not limited to fees related to the exploration and discussion of the Transactions (collectively, "Transaction Expenses").  The Transaction Expenses shall be payable by the Company within 20 days of presentation of an invoice approved by the Backstop Purchasers, and, subject to the final sentence of this paragraph, 100% of the Transaction Expenses set forth on such invoice will be paid without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated; provided, however, that all Transaction Expenses outstanding on the Effective Date shall be paid on the Effective Date simultaneously with the consummation of the Plan and the Rights Offering. These obligations are in addition to, and do not limit, the Company's obligations under Section 10.  The provision of payment of the Transaction Expenses, the Breakup Fee and the Put Premium is an integral part of the Transactions, without which the Backstop Purchasers would not have entered into this Agreement, and shall constitute an administrative expense of the

---

[1] The proposed order filed on April 27, 2017 shall be deemed satisfactory for purpose of this definition.

Debtors under sections 364(c)(1), 503(b) and 507(a)(2) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this paragraph is intended to limit the Debtors' obligations pursuant to the Approval Order.  The obligations of the Debtors set forth in this paragraph are subject to entry by the Bankruptcy Court of an order in form and substance reasonably satisfactory to the Requisite Purchasers authorizing and approving the Debtors' performance hereof.

  (d) <u>Deliverables on the Effective Date</u>.

   (i) <u>Deliverables by the Company</u>.  On the Effective Date, the Company shall deliver to the Backstop Purchasers:

    (A) such number of New Units to be acquired by each Backstop Purchaser in accordance with this Agreement (including such number of New Units that reflect the Put Premium), in book entry form, to the account of each Backstop Purchaser (or to such other accounts as each Backstop Purchaser may designate in accordance with this Agreement);

    (B) cash in an amount equal to all Transaction Expenses that have been invoiced and remain unpaid as of the Effective Date;

    (C) a duly executed officer's certificate pursuant to the requirements of Section 9(a)(xiii) herein;

    (D) evidence from the office of the Delaware Secretary of State that the Amended and Restated Certificate of Incorporation of the Company, in a form to be reasonably agreed to by the Company and the Backstop Purchasers prior to the Commencement Date (the "<u>Amended and Restated Certificate of Incorporation</u>"), has been filed and is in effect as of the Effective Date; and

    (E) Copies of the Amended and Restated By-Laws of the Company, in a form to be reasonably agreed to by the Company and the Backstop Purchasers prior to the Commencement Date (the "<u>By-Laws</u>") and resolutions of the board of directors of the Company approving and adopting the respective By-Laws.

   (ii) [RESERVED]

  (e) <u>Taxes</u>.  Notwithstanding anything to the contrary in this Agreement, subject to Section 1146(a) of the Bankruptcy Code, all Backstop Purchaser Shares, if any, will be delivered with any and all issue, stamp, transfer or similar taxes or duties due and payable (if any) in connection with such delivery duly paid by the Company.

  (f) <u>Backstop Purchaser Affiliates</u>.  Notwithstanding anything to the contrary in this Agreement, the Backstop Purchasers, in their sole discretion, may designate that some or all of the Backstop Purchaser Shares be issued in the name of, and delivered to, one or more of their affiliates, as long as such issuance and delivery are in compliance with federal and state securities laws and in accordance with the provisions in <u>Section 14</u> herein.

  Section 3. [RESERVED].

Section 4.     <u>Incremental TERP Share Right</u>.

(a)     <u>Notice, Offer and Election</u>.  Subject to <u>Section 12</u> (*Termination*), no less than five business days prior to the date (the "<u>Election Deadline</u>") that the Company's consideration election is required to be made in respect of the TERP Merger, the Company shall (i) deliver written notice to the Backstop Purchasers, including appropriate backup documentation and calculations, of its best estimate of the appropriate consideration mix for the Company to elect in the TERP Merger to ensure that, based upon the Company's reasonable assumption of the elections of other holders of TERP Class A stockholders, the Company will receive cash in the TERP Merger in an amount equal to that set forth in the Initial Budget, and (ii) offer each Backstop Purchaser the right (the "<u>Incremental TERP Share Right</u>") to require the Company to increase the proportion of New TERP Class A Shares it elects to receive or retain in the TERP Merger, in exchange for the Incremental TERP Merger Increases in amounts sufficient to purchase the additional New Units to be included in the Rights Offering and the Direct Equity Offering as a result of such change in the Company's election, at a price equal to the Purchase Price. Each Backstop Purchaser shall be entitled to exercise the Incremental TERP Share Right until 5:00 p.m. Eastern Time on the date that is one business day prior to the Election Deadline, by written notice to the Company. The Company shall make its consideration election in respect of the TERP Merger in accordance with the notice provided to the Backstop Purchasers, as adjusted for any exercise of the Incremental TERP Share Right (i.e. an increase may only be elected in an amount equal to the aggregate amount of all Incremental TERP Share Rights exercised by any Backstop Purchasers).

(b)     <u>Application of New TERP Class A Shares</u>.  Upon receipt by the Company of the New TERP Class A Shares in the TERP Merger, (i) 75% of any additional New TERP Class A Shares resulting from the Incremental TERP Share Right shall be applied to the Rights Offering Shares and 25% shall be applied to the Direct Equity Commitment Shares; (ii) the Rights Offering Amount and Direct Commitment Amount of the applicable Backstop Purchasers shall be increased accordingly, and (iii) the Commitment Percentages of the Backstop Purchasers shall be adjusted to the extent necessary to ensure that Backstop Purchasers exercising their Incremental TERP Share Rights have an obligation hereunder to purchase any additional Units resulting from such exercise.

Section 5.     <u>Representations and Warranties of the Company</u>.

Except as set forth in the Disclosure Statement or the Disclosure Schedule attached as Schedule IV hereto (the "<u>Disclosure Schedule</u>"), it being agreed that disclosure of any item in any section of the Disclosure Statement or Disclosure Schedule shall also be deemed disclosure with respect to any other section of this Agreement to which the relevance of such item is reasonably apparent on its face, the Company represents and warrants to the Backstop Purchasers that:

(a)     <u>Incorporation and Qualification</u>.  The Company is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, with the requisite power and authority to own and lease its properties and conduct its business as currently conducted, except to the extent the failure to be so qualified or in good standing or to possess requisite power or authority, individually or in the aggregate, has not had or would not

reasonably be expected to have, a Material Adverse Effect. The Company is duly qualified as a foreign entity for the transaction of business and is in good standing under the Laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent the failure to be so qualified or in good standing, individually or in the aggregate, has not had or would not reasonably be expected to have, a Material Adverse Effect. The certificate of incorporation of the Company and the current by-laws of the Company that have been requested by the Backstop Purchasers have been provided to the Backstop Purchasers and reflect all amendments thereto and are true, correct and complete.

(b)    <u>Corporate Power and Authority</u>.

(i)    The Company has the requisite power and authority to enter into, execute and deliver this Agreement and, subject to the entry of the Approval Order and the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code (such order, in form and substance satisfactory to the Backstop Purchasers in their sole and absolute discretion, the "<u>Confirmation Order</u>" and together with the Approval Order, the "<u>Court Orders</u>") and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") respectively, to perform its obligations hereunder, including the issuance of the Rights and New Units. As of the consummation of the Rights Offering, the Company shall have taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the Ancillary Agreements, including the issuance of the Rights and New Units.

(ii)    When executed and delivered, the Company will have the requisite power and authority to enter into, execute and deliver the Ancillary Agreements and the Company will have taken all necessary actions required for the due authorization, execution, delivery and, subject to the entry of the Court Orders and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), respectively, performance of the Ancillary Agreements.

(iii)    When executed and filed, the Company will have the requisite power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken all necessary actions required for the due authorization, execution, delivery and performance by it of the Plan by the Effective Date.

(c)    <u>Execution and Delivery; Enforceability</u>.

(i)    This Agreement has been and the Ancillary Agreements will be duly and validly executed and delivered by the Company, and, upon the entry of the Approval Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 6004(h), and assuming this Agreement and the Ancillary Agreements will constitute valid and binding agreements of the other parties hereto and thereto, each such document will constitute the valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, subject to applicable bankruptcy, insolvency,

reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in  a proceeding in equity or at law.

(ii)    The Plan will be duly and validly filed with the Bankruptcy Court by the Company on the date hereof and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(d)    <u>Authorized Capital Stock</u>.  On the Effective Date, the authorized capital stock of the Company will consist of 100,000,000 shares of New SunE Common Stock, and the outstanding capital stock of the Company will consist of a number of shares of New SunE Common Stock equal to the sum of the Rights Offering Shares *plus* the Direct Commitment Shares *plus* the Put Premium Shares *plus* any other shares issued under the Plan (which, for the avoidance of doubt, will not exceed 3.4% of the total outstanding shares of New SunE Common Stock as of the Effective Date), and no other shares of New SunE Common Stock will be outstanding.  Except as it will be provided by the Plan and any agreements and other documents entered into or adopted by the Company in accordance with the Plan and as required by Law, as of the Effective Date, the Company will not be a party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which (i) obligates the Company or any of its subsidiaries to issue, deliver, sell or transfer or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in the Company, (ii) obligates the Company or any of its subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking (any of the items referred to in clauses (i) and (ii) of this <u>Section 5(d)</u> being referred to as "<u>Derivative Securities</u>"), (iii) restricts the transfer of any shares of capital stock of the Company or its subsidiaries, except, with respect to any subsidiary, as would not reasonably be expected to have a Material Adverse Effect, or (iv) relates to the voting of any shares of capital stock of the Company.

(f)    <u>Issuance</u>.  Subject to the approval of this Agreement by the Bankruptcy Court, the distribution of the Rights with respect to the New SunE Common Stock and issuance of the New SunE Common Stock, including the Backstop Purchaser Shares to be issued and sold by the Company to the Backstop Purchasers hereunder, have been duly and validly authorized and, when the New Units are issued and delivered against payment therefor in the Rights Offering or to the Backstop Purchasers hereunder, will be duly and validly issued, fully paid and non-assessable, and free and clear of all Liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except for any such rights as it will be provided by the Plan, any agreements and other documents entered into or adopted by the Company in accordance with the Plan.

(g)    <u>No Conflict</u>.  Subject to the entry of the Court Orders and the expiration, or waiver by the Bankruptcy Court, of the 14 day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the New

11

Units, the sale, issuance and delivery of the Backstop Purchaser Shares and the consummation of the other Transactions; the execution and delivery (or, with respect to the Plan, the filing) by the Company of this Agreement, the Ancillary Agreements and the Plan; and compliance by the Company with all of the provisions hereof and thereof: (i) will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or, except as provided in the Plan, result in the acceleration of, or the creation of any Lien or give rise to any termination rights under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of the property or assets of the Company or any of its subsidiaries are subject, (ii) will not result in any violation of the provisions of (A) the certificate of incorporation or by-laws or equivalent organizational documents of the subsidiaries or (B) the Amended and Restated Certificate of Incorporation or the By-Laws from and after the Effective Date, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under any Law or Order of any Governmental Authority having jurisdiction over the Company or any of its subsidiaries or any of their properties, except in any such case described in subclause (i) or (iii) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    <u>Consents and Approvals</u>.  Subject to the representations and warranties made by the Backstop Purchasers in this Agreement being true and correct, no consent, approval, authorization, order, registration or qualification of or with any Governmental Authority having jurisdiction over the Company or any of its subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of the New Units upon exercise of the Rights, or to Backstop Purchasers, hereunder and the consummation of the Rights Offering by the Company and its subsidiaries and the execution and delivery by the Company  or, as applicable, its subsidiaries, of this Agreement or the Plan or the performance of and compliance by the Company and its subsidiaries with all of the provisions hereof and thereof and the consummation of the Transactions, except (i) the entry of the Court Orders and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) any required filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Act (the "<u>HSR Act</u>") relating to the placement of New Units with the Backstop Purchasers, (iii) any other merger control filings and approvals required by Law relating to the placement of New Units with the Backstop Purchasers, (iv) the filing with the Secretary of State of the State of Delaware of the Amended and Restated Certificate of Incorporation to be applicable to the Company from and after the Effective Date, or (v) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws, in connection with the distribution of Rights or the issuance and/or purchase of the New Units, and except to the extent the absence of any such consent, approval, authorization, order, registration or qualification, individually or in the aggregate, has not had or would not reasonably be expected to have, a Material Adverse Effect.

(i)    <u>Arm's Length</u>.  The Company acknowledges and agrees that the Backstop Purchasers are acting solely in the capacity of arm's length contractual counterparties to the Company with respect to the Transactions (including in connection with determining the terms of the offering) and not as financial advisors or fiduciaries to, or agents of, the Company or any other person.  Additionally, the Backstop Purchasers are not advising the Company or any other

12

person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the Transactions, and the Backstop Purchasers shall have no responsibility or liability to the Company with respect thereto. Any review by the Backstop Purchasers of the Company, the Transactions or other matters relating to the Transactions will be performed solely for the benefit of the Backstop Purchasers and shall not be on behalf of the Company.

(j)    Initial Budget. The Initial Budget (i) was prepared in good faith and materially consistent with prior practice; (ii) reflected a Pre-Emergence Cash Need of $285.0 million and (iii) reflected Post-Emergence Cash Flows of $61.5 million.

(k)    No Undisclosed Liabilities. As of the date hereof, the Company (on a consolidated basis) does not have any material liabilities, whether absolute, accrued, contingent or otherwise, since the filing of the Bankruptcy Cases except as set forth on the Disclosure Schedule and except (i) for fees and expenses incurred in connection with the Bankruptcy Cases and disclosed or to be disclosed to the Bankruptcy Court, (ii) executory obligations required to be performed after the date of this Agreement under any Contract to which the Company or any of its subsidiaries are a party, or (iii) as set forth in any schedules of assets and liabilities and statements of financial affairs filed by the Debtors with the Bankruptcy Court, except in any such case as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(l)    Disclosure Statement; Other Information.

The Disclosure Statement and any further documents incorporated by reference in the Disclosure Statement or any future amendments thereto, in each case, when such documents are filed with the Bankruptcy Court will be in form and substance reasonably satisfactory to the Backstop Purchasers and will conform in all material respects to the requirements of the Bankruptcy Code and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that the Company is not making any representation or warranty about any statements (including with respect to the accuracy thereof) included in such Disclosure Statement and other documents at the request of any third parties in interest (other than the Debtors, their affiliates and their representatives) in the Bankruptcy Cases.

(m)    Absence of Certain Changes. Other than as disclosed to the Backstop Purchasers or their advisors, as of the date hereof, the Company has not received a written notice, nor does the CRO or the CFO have actual knowledge (without any obligation of due inquiry), that any purchaser under a Bankruptcy Sale Agreement has (x) claimed that it is entitled to recover against an indemnity applicable to such Bankruptcy Sale Agreement (other than any de minimis indemnity claim) or (y) claimed that the Company is in material breach of such Bankruptcy Sale Agreement.

(n)    No Violation or Default.

13

(i)        The Company and each of its subsidiaries are in compliance with their charter and by-laws or equivalent organizational documents, except to the extent that the failure to be in compliance thereof does not or would not, individually or in the aggregate, have a Material Adverse Effect.

(ii)        Neither the Company nor its subsidiaries are: (A) except as a result of the Bankruptcy Cases, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries are a party or by which the Company or any of its subsidiaries are bound or to which any of the property or assets of the Company or any of its subsidiaries are subject; or (B) in violation of any Law or Order of any Governmental Authority, except, in the case of clauses (A) and (B) above, for any such default or violation that does not or would not, individually or in the aggregate, have a Material Adverse Effect.

(o)        <u>Legal Proceedings</u>.  Except as described in the Disclosure Schedule, disclosed in the Bankruptcy Cases or otherwise publicly disclosed, there are no legal, governmental or regulatory investigations, actions, suits or proceedings pending to which the Company or any of its subsidiaries are a party or to which any property of the Company or any of its subsidiaries are the subject that, if decided against the Company or any of its subsidiaries, would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.  Except as described in the Disclosure Schedule, disclosed in the Bankruptcy Cases or otherwise publicly disclosed, to the actual knowledge of the executive officers of the Company or its subsidiaries, there is no threat by any governmental or regulatory authority or by others of any investigation, action, suit or proceeding against the Company or its subsidiaries, except for such threats that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except in connection with the Bankruptcy Cases, there is no injunction, order, judgment or decree imposed upon the Company or its subsidiaries or upon the assets of the Company or its subsidiaries, except for such injunctions, orders, judgments or decrees that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)        <u>No Broker's Fees</u>.  The Company is not a party to any contract, agreement or understanding with any person (other than this Agreement and the Company's agreement with Rothschild, Inc., as approved by Court order dated May 20, 2016) that would give rise to a valid claim against the Company or the Backstop Purchasers for a brokerage commission, finder's fee or like payment in connection with the Transactions.

(q)        <u>Material Contracts</u>.  As of the date hereof:

(i)        A list of each Contract to which the Company or any of its subsidiaries is a party (excluding any Contract that has expired or terminated in accordance with its terms and under which no party has any continuing rights or obligations other than those Contracts that either party thereto could reasonably claim has been extended or renewed as a result of the course of conduct of the parties thereto) that is not being rejected under the Plan and that is material to the Company, including but not limited to (i) any contracts related to the sale of

14

material assets or entities and (ii) the TERP and GLBL Documents (collectively, the "Material Contracts") will be set forth on the Plan Supplement (as defined in the Plan). True, correct and complete copies of each Material Contract have been previously provided to the Backstop Purchasers to the extent that the Backstop Purchasers have specifically requested copies of such contracts.

(ii)     Each Material Contract that shall survive the Bankruptcy Cases is valid and binding on the Company or its subsidiaries, as applicable, and, to the knowledge of the Company, on each other person party thereto, and is in full force and effect, except for such failures to be valid and binding or to be in full force and effect that would not, individually or in the aggregate, have a Material Adverse Effect.  Other than those caused as a result of the filing of the Bankruptcy Cases, neither the Company nor any of its subsidiaries is in breach or default of any Material Contract to which it is a party and which shall survive the Bankruptcy Cases, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the knowledge of the Company, no party to any Material Contract has repudiated any material provision thereof or terminated any Material Contract, which repudiation or termination would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(r)     Ownership of TERP and GLBL Shares.  The Company owns its equity interest of TERP, TerraForm Power, LLC, TerraForm Global, Inc. ("GLBL") and TerraForm Global, LLC free and clear of all encumbrances, other than encumbrances under the DIP Credit Agreement, the Prepetition Second Lien Credit Agreement, and the Prepetition Second Lien Notes.

(s)     No Additional Representations and Warranties.  Except as and to the extent expressly set forth in this Section 5, the Company makes no representations or warranties and disclaims any liability and responsibility for any representation, warranty, statement made or information communicated (orally in writing) by the Company or any of its subsidiaries or any of their respective officers, directors, stockholders, employees, affiliates, legal or financial representatives or other agents and consultants to any of the Backstop Purchasers or any of their respective affiliates, officers, directors, security holders, employees, legal or financial representatives or other agents and consultants (including, but not limited to, any written or oral presentations, information memorandums, other documents, any opinions, information or advice).

Section 6.     Representations and Warranties of the Backstop Purchasers.  Each of the Backstop Purchasers, severally and not jointly, represents and warrants to, and agrees with, the Company as set forth below.

(a)     Organization.  Such Backstop Purchaser has been duly organized or formed, as applicable, and, to the extent applicable, is validly existing and in good standing under the Laws of the jurisdiction of its organization.

(b)     Power and Authority.  Such Backstop Purchaser has the requisite corporate or similar power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)      Execution and Delivery.  This Agreement has been duly and validly executed and delivered by such Backstop Purchaser and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)      Securities Laws Compliance.  The shares of New SunE Common Stock to be purchased by such Backstop Purchaser pursuant to the terms of this Agreement have not been registered under the Securities Act or any state securities law.

The Company shall not be required to effect any registration under any U.S. federal or state securities law.  The Backstop Purchaser Shares are being acquired under this Agreement by such Backstop Purchaser in good faith solely for investment purposes and for its own account and will not be offered for sale, sold or otherwise transferred by such Backstop Purchaser except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(e)      Accredited Investor.  Such Backstop Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Backstop Purchaser Shares being acquired hereunder. Such Backstop Purchaser is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "Accredited Investor"). It understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the New Units for an indefinite period of time).

(f)      No Conflict.  The execution and delivery by such Backstop Purchaser of this Agreement and compliance by such Backstop Purchaser with all of the provisions hereof and the consummation of the Transactions (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien or give rise to any termination rights under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Backstop Purchaser is a party or by which such Backstop Purchaser is bound or to which any of the property or assets of such Backstop Purchaser is subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or by-laws or similar governance documents of such Backstop Purchaser, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any Law or Order of any Governmental Authority having jurisdiction over such Backstop Purchaser or any of its properties, except in any such case described in subclause (i) or (iii) as would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Purchaser's performance of its obligations under this Agreement.

(g)      Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Authority having jurisdiction over such Backstop Purchaser or any of its properties is required for the purchase by such Backstop Purchaser of the Backstop Purchaser Shares, the execution and delivery by such Backstop Purchaser of this Agreement and the performance of and compliance by such Backstop Purchaser with all of the provisions hereof and thereof or the consummation of the Transactions, except (i) any required filings with respect to and the expiration or termination of the waiting period under the HSR Act relating to the placement of New Units with such Backstop Purchasers, (ii) any other merger

16

control filings and approvals required by Law relating to the placement of New Units with the Backstop Purchasers, (iii) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase of the New Units by such Backstop Purchasers, or (iv) such consents, approvals, authorizations, registrations or qualifications the absence of which would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Purchaser's performance of its obligations under this Agreement.

(h)    <u>Legal Proceedings</u>.  There are no legal, governmental or regulatory investigations, actions, suits or proceedings pending to which such Backstop Purchaser is a party or to which any property of such Backstop Purchaser is the subject that, individually or in the aggregate, if determined adversely to such Backstop Purchaser, would reasonably be expected to prohibit, materially delay or materially and adversely impact such Backstop Purchaser's performance of its obligations under this Agreement; no such investigations, actions, suits or proceedings are threatened or, to the best knowledge of such Backstop Purchaser, contemplated by any governmental or regulatory authority or threatened by others.

(i)    <u>Sufficiency of Funds</u>.  On the date that is seven days prior to the Confirmation Hearing, each Backstop Purchaser will have available funds sufficient to pay the aggregate Purchase Price for its Equity Commitment.

(j)    <u>No Broker's Fees</u>.  Such Backstop Purchaser is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Company or any of its subsidiaries or any of the Backstop Purchasers for a brokerage commission, finder's fee or like payment in connection with the Transactions.

(k)    <u>No Violation or Default</u>.

(i)    Such Backstop Purchaser is in compliance with its respective charter and by-laws or equivalent organizational documents.

(ii)    Such Backstop Purchaser is: (A) not in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Backstop Purchaser is a party or by which it is bound or to which any of its property or assets is subject; or (B) in violation of any Law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except, in the case of clauses (A) and (B) above, for any such default or violation that would not, individually or in the aggregate, have a material adverse effect on such Backstop Purchaser's ability to consummate the transactions contemplated by this Agreement.

(l)    <u>No Reliance</u>.  Such Backstop Purchaser acknowledges and agrees that except for the representations and warranties expressly contained in <u>Section 5</u> herein none of the Company and its subsidiaries nor any other Person on behalf of the Company or its subsidiaries makes any other representation or warranty of any kind or nature, express or implied, in connection with the Transactions contemplated by this Agreement and the Ancillary Agreements.  Except for the

17

representations and warranties expressly set forth in this Agreement, none of the Backstop Purchasers has relied on any representation or warranty, express or implied, with respect to the Company or any of its subsidiaries or with respect to any other information provided or made available to the Backstop Purchasers in connection with the Transactions contemplated by this Agreement and the Ancillary Agreements. None of the Company and its subsidiaries nor any other Person will have or be subject to any liability or indemnification obligation to any of the Backstop Purchasers or any other Person resulting from the distribution to any of the Backstop Purchasers or their respective representatives, or use by any of the Backstop Purchasers or their respective representatives of any such information, including any information, documents, projections, forecasts or other material made available to any of the Backstop Purchasers or their respective representatives or management presentations in expectation of the Transactions contemplated by this Agreement and the Ancillary Agreements.

(m)    No Additional Representations and Warranties.  Except as and to the extent expressly set forth in this Section 6, each Backstop Purchaser makes no representations or warranties and disclaims any liability and responsibility for any representation, warranty, statement made or information communicated (orally in writing) by such Backstop Purchaser or any of its affiliates or any of its or their respective officers, directors, stockholders, employees, legal or financial representatives or other agents and consultants to the Company or any of its respective affiliates, officers, directors, security holders, employees, legal or financial representatives or other agents and consultants (including, but not limited to, any written or oral presentations, information memorandums, other documents, any opinions, information or advice).

Section 7.    Additional Covenants of the Company.  The Company agrees with the Backstop Purchasers:

(a)    Approval Order.  The Company agrees that it shall use commercially reasonable efforts, subject to any applicable fiduciary duties, to (i) obtain a waiver of Bankruptcy Rule 6004(h) and request that the Approval Order be effective immediately upon its entry by the Bankruptcy Court, which Approval Order shall not be revised, modified, or amended by the Confirmation Order for the Plan or any other further order of this Bankruptcy Court (except as permitted hereunder), (ii) fully support the Approval Motion, and any application seeking Bankruptcy Court approval and authorization to pay the reasonable fees and expenses hereunder as well as the Breakup Fee and the Put Premium as administrative expenses of the estate, and (iii) use reasonable best efforts to obtain approval of the Approval Order as soon as practicable following the filing of the Approval Motion.

(b)    Plan and Disclosure Statement; Confirmation Order and Sanction Order.  To file, the Plan and Disclosure Statement, in the forms attached hereto, and to use reasonable best efforts, to obtain the entry of a Confirmation Order by the Bankruptcy Court, in form and substance reasonably satisfactory to the Backstop Purchasers.  The Company shall file the Plan and Disclosure Statement with the Bankruptcy Court on the date hereof.  The Plan and any amendments, modifications or changes thereto shall be consistent in all respects with this Agreement. No amendments, modifications or changes (other than immaterial and non-substantive amendments, modifications or changes) to the Plan shall be filed without the Consent of the Backstop Purchasers in their sole and absolute discretion.  The Confirmation Order must

be in form and substance satisfactory to the Backstop Purchasers in their sole and absolute discretion.

(c)    <u>Rights Offering</u>.  To effectuate the Rights Offering as provided herein and to use commercially reasonable efforts to seek entry of the Approval Order, prior to the commencement of the Rights Offering, authorizing the Company to conduct the Rights Offering pursuant to the terms of the Rights Offering Procedures.

(d)    <u>Notification</u>.  To use commercially reasonable efforts to notify, or to cause the Subscription Agent to notify the Backstop Purchasers, (i) on each Friday during the Rights Exercise Period and, to the extent reasonably requested by the Backstop Purchasers, on each Business Day during the five Business Days prior to the Expiration Time, of the aggregate number of Rights known by the Company or the Rights Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be, and (ii) as soon as practicable after the Expiration Time, and in no event later than three Business Days after the Expiration Time, the aggregate number of Rights exercised pursuant to the Rights Offering.

(e)    <u>Backstop Shares</u>.  In accordance with the terms and provisions of this Agreement, to determine the number of Backstop Shares, if any, in good faith, to provide a Commitment Notice or a Satisfaction Notice that accurately reflects the number of Backstop Shares as so determined.

(f)    <u>Antitrust Approvals</u>.  To use reasonable best efforts to prepare and file as promptly as practicable, and in any event by no later than ten days (or earlier if required by Law) from the entry by the Bankruptcy Court of an order approving this Agreement, all required notification and report forms under (i) the HSR Act, and (ii)  the merger control rules of any other jurisdiction in which approval is required by Law related to the placement of New Units with the Backstop Purchasers, and to not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Transactions.  The Company shall (A) promptly supply the Backstop Purchasers with any information which may be required in order to obtain approval under the HSR Act or the merger control rules of any other jurisdiction or jurisdictions in which approval is required by Law related to the placement of New Units with the Backstop Purchasers, and (B) respond as promptly as practicable to any inquiries received from any Governmental Authority for additional information or documentation.

(g)    <u>Conduct of Business</u>.  Except as expressly provided or permitted by this Agreement (including as set forth on Schedule V hereto), in any order of, or agreement or other document approved by, the Bankruptcy Court prior to the date hereof, or as required by Law, during the period from the date of this Agreement to the Effective Date, the Company and its subsidiaries shall carry on their businesses in the ordinary course and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact in all material respects their current business organizations (taken as whole), keep available the material services of their current officers and material employees and preserve in all material respects their relationships with material customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company or its subsidiaries.  Without limiting the generality of the

19

foregoing, and except as otherwise expressly provided or permitted by this Agreement (including as set forth on Schedule V hereto),  in any order of, or agreement or other document approved by, the Bankruptcy Court prior to the date hereof, or as required by Law, during the period from the date of this Agreement to the Effective Date the Company shall not, and shall cause its subsidiaries not to, take any of the following actions without the prior written Consent of the Backstop Purchasers, which consent shall not be unreasonably withheld, conditioned or delayed:

(i)        (A) declare or pay any dividends on, or make any other distributions in respect of, any of the capital stock of the Company, or (B) make any payment on account of the purchase, redemption or acquisition of any shares of capital stock or any other Derivative Securities of the Company;

(ii)        Take or fail to take, or cause or fail to cause any of its subsidiaries to take or fail to take, any action which could result in (A) non-compliance in any respect with any provision of Article VI or Article VII of the DIP Credit Agreement or the other Loan Documents (as defined in the DIP Credit Agreement) or (B) a default or event of default thereunder; in each case, in accordance with the term of such Loan Documents (as defined in the DIP Credit Agreement) as in effect on the date hereof and without taking into account any amendments, modifications, waivers or consents (other than immaterial and non-substantive amendments, modifications, waivers or consents) granted or agreed to by the agents or lenders thereunder unless the Consent of the Backstop Purchasers is also obtained;

(iii)        change materially its tax accounting policies or reporting practices, except insofar as may have been required by applicable Law;

(iv)        knowingly take any action that is inconsistent with this Agreement or the Transactions contemplated hereby, to the extent such action could reasonably be expected to result in an impairment of the rights or remedies of the Backstop Purchasers (in their capacities as such); or

(v)        enter into any binding commitment or agreement with a third party to take any action prohibited by the foregoing clauses (i) through (x) of this Section 7(g).

(h)     <u>Ancillary Agreements</u>.  Within five Business Days after the parties agree as to the form and substance of each of the Ancillary Agreements or other document, the form of which is not attached to this Agreement, the Company shall file with the Bankruptcy Court a Plan Supplement (as defined in the Plan) or a motion (attaching thereto a copy of such Ancillary Agreements or documents and otherwise in form and substance reasonably satisfactory to the Backstop Purchasers, including the proposed form of order filed in connection therewith) seeking Bankruptcy Court approval of such Ancillary Agreements or documents as promptly as practicable thereafter, it being understood and agreed that the Company may satisfy its obligations under this sentence by seeking Bankruptcy Court approval of such Ancillary Agreements or documents as part of the process and at the hearing to confirm the Plan (the "<u>Confirmation Hearing</u>").

(i)     <u>Confidentiality Obligations</u>.  The parties hereto shall continue to be bound by and comply with any and all existing confidentiality agreements between the Company and any Backstop Purchaser or affiliate of a Backstop Purchaser.

(j)     <u>Financial Information</u>.  Beginning on the date hereof until the Effective Date, the Debtors shall provide to each Backstop Purchaser or advisors thereto, subject to any and all existing confidentiality agreements between the Company and such Backstop Purchaser or affiliate thereof, copies of all financial reports and other financial information required to be provided to, or requested by, its lenders under Sections 6.01, 6.02 (other than Section 6.02(i)) or 6.03 of the DIP Credit Agreement (as in effect on the date hereof), which, other than with respect to such materials marked "PUBLIC" or otherwise identified or designated as suitable for distribution to Public Lenders (as defined in the DIP Credit Agreement) may be provided on a professionals' eyes only basis.

(k)     <u>Amendments to Organizational Documents</u>.  As of the Effective Date, the Company shall file, adopt or amend the Amended and Restated Certificate of Incorporation in the form attached hereto, the By-Laws in the form attached hereto.

(l)     <u>Competing Proposals</u>.  Prior to the Approval of this Agreement by the Bankruptcy Court, the Debtors shall (i) immediately upon execution of this Agreement, cease and cause to be terminated any ongoing solicitation, discussions and negotiations with respect to an Alternative Transaction and (ii) not solicit any inquiries or proposals, or enter into any discussions, negotiations, understandings, arrangements or agreements, relating to an Alternative Transaction. Notwithstanding anything to the contrary contained in this Agreement, if, prior to the Approval of this Agreement by the Bankruptcy Court, the Company receives a proposal not solicited by the Company or any of its affiliates in violation of this <u>Section 7(l)</u> and the board of directors of the Company acting in good faith, reasonably believes, after consulting with legal counsel, that the following actions are necessary to comply with its fiduciary duties under applicable Law, then the Company may, in response to such proposal: (i) furnish information concerning the business to the party making such proposal (and to such party's representatives); (ii) participate in discussions and negotiations with such party (and with such party's representatives) regarding such proposal or enter into understandings, arrangements or agreements with respect to such proposal, and (iii) take any other actions necessary to satisfy such duties; <u>provided</u>, that (A) the Company may only provide to the party making such proposal (and to such party's advisors and representatives) access to no more information regarding the business than that made available to

21

the Backstop Purchasers or their advisors and representatives, it being understood that the Company may provide to such party and its advisors and representative access to more information regarding the business than that made available to the Backstop Purchasers or their advisors and representatives so long as the Company provides such information to the Backstop Purchasers or their advisors and representatives within 48 hours of providing such information to such party, (B) the Company may only engage in discussions with the party making such proposal (and to such party's representatives) subject to the requirement that the Company shall have first received an executed confidentiality agreement that is no more favorable to such party than the confidentiality agreement to which the Backstop Purchasers were subject prior to entering into this Agreement, (C) the Company shall provide the Backstop Purchasers with notice of such proposal as soon as practicable (and in no event less than 24 hours after receipt thereof) including the material terms of the proposal and the Company shall keep the Backstop Purchasers reasonably informed of such discussions and negotiations and (D) the Company shall negotiate with the Backstop Purchasers in good faith (to the extent that the Backstop Purchasers so desire) with respect to any changes proposed by the Backstop Purchasers to the terms of this Agreement.  If at any time Debtors receive any proposals regarding an Alternative Transaction (whether or not solicited by the Company), Debtors must promptly (and in any event within one business day) (i) notify the Backstop Purchasers and (ii) share any and all information (written or oral) received regarding the Alternative Transaction with the Backstop Purchasers.

(m)     Disclosure.  Within two Business Days following the earliest of the (i) Effective Date and (ii) the date that this Agreement is terminated pursuant to Section 12 hereof, the Company shall disclose and make generally available to the public any material non-public information previously disclosed to the Backstop Purchasers or an appropriate summary thereof, but solely to the extent that on such date such information constitutes material non-public information under U.S. securities laws under the circumstances then in effect it being understood that information disclosed by the Company and its advisors only to counsel to the Backstop Purchasers shall not have to be disclosed.

(n)     Notice of Changes.  The Company will give prompt notice to the Backstop Purchasers upon becoming aware of (i) the discovery or occurrence, or failure to occur, of any event or circumstance which causes, or would reasonably be likely to cause, any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate, or (ii) any failure on its part to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement on or prior to the Effective Date, where, in the case of (i) and (ii), such discovery, occurrence or failure would permit the Backstop Purchasers to terminate this Agreement pursuant to Section 12(c).  No notice pursuant to this Section 7(n) will affect any representations or warranties, covenants, agreements, obligations or conditions set forth herein or limit or otherwise affect any available remedies.

(o)     Further Assurances.  The Company shall, and shall cause its subsidiaries to, execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action and cause entities controlled by them to take such action as may be reasonably necessary (or as reasonably requested by the Backstop Purchasers) to carry out the Transactions, including seeking the consents and approvals set out in Section 5(h).

(p)     RESERVED.

22

(q)    <u>TERP and GLBL Documents</u>.  The Company and its subsidiaries party thereto shall not amend or waive any terms of the TERP and GLBL Documents without the Consent of the Backstop Purchasers.

(r)    <u>Monthly Budgets</u>.  The Company shall deliver monthly budgets (each, a "<u>Monthly Budget</u>") to the Backstop Purchasers and their advisors, each setting forth the Company's then-current (i.e. updated) calculations of the Pre-Emergence Cash Need and the Post-Emergence Cash Flows, on the same time frames that govern the Company's delivery of monthly cash flow projections under the DIP Credit Agreement; <u>provided</u>, that, in addition to the Monthly Budget delivery requirements set forth above, the Company shall (x) deliver a Monthly Budget no later than three days prior to the Election Deadline (the "<u>Pre-Election Budget</u>") and, (y) in the event that the Effective Date has not occurred within fourteen days following delivery of the Pre-Election Budget, deliver a Monthly Budget no later than three days prior to the projected Effective Date.

The underlying assumptions in the Monthly Budgets shall not be altered from the Initial Budget unless there is a specific change in the circumstances related thereto, and for all material changes, the Company shall provide a cash flow variance and explanation of why such change occurred and how the Company determined the magnitude of such change.  The Monthly Budget shall be delivered in a form, and on terms, reasonably acceptable to the Backstop Purchasers and their advisors.  Upon delivery of the Monthly Budget either the CFO or the CRO in their capacity as such, but not individually or in their respective firm capacity, shall represent on behalf of the Company that the Monthly Budget was prepared in good faith and consistent with prior practice; <u>provided</u>, <u>however</u>, that only the Company shall have any obligation or liability with respect to such representation or related budget items and neither the individual CFO or the CRO making such representations nor their respective firms or affiliates, or equity holders shall have any obligation or liability with respect to such representation or related budget items.

(s)    <u>Obligations in the Event of Backstop Purchaser Default</u>.  In the event of a Backstop Purchaser Default, the Company shall use its best efforts to find a third-party to replace any remaining commitment of the Defaulting Backstop Purchaser in accordance with <u>Section 2(a)(iii)</u>.

(t)    <u>Indemnity Claims</u>.  The Company will promptly (and in any event within three (3) Business Days) provide the Backstop Purchasers or their advisors with a copy of any written notice received by the Company, or, notice upon the CRO or the CFO becoming actually aware (without any obligation of due inquiry), that any purchaser under a Bankruptcy Sale Agreement (x) claims that it is entitled to recover against an indemnity applicable to such Bankruptcy Sale Agreement (other than any de minimis indemnity claim) or (y) claims that the Company is in material breach of such Bankruptcy Sale Agreement.

Section 8.    <u>Additional Covenants of the Backstop Purchasers</u>.

(a)    <u>Support of the Plan</u>.  Each Backstop Purchaser agrees, severally and not jointly, with the Company, and agrees to use its commercially reasonable efforts (to the extent permitted under applicable Law) to cause its controlled affiliates to:

(i)        not (A) object to, delay or impede, directly or indirectly, the confirmation of the Plan, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan that is approved by the Bankruptcy Court, as containing "adequate information" under section 1125 of the Bankruptcy Code (as may be amended, modified or changed in accordance with this Agreement), (B) object, delay or impede, directly or indirectly, the approval of the Disclosure Statement (as may be amended, modified or changed in accordance with this Agreement), (C) vote for, consent to, induce, encourage, support or participate in the formulation of any plan of reorganization other than, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan that is approved by the Bankruptcy Court, the Plan (as such Plan may be amended, modified or changed in accordance with this Agreement), (D) directly or indirectly seek, solicit, induce, support or encourage any sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Debtors or any of their subsidiaries other than as provided in the Plan (as such Plan may be amended, modified or changed in accordance with this Agreement), (E) object to the Disclosure Statement or, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan that is approved by the Bankruptcy Court, the solicitation of consents to the Plan (each as may be amended, modified or changed in accordance with this Agreement), (F) withdraw or revoke its vote in favor of the Plan, or (G) take any other action in the Debtors' chapter 11 cases or otherwise that is inconsistent with, or that would or is intended or is reasonably likely to materially delay, confirmation or consummation of, the Transactions;

(ii)        (A) subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan that is approved by the Bankruptcy Court, vote (and cause the person, if any, otherwise entitled to vote) any claims as a 2L Stub Claimholder (the "Noteholder Claims") in which such Backstop Purchaser and its controlled affiliates have a beneficial interest arising under the Prepetition Second Lien Credit Agreement or the indenture governing the Prepetition Second Lien Notes, to accept the Plan (as such Plan may be amended, modified or changed in accordance with this Agreement) and timely return a duly executed ballot in connection therewith prior to the applicable voting deadline, and (B) reasonably cooperate with the Debtors in respect of the pursuit and support of the transactions contemplated by this Agreement and the Plan;

(iii)        for so long as this Agreement remains in effect, not sell, transfer, assign, pledge or otherwise dispose of, directly or indirectly, any of its Noteholder Claims or any option thereon or any right or interest (voting or otherwise) therein unless the transferee, assignee, pledgee or other successor in interest agrees to vote such Noteholder Claims in favor of the Plan; notwithstanding the foregoing, no Backstop Purchaser will be permitted to transfer its rights or obligations with respect to this Agreement; and

(iv)        to the extent it or its controlled affiliates acquire additional Noteholder Claims, or equity interests in the Debtors, or hold or acquire other Noteholder Claims or equity interests in the Debtors, each such Backstop Purchaser agrees that such debt, Noteholder Claims or equity interests are and shall be subject to this Section 8(a).

(b)     Support of Yieldco Transactions.  Until the occurrence of a Yieldco Support Termination Event (as defined below) with respect to the applicable Yieldco Parent (as defined below), it shall, with respect to the applicable Yieldco Parent,

(i)     support, and not object to, delay or impede, directly or indirectly, any relief requested by the Debtors consistent with the transactions contemplated by (A) that certain Agreement and Plan of Merger (the "GLBL Merger Agreement") dated as of March 6, 2017, by and between, GLBL, Orion US Holdings 1 L.P., a Delaware limited partnership ("Parent"), and BRE GLBL Holdings Inc., a Delaware corporation and (B) that certain Merger and Sponsorship Transaction Agreement (the "TERP Merger Agreement"), dated as of March 6, 2017, by and between TERP (each of TERP and GLBL a "Yieldco Parent"), Parent and BRE TERP Holdings Inc., a Delaware corporation, in each case, solely as in effect on the date hereof, or as amended with the Consent of the Backstop Purchasers, such consent not to be unreasonably withheld, including the Company's motions seeking the entry by the Bankruptcy Court of the Bankruptcy Court Orders (as defined in each of the GLBL Merger Agreement and the TERP Merger Agreement) (the "Motions");

(ii)     not object to, delay or impede, directly or indirectly the Motions, and not file or support any motion, application, pleading or other document (or make any comments on the record before the Bankruptcy Court) that is inconsistent with the Yieldco Support Covenants or that in any way undermines its support for the Yieldco Support Covenants and the Bankruptcy Court Orders;

(iii)     not, directly or indirectly, seek, solicit, induce, support or encourage any sale, proposal or offer of reorganization, merger, or restructuring of the Yieldco Parents or any of their subsidiaries other than as provided in the GLBL Merger Agreement or the TERP Merger Agreement, including any indication of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal or SunEdison Standalone Acquisition Proposal (with respect to TERP, as defined in the TERP Merger Agreement, and with respect to GLBL, as defined in the GLBL Merger Agreement);

(iv)     not, directly or indirectly engage in, continue or otherwise participate in any discussions or negotiations regarding, any inquiry, indication of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal or SunEdison Standalone Acquisition Proposal;

(v)     not, directly or indirectly knowingly facilitate any effort or attempt to make any inquiry, indication of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal or SunEdison Standalone Acquisition Proposal (collectively (i) through (v), the "Yieldco Support Covenants");

provided, however, that nothing contained herein shall limit the ability of any Backstop Purchaser or Affiliated Holder to consult with the Debtors, or to appear and be heard, or to file objections, concerning any matter arising in the Bankruptcy Cases, or consulting or discussing the TERP Merger Agreement or the GLBL Merger Agreement and related matters with other Backstop Purchasers or their affiliates, TERP, GLBL or the Company, so long as such discussion, consultation, appearance or objection is not inconsistent with such Backstop Purchaser's or

25

Affiliated Holder's obligations hereunder and the terms of the Plan, the Rights Offering and the Direct Equity Offering, and could not be reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the TERP Merger Agreement or the GLBL Merger Agreement.

Each of the following shall be a "Yieldco Support Termination Event" with respect to the applicable Yieldco: (a) the occurrence of the "Effective Time," as defined in the TERP Merger Agreement or the GLBL Merger Agreement, (b) the termination of the TERP Merger Agreement or the GLBL Merger Agreement, (c) the termination of the Voting and Support Agreement, dated as of March 6, 2017, entered into by the Company and SunEdison Holdings Corporation. with respect to the TERP Merger Agreement or the GLBL Merger Agreement, or (d) the termination of the Settlement Agreement, dated as of March 6, 2017, among TERP and certain of its subsidiaries, or GLBL and certain of its subsidiaries, and the other parties thereto. For the avoidance of doubt, a Yieldco Support Termination Event with respect to one Yieldco shall cause the termination of the Yieldco Support Covenants solely with respect to the transactions and approvals for such Yieldco, and shall not affect the Yieldco Support Covenants with respect to the transactions and approvals for the other Yieldco.

(c)      Transfers.  Each Backstop Purchaser hereby agrees, severally and not jointly, for so long as the covenants in Section 8(a) shall remain in effect, not to transfer, sell, assign, participate, hypothecate or otherwise dispose of (each, a "Transfer") (i) any Subject Debt held by it, or (ii) any of its Equity Commitment, unless such transferring Backstop Purchaser acknowledges, in writing, that such Transfer shall not amend, modify, change, terminate or otherwise affect such Backstop Purchaser's obligations under this Agreement to fund its portion of the Equity Commitment and/or to perform the covenants in Section 8(a) with respect to its remaining Subject Debt, as applicable, and:

(i)      if such transferring Backstop Purchaser desires to Transfer only Subject Debt, but not any portion of its Equity Commitment, then the transferee of such Subject Debt agrees, in writing, to be bound by the covenants in Section 8(a) as if such transferee was an original signatory hereto (as an "Backstop Purchaser"), by executing a joinder agreement in the form attached hereto as Exhibit D;

(ii)      if such Backstop Purchaser desires to Transfer both Subject Debt and a portion of its Equity Commitment, the transferee of such Subject Debt and Equity Commitment agrees, in writing, to be bound by the covenants in Section 8(a) and the obligations of the transferring Backstop Purchaser with respect to the portion of the transferor's Subject Debt and transferred Equity Commitment (as applicable), as if such transferee was an original signatory hereto (as a "Backstop Purchaser"), by executing a joinder agreement in the form attached hereto as Exhibit E, and

(iii)      if such Backstop Purchaser desires to Transfer only Equity Commitment, but not any portion of its Subject Debt (if any), then the transferee of such Equity Commitment agrees, in writing, to be bound by the obligations of the transferring Backstop Purchaser with respect to the portion of the transferor's Equity Commitment Transferred, as if such transferee was an original signatory hereto (as a "Backstop Purchaser"), by executing a joinder agreement in the form attached hereto as Exhibit F;

provided that (x) a Backstop Purchaser may Transfer Subject Debt, to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker execute a joinder hereto, so long as (1) such Qualified Marketmaker Transfers such right, title or interest in such Subject Debt within three Business Days and (2) any subsequent Transfer by such Qualified Marketmaker of any right, title or interest in such Subject Debt is to a transferee that executes a joinder in accordance with this Section 8(c); and (y) to the extent that a Backstop Purchaser is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in Subject Debt that such Qualified Marketmaker acquires from a holder of Subject Debt that is not a Backstop Purchaser or an Affiliated Holder without the requirement that the transferee execute a joinder hereto.

Any Transfer of Subject Debt or Equity Commitment or interest in Subject Debt or Equity Commitment that does not comply with the procedures set forth in this Section 8(c) shall be deemed void ab initio.  This Section 8(c) shall in no way be construed to preclude any Backstop Purchaser from acquiring additional Subject Debt; provided, that such additional Subject Debt is subject to the covenants in Section 8(a).  Notwithstanding anything to the contrary set forth in this Section 8(c), a Backstop Purchaser may Transfer (i) any Subject Debt held by it or (ii) any of its Equity Commitment hereunder, in whole or in part, to any affiliate (as defined in Rule 12b 2 under the Exchange Act) of such Backstop Purchaser over which such Backstop Purchaser or any of its affiliates under common control exercise investment authority, including, without limitation, with respect to voting and dispositive rights; provided, however, that any such affiliated Transferee assumes the obligations of such Backstop Purchaser hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as the Transferring Backstop Purchaser.

(d)     Information.  Each Backstop Purchaser agrees, severally and not jointly, with the Company to provide the Company with such information as the Company reasonably requests regarding the Backstop Purchasers for inclusion in the Disclosure Statement.

(e)     Antitrust Approvals.  Each Backstop Purchaser agrees, severally and not jointly, with the Company to use its reasonable best efforts to prepare and file as promptly as practicable, and in any event by no later than ten days (or earlier if required by Law) from the entry by the Bankruptcy Court of an order approving this Agreement, all required notification and report forms under (i) the HSR Act, and (ii) the merger control rules of any other jurisdiction or jurisdictions in which approval is required by Law related to the placement of  New Units with the Backstop Purchasers, and to not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Transactions.  Notwithstanding the foregoing, in no event shall this Section 8(e) obligate any Backstop Purchaser to dispose or hold separate any of its assets.  The Backstop Purchasers shall not have any material obligation to make payments or any concessions to any third party in connection with obtaining any consents or approvals.  Each Backstop Purchaser shall
(A) promptly supply the Company with any information which may be required in order to obtain approval under the HSR Act or the merger control rules of any other jurisdiction or jurisdictions in which approval is required by Law related to the placement of New Units with the Backstop Purchasers, and (B) respond as promptly as practicable to any inquiries received from any Governmental Authority for additional information or documentation.

(f)     Further Assurances.  Each Backstop Purchaser agrees, severally and not jointly, with the Company to execute and deliver, and to use commercially reasonable efforts to cause its controlled affiliates to, execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action and to use commercially reasonable efforts to cause entities controlled by them to take such action as may be reasonably necessary (or as reasonably requested by the Company) to carry out the Transactions.

(g)     Company.  Nothing contained in this Agreement shall give to the Backstop Purchasers, directly or indirectly, rights to control or direct the operations of the Company prior to the Effective Date.  Prior to the Effective Date, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Company.

Section 9.     Conditions to the Obligations of the Parties.

(a)     Conditions to the Obligations of the Backstop Purchasers.  The obligation of the Backstop Purchasers to purchase the New Units pursuant to the Backstop Commitment and the Direct Equity Commitment on the Effective Date is subject to the following conditions (any or all of which may be waived with the Consent of the Requisite Purchasers subject to applicable Law):

(i)     the settlement of all material outstanding issues as between the debtors, TERP, GLBL and each of their affiliates shall have occurred and been approved by the Bankruptcy Court by no later than August 15, 2017 (such settlement, any settlement agreement, and any order of the Bankruptcy Court approving such settlement, including any allocation of settlement proceeds to Unsecured Creditors (including the allocation among various estates) thereunder or on account of avoidance actions against TERP and GLBL), in form and substance reasonably satisfactory to the Requisite Purchasers; provided, that the settlements embodied in the TERP and GLBL Settlement Agreements filed by the Debtors on March 10, 2017 [Docket No. 2570], including any amendment or modification thereto that is reasonably satisfactory to the Requisite Purchasers, shall be deemed satisfactory to the Requisite Purchasers);

(ii)     any resolution (or settlement, if any) of outstanding issues as between the Debtors, the Debtors' prepetition secured creditors and the Official Committee of Unsecured Creditors and the documentation related thereto shall have been approved by the Bankruptcy Court by no later than August 1, 2017 (such settlement, including any settlement consistent with the Approved Plan, any documentation therefore, and any order of the Bankruptcy Court approving the same, in form and substance reasonably satisfactory to the Requisite Purchasers);

(iii)     any transaction regarding the disposition of interests in TERP and GLBL (the "Acquisitions") shall have been effectuated in a manner and with documents in form and substance reasonably satisfactory to the Requisite Purchasers, and any Bankruptcy Court order approving such disposition shall have been entered in form and substance reasonably satisfactory to the Requisite Purchasers (including any Bankruptcy Court order approving the same); provided that the Backstop Purchasers acknowledge and agree that the definitive documentation (but not including any amendments, modifications or waivers thereof that are material and adverse to the Backstop Purchasers) entered into on March 6, 2017 by TERP and GLBL with

28

respect to the Acquisitions, shall be deemed to be reasonably acceptable to the Requisite Purchasers;

(iv) votes by the stockholders of TERP and GLBL approving the applicable Acquisition shall have occurred by no later than September 22, 2017;

(v) the Company shall have made its consideration election in the TERP Merger consistent with its obligations under this Agreement;

(vi) the Plan shall be in form and substance reasonably satisfactory to the Requisite Purchasers and consistent with this Agreement (the "Approved Plan", it being understood and agreed that a Plan in accordance with the terms hereof and in form and substance reasonably satisfactory to the Requisite Purchasers, that will be filed with the Bankruptcy Court and included in the Debtors' solicitation materials, without any modifications, amendments or supplements thereto that are not reasonably acceptable to the Requisite Purchasers, is an "Approved Plan"), and shall have been approved by the Bankruptcy Court pursuant to a confirmation order in form and substance reasonably satisfactory to the Requisite Purchasers, which order is in full force and effect and has not been stayed, and the Effective Date shall have occurred prior to September 30, 2017;

(vii) the Disclosure Statement shall be in form and substance reasonably satisfactory to the Requisite Purchasers (it being understood and agreed that the disclosure statement in accordance with the terms hereof and in form and substance reasonably satisfactory to the Requisite Purchasers, that will be filed with the Bankruptcy Court and included in the Debtors' solicitation materials, shall be reasonably satisfactory to the Requisite Purchasers, excluding any modifications, amendments or supplements thereto that are not reasonably acceptable to the Requisite Purchasers), and shall have been approved by the Bankruptcy Court pursuant to an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Requisite Purchasers, which order is in full force and effect and has not been stayed;

(viii) the entry of an order by the Bankruptcy Court, in form and substance reasonably satisfactory to the Requisite Purchasers, which is in full force and effect and has not been stayed, approving this Agreement, including the payment by the Company of all of the premiums and fees and other terms that are provided for herein;

(ix) following the consummation of the Rights Offering, Rights Offering Shares and Direct Commitment Shares (excluding any New SunE Common Stock issued pursuant to the Put Premium) shall constitute 90.0% of the Company's outstanding equity and no Derivative Securities shall be outstanding.

(x) Following the execution of this Agreement, there has not been (i) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other fact, event, change, effect, development, circumstance or occurrence, has had or could reasonably be expected to have a material and adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Company and its subsidiaries taken as a whole, (ii) anything that could reasonably be expected to prevent, materially delay or materially restrict or impair the Company and its subsidiaries from

29

consummating the transactions contemplated in the Approved Plan, or (iii) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other  fact, event, change, effect, development, circumstance or occurrence that, has had or could reasonably be expected to have a material and adverse effect on (A) the ability of the Company or its subsidiaries to perform their respective obligations under this Agreement, or (B) the ability of the Backstop Purchasers to enforce their rights and remedies under this Agreement;

    (xi)     the transactions contemplated by this Agreement shall be consummated pursuant to this Agreement in accordance with applicable laws, rules and regulations and in a manner reasonably acceptable to the Requisite Purchasers and the Company;

    (xii)     all fees and reasonable, documented out-of-pocket costs, fees, premiums, expenses (including, without limitation, legal and financial advisory fees and expenses, including, without limitation, any such fees of Houlihan Lokey Inc. and JPMorgan Securities, Inc. pursuant to their respective engagement letters and subject to any required court approvals) and other compensation payable to the Backstop Purchasers pursuant to the Commitment Letter or otherwise payable pursuant to this Agreement and the Approved Plan, shall, in each case, have been paid to the extent due or shall have been provided for in the flow of funds in connection with the consummation of the Approved Plan;

    (xiii)     the Backstop Purchasers shall have received, among other things, (i) evidence of authorization of the Company to execute, deliver and perform its obligations under this Agreement, (ii) customary officer's and secretary's certificates, and (iii) customary corporate documents of Reorganized Debtors, in each case, in form and substance reasonably satisfactory to the Requisite Purchasers;

    (xiv)     The representations and warranties of the Company in this Agreement that are not qualified as to materiality or Material Adverse Effect shall be true and correct in all material respects in each case, as of the date hereof and at and as of the Effective Date (except for representations and warranties made as of a specific date, which shall be true and correct only as of the specified date), and the representations and warranties that are qualified as to materiality or Material Adverse Effect shall be true and correct in all respects, in each case, as of the date hereof at and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the Company shall have, in all material respects, complied with all of the obligations, covenants and conditions to be performed or complied with in this Agreement applicable to it;

    (xv)     any and all governmental and third party consents and approvals necessary in connection with the Rights Offering and the Equity Commitment, the execution and filing where applicable, of any customary corporate documents of Reorganized Debtors, and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect;

    (xvi)     the entry of an order by the Bankruptcy Court, in form and substance reasonably satisfactory to the Requisite Purchasers, which is in full force and effect and has not been stayed, confirming the Approved Plan on or prior to August 1, 2017; and

(xvii)        Company shall not have withdrawn the Approved Plan.

(b)        <u>Conditions to the Obligations of the Company</u>.  The obligation of the Company to issue and sell the Backstop Purchaser Shares to the Backstop Purchasers on the Effective Date are subject to the following conditions (any or all of which may be waived by the Company):

(i)        The Approval Order shall have been entered by the Bankruptcy Court in the form reasonably satisfactory to the Company, and the Approval Order shall have become a Final Order.

(ii)        The Confirmation Order shall have been entered by the Bankruptcy Court and such order shall be a Final Order.  The Plan as approved and the Confirmation Order as entered in each case by the Bankruptcy Court shall be consistent with the requirements for the Plan and the Confirmation Order set forth in Section 7(b) of this Agreement, and the conditions to confirmation and the conditions to the Effective Date of the Plan shall have been satisfied or waived by the Company in accordance with the Plan.

(iii)        The Eligible Claimholders and the Backstop Purchasers shall have (collectively, and including the Prefunding Amount) delivered to the Company the Total Commitment Amount in accordance with this Agreement and the Rights Offering.

(iv)        The representations and warranties of each Backstop Purchaser in this Agreement that are not qualified as to material adverse effect on the Backstop Purchaser's performance of its obligations hereunder or similar qualifications shall be true and correct (without giving effect to any limitation or qualifications as to materiality) in each case, as of the date hereof and at and as of the Effective Date (except for representations and warranties made as of a specific date, which shall be true and correct only as of the specified date), except to the extent that the failure of such representations or warranties to be so true and correct as of such dates, individually or in the aggregate, would not have a material adverse effect on the Backstop Purchaser's performance of its obligations hereunder, and the representations and warranties that are qualified as to material adverse effect on the Backstop Purchaser's performance of its obligations hereunder or similar qualifications shall be true and correct in all respects, in each case, as of the date hereof at and as of the Effective Date as if made at and as of the Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and each Backstop Purchaser shall have, in all material respects, complied with all of the obligations, covenants and conditions to be performed or complied with in this Agreement applicable to it, except as a result of any breach of representations, warranties or covenants by a Defaulting Backstop Purchaser to the extent that the Non-Defaulting Backstop Purchasers or a third party purchase all Default Shares pursuant to <u>Section 2(a)(iii)</u>.

(v)        If the purchase of New Units by the Backstop Purchasers pursuant to this Agreement is subject to the terms of the HSR Act and/or merger control clearance in any other material jurisdictions, the applicable waiting period shall have expired or been terminated or the requisite clearance shall have been obtained, as applicable, with respect to such purchase.  Any third party consents set forth on the Disclosure Schedules (and without reference to any other Disclosure Schedule) and all other material notifications, filings, consents, waivers and approvals

31

of or by any Governmental Authority required in connection with the consummation of the Transactions or as contemplated by this Agreement or the Ancillary Agreements shall remain in full force and effect.

       (vi)      No Order shall prohibit the consummation of the Plan, the Rights Offering or the Transactions.

Section 10.    Indemnification.

       (a)      Indemnification Generally.  Subject to the approval of this Agreement by the Bankruptcy Court, whether or not the Rights Offering is consummated or this Agreement or the Backstop Commitment of any Backstop Purchaser is terminated, the Company (in such capacity, the "Indemnifying Party") shall indemnify and hold harmless the Backstop Purchasers, their affiliates, and their and their affiliates' respective general partners, members, managers and equity holders, and their respective officers, employees, affiliates, advisors, agents, attorneys, accountants, financial advisors and consultants (each an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses"), to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this Agreement, the Rights Offering, the Backstop Commitments, the Direct Purchase Commitments, the Ancillary Agreements or the Transactions, including without limitation, payment of the Put Premium and the Breakup Fee, if any, distribution of Rights, purchase and sale of New Units in the Rights Offering and purchase and sale of New Units pursuant to the Backstop Commitments or the Direct Purchase Commitments or any breach of the Company of this Agreement or the Ancillary Agreements or any claim, litigation, investigation or proceeding relating to any of the foregoing (a "Claim"), regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse such Indemnified Persons upon 20 days demand for any legal or other out-of-pocket expenses in connection with the foregoing, provided, however, that the foregoing indemnification will not, as to any Indemnified Person, apply to Losses to the extent that they are finally judicially determined to have resulted from gross negligence or willful misconduct on the part of such Indemnified Person or have resulted from a material breach by such Indemnified Person of the terms of this Agreement or the Ancillary Agreements. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of New Units contemplated by this Agreement bears to (ii) the Put Premium paid or proposed to be paid to the Backstop Purchasers. The Indemnifying Party also agrees that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Party, any person asserting claims on behalf of or in right of any of the Indemnifying Party, or any other person in connection with any Claim, except as to any Indemnified Person to the extent that any Losses incurred by the Company are finally judicially determined to have resulted from gross

negligence or willful misconduct of such Indemnified Person in performing the services that are the subject of this Agreement or the Ancillary Agreements; provided, however, that in no event shall an Indemnified Person or such other parties have any liability for any special, indirect, consequential or punitive damages in connection with or as a result of any of their activities related to the foregoing. Furthermore, the Company and the Backstop Purchasers hereby agree that no Defaulting Backstop Purchaser shall be entitled to indemnity for breach of this Agreement. The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this Section 10 shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

(b)    Certain Procedures. Promptly after receipt by an Indemnified Person of notice of the commencement of a Claim (a "Proceeding"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, promptly (and in any event within ten Business Days) notify the Indemnifying Party in writing of the commencement thereof; provided that (i) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this Section 10. In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person, provided that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel, approved by Backstop Purchasers, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)    Limitations. The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld). If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a Final Order for the plaintiff in any such Proceedings, the

33

Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this <u>Section 10</u>. Notwithstanding anything in this <u>Section 10</u> to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses in connection with investigating, responding to or defending any Proceedings as contemplated by this <u>Section 10</u>, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than 60 days after receipt by the Indemnifying Party of such request for reimbursement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld in the Indemnified Party's sole discretion), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)    <u>Indemnitor of First Resort</u>.  The Indemnifying Party hereby agrees that, with respect to claims against individuals, (i) it is the indemnitor of first resort (i.e., its obligations to an Indemnified Person that is an individual are primary and any obligation of any other parties to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Indemnified Person are secondary) and (ii) it shall be required to advance any and all expenses pursuant to this Section 10, without regard to any rights such Indemnified Person may have against any other parties.

Section 11.    <u>No Survival of Representations and Warranties</u>.  All representations and warranties made in this Agreement or in any instrument delivered pursuant to this Agreement, and all rights, claims and causes of action (whether in contract or in tort or otherwise) with respect thereto, shall terminate on the Effective Date.

Section 12.    <u>Termination</u>.

(a)    <u>Automatic Termination</u>.  This Agreement shall automatically terminate if the Bankruptcy Court, or any other court of competent jurisdiction, enters an Order declaring, in a Final Order, that this Agreement is unenforceable.

(b)    <u>Termination by Mutual Consent</u>.  This Agreement may be terminated at any time prior to the Effective Date upon the mutual written consent of the Company and the Requisite Purchasers.

(c)    <u>Termination by Backstop Purchasers</u>.  The Backstop Purchasers may terminate this Agreement upon written notice to the Company from the Requisite Purchasers of the occurrence of any of the following events (and for the avoidance of doubt, if an event occurs or fails to occur that triggers the payment of the Breakup Fee, the Backstop Purchasers shall have the right to terminate this Agreement):

(i)        Alternative Transaction: The Company enters into definitive agreements with respect to, or otherwise consummates, an Alternative Transaction.

(ii)        Approved Plan: The Company shall (i) have withdrawn the Approved Plan,(ii) have otherwise ceased to diligently and in good faith pursue confirmation of the Approved Plan or (iii) have solicited (or have sought to solicit) a Plan that is not an Approved Plan, in each case without the consent of the Requisite Purchasers.

(iii)        Approval Order: the Bankruptcy Court shall have failed to enter the Approval Order prior to June 15, 2017 or a court of competent jurisdiction or other competent governmental or regulatory authority declares this Agreement unenforceable or making illegal or otherwise restricting, preventing or prohibiting the consummation of the Approved Plan or the Rights Offering and the Direct Equity Offering;

(iv)        Order Re: Other Transaction: The Bankruptcy Court shall have entered an Order authorizing the Debtors to enter into a capital raising transaction that does not contemplate or is inconsistent with the Rights Offering described herein, including, without limitation, the identity of the Backstop Purchasers;

(v)        Company Breach: The Company violates, breaches or fails to perform any of its covenants contained in this Agreement which (x) would result in a failure of a condition set forth in Section 9(a) and (y) such breach, violation, or failure to perform is incapable of being cured or, if curable, is not cured by the Company within three business days after the giving of written notice of such breach, violation, or failure to perform; provided, however, that the right to terminate this Agreement pursuant to this Section 12(c)(v) shall not be available if any Backstop Party's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of such condition;

(vi)        Order and Consummation of Approved Plan: (1) the Bankruptcy Court has not entered an order, in form and substance reasonably satisfactory to the Requisite Purchasers, confirming the Approved Plan on or prior to August 1, 2017 or (2) the Debtors have not consummated the Approved Plan on or prior to September 30, 2017;

(vii)        Pre-Emergence Cash Need: (1) the Company has submitted a Monthly Budget that reflects a Pre-Emergence Cash Need greater than $285 million (without taking into account any Pre-Emergence Cash Flows, which will be deemed to have been received following emergence for such purposes) and (2) the Requisite Purchasers do not agree to increase the Total Commitment Amount up to an amount equal to the then-updated Pre-Emergence Cash Need (which, for the avoidance of doubt, cannot be greater than the Maximum Rights Offering Amount);

(viii)        Post-Emergence Cash Flows: the Company has submitted a Monthly Budget reporting Post-Emergence Cash Flows that are lower than the Deviation Threshold; provided, that, for purposes of the foregoing, if the Company has received any cash payments prior to emergence from bankruptcy on account of any anticipated payments included in Post-Emergence Cash Flows as reported in the Initial Budget (the "Pre-Emergence Cash Flows"), such Pre-Emergence Cash Flows will be added back to the Post-Emergence Cash Flows set forth

in such Monthly Budget for the purpose of determining whether the Backstop Purchasers shall have a right to terminate this Agreement pursuant to this Section 12(c)(viii).

(ix)    Conditions Precedent: the Requisite Purchasers reasonably determine that any of the conditions precedent set forth herein become incapable of being satisfied by September 30, 2017;

(x)    Termination of Exclusivity: the termination of the Company's exclusive right to file a plan, dismissal or conversion of the Debtors' bankruptcy cases or appointment of a trustee or examiner; provided, that it shall not constitute a termination event pursuant to Section 12(c)(x) in the event that the Company continues to prosecute the Approved Plan in the event of a termination of exclusivity;

(d)    Termination by the Company.  The Company may terminate this Agreement upon written notice to the Backstop Purchasers of the occurrence of any of the following events:

(i)    Alternative Transaction.  In connection with an Alternative Transaction.

(ii)    Breach or Failure to Perform.  By written notice from the Company if any Backstop Purchaser violates, breaches or fails to perform any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 9(a) to be satisfied as of the Effective Date (including in accordance with Section 2(a)(iii)), (B) cannot be or has not been cured by the third Business Day following delivery by the Company to such Backstop Purchaser of written notice of such breach or failure to perform, and (C) has not been waived by the Company; provided, however, that the right to terminate this Agreement pursuant to this Section 12(d)(ii) shall not be available if the Company's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of such condition; provided further, however, that if the Non-Defaulting Backstop Purchasers or a third-party have agreed to purchase all of the Default Shares in accordance with Section 2(a)(iii) herein, a breach by any Defaulting Backstop Purchaser shall not give rise to a right to terminate this Agreement.

(iii)    Dismissal, Conversion or Appointment of Examiner.  If the Debtors' Bankruptcy Cases shall have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or if an interim or permanent trustee or an examiner with expanded powers shall have been appointed to oversee or operate the Debtors in their Bankruptcy Cases.

(e)    Effect of Termination.  Upon termination under this Section 12, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party except that (i) nothing contained herein shall release any party hereto from liability from any breach, and (ii) the covenants and agreements made by the parties herein under, Section 2(c), Section 10, Section 12(f) and Section 13 through Section 24 shall survive indefinitely in accordance with their terms.

(f)    Breakup Fee.  Upon the filing of an Approved Plan, in the event this Agreement is terminated pursuant to Section 12(c)(i) (*Alternative Transaction*), Section 12(c)(ii) (*Approved Plan*), Section 12(c)(iv) (*Order Re: Other Transaction*), Section 12(c)(v) (*Company Breach*), or Section 12(d)(i) (*Alternative Transaction*), then, in each case, an amount in cash equal to 3% of

36

the Maximum Rights Offering Amount (without giving effect to the Incremental TERP Share Right) (the "Full Break Fee") shall become due and payable to the Backstop Purchasers, provided, however, that in the event of termination pursuant to Section 12(c)(i) (*Alternative Transaction*), the Full Break Fee shall become due and payable only if and when an Alternative Transaction is consummated.  In the event this Agreement is terminated pursuant to Section 12(c)(iii) (*Approval Order*), Section 12(c)(vi) (*Order and Consummation of Approved Plan*), Section 12(c)(vii) (*Pre-Emergence Cash Need*) or Section 12(c)(viii) (*Post-Emergence Cash Flows*), then, in each case, an amount in cash equal to 1.5% of the Maximum Rights Offering Amount (without giving effect to the Incremental TERP Share Right) (the "Half Break Fee" and together with the Full Break Fee, the "Breakup Fees" and each a "Breakup Fee") shall become due and payable to the Backstop Purchasers.  If a Breakup Fee is payable pursuant to either of the immediately preceding sentences, then the Company shall immediately, by wire transfer of immediately available funds, pay the Breakup Fee to the Backstop Purchasers in accordance with their respective Commitment Percentages. In no event shall the Company be required to pay the Breakup Fee to the Backstop Purchasers on more than one occasion.  The parties hereto intend the Breakup Fee to be entitled to administrative expense priority under Section 503(b) of the Bankruptcy Code. For the avoidance of doubt: (i) the Breakup Fee shall not be payable solely as a result of the failure to satisfy any condition precedent except as otherwise expressly set forth herein, and (ii) if the Agreement can have been terminated under more than one provision of Section 12(c) or Section 12(d), for purposes of payment of a Breakup Fee, the Agreement shall be deemed to have been terminated under the provision that results in the payment of the largest Breakup Fee possible to the Backstop Purchasers.

Section 13.    Notices.  All notices and other communications in connection with this Agreement will be in writing and will be deemed given (a) upon receipt if delivered personally, (b) upon written confirmation if sent via electronic facsimile or electronic mail, (c) three Business Days if being mailed by registered or certified mail (return receipt requested), or (d) upon receipt if delivered by an express courier (with confirmation), to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

    (a)    If to the Backstop Purchasers, to the addresses set forth on Schedule I hereto.

        with copies to:

        Akin Gump Strauss Hauer & Feld LLP
        One Bryant Park
        New York, New York  10036
        Attention:  Arik Preis and Jeffrey Kochian
        E-mail: apreis@akingump.com; jkochian@akingump.com

    (b)    If to the Company, to:

        SunEdison, Inc.
        13736 Riverport Drive,
        Maryland Heights, MO 63043
        Attention: General Counsel
        Telephone: (314) 770-7300

Telecopier: (314) 770-7381
E-mail: MTruong@sunedison.com

With a further copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522
Attention: J. Eric Ivester
Telephone: (212) 735-3111
Telecopier: (917) 777-3111
eric.ivester@skadden.com

Section 14.    <u>Assignment; Third Party Beneficiaries</u>.  Except as contemplated by Section 8(c) (*Transfers*), neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of Law or otherwise) without the prior written consent of other party.  Notwithstanding the previous sentence, this Agreement, or the Backstop Purchasers' obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by the Backstop Purchasers to any Affiliate (as defined in Rule 12b 2 under the Exchange Act) of the Backstop Purchasers over which the Backstop Purchasers or any of their affiliates exercise investment authority, including, without limitation, with respect to voting and dispositive rights; provided, however, that any such assignee assumes the obligations of the Backstop Purchasers hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as the Backstop Purchasers. Notwithstanding the foregoing or any other provisions herein, except as contemplated by Section 8(c) (*Transfers*), no such assignment will relieve the Backstop Purchasers of their obligations hereunder.  Except as provided in <u>Section 10</u> with respect to the Indemnified Parties and Section 8(c) with respect to Transfers, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

Section 15.    <u>Prior Negotiations; Entire Agreement</u>.  This Agreement (including Schedules and Exhibits attached hereto and the Ancillary Agreements) constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, including, without limitation, the Commitment Letter; <u>provided</u>*,* <u>however</u>, that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties will continue in full force and effect.

Section 16.    <u>GOVERNING LAW; VENUE</u>.  THIS AGREEMENT, AND ALL CLAIMS ARISING OUT OF OR RELATING THERETO, WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (EXCLUDING CONFLICT OF LAWS RULES AND PRINCIPLES). THE BACKSTOP PURCHASERS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON *FORUM NON CONVENIENS*.

Section 17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

Section 18.    <u>Waivers and Amendments</u>.  This Agreement (including the exhibits and schedules hereto) may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and such Backstop Purchasers as necessary for there to be a Consent of the Backstop Purchasers (the "<u>Requisite Purchasers</u>"), and, to the extent required, the approval of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that any amendment, modification, supersession, cancellation, renewal, extension or waiver (i) to a Backstop Purchaser's Backstop Commitment or Direct Purchase Commitment (other than as contemplated by this Agreement), or (ii) that disproportionately adversely affects any Backstop Purchaser (including its Commitment Percentage) including without limitation by the withholding of a benefit, shall not be effective without such Backstop Purchaser's individual prior written consent.  Each Backstop Purchaser may grant or withhold such Backstop Purchaser's written consent to any amendment, modification, supersedence, cancellation, renewal or extension pursuant to the prior sentence in its sole discretion.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

Section 19.    <u>Interpretation and Construction</u>.  This Agreement has been freely and fairly negotiated among the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  Capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed thereto in Schedule III.  Unless the context requires otherwise, any agreements, documents, instruments or Laws defined or referred to in this Agreement will be deemed to mean or refer to such agreements, documents, instruments or Laws as from time to time amended, modified or supplemented, including (a) in the case of agreements, documents or instruments, by waiver or consent and (b) in the case of Laws, by succession of comparable successor statutes.  All references in this Agreement to any particular Law will be deemed to refer also to any rules and regulations promulgated under that Law.  The words "include," "includes" and "including" will be deemed to be followed by "without limitation."  The word "or" is used in the inclusive sense of "and/or" unless the context requires otherwise.  References to a person are also to its permitted successors and assigns.  Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context requires otherwise.  When a reference in this Agreement is made to an Article, Section, Exhibit, Annex or Schedule, such reference is to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement unless otherwise indicated.  The words "this Agreement," "herein," "hereof,"

"hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  If any party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached will not detract from or mitigate the fact that the party is in breach of the first representation, warranty or covenant.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Commitment Agreement.  References to "subsidiaries" of the Company in this Agreement shall not include the YieldCos.

Section 20.    Headings.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 21.    Specific Performance.  The parties acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly, the parties agree that, in addition to any other remedies, each will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

Section 22.    Damages.  Notwithstanding anything to the contrary in this Agreement, the parties to this Agreement, waive their rights to claim or otherwise seek consequential, special or punitive damages or lost profits.

Section 23.    Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 24.    Certain Information.  Each party to this Agreement agrees to comply with the reasonable request of the Company to provide an appropriate Form W-8 or Form W-9, or other applicable Tax form.

Section 25.    Backstop Purchasers Acting Directly.  The Company and each of the Backstop Purchasers hereby agree that, notwithstanding anything to the contrary in this Agreement, (a) each Backstop Purchaser is entering into this Agreement directly with the Company and not with any other Backstop Purchaser; (b) no Backstop Purchaser shall have any right to bring any action against any other Backstop Purchaser with respect the Equity Commitment or this Agreement (or any breach hereof); (c) no Backstop Purchaser shall act, nor shall any action taken by a Backstop Purchaser pursuant to this Agreement be deemed to be acting, in concert with any other Backstop

Purchaser with respect to the Equity Commitment or this Agreement; and (d) the Equity Commitment and this Agreement shall not create a presumption that the Backstop Purchasers are in any way acting as a group. The decision of each Backstop Purchaser to commit to enter into the Equity Commitment and this Agreement has been made independently of any other Backstop Purchaser.

Section 26.    <u>No Recourse</u>.  Notwithstanding anything to the contrary that may be expressed or implied in this Agreement or any instrument delivered in connection herewith, the Backstop Purchasers, by their acceptance of the benefits hereof, covenant, agree and acknowledge that, other than in the event of fraud or willful misconduct, they have no rights of recovery against, and no recourse hereunder, against, any former, current or future director, officer, equityholder, agent, advisor, attorney, representative, Affiliate, manager or employee of the Company (or any of its successors or assigns) or against any former, current or future director, officer, equityholder, agent, advisor, attorney, representative, Affiliate, manager or employee of any of the foregoing, whether by or through attempted piercing of the corporate veil, by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law; provided, however, that nothing in this Section 26 shall exonerate any of the foregoing from future acts or obligations not arising under or related to this Agreement.

*[Signature Page Follows]*

41

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

SUNEDISON, INC.

By:
Name: _John S. Dube_
Title: _CEO & CRO_

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BACKSTOP PURCHASERS:

**Merrill Lynch, Pierce, Fenner & Smith Incorporated**

By: _____

Name: _____

Title: SETH DENSON
DIRECTOR

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BACKSTOP PURCHASERS:

**Investment Partners IV (A), LLC**

By: BlackRock Financial Management Inc.,
its Investment Manager

By: _____
Name: David N. Barenborg
Title: Managing Director

**Sainsbury's Credit Opportunities Fund, Ltd.**

By: BlackRock Financial Management Inc.,
its Investment Manager

By: _____
Name: David N. Barenborg
Title: Managing Director

**K Special Opportunities Fund L.P.**

By: BlackRock Financial Management Inc.,
its Investment Manager

By: _____
Name: David N. Barenborg
Title: Managing Director

**Cadbury Hedge Fund Alternatives Portfolio**

By: BlackRock Financial Management Inc.,
its Investment Manager

By: _____
Name: David N. Barenborg
Title: Managing Director

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BACKSTOP PURCHASERS:

**Castlelake III, L.P.**

By: Castlelake III GP, L.P., its General Partner

By: _____
Name:
Title:        Kevin Hiniker
             Vice President


**Castlelake IV, L.P.**

By: Castlelake IV GP, L.P., its General Partner

By: _____
Name:
Title:        Kevin Hiniker
             Vice President

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

*smv*    **BACKSTOP PURCHASERS:**

**Centerbridge Credit Partners, L.P.**

By: _____
Name: 
Title:        **Susanne V. Clark**
              **Authorized Signatory**

**Centerbridge Credit Partners Master, L.P.**

By: _____
Name: 
Title:        **Susanne V. Clark**
              **Authorized Signatory**

**Centerbridge Special Credit Partners III, L.P.**

By: _____
Name: 
Title:        **Susanne V. Clark**
              **Authorized Signatory**

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BACKSTOP PURCHASERS:

**Canary SC Master Fund, L.P.**

By: Cyrus Capital Partners, L.P., its Investment Manager

By: _____
　　　Name:  Thomas Stamatelos
　　　Title:   Authorized Signatory


**Cyrus Opportunities Master Fund II, Ltd.**

By: Cyrus Capital Partners, L.P., its Investment Manager

By: _____
　　　Name:  Thomas Stamatelos
　　　Title:   Authorized Signatory


**Crescent 1, L.P.**

By: Cyrus Capital Partners, L.P., its Investment Manager

By: _____
　　　Name:  Thomas Stamatelos
　　　Title:   Authorized Signatory

**CRS Master Fund, L.P.**

By: Cyrus Capital Partners, L.P., its Investment Manager

By: _____
      Name:  Thomas Stamatelos
      Title:   Authorized Signatory

**Cyrus Select Opportunities Master Fund, Ltd.**

By: Cyrus Capital Partners, L.P., its Investment Manager

By: _____
      Name:  Thomas Stamatelos
      Title:   Authorized Signatory

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BACKSTOP PURCHASERS:

**Stonehill Master Fund Ltd.**

By: Stonehill Capital Management LLC, its advisor

By: _____

Name: Paul Malek
Title: General Counsel

**Stonehill Institutional Partners, L.P.**

By: Stonehill Capital Management LLC, its advisor

By: _____

Name:  Paul Malek
Title: General Counsel

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BACKSTOP PURCHASERS:

**Strategic Value Master Fund, Ltd.**

By: Strategic Value Partners, LLC, its Investment Manager

By: _____

Name:

Title:    James Dougherty
          Fund Chief Financial Officer

**Strategic Value Opportunities Fund, L.P.**

By: SVP Special Situations III-A LLC, its Investment Manager

By: _____

Name:

Title:    James Dougherty
          Fund Chief Financial Officer

**Strategic Value Special Situations Master Fund III, L.P.**

By: SVP Special Situations III LLC, its Investment Manager

By: _____

Name:

Title:    James Dougherty
          Fund Chief Financial Officer

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

BACKSTOP PURCHASERS:

**Tennenbaum Heartland Co-Invest, LP**

By: _____
Name: Rajneesh Vig
Title:  Managing Partner

**Tennenbaum Senior Loan Fund II, LP**

By: _____
Name: Rajneesh Vig
Title:  Managing Partner

**Tennenbaum Senior Loan Fund V, LLC**

By: _____
Name: Rajneesh Vig
Title:  Managing Partner

**Tennenbaum Special Situations Fund IX-S, L.P.**

By: _____
Name: Rajneesh Vig
Title:  Managing Partner

**Tennenbaum Special Situations Fund IX, LLC**

By: _____
Name: Rajneesh Vig
Title: Managing Partner

**Tennenbaum Special Situations IX-C, L.P.**

By: _____
Name: Rajneesh Vig
Title: Managing Partner

**Tennenbaum Special Situations IX-O, L.P.**

By: _____
Name: Rajneesh Vig
Title: Managing Partner

**Schedule I**

**Backstop Purchasers**

**Schedule I**
Backstop Purchasers

| Backstop Purchaser | Commitment (%) | Commitment ($) |
|---|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | | |
| Cadbury Hedge Fund Alternatives Portfolio | | |
| Investment Partners IV (A), LLC | | |
| K Special Opportunity Fund L.P. | | |
| Sainsbury's Credit Opportunities Fund, Ltd. | | |
| Castlelake III, L.P. | | |
| Castlelake IV, L.P. | | |
| Centerbridge Credit Partners, L.P. | | |
| Centerbridge Credit Partners Master, L.P. | | |
| Centerbridge Special Credit Partners III, L.P. | | |
| Canary SC Master Fund, L.P. | | |
| Crescent 1, L.P. | | |
| CRS Master Fund, L.P. | | |
| Cyrus Opportunities Master Fund II, Ltd. | | |
| Cyrus Select Opportunities Master Fund, Ltd. | | |
| Stonehill Institutional Partners, L.P. | | |
| Stonehill Master Fund Ltd. | | |
| Strategic Value Master Fund, Ltd. | | |
| Strategic Value Special Situations Master Fund III, L.P. | | |
| Strategic Value Opportunities Fund, L.P. | | |
| Tennenbaum Heartland Co-Invest, LP | | |
| Tennenbaum Senior Loan Fund II, LP | | |
| Tennenbaum Senior Loan Fund V, LLC | | |
| Tennenbaum Special Situations Fund IX-S, L.P. | | |
| Tennenbaum Special Situations Fund IX, LLC | | |
| Tennenbaum Special Situations IX-C, L.P. | | |
| Tennenbaum Special Situations IX-O, L.P. | | |
| **TOTAL** | 100.0000% | $    300,000,000.00 |

## Schedule II

## RESERVED

**Schedule III**

**Index of Defined Terms**

"Ancillary Agreements" means the Amended and Restated Certificate of Incorporation, the By-Laws and such other agreements to be executed by some or all of the parties hereto as may be reasonably necessary to carry out the Transactions including any and all documents which are included in the Plan Supplement (as defined in the Plan).

"Affiliated Holder" each respective affiliate of a Backstop Holder holding Subject Debt.

"Alternative Transaction" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, sale of equity or debt, recapitalization, or restructuring of the Debtors other than pursuant to the Approved Plan.

"Bankruptcy Sale Agreement" means any agreement that was entered into during the pendency of the Bankruptcy Cases and that has not been consummated, pursuant to which the Company has agreed to sell material assets to a third party purchaser.

"Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"CFO" means the Chief Financial Officer of the Company.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commission" means the United States Securities and Exchange Commission.

"Consent of the Backstop Purchasers" means the consent of the Backstop Purchasers who have committed at least a majority of the Equity Commitment, which consent may be granted or withheld in accordance with Section 18 of this Agreement.

"Contract" means any agreement, lease, license, evidence of indebtedness, mortgage, indenture, security agreement or other contract.

"CRO" means the Chief Restructuring Officer of the Company.

"Deviation Threshold" means an amount equal to 85% of the expected Post-Emergence Cash Flows as reported in the Initial Budget.

"DIP Credit Agreement" means that certain Amended and Restated Senior Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of May 2, 2017, among (i) the Company, (ii) the various lenders party thereto, (iii) Deutsche Bank AG New York Branch, in its capacity as Collateral Sub-Agent (as defined therein), and (iv) Cantor Fitzgerald Securities, as Administrative Agent (as defined therein), as such exists on the date hereof (and without taking into account any amendments, waivers or modifications thereto).

"Eligible Claimholder" means a 2L Stub Claimholder that submits a Subscription Form to the Subscription Agent indicating that it is an Accredited Investor.

"Economic Sanctions Laws" means:  (i) the Trading With the Enemy Act, 50 U.S.C. App. §5 et seq.; (ii) the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq.; (iii) Executive Order No. 13224 on Terrorist Financing:  Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (September 23, 2001), as amended by Executive Order 13268 (July 3, 2002); or (iv) any other United States Law or regulation concerning economic sanctions administered by the U.S. Department of Treasury Office of Foreign Assets Control.

"Environmental Laws" means all applicable federal, state, provincial, local and foreign laws, rules, regulations, by-laws, codes, judicial or administrative decisions and orders relating to the protection of human health and safety or the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means an entity that is treated with the Company as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Exchange Act" means the Securities and Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Final Order" means an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending, or as to which any right to appeal, petition for *certiorari*, reargue, or rehear will have been waived in writing in form and substance satisfactory to the Debtors and satisfactory to the Backstop Purchasers in their sole and absolute discretion or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of *certiorari*, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction (as applicable) will have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing will have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order will not cause such order not to be a Final Order.

"Governmental Authority" means any government, any governmental administrative or regulatory entity or body, department, commission, board, agency or instrumentality, and any court, tribunal, arbitral or judicial body, in each case whether federal, state, county, provincial, territorial, and whether local, state, foreign or multinational.

"Hazardous Materials" means any pollutant, substance, asbestos and asbestos-containing materials, waste, material, contaminant, petroleum, petroleum-containing materials, radiation and

radioactive materials or polychlorinated biphenyls as defined in, or regulated by, any Environmental Laws.

"Intellectual Property" means  (i) registered and unregistered copyrights in both published works and unpublished works, (ii) fictitious business names, trading names, domain names, corporate names, trade dress, registered and unregistered trademarks, service marks, and pending applications for any of the foregoing, (iii) any patents and patent applications, and all reissues, divisionals, renewals, extensions, provisionals, continuations and continuations-in-part thereof, (iv) computer software (source code and object code) or middleware, and (v) know-how, trade secrets and other proprietary and confidential information, including proprietary and confidential customer/vendor lists, technical information, data, data bases, process technology, plans, drawings, agreements, licenses and blue prints.

"Initial Budget" means that certain budget submitted to the financial advisors to the Backstop Purchasers by electronic transmission on May 2, 2017 at 12:07 a.m. (Eastern Time) and the supplemental submission to the financial advisors to the Backstop Purchasers by electronic transmission on May 17, 2017 at 9:46 p.m. (Eastern Time), pursuant to the terms of the Commitment Letter.

"Law" means any and all applicable federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, code, rule, regulation or other similar legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"Material Adverse Effect" means (i) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other fact, event, change, effect, development, circumstance or occurrence, has had or could reasonably be expected to have a material and adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Company and its subsidiaries taken as a whole or that could be reasonably expected to result in the Post-Emergence Cash Flows being reduced to less than the Deviation Threshold, (ii) anything that could reasonably be expected to prevent, materially delay or materially restrict or impair the Company and its subsidiaries from consummating the transactions contemplated in the Plan, or (iii) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other fact, event, change, effect, development, circumstance or occurrence that, has had or could reasonably be expected to have a material and adverse effect on (A) the ability of the Company or its subsidiaries to perform their respective obligations under this Agreement relating to the Backstop Commitment, or (B) the ability of the Backstop Purchasers to enforce their rights and remedies under this Agreement.

"Order" means any order, judgment, decree, injunction, ruling, writ or assessment of any Governmental Authority (whether temporary, preliminary or permanent) that is binding on any Person or its property under applicable Law.

"Non-Roll Up Second Lien Secured Parties" means collectively, each "Secured Party" under and as defined in the Prepetition Second Lien Collateral Trust Agreement.

"Permitted Encumbrances" means (i) Liens imposed by an Order of the Bankruptcy Court; (ii) Liens imposed by Law for Taxes, rates, assessments or other governmental charges or levies the payment of which is not yet due, or for which installments have been paid based on reasonable estimates pending final assessments, or if due, the validity of which is being contested and for which reserves have been taken in accordance with and to the extent required by GAAP; (iii) carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers' and other like Liens imposed by Law (including Liens of customs and revenue authorities to secure customs duties in connection with the importation of goods), arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested; (iv) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (v) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (vi) easements, zoning restrictions, rights-of-way, licenses, permits, reservations, covenants, servitudes, and rights in the nature of easements (including, without limiting the generality of the foregoing, licenses, easements, rights-of-way and rights in the nature of easements for sidewalks, public ways, sewers, drains, gas, steam and water mains or electric light and power, or telephone and telegraph conduits, poles, wires and cables) and land use and building restrictions, by-laws, regulations and ordinances of federal, provincial, regional, state, municipal and other Governmental Authorities, minor defects or irregularities of title and other similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Company or any of its subsidiaries; (vii) landlords' and lessors' and other like Liens in respect of rent not in default or being reasonably contested and the rights of any tenant, occupant or licensee under any lease, occupancy agreement or license which do not materially impair the use of the real property subject thereto for the purpose for which it is used by that Person; and (viii) the right reserved to or vested in any Governmental Authority by the terms of any lease, license, franchise, grant or permit acquired by that Person or by any statutory provision to terminate any such lease, license, franchise, grant or permit, or to require annual or other payments as a condition to the continuance thereof.

"Person" means any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or Governmental Authority.

"Post-Emergence Cash Flows" means the present value of the Company's cumulative post-emergence net cash flows.

"Pre-Emergence Cash Need" the Company's expected total cash need as of the later of September 30, 2017 and the Effective Date as set forth in the Initial Budget or in a Monthly Budget.

"Prepetition Second Lien Notes" means the 5.00% guaranteed convertible senior secured notes due 2018 in an initial aggregate principal amount of $225,000,000 issued by the SunEdison, Inc. on January 11, 2016.

"Prepetition Second Lien Collateral Trust Agreement" means that certain Collateral Trust Agreement, dated as of January 11, 2016, among the SunEdison, Inc., the guarantors party thereto, Wilmington Trust, National Association, as collateral agent, and the other parties party thereto from time to time, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time.

"Prepetition Second Lien Credit Agreement" means that that certain Second Lien Credit Agreement dated as of January 11, 2016, by and among SunEdison, Inc., Wilmington Savings Fund Society, FSB, and the various lenders party thereto from time to time, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Qualified Marketmaker" means an entity that holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors and is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"Reorganized Debtors" means the Debtors from and after the Effective Date.

"Restricted Party" means:  (i) any target of Economic Sanctions Laws or any person, entity or vessel, directly or indirectly, controlled by or acting for or on behalf of any such target, or (ii) any person, entity or vessel listed on the "Specially Designated Nationals and Blocked Persons" List maintained by the Office of Foreign Assets Control.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Subject Debt" means any right, title or interest (including by way of a participation) in (i) the Prepetition Second Lien Notes (as defined in the DIP Credit Agreement) (excluding any Roll-Up Obligations (as defined in the DIP Credit Agreement)) (the "Relevant 2018 Notes"), (ii) loans under that certain Second Lien Credit Agreement dated as of January 11, 2016 ( "Relevant Second Lien Credit Agreement Loans"), by and among the Company, the Prepetition Second Lien Administrative Agent (as defined in the DIP Credit Agreement), and the various lenders party thereto from time to time (excluding any Roll-Up Obligations (as defined in the DIP Credit Agreement)), and (iii) Roll-Up Obligations (as defined in the DIP Credit Agreement).

"Subscription Agent" means the subscription agent for the Rights Offering as determined by the Company.

"Subscription Form" means the form delivered to all Eligible Claimholders pursuant to which such Eligible Claimholders may exercise their Rights.

"Tax" or "Taxes" means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), customs duties, capital stock,

franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taking" means a taking, expropriation or voluntary conveyance of all or part of any real property, or any interest therein or right accruing thereto or use thereof, as the result of, or in settlement of, any condemnation, expropriation or other eminent domain proceeding by any governmental authority, whether or not the same shall have actually been commenced.

"TERP and GLBL Documents" means (i) that certain Incentive Distribution Rights Transfer Agreement, dated as of March 6, 2017, between TERP, TerraForm Power, LLC, the Company, SunEdison Holdings Corporation, SunE ML 1, LLC and BRE Delaware Inc.; (ii) that certain Settlement Agreement, entered into as of March 6, 2017, by and among TERP, TerraForm Power, LLC, TerraForm Power Operating, LLC, the subsidiaries of TERP party thereto, the Company and the non-debtor subsidiaries party thereto; (iii) Voting and Support Agreement, dated as of March 6, 2017, among Orion US Holdings 1 L.P., BRE TERP Holdings Inc., TERP, SunE, SunEdison Holdings Corporation and SunE ML 1, LLC; (iv) Voting and Support Agreement, dated as of March 6, 2017, among Orion US Holdings 1 L.P., BRE TERP Holdings Inc., TERP, the Company, SunEdison Holdings Corporation, and SunE ML 1, LLC; (v) Settlement Agreement, dated as of March 6, 2017, among GLBL, TerraForm Global, LLC, TerraForm Global Operating, LLC, certain direct and indirect, subsidiaries of GLBL, the Company for itself and on behalf of its affiliated U.S. debtors-in possession and certain non-debtor direct and indirect subsidiaries of the Company; and (vi) Voting and Support Agreement, dated as of March 6, 2017, among Orion US Holdings 1 L.P., BRE GLBL Holdings Inc., GLBL, the Company, and SunEdison Holdings Corporation.

"Total Exercise Price" means the aggregate Purchase Price an Eligible Claimholder or a Backstop Purchaser is required to pay to purchase Rights Offering Shares issued with respect to the exercise of its Rights, and solely with respect to the Backstop Purchasers, the acquisition of the Backstop Shares.

"YieldCos" means TERP, TerraForm Power, LLC, GLBL, TerraForm Global, LLC and their respective subsidiaries.

| Term | Section |
|---|---|
| 2L Stub Claimholders | Recitals |
| Accredited Investor | Section 6(e) |
| Acquisition | Section 9(a)(iii) |
| Agreement | Preamble |
| Amended and Restated Certificate of Incorporation | Section 2(d)(i)(D) |

| Term | Section |
|------|---------|
| Approval Motion | Section 7(a) |
| Approval Order | Section 2(b)(i) |
| Backstop Commitment | Section 2(a)(i) |
| Backstop Purchaser Default | Section 2(a)(iii)(A) |
| Backstop Purchaser Shares | Recitals |
| Backstop Purchasers | Preamble |
| Backstop Shares | Recitals |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 5(b)(i) |
| Breakup Fee | Section 12(f) |
| Breakup Fee Amount | Section 12(f) |
| By-Laws | Section 2(d)(i)(E) |
| Claim | Section 10(a) |
| Commencement Date | Section 1(a) |
| Commitment Notice | Section 1(c) |
| Commitment Percentage | Section 2(a)(i) |
| Company | Preamble |
| Confirmation Hearing | Section 7(h) |
| Confirmation Order | Section 5(b)(i) |
| Court Orders | Section 5(b)(i) |
| Debtors | Recitals |
| Default Purchase Right | Section 2(a)(iii)(A) |
| Default Shares | Section 2(a)(iii)(A) |
| Defaulting Backstop Purchaser | Section 2(a)(iii)(A) |
| Derivative Securities | Section 5(d) |
| Direct Commitment Amount | Recitals |
| Direct Commitment Shares | Recitals |
| Direct Equity Commitment | Section 2(a)(i) |
| Disclosure Schedule | Section 5 |
| Disclosure Statement | Recitals |
| Effective Date | Section 1(a) |
| Election Deadline | Section 4 |
| Equity Commitment | Section 2(a)(i) |
| Escrow Agent | Section 2(a)(ii)(A) |
| Escrow Agreement | Section 2(a)(ii)(A) |
| Escrow Return Date | Section 2(a)(ii)(D) |
| Expiration Time | Section 1(a) |
| Full Break Fee | Section 12(f) |
| GLBL Merger Agreement | Section 8(b) |
| Half Break Fee | Section 12(f) |
| HSR Act | Section 5(h) |
| Incremental TERP Share Right | Section 4 |
| Indemnifying Party | Section 10(a) |

| Term | Section |
|------|---------|
| Indemnified Person | Section 10(a) |
| Losses | Section 10(a) |
| Material Contracts | Section 5(q)(i) |
| Maximum Direct Equity Commitment | Section 2(a)(i) |
| Maximum Rights Offering Amount | Section 1(d) |
| Monthly Budgets | Section 7(r) |
| New SunE Common Stock | Recitals |
| New TERP Class A Shares | Recitals |
| New Units | Recitals |
| Non-Defaulting Backstop Purchaser | Section 2(a)(iii)(A) |
| Noteholder Claims | Section 8(a)(ii) |
| Parent | Section 8(b) |
| Plan | Recitals |
| Pre-Election Budget | Section 7(r) |
| Pre-Emergence Cash Flows | Section 12(c)(viii) |
| Prefunding Amount | Section 2(a)(ii)(C) |
| Prefunding Certificate | Section 2(a)(ii)(B) |
| Proceeding | Section 10(b) |
| Purchase Price | Recitals |
| Put Premium | Section 5(a) |
| Put Premium Amount | Recitals |
| Put Premium Shares | Recitals |
| Relevant Second Lien Credit Agreement Loans | "Subject Debt" |
| Right | Recitals |
| Rights Exercise Period | Section 1(a)(i) |
| Rights Offering | Recitals |
| Rights Offering Escrow Amount | Section 1(a)(i) |
| Rights Offering Procedures | Recitals |
| Rights Offering Shares | Recitals |
| Satisfaction Notice | Section 1(c) |
| TERP | Recitals |
| TERP Merger | Recitals |
| TERP Merger Agreement | Section 8(b) |
| Total Commitment Amount | Recitals |
| Total Rights Offering Shares | Section 1(a) |
| Transaction Expenses | Section 2(c) |
| Transactions | Section 2(b)(i) |
| Transfer | Section 8(c) |
| Yieldco Parent | Section 8(b) |
| Yieldco Support Covenants | Section 8(b) |
| Yieldco Support Termination Event | Section 8(b) |

**Schedule IV**

**Disclosure Schedule**

**NONE**

**Schedule V**

**NONE**

**Schedule VI***
Holdings of Subject Debt

| Backstop Purchaser | Roll-Up Loans | Remaining Prepetition Second Lien Debt |
| --- | --- | --- |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | | |
| Cadbury Hedge Fund Alternatives Portfolio | | |
| Investment Partners IV (A), LLC | | |
| K Special Opportunity Fund L.P. | | |
| Sainsbury's Credit Opportunities Fund, Ltd. | | |
| Castlelake III, L.P. | | |
| Castlelake IV, L.P. | | |
| Centerbridge Credit Partners, L.P. | | |
| Centerbridge Credit Partners Master, L.P. | | |
| Centerbridge Special Credit Partners III, L.P. | | |
| Canary SC Master Fund, L.P. | | |
| Crescent 1, L.P. | | |
| CRS Master Fund, L.P. | | |
| Cyrus Opportunities Master Fund II, Ltd. | | |
| Cyrus Select Opportunities Master Fund, Ltd. | | |
| Stonehill Institutional Partners, L.P. | | |
| Stonehill Master Fund Ltd. | | |
| Strategic Value Master Fund, Ltd. | | |
| Strategic Value Special Situations Master Fund III, L.P. | | |
| Strategic Value Opportunities Fund, L.P. | | |
| Tennenbaum Heartland Co-Invest, LP | | |
| Tennenbaum Senior Loan Fund II, LP | | |
| Tennenbaum Senior Loan Fund V, LLC | | |
| Tennenbaum Special Situations Fund IX-S, L.P. | | |
| Tennenbaum Special Situations Fund IX, LLC | | |
| Tennenbaum Special Situations IX-C, L.P. | | |
| Tennenbaum Special Situations IX-O, L.P. | | |
| **TOTAL** | | |

*Schedule VI sets forth the Subject Debt held by the Backstop Purchasers as of the date hereof.  For the avoidance of doubt, Subject Debt acquired by any Backstop Purchaser following the date hereof shall be subject to the terms, conditions, and obligations contained in this Agreement, including (without limitation) the covenants set forth in Section 8 hereof.

**Exhibit A**

**RESERVED**

**Exhibit B**

**RESERVED**

**Exhibit C**

**Rights Offering Procedures**

(see attached)

ATTACHED TO ORDER AS EXHIBIT 3

## Exhibit D

Form of Joinder – Subject Debt Only

## Joinder Agreement

The undersigned is executing and delivering this Joinder Agreement pursuant to the Commitment Agreement dated [__], 2017, as amended and/or modified from time to time in accordance with its terms (the "Commitment Agreement") by and among SunEdison, Inc. (the "Company") and the Backstop Purchasers signatory thereto.  Capitalized terms used in this Joinder Agreement and not otherwise defined herein shall have the meanings provided in the Commitment Agreement.

By executing and delivering this Joinder Agreement to the Company and the Backstop Purchasers, the undersigned hereby agrees to be bound by the Commitment Agreement solely for the purpose of being bound by and complying with the covenants in Section 8(a) as if it were a "Backstop Purchaser" (as such term is defined in the Commitment Agreement) on the terms and conditions set forth in the Commitment Agreement. The undersigned further agrees that it shall cause any subsequent transferee to which it Transfers any of the Subject Debt held by it to execute and deliver a Joinder Agreement in the form attached as Exhibit D or Exhibit E to the Commitment Agreement, as applicable.

The undersigned represents and warrants to the Company and the Backstop Purchasers that as of the date hereof (i) prior to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement, it held and had the power to vote the Subject Debt set forth in row (i) of the table below, and (ii) pursuant to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement, it will acquire and will hold the power to vote the additional Subject Debt set forth in row (ii) of the table below:

|  | Relevant 2018 Notes | Relevant Second Lien Credit Agreement Loans | Roll-Up Obligations |
| --- | --- | --- | --- |
| (i) prior to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement |  |  |  |
| (ii) pursuant to the transfer of Subject Debt which resulted in the execution of this Joinder Agreement |  |  |  |

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of [____] [____], 20[17].

[_____]

By: _____
Name:
Title:

## Exhibit E
Form of Joinder – Subject Debt and Equity Commitment
## Joinder Agreement

The undersigned is executing and delivering this Joinder Agreement pursuant to the Commitment Agreement dated [__], 2017, as amended and/or modified from time to time in accordance with its terms (the "Commitment Agreement") by and among SunEdison, Inc. (the "Company") and the Backstop Purchasers signatory thereto. Capitalized terms used in this Joinder Agreement and not otherwise defined herein shall have the meanings provided in the Commitment Agreement.

By executing and delivering this Joinder Agreement to the Company and the Backstop Purchasers, the undersigned hereby agrees to be bound by the Commitment Agreement for the purpose of being bound by and complying with the covenants in Section 8(a) and the Equity Commitment as if it were a "Backstop Purchaser" (as such term is defined in the Commitment Agreement) on the terms and conditions set forth in the Commitment Agreement. The undersigned further agrees that it shall cause any subsequent transferee to which it Transfers any of the Subject Debt and/or the Equity Commitment held by it to execute and deliver a Joinder Agreement in the form attached as Exhibit D, Exhibit E or Exhibit F to the Commitment Agreement, as applicable.

The undersigned represents and warrants to the Company and the Backstop Purchasers that as of the date hereof (i) prior to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement, it held and had the power to vote the Subject Debt and held the Equity Commitment set forth in row (i) of the table below, and (ii) pursuant to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement, it will acquire and will hold the power to vote the additional Subject Debt, and is accepting an additional Equity Commitment, in each case, as set forth in row (ii) of the table below:

|  | Relevant 2018 Notes | Relevant Second Lien Credit Agreement Loans | Roll-Up Obligations | Equity Commitment |
|---|---|---|---|---|
| (i) prior to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement |  |  |  |  |
| (ii) pursuant to the transfer of Subject Debt and Equity Commitment which resulted in the execution of this Joinder Agreement |  |  |  |  |

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of [_____] [____], 20[17].

[_____]

By: _____
Name:
Title:

**Exhibit F**
Form of Joinder – Equity Commitment Only
**Joinder Agreement**

The undersigned is executing and delivering this Joinder Agreement pursuant to the Commitment Agreement dated [__], 2017, as amended and/or modified from time to time in accordance with its terms (the "Commitment Agreement") by and among SunEdison, Inc. (the "Company") and the Backstop Purchasers signatory thereto. Capitalized terms used in this Joinder Agreement and not otherwise defined herein shall have the meanings provided in the Commitment Agreement.

By executing and delivering this Joinder Agreement to the Company and the Backstop Purchasers, the undersigned hereby agrees to be bound by the Commitment Agreement for the purpose of being bound by and complying with the Equity Commitment as if it were a "Backstop Purchaser" (as such term is defined in the Commitment Agreement) on the terms and conditions set forth in the Commitment Agreement. The undersigned further agrees that it shall cause any subsequent transferee to which it Transfers any of the Equity Commitment held by it to execute and deliver a Joinder Agreement in the form attached as Exhibit E or Exhibit F to the Commitment Agreement, as applicable.

The undersigned represents and warrants to the Company and the Backstop Purchasers that as of the date hereof (i) prior to the transfer of the Equity Commitment which resulted in the execution of this Joinder Agreement, it held and had the power to vote the Subject Debt and held the Equity Commitment set forth in row (i) of the table below, and (ii) pursuant to the transfer of Equity Commitment which resulted in the execution of this Joinder Agreement, it is accepting an additional Equity Commitment set forth in row (ii) of the table below:

|  | Relevant 2018 Notes | Relevant Second Lien Credit Agreement Loans | Roll-Up Obligations | Equity Commitment |
|---|---|---|---|---|
| (i) prior to the transfer of Equity Commitment which resulted in the execution of this Joinder Agreement |  |  |  |  |
| (ii) pursuant to the transfer of Equity Commitment which resulted in the execution of this Joinder Agreement |  |  |  |  |

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of [____] [____], 20[17].

[_____]

By: _____
Name:
Title:

## **EXHIBIT 3**

**Rights Offering Procedures**

## EXHIBIT 3

**Rights Offering Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| In re: | : |
|  | : **Chapter 11** |
| **SUNEDISON, INC.,** *et al.,* | : |
|  | : **Case No. 16-10992 (SMB)** |
| **Debtors.**[1] | : |
|  | : **(Jointly Administered)** |
|  | : |

---

## RIGHTS OFFERING PROCEDURES FOR HOLDERS OF ALLOWED SECOND LIEN CLAIMS

---

   Capitalized terms used herein without definition have the meanings given in the Plan (as defined below).  The Rights Offering and the issuance of each Rights Offering Share are being conducted under the Plan.

   The Rights Offering Shares are being distributed and/or issued without registration under the Securities Act of 1933, as amended (the "Securities Act").

   None of the Rights distributed in connection with these Rights Offering Procedures or any Rights Offering Shares have been or will be registered under the Securities Act, nor under any state or local law requiring registration for the offer and/or sale of a security, and no Rights may be sold, transferred, assigned, pledged, hypothecated,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Rights, the Allowed Second Lien Claims or the Rights Offering Shares) (each of the above, a "<u>Transfer</u>") except in compliance with the applicable registration requirements of the Securities Act and applicable state or local laws and the terms of that certain Commitment Agreement, dated as of May [_], 2017, by and between SunEdison, Inc. ("<u>SunE</u>") and each Backstop Purchaser thereto (as may be amended, the "<u>Commitment Agreement</u>").

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.

On [•], 2017, the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") entered the *Order (A) Approving The Adequacy Of The Debtors' Disclosure Statement; (B) Approving Solicitation And Notice Procedures With Respect To Confirmation Of The Debtors' Joint Proposed Plan; (C) Approving The Form Of Various Ballots And Notices In Connection Therewith; And (D) Scheduling Certain Dates With Respect Thereto* [Docket No. [•]] (the "<u>Disclosure Statement Approval Order</u>") that, among other things, (a) approved the adequacy of the Disclosure Statement for the Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates [Docket No. 2672] (as may be amended from time to time and including all exhibits and supplements thereto, the "<u>Disclosure Statement</u>") filed in support of the *Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates* [Docket No. 2671] (as amended from time to time and including all exhibits and supplements thereto, the "<u>Plan</u>") and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>" and, together with their non-Debtor affiliates, "<u>SunEdison</u>" or the "<u>Company</u>") to solicit acceptances or rejections of the Plan from Holders of Impaired Claims who are (or may be) entitled to receive distributions under the Plan.

On [•], 2017, the Bankruptcy Court entered an order (the "<u>Rights Offering Procedures Order</u>") approving, among other things, these procedures (including all exhibits, annexes and attachments hereto)  (the "<u>Rights Offering Procedures</u>") for the conduct of, and participation in, the Rights Offering (defined below).

Before electing to participate in the Rights Offering, all Eligible Holders should review the Disclosure Statement (including the risk factors described in the section entitled *"Risk Factors to be Considered"*) and the Plan, and, in each case, any amendments, supplements or other modifications thereto, in addition to these Rights Offering Procedures and the instructions contained in the Rights Exercise Form. A copy of the Disclosure Statement is available from the Rights Offering Agent and on the Debtors' restructuring website <u>https://cases.primeclerk.com/sunedison</u>.  Holders of Rights may wish to seek legal advice concerning the Rights Offering.

**These Rights Offering Procedures and any and all exhibits, annexes and attachments hereto, and documents referenced herein, should be read carefully and the instructions therein must be strictly followed. The risk of non-delivery of any documents sent or payments remitted to the Rights Offering Agent or escrow agent in connection with the exercise of Rights or the revocation (if permitted) of any exercise of Rights lies solely with Eligible Holders, and shall not fall on the Debtors, Reorganized Debtors, the Company, any Backstop Party or any of their respective officers, directors, employees, agents or legal or financial advisors, including the Rights Offering Agent, under any circumstance whatsoever.**

## A.    Overview of the Rights Offering[2]

The Debtors are offering to Eligible Holders (as defined below) of Allowed Second Lien Claims the rights (the "Rights") to (a) purchase the new common stock ("New SunE Common Stock") of Reorganized SunEdison Inc. (the "Issuer"), (b) purchase Class A shares (the "Continuing TERP Class A Shares") of TerraForm Power, Inc. ("TERP") available as a result of the merger of TERP and BRE TERP Holdings Inc. (the "TERP Merger"), and (c) have a portion of their respective Allowed Second Lien Secured Claims reinstated as new debt of the Issuer and its subsidiaries subject to the Reinstated Second Lien Modification Terms in the same proportion as they will hold New SunE Common Stock on the Effective Date (i.e., if a participant would receive 2% of New SUNE Common Stock, such participant would hold 2% of Reinstated Second Lien Claims).[3]   The shares of New SunE Common Stock and Continuing TERP Class A Shares issuable in connection with the Rights Offering are collectively referred to as the "Rights Offering Shares."

To the extent set forth in the Plan, each Eligible Holder of an Allowed Second Lien Secured Claim as of the Rights Offering Record Date (as defined below) has the right, but not the obligation, to participate in the Rights Offering in accordance with the terms and conditions of these Rights Offering Procedures.  Holders who are not Eligible Holders shall not be permitted to participate in the Rights Offering.  Non-Eligible Holders of Allowed Second Lien Claims will be entitled to their Pro Rata share of the Second Lien Secured Claim Distribution to holders of Allowed Second Lien Secured Claims under Article 4.1 of the Plan.

Eligible Holders of Allowed Second Lien Claims shall have the right to subscribe for their Pro Rata portion of the Rights Offering Shares based on such Holder's Allowed Second Lien Claim amount as a percentage of all Allowed Second Lien Claims as of the Rights Offering Record Date.  Rights allocated to Holders of Allowed Second Lien Claims will be calculated based on the full principal amount of such Holders' Allowed Second Lien Claims (which, for the avoidance of doubt, is inclusive of any Second Lien Deficiency Claims).  Only Eligible Holders of Allowed Second Lien Claims that exercise Rights in the Rights Offering will have a

---

[2]   The summaries of the Rights Offering and Plan provisions contained herein are qualified in their entirety by reference to the provisions of the Plan.

[3]   The reinstatement of Allowed Second Lien Secured Claims of Rights Offering participants that exercise their Rights will be independent from and in addition to the reinstatement of Allowed Second Lien Secured Claims pursuant to the Plan distribution to Holders of Allowed Second Lien Secured Claims in Article 4.1 of the Plan.

proportional amount of their Allowed Second Lien Claims reinstated pursuant to the Reinstated Second Lien Modification Terms. Only Holders of Second Lien Claims as of the Rights Offering Record Date may participate in the Rights Offering.

The Rights may be transferred _only_ together with the Second Lien Claims with respect to which they were issued, as described below.

In connection with the Rights Offering, each of the Backstop Purchasers has committed, severally, and not jointly, to backstop the Rights Offering such that all Rights will be exercised and all Rights Offering Shares will be purchased in accordance with the terms and subject to the conditions of the Commitment Agreement and the Plan.

The Rights may only be exercised by Eligible Holders. Each participating Eligible Holder will be entitled, upon the exercise of its Rights and in accordance with the terms and subject to the conditions of the Plan and these Rights Offering Procedures, to purchase the Rights Offering Shares at the Purchase Price per New Unit (each, as defined in the Commitment Agreement).

An Eligible Holder of an Allowed Second Lien Claim may exercise its Rights by (i) timely completing and delivering the documentation described in these Rights Offering Procedures, (ii) timely delivering payment of the aggregate Funding Amount (as defined below) for such Rights to the Closing Date Escrow Account (as defined below), and (iii) otherwise complying with these Rights Offering Procedures.

The Debtors have designated Prime Clerk, Inc. ("Prime Clerk") as the Rights Offering Agent for the Rights Offering (the "Rights Offering Agent").

_Eligibility to Participate in Rights Offering_

Only Eligible Holders may participate in the Rights Offering.  An "Eligible Holder" means a Person that—

(i)     is Holder of an Allowed Second Lien Claim as of the Rights Offering Record Date;

(ii)    is either (A) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (B) an "institutional accredited investor" (an "IAI") within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act or an entity in which all of the equity investors are IAIs; and

(iii)   timely and properly submits the Rights Exercise Form affirmatively certifying that they are an Accredited Investor in accordance with the Rights Offering Procedures set forth below in Section B.4.

*Rights Offering Shares*

        The number of Rights Offering Shares issuable upon the exercise of each right at the Purchase Price shall be determined such that the exercise of all Rights would result in gross cash proceeds of up to $213.75 million (subject to increase to $225 million in accordance with the Commitment Agreement). The Purchase Price for each New Unit comprising the Rights Offering Shares shall be calculated such that the Continuing TERP Class A Shares and the New SunE Common Stock distributed or issued, as applicable, pursuant to the Rights Offering and the Direct Equity Commitment together constitute 90% of the aggregate Continuing TERP Class A Shares and New SunE Common Stock distributed or issued, as applicable, under the Plan (with the number of shares of New SunE Common Stock issued thereunder to be equal to (as close as is practicable) the number of Continuing TERP Class A Shares received by Issuer in the TERP Merger).

        At the commencement of the Rights Offering, for purposes of calculating an Eligible Holders' Funding Amount, the Maximum Purchase Price (calculated in accordance with such Eligible Holder's Rights Exercise Form) such Eligible Holder may elect to exercise will be calculated such that the exercise of all Rights will result in gross cash proceeds of $225 million. If the Company's Pre-Emergence Cash Need (as defined in the Commitment Agreement) is determined to be less than $300 million (in accordance with the Commitment Agreement), then within five (5) Business Days of the Effective Date, the Rights Offering Agent shall return any excess to the Rights Offering participants on a pro rata basis (based on their aggregate Funding Amount), in each case, by wire transfer of immediately available funds.

*Treatment of Second Lien Claims Under the Plan*

        <u>*Second Lien Claims*</u>. Under the Plan, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata portion of the Second Lien Secured Claim Distribution. In addition to the foregoing, in the TERP Share Election Alternative (as opposed to the TERP Cash Election Alternative), each Eligible Holder of an Allowed Second Lien Secured Claim shall receive, in addition to any other Second Lien Secured Claim Distribution as set forth in the Plan, its Pro Rata portion of the Rights. For the avoidance of doubt, the Debtors will only elect the TERP Cash Election Alternative if they do not receive a commitment to fully backstop the Rights Offering or if the Commitment Agreement is not approved by the Bankruptcy Court or is terminated prior to the date that the Debtors need to make their election.

        Thus, to the extent set forth in the Plan, Eligible Holders of Allowed Second Lien Claims shall be allocated the right to subscribe for up to 100% of all Rights Offering Shares (which, if subscribed in full, shall result in gross cash proceeds of up to $213.75 million (subject to increase to $225 million)).

**B.    Rights Offering Procedures**

**These Rights Offering Procedures should be read carefully before electing to exercise the Rights, as strict compliance with their terms is required.**

1.    *Subscription Period*

The Rights Offering will commence on [the later of June 1, 2017 or on the date on which the solicitation of votes to approve the Plan is commenced in accordance with the Disclosure Statement Order] (the "Commencement Date") and will expire at 4:00 p.m. (prevailing Eastern Time) on [July 10], 2017 (the "Rights Offering Expiration Date"), or such later date as the Debtors may specify in a notice provided to Eligible Holders no later than 4:00 p.m. (prevailing Eastern Time) on the Business Day immediately prior to the then-effective Rights Offering Expiration Date.  The Debtors may extend the Rights Offering Expiration Date, from time to time, with the reasonable consent of the Requisite Purchasers.

The period beginning on the Commencement Date and ending at the Rights Offering Expiration Date is referred to as the "Rights Offering Period."

In order to participate in the Rights Offering, each Eligible Holder must satisfy all conditions and requirements set forth in these Rights Offering Procedures (including any attached exhibit, annex or attachment or other document referenced in these Rights Offering Procedures). If an Eligible Holder does not satisfy all such conditions and requirements prior to the Rights Offering Expiration Date, such Eligible Holder shall be deemed to have forever and irrevocably relinquished and waived the right to participate in the Rights Offering and any Rights distributed to such Eligible Holder pursuant to the Plan shall be forefeited without any further action by the Company and, to the extent that any such holder has paid the Funding Amount with respect to such cancelled Rights, the Rights Offering Agent shall refund such amounts to such subscribing holder.

2.    *Rights Offering Documents*

On the Commencement Date, the Rights Offering Agent will provide to each Holder of an Allowed Second Lien Claim, or its Nominee (defined below), as applicable: (i) these Rights Offering Procedures, together with all exhibits and attachments hereto, and (ii) a form (attached hereto as Annex B) for Eligible Holders to exercise their Rights (the "Rights Exercise Form").

Please note that Eligible Holders that hold Allowed Second Lien Senior Notes Claims through a broker, dealer, commercial bank, trust company or other nominee ("Nominee") must deliver the Rights Exercise Form to the applicable Nominee(s) instead of the Rights Offering Agent. All Rights Exercise Forms of Allowed Second Lien Senior Notes Claims held through a Nominee must be delivered to the applicable Nominee in sufficient time to allow such Nominee to process and deliver the Rights Exercise Form to the Rights Offering Agent and appropriate funding to the Closing Date Escrow Account prior to the Rights Offering Expiration Date.

3.    *Valid Exercise*

In order to validly exercise its Rights, during the Rights Offering Period, an Eligible Holder must:

(i)      timely return the duly completed and signed Rights Exercise Form (each of which must be completed and returned in whole and not in part) to the Rights Offering Agent or its Nominee, as applicable, electing to exercise all or a portion of its Rights (the "Exercised Rights"); and

(ii)     deliver or arrange for delivery, via wire transfer of immediately available funds in U.S. dollars to the applicable account indicated in the Rights Exercise Form (such account, the "Closing Date Escrow Account"), the full Purchase Price for the Rights Offering Shares to be issued to such Eligible Holder upon valid exercise of its Rights as calculated in accordance with such Eligible Holder's Rights Exercise Form (the "Funding Amount").

With respect to (i) and (ii) above, any Eligible Holder that holds Allowed Second Lien Senior Notes Claims through a Nominee must duly complete, execute and return its Rights Exercise Form in accordance with the instructions herein **directly to its Nominee** (or otherwise in accordance with the instructions of its Nominee) in sufficient time to allow the Nominee to process the instructions and deliver the completed Rights Exercise Form to the Rights Offering Agent.  Any Eligible Holder that does not hold an Allowed Second Lien Claim through a Nominee (*e.g.*, Holders of Allowed Second Lien Loan Claims) must deliver its duly completed and executed Rights Exercise Form directly to the Rights Offering Agent.  All Eligible Holders must deliver or arrange for delivery the Funding Amount to the Closing Date Escrow Account on or before the Rights Offering Expiration Date.

4.      *Failure to Exercise Subscription Rights*

**Unexercised Rights will be forfeited at the Rights Offering Expiration Date**. An Eligible Holder will be deemed to have relinquished and waived its Rights if the Rights Offering Agent for any reason does not receive from such Eligible Holder, prior to the Rights Offering Expiration Date, (a) a duly completed and executed Rights Exercise Form, and (b) the Funding Amount.

Any attempt to exercise any Rights at or after the Rights Offering Expiration Date will be null and void and the Debtors are not required to honor any Rights Exercise Form or other documentation received by the Rights Offering Agent relating to any purported exercise of Rights at or after the Rights Offering Expiration Time, regardless of when such Rights Exercise Form or other documentation was sent.

Delivery by the Rights Offering Agent of the Rights Exercise Form and these Rights Offering Procedures to the Nominees reflected on the securities position report provided by DTC as of the Rights Offer Record Date (with instructions to forward such documents to the Nominees' beneficial holder clients) shall constitute valid and sufficient delivery of such documents, and satisfy the obligations of the Rights Offering Agent with respect thereto. Nominees may utilize an agent to distribute the Rights Exercise Form and these procedures to their beneficial holder clients and seek reasonable reimbursement of the costs associated therewith by submitting a timely invoice to the Rights Offering Agent.

**The method of delivery of the Rights Exercise Form and any other required documents, and delivery of the Funding Amount by each Eligible Holder is at such Eligible Holder's option and sole risk, and delivery will be considered made only when such Rights Exercise Form and other documentation are actually received by the Rights Offering Agent and such Funding Amount is actually received in the Closing Date Escrow Account. If delivery of the Rights Exercise Form and any other required documents is by mail, the use of registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. Rights Exercise Forms and other required documents will not be accepted by telecopy, facsimile, email or other electronic means. In all cases, you should allow sufficient time to ensure timely delivery prior to the Rights Offering Expiration Date. To the extent any Allowed Claim is held through a Nominee, the Holder thereof should allow sufficient time to obtain the proper certifications from its Nominee.**

        5.     *No Fractional New Securities*

No fractional Rights Offering Shares will be issued. All Rights Offering Shares issued in connection with the Rights Offering will be rounded down to the nearest whole share. No compensation will be paid in respect of such adjustment.

**C.     Defects, Disputes, Waivers**

        1.     *Defects*

Rights Exercise Forms and other required documentation will be deemed not to have been properly completed until all defects and irregularities have been waived or cured within such time as the Debtors determine in their reasonable discretion and in good faith. The Debtors reserve the right, in consultation with the Requisite Purchasers, but are under no obligation, to give notice to any Eligible Holder regarding any defect or irregularity in connection with any purported exercise of Rights by such Eligible Holder; provided, however, that none of the Debtors, Reorganized Debtors, the Backstop Parties, and each of their respective affiliates, officers, directors, counsel and advisors nor the Rights Offering Agent shall incur any liability for any failure to give such notification.

        2.     *Disputes*

Any and all disputes concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be addressed in good faith by the Debtors and Rights Offering Agent, in consultation with the Requisite Purchasers (as defined in the Commitment Agreement), which parties shall incur no liability in connection with such determinations. Any determination made with respect to such disputes shall be final and binding.

        3.     *Waivers*

The Debtors, with the reasonable consent of the Requisite Purchasers, may (i) waive any defect or irregularity in any Rights Exercise Form or other required documentation, or permit such a defect or irregularity to be corrected, within such times as the Debtors may determine, with the reasonable consent of the Requisite Purchasers, to be appropriate, or (ii)

reject the purported exercise of any Rights for which the exercise thereof and/or payment of the Rights Offering Payment includes defects or irregularities.

## D.     Rights Offering Funds

### 1.     *Rights Offering Escrow*

Funds (the "Rights Offering Funds") paid in connection with an Eligible Holder's exercise of Rights pursuant to these Rights Offering Procedures will be deposited when transferred and held in the Closing Date Escrow Account, pending the release from the Closing Date Escrow Account on the Effective Date, which account will be (a) separate and apart from the escrow agent's general operating funds and from any other funds subject to any lien or any cash collateral arrangements and (b) maintained for the sole purpose of holding the Rights Offering Funds for administration of the Rights Offering. Neither the Rights Offering Agent nor the escrow agent will use the Rights Offering Funds for any purpose other than to release such funds as mutually directed by the Debtors and the Requisite Purchasers pursuant to the Plan and neither will encumber or permit the Rights Offering Funds to be encumbered by any lien or similar encumbrance. No interest will be paid to any Eligible Holder on account of the Rights Offering Funds or other amounts paid in connection with the exercise of their Rights under any circumstances. The Rights Offering Funds will not be property of the Debtors' estates until such times, and in such amounts, as such Rights Offering Funds are to be released from the Closing Date Escrow Account in accordance with the Plan and these Rights Offering Procedures.

In the event that the Rights Offering Agent or the escrow agent receives more funds from an Eligible Holder than such person's Funding Amount, then such funds, to the extent of such overpayment, will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days after such determination is made or after the Effective Date.

### 2.     *Rights Offering Conditioned on Plan Confirmation; Return of Rights Offering Funds*

All exercises of Rights are subject to and conditioned upon confirmation of the Plan and the occurrence of the Effective Date under the Plan.  In the event that the Rights Offering is terminated for any reason, the Debtors will provide all Eligible Holders who subscribed to the Rights Offering written notice of such termination, and all Rights Offering Funds held by the Rights Offering Agent will be refunded, without interest, to each respective Eligible Holder as soon as reasonably practicable, but in any event within six (6) Business Days after the notice of termination.

## E.     Rights Offering Record Date

### 1.     *Transfers Not Recognized After the Record Date*

From and after [May 27], 2017 (the "Rights Offering Record Date"), any transfers of Allowed Second Lien Claims (or beneficial interests therein) shall be disregarded for purposes of participation in the Rights Offering. Distribution of Rights will only be made to Eligible Holders of record of Allowed Second Lien Claims as of the Rights Offering Record Date, and the

Debtors shall have no obligation to make any distribution to any person who was not an Eligible Holder of record of Allowed Second Lien Claims as of the Rights Offering Record Date.

**Each Right may only be exercised by the person who, on the Rights Offering Record Date, is the Eligible Holder of the Allowed Second Lien Claim in respect of which such Right was distributed. If any such Second Lien Claim is transferred to any Person from or after the Rights Offering Record Date, the Rights corresponding to such Claim may not be exercised by such transferee nor will such transferee receive any consideration in respect of such Rights.**

**Following the Rights Offering Record Date, if any Second Lien Claims are transferred to any other Person, the Rights corresponding to such Claim may not be exercised by such transferee, who will not be entitled to any distribution of Rights and will not receive any consideration therefor. Under the Plan, such Second Lien Claims shall only entitle the Holder thereof to be a Holder of record for the distribution of New SunE Common Stock or Continuing Class A Term Shares as of the record date for such distribution pursuant to the terms of the Plan.**

2.      *No Transfer of Rights*

The Rights are not detachable or separately transferable from the Allowed Second Lien Claims.  The Rights of Eligible Holders may not be sold, transferred, or assigned except in connection with the transfer of all or a portion of the underlying Claim prior to the Rights Offering Record Date.  To the extent any Second Lien Claim is transferred subsequent to the Rights Offering Record Date, the attached Rights with respect to those Claims may no longer be exercised.

3.      *No Revocation Except in Limited Circumstances*

**Once an Eligible Holder has properly exercised its Rights, such exercise will not be permitted to be revoked, withdrawn, or cancelled except in the limited circumstances set forth.**

If the Effective Date has not occurred on or before October 31, 2017 (the "Revocation Date"), an Eligible Holder shall be permitted to revoke such exercise after the Revocation Date, so long as the Effective Date has not occurred; provided, however, that if the Requisite Purchasers agree to extend the deadline set forth in Section 9(vi) of the Commitment Agreement, the Revocation Date shall be extended by the same period of time of the extension of the deadline in Section 9(vi) of the Commitment Agreement (i.e., if the deadline in Section 9(vi) of the Commitment Agreement is extended by 15 days, the Revocation Date shall be extended by 15 days).  An Eligible Holder electing to revoke the exercise of its Rights must deliver written notice to the Subscription Agent at least three (3) business days prior to the Effective Date (i) stating that the Eligible Holder revokes its Rights, (ii) stating the type and number of Rights being revoked, and (iii) certifying that the Rights being revoked are the only Rights exercised by such Eligible Participant (the "Revocation Notice").  Upon receipt of a properly completed and timely returned Revocation Notice by an Eligible Holder, the Rights Offering Agent or escrow agent, as applicable, will use its reasonable efforts to return as promptly as practicable the Rights

Offering Funds of such Eligible Holder and held in the Closing Date Escrow Account, without any interest. If any Rights exercise is revoked as provided in this paragraph, such Rights may no longer be exercised, and will become null and void upon such revocation.

**The delivery of a Revocation Notice is at the Eligible Holder's risk. Eligible Holders should take appropriate steps to ensure that the Revocation Notice is properly completed, duly executed and delivered to the Rights Offering Agent as described above. Incomplete or unsigned forms will not be accepted and, therefore, will not result in the revocation of an election to exercise Rights.**

**F.       Exemption From Securities Act Registration; Absence of Listing**

The Rights Offering Shares to be issued or distributed in connection with the Rights Offering shall be issued or distributed pursuant to the exemption provided under section 4(a)(2) of the Securities Act, and such shares will be "restricted shares," which may not be sold or transferred in the absence of an effective registration statement under the Securities Act or an available exemption from registration thereunder.

**Please refer to Section VI.F.11 "Exemptions from Securities Act Registration Requirements," and Section VIII.G.2 "Reliance on Exemptions from Registration Under the Securities Act" of the Disclosure Statement for a more detailed discussion regarding the applicability of federal and state securities laws to the Rights Offering.**

The Rights will not be listed on any national securities exchange or listed or quoted in any over-the-counter market.

**G.       Reservation of Rights; Amendments**

Notwithstanding anything contained herein, the Disclosure Statement or the Plan to the contrary, the Debtors, with the reasonable consent of the Requisite Purchasers, may amend or modify these Rights Offering Procedures, or adopt additional procedures consistent with the provisions of these Rights Offering Procedures and the Commitment Agreement, as applicable, to effectuate the Rights Offering or more efficiently administer the Rights Offering or make such other changes to the Rights Offering, including the criteria for eligibility to participate in the Rights Offering, as necessary in the Debtors' or Reorganized Debtors' business judgment. In so doing, the Debtors may execute and enter into agreements and take further action that the Debtors (with the reasonable consent of the Requisite Purchasers) determine in good faith are necessary and appropriate to effect and implement the Rights Offering. Nothing in this paragraph shall be construed to permit the Debtors to modify the terms of the Commitment Agreement or the Rights Offering Procedures without the consent of the Requisite Purchasers, as provided for therein and herein.

**H.       Inquiries and Documentation**

Questions relating to these Rights Offering Procedures or any of the requirements for exercising Purchase Rights or otherwise participating in the Rights Offering should be directed to the Rights Offering Agent at:

SunE Rights Offering
c/o Prime Clerk, Inc.
830 Third Avenue, 3rd Floor
New York, NY 10022
(855) 388-4575
sunedisonsubscription@primeclerk.com

All documents relating to the Rights Offering are available from the Rights Offering Agent at these addresses.  In addition, these documents, together with all filings made with the Bankruptcy Court by the Debtor, are available free of charge from the Debtor's restructuring website: https://cases.primeclerk.com/sunedison.

## Annex B

**Second Lien Claims Rights Exercise Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **SUNEDISON, INC.,** *et al.,* | : | **Case No. 16-10992 (SMB)** |
|  | : |  |
| **Debtors.**[1] | : | **(Jointly Administered)** |
|  | : |  |

**INSTRUCTIONS TO RIGHTS EXERCISE FORM FOR ELIGIBLE HOLDERS OF SECOND LIEN CLAIMS FOR THE RIGHTS OFFERING IN CONNECTION WITH THE JOINT PLAN OF REORGANIZATION OF SUNEDISON, INC. AND ITS DEBTOR AFFILIATES**

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THE RIGHTS EXERCISE FORM CAREFULLY BEFORE COMPLETING THE RIGHTS EXERCISE FORM.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

> **IN ORDER FOR YOU TO PARTICIPATE IN THE RIGHTS OFFERING, THIS RIGHTS EXERCISE FORM MUST BE RECEIVED BY THE RIGHTS OFFERING AGENT AND PAYMENTS OF THE FUNDING AMOUNT MUST BE RECEIVED IN THE CLOSING DATE ESCROW ACCOUNT, IN EACH CASE PRIOR TO THE RIGHTS OFFERING EXPIRATION DATE.**
>
> **THE RIGHTS OFFERING EXPIRATION DATE IS [●], 2017 AT 4:00 P.M. (PREVAILING EASTERN TIME)**

On [●], 2017, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered the *Order (A) Approving The Adequacy Of The Debtors' Disclosure Statement; (B) Approving Solicitation And Notice Procedures With Respect To Confirmation Of The Debtors' Joint Proposed Plan; (C) Approving The Form Of Various Ballots And Notices In Connection Therewith; And (D) Scheduling Certain Dates With Respect Thereto* [Docket No. [●]] (the "**Disclosure Statement Approval Order**") that, among other things, (a) approved the adequacy of the *Disclosure Statement for the First Amended Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates* [Docket No. 2672] (as may be amended from time to time and including all exhibits and supplements thereto, the "**Disclosure Statement**") filed in support of the *Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates* [Docket No. 2671] (as amended from time to time and including all exhibits and supplements thereto, the "**Plan**") and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**SunEdison**" or the "**Company**") to solicit acceptances or rejections of the Plan from Holders of Impaired Claims who are (or may be) entitled to receive distributions under the Plan.

On [●], 2017, the Bankruptcy Court entered an order (the "Rights Offering Procedures Order") approving, among other things, these procedures (including all exhibits, annexes and attachments hereto) (the "Rights Offering Procedures") for the conduct of, and participation in, the Rights Offering (defined below).

Enclosed herein is a copy of the Rights Offering Procedures.[2] The Disclosure Statement and the Plan, and, in each case, any amendments, supplements or other modifications thereto, along with the Rights Offering Procedures, the Disclosure Statement Order, and the Rights Offering Order can be accessed via the Debtors' restructuring information website, http://cases.primeclerk.com/sunedison. If you desire paper copies of any of the foregoing, you may contact the Rights Offering Agent, Prime Clerk LLC at:

SUNE Rights Offering
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022
(855) 388-4575
sunedisonsubscription@primeclerk.com

---

[2]    In the event of any inconsistency between these instructions and the Rights Offering Procedures, the Rights Offering Procedures shall control.

**You are advised to read the Plan and the Disclosure Statement, and, in each case, any amendments, supplements or other modifications thereto, along with the Rights Offering Procedures, prior to making a determination with respect to participation in the Rights Offering.**

Only Eligible Holders of Allowed Second Lien Claims are entitled to participate in the Rights Offering, as further described in the Rights Offering Procedures. A Holder of an Allowed Second Lien Claim is an "Eligible Holder" if (among other things) such Holder certifies that it is (i) either (A) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), or (B) an "institutional accredited investor" (an "IAI") within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act or (ii) an entity in which all of the equity investors are IAIs. Holders who are not Eligible Holders as of the Rights Offering Record Date shall not be permitted to participate in the Rights Offering.

You have received the attached Rights Exercise Form because you are a Holder of an Allowed Second Lien Claim as of the Rights Offering Record Date. Please utilize the attached Rights Exercise Form to participate in the Rights Offering. To elect to participate in the Rights Offering, you must (a) duly complete in full, execute and return this Rights Exercise Form and any other documents referenced herein to the Rights Offering Agent so as to be received by the Rights Offering Agent no later than the Rights Offering Expiration Date, and (b) fund the full Funding Amount for exercised Rights (as calculated in Item 5 below) by wire transfer so as to be received in the Closing Date Escrow Account no later than the Rights Offering Expiration Date (collectively, the "Rights Offering Deliveries"). You may return this Rights Exercise Form in the enclosed pre-addressed envelope, via email to the Rights Offering Agent at sunedisonsubscription@primeclerk.com, or via another approved return method.

If you are a Holder of Second Lien Senior Notes, you must provide the Nominee holding your Second Lien Senior Notes with sufficient time to allow your Nominee to complete the Nominee Certification included herein on your behalf and deliver it to the Rights Offering Agent no later than the Rights Offering Expiration Date. If your Second Lien Senior Notes are held through more than one Nominee, please have each Nominee complete a Nominee Certification for the respective Second Lien Senior Notes held.

**Your election to participate in the Rights Offerings will not be permitted to be revoked until October 31, 2017 (the "Revocation Date"), if the Plan has not taken effect on or before such date. Thereafter you shall be permitted to revoke such exercise so long as the Plan has not taken effect; provided, however, that if the Requisite Purchasers agree to extend the deadline set forth in Section 9(vi) of the Commitment Agreement, the Revocation Date shall be extended by the same period of time of the extension of the deadline in Section 9(vi) of the Commitment Agreement (i.e., if the deadline in Section 9(vi) of the Commitment Agreement is extended by 15 days, the Revocation Date shall be extended by 15 days). After the Revocation Date, if the Plan has not taken effect, in order to revoke the exercise of your Rights, you must deliver written notice to the Rights Offering Agent at least three (3) business days prior to the Effective Date (i) stating that you revoke your rights, (ii) stating the type and number of Rights being revoked, and (iii) certifying that the Rights being revoked are the only Rights exercised you have exercised (the**

3

**"Revocation Notice"). Upon receipt of your properly completed and timely returned Revocation Notice, the Rights Offering Agent or escrow agent, as applicable, will use its reasonable efforts to return as promptly as practicable the funds you have transmitted to exercise your Rights without any interest. If any Rights exercise is revoked as provided in this paragraph, such Rights may no longer be exercised, and will become null and void upon such revocation.**

**The delivery of a Revocation Notice is at the Eligible Holder's risk. Eligible Holders should take appropriate steps to ensure that the Revocation Notice is properly completed, duly executed and delivered to the Rights Offering Agent as described above. Incomplete or unsigned forms will not be accepted and, therefore, will not result in the revocation of an election to exercise Rights.**

This Rights Exercise Form must indicate a Funding Amount based on your desired participation rate in the Rights Offering (as calculated in Item 2 below), which must be paid by wire transfer of immediately available funds in U.S. dollars (to the Closing Date Escrow Account) so as to be received by the Rights Offering Agent no later than the Rights Offering Expiration Date.

<u>Questions</u>. If you have any questions about this Rights Exercise Form or the procedures described herein, please contact the Rights Offering Agent by (i) calling the Debtors' restructuring hotline at (855) 388-4575; or (ii) emailing the Rights Offering Agent at sunedisonsubscription@primeclerk.com.

<u>Important Transfer Restriction</u>. The Rights may not be sold, transferred, or assigned. Only an Eligible Holder as of the Rights Offering Record Date may exercise the Rights.

**Participation by Holders of Allowed Second Lien Claims in the Rights Offering hereunder is voluntary and is limited to Holders of Allowed Second Lien Claims that are Eligible Holders.**

**If the Rights Offering Deliveries are not received by the Rights Offering Agent by the Rights Offering Expiration Date, your unexercised Rights will automatically be relinquished, and you shall have no further interest in the Rights.**

To subscribe for the Rights Offering Shares pursuant to the Rights Offerings:

1. <u>Review and confirm</u> the amount of your Allowed Second Lien Claim as of the Rights Offering Record Date as set forth in Items 1.

2. <u>Complete</u> Item 2, indicating the Funding Amount you wish to fund to purchase the Rights Offering Shares.

3. <u>Complete</u> the wire instructions in Item 4.

4. <u>Complete</u> the Rights Offering Shares registration information in Item 6.

5.      <u>Read</u> and complete the certification, representations, warranties, and covenants in Item 7.

6.      <u>Complete</u> the certification in Item 8.

7.      <u>Return</u> the Rights Exercise Form in the enclosed pre-addressed envelope, via email to the Rights Offering Agent at <u>sunedisonsubscription@primeclerk.com</u>, or via another approved return method so that it is **actually** **received** by the Rights Offering Agent prior to the Rights Offering Expiration Date.

8.      If you are a Holder of Second Lien Senior Notes, <u>return</u> the Rights Exercise Form to your Nominee by mail, electronic mail, or otherwise in accordance with the instructions of your Nominee in sufficient time for your Nominee to complete the Rights Exercise Form and return it to the Rights Offering Agent so that it is **actually** **received** by the Rights Offering Agent prior to the Rights Offering Expiration Date.

9.      If you are a Holder of Second Lien Senior Notes, <u>instruct</u> your Nominee to (a) complete the Nominee Confirmation of Ownership or DTC Information, as applicable, in Item 9 and (b) return this Rights Exercise Form to the Rights Offering Agent no later than the Rights Offering Expiration Date  The Rights Exercise Form may be submitted to the Rights Offering Agent by email to: <u>sunedisonsubscription@primeclerk.com</u>, or by mail to:

SUNE Rights Offering
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

10.     <u>Pay</u> the Funding Amount to the Rights Offering Agent in accordance with the instructions in Item 2 so that it is **actually** **received** prior to the Rights Offering Expiration Date.

11.     <u>Return</u> your W-8 or W-9, as applicable, to the Rights Offering Agent so that it is **actually** **received** on or before the Rights Offering Expiration Date pursuant to Item 6.

5

**RIGHTS EXERCISE FORM FOR ELIGIBLE HOLDERS OF SECOND LIEN CLAIMS
FOR THE RIGHTS OFFERING IN CONNECTION WITH THE FIRST AMENDED
JOINT PLAN OF REORGANIZATION OF SUNEDISON, INC. AND ITS DEBTOR
AFFILIATES**

**RIGHTS OFFERING EXPIRATION DATE**

**The Rights Offering Expiration Date is 4:00 p.m. (prevailing Eastern Time)
on [●], 2017.**

**Please consult the Rights Offering Procedures for additional
information with respect to this Rights Exercise Form.**

Eligible Holders of Allowed Second Lien Claims are entitled to participate in the Rights Offering, as further described in the Rights Offering Procedures.  To subscribe, read and complete Items 1 to 9 below.

**Item 1. Maximum Rights Offering Amount**

Pursuant to the Rights Offering Procedures, each Eligible Holder of Allowed Second Lien Claims is entitled to participate in the Rights Offering to the extent of such Eligible Holder's proportionate amount of Second Lien Debt.

**1a.** Indicate below the aggregate face amount of your Second Lien Debt as of the Rights Offering Record Date:

$ _____

**1b.** For purposes of the Rights Offering, you have the right to subscribe for Rights Offering Shares offered in the Rights Offering for a maximum purchase price of:

$_____  *  0.375[3]  =  $_____
(Insert aggregate face amount of Second Lien       (Maximum Purchase Price of
Debt in Item 1a)                                    Rights Offering Shares)

---

[3]  Equal to: (i) $300,000,000 (which is the maximum Total Commitment Amount) *divided by* (ii) $600,000,000 (which is the total aggregate face amount of Second Lien Debt outstanding on the Rights Offering Record Date) *multiplied by* (iii) 0.75 (which is the portion of the equity allocated to the Rights Offering).

**Item 2.  Rights Offering Election**

As Eligible Holder, you agree to purchase (on an irrevocable basis, but subject to the Rights Offering Procedures):

$_____
**Funding Amount**

(cannot exceed Maximum Purchase Price in Item 1b)

**At the commencement of the Rights Offering, for purposes of calculating an Eligible Holders' Funding Amount, the Maximum Purchase Price (calculated in accordance with such Eligible Holder's Rights Exercise Form) such Eligible Holder may elect to exercise will be calculated such that the exercise of all Rights will result in gross cash proceeds of $225 million.  If the Company's Pre-Emergence Cash Need (as defined in the Commitment Agreement) is determined to be less than $300 million (in accordance with the Commitment Agreement), then within five (5) Business Days of the Effective Date, the Rights Offering Agent shall return any excess to the Rights Offering participants on a pro rata basis (based on their aggregate Funding Amount), in each case, by wire transfer of immediately available funds.**

**Once the Purchase Price per New Unit (as defined in the Equity Commitment Agreement) is determined, the number of Rights Offering Shares allocable to you based on the Funding Amount you elect (not to exceed the Maximum Purchase Price calculated in Item 1b) will be determined.**  No fractional Rights Offering Shares will be issued.  All Rights Offering Shares issued in connection with the Rights Offering will be rounded down to the nearest whole share.

Notwithstanding anything herein or in any of the Rights Offering documents to the contrary, your final allocation of the Rights Offering Shares shall be finally determined by the Debtors in accordance with the Rights Offering Procedures and the Plan.  Any funds held in the Closing Date Escrow Account pursuant to the Plan and not utilized pursuant to the Rights Offering Procedures, the Plan or otherwise, shall be returned to you in accordance with the terms of the Rights Offering Procedures and the return information provided in Item 4 below.

**Item 3. Payment Instruction.**

Pursuant to your election to exercise your Rights under the Rights Offering, you must make your payment of the Funding Amount set forth in Item 2 above by wire transfer so that it is actually received by the Rights Offering Agent on or before the Rights Offering Expiration Date.

Please have wire transfers delivered to:

Account Name:
Account No.:
CCY:                      USD

2

ABA/Routing No.:
Swift Code:
Bank Name:
Bank Address:

Ref:                          SUNE Rights Offering – [Insert Name of Eligible Holder]

**WE STRONGLY ADVISE YOU TO ALLOW FOR SUFFICIENT TIME FOR THE RIGHTS OFFERING AGENT TO RECEIVE YOUR WIRE ON OR BEFORE THE RIGHTS OFFERING EXPIRATION DATE.  RETURN OF YOUR WIRE BECAUSE IT IS RECEIVED AFTER THE BANK'S DAILY CUTOFF TIME OF 4:30 P.M. (EASTERN TIME) IS AT YOUR OWN RISK.**

**Item 4.  Wire Instructions for Receiving Refund (If Applicable)**

Please provide wire instructions for any refund or return of the Funding Amount to which the Eligible Holder is entitled:

Account Name:          _____

                       _____

Account No.:           _____

Account Address:       _____

ABA/Routing No.:       _____

Bank Name:             _____

Bank Address:          _____

                       _____

Ref:                   _____

**Item 6.  Registration of Rights Offering Shares.**

**Item 6a.** Please indicate on the lines provided below the Registration Name of the Eligible Holder in whose name the Rights Offering Shares should be issued, in the event the Rights Offering Shares are not DTC eligible (it is strongly recommended that the below information be typed to ensure that it is legible):

Registration Line 1  (Maximum 35 Characters):_____

Registration Line 2 (Maximum 35 Characters):_____
(if needed)

Address 1:_____

Address 2:_____

Address 3:_____

3

Address 4:_____

Telephone:_____

Email: _____

**Item 6b.**  DTC Participant for the deposit of Rights Offering Shares, in the event the Rights Offering Shares are DTC eligible:

DTC Participant Name:_____

DTC Participant Number:_____

Beneficial Holder Account Number Reference:_____

DTC Participant Contact Name:_____

DTC Participant Contact Telephone:_____

DTC Participant Contact Email:_____

**Item 7.  Certifications, Representations, Warranties, and Agreements.**

By returning the Rights Exercise Form, you agree, acknowledge, and certify the following:

1.    I certify that (a) I am the holder or the authorized signatory of the holder of the Allowed Second Lien Secured Claim identified in Item 1; (b) I agree to be bound by all the terms and conditions described in the Instructions and as set forth in this Rights Exercise Form; (c) I have obtained a copy of the Rights Offering Procedures and all related documents and agreements and understand that the exercise of Rights pursuant to the Rights Offering are subject to all the terms and conditions set forth in such documents; and (d) I acknowledge that the Debtors, the Reorganized Debtors, the Backstop Purchasers, the Rights Offering Agent, and their respective affiliates and each of their (and their affiliates') respective officers, directors, equity holders, employees, members, managers, agents, attorneys, representatives, and advisors shall have no liability to any other party in interest arising from, or related to such parties' participation in, the transactions contemplated by the Rights Offering and hereby are exculpated from any and all claims, obligations, suits, judgments, damages, rights, liabilities, or causes of action as set forth in Article XI of the Plan.

2.    The holder represents and warrants that (a) to the extent applicable, it is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; and (b) it has the requisite power and authority to enter into, execute and deliver this Rights Exercise Form and to perform its obligations hereunder and has taken all necessary action required for due authorization, execution, delivery and performance hereunder.

3.     The holder agrees that this Rights Exercise Form constitutes a valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.     The holder hereby understands, represents, warrants, covenants and agrees as follows:

(a)     The holder is it is (i) either (A) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or (B) an "institutional accredited investor" (an "<u>IAI</u>") within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act or (ii) an entity in which all of the equity investors are IAIs.

(a)     The Rights Offering Shares are being acquired by the holder for the account of the holder for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof other than as permitted by the organizational documents of the Reorganized Debtors or issuer of the Rights Offering Shares, as applicable, and in compliance with applicable securities laws. No one other than the holder has any right to acquire the Rights Offering Shares being acquired by the holder.

(b)     The holder's financial condition is such that the holder has no need for any liquidity in its investment in the Rights Offering Shares and is able to bear the risk of holding the Rights Offering Shares for an indefinite period of time and the risk of loss of its entire investment in the Rights Offering Shares. The holder (i) is a financial institution or other organization and its representatives are capable of evaluating the merits and risks of acquiring the Rights Offering Shares, or (ii) has knowledge and experience (or the holder has utilized the services of a representative and together they have knowledge and experience) in financial and business matters to be capable of evaluating the merits and risks of holding the Rights Offering Shares and to make an informed decision relating thereto.

(c)     The holder has been given the opportunity to (i) ask questions and receive satisfactory answers concerning the terms and conditions of the Rights Offering and (ii) obtain additional information in order to evaluate the merits and risks of an investment in Rights Offering Shares, and to verify the accuracy of the information contained in the Rights Offering documents.  No statement, printed material or other information that is contrary to the information contained in any Rights Offering document has been given or made by or on behalf of the Debtors, Reorganized Debtors, or the Backstop Purchaser to the holder.

(d)     The holder acknowledges and understands that:

5

(i)      An investment in Rights Offering Shares is speculative and involves significant risks.

(ii)     The Rights Offering Shares will be subject to certain restrictions on transferability as described in the Plan and as a result of the foregoing, the marketability of the Rights Offering Shares may be severely limited.

(iii)    The holder will not transfer, sell, or otherwise dispose of the Rights Offering Shares in any manner that will violate the organizational documents of the Reorganized Debtors or  issuer of the Rights Offering Shares, as applicable, the Securities Act or any state or foreign securities laws or subject the Reorganized Debtors or any of its affiliates to regulation under the rules and regulations of the Securities and Exchange Commission or the laws of any other federal, state, or municipal authority or any foreign governmental authority having jurisdiction thereof.

(iv)    The Rights Offering Shares have not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and are being offered and sold in reliance upon federal, state and foreign exemptions from registration requirements for transactions not involving any public offering. The holder recognizes that reliance upon such exemptions is based in part upon the representations of the holder contained herein.

(v)     Neither the Debtors nor the Reorganized Debtors intend to register as an investment company under the Investment Company Act of 1940, as amended ("Investment Company Act"), and neither the Debtors nor the Reorganized Debtors nor their respective managers, members or partners nor any other person or entity selected to act as an agent of the Debtors or the Reorganized Debtors with respect to managing their affairs, is registered as of the date hereof as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

(e)    The holder is aware that: (i) no federal, state, local, or foreign agency has passed upon the Rights Offering Shares or made any finding or determination as to the fairness of this investment and (ii) data set forth in any Rights Offering Documents or in any supplemental letters or materials thereto is not necessarily indicative of future returns, if any, which may be achieved by the Reorganized Debtors.

5.    The holder hereby acknowledges that the Reorganized Debtors seek to comply with all applicable anti-money laundering laws and regulations.  In furtherance of such efforts, the holder hereby represents and agrees that: (i) no part of the funds used by the holder to acquire the Rights Offering Shares has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (ii) no

6

contribution, or payment to the Reorganized Debtors by the holder shall cause the Reorganized Debtors to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations.  The holder agrees to provide the Reorganized Debtors all information that may be reasonably requested to comply with applicable U.S. law.  The holder agrees to promptly notify the Reorganized Debtors (if legally permitted) if there is any change with respect to the representations and warranties provided herein.

6.      The holder hereby agrees to provide such information and to execute and deliver such documents as may reasonably be necessary to comply with any and all laws, rules and regulations to which the Reorganized Debtors are subject.

7.      The representations, warranties, covenants, and agreements of the holder contained in this Rights Exercise Form will survive the execution hereof and the distribution of the Rights Offering Shares to the holder.

8.      Neither this Rights Exercise Form nor any provision hereof shall be waived, modified, discharged, or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge, or termination is sought except by the Debtors or the Reorganized Debtors in accordance with the Plan and the terms herein.

9.      References herein to a person or entity in either gender include the other gender or no gender, as appropriate.

10.     This Rights Exercise Form may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same agreement.

11.     This Rights Exercise Form and its validity, construction, and performance shall be governed in all respects by the laws of the State of Delaware.

12.     This Rights Exercise Form is intended to be read and construed in conjunction with the Reorganized Debtors' organizational documents, as applicable, and the other Rights Offering documents pertaining to the issuance and/or distribution by Reorganized Debtors of the Rights Offering Shares to the holder.  Accordingly, pursuant to the terms and conditions of this Rights Exercise Form and such related agreements it is hereby agreed that the execution by holder of this Rights Exercise Form, in the place set forth herein, shall constitute agreement to be bound by the terms and conditions hereof and the terms and conditions of the organizational documents of the Reorganized Debtors or issuer of the Rights Offering Shares, as applicable, with the same effect as if each of such separate but related agreement were separately signed.

**Item 6.  Tax Information**

13.     Each holder that is a U.S. person (i.e., a U.S. citizen or resident, a partnership organized under U.S. law, a corporation organized under U.S. law, a limited liability company

organized under U.S. law, or an estate or trust (other than a foreign estate or trust whose income from sources without the U.S. is not includible in the beneficiaries' gross income)), must provide its taxpayer identification number on a signed IRS form W-9 to the Rights Offering Agent.  This form is necessary for the Debtors and the Reorganized Debtors, as applicable, to comply with tax filing obligations to comply with its tax filing obligations and to establish that the holder is not subject to certain withholding tax obligations applicable to non-U.S. persons.  The enclosed W-9 form contains detailed instructions for furnishing this information.

14.    Each holder that is not a U.S. person or resident alien is required to provide information about its status for withholding purposes, generally on form W-8BEN or W-8BEN-E (for most foreign beneficial owners), form W-8IMY (for most foreign intermediaries, flow-through entities, and certain U.S. branches), form W-8EXP (for most foreign governments, foreign central banks of issue, foreign tax-exempt organizations, foreign private foundations, and governments of certain U.S. possessions), or form W-8ECI (for most non-U.S. persons receiving income that is effectively connected with the conduct of a trade or business in the United States).  Each holder that is not a U.S. person should provide the Rights Offering Agent with the appropriate form W-8.  Please contact the Rights Offering Agent if you need further information regarding these forms.  Holders may also access the IRS website (www.irs.gov) to obtain the appropriate form W-8 and its instructions.

**Item 7.  Certification**

By its signature below, the signatory certifies that the information contained in this Rights Exercise Form is true and correct, that he/she read the certification and representations in Item 6, and that the signatory has the authority to execute this Form on behalf of the Eligible Offeree.

Name of Holder: _____
                                              (Print or Type)

Signature: _____

Name of
Signatory: _____

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

**Item 8.**

## FOR SECOND LIEN SENIOR NOTEHOLDERS ONLY:

## NOMINEE'S CONFIRMATION OF OWNERSHIP

### Your ownership (or affiliate status with respect to such owner) of Second Lien Secured Notes must be confirmed to participate in the Rights Offering

The Nominee holding your Second Lien Secured Notes as of [●], 2017 (the "Rights Offering Record Date") must complete Box A on your behalf. Box B is only required if any or all of your Second Lien Secured Notes were on loan as of the Rights Offering Record Date (as determined by your Nominee).

| Box A<br>For Use Only by the Nominee | Box B<br>Nominee Proxy - Only if Needed |
|---|---|
| DTC Participant Name:<br><br>_____ | DTC Participant Name:<br><br>_____ |
| DTC Participant Number:<br>_____ | DTC Participant Number:<br>_____ |
| Principal Amount of the Second Lien Secured Notes (CUSIP 86732Y AN9) that was held by this account as of [●], 2017:<br><br>$_____ principal amount | Principal Amount of Second Lien Secured Notes (CUSIP 86732Y AN9) held on behalf of, and hereby assigned to, the Nominee listed in Box A as of [●], 2017:<br>$_____ principal amount |
| Medallion Guarantee:<br><br><br><br><br><br><br><br><br>Signature:_____ | Medallion Guarantee:<br><br><br><br><br><br><br><br><br>Signature:_____ |
| DTC Participant Contact Name:_____ | DTC Participant Contact Name:_____ |
| Contact Telephone Number:<br>_____ | Contact Telephone Number:<br>_____ |
| Contact Email Address:<br>_____ | Contact Email Address:<br>_____ |

**PLEASE COMPLETE, SIGN, AND DATE THIS RIGHTS EXERCISE FORM AND RETURN IT PROMPTLY TO THE RIGHTS OFFERING AGENT OR YOUR NOMINEE, AS APPLICABLE, BY EMAIL, FIRST CLASS MAIL, VIA OTHER APPROVED RETURN METHOD, OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS OF YOUR NOMINEE (IF APPLICABLE). THE RIGHTS EXERCISE FORM MAY BE SUBMITTED OR RETURNED BY NOMINEE, AS APPLICABLE, TO:**

**SUNE Rights Offering**
**c/o Prime Clerk LLC**
**830 Third Avenue, 3rd Floor**
**New York, NY 10022**
**(855) 388-4575**
**sunedisonsubscription@primeclerk.com**

IF THE RIGHTS OFFERING AGENT DOES NOT **ACTUALLY RECEIVE** THIS RIGHTS EXERCISE FORM AND YOUR FUNDING AMOUNT **ON OR BEFORE THE RIGHTS OFFERING EXPIRATION DATE**, YOU WILL BE DEEMED TO HAVE RELINQUISHED AND WAIVED YOUR RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING