SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC., *et al.*,** | : | **Case No. 16-10992 (SMB)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); TerraForm Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607). Effective June 13, 2017, the address of the Debtors' corporate headquarters is Two City Place Drive, 2nd floor, St. Louis, MO 63141.

**AMENDED NOTICE OF FILING OF SOLICITATION VERSION OF FIRST
AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PLAN OF
REORGANIZATION OF SUNEDISON, INC. AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE** that on March 28, 2017, SunEdison, Inc. and certain

of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") filed the *Disclosure Statement for the Joint Plan of Reorganization of SunEdison,*

*Inc. and its Debtor Affiliates* (Docket No. 2672).

**PLEASE TAKE FURTHER NOTICE** that on May 26, 2017, the Debtors filed

the *Notice Of Filing Of And Notice Of Hearing On Proposed Modifications To Disclosure*

*Statement For Joint Plan Of Reorganization Of SunEdison, Inc. And Its Debtor Affiliates*

(Docket No. 3217).

**PLEASE TAKE FURTHER NOTICE** that on June 2, 2017, the Debtors filed

the *Notice Of Filing Of Further Proposed Modifications To Disclosure Statement For Joint Plan*

*Of Reorganization Of SunEdison, Inc. And Its Debtor Affiliates* (Docket No. 3266).

**PLEASE TAKE FURTHER NOTICE** that on June 7, 2017, the Debtors filed

the *Notice Of Filing Of First Amended Disclosure Statement For First Amended Joint Plan Of*

*Reorganization Of SunEdison, Inc. And Its Debtor Affiliates* (Docket No. 3290) (the "First

Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that on June 11, 2017, the Debtors filed

the *Notice Of Filing Of Revised Pages Of The First Amended Disclosure Statement For First*

*Amended Joint Plan Of Reorganization Of SunEdison, Inc. And Its Debtor Affiliates* (Docket No.

3309).

**PLEASE TAKE FURTHER NOTICE** that a hearing on the First Amended

Disclosure Statement was held before the Honorable Stuart M. Bernstein, United States

Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 723, New York, New York 10004 (the "Bankruptcy Court"), on June 12, 2017 at 2:00 p.m. (Prevailing Eastern Time), during which the First Amended Disclosure Statement was approved on the record.

PLEASE TAKE FURTHER NOTICE that on June 12, 2017, the Debtors filed the *Notice Of Filing Of Solicitation Version Of First Amended Disclosure Statement For First Amended Joint Plan Of Reorganization Of SunEdison, Inc. And Its Debtor Affiliates* (Docket No. 3313).

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file an amended solicitation version of the First Amended Disclosure Statement attached hereto as Exhibit A, which has been is amended to include Exhibit 6.1 to the First Amended Joint Plan of Reorganization.

Dated: June 12, 2017
    New York, New York

                                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                    By:  /s/ J. Eric Ivester
                                        Jay M. Goffman
                                        J. Eric Ivester
                                        Four Times Square
                                        New York, New York 10036-6522
                                        Telephone: (212) 735-3000
                                        Fax: (212) 735-2000
                                        -and-
                                        James J. Mazza, Jr. (admitted *pro hac vice*)
                                        Louis S. Chiappetta (admitted *pro hac vice*)
                                        155 N. Wacker Dr.
                                        Chicago, Illinois 60606-1720
                                        Telephone: (312) 407-0700
                                        Fax: (312) 407-0411

                                        *Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Jay M. Goffman                          Anthony W. Clark (admitted *pro hac vice*)
J. Eric Ivester                         One Rodney Square
Four Times Square                       P.O. Box 636
New York, New York 10036-6522           Wilmington, Delaware 19899-0636
Telephone: (212) 735-3000               Telephone:  (302) 651-3000
Fax: (212) 735-2000                     Fax:  (302) 651-3001

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **SUNEDISON, INC., *et al.*,** | **Case No. 16-10992 (SMB)** |
| Debtors.[1] | **Jointly Administered** |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607).  Effective June 13, 2017, the address of the Debtors' corporate headquarters is Two City Place Drive, 2nd floor, St. Louis, MO 63141.

**FIRST AMENDED DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT
PLAN OF REORGANIZATION OF SUNEDISON, INC. AND ITS DEBTOR AFFILIATES**

Dated:  June 12, 2017

## DISCLAIMER

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THE DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT TO BE ISSUED PURSUANT TO THE PLAN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE

SECURITIES ACT, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, GENERALLY IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTIONS 4(A)(1) OR 4(A)(2) OF THE SECURITIES ACT, AS APPLICABLE.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION COMMENTED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

THE CONSOLIDATED FINANCIAL PROJECTIONS OF THE DEBTORS AND NON-DEBTOR SUBSIDIARIES ATTACHED HERETO AS EXHIBIT B AND DESCRIBED IN THE DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP").

PLEASE REFER TO ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY PRIME CLERK, LLC, THE DEBTORS' CLAIMS AND SOLICITATION AGENT, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME, ON JULY 13, 2017. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE III OF THE DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE

VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON JULY 20, 2017 AT 10:00 A.M. PREVAILING EASTERN TIME, BEFORE THE HONORABLE STUART M. BERNSTEIN, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, MANHATTAN COURTHOUSE, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004-1408. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS JULY 13, 2017, AT 4:00 P.M. PREVAILING EASTERN TIME. ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

## EXECUTIVE SUMMARY[2]

Beginning on April 21, 2016,[3] SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "SunEdison" or the "Company"),[4] filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and commenced these chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 16-10992. None of the YieldCos (defined below) nor their respective direct and indirect subsidiaries are included as "Debtors" in these Chapter 11 Cases. The Debtors continue to operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. To date, no trustee or examiner has been appointed in the Chapter 11 Cases. On April 29, 2016, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code (Docket No. 148).

The Debtors submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for purposes of soliciting votes to accept or reject the First Amended Joint Plan of SunEdison, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A.[5] The Plan is

---

[2]    This summary is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VI below.

[3]    Certain other Debtors filed at later dates. Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3771); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A) filed voluntary petitions on June 1, 2016. EverStream Holdco Fund I, LLC (9564) filed a voluntary petition on July 20, 2016. Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); and SunE Waiawa Holdings, LLC (9757) filed voluntary petitions on August 9, 2016. SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); and SunE Minnesota Holdings, LLC (8926) filed voluntary petitions on August 10, 2016. TerraForm Private Holdings, LLC (5993) filed a voluntary petition on December 16, 2016. Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607) filed voluntary petitions on April 7, 2017. Unless otherwise specified, general references to "Petition Date" refer to the initial April 21, 2016 filing of the twenty-six Debtors; however, "Petition Date" references for Claim and Plan purposes refer to each Debtor's respective Petition Date of April 21, 2016, June 1, 2016, July 20, 2016, August 9, 2016, or December 16, 2016, or April 7, 2017.

[4]    For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc. ("TERP") and Terraform Global, Inc. ("GLBL," and together with TERP, the "YieldCos"), and each of their respective direct and indirect subsidiaries, unless otherwise provided.

[5]    Capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in the Plan.

the result of extensive discussions and settlements between and among the Debtors and their creditor constituents. The Debtors believe that the various compromises contemplated under the Plan are fair and equitable, maximize the value of the Debtors' Estates, and provide the best recovery to Holders of Claims. The Supporting Second Lien Parties, who collectively hold, in the aggregate, approximately 80% in amount of the Second Lien Claims, support the Plan on the terms set forth in the Equity Commitment Agreement. In addition, the Creditors' Committee supports, and BOKF, N.A. has agreed not to object to, the Plan as set forth in the Committee/BOKF Plan Settlement Term Sheet.

**FOR THE REASONS SET FORTH HEREIN, THE DEBTORS, THE SUPPORTING SECOND LIEN PARTIES, AND THE CREDITORS' COMMITTEE URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES FOR THE HOLDERS OF CLAIMS AND <u>STRONGLY RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

**THE DEBTORS WILL REQUEST AT THE CONFIRMATION HEARING THAT PARTIES ENTITLED TO VOTE FOR OR AGAINST THE PLAN THAT DO NOT VOTE TO REJECT THE PLAN WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN <u>ARTICLE XI</u> OF THE PLAN OF THE PARTIES SPECIFIED IN <u>ARTICLE XI</u> OF THE PLAN. THE RELEASES PROPOSED TO BE PROVIDED BY HOLDERS OF CLAIMS ARE NOT SUBJECT TO CERTAIN EXCEPTIONS APPLICABLE TO THE RELEASES PROVIDED BY THE DEBTORS AND SHOULD BE REVIEWED CAREFULLY.**

### Explanation of the Plan[6]

The Plan depends on two global settlements:

(1)     The YieldCo Settlements – As of March 6, 2017, the Debtors announced their proposed settlements of Claims and Causes of Action between the Debtors and each of the YieldCos (the "<u>YieldCo Settlements</u>") that provide for the Debtors to receive 36.9% and 25% (exclusive of SunEdison's current Class A share ownership in GLBL), respectively, of the total consideration flowing to TERP and GLBL from the Jointly Supported Transactions with Brookfield, as set forth below. The Plan envisions (a) the Debtors' (or their creditors') continued ownership of certain shares in TERP under Brookfield's sponsorship, (b) the Debtors' receipt of some cash from the sale of certain of their shares in TERP, and (c) the Debtors' sale (for cash) of their interests in GLBL. The amounts of sub-clauses (a) and (b) shall be determined, in part, by the Debtors' choice as well as the choices made by the public "Class A" shareholders of TERP. As of the date hereof and based on the announced share price on March 7, 2017, the approximate aggregate value of sub-clauses (a), (b), and (c) will be more than $800 million. The YieldCo

---

[6]     The following summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement with respect to the Plan.

Settlements and Jointly Supported Transactions are discussed in more detail in Section A of this Executive Summary below.

(2)    The Committee/BOKF Plan Settlement – On May 16, 2017, the Debtors announced a global settlement (the "Committee/BOKF Plan Settlement") among the Debtors, the Tranche B Roll-Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders (the "Tranche B Lenders/Steering Committee"), the Creditors' Committee, and BOKF, N.A. (as Convertible Senior Notes Indenture Trustee) of all pending litigation commenced by the Creditors' Committee and BOKF (i.e., the UCC Challenge Litigation, the BOKF Objection, and the objections to the YieldCo Settlements including the YieldCo Avoidance Allocation contained therein), in consideration for, among other things, the transfer of certain assets of meaningful value to the GUC/Litigation Trust for the benefit of Holders of General Unsecured Claims.  In addition, the Creditors' Committee agreed not to take any actions or file any pleadings inconsistent with the settlement or that would have the effect of modifying the settlement, and so long as the Plan (including any amendments or supplements thereto) and other definitive documentation reflects the settlement, the Creditors' Committee agreed to support the Disclosure Statement and the Plan.  In doing so, the Committee/BOKF Plan Settlement, described in Section B of this Executive Summary below, avoids costly, time-consuming litigation over Confirmation and certain other issues and clears the way to consummation of the Jointly Supported Transactions and the Debtors' emergence from chapter 11.  A copy of the Committee/BOKF Plan Settlement Term Sheet is attached to the Plan as Exhibit 6.1, and should be referenced when reviewing the summaries of the Committee/BOKF Plan Settlement contained herein.

Distributions to Holders of Second Lien Claims under the Plan will be made from a combination of either: (A) in the TERP Share Election Alternative, (i) 10% of the New SUNE Common Stock, (ii) 10% of the Continuing TERP Class A Shares, (iii) 10% of the Reinstated Second Lien Claim Amount, and (iv) 100% of the Class B GUC/Litigation Trust Interests, and (B) in the TERP Cash Election Alternative,[7]  (i) 100% of the New SUNE Common Stock, (ii) 100% of the Reinstated Second Lien Claim Amount and (iii) 100% of the Class B GUC/Litigation Trust Interests.[8]  In addition, in the TERP Share Election Alternative, Eligible Holders of Second Lien Claims will get their pro rata portion of Rights Offering Subscription Rights.[9]

Distributions to Holders of General Unsecured Claims will be made, based on their pro rata portion of the Class A GUC/Litigation Trust Interests, from the GUC/Litigation Trust which will distribute the potential value from assets reserved for the benefit of Holders of General Unsecured Claims pursuant to the Committee DIP Settlement and the Committee/BOKF Plan

---

[7]    Holders of Second Lien Claims should review the Plan for further details regarding the TERP Cash Election Alternative.

[8]    The equity percentages set forth for the TERP Share Election Alternative do not reflect dilution attributable to the Rights Offering Backstop Standby Fee (i.e., the "put premium" to be paid to the Rights Offering Backstop Purchasers, pursuant to the Equity Commitment Agreement).

[9]    Subject to the Direct Equity Offering as defined in the Equity Commitment Agreement.

Settlement. The GUC/Litigation Trust will be seeded with $7.5 million, and the GUC/Litigation Trust Causes of Action, the D&O Insurance Proceeds, the YieldCo Avoidance Allocation, and the Voluntary Professional Fee Reduction Amount will be transferred to the GUC/Litigation Trust. Distributions from the GUC/Litigation Trust will be on a consolidated basis without reference to Debtor-specific Claims.

Other distributions under the Plan will be made from Cash on hand, Cash from proceeds received through the Rights Offering (in the TERP Share Election Alternative only), and Cash received from the Jointly Supported Transactions.

A.    The Jointly Supported Transactions and the YieldCo Settlements Embodied in the Plan

The Debtors previously announced two separate transactions (each a "Jointly Supported Transaction") pursuant to which Brookfield Asset Management, Inc. and certain of its affiliates ("Brookfield") are to acquire 51% of TERP's outstanding stock in a sponsorship merger transaction and 100% of GLBL's outstanding stock in a whole company cash merger.

The Plan is dependent on settlements of Claims and Causes of Action between the Debtors and each of the YieldCos, negotiations of which were first announced in late January 2017. As of March 6, 2017, the Debtors and the YieldCos, and certain of their respective affiliates, entered into two settlement agreements (the "YieldCo Settlement Agreements"), which, among other things, provide for the Debtors to receive 36.9% and 25% (exclusive of SunEdison's current Class A share ownership in GLBL), respectively, of the total consideration flowing to TERP and GLBL shareholders[10] under the agreements (the "Jointly Supported Transaction Agreements") that are the basis for Jointly Supported Transactions. The YieldCo Settlements are the subject of the motion before the Bankruptcy Court filed on March 10, 2017 [Docket No. 2570] (the "YieldCo Settlement Motion"), and parties should review the YieldCo Settlement Motion for a more comprehensive explanation of the YieldCo Settlement Agreements. The Bankruptcy Court entered an order approving the YieldCo Settlement Motion on June 7, 2017 [Docket No. 3292]. The YieldCo Settlement Motion also included the Debtors' determination of a $16.1 million allocation of the transaction consideration received pursuant to the Jointly Supported Transactions that would be attributable to hypothetically-brought Avoidance Actions claimed by the Debtors against the YieldCos [Docket No. 2641]. As further detailed below, as part of the Committee/BOKF Plan Settlement, this allocation amount was increased to $18 million, which will be transferred to the GUC/Litigation Trust for distribution to Holders of General Unsecured Claims. In addition, the Committee/BOKF Plan Settlement and the Committee's support of Confirmation of the Plan is conditioned on the YieldCos withdrawing all General Unsecured Claims against the Debtors, subject to the right of TERP to assert up to one-half of the actual amount the YieldCos ultimately are required to pay (and therefore have the right to assert as a General Unsecured Claim) in connection with the Preserved DE Shaw Unsecured Claim (as defined in the YieldCo Settlement Motion), capped at one-half of $231 million.

---

[10]    As adjusted for shares excluded under the applicable merger agreement with Brookfield, including shares held by Brookfield.

Further, while the Debtors are not party to the Jointly Supported Transaction Agreements, they are party to, and have obligations under, certain voting and support agreements (with Brookfield and the respective YieldCo) and a certain incentive distribution rights transfer agreement (collectively, the "Voting and Support Agreements") that facilitate and relate to the Jointly Supported Transaction Agreements that were entered into by the YieldCos and Brookfield at the same time as the YieldCo Settlement Agreements.  Specifically, the two voting and support agreements obligate the Debtors to support the Brookfield merger transactions and vote all of their equity interests in the YieldCos in favor of such transactions, and the incentive distribution rights transfer agreement will effectuate the transfer all of the Debtors' incentive distribution rights in TerraForm Power, LLC to Brookfield.  The Voting and Support Agreements are the subject the motion before the Bankruptcy Court, filed on March 14, 2017 [Docket No. 2580], and parties should review the motion for a more comprehensive explanation of the Voting and Support Agreements and the Debtors' respective obligations thereunder.  The Bankruptcy Court entered orders approving the Voting and Support Agreements on June 7, 2017 [Docket Nos. 3293 and 3294].

B.      The Committee/BOKF Plan Settlement

The Plan also incorporates the Committee/BOKF Plan Settlement, which settles all pending litigation that has been commenced by the Creditors' Committee or BOKF, N.A. (the "UCC/BOKF Litigation") (i.e., the UCC Challenge Litigation, the BOKF Objection, and the objections to the YieldCo Settlements including the YieldCo Avoidance Allocation contained therein), and pursuant to which the Creditors' Committee agreed not to take any actions or file any pleadings inconsistent with the settlement or that would have the effect of modifying the settlement, and so long as the Plan (including any amendments or supplements thereto) and other definitive documentation reflects the settlement, the Creditors' Committee agreed to support the Disclosure Statement and the Plan, in consideration for, among other things, (a) the transfer of certain assets to the GUC/Litigation Trust as set forth below and (b) the final resolution of any and all issues that may be in dispute (either currently or pending or that could be commenced in the future) regarding the Committee DIP Settlement, including any right to receive amounts attributable to the Excess Non-Prepetition 1L/2L Obligor Sale Proceeds.

A copy of the Committee/BOKF Plan Settlement Term Sheet is attached as Exhibit 6.1 to the Plan and should be reviewed carefully.  Certain of the provisions of the Committee/BOKF Plan Settlement Term Sheet are described below.  However, to the extent of any inconsistency between this Disclosure Statement, the Plan and the Committee/BOKF Plan Settlement Term Sheet, the Committee/BOKF Plan Settlement Term Sheet shall prevail.

Pursuant to the Committee/BOKF Plan Settlement, on the Effective Date, the Debtors will transfer the following assets to the GUC/Litigation Trust for the benefit of Holders of General Unsecured Claims:

- $7.5 million in Cash on account of the initial funding for the GUC/Litigation Trust as contemplated by the Committee DIP Settlement annexed to the Original DIP Facility

Order and the Replacement DIP Facility Order (the "GUC/Litigation Trust Initial Funding");[11]

- all proceeds realized from the D&O Settlement (described in ARTICLE V.I.2) on account of proceeds allocable from the D&O Insurance to certain estate Causes of Action against the Debtors' current or former directors or officers, which is expected to be $32.0 million in Cash (the "D&O Insurance Proceeds");

- $18.0 million in Cash on account of the settlement of certain Avoidance Actions in connection with the YieldCo Settlement Motion (the "YieldCo Avoidance Allocation");[12]

- at least $5.0 million in Cash on account of Voluntary Professional Fee Reductions (the "Voluntary Professional Fee Reduction Amount"), as well as all additional voluntary professional fee reductions that exceed the Voluntary Professional Fee Reduction Amount (collectively, the "Voluntary Professional Fee Reductions"); and

- all Causes of Action of the Debtors' Estates as of the Effective Date, including all estate Avoidance Actions (other than Avoidance Actions against the YieldCos and Avoidance Actions against the Prepetition First Lien Secured Parties and Second Lien Creditors) to the extent such Causes of Action are not released or settled with the consent of the Creditor' Committee pursuant to Article 11.5 of the Plan or released or settled pursuant to an order of the Bankruptcy Court or the Committee/BOKF Plan Settlement Term Sheet (collectively, the "GUC/Litigation Trust Causes of Action," and together with the D&O Insurance Proceeds, the YieldCo Avoidance Allocation, and all Voluntary Professional Fee Reductions, the "GUC/Litigation Trust Assets"), subject to a sharing mechanism set forth in the Committee/BOKF Plan Settlement Term Sheet.

Any proceeds recovered by the GUC/Litigation Trust (or for the benefit of unsecured creditors) on account of Avoidance Actions, net of fees and expenses expended to prosecute such Avoidance Actions (including fees paid on a contingency arrangement, any expenses of prosecuting the GUC/Litigation Trust, including, without limitation, the costs associated with preparation of the GUC/Litigation Trust Reports, all of which shall be deducted prior to any distribution of Net Avoidance Action Proceeds), other than proceeds from those Avoidance Actions against the YieldCos that are settled in connection with the YieldCo Avoidance

---

[11]    Pursuant to the terms of the Replacement DIP Facility Order, the GUC/Litigation Trust was to be seeded with $10 million minus any amounts previously incurred by the Creditors' Committee in connection with the lien challenge investigation and incurred in connection with the investigation and prosecution of GUC/Litigation Trust Causes of Action.  Pursuant to the Committee/BOKF Plan Settlement, the parties have determined that the Initial GUC/Litigation Trust Funding amount will be set at $7.5 million (subject to any deductions agreed to by the Creditors' Committee as set forth in the Committee/BOKF Plan Settlement Term Sheet).

[12]    The YieldCo Avoidance Allocation was determined to be $16.1 million by the Debtors as set forth in the YieldCo Settlement Motion.  This amount was increased to $18 million under the Committee/BOKF Plan Settlement.

Allocation (the "Net Avoidance Actions Proceeds"), whether such Net Avoidance Actions Proceeds are recovered pursuant to the successful prosecution or settlement of such Avoidance Actions, are to be shared as follows:

- the initial $63.0 million of Net Avoidance Action Proceeds recovered shall be distributed on a Pro Rata basis to Holders of Allowed General Unsecured Claims; and

- any Net Avoidance Actions Proceeds recovered that exceed $63.0 million in the aggregate (the "Additional Net Avoidance Action Proceeds") shall be distributed (i) fifty-two percent (52%) on a Pro Rata basis to Holders of Allowed General Unsecured Claims and (ii) forty-eight percent (48%) on a Pro Rata basis to Holders of Allowed Second Lien Claims or their representatives.

Holders of General Unsecured Claims, in their capacity as such, shall not be permitted to share or participate in (a) the Continuing TERP Class A Shares, (b) the Rights Offering, (c) the New SUNE Common Stock, and (d) the Reinstated Second Lien Claims.

In further consideration for the settlement of the UCC/BOKF Litigation, on the Effective Date:

- on the Effective Date, the Tranche B Roll Up Lenders will be deemed to have agreed to release any liens, claims or interests in all assets transferred to the GUC/Litigation Trust in accordance with the Committee/BOKF Plan Settlement, including the D&O Insurance Proceeds, and such assets shall not secure the Tranche B Roll-Up Loans (as defined in the DIP Credit Agreement), and the D&O Insurance Proceeds shall not constitute adequate protection for the benefit of the Original DIP Lenders, the Replacement DIP Lenders, or the Prepetition Secured Parties; and

- the investigation/prosecution cap (the "Investigation/Prosecution Cap") described in the Original DIP Facility Order and the Replacement DIP Facility Order shall be deemed increased from $175,000 to $2.25 million.

In consideration of the foregoing the UCC/BOKF Litigation shall be held in abeyance pending the Bankruptcy Court's approval of the Committee/BOKF Plan Settlement and Confirmation of the Plan. The Plan serves as the Debtors' motion to approve the Committee/BOKF Plan Settlement under Bankruptcy Rule 9019 and confirmation of the Plan will be deemed approval of such settlement. If the Committee/BOKF Plan Settlement is approved, the Plan is confirmed, and the Plan becomes effective, the UCC/BOKF Litigation will be deemed withdrawn with prejudice (and if necessary, parties will file with the Bankruptcy Court any necessary withdrawal notices). The Creditors' Committee has agreed to support, and BOKF has agreed not to object to, the Plan and the YieldCo Settlement Motion on the terms set forth in in the Committee/BOKF Plan Settlement. In further consideration for the settlement of the UCC/BOKF Litigation, on the Effective Date, the terms of the Committee/BOKF Plan Settlement Term Sheet shall be effectuated to the extent that they have not previously occurred.

The Committee/BOKF Plan Settlement and the Creditors' Committee's support of Confirmation of the Plan is conditioned on the YieldCos withdrawing all General Unsecured

Claims against the Debtors, subject to the right of TERP to assert up to one-half of the actual amount the YieldCos ultimately are required to pay (and therefore have the right to assert as a General Unsecured Claim) in connection with the Preserved DE Shaw Unsecured Claim (as defined in the YieldCo Settlement Motion), capped at one-half of $231 million.

The Committee/BOKF Plan Settlement is the result of extensive discussions and mediation between the Debtors, the Tranche B Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders, the Creditors' Committee, and BOKF, N.A.

As noted above, the Committee/BOKF Plan Settlement constitutes a complete settlement of any and all issues that may be in dispute (either currently or pending or that could be commenced in the future) regarding distributions pursuant to the Committee DIP Settlement. The Committee DIP Settlement entered into in June 2016 (as described in ARTICLE V.B herein) contemplated that a GUC/Litigation Trust would be established as a vehicle to distribute potential value from the following assets: (a) certain Estate Causes of Action, including certain Avoidance Actions; (b) proceeds from D&O Insurance subject to the terms of the Committee DIP Settlement; (c) net proceeds from asset sales of certain Debtors in excess of $175 million as set forth in the Committee DIP Settlement; and (d) certain other assets transferred to the GUC/Litigation Trust in accordance with the Plan and Committee DIP Settlement.

Under the Committee DIP Settlement, general unsecured creditors were offered certain rights (on behalf of the Estates) over the Second Lien Creditors' rights to any D&O insurance proceeds that they could recover from the Second Lien Creditors' direct claims against the Debtors' directors and officers stemming from the January 2016 financing transactions. Unsecured creditors would lose these rights, however, if the Creditors' Committee chose to challenge the Prepetition Secured Parties' liens and claims; the Creditors' Committee was also given $175,000 to conduct its investigation of such liens and claims.

In October 2016, the Creditors' Committee chose to commence the UCC Challenge Litigation, resulting in the forfeiture of its rights to the Second Lien Creditors' rights to any D&O insurance proceeds.  Around the same time, the indenture trustee for certain convertible unsecured notes issued by SUNE also filed the BOKF Objection to proofs of claim filed by the Second Lien Notes Trustee and the Second Lien Loans Agent, which objection asserted certain of the same claims raised in the UCC Challenge Litigation.  As of the date hereof, the Creditors' Committee has filed its complaint, the respective Prepetition First and Second Lien Defendants have filed motions to dismiss such complaint, the Creditors' Committee had responded to such motions to dismiss, and the Bankruptcy Court has heard oral arguments with regard to the Prepetition First Lien Defendants' motion to dismiss, the Second Lien Defendants' motion to dismiss, and the BOKF Objection.  The Bankruptcy Court has not yet issued any decision on these matters, and as a result of the Committee/BOKF Plan Settlement, all of these litigations are being held in abeyance.

Prior to mediation in April 2017, the Debtors participated in numerous conversations, negotiation sessions, and other informal and formal meetings with the Creditors' Committee and the Prepetition Secured Parties in an attempt to resolve all issues among the parties, including those raised in the UCC Challenge Litigation and the BOKF Objection.  The Debtors also understand that the parties, during the same timeframe and equally as often, have participated in

such conversations, sessions and meetings among themselves, outside the presence of the Debtors, but at the Debtors' encouragement.

At the request of the parties, on March 18, 2017, the Bankruptcy Court entered an order assigning certain matters to mediation, including the UCC Challenge Litigation, the BOKF Objection, the YieldCo Avoidance Allocation, and issues related to the Plan (together, the "Mediation Issues"), before Chief Judge Cecelia Morris of the Bankruptcy Court for the Southern District of New York.  As a result of the mediation, the Debtors, the Tranche B Lenders/Steering Committee, the Creditors' Committee, and BOKF, N.A. reached a global settlement with respect to the Mediation Issues, allowing the Debtors to move the Chapter 11 Cases to their conclusion.  In the Debtors' view, the Committee/BOKF Plan Settlement represents a fair and reasonable compromise of the Mediation Issues.

The Debtors believe the Committee/BOKF Plan Settlement permits a significant distribution to Holders of other General Unsecured Claims that may not have occurred otherwise. The Debtors believe that but for the Committee/BOKF Plan Settlement, the Holders of the Second Lien Claims would have received almost all of the distributable value of the Company after payment in full of the Original DIP Facility Claims (in the event amounts are owed and not disputed by any party as of the Effective Date), Replacement DIP Facility Claims, and Administrative Claims, and Holders of General Unsecured Claims would have received no value other than the value that resulted from the Committee DIP Settlement.

C.    Plan Funding and Value

The value available to fund the Plan consists of the following components:

(i)    the value that will be realized by the Debtors' Estates as a result of the consideration received prior to consummation of the Jointly Supported Transactions which are made possible as a result of the settlements that the Debtors reached with the YieldCos (which settlements were approved by the Bankruptcy Court on June 7, 2017 [Docket No. 3292]); (the agreements documenting the terms of the Jointly Supported Transactions were entered into on March 6, 2017, and are still subject to YieldCo shareholder and regulatory approval);

(ii)    the value that has been and will be realized (including after the Effective Date) by the Debtors' Estates from the proceeds of asset sales by the Debtors and non-Debtors (other than the Jointly Supported Transactions) that have occurred and continue to occur during the Chapter 11 Cases, including, without limitation, direct asset sale proceeds and earnouts realized after the closing of any sales;

(iii)    solely in the event of the TERP Share Election Alternative (as described in Section D of this Executive Summary below), the proceeds of

(A) the Rights Offering, backstopped by the Rights Offering Backstop Purchasers on a fully committed basis, pursuant to which Eligible Holders of Second Lien Claims will be offered the rights to purchase 67.5% of the New SUNE Common Stock and 67.5% of the Continuing TERP Class A Shares to be issued or distributed under the Plan, and receive a portion of the Reinstated Second Lien Claims pursuant to the Reinstated Second Lien Modification Terms in the same

proportion as they will hold New SUNE Common Stock, which will generate gross cash proceeds of $213.75 million (subject to increase to $225 million); and

(B) the direct purchase of 22.5% of the New SUNE Common Stock and 22.5% of Continuing TERP Class A Shares to be issued or distributed under the Plan by the Rights Offering Backstop Purchasers (the "Direct Equity Commitment"), resulting in gross cash proceeds of $71.25 million (subject to increase to $75 million); [13]

(iv)    remaining Cash on hand of the Debtors, and any Cash that the Reorganized Debtors receive after the Effective Date, from Residual Assets Proceeds, Earnout Assets, and Repatriated Cash; and

(v)    other sources of value, including, without limitation, the D&O Insurance Proceeds.

## D.    Plan Funding Alternatives

The Plan incorporates the Debtors' sale, distribution, or transfer of all of their interests in the YieldCos, either pursuant to the Jointly Supported Transactions, or, pursuant to the Plan immediately following completion of the Jointly Supported Transactions. Pursuant to the Jointly Supported Transaction Agreements, the Debtors will sell (for cash) all of their interests in GLBL. Pursuant to the TERP Merger Agreement and the TERP Settlement Agreement, and in exchange for the Debtors' Class B Shares of TERP Inc. common stock and Class B units of TERP LLC, the Debtors will receive Class A shares of TERP Inc. common stock, and with respect to each Class A share of TERP Inc. common stock held by them (as of immediately prior to the consummation of the merger contemplated by the TERP Merger Agreement), either (1) elect to retain one Continuing TERP Class A Share (the "TERP Share Election Alternative") and receive $4.50 in Cash or (2) elect to receive $9.52 in Cash and retain zero Continuing TERP Class A Shares (the "TERP Cash Election Alternative").[14]    The Debtors will only elect the TERP Cash Election Alternative in the event that (a) they do not receive a commitment to fully backstop the Rights Offering, (b) the Rights Offering Backstop Commitment is not approved by the Bankruptcy Court, or (c) the Equity Commitment Agreement is terminated prior to the date that the Debtors need to make their election.[15]    In the TERP Share Election Alternative only, the

---

[13]    The up to $75 million of New SUNE Common Stock and Continuing TERP Class A Shares to be sold under the Direct Equity Commitment will only be available for purchase by the Rights Offering Backstop Purchasers.

[14]    The dollar amounts set forth for each of the TERP Share Election Alternative and the TERP Cash Election Alternative exclude the $1.94 per TERP Class A Share special dividend to be paid in Cash pursuant to the TERP Merger Agreement.

[15]    To the extent that (a) the Debtors elect the TERP Cash Election Alternative and (b) the cash received from the Jointly Supported Transactions is insufficient to repay the Tranche B Roll-Up Lenders in full and in Cash, the Debtors will issue Reinstated Tranche B Roll-Up Loans in an amount and with terms necessary to render the Tranche B Roll-Up Loans Unimpaired, including, without limitation, priority (over the Reinstated Second Lien Claims) in lien and claim amount and interest, and with other terms that are identical to the current Tranche B Roll-Up Loans.

Continuing TERP Class A Shares will be offered to Eligible Holders of Second Lien Claims pursuant to the Rights Offering. The Rights Offering will be backstopped by the Supporting Second Lien Parties on a fully committed basis.

E.    Corporate Structure Under the Plan

The Plan contemplates a chapter 11 reorganization resulting in two distinct corporate structures upon consummation:

(1)    *Reorganized SUNE and its Reorganized Debtor Affiliates.*

Following emergence, Reorganized SUNE and its Reorganized Debtor affiliates, as well as certain of its non-Debtor affiliates will continue business operations to administer and maximize the value of remaining assets. Reorganized SUNE will employ personnel[16] and maintain systems and back-office capabilities reasonably necessary to administer the Earnout Assets and Residual Assets of Reorganized SUNE and its subsidiaries (which include, among other assets, inventory, equipment, contractual rights, intellectual property, real property, fixtures, goods, and equity interests in subsidiaries) and will use commercially reasonable efforts to generate Earnout Proceeds and Residual Assets Proceeds therefrom. In particular, Reorganized SUNE will consummate transactions of remaining assets held for sale, collect payment reimbursements from various entities related to assets that have previously been sold, collect earnouts associated with project milestones, collect other receivables, maximize recovery of Repatriated Cash and receivables, and maximize recovery of tax refunds.

The consolidated Financial Projections of the Debtors and their non-Debtor subsidiaries, attached as Exhibit B to this Disclosure Statement, show the Debtors' and their non-Debtor subsidiaries' expected realization of proceeds from the Earnout Assets and Residual Assets, Repatriated Cash, and cash from other opportunities (before fixed costs, restructuring costs, and the costs of the post-emergence entity).[17] Certain entities are expected to continue operating through 2020 to realize the value on the Earnout Assets, Repatriated Cash, Residual Assets and other opportunities.[18]

In connection with the foregoing business operations and maximization of asset value, personnel of Reorganized SUNE will also provide the necessary corporate functions to support ongoing activity of its subsidiaries. In addition, SUNE is negotiating certain transition agreements with TERP and GLBL:

---

[16]    Reorganized SUNE is expected to have a Board of Directors to be managed by a chief executive officer supported a by limited staff of full-time employees that are retained from the current workforce, as well as limited cadre of professional advisors.

[17]    The Financial Projections reflect the assets and estimated values thereof that are expected to remain with Reorganized SUNE and its Affiliates, including non-Debtor Affiliates, immediately following emergence. The Financial Projections reflect consolidated cash flow projections of both Debtor and non-Debtor entities.

[18]    The Financial Projections contemplate that the reorganized Company will have realized substantially all anticipated value from its remaining assets by the end of 2020 and substantially all of its Affiliates will have wound down operations.

(1)    Pursuant to a transition services agreement (filed at Docket No. 3247) (the "GAM TSA"), SUNE will provide for the orderly transition of employees who provide asset management and operating and maintenance services from the Company to TERP as well as the transition of service responsibilities performed by such employees.  In particular the GAM Letter Agreement between SUNE, certain affiliates of SUNE ("Service Providers"), and TERP will provide the terms and conditions by which certain affiliates of TERP ("Service Recipients") and certain of their respective affiliates and designees are permitted to make an offer of employment to employees of the Service Providers.  The GAM Letter Agreement also will provide the terms and conditions by which SUNE, Service Providers, TERP, and Service Recipients will cooperate so that the services and obligations under asset management and operation and maintenance ("O&M") contracts between the Service Providers and the Service Recipients will be transitioned in-house to TERP or subcontracted to new service providers.[19]

(2)    Under the corporate transition services agreements with certain of the TERP and GLBL entities (the "Yieldco TSAs"), SunEdison will provide the Yieldcos with a variety of corporate and administrative services for the transition period provided thereunder, including: information technology services (e.g., telephone, server and data center services, email and other IT support), tax transition services (e.g., creating and managing the budget, preparing tax returns and other tax filings), and human resources services (e.g., hiring and onboarding employees, visa administration, payroll processing).

In addition, as set forth in Annex 1 of the Committee/BOKF Plan Settlement Term Sheet, Reorganized SUNE will provide certain services, which may include personnel, systems, and access to books and records, to the GUC/Litigation Trust in connection with the administration of certain GUC/Litigation Trust Assets, including claims administration and the prosecution of the GUC/Litigation Trust Causes of Action.

Reorganized SUNE personnel will also assist the reorganized company in winding down entities and business units that do not hold additional assets or are not anticipated to realize further value.

(2)    *GUC/Litigation Trust* (as explained above and in ARTICLE VI.G of the Disclosure Statement).

F.    Classification Under the Plan

The Plan provides for the resolution of all Claims against and Interests in each of the 51 Debtors in these Chapter 11 Cases, and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan contains separate classes for Holders of Claims and Interests.  For administrative convenience, the Plan organizes the Debtors into Debtor Groups and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group.  Pursuant to section 1122 of the Bankruptcy Code, set forth below and in Article VI.D of this Disclosure Statement is a designation of the Debtor Groups and Classes of Claims and

---

[19]    Additional detail about the GAM TSA and the Debtors efforts to sell the GAM business unit is set forth in ARTICLE V.F.

Interests. The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims.  For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator equal to the amount of a particular Holder's Allowed General Unsecured Claim.  For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting Classes or cramdown.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II of the Plan.

| Letter | Debtor Group |
|--------|--------------|
| A | **Parent** <br> SunEdison, Inc. |
| B | **DIP and Second Lien Secured Guarantors** <br> Buckthorn Renewables Holdings, LLC <br> Everstream HoldCo Fund I, LLC <br> Greenmountain Wind Holdings, LLC <br> Rattlesnake Flat Holdings, LLC <br> Somerset Wind Holdings, LLC <br> SunE Minnesota Holdings, LLC <br> SunE MN Development, LLC <br> SunE MN Development Holdings, LLC <br> SunE Waiawa Holdings, LLC <br> Sunflower Renewables Holdings 1, LLC <br> Enflex Corporation <br> Fotowatio Renewable Ventures, Inc. <br> MEMC Pasadena, Inc. <br> NVT Licenses, LLC <br> NVT, LLC <br> Solaicx <br> SunE ML 1, LLC <br> SunEdison Canada, LLC <br> SunEdison Contracting, LLC <br> SunEdison DG, LLC <br> SunEdison Holdings Corporation <br> SunEdison International, Inc. <br> SunEdison International, LLC <br> Sun Edison LLC |

| # | Designation |
|---|-------------|
| 1 | Second Lien Claims |
| 2 | Other Secured Claims |
| 3 | Other Priority Claims |
| 4 | General Unsecured Claims |
| 5 | Intercompany Claims |
| 6 | Other Subordinated Claims |
| 7 | Interests in Debtor Subsidiaries |
| 8 | Interests in SUNE |

| | |
|---|---|
| | SunEdison Utility Holdings, Inc.<br>Team-Solar Inc.<br>First Wind Holdings, LLC<br>First Wind Energy, LLC<br>Vaughn Wind, LLC<br>Maine Wind Holdings, LLC<br>SunEdison Products, LLC<br>Hudson Energy Solar Corporation<br>SunE REIT-D PR, LLC<br>SunEdison International Construction, LLC<br>EchoFirst Finance Co., LLC |
| C | **DIP-only Secured Guarantors**<br>Blue Sky West Capital, LLC<br>DSP Renewables, LLC<br>First Wind California Holdings, LLC<br>First Wind Oakfield Portfolio, LLC<br>First Wind Panhandle Holdings III, LLC<br>First Wind Solar Portfolio, LLC<br>Hancock Renewables Holdings, LLC<br>PVT Solar, Inc.<br>SunE Hawaii Solar Holdings, LLC<br>SunE Wind Holdings, Inc.<br>SunEdison Residential Services, LLC |
| D | **DIP-only Unsecured Guarantor**<br>Silver Ridge Power Holdings, LLC<br>TerraForm Private Holdings LLC |
| E | **Not Obligated on DIP or Second Lien Claims**<br>SunEdison Products Singapore Pte. Ltd<br>SEV Merger Sub Inc. |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below:

| Class | | Claim or Interest | | Status | | Voting Rights |
|---|---|---|---|---|---|---|
| 1A and 1B | | Second Lien Claims | | Impaired | | Entitled to Vote |
| 2A-2E | | Other Secured Claims | | Unimpaired | | Presumed to Accept |
| 3A-3E | | Other Priority Claims | | Unimpaired | | Presumed to Accept |
| 4A-4E | | General Unsecured Claims and Convertible Senior Notes Claims | | Impaired | | Entitled to Vote |
| 5A-5E | | Intercompany Claims | | Impaired or Unimpaired | | Deemed to Reject or Presumed to Accept |
| 6A-6E | | Other Subordinated Claims | | Impaired | | Deemed to Reject |

| 7B-7E | Interests in Debtor Subsidiaries | Impaired or Unimpaired | | Deemed to Reject or Presumed to Accept |
| 8A | Interests in SUNE | Impaired | | Deemed to Reject |

The table below summarizes the classification and treatment of Claims and Interests under the Plan.  These summaries are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see <u>Article VI</u> below.

| Class Description | Treatment under the Plan |
|---|---|
| Classes 1A-1B – Second Lien Claims | Classes 1A and 1B consist of all Allowed Second Lien Claims. |
| | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim (except as otherwise set forth herein with respect to the Reinstated Second Lien Claims), on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata portion of the Second Lien Claim Distribution. |
| | In addition to the foregoing, in the TERP Share Election Alternative, each Holder of an Allowed Second Lien Claim that is an Eligible Holder shall receive its Pro Rata portion of the Rights Offering Subscription Rights. |
| | Classes 1A and 1B are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan. |
| Classes 2A-2E – Other Secured Claims | Classes 2A, 2B, 2C, 2D, and 2E consist of all Allowed Other Secured Claims. |
| | Except as otherwise provided in and subject to <u>Article 10.6</u> of the Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable: |
| | (i)    have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default; |

xx

| Class Description | Treatment under the Plan |
|---|---|
| | (ii)      be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or<br><br>(iii)      receive such other less favorable treatment as to which the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing.<br><br>provided, that Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in Article 4.2 of the Plan or elsewhere in the Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim.<br><br>Classes 2A, 2B, 2C, 2D, and 2E are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan. |
| Classes 3A-3E – Other Priority Claims | Classes 3A, 3B, 3C, 3D, and 3E consist of all Allowed Other Priority Claims.<br><br>Except as otherwise provided in and subject to Article 10.6 of the Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or such other ate as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Other Priority Claim; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.<br><br>Classes 3A, 3B, 3C, 3D, and 3E are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan |

| Class Description | Treatment under the Plan |
|---|---|
| | pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan. |
| Class 4A-4E – General Unsecured Claims | Class 4A, 4B, 4C, 4D, and 4E consist of all Allowed General Unsecured Claims. |
| | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata portion of the Class A GUC/Litigation Trust Interests, subject to the specifics set forth in the Plan.  For the avoidance of doubt, Holders of Allowed General Unsecured Claims shall not receive any of the Class B GUC/Litigation Trust Interests. |
| | For purposes of Article 4.4 of the Plan, Pro Rata shall apply to all Allowed General Unsecured Claims on a consolidated basis. |
| | Classes 4A, 4B, 4C, 4D, and 4E are Impaired and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan. |
| Class 5A-5E – Intercompany Claims | Classes 5A, 5B, 5C, 5D, and 5E consist of all Allowed Intercompany Claims. |
| | On the Effective Date, and subject to any repayment obligations necessary to satisfy secured Intercompany Claims, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion with the reasonable consent of the Supporting Second Lien Parties.  For the avoidance of doubt, all Allowed Intercompany Claims held by any Debtor constitutes collateral of the Original DIP Lenders, the Replacement DIP Lenders, Second Lien Lenders, and Second Lien Senior Noteholders. |
| | Classes 5A, 5B, 5C, 5D, and 5E are either: (i) Impaired, and Holders of Allowed applicable Class 5 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan; or (ii) Unimpaired, and Holders of Allowed applicable Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan. |
| Class 6A-6E – Other Subordinated | Classes 6A, 6B, 6C, 6D, and 6E consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims. |
| | Holders of Allowed Other Subordinated Claims shall not receive any |

| Class Description | Treatment under the Plan |
|---|---|
| Claims | distributions on account of such Allowed Other Subordinated Claims. |
| | Classes 6A, 6B, 6C, 6D, and 6E are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan. |
| Class 8B-8E – Interests in Debtor Subsidiaries | Classes 7A, 7B, 7C, 7D, and 7E consist of all Allowed Interests in Debtor Subsidiaries. |
| | On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion with the consent of the Supporting Second Lien Parties.  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests. |
| | Classes 7A, 7B, 7C, 7D, and 7E are either: (i) Impaired, and Holders of Allowed applicable Class 7 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan; or (ii) Unimpaired, and Holders of Allowed applicable Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan. |
| Class 8A – Interests in SUNE | Class 8A consists of all Interests in SUNE. |
| | On the Effective Date, Allowed Class 8A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged. |
| | Class 8A is Impaired, and Holders of Allowed Class 8A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 8A Interests are not entitled to vote to accept or reject the Plan. |

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ...............................................................................................vi
    A.    The Jointly Supported Transactions and the YieldCo Settlements
            Embodied in the Plan ...................................................................ix
    B.    The Committee/BOKF Plan Settlement ..............................................x
    C.    Plan Funding and Value ..................................................................xiv
    D.    Plan Funding Alternatives ...............................................................xv
    E.    Corporate Structure Under the Plan .................................................xvi
    F.    Classification Under the Plan ..........................................................xvii
ARTICLE I. INTRODUCTION ........................................................................................1
    A.    Rules of Interpretation.........................................................................3
ARTICLE II. OVERVIEW OF THE PLAN ....................................................................4
    A.    Plan Distributions and Plan Value ......................................................4
    B.    Classification Under the Plan ..............................................................5
    C.    Unclassified Claims ............................................................................6
    D.    Treatment of Claims and Interests under the Plan ...............................6
    E.    Liquidation Analyses ........................................................................10
ARTICLE III. VOTING PROCEDURES........................................................................10
    A.    Classes Entitled to Vote ...................................................................10
    B.    Solicitation Procedures......................................................................11
    C.    Voting Procedures.............................................................................12
    D.    Rights Offering Procedures ...............................................................13
ARTICLE IV. GENERAL INFORMATION ..................................................................14
    A.    Overview of the Debtors' Corporate History and Business Operations ...............14
    B.    SunEdison's Corporate Structure.......................................................16
    C.    SunEdison, Inc.'s Board of Directors .................................................17
    D.    Executive Officers of SunEdison, Inc. ...............................................17
    E.    The Debtors' Workforce ...................................................................19
    F.    The Debtors' Prepetition Capital Structure ........................................19
ARTICLE V. THE CHAPTER 11 CASES .....................................................................24
    A.    Events Leading to the Commencement of the Chapter 11 Cases ........24
    B.    Postpetition Financing.......................................................................27
    C.    Administration of Chapter 11 Cases ..................................................30
    D.    Appointment of the Creditors' Committee .........................................33
    E.    Attempts to Seek Appointment of an Equity Committee.....................33
    F.    Investigations...................................................................................35
    G.    Debtor and Non-Debtor Asset Sales ..................................................37
    H.    Non-Debtor Value Analysis ..............................................................41
    I.    Litigation and Creditors' Committee and Developments ...................43
    J.    YieldCo Developments .....................................................................47
    K.    Analyzing Executory Contracts and Unexpired Leases ......................52
    L.    Restructuring Paths ..........................................................................53
    M.    Employee Incentive and Retention Programs .....................................60
    N.    Analysis and Resolution of Claims ....................................................62
    O.    Exclusivity.......................................................................................64
ARTICLE VI. PLAN SUMMARY ................................................................................65

A.    Overview of Chapter 11 ...........................................................................65
B.    Overall Structure of the Plan .................................................................66
C.    Administrative Expenses and Priority Claims ...................................67
D.    Classification, Treatment, and Voting of Claims and Interests ..........72
E.    Acceptance ...............................................................................................79
F.    Means for Implementation of the Plan.................................................79
G.    GUC/Litigation Trust ...........................................................................89
H.    Executory Contracts and Unexpired Leases ......................................97
I.    Procedures for Resolving Disputed Claims and Interests ...............104
J.    Provisions Governing Distributions....................................................107
K.    Effect of the Plan on Claims and Interests .......................................114
L.    Conditions Precedent ..........................................................................121
M.    Retention of Jurisdiction .....................................................................123
N.    Miscellaneous Provisions .....................................................................126
O.    Second Lien Litigation .........................................................................131
ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF
THE PLAN ...............................................................................................132
A.    The Confirmation Hearing ..................................................................132
B.    Confirmation Standards .......................................................................132
C.    Liquidation Analyses ...........................................................................134
D.    Financial Feasibility.............................................................................134
E.    Acceptance by Impaired Classes ........................................................135
F.    Confirmation Without Acceptance by All Impaired Classes ...........135
ARTICLE VIII. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO
CONFIRMATION AND CONSUMMATION OF THE PLAN ...............136
A.    General ...................................................................................................136
B.    Risks Related to Jointly Supported Transactions and the YieldCo
Settlements ............................................................................................137
C.    Certain Bankruptcy Considerations ...................................................137
D.    Risk Factors That May Affect Recoveries Under the Plan ...............139
E.    Business Risks .......................................................................................140
F.    Risks Associated with Forward Looking Statements .......................143
G.    Disclosure Statement Disclaimer........................................................144
H.    Liquidation Under Chapter 7...............................................................146
ARTICLE IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES...............146
A.    Certain U.S. Federal Income Tax Consequences to the Debtors......147
B.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims
or Interests ............................................................................................151
C.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of
Claims or Interests ...............................................................................159
D.    Backup Withholding ............................................................................160
E.    Importance of Obtaining Professional Tax Assistance .....................160
ARTICLE X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN .........................................................................................161
A.    Continuation of the Bankruptcy Case ...............................................161
B.    Alternative Plans of Reorganization ..................................................161

C.     Liquidation Under Chapter 7 of the Bankruptcy Code ..................................... 161
**ARTICLE XI. RECOMMENDATION** ........................................................................................... **162**
A.     Hearing on and Objections to Confirmation ................................................... 162
B.     Recommendation .......................................................................................... 162

## <u>EXHIBITS</u>

**Exhibit A**     First Amended Joint Plan of SunEdison, Inc., et al.

**Exhibit B**     Financial Projections

**Exhibit C**     Liquidation Analyses

**Exhibit D**     Capital Analysis

# ARTICLE I.

## INTRODUCTION

Beginning on April 21, 2016,[20] SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "SunEdison" or the "Company"), filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continue to operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under Case No. 16-10992 (the "Chapter 11 Cases").

The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered. To date, no trustee or examiner has been appointed in these Chapter 11 Cases. On April 29, 2016, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code (Docket No. 148).

The Debtors submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for purposes of soliciting votes to accept or reject the First Amended Joint Plan of SunEdison, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A.[21]

The Plan provides for the resolution of all Claims against and Interests in each of the 51 Debtors in these Chapter 11 Cases, and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan contains separate classes for Holders of Claims and Interests. For

---

[20]  Certain other Debtors filed at later dates. Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3771); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A) filed voluntary petitions on June 1, 2016. EverStream Holdco Fund I, LLC (9564) filed a voluntary petition on July 20, 2016. Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); and SunE Waiawa Holdings, LLC (9757) filed voluntary petitions on August 9, 2016. SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); and SunE Minnesota Holdings, LLC (8926) filed voluntary petitions on August 10, 2016. TerraForm Private Holdings, LLC (5993) filed a voluntary petition on December 16, 2016. Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607) filed voluntary petitions on April 7, 2017. Unless otherwise specified, general references to "Petition Date" refer to the initial April 21, 2016 filing of the twenty-six Debtors; however, "Petition Date" references for Claim and Plan purposes refer to each Debtor's respective Petition Date of April 21, 2016, June 1, 2016, July 20, 2016, August 9, 2016, or December 16, 2016, or April 7, 2017.

[21]  Capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in the Plan.

administrative convenience, the Plan organizes the Debtors into Debtor Groups and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group. Pursuant to section 1122 of the Bankruptcy Code, set forth below and in <u>Article VI.D</u> of this Disclosure Statement is a designation of the Debtor Groups and Classes of Claims and Interests. The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims. For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator equal to the amount of a particular Holder's Allowed General Unsecured Claim. For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting Classes or cramdown. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in <u>Article II</u> of the Plan.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, their reasons for seeking protection under chapter 11, and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the requirements for confirmation of the Plan and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND THE VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AND INTERESTS, PLEASE SEE <u>ARTICLES VI</u> AND <u>VIII</u> HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION. TO THE EXTENT ANY PORTION OF THIS DISCLOSURE STATEMENT CONFLICTS WITH THE PLAN, THE PLAN SHALL GOVERN. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES CONTAINED HEREIN ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS OR STATUTORY PROVISIONS THEY ARE SUMMARIZING. THE DEBTORS' MANAGEMENT HAS PROVIDED FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE

INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

A.    Rules of Interpretation

For purposes of this Disclosure Statement, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter gender includes the masculine, feminine, and neuter gender; (c) any reference in the Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; I all references in this Disclosure Statement to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Disclosure Statement; (f) the words "herein," "hereunder," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (h) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (k) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; (l) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America; (m) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (n) to the extent this Disclosure Statement is inconsistent with the terms of the Plan, the Plan shall control; (o) to the extent this Disclosure Statement is inconsistent with the Confirmation Order, the Confirmation Order shall control; (p) to the extent this Disclosure Statement is inconsistent with the terms of the Committee/BOKF Plan Settlement Term Sheet, the Committee/BOKF Plan Settlement Term Sheet shall control; and (q) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Disclosure Statement and the Plan without further Bankruptcy Court Order.

The Plan is the result of extensive discussions and settlements between and among the Debtors and their creditor constituents, as set forth below in more detail in ARTICLE V.L.2. The foregoing parties were represented by counsel, who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, the general rule of contract construction known as "*contra proferentem*" shall not apply to the construction or interpretation of any provision of the Plan, the Disclosure Statement, or any

contract, instrument, release, indenture, exhibit, or other agreement or document generated in connection herewith.

# ARTICLE II.

## OVERVIEW OF THE PLAN

As described herein, the Debtors' proposed First Amended Joint Plan of SunEdison, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), a copy of which is attached hereto as <u>Exhibit A</u>, is the result of extensive discussions between and among the Debtors and their creditor constituents.  The Debtors believe that the settlements contemplated under the Plan are fair and equitable and maximizes the value of the Debtors' estates, and provide the best recovery to Holders of Claims.

For a detailed summary of the Plan, refer to <u>Article VI</u> of this Disclosure Statement.

A.    <u>Plan Distributions and Plan Value</u>

Under the terms of the Plan, administrative expenses (including the Original DIP Facility Claims (in the event amounts are owed and not disputed by any party as of the Effective Date) and the Replacement DIP Facility Claims) will be paid in full.

Distributions to Holders of Second Lien Claims under the Plan will be made from a combination of either: (A) in the TERP Share Election Alternative, (i) 10% of the New SUNE Common Stock, (ii) 10% of the Continuing TERP Class A Shares, (iii) 10% of the Reinstated Second Lien Claim Amount, and (iv) 100% of the Class B GUC/Litigation Trust Interests, and (B) in the TERP Cash Election Alternative,[22] (i) 100% of the New SUNE Common Stock, (ii) 100% of the Reinstated Second Lien Claim Amount, and (iii) 100% of the Class B GUC/Litigation Trust Interests.[23]   In addition, in the TERP Share Election Alternative, Eligible Holders of Second Lien Claims will get their pro rata portion of Rights Offering Subscription Rights.[24]

Holders of General Unsecured Claims, based on their Pro Rata portion of the Class A GUC/Litigation Trust Interests, and on a consolidated basis without reference to Debtor-specific Claims, will receive from the GUC/Litigation Trust certain distributable value from assets reserved for the benefit of Holders of General Unsecured Claims pursuant to the Committee DIP Settlement and the Committee/BOKF Plan Settlement.  The assets to be transferred to the GUC/Litigation Trust and the additional consideration to Holders of General Unsecured Claims

---

[22]    Holders of Second Lien Claims should review the Plan for further details regarding the TERP Cash Election Alternative.

[23]    The equity percentages set forth for the TERP Share Election Alternative do not reflect dilution attributable to the Rights Offering Backstop Standby Fee (i.e., the "put premium" to be paid to the Rights Offering Backstop Purchasers, pursuant to the Equity Commitment Agreement).

[24]    Subject to the Direct Equity Offering as defined in the Equity Commitment Agreement.

as a result of the Committee/BOKF Plan Settlement are described in more detail in the Executive Summary of this Disclosure Statement. The Committee DIP Settlement is described in more detail in ARTICLE V.B and the Committee/BOKF Plan Settlement is described in more detail in Executive Summary herein.

The value available to fund the Plan consists of the following components:

(i)     the value that will be realized by the Debtors' Estates as a result of the consideration received prior to consummation of the Jointly Supported Transactions which are made possible as a result of the settlements that the Debtors reached with the YieldCos (a more detailed summary of the Jointly Supported Transactions and YieldCo Settlements is provided in the Executive Summary and ARTICLE V.J of this Disclosure Statement);

(ii)    the value that has been and will be realized (including after the Effective Date) by the Debtors' Estates from the proceeds of asset sales by the Debtors and non-Debtors (other than the Jointly Supported Transactions) that have occurred and continue to occur during the Chapter 11 Cases, including, without limitation, direct asset sale proceeds and earnouts realized after the closing of any sales;

(iii)   solely in the event of the TERP Share Election Alternative, the proceeds of the Rights Offering and the Direct Equity Commitment, (a more detailed summary of the Rights Offering and Direct Equity Commitment is provided in the Executive Summary and ARTICLE VI.F.4 of this Disclosure Statement);

(iv)    remaining Cash on hand of the Debtors, and any Cash that the Reorganized Debtors receive after the Effective Date, from Residual Assets Proceeds, Earnout Assets, and Repatriated Cash; and

(v)     other sources of value, including, without limitation, the D&O Insurance Proceeds.

B.    <u>Classification Under the Plan</u>

The Plan provides for the resolution of all Claims against and Interests in each of the 51 Debtors in these Chapter 11 Cases, and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan contains separate classes for Holders of Claims and Interests. For administrative convenience, the Plan organizes the Debtors into Debtor Groups and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group. Pursuant to section 1122 of the Bankruptcy Code, set forth below and in <u>Article VI.D</u> of this Disclosure Statement is a designation of the Debtor Groups and Classes of Claims and Interests. The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims. For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator equal to the amount of a particular Holder's Allowed General Unsecured Claim. For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting

Classes or cramdown.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

C.    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Professional Claims, Original DIP Facility Claims (in the event amounts are owed and not disputed by any party as of the Effective Date), Replacement DIP Facility Claims, or Priority Tax Claims. These Claims are therefore excluded from the Classes of Claims set forth in Article II of the Plan.

| Claim | Plan Treatment | Projected Recovery Under the Plan |
|---|---|---|
| Administrative Claims | Paid in full in Cash. | 100% |
| Replacement DIP Term Loan Claims | Paid in full in Cash. | 100% |
| Original DIP Term Loan Claims | Paid in full in Cash. | 100% |
| L/C Borrowing Claims | Paid in full in Cash. | 100% |
| Tranche A-1 Roll-Up Loan Claims | Paid in full in Cash. | 100% |
| Tranche A-2 Roll-Up Loan Claims | Paid in full in Cash. | 100% |
| Tranche B Roll-Up Loan Claims[25] | Paid in full in Cash. | 100% |
| Professional Claims | Paid in full in Cash. | 100% |
| Priority Tax Claims | Paid in full in Cash. | 100% |

D.    Treatment of Claims and Interests under the Plan

The table below summarizes the classification, treatment, and estimated percentage recoveries of the Claims and Interests under the Plan.[26]  Estimated percentage recoveries have been calculated based upon a number of assumptions and, therefore, are subject to material change.  For certain Classes of Claims, the actual percentage recoveries is contingent upon a number of factors, including, but not limited to, Claims that are subject to liquidation pursuant to litigation.  The projected percentage of recoveries provided below are projected as of June 2, 2017.

| Class(es) | Type of Claim or | Treatment of Claim/Interest | Estimated % |
|---|---|---|---|

---

[25]    To the extent that (a) the Debtors elect the TERP Cash Election Alternative and (b) the cash received from the Jointly Supported Transactions is insufficient to repay the Tranche B Roll-Up Lenders in full and in Cash, the Debtors will issue Reinstated Tranche B Roll-Up Loans in an amount and with terms necessary to render the Tranche B Roll-Up Loans Unimpaired, including, without limitation, priority (over the Reinstated Second Lien Claims) in lien and claim amount and interest, and with other terms that are identical to the current Tranche B Roll-Up Loans.

[26]    These summaries below are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see ARTICLE VI below.

|  | **Equity Interest** | | **Recovery Under the Plan** |
|---|---|---|---|
| 1A and 1B | Second Lien Claims | Each Holder of an Allowed Second Lien Claim shall receive its Pro Rata portion of the Second Lien Claim Distribution. In addition to the foregoing, in the TERP Share Election Alternative, each Holder of an Allowed Second Lien Claim that is an Eligible Holder shall receive its Pro Rata portion of the Rights Offering Subscription Rights. | 5.4% |
| 2A – 2E | Other Secured Claims | Except as otherwise provided in and subject to Article 10.6 of the Plan, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable: (i) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default; (ii) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or (iii) receive such other less favorable treatment as to which the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing; _provided_, that Other Secured Claims incurred by the | 100% |

7

| | | Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Nothing in Article 4.2 of the Plan or elsewhere in the Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim. | |
|---|---|---|---|
| 3A – 3E | Other Priority Claims | Except as otherwise provided in and subject to Article 10.6 of the Plan, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date and such other date as agreed between the Debtors (or Reorganized Debtors) and such Holder of an Allowed Other Priority Claim becomes an Allowed Claim or (y) otherwise be left Unimpaired; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. | 100% |
| 4A – 4E | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata portion of the Class A GUC/Litigation Trust Interests, subject to the specifics set forth in the Plan. For the avoidance of doubt, Holders of an Allowed General Unsecured Claims shall not receive any of the Class B GUC/Litigation Trust Interests. | 2.8% |
| 5A-5E | Intercompany Claims | On the Effective Date, and subject to any repayment obligations necessary to satisfy secured Intercompany Claims, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any | 0% |

| | | | |
|---|---|---|---|
| | | Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion with the reasonable consent of the Supporting Second Lien Parties. For the avoidance of doubt, all Allowed Intercompany Claims held by any Debtor constitutes collateral of the Original DIP Lenders, the Replacement DIP Lenders, Second Lien Lenders, and Second Lien Senior Noteholders. | |
| 6A-6E | Other Subordinated Claims | Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims. | 0% |
| 7B-7E | Interests in Debtor Subsidiaries | On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion with the consent of the Supporting Second Lien Parties. To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests. | 0% |
| 8A | Interests in SUNE | On the Effective Date, Allowed Interests in SUNE shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged. | 0% |

As of the General Bar Date, the Debtors' Claims and Solicitation Agent, Prime Clerk, LLC, had received approximately 5,761 Proofs of Claim (as defined below) totaling approximately $46.5 billion. As of the Second Bar Date, the Debtors' Claims and Solicitation Agent, Prime Clerk, had received 63 Proofs of Claim totaling approximately $3.0 billion for Debtors who filed chapter 11 petitions after July 20, 2016 and before March 2, 2017. With respect to Debtors that filed chapter 11 petitions on April 7, 2017, as of the date hereof, the Debtors' Claims and Solicitation Agent, Prime Clerk, has received 13 Proofs of Claim totaling $73.2 million. As of the date hereof, the Debtors have received more than approximately 6,215 Proofs of Claim totaling approximately $49.28 billion.[27] The Debtors have not objected to any

---

[27]    These numbers include approximately 1,618 Proofs of Claim filed by non-Debtor affiliates.

Claims as of the date hereof, but believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, has assumed for purposes of estimating recoveries that such Claims shall be expunged from, or reduced in amount in, the Claims Register.

E.    Liquidation Analyses

The Debtors have prepared liquidation analyses, attached hereto as Exhibit C (the "Liquidation Analyses") to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analyses compares the creditor recoveries to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the distributions to Holders of Allowed Claims and Interests under the Plan. The analyses are based upon the value of the Debtors' assets and liabilities as of a certain date, and incorporate various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, each analysis is subject to potentially material changes including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analyses.

The Debtors believe that the Plan provides the same or a greater recovery for Holders of Allowed Claims and Interests as would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code under either scenario because of a number of factors, including, but not limited to: the additional Administrative Claims generated by conversion to a chapter 7 case, the administrative costs of liquidation, loss of value from remaining asset sales in the pipeline caused  by, among other things, business discontinuity and loss of employee knowledge, associated delays in connection with a chapter 7 liquidation, and the low likelihood that recoveries on assets (including litigation assets) will be maximized in a chapter 7 case.  In addition, in a chapter 7 liquidation, the value of the Committee/BOKF Plan Settlement, the YieldCo Settlements and the Jointly Supported Transactions would be put at significant risk.

## ARTICLE III.

## VOTING PROCEDURES

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 1A and 1B | Second Lien Claims | Impaired |
| 4A-4E | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in any of these Classes, you are not entitled to vote and you will not receive a Solicitation Package.

A.    Classes Entitled to Vote

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims voting on the Plan.  Acceptance by a Class requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least

two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. In addition, under the Bankruptcy Code, creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. The following table sets forth which Classes of Claims will or will not be entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1A and 1B | Second Lien Claims | Impaired | Entitled to Vote |
| 2A-2E | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3A-3E | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4A-4E | General Unsecured Claims | Impaired | Entitled to Vote |
| 5A-5E | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 6A-6E | Other Subordinated Claims | Impaired | Deemed to Reject |
| 7B-7E | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 8A | Interests in SUNE | Impaired | Deemed to Reject |

B.    Solicitation Procedures

1.    Claims and Solicitation Agent

The Debtors retained Prime Clerk, LLC ("Prime Clerk") to, among other things, act as Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

2.    Solicitation Package

The Solicitation Package, as applicable pursuant to the Disclosure Statement Order, may include:

> the Order (A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Proposed Plan; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto (the "Disclosure Statement Order"); and

> the Notice of (A) Approval of Adequacy of Disclosure Statement, (B) Solicitation and Voting Procedures, (C) the Objection and Voting Deadlines, and (D) the Hearing to Confirm the Debtors' Joint Plan;

11

the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;

a letter from the Creditors' Committee (the "UCC Letter") setting forth the Creditors' Committee's recommendation that you vote in favor of the Plan; and

any supplemental solicitation materials the Debtors may file with the Bankruptcy Court.

3.     Distribution of the Solicitation Package and Plan Supplement

Through the Claims and Solicitation Agent, the Debtors intend to distribute the Solicitation Packages within five (5) Business Days after entry of the Disclosure Statement Order.

The Solicitation Package will be distributed in accordance with the Solicitation Procedures, which shall be attached as Exhibit 5 to the Disclosure Statement Order.  The Solicitation Package (except the Ballots) may also be obtained from the Claims and Solicitation Agent by: (a) calling the Debtors' restructuring hotline at (855) 388-4575; (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sunedison and/or (c) writing to SunEdison Case Administration, c/o Prime Clerk, 830 Third Avenue, 3rd Floor, New York, NY 10022.  You may also obtain modified copies of any pleadings filed in these Chapter 11 Cases for free by visiting the Debtors' restructuring website at https://cases.primeclerk.com/sunedison or for a fee via PACER at http://www.nysb.uscourts.gov.

At least seven (7) days prior to the Confirmation Hearing, the Debtors intend to file a Plan Supplement that includes, among other things, the list of Executory Contracts to be assumed (with associated Cure Amounts, if any), a description of Causes of Action to be retained by the Reorganized Debtors, and the GUC/Litigation Trust Agreement.  As the Plan Supplement is updated or otherwise modified, such or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement.  However, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by: (a) calling the Debtors' restructuring hotline at (855) 388-4575; (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sunedison; and/or (c) writing to SunEdison Case Administration, c/o Prime Clerk, 830 Third Avenue, 3rd Floor, New York, NY 10022.

C.     Voting Procedures

The Voting Record Date is **11:59 p.m. prevailing Eastern Time on June 5, 2017**.  The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim.  The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.  In order for the Holder of a Claim in the Voting Classes to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by using the return envelope provided by: (a) first class mail; (b) overnight courier; (c) personal delivery, or (d) through online transmission solely via, and in accordance with the instructions set forth on Prime Clerk's e-ballot platform on the Debtors' case website (https://cases.primeclerk.com/sunedison), in each case so that such Holder's Ballot is **actually received** by the Claims and Solicitation Agent prior to **4:00 p.m. prevailing Eastern Time on July 13, 2017** (the "Voting Deadline").  It is important that the Holder of a Claim in the Voting Classes follow the specific instructions provided on such Holder's Ballot and the accompanying instructions.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, SUBJECT TO COURT APPROVAL, THE DEBTORS MAY, IN THEIR SOLE AND ABSOLUTE DISCRETION, REJECT SUCH BALLOT AS INVALID AND DECLINE TO COUNT IT IN CONNECTION WITH CONFIRMATION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

D.    Rights Offering Procedures

The Debtors and the Rights Offering Backstop Purchasers will implement and conduct the Rights Offering in accordance with the Equity Commitment Agreement and the Rights Offering Procedures. The Rights Offering will be open to Eligible Holders of Allowed Second Lien Claims, who will have the right to subscribe for their pro rata portion of the Rights Offering Shares based on such Holder's Allowed Second Lien Claim amount as a percentage of all Allowed Second Lien Claims as of the Rights Offering Record Date.  Eligible Holders that exercise Rights in the Rights Offering shall receive a portion of the Reinstated Second Lien Claims pursuant to the Reinstated Second Lien Modification Terms in the same proportion as they will hold New SUNE Common Stock (i.e., if a participant would receive 2% of New SUNE Common Stock, such participant would hold 2% of Reinstated Second Lien Claims). The Rights

13

Offering Backstop Purchasers will, severally, and not jointly, backstop the Rights Offering on a fully committed basis and will receive a 7% fee to be paid-in-kind with additional New SUNE Common Stock, Continuing TERP Class A Shares, and Reinstated Second Lien Claims.

## ARTICLE IV.

## GENERAL INFORMATION

A.    Overview of the Debtors' Corporate History and Business Operations

1.    The Debtors' Corporate History

The Debtors are direct and indirect subsidiaries and affiliates of Debtor SUNE, a renewable-energy development company that has its early roots tied to MEMC Electronics Materials, Inc. ("MEMC"), a silicon wafer manufacturing company.  In November 2009, MEMC acquired privately-owned Sun Edison LLC.  At the time of the acquisition, Sun Edison LLC was already one of North America's largest solar energy developers in the commercial and industrial market, developing, financing, building, operating, and monitoring large-scale photovoltaic ("PV")[28]  plants since 2003.  After its acquisition of Sun Edison LLC, MEMC became a developer of solar power projects and one of North America's largest solar energy services providers, focusing on developing and acquiring advanced technologies used in the production of low-cost, high-performance solar panels and developing, owning, operating, and selling solar power projects.

Thereafter, MEMC continued to expand its solar-energy business and ultimately determined to focus predominantly on this business line.  In May, 2013, MEMC changed its name to SunEdison, Inc.  Subsequently, in May 2014, SUNE spun off its semiconductor materials business segment.  In June 2015, SunEdison announced its divestiture of its semiconductor business.  The completion of the sell-off finalized SunEdison's transition into a dedicated renewable energy company.

In March 2014, SUNE created a "yieldco" subsidiary – a dividend-oriented entity,[29] called TerraForm Power, LLC ("Power LLC").  On July 22, 2014, SUNE contributed Power LLC to a separate SUNE subsidiary, TerraForm Power, Inc. ("TERP"),[30]  concurrently with the IPO of TERP.  Following the IPO, SUNE maintained a majority stake in both Power LLC and TERP (as described further below).  As part of the TERP IPO, many of SUNE's completed projects in developed countries (primarily North America, the UK, and Chile) were contributed

---

[28]    "Photovoltaic" refers to the conversion of sunlight (photons) to electrical energy (voltage).

[29]    A yieldco is akin to a master limited partnership elsewhere in the energy field, and  is essentially a collection of operating energy assets (e.g., wind farms and solar plants) that are expected to produce foreseeable economic returns.  The concept of a yieldco is to have a steady stream of predictable income – such as that from long-term PPAs (defined below) with power utilities – in order to fund a strong, sustainable dividend for the yieldco's investors.

[30]    TerraForm Power, Inc. currently trades on the NASDAQ under the ticker "TERP."

to the capital of Power LLC. In similar fashion, on August 5, 2015, SUNE completed the IPO of a second yieldco subsidiary, TerraForm Global, Inc. ("GLBL"),[31] to own, through TerraForm Global, LLC ("Global LLC"), many of SunEdison's completed renewable-energy projects in emerging markets such as Brazil, China, and India. Following the IPO, SUNE maintained a majority stake in both Global LLC and GLBL (as described further below). The process of creating the YieldCos required intensive capital in order to build the YieldCos' portfolios prior to their IPOs and grow them after. **Neither the YieldCos nor their direct and indirect subsidiaries are included as "Debtors" in these Chapter 11 Cases.**

2.    The Debtors' Interests in the YieldCos

SunEdison holds a total of approximately 48,202,310 Class B shares of TERP and 48,202,310 Class B units[32] of Power LLC, which represents 100% of both the outstanding Class B shares of TERP and Class B units of TERP LLC.[33]  Pursuant to the limited liability company agreement of Power LLC, SunEdison is also entitled to certain incentive distribution rights ("IDRs") of Power LLC.[34]  SunEdison's position represents 100% of the Class B shares of TERP and Class B units of Power LLC outstanding. In the aggregate, SunEdison holds approximately 33.9% of the economic interests and 88.3% of the voting interests in TERP, with the securities held indirectly through two SunEdison subsidiaries – SunEdison Holdings Corporation and SUNE ML 1, LLC (each of which are Debtors in these Chapter 11 Cases).

SunEdison holds a total of approximately 61,343,054 Class B shares of GLBL (and 2 million class A shares of GLBL) and 61,343,054 Class B units[35] of Global LLC, which represents 100% of both the Class B shares of GLBL and Class B units of Global LLC outstanding.[36]  As is the case with TERP LLC, SunEdison holds all of the IDRs of Global LLC. In the aggregate, SunEdison holds approximately 35.7% of the economic interests and 98.2% of the voting interests in GLBL, with the securities held indirectly through SunEdison Holdings Corporation.

As described in more detail in the Executive Summary and ARTICLE V.I.2 herein, as of March 6, 2017, the Debtors entered into the YieldCo Settlement Agreements, which, among other things, provide for the Debtors to receive 36.9% and 25% (exclusive of SunEdison's current Class A share ownership in GLBL), respectively, of the total consideration flowing to

---

[31]    TerraForm Global, Inc. currently trades on the NASDAQ under the ticker "GLBL."

[32]    Class B units are economic units and Class B shares are voting, non-economic shares (10 votes per share).

[33]    One Class B share, together with one Class B unit, is exchangeable for one Class A share of TERP.

[34]    The IDRs entitle SunEdison to preferential dividends in the event certain dividend thresholds are achieved for other shareholders. SunEdison holds all of the IDRs of Power LLC.

[35]    Class B units are economic units and Class B shares are voting, non-economic shares (100 votes per share).

[36]    One Class B share, together with one Class B unit, is exchangeable for one Class A share of GLBL.

TERP and GLBL shareholders[37] under the two separate Jointly Supported Transaction Agreements pursuant to which Brookfield is to acquire 51% of TERP's outstanding stock in a sponsorship merger transaction and 100% of GLBL's outstanding stock in a whole company cash merger.

    3.     The Debtors' Business Operations

Prior to the Petition Date, SunEdison was the largest global renewable-energy development company and developed, financed, constructed, owned, and operated renewable energy power plants for contribution or sale to the YieldCos, strategic partners, or unaffiliated third-party buyers, while also serving as a renewable energy asset manager. In its capacity as asset manager, SunEdison historically provided asset management, operations and maintenance, monitoring, and reporting services to safeguard and maximize the performance of its customers' renewable energy assets. The Debtors' development business units historically fell into the following business unit: (i) residential and small commercial ("RSC"); (ii) large commercial and industrial ("C&I"); (iii) utility scale ("Utility"); (iv) global asset management ("GAM"); and (v) the solar materials business (the "Solar Materials Business Unit"). As discussed further in Article V herein, over the course of the Chapter 11 Cases, the Debtors have largely wound up the Company's development activities through the sale and divestiture of certain key business segments and platforms (comprised of Debtor and non-Debtor assets). The RSC, Utility, C&I, and Solar Materials business units have been substantially divested over the course of the Chapter 11 Cases. The Debtors are currently in the process of divesting the GAM business unit and have been working with the YieldCos to facilitate a transition of the GAM employees and employee related obligations and contracts. The Financial Projections reflect the assets and estimated values thereof that are expected to remain with Reorganized SUNE and its Affiliates immediately following emergence.

B.     SunEdison's Corporate Structure

SUNE is the ultimate parent company of hundreds of domestic and foreign subsidiaries. This includes Debtor and non-Debtor subsidiaries and affiliates that operate throughout the world, including in the United States, Canada, Mexico, Latin America, Europe, India, Malaysia, Singapore, Africa, the Middle East, Australia, and Asia. As of the Petition Date, the Company's organizational structure consisted of approximately two thousand distinct corporate entities formed in jurisdictions around the globe. The large number of entities within the Company's corporate structure resulted from the breadth of the Company's business, both operationally and geographically. Specifically, the Company's business consisted of developing, constructing, and managing solar, wind, and other renewable energy systems in various regions around the globe.

With respect to project development, the Company typically formed a new special purpose entity for each of its projects. Such special purpose entities were formed prior to developing and constructing each renewable energy project (or a group of related projects) or prior to selling or financing a project. In this regard, the majority of entities formed by the

---

[37]    As adjusted for shares excluded under the applicable merger agreement with Brookfield, including shares held by Brookfield.

Company initially held no assets or minimal, early-stage assets, with the intent that such entities would develop and construct projects that could ultimately be financed and sold.

As the Company's liquidity situation worsened, and following the Company's bankruptcy filings, hundreds of non-Debtor project entities were essentially stranded, with no source of capital to further develop the intended projects. Stalled project development resulted in value degradation for various reasons, including the inability to fund necessary land acquisitions and governmental permits and the failure to achieve construction milestones. The Company has therefore commenced sale and/or wind down processes for the majority of its project entities, and intends to continue to dissolve or otherwise dispose of the majority of the Company's project subsidiaries.

In addition, many of the Company's subsidiaries consist of holding companies that own no assets other than equity interests in project companies or intermediate holding companies. The Company implemented a holding company structure due to the regional nature of its renewable energy projects, which are each subject to local tax, regulatory, corporate governance, and other obligations dependent on where such project is located. Therefore, many of the Company's subsidiaries own no assets other than project subsidiaries, and will be wound down upon the disposition of the holdings companies' subsidiaries' project assets.

Finally, the Company also formed numerous distinct entities in connection with the Company's engineering, construction, and procurement ("EPC") and O&M business and Solar Materials business. Such EPC and O&M entities entered into agreements to construct or manage SunEdison-owned and third party-owned renewable energy projects and the Solar Materials entities conducted research, development and analysis related to solar products and implemented a tax efficient supply chain for the purchase and sale or solar materials used in the Company's project business.

C.    SunEdison, Inc.'s Board of Directors

The following persons comprise the board of directors of SUNE (the "Board of Directors"):

| Name | Position |
|------|----------|
| Antonio Alvarez | Director |
| Clayton Daley, Jr. | Director |
| Claire Gogel | Director |
| Emmanuel T. Hernandez | Director, Chairman of the Board |
| Georgeanne C. Proctor | Director |
| James B. Williams | Director |
| Randy H. Zwirn | Director |

D.    Executive Officers of SunEdison, Inc.

SUNE's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"), John S. Dubel; Chief Financial Officer ("CFO") Phillip J. Gund; and Senior Vice President, Corporate Controller, Salvatore LoBiondo, Jr. were each appointed to their positions during the course of the Chapter 11 Cases.

The Debtors appointed John S. Dubel, Chief Executive Officer of Dubel & Associates, LLC, as their Chief Restructuring Officer ("CRO") to satisfy certain requirements of the DIP Credit Agreement. Mr. Dubel has extensive experience in board representation, turnaround management, crisis management, operational restructurings, and divestments in the distressed space and has assisted, advised, and provided strategic advice to debtors, creditors, and equity holders in chapter 11 cases of similar size and complexity to the Debtors' Chapter 11 Cases. The Bankruptcy Court approved the appointment of Mr. Dubel as CRO on June 8, 2016, *nunc pro tunc* to April 29, 2016 [Docket No. 512]. As CRO, Mr. Dubel was granted sole authority and discretion on behalf of management with respect to all matters in connection with the Debtors' restructuring initiatives. As such, with the assistance of the Debtors' advisors, Mr. Dubel has led and directed the evaluation and implementation of strategic, tactical, and operational alternatives throughout the chapter 11 process to maximize the value of the Debtors' Estates. Among other responsibilities, Mr. Dubel negotiated with key creditor constituents in the Chapter 11 Cases, oversaw and provided strategic advice regarding the marketing process for certain components of the Debtors' renewable energy development businesses, monitored the implementation of financial controls over intercompany transactions, oversaw compliance with various reporting requirements, and led a comprehensive cost reduction program designed to maximize value for all stakeholders.

On June 16, 2016, former President and CEO Ahmad Chatila resigned from his management positions and seat on the Board of Directors at SUNE. On June 22, 2016, the Debtors elevated Mr. Dubel to the position Chief Executive Officer ("CEO"). In addition to continuing his role as CRO, Mr. Dubel as CEO assumed the responsibilities of reporting directly to the full Board of Directors, overseeing the day-to-day operations of the Debtors, and leading the Debtors and their senior management in the development of the Company's business plan, among other tasks.

On June 28, 2016, the Debtors hired Philip J. Gund as their new Chief Financial Officer ("CFO"). Mr. Gund is a Senior Managing Director of Ankura Consulting Group, LLC ("Ankura") with more than 30 years of professional experience, including 26 years working with debtor companies, their creditors, investors, and court-appointed professionals. Mr. Gund's terms of employment are set forth in a management agreement between the Debtors and Ankura, dated June 28, 2016 (the "Ankura Management Agreement"). On August 11, 2016, the Bankruptcy Court approved the Ankura Management Agreement and the Debtors appointment of Mr. Gund as CFO, effective as of June 28, 2016 [Docket No. 967].

Pursuant to the Ankura Management Agreement, the Debtors also appointed Salvatore LoBiondo, Jr. as Senior Vice President and Corporate Controller effective as of June 24, 2016 [Docket No. 967]. Mr. LoBiondo is a Senior Managing Director of Ankura and has advised on complex restructurings across a diverse range of industries, often working in advisory and interim management roles.

SUNE's executive management team currently consists of the following individuals:

| Name | Position |
| --- | --- |
| John S. Dubel | Chief Executive Officer and Chief Restructuring Officer |
| Philip J. Gund | Chief Financial Officer |

18

| Salvatore LoBiondo, Jr. | Senior Vice President, Corporate Controller |
| Stephen Cerrone | Executive Vice President and Chief Human Resources Officer |
| Martin H. Truong | Senior Vice President, General Counsel and Secretary |

## E.    The Debtors' Workforce

As of the Petition Date, the Debtors employed approximately 1,610 employees in the United States and Singapore (the "Employees"),[38] of which approximately 1,270 were paid on a salaried basis and the remaining employees were paid on an hourly basis.  In conjunction with the Company's overall operational and cost reduction strategy, as well as the sale of various business units, the Company has significantly reduced its global workforce over the course of these Chapter 11 Cases.  As of the date hereof, the Debtors currently employ approximately 301[39] Employees in the United States and Singapore, of which approximately 225 are paid on a salaried basis and approximately 76 are paid on an hourly basis.  The Company anticipates further significant reductions in workforce in connection with the Plan, as the reorganized Company will continue minimal operations focused on collecting Earnout Proceeds, Residual Assets Proceeds, and Repatriated Cash and winding down remaining entities in foreign jurisdictions.

## F.    The Debtors' Prepetition Capital Structure

As of April 2016, the Debtors' principal debt obligations were as follows:

### 1.    Secured Recourse Debt

#### (a)    Prepetition First Lien Facility

On February 28, 2014, SUNE entered into a credit agreement with the lenders and letter of credit issuers party thereto from time to time (the "Prepetition First Lien Lenders"), Wells Fargo Bank, N.A., as administrative agent (as amended from time to time, the "Prepetition First Lien Facility").  The Prepetition First Lien Facility provided for a senior secured letter of credit facility in an aggregate principal amount of up to $750 million with a term ending February 28, 2017.  As of April 14, 2015, SUNE had $678 million of outstanding third-party letters of credit backed by the Prepetition First Lien Facility, of which approximately $145 million were drawn and unreimbursed amounts in respect of the letters of credit as of the Petition Date (the "Drawn L/C Borrowings").  As described in Article V.B herein, the Prepetition First Lien Facility was replaced in whole by the DIP L/C Facility, and all outstanding Drawn L/C Borrowings were rolled up into the Original DIP Facility as the Tranche A-1 Roll-Up Loans.

---

[38]    Overall, the Company employed approximately 3,105 people globally as of the Petition Date.  The Company's global workforce includes employees that support the Company's businesses at non-debtor affiliates either within or outside the United States, including, as of the Petition Date, approximately 100 employees (employed by both Debtor and non-Debtor affiliates) that provide various levels and types of services to TERP, pursuant to a certain Management Services Agreement, dated July 23, 2014, and GLBL, pursuant to a certain Management Services Agreement, dated August 5, 2015.

[39]    This does not include the CEO, CFO, or Senior Vice President, Corporate Controller.

SUNE's obligations under the Prepetition First Lien Facility are guaranteed by certain of its domestic subsidiaries (such subsidiaries that have provided a guaranty, the "Prepetition Guarantors"). SUNE's obligations and the guaranty obligations of the Prepetition Guarantors under the Prepetition First Lien Facility are secured by first priority liens on, and security interests in, substantially all present and future assets of SUNE and the Prepetition Guarantors, including a pledge of the capital stock of certain of their respective domestic and foreign direct subsidiaries. As discussed in ARTICLE V.I.3 herein, the Creditors' Committee commenced an adversary proceeding challenging, among other things, the validity of certain of these liens; however, the Committee/BOKF Plan Settlement resolves the UCC Challenge Litigation and this proceeding is currently stayed and shall be deemed withdrawn with prejudice upon the approval of the Committee/BOKF Plan Settlement, Confirmation of the Plan, and the occurrence of the Effective Date.

      (b)     Prepetition Second Lien Facility

On January 11, 2016, SUNE entered into a second lien credit agreement (the "Prepetition Second Lien Facility" and, the loans thereunder, the "Prepetition Second Lien Loans") among SUNE, as borrower, each lender from time to time party thereto (the "Prepetition Second Lien Lenders"), Wilmington Savings Fund Society, FSB, as successor administrative agent to Deutsche Bank AG New York Branch, pursuant to which term loans in an aggregate principal amount of $725 million were made, consisting of $500 million aggregate principal amount of Tranche A-1 term loans and $225 million aggregate principal amount of Tranche A-2 term loans. As described in ARTICLE V.B herein, $350 million aggregate principal amount of the Prepetition Second Lien Debt (defined below) was approved to be rolled up into the Original DIP Facility and the Replacement DIP Facility, and the roll-up of the Tranche B Roll-Up Loans became effective on May 2, 2017.

SUNE's obligations under the Prepetition Second Lien Facility are guaranteed by the Prepetition Guarantors. SUNE's obligations and the guaranty obligations of the Prepetition Guarantors under the Prepetition Second Lien Facility are secured by second priority liens on, and security interests in, all present and future assets of SUNE and the Prepetition Guarantors that secure the Prepetition First Lien Facility, including a pledge of the capital stock of certain of their respective domestic and foreign direct subsidiaries. As discussed in ARTICLE V.I.3 herein, the Creditors' Committee commenced an adversary proceeding challenging, among other things, the validity of certain of these claims and liens; however, the Committee/BOKF Plan Settlement resolves the UCC Challenge Litigation and this proceeding is currently stayed and shall be deemed withdrawn with prejudice upon the approval of the Committee/BOKF Plan Settlement, Confirmation of the Plan, and the occurrence of the Effective Date.

      (c)     Second Lien Senior Notes

On January 11, 2016, in connection with the Convertible Notes Exchange Transactions (defined below), SUNE issued $225 million aggregate principal amount of second lien senior secured convertible notes due 2018 (the "Prepetition Second Lien Senior Notes," and together with the Prepetition Second Lien Facility, the "Prepetition Second Lien Debt," and the Prepetition Second Lien Debt together with the Prepetition First Lien Facility, the "Prepetition Secured Debt") under an indenture, dated as of January 11, 2016, among SUNE, as borrower, the

Prepetition Guarantors, as guarantors, and Wilmington Trust, National Association, as trustee. As described in <u>ARTICLE V.B</u> herein, $350 million aggregate principal amount of the Prepetition Second Lien Debt (defined below) was approved to be rolled up into the Original DIP Facility and the Replacement DIP Facility, and the roll-up of the Tranche B Roll-Up Loans became effective on May 2, 2017.

SUNE's obligations and the guaranty obligations of the Prepetition Guarantors under the Prepetition Second Lien Senior Notes are secured by the same second priority liens on, and security interests in, all present and future assets of SUNE and the Prepetition Guarantors that secure the Prepetition Second Lien Facility, including a pledge of the capital stock of certain of their respective domestic and foreign direct subsidiaries. As discussed in <u>ARTICLE V.I.3</u> herein, the Creditors' Committee commenced an adversary proceeding challenging, among other things, the validity of certain of these claims and liens; however, the Committee/BOKF Plan Settlement resolves the UCC Challenge Litigation and this proceeding is currently stayed and shall be deemed withdrawn with prejudice upon the approval of the Committee/BOKF Plan Settlement, Confirmation of the Plan, and the occurrence of the Effective Date.

    2.    <u>Unsecured Recourse Debt</u>

    (a)    <u>Exchangeable Notes (Guaranteed by SUNE)</u>

On January 29, 2015, Seller Note, LLC ("<u>Seller Note</u>"), a wholly-owned non-Debtor subsidiary of SUNE, issued $336 million aggregate principal amount of 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "<u>Exchangeable Notes</u>") in a private placement pursuant to an indenture agreement among Seller Note, SUNE, as guarantor, and Wilmington Trust, N.A., as exchange agent, registrar, paying agent, and collateral agent (the "<u>Exchangeable Notes Trustee</u>"). The Exchangeable Notes were issued to fund a portion of the purchase price of the First Wind acquisition described herein.

In connection with the issuance of the Exchangeable Notes, Seller Note also entered into a pledge agreement with the Exchangeable Notes Trustee, in its capacity as collateral agent, providing for the pledge of certain shares of TERP Class B common stock and Power LLC's Class B units contributed to and held by the subsidiary (the "<u>Class B Securities</u>").[40] In addition, the Exchangeable Notes are fully and unconditionally guaranteed by SUNE. The Exchangeable Notes and the guarantees are *pari passu* in right of payment to the SUNE's obligations under its outstanding convertible debt.

On December 29, 2015, SUNE, Seller Note, and certain wholly-owned SUNE subsidiaries entered into a purchase and sale agreement (the "<u>D. E. Shaw Purchase Agreement</u>") with certain holders of the Exchangeable Notes – i.e. affiliates of the D.E. Shaw Group, Madison Dearborn Capital Partners IV, L.P., and Northwestern University (collectively, the "<u>D.E. Shaw Buyers</u>") – pursuant to which the D.E. Shaw Buyers accepted Power LLC shares serving as collateral securing the Exchangeable Notes in satisfaction of $121 million of principal owed

---

[40]   The Class B Securities were converted to Class A shares of TERP common stock in connection with the transfer of the Class B Securities to the holders of the Exchangeable Notes.

under the Exchangeable Notes and agreed to take Project transfers from SunEdison in lieu of cash to satisfy the remaining $215 million of principal owed under the Exchangeable Notes. In the event that any of the Project transfers could not be completed, specified amounts (in the aggregate not to exceed $215 million) of the Exchangeable Notes would become due in cash.

(b)    Convertible Senior Notes

The 2018 Notes, 2020 Notes, 2021 Notes, 2022 Notes, 2023 Notes, and 2025 Notes (collectively referred to as the "Convertible Notes" and individually referred to as defined below) are: (i) general unsecured obligations of SUNE (there are no guarantees) and rank senior in right of payment to any of SUNE's future indebtedness that is expressly subordinated in right of payment to the Convertible Notes; (ii) equal in right of payment to SUNE's existing and future unsecured indebtedness that is not so subordinated; (iii) effectively subordinated in right of payment to any of SUNE's secured indebtedness to the extent of the value of the assets securing such indebtedness; and (iv) structurally subordinated to all existing and future indebtedness (including trade payables) incurred by SUNE's subsidiaries. More specifically, the Convertible Notes are as follows:

- Convertible Senior Notes Due 2018 and 2021. On December 20, 2013, SUNE issued $600 million in aggregate principal amount of 2.00% convertible senior notes due 2018 (the "2018 Notes") and $600 million aggregate principal amount of 2.75% convertible senior notes due 2021 (the "2021 Notes") in a private placement offering. On May 12, 2015, SUNE entered into privately negotiated exchange agreements (the "2018/2021 Exchange Agreements") with a limited number of holders of its outstanding 2018 Notes and 2021 Notes. Pursuant to the 2018/2021 Exchange Agreements, SUNE exchanged $600 million aggregate principal amount of outstanding 2018 Notes and 2021 Notes ($300 million of the 2018 Notes and $300 million of the 2021 Notes) for 41 million shares of common stock underlying the 2018 Notes and 2021 Notes to be exchanged and $63 million in cash.

- Convertible Senior Notes Due 2020. On June 10, 2014, SUNE issued $600 million in aggregate principal amount of 0.25% convertible senior notes due 2020 (the "2020 Notes") in a private placement offering.

- Convertible Senior Notes Due 2022. On January 27, 2015, SUNE issued $460 million in aggregate principal amount of 2.375% convertible senior notes due 2022 (the "2022 Notes") in a private placement offering.

- Convertible Senior Notes Due 2023 and 2025. On May 20, 2015, SUNE issued $450 million in aggregate principal amount of 2.625% convertible senior notes due 2023 (the "2023 Notes") and $450 million aggregate principal amount of 3.375% convertible senior notes due 2025 (the "2025 Notes") in a private placement offering.

(c)    Convertible Notes Exchange

On January 7, 2016, SUNE entered into a series of exchange agreements with certain holders of the 2018 Notes, the 2020 Notes, the 2021 Notes, the 2022 Notes, the 2023 Notes, the 2025 Notes (collectively, the "Existing Convertible Notes") and its 6.75% Series A Perpetual Convertible Preferred Stock (the "Preferred Stock"), pursuant to which SUNE agreed to issue in exchange for Existing Convertible Notes and Preferred Stock, new notes and common stock (the "Convertible Notes Exchange Transactions").

Pursuant to the Convertible Notes Exchange Transactions, SUNE issued a total of approximately 51.9 million shares of common stock in exchange for approximately $244.3 million aggregate principal amount of the Existing Convertible Notes and approximately $158.3 million of the Preferred Stock.  SUNE issued the Second Lien Senior Notes in exchange for approximately $335.9 million aggregate principal amount of the Existing Convertible Notes.

3.    Project-Level Non-Recourse and Unsecured Non-Recourse Debt

The Company's renewable-energy systems, and the related short-term and long-term debt and financing obligations, are generally included in separate legal entities.  This debt has recourse to those separate legal entities but no or limited recourse to the Debtors under the terms of the applicable agreements.  These finance obligations are fully collateralized by the related renewable energy system assets and may also include limited guarantees by the Debtors related to equity commitments, operations, maintenance, certain indemnities, and other "sponsor" commitments negotiated on a deal-by-deal basis.

As of the Petition Date, the Debtors had outstanding $3.8 billion project-level secured non-recourse debt obligations, which debt obligations have priority at the project level.  With respect to non-recourse trade debt obligations as of the Petition Date, the Debtors estimated that they had outstanding prepetition trade claims totaling approximately $357 million,[41] which represents estimated trade accounts payable as of April 13, 2016.  The Debtors' estimate of outstanding prepetition accounts payable reflects only invoices actually entered in the Debtors' books and records (as of or around the Petition Date).

4.    SUNE Preferred Stock and Common Stock

As of April 20, 2016, there were approximately 436 million shares of common stock in SUNE outstanding, with approximately 214 holders of record and a trading price of $0.34/share.  Prior to the Petition Date, SUNE was a publicly-traded company listed on the New York Stock Exchange (the "NYSE") under the symbol "SUNE."  SUNE's common stock was suspended from trading effective as of April 21, 2016.  The delisting of SUNE's common stock was completed effective as of May 17, 2016.  After the suspension from trading on the NYSE,

---

[41]    As set forth in the Declaration of Patrick M. Cook Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Pleadings (Docket No. 4) (the "First Day Declaration"), the Debtors believed that there were additional amounts not reflected in this total  trade debt estimate as of the  Petition Date, which does not includes goods and services that have been received, but not yet invoiced in the Debtors' books and records.

23

SUNE's common stock has traded on the over-the-counter market, also known as the "Pink Sheets," under the symbol "SUNEQ."

## ARTICLE V.

## THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including certain events preceding the Chapter 11 Cases, the stabilization of the Debtors' operations while in chapter 11, and the Debtors' restructuring initiatives implemented and key transactions executed since the Petition Date.

A.    Events Leading to the Commencement of the Chapter 11 Cases

From December 2013 to January 2016, SunEdison experienced a period of significant growth, during which the Company made significant investments and committed to in excess of $18 billion in acquisitions (*including by the YieldCos*), including, but not limited to (i) the Power LLC IPO and associated investments (July 2014); (ii) the $2.4 billion acquisition of First Wind Holdings, LLC ("First Wind") (January 2015); (iii) the $525 million acquisition of 521 MW of wind projects from Atlantic Power Transmission, Inc. (June 2015); (iv) the Global LLC IPO (July 2015) and associated investments; (v) the nearly $2.2 billion commitment (at announcement) to purchase Vivint Solar, Inc.; (vi) the $5 billion transactions with Renova Energia S.A. to acquire certain projects; (vii) the $1.9 billion acquisition by TERP of 930 MW of operating wind power plants from Invenergy Wind LLC; and (viii) GLBL's acquisition of call rights over certain project companies located in China.  As stated above, not all of these transactions actually reached closing due to the liquidity constraints.  Such growth required capital investments; and to fund these investments, from 2013 to 2016, SunEdison raised $24 billion through debt and equity offerings.[42]

In November 2014, SunEdison and Power LLC jointly entered into an agreement to acquire First Wind Holdings, LLC ("First Wind"), the largest wind power developer in the United States, for $2.4 billion.  SunEdison funded its $1.5 billion portion of the purchase price from the proceeds of: (i) the issuance by non-Debtor Seller Note, LLC (a wholly-owned special purpose subsidiary of SUNE) of $336.5 million aggregate principal amount of the Exchangeable Notes which were guaranteed by SUNE and secured by 12.1 million of equity interests in Power LLC owned by SUNE; (ii) the issuance by SunE ML 1, LLC of $410 million in margin term loans which were guaranteed by SUNE and secured by 32.2 million of equity interests in Power LLC owned by SUNE (the "Margin Loan"); and (iii) the issuance by SUNE of $350 million in unsecured convertible notes.  On top of the consideration paid by SUNE at the closing of the acquisition, SunEdison also had agreed to pay earnout payments in excess of $510 million to First Wind's owners based on the future successful development of the assets it acquired.  In

---

[42]    In response to inquiries from holders of Interests in SUNE, the Debtors have compiled information from their publicly available securities filings summarizing SunEdison's $24 billion in capital raised and uses thereof as reflected in Exhibit D hereto.  Exhibit D includes funds raised and used by non-Debtor affiliates, including by the YieldCos, as such amounts were consolidated with the Debtors' previous financial reporting.

addition to this initial capital raise, the "pipeline" projects that SunEdison acquired would require significant additional capital to develop. To raise the necessary construction capital for these development projects, SunEdison negotiated a $500 million equity commitment from affiliates of First Reserve Corp. and approximately $1 billion in debt commitments from a syndicate of commercial banks.

In July 2015, after SunEdison's announcement of its entry into an Agreement and Plan of Merger with Vivint Solar, Inc. ("Vivint"), dated July 20, 2015 (as amended from time to time, the "Vivint Merger Agreement"), pursuant to which SunEdison would acquire Vivint, the stock price of SUNE and TERP declined. In August 2015, there was insufficient demand to close the GLBL IPO on its offered terms and SUNE agreed to acquire $30 million of Class A common stock of GLBL.

The Margin Loan included provisions requiring cash collateralization and/or prepayments if the share price of TERP dropped below certain thresholds. Beginning in September 2015, the share price of TERP fell below all of these thresholds, and in October 2015 the entire Margin Loan became mandatorily prepayable. This prepayment, which amounted to $439 million, drained SunEdison's cash reserves and fundamentally changed its and the YieldCos' financial outlook. Concurrently, stock prices of SUNE and the YieldCos continued to fall, and the ability of SUNE and the YieldCos to access the equity markets was curtailed. Without access to the equity markets, the YieldCos' cost of capital increased, and plans to acquire projects from SunEdison and its arranged "warehouses" were put on hold. Subsequently, SunEdison announced a global workforce reduction.[43] Despite the Company's workforce reduction and other operational cuts, the combination of inadequate capital to fund further investment and the evaporation of planned acquisitions by the YieldCos left SunEdison with difficult financial prospects.

In connection with and in an attempt to resolve a dispute with respect to certain earnout payments in connection with the First Wind acquisition, on December 29, 2015, SUNE, Seller Note, and certain other wholly-owned subsidiaries of SUNE entered into a settlement agreement with the sellers of First Wind, which effectively accelerated the maturity of the Exchangeable Notes from 2020 to 2016. In addition, the settlement effectively removed all conditions to the remaining $231 million in earnout payments payable under the First Wind transaction, and established a payment schedule for those amounts. SunEdison's obligations arising from the settlement and ancillary agreements put further strain on the Company's liquidity.

In January 2016, SUNE entered into the Prepetition Second Lien Facility, raising $725 million in new financing, and entered into a series of exchange agreements with certain holders of its existing Convertible Notes, pursuant to which SUNE agreed to issue $225 million of the Second Lien Senior Notes in exchange for $336 million of outstanding Convertible Notes. The exchange agreements also provided for the issuance of SUNE common stock in exchange for an additional $245 million in Convertible Notes, resulting in an aggregate reduction in SUNE's

---

[43]    From around September 2015 through March 2016, the Debtors reduced their Workforce by approximately 27%, and during that same period, the Company reduced its total global workforce (which includes employees of non-Debtor affiliates) by approximately 40%.

outstanding debt of $356 million.  Part of the proceeds of the January financing were used to pay off an existing second lien term loan and to refinance the Margin Loan.

On February 29, 2016, SunEdison announced that it was unable to file its 2015 financial results on time, due in part to an internal investigation, which was launched late in 2015 and tied to allegations made by former executives at SunEdison (the "Audit Committee Investigation"). Then, on March 16, 2016, SunEdison announced that it had to delay releasing its financials again due to "material weaknesses" in its internal controls tied to "deficient information technology." On April 2, 2016, SunEdison received a notice of default and reservation of rights from the lenders under the Prepetition First Lien Facility, which, among other things, provided notice that SunEdison's failure to deliver its financials by March 31, 2016 constituted an event of default under the Prepetition First Lien Facility.

On April 13, 2016, following the Audit Committee Investigation and an evaluation of materials prepared by independent counsel and consultants to the Audit Committee, SunEdison's independent directors determined that, as of the date of the independent counsel report, there were no identified material misstatements in SunEdison's historical financial statements, as well as no substantial evidence to support a finding of fraud or willful misconduct of management, other than with respect to the conduct of one former non-executive employee.  However, the independent counsel materials identified issues with SunEdison's overly optimistic culture and its tone at the top.  SunEdison's independent directors also identified several specific issues regarding SunEdison's cash forecasting and liquidity management practices.  As a result, SunEdison's independent directors adopted certain remedies, such as (a) requiring implementation of improved cash forecasting systems with requisite controls, (b) requiring management to provide SunEdison's board with more transparency regarding cash management practices and to ensure that assumptions and estimates are made with a reasonable basis and include a detailed discussion of risks and top-down adjustments, (c) approving the hiring of a chief financial officer designee, (d) reviewing and altering the board's delegations of authority to management, (e) emphasizing comprehensive training and communications programs, (f) strengthening internal controls at both the enterprise and project level to enhance visibility and control over project status and cash availability, (g) strengthening SunEdison's legal groups and financial planning and analysis group, and (h) replacing a departure in SunEdison's internal audit group.

Ultimately, the Debtors determined entering chapter 11 was necessary and initiated discussions with the Prepetition Secured Parties to solicit a proposal for debtor-in-possession financing.  The Debtors commenced the first of the Chapter 11 Cases on April 21, 2016, with certain Debtors subsequently entering chapter 11 over the course of the months of June 2016 through April 2017.  Entities filed for chapter 11 for the following reasons: (i) as guarantors under the Debtors' prepetition secured debt, (ii) to effect asset sales, (iii) to preserve claims, or (iv) to stay litigation.  Given the costs associated with filing entities and SunEdison's complex corporate structure consisting of approximately two thousand entities many of which are in foreign jurisdictions, a number of affiliated entities have not been filed as part of these chapter 11 cases.

B.    Postpetition Financing

1.    Original DIP Facility

On the Petition Date, the Debtors sought Bankruptcy Court approval of a senior secured, superpriority debtor-in-possession financing facility (as amended, modified, or supplemented from time to time, the "Original DIP Facility") jointly provided by the Prepetition First Lien Lenders and an ad hoc group of Prepetition Second Lien Lenders and holders of Prepetition Second Lien Senior Notes (the "Tranche B Roll-Up Lenders"). The Original DIP Facility provided the Debtors access to $300 million new money term loans (the "Original DIP Term Loans") and a replacement letter of credit facility (the "Original DIP L/C Facility"). The Original DIP Facility also consists of a roll-up of the outstanding Drawn L/C Borrowings under the Prepetition First Lien Facility (the "Tranche A-1 Roll-Up Loans") and a roll-up of $350 million aggregate principal amount of the Prepetition Second Lien Debt (the "Tranche B Roll-Up Loans"). On June 9, 2016 the Bankruptcy Court entered a final order (the "Original DIP Facility Order") approving the Original DIP Facility on the terms set forth in the debtor-in-possession credit agreement (as amended, modified, or supplemented from time to time, the "Original DIP Credit Agreement") [Docket No. 523].[44]

The Original DIP Facility provided the Company with liquidity to continue funding the development of near-complete projects and to meet operational expenses, including the payment of certain postpetition vendors and certain permitted prepetition claims. This financing also permitted the Company to continue to renew and extend issued and outstanding letters of credit originally issued under the Prepetition First Lien Facility. The letters of credit enabled the Debtors to secure, among other things, power purchase agreements, project financings, and other material contracts for the development of the projects. SUNE's obligations under the Original DIP Facility were guaranteed by certain of its domestic and foreign subsidiaries (the "DIP Guarantors"). SUNE's obligations and the guaranty obligations of the DIP Guarantors under the Original DIP Facility (in each case, subject to the relative priorities of the obligations under the Original DIP Facility, as provided in the Original DIP Facility Order and Annex I (the Intercreditor Annex) thereto) constituted superpriority administrative expenses and were secured by senior priming liens on, and security interests in, substantially all present and future assets of SUNE and the DIP Guarantors, including a pledge of the capital stock of certain of their respective domestic and foreign subsidiaries.

Entering into a postpetition financing arrangement with the majority of its prepetition secured lenders avoided a potential intercreditor dispute between the Debtors' first and second lien creditors, thereby allowing the Debtors to enter the chapter 11 operating environment without the overhang of litigation between the Debtors' two largest secured creditor constituencies. The Debtors' first and second lien creditors settled their intercreditor dispute on the terms set forth in Annex 1 to the Original DIP Facility Order, as amended and replaced by Annex I to the Replacement DIP Facility Order.

---

[44]    Over the course of the Chapter 11 Cases, the Debtors executed 17 amendments to and several waivers under the Original DIP Credit Agreement.

2.      Tranche B Roll-Up Loans Effective Date

Pursuant to the Original DIP Facility Order, the Bankruptcy Court authorized a roll-up of Prepetition Second Lien Debt as Tranche B Roll-Up Loans pursuant to the Original DIP Credit Agreement.  On April 5, 2017, the Debtors launched the roll-up election process whereby each holder of Tranche B Roll-Up Dollar Amount (as defined in the Original DIP Credit Agreement) was provided notice to exercise their right to substitute and exchange an aggregate principal amount of Prepetition Second Lien Debt, equal to such holder's Tranche B Roll-Up Dollar Amount, into Tranche B Roll-Up Loans [Docket Nos. 2741 and 2796].  On May 2, 2017 (the "Tranche B Roll-Up Effective Date"), in connection with the closing of the Replacement DIP Facility as set forth below, the Tranche B Roll-Up Loans previously approved under the Original DIP Facility Order became effective.

After giving effect to the Tranche B Roll-Up Loans, the aggregate outstanding principal amount of Prepetition Second Lien Loans was $325,537,003.96 in Tranche A-1 second lien term loans and $167,425,599.50 in Tranche A-2 second lien term loans, and the aggregate outstanding principal amount of Prepetition Second Lien Senior Notes was $107,038,000.00.

As set forth in more detail below, immediately prior to giving effect to the mandatory prepayment of approximately $50 million in aggregate principal amount of the Tranche B Roll-Up Loans on the closing date of the Replacement DIP Facility, the aggregate principal amount of outstanding Tranche B Roll-Up Loans was $370,475,108.41.  On the Effective Date, the Tranche B Roll-Up Loan Claims shall be Allowed in full in the amount of $317,549,980.22, plus accrued postpetition interest in an amount to be determined.

3.      Replacement DIP Facility

As the Original DIP Facility neared its April 26, 2017 maturity date, on April 4, 2017, the Debtors filed a motion seeking Bankruptcy Court approval of a senior secured, superpriority replacement debtor-in-possession financing facility (as amended, modified, or supplemented from time to time, the "Replacement DIP Facility") provided by certain of the existing lenders under the Original DIP Facility.  On May 1, 2017 the Bankruptcy Court entered a final order (the "Replacement DIP Facility Order," and together with the Original DIP Facility Order, the "DIP Facility Orders") approving the Replacement DIP Facility on the terms set forth in the amended and restated debtor-in-possession credit agreement (as amended, modified, or supplemented from time to time, the "Replacement DIP Credit Agreement") [Docket No. 2880].

The Replacement DIP Facility provided the Debtors with access to $640 million non-amortizing new money term loans (the "Replacement DIP Term Loans") to be used to repay in full in cash the Original DIP Facility (other than approximately $300 million in principal amount (plus accrued unpaid interest) of the Tranche B Roll-Up Loans) and to cash collateralize all issued and undrawn letters of credit (the "Existing Letters of Credit") under the Original DIP L/C Facility.  The Replacement DIP Facility also consists of a roll-up of $370,475,108.41 aggregate principal amount of the Prepetition Second Lien Debt, of which approximately $50 million in aggregate principal amount plus accrued postpetition interest has been paid.

The Replacement DIP Facility provides the Debtors access to sufficient funds to operate their businesses between the maturity date of the Original DIP Facility and consummation of the Jointly Supported Transactions and the Plan, to seek confirmation and consummation of the Plan, and to cash collateralize the Existing Letters of Credit.

The DIP Facility Orders also incorporated a settlement between the Creditors' Committee and the DIP Lenders (the "Committee DIP Settlement"). The Committee DIP Settlement, as revised, is set forth in Annex II to the Replacement DIP Facility Order. The Committee DIP Settlement contemplates, among other things, the eventual creation of a trust for the benefit of Holders of General Unsecured Claims that would be funded with $10 million for the purpose of pursuing certain causes of action (as described in more detail in the Executive Summary of this Disclosure Statement).[45] Additionally, under the terms of the Committee DIP Settlement, avoidance actions were not encumbered by the liens securing the Original DIP Facility or the Replacement DIP Facility. The Committee DIP Settlement also addresses sharing of certain proceeds from sales by certain subsidiaries of the Company that were not original obligors under the Prepetition First Lien Facility or the Prepetition Second Lien Debt.[46]

SUNE's obligations under the Replacement DIP Facility are guaranteed by the DIP Guarantors. SUNE's obligations and the guaranty obligations of the DIP Guarantors under the Replacement DIP Facility (in each case, subject to the relative priorities of the obligations under the Replacement DIP Facility, as provided in the Replacement DIP Facility Order and Annex I (the Replacement Intercreditor Annex) thereto) constitute superpriority administrative expenses and are secured by senior priming liens on, and security interests in, substantially all present and future assets of SUNE and the DIP Guarantors, including a pledge of the capital stock of certain of their respective domestic and foreign subsidiaries. At various times since the Petition Date, the Debtors applied proceeds from certain sales to pay down borrowings under the Original DIP Facility. On May 2, 2017, the remaining outstanding balance of the Original DIP Facility, including $50 million in aggregate principal amount (plus accrued unpaid interest) of the Tranche B Roll-Up Loans, was paid in full in cash with proceeds from the Replacement DIP Facility and all outstanding Existing L/Cs under the Original DIP Facility were cash collateralized in accordance with the terms of the Original DIP Facility and certain cash collateralization agreements entered into with the applicable letter of credit issuers. As of May 12, 2017, the following principal amounts remain outstanding under the Replacement DIP Facility:

| Replacement DIP Term Loans | $ 640,000,000.00 |
| Tranche B Roll-Up Loans | $ 317,549,980.22 |

---

[45]   The $10 million in funding was subject to reduction for any amounts expended during the Chapter 11 Cases to pursue the Litigation Trust Causes of Action, pursuant to the terms of the Replacement DIP Facility Order. Under the Committee/BOKF Plan Settlement, the amount of the GUC/Litigation Trust Initial Funding will be $7.5 million (subject to any reductions set forth in the Committee/BOKF Plan Settlement Term Sheet).

[46]   The Committee/BOKF Plan Settlement settles the amount of this sharing.

The Replacement DIP Facility matures upon the earlier of (i) April 28, 2018 (which may be extended pursuant to the terms of the Replacement DIP Credit Agreement), (ii) the substantial consummation of a plan of reorganization or liquidation in these Chapter 11 Cases, (iii) the consummation of a disposition (through one or a series of transactions) of all or substantially all of SunEdison's assets pursuant to section 363 of the Bankruptcy Code (other than in connection with the Jointly Supported Transactions, so long as SunEdison makes a certain mandatory prepayment of the Replacement DIP Facility as required under the Replacement DIP Credit Agreement with the proceeds from such transaction(s)), and (iv) the acceleration of the loans under the Replacement DIP Facility in accordance with the Replacement DIP Credit Agreement.

C.    Administration of Chapter 11 Cases

Upon commencing the Chapter 11 Cases, the Debtors sought and obtained a number of orders from the Bankruptcy Court to ensure a smooth transition of their operations in the chapter 11 environment and facilitate the administration of the Chapter 11 Cases.  Certain of these orders are briefly summarized below.

1.    Procedural and Administrative Motions

To facilitate a smooth and efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Bankruptcy Court entered the following procedural orders: (a) authorizing joint administration of the Debtors' Estates [Docket No. 66]; (b) authorizing the filing of a consolidated list of the top 40 unsecured creditors [Docket No. 67]; (c) authorizing the retention of Prime Clerk, LLC as the Debtors' claims and noticing agent as well as their administrative agent [Docket No. 257], (d) granting the Debtors extensions of time to file their Schedules [Docket Nos. 64,   510]; and (e) establishing certain notice, case management, and administrative procedures [Docket No. 360].

Further, in the ordinary course of business, the Debtors retain various attorneys and other ordinary course professionals (collectively, the "OCPs") who render a wide range of services to the Debtors in a variety of matters unrelated to these Chapter 11 Cases, including litigation, regulatory, labor and employment, intellectual property, general corporate, and other matters that have a direct impact on the Debtors' day-to-day operations.  To prevent disruption to these services, on the Petition Date, the Debtors filed a motion to authorize the Debtors to employ and pay professionals utilized in the ordinary course of business [Docket No. 30], which the Bankruptcy Court approved in interim orders entered on May 12, 2016 [Docket No. 259] and May 20, 2016 [Docket No. 364], and a final order entered on June 8, 2016 [Docket No. 517].

2.    Motion to Continue Using Existing Cash Management System [Docket No. 7]

The Bankruptcy Court authorized the Debtors to continue using their cash management systems and their respective bank accounts, business forms, and deposit practices by an interim order granted on April 26, 2016 [Docket No. 84], and final order granted on July 8, 2016 [Docket No. 742].  The cash management order also approved the Debtors' deposit guidelines and permitted the Debtors to engage in non-Debtor intercompany transactions pursuant to a court-approved protocol.

30

3.      Motion to Pay Employee Wages and Benefits [Docket No. 8]

By interim order granted on April 25, 2016 [Docket No. 78], and final order granted on May 20, 2016 [Docket No. 362], the Bankruptcy Court authorized the Debtors to pay, inter alia, prepetition compensation (including wages, salaries, and commissions), prepetition business expenses, prepetition payroll deductions and prepetition withholdings, and prepetition contributions to and benefits under medical, insurance, and retirement benefit plans, of qualified employees.  Subject to certain limitations outlined in the final order, the Debtors are authorized to pay the postpetition employee obligations listed above in the ordinary course and in accordance with their prepetition practices.

4.      Motion to Authorize Payment of Prepetition Claims of Certain Lien Claimants [Docket No. 10]

By interim order granted on April 25, 2016 [Docket No. 82], and final order granted on June 8, 2016 [Docket No. 516], the Bankruptcy Court authorized the Debtors to pay prepetition amounts owed to certain lien claimants up to $17.3 million.  In addition, the Court granted administrative expense status to the Debtors' undisputed obligations to lien claimants under prepetition orders arising from (a) the shipment of goods delivered to and accepted by the Debtors on and after the Petition Date, and (b) the provision of services to the Debtors on and after the Petition Date.  As of the date hereof, the Debtors had paid approximately $10.5 million of prepetition claims of lien claimants pursuant to this order.

5.      Motion to Authorize Maintenance of Customer Programs [Docket No. 12]

By interim order granted on April 26, 2016 [Docket No. 77], and final order granted on May 11, 2016 [Docket No. 252], the Bankruptcy Court authorized, but did not direct, the Debtors to honor certain prepetition obligations to customers and to otherwise continue customer programs and practices (relating to certain warranties and guarantees) in the ordinary course of business.

6.      Motion to Pay Prepetition Taxes [Docket No. 13]

By final order granted on April 25, 2016 [Docket No. 79], the Bankruptcy Court authorized the Debtors to, among other things, pay up to $9.34 million for prepetition taxes and any tax-related fees, charges, and assessments accrued prepetition.

7.      Motion Determining Adequate Assurance of Payment for Future Utility Services [Docket No. 21]

By final order granted on May 11, 2016 [Docket No. 254], the Bankruptcy Court established procedures for determining adequate assurance of payment for future utility service in recognition of the impact even a brief disruption of utility services would have on the Debtors.

8.      Motion to Pay Critical Trade Vendors [Docket No. 9]

By interim order granted on April 25, 2016 [Docket No. 81], and final order granted on June 8, 2016 [Docket No. 515], the Bankruptcy Court authorized the Debtors to pay up to $52

31

million in the aggregate of the prepetition fixed, liquidated, and undisputed claims of certain critical vendors and service providers that arose in the ordinary course of business, subject to the conditions set forth in the orders.  As of the date hereof, the Debtors had paid approximately $10.3 million of prepetition claims of critical vendors pursuant to this order.

9.    Motion to Establish Notification and Hearing Procedures for Trading in Equity Securities [Docket No. 14]

As of December 31, 2015, the Debtors had approximately $1.7 billion of unlimited net operating losses and net operating loss carryforwards ("NOLs") that were available to offset taxable income.  In an attempt to protect these NOLs for future use to offset potential taxable income, the Debtors sought and obtained an interim order granted on April 25, 2016 [Docket No. 83], and a final order granted on May 11, 2016 [Docket No. 253], restricting trading of their equity securities.

10.    Motion to Authorize Debtors to Maintain Existing Insurance Policies, Renew or Enter Into New Insurance Policies, and Continue to Honor Premium Financing Obligations [Docket No. 15]

By final order granted April 25, 2016 [Docket No. 80], the Bankruptcy Court authorized the Debtors to, subject to certain notice and consent provisions set forth in the order, maintain their insurance policies and pay their insurance obligations; to renew, revise, extend, supplement, change, or enter into new insurance coverage; and to maintain their premium financing agreements, make all payments thereunder, and continue to grant the premium financing companies security interests in the relevant insurance policies.

11.    Motion to Authorize and Approve Expedited Procedures for Rejection or Assumption of Executory Contracts and Unexpired Leases [Docket No. 23]

Because the Debtors are party to thousands of executory contracts and unexpired leases, and because the Debtors believed that they would seek to assume or reject contracts during the pendency of these Chapter 11 Cases, the Debtors determined that it would be beneficial to establish streamlined procedures for assuming and rejecting such contracts and leases. Accordingly, the Debtors filed a motion seeking approval of these procedures, and the Court entered an order on May 13, 2016 authorizing the Debtors to utilize the procedures [Docket No. 280].  In total, over the course of the Chapter 11 Cases, the Debtors have rejected approximately 405 Executory Contracts and Unexpired Leases.  Additionally, the Debtors have assumed 126 Executory Contracts and Unexpired Leases pursuant to the Contract Assumption and Rejection Procedures Order in connection to various asset dispositions approved by the Bankruptcy Court.

12.    Applications for Retention of Debtors' Professionals

Throughout the Chapter 11 Cases, the Bankruptcy Court has approved the Debtors' retention of certain professionals to represent and assist the Debtors in connection with the Chapter 11 Cases.  These professionals include, among others: (a) Skadden, Arps, Slate, Meagher & Flom, LLP as counsel for the Debtors (order granted May 12, 2016) [Docket No. 260]; (b) Togut, Segal & Segal LLP as co-counsel for the Debtors (order granted May 17, 2016) [Docket No. 307]; (c) Joseph Hage Aaronson LLC as special litigation counsel to the Debtors

(order granted May 20, 2016) [Docket No. 361]; (d) Rothschild Inc. ("Rothschild") as financial advisor and investment banker to the Debtors (order granted May 20, 2016) [Docket No. 369]; (e) PricewaterhouseCoopers LLP ("PwC") as financial advisor to the Debtors (order granted May 20, 2016) [Docket No. 370]; (f) KPMG, LLP ("KPMG") as auditor and tax consultant to the Debtors (order granted June 8, 2016) [Docket No. 513]; (g) McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey") as restructuring advisor to the Debtors (order granted June 23, 2016) [Docket No. 639]; Eversheds LLP ("Eversheds") as special counsel (order granted July 20, 2016) [Docket No. 808]; (h) Ernst & Young LLP ("E&Y") as tax services provider (order granted July 20, 2016) [Docket No. 809]; (i) Keen-Summit Capital Partners LLC ("Keen-Summit") as real estate advisors (order granted July 20, 2016) [Docket No. 810]; (j) Cohen & Gresser LLP ("Cohen & Gresser") as special counsel to the Debtors in connection to certain DOJ and SEC investigations (order granted July 20, 2016) [Docket No. 811]; (k) Binswanger of Texas, Inc. ("Binswanger") as real estate agent (order granted October 19, 2016) [Docket No. 1438]; and (l) Brown Rudnick LLP as special litigation counsel to the Debtors in connection to certain YieldCo matters (order granted January 11, 2017) [Docket No. 2219].

With respect to the professionals retained by order of the Bankruptcy Court, as applicable, on May 12, 2016, the Bankruptcy Court entered the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 258].

D.    Appointment of the Creditors' Committee

On April 20, 2016, the United States Trustee filed a Notice of Appointment of the Unsecured Creditors' Committee [Docket No. 148]. The members of the Creditors' Committee are: BOKF, N.A., AQR DELTA Master Account, L.P., Advantage Opportunities Fund, LP, D.E. Shaw Composite Holdings, LLC, Flextronics Industrial, Ltd., Albemarle Corporation, and Vivint Solar, Inc.

The Creditors' Committee has retained the following professionals: (a) Weil, Gotshal & Manges LLP as counsel to the Creditors' Committee (order granted June 8, 2016) [Docket No. 502]; (b) Morrison & Foerster LLP as special renewable counsel to the Creditors' Committee (order granted June 8, 2016) [Docket No. 503]; (c) Lazard Frères & Co. LLC as investment banker to the Creditors' Committee (order granted July 8, 2016) [Docket No. 734]; (d) Alvarez & Marsal North America, LLC as financial advisor to the Creditors' Committee (order granted July 8, 2016) [Docket No. 737]; and (e) Kobre & Kim LLP as conflicts counsel to the Creditors' Committee (order granted November 17, 2016) [Docket No. 1618].[47]

E.    Attempts to Seek Appointment of an Equity Committee

---

[47]    Pursuant to the DIP Facility Orders, the fees and expenses of Kobre & Kim LLP may not be paid in Cash or otherwise to the extent such fees and expenses are incurred in connection with, among other things, the investigation or challenge of the Prepetition Secured Parties' liens and claims. The Creditors' Committee was granted a $175,000 investigation budget pursuant to the Original DIP Facility Order [Docket No. 1711]. Pursuant to the Committee/BOKF Plan Settlement, the Investigation/Prosecution Cap described in the Original DIP Facility Order (and the Replacement DIP Facility Order) will be deemed increased from $175,000 to $2.25 million.

The Court twice considered requests for formation of an official committee of equity holder denying such appointment each time. On May 20, 2016, in response to a number of letter requests made by equity holders of SunEdison, Inc., the Court entered an Order To Show Cause Why An Official Committee Of Equity Security Holders Should Not Be Appointed [Docket No. 356]. The Debtors, the Official Committee of Unsecured Creditors, and BOKF, N.A. each filed pleadings in opposition to such appointment, while the Investor Recovery Charitable Trust and a group of equity holders filed pleadings supporting appointment.

The Court held a contested evidentiary hearing on July 14, 2016. At such hearing, the Court heard testimony from two witnesses, Mr. Homer Parkhill, Managing Director at Rothschild, and Mr. Patrick Cook, SunEdison's Vice-President – Capital Markets and Corporate Finance. Mr. Parkhill testified that the Debtors' stock in the YieldCos could be worth as much as $1.1 billion, and the sale of other assets could realize approximately $400 million of additional value. *See In re SunEdison, Inc.*, 556 B.R. 94, 101 (Bankr. S.D.N.Y. 2016). The Court credited Mr. Parkhill's testimony that the Debtors "owed approximately $4.2 billion in secured and unsecured debt, and its contingent liabilities could exceed another $1.2 billion." *Id.* Evaluating such testimony, the Court held that "the evidence showed that SunEdison appears to be hopelessly insolvent, and it is substantially unlikely that equity will receive a distribution." Id. at 103-04 ("Even if Parkhill's conservative estimate of value is doubled, the Debtors are still $1 billion short [of solvency], and the contingent debt may add an additional $1.2 billion of red ink."). For that reason and because the Creditors' Committee would adequately represent the interest of equity holders, the Court declined to appoint an equity committee, but did not foreclose a future request in the event that "the facts change." *Id.* at 107.

On December 2016, a number of equity holders submitted letters to the Court renewing their request to form an official equity committee based on their view the Debtors' solvency. On December 6, 2016, the Court asked the Debtors to respond to such allegations. The Debtors did so in the quarterly status report filed by Mr. John S. Dubel, the Debtors' Chief Executive Officer, on December 22, 2016 [Docket No. 1979]. At a hearing held on January 12, 2017, the Debtors presented the testimony of Mr. Homer Parkhill, and Mr. Salvatore LoBiondo, SunEdison, Inc.'s Senior Vice President and Corporate Controller. Mr. Parkhill updated his assessment, concluding that the sale of the Debtors' assets could yield approximately $1.2 billion in value, with approximately $870 million of that amount derived from the sale of their interest in the YieldCos. The remaining $346 million was derived from the value of anticipated proceeds and earn-outs after subtracting repayment of $251 million in postpetition borrowings. Mr. Parkhill further testified that such amounts would be insufficient to repay an estimated $4.6 billion in secured and unsecured claims, which was the estimated claims pool as of that date. Mr. LoBiondo testified that any "investments in subsidiaries" appearing on the Debtors' accounting statements[48] did not translate to fair market value.

At the conclusion of this hearing, the Court stated that "I'm not going to require the debtor to pay for [an equity committee], given then financial information I have received and the absence of any evidence that the shareholders are going to receive a distribution in this case, very

---

[48]    A number of equity holders alleged that the Debtors were solvent because monthly operating reports showed billions in "investments in subsidiaries."

frankly." Transcript of Record at 104:3-104:7, *In re: SunEdison, Inc.,* No. 16-10992 (SMB) (Bankr. S.D.N.Y. Jan. 12, 2016). Indeed, after this update, the expected proceeds from the sale of the YieldCos had dropped from $1.1 billion to $870 million, and the overall value of the Estates, including value of non-Debtor subsidiaries, was reduced from an estimated $1.5 billion to $1.2 billion.

The Estates remain insolvent. The consolidated Financial Projections of the Debtors and their non-Debtor subsidiaries, attached as Exhibit B to this Disclosure Statement, show the Debtors' and their non-Debtor subsidiaries' expected realization of proceeds from the Earnout Assets and Residual Assets, Repatriated Cash, and cash from other opportunities (before fixed costs, restructuring costs, and the costs of the post-emergence entity).[49] The Debtors believe that there is a degree of uncertainty in its ability to achieve the milestones for certain earnouts, collect on past due receivables, and monetize other assets. The projected ending cash balance, after monetization of all the remaining assets, is estimated to be $72.2 million. The ending cash balance together with the value expected to be realized from the Jointly Supported Transactions comprise the distributable value available to creditors in these Chapter 11 Cases, which is well below the outstanding amount of Claims asserted against the Debtors. While the Debtors may be able to recover more value from certain assets than reflected in the Financial Projections, such amounts would still result in impairment of the Second Lien Claims.

F.    Investigations

As noted in Article V.A beginning in late 2015 the Audit Committee of the Board of Directors of SUNE launched an investigation with the assistance of Paul Hastings LLC and FTI Consulting, independent counsel and consultants to the Audit Committee, respectively, tied to allegations made by former executives at SunEdison. On April 13, 2016, following the Audit Committee Investigation and an evaluation of materials prepared by Paul Hastings LLC and FTI Consulting, SunEdison's independent directors determined that, as of the date of the independent counsel report, there were no identified material misstatements in SunEdison's historical financial statements, as well as no substantial evidence to support a finding of fraud or willful misconduct of management, other than with respect to the conduct of one former non-executive employee. However, the inquiry identified issues with the Company's overly optimistic culture and identified several specific issues regarding the Company's cash forecasting and liquidity management practices lacking sufficient controls. The independent directors adopted remedies to address the issues identified by the investigation. A more detailed description of the issues identified by the Audit Committee and the remedies adopted are set forth in more detail in Article V.A.

Nevertheless, because the Debtors' prepetition conduct was under scrutiny, on the Petition Date, the Debtors filed a motion seeking the appointment of an examiner [Docket No. 11] to conduct an independent review of certain activities that precipitated the filing of these Chapter 11 Cases, including related-party transactions involving directors, officers, management,

---

[49]    The Financial Projections reflect the assets and estimated values thereof that are expected to remain with Reorganized SUNE and its Affiliates, including non-Debtor Affiliates, immediately following emergence. The Financial Projections reflect consolidated cash flow projections of both Debtor and non-Debtor entities.

agents, advisors and professionals. However, the Committee DIP Settlement reached with the Creditors' Committee (described in more detail in Article V.B.3) required the withdrawal of the examiner motion.  Instead, the Creditors' Committee would spearhead any investigation into prepetition conduct by directors and officers, as well as other causes of actions.  The Creditors' Committee was furnished hundreds of thousands of pages of documents in connection with its investigation of the claims asserted in the adversary proceeding.  Consistent with its *de facto* role as "examiner," in November 2016, the Creditors' Committee filed: (1) a proposed adversary complaint in the Bankruptcy Court against the plaintiffs in the pending D&O Actions; (2) a motion in the adversary proceeding seeking to stay the D&O Actions in their entirety; and (3) the D&O Standing Motion (described in more detail in Article V.I.2), proposing to bring claims for alleged breach of fiduciary duty and other alleged violations against present and former directors and officers of SUNE.  The proposed adversary complaint named more than 20 defendants, and made numerous allegations spanning nearly two years. Those allegations included breach of fiduciary duty, corporate waste and gross mismanagement. The Debtors and the Creditors' Committee negotiated a resolution with respect to the D&O Standing Motion (and related pleadings) that, among other things, required that the Creditors' Committee, along with the YieldCos, the Debtors, the insurers, and the plaintiffs and defendants in the D&O Actions to attempt to mediate in good faith.  The result of that mediation is the D&O Settlement, pursuant to which the Company's D&O Insurance will pay $32 million to SunEdison to settle the allegations in the proposed adversary complaint. The named defendants will receive releases from the Company in exchange for causing D&O Insurance proceeds to be paid into the estate. Under the Committee/BOKF Plan Settlement, the proceeds of that settlement will be transferred to the GUC/Litigation Trust for the benefit of Holders of General Unsecured Claims.  The Debtors submit that the settlement is fair and appropriate given the value of the potential claims arising from the alleged prepetition conduct of the Company's current and former directors and officers and defenses to such claims.

        In addition, in December 2016, Brown Rudnick was retained as the Debtors' special litigation counsel to lead the Debtors' investigation of the YieldCos' alleged claims (and the Debtors' defenses thereto).  As part of this investigation, Brown Rudnick worked closely with PwC to analyze and evaluate the Estates' avoidance claims against the YieldCos and advise the Debtors regarding the value of such claims that could be recovered for the benefit of the Debtors' Estates.  As described in more detail in Article V.J, this investigation has included: (i) a review of hundreds of thousands of pages of relevant documents; (ii) in-depth, in-person and telephonic interviews with current and former members of SunEdison's senior management; (iii) analysis of the Creditors' Committee's YieldCo Standing Motion; and (iv) thorough research and analysis of the factual and legal issues pertinent to potential claims.   Ultimately, as a result of this investigation, the Debtors and their advisors determined that the appropriate YieldCo Avoidance Allocation is between $9.4 million and $22.9 million, with a mid-point of $16.1 million.

        In connection with this work, Brown Rudnick also investigated whether SUNE engaged in acts that might give rise to claims sounding in, among other theories, intentional fraudulent transfer to either YieldCo.  This investigation was foundationally based on extensive analysis prepared by PWC into, among other issues, SUNE's overarching business plan and individual transaction objectives, evolving status in the investing marketplace at various points in time, changing liquidity profile, and ability to attract debt and equity capital prior to bankruptcy.  The investigation also considered evidence reflecting the motivations of key members of

management and the board at various points in time, including their procedures for and manner of corporate decision-making. Brown Rudnick also considered other so-called "badges" of intentional wrongdoing, including whether each transfer in question had a business purpose consistent with SUNE's long-term strategic objectives, was disclosed or secretive, rendered SUNE insolvent, and whether SUNE received more or less than reasonably equivalent value in exchange for each such transfer. Ultimately, Brown Rudnick concluded that the evidence did not support intentional avoidance theories that were incrementally greater than was otherwise reflected in the YieldCo Avoidance Allocation between $9.4 million and $22.9 million.

G.    Debtor and Non-Debtor Asset Sales

Due in large part to the significant transaction volume in which the Company engages as a renewable-energy project developer – together with the Debtors' efforts to maximize value for the Estates and to pay down the Original DIP Facility (and to continue paying down the Replacement DIP Facility) – the Debtors have engaged in a high volume of asset sales over the course of the Chapter 11 Cases that have allowed the Company to monetize both Debtor and non-Debtor assets around the world. Certain of these transactions have been approved by the Bankruptcy Court as either asset sales pursuant to section 363 of the Bankruptcy Code or pursuant to *de minimis* sale procedures approved by the Bankruptcy Court (as set forth in greater detail below). The Debtors' robust sale and marketing efforts (not including the YieldCo M&A process) have garnered tangible results: the Debtors have executed confidentiality agreements with, and/or granted data-room access to, more than approximately 300 parties; the Debtors have received bids to purchase assets from more than 100 parties; the Debtors have entered into over 40 definitive asset purchase agreements; and notably, by the end of May 2017, such sales have generated, in the aggregate, more than $1.1 billion in gross sale proceeds and approximately $632 million in net sale proceeds for the Estates.[50]

In addition to the sale of projects and other renewable energy assets, the Company has divested itself of certain business segments in platform sales, including the RSC Business Unit (substantially completed in or around September 2016), the North American C&I Platform (divested in January 2017), and the Solar Materials Business Unit (divested in March 2017). The Company is currently in the process of divesting the GAM business unit (which the Company anticipates consummating in the second quarter of 2017). Moreover, outside the U.S., the Debtors' non-Debtor foreign subsidiaries and affiliates are monetizing certain renewable-energy assets, including sales of the India, South Africa, and Latin America (including Chile, Uruguay, and Honduras) project development platforms.

In total, the Debtors worked on over 35 separate sales processes, many of which were highly complex transactions that involved multi-party, and often cross-jurisdictional, negotiations and regulatory considerations. Proceeds from such sales have been utilized to pay project-level financing costs and other project-level expenses, including amounts outstanding under project financing facilities (such as outstanding revolving construction facilities), overhead costs, advisory fees, closing and other costs associated with sales processes, an approximately

---

[50]    These numbers do not reflect the value of the consideration to be received from the consummation of the Jointly Supported Transactions.

$244.3 million paydown of the Original DIP Facility, and other amounts necessary to satisfy various project-level liens and encumbrances as required under the applicable sale agreements.

1.    Bankruptcy Court Approved Section 363 Sales

Of the sales conducted during the course of the Chapter 11 Cases, the Debtors have conducted 13 sales by separate motion under Bankruptcy Code section 363 (either as private sales or as sale processes subject to bidding procedures and the opportunity for a public auction), including the following:

- Sunflower Project Company [Docket No. 444]: the sale of the Debtors' interests in the 104MW renewable energy Project located in North Dakota known as Sunflower to Novatus Project Holdings I, LLC, resulting in net proceeds of approximately $13.1 million to date.

- California Utility Business Unit Projects [Docket Nos. 785, 834]: the sale of certain Utility business unit Project assets located in California under two separate sales to DESRI MS2 Development, L.L.C. and 93LF 8ME LLC, resulting in net proceeds for both sales of approximately $73.6 million in total to date.

- RSC Business Unit (Global Channel and Australia Business) [Docket No. 1002]: the sale of material components of the Company's RSC Business Unit (namely, the global channel business and the Australia business components) to Flextronics International USA, Inc., resulting in net proceeds of approximately $8.8 million to date.

- Utility Business Unit Project Companies [Docket No. 1204]: the sale of certain Utility business unit project companies to NRG Renew LLC, including Utility business unit projects, separated into three "packages" of energy projects – namely, the Utah projects, the Hawaii development projects, and the Buckthorn project located in Texas, resulting in net proceeds of approximately $105.9 million to date.

- Minnesota C&I Projects [Docket No. 1267]: the sale of twenty-two C&I solar Projects under development in Minnesota to SoCore MN Acquisition LLC ("SoCore"). This sale also incorporates a settlement agreement entered into with Project co-developer Ecoplexus, which resolves certain claims related to an older purchase and sale agreement of certain Minnesota C&I Projects. Net proceeds for this sale were expected to be approximately $79.8 million, assuming the closure of all projects. Certain projects originally agreed to be sold to SoCore were re-marketed after they appeared unlikely to close to SoCore, resulting in a signed purchase agreement with Fresh Air Energy II, LLC and its parent Ecoplexus, Inc. (together, "Ecoplexus") and Geronimo Energy, LLC ("Geronimo"). The Ecoplexus and Geronimo sales contemplate aggregate net proceeds, assuming all projects reach closing, of approximately $26.5 million and $3.0 million respectively. To date, the Debtors have

received $16.6M million in net proceeds related to the Minnesota C&I Projects.

- <u>Troughton Project Company</u> [Docket No. 1240]: the sale of SUNE Troughton Farm Solar Limited to Stark Solar Limited. The sale closed in March 2017, resulting in net proceeds of approximately $23 million to date.

- <u>Turbines</u> [Docket No. 1630]: the sale of fifteen GE 1.79-100 wind turbines to BayWa r.e. Wind, LLC, resulting in net proceeds of $11.4 million to date.

- <u>C&I Platform</u> [Docket No. 2338]: the private sale of the C&I Platform (as a going-concern operation), resulting in net proceeds of approximately $9.7 million to date. Of this amount approximately $7.2 million was received in January 2017.

- <u>Atlantic Power Warehouse</u> [Docket No. 2270]: the sale by TerraForm Private Holdings, LLC of its equity interests in TerraForm Private, LLC, to DIF INFRA 4 US LLC and DIF IV CO-INVEST LLC. TerraForm Private, LLC is a holding company for the "Atlantic Power Warehouse," a collection of operating project entities that together provide approximately 806 MW of wind-power capacity. This sale is expected to close in June 2017 and net proceeds for this sale are expected to be approximately $42 million.

- <u>Solar Materials Business Unit</u> [Docket No. 1466]: the sale of the Solar Materials Business Unit to stalking horse bidder GCL-Poly Energy Holdings Limited. The sale closed in March 2017 and $89.7 million in net proceeds were received in cash at closing,[51] with up to an additional $50 million in contingent consideration based on GCL's progress in constructing a facility which uses the purchased intellectual property. On March 28, 2017, GCL issued a press release announcing that all conditions precedent to closing have been fulfilled or waived in accordance with the terms of the asset purchase agreement.

- <u>Sale Leaseback Asset Sales</u> [Docket Nos. 2858 and 2859]: the proposed private sales of (1) approximately 352 renewable energy projects (and certain real property related thereto) financed through sale leaseback and partnership flip transactions to Longroad Solar Portfolio Holdings, LLC and (2) approximately 80 renewable energy projects financed through sale leaseback transactions to Silicon Ranch Corporation. Together, the transactions are anticipated to result in gross sale proceeds of approximately $11.6 million and the Debtors estimate net sale proceeds of approximately $9 million in cash (which amount could be higher or lower depending on closing costs). In

---

[51]   Approximately $2.96 million of these net proceeds are expected to be allocated to Debtor SunEdison Products Singapore Pte Ltd. The Debtors will also transfer to SMP Ltd. $5 million, half of which will be received from GCL-Poly Energy Holdings Limited, in order to resolve SMP Ltd.'s sale objection.

addition the Debtors anticipate the cancellation or return of approximately $45 million in credit support obligations provided by the Debtors. The sale transactions are anticipated to close in the third quarter of 2017.

- <u>GAM Business</u>: Throughout the Chapter 11 Cases, the conducted an ongoing marketing process for the divestiture of SunEdison's GAM business unit. Beginning in May 2016, SunEdison conducted a marketing process for its GAM business. A significant portion of the GAM business volume (approximately 60%) is attributable to services provided to affiliates of YieldCos.

  Simultaneously with the Debtors' marketing process, and in connection with the YieldCos' exploration of strategic alternatives that ultimately resulted in the proposed merger transactions between the YieldCos and affiliates of Brookfield Asset Management, Inc., the YieldCos evaluated whether they would continue receiving operating and asset management services from the GAM Business (either from SUNE or a purchaser of the GAM Business), and they informed the Company by late fourth quarter of 2016 that they generally would exercise asserted rights under their agreements with the GAM Business—certain of which were disputed by the Debtors—to terminate their relationships with the GAM business. Because the services provided to the YieldCos comprised such a large portion of the GAM business volume, the value of the GAM business was limited by the YieldCos' decision to terminate their relationship with the GAM business. In light of this, ultimately, in February 2017, the one party still pursuing purchasing the GAM business ceased negotiations.

  After considering its alternatives, the Debtors determined that immediate rejection of the asset management and O&M agreements with the YieldCo affiliates would have a detrimental effect on the YieldCos because the GAM service recipients rely on the GAM business for monitoring, reporting, and management and operation of their facilities, including compliance with certain regulatory requirements and the terms of certain credit facilities. Accordingly, the Debtors determined to work with YieldCos facilitate an orderly transition of the GAM Business employees, including employee-related obligations, and GAM Business services to develop in-house capabilities or alternative third party providers.

  On June 1, 2017, the Debtors and TERP executed a transition services agreement (filed at Docket No. 3247) setting forth the terms and conditions by which certain affiliates of TERP are permitted to make an offer of employment to GAM employees, and the terms and conditions by which SUNE, its affiliated Service Providers, TERP, and its affiliated Service Recipients will cooperate so that the services and obligations under asset management and O&M contracts between the Service Providers and the Service Recipients will be transitioned in-house to TERP or subcontracted to new service providers. The Debtors have also been working with GLBL to

facilitate a transition of the GAM employees and employee related obligations and contracts.

2.    De Minimis Asset Sales

Over the course of the Chapter 11 Cases, the Debtors have filed notices of presentment for approximately 28 "de minimis" asset sales under the procedures set forth in the *de minimis* sale order entered by the Court on July 14, 2016 (the "*De Minimis* Sale Order") [Docket No. 781]. Such sales have, in the aggregate, generated gross sale proceeds of approximately $52.3 million and net proceeds of approximately $36 million.[52]

H.    Non-Debtor Value Analysis

As further described herein, since the commencement of these Chapter 11 Cases, the Debtors and their advisors conducted an entity-by-entity analysis to determine the value held in foreign (non-US entity) non-Debtor subsidiaries (collectively, the "Foreign Subsidiaries"), many of which are DIP Guarantors. This analysis served as one of the foundations of the assumptions underlying the Debtors' financial projections.

In this regard, in the ordinary course of business the Debtors have engaged in various intercompany financial transactions with Debtors and non-Debtor affiliates, both foreign and domestic (collectively, the "Intercompany Transactions"). The Intercompany Transactions include, but are not limited to, the following:

1.    Payments or transfers from a Debtor to another Debtor or a non-Debtor affiliate giving rise to claims ("Intercompany Claims");

2.    Loans among Debtors and other Debtors or non-Debtors ("Intercompany Loans"); and

3.    Capital contributions and other investments made by Debtors with respect to other Debtors and non-Debtors ("Intercompany Investments").

SunEdison, Inc. is the ultimate parent company of more than 2,000 domestic and foreign subsidiaries. As described above, this includes Debtor and non-Debtor subsidiaries and affiliates that operate throughout the world, including in the United States, Canada, Mexico, Latin America, Europe, India, Malaysia, Singapore, Africa, the Middle East, Australia, and Asia.

Beginning almost immediately after the commencement of these Chapter 11 Cases, the Debtors and their advisors analyzed the financial data from the Debtors' books and records in order to focus on the legal entities that have assets, either in the form of cash on hand, assets held for sale, or other assets, such as tax refunds, deposits, etc. As a result of this review, the Debtors

---

[52]    Over the course of the Chapter 11 Cases, the Debtors have filed numerous notices of presentment of De Minimis Asset Sale orders, which include the following: [Docket Nos. 837, 866, 930, 1049, 1050, 1051, 1052, 1053, 1054, 1055, 1105, 1106, 1265, 1394, 1459, 1655, 1740, 1811, 1984, 1986, 1996, 2206, 2265, 2321, 2605, 2814, 2815, 2878, and 2935].

determined that the number of Foreign Subsidiaries that met this criteria was fewer than 100 legal entities. The Debtors held numerous meetings with key constituents regarding the foregoing throughout the Chapter 11 Cases.

In assessing the potential value of the Debtors' interests in Foreign Subsidiaries and Intercompany Transactions, the Debtors and their advisors considered the following criteria on an entity-by-entity basis:

1.  Cash balances;

2.  Assets held for sale and anticipated proceeds (net of transaction expenses);

3.  Inflows and outflows by project or source (i.e., tax refunds, return of cash collateralized bonds or letters of credit, etc.);

4.  Quantification of third-party liabilities, including but not limited to accounts payable;

5.  Required operating costs until wind down (i.e., rent, utilities, etc.);

6.  Local restructuring expenses, including legal advice, contract termination expenses, etc.; and

7.  Other assets and liabilities, including intercompany payables and receivables.

In considering how funds might flow through the corporate structure upon receipt of the net cash inflows, the Debtors and their advisors (1) identified the legal entity into which the cash inflows are expected to be received; (2) identified the third-party and intercompany liability positions for each entity; and (3) reconciled intercompany balances of key legal entities and are in the process of agreeing with counterparties to confirm the availability of funds through these entities to DIP Guarantors.

Based upon the above criteria and other considerations, including whether the entity was a DIP Guarantor, the Debtors with the assistance of their advisors developed a detailed analysis of the potential recoveries of funds held in foreign jurisdictions that could be repatriated to the parent Company. The analysis is based on estimates and assumptions, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. In certain cases, the Debtors or Reorganized Debtors' ability to repatriate cash is subject to the completion and acceptance of statutory accounting, tax audits, and other tax authority approvals, which may be impacted if the Debtors' or Reorganized Debtors' international operations are limited or impaired. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual results will be different from those contained in the actual cash that is repatriated to the Parent Company and such differences may be material. The Financial Projections are in part derived from this analysis. Refer to the Financial Projections for additional information and disclosures.

I.      Litigation and Creditors' Committee and Developments

1.      Vivint Litigation

On January 12, 2016, Appaloosa filed suit against SunEdison in the Delaware Court of Chancery for alleged breaches of fiduciary duty in relation to SunEdison's plans to acquire Vivint and require Power LLC to acquire Vivint's projects in turn under what Appaloosa alleged were unfavorable take-or-pay arrangements (the "Appaloosa Complaint"). SunEdison vigorously denied the allegations in the Appaloosa Complaint and on February 25, 2016, the court denied Appaloosa's motion for a preliminary injunction on SunEdison's plans to acquire Vivint, but left open the possibility of the case going to trial. Thereafter, Appaloosa sought an expedited trial against SunEdison in a further attempt to block the acquisition of Vivint. However, the issue became moot when Vivint cancelled the Vivint Merger Agreement. Shortly thereafter, Vivint filed a complaint (Vivint Solar, Inc. v. SunEdison, Inc., Case No. 12088) against SUNE and SEV Merger Sub Inc. ("SEV") in the Delaware Court of Chancery alleging that SUNE and SEV breached the Vivint Merger Agreement (the "Merger Litigation"). SUNE and SEV filed an answer denying the allegations and asserting certain affirmative defenses. On the April 21, 2106 Petition Date, the automatic stay went into effect, staying all actions against SUNE and SEV (and the other then-existing Debtors), including Vivint's pending suit against SunEdison.

On July 7, 2016, Vivint filed a motion in the Bankruptcy Court seeking limited relief from the automatic stay to permit Vivint to continue to prosecute the Merger Litigation.[53] The Bankruptcy Court denied Vivint's motion for relief from the automatic stay on September 13, 2016 [Docket No. 1168].

2.      Consolidation of Federal Actions / D&O Actions and Settlement of Estate

Prior to the Petition Date, the Company and its affiliates faced more than thirty different lawsuits arising from a variety of alleged prepetition actions and transactions, including, but not limited to, the YieldCo initial public offering transactions and other securities transactions (the "D&O Actions"). Many of the D&O Actions assert overlapping direct individual and class claims and derivative claims by shareholders or investors against the Company, the YieldCos, and their respective present and former directors and officers (as well as third parties such as the underwriters of certain securities and debt offerings of the Debtors or the YieldCos, and the Company's independent auditor), and many of such claims are arguably covered by the Company's D&O Insurance.

Pursuant to October 4 and 13, 2016 transfer orders of the U.S. Judicial Panel on Multidistrict Litigation, approximately twenty-two of the federal D&O Actions were centralized and consolidated before the Honorable Judge P. Kevin Castel in the United States District Court for the Southern District of New York the ("District Court") (In re SunEdison Inc. Securities

---

[53]    The Debtors filed a response in opposition to Vivint's stay relief motion on August 9, 2016 [Docket No. 944], and Vivint filed a reply in further support of its motion for relief from the automatic stay on August 10, 2016 [Docket No. 973].

Litigation, MDL No. 2742) (the "Multidistrict Litigation" or "MDL"). Several other similar cases have been added to the MDL since the initial transfer orders.

On November 2, 2016, the Creditors' Committee filed an adversary complaint in the Bankruptcy Court against the plaintiffs in the pending D&O Actions seeking declaratory relief that SunEdison has a property interest in the D&O Insurance, and enforcement of the automatic stay with respect to the D&O Actions pending against certain current and former directors and officers of SunEdison (Official Committee of Unsecured Creditors v. Juan M. Beltran, et al., Adversary Case No. 16-01257) [D&O Adv. Docket No. 1]. On the same day, the Creditors' Committee filed a motion in the adversary proceeding seeking to stay the D&O Actions in their entirety [D&O Adv. Docket No. 2]. On November 4, 2016, the Creditors' Committee also filed a motion seeking standing to pursue claims, including for alleged breaches of fiduciary duty and various other alleged violations, against certain current and former SunEdison directors and officers (the "D&O Standing Motion") [Docket No. 1550].

As announced during Bankruptcy Court hearings on November 17 and December 6, 2016, the Debtors and the Creditors' Committee negotiated a resolution with respect to the D&O Standing Motion (and related pleadings) that would grant the Creditors' Committee standing to pursue certain claims on behalf of the Debtors' Estates under certain circumstances. The agreement required that the Creditors' Committee, along with the YieldCos, the Debtors, the insurers, and the plaintiffs and defendants in the D & O Actions attempt to mediate in good faith before the Creditors' Committee could proceed on its proposed claims against directors and officers. In order to achieve mediation of all necessary parties and preserve the Debtors' insurance policies, the Debtors and the Creditors' Committee agreed to seek a stay of all pending D&O Actions and orders compelling mediation in both the Bankruptcy Court and the District Court. On December 19, 2016, at a status conference in the Multidistrict Litigation, the District Court ordered a limited stay of the MDL through March 31, 2017, and directed all parties in the MDL to participate in mediation. On December 28, 2016, the Bankruptcy Court entered a consent order directing the following additional parties to participate in the mediation, along with the MDL parties: the Debtors; the Creditors' Committee; the Agent for the Prepetition First Lien Lenders, the DIP Agent, and the Prepetition Second Lien Lenders and the Prepetition Second Lien Noteholders; and the parties to TerraForm Global, Inc. v. SunEdison, Inc., et al., C.A. No. 12159-VCL, and Aldridge v. Blackmore, et al., C.A. No. 12196-VCL, both of which are pending in the Delaware Court of Chancery (the "Delaware Chancery Actions") [D&O Adv. Docket No. 61]. The consent order also stayed the Creditors' Committee's Proposed Claims, any claims that are or may be brought by the Agent for the Prepetition First Lien Lenders, the DIP Agent, the Prepetition Second Lien Lenders and the Prepetition Second Lien Noteholders against any current or former officers and directors of the Debtors that may be covered under the Company's D&O Insurance, and the claims asserted in Delaware Chancery Actions, through March 31, 2017. Finally, this consent order also held the Creditors' Committee' motion seeking to stay the D&O Actions [D&O Adv. Docket No. 2] in abeyance during the period of the stay.

The court-ordered mediation was held on February 10, February 27, and March 2-3, 2017. A comprehensive settlement of the D&O Actions and the other pending and threatened actions against parties covered by the Company's and YieldCos D&O Insurance was not achieved and the court-ordered stay of those actions expired on March 31, 2017. However, on March 27, 2017, the Company, the Creditors' Committee and the SunEdison directors and

officers who would be defendants on the estate claims proposed to be brought by the Creditors' Committee under the D&O Standing Motion reached an agreement in principle to settle those claims in exchange for a payment of $32 million from the Company's D&O Insurance, which the applicable insurance carriers have agreed to fund, to SunEdison (the "D&O Settlement"). The D&O Settlement is the subject of a pending motion before the Bankruptcy Court filed on June 7, 2017 [Docket No. 3296] (the "D&O Settlement Motion"), and parties should review the D&O Settlement Motion for a more comprehensive explanation of the D&O Settlement. Pursuant to the Committee DIP Settlement, any and all D&O Insurance Proceeds from the D&O Settlement will be distributed to the GUC/Litigation Trust for the benefit of Holders of Allowed General Unsecured Claims. Pursuant to the Committee/BOKF Plan Settlement, the Holders of Tranche B Roll-Up Claims will waive their liens on D&O Insurance Proceeds.

The first $150 million of coverage under the Company's D&O Insurance is shared with the YieldCos, whose directors and officers are also insureds thereunder. On March 27, 2017, the Debtors and the independent directors of SunEdison (the "SUNE Parties") reached an agreement (as amended June 6, 2017, the "D&O Insurance Cooperation Agreement") with the YieldCos and their current directors and officers (the "YieldCo Parties") related to the D&O Insurance. The D&O Insurance Cooperation Agreement is also the subject of the pending D&O Settlement Motion, and parties should review the D&O Settlement Motion for a more comprehensive explanation of the D&O Insurance Cooperation Agreement. Among other things, this agreement provides that: (i) the YieldCo Parties consent to the $32 million payment to SunEdison from the D&O Insurance in connection with the D&O Settlement; (ii) for a specified period of time, the SUNE Parties and the YieldCo Parties agree to cooperate in trying to reach settlements of certain of the D&O Actions, and similar litigations, pending against the YieldCos and their respective present and former directors and officers, and SunEdison will consent to such proposed settlements to be funded by up to $32 million from the D&O Insurance; and (iii) for a specified period of time, SunEdison, its independent directors and the YieldCos will not assert certain payment priority provisions of the D&O Insurance.

3.    UCC Challenge Litigation and Related Matters

Pursuant to the terms of the DIP Facility Orders, the Creditors' Committee was granted standing to file an adversary proceeding to challenge the validity, enforceability, priority, or extent of any obligations arising under the Prepetition Debt documents and the liens on the prepetition collateral securing such obligations. Also, pursuant to the Original DIP Facility Order, the Creditors' Committee was granted certain rights with regards to the Second Lien Creditors' rights to the proceeds of the D&O Insurance, as a result of any Second Lien Creditors' claims against such D&Os, which rights would lapse if the Creditors' Committee commenced any litigation against the Prepetition Secured Parties.

On October 20, 2016, the Creditors' Committee commenced an adversary proceeding against the First Lien Administrative Agent, Second Lien Notes Collateral Trustee, and various holders of the Debtors' prepetition secured debt (Official Committee of Unsecured Creditors v. Wells Fargo Bank, N.A., et al., Adversary Case No. 16-01228) [Lien Adv. Docket No. 1] (the "UCC Challenge Litigation"). As a result of commencing such litigation, the unsecured creditors lost their rights with regard to the Second Lien Creditors' claims against the D&O Insurance stemming from the Second Lien Creditors' direct claims against the Debtors' directors

and officers. On the same day, the indenture trustee for certain convertible unsecured notes issued by SUNE also filed an objection (the "BOKF Objection") [Docket No. 1455] to proofs of claim that had been filed by the trustee (the "Second Lien Notes Trustee") for the Second Lien Senior Notes and the administrative agent (the "Second Lien Loans Agent") for the Second Lien Loans [Proof of Claim Nos. 1490, 3555], which objection asserted certain of the same claims as raised in the UCC Challenge Litigation.

In connection with the UCC Challenge Litigation, the Creditors' Committee has asserted fifteen causes of action (the "UCC Challenge Litigation Causes of Action") against the Prepetition First Lien and Prepetition Second Lien Lenders seeking, among other things, to avoid certain January 2016 financing transactions as fraudulent and preferential transfers, equitably subordinate Prepetition First Lien Lenders' and Prepetition Second Lien Lenders' claims, avoid certain liens as unperfected, recover affirmative damages on the basis of alleged aiding and abetting breach of fiduciary duty claims, and disallow portions of certain Prepetition Second Lien Claims as unmatured interest arising from alleged original issue discount ("OID"). Both the Prepetition First Lien Lenders and Prepetition Second Lien Lenders moved to dismiss the UCC Challenge Litigation [Lien Adv. Docket Nos. 17, 18, 24, 25]. The Creditors' Committee filed an omnibus opposition to both motions to dismiss [Lien Adv. Docket No. 35], to which the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders filed separate replies in opposition thereto [Lien Adv. Docket Nos. 46, 47].[54]    Also on January 31, 2017, the Second Lien Notes Trustee and the Second Lien Loans Agent filed responses to the BOKF Objection [Docket Nos. 2361, 2362].

The Bankruptcy Court held a hearing on the Prepetition First Lien Lenders' motion to dismiss the UCC Challenge Litigation, as well as the BOKF Objection, on February 16, 2017. A hearing on the Second Lien Defendants' motions to dismiss the UCC Challenge Litigation was held on March 30, 2017. The Bankruptcy Court took the matter under consideration and ordered the relevant parties into mediation before the Honorable Cecelia G. Morris, Chief Judge of the United States Bankruptcy Court for the Southern District of New York, concerning their disputes and the issues raised by the Debtors' proposed Plan and the settlement of the UCC Challenge Litigation and BOKF Objection, as well as the YieldCo Settlement Motion and the YieldCo Avoidance Allocation (both as defined below). The mediation was successful and culminated in the Committee/BOKF Plan Settlement, which, among other things, settles the UCC Challenge Litigation on behalf of the Debtors' Estates against Prepetition Secured Parties, including the challenge to their liens, and the BOKF Objection.

---

[54]    Additionally, on November 21, 2016, the Creditor's Committee filed an amended complaint [Lien Adv. Docket No. 12, 13]. The amended complaint corrected the corporate identities of certain previously named defendants and named several new Prepetition First Lien Lenders and Prepetition Second Lien Lenders as defendants (the "Newly Named Lenders") that were not previously named in the initial complaint.   On January 24, 2017, the Newly Named Lenders moved to dismiss the complaint on the same grounds set for the in the initial defendants' motions to dismiss [Lien Adv. Docket Nos. 50, 51, 64].   Additionally, the Newly Named Lenders argued that because the Creditors' Committee did not add them as defendants until after the Challenge Period established in the Original DIP Facility Order expired, the Creditors' Committee is barred from challenging the validity of their claims.   On January 31, 2017, the Creditors' Committee filed the Omnibus Opposition to the Newly Named Lenders' motions to dismiss. [Lien Adv. Docket No. 68].   The Newly Named Lenders filed replies on February 3, 2017. [Lien Adv. Docket Nos. 72, 73.]

4.    SEC/DOJ Investigation

On March 28, 2016, SUNE received a grand jury subpoena from the United States Department of Justice (the "DOJ") seeking documents and information relating to: (i) certain financing activities in connection with SUNE's acquisition of Vivint; (ii) the conduct of a former non-executive employee who is alleged to have committed wrongdoing in connection with the Vivint termination negotiations; (iii) investigations by SUNE's Audit Committee; (iv) intercompany transactions involving the Company and each of TERP and GLBL; and (v) the financing of the Company's Uruguay projects in connection with project costs and equity contributions that remain to be contributed by the Company.  On June 23, 2016, SUNE received a second grand jury subpoena from the DOJ seeking production of certain e-mails, telephone call records, and personnel records for a former officer of the Company and a former non-executive employee of the Company.

On October 5, 2016, the Company received a notice that the United States Securities and Exchange Commission (the "SEC") is conducting a non-public, fact-finding investigation relating to the Company. The notice was accompanied by a subpoena seeking production of certain e-mails and other electronic communications sent or received by certain current and/or former directors and/or officers of SUNE, TERP and/or GLBL.  The Company previously had received a non-public, informal inquiry from the SEC covering areas similar to the initial DOJ subpoena.  On April 20, 2017, the Company received a second subpoena from the SEC, seeking production of: (i) e-mails and other electronic communications sent or received by certain current and/or former employees of SUNE, TERP and/or GLBL; (ii) documents relating to certain transactions between the Company and McKinsey & Company, a consultant to the Company; (iii) documents relating to certain transactions between the Company and United Overseas Bank and Oversea-Chinese Banking Corporation; and (iv) documents relating to certain meetings of the Company's Board of Directors and Audit Committee.

The Company has cooperated, and continues to cooperate, with the DOJ and SEC in their ongoing investigations.  To date, the Company has gathered, reviewed and produced to the DOJ and the SEC a substantial volume of documents responsive to the grand jury and SEC subpoenas. In addition, the Company has provided documents in response to informal requests by the DOJ, and in response to the informal inquiry from the SEC.

J.    YieldCo Developments

On September 23, 2016, the YieldCos filed proofs of claim ("YieldCo POCs"), which were amended on October 7, 2016.  In them, the YieldCos asserted various categories of claims against the Debtors, including contract, tort, fiduciary duty, contribution, indemnification and other claims allegedly amounting to more than $3 billion in the aggregate.  In addition, the YieldCos have alleged that they are owed over $100 million of postpetition administrative expense claims.

On March 25, 2016, in anticipation of and in connection with SUNE's bankruptcy filing, the YieldCos' respective boards authorized the conflicts committee at GLBL Inc. and TERP Inc., respectively, to evaluate and act affirmatively with respect to matters involving or substantially relating to SUNE, including actions to protect the YieldCos' contractual and other rights and

otherwise to preserve the value of the YieldCos and their assets.  In June 2016, without notice to SUNE, which, along with the DIP Lenders, was in active discussions with the YieldCos about the terms of the Original DIP Facility Order, GLBL Inc. and TERP Inc. each ratified amendments (the "LLC Amendments") to the operating agreement of its respective LLC subsidiary, Power LLC and Global LLC, which are the YieldCo entities in which SunEdison holds its Class B (economic) units. The LLC Amendments delegated to an independent conflicts committee at the respective LLC subsidiary level the exclusive power to exercise all rights, powers and authority of GLBL Inc. and TERP Inc. (as sole managing member) to manage and control the business and affairs of their LLC subsidiaries and each of their controlled affiliates relating to or involving SUNE and any of its affiliates (other than the LLC subsidiaries and their controlled affiliates). The LLC Amendments also provided that nothing could be done to change the delegation of power or the composition of the LLC level conflicts committees without a Class A Shareholder vote that will not occur until the first annual shareholders meeting in 2017 or thereafter.

Since the early days of these Chapter 11 Cases, SunEdison, the YieldCos, and their respective independent advisors engaged in an arm's-length process to explore strategic alternatives with respect to SunEdison's interests in the YieldCos – the Estates' most valuable assets – including a sale, sponsorship, or other transaction.  Upon entering into a joint sale and marketing protocol (the "YieldCo Sale Protocol"), the parties agreed to the common goal of effectuating a tangible and jointly supported M&A transaction for each of the YieldCos. In parallel with the joint marketing process, the Debtors participated in arm's-length settlement discussions with the YieldCos.  The Debtors and their advisors periodically met with the YieldCos and their advisors regarding the YieldCos' alleged claims against the Estates and the Debtors' potential defenses thereto, as well as the Debtors' claims against the YieldCos.

On October 7, 2016, the Creditors' Committee sent the Debtors a letter demanding that they immediately commence avoidance actions against the YieldCos or, alternatively, consent to the Creditors' Committee's standing to pursue such actions.  On October 17, 2016, the Debtors responded that proceeding with litigation and/or turning over control of causes of action to the Creditors' Committee before the Debtors completed their investigation and identification of all of the Debtors' claims and defenses would be contrary to their fiduciary duties.  In an October 28, 2016 response, the Creditors' Committee rejected the Debtors' request that the parties first attempt a negotiated resolution and insisted on commencing litigation immediately.  To that end, on November 7, 2016, the Creditors' Committee moved for derivative standing to pursue certain avoidance claims against the YieldCos (the "YieldCo Standing Motion") [Docket No. 1557]. The Creditors' Committee attached a proposed complaint to the YieldCo Standing Motion alleging four causes of action: (i) to avoid as fraudulent transfers, under Bankruptcy Code sections 548(a)(1)(A) and 548(a)(1)(B), projects contributed by the Debtors to TERP in connection with its initial public offering and certain other payments and services provided to TERP by the Debtors; (ii) same as the first cause of action but with respect to GLBL; (iii) to avoid as preferences within one year of the Petition Date, under Bankruptcy Code section 547(b)(1), certain projects transferred, and payments made, by the Debtors to TERP; and (iv) same as the third cause of action but with respect to GLBL.  The Creditors' Committee also requested settlement authority over the claims against the YieldCos.

On November 29, 2016, the Debtors filed an objection to the Creditors' Committee's YieldCo Standing Motion (the "YieldCo Standing Objection") [Docket No. 1687],[55] arguing, *inter alia*, that litigation against the YieldCos at that stage of the Chapter 11 Cases would be premature, value destructive, and costly, and that it was in the best interests of the Debtors and all creditor constituents for the Debtors to continue with a negotiated value-maximizing path with the YieldCos. After an evidentiary hearing on the YieldCo Standing Motion and Objections on December 22, 2016, the YieldCo Standing Motion was adjourned to a date yet to be determined. Thereafter, at the Bankruptcy Court's suggestion, the Debtors, the Creditors' Committee, the Tranche B Lenders/Steering Committee, and the YieldCos worked together to develop a protocol for the non-YieldCo parties to exchange certain privileged and confidential information related to the various claims and defenses asserted by and against the Debtors and the YieldCos, without waiving privilege or permitting the YieldCos to gain access to the shared information; the protocol was incorporated into a stipulation and order entered by the Court on January 24, 2017 [Docket No. 2314]. The parties have continued to adjourn further proceedings on the YieldCo Standing Motion.

Under the YieldCo Sale Protocol, the Company and the YieldCos conducted a thorough, arm's-length marketing process that was comprised of two rounds of bidding, which generated approximately 19 indications of interest and approximately 12 formal bids. On January 9, 2017, Brookfield submitted a bid comprised of four alternative proposals based on different transaction structures with respect to TERP and GLBL (and their respective subsidiaries and affiliates). On January 20, 2017, the YieldCos entered into exclusivity agreements with Brookfield (the "Exclusivity Agreements"), pursuant to which TERP and GLBL negotiated exclusively with Brookfield in connection with a whole company or sponsorship transaction until March 6, 2017 (as extended for TERP), which resulted in the execution of the Jointly Supported Transaction Agreements.

Also on January 20, 2017, the arm's-length negotiations with the YieldCos culminated in the execution of a memorandum of understanding (the "MOU") which, subject to definitive documentation, provided for the sharing with the Debtors of the consideration to be received by the TERP and GLBL shareholders in the M&A transactions and the release of claims between the Debtors and each of the YieldCos. In accordance with the MOU, on March 6, 2017, the Debtors and the YieldCos entered into two comprehensive YieldCo Settlement Agreements, which, among other things, provide for the Debtors to receive 36.9% and 25% (exclusive of SunEdison's current Class A share ownership in GLBL), respectively, of the total consideration flowing to TERP and GLBL shareholders[56] under the two separate Jointly Supported Transaction Agreements pursuant to which Brookfield is to acquire 51% of TERP's outstanding stock in a sponsorship merger transaction and 100% of GLBL's outstanding stock in a whole

---

[55]  On the same day, the YieldCos also filed an objection to the YieldCo Standing Motion [Docket No. 1684], and the DIP Agent (on behalf of all of the DIP Lenders) filed a Statement of Joinder to the Debtors' YieldCo Standing Objection (collectively with the YieldCo Standing Objection, the "YieldCo Standing Objections") [Docket No. 1690]. Subsequently, on December 22, 2016, the Debtors filed a Supplemental Declaration of John S. Dubel in Support of the Debtors' YieldCo Standing Objection [Docket No. 1970].

[56]  As adjusted for shares excluded under the applicable merger agreement with Brookfield, including shares held by Brookfield.

company cash merger.  The YieldCo Settlement Agreements also provide for, inter alia: (i) broad reciprocal releases among SUNE and certain of its subsidiaries, on the one hand, and the YieldCos and certain of their subsidiaries, on the other (subject to certain stipulated and preserved claims and defenses); (ii) the facilitation of the sale of the YieldCos to Brookfield pursuant to the Jointly Supported Transactions (and the ancillary agreements and obligations related thereto); (iii) the consensual rejection of YieldCo contracts without any rejection damage claims or other liabilities, as well as the termination of contracts between the YieldCos and non-Debtor SunEdison entities; and (iv) the facilitation of the transition process of establishing the YieldCos as stand-alone entities.  These settlements are the subject of the motion before the Bankruptcy Court [Docket No. 2570] filed on March 10, 2017 and supplemented on March 24, 2017 [Docket No. 2641] (together, the "YieldCo Settlement Motion"), and parties should review the YieldCo Settlement Motion for a more comprehensive explanation of the YieldCo Settlement Agreements.  The Bankruptcy Court entered an order approving the YieldCo Settlement Motion on June 7, 2017 [Docket No. 3292].

Further, while the Debtors are not party to the Jointly Supported Transaction Agreements, they are party to, and have obligations under, certain voting and support agreements (with Brookfield and the respective YieldCo) and an IDR transfer agreement (collectively, the "Voting and Support Agreements") that facilitate and relate to the Jointly Supported Transaction Agreements.  Specifically, the two Voting and Support Agreements obligate the Debtors to support the Brookfield merger transactions and vote all of their equity interests in the YieldCos in favor of such transactions, and the IDR transfer agreement will effectuate the transfer all of the Debtors' IDRs in TERP LLC to Brookfield.  The Voting and Support Agreements are the subject of the motion before the Bankruptcy Court, filed on March 14, 2017  [Docket No. 2580], and parties should review the motion for a more comprehensive explanation of the Voting and Support Agreements and the Debtors' respective obligations thereunder.  The Bankruptcy Court entered orders approving the Voting and Support Agreements on June 7, 2017 [Docket Nos. 3293 and 3294].

The YieldCo Settlement Motion also included a specific allocation of the transaction consideration received by SunEdison pursuant to the Jointly Supported Transactions attributable to potential avoidance actions claimed by the Debtors against the YieldCos (the "YieldCo Avoidance Allocation").  As set forth in the YieldCo Settlement Motion, the Debtors' ongoing investigation of YieldCo-related claims and defenses included an exhaustive, in-depth, and objective analysis of the strengths and weaknesses of the Estates' potential avoidance actions against the YieldCos.  In particular, since the beginning of December 2016, Brown Rudnick LLP ("Brown Rudnick"), the Debtors' special litigation counsel retained to lead the Debtors' investigation of the YieldCos' alleged claims (and the Debtors' defenses thereto), worked closely with the Debtors' financial advisor, PricewaterhouseCoopers ("PwC"), to continue the investigation; ultimately these advisors also were tasked with advising the Debtors regarding the appropriate YieldCo Avoidance Allocation.  This investigation has included: (i) a review of hundreds of thousands of pages of relevant documents concerning the TERP and GLBL IPOs and related agreements, and other financing, sponsorship, and M&A transactions between SunEdison and the YieldCos, internal e-mails, and other corporate and financial documents; (ii) in-depth, in-person (at SunEdison's headquarters in Maryland Heights, Missouri) and telephonic interviews with current and former members of SunEdison's senior management; (iii) analysis of the Creditors' Committee's YieldCo Standing Motion; and (iv) thorough research and analysis of

50

the factual and legal issues pertinent to potential claims, irrespective of whether such issues were included in the YieldCo Standing Motion.

As part of this investigation and for purposes of determining the appropriate YieldCo Avoidance Allocation, the Debtors instructed Brown Rudnick and PwC to analyze and evaluate the Estates' avoidance claims against the YieldCos, advise the Debtors regarding the value of such claims that could be recovered for the benefit of the Debtors' Estates if prosecuted, and to solicit input from the creditor constituents and to freely share Brown Rudnick/PWC's own findings and conclusions. Although their investigation was limited by time and circumstance, and was not akin to formal discovery in civil litigation, Brown Rudnick and PwC dedicated significant time and effort to this assignment, considering, among other things: (i) SunEdison's likely insolvency at points in time when transfers were made to or for the benefit of the YieldCos; (ii) what value SunEdison received (directly or indirectly) in exchange for such transfers; (iii) whether the facts support any intentional fraudulent transfer claims; (iv) the impact to claim value if GLBL were to file for bankruptcy relief; (v) the incremental costs likely to be incurred by the Estates should litigation ensue; and (vi) potential counter-arguments, counter-narratives, and claim defenses that the YieldCos should be expected to advance. In connection with this process, Brown Rudnick and PwC were in regular communication (by telephone and e-mail) with the professionals and/or principals for the Tranche B Lenders/Steering Committee, the Creditors' Committee, and the indenture trustee for SunEdison's prepetition unsecured notes (also a member of the Creditors' Committee), and held several in-person meetings with each of these constituencies.

To enable a more open dialogue, the parties attempted to negotiate an information sharing protocol to address two main goals – that no interested party be put at an information deficit, and that no privileges against disclosure be waived in the effort to achieve informational parity. The parties did agree on a stipulation and order that was entered by the Bankruptcy Court protecting against any privilege waiver [Docket No. 2314], but they were not able to reach agreement on an information sharing protocol (i.e., when, what and with whom such information must be shared). Nevertheless, the Debtors voluntarily acted in accordance with the version of the protocol that they submitted to the Court.

In early February 2017, to better inform their views, the Debtors requested and received separate written allocation analyses from advisors to the Creditors' Committee and the Tranche B Lenders/Steering Committee, and had follow-up communications with these constituents regarding their respective views and analysis. The constituents' views, as contained in their submissions, have informed the Debtors' assumptions and conclusions contained in the Debtors' analysis with respect to the YieldCo Avoidance Allocation. The Debtors shared their detailed (more than 70 pages) analysis and proposed YieldCo Avoidance Allocation with the Creditors' Committee and the Tranche B Lenders/Steering Committee on March 15, 2017. Ultimately, as reflected in the supplement to the YieldCo Settlement Motion filed on March 24, 2017 [Docket No. 2641], the Debtors and their advisors determined that the appropriate YieldCo Avoidance Allocation is between $9.4 million and $22.9 million, with a mid-point of $16.1 million.

On March 28, 2017, the Creditors' Committee and the Convertible Senior Notes Indenture Trustee filed preliminary objections to the YieldCo Settlement Motion [Docket Nos.

2666 and 2667] (the "Yield Co Settlement Objections"), objecting to, among other issues, the Debtors' proposed YieldCo Avoidance Allocation.

The Bankruptcy Court-ordered mediation before Chief Judge Morris also included the issues raised by the Debtors' YieldCo Settlement Motion and the YieldCo Avoidance Allocation. As a result of the mediation and as part of the Committee/BOKF Plan Settlement, the parties agreed that the YieldCo Avoidance Allocation would be $18 million, which amount would be transferred to the GUC/Litigation Trust to be distributed to Holders of Allowed General Unsecured Claims. The Committee/BOKF Plan Settlement resolves, among other things, the YieldCo Settlement Objections.

K.    Analyzing Executory Contracts and Unexpired Leases

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject executory contracts and unexpired leases. Accordingly, in conjunction with the Debtors' ongoing asset rationalization efforts, the Debtors have engaged in a comprehensive evaluation of their Executory Contracts and Unexpired Leases.

At the outset of the Chapter 11 Cases, the Debtors rejected a burdensome and unprofitable supply agreement with SMP Ltd. relating to the purchase of polysilicon products [Docket No. 256]. Soon thereafter, on May 13, 2016, the Bankruptcy Court approved streamlined procedures to reject or assume Executory Contracts and Unexpired Leases (the "Contract Assumption and Rejection Procedures Order") [Docket No. 280]. Pursuant to the Contract Assumption and Rejection Procedures Order, the Debtors and their Professionals have analyzed and selected certain burdensome Executory Contracts and Unexpired Leases to be rejected pursuant to the streamlined procedures, as set forth in the eighteen omnibus notices of rejection that the Debtors have filed with the Bankruptcy Court. In total, over the course of the Chapter 11 Cases, the Debtors have rejected approximately 405 Executory Contracts and Unexpired Leases. Additionally, the Debtors have assumed 126 Executory Contracts and Unexpired Leases pursuant to the Contract Assumption and Rejection Procedures Order in connection to various asset dispositions approved by the Bankruptcy Court. Separately, the Debtors also sought and obtained the approval of the Bankruptcy Court of an extension (through and including November 17, 2016) from the Bankruptcy Court of the time within which the Debtors have to assume or reject Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code [Docket No. 969] (the "Section 365(d)(4) Extension Order"). The Section 365(d)(4) Extension Order also provided procedures by which the Debtors may extend the section 365(d)(4) deadline beyond November 17, 2016 upon, *inter alia*, written consent from the applicable landlord(s).

During the course of the Chapter 11 Cases, the Debtors and their Professionals have evaluated the Debtors' numerous Executory Contracts and Unexpired Leases in the context of their ongoing asset-sale and reorganization efforts. The Debtors continue to assess their options in connection with each of these Executory Contracts and Unexpired Leases, including the potential assumption, rejection, or amendment and assumption thereof – decisions that the Debtors will ultimately make prior to confirmation of the Plan as would be required by the Bankruptcy Code.

L.    Restructuring Paths

1.    Business Plan Development

The Debtors' prepetition business included the development, construction, and managements of renewable energy projects around the world. This business model was highly capital intensive and relied on access to the capital markets to raise funds necessary to fund the project. Typically, development projects only become valuable as they near completion of development. In addition, development typically takes several years to complete and requires significant capital to advance a project. At the time of filing, the Debtors had relatively few projects that were near completion and could be easily monetized. Thus, to continue developing projects, the Debtors would have required many years of additional high-risk capital contributions. After the chapter 11 filing the Debtors were cutoff from the capital markets and no longer had the capital necessary to continue its development business. Indeed, in order to continuing developing projects on the same scale, the Company would have required several hundreds of millions of additional funds. Due to the long term nature of the development and construction of renewable energy projects, the extensive capital requirements to fund the projects, and the uncertainty of the Debtors ability to continue as a viable business, it was doubtful that any independent third party would have selected the Debtors to develop and build long term projects. Additionally, the Company would have required significant capital to cash collateralize performance and warranty bonds for new projects, to the extent the Company would have been able to enter in to a new development or construction project, which is highly doubtful.

As noted above, at the time of filing, the Company had limited access to capital. The Original DIP Facility only provided enough liquidity to allow the Company to complete certain projects that could be monetized in the near term. Thus, other than the projects specifically identified for further development, continuing the development business wasn't feasible under the Original DIP Facility. Moreover, the Debtors' bankruptcy cases made continuation of its development business practically impossible because third parties necessary to the business would not continue to work with the Debtors: utilities and corporations would not provide a PPA to a bankrupt entity; vendors of modules and turbines who had not been paid would not continue to supply, and many of the skilled developers who have the necessary relationships with third parties (e.g., landowners, grid operators, utilities) left the Company.

Throughout the course of the Chapter 11 Cases, the Debtors have engaged in numerous transactions to maximize the value of their renewable energy development projects, their business platforms, including the Solar Materials, C&I, and RSC business units, and their interests in the YieldCos.[57] The Debtors explored the possibility of selling the whole company to

---

[57]    The Debtors have filed monthly operating reports ("MORs") during the course of the Chapter 11 Cases. As noted in the second quarterly Status Report by John S. Dubel, Chief Executive Officer and Chief Restructuring Officer [Docket No.1979], the assets reflected in the MORs are historical book-values and are not intended to be indicative of the value that could be realized by SunEdison for its equity holders. Amounts reported in monthly operating reports as "investments in subsidiaries" represent the amount of funds that the Debtors previously invested in their subsidiaries and do not account for the losses of those monies or write-downs of such investments that will necessarily be incurred once these assets are monetized in a market transaction. The

*(cont'd)*

a third party who would be able to continue the development business.  As part of the Debtors' efforts to maximize value during these Chapter 11 Cases, Rothschild began marketing the Company's assets in early May 2016.  Rothschild contacted 427 potential buyers regarding the purchase of the Company's assets, in part or in whole.  Over 300 of these parties entered into non-disclosure agreements with the Debtors to further explore the potential purchase of certain of the Company's assets.  Rothschild conducted numerous calls and meetings, established a virtual data room and provided material amounts of due diligence to potential buyers in the process.  As a result of these efforts, the Company received over 100 bids on assets. While some buyers provided indicative bids for a majority of the Company's assets, not a single buyer bid offered an holistic solution to purchase the entirety of SUNE's assets.   Indeed, during this marketing process, only one party indicated an interest in purchasing the whole Company, submitting a non-binding offer that assumed a total transaction value of approximately $1 billion and only 10% of stock in Reorganized SUNE would remain available for distribution to Holders of Second Lien Claims and General Unsecured Claims, subject to dilution from a proposed management incentive program.  This proposed transaction would have left Holders of Second Lien Claims materially impaired and it was unclear what value, if any, would have been allocated to the Unsecured Creditors other than potentially a *de minimis* amount of equity in the Reorganized Company.  Holders of Interests in SUNE would not have received any recoveries if the proposed transaction was pursued.  Moreover, at the time, the value of this proposed whole-company transaction was less than the aggregation of various other bids for the Company's assets.  Ultimately, the party that bid on the whole Company walked away.

Given the need for continued capital to develop projects and the Debtors' limited ability to obtain the same, the Debtors have developed a plan that disposes of their remaining development assets, collects on future earnouts, and repatriates cash from foreign jurisdictions. Continuation of the Debtors' capital-intensive renewable project development business is not contemplated under the Plan based on the Debtors' inability to access the capital markets. Consistent with the Financial Projections, the Plan provides that Reorganized SUNE will distribute such proceeds to pay down Reinstated Second Lien Debt or otherwise make equity distributions to holders of New SUNE Common Stock.

2.    Plan Negotiations

In December 2016, after spending several months in negotiations with the Creditors' Committee and the Tranche B Lenders/Steering Committee, the Debtors received a preliminary, non-binding plan term sheet from the advisors to the Tranche B Lenders/Steering Committee. As the YieldCo Settlements and the Jointly Supported Transactions form the foundational structure for a plan of reorganization, from January 2017 through the beginning of March 2017, the Debtors focused their efforts on negotiating and finalizing the terms of the YieldCo

---

*(cont'd from previous page)*

Debtor has historically been carrying these numbers on its books to track its investments in subsidiaries as an accounting matter; but such record keeping is not a proxy for value upon such assets' sale.  Moreover, the use of "combined" reporting in compliance with the U.S. Trustee's reporting requirements results in a calculation of book value that is higher than that derived from "consolidated" reporting because equity value of a subsidiary is not offset against the parent's investment, resulting in double-counting.

Settlement Agreements and the Jointly Supported Transaction Agreements, and other documentation related thereto, before turning their focus to negotiating a plan of reorganization.

In January 2017, the Debtors also received a plan proposal outline from the Creditors' Committee. The Creditors' Committee's proposed plan would have crammed up the Tranche B Roll-Up Loan Claims under section 6.27 of the Original DIP Credit Agreement with new debt.

After considering the proposals from both the Tranche B Lenders/Steering Committee and the Creditors' Committee, the Debtors determined, among other things, that the Creditors' Committee's cram-up plan would not be (1) confirmable given the value available for distribution to creditors or (2) feasible given Reorganized SUNE's future debt capacity. In particular, other than the value that the Holders of the Second Lien Claims have given up to unsecured creditors pursuant to the Committee DIP Settlement, there would have been no value available for distribution to general unsecured creditors after payment in full of Administrative Claims, including the Original DIP Facility Claims, and the Second Lien Claims. Moreover, the Debtors would have needed to raise capital in connection with any Creditors' Committee-structured plan in order to pay the Original DIP Facility Claims in full in cash. The Supporting Second Lien Parties would not support or provide funding for a plan in which their Claims were crammed up, and the Creditors' Committee had not presented any meaningful alternative plan funding.

In addition, as the Debtors worked toward finalizing the YieldCo Settlements and negotiating a plan construct, it became clear that, given the timing of the consummation of the YieldCo transactions, it would not be feasible to emerge from bankruptcy by the end of April 2017, at which point the Debtors' Original DIP Facility would mature. Accordingly, the Debtors turned to the Original DIP Lenders to obtain a maturity extension or potential replacement debtor-in-possession financing.

In light of the Debtors' need to obtain replacement financing for its maturing Original DIP Facility and financing to pay the Original DIP Facility Claims, as well as their concerns about the feasibility and confirmability of the Creditors' Committee's initial proposal, the Debtors began negotiating a plan of reorganization based on the Tranche B Lenders/Steering Committee's proposal. At the same time, the Debtors were successful in encouraging the Creditors' Committee and the Tranche B Lenders/Steering Committee to re-engage in settlement conversations (which ultimately led to a successful multi-day mediation process with Chief Bankruptcy Judge Morris as described below). Following execution of the YieldCo Settlement Agreements and certain of the Jointly Supported Transaction Agreements on March 6, 2017, negotiations regarding the plan construct and the investment required to fund a plan progressed with the Tranche B Lenders/Steering Committee members. The Debtors engaged in extensive negotiations with the Tranche B Lenders/Steering Committee regarding the terms of a plan, including the terms of the settlement of the UCC Challenge Litigation and BOKF Objection.

Ultimately, the Debtors and the Supporting Second Lien Parties reached an agreement in principle on a plan premised on the settlements contained in the Plan, including settlement of the UCC Challenge Litigation and BOKF Objection. As discussed above, as a result of the mediation, the Debtors, the Supporting Second Lien Parties, the Creditors' Committee, and

55

BOKF, N.A. reached a global settlement with respect to the Mediation Issues, and the Committee/BOKF Plan Settlement is incorporated into the Plan.

3. Rights Offering, Direct Equity Commitment, and Equity Commitment Agreement

After filing a plan in late March 2017, negotiations between the Debtors and the Supporting Second Lien Parties continued regarding the terms of the Plan and the investment that would adequately capitalize the Reorganized Debtors upon emergence. The plan supported by the Supporting Second Lien Parties contemplates that up to $285 million (subject to increase to $300 million) of new money would be raised pursuant to a rights offering and a commitment by the Rights Offering Backstop Purchasers to directly purchase New SUNE Common Stock and Continuing TERP Class A Shares. On April 27, 2017, the Debtors and the Supporting Second Lien Parties reached agreement in principal on the terms of (a) a $213.75 million (subject to increase to $225 million) rights offering (the "Rights Offering") of (i) New SUNE Common Stock, (ii) Continuing TERP Class A Shares, and (iii) receipt of a portion of the Reinstated Second Lien Claims pursuant to the Reinstated Second Lien Modification Terms in the same proportion as they will hold New SUNE Common Stock; (b) the Supporting Second Lien Parties' commitment to fully backstop the Rights Offering; and (c) the $71.25 million (subject to increase to $75 million) Direct Equity Commitment, pursuant to which the Rights Offering Backstop Purchasers will purchase additional shares of New SUNE Common Stock and Continuing TERP Class A Shares. The terms of the Rights Offering and Direct Equity Commitment were documented in a term sheet (the "Rights Offering Term Sheet") attached to the commitment letter pursuant to which the Rights Offering Backstop Purchasers set forth the terms on which they would provide the $285 million equity commitment (the "Equity Commitment"). On April 27, 2017, the Debtors filed their motion with the Bankruptcy Court seeking approval of the Rights Offering Procedures and the Equity Commitment [Docket No. 2857] (the "Backstop Approval Motion").

Following the filing of the Backstop Approval Motion, the Debtors continued to engage with the Backstop Purchasers to reach definitive terms of an equity commitment agreement. On May 19, 2017, the Debtors and the Rights Offering Backstop Purchasers entered into the Equity Commitment Agreement, which was filed with the Bankruptcy Court [Docket No. 3173]. Pursuant to the terms of the Equity Commitment Agreement, the Supporting Second Lien Parties agreed to support a plan on the terms and subject to the conditions contained therein (an "Approved Plan"). The transactions contemplated by the Equity Commitment Agreement (on the terms set forth therein) represent a heavily-negotiated business deal through which the Debtors have secured a commitment from Holders of Second Lien Claims who (as set forth in the Amended Equity Commitment Agreement (defined below)) hold, directly or through their affiliates, approximately 80% in amount of the aggregate Second Lien Claims so that DIP Claims will be paid in full and the post-emergence business will be adequately capitalized to maximize value.

AQR Capital Management, LLC and CNH Partners, LLC (the "Unsecured Objecting Parties") filed an objection to the Backstop Approval Motion [Docket No. 3133], which was joined by certain holders of Second Lien Claims [Docket No. 3174] (collectively, the "Second Lien Objecting Parties," and together with the Unsecured Objecting Parties, the "Objecting

Parties").[58]  On the morning of the hearing on the Backstop Approval Motion on May 19, 2017 (the "Backstop Approval Hearing"), the Objecting Parties provided the Debtors with a proposal to provide an alternative equity commitment (the "Objecting Party Proposal").  The Objecting Party Proposal was contingent on a due diligence period of five (5) business days (the "Diligence Period") after entry by the Objecting Parties into non-disclosure agreements, within two (2) business days of the date of the proposal.

For the reasons stated on the record and in sworn testimony at the Backstop Approval Hearing, the Debtors, having received this proposal, which was subject to contingencies, determined it was in the best interests of the Estates to proceed with the Backstop Approval Hearing because, among other reasons, the Equity Commitment Agreement is a binding commitment.   After extensive testimony, the Bankruptcy Court approved the Equity Commitment Agreement and the Rights Offering Procedures on the record at the Backstop Approval Hearing on May 19, 2017

Following the Backstop Approval Hearing, the Second Lien Objecting Parties retained a financial advisor that became party to a non-disclosure agreement with the Company and commenced diligence for the Second Lien Objecting Parties on May 24, 2017.  Prior to the hearing on the settlement of the order approving the Backstop Approval Motion on June 1, 2017 (the "Backstop Order Settlement Hearing"), the Second Lien Objecting Parties reached a resolution with the Backstop Purchasers and withdrew their objection to the Debtors' proposed form of order approving the Backstop Approval Motion in the entirety.  On June 8, 2017, the Objecting Second Lien Parties became parties (along with the initial Backstop Purchasers) to the Equity Commitment Agreement, as amended (the "Amended Equity Commitment Agreement"), a copy of which was filed with the Bankruptcy Court [Docket No. 3304].

At the Backstop Order Settlement Hearing, counsel to the Unsecured Objecting Parties took the position that under the terms of the Objecting Party Proposal, the diligence condition was automatically satisfied at the conclusion of the Diligence Period unless the Objecting Parties affirmatively exercised their right to exercise the diligence out by notice to the Debtors.  Counsel to the Unsecured Objecting Parties stated on the record at the Backstop Order Settlement Hearing that the Diligence Period expired on May 31, 2017 and therefore, the Objecting Party Proposal had become a firm offer.  [June 1, 2017 Hr'g Tr. 14:5-13.]

Subsequent to the Backstop Order Settlement Hearing, to avoid any potential confusion, the Debtors were informed by the Second Lien Objecting Parties in an email dated June 6, 2017 at 9:57 a.m. (Eastern Time) that, based on the Debtors never having accepted the Objecting Party Proposal, the Second Lien Objecting Parties view the proposal as being and having been terminated.

An order approving the Backstop Approval Motion was entered on June 6, 2017 [Docket No. 3283].

---

[58]   The objection and the joinder were both filed after the objection deadline for the Backstop Approval Motion had passed.

4.    AQR and CNH Assertions Regarding Rights Offering, Direct Equity Commitment, and Equity Commitment Agreement

AQR Capital Management, LLC ("AQR") and CNH Partners, LLC ("CNH") objected to the Disclosure Statement at Docket No. 3278 and provided the following statement concerning the Rights Offering, Direct Equity Commitment and Equity Commitment Agreement (the "AQR/CNH Statement").

AQR and CNH (the "Unsecured Objecting Parties") filed an objection to the Backstop Approval Motion [Docket No. 3133], which was joined by certain holders of Second Lien Claims [Docket No. 3174] (collectively, the "Second Lien Objecting Parties," together with the Unsecured Objecting Parties, the "Objecting Parties").  On the morning of the hearing on the Backstop Approval Motion on May 19, 2017 (the "Backstop Approval Hearing"), the Objecting Parties provided the Debtors with a proposal to provide an alternative equity backstop commitment (the "Objecting Party Proposal").

The Objecting Party Proposal, which AQR and CNH assert followed as closely as possible the terms of the Debtors' proposed transaction with the Rights Offering Backstop Purchasers, contained a backstop commitment fee of 5%, rather than 7% under the Rights Offering Backstop Commitment and did not charge the backstop commitment fee on the Direct Equity Commitment, which was reduced from a maximum of $75 million to a maximum of $30 million. These changes reduced the total amount of the backstop commitment fee from $21 million under the Rights Offering Backstop Commitment to $13.5 million under the Objecting Party Proposal, which AQR and CNH assert would save the Debtors $7.5 million, and also made up to an additional $45 million of discounted SUNE Common Stock and Continuing TERP Class A Shares available to Eligible Holders of Second Lien Claims who were not Rights Offering Backstop Purchasers.  In addition, the Objecting Party Proposal contained a maximum breakup fee of $300,000, rather than a maximum breakup fee of $9 million under the Rights Offering Backstop Commitment.

While the Unsecured Objecting Parties' view the Objecting Party Proposal as a better economic proposal and therefore in the best interest of the estates and all creditors, the Debtors proceeded with the hearing on approval of the Backstop Approval Motion and the Equity Commitment Agreement and did not accept the Objecting Party Proposal.

The Bankruptcy Court approved the Equity Commitment Agreement and the Rights Offering Procedures on the record at the Backstop Approval Hearing on May 19, 2017.  The Bankruptcy Court stated on the record at the Backstop Approval Hearing that it was not deciding issues involving vote buying [May 19, 2017 Hr'g Tr. (the "5/19/17 Tr.") 211: 4-15] or improper solicitation [5/19/17 Tr. 211: 23-212: 4.], which would be reserved until confirmation.  An order approving the Backstop Approval Motion was entered on June 6, 2017.

The Objecting Party Proposal was contingent on a due diligence period of five (5) business days (the "Diligence Period") after entry by the Objecting Parties into Non-Disclosure Agreements, within two (2) business days of the date of the proposal.  AQR and CNH asserts that pursuant to the terms of the Objecting Party Proposal, the diligence condition was automatically satisfied at the conclusion of the Diligence Period unless the Objecting Parties

affirmatively exercised their right to exercise the diligence out by notice to the Debtors.[59] Following the Backstop Approval Hearing, the Second Lien Objecting Parties retained a financial advisor that became party to a non-disclosure agreement with the Company and commenced diligence for the Second Lien Objecting Parties on May 24, 2017.  Accordingly, the Diligence Period expired on May 31, 2017.

At the hearing on June 1, 2017 (the "Backstop Order Settlement Hearing"), on the settlement of a proposed order approving the Backstop Approval Motion, counsel to the Unsecured Objecting Parties confirmed on the record that the Diligence Period expired on May 31, 2017 and, therefore, the Objecting Party Proposal had become a firm offer. [June 1, 2017 Hr'g Tr. 14:5-13.]

5.    Debtors' Response to AQR/CNH

The Debtors disagree with many of the assertions made in the foregoing AQR/CNH Statement.  The Debtors disagree that the Objecting Party Proposal is superior for, among other reasons, the Second Lien Objecting Parties have informed the Debtors that they view the proposal as terminated.  Thus, the parties that would have provided over two-thirds of the potential funding upon which the Objecting Party Proposal is based are no longer in support of such proposal.  Additionally, the Objecting Parties have never made a proposal incorporating the more fulsome terms of the Equity Commitment Agreement, which is the operative document governing the Backstop Parties' commitments to the Debtors.  To date, the Unsecured Objecting Parties have not proposed a binding superior alternative to the Debtors.

6.    Committee/BOKF Plan Settlement

As described above, at the request of the parties, on March 18, 2017, the Bankruptcy Court entered an order assigning the Mediation Issues, which included the UCC Challenge Litigation, the BOKF Objection, the YieldCo Settlement Motion, and the YieldCo Avoidance Allocation, and issues related to the Plan to mediation by Chief Judge Morris.  As a result of the mediation, the Debtors, the Tranche B Lenders/Steering Committee, the Creditors' Committee,

---

[59]

Within two (2) business days hereof, the Company and each of the Backstop Purchasers shall enter into non-disclosure agreements, which shall be in form and substance reasonably acceptable to the Backstop Purchasers and the Company (the "NDAs").  Following execution of the NDAs, the Backstop Purchasers shall have access to Company information and personnel reasonably necessary to confirm the financial analysis underlying the terms of the Plan, the Rights Offering and the related transactions for a period of 5 business days (the "Diligence Period").  Notwithstanding anything else set forth in the Commitment Letter or this Term Sheet, the obligation of each Backstop party under Backstop Commitment is, in all respects, conditioned on written confirmation by the Requisite Purchasers during the Diligence Period of such financial analysis (the "Diligence Condition").  In the event the Requisite Purchasers shall advise the Debtors prior to the close of the Diligence Period that the Diligence Condition has not been satisfied, the Commitment Letter and the Equity Commitment Agreement shall terminate.

Objecting Party Proposal, Term Sheet for Proposed Rights Offering at 5.

and BOKF, N.A. reached a global settlement with respect to the Mediation Issues, as documented in the Committee/BOKF Plan Settlement Term Sheet.

A copy of the Committee/BOKF Plan Settlement Term Sheet is attached as Exhibit 6.1 to the Plan and should be reviewed carefully. Certain of the provisions contained therein are described in Section B of the Executive Summary. However, to the extent of any inconsistency between this Disclosure Statement, the Plan, and the Committee/BOKF Plan Settlement Term Sheet, the Committee/ BOKF Plan Settlement Term Sheet shall prevail.

The Debtors hereby seek the Bankruptcy Court's approval of the Committee/BOKF Plan Settlement as part of Confirmation of the Plan.

M.    Employee Incentive and Retention Programs

Prior to the Petition Date, the Debtors have historically employed broad-based annual incentive compensation program for their salaried employees. In order to reward and incentivize employees to maximize the value of Debtors' Estates during the pendency of these Chapter 11 Cases, the Debtors filed three motions seeking approval of various employee compensation programs: (1) on July 7, 2016 Debtors filed a motion (Docket No. 729) seeking approval of a key employee retention plan (the "KERP"), the Utility Project Incentive Plan, and the Solar Materials Incentive Plan; (2) on July 29, 2016, the Debtors filed a motion (Docket No. 883) seeking approval of the C&I Deal Incentive Plan; and (3) on August 23, 2016, the Debtors filed a motion (Docket No. 1046) seeking approval of the key employee incentive plan (the "KEIP") and the RSC Deal Incentive Plan (together with the KERP, Utility Project Incentive Plan, Solar Materials Incentive Plan, C&I Deal Incentive Plan, and KEIP, the "Compensation Programs"). After negotiations with their constituencies in these Chapter 11 Cases, the Debtors proposed modifications to certain of the Compensation Programs, which the Court approved by orders dated July 29, 2016 (Docket No. 871), August 2, 2016 (Docket No. 903), August 19, 2016 (Docket No. 1034), and September 16, 2015 (Docket No. 1205). The Plan provides that the Reorganized Debtors shall have the discretion, with the reasonable consent of the Supporting Second Lien Parties, to amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided in the Plan, the Employee Compensation Plans. Each of the Compensation Programs is described in additional detail below.

1.    Non-Insider Key Employee Retention Plan

The terms of the KERP, as approved, apply to a select group of approximately 126 non-insider employees[60] ranging from the "Individual Contributor" to "Vice President" level of the enterprise. The KERP costs approximately $7 million with an additional discretionary pool of $600,000. The discretionary pool provides flexibility to add new participants to the KERP and to adjust awards to employees to reflect changes in job responsibility and employment terms. The Debtors agreed, however, that the total number of participants shall not exceed 150 and that

---

[60]    Approximately ninety-one (91) of these employees are employees of the Debtors that account for approximately 79% of the aggregate cost and approximately thirty-five (35) are employees of non-debtor affiliates that account for approximately 21% of the aggregate cost.

no employee will receive an award greater than $262,500 under the KERP. The Debtors also agreed to provide monthly reports to certain notice parties in any month where KERP awards are reallocated or the discretionary pool is used. Additionally, Debtors agreed to notify the notice parties if Debtors used more than $300,000 of the discretionary pool and the notice parties can object to the Debtors' use of the discretionary pool beyond $300,000. Approximately 33% of the KERP award was paid out 60 days after filing the motion, an additional 33% of the award will paid out at the Debtors' emergence from chapter 11, and the remaining 34% will be paid 60 days after emergence from chapter 11.

### 2.  Utility Project Incentive Plan

The Utility Project Incentive Plan is a refinement of the Debtors' prepetition sales-based incentive program, which rewarded employees for the successful development of a utility scale project. The plan, as approved, covered approximately fifty (50) employees working on the Company's North American Utility projects development teams. The underlying asset sale proceeds fund an aggregate incentive pool, which is allocated across deal team members on the basis of their proportional contribution to the deal. The pool is derived from 2.45% of the applicable net cash sale proceeds plus the value of any returned letters of credit (subject to a per Project incentive pool cap of $1 million per Project).

### 3.  The Solar Materials Incentive Plan

The Solar Materials Incentive Plan is a deal-based incentive implemented in connection with the sale of the Debtors' solar materials business unit. The plan, as approved, covered approximately 20 employees. Plan payments are derived from and funded by net sale proceeds of the entire solar materials business unit. The percentage of net proceeds is determined by a sliding scale that increases incrementally with a corresponding increase in the purchase price of the solar materials business unit. Award payouts are made to participants on the payroll period following the receipt of sale proceeds.

### 4.  The C&I Deal Incentive Plan

The C&I Deal Incentive Plan, as approved, covered approximately forty-four (44) employees who play important roles driving sales transactions for the Company's North American large commercial and industrial segment (commonly referred to as C&I). Awards for plan participants are paid out from an incentive pool created from approximately 1.16% of gross sale proceeds, according to each individual's value to the sale of each portfolio of projects. Awards are calculated as a percentage of base salary depending on the employee's role in the given transaction, but no individual award exceeds $300,000.

### 5.  The RSC Deal Incentive Plan

The RSC Deal Incentive Plan, as approved, covered approximately 13 non-insider employees in the Company's residential and small commercial (or "RSC," as defined herein) business unit identified as playing a critical role in the sale and divestiture of the RSC business unit. Awards for plan participants will be paid out and entirely funded from an aggregate incentive pool derived from 3% of the net proceeds from the sale in accordance with their

criticality and contributions to the sale.  No awards are paid out if net proceeds from the sale are below $1 million, and no single participant award exceeds $150,000.

6.    Key Employee Incentive Plan

The terms of the KEIP, as approved, award the Debtors' nine senior executives based on individualized sale-metrics in connection with the Company's various sale processes during the pendency of these Chapter 11 Cases.  Each KEIP participant's proposed award is tied to certain specified sale(s) proceeds depending on the role the executive played in the pertinent sale(s), which include the: (i) sale of the Company's Solar Materials Business Unit; (ii) North American Utility Project sales; (iii) sale of certain C&I assets; (iv) sale of the RSC Business Unit; (v) sale of certain Company assets in Latin America; and (vi) sale of certain projects and development pipelines in India.  Additionally, the KEIP has an achievement metric tied to the Company's equity ownership stake in the YieldCos, measured either by the value of sale proceeds generated or the value of the Debtors' interests in the YieldCos under a plan of reorganization.  The KEIP has a threshold, target, and goal metric for each of the sales.  The achievement levels increase in difficulty with corresponding increases in the proposed award payout.  After negotiations with their constituents, the Debtors increased the target and goal achievement levels for each of the KEIP metrics, except for the C&I sale metric, by 10% (without increasing the corresponding award payouts tied to those achievement levels).

N.    Analysis and Resolution of Claims

Following below is a discussion of Claims filed in the Chapter 11 Cases and certain motions and orders regarding such Claims.  In addition, the Debtors' Schedules provide information pertaining to the Claims.  On May 17, 2016, the Debtors filed a motion to extend the deadline to file their Schedules and Statements of Financial Affairs (Docket No. 306), which was approved by an order entered by the Bankruptcy Court Order on June 8, 2016 (Docket No. 510) extending the date to file the Debtors' Schedules and Statements of Financial Affairs to July 20, 2016.  On or around July 20, 2016, the Debtors filed their Schedules and Statements of Financial Affairs with the Bankruptcy Court (Docket Nos. 819, 821).  Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408, or online at https://cases.primeclerk.com/sunedison.

1.    Claims Bar Dates

On August 10, 2016, the Bankruptcy Court entered an order (Docket No. 948) requiring all persons or entities who wished to assert claims against the Debtors' Estates to file a proof of Claim ("Proof of Claim") against the Debtors that filed chapter 11 petitions prior to or on July 20, 2016 by no later than September 23, 2016 at 5:00 p.m. (Eastern time) (the "General Bar Date").  The General Bar Date applied to any person, other than governmental units, holding a claim against the Debtors allegedly owing as of the Petition Date, including claims under Bankruptcy Code section 503(b)(9), or any person with an alleged claim or expense claimed to have allegedly arisen prior to the Petition Date of the Debtor or Debtors to which such claim pertains. Any governmental unit seeking to file a claim against the Debtors that filed chapter 11 petitions prior to or on July 20, 2016 was required to do so by no later than October 18, 2016 at

5:00 p.m. (Eastern Time).  Additionally, any entity asserting claims arising from or relating to the rejection of Executory Contracts or Unexpired Leases, in accordance with section 365 of the Bankruptcy Code was required to file a Proof of Claim by the later of (a) the General Bar Date and (b) the Rejection Bar Date.

As of the General Bar Date, the Debtors' Claims and Solicitation Agent, Prime Clerk, LLC, had received approximately 5,761 Proofs of Claim (as defined below) totaling approximately $46.5 billion. With respect to Debtors that filed chapter 11 petitions after July 20, 2016 and prior to March 2, 2017, the Court established May 4, 2017 as the deadline (the "Second General Bar Date") for submitting proofs of claim for these Debtors [Docket No. 2627].  As of the Second Bar Date, the Debtors' Claims and Solicitation Agent, Prime Clerk, has received 63 Proofs of Claim totaling approximately $3.0 billion for Debtors who filed chapter 11 petitions after July 20, 2016.  With respect to the Debtors that filed chapter 11 petitions after March 2, 2017, the Bankruptcy Court established June 23, 2017 as the deadline (the "Third General Bar Date") for submitting proofs of claim [Docket No. 3140].  With respect to the Debtors that filed chapter 11 petitions after March 2, 2017, as of the date hereof, the Debtors' Claims and Solicitation Agent, Prime Clerk, has received 13 Proofs of Claim totaling $73.2 million.

As of the date hereof, the Debtors have received more than approximately 6,215 Proofs of Claim totaling approximately $49.28 billion.[61]  The Debtors have not objected to any Claims as of the date hereof, but believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, has assumed for purposes of estimating recoveries that such Claims shall be expunged from, or reduced in amount in, the official register of Claims and Interests maintained by the Debtors' Claims and Solicitation Agent (the "Claims Register").

2.    Avoidance Actions

All Causes of Action of the Debtors' Estates as of the Effective Date, including all Estate Avoidance Actions (other than Avoidance Actions against the YieldCos and Avoidance Actions against the Prepetition First Lien Secured Parties and the Second Lien Creditors), to the extent such Causes of Action are not released, or settled with the consent of the Creditors' Committee, pursuant to Article 11.5 of the Plan or released or settled pursuant to an Order of the Bankruptcy Court or the Committee/BOKF Plan Settlement Term Sheet will be transferred to the GUC/Litigation Trust.  The Debtors' preliminary analysis of recoveries from avoidance actions is ongoing.  Based on this preliminary analysis, which is subject to material change, Avoidance Action Proceeds, which do not include the YieldCo Avoidance Allocation, may be between $50 to $100 million.  Pursuant to the Committee/BOKF Plan Settlement, the GUC/Litigation Trust Causes of Action will be transferred to the GUC/Litigation Trust for the benefit of the Holders of General Unsecured Claims.  With respect to Net Avoidance Actions Proceeds: (x) the initial $63.0 million of Net Avoidance Action Proceeds recovered shall be distributed on a Pro Rata basis to Holders of Allowed General Unsecured Claims, and (y) any Additional Net Avoidance Action Proceeds shall be distributed (i) fifty-two percent (52%) on a Pro Rata basis to Holders of Allowed General Unsecured Claims and (ii) forty-eight percent (48%) to Holders of Allowed Second Lien Claims or their representatives on a Pro Rata basis.

---

[61]    These numbers include approximately 1,618 Proofs of Claim filed by non-Debtor affiliates.

O.    <u>Exclusivity</u>

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code during which only the debtor may file a plan of reorganization (the "<u>Exclusive Filing Period</u>").  On July 21, 2016, the Debtors filed the Debtors' Motion for an Order Pursuant to Bankruptcy Code Section 1121(d) Extending the Debtors' Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances Thereof [Docket No. 826] (the "<u>First Exclusivity Motion</u>").  On August 11, 2016, the Bankruptcy Court extended the Exclusive Filing Period for each of the Debtors through and including November 17, 2016 and the exclusive period for the Debtors to solicit votes on a chapter 11 plan through and including January 16, 2017 [Docket No. 970].

On October 27, 2016, the Debtors filed a motion seeking to further extend the Exclusive Filing Period for each of the Debtors through and including February 15, 2017, and the exclusive period for the Debtors to solicit votes on a chapter 11 plan through and including April 17, 2017 [Docket No. 1492] (the "<u>Second Exclusivity Motion</u>").  On November 18, 2016, the Bankruptcy Court further extended the Exclusive Filing Period for each of the Debtors through and including January 26, 2017 and the exclusive period for the Debtors to solicit votes on a chapter 11 plan through and including March 27, 2017 [Docket No. 1629].

On January 6, 2017, the Debtors filed a motion seeking to further extend the Exclusive Filing Period for each of the Debtors through and including February 27, 2017, and the exclusive period for the Debtors to solicit votes on a chapter 11 plan through and including April 28, 2017 [Docket No. 2152] (the "<u>Third Exclusivity Motion</u>").  On January 23, 2017, the Bankruptcy Court further extended the Exclusive Filing Period for each of the Debtors through and including February 26, 2017 and the exclusive period for the Debtors to solicit votes on a chapter 11 plan through and including April 28, 2017 [Docket No. 2307].

On February 14, 2017, the Debtors filed a motion to seeking to further extend the Exclusive Filing Period for each of the Debtors through and including March 29, 2017, and the exclusive period to solicit votes on a chapter 11 plan through and including May 29, 2017 [Docket No. 2455] (the "<u>Fourth Exclusivity Motion</u>"), which was heard at the March 7, 2017 hearing (the "<u>Fourth Exclusivity Hearing</u>").  The Court originally granted the extension and further adjourned the exclusivity hearing to request further exclusivity extensions to April 13, 2017.  However, the Court requested that the proposed April 13, 2017 hearing be rescheduled to April 4, 2017.  Accordingly, the plan filing exclusivity period was extended through and including April 4, 2017, and the period to solicit votes in connection with such plan was extended through and including May 29, 2017.  On April 7, 2017, the Bankruptcy Court entered an order extending the exclusive period for the Debtors to solicit acceptances in respect of their chapter 11 plan through and including July 28, 2017 and ordered that no other party may file a competing plan of reorganization during the exclusive solicitation period.

The Debtors reserve the right to seek further extensions of their exclusive right to file a plan and solicit votes thereon as necessary and appropriate.

# ARTICLE VI.

# PLAN SUMMARY

A.    <u>Overview of Chapter 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest Holders.  Chapter 11 also strives to promote equality of treatment for similarly situated creditors and similarly situated interest Holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims and interests. Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity Holder in the debtor, whether or not such creditor or equity Holder is impaired under or has accepted the plan, or receives or retains any property under the plan.  Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the Holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as Unimpaired and, because of such favorable treatment, are presumed to accept the plan.  Accordingly, a debtor need not solicit votes from the Holders of claims or equity interests in such Unimpaired classes.  A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such classes are deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not Unimpaired will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest Holders.  In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class.  The Debtors believe that the Plan has classified all Claims and Interests in compliance with section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications

65

of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE DEBTORS' PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN.  THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE REORGANIZED DEBTORS, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.      Overall Structure of the Plan

As described herein, the Debtors' proposed First Amended Joint Plan of SunEdison, Inc., et al., pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), a copy of which is attached hereto as Exhibit A, is the result of extensive discussions and settlements between and among the Debtors, the Tranche B Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders, the Creditors' Committee, and certain other creditor constituencies.  The Debtors believe that the compromise contemplated under the Plan is fair and equitable and maximizes the value of the Debtors' estates, and provides the best recovery to Holders of Claims.

C.    Administrative Expenses and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

1.    Administrative Claims

Except to the extent that the Debtors (or the Reorganized Debtors) and a Holder of an Allowed Administrative Claim agree to less favorable treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which shall be subject to Article 2.3 of the Plan) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Effective Date, (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims, or (c) on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Administrative Claim[62]; provided, however, that other than Holders of (i) Original DIP Facility Claims, (ii) Replacement DIP Facility Claims; (iii) Professional Claims, (iv) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (v) Administrative Claims that are not Disputed and arose in the ordinary course of business and was paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided in the Plan and as set forth in Articles 2.2 or 2.3 of the Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in Exhibit 2.1 of the Plan, with the Claims Agent and served on counsel for the Debtors or the Reorganized Debtors (and, if filed after the Disclosure Statement Order is entered, counsel to the Supporting Second Lien Parties) by no later than the Administrative Claims Bar Date. After the Effective Date, the Reorganized Debtors, with the consent of the Supporting Second Lien Parties (such consent not to be unreasonably withheld or delayed) may settle an Administrative Claim without further Bankruptcy Court approval. In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. For the avoidance of doubt, the fees and expenses incurred by the Creditors' Committee's Professionals with regard to the investigation or prosecution of the UCC Challenge Litigation shall be paid in Cash in the amount set forth in the Committee/BOKF Plan Settlement Term Sheet. Subject to the other provisions of the Committee/BOKF Plan Settlement, the Creditors' Committee's Professionals reserve any and all rights to seek allowance and payment of any fees and expenses in connection with matters other

---

[62]    Subject to, in the TERP Cash Election Alternative, the issuance, if necessary, of the Reinstated Tranche B Roll-Up Loans.

than (a) fees and expenses subject to the Investigation/Prosecution Cap and (b) other than as already paid, fees and expenses related to GUC/Litigation Trust Causes of Action.

2.    Original and Replacement DIP Facility Claims.

(a)    *Replacement DIP Term Loan Claims*. On the Effective Date, the Replacement DIP Term Loan Claims shall be Allowed in full, in the amount of $640 million (less any amounts paid prior to the Effective Date) plus all accrued and unpaid postpetition interest under the Replacement DIP Credit Agreement (and any unpaid fees, costs, and expenses). Except to the extent that a Holder of a Replacement DIP Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Replacement DIP Term Loan Claim, each Holder of an Allowed Replacement DIP Term Loan Claim shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Replacement DIP Agent for the ratable benefit of the Holders of Replacement DIP Term Loan Claims.

(b)    *Original DIP Term Loan Claims.* On the Effective Date, the Original DIP Term Loan Claims (including any unpaid interest, fees, costs, and expenses) shall be Allowed in full to the extent not previously repaid. As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Original DIP Facility with respect to the Original DIP Term Loans. In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of an Original DIP Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Original DIP Term Loan Claim, each Holder of an Allowed Original DIP Term Loan Claim shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of Original DIP Term Loan Claims.

(c)    *L/C Borrowing Claims*. On the Effective Date, the L/C Borrowing Claims (including any unpaid interest, fees, costs, and expenses) shall be Allowed in full to the extent not previously repaid. As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Original DIP Facility with respect to the L/C Borrowings. In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of an L/C Borrowing Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every L/C Borrowing Claim, Holders of L/C Borrowing Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of L/C Borrowing Claims.

(d)    *Tranche A-1 Roll-Up Loan Claims*. On the Effective Date, the Tranche A-1 Roll-Up Loan Claims shall be Allowed in full to the extent not previously repaid. As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Tranche A-1 Roll-Up Loans. In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of a Tranche A-1 Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche A-1 Roll-Up Loan Claim, Holders of Tranche A-1 Roll-Up Loan Claims

68

shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of Tranche A-1 Roll-Up Loan Claims.

(e)    *Tranche A-2 Roll-Up Loan Claims*.  On the Effective Date, the Tranche A-2 Roll-Up Loan Claims shall be Allowed in full to the extent not previously repaid.  As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Tranche A-2 Roll-Up Loans.    In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of a Tranche A-2 Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche A-2 Roll-Up Loan Claim, Holders of Tranche A-2 Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of Tranche A-2 Roll-Up Loan Claims.

(f)    *Tranche B Roll-Up Loan Claims*. On the Effective Date, the Tranche B Roll-Up Loan Claims shall be Allowed in full, in the amount of $317,549,980.22 plus accrued postpetition interest in an amount to be determined.  Except to the extent that a Holder of a Tranche B Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche B Roll-Up Loan Claim, Holders of Tranche B Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Replacement DIP Agent for the ratable benefit of the Holders of Tranche B Roll-Up Loan Claims.[63]

(g)    Upon the Effective Date, subject to (a) payment in full and in Cash of the Replacement DIP Facility Claims and the Original DIP Facility Claims, and (b) any indemnification and reimbursement claims that survive under the terms of the Replacement DIP Facility and the Original DIP Facility, all Liens and security interests granted to secure the Replacement DIP Facility or the Original DIP Facility shall be deemed discharged, cancelled, and released and shall be of no further force and effect.  To the extent that the Replacement DIP Lenders, the Replacement DIP Agent, the Original DIP Lenders, or the Original DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the Replacement DIP Facility or the Original DIP Facility, the Replacement DIP Lenders, the Replacement DIP Agent, the Original DIP Lenders, or the Original DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests.

(h)    On the later of the Effective Date or such other date as permitted by the Replacement DIP Facility Order, in the event any Existing L/Cs are outstanding, the Debtors

---

[63]    To the extent that (a) the Debtors elect the TERP Cash Election Alternative and (b) the cash received from the Jointly Supported Transactions is insufficient to repay the Tranche B Roll-Up Lenders in full and in Cash, the Debtors will issue Reinstated Tranche B Roll-Up Loans in an amount and with terms necessary to render the Tranche B Roll-Up Loans Unimpaired, including, without limitation, priority (over the Reinstated Second Lien Claims) in lien and claim amount and interest, and with other terms that are identical to the current Tranche B Roll-Up Loans.

shall have caused all such Existing L/Cs to be cancelled without any further liability to any Applicable Issuer.

(i)        Nothing in the Plan shall impair or otherwise affect the L/C Cash Collateralization Agreements, the obligations of the Debtors (and from and after the Effective Date, the Reorganized Debtors) thereunder, the rights and remedies of the Applicable Issuers thereunder or under the Replacement DIP Facility Order (including, without limitation, under the Replacement Intercreditor Annex (as defined in the Replacement DIP Facility Order)) or the provisions in the Replacement DIP Facility Order relating to the "Prepetition Control Agreements" and the "Prepetition Blocked Accounts" (as each such term is defined in the Replacement DIP Facility Order), and the L/C Cash Collateralization Agreements and all such applicable provisions of the Replacement DIP Financing Order shall be binding upon the Reorganized Debtors and shall remain in full force and effect from and after the Effective Date in accordance with their terms.

3.        Professional Claims.

(a)        *Final Fee Applications.*  All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of all Professional Claims and expenses shall be determined by the Bankruptcy Court.  In accordance with the Investigation/Prosecution Cap, other than as may have already been paid, and subject to the interim fee order entered by the Bankruptcy Court on December 1, 2016 (Docket No. 1711), the Original DIP Facility Order, and the Replacement DIP Facility Order, the Professional Claims of the Creditors' Committee's Professionals with regard to the investigation or prosecution of the UCC Challenge Litigation shall be deemed to be satisfied upon receipt of a payment of $2.25 million in Cash. All Final Fee Applications shall be made in accordance with and subject to, the terms of the Committee/BOKF Plan Settlement Term Sheet.

(b)        *Payment of Interim Amounts.*  Subject to the Holdback Escrow Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed (and as to which there is no then-existing Court-mandated or Court-ordered prohibition on making payment or as to which such payment is not prohibited by the terms of the Committee/BOKF Plan Settlement Term Sheet).  In order to receive payment on the Effective Date for such unbilled fees and expenses incurred through the Effective Date that have not yet been billed pursuant to the Professional Fee Order, no later than two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors' Committee, shall only be permitted to take the actions set forth in Article 14.8 of the Plan after the Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors and the Supporting Second Lien Parties.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period, subject to any parties' right to object as set forth in the Professional Fee Order.

(c)     *Holdback Escrow Account.*   On the Effective Date, and subject to the Investigation/Prosecution Cap as set forth in Article 6.1 of the Plan and the Committee/BOKF Plan Settlement Term Sheet, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.  The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to Reorganized SUNE to be used by the Reorganized Debtors in accordance with the Plan, or distributed to holders of New SUNE Common Stock.

(d)     *Voluntary Professional Fee Reductions.*  Every Entity (collectively, the "Affected Professionals") (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) or 506(b) of the Bankruptcy Code; or (c) awarded compensation and reimbursement pursuant to the Original DIP Facility Order or the Replacement DIP Facility Order, will be asked to voluntarily reduce the aggregate amount of its Professional Claims earned during the course of the Chapter 11 Cases in order to assist in the funding of the Plan and the Committee/BOKF Plan Settlement (the "Voluntary Professional Fee Reductions").   It is a condition to the effectiveness of the Committee/BOKF Plan Settlement that the Voluntary Professional Fee Reductions equal at least $5 million.

In the event an Affected Professional does not agree to a Voluntary Professional Fee Reduction, such Affected Professional's fees and expenses will be subject to review and objection by a fee examiner to be appointed in these cases (the "Fee Examiner"), whose fees and expenses will be deducted from the savings realized by the Fee Examiner.  For the avoidance of doubt, the Fee Examiner may only receive compensation from any savings it realizes, and in no event will the Debtors, the Debtors' estates, the Reorganized Debtors, the Second Lien Lenders or Second Lien Senior Noteholders, or any other party incur any fees, costs, or expenses relating to the Fee Examiner or its work.  If, as a result of the Fee Examiner's recommendation, any fees are disallowed or reduced by the Court, or fee reductions are agreed to by any Affected Professional per the Fee Examiner's recommendation, then such amounts shall be transferred to the GUC/Litigation Trust for the Holders of General Unsecured Claims.  The Fee Examiner will only be permitted to examine the fees of an Affected Professional who does not agree to a Voluntary Professional Fee Reduction.

In the event the fees and expenses of an Affected Professional that has agreed to a Voluntary Professional Fee Reduction is subject to objection, any requested amounts that are Disallowed shall be deemed credited to the Voluntary Professional Fee Reduction Amount so that the Affected Professional will not receive a reduction of the amount payable to it unless the Disallowed amount exceeds the Voluntary Professional Fee Reduction agreed to by such Affected Professional.

71

The Voluntary Professional Fee Reduction Amount shall be funded into the GUC/Litigation Trust on the Effective Date (to the extent determined as of the Effective Date). The Distribution Agent shall distribute to the GUC/Litigation Trust for the Holders of General Unsecured Claims, the aggregate amount of the Voluntary Professional Fee Reductions.  As of the date hereof, Affected Professionals have agreed to Voluntary Professional Fee Reductions in excess of $5 million.

(e)    *Post-Confirmation Date Retention*.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).  The Creditors' Committee's Professionals may only be paid for services rendered after the Confirmation Date if such services are permitted pursuant to Article 14.8 of the Plan.

4.    Priority Tax Claims

On the Effective Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors (with the reasonable consent of the Supporting Second Lien Parties), Cash in the aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at a rate determined under applicable non-bankruptcy law, payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

D.    Classification, Treatment, and Voting of Claims and Interests

1.    Classification of Claims and Interests

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in

sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II of the Plan.

(b)      For administrative convenience, the Plan organizes the Debtors into groups (each a "Debtor Group") and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group.   Notwithstanding this organizing principle, the Plan is a separate plan of reorganization or liquidation for each Debtor.  Claims and Interests belonging to a Debtor Group consisting of more than one Debtor shall be deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting.  To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group.  For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each Debtor Group.   The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims.   For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator is equal to the amount of a particular Holder's Allowed General Unsecured Claim.   For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting Classes or cramdown.  Claims and Interests are classified as follows:

| Letter | Debtor Group |
|--------|-------------|
| A | **Parent**<br>SunEdison, Inc. |
| B | **DIP and Second Lien Secured Guarantors**<br>Buckthorn Renewables Holdings, LLC<br>Everstream HoldCo Fund I, LLC<br>Greenmountain Wind Holdings, LLC<br>Rattlesnake Flat Holdings, LLC<br>Somerset Wind Holdings, LLC<br>SunE Minnesota Holdings, LLC<br>SunE MN Development, LLC<br>SunE MN Development Holdings, LLC<br>SunE Waiawa Holdings, LLC<br>Sunflower Renewables Holdings 1, LLC<br>Enflex Corporation<br>Fotowatio Renewable Ventures, Inc.<br>MEMC Pasadena, Inc.<br>NVT Licenses, LLC<br>NVT, LLC<br>Solaicx<br>SunE ML 1, LLC |

| # | Designation |
|---|-------------|
| 1 | Second Lien Claims |
| 2 | Other Secured Claims |
| 3 | Other Priority Claims |
| 4 | General Unsecured Claims |
| 5 | Intercompany Claims |
| 6 | Other Subordinated Claims |
| 7 | Interests in Debtor Subsidiaries |
| 8 | Interests in SUNE |

| | |
|---|---|
| | SunEdison Canada, LLC<br>SunEdison Contracting, LLC<br>SunEdison DG, LLC<br>SunEdison Holdings Corporation<br>SunEdison International, Inc.<br>SunEdison International, LLC<br>Sun Edison LLC<br>SunEdison Utility Holdings, Inc.<br>Team-Solar Inc.<br>First Wind Holdings, LLC<br>First Wind Energy, LLC<br>Vaughn Wind, LLC<br>Maine Wind Holdings, LLC<br>SunEdison Products, LLC<br>Hudson Energy Solar Corporation<br>SunE REIT-D PR, LLC<br>SunEdison International Construction, LLC<br>EchoFirst Finance Co., LLC |
| C | **DIP-only Secured Guarantors**<br>Blue Sky West Capital, LLC<br>DSP Renewables, LLC<br>First Wind California Holdings, LLC<br>First Wind Oakfield Portfolio, LLC<br>First Wind Panhandle Holdings III, LLC<br>First Wind Solar Portfolio, LLC<br>Hancock Renewables Holdings, LLC<br>PVT Solar, Inc.<br>SunE Hawaii Solar Holdings, LLC<br>SunE Wind Holdings, Inc.<br>SunEdison Residential Services, LLC |
| D | **DIP-only Unsecured Guarantor**<br>Silver Ridge Power Holdings, LLC<br>TerraForm Private Holdings LLC |
| E | **Not Obligated on DIP or Second Lien Claims**<br>SunEdison Products Singapore Pte. Ltd<br>SEV Merger Sub Inc. |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below:

| Class | | Claim or Interest | | Status | | Voting Rights |
|---|---|---|---|---|---|---|
| 1A and 1B | | Second Lien Claims | | Impaired | | Entitled to Vote |

| 2A-2E | Other Secured Claims | Unimpaired | | Presumed to Accept |
| 3A-3E | Other Priority Claims | Unimpaired | | Presumed to Accept |
| 4A-4E | General Unsecured Claims | Impaired | | Entitled to Vote |
| 5A-5E | Intercompany Claims | Impaired or Unimpaired | | Deemed to Reject or Presumed to Accept |
| 6A-6E | Other Subordinated Claims | Impaired | | Deemed to Reject |
| 7B-7E | Interests in Debtor Subsidiaries | Impaired or Unimpaired | | Deemed to Reject or Presumed to Accept |
| 8A | Interests in SUNE | Impaired | | Deemed to Reject |

2.    Treatment of Classes of Claims and Interests

| Class Description | Treatment under the Plan |
| --- | --- |
| Classes 1A-1B – Second Lien Claims | Classes 1A and 1B consist of all Allowed Second Lien Claims. |
| | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim (except as otherwise set forth herein with respect to the Reinstated Second Lien Claims), on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata portion of the Second Lien Claim Distribution. |
| | In addition to the foregoing, in the TERP Share Election Alternative, each Holder of an Allowed Second Lien Claim that is an Eligible Holder shall receive its Pro Rata portion of the Rights Offering Subscription Rights. |
| | Classes 1A and 1B are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan. |
| Classes 2A-2E – Other Secured Claims | Classes 2A, 2B, 2C, 2D, and 2E consist of all Allowed Other Secured Claims. |
| | Except as otherwise provided in and subject to Article 10.6 of the Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable: |
| | (i)    have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or |

75

| Class Description | Treatment under the Plan |
|---|---|
| | receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default; |
| | (ii)    be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or |
| | (iii)    receive such other less favorable treatment as to which the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing. |
| | provided, that Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in Article 4.2 of the Plan or elsewhere in the Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim. |
| | Classes 2A, 2B, 2C, 2D, and 2E are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan. |
| Classes 3A-3E – Other Priority Claims | Classes 3A, 3B, 3C, 3D, and 3E consist of all Allowed Other Priority Claims. |
| | Except as otherwise provided in and subject to Article 10.6 of the Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or such other ate as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Other Priority Claim; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course |

| Class Description | Treatment under the Plan |
|---|---|
| | of business in accordance with the terms thereof. |
| | Classes 3A, 3B, 3C, 3D, and 3E are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan. |
| Class 4A-4E – General Unsecured Claims | Class 4A, 4B, 4C, 4D, and 4E consist of all Allowed General Unsecured Claims. |
| | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata portion of the Class A GUC/Litigation Trust Interests, subject to the specifics set forth in the Plan.  For the avoidance of doubt, Holders of an Allowed General Unsecured Claims shall not receive any of the Class B GUC/Litigation Trust Interests. |
| | For purposes of Article 4.4 of the Plan, Pro Rata shall apply to all Allowed General Unsecured Claims on a consolidated basis. |
| | Classes 4A, 4B, 4C, 4D, and 4E are Impaired and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan. |
| Class 5A-5E – Intercompany Claims | Classes 5A, 5B, 5C, 5D, and 5E consist of all Allowed Intercompany Claims. |
| | On the Effective Date, and subject to any repayment obligations necessary to satisfy secured Intercompany Claims, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion with the reasonable consent of the Supporting Second Lien Parties.  For the avoidance of doubt, all Allowed Intercompany Claims held by any Debtor constitutes collateral of the Original DIP Lenders, the Replacement DIP Lenders, Second Lien Lenders, and Second Lien Senior Noteholders. |
| | Classes 5A, 5B, 5C, 5D, and 5E are either: (i) Impaired, and Holders of Allowed applicable Class 5 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan; or (ii) Unimpaired, and Holders of Allowed applicable Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan. |

| Class Description | Treatment under the Plan |
|---|---|
| Class 6A-6E – Other Subordinated Claims | Classes 6A, 6B, 6C, 6D, and 6E consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.<br><br>Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.<br><br>Classes 6A, 6B, 6C, 6D, and 6E are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan. |
| Class 8B-8E – Interests in Debtor Subsidiaries | Classes 7A, 7B, 7C, 7D, and 7E consist of all Allowed Interests in Debtor Subsidiaries.<br><br>On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion with the consent of the Supporting Second Lien Parties.  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.<br><br>Classes 7A, 7B, 7C, 7D, and 7E are either: (i) Impaired, and Holders of Allowed applicable Class 7 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan; or (ii) Unimpaired, and Holders of Allowed applicable Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan. |
| Class 8A – Interests in SUNE | Class 8A consists of all Interests in SUNE.<br><br>On the Effective Date, Allowed Class 8A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.<br><br>Class 8A is Impaired, and Holders of Allowed Class 8A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 8A Interests are not entitled to vote to accept or reject the Plan. |

E.      Acceptance

1.      Classes Entitled to Vote

Classes 1A – 1B and 4A – 4E are entitled to vote to accept or reject the Plan.  By operation of law, Classes 2A – 2E, 3A – 3E, 5A – 5E, 6A – 6E, 7B – 7E, and 8A are either deemed to have accepted the Plan or to have rejected the Plan and are not entitled to vote.

2.      Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

3.      Elimination of Classes

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

4.      Deemed Acceptance if No Votes Cast.

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

5.      Cramdown

To the extent necessary, the Debtors shall request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors, with the consent of the Supporting Second Lien Parties and to the extent Holders of Allowed General Unsecured Claims are affected, the Creditors' Committee (in each case, such consent not to be unreasonably withheld), reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

F.      Means for Implementation of the Plan

1.      General Settlement of Claims and Interests

(a)      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with

respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

(b)    In consideration for the compromises and settlements contained herein, including the distribution of the Class A GUC/Litigation Trust Interests for the benefit of Holders of General Unsecured Claims, the transfer of the GUC/Litigation Trust Assets to the GUC/Litigation Trust, and the settlement of any and all issues that may be in dispute (either currently or pending or that could be commenced in the future) regarding Annex II to the Replacement DIP Facility Order, including any right to receive amounts attributable to the Excess Non-Prepetition 1L/2L Obligor Sale Proceeds, and in each case as more fully set forth in the Disclosure Statement, on the Effective Date all pending litigation commenced by the Creditors' Committee or BOKF, N.A., including the UCC Challenge Litigation, the BOKF Objection, and the objections to the YieldCo Settlement Motion, shall be dismissed with prejudice in accordance with the Committee/BOKF Plan Settlement Term Sheet.

(c)    In further consideration for the settlement of the litigation commenced by the Creditors' Committee and BOKF, N.A., on or after the Effective Date (as applicable), the terms of the Committee/BOKF Plan Settlement Term Sheet shall be effectuated to the extent that they have not previously occurred.

(d)    The Plan shall be deemed a motion to settle all pending litigation that has been commenced by the Creditors' Committee or BOKF, N.A. in the Chapter 11 Cases, including the UCC Challenge Litigation, the BOKF Objection, and the objections to the YieldCo Settlement Motion and pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and Confirmation of the Plan shall be deemed approval of such settlement.

2.    [RESERVED]

3.    Restructuring Transactions

(a)    On or after the Confirmation Date, the Debtors (with the reasonable consent of the Supporting Second Lien Parties and the Creditors' Committee) shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "Restructuring Transactions"). In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations.

(b)    In effecting the Restructuring Transactions, the Debtors (with the reasonable consent of the Supporting Second Lien Parties and the Creditors' Committee) shall be permitted to (i) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

4.    <u>Sources of Cash for Plan Distribution</u>

All Cash required for payments to be made under the Plan on the Effective Date shall be obtained from Cash on hand, proceeds of the Jointly Supported Transactions, and, in the TERP Share Election Alternative only, proceeds of the Rights Offering.

(a)    Rights Offering. In the TERP Share Election Alternative, prior to the Effective Date and without the need for any further corporate action and without further action by the Holders of Claims or Interests, SUNE shall commence the Rights Offering pursuant to the Rights Offering Procedures. On the Effective Date, if the TERP Share Election Alternative shall have occurred, Reorganized SUNE shall distribute the Rights Offering Common Stock to the Rights Holders that participate in the Rights Offering as of the Rights Offering Record Date pursuant to the Rights Offering Procedures and the Equity Commitment Agreement. The Rights Offering shall be fully backstopped by the Rights Offering Backstop Purchasers such that the Rights Offering results in the funding of Reorganized SUNE with the Rights Offering Amount on the terms and conditions set forth in the Rights Offering Backstop Commitment and the Equity Commitment Agreement. In exchange for providing the Rights Offering Backstop Commitment for the Rights Offering, on the Effective Date, the Rights Offering Backstop Parties will receive payment of the Rights Offering Backstop Standby Fee to the extent earned and payable pursuant to the Equity Commitment Agreement and any order of the Bankruptcy Court approving such fee. For the avoidance of doubt, the Rights Offering Backstop Standby Fee is a necessary expense of the Debtors' Estates and shall be deemed an Allowed Administrative Expense Claim pursuant to the order approving the Debtors' entry into the Rights Offering Commitment Letter and the Equity Commitment Agreement.

(b)    Jointly Supported Transactions. The Debtors or Reorganized Debtors may enter into, support, or otherwise effectuate one or more Jointly Supported Transactions pursuant to which the Debtors or Reorganized Debtors sell or otherwise dispose of some or all of their equity interests in the YieldCos to a third party purchaser. The Debtors or Reorganized Debtors are authorized to enter into and perform under the Jointly Supported Transaction Agreements and such other documents as may be required or appropriate.

5.    <u>Reinstated Second Lien Claims</u>

On the Effective Date, the Reinstated Second Lien Claims shall be reinstated as modified pursuant to the Reinstated Second Lien Claim Modification Terms. The Debtors and Reorganized Debtors are authorized to take all actions necessary to amend the Second Lien Documents in accordance with the Reinstated Second Lien Claim Modification Terms and such amendments shall be deemed to be effective on the Effective Date. All Liens granted in connection with the Second Lien Claims and that exist over property of the Debtors (and, to the extent applicable, non-Debtors) immediately prior to the Effective Date shall remain in full force and effect following the Effective Date to the extent that the Debtors or Reorganized Debtors have not otherwise disposed of such property free and clear of such Liens in connection with the Plan, and solely to the extent of the Reinstated Second Lien Claims. The Holders of the Reinstated Second Lien Claims, and the amount held by such Holders, shall be consistent with the amounts held by such Holders of Reorganized SUNE equity.[64]

6.      Conversion and Distribution of Continuing TERP Class A Shares

In accordance with the Jointly Supported Transaction Agreements, the Debtors or Reorganized Debtors are authorized to exercise any exchange or conversion rights with respect to their interests in the YieldCos, including the exchange or conversion of their Class B shares in TERP Inc. and/or Class B Units in TERP LLC into Class A shares in TERP Inc. in respect of which they may elect to retain Continuing TERP Class A Shares through the TERP Share Election Alternative. The Debtors or Reorganized Debtors are authorized without further corporate or other action or approval to distribute the Continuing TERP Class A Shares to Holders of Allowed Second Lien Claims in accordance with the Plan, including the Rights Offering, free and clear of all Liens.

7.      Administration of Repatriated Cash, Earnout Assets, and Residual Assets.

Reorganized SUNE shall employ employees and maintain systems and back-office capabilities reasonably necessary to administer the Earnout Assets and the Residual Assets and to collect the Repatriated Cash, and shall use commercially reasonable efforts to (a) generate Earnout Proceeds and Residual Assets Proceeds therefrom and to maximize the recovery of Repatriated Cash and (b) to transfer such assets to Reorganized SUNE if not otherwise applied to the Reinstated Second Lien Claims.

8.      Certain Transfers Between SUNE and Other Debtors.

Following the Effective Date, the Reorganized Debtors may transfer in their sole discretion the right to receive any Earnout Proceeds, Residual Assets Proceeds, and the Repatriated Cash to Reorganized SUNE, free and clear of any Lien, except for the Liens securing

---

[64]    To the extent that (a) the Debtors elect the TERP Cash Election Alternative and (b) the cash received from the Jointly Supported Transactions is insufficient to repay the Tranche B Roll-Up Lenders in full and in Cash, the Debtors will issue Reinstated Tranche B Roll-Up Loans in an amount and with terms necessary to render the Tranche B Roll-Up Loans Unimpaired, including, without limitation, priority (over the Reinstated Second Lien Claims) in lien and claim amount and interest, and with other terms that are identical to the current Tranche B Roll-Up Loans. The provisions of Section 6.5 of the Plan shall apply mutatis mutandis to the Reinstated Tranche B Roll-Up Loans.

the Reinstated Second Lien Claims.  The Confirmation Order shall authorize the Debtors to effectuate the transfer of the right to receive Earnout Proceeds, the Residual Assets Proceeds, and Repatriated Cash in accordance with the terms of the Plan as part of the settlements and compromises contained in the Plan.  All matters and transactions necessary to effectuate the transfer of the right to receive Earnout Proceeds, the Residual Assets Proceeds, or the Repatriated Cash, and any partnership, membership, or shareholder action required by the applicable Debtors in connection with such transfer will be deemed to have occurred and will be in effect, without any requirement of further action by those authorized to act on behalf of the applicable Debtors.  Upon entry of the Confirmation Order, subject to the terms of the Original DIP Facility and the Replacement DIP Facility, the appropriate officers or managing members of each Debtor shall be authorized and directed to issue, execute, deliver, file, and/or record any contracts, agreements, instruments, or other documents contemplated by, or necessary or desirable to effect, the transfer of the right to receive the Earnout Proceeds, the Residual Assets Proceeds, and the Repatriated Cash in accordance with the terms of the Plan, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the transfer of the right to receive the Earnout Proceeds, the Residual Assets Proceeds, and the Repatriated Cash, in each case in the name of and on behalf of the applicable Debtor.  The authorizations contained in Article 6.6 of the Plan apply on a continuing basis to any Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash received by any Debtor (in such case, subject to the terms of the Original DIP Facility and the Replacement DIP Facility) or Reorganized Debtor following the entry of the Confirmation Order.

9.    Authorization and Issuance of New SUNE Common Stock

On the Effective Date, Reorganized SUNE shall authorize and issue the New SUNE Common Stock.  Distribution of New SUNE Common Stock under the Plan shall constitute issuance of 100% of such New SUNE Common Stock and in each case shall be deemed issued on the Effective Date.  The issuance of New SUNE Common Stock by Reorganized SUNE is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the shares of New SUNE Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

10.    GUC/Litigation Trust Initial Funding.

On the Effective Date, the GUC/Litigation Trust Initial Funding shall be $7.5 million, in accordance with the Committee/BOKF Plan Settlement Term Sheet.

11.    Exemptions from Securities Act Registration Requirements.

Except as otherwise set forth in the Plan and consistent with the Jointly Supported Transaction Agreements (if applicable), the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein will be exempt from the registration requirements of Section 5 of the Securities Act pursuant to Section 1145 of the Bankruptcy Code, Sections 4(a)(1) and 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving a public offering and Section

4(a)(1) exempts transactions by any person other than an issuer, underwriter, or dealer. In addition, under Section 1145 of the Bankruptcy Code, if applicable, any Securities (other than the Continuing TERP Class A Shares) issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to (1) the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, (2) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the GUC/Litigation Trust Agreement (if applicable), (3) any other applicable regulatory approval, and (4) the restrictions, if any, contained in the SUNE Certificate of Incorporation and Bylaws. Except as otherwise set forth in the Plan, in reliance upon these exemptions, the offer, issuance, and distribution of Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder. Accordingly, the Securities may be subject to restrictions on transfer as set forth in the governing documents to such Securities.

The Debtors are offering, issuing, and distributing Securities pursuant to the Plan, including offering, issuing, and/or distributing New SUNE Common Stock and Continuing TERP Class A Shares in good faith reliance upon exemption from the registration requirements of the Securities Act and similar state statutes pursuant to and subject to Section 1145 and Sections 4(a)(1) and 4(a)(2) as follows:

(a)    The Debtors are issuing 10% of New SUNE Common Stock (subject to dilution by the Backstop Fee) and distributing 10% of Continuing TERP Class A Shares (subject to dilution by the Backstop Fee) on account of and in exchange for Second Lien Claims as contemplated by the Plan, in good faith reliance upon exemption registration under the Securities Act under section 1145.

(b)    The Debtors are issuing the rights to participate in the Rights Offering contemplated by the Plan in good faith reliance upon exemption from registration under the Securities Act under Sections 4(a)(1) or 4(a)(2), as applicable.

(c)    The Debtors are issuing 90% of New SUNE Common Stock in exchange for exercising rights in the Rights Offering, as contemplated by the Plan, in good faith reliance upon exemption from registration under the Securities Act under Section 4(a)(2).

(d)    The Debtors are distributing 90% of Continuing TERP Class A Shares in exchange for exercising rights in the Rights Offering, as contemplated by the Plan, in good faith reliance upon exemption from registration under the Securities Act under Section 4(a)(1).

(e)    The Debtors are issuing New SUNE Common Stock and distributing Continuing TERP Class A Shares for the Rights Offering Backstop Standby Fee, as contemplated by the Plan, in good faith reliance upon exemption from registration under the Securities Act under Section 4(a)(2).

Except as otherwise set forth in the Plan, in reliance upon these exemptions, the offer, issuance, and distribution of Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder. Accordingly, the Securities may be subject to restrictions on transfer as set forth in the governing documents to such Securities.

12.     Cancellation of Old SUNE Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for herein (including with respect to the Reinstated Second Lien Claims), (a) the Old SUNE Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in SUNE (including the Indentures) shall be cancelled and (b) the obligations of, Claims against, and/or Interests in SUNE under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old SUNE Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of SUNE shall be released and discharged and cancelled; provided, however, that any agreement (including the Indentures) that governs the rights of a Holder of a Claim that is otherwise released, discharged, and cancelled and that is administered by a Servicer shall continue in effect, notwithstanding anything to the contrary contained herein, solely for the purposes of (a) enabling Holders of Allowed Claims to receive distributions under the Plan and (b) allowing and preserving the rights of any Servicer to (i) make the distributions on account of such Claims under the Plan as provided for in Articles 7.10, 7.11, and 10.5(c) of the Plan; (ii) maintain and exercise any charging liens against any such distributions for the payment of fees and expenses and for indemnification under the applicable Indenture; (iii) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or in any other court; and (iv) enforce any obligation owed to such Servicer under the Plan; provided, further, that any indemnification and reimbursement obligations in respect of the Replacement DIP Facilities, the Existing DIP Facilities, the Prepetition Second Lien Credit Facility, the Prepetition Second Lien Notes, and/or the Prepetition First Lien Credit Facility (in each case as defined in the Replacement DIP Order) which are expressly stated to survive any repayment under, or termination of, such respective facilities shall survive any cancellation or discharge under the Plan in accordance with their respective terms, and any rights that the Agents (in each case as defined under the respective Replacement DIP Documents, Existing DIP Documents, the Prepetition Second Lien Credit Facility, the Prepetition Second Lien Notes, or the Prepetition First Lien Credit Facility (each as defined in the Replacement DIP Order)) may have under the agency provisions of such facilities shall survive any such cancellation or discharge. Notwithstanding the foregoing, in no event shall the 2020 Exchangeable Notes be cancelled with respect to any non-Debtor obligor thereof, nor shall any non-Debtor be released or discharged with respect to any obligation under the 2020 Exchangeable Notes or the 2020 Exchangeable Notes Indenture by any provision of the Plan.

13.     Issuance and Distribution of New Securities; Execution of Plan Documents

Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan, and shall amend the Second Lien Documents to implement the Reinstated Second Lien Claim Modification Terms, in form and substance reasonably satisfactory to the Supporting Second Lien Parties.

14.    Continued Corporate Existence

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation under applicable law in the jurisdiction in which each respective Debtor is incorporated and pursuant to its respective certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organization documents are amended and restated by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b)    Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in Article 11.1 of the Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.[65]

15.    Certificate of Incorporation and Bylaws

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnership, or other forms of Entity) of the Debtors shall be amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (and which shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties) and the form and substance of which shall be included in the Plan Supplement.  After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnership, or other forms of Entity) as permitted by applicable state corporation law and their respective charters and bylaws or other organizational documents.

---

[65]    For clarity, the Stringer referenced in Paragraph 59 of the order approving the Solar Materials Sale [Docket No. 1466] (the "Solar Materials Sale Order") is being treated as a deferred asset pursuant to the Purchase Agreement (as defined therein).  Title to the Stringer shall vest in the Reorganized Debtors upon the Effective Date pursuant to Section 11.1 of the Plan unless otherwise ordered in connection with a determination of the objection of Solaria Corporation to such sale [Docket No. 1399], subject to the terms and provisions of Paragraph 59 of the Solar Materials Sale Order.

16.     Directors and Officers of Reorganized Debtors

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors and each of the initial officers of the Reorganized Debtors (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing. The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Supporting Second Lien Parties.

17.     Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided therein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of the Debtors or the Reorganized Debtors. Such actions may include (a) the adoption and filing of the SUNE Certificate of Incorporation and Bylaws, (b) the appointment of the New Boards, and (c) the issuance and distribution of New SUNE Common Stock and (d) the distribution of Continuing TERP Class A Shares.

18.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

19.     Employment, Retirement, Indemnification and Other Agreements and Employee Compensation Programs

(a)     *Employment Agreements.* To the extent that the Debtors intend for any employment, retirement, indemnification or other agreement with its respective directors, officers, managing members and employees to remain in place after the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, will list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan, and such agreement will be assumed as of the Effective Date. If the Debtors do not list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1, such agreement shall be deemed rejected. The Debtors, with the reasonable consent of the Supporting Second Lien Parties, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date. On the Effective Date or as soon

as reasonably practicable thereafter, the Reorganized Debtors shall adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.

(b)    *Other Incentive Plans and Employee Benefits*.  Unless otherwise specified in the Plan, and except in connection and not inconsistent with Article 6.19(a) of the Plan, on and after the Effective Date, the Reorganized Debtors shall have the discretion, with the reasonable consent of the Supporting Second Lien Parties, to (a) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided in the Plan, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or of the Plan, including the Employee Compensation Plans, any incentive plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

20.    Preservation Of Causes Of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not (a) released pursuant to *Article 11.5* of the Plan or an order of the Bankruptcy Court or (b) GUC/Litigation Trust Causes of Action, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.20 to the Plan, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for transfer to the GUC/Litigation Trust and later adjudication.

21.    Reservation of Rights

With respect to Avoidance Actions that are transferred to the GUC/Litigation Trust in accordance with Article 7.5 of the Plan, the Debtors, the Reorganized Debtors, and the GUC/Litigation Trust, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the transferred Avoidance Actions as a basis to object

to all or any part of a claim against any of the Estates asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

22.     Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan, or any transaction entered into by the GUC/Litigation Trust, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

23.     Insured Claims

Notwithstanding anything to the contrary contained in the Plan, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and, (b) solely for the portion of such Claim that is not paid by the applicable insurance policy, receive the treatment provided for in the Plan for Allowed General Unsecured Claims.

24.     Intercompany Account Settlement

The Debtors and the Reorganized Debtors, and their respective Affiliates, with the reasonable consent of the Supporting Second Lien Parties, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  For the avoidance of doubt, because Intercompany Claims are the collateral of the Original DIP Facility, the Replacement DIP Facility, the Second Lien Loans, and the Second Lien Senior Notes, such transfers or settlements shall not affect distributions under the Plan.

25.     Private Company.

It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the SEC or list such equity on an exchange; provided, however, that, to the extent applicable, the Reorganized Debtors may (in the discretion of the New Boards) implement procedures to facilitate trading of such equity, e.g., providing investors with access (on a secure website) to current information concerning the Reorganized Debtors and their subsidiaries on a consolidated basis.

G.     GUC/Litigation Trust

1.     GUC/Litigation Trust Agreement

The GUC/Litigation Trust shall be established on the Effective Date and shall be governed and administered in accordance with the GUC/Litigation Trust Agreement. The GUC/Litigation Trust Agreement shall be drafted by the Creditors' Committee's Professionals and shall be in form and substance acceptable to the Creditors' Committee and reasonably acceptable to the Debtors. Any provisions of the GUC/Litigation Trust Agreement that affect any rights of any holders of Class B GUC/Litigation Trust Interests shall be in form and substance acceptable to the Supporting Second Lien Parties (or their advisors). The GUC/Litigation Trust Assets or such portion of the GUC/Litigation Trust Assets as determined by the Creditors' Committee/GUC/Litigation Trust Oversight Board shall be used to fund the activities of the GUC/Litigation Trust, including the prosecution of the GUC/Litigation Trust Causes of Action. For the avoidance of doubt, the GUC/Litigation Trust Initial Funding shall be used to prosecute GUC/Litigation Trust Causes of Action and pay other expenses of the GUC/Litigation Trust prior to any excess being distributed to Holders of Allowed General Unsecured Claims. The GUC/Litigation Trust Agreement shall provide for (i) distributions at least once per year; (ii) an initial distribution within thirty (30) days of the Effective Date (including deposits into the GUC Disputed Claims Reserve as provided in (iii) hereof) of no less than 50% of all Cash which is transferred to the GUC/Litigation Trust on the Effective Date subject to any holdback necessary to fund or maintain the GUC Disputed Claims Reserve; and (iii) mechanics for a GUC Disputed Claims Reserve sufficient to ensure that a holder of a Disputed General Unsecured Claim which becomes Allowed after the Effective Date receives aggregate distributions from the GUC/Litigation Trust equal to what such holder would have received had such Claims been Allowed on the Effective Date (net of any taxes imposed on, or with respect to, the GUC Disputed Claims Reserve as relates to such Claim, including in connection with such distributions). The first $2 million of Cash to be distributed from the GUC/Litigation Trust shall be distributed to the Convertible Senior Notes Indenture Trustee as partial payment of its fees and expenses incurred in connection with these Chapter 11 Cases.

2.    Class A and Class B GUC/Litigation Trust Interests

(a)    *Class A GUC/Litigation Trust Interests.*    Holders of Class A GUC/Litigation Trust Interests shall be entitled to share in all of the GUC/Litigation Trust Assets.

(b)    *Class B GUC/Litigation Trust Interests.*    Holders of Class B GUC/Litigation Trust Interests shall only be entitled to the following:

(i)    forty-eight percent (48%) of the Additional Net Avoidance Action Proceeds; provided, that, the GUC/Litigation Trust Agreement shall provide that the GUC/Litigation Trust Agreement may not be amended to change the distributions set forth in this clause (i) without the consent of 75% of the holders (in amount of Class B GUC/Litigation Trust Interests held, not number of holders) of the Class B GUC/Litigation Trust Interests in the GUC/Litigation Trust and the requisite consent of the holders of the Class A GUC/Litigation Trust Interests in the GUC/Litigation Trust in accordance with the GUC/Litigation Trust Agreement;

(ii)    delivery of the GUC/Litigation Trust Reports;

90

(iii)    following the filing of any Contingency Fee Advisor Retention Notice, at the request of any of the holders of Class B GUC/Litigation Trust Interests (or their advisor at the instruction of a holder) the GUC/Litigation Trust Trustee will provide additional information regarding the proposed contingency fee engagement (including the actual engagement letter on a confidential basis, if so requested).  Holders of Class B GUC/Litigation Trust Interests (or their advisors at the instruction of a holder) shall have ten (10) Business Days from the date of the filing of the Contingency Fee Advisor Retention Notice to file with the Bankruptcy Court a pleading seeking to prohibit such retention on the grounds that such retention is not consistent with the purpose of the Committee/BOKF Plan Settlement Term Sheet because the engagement does not provide a sufficient incentive for such contingency fee advisor to procure Additional Net Avoidance Action Proceeds, and the GUC/Litigation Trust, GUC Litigation Trust Trustee, GUC Litigation Trust Oversight Board, or the Committee may oppose such pleading (but solely with respect to such issue), and the Bankruptcy Court shall retain jurisdiction to settle such dispute;

(iv)    enforcement rights with regard to any and all of the above rights (and clause (v) below) (as well as the fiduciary duties owed to all holders of GUC/Litigation Trust Interests by the GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board as set forth below); and

(v)    reasonable consent rights with regard to any modifications, amendments, or supplements of the GUC/Litigation Trust Agreement that affect (i) through (iv) above.

(c)    The GUC/Litigation Trust Trustee shall provide GUC/Litigation Trust Reports to all Holders of GUC/Litigation Trust Interests.

3.    GUC/Litigation Trust Governance

The GUC/Litigation Trust Trustee, who shall administer the GUC/Litigation Trust, shall be selected by the Creditors' Committee.  All GUC/Litigation Trust governance issues shall be determined by the Creditors' Committee including the composition of the GUC/Litigation Trust Oversight Board.  The GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board shall owe fiduciary duties to all holders of GUC/Litigation Trust Interests.  The GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board shall have the authority to retain any advisors for the purpose of carrying out their respective duties under the GUC/Litigation Trust Agreement.  The GUC/Litigation Trust Trustee shall file a notice (summarizing the key terms of such retention, including the economic terms thereof) regarding the proposed retention of any such advisors on a contingency fee basis (other than the GUC/Litigation Trust Trustee) (each such notice, a "Contingency Fee Advisor Retention Notice") on the docket of the Bankruptcy Court.

4.    Tax Treatment

It is intended that the GUC/Litigation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business. In furtherance of

this objective, the GUC/Litigation Trust Trustee shall, in an expeditious but commercially reasonable manner and exercising its reasonable business judgment, liquidate and convert to cash the GUC/Litigation Trust Assets (which may include the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action) and not unduly prolong the existence of the GUC/Litigation Trust.  All assets held by the GUC/Litigation Trust on the Effective Date shall be treated for federal income tax purposes (i) to have been distributed (subject to any obligations relating to such assets) by the Debtors or Reorganized Debtors to the GUC/Litigation Trust Beneficiaries (other than the assets allocable to Disputed Claims) in satisfaction of Allowed General Unsecured Claims and in partial satisfaction of Allowed Second Lien Claims and (ii) immediately thereafter contributed by the holder of such Claims (thereafter, the GUC/Litigation Trust Beneficiaries) to the GUC/Litigation Trust in exchange for GUC/Litigation Trust Interests.  The GUC/Litigation Trust Trustee shall in good faith value all of the GUC/Litigation Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the GUC/Litigation Trust (including, without limitation, the Debtors, the Reorganized Debtors, the GUC/Litigation Trust Trustee, and GUC/Litigation Trust Beneficiaries) for all federal income tax purposes.  The GUC/Litigation Trust Beneficiaries shall be treated for federal income tax purposes as the grantors and owners of their respective share of the GUC/Litigation Trust Assets (other than such GUC/Litigation Trust Assets as are allocable to Disputed Claims).  The GUC/Litigation Trust Trustee shall file tax returns and other tax filings for the GUC/Litigation Trust treating the GUC/Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the GUC/Litigation Trust Trustee of a private letter ruling if the GUC/Litigation Trust Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC/Litigation Trust Trustee), the GUC/Litigation Trust Trustee may (A) timely elect to treat the GUC Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the GUC/Litigation Trust Trustee, the Debtors and the GUC/Litigation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

The GUC/Litigation Trust Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the GUC/Litigation Trust Beneficiaries or any amounts received or earned by the GUC/Litigation Trust treated as allocable to the GUC/Litigation Trust Beneficiaries.  All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such GUC/Litigation Trust Beneficiaries for all purposes of the GUC/Litigation Trust Agreement. The GUC/Litigation Trust Trustee shall be authorized to collect such tax information from the GUC/Litigation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the GUC/Litigation Trust Agreement.  In order to receive distributions under the Plan, all GUC/Litigation Trust Beneficiaries will need to identify themselves to the GUC/Litigation Trust Trustee and provide tax information and the specifics of

their holdings, to the extent the GUC/Litigation Trust Trustee deems appropriate. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The GUC/Litigation Trust Trustee may refuse to make a distribution to any GUC/Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a GUC/Litigation Trust Beneficiary, the GUC/Litigation Trust Trustee shall make such distribution to which the GUC/Litigation Trust Beneficiary is entitled, without interest; and, provided, further, that, if the GUC/Litigation Trust Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the GUC/Litigation Trust Trustee is later held liable for the amount of such withholding, such holder shall reimburse the GUC/Litigation Trust Trustee for such liability.

5.    GUC/Litigation Trust Assets

(a)    On the Effective Date, or on such other date as is set forth in the GUC/Litigation Trust Agreement, pursuant to section 1123(b)(3) of the Bankruptcy Code, the GUC/Litigation Trust Assets shall be transferred by the Debtors (and deemed transferred) to the GUC/Litigation Trust free and clear of all Claims, Liens, charges, encumbrances, rights, and interests, without the need for any Entity to take any further action or obtain any approval and the GUC/Litigation Trust shall be authorized as the representative of the Estates to pursue GUC/Litigation Trust Causes of Action.

(b)    For the avoidance of doubt, Causes of Action transferred, assigned, and delivered to the GUC/Litigation Trust shall not include any Causes of Action (i) against the YieldCos or otherwise released in the YieldCo Settlement Agreements, (ii) against any or all of the Prepetition Secured Parties in their capacities as such, (iii) against any of the DIP Secured Parties in their capacities as such (as such terms are defined in the Original DIP Facility Order), or (iv) against any of the Replacement DIP Secured Parties in their capacities as such (as such terms are defined in the Replacement DIP Facility Order). For the avoidance of doubt, the Second Lien Litigation will not be transferred to the GUC/Litigation Trust.

6.    GUC/Litigation Trust Causes of Action

(a)    GUC/Litigation Trust Causes of Action shall exclude any action released or settled by the Debtors pursuant to the Plan or an order of the Bankruptcy Court; provided, that with respect to any settlements or releases proposed by the Debtors after the Disclosure Statement Order is entered, such settlements or releases shall require the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

(b)    The GUC/Litigation Trust, with the consent of the Reorganized Debtors to the extent such GUC/Litigation Trust Causes of Action interfere with (i) the Reorganized Debtors' collection of Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash or (ii) the continuing operations of TERP, shall determine whether to bring, settle, release, compromise, or enforce such GUC/Litigation Trust Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The GUC/Litigation Trust or any successors may pursue such litigation claims in accordance with the best interests of the GUC/Litigation Trust or any successor holding such

rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any GUC/Litigation Trust Cause of Action against them as any indication that the GUC/Litigation Trust will not pursue any and all available GUC/Litigation Trust Causes of Action against them. The GUC/Litigation Trust expressly reserves all rights to prosecute any and all GUC/Litigation Trust Causes of Action against any Entity, except as otherwise provided in the Plan**. Unless any GUC/Litigation Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the GUC/Litigation Trust expressly reserves all GUC/Litigation Trust Causes of Action for later adjudication.

7.      Disputed Claims Reserve

From and after the Effective Date, in accordance with the GUC/Litigation Trust Agreement, the GUC/Litigation Trust Trustee shall hold and maintain the GUC Disputed Claims Reserve for the benefit of the Holders of such Disputed General Unsecured Claims, including any amounts that would otherwise have been received by each such holder from the GUC/Litigation Trust had such Disputed Claim been an Allowed Claim on the Effective Date, determined based on (i) the asserted amount of such Disputed Claim, (ii) such other amount as may be agreed upon by the Holder of such Disputed Claim and the GUC/Litigation Trust Trustee or (iii) except with respect to any Disputed General Unsecured Claims asserted by Vivint Solar, Inc., such other amount as may be deemed appropriate reasonably determined by the GUC/Litigation Trust Trustee in accordance with the terms of the GUC/Litigation Trust Agreement (in each case, net of any taxes imposed on, or with respect to, the GUC Disputed Claims Reserve as relates to such Claim, including in connection with such distributions).

8.      Claims Objections and Transition Services

The Debtors or the Reorganized Debtors, as the case may be, will cooperate with the Creditors' Committee and its Professionals in relation to the GUC/Litigation Trust's prosecution of Avoidance Actions and Claims objections, on the terms set forth on Annex 1 to the Committee/BOKF Plan Settlement Term Sheet. To that end, and consistent with Annex 1 to the Committee/BOKF Plan Settlement Term Sheet, on the Effective Date, the GUC/Litigation Trust and Reorganized SUNE will enter into an agreement (the "Transition Services Agreement") pursuant to which Reorganized SUNE will provide services, which may include personnel, systems, and access to books and records, to the GUC/Litigation Trust in connection with the administration of the GUC/Litigation Trust Assets, including claims administration and the prosecution of the GUC/Litigation Trust Causes of Action. The Transition Services Agreement shall include customary indemnification and limitations of liability to Reorganized SUNE and its representatives that provide services to the GUC/Litigation Trust; provided, however, that the indemnification shall exclude any liability of the GUC/Litigation Trust for any claims relating to the gross negligence or willful misconduct of Reorganized SUNE. A copy of the Transition Services Agreement will be filed with the Plan Supplement.

9.      Indemnification and Exculpation

The GUC/Litigation Trust Trustee or the individuals comprising the GUC/Litigation Trust Trustee, as the case may be, and the GUC/Litigation Trust Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the GUC/Litigation Trust Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the GUC/Litigation Trust Trustee, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification or reimbursement claim of the GUC/Litigation Trust Trustee (and the other parties entitled to indemnification or reimbursement under this subsection) shall be satisfied, first, from the GUC/Litigation Trust Initial Funding and, then, to the extent the GUC/Litigation Trust Initial Funding is exhausted, from other GUC/Litigation Trust Assets. The GUC/Litigation Trust Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

10.    Preservation of Privilege and Defenses

No action taken by the Debtors or Reorganized Debtors in connection with the Plan, shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or Reorganized Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral). The Confirmation Order shall provide that notwithstanding the Reorganized Debtors' providing any privileged information (if any) to the GUC/Litigation Trust Trustee, the GUC/Litigation Trust, or any party or person associated with the GUC/Litigation Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estates and shall remain privileged. The Confirmation Order shall provide that the GUC/Litigation Trust shall have no right to waive the attorney-client privilege, work product or other protection of any information received from the Reorganized Debtors. The Debtors (or the Reorganized Debtors) retain the right to waive their own privileges. The GUC/Litigation Trust shall have no right to any privileged information or analysis of the Debtors or the Reorganized Debtors.

11.    No Bonding of GUC/Litigation Trust Claims

There shall be no bonding of the GUC/Litigation Trust Trustee.

12.    Service of the Indenture Trustees

The applicable Indenture Trustees and their respective agents, successors and assigns, and the GUC/Litigation Trust Trustee shall facilitate the making of the Plan Distributions to the Holders of the Second Lien Senior Notes Claims and the Convertible Senior Notes Claims, to the extent applicable, in accordance with the Plan. The GUC/Litigation Trust Trustee shall be obligated to calculate the distributions to be made on account of Class B GUC/Litigation Trust Interests and the distributions to be made to Holders of Allowed Convertible Senior Notes Claims, as applicable, and shall provide such distribution calculations and related information to the applicable Indenture Trustees at least five (5) business days in advance of the GUC/Litigation Trust Trustee making distributions on account of Class B GUC/Litigation Trust Interests or Convertible Senior Notes Claims, as applicable. The applicable Indenture Trustees shall only be

95

required to act and make distributions in accordance with the Plan, shall not be required to independently verify or review the calculations prepared by the GUC/Litigation Trust Trustee with respect to distributions to be made on account of Class B GUC/Litigation Trust Interests or made to Holders of Convertible Senior Notes Claims, as applicable, and shall have no liability for actions taken in accordance with the Plan or in reliance upon distribution information and distribution calculations provided by the GUC/Litigation Trust Trustee, except solely for actions or omissions arising out of such Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct. Further, the Indenture Trustees shall have no obligation or liability for distributions under the Plan to any party who does not (i) hold a Claim against the Debtors as of the Distribution Record Date or (ii) otherwise comply with the terms of the Plan, except solely for actions or omissions arising out of such Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct.

     13.     <u>Delivery of Distributions on Account of Second Lien Senior Notes Claims and Convertible Senior Notes Claims</u>

     Upon the occurrence of the Effective Date, the Claims of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee for the Second Lien Senior Notes Claims and the Convertible Senior Notes Claims, as applicable, shall be, for purposes under the Plan, including without limitation, the right to receive Plan distributions, substituted for all Claims of individual Holders of Allowed Second Lien Senior Notes Claims and Convertible Senior Notes Claims, as applicable; <u>provided</u>, <u>however</u>, that non-Cash consideration shall not be distributed in the name of the Second Lien Senior Notes Indenture Trustee or the Convertible Senior Notes Indenture Trustee. The Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Second Lien Senior Notes Claims and Convertible Senior Notes Claims, as applicable, in accordance with the Plan and the applicable Indenture. As soon as practicable in accordance with the requirements set forth in this Article VII, the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable, shall arrange to deliver such distributions to or on behalf of such Holders, subject to the charging liens of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable. If the Second Lien Senior Notes Indenture Trustee or the Convertible Senior Notes Indenture Trustee is unable to make, or consents to the GUC/Litigation Trust Trustee making, such distributions, the GUC/Litigation Trust Trustee, with the cooperation of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable, shall make such distributions to the extent practicable to do so, including by means of book-entry exchange through the facilities of DTC in accordance with DTC's customary practices (provided that until such distributions are made, the charging lien of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable shall attach to the property to be distributed in the same manner as if such distributions were made through the Second Lien Senior Notes Indenture Trustee or the Convertible Senior Notes Indenture Trustee, as applicable). For the avoidance of doubt, the Second Lien Senior Notes Indenture Trustee shall have no duty to make any distributions that are not DTC eligible.

     14.     <u>Tax Determination</u>

The GUC/Litigation Trustee may request an expedited determination of Taxes of the GUC/Litigation Trust (including with respect to the GUC Disputed Claims Reserve) under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the GUC/Litigation Trust (or the GUC Disputed Claims Reserve) for all taxable periods through the dissolution of the GUC/Litigation Trust.

H.    Executory Contracts and Unexpired Leases

    1.    Rejection of Executory Contracts and Unexpired Leases

    (a)    *Automatic Rejection*.   Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan; (b) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim; or (e) is otherwise assumed pursuant to the terms of the Plan.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements of the Plan.

    (b)    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*.   To the extent not inconsistent with the YieldCo Settlement Agreements, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.   In particular, notwithstanding any non-bankruptcy law to the contrary and to the extent consistent with the YieldCo Settlement Agreements, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

    (c)    *Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases*.   Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection.   Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without

the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)    *Reservation of Rights*.  Notwithstanding anything to the contrary in the Plan, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors (or the Reorganized Debtors), with the consent of the Supporting Second Lien Parties, amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

2.    Assumption of Executory Contracts and Unexpired Leases

Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease (other than Executory Contracts or Unexpired Leases that (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court or have been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date or (b) are the subject of a motion to reject pending as of the Effective Date) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in Exhibit 8.1 of the Plan shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignee in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  With respect to each such Executory Contract and Unexpired Lease, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(a)    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.* Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant to the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    *Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed.*  Any and all proofs of Claims based upon Executory Contracts or

98

Unexpired Leases that have been assumed in the Chapter 11 Cases, including under the Plan, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Indemnification Obligations

From and after the Effective Date, but subject to the rest of Article 8.3 of the Plan, the Reorganized Debtors will indemnify each Indemnitee to the same extent of any Indemnification Obligation in effect immediately prior to the Effective Date. The Reorganized Debtors' Indemnification Obligations shall remain in full force and effect, shall not be modified, reduced, discharged under section 1141 of the Bankruptcy Code, impaired, or otherwise affected in any way, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, or after the Petition Date; provided, however, that the Reorganized Debtors shall have no Indemnification Obligations to an Indemnitee for any losses, liabilities, or expenses arising out of conduct determined by a Final Order to have constituted fraud, gross negligence, bad faith, or willful misconduct. Except as expressly set forth in the proviso and, notwithstanding anything contained in any Assumed Executory Contracts and Unexpired Leases to the contrary, (i) the Reorganized Debtors' will have no indemnification liability under Article 8.3 of the Plan arising out of any losses, liabilities, or expenses relating to events that occurred prior to the Petition Date giving rise to Indemnification Obligations ("Prepetition Indemnification Obligations"), and (ii) any claims against the Debtors for any indemnification liability owed to any Indemnitee arising out of any losses, liabilities, or expenses relating to events that occurred prior to the Petition Date giving rise to Indemnification Obligations  shall be treated as General Unsecured Claims; provided, however, that the Reorganized Debtors shall pay any Prepetition Indemnification Obligations of the Existing Directors at an amount to be set forth in the Plan Supplement (in an amount not less than $350,000 nor more than $1.3 million) (the "Plan Supplement Amount"), to be agreed to prior to the Effective Date by the Debtors and the Supporting Second Lien Parties acting reasonably and in good faith, for all Existing Directors and shall be for fees, costs or expenses (but not judgments, losses, liabilities, or settlements payable to third parties) not covered by D&O Insurance or the EPL Policy (including, without limitation, because either (x) they are not covered by such policies or (y) such policies have been exhausted) for all such Prepetition Indemnification Obligations.  The manner and terms of the Plan Supplement Amount shall be set forth in the Plan Supplement, it being agreed and acknowledged that the Plan Supplement Amount shall be payable by the Reorganized Debtors from time to time within five business days' notice provided by counsel to the Existing Directors, except to the extent that the Reorganized Debtors after making such payment would not have sufficient liquidity to fund ordinary course business operations for at least 90 days thereafter.  The treatment of Indemnification Obligations in Article 8.3 of the Plan shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation of the Debtors. In accordance with the foregoing, the Debtors and the Reorganized Debtors shall cooperate with Indemnitees in relation to Indemnification Obligations, including, but not limited to, responding to reasonable requests for information and providing access to attorneys, financial advisors, accountants and other professionals with knowledge of matters relevant to any such claim covered by an Indemnification Obligation.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, or any prior order of the

Bankruptcy Court regarding the retention of such professional, or otherwise, in no event will (a) the Debtors have any obligation to indemnify Debtor Professionals or any professional, consultant, representative, counsel or other advisor who served for the Debtors in such capacity at any time prior to the Effective Date for prepetition conduct (or Causes of Action stemming from prepetition conduct), although any such indemnification obligation may give rise to a General Unsecured Claim, and (b) the Reorganized Debtors have any obligation to indemnify Debtor Professionals or any professional, consultant, representative, counsel or other advisor who served for the Debtors in such capacity at any time prior to the Effective Date for prepetition conduct (or Causes of Action stemming from such prepetition conduct).

    4.    <u>Insurance Policies</u>

    (a)    Notwithstanding anything to the contrary in the Disclosure Statement, the Disclosure Statement Order, the Plan, the Plan Transaction Documents, the Plan Supplement, the Confirmation Order, any prepetition or administrative claim bar date order (or notice) or claim objection order, including without limitation, the Bar Date Orders and the Administrative Claims Bar Date,  any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that confers jurisdiction or purports to be preemptory or supervening or grants an injunction or release, including, but not limited to, the injunctions set forth in Article 11.9 of the Plan): (i) on the Effective Date, the Reorganized Debtors shall reject all insurance policies except for the D&O Insurance, the EPL Policy, and those specific insurance policies (and all agreements related thereto) that are set forth in the Plan Supplement, which shall be assumed in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code as such insurance policies and such agreements related thereto may be amended or modified (such assumed insurance policies and related agreements, collectively, the "Insurance Contracts"); (ii) nothing alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Contracts (including any and all letters of credit and other collateral and security provided in relation thereto) and all debts, obligations, and liabilities of the Debtors (and after the Effective Date, of the Reorganized Debtors) thereunder, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect; (iii) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Contracts (including, but not limited to, (A) any agreement to arbitrate disputes, (B) any provisions regarding the provision, maintenance, use, nature and priority of collateral/security, and (C) any provisions regarding the payment of amounts within any deductible by the insurers and the obligation of the Debtors (or, after the Effective Date, the Reorganized Debtors) to pay or reimburse the applicable insurer therefor and any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred; (iv) nothing alters or modifies the duty, if any, that the insurers and/or third party administrators have to pay claims covered by the Insurance Contracts and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors)  or draw on any collateral or security therefor in accordance with the terms of the Insurance Contracts; and (v) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 11.9 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid

claims covered by any of the Insurance Contracts, including, but not limited to, valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law (the "Insured Claims") to proceed with their claims, in each case against the applicable insurer, or, to the extent required by applicable law, nominally against any of the Debtors (or after the Effective Date, the Reorganized Debtors); (B) insurers and/or third party administrators to administer, handle, defend, settle, and/or pay, in the ordinary course of business and subject to the terms of the Insurance Contracts, without further order of the Bankruptcy Court, (I) all Insured Claims, and (II) all costs in relation to each of the foregoing; (C) insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Contracts, in such order as the applicable insurer may determine; and (D) the insurers and/or third party administrators to (I) cancel any policies under the Insurance Contracts, and (II) take other actions relating thereto, in each case to the extent permissible under applicable non-bankruptcy law, each in accordance with the terms of the Insurance Contracts. For the avoidance of doubt, the Debtors or Reorganized Debtors, as applicable, shall retain the right, if any, to challenge any amounts owed under the Insurance Contracts in accordance with their terms; provided, however, that nothing in Article 8.4(a) of the Plan or any other provision of the Plan shall permit a challenge by the Debtors, Reorganized Debtors, or any other Person to rights of TERP, GLBL, and their directors and officers to access coverage under the Insurance Contracts pursuant to the SunEdison/YieldCos Settlement Agreement unless and until such time as the Bankruptcy Court denies a motion to approve such agreement.

(b)     The Debtors or the Reorganized Debtors, as the case may be, shall maintain D&O Insurance and the EPL Policy providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors; provided, however, that nothing in the Plan or the Confirmation Order alters the terms and conditions of the D&O Insurance.

(c)     Notwithstanding anything to the contrary contained in the Plan, but subject to the terms and conditions of the D&O Insurance, which policies shall be assumed pursuant to the Plan, the Existing Directors shall be deemed to be the independent directors of the Reorganized Debtors solely with respect to the D&O Insurance, including, but not limited to, with respect to the rights referred to in Endorsement 12 of ACE American Insurance Company's ACE Advantage Management Protection Policy Number DON G23652389009 (the "ACE Policy") and any other provision in the D&O Insurance that permits independent directors to direct an insurer to delay any payment of Loss (as defined in the ACE Policy) otherwise due and owing to or on behalf of the Company (as defined in the ACE Policy); provided, however, that with respect to the D&O Insurance, the Existing Directors shall continue to be bound by the terms and conditions set forth in the SunEdison/YieldCos Settlement Agreement, unless and until such time as the Bankruptcy Court denies a motion to approve such agreement. Notwithstanding anything to the contrary in the Plan or contained in any organizational or

101

governance document of the Reorganized Debtors, the New Board shall have no rights to terminate, reduce or otherwise impair the D&O Insurance or the EPL Policy and any of the rights of the Existing Directors thereunder that existed immediately before the Effective Date, including, but not limited to, by retracting any notice sent pursuant to Endorsement 12 of the ACE Policy or any similar provision of any other D&O Insurance policy, and any such attempt by the New Board to do so shall be deemed void ab initio.

5.    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases

With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors, with the reasonable consent of the Supporting Second Lien Parties, shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure.  Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties, with the reasonable consent of the Supporting Second Lien Parties, to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.  Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.  The Debtors shall serve a counterparty to an Executory Contract or Unexpired Lease to be assumed under the Plan with evidence of adequate assurance upon such counterparty's written request to the Debtors' counsel.

If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, with the reasonable consent of the Supporting Second Lien Parties, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors, with the reasonable consent of the Supporting Second Lien Parties, or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(a)    *Cure Notices*.  No later than seven (7) days prior to the Confirmation Hearing, and pursuant to the Assumption and Rejection Procedures, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (i) list the applicable Cure, if any, (ii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iii) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (iv) explain the process by which related disputes will be resolved by the Bankruptcy Court.  If no objection is timely received, the non-Debtor party to the Assumed Contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease and shall be forever barred from asserting any objection with regard to such assumption.

(b)    *Cure Objections*.  If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.  Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served so that they are actually received by the Cure Objection Deadline.

(c)    *Hearing with Respect to Objections*.  If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Article 8.5(b) of the Plan, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors.  Objections to the proposed Cure Amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(d)    *Reservation of Rights*.  Notwithstanding anything to the contrary in the Plan, prior to the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice, subject to the Assumption and Rejection Procedures, and shall serve such notice on the applicable counterparty; provided, that notwithstanding anything to the contrary in the Plan, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved with respect to any such amended decision or notice.  In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure Objection which has not been resolved prior to the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

6.    Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms of such Executory Contract or Unexpired Lease.

7.    General Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on Exhibit 8.1 of the Plan, in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of its Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

8.    Surety Bonds

(a)    Notwithstanding anything in the Plan Transaction Documents to the contrary, nothing in the Plan Transaction Documents shall discharge, release, impair or otherwise diminish any Surety's valid rights to (1) subrogation under the applicable surety bond or indenture agreement or under applicable law or (2) setoff or recoupment to the extent permitted under applicable law. To the extent that a Surety pays, has paid or otherwise discharges a bonded obligation, in part or in full, a Claim against any of the Debtors which also relates to the applicable surety bond or indenture agreement, such Claim shall not be reduced by any amount paid by such Surety and such Surety's subrogation rights shall remain. Any party to whose rights a Surety may or has become subrogated, shall also retain their set-off and recoupment rights to the extent permitted under applicable law and any such party's Claim shall not be reduced by the amount of any corresponding loss of the Surety.

(b)    Nothing in the Plan Transaction Documents shall impair a Surety's rights with respect to any and all letters of credit, proceeds drawn or to be drawn from letters of credit, other collateral of a Surety as security for bonded obligations under an existing or new Surety Bond, or any security or trust interest of any Surety or any party whose rights a Surety may become subrogated.

(c)    Notwithstanding anything in the Plan Transaction Documents to the contrary, including Section 11.14 of the Plan, to the extent the Bankruptcy Court disallows a Claim for reimbursement or contribution, all rights of a Surety under section 502(j) of the Bankruptcy Code are preserved.

(d)    Notwithstanding any provision of the Plan Transaction Documents to the contrary, any and all rights delineated for XL contained in that certain Notice of Rejection, filed with the Bankruptcy Court on October 21, 2016 (Docket No. 1457), shall not be abrogated in any manner by the Plan Transaction Documents.

I.    Procedures for Resolving Disputed Claims and Interests

1.      Determination Of Claims and Interests

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to <u>Article 6.20</u> of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties. For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan.

Nothing contained in Article 9.1 of the Plan shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

2.      Claims Administration Responsibility

Except as otherwise specifically provided for in the Plan or the Committee/BOKF Plan Settlement Term Sheet, including with respect to the administration of and making distributions with respect to General Unsecured Claims in accordance with <u>Article VII</u> of the Plan, after the Effective Date, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors, including, without limitations, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (b) making distributions (if any) with respect to all Claims and Interests.

3.      Objections to Claims

Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors, or the GUC/Litigation Trust Trustee, as applicable, without further notice to parties-in-

105

interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

4.      Disallowance of Claims

Nothing in the Plan shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC/Litigation Trust Trustee after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

5.      Estimation of Claims

Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable (but solely with the consent of the Supporting Second Lien Parties and the Creditor's Committee, such consent not to be unreasonably withheld), and, after the Effective Date, the GUC/Litigation Trust Trustee, may (but is not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection, but without prejudice to the Holder of such Claim's right to (i) object to appropriateness of estimating such Claim (or the requested purpose of such estimation) under section 502(c) of the Bankruptcy Code or (ii) request that any such estimation should be for the purpose of determining the Allowed amount of such Claim.  In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on

106

the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors (or, in the case of General Unsecured Claims, the GUC/Litigation Trust Trustee) may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

> 6.    No Interest on Disputed Claims

Unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

> 7.    Amendments to Claims

(a)    On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)    Notwithstanding anything to the contrary contained in the Plan, the SEC may amend any timely filed claim within 120 days following the Effective Date to the extent permitted under applicable law without the need to seek prior authorization of the Bankruptcy Court, the Debtors, or the Reorganized Debtors.  After such date the provisions of Article 9.7(a) of the Plan shall apply to the SEC's Claims.  For the avoidance of doubt, nothing in the immediately preceding sentence shall waive, release, modify or abrogate the Debtors' rights to object to the allowance of any Claim filed by the SEC or any amendment of any Claim filed by the SEC on any grounds under applicable law.

> J.    Provisions Governing Distributions

> 1.    Distributions of GUC/Litigation Trust Interests to Holders of Second Lien
> Claims and General Unsecured Claims

The provisions of Article X of the Plan shall not apply to distributions from the GUC/Litigation Trust to Holders of Second Lien Claims and General Unsecured Claims. Distributions from the GUC/Litigation Trust to Holders of such Allowed Claims shall be administered in accordance with and subject to, as applicable, the terms of the GUC/Litigation Trust Agreement and Article IV and VII of the Plan.

107

2.      Time of Distributions

Except as otherwise provided for in the Plan or ordered by the Bankruptcy Court, distributions under the Plan shall be made on the later of (a) the Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; provided, however, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date.

3.      Distribution Agent

The Distribution Agent shall make all distributions required under the Plan except (a) as set forth in Article 10.5 of the Plan and (b) with respect to any Holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer, as applicable, who shall deliver such distributions to the Holders of Claims in accordance with the provisions of the Plan and the terms of any governing agreement.

4.      Currency

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next The Wall Street Journal, National Edition following the Effective Date.

5.      Distributions on Account of Claims Allowed as of the Effective Date

(a)      *Delivery of Distributions in General*.  Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Initial Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; provided, however, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(c) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

(b)      *Delivery of Distributions to Servicers*.  In the case of a Holder of Claims whose Claims are governed by an agreement and administered by a Servicer, the respective Servicer shall be deemed to be the Holder of such Claims for purposes of distributions to be made under the Plan; provided, however, that non-Cash consideration shall not be distributed in the name of a Servicer.  The Distribution Agent shall make all distributions on account of such

108

Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion. The Servicers shall hold or direct such distributions for the benefit of Holders of such Allowed Claims, as applicable; provided, however, that the Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to Claim Holders (including the right to deliver distributions subject to any charging lien under such agreement); and provided further, however, that the Debtors' obligations to make distributions in accordance with Article X of the Plan shall be deemed satisfied upon delivery of distributions to each Servicer or the entity or entities designated by the Servicers. Nothing in the Plan shall be deemed to impair, waive, or extinguish any right of any Servicer with respect to its Charging Lien against applicable Plan Distributions. For the avoidance of doubt, the Second Lien Senior Notes Indenture Trustee shall have no duty to make any distributions that are not DTC eligible.

(c)    *Fees and Expenses of Servicers.*    The Reorganized Debtors shall reimburse in Cash any Servicer for reasonable and necessary services that the Reorganized Debtors expressly request such Servicer to perform (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under the Plan to Holders of Allowed Claims or the Servicer's further performance of its duties under the Indentures until all such Allowed Claims are paid in full and a Final Decree is entered, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court. To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties shall report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses. Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution. For the avoidance of doubt, the disallowance of any disputed fees or expenses of any Servicer shall not affect or modify in any way such Servicer's charging lien or other rights to recover such fees and expenses pursuant to its respective agreement.

6.    Distributions on Account of Claims Allowed After the Effective Date

(a)    *No Distributions Pending Allowance*.    No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)    *Distributions After Allowance.*    Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of the Plan that govern distributions to such Holder of a Claim. On the first Periodic Distribution Date that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions

of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

(c)    *Special Rules for Distributions to Holders of Disputed Claims*. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or the Plan.

7.    Delivery Of Distributions

(a)    *Record Date for Distributions*.  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)    *Allowed Claims*.  Distributions to Holders of Allowed Claims shall be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)    *Undeliverable Distributions*.  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or the appropriate Servicer is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic

110

Distribution Date.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.

(d)    *Reversion*.    Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors free of any restrictions thereon, and to the extent such Unclaimed Distribution is New SUNE Common Stock, shall be deemed cancelled.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(e)    *De Minimis Distributions*.    Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $1,000,000; provided that the Reorganized Debtors shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $1,000,000 if the Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

(f)    *Fractional Distributions*.    Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make partial distributions or distributions of fractional shares of New SUNE Common Stock, Continuing TERP Class A Shares, or distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fractional share of New SUNE Common Stock or Continuing TERP Class A Shares under the Plan would otherwise be called for, such fraction shall be deemed zero.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

8.    Accrual of Dividends and Other Rights

For purposes of determining the accrual of dividends or other rights after the Effective Date, New SUNE Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New SUNE Common Stock actually take place.

111

9.    Surrender of Securities or Instruments

As soon as practicable after the Effective Date, each Second Lien Senior Noteholder and Convertible Senior Noteholder shall surrender its note(s) to the relevant Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, The Depository Trust Company, the Reorganized Debtors shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustees.  No distributions under the Plan shall be made for or on behalf of such Holder unless and until  such note(s) is received by the Indenture Trustees or the loss, theft or destruction of such note(s) is established to the reasonable satisfaction of the applicable Indenture Trustee, which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Indenture Trustees, harmless in respect of such note and distributions made thereof.  Upon compliance with Article 10.9 of the Plan by a Second Lien Senior Noteholder or Convertible Senior Noteholder, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such Claim.  Any Holder that fails to surrender such Second Lien Senior Note or Convertible Senior Note or satisfactorily explain its non-availability to the applicable Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property), or the Indenture Trustees in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the applicable Indenture Trustee, and any such security shall be cancelled.  Notwithstanding the foregoing, if the record Holder of a Second Lien Senior Noteholder or a Convertible Senior Noteholder is DTC or its nominee or such other securities depository or custodian thereof, or if a Second Lien Senior Notes Claim or a Convertible Senior Notes Claim is held in book-entry or electronic form pursuant to a global security held by DTC or such other securities depository or custodian thereof, then the beneficial Holder of such an Allowed Second Lien Senior Notes Claim or Allowed Convertible Senior Notes Claim shall be deemed to have surrendered such Holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.  Notwithstanding the foregoing, the Holders of the 2020 Exchangeable Notes shall not be required to surrender such 2020 Exchangeable Notes.

10.    Compliance Matters

In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, Reorganized Debtors, and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

112

For the avoidance of doubt, the Debtors and Reorganized Debtors shall comply with applicable non-bankruptcy law relating to document preservation obligations in connection with ongoing litigation.

11.    Claims Paid or Payable by Third Parties

(a)    *Claims Paid by Third Parties*.  The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)    *Claims Payable by Insurers*.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim or otherwise settle an insured Claim, then immediately upon such insurers' payment, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    *Applicability of Insurance Contracts*.  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any of the Insurance Contracts, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

12.    Setoffs

Except as otherwise expressly provided for in the Plan and except with respect to any Original DIP Facility Claims, Replacement DIP Facility Claims, Second Lien Claim, Convertible Senior Notes Claim, and any distribution on account thereof, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action

113

that the Reorganized Debtors may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

13.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

K.    Effect of the Plan on Claims and Interests

1.    Vesting of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Causes of Action, but excluding the GUC/Litigation Trust Assets and property that has been abandoned pursuant to an order of the Bankruptcy Court) shall vest in the Reorganized Debtors which, unless otherwise indicated in the Plan, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests. As of and following the Effective Date, the Reorganized Debtors may operate its business and use, acquire, and dispose of property (subject to applicable law) and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

2.    Discharge of the Debtors

**Except as otherwise specifically provided in section 1141(d) of the Bankruptcy Code, the Plan, or the Confirmation Order, and effective as of the Confirmation Date: (a) the distributions and rights that are provided in the Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or**

Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted the Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

3.    Discharge of Liabilities Related to General Unsecured Claims and Convertible Senior Notes Claims

The transfer to, vesting in, and assumption by the GUC/Litigation Trust of the GUC/Litigation Trust Assets as contemplated by the Plan, among other things, shall discharge the Debtors, the Reorganized Debtors, and their representatives for and in respect of all General Unsecured Claims and Convertible Senior Notes Claims.

4.    Compromises and Settlements

The Plan is intended to incorporate the agreements reached in the GUC/Litigation Trust Agreement and the settlement regarding the UCC Challenge Litigation and the BOKF Objection set forth in the Committee/BOKF Plan Settlement Term Sheet.  In accordance with Article 9.2 of the Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to and including the Effective Date.  After the Effective Date, any such right shall pass to the Reorganized Debtors and/or the GUC/Litigation Trust, pursuant to the terms of the GUC/Litigation Trust Agreement, and as contemplated in Article 11.1 of the Plan, without the need for further approval of the Bankruptcy Court.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, its Estate, and Holders of Claims and Interests, and is fair, equitable, and reasonable.

5.    **Release by Debtors**

Under the Plan, the Debtors will be releasing certain parties, including current Directors and Officers, which is consistent with the terms of the D&O Settlement

Agreement, pursuant to which approximately $32 million is expected to be paid to SunEdison by D&O Insurance and subsequently transferred to the GUC/Litigation Trust for distribution to unsecured creditors in accordance with the terms of the Committee/BOKF Plan Settlement. The Debtors are not releasing former Directors and Officers under the Plan. As set forth below, the Debtors are not releasing any of the Released Parties for claims or liabilities arising out of actions that constitute fraud, willful misconduct, or gross negligence.

Pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, the Debtors and their Estates, the Reorganized Debtors, and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted on behalf of the Debtors), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Original DIP Facility, the Replacement DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering, the GUC/Litigation Trust Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above (t) does not release the Debtor Professionals to the extent that potential claims against such parties are identified as GUC/Litigation Trust Causes of Action, with the identification of such claims to be reasonably agreed to by the Debtors (after consulting with the Supporting Second Lien Parties) and the Creditors' Committee; provided, that any disagreement regarding whether a particular claim should be identified as a GUC/Litigation Trust Cause of Action shall be decided by the Bankruptcy Court, (u) does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) does not release, waive, address, or otherwise impact the (i) releases given as contemplated in the D&O Settlement Agreement or (ii) the various matters that are carved-out and preserved in the D&O Settlement Agreement, (w) shall not impair any defenses the Debtors may have with regard to any alleged indemnification obligation that the Debtors may have to any party, (x) shall not release any claims by any non-Debtor Affiliate of the Debtors arising in the ordinary course of business (i.e., ordinary course trade claims), (y) shall not release any claims against any non-Debtor Affiliate of the Debtors held by the Debtors that is necessary to effectuate the transactions contemplated

116

by the Plan (including, without limitation, any claims to collect proceeds from Earnout Assets, Repatriated Cash, Residual Assets, etc.), and (z) is subject to section 1125(e) of the Bankruptcy Code to the extent applicable.

6.    **Release by Holders of Claims**

As of the Effective Date, subject to Article 11.8, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Debtors, the Reorganized Debtors, their Estates, non-Debtor Affiliates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or capable of being asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Original DIP Facility, the Replacement DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering, the GUC/Litigation Trust Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any cause of action held by a governmental entity against any non-Debtor existing as of the Effective Date based on Sections 1104-1109, 1161-1169, and 1342(d) of the Employee Retirement Income Security Act.  Notwithstanding the foregoing, nothing in the Plan shall release any claims against any non-Debtor Affiliate of the Debtors arising in the ordinary course of business (i.e., ordinary course trade claims).

The Debtors will request at the Confirmation Hearing that Releasing Parties will include, among others, to the fullest extent permitted by law, all Holders of Claims entitled to vote for or against the Plan that do not vote to reject the Plan.  Under the Plan, Holders of Interests in SUNE will be deemed to reject.  Accordingly, such Holders of Interests will not be entitled to vote on the Plan and will not be "Releasing Parties" as that term is defined in the Plan.

7.    **Exculpation and Limitation of Liability**

117

To the extent permitted by section 1125(e) of the Bankruptcy Code, and subject to Article 11.8 of the Plan, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with regard to the distributions of the New SUNE Common Stock and Continuing TERP Class A Shares, as applicable, pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything to the contrary contained in the Plan, subject to Article 11.8 of the Plan, the YieldCos and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after the Petition Date) shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law.

Nothing in this Article shall limit the liability of any Person or Entity (other than the Debtors) for any pre- or postpetition action taken or omitted to be taken by them as a fiduciary, co-fiduciary, party in interest or knowing participant in violation of ERISA with respect to any ERISA-covered employee benefit plan sponsored by the Debtors.

8.    Exclusions and Limitations on Exculpation, Indemnification, and Releases

Notwithstanding anything in the Plan to the contrary, no provision of the Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated under the Plan or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.  In the event that any exculpation or release provision in the Plan conflicts with Section 4 of a YieldCo Settlement Agreements, Section 4 of such YieldCo Settlement Agreement shall govern with respect to the applicable YieldCo.

Notwithstanding any provision to the contrary, no provision of the Disclosure Statement, Plan, or Confirmation Order shall preclude the United States, its agencies, departments or agents (collectively, the "United States") from enforcing its police or regulatory powers.

Notwithstanding anything contained in the Plan, Disclosure Statement or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair

118

or otherwise preclude: (1) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of the United States arising on or after the Effective Date; (3) any valid right of setoff or recoupment of the United States against any of the Debtors to the extent permitted under applicable law; or (4) any Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) from enforcing its police or regulatory powers against the Debtors or Reorganized Debtors, including as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Effective Date. Nor shall anything in the Confirmation Order or the Plan enjoin or otherwise bar the United States or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any matters described in subsection (1) through (4) described in the preceding sentence.

Nothing in the Confirmation Order or the Plan shall release or exculpate any non-Debtor, including any Released Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, applicable environmental laws, or applicable criminal laws, or any legal action or claim brought by the SEC, nor shall anything in this Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any non-Debtor, including any Released Party for any liability whatsoever; provided, however, that the foregoing sentence shall not limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

In each case, except as permitted under sections 505, 1129(a)(9)(c), and 1146 of the Bankruptcy Code, nothing contained in the Plan or Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall the Plan or Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment.

9.    **Injunction**

**Subject to Article 11.8 of the Plan, the satisfaction, release, and discharge pursuant to Article XI of the Plan shall act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, including any Exculpated Claim, or discharged under the Plan or pursuant to the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

10.    Subordination Rights

(a)    Except as otherwise provided in the Plan, the allowance, classification and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual (including, without limitation, pursuant to the Replacement Intercreditor Annex (as defined in the Replacement DIP Facility Order)), legal and equitable

subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise and all Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims under the Plan shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan (including Plan Exhibits), the Confirmation Order or an order of the Bankruptcy Court, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination; provided, however, that the Debtors and the Reorganized Debtors shall not seek subordination of any Original DIP Facility Claim, Replacement DIP Facility Claim, or Second Lien Claim, and such Claims are Allowed in full and not subject to any subordination of any kind. Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to Article 11.10(b) of the Plan unless ordered by the Bankruptcy Court.

(c)    The Plan shall be deemed compliant with all of the provisions of that certain Collateral Trust Agreement, dated January 11, 2016, between and among SunEdison, Inc., the guarantors and additional *pari passu* lien representatives from time to time party thereto, the Second Lien Administrative Agent, the Second Lien Senior Notes Indenture Trustee, and the Second Lien Collateral Trustee. Upon entry of the Confirmation Order, and provided that distributions under the Plan are made in accordance with the Plan and the Confirmation Order, no party shall have any further rights to enforce the Collateral Trust Agreement or the provisions thereof.

11.    Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom such the Reorganized Debtors has been associated, solely because the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

12.    Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

13.     Release of Liens

Except as otherwise provided in the Plan (including with respect to the Reinstated Second Lien Claims) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

14.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

L.     Conditions Precedent

1.     Conditions to Confirmation

The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article 12.3 of the Plan:

(a)     the Bankruptcy Court shall have entered the Disclosure Statement Order;

(b)     in the TERP Share Election Alternative, the Bankruptcy Court shall have entered an Order, in form and substance reasonably satisfactory to the Supporting Second Lien Parties, approving the Debtors' entry into the Equity Commitment Agreement;

(c)     the Confirmation Order shall have been entered; and

(d)     the YieldCos shall have withdrawn all General Unsecured Claims against the Debtors, subject to the right of TERP to assert up to one-half of the actual amount the YieldCos ultimately are required to pay (and therefore have the right to assert as a General Unsecured Claim) in connection with the Preserved DE Shaw Unsecured Claim (as defined in the YieldCo Settlement Motion), capped at one-half of $231 million, plus fees and interest.

2.     Conditions to the Effective Date of the Plan

121

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with <u>Article 12.3</u> of the Plan:

        (a)    the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

        (b)    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

        (c)    all Plan Transaction Documents shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties and the Creditors' Committee (as applicable);

        (d)    in the TERP Share Election Alternative, the Rights Offering (and the Equity Commitment Agreement) shall have been consummated on terms and conditions reasonably satisfactory to the Supporting Second Lien Parties;

        (e)    the Jointly Supported Transactions shall have closed, the terms and conditions of which Jointly Supported Transactions (including, without limitation, purchase price) shall be reasonably satisfactory to the Supporting Second Lien Parties; <u>provided</u>, that the Jointly Supported Transactions embodied by the YieldCo Settlement Agreements, Voting and Support Agreements, and Merger Agreements (in the forms required to be supported by the Supporting Second Lien Parties) are deemed to be reasonably satisfactory to the Supporting Second Lien Parties;

        (f)    the organizational documents of the Reorganized Debtors as contemplated in the Plan shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

        (g)    all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless (i) the Supporting Second Lien Parties and, to the extent the Creditors' Committee or Holders of General Unsecured Claims are affected, the Creditors' Committee, consent to such failure (such consent not to be unreasonably withheld) and (ii) such failure will not have a material adverse effect on the Reorganized Debtors;

        (h)    each of Reorganized SUNE and the GUC/Litigation Trust shall have been established in a manner consistent with the Plan and the Committee/BOKF Plan Settlement Term Sheet and on terms and conditions reasonably satisfactory to the Supporting Second Lien Parties and, with respect to the GUC/Litigation Trust, the Creditors' Committee;

        (i)    the New Boards and senior management shall have been selected as contemplated by the Plan;

        (j)    all other documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered and all other actions required to be

122

taken in connection with the Effective Date shall have occurred in form and substance and in a manner reasonably satisfactory to the Supporting Second Lien Parties and the Creditors' Committee (as applicable);

(k)    the amount of the Voluntary Professional Fee Reduction shall be equal to at least $5 million; and

(l)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

3.    <u>Waiver of Conditions Precedent</u>

The conditions set forth in <u>Articles 12.1</u> and <u>12.2</u> of the Plan  may be waived, in whole or in part, by agreement of (a) the Debtors and (b) the Supporting Second Lien Parties and (c) solely to the extent the Creditors' Committee has a consent right with respect to the conditions set forth in Articles 12.2(c) and 12.2(g), the Creditors' Committee, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

4.    <u>Notice of Effective Date</u>

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in <u>Article 12.2</u> of the Plan have been satisfied or waived pursuant to <u>Article 12.3</u> of the Plan.

5.    <u>Effect of Non-Occurrence of Conditions to Consummation</u>

If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

M.    <u>Retention of Jurisdiction</u>

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)    resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or

123

otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)    adjudicate any and all adversary proceedings and contested matters that may be commenced and maintained by the GUC/Litigation Trust or any other matters concerning administration of the GUC/Litigation Trust or any actions taken or contemplated to be taken by the GUC/Litigation Trust;

(d)    ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)    allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(f)    hear and determine or resolve any and all matters related to Causes of Action;

(g)    enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(h)    issue and implement orders in aid of execution, implementation, or consummation of the Plan;

(i)    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)    hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(k)    determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(l)    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(m)    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(n)    hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(o)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, with respect to requests under section 505(b) of the Bankruptcy Code with respect to Tax Returns filed by, or on behalf of, the GUC/Litigation Trust, or any reserve for or other amounts allocable to Disputed Claims, for all taxable periods through the dissolution of the GUC/Litigation Trust);

(p)    resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(q)    hear any other matter not inconsistent with the Bankruptcy Code;

(r)    hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(s)    enter a Final Decree closing the Chapter 11 Cases;

(t)    enforce all orders previously entered by the Bankruptcy Court;

(u)    hear and determine all matters relating to any Bankruptcy Code section 510(b) Claims;

(v)    hear and determine all disputes and issues arising from the GUC/Litigation Trust, the GUC/Litigation Trust Agreement, the assets and Causes of Action granted and/or assigned to the GUC/Litigation Trust, and any other related matters in connection therewith (including any items set forth in the Committee/BOKF Plan Settlement Term Sheet);

(w)    hear and determine all disputes regarding the out-of-pocket costs and expenses of the Debtors and Reorganized Debtors in connection with cooperating with the GUC/Litigation Trust Trustee with respect to GUC/Litigation Trust Causes of Actions.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of the Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement. Nothing contained in the Plan shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

N.    Miscellaneous Provisions

1.    Binding Effect

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

2.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree.

3.    Payment of Certain Additional Professional Fees

To the extent not paid prior to the Effective Date, on the Effective Date, subject to the Voluntary Professional Fee Reduction, the Reorganized Debtors shall pay all obligations required to be paid under paragraph 2(a) of the Original DIP Facility Order or under paragraph 2(a) of the Replacement DIP Facility Order, in each case, in Cash until such obligations are satisfied in full.

4.    Payment of Fees of Second Lien Senior Notes Indenture Trustee and Second Lien Collateral Trustee.

To the extent not paid prior to the Effective Date, on the Effective Date, subject to the Voluntary Professional Fee Reduction, the Reorganized Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Second Lien Senior Notes Indenture Trustee and the Second Lien Collateral Trustee and its advisors, including counsel, without application to or approval of the Bankruptcy Court.

5.    Modification and Amendments

The Debtors, with the consent of (x) the Supporting Second Lien Parties and, (y) with respect to those portions of the Plan that affect the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee (in each case, such consent not to be unreasonably withheld or delayed), may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, with the consent of (a) the Supporting Second Lien Parties and, (b) with respect to those portions of the Plan that affect the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee (in each case, such consent not to be unreasonably withheld or delayed), under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such

matters as may be necessary to carry out the purposes and effects of the Plan. For the avoidance of doubt, nothing in the Plan is intended to negate or override any consent requirements (including any applicable consent thresholds) set forth in the Replacement DIP Credit Agreement or the Replacement DIP Facility Order or the Committee/BOKF Plan Settlement Term Sheet.

6.      Confirmation of the Plan

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan, with the reasonable consent of the Supporting Second Lien Parties and, with respect to those portions of the Plan that affect the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee, to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

7.      Additional Documents

On or before the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties and, to the extent affecting the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee, may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors (with the reasonable consent of the Supporting Second Lien Parties and, to the extent affecting the Creditors' Committee or any Holders of General Unsecured Claims, the Creditors' Committee) or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

8.      Dissolution of Creditors' Committee

Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, and the members thereof (solely in their capacities as Creditors' Committee members) shall be released, exculpated, and discharged from all their duties relating to the Chapter 11 Cases in accordance with Article 11 of the Plan; provided, however, that the Creditors' Committee shall continue to exist and its Professionals shall continue to be retained and entitled to reasonable compensation, without further order of the Court, with respect to: (1) the preparation and prosecution of any final fee applications of the Creditors' Committee's Court approved Professionals and (2) all final fee applications filed with the Bankruptcy Court.

9.      Revocation, Withdrawal, or Non-Consummation

(a)      Right to Revoke or Withdraw. The Debtors reserve the right (such right, following Confirmation, subject to the reasonable consent of the Supporting Second Lien Parties and the Creditors' Committee), to revoke or withdraw the Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    Effect of Withdrawal, Revocation, or Non-Consummation.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, the Committee/BOKF Plan Settlement, including with regard to the Investigation/Prosecution Cap, the settlement of the BOKF Objection, the settlement of the UCC Challenge Litigation, and any settlement or compromise approved as part of the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made under the Plan), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be null and void in all respects.  In such event, nothing contained in the Plan or in the Disclosure Statement, or the Committee/BOKF Plan Settlement, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Creditors' Committee, BOKF, or any other Entity.

10.    <u>Notices</u>

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**If to the Debtors:**

c/o SunEdison, Inc.
13736 Riverport Dr.
Maryland Heights, MO 63043
Att'n.: Martin H. Truong (mtruong@sunedison.com)
Senior Vice President, General Counsel and Secretary

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Att'n:  Jay M. Goffman
         J. Eric Ivester

– and –

Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
Att'n:  James J. Mazza, Jr.
         Louis S. Chiappetta

– and –

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
Att'n:  Anthony W. Clark

**If to the Replacement DIP Agent or Original DIP Agent:**

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Att'n:  Scott Greissman
Elizabeth Feld

**If to the Tranche B Lenders/Steering Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
Att'n:  Arik Preis
        Yochun Katie Lee

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of New York
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York   10014
Att'n:  Paul Schwartzberg

**If to the Creditors' Committee:**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Att'n:  Matt Barr
        Jill Frizzley

– and –

Morrison & Foerester LLP
250 West 55th Street
New York, New York 10019
Att'n:  Elizabeth Sluder

11.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

12.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).   Corporate governance matters shall be governed by the laws of the state of incorporation of the Reorganized Debtors.

13.    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

14.    Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

15.    No Waiver or Estoppel

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

16. <u>Conflicts</u>

In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of the Plan shall govern. In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

O.    <u>Second Lien Litigation</u>

Notwithstanding anything to the contrary that may be set forth (or may be construed or argued to be set forth) in the Plan, the Disclosure Statement, or the Confirmation Order, including, without limitation, in <u>Articles 1</u>, <u>4.1</u>, <u>6.12</u>, <u>10.9</u>, <u>11.2</u>, <u>11.4</u>, <u>11.5</u>, <u>11.6</u>, and <u>11.7</u> of the Plan:

(a)    The term "Second Lien Litigation" shall mean any and all direct (i.e., not derivative) Causes of Action held by the Holders of Second Lien Claims (or Tranche B Roll Up Loan Claims, if applicable), or their respective successors or assigns, against any non-debtor, third party (including without limitation, any directors and officers of the Debtors and any party that is not a "Released Party" under the Plan as set forth in clause (f) below) involved in, implicated by, or related to the entry into the documents or transactions giving rise to the Second Lien Loans and Second Lien Senior Notes. The Second Lien Litigation is being or, with regard to certain potential defendants, will be prosecuted by, Kasowitz Benson Torres LLP (or any successor law firm).

(b)    Subject to clause (d) below, nothing in the Plan, Disclosure Statement or Confirmation Order shall prevent the Second Lien Lenders and the Second Lien Noteholders from asserting against (or collecting from) third parties in the Second Lien Litigation the full amount of any of their Tranche B Roll-Up Claims or Second Lien Claims, to the extent that such Claims do not receive a full recovery under the Plan.

(c)    None of the Second Lien Creditors shall provide a release under the Plan or otherwise to any current or potential defendants to the Second Lien Litigation (which includes, without limitation, the arrangers, agents, bookrunners, syndication agents, and underwriters of the Second Lien Loans and Second Lien Senior Notes, any of the Debtors' current and former principals, employees, agents, affiliates, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals) under the Plan, the Confirmation Order, or the Disclosure Statement for purposes of the Second Lien Litigation.

(d)    Nothing in the Plan, Disclosure Statement or Confirmation Order shall impair any defenses, claims, counterclaims, or rights that any third parties (which, for the avoidance of doubt, also includes the Holders of Second Lien Claims or Tranche B Roll-Up Loan Claims, if applicable) may have, and such defenses, claims, counterclaims or rights (including, without limitation, any rights to seek indemnity, and any rights to seek setoff or recoupment, under any contract or agreement, or under applicable law or equity) with respect to the Second Lien Litigation (and any defenses thereto) are preserved and not impaired.

(e)    For the avoidance of doubt, the exculpatory and limitation of liability provisions set forth in Article 11.7 of the Plan shall not apply to the Second Lien Litigation.

131

(f)    None of the current or potential defendants (which includes, without limitation, the arrangers, agents, bookrunners, syndication agents, and underwriters of the Second Lien Loans and Second Lien Senior Notes, any of the Debtors' current and former principals, employees, agents, affiliates, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals) to the Second Lien Litigation shall be deemed "Released Parties" under Article 11.6 of the Plan or the Disclosure Statement for purposes of the Second Lien Litigation.  For the avoidance of doubt, (x) nothing in this Article XV shall limit, impair, abridge, or otherwise affect Article 11.5 of the Plan (Release by Debtors) and (y) the Second Lien Senior Notes Indenture Trustee and the Second Lien Collateral Trustee shall not be defendants to the Second Lien Litigation.

# ARTICLE VII.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

B.    Confirmation Standards

Among the requirements for the Confirmation of the Plan are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.  The Plan complies with the statutory requirements for Confirmation of the Plan, which are listed below.

1.    The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

2.    The Plan has been proposed in good faith and not by any means forbidden by law.

3.    Any payment made or to be made by the proponent, by the Debtors, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

4.    The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer,

or voting trustee of the Debtors, an Affiliate of the Debtors participating in a joint Plan with the Debtors or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and Holders of Interests and with public policies.

5.      The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

6.      With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

7.      With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan, or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

8.      Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

   ▪ with respect to a Claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the Holder of such Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim;

   ▪ with respect to a Class of Claims of a kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each Holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred Cash payments of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (ii) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim;

   ▪ with respect to a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the Holder of such Claim will receive on account of such claim regular installment payments in Cash, over a period not exceeding five years after the date of the order for relief under sections 301, 302, or 303 of the Bankruptcy Code, of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

9.      If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

10.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11.     All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

12.     The Plan provides that following the Effective Date of the Plan, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall continue to pay all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the debtor has obligated itself to provide such benefits.[66]

C.     Liquidation Analyses

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Based on the Liquidation Analyses attached hereto as Exhibit C, the Debtors believe that the value of any distributions if the Debtors' Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would not be greater than the value of distributions under the Plan.

As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

D.     Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Company has prepared certain Financial Projections for the Debtors and non-Debtor subsidiaries on a consolidated basis.  These Financial Projections and the assumptions upon which they are based, are attached hereto as Exhibit B.  Based on these Financial Projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and,

---

[66]     The requirements for Confirmation of a plan of reorganization are set forth in section 1129(a) of the Bankruptcy Code.

therefore, that Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

E.    Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is Impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cram-down" such Classes, as described below.  A Class that is Unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required.  A Class is Impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the Holder of such Claim or Interest to, or the Debtors cure any default and reinstates the original terms of the obligation.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (a) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than half in number of the voting Allowed Claims have voted to accept the Plan; and (b) an Impaired Class of Interests has accepted the Plan the Holders of at least two-thirds in amount of the Allowed interests of such Class actually voting have voted to accept the plan.

F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class entitled to vote, excluding any Insider Classes. Section 1129(b) of the Bankruptcy Code permits the Debtors to confirm the Plan, notwithstanding the failure of any Impaired Class to accept the Plan, in a procedure commonly known as "cram-down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class of Claims or Interests that voted to reject the Plan.

1.    No Unfair Discrimination

The test to determine whether the Plan unfairly discriminates applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for nonconsensual Confirmation.

2.    Fair and Equitable Treatment

The test to determine whether the Plan affords fair and equitable treatment applies to Classes of different priority and status (e.g., Secured Claims versus General Unsecured Claims) and includes the general requirement that no Class of Claims receive more than 100% of the

amount of the Allowed Claims in such Class. As to a dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class. Specifically, in order to demonstrate that the Plan is fair and equitable, the Debtors must demonstrate that:

> Each Holder of a Secured Claim either (a) retains its Liens on the property, to the extent of the Allowed amount of its Secured Claim and receives deferred Cash payments having a value, as of the effective date of the chapter 11 plan, of at least the Allowed amount of such Claim, (b) has the right to credit bid the amount of its Claim if its property is sold and retains its Liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its Allowed Secured Claim.

> Either (a) each Holder of an impaired Unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (b) the Holders of Claims and Interests that are junior to the Claims of the rejecting Classes will not receive any property under the Plan.

> Either (a) each Holder of an Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the Interest or (b) the Holder of an Interest that is junior to the rejecting Class will not receive or retain any property under the Plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes 5A-5E, 6A-6E, 7B-7E and 8A are not receiving a distribution because, there is no Class of equal priority to Classes 5A-5E, 6A-6E, 7B-7E and 8A receiving more favorable treatment, and there are no Classes junior to Classes 5A-5E, 6A-6E, 7B-7E and 8A that will receive or retain any property on account of the Claims or Interests in such Class.

## ARTICLE VIII.

## PLAN-RELATED RISK FACTORS AND ALTERNATIVES
## TO CONFIRMATION AND CONSUMMATION OF THE PLAN

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH IN THIS <u>ARTICLE VIII</u> AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

A.    <u>General</u>

The following provides a summary of important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims and Interests that are Impaired and entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

136

B.     <u>Risks Related to Jointly Supported Transactions and the YieldCo Settlements</u>

Consummation of the Plan is dependent on consummation of the Jointly Supported Transactions and approval of the YieldCo Settlements. The Debtors currently anticipate that the YieldCos and Brookfield will consummate the merger transactions as contemplated by the Jointly Supported Transaction Agreements in the second half of 2017. However, there are many factors outside of the Debtors' control, including the ability of the YieldCos and/or Brookfield to satisfy required conditions, such as obtaining certain regulatory approvals, completion of financial statement audits that may be necessary to satisfy certain conditions, and obtaining the approval of a majority of YieldCo shareholders other than the Debtors. In the event that various closing conditions are not satisfied, Brookfield or the YieldCos may determine to terminate the applicable merger agreement. Consequently, the Debtors can provide no assurance that the transactions set forth in the Jointly Supported Transaction Agreements will be consummated or if they are, that they will consummated in the second half of 2017 or on the terms currently contemplated. Undue delay in consummation of the Jointly Supported Transactions could adversely affect the Debtors' ability to consummate the Plan.

The Voting Support Agreements are subject to Bankruptcy Court approval, and there can be no assurance that the Bankruptcy Court will approve the Voting Support Agreements. Failure of the Bankruptcy Court to approve the Voting Support Agreements would prevent the Jointly Supported Transactions from being consummated.

The Debtors cannot guarantee how much distributable value will result from the Jointly Supported Transactions because the Debtors may receive a portion of their consideration in the form of Continuing TERP Class A Shares, the value of which is uncertain due to various factors, including TERP's ability to reestablish compliance with NASDAQ's listing requirements.

Moreover, for the avoidance of doubt, as of the date of the Plan, the only Jointly Supported Transactions that the Supporting Second Lien Parties support is the Brookfield transaction described in the definition of the term "Jointly Supported Transactions" in the Plan and, therefore, should, subject to the terms and conditions of the Jointly Supported Transaction Agreements with Brookfield, the Debtors and either YieldCo choose a different Jointly Supported Transaction, the Supporting Second Lien Parties may not support the Plan, and the Rights Offering Backstop Purchasers will not be required to fund the Rights Offering Backstop Commitment or perform their obligations under the Rights Offering Commitment Letter.

C.     <u>Certain Bankruptcy Considerations</u>

1.     <u>Undue Delay in Confirmation May Significantly Degrade the Debtors' Value</u>

The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, creates a significant risk that the value of the Debtors' enterprises would be substantially eroded to the detriment of all stakeholders. The Debtors' future results are dependent upon the successful confirmation and implementation of a plan. Failure to obtain this approval in a timely manner could adversely affect the Debtors' ability to maximize value for their estates and all parties in interest. If Confirmation does not

occur expeditiously, the Chapter 11 Cases could result in, among other things, increased Administrative Claims or Professional Claims, and similar expenses.

    2.    <u>Parties in Interest May Object to Classification of Claims and Interests</u>

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or interest in a particular Class only if such claim or interest is substantially similar to the other claims or interests in such Class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

    3.    <u>The Debtors or the GUC/Litigation Trust Trustee May Object to Claims Before or After the Effective Date</u>

Prior to the Effective Date and subject to the terms of the Committee/BOKF Plan Settlement, the Debtors, and after the Effective Date, the GUC/Litigation Trust Trustee, reserve the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan. There can be no assurance that the estimated Claim amounts set forth herein are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a plan.

    4.    <u>Risk of Non-Occurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date may occur within approximately two to three months after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

    5.    <u>Failure to Satisfy Vote Requirements</u>

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

6.    Debtors May Not Be Able to Secure Confirmation of the Plan

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" (discussed in more detail in Article VII herein) are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

7.    The Debtors May Be Unable to Obtain Sufficient Liquidity to Confirm the
Plan and Exit from Chapter 11

As of the date hereof, the Debtors contemplate that, in the TERP Share Election Alternative, the Plan will be funded by, among other things, the proceeds of a Rights Offering. Although the Debtors have received commitments from certain Supporting Second Lien Parties to fully backstop the Rights Offering to provide the liquidity needed to fund the Plan in the TERP Share Election Alternative, it is possible that the Rights Offering may not close.  If the proceeds of the Rights Offering are not received, the Debtors' ability to confirm the Plan in the TERP Share Election Alternative will be severely compromised, and the Debtors' ability to reorganize at all could be placed in jeopardy.

8.    The Bankruptcy Rule 9019 Settlements Contained in the Plan May Not Be
Approved

The Plan also is a motion to approve the Committee/BOKF Plan Settlement, including the settlement of the UCC Challenge Litigation and the BOKF Objection. The Debtors believe such settlement is fair and reasonable and meets the lowest point in the range of reasonableness. There can be no assurance that the Bankruptcy Court will approve the Committee/BOKF Plan Settlement, and the failure to approve such settlement could significantly harm the Debtors' ability to consummate the Plan.

D.    Risk Factors That May Affect Recoveries Under the Plan

1.    Debtors Cannot Guarantee What Recovery Will Be Available to Holders
of Allowed Claims in Voting Classes

No less than three unknown factors make certainty in creditor recoveries impossible: (a) how much money or other distributable value will remain after satisfaction of all Allowed Claims that are senior to the Allowed Claims in Voting Classes or unclassified Allowed Claims; (b) the number or amount of Claims in Voting Classes that will ultimately be Allowed; and (c) the number or size of Claims senior to the Claims in the Voting Classes or unclassified Claims that will ultimately be Allowed.

2.      Actual Amounts of Allowed Claims May Differ from the Estimated
        Claims and Adversely Affect the Percentage Recovery on Certain Claims

The Claims estimates set forth above are based on various assumptions. The actual amounts of certain Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan.

3.      Estimated Valuation of the Reorganized Debtors and the New SUNE
        Common Stock and the Estimated Recoveries to Holders of Allowed
        Claims Are Not Intended to Represent the Private Sale Values of the New
        SUNE Common Stock

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the New SUNE Common Stock, nor are they intended to represent the Debtors' view of what may happen with regard to the value of the Continuing TERP Class A Shares after closing of the Brookfield merger transaction. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; and (c) the assumption that capital and equity markets remain consistent with current conditions.

4.      The Reorganized Debtors May Be Controlled By a Small Number of
Holders

Consummation of the Plan may result in a small number of Holders owning a significant percentage of the outstanding shares of New SUNE Common Stock. These Holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve material corporate transactions. The Debtors can make no assurances regarding the future actions of the Holders of New SUNE Common Stock and the impact such actions may have on the value of the New SUNE Common Stock.

5.      Certain Tax Implications of the Debtors' Bankruptcy and Reorganization
May Increase the Tax Liability of the Reorganized Debtors

Holders of Allowed Claims should carefully review Article IX herein, "Certain Federal Income Tax Consequences," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

6.      Impact of Interest Rates

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets. Specifically, decreases in interest rates will positively impact the value of the Debtors' assets and the strengthening of the dollar will negatively impact the value of their net foreign assets.

E.      Business Risks

1.    Restrictive Covenants in Replacement DIP Financing Facility Limit
     Company's Ability to Operate Businesses; Failure to Comply With
     Covenants Could Result in Acceleration of Indebtedness

The Replacement DIP Credit Agreement contain covenants that limit or restrict the Company's ability to finance future operations or capital needs, to respond to changing business and economic conditions or to engage in other transactions or business activities that may be important to its ability to complete sales of assets, administer Earnout Assets, administer Residual Assets, collect Repatriated Cash, or otherwise take actions that are important to maximizing the value of the Company. The Replacement DIP Credit Agreement, limits or restricts, among other things, the Company's ability and the ability of its subsidiaries to:

- incur or guarantee additional indebtedness;

- pay dividends or make distributions on the Company's or its subsidiaries' capital stock or certain other restricted payments or investments;

- purchase or redeem stock or subordinated indebtedness;

- make investments and extend credit;

- engage in transactions with affiliates;

- transfer and sell assets;

- affect a consolidation or merger or sell, transfer, lease or otherwise dispose of all or substantially all of the Company's or its subsidiaries' assets;

- engage in transactions with affiliates; and

- create liens on the Company's or its subsidiaries' assets to secure debt or other obligations.

In addition, the Replacement DIP Credit Agreement requires the Company to repay outstanding borrowings with portions of the proceeds the Company receives from certain sales of assets, insurance or casualty events and specified future debt offerings.  Certain other asset sale proceeds designated as Budgeted Asset Sale Proceeds pursuant to the Replacement DIP Credit Agreement are required to be deposited in the Replacement DIP Facilities Blocked Account, and withdrawals from such account are subject to the satisfaction of certain conditions, including the absence of a default and compliance with the Budget. The Company's ability to comply with these provisions may be affected by events beyond its control. Any breach of the covenants in the Replacement DIP Credit Agreement could cause a default under the Company's Replacement DIP Credit Agreement and other debt, which would restrict the Company's ability to access funds under the Replacement DIP Facilities Blocked Account pursuant to its Replacement DIP Credit Agreement thereby significantly impacting the Company's liquidity which could have a material adverse effect on the Company's business, financial condition, cash flows or results of operations. If there were an event of default under any of the Company's debt instruments that

141

was not cured or waived, the Holders of the defaulted debt could cause all amounts outstanding with respect to the debt instrument to be due and payable immediately. The Company's assets and cash flow may not be sufficient to fully repay borrowings under its outstanding debt instruments if accelerated upon an event of default.

If, as or when required, the Company is unable to repay, refinance or restructure its indebtedness under, or amend the covenants contained in the Replacement DIP Credit Agreement, the Replacement DIP Lenders could institute foreclosure proceedings against the assets securing borrowings under the Replacement DIP Credit Agreement.

    2.    <u>The Debtors May Be Subject To Claims That Will Not Be Discharged in the Chapter 11 Cases</u>

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With a few exceptions primarily relating to claims arising from certain ongoing government investigations, all claims that arose prior to the filing of the Chapter 11 Cases (i) will be subject to compromise, and/or discharge in the Chapter 11 Cases in any plan of reorganization that may be certified, or (ii) will be discharged in accordance with the Bankruptcy Code and the terms of the plan of reorganization.  However, the aggregate amount of such claims that are not subject to treatment under the plan of reorganization or that are not discharged may be material.

    3.    <u>The Debtors or Reorganized Debtors May Be Unable To Complete Sales of Residual Assets Or Realize Maximum Value From Such Residual Assets</u>

The Company's ability to sell its Residual Assets is subject to many risks, including a potentially limited or unstable marketplace, market competition, inability to obtain necessary regulatory approvals, strict sales timelines that must be adhered to in order to realize value from certain assets, and changes to legal and  regulatory rules applicable to assets, among other factors. There can be no assurance that the Debtors will be able to overcome these risks, or that these risks will not negatively impact the realized value of Residual Assets.  Given the risk that Residual Assets Proceeds are subject to significant uncertainties and may not be recovered at all, creditors should not assume that any or all will be recovered, which may significantly harm creditor recoveries.

    4.    <u>Debtors or Reorganized Debtors May Fail to Realize Earnout Proceeds or Recover Escrow Amounts</u>

In connection with the sale of certain projects, relevant sale agreements may provide for earnout payments to the Company upon the satisfaction of specified conditions and/or milestones.  The Company's ability to satisfy such conditions and/or milestones and receive the earnout payments is subject to both general and project-specific risks and uncertainties, many of which are beyond the Debtors' control. In addition, the Debtors may be able to recover escrow amounts related to the sale of certain projects to the extent the relevant escrows are not used for the purposes for which they were established.  There can be no assurance that the Debtors will realize earnout proceeds on any project or recover escrow amounts related to any project, and the inability to realize any or all of such proceeds could have a material adverse effect on the

Debtors' future business, financial condition, results of operations and cash flows. Given the risk that Earnout Proceeds are subject to significant uncertainties and may not be recovered at all, creditors should not assume that any or all will be recovered, which may significantly harm creditor recoveries.

     5.     <u>Debtors' or Reorganized Debtors' Ability to Repatriate Cash and Sustain International Operations May Be Hindered</u>

The Company derives a portion of its revenue and earnings from its international operations.  Such operations are subject to risks that could materially adversely affect the Debtors' or Reorganized Debtors' business, financial condition, results of operations and cash flow, including uncertain political, legal and economic environments, potential incompatibility with foreign partners, foreign currency controls and fluctuations, global energy prices and availability, terrorist attacks, the imposition of additional governmental controls and regulations, war and civil disturbances and foreign labor uncertainties.

Because of these risks, the Debtors' or Reorganized Debtors' international operations may be limited, or disrupted, they may lose contract rights, their foreign taxation may be increased or they may be limited in repatriating earnings. In addition to earnings, a portion of cash available for repatriation include direct and indirect tax refunds and return of deposits from government and regulatory authorities. In certain cases, the Debtors or Reorganized Debtors' ability to repatriate cash is subject to the completion and acceptance of statutory accounting, tax audits, and other tax authority approvals, which may be impacted if the Debtors' or Reorganized Debtors' international operations are limited or impaired. In addition, in some cases, applicable law and joint venture or other agreements may provide that each joint venture partner is jointly and severally liable for all liabilities of the venture.  Given the risk that Repatriated Cash is subject to significant uncertainties and may not be recovered at all, creditors should not assume that any or all will be recovered, which may significantly harm creditor recoveries.

     6.     <u>The Debtors' employees face uncertainty due to the Chapter 11 Cases</u>

As a result of the Chapter 11 Cases, the Debtors' employees are facing uncertainty. A material erosion of the Debtors' workforce, either during the Chapter 11 Cases or following emergence, could have a material adverse effect on the Debtors' or Reorganized Debtors' ability to maximize Earnout Asset Proceeds, Residual Asset Proceeds, proceeds from other opportunities, and recovery of Repatriated Cash.

F.     <u>Risks Associated with Forward Looking Statements</u>

     1.     <u>Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed</u>

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to

warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.    <u>Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary</u>

Except for historical information, this Disclosure Statement may be deemed to contain "forward-looking" statements. The Company is including this cautionary statement for the express purpose of availing itself of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or amount of Claims in the various Classes that might be allowed. The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in the "Risk Factors" section of this Disclosure Statement. Such factors have, in some instances, affected and in the future could affect the ability of the Company to achieve its projected results and may cause actual results to differ materially from those expressed herein. The Company undertakes no obligation to update any forward-looking statements in this Disclosure Statement.

G.    <u>Disclosure Statement Disclaimer</u>

1.    <u>This Disclosure Statement Was Not Approved by the Securities and Exchange Commission</u>

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

2.    <u>Reliance on Exemptions from Registration Under the Securities Act</u>

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of New SUNE Common Stock and Continuing TERP Class A Shares to Holders of Second Lien Claims has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New SUNE Common Stock and the distribution of Continuing TERP Class A Shares will be exempt from registration under the Securities Act by virtue of Section 1145 of the Bankruptcy Code, Sections 4(a)(1) or 4(a)(2) of the Securities Act.

3.    <u>This Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analyses, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.      No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, Holders of Allowed Claims or Interests, or any other parties in interest.

6.      Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

7.      No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

8.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

145

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

9.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.     No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement or other materials included in the Solicitation Package. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel for the Debtors, the counsel for the Creditors' Committee and the United States Trustee.

H.      Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee (or trustees) would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analyses is described herein and attached hereto as Exhibit C.

## ARTICLE IX.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

A summary description of certain U.S. federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Claims or Interests are described below.  No opinion of counsel has been sought or obtained with respect to any tax

consequences of the Plan. The discussion below is not binding upon the Internal Revenue Service ("IRS") or any other tax authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim or Interest. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it address all aspects of U.S. federal income taxation applicable to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, broker-dealers, tax-exempt organizations, Holders of Claims or Interests who are, or who hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction, and persons who acquired their Claims or Interests pursuant to the exercise of employee stock options or otherwise as compensation). The following discussion assumes that Holders of Claims or Interests hold their Claims or Interests as capital assets for U.S. federal income tax purposes. Furthermore, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim or Interest that is (1) an individual who is a citizen or resident of the United States, (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States or any state or political subdivision thereof, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust that (i) is subject to the primary supervision of a U.S. court and which has one or more U.S. persons who have the authority to control all substantial decisions of the trust, or (ii) has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. A "Non-U.S. Holder" is a beneficial owner of a Claim or Interest that is neither a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) nor a U.S. Holder.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds Claims or Interests, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership participating in the Plan (and its partners) should consult their tax advisors regarding the consequences of participating in the Plan.

A.    Certain U.S. Federal Income Tax Consequences to the Debtors

    1.    Cancellation of Indebtedness Income

147

Under general U.S. federal income tax principles, the Debtors should realize cancellation of indebtedness ("COD") income to the extent that their obligations to a Holder are discharged pursuant to the Plan for an amount less than the adjusted issue price of such Holder's Claim. For this purpose, the amount paid to a Holder in discharge of its Claim should equal the fair market value of any consideration given to such Holder in satisfaction of the Claim at the time of the exchange.

Because the Debtors will be debtors in a bankruptcy case at the time they realize COD income, the Debtors should not be required to include such COD income in their gross income but rather should be required to reduce certain of their tax attributes by the amount of COD income so excluded, generally in the following order: (a) net operating losses and net operating loss carryforwards (collectively, "NOLs"); (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the debtor's depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A Debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries). The reduction in tax attributes occurs after the tax for the year of the debt discharge has been determined (i.e., subject to the discussion below regarding Section 382 of the Tax Code, such attributes may be available to offset taxable income, if any, that is generated between the date of discharge and the end of the Debtors' taxable year and/or may be carried back to prior years).

The Debtors expect to realize COD income as a result of the discharge of obligations pursuant to the Plan, which, under the attribute reduction rules described above, is generally expected to result in a reduction, or possible elimination, of certain of the Debtors' tax attributes, including NOLs.

2.    Utilization of NOLs

If a corporation experiences an "ownership change" (within the meaning of Section 382 of the Tax Code), the corporation's ability to utilize its NOLs and certain other tax attributes allocable to periods before the Effective Date (collectively, "Pre-Change Losses") to offset future taxable income (in any post-Effective Date taxable year and in the portion of the current taxable year beginning after the Effective Date) generally will be subject to certain limitations. Section 382 of the Tax Code may also limit a corporation's ability to use certain "net unrealized built-in losses" existing on the date of the ownership change but recognized within five years of the ownership change to offset future taxable income. In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject (the "Section 382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) and (b) the "long-term tax-exempt rate" announced by the IRS (for example, 2.09% for ownership changes occurring during June 2017).

An exception to the foregoing annual limitation rules generally applies when stockholders and qualified creditors of a debtor corporation in chapter 11 collectively receive, in respect of their claims, at least fifty percent (50%) of the vote and value of the stock of the

reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a plan of reorganization (the "382(l)(5) Exception"). A "qualified creditor" is any creditor who has held the debt of the debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt owned immediately before the ownership change, unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period. Since the Prepetition Second Lien Facility and Second Lien Senior Notes were issued approximately three months before the petition date, the Reorganized Debtors will be eligible for the 382(l)(5) Exception only if the Second Lien Claims are treated as ordinary course indebtedness, and other requirements are satisfied. Under the 382(l)(5) Exception, a debtor's ability to utilize its Pre-Change Losses is not limited on an annual basis, but, instead, NOLs will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date of the Plan, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If there is a second "ownership change" during the two-year period following the effective date of the plan, the second ownership change would not qualify for the 382(l)(5) Exception and the Section 382 Limitation with respect to such second ownership change would be zero. The Debtors have not yet determined whether to implement post-emergence trading restrictions to minimize the likelihood of a subsequent "ownership change."

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the Section 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's equity (with certain adjustments) immediately after the ownership change or the value of the debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. For purposes of the calculation of the Section 382 Limitation under the 382(l)(6) Exception, if the debtor corporation holds substantial nonbusiness assets after the ownership change, the value of any nonbusiness assets of the debtor corporation (potentially including stock of subsidiaries in which the debtor corporation owns less than 50% by vote or value) might not be allowed to be taken into account. Notwithstanding the general rule, if the corporation (or the consolidated group of which it is a member) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the Section 382 Limitation resulting from the ownership change becomes zero retroactively to the date of the ownership change, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to any recognized built-in gains).

Whether the Debtors qualify for the 382(l)(5) Exception is highly fact specific and significant uncertainties exist as to the facts and law underlying this position. Thus, the Debtors are not certain whether they will qualify for the 382(l)(5) Exception or would choose to elect out of the 382(l)(5) Exception. If the Debtors do not qualify for the 382(1)(5) Exception or the Debtors elect out of the 382(l)(5) Exception, the Debtors' use of their Pre-Change Losses will be subject to the Section 382 Limitation following confirmation of the Plan, calculated under the special rule of Section 382(1)(6) of the Tax Code described above.

149

3.      Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") each year at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax for such year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation may otherwise be able to offset all of its taxable income for regular tax purposes by available NOLs, only 90% of a corporation's AMTI generally may be offset by its AMT NOLs.

An ownership change (within the meaning of Section 382 of the Tax Code) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the Tax Code, immediately before the ownership change.

If the Debtors undergo an "ownership change" (as described above) and have a net unrealized built-in loss in their assets, the basis of the Debtors' assets is expected to be adjusted for AMT purposes.

4.      Transfer of Assets to the GUC/Litigation Trust

Pursuant to the Plan, the GUC/Litigation Trust will be established for the benefit of holders of GUC/Litigation Trust Interests. The GUC/Litigation Trust is intended to be treated as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) for U.S. federal income tax purposes, which is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., a pass-through entity) with the holders of GUC/Litigation Trust Interests as the grantors. See "—B. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests—3. Tax Treatment of GUC/Litigation Trust and Holders of Beneficial Interests," below, for a discussion of the U.S. federal income tax consequences of the GUC/Litigation Trust to holders of GUC/Litigation Trust Interests.

Accordingly, pursuant to the Plan, all assets held by the GUC/Litigation Trust on the Effective Date will be treated by the Debtors for U.S. federal income tax purposes as having been (1) distributed (subject to any obligations relating to such assets) by the Debtors or Reorganized Debtors in a taxable transaction to Holders of General Unsecured Claims (other than to the extent any assets are allocable to Disputed Claims) and in part to Holders of Allowed Second Lien Claims and (2) immediately thereafter contributed by the holders of such Claims (thereafter, the GUC/Litigation Trust Beneficiaries) to the GUC/Litigation Trust in exchange for GUC/Litigation Trust Interests.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the GUC/Litigation Trust Trustee of a private letter ruling if the GUC/Litigation Trust Trustee so requests, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC/Litigation Trust Trustee), the GUC/Litigation Trust

Trustee may elect to treat any assets allocable to, or retained on account of, Disputed Claims (hereafter referred as to the "GUC Disputed Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9.  A disputed ownership fund is generally treated as a separate corporate entity for U.S. federal income tax purposes and amounts earned in a disputed ownership fund are generally subject to tax on a current basis as the amounts are earned.  Accordingly, the transfer of assets to the GUC Disputed Claims Reserve in respect of Disputed General Unsecured Claims should also be treated as a taxable distribution of assets by the Debtors. To the extent permitted by applicable law, the Plan provides that all parties (including the GUC/Litigation Trust Trustee, the Debtors and the GUC/Litigation Trust Beneficiaries) must report for U.S. federal, state, and local income tax purposes consistently with the GUC/Litigation Trust Trustee's treatment of such reserve.

B.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests

The tax consequences described below are not exclusive, and some of the conclusions expressed are uncertain.  U.S. Holders may be treated for U.S. federal income tax purposes in some manner other than that set forth herein.  Each U.S. Holder should consult its tax advisor regarding the tax consequences to it of the transactions contemplated by the Plan.

1.    U.S. Holders of Classes 1A-1B – Second Lien Claims

(a)    General

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim (except as otherwise set forth herein with respect to the Reinstated Second Lien Claims and the Second Lien Litigation), on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata portion of the Second Lien Claim Distribution. In addition to the foregoing, in the TERP Share Election Alternative, each Holder of an Allowed Second Lien Claim that is an Eligible Holder shall receive its Pro Rata portion of the Rights Offering Subscription Rights.

Subject to the discussion below regarding accrued interest, the Debtors intend to take the position that, for U.S. federal income tax purposes, a U.S. Holder of such Allowed Second Lien Claim should be treated as exchanging its Allowed Second Lien Claims for any Cash and/or other property in a taxable transaction. Under this approach, such U.S. Holder should recognize gain or loss equal to the difference between (a) the sum of any Cash and/or the fair market value of other property received in exchange for the Allowed Second Lien Claims pursuant to the Plan (please see "—3. Tax Treatment of GUC/Litigation Trust and Holders of Beneficial Interests," below, for a discussion relating to the receipt and holding of interests in the GUC/Litigation Trust) and (b) the U.S. Holder's adjusted tax basis of the Allowed Second Lien Claims surrendered pursuant to the Plan. Except to the extent described below under "Market Discount," any such gain recognized should be treated as capital gain. The utilization of capital losses is subject to certain limitations under the Tax Code.

As discussed below (see "—3. Tax Treatment of GUC/Litigation Trust and Holders of Beneficial Interests," below), the GUC/Litigation Trust has been structured with the intent to

151

qualify as a "grantor Trust" for U.S. federal income tax purposes. Accordingly, each Holder of an Allowed Second Lien Claim receiving a beneficial interest in the GUC/Litigation Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the GUC/Litigation Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the GUC/Litigation Trust Trustee will in good faith value the assets transferred to the GUC/Litigation Trust, and all parties to the GUC/Litigation Trust (including holders of Claims receiving GUC/Litigation Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

(b)    Accrued Interest

To the extent that any Allowed Second Lien Claim entitled to a distribution under the Plan includes accrued but unpaid interest (including original issue discount ("OID"), if any) thereon, the Debtors intend to take the position that, for U.S. federal income tax purposes, such distribution should be allocated to the principal amount of the Allowed Second Lien Claim first with any excess consideration allocated to accrued but unpaid interest. Under this approach, a U.S. Holder who had previously included such accrued interest income (including OID, if any) generally would recognize a deductible loss to the extent that such accrued interest (including OID, if any) was not viewed as received. No assurances can be made that the IRS will respect such allocation. To the extent that any consideration received by U.S. Holders of Allowed Second Lien Claims is allocated to accrued but unpaid interest (including OID, if any), such amount should be excluded from the U.S. Holder's amount realized for purposes of determining capital gain or loss and should instead be taxed as ordinary income to the extent it has not yet been included in such U.S. Holder's gross income. U.S. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences applicable to them under the Plan with respect to accrued but unpaid interest.

Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by U.S. Holders should be allocated in some way other than as provided in the Plan. U.S. Holders should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

(c)    Market Discount

The market discount provisions of the Tax Code may apply to U.S. Holders of Allowed Second Lien Claims who receive a distribution pursuant to the Plan. An Allowed Second Lien Claim is a "market discount bond" for a U.S. Holder that acquired such Claim in the secondary market (or, in certain circumstances, upon original issuance) if its stated redemption price at maturity exceeds the adjusted tax basis of such Claim in the U.S. Holder's hands immediately after its acquisition.

Under the market discount rules (subject to a de minimis exception), any gain recognized by a U.S. Holder of an Allowed Second Lien Claim on the taxable disposition of such Claim (determined as described above) that was acquired with market discount should be characterized

as ordinary interest income to the extent of the accrued market discount on such Allowed Second Lien Claim as of the Effective Date (unless the U.S. Holder elected to include market discount in income as it accrued). U.S. Holders of Allowed Second Lien Claims should consult their tax advisors as to the tax consequences to them of the market discount rules.

   (d) Ownership and Disposition of New SUNE Common Stock/Continuing TERP Class A Shares

   Any distribution made on New SUNE Common Stock or Continuing TERP Class A Shares, will constitute dividends for U.S. federal income tax purposes to the extent of such company's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such company's current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of New SUNE Common Stock or Continuing TERP Class A Shares, respectively. Any such distribution in excess of the U.S. Holder's basis in its shares of such company (determined on a share-by-share basis) generally will be treated as capital gain. Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as New SUNE or TERP, respectively, has sufficient earnings and profits, subject to certain holding period requirements.

   Subject to the discussion above of market discount rules in "—c. Market Discount," a U.S. Holder generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New SUNE Common Stock or Continuing TERP Class A Shares received in an amount equal to the difference between (i) the U.S. Holder's adjusted tax basis in the New SUNE Common Stock or Continuing TERP Class A Shares, respectively, and (ii) the sum of the cash plus the fair market value of any property received from such disposition. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital losses is subject to certain limitations under the Tax Code.

   2. <u>U.S. Holders of Classes 4A-4E – Allowed General Unsecured Claims</u>

   Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata portion of the Class A GUC/Litigation Trust Interests, subject to the specifics set forth in the Plan.

   As discussed below (see "—3. Tax Treatment of GUC/Litigation Trust and Holders of Beneficial Interests," below), the GUC/Litigation Trust has been structured with the intent to qualify as a "grantor Trust" for U.S. federal income tax purposes. Accordingly, each Holder of an Allowed General Unsecured Claim receiving a beneficial interest in the GUC/Litigation Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the GUC/Litigation Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the GUC/Litigation Trust Trustee will in good faith value the assets transferred to the GUC/Litigation Trust, and all parties to the GUC/Litigation Trust (including holders of Claims receiving GUC/Litigation Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

(a)        Taxable Transaction

In general, a U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss with respect to its Allowed Claim equal to the difference between (a) the sum of any Cash and the fair market value of other property received in exchange for the Allowed General Unsecured Claims pursuant to the Plan (other than any consideration attributable to a Claim for accrued but unpaid interest) and (b) the U.S. Holder's adjusted tax basis of the Allowed General Unsecured Claims surrendered pursuant to the Plan (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  See "—2. Accrued Interest," below, for the treatment of Allowed Claims with respect to accrued but unpaid interest.

After the Effective Date, a Holder's share of any collections received on the assets of the GUC/Litigation Trust (other than as a result of the subsequent disallowance of Disputed Claims or the redistribution among holders of Allowed Claims of undeliverable distributions), should not be included, for U.S. federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the GUC/Litigation Trust.  See "—3. Tax Treatment of GUC/Litigation Trust and Holders of Beneficial Interests," below, for a discussion relating to the receipt and holding of interests in the GUC/Litigation Trust.

In the event of a subsequent disallowance of a Disputed General Unsecured Claim, it is possible that a Holder of a previously Allowed Claim may be taxed as such Disputed Claims are resolved and the holder effectively becomes entitled to an increased share of the assets held in the GUC/Litigation Trust. The imputed interest provisions of the Tax Code may apply to treat a portion of such increased share or any additional distributions as imputed interest.  In addition, it is possible that any loss realized by a U.S. Holder in satisfaction of an Allowed Claim may be deferred until all Disputed Claims in such Holder's class are determined and such U.S. Holder's share can no longer increase, and with respect to certain Claims, that a portion of any gain realized may be deferred under the "installment method" of reporting.  Holders are urged to consult their tax advisors regarding the possibility for deferral, and the ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

Where gain or loss is recognized by a Holder in respect of its Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, and whether and to what extent the Holder had previously claimed a bad debt deduction in respect of such Claim.  The market discount provisions of the Tax Code may apply to U.S. Holders of Allowed General Unsecured Claims who receive a distribution pursuant to the Plan.  An Allowed General Unsecured Claim is a "market discount bond" for a U.S. Holder that acquired such Claim in the secondary market (or, in certain circumstances, upon original issuance) if its stated redemption price at maturity exceeds the adjusted tax basis of such Claim in the U.S. Holder's hands immediately after its acquisition.  Under the market discount rules (subject to a de minimis exception), any gain recognized by a U.S. Holder of an Allowed General Unsecured Claim on the taxable disposition of such Claim that was acquired with market discount should be characterized as ordinary interest income to the extent of the accrued market discount on such Allowed General Unsecured

154

Claim as of the Effective Date (unless the U.S. Holder elected to include market discount in income as it accrued). A reduced tax rate on long-term capital gain may apply to non-corporate Holders. The deductibility of capital losses are subject to certain limitations under the Tax Code. U.S. Holders of Allowed General Unsecured Claims should consult their tax advisors as to the determination of the character of any gain or loss to them.

A holder's aggregate tax basis in its respective share of the GUC/Litigation Trust Assets received (other than Cash) in satisfaction of an Allowed General Unsecured Claim will equal the amount taken into account in determining the Holder's amount realized. A holder's holding period in its share of the GUC/Litigation Trust Assets generally will begin the day following the Effective Date.

(b)    Accrued Interest

To the extent that any Allowed General Unsecured Claim entitled to a distribution under the Plan includes accrued but unpaid interest (including OID, if any) thereon, the Debtors intend to take the position that, for U.S. federal income tax purposes, such distribution should be allocated to the principal amount of the Allowed General Unsecured Claim first with any excess consideration allocated to accrued but unpaid interest (see Article 10.13 of the Plan). Under this approach, a U.S. Holder who had previously included such accrued interest income (including OID, if any) generally would recognize a deductible loss to the extent that such accrued interest (including OID, if any) was not viewed as received. No assurances can be made that the IRS will respect such allocation. To the extent that any consideration received by U.S. Holders of Allowed General Unsecured Claim is allocated to accrued but unpaid interest (including OID, if any), such amount should be excluded from the U.S. Holder's amount realized for purposes of determining capital gain or loss and should instead be taxed as ordinary income to the extent it has not yet been included in such U.S. Holder's gross income. U.S. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences applicable to them under the Plan with respect to accrued but unpaid interest.

Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by U.S. Holders should be allocated in some way other than as provided in the Plan. U.S. Holders should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

3.    Tax Treatment of GUC/Litigation Trust and Holders of Beneficial Interests

(a)    Classification as a Liquidating Trust

The GUC/Litigation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the GUC/Litigation Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax

purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Any liquidating trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45 all parties (including, without limitation, the Debtors, the GUC/Litigation Trust Trustee and GUC/Litigation Trust Beneficiaries) will treat the transfer of GUC/Litigation Trust Assets to the GUC/Litigation Trust as (1) a transfer of GUC/Litigation Trust Assets (subject to any obligations relating to those assets) directly to GUC/Litigation Trust Beneficiaries (other than to the extent GUC/Litigation Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the GUC/Litigation Trust of GUC/Litigation Trust Assets in exchange for GUC/Litigation Trust Interests. Accordingly, except in the event of contrary definitive guidance, GUC/Litigation Trust Beneficiaries will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of GUC/Litigation Trust Assets (other than such GUC/Litigation Trust Assets as are allocable to, or retained on account of, Disputed Claims).

While the following discussion assumes that the GUC/Litigation Trust would be treated as a liquidating trust for U.S. federal income tax purposes, no ruling is currently being requested from the IRS concerning the tax status of the liquidating trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC/Litigation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC/Litigation Trust and the Holders of Claims could vary from those discussed herein.

(b)    General Tax Reporting by the GUC/Litigation Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties must treat the GUC/Litigation Trust as a grantor trust of which the holders of GUC/Litigation Trust Interests are the owners and grantors, and treat the GUC/Litigation Trust Beneficiaries as the direct owners of an undivided interest in the GUC/Litigation Trust Assets (other than any assets allocable to, or retained on account of, Disputed Claims), consistent with their economic interests therein. The GUC/Litigation Trust Trustee will file tax returns treating the GUC/Litigation Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The GUC/Litigation Trust Trustee also will annually send to each holder of a GUC/Litigation Trust Interest a separate statement regarding the receipts and expenditures of the GUC/Litigation Trust as relevant for U.S. federal income tax purposes.

Allocations of taxable income of the GUC/Litigation Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the GUC/Litigation Trust) among the GUC/Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the GUC/Litigation Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to Disputed Claims) to the GUC/Litigation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC/Litigation Trust. Similarly, taxable loss of the GUC/Litigation Trust shall be allocated by reference to the manner in which an

156

economic loss would be borne immediately after a liquidating distribution of the remaining GUC/Litigation Trust Assets.  The tax book value of the GUC/Litigation Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the GUC/Litigation Trust Assets to the GUC/Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the GUC/Litigation Trust Assets to the GUC/Litigation Trust, the GUC/Litigation Trust Trustee shall make a good faith valuation of the GUC/Litigation Trust Assets.  All parties to the GUC/Litigation Trust (including, without limitation, the Debtors, Holders of Allowed Claims, and the GUC/Litigation Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a GUC/Litigation Trust Beneficiary will be treated as income or loss with respect to such GUC/Litigation Trust Beneficiary's undivided interest in the GUC/Litigation Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the GUC/Litigation Trust Beneficiary.  It is currently unknown whether and to what extent the GUC/Litigation Trust Interests will be transferable.

The U.S. federal income tax obligations of a Holder with respect to its GUC/Litigation Trust Interest are not dependent on the GUC/Litigation Trust distributing any cash or other proceeds.  Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of GUC/Litigation Trust income even if the GUC/Litigation Trust does not make a concurrent distribution to the Holder.  In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a Holder's Allowed Claim), a distribution of cash by the GUC/Litigation Trust will not be separately taxable to a GUC/Litigation Trust Beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the GUC/Litigation Trust).  Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the GUC/Litigation Trust on account of Disputed Claims.

The GUC/Litigation Trust Trustee will comply with all applicable governmental withholding requirements (see Article 7.2 of the Plan).  Thus, in the case of any GUC/Litigation Trust Beneficiaries that are not U.S. persons, the GUC/Litigation Trust Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).  See "—C. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims or Interests," below.

(c)    Tax Treatment of Assets Allocable to Disputed Claims and Distributions From the GUC Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC/Litigation Trust Trustee of an IRS private letter ruling if the GUC/Litigation Trust Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC/Litigation Trust Trustee), the GUC/Litigation Trust Trustee (A) may elect to treat any GUC/Litigation Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., the GUC Disputed Claims Reserve) as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. All parties (including, without limitation, the Debtors, the GUC/Litigation Trust Trustee and the GUC/Litigation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

Accordingly, if a "disputed ownership fund" election is made, and likely even if such an election is not made, the GUC Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all actual and constructive distributions from such reserve (that is, to the extent assets were initially allocable to Disputed Claims, but pursuant to the Plan or GUC/Litigation Trust Agreement are no longer retained by the GUC Disputed Claims Reserve) will be taxable to the reserve as if sold at fair market value. Any taxes incurred by the GUC/Litigation Trust with respect to assets allocable to, or retained on account of, a Disputed Claim (including any taxes that would be incurred upon a distribution of such assets as a result of the resolution of the Disputed Claim) will be netted against the amounts otherwise distributable from the GUC Disputed Claims Reserve in respect of, or as a result of the resolution of, such Claim. It is currently anticipated that no assets allocable to, or retained on account of, a Disputed Claim will be released from the GUC Disputed Claims Reserve until such time as the cash otherwise distributable as a result of the resolution of such Claim is sufficient to pay any taxes incurred or that would be incurred upon the distribution.

Any actual or constructive distributions from the GUC Disputed Claims Reserve to a Holder of an Allowed General Unsecured Claim (including in respect of a previously Allowed Claim in the event a Disputed Claim is disallowed) generally should treated for U.S. federal income tax purposes as if received by such Holder directly from the Debtors on its original Claim. Thus, a holder of a previously Allowed Claim must be careful to differentiate between the tax treatment of actual or constructive distributions from GUC/Litigation Trust with respect to the GUC Disputed Claims Reserve and the tax treatment of distributions out of assets of the GUC/Litigation Trust to which the Holder is already considered the direct owner for U.S. federal income tax purposes (discussed above).

4.    U.S. Holders of Class 8A – Interests in SUNE

Pursuant to the Plan, on the Effective Date, Interests in SUNE will be deemed automatically cancelled, released, and extinguished and the obligations of the Debtors and the Reorganized Debtors thereunder will be discharged. Accordingly, U.S. Holders of Allowed Interests in SUNE should recognize a capital loss for U.S. federal income tax purposes in an amount equal to the Holder's adjusted tax basis of its SUNE common stock. The utilization of capital losses is subject to certain limitations under the Tax Code.

C.     Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims or Interests

Each Non-U.S. Holder should consult its tax advisor regarding the U.S. tax consequences to it of the transactions contemplated by the Plan

1.     Ownership and Disposition of New SUNE Common Stock/Continuing TERP Class A Shares

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to Cash and/or property received pursuant to the Plan, unless (a) such Holder is engaged in a trade or business in the United States to which income, gain or loss from a distribution is "effectively connected" for U.S. federal income tax purposes, or (b) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the distribution, and certain other requirements are met. Non-U.S. Holders that are engaged in a trade or business in the United States to which income, gain or loss from a distribution is effectively connected will be taxable on a net income basis at the applicable U.S. federal income tax rate and Non-U.S. Holders who are individuals present in the United States for 183 days or more in the taxable year of the distribution will be taxable on the gain or loss from the distribution at the U.S. federal income tax rates applicable to capital gains.

Any distributions made on New SUNE Common Stock/Continuing TERP Class A Shares will constitute dividends for U.S. federal income tax purposes to the extent of New SUNE/TERP's current or accumulated earnings and profits as determined under U.S. federal income tax principles. Unless a reduction or exemption applies, dividends paid on New SUNE Common Stock/Continuing TERP Class A Shares held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid on New SUNE Common Stock/Continuing TERP Class A Shares held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a trade or business generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder.

A Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax on gain realized on the sale or other taxable disposition of New SUNE Common Stock/Continuing TERP Class A Shares received pursuant to the Plan unless (i) such holder is an individual who was present in the United States for 183 days or more during the taxable year, and certain other conditions are met, (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business within the United States, or (iii) New SUNE or TERP is

or has been a USRPHC at any time within the shorter of the five-year period preceding such disposition or such holder's Holding period.

2.  GUC/Litigation Trust Interests

As discussed above (see "—B. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests—3. Tax Treatment of GUC/Litigation Trust and Holders of Beneficial Interests"), the GUC/Litigation Trust has been structured with the intent to qualify as a "grantor trust" for U.S. federal income tax purposes.  Accordingly, each Holder of an Allowed General Unsecured Claim receiving a beneficial interest in the GUC/Litigation Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the GUC/Litigation Trust Assets (consistent with its economic rights in the trust), and will thereafter be taxable accordingly for U.S. federal income tax purposes.

Thus, a Non-U.S. Holder of a GUC/Litigation Trust Interest may be subject to up to 30% withholding on the income or proceeds allocable to such persons, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.  A Non-U.S. Holder may also be subject to other adverse tax consequences in connection with the implementation of the Plan.

D.  Backup Withholding

Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup withholding generally applies if the Holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to properly report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Non-U.S. Holders that receive payments or distributions pursuant to the Plan will not be subject to backup withholding, provided that such holders furnish certification of their status as Non-U.S. persons (and furnish any other required certifications), or are otherwise exempt from backup withholding.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Holders are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

E.  Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND DOES NOT CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OF CLAIMS OR**

INTERESTS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

## ARTICLE X.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (A) continuation of the pending Chapter 11 Cases; (B) an alternative plan or plans of reorganization; or (C) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

A.    Continuation of the Bankruptcy Case

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtors in possession, but would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases. In particular, the Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors in possession and gaining access to sufficient liquidity to allow it to continue their operations as a going concern. And as further discussed herein, the Debtors believe that the Company has accomplished the goals that chapter 11 has allowed it to achieve, and that the Company's key remaining challenges and objectives do not require that the Company remain in chapter 11.

B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases (if the Debtors' exclusive period in which to file a chapter 11 plan has expired) could propose a different plan or plans. Such plans might involve either a reorganization and continuation of the Debtors' remaining business, or an orderly liquidation of the Debtors' assets or a combination of both.

C.    Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee (or trustees) would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. A chapter 7 trustee, who would lack the Debtors' knowledge of their affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Debtors' estates. If a trustee is (or trustees are) appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims may receive distributions of a

lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions. A liquidation under chapter 7 likely would result in smaller distributions made to creditors than that provided for in the Plan because of a number of factors, including, but not limited to: (i) additional Administrative Claims generated by conversion to a chapter 7 case, (ii) the administrative costs of liquidation, (iii) loss of value from remaining sales in the pipeline caused by, among other things, business discontinuity and loss of employee knowledge, (iv) associated delays in connection with a chapter 7 liquidation, (v) the low likelihood that recoveries on assets (including litigation assets) will be maximized in a chapter 7 case, and (vi) additional Claims, some of which would be entitled to priority, which would be generated during the chapter 7 liquidation process.

The Liquidation Analyses are premised upon a hypothetical liquidation in chapter 7 cases. In the Liquidation Analyses, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. Based on these analyses, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the Debtors' opinion, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford Holders of Claims and Interests as great a realization potential as does the Plan.

## ARTICLE XI.

## RECOMMENDATION

A.    Hearing on and Objections to Confirmation

1.    Confirmation Hearing

The Confirmation Hearing has been scheduled for July 20, 2017 at 10:00 a.m. (Eastern Time). Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

2.    Date Set for Filing Objections to Confirmation of the Plan

The time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for July 30, 2017 at 4:00 p.m. (Eastern time). A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

B.    Recommendation

The Debtors, the Supporting Second Lien Parties, and the Creditors' Committee recommend the Plan because it provides for greater distributions to the Holders of Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Claims. Accordingly,

the Debtors, the Supporting Second Lien Parties, and the Creditors' Committee recommend that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Dated:  June 12, 2017                    Respectfully submitted,


                                         SUNEDISON, INC. AND ITS AFFILIATE
                                         DEBTORS


                                         By: /s/John S. Dubel_____
                                              Name:  John S. Dubel
                                              Title:   Chief Executive Officer of
                                              SunEdison. Inc. and Chief
                                              Restructuring Officer of all Debtors

## EXHIBIT A

**First Amended Joint Plan of SunEdison, Inc., et al.**
**Pursuant to Chapter 11 of the United States Bankruptcy Code**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10992 (SMB)** |
|  | : |  |
| Debtors.[1] | : | **Jointly Administered** |
|  | : |  |

---

## FIRST AMENDED JOINT PLAN OF REORGANIZATION OF SUNEDISON, INC. AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000

James J. Mazza, Jr.
Louis S. Chiappetta

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (6273); SunE Minnesota Holdings, LLC (8926); TerraForm Private Holdings, LLC (5993); SunEdison Products, LLC (3557); Hudson Energy Solar Corporation (1344); SunE REIT-D PR, LLC (2171); First Wind Energy, LLC (5519); First Wind Holdings, LLC (4445); Vaughn Wind, LLC (9605); Maine Wind Holdings, LLC (4825); SunEdison International Construction, LLC (6257); and EchoFirst Finance Co., LLC (1607). Effective June 13, 2017, the address of the Debtors' corporate headquarters is Two City Place Drive, 2nd floor, St. Louis, MO 63141.

155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700

Anthony W. Clark
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000

*Attorneys for Debtor and Debtor-in-Possession*

Dated:        June 12, 2017

# TABLE OF CONTENTS

**Page**

Article I

DEFINITIONS, RULES OF
INTERPRETATION, AND COMPUTATION OF TIME

A.        Scope of Definitions..........................................................................................4
B.        Definitions ........................................................................................................4
C.        Rules of Interpretation....................................................................................34
D.        Computation Of Time .....................................................................................35
E.        References to Monetary Figures ......................................................................35
F.        Exhibits............................................................................................................35

Article II

ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1        Administrative Claims .....................................................................................36
2.2        Original and Replacement DIP Facility Claims ..............................................37
2.3        Professional Claims.........................................................................................39
2.4        Priority Tax Claims .........................................................................................41

Article III

CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1        Classification of Claims and Interests..............................................................41

Article IV

PROVISIONS FOR TREATMENT
OF CLAIMS AND INTERESTS

4.1        Second Lien Claims .........................................................................................44
4.2        Other Secured Claims ......................................................................................44
4.3        Other Priority Claims ......................................................................................45
4.4        General Unsecured Claims ...............................................................................46
4.5        Intercompany Claims .......................................................................................46
4.6        Other Subordinated Claims ..............................................................................47
4.7        Interests in Debtor Subsidiaries .......................................................................47
4.8        Interests in SUNE ............................................................................................48

i

## Article V

## ACCEPTANCE

5.1     Classes Entitled to Vote ....................................................................48
5.2     Acceptance by Impaired Classes .......................................................48
5.3     Elimination of Classes........................................................................48
5.4     Deemed Acceptance if No Votes Cast ...............................................49
5.5     Cramdown ...........................................................................................49

## Article VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.1     General Settlement of Claims and Interests .....................................49
6.2     [RESERVED]......................................................................................50
6.3     Restructuring Transactions. ...............................................................50
6.4     Sources of Cash for Plan Distribution...............................................50
6.5     Reinstated Second Lien Claims.   ......................................................51
6.6     Conversion and Distribution of Continuing TERP Class A Shares.  .................51
6.7     Administration of Repatriated Cash, Earnout Assets, and Residual Assets..........52
6.8     Certain Transfers Between SUNE and Other Debtors........................52
6.9     Authorization and Issuance of New SUNE Common Stock ...............52
6.10    GUC/Litigation Trust Initial Funding.   ............................................53
6.11    Exemptions from Securities Act Registration Requirements.............53
6.12    Cancellation of Old SUNE Securities and Agreements .....................53
6.13    Issuance and Distribution of New Securities; Execution of Plan
        Documents ..........................................................................................54
6.14    Continued Corporate Existence .........................................................54
6.15    Certificate of Incorporation and Bylaws ...........................................55
6.16    Directors and Officers of Reorganized Debtors ................................55
6.17    Corporate Action.................................................................................55
6.18    Effectuating Documents; Further Transactions ..................................55
6.19    Employment, Retirement, Indemnification and Other Agreements and
        Employee Compensation Programs ....................................................56
6.20    Preservation Of Causes Of Action .....................................................56
6.21    Reservation of Rights..........................................................................57
6.22    Exemption from Certain Transfer Taxes and Recording Fees ...........57
6.23    Insured Claims ....................................................................................57
6.24    Intercompany Account Settlement......................................................57
6.25    Private Company..................................................................................57

## Article VII

## GUC/LITIGATION TRUST

7.1     GUC/Litigation Trust Agreement ......................................................58
7.2     Class A and Class B GUC/Litigation Trust Interests.........................58

7.3     GUC/Litigation Trust Governance. ....................................................59
7.4     Tax Treatment..................................................................................60
7.5     GUC/Litigation Trust Assets ...........................................................61
7.6     GUC/Litigation Trust Causes of Action............................................61
7.7     Disputed Claims Reserve .................................................................62
7.8     Claims Objections and Transition Services.......................................62
7.9     Indemnification and Exculpation......................................................63
7.10    Preservation of Privilege and Defenses.............................................63
7.11    No Bonding of GUC/Litigation Trust Claims ...................................63
7.12    Service of the Indenture Trustees .....................................................63
7.13    Delivery of Distributions on Account of Second Lien Senior Notes Claims
        and Convertible Senior Notes Claims ..............................................64
7.14    Tax Determination. ..........................................................................64

### Article VIII

### UNEXPIRED LEASES AND EXECUTORY CONTRACTS

8.1     Rejection of Executory Contracts and Unexpired Leases ....................65
8.2     Assumption of Executory Contracts and Unexpired Leases ...............66
8.3     Indemnification Obligations..............................................................67
8.4     Insurance Policies ...........................................................................68
8.5     Cure Procedures and Payments Related to Assumption of Executory
        Contracts and Unexpired Leases......................................................70
8.6     Contracts, Intercompany Contracts, and Leases Entered into After the
        Petition Date ...................................................................................71
8.7     General Reservation of Rights..........................................................71
8.8     Surety Bonds...................................................................................72

### Article IX

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

9.1     Determination Of Claims and Interests..............................................72
9.2     Claims Administration Responsibility ...............................................73
9.3     Objections to Claims .......................................................................73
9.4     Disallowance of Claims ...................................................................73
9.5     Estimation of Claims .......................................................................74
9.6     No Interest on Disputed Claims........................................................74
9.7     Amendments to Claims ....................................................................75

### Article X

### PROVISIONS GOVERNING DISTRIBUTIONS

10.1    Distributions of GUC/Litigation Trust Interests to Holders of Second Lien
        Claims and General Unsecured Claims.............................................75
10.2    Time of Distributions ......................................................................75

10.3    Distribution Agent ..........................................................................75
10.4    Currency .......................................................................................75
10.5    Distributions on Account of Claims Allowed as of the Effective Date ...............76
10.6    Distributions on Account of Claims Allowed After the Effective Date ..............77
10.7    Delivery Of Distributions ..................................................................77
10.8    Accrual of Dividends and Other Rights .................................................79
10.9    Surrender of Securities or Instruments .................................................79
10.10   Compliance Matters .......................................................................80
10.11   Claims Paid or Payable by Third Parties ...............................................80
10.12   Setoffs ........................................................................................81
10.13   Allocation of Plan Distributions Between Principal and Interest ....................81

Article XI

EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

11.1    Vesting of Assets ...........................................................................81
11.2    Discharge of the Debtors ..................................................................82
11.3    Discharge of Liabilities Related to General Unsecured Claims and
        Convertible Senior Notes Claims .........................................................82
11.4    Compromises and Settlements ...........................................................82
11.5    Release by Debtors .........................................................................83
11.6    Release by Holders of Claims ............................................................84
11.7    Exculpation and Limitation of Liability .................................................84
11.8    Exclusions and Limitations on Exculpation, Indemnification, and Releases........85
11.9    Injunction.....................................................................................86
11.10   Subordination Rights.......................................................................86
11.11   Protection Against Discriminatory Treatment .........................................87
11.12   Recoupment ..................................................................................87
11.13   Release of Liens.............................................................................87
11.14   Reimbursement or Contribution .........................................................88

Article XII

CONDITIONS PRECEDENT

12.1    Conditions to Confirmation...............................................................88
12.2    Conditions to the Effective Date of the Plan ..........................................88
12.3    Waiver of Conditions Precedent .........................................................89
12.4    Notice of Effective Date...................................................................90
12.5    Effect of Non-Occurrence of Conditions to Consummation..............................90

Article XIII

RETENTION OF JURISDICTION

Article XIV

MISCELLANEOUS PROVISIONS

14.1     Binding Effect.....................................................................................................92
14.2     Payment of Statutory Fees..................................................................................92
14.3     Payment of Certain Additional Professional Fees ..............................................93
14.4     Payment of Fees of Second Lien Senior Notes Indenture Trustee and
         Second Lien Collateral Trustee. ........................................................................93
14.5     Modification and Amendments ..........................................................................93
14.6     Confirmation of the Plan ...................................................................................93
14.7     Additional Documents .......................................................................................93
14.8     Dissolution of Creditors' Committee ..................................................................94
14.9     Revocation, Withdrawal, or Non-Consummation ...............................................94
14.10    Notices...............................................................................................................94
14.11    Term of Injunctions or Stays .............................................................................96
14.12    Governing Law ..................................................................................................96
14.13    Entire Agreement ..............................................................................................97
14.14    Severability........................................................................................................97
14.15    No Waiver or Estoppel.......................................................................................97
14.16    Conflicts ............................................................................................................97

Article XV

SECOND LIEN LITIGATION

# EXHIBITS[2]

**Exhibit 2.1**          **Administrative Claim Request Form**

**Exhibit 6.1**          **Committee/BOKF Plan Settlement Term Sheet**

**Exhibit 6.5**          **Reinstated Second Lien Claim Modification Terms**

**Exhibit 6.12**         **Certificate of Incorporation and Bylaws**

**Exhibit 6.20**         **Retained Causes of Action**

**Exhibit 7.3**          **GUC/Litigation Trust Causes of Action**

**Exhibit 8.1**          **Assumed Executory Contracts and Unexpired Leases**

---

[2]    The Exhibits, other than Exhibit 6.1, will be filed with the Plan Supplement.

# INTRODUCTION

SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, "SunEdison" or the "Company") in the above-captioned cases (the "Chapter 11 Cases"), hereby propose this joint plan (this "Plan") for the resolution of the outstanding Claims and Interests. Capitalized terms used herein shall have the meanings ascribed to them in Article I.B of this Plan.

The Plan contemplates a chapter 11 reorganization resulting in two distinct corporate structures upon consummation: (1) Reorganized SUNE and its subsidiaries and (2) the GUC/Litigation Trust. The Plan incorporates, and is primarily funded by, the Debtors' sale, distribution or transfer of all of their interests in the YieldCos, either pursuant to the Jointly Supported Transactions or pursuant to the Plan immediately following the completion of the Jointly Supported Transactions.  With respect to TERP, pursuant to the TERP Merger Agreement and the TERP Settlement Agreement, and in exchange for the Debtors' Class B shares of TERP Inc. common stock and Class B units of TERP LLC, the Debtors will receive Class A shares of TERP Inc. common stock, and with respect to each Class A share of TERP Inc. common stock held by them (as of immediately prior to the consummation of the merger contemplated by the TERP Merger Agreement), either (1) elect to retain one Continuing TERP Class A Share (the "TERP Share Election Alternative") and receive $4.50 in Cash or (2) elect to receive $9.52 in Cash and retain zero Continuing TERP Class A Shares, subject to the election terms set forth in the TERP Merger Agreement (the "TERP Cash Election Alternative").[3]  The Debtors will only elect the TERP Cash Election Alternative in the event that (a) they do not receive a commitment to fully backstop the Rights Offering, (b) the Rights Offering Backstop Commitment is not approved by the Bankruptcy Court, or (c) the Equity Commitment Agreement is terminated prior to the date that the Debtors need to make their election.

Plan distributions will be made from a combination of equity and debt in Reorganized SUNE, interests in the GUC/Litigation Trust, Cash on hand, and Cash from proceeds received through a combination of the Rights Offering (in the TERP Share Election Alternative only) and the Jointly Supported Transactions.

In addition to the overall plan structure, the Plan also proposes or incorporates two settlements:

- First, the Plan is dependent on settlements of Claims and Causes of Action between the Debtors and each of the YieldCos.  The YieldCo Settlements, negotiations of which were first announced in late January 2017, were entered into as of March 6, 2017 and the YieldCo Settlement Motion was filed with the Bankruptcy Court on March 10, 2017.  As of the date hereof, the YieldCo Settlement Motion is pending

---

[3]    The dollar amounts set forth for each of the TERP Share Election Alternative and the TERP Cash Election Alternative exclude a special dividend in the amount of $1.94 per TERP Class A to be paid in Cash pursuant to the TERP Merger Agreement.

before the Bankruptcy Court.  As set forth herein, the value of the Debtors' settled Claims and Causes of Action will be distributed to the Debtors' creditors.

- Second, the Plan includes a settlement (the "Committee/BOKF Plan Settlement") among the Debtors, the Tranche B Roll-Up Lenders/Steering Committee of Prepetition Secured Lenders and Noteholders, the Creditors' Committee, and BOKF, N.A. (as Convertible Senior Notes Indenture Trustee).  The executed term sheet for the Committee/BOKF Plan Settlement is attached hereto as Exhibit 6.1.[4]  Pursuant to the Committee/BOKF Plan Settlement, on the Effective Date, the Debtors will transfer to the GUC/Litigation Trust for the benefit of Holders of General Unsecured Claims the following assets:

  o $7.5 million in Cash on account of the initial funding for the GUC/Litigation Trust as contemplated by the Committee DIP Settlement annexed to the Original DIP Facility Order and the Replacement DIP Facility Order (the "GUC/Litigation Trust Initial Funding");

  o all proceeds realized from the settlement on account of proceeds allocable from the D&O Insurance to certain estate Causes of Action against the Debtors' current or former directors or officers, which are expected to be $32 million in Cash (the "D&O Insurance Proceeds");

  o $18 million in Cash on account of the settlement of certain Avoidance Actions in connection with the YieldCo Settlement Motion (the "YieldCo Avoidance Allocation");

  o at least $5 million in Cash on account of Voluntary Professional Fee Reductions (the "Voluntary Professional Fee Reduction Amount"), as well as all additional Voluntary Professional Fee Reductions that exceed the Voluntary Professional Fee Reduction Amount; and

  o the GUC/Litigation Trust Causes of Action, subject to a sharing mechanism set forth in the Committee/BOKF Plan Settlement Term Sheet.

- Pursuant to the Committee/BOKF Plan Settlement, all pending litigation that has been commenced by the Creditors' Committee or BOKF, N.A. in the Chapter 11 Cases, including the UCC Challenge Litigation, the BOKF Objection, and the objections to the YieldCo Settlement Motion, will be held in abeyance pending the Bankruptcy Court's approval of the Committee/BOKF Plan Settlement and the Confirmation of the Plan.  The Plan serves as the Debtors' motion to approve the Committee/BOKF Plan Settlement under Bankruptcy Rule 9019, and Confirmation of the Plan shall be deemed approval of such settlement.  If the Committee/BOKF Plan Settlement is approved, the Plan is Confirmed, and the Plan becomes effective, all pending

---

[4]  To the extent of any inconsistency between the Plan and the Committee/BOKF Plan Settlement Term Sheet, the Committee/BOKF Plan Settlement Term Sheet shall prevail.

litigation will be deemed withdrawn with prejudice (and, if necessary, parties will file with the Bankruptcy Court any necessary withdrawal notices).

- The Committee/BOKF Plan Settlement also constitutes a complete settlement of any and all issues that may be in dispute (either currently or pending or that could be commenced in the future) regarding Annex II to the Replacement DIP Facility Order, including any right to receive amounts attributable to the Excess Non-Prepetition 1L/2L Obligor Sale Proceeds.

- The Creditors' Committee has agreed to support, and BOKF, N.A. has agreed not to object to, the Plan and related motions on the foregoing terms, as more fully set forth in the Committee/BOKF Plan Settlement Term Sheet.

- Holders of General Unsecured Claims, in their capacity as such, shall not be permitted to share or participate in (a) the Continuing TERP Class A Shares, (b) the Rights Offering, (c) the New SUNE Common Stock, and (d) the Reinstated Second Lien Claims.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. The Supporting Second Lien Parties, who collectively hold, in the aggregate, approximately 80% in amount of the Second Lien Claims, support the Plan on the terms set forth in the Equity Commitment Agreement. The Creditors' Committee also supports, and BOKF, N.A. has agreed not to object to, the Plan on the terms set forth in the Committee/BOKF Plan Settlement. The distributions to be made to Holders of Claims are set forth herein. The Debtors' non-Debtor subsidiaries are not subject to the Chapter 11 Cases. **None of the YieldCos (defined below) nor their respective direct and indirect subsidiaries are included as "Debtors" in these Chapter 11 Cases.**

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a Holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests. The Disclosure Statement relating to this Plan was approved by the Bankruptcy Court on June 12, 2017 and has been made available to all parties whose votes are being solicited. The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, a summary and analysis of the settlements contained in the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIV of this Plan, the Debtors, with the consent of the Supporting Second Lien Parties and, to the extent affecting the Creditors' Committee or any Holders of General Unsecured Claims, the reasonable consent of the Creditors' Committee, expressly reserve their rights to

3

alter, amend, modify, revoke, or withdraw this Plan, one or more times, prior to this Plan's substantial consummation.

# ARTICLE I

## DEFINITIONS, RULES OF
## INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope of Definitions

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

1.1    "**2018 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2018 Convertible Senior Notes Indenture, bearing interest at a rate of 2.00% per annum and issued in an aggregate principal amount of $600 million.

1.2    "**2018 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of December 20, 2013, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2018 Convertible Senior Notes.

1.3    "**2020 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2020 Convertible Senior Notes Indenture, bearing interest at a rate of 0.25% per annum and issued in an aggregate principal amount of $600 million.

1.4    "**2020 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of June 10, 2014, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2020 Convertible Senior Notes.

1.5    "**2020 Exchangeable Notes**" means the notes issued by Seller Note, LLC and guaranteed by SUNE under the 2020 Exchangeable Notes Indenture, bearing interest at a rate of 3.75% per annum and issued in an aggregate principal amount of $336,470,000.

1.6    "**2020 Exchangeable Notes Indenture**" means that certain Indenture, dated as of January 29, 2015, by and among Seller Note, LLC, as issuer, SUNE, as guarantor, and BOKF, N.A. or its successor or successors (as may be amended or supplemented from time to time) governing the 2020 Exchangeable Notes.

1.7    "**2021 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2021 Convertible Senior Notes Indenture, bearing interest at a rate of 2.75% per annum and issued in an aggregate principal amount of $600 million.

4

1.8    "**2021 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of December 20, 2013, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2021 Convertible Senior Notes.

1.9    "**2022 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2022 Convertible Senior Notes Indenture, bearing interest at a rate of 2.375% per annum and issued in an aggregate principal amount of $460 million.

1.10    "**2022 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of January 27, 2015, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2022 Convertible Senior Notes.

1.11    "**2023 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2023 Convertible Senior Notes Indenture, bearing interest at a rate of 2.625% per annum and issued in an aggregate principal amount of $450 million.

1.12    "**2023 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of May 20, 2015, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2023 Convertible Senior Notes.

1.13    "**2025 Convertible Senior Notes**" means the Convertible Senior Notes issued by SUNE under the 2025 Convertible Senior Notes Indenture, bearing interest at a rate of 3.375% per annum and issued in an aggregate principal amount of $450 million.

1.14    "**2025 Convertible Senior Notes Indenture**" means that certain Indenture, dated as of May 20, 2015, by and between SUNE and the Convertible Senior Notes Indenture Trustee (as may be amended or supplemented from time to time) governing the 2025 Convertible Senior Notes.

1.15    "**Accredited Investor**" has the meaning set forth in section 230.501(a) of title 17 of the Code of Federal Regulations.

1.16    "**ACE Policy**" has the meaning ascribed to such term in Article 8.4(c).

1.17    "**Additional Net Avoidance Action Proceeds**" means any Net Avoidance Actions Proceeds recovered that exceed $63 million in the aggregate.

1.18    "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Section 503(b)(9) Claims, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as

Administrative Claims pursuant to a Final Order of the Bankruptcy Court (under section 546(c)(2)(A) of the Bankruptcy Code or otherwise).

         **1.19** "**Administrative Claims Bar Date**" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to the Original DIP Facility Claims, the Replacement DIP Facility Claims, and Professional Claims, which shall be subject to the provisions of Articles 2.2 and 2.3 hereof, as applicable.

         **1.20** "**Affected Professional**" has the meaning ascribed to such term in Article 2.3(d).

         **1.21** "**Affiliates**" has the meaning ascribed to such term by section 101(2) of the Bankruptcy Code; provided, however, that, for purposes of this Plan, the term "Affiliates" with reference to Affiliates of the Debtors or Reorganized Debtors shall not include any of the YieldCos.

         **1.22** "**Allowed**" means, for distribution purposes, a Claim or Interest, or any portion thereof, or a particular Class of Claims or Interests (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as the Reorganized Debtor and the Holder of such Claim or Interest agree may adjudicate such Claim or Interest and objections thereto), (b) which is not the subject of a proof of Claim timely filed with the Bankruptcy Court and is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent, (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or, (iii) following the Effective Date, with respect to General Unsecured Claims, as otherwise may be determined by the GUC/Litigation Trust in accordance with the GUC/Litigation Trust Agreement, or (d) that is expressly allowed in a liquidated amount pursuant to this Plan.

         **1.23** "**Applicable Issuer**" has the meaning ascribed to such term in the Replacement DIP Facility Order.

         **1.24** "**Assumption and Rejection Procedures**" means the expedited procedures for the Debtors to assume or reject Executory Contracts and Unexpired Leases pursuant to the Bankruptcy Court's order dated May 13, 2016 (Docket No. 280).

         **1.25** "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors and their recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under section 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code.

1.26    "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

1.27    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

1.28    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

1.29    "**Bar Date**" means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Orders or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.

1.30    "**Bar Date Orders**" means the orders entered by the Bankruptcy Court on August 10, 2016 (Docket No. 948), March 22, 2017 (Docket No. 2627), and May 16, 2017 (Docket No. 3410) and any subsequent order supplementing such orders or relating thereto.

1.31    "**BOKF Objection**" means the *Objection to Proofs of Claim Nos. 1490 and 3555* filed by BOKF, N.A., as indenture trustee for certain convertible unsecured notes issued by SunEdison, Inc. (Docket No. 1455).

1.32    "**Brookfield**" means Brookfield Asset Management, Inc. or one or more of its subsidiaries that are party to the Jointly Supported Transactions.

1.33    "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

1.34    "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.35    "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable, in contract or in tort, directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by any Debtor, all claims, suits or proceedings relating to

enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.36    "**Certificate**" means any instrument evidencing a Claim or an Interest.

1.37    "**Chapter 11 Cases**" means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court under Case No. 16-10992 (SMB).

1.38    "**Chubb Companies**" shall mean ACE American Insurance Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, ACE Property and Casualty Insurance Company, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance Company, Federal Insurance Company, Executive Risk Specialty Insurance Company, Executive Risk Indemnity, Inc., ESIS, Inc. and each of their respective affiliates. For the avoidance of doubt, the Chubb Companies are "insurers" as that term is used herein.

1.39    "**Chubb Insurance Contracts**" means all insurance policies that have been issued by any of the Chubb Companies that provide coverage to any of the Debtors (or any of their predecessors), and all agreements, documents or instruments relating thereto. For the avoidance of doubt, (i) Policy Number DON G23652389009 issued by ACE American Insurance Company, which comprises a portion of the D&O Insurance, is one of the Chubb Insurance Contracts, and (ii) the Chubb Insurance Contracts are "Insurance Contracts," as that term is used herein.

1.40    "**Claim**" means a claim against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

1.41    "**Claims and Solicitation Agent**" means Prime Clerk LLC, 830 Third Avenue, 9th Floor, New York, New York 10022, Attention: SunEdison Case Administration.

1.42    "**Claims Objection Deadline**" means, as applicable (except for Administrative Claims), (a) the day that is the later of the first Business Day that is at least 180 days after the Effective Date or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.

1.43    "**Class**" means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in Article III of this Plan.

1.44    "**Class A GUC/Litigation Trust Interest**" means an interest in the GUC/Litigation Trust representing all of the GUC/Litigation Trust Assets, other than forty-eight percent (48%) of the Additional Net Avoidance Action Proceeds.

**1.45** "**Class B GUC/Litigation Trust Interest**" means an interest in the GUC/Litigation Trust representing a right of recovery to forty-eight percent (48%) of the Additional Net Avoidance Action Proceeds as further set forth in Article 7.2(b).

**1.46** "**Committee DIP Settlement**" means the Committee Settlement Annex as incorporated as Annex II to the Replacement DIP Facility Order.

**1.47** "**Committee/BOKF Plan Settlement**" means the settlement among the Debtors, the Creditors' Committee, BOKF, N.A. (as Convertible Senior Notes Indenture Trustee), and the Tranche B Roll-Up Lenders/Steering Committee of Prepetition Secured Lenders and Noteholders, as set forth in the Committee/BOKF Plan Settlement Term Sheet.

**1.48** "**Committee/BOKF Plan Settlement Term Sheet**" means the term sheet attached hereto as Exhibit 6.1, which sets forth the terms and conditions of the Committee/BOKF Plan Settlement.

**1.49** "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, subject to all conditions specified in Article 12.1 having been satisfied or waived, in accordance with the terms herein.

**1.50** "**Confirmation Date**" means the date on which Confirmation occurs.

**1.51** "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters as such hearing may be adjourned or continued from time to time.

**1.52** "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code in form and substance reasonably satisfactory to the Supporting Second Lien Parties and the Creditors' Committee.

**1.53** "**Contingency Fee Advisor Retention Notice**" has the meaning ascribed to such term in Article 7.3.

**1.54** "**Continuing TERP Class A Shares**" means the Class A shares of TERP Inc. common stock to be retained by the Debtors pursuant to the Jointly Supported Transactions.

**1.55** "**Convertible Senior Noteholder**" means a Holder of Convertible Senior Notes.

**1.56** "**Convertible Senior Notes**" means, collectively, the 2018 Convertible Senior Notes, the 2020 Convertible Senior Notes, the 2021 Convertible Senior Notes, the 2022 Convertible Senior Notes, the 2023 Convertible Senior Notes, the 2025 Convertible Senior Notes, and the 2020 Exchangeable Notes.

**1.57** "**Convertible Senior Notes Claim**" means any and all Claims held by the Convertible Senior Noteholders against SUNE arising under or related to the Convertible Senior Notes.

9

**1.58** "**Convertible Senior Notes Indenture Trustee**" means BOKF, N.A. or its successor or successors, in its or their capacity as indenture trustee for the Convertible Senior Notes pursuant to the Convertible Senior Notes Indentures.

**1.59** "**Convertible Senior Notes Indentures**" means the 2018 Convertible Senior Notes Indenture, the 2020 Convertible Senior Notes Indenture, the 2021 Convertible Senior Notes Indenture, the 2022 Convertible Senior Notes Indenture, the 2023 Convertible Senior Notes Indenture, the 2025 Convertible Senior Notes Indenture, and the 2020 Exchangeable Notes Indenture.

**1.60** "**Creditor**" has the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.61** "**Creditors' Committee**" means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on April 29, 2016, as may be reconstituted from time to time.

**1.62** "**Cure**" means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.63** "**Cure Notice**" means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Article 8.5 of the Plan.

**1.64** "**Cure Objection Deadline**" means the deadline for filing objections to a Cure Notice or proposed Cure, which shall be on or before fourteen (14) days after the applicable counterparty was served with a Cure Notice.

**1.65** "**D&O Insurance**" means insurance maintained by the Debtors which covers, among others, current or former directors and officers of the Debtors or any of them, including any runoff policies or tail coverage, including, but not limited to, those insurance policies set forth in Exhibit 1 to the *Order Granting Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 362, Bankruptcy Rule 4001, and Local Bankruptcy Rule 4001-1 Authorizing Modification of the Automatic Stay, to the Extent Applicable, to Allow for Reimbursement and/or Payment of Defense Costs Under Directors' and Officers' Insurance Policies* (Docket No. 368).

**1.66** "**D&O Insurance Proceeds**" has the meaning ascribed to such term in the Introduction.

**1.67** "**D&O Settlement Agreement**" means that certain Settlement Agreement contemplated to be entered into by and among the Debtors, the Creditors' Committee, and the Individual Defendants (as defined therein).  A form of the D&O Settlement Agreement was attached to the Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b), and Bankruptcy Rules 6004 and 9019, Authorizing and Approving D&O Mediation Settlement Agreement and D&O Insurance Cooperation Agreement, filed on June 7, 2017 at Docket No. 3296.

**1.68** "**Debtor Group**" has the meaning ascribed to such term in Article 3.1.

**1.69** "**Debtor Professionals**" has the meaning ascribed to such term in the definition of Released Parties.

**1.70** "**Debtor Subsidiaries**" means each Debtor that is a direct or indirect subsidiary of SUNE.

**1.71** "**Debtors**" means, collectively, SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); TerraForm Private Holdings, LLC (5993); SunEdison Products, LLC (3557); Hudson Energy Solar Corporation (1344); SunE REIT-D PR, LLC (2171); First Wind Energy, LLC (5519); First Wind Holdings, LLC (4445); Vaughn Wind, LLC (9605); Maine Wind Holdings, LLC (4825); SunEdison International Construction, LLC (6257); and EchoFirst Finance Co., LLC (1607).

**1.72** "**Disallowed**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the

Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.73 "**Disclosure Statement**" means the disclosure statement or any supplements thereto (including the Plan Supplement and all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time in accordance with the terms therein, in form and substance reasonably satisfactory to the Supporting Second Lien Parties, and the Creditors' Committee, all as approved by an order of the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.74 "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement, in form and substance reasonably satisfactory to the Supporting Second Lien Parties and the Creditors' Committee, as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

1.75 "**Disputed**" means with respect to a Claim, (a) any Claim as to which any Debtor or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by any Debtor, or other parties-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.76 "**Distribution Agent**" means any Entity selected by the Debtors or the Reorganized Debtors, in their sole discretion, to make or facilitate distributions pursuant to this Plan.

1.77 "**Distribution Date**" means the date selected by the Reorganized Debtors, in their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

1.78 "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court; provided, however, that the Distribution Record Date shall not apply to any Claim governed by an Indenture. All distributions under this Plan to Holders of Allowed Claims that are governed by an Indenture shall be made in accordance with DTC's procedures (as applicable).

1.79 "**District Court**" means the United States District Court for the Southern District of New York.

1.80 "**DTC**" means the Depository Trust Company, and its successors and assigns.

**1.81** "**Earnout Asset**" means any contract, agreement, right or other asset that gives rise to the right to receive Cash or non-Cash proceeds, including conditional or contingent consideration, in connection with the Debtors' or Reorganized Debtors' or their respective subsidiaries' disposition of any asset.

**1.82** "**Earnout Proceeds**" means the Cash or non-Cash proceeds received directly or indirectly by any Debtor or Reorganized Debtor on account of any Earnout Asset.

**1.83** "**Effective Date**" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan specified in Article 12.2, have been satisfied, or, if capable of being waived in accordance with the terms herein, waived, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court.

**1.84** "**Eligible Holder**" means a Holder of an Allowed Second Lien Claim who is an Accredited Investor.

**1.85** "**Employee Compensation Plans**" means, collectively, the KEIP, the KERP, the Utility Project Incentive Plan, the RSC Deal Incentive Plan, the C&I Deal Incentive Plan, and any other employee compensation plan implemented by the Debtors in the ordinary course of business.

**1.86** "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

**1.87** "**EPL Policy**" means insurance maintained by the Debtors related to certain employment-related claims which covers, among others, current or former directors and officers of the Debtors or any of them, including any runoff policies or tail coverage, including, but not limited to, Continental Casualty Company's Employment Practices Liability Solutions Insurance Policy Number 596411042.

**1.88** "**Equity Commitment Agreement**" means that certain Commitment Agreement, by and among SUNE and the backstop purchasers set forth therein, dated as of May 19, 2017 (as may be amended, supplemented, or modified from time to time), a copy of which is attached to the order entered by the Bankruptcy Court on June 6, 2017 at Docket No. 3283.

**1.89** "**Equity Security**" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

**1.90** "**ERISA**" means the Employee Retirement Income Security Act of 1974.

**1.91** "**Estates**" means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.92** "**Event**" means any event, development, occurrence, circumstance or change.

**1.93** "**Excess Non-Prepetition 1L/2L Obligor Sale Proceeds**" has the meaning set forth in the Replacement DIP Facility Order, the determination of which amount is being settled pursuant to the Committee/BOKF Plan Settlement described in Section 6.1 herein.

**1.94** "**Exchange Act**" means the Securities Exchange Act of 1934, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

**1.95** "**Exchangeable Notes Claim**" means any and all Claims held by the Holders of 2020 Exchangeable Notes against SUNE arising under or related to the 2020 Exchangeable Notes.

**1.96** "**Exculpated Claim**" means any claim (as defined in section 101(5) of the Bankruptcy Code ) or Legal Proceeding against any Entity related to any act or omission in connection with, relating to, or arising out of the Debtors' restructuring, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Rights Offering, the Jointly Supported Transaction Agreements, the YieldCo Avoidance Allocation, the settlement of the Creditors' Committee's claims and Causes of Action against the Prepetition Secured Parties as proposed by the Debtors in the Plan, the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases, the negotiation of the Plan, the Original DIP Credit Agreement, the Replacement DIP Credit Agreement, the GUC/Litigation Trust Agreement, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration, consummation, and implementation of the Plan, including the issuance of Plan securities, the distribution of property under the Plan, the Jointly Supported Transactions or any other transaction contemplated by the Plan or Disclosure Statement, or in furtherance thereof.

**1.97** "**Exculpated Parties**" means, collectively, each of the following solely in their respective capacities as such: (a) the Debtors, and each of their successors and assigns, (b) the Reorganized Debtors, (c) the Rights Offering Backstop Purchasers, (d) the Supporting Second Lien Parties, (e) the Original DIP Lenders and all other Original DIP Secured Parties, (f) the Original DIP Agents, (g) the Replacement DIP Lenders, (h) the Replacement DIP Agents, (i) the Creditors' Committee and each of its members, solely in their capacity as such, (j) the Prepetition First Lien Secured Parties, (k) the Prepetition First Lien Agents, (l) the Indenture Trustees, (m) the Second Lien Agents, (n) any underwriters, arrangers, or placement agents in respect of the Second Lien Senior Notes, (o) the Second Lien Collateral Trustee, (p) TERP Inc., TERP LLC, and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after April 21, 2016), (q) GLBL Inc., GLBL LLC, and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after April 21, 2016), (r) the Applicable Issuers, and (s) with respect to each of the foregoing parties in clauses (a) through (r), such parties' subsidiaries, Affiliates, officers, directors, principals, members, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other representatives and professionals (but solely in their capacities related to the functions that such primary exculpated party is receiving

14

exculpation for in clauses (a) through (r)); provided, that, solely with respect to the Debtors' directors and officers, this clause (s) shall apply only to (i) the Existing Directors (and their counsel) and (ii) the Debtors' officers who continued to serve in such roles as of March, 28, 2017 (the initial filing of this Plan).

     **1.98** "**Executory Contract**" means any contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

     **1.99** "**Exhibit**" means an exhibit annexed either to this Plan, contained in the Plan Supplement, or annexed as an appendix to the Disclosure Statement.

     **1.100** "**Existing Directors**" means Antonio R. Alvarez, Clayton C. Daley, Jr., Claire Gogel, Emmanuel T. Hernandez, Georganne C. Proctor, James B. Williams and Randy H. Zwirn, each in his or her respective capacity as a director of the SUNE prior to the Effective Date.

     **1.101** "**Existing L/Cs**" has the meaning ascribed to such term in the Replacement DIP Facility Order.

     **1.102** "**Face Amount**" means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any proof of Claim, or amendment thereof in accordance with applicable law, timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, or the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to an Allowed Claim or Allowed Interest, the allowed amount of such Claim or Interest. If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

     **1.103** "**Fee Examiner"** has the meaning ascribed to such term in Article 2.3(d).

     **1.104** "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

     **1.105** "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

1.106 "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, an Original DIP Facility Claim, Replacement DIP Facility Claim, Priority Tax Claim, Second Lien Claim, Other Secured Claim, Other Priority Claim, Intercompany Claim, or Other Subordinated Claim.  Without limiting the foregoing, General Unsecured Claims include all Rejection Damages Claims that are not Allowed Section 503(b)(9) Claims and all Exchangeable Notes Claims.

1.107 "**GLBL**" means, collectively, GLBL Inc., GLBL LLC, and their direct and indirect subsidiaries.

1.108 "**GLBL Inc.**" means TerraForm Global, Inc.

1.109 "**GLBL LLC**" means TerraForm Global, LLC.

1.110 "**GLBL Merger Agreement**" means the Agreement and Plan of Merger, dated as of March 6 2017, by and among GLBL Inc. and certain affiliates of Brookfield.

1.111 "**GLBL Settlement Agreement**" means the Settlement Agreement, dated as of March 6, 2017, by and among SUNE, GLBL Inc., and certain of their respective affiliates. A copy of the GLBL Settlement Agreement was filed as an attachment to the YieldCo Settlement Motion.

1.112 "**GLBL Voting and Support Agreement**" means that certain Voting and Support Agreement, dated as of March 6, 2017, by and among SUNE, SunEdison Holdings Corporation, GLBL Inc., and certain affiliates of Brookfield.  A copy of the GLBL Voting and Support Agreement was filed as an attachment to the Voting and Support Motion.

1.113 "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.114 "**GUC Disputed Claims Reserve**" means assets of the GUC/Litigation Trust allocable to, or retained on account of, Disputed General Unsecured Claims.

1.115 "**GUC/Litigation Trust**" means the "SunEdison GUC/Litigation Trust" established pursuant to the GUC/Litigation Trust Agreement, the Original DIP Facility Order, and the Replacement DIP Facility Order.

1.116 "**GUC/Litigation Trust Agreement**" means the GUC/Litigation Trust Agreement, as may be amended, supplemented, restated, or otherwise modified from time to time pursuant to the terms thereof, by and between the Debtors and the GUC/Litigation Trust Trustee, the then-current form of which shall be included in the Plan Supplement, and which shall be consistent with the Committee/BOKF Plan Settlement Term Sheet.

1.117 "**GUC/Litigation Trust Assets**" means (i) the GUC/Litigation Trust Initial Funding, (ii) the GUC/Litigation Trust Causes of Action that have not already been settled as of the Effective Date, (iii) the D&O Insurance Proceeds, (iv) the YieldCo Avoidance Allocation, and (v) the Voluntary Professional Fee Reduction Amount.  Except as otherwise prescribed by this Plan or the GUC/Litigation Trust Agreement, the GUC/Litigation Trust Assets

shall be transferred to the GUC/Litigation Trust by the Debtors or by any other Person then in possession of GUC/Litigation Trust Assets, as applicable, on the Effective Date.

   **1.118 "GUC/Litigation Trust Beneficiaries"** means the Holders of GUC/Litigation Trust Interests.

   **1.119 "GUC/Litigation Trust Causes of Action"** mean all Causes of Action of the Debtors' Estates as of the Effective Date, including all Estate Avoidance Actions (other than Avoidance Actions against the Yieldcos and Avoidance Actions against the Prepetition First Lien Secured Parties and the Second Lien Creditors), to the extent such Causes of Action are not released, or settled with the consent of the Creditors' Committee, pursuant to Article 11.5 of this Plan or released or settled pursuant to an Order of the Bankruptcy Court or the Committee/BOKF Plan Settlement Term Sheet.

   **1.120 "GUC/Litigation Trust Initial Funding"** has the meaning ascribed to such term in the Introduction.

   **1.121** "**GUC/Litigation Trust Interests**" means the Class A GUC/Litigation Trust Interests and the Class B GUC/Litigation Trust Interests.

   **1.122 "GUC/Litigation Trust Oversight Board"** means the oversight board created by the Creditors' Committee to oversee the GUC/Litigation Trust, the members of which shall be set forth in the Plan Supplement. Any compensation to be paid to the members of the GUC/Litigation Trust Oversight Board shall be paid, first, from the GUC/Litigation Trust Initial Funding and, then, after such funding is exhausted, from other GUC/Litigation Trust Assets. The GUC/Litigation Trust Oversight Board will owe fiduciary duties to the GUC/Litigation Trust Beneficiaries.

   **1.123** "**GUC/Litigation Trust Reports**" means semi-annual reports, provided by the GUC/Litigation Trust Trustee, containing, among other things, descriptions in reasonable detail of all Net Avoidance Actions Proceeds collected during the relevant half-year and all fees and expenses expended in connection therewith.

   **1.124 "GUC/Litigation Trust Trustee"** means the Person selected by the Creditors' Committee or the GUC/Litigation Trust Oversight Board (as applicable) pursuant to the GUC/Litigation Trust Agreement to serve as trustee of the GUC/Litigation Trust from time to time. Any compensation to be paid to the GUC/Litigation Trust Trustee shall be paid, first, from the GUC/Litigation Trust Initial Funding and, then, after such funding is exhausted, from other GUC/Litigation Trust Assets. The GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board will owe fiduciary duties to the GUC/Litigation Trust Beneficiaries.

   **1.125** "**Holdback Escrow Account**" means the interest-bearing escrow account into which Cash equal to the Holdback Escrow Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims (as Allowed pursuant to the terms of this Plan) to the extent not previously paid or disallowed.

   **1.126** "**Holdback Escrow Amount**" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of

17

Professional Claims pursuant to the Professional Fee Order and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to Article 2.3(c) of the Plan attributable to fees incurred as of the Confirmation Date, less (c) the Voluntary Professional Fee Reduction Amount; provided, however, that if a Professional does not provide an estimate pursuant to Article 2.3(c), the Debtors (with the consent of the Supporting Second Lien Parties) may estimate the unbilled fees of such Professional incurred as of the Confirmation Date, and the sum of provision (a) above and the total amount so estimated shall comprise the Holdback Escrow Amount.

 1.127 "**Holder**" means a holder of a Claim against or Interest in the Debtors.

 1.128 "**Impaired**" means impaired within the meaning of section 1124 of the Bankruptcy Code.

 1.129 "**Indemnitee**" means an Existing Director or a Person employed by a Debtor or serving as a director or officer of a Debtor immediately prior to the Effective Date and who, acting in their respective capacities as such immediately prior to the Effective Date, are entitled to assert Indemnification Obligations.

 1.130 "**Indemnification Obligations**" means obligations of a Debtor, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to such Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtor.

 1.131 "**Indenture Trustees**" means the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee.

 1.132 "**Indentures**" means the Convertible Senior Notes Indentures and the Second Lien Senior Notes Indenture.

 1.133 "**Insurance Contract**" has the meaning ascribed to it in Article 8.4 of this Plan.

 1.134 "**Insured Claims**" has the meaning ascribed to it in Article 8.4 of this Plan.

 1.135 "**Intercompany Claim**" means a Claim or a Cause of Action by SUNE or any direct or indirect subsidiary of SUNE against SUNE or any direct or indirect subsidiary of SUNE, in each case other than (i) any Claim or Cause of Action by or against any YieldCo, (ii) any Claim or Cause of Action by a non-Debtor against another non-Debtor, and (iii) any Claim or Cause of Action by a Debtor against a non-Debtor.  For the avoidance of doubt, any Intercompany Claim of a Debtor or a non-Debtor guarantor of the Original DIP Facility, the Replacement DIP Facility, the Second Lien Loans, or the Second Lien Senior Notes constitutes collateral for such Original DIP Facility Claims, Replacement DIP Facility Claims or Second Lien Claims.

**1.136** "**Interest**" means any Equity Security of a Debtor existing immediately prior to the Effective Date.

**1.137** "**Investigation/Prosecution Cap**" has the meaning ascribed to such term in the Committee/BOKF Plan Settlement Term Sheet.

**1.138** "**Jointly Supported Transaction Agreements**" means any and all agreements entered into by and between any of the Debtors, any of the YieldCos, and/or one or more purchasers in connection with a Jointly Supported Transaction, including any asset purchase agreements, stock purchase agreements, merger agreements, or other agreements effectuating and consummating a Jointly Supported Transaction, and any exhibits, attachments, annexes, or schedules to any of the foregoing, the form(s) of which shall be included in the Plan Supplement. The Jointly Supported Transaction Agreements include the Voting and Support Agreements, the YieldCo Settlement Agreements, and the Merger Agreements.

**1.139** "**Jointly Supported Transactions**" means one or more transactions, each structured as a merger, sale, or other business combination, pursuant to which the Debtors or the YieldCos, as applicable, will transfer a material part of the equity or assets of the YieldCos, in each case that TERP or GLBL, as applicable, and SunEdison have agreed in writing. The Jointly Supported Transactions include the transactions pursuant to which Brookfield is to acquire 51% of TERP Inc.'s outstanding stock in a sponsorship merger transaction and 100% of GLBL Inc.'s outstanding stock in a whole company cash merger, in each case as more fully described in the YieldCo Settlement Motion and the Jointly Supported Transaction Agreements.

**1.140** "**KEIP**" means the Key Employee Incentive Plan for certain of the Debtors' officers and management adopted by the Debtors and approved by the Bankruptcy Court on September 16, 2016 (Docket No. 1205).

**1.141** "**KERP**" means the Key Employee Retention Plan for certain of the Debtors' officers and management adopted by the Debtors and approved by the Bankruptcy Court on July 29, 2016 (Docket No. 871) and on August 3, 2016 (Docket No. 903).

**1.142** "**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

**1.143** "**L/C Borrowing**" has the meaning set forth in the Original DIP Credit Agreement.

**1.144** "**L/C Borrowing Claims**" means any and all Claims against the Debtors arising under or related to the Original DIP Credit Agreement on account of L/C Borrowings, which shall be Allowed as set forth in this Plan.

**1.145** "**L/C Cash Collateralization Agreements**" has the meaning ascribed to such term in the Replacement DIP Facility Order.

**1.146** "**Legal Proceeding**" means legal, governmental, administrative, judicial, or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, notices of noncompliance or violation, or proceedings.

**1.147** "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

**1.148** "**MDL Litigation**" means the centralized and consolidated actions against SUNE, the YieldCos, the Debtors' and the YieldCos' current and former directors and officers, the underwriters of certain securities and debt offerings of the Debtors or the YieldCos, and SUNE's independent auditor pending before the Honorable P. Kevin Castel in the District Court (MDL No. 2742).

**1.149** "**Mediation**" means the private mediation process initiated pursuant to the Mediation/Stay Order.

**1.150** "**Mediation/Stay Order**" means the order (as may be amended, modified, or supplemented, from time to time) entered by the District Court on December 19, 2016 directing the parties in the MDL Litigation and certain other shareholder lawsuits to participate in a private mediation and granting a limited stay of all such actions through March 31, 2017.

**1.151** "**Merger Agreements**" means the GLBL Merger Agreement and TERP Merger Agreement.

**1.152** "**Net Avoidance Action Proceeds**" means proceeds recovered by the GUC/Litigation Trust (or for the benefit of unsecured creditors) on account of Avoidance Actions, net of fees and expenses expended to prosecute such Avoidance Actions (including fees paid on a contingency arrangement, any expenses of prosecuting the GUC/Litigation Trust Causes of Action or administering the GUC/Litigation Trust, including, without limitation, the costs associated with preparation of the GUC/Litigation Trust Reports, all of which shall be deducted prior to any distribution of Net Avoidance Action Proceeds), other than proceeds from those Avoidance Actions against the YieldCos that are settled in connection with the YieldCo Avoidance Allocation, whether such Net Avoidance Actions Proceeds are recovered pursuant to the successful prosecution or settlement of such Avoidance Actions.

**1.153** "**New Boards**" means the initial boards of directors of the Reorganized Debtors, which shall as of the Effective Date consist of members selected by the Supporting Second Lien Parties and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing.

**1.154** "**New SUNE Common Stock**" means the shares of new common stock of Reorganized SUNE.

**1.155** "**Non-Eligible Holder**" means any Holder of an Allowed Claim that is not an Eligible Holder.

**1.156** "**Old SUNE Common Stock**" means shares of common stock of SUNE that are authorized, issued, and outstanding prior to the Effective Date.

**1.157** "**Old SUNE Securities**" means, collectively, the Second Lien Senior Notes (other than Second Lien Senior Notes that constitute Reinstated Second Lien Claims), the Convertible Senior Notes (except for the 2020 Exchangeable Notes), and Old SUNE Common

Stock, and all options, warrants, rights and other instruments evidencing an ownership interest in SUNE (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

**1.158** "**Ordinary Course Professionals Order**" means the Bankruptcy Court's Final Order Pursuant to Bankruptcy Code Sections 105(a), 327, 330, and 331 Authorizing Debtors to Employ and Pay Professionals Utilized in the Ordinary Course of Business (Docket No. 517).

**1.159** "**Original DIP Agent**" means Deutsche Bank AG New York Branch, in its capacity as administrative agent for the Original DIP Lenders pursuant to the Original DIP Credit Agreement (and, together with all other Agents under (and as defined in) the Original DIP Credit Agreement, the "Original DIP Agents").

**1.160** "**Original DIP Credit Agreement**" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, between SunEdison, Inc., the Original DIP Lenders, the Original DIP Agent and the other parties thereto, dated as of April 26, 2016, as has been or may be amended, restated, supplemented or otherwise modified from time to time (but not including the Replacement DIP Credit Agreement).

**1.161** "**Original DIP Facility**" means the debtor-in-possession secured financing facility, consisting of a letter of credit facility and a term loan facility, provided to the Debtors by the Original DIP Lenders pursuant to the Original DIP Credit Agreement or the other DIP Loan Documents (as defined in the Original DIP Facility Order) as authorized by the Bankruptcy Court pursuant to the Original DIP Facility Order (but not including the Replacement DIP Facility).

**1.162** "**Original DIP Facility Claim**" means any Claim arising under, derived from, based upon, or as a result of the Original DIP Facility, including, without limitation, any Claim arising on account of the letter of credit or term loan facilities under the Original DIP Credit Agreement.  For the avoidance of doubt, Claims arising under the Tranche A Roll-Up Loans (as defined in the Original DIP Facility Order) and Tranche B Roll-Up Loans (as defined in the Original DIP Facility Order) shall constitute Original DIP Facility Claims, except to the extent such Claims constitute Replacement DIP Facility Claims pursuant to the terms of the Replacement DIP Facility Order.  As of May 2, 2017, the Debtors believe there are no amounts outstanding under the Original DIP Facility.

**1.163** "**Original DIP Facility Order**" means, collectively, (a) the interim order that was entered by the Bankruptcy Court on April 26, 2016 (Docket No. 87), (b) the final order that was entered by the Bankruptcy Court on June 9, 2016 (Docket No. 523), authorizing and approving the Original DIP Facility and the agreements related thereto, in each case as amended or modified in accordance with the terms thereof.  The term "Original DIP Facility Order" includes any and all annexes, exhibits, etc. attached thereto.

**1.164** "**Original DIP Lenders**" means the banks and other financial institutions or entities from time to time party to the Original DIP Credit Agreement as lenders, including, without limitation, the L/C Issuers (as defined in the Original DIP Facility Order).

**1.165** "**Original DIP Secured Parties**" has the meaning ascribed to the term "Secured Parties" in the Original DIP Credit Agreement.

**1.166** "**Original DIP Term Loan Claim**" means any Original DIP Facility Claim arising on account of the term loans under the Original DIP Credit Agreement.

**1.167** "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a) of the Bankruptcy Code.

**1.168** "**Other Secured Claim**" means any Secured Claim other than the following: (a) an Original DIP Facility Claim; (b) a Replacement DIP Facility Claim; or (c) a Second Lien Claim.

**1.169** "**Other Subordinated Claim**" means any Claim against the Debtors that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security, except that if such security is Old SUNE Common Stock, such Claim has the same priority as Old SUNE Common Stock.

**1.170** "**Periodic Distribution Date**" means, as applicable, (a) the Distribution Date, as to the first distribution made by the Distribution Agent, and (b) thereafter, such Business Days selected by the Reorganized Debtors in their reasonable discretion, which shall be no less frequent than once every three (3) months unless otherwise determined by the New Board.

**1.171** "**Person**" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

**1.172** "**Petition Date**" means (i) April 21, 2016 with respect to the following Debtors only: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A), (ii) June 1, 2016 with respect to the following Debtors only: Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A), (iii) July 20, 2016 with respect to the following Debtor only: EverStream HoldCo Fund I, LLC (9564), (iv) August 9, 2016 with respect to the following Debtors only: Buckthorn

22

Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757), (v) August 10, 2016 with respect to the following Debtors only: SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926), (vi) December 16, 2016, with respect to the following Debtor only: TerraForm Private Holdings, LLC (5993), and (vii) April 7, 2017 with respect to the following Debtors only: SunEdison Products, LLC (3557); Hudson Energy Solar Corporation (1344); SunE REIT-D PR, LLC (2171); First Wind Energy, LLC (5519); First Wind Holdings, LLC (4445); Vaughn Wind, LLC (9605); Maine Wind Holdings, LLC (4825); SunEdison International Construction, LLC (6257); and EchoFirst Finance Co., LLC (1607).

**1.173** "**Plan**" means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as may be modified in accordance with the Bankruptcy Code, Bankruptcy Rules, and the terms herein, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules, and in each case in form and substance reasonably satisfactory to the Supporting Second Lien Parties and the Creditors' Committee (as applicable pursuant to the terms of the Committee/BOKF Plan Settlement Term Sheet).

**1.174** "**Plan Supplement**" means the supplement or supplements to the Plan containing certain Exhibits and documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court in accordance with the terms herein, and in form and substance reasonably satisfactory to the Supporting Second Lien Parties and, to the extent the Creditors' Committee or Holders of General Unsecured Claims are affected, the Creditors' Committee.

**1.175** "**Plan Supplement Amount**" has the meaning set forth in Article 8.3.

**1.176** "**Plan Supplement Filing Date**" means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice, so long as such date is prior to the Voting Deadline.

**1.177** "**Plan Transaction Documents**" means all definitive documents and agreements to which the Debtors will be a party as contemplated by the Plan, each of which shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties and, to the extent Holders of General Unsecured Claims are affected, the Creditors' Committee, including, without limitation, (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings (but not declarations) in support of entry thereof, (c) the solicitation materials in respect of the Plan, the motion to approve the Disclosure Statement, and the Disclosure Statement Approval Order, and (d) all documents that will comprise the Plan Supplements.

**1.178** "**Prepetition Indemnification Obligations**" has the meaning set forth in Article 8.3.

**1.179** "**Prepetition First Lien Administrative Agent**" means Wells Fargo Bank, National Association, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Prepetition First Lien Credit Agreement (and, together

23

with each other Agent under (and as defined in) the Prepetition First Lien Credit Agreement, the "Prepetition First Lien Agents").

**1.180** "**Prepetition First Lien Credit Agreement**" means that certain Credit Agreement, dated as of February 14, 2014, by and among SUNE, the Prepetition First Lien Administrative Agent, and the letter of credit issuers and various lenders party thereto from time to time, as it may be amended, supplemented, amended and restated or otherwise modified from time to time.

**1.181** "**Prepetition First Lien Credit Documents**" means the Prepetition First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Prepetition Frist Lien Credit Agreement).

**1.182** "**Prepetition First Lien Secured Parties**" has the meaning set forth in the Replacement DIP Credit Agreement.

**1.183** "**Prepetition Secured Parties**" has the meaning set forth in the Replacement DIP Credit Agreement.

**1.184** "**Priority Tax Claim**" means a Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.185** "**Pro Rata**" means, with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes at issue; provided, however, that for purposes of distributions to Holders of Allowed General Unsecured Claims, Pro Rata shall apply on a consolidated basis.

**1.186** "**Professional**" means any Entity (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order.

**1.187** "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date; provided, however, that none of the fees and expenses incurred by the Professionals of the Creditors' Committee with regards to actions reimbursed by, or paid out of, the GUC/Litigation Trust Initial Funding (including, without limitation, any actions regarding the investigation and prosecution of any GUC/Litigation Trust Causes of Action) , shall constitute Professional Claims or otherwise be paid in cash pursuant to this Plan or otherwise.

**1.188** "**Professional Fee Order**" means the order entered by the Bankruptcy Court on May 12, 2016, authorizing the interim payment of Professional Claims subject to the Holdback Escrow Amount (Docket No. 258).

**1.189** "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

**1.190** "**Reinstated Second Lien Claim Amount**" means an amount, as reasonably agreed to by the Supporting Second Lien Parties, equal to the approximate value of the Earnout Assets, Repatriated Cash, Residual Assets and any other of the Debtors' assets (other than the GUC/Litigation Trust Assets) as of the Effective Date.

**1.191** "**Reinstated Second Lien Claim Modification Terms**" means the terms upon which the Second Lien Claims that constitute Reinstated Second Lien Claims and the Second Lien Documents shall be modified, amended, supplemented or otherwise restated, in form and substance reasonably satisfactory to the Supporting Second Lien Parties and, to the extent that it serves as indenture trustee or collateral trustee with respect to the Reinstated Second Lien Claims, the Second Lien Senior Notes Indenture Trustee or the Second Lien Collateral Trustee, respectively. A summary of the Reinstated Second Lien Claim Modification Terms, in form and substance reasonably satisfactory to the Supporting Second Lien Parties, will be set forth on Exhibit 6.5. Exhibit 6.5 will be filed with the Plan Supplement.

**1.192** "**Reinstated Second Lien Claims**" means Second Lien Claims in an aggregate amount equal to the Reinstated Second Lien Claim Amount which shall be reinstated in accordance with this Plan and subject to the Reinstated Second Lien Claim Modification Terms.[5]

---

[5] To the extent that (a) the Debtors elect the TERP Cash Election Alternative and (b) the cash received from the Jointly Supported Transactions is insufficient to repay the Tranche B Roll-Up Lenders in full and in Cash, the Debtors will issue Reinstated Tranche B Roll-Up Loans in an amount and with terms necessary to render the Tranche B Roll-Up Loans Unimpaired, including, without limitation, priority (over the Reinstated Second Lien Claims) in lien and claim amount and interest, and with other terms that are identical to the current Tranche B Roll-Up Loans.

**1.193** "**Rejection Damages Claim**" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

**1.194** "**Released Parties**" means, collectively, in each case, solely in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals (collectively, the "Debtor Professionals"); (2) current employees, consultants, Affiliates, officers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; and (3) Existing Directors, (b) the Original DIP Agents, (c) the Original DIP Lenders and all other Original DIP Secured Parties, (d) the Replacement DIP Agents, (e) the Replacement DIP Lenders, (f) the Supporting Second Lien Parties, (g) all Professionals (to the extent not duplicative of the Entities covered by clauses (a) and (m) of this definition), (h) the Creditors' Committee and each of its members, solely in their capacity as such, (i) the Indenture Trustees, (j) the Second Lien Collateral Trustee, (k) the Second Lien Agents, (l) any underwriters, arrangers, or placement agents in respect of the Second Lien Senior Notes, (m) the Prepetition First Lien Secured Parties, (n) the Prepetition First Lien Agents, (o) the Applicable Issuers, and (p) with respect to each of the above-named Entities described in subsections (b) through (o), such Entity's current and former affiliates, subsidiaries, advisors, principals, partners, managers, members, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals, in each case to the extent a claim arises from actions taken or omissions by any such person in its capacity as a related person of one of the parties listed in clauses (b) through (o) and is released as against such party.

**1.195** "**Releasing Parties**" means, collectively, in each case, in their respective capacities as such, (a) the Original DIP Lenders, (b) the Original DIP Agent, (c) the Replacement DIP Lenders, (d) the Replacement DIP Agent, (e) the Holders of Convertible Senior Notes Claims who vote to accept the Plan, (f) the Holders of Second Lien Senior Notes Claims who vote to accept the Plan, (g) the Holders of Second Lien Loan Claims who vote to accept the Plan, (h) the Creditors' Committee and each of its members, solely in their capacity as such, (i) the Indenture Trustees, (j) the Second Lien Administrative Agent, (k) to the fullest extent permitted by law, all Holders of Claims entitled to vote for or against the Plan that do not vote to reject the Plan, and (l) with respect to each of the foregoing clauses (a) through (k), to the fullest extent permitted by law, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such. For the avoidance of doubt, in the event an Entity who is a Releasing Party also holds a Claim or Interest in a non-voting Class under the Plan, such entity will not be a Releasing Party with respect to its Claim or Interest in such non-voting Class.

**1.196** "**Reorganized Debtors**" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

**1.197** "**Reorganized SUNE**" means SUNE or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

**1.198** "**Repatriated Cash**" means Cash received, directly or indirectly, by any Debtor or Reorganized Debtor from any of the Debtors' or Reorganized Debtors' non-U.S. subsidiaries.

**1.199** "**Replacement DIP Agent**" means Cantor Fitzgerald Securities, in its capacity as administrative agent, or any successor agent in such capacity, for the Replacement DIP Lenders pursuant to the Replacement DIP Credit Agreement (and, together with all other Agents under (and as defined in) the Replacement DIP Credit Agreement, solely in their capacities as such, the "Replacement DIP Agents").

**1.200** "**Replacement DIP Credit Agreement**" means that certain Amended and Restated Senior Secured Superpriority Debtor-in-Possession Credit Agreement, between SunEdison, Inc., the Replacement DIP Lenders, the Replacement DIP Agent, and the other parties thereto, dated as of May 2, 2017, as has been or may be amended, restated, supplemented or otherwise modified from time to time.

**1.201** "**Replacement DIP Facility**" means the debtor-in-possession secured financing facility, consisting of (a) a new money term loan facility in an aggregate principal amount of no less than $640 million and (b) a roll-up loan facility comprised of the Tranche B Roll-Up Loans deemed outstanding under such facility (including, in each case, any unpaid interest, fees, costs, and expenses), in each case, provided to the Debtors by the Replacement DIP Lenders pursuant to the Replacement DIP Credit Agreement and the Replacement DIP Documents (as defined in the Replacement DIP Facility Order), as authorized by the Bankruptcy Court pursuant to the Replacement DIP Facility Order.

**1.202** "**Replacement DIP Facility Claim**" means any Claim arising under, derived from, based upon, or as a result of the Replacement DIP Facility, including, without limitation, any Replacement DIP Term Loan Claim or a Tranche B Roll-Up Loan Claim.  For the avoidance of doubt, Claims arising under the Roll-Up Loans (as defined in the Replacement DIP Credit Agreement) shall constitute Replacement DIP Facility Claims.

**1.203** "**Replacement DIP Facility Order**" means the order that was entered by the Bankruptcy Court on May 1, 2017 (Docket No. 2880), authorizing and approving the Replacement DIP Facility and the agreements related thereto, as such order may be amended or modified in accordance with the terms thereof.  The term "Replacement DIP Facility Order" includes any and all annexes, exhibits, etc. attached thereto.

**1.204** "**Replacement DIP Lenders**" means the banks and other financial institutions or entities from time to time party to the Replacement DIP Credit Agreement as lenders and the Holders of Replacement DIP Facility Claims, including any Applicable Issuers (as defined in the Replacement DIP Facility Order).

**1.205** "**Replacement DIP Term Loan Claim**" means any Replacement DIP Facility Claim arising on account of or with respect to the new money term loans under the Replacement DIP Credit Agreement.

**1.206** "**Residual Assets**" means assets of the Reorganized Debtors other than Repatriated Cash, Earnout Assets, and/or interests in the YieldCos, including, but not limited to, inventory, equipment, contractual rights, intellectual property, real property, fixtures, goods, and equity interests in subsidiaries.

**1.207** "**Residual Assets Proceeds**" means the Cash or non-Cash proceeds received by any Debtor or Reorganized Debtor on account of any Residual Asset.

**1.208** "**Restructuring Transactions**" has the meaning set forth in Article 6.3.

**1.209** "**Rights Holders**" means Holders of Allowed Second Lien Claims, except the Rights Holders shall not include any Non-Eligible Holder.

**1.210** "**Rights Offering**" means, in the TERP Share Election Alternative, that certain rights offering pursuant to which the Rights Holders are entitled to receive Rights Offering Subscription Rights.

**1.211** "**Rights Offering Amount**" means the amount to be raised pursuant to the Rights Offering, as set forth in the Equity Commitment Agreement, as may be modified pursuant to the terms therein.

**1.212** "**Rights Offering Backstop Commitment**" means the commitment provided by the Rights Offering Backstop Purchasers pursuant to the Equity Commitment Agreement to purchase the number of Rights Offering Common Stock necessary to fund the Plan with the Rights Offering Amount.

**1.213** "**Rights Offering Backstop Purchasers**" means the Entities set forth in the Equity Commitment Agreement.

**1.214** "**Rights Offering Backstop Standby Fee**" means the standby fee to be paid to the Rights Offering Backstop Purchasers, pursuant to the Equity Commitment Agreement.

**1.215** "**Rights Offering Commitment Letter**" means that certain Commitment Letter, dated as of April 27, 2017, by and among the Debtors and the Rights Offering Backstop Purchasers.

**1.216** "**Rights Offering Common Stock**" means the shares of Continuing TERP Class A Shares purchased and distributed pursuant to the Rights Offering upon the exercise of the Rights Offering Subscription Rights.

**1.217** "**Rights Offering Procedures**" means those certain rights offering procedures (as may be amended, supplemented, or modified from time to time) with respect to the Rights Offering, which shall be in form and substance reasonably satisfactory to the Rights Offering Backstop Purchasers, a copy of which procedures is attached to the order entered by the Bankruptcy Court on June 6, 2017 at Docket No. 3283.

**1.218** "**Rights Offering Record Date**" means the date to be established in the Rights Offering Procedures as of which a Holder of Second Lien Claims must be an Eligible Holder for purposes of participating in the Rights Offering.

**1.219** "**Rights Offering Subscription Rights**" means subscription rights to acquire 90% of the Continuing TERP Class A Shares and 90% of the New SUNE Common Stock to be distributed on the Effective Date pursuant to the Rights Offering (in both cases, minus the direct purchase by the Rights Offering Backstop Purchasers, as set forth in the Equity Commitment Agreement and approved by the Bankruptcy Court order approving the Equity Commitment Agreement) in accordance with the Rights Offering Procedures. Participants in the Rights Offering shall receive a portion of the Reinstated Second Lien Claims in the same proportion as they will hold New SUNE Common Stock (*i.e.*, if a participant would receive 2% of New SUNE Common Stock, such participant would hold 2% of Reinstated Second Lien Claims).

**1.220** "**Rights Offering Term Sheet**" means the term sheet for the Rights Offering attached to the Rights Offering Commitment Letter as filed with the Bankruptcy Court on April 27, 2017 (Docket No. 2857).

**1.221** "**RSC Deal Incentive Plan**" means the RSC Deal Incentive Plan for certain of the Debtors' employees adopted by the Debtors and approved by the Bankruptcy Court on September 16, 2016 (Docket No. 1205).

**1.222** "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

**1.223** "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

**1.224** "**SEC**" means the United States Securities and Exchange Commission.

**1.225** "**Second Lien Administrative Agent**" means Wilmington Savings Fund Society, FSB (as successor to Deutsche Bank AG New York Branch), and its predecessors, successors and assigns as "Administrative Agent" pursuant to the Second Lien Credit Agreement (and, together with each other Agent under (and as defined in) the Second Lien Credit Agreement, the "Second Lien Agents").

**1.226** "**Second Lien Claim Distribution**" means, (A) in the TERP Share Election Alternative, (i) 10% of the New SUNE Common Stock, (ii) 10% of the Continuing TERP Class A Shares, (iii) 10% of the Reinstated Second Lien Claim Amount, and (iv) 100% of the Class B GUC/Litigation Trust Interests, and (B) in the TERP Cash Election Alternative,

(i) 100% of the New SUNE Common Stock, (ii) 100% of the Reinstated Second Lien Claim Amount, and (iii) 100% of the Class B GUC/Litigation Trust Interests.[6]

1.227  "**Second Lien Claims**" means the Second Lien Loan Claims and the Second Lien Senior Notes Claims.

1.228  "**Second Lien Collateral Trustee**" means Wilmington Trust, National Association or its successor, in its capacity as collateral trustee pursuant to that certain Collateral Trust Agreement, dated as of January 11, 2016, among SUNE, the guarantors named therein, the Second Lien Administrative Agent, the Second Lien Senior Notes Indenture Trustee, and Wilmington Trust, National Association as collateral trustee (as may be amended or supplemented from time to time).

1.229  "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of January 11, 2016, by and among SUNE, the Second Lien Administrative Agent, and the various lenders party thereto from time to time, as it may be amended, supplemented, amended and restated or otherwise modified from time to time.

1.230  "**Second Lien Creditors**" means the Second Lien Lenders and Second Lien Senior Noteholders.

1.231  "**Second Lien Documents**" means the Second Lien Credit Agreement, the Second Lien Senior Notes Indenture, and the related loans, notes, guarantees, pledges, security agreements, and other agreements and documents given or issued pursuant to or in connection with the Second Lien Claims.

1.232  "**Second Lien Litigation**" has the meaning ascribed to such term in Article XV.

1.233  "**Second Lien Lender**" means a lender under the Second Lien Credit Agreement.

1.234  "**Second Lien Loans**" means the loans under the Second Lien Credit Agreement.

1.235  "**Second Lien Loan Claims**" means any and all Claims held by the Second Lien Lenders against the Debtors arising under or related to the Second Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in the aggregate amount of $515.1 million.  For the avoidance of doubt, the Second Lien Loan Claim shall not include any Claim on account of the Tranche B Roll-Up Loans.

---

[6]    The equity percentages set forth for the TERP Share Election Alternative do not reflect dilution attributable to the Rights Offering Backstop Standby Fee.

**1.236**  "**Second Lien Senior Noteholder**" means a Holder of Second Lien Senior Notes.

**1.237**  "**Second Lien Senior Notes**" means the Guaranteed Convertible Senior Secured Notes issued by SUNE under the Second Lien Senior Notes Indenture, bearing interest at a rate of 5.00% per annum and issued in an aggregate principal amount of $225 million.

**1.238**  "**Second Lien Senior Notes Claims**" means any and all Claims held by the Second Lien Senior Noteholders against the Debtors arising under or related to the Second Lien Senior Notes, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in the aggregate amount of $110.1 million.  For the avoidance of doubt, the Second Lien Senior Notes Claim shall not include any Claim on account of the Tranche B Roll-Up Loans.

**1.239**  "**Second Lien Senior Notes Indenture**" means that certain Indenture, dated as of January 11, 2016, by and among SUNE, the guarantors named therein, and the Second Lien Senior Notes Indenture Trustee (as may be amended or supplemented from time to time).

**1.240**  "**Second Lien Senior Notes Indenture Trustee**" means Wilmington Trust, National Association or its successor, in its capacity as indenture trustee for the Second Lien Senior Notes pursuant to the Second Lien Senior Notes Indenture.

**1.241**  "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtors within 20 days before the Petition Date in which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

**1.242**  "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.243**  "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

**1.244**  "**Security**" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

**1.245**  "**Servicer**" means any indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors.  The Debtors recognize only Wilmington Trust, National Association, in its capacity as the Second Lien Senior Notes Indenture Trustee, and BOKF, N.A., in its capacity as Convertible Senior Notes Indenture Trustee, as a Servicer.

1.246 "**SUNE Certificate of Incorporation and Bylaws**" means the amended and restated certificate of incorporation and bylaws of Reorganized SUNE, the form and substance of which shall be included in the Plan Supplement.

1.247 "**SunEdison/YieldCos Settlement Agreement**" means that certain SunEdison/Yieldcos UCC Settlement Agreement, dated as of March 27, 2017, by and among SUNE, TERP, GLBL, and certain of their respective current directors and officers.

1.248 "**Supporting Second Lien Parties**" means those Holders of Second Lien Claims who are, or who become, party to the Rights Offering Backstop Commitment or the Equity Commitment Agreement.  Any provision in this Plan that requires the consent of the Supporting Second Lien Parties shall require the consent of the Supporting Second Lien Parties holding more than one-half of the Second Lien Claims held by all of the Supporting Second Lien Parties, who were Supporting Second Lien Parties as of May 26, 2017.

1.249 "**Surety**" means any surety bond provider that has issued one or more surety bonds to any of the Debtors.

1.250 "**TERP**" means, collectively, TERP Inc., TERP LLC, and their direct and indirect subsidiaries.

1.251 "**TERP Cash Election Alternative**" has the meaning ascribed to such term in the Introduction.

1.252 "**TERP Inc.**" means TerraForm Power, Inc.

1.253 "**TERP LLC**" means TerraForm Power LLC.

1.254 "**TERP Merger Agreement**" means the Merger and Sponsorship Transaction Agreement, dated as of March 6, 2017, by and among TERP Inc. and certain affiliates of Brookfield.

1.255 "**TERP Settlement Agreement**" means the Settlement Agreement, dated as of March 6, 2017, by and among SUNE, TERP Inc., and certain of their respective affiliates. A copy of the TERP Settlement Agreement was filed as an attachment to the YieldCo Settlement Motion.

1.256 "**TERP Share Election Alternative**" has the meaning ascribed to such term in the Introduction.

1.257 "**TERP Voting and Support Agreement**" means that certain Voting and Support Agreement, dated as of March 6, 2017, by and among SUNE, SunEdison Holdings Corporation, SUNE ML1, LLC, TERP Inc., and certain affiliates of Brookfield.  A copy of the TERP Voting and Support Agreement was filed as an attachment to the Voting and Support Motion.

1.258 "**Tranche A-1 Roll-Up Lender**" has the meaning set forth in the Original DIP Credit Agreement.

**1.259**  "**Tranche A-1 Roll-Up Loan**" has the meaning set forth in the Original DIP Credit Agreement.

**1.260**  "**Tranche A-1 Roll-Up Loan Claims**" means any and all Claims held by the Tranche A-1 Roll-Up Lenders against the Debtors arising under or related to the Original DIP Credit Agreement on account of the Tranche A-1 Roll-Up Loans, which shall be Allowed for all purposes under this Plan.

**1.261**  "**Tranche A-2 Roll-Up Lender**" has the meaning set forth in the Original DIP Credit Agreement.

**1.262**  "**Tranche A-2 Roll-Up Loan**" has the meaning set forth in the Original DIP Credit Agreement.

**1.263**  "**Tranche A-2 Roll-Up Loan Claims**" means any and all Claims held by the Tranche A-2 Roll-Up Lenders against the Debtors arising under or related to the Original DIP Credit Agreement on account of the Tranche A-2 Roll-Up Loans, which shall be Allowed for all purposes under this Plan.

**1.264**  "**Tranche B Roll-Up Lender**" has the meaning set forth in the Original DIP Credit Agreement or the meaning of the term "Roll-Up Lender" in the Replacement DIP Credit Agreement, as applicable.

**1.265**  "**Tranche B Roll-Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders**" has the meaning set forth in the Committee/BOKF Plan Settlement.

**1.266**  "**Tranche B Roll-Up Loan**" has the meaning set forth in the Original DIP Credit Agreement or the meaning of the term "Roll-Up Loan" in the Replacement DIP Credit Agreement, as applicable.

**1.267**  "**Tranche B Roll-Up Loan Claims**" means any and all Claims held by the Tranche B Roll-Up Lenders against the Debtors arising under or related to the Original DIP Credit Agreement or the Replacement DIP Credit Agreement on account of the Tranche B Roll-Up Loans, which shall be Allowed for all purposes under this Plan.

**1.268**  "**Transition Services Agreement**" has the meaning ascribed to such term in Article 7.6.

**1.269**  "**UCC Challenge Litigation**" means Adversary Proceeding No. 16-01228 commenced by the Creditors' Committee in connection with the Chapter 11 Cases.

**1.270**  "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

**1.271**  "**Unexpired Lease**" means a lease of nonresidential real property to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.272**  "**Unimpaired**" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

**1.273**  "**United States**" has the meaning ascribed to such term in Article 11.8.

**1.274**  "**Utility Project Incentive Plan**" means the Utility Project Incentive Plan for certain of the Debtors' employees adopted by the Debtors and approved by the Bankruptcy Court on July 29, 2016 (Docket No. 871).

**1.275**  "**Voluntary Professional Fee Reduction Amount**" has the meaning ascribed to such term in the Introduction.

**1.276**  "**Voluntary Professional Fee Reductions**" has the meaning ascribed to such term in Article 2.3(d).

**1.277**  "**Voting and Support Agreements**" means, together, (1) the TERP Voting and Support Agreement and (2) the GLBL Voting and Support Agreement.

**1.278**  "**Voting and Support Motion**" means the motion filed by the Debtors on March 14, 2017 seeking this Court's approval of the Voting and Support Agreements (Docket No. 2580).

**1.279**  "**Voting Deadline**" means July 13, 2017 at 4:00 p.m. prevailing Eastern time.

**1.280**  "**YieldCo Avoidance Allocation**" has the meaning ascribed to such term in the Introduction.

**1.281**  "**YieldCo Settlement Agreements**" means, together, (1) the TERP Settlement Agreement and (2) the GLBL Settlement Agreement.

**1.282**  "**YieldCo Settlement Motion**" means the motion filed by the Debtors on March 10, 2017 seeking this Court's approval of the YieldCo Settlement Agreements (Docket No. 2570) as supplemented on March 24, 2017 (Docket No. 2641), as modified in accordance with the Committee/BOKF Plan Settlement Term Sheet.

**1.283**  "**YieldCos**" means, collectively, GLBL and TERP.

## C.    Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing

document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (j) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (k) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court; (l) to the extent that any right of any Entity (other than the Debtors or Reorganized Debtors) to consent to a matter, action or otherwise is unqualified, it shall be implied that such consent right may not be unreasonably withheld; and (m) to the extent that this Plan is inconsistent with the Committee/BOKF Plan Settlement Term Sheet, the Committee/BOKF Plan Settlement Term Sheet shall control.

## D.    Computation Of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## E.    References to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## F.    Exhibits

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the Plan Supplement Filing Date, copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Att'n: J. Eric Ivester), or Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, Illinois 60606 (Att'n: James J. Mazza, Jr. and Louis S. Chiappetta), counsel to the Debtors, or by downloading such exhibits from the Debtor's informational website at https://cases.primeclerk.com/sunedison/.  To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

# ARTICLE II

## ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

**2.1    Administrative Claims**. Except to the extent that the Debtors (or the Reorganized Debtors) and a Holder of an Allowed Administrative Claim agree to less favorable treatment, a Holder of an Allowed Administrative Claim (other than a Professional Claim, which shall be subject to Article 2.3 of the Plan) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Effective Date, (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims, or (c) on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Administrative Claim[7]; provided, however, that other than Holders of (i) Original DIP Facility Claims, (ii) Replacement DIP Facility Claims, (iii) Professional Claims, (iv) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (v) Administrative Claims that are not Disputed and arose in the ordinary course of business and was paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and as set forth in Articles 2.2 or 2.3 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in Exhibit 2.1, with the Claims Agent and served on counsel for the Debtors or the Reorganized Debtors (and, if filed after the Disclosure Statement Order is entered, counsel to the Supporting Second Lien Parties) by no later than the Administrative Claims Bar Date. After the Effective Date, the Reorganized Debtors, with the consent of the Supporting Second Lien Parties (such consent not to be unreasonably withheld or delayed) may settle an Administrative Claim without further Bankruptcy Court approval. In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. For the avoidance of doubt, the fees and expenses incurred by the Creditors' Committee's Professionals with regard to the investigation or prosecution of the UCC Challenge Litigation shall be paid in Cash in the amount set forth in the Committee/BOKF Plan Settlement Term Sheet. Subject to the other provisions of the Committee/BOKF Plan Settlement, the Creditors' Committee's Professionals reserve any and all rights to seek allowance and payment of any fees and expenses in connection with matters other than (a) fees and expenses subject to the Investigation/Prosecution Cap and (b) other than as already paid, fees and expenses related to GUC/Litigation Trust Causes of Action.

---

[7] Subject to, in the TERP Cash Election Alternative, the issuance, if necessary, of the Reinstated Tranche B Roll-Up Loans.

## 2.2    Original and Replacement DIP Facility Claims.

(a)    **Replacement DIP Term Loan Claims**.  On the Effective Date, the Replacement DIP Term Loan Claims shall be Allowed in full, in the amount of $640 million (less any amounts paid prior to the Effective Date) plus all accrued and unpaid postpetition interest under the Replacement DIP Credit Agreement (and any unpaid fees, costs, and expenses).  Except to the extent that a Holder of a Replacement DIP Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Replacement DIP Term Loan Claim, each Holder of an Allowed Replacement DIP Term Loan Claim shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Replacement DIP Agent for the ratable benefit of the Holders of Replacement DIP Term Loan Claims.

(b)    **Original DIP Term Loan Claims.**  On the Effective Date, the Original DIP Term Loan Claims (including any unpaid interest, fees, costs, and expenses) shall be Allowed in full to the extent not previously repaid.  As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Original DIP Facility with respect to the Original DIP Term Loans.  In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of an Original DIP Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Original DIP Term Loan Claim, each Holder of an Allowed Original DIP Term Loan Claim shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of Original DIP Term Loan Claims.

(c)    **L/C Borrowing Claims.**  On the Effective Date, the L/C Borrowing Claims (including any unpaid interest, fees, costs, and expenses) shall be Allowed in full to the extent not previously repaid.  As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Original DIP Facility with respect to the L/C Borrowings.  In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of an L/C Borrowing Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every L/C Borrowing Claim, Holders of L/C Borrowing Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of L/C Borrowing Claims.

(d)    **Tranche A-1 Roll-Up Loan Claims.**  On the Effective Date, the Tranche A-1 Roll-Up Loan Claims shall be Allowed in full to the extent not previously repaid.  As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Tranche A-1 Roll-Up Loans.  In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of a Tranche A-1 Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche A-1 Roll-Up Loan Claim, Holders of Tranche A-1 Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of Tranche A-1 Roll-Up Loan Claims.

(e)      **Tranche A-2 Roll-Up Loan Claims.**  On the Effective Date, the Tranche A-2 Roll-Up Loan Claims shall be Allowed in full to the extent not previously repaid. As of May 2, 2017, the Debtors believe that there are no amounts outstanding under the Tranche A-2 Roll-Up Loans.  In the event amounts are owed and not disputed by any party as of the Effective Date, except to the extent that a Holder of a Tranche A-2 Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche A-2 Roll-Up Loan Claim, Holders of Tranche A-2 Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Original DIP Agent for the ratable benefit of the Holders of Tranche A-2 Roll-Up Loan Claims.

(f)      **Tranche B Roll-Up Loan Claims.**  On the Effective Date, the Tranche B Roll-Up Loan Claims shall be Allowed in full, in the amount of $317,549,980.22 plus accrued postpetition interest in an amount to be determined.  Except to the extent that a Holder of a Tranche B Roll-Up Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Tranche B Roll-Up Loan Claim, Holders of Tranche B Roll-Up Loan Claims shall be paid in full in Cash on the Effective Date, with such payments to be distributed to the Replacement DIP Agent for the ratable benefit of the Holders of Tranche B Roll-Up Loan Claims.[8]

(g)      Upon the Effective Date, subject to (a) payment in full and in Cash of the Replacement DIP Facility Claims and the Original DIP Facility Claims, and (b) any indemnification and reimbursement claims that survive under the terms of the Replacement DIP Facility and the Original DIP Facility, all Liens and security interests granted to secure the Replacement DIP Facility or the Original DIP Facility shall be deemed discharged, cancelled, and released and shall be of no further force and effect.  To the extent that the Replacement DIP Lenders, the Replacement DIP Agent, the Original DIP Lenders, or the Original DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the Replacement DIP Facility or the Original DIP Facility, the Replacement DIP Lenders, the Replacement DIP Agent, the Original DIP Lenders, or the Original DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests.

(h)      On the later of the Effective Date or such other date as permitted by the Replacement DIP Facility Order, in the event any Existing L/Cs are outstanding, the Debtors shall have caused all such Existing L/Cs to be cancelled without any further liability to any Applicable Issuer.

---

[8] To the extent that (a) the Debtors elect the TERP Cash Election Alternative and (b) the cash received from the Jointly Supported Transactions is insufficient to repay the Tranche B Roll-Up Lenders in full and in Cash, the Debtors will issue Reinstated Tranche B Roll-Up Loans in an amount and with terms necessary to render the Tranche B Roll-Up Loans Unimpaired, including, without limitation, priority (over the Reinstated Second Lien Claims) in lien and claim amount and interest, and with other terms that are identical to the current Tranche B Roll-Up Loans.

38

(i)        Nothing in this Plan shall impair or otherwise affect the L/C Cash
Collateralization Agreements, the obligations of the Debtors (and from and after the Effective
Date, the Reorganized Debtors) thereunder, the rights and remedies of the Applicable Issuers
thereunder or under the Replacement DIP Facility Order (including, without limitation, under the
Replacement Intercreditor Annex (as defined in the Replacement DIP Facility Order)) or the
provisions in the Replacement DIP Facility Order relating to the "Prepetition Control
Agreements" and the "Prepetition Blocked Accounts" (as each such term is defined in the
Replacement DIP Facility Order), and the L/C Cash Collateralization Agreements and all such
applicable provisions of the Replacement DIP Financing Order shall be binding upon the
Reorganized Debtors and shall remain in full force and effect from and after the Effective Date
in accordance with their terms.

### 2.3    Professional Claims.

(a)        **Final Fee Applications**.    All final requests for payment of
Professional Claims and requests for reimbursement of expenses of members of the Creditors'
Committee must be filed no later than sixty (60) days after the Effective Date.  After notice and a
hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy
Rules and prior orders of the Bankruptcy Court, the Allowed amounts of all Professional Claims
and expenses shall be determined by the Bankruptcy Court.    In accordance with the
Investigation/Prosecution Cap, other than as may have already been paid, and subject to the
interim fee order entered by the Bankruptcy Court on December 1, 2016 (Docket No. 1711), the
Original DIP Facility Order, and the Replacement DIP Facility Order, the Professional Claims of
the Creditors' Committee's Professionals with regard to the investigation or prosecution of the
UCC Challenge Litigation shall be deemed to be satisfied upon receipt of a payment of $2.25
million in Cash.  All Final Fee Applications shall be made in accordance with and subject to, the
terms of the Committee/BOKF Plan Settlement Term Sheet.

(b)        **Payment of Interim Amounts.**  Subject to the Holdback Escrow
Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts
owing to Professionals for all outstanding amounts billed relating to prior periods through the
Effective Date as to which no objection has been filed (and as to which there is no then-existing
Court-mandated or Court-ordered prohibition on making payment or as to which such payment is
not prohibited by the terms of the Committee/BOKF Plan Settlement Term Sheet).  In order to
receive payment on the Effective Date for such unbilled fees and expenses incurred through the
Effective Date that have not yet been billed pursuant to the Professional Fee Order, no later than
two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors'
Committee, shall only be permitted to take the actions set forth in Article 14.8 after the
Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as
of the Effective Date and shall deliver such estimate to counsel for the Debtors and the
Supporting Second Lien Parties.  Within fifteen (15) days after the Effective Date, a Professional
receiving payment for the estimated period shall submit a detailed invoice covering such period,
subject to any parties' right to object as set forth in the Professional Fee Order.

(c)        **Holdback Escrow Account**.  On the Effective Date, and subject to
the Investigation/Prosecution Cap as set forth in Article 6.1 and the Committee/BOKF Plan
Settlement Term Sheet, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow

Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.  The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to Reorganized SUNE to be used by the Reorganized Debtors in accordance with the Plan, or distributed to holders of New SUNE Common Stock.

(d)    **Voluntary Professional Fee Reductions**.    Every Entity (collectively, the "Affected Professionals") (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) or 506(b) of the Bankruptcy Code; or (c) awarded compensation and reimbursement pursuant to the Original DIP Facility Order or the Replacement DIP Facility Order, will be asked to voluntarily reduce the aggregate amount of its Professional Claims earned during the course of the Chapter 11 Cases in order to assist in the funding of the Plan and the Committee/BOKF Plan Settlement (the "Voluntary Professional Fee Reductions").  It is a condition to the effectiveness of the Committee/BOKF Plan Settlement that the Voluntary Professional Fee Reductions equal at least $5 million.

In the event an Affected Professional does not agree to a Voluntary Professional Fee Reduction, such Affected Professional's fees and expenses will be subject to review and objection by a fee examiner to be appointed in these cases (the "Fee Examiner"), whose fees and expenses will be deducted from the savings realized by the Fee Examiner.  For the avoidance of doubt, the Fee Examiner may only receive compensation from any savings it realizes, and in no event will the Debtors, the Debtors' estates, the Reorganized Debtors, the Second Lien Lenders or Second Lien Senior Noteholders, or any other party incur any fees, costs, or expenses relating to the Fee Examiner or its work.  If, as a result of the Fee Examiner's recommendation, any fees are disallowed or reduced by the Court, or fee reductions are agreed to by any Affected Professional per the Fee Examiner's recommendation, then such amounts shall be transferred to the GUC/Litigation Trust for the Holders of General Unsecured Claims.  The Fee Examiner will only be permitted to examine the fees of an Affected Professional who does not agree to a Voluntary Professional Fee Reduction.

In the event the fees and expenses of an Affected Professional that has agreed to a Voluntary Professional Fee Reduction is subject to objection, any requested amounts that are Disallowed shall be deemed credited to the Voluntary Professional Fee Reduction Amount so that the Affected Professional will not receive a reduction of the amount payable to it unless the Disallowed amount exceeds the Voluntary Professional Fee Reduction agreed to by such Affected Professional.

The Voluntary Professional Fee Reduction Amount shall be funded into the GUC/Litigation Trust on the Effective Date (to the extent determined as of the Effective Date).  The Distribution Agent shall distribute to the GUC/Litigation Trust for the Holders of General

40

Unsecured Claims, the aggregate amount of the Voluntary Professional Fee Reductions. As of the date hereof, Affected Professionals have agreed to Voluntary Professional Fee Reductions in excess of $5 million.

(e)    **Post-Confirmation Date Retention**.    Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications). The Creditors' Committee's Professionals may only be paid for services rendered after the Confirmation Date if such services are permitted pursuant to Article 14.8 below.

**2.4    Priority Tax Claims**. On the Effective Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors (with the reasonable consent of the Supporting Second Lien Parties), Cash in the aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at a rate determined under applicable non-bankruptcy law, payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### 3.1    Classification of Claims and Interests.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b) For administrative convenience, the Plan organizes the Debtors into groups (each a "Debtor Group") and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group. Notwithstanding this organizing principle, the Plan is a separate plan of reorganization or liquidation for each Debtor. Claims and Interests belonging to a Debtor Group consisting of more than one Debtor shall be deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting. To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group. For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each Debtor Group. The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims. For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator is equal to the amount of a particular Holder's Allowed General Unsecured Claim. For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting Classes or cramdown. Claims and Interests are classified as follows:

| Letter | Debtor Group |
|---|---|
| A | **Parent**<br>SunEdison, Inc. |
| B | **DIP and Second Lien Secured Guarantors**<br>Buckthorn Renewables Holdings, LLC<br>Everstream HoldCo Fund I, LLC<br>Greenmountain Wind Holdings, LLC<br>Rattlesnake Flat Holdings, LLC<br>Somerset Wind Holdings, LLC<br>SunE Minnesota Holdings, LLC<br>SunE MN Development, LLC<br>SunE MN Development Holdings, LLC<br>SunE Waiawa Holdings, LLC<br>Sunflower Renewables Holdings 1, LLC<br>Enflex Corporation<br>Fotowatio Renewable Ventures, Inc.<br>MEMC Pasadena, Inc.<br>NVT Licenses, LLC<br>NVT, LLC<br>Solaicx<br>SunE ML 1, LLC<br>SunEdison Canada, LLC<br>SunEdison Contracting, LLC<br>SunEdison DG, LLC |

| # | Designation |
|---|---|
| 1 | Second Lien Claims |
| 2 | Other Secured Claims |
| 3 | Other Priority Claims |
| 4 | General Unsecured Claims |
| 5 | Intercompany Claims |
| 6 | Other Subordinated Claims |
| 7 | Interests in Debtor Subsidiaries |
| 8 | Interests in SUNE |

| | |
|---|---|
| | SunEdison Holdings Corporation<br>SunEdison International, Inc.<br>SunEdison International, LLC<br>Sun Edison LLC<br>SunEdison Utility Holdings, Inc.<br>Team-Solar Inc.<br>First Wind Holdings, LLC<br>First Wind Energy, LLC<br>Vaughn Wind, LLC<br>Maine Wind Holdings, LLC<br>SunEdison Products, LLC<br>Hudson Energy Solar Corporation<br>SunE REIT-D PR, LLC<br>SunEdison International Construction, LLC<br>EchoFirst Finance Co., LLC |
| C | **DIP-only Secured Guarantors**<br>Blue Sky West Capital, LLC<br>DSP Renewables, LLC<br>First Wind California Holdings, LLC<br>First Wind Oakfield Portfolio, LLC<br>First Wind Panhandle Holdings III, LLC<br>First Wind Solar Portfolio, LLC<br>Hancock Renewables Holdings, LLC<br>PVT Solar, Inc.<br>SunE Hawaii Solar Holdings, LLC<br>SunE Wind Holdings, Inc.<br>SunEdison Residential Services, LLC |
| D | **DIP-only Unsecured Guarantor**<br>Silver Ridge Power Holdings, LLC<br>TerraForm Private Holdings, LLC |
| E | **Not Obligated on DIP or Second Lien Claims**<br>SunEdison Products Singapore Pte. Ltd<br>SEV Merger Sub Inc. |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below.

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1A – 1B | Second Lien Claims | Impaired | Entitled to Vote |
| 2A – 2E | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3A – 3E | Other Priority Claims | Unimpaired | Presumed to Accept |

43

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 4A – 4E | General Unsecured Claims | Impaired | Entitled to Vote |
| 5A – 5E | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 6A – 6E | Other Subordinated Claims | Impaired | Deemed to Reject |
| 7B – 7E | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 8A | Interests in SUNE | Impaired | Deemed to Reject |

## ARTICLE IV

## PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

### 4.1    Second Lien Claims (Classes 1A and 1B)

(a)    Classification: Classes 1A and 1B consist of all Allowed Second Lien Claims.

(b)    Allowance:  The Second Lien Claims shall be Allowed in the amount of $625.2 million.

(c)    Treatment: Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim (except as otherwise set forth herein with respect to the Reinstated Second Lien Claims), on the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata portion of the Second Lien Claim Distribution.

In addition to the foregoing, in the TERP Share Election Alternative, each Holder of an Allowed Second Lien Claim that is an Eligible Holder shall receive its Pro Rata portion of the Rights Offering Subscription Rights.

(d)    Voting: Classes 1A and 1B are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan.

### 4.2    Other Secured Claims (Classes 2A – 2E)

(a)    Classification: Classes 2A, 2B, 2C, 2D, and 2E consist of all Allowed Other Secured Claims.

44

(b)     Treatment: Except as otherwise provided in and subject to <u>Article 10.6</u> of this Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable:

(i)     have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default;

(ii)     be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or

(iii)     receive such other less favorable treatment as to which the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing.

<u>provided</u>, that Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Nothing in this <u>Article 4.2</u> or elsewhere in this Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim.

(c)     Voting: Classes 2A, 2B, 2C, 2D, and 2E are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

### 4.3     Other Priority Claims (Classes 3A – 3E)

(a)     Classification: Classes 3A, 3B, 3C, 3D, and 3E consist of all Allowed Other Priority Claims.

(b)     Treatment: Except as otherwise provided in and subject to <u>Article 10.6</u> of this Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and

45

discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Other Priority Claim; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)    Voting: Classes 3A, 3B, 3C, 3D, and 3E are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 4.4    General Unsecured Claims (Classes 4A – 4E)

(a)    Classification: Classes 4A through 4E consist of all Allowed General Unsecured Claims.

(b)    Allowance:  (i) the Convertible Senior Notes Claims with respect to the 2018 Convertible Senior Notes shall be Allowed in the amount of $258,543,952.22, (ii) the Convertible Senior Notes Claims with respect to the 2020 Convertible Senior Notes shall be Allowed in the amount of $488,825,666.67, (iii) the Convertible Senior Notes Claims with respect to the 2021 Convertible Senior Notes shall be Allowed in the amount of $291,932,604.17, (iv) the Convertible Senior Notes Claims with respect to the 2022 Convertible Senior Notes shall be Allowed in the amount of $351,259,610.25, (v) the Convertible Senior Notes Claims with respect to the 2023 Convertible Senior Notes shall be Allowed in the amount of $281,870,349.58, (vi) the Convertible Senior Notes Claims with respect to the 2025 Convertible Senior Notes shall be Allowed in the amount of $324,326,640.63, and (vii) the Convertible Senior Notes Claims with respect to the 2020 Exchangeable Notes shall be Allowed in the amount of $217,159,049.00 unless an objection thereto is filed prior to the Effective Date.

(c)    Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata portion of the Class A GUC/Litigation Trust Interests subject to the specifics set forth herein.  For the avoidance of doubt, Holders of Allowed General Unsecured Claims shall not receive any of the Class B GUC/Litigation Trust Interests.  For purposes of this Article 4.4, Pro Rata shall apply to all Allowed General Unsecured Claims on a consolidated basis.

(d)    Voting: Classes 4A, 4B, 4C, 4D, and 4E are Impaired and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.5    Intercompany Claims (Classes 5A – 5E)

(a)    Classification:  Classes 5A through 5E consist of all Allowed Intercompany Claims.

46

(b)    Treatment: On the Effective Date, and subject to any repayment obligations necessary to satisfy secured Intercompany Claims, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion with the reasonable consent of the Supporting Second Lien Parties. For the avoidance of doubt, all Allowed Intercompany Claims held by any Debtor constitutes collateral of the Original DIP Lenders, the Replacement DIP Lenders, Second Lien Lenders, and Second Lien Senior Noteholders.

(c)    Voting: Classes 5A, 5B, 5C, 5D, and 5E are either:

(i)    Impaired, and Holders of Allowed applicable Class 5 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan; or

(ii)    Unimpaired, and Holders of Allowed applicable Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan.

### 4.6    Other Subordinated Claims (Classes 6A – 6E)

(a)    Classification:  Classes 6A through 6E consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.

(b)    Treatment: Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.

(c)    Voting: Classes 6A, 6B, 6C, 6D, and 6E are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan.

### 4.7    Interests in Debtor Subsidiaries (Classes 7B – 7E)

(a)    Classification:  Classes 7B through 7E consist of all Allowed Interests in Debtor Subsidiaries.

(b)    Treatment:  On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion with the consent of the Supporting Second Lien Parties.  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.

(c)    Voting: Classes 7B, 7C, 7D, and 7E are either:

(i)    Impaired, and Holders of Allowed applicable Class 7 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan; or

(ii)    Unimpaired, and Holders of Allowed applicable Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan.

### 4.8    Interests in SUNE (Class 8A)

(a)    Classification:  Class 8A consists of all Interests in SUNE.

(b)    Treatment: On the Effective Date, Allowed Class 8A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.

(c)    Voting: Class 8A is Impaired, and Holders of Allowed Class 8A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 8A Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE

**5.1    Classes Entitled to Vote.**  Classes 1A – 1B and 4A – 4E are entitled to vote to accept or reject this Plan.  By operation of law, Classes 2A – 2E, 3A – 3E, 5A – 5E, 6A – 6E, 7B – 7E, and 8A are either deemed to have accepted this Plan or to have rejected this Plan and are not entitled to vote.

**5.2    Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

**5.3    Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

48

5.4     **Deemed Acceptance if No Votes Cast.**  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

5.5     **Cramdown.**    To the extent necessary, the Debtors shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors, with the consent of the Supporting Second Lien Parties, and, to the extent Holders of Allowed General Unsecured Claims are affected, the Creditors' Committee (in each case, such consent not to be unreasonably withheld), reserve the right to modify this Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.1     **General Settlement of Claims and Interests**.

(a)     Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

(b)     In consideration for the compromises and settlements contained herein, including the distribution of the Class A GUC/Litigation Trust Interests for the benefit of Holders of General Unsecured Claims, the transfer of the GUC/Litigation Trust Assets to the GUC/Litigation Trust, and the settlement of any and all issues that may be in dispute (either currently or pending or that could be commenced in the future) regarding Annex II to the Replacement DIP Facility Order, including any right to receive amounts attributable to the Excess Non-Prepetition 1L/2L Obligor Sale Proceeds, and in each case as more fully set forth in the Disclosure Statement, on the Effective Date all pending litigation commenced by the Creditors' Committee or BOKF, N.A., including the UCC Challenge Litigation, the BOKF Objection, and the objections to the YieldCo Settlement Motion, shall be dismissed with prejudice in accordance with the Committee/BOKF Plan Settlement Term Sheet.

(c)     In further consideration for the settlement of the litigation commenced by the Creditors' Committee and BOKF, N.A., on or after the Effective Date (as applicable), the terms of the Committee/BOKF Plan Settlement Term Sheet shall be effectuated to the extent that they have not previously occurred.

(d)     This Plan shall be deemed a motion to settle all pending litigation that has been commenced by the Creditors' Committee or BOKF, N.A. in the Chapter 11 Cases, including the UCC Challenge Litigation, the BOKF Objection, and the objections to the YieldCo

Settlement Motion and pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and Confirmation of the Plan shall be deemed approval of such settlement.

### 6.2    [RESERVED]

### 6.3    Restructuring Transactions.

(a)    On or after the Confirmation Date, the Debtors (with the reasonable consent of the Supporting Second Lien Parties and the Creditors' Committee) shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "Restructuring Transactions"). In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations.

(b)    In effecting the Restructuring Transactions, the Debtors (with the reasonable consent of the Supporting Second Lien Parties and the Creditors' Committee) shall be permitted to (i) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

### 6.4    Sources of Cash for Plan Distribution. All Cash required for payments to be made under the Plan on the Effective Date shall be obtained from Cash on hand, proceeds of the Jointly Supported Transactions and, in the TERP Share Election Alternative only, proceeds of the Rights Offering.

(a)    **Rights Offering**. In the TERP Share Election Alternative, prior to the Effective Date and without the need for any further corporate action and without further action by the Holders of Claims or Interests, SUNE shall commence the Rights Offering

50

pursuant to the Rights Offering Procedures.  On the Effective Date, if the TERP Share Election Alternative shall have occurred, Reorganized SUNE shall distribute the Rights Offering Common Stock to the Rights Holders that participate in the Rights Offering as of the Rights Offering Record Date pursuant to the Rights Offering Procedures and the Equity Commitment Agreement.  The Rights Offering shall be fully backstopped by the Rights Offering Backstop Purchasers such that the Rights Offering results in the funding of Reorganized SUNE with the Rights Offering Amount on the terms and conditions set forth in the Rights Offering Backstop Commitment and the Equity Commitment Agreement.  In exchange for providing the Rights Offering Backstop Commitment for the Rights Offering, on the Effective Date, the Rights Offering Backstop Parties will receive payment of the Rights Offering Backstop Standby Fee to the extent earned and payable pursuant to the Equity Commitment Agreement and any order of the Bankruptcy Court approving such fee.  For the avoidance of doubt, the Rights Offering Backstop Standby Fee is a necessary expense of the Debtors' Estates and shall be deemed an Allowed Administrative Expense Claim pursuant to the order approving the Debtors' entry into the Rights Offering Commitment Letter and the Equity Commitment Agreement.

(b)     **Jointly Supported Transactions**.  The Debtors or Reorganized Debtors may enter into, support, or otherwise effectuate one or more Jointly Supported Transactions pursuant to which the Debtors or Reorganized Debtors sell or otherwise dispose of some or all of their equity interests in the YieldCos to a third party purchaser.  The Debtors or Reorganized Debtors are authorized to enter into and perform under the Jointly Supported Transaction Agreements and such other documents as may be required or appropriate.

**6.5     Reinstated Second Lien Claims**.  On the Effective Date, the Reinstated Second Lien Claims shall be reinstated as modified pursuant to the Reinstated Second Lien Claim Modification Terms.  The Debtors and Reorganized Debtors are authorized to take all actions necessary to amend the Second Lien Documents in accordance with the Reinstated Second Lien Claim Modification Terms and such amendments shall be deemed to be effective on the Effective Date.  All Liens granted in connection with the Second Lien Claims and that exist over property of the Debtors (and, to the extent applicable, non-Debtors) immediately prior to the Effective Date shall remain in full force and effect following the Effective Date to the extent that the Debtors or Reorganized Debtors have not otherwise disposed of such property free and clear of such Liens in connection with this Plan, and solely to the extent of the Reinstated Second Lien Claims.  The Holders of the Reinstated Second Lien Claims, and the amount held by such Holders, shall be consistent with the amounts held by such Holders of Reorganized SUNE equity.[9]

**6.6     Conversion and Distribution of Continuing TERP Class A Shares**.  In accordance with the Jointly Supported Transaction Agreements, the Debtors or Reorganized

---

[9] To the extent that (a) the Debtors elect the TERP Cash Election Alternative and (b) the cash received from the Jointly Supported Transactions is insufficient to repay the Tranche B Roll-Up Lenders in full and in Cash, the Debtors will issue Reinstated Tranche B Roll-Up Loans in an amount and with terms necessary to render the Tranche B Roll-Up Loans Unimpaired, including, without limitation, priority (over the Reinstated Second Lien Claims) in lien and claim amount and interest, and with other terms that are identical to the current Tranche B Roll-Up Loans. The provisions of Section 6.5 shall apply *mutatis mutandis* to the Reinstated Tranche B Roll-Up Loans.

Debtors are authorized to exercise any exchange or conversion rights with respect to their interests in the YieldCos, including the exchange or conversion of their Class B shares in TERP Inc. and/or Class B Units in TERP LLC into Class A shares in TERP Inc. in respect of which they may elect to retain Continuing TERP Class A Shares through the TERP Share Election Alternative.  The Debtors or Reorganized Debtors are authorized without further corporate or other action or approval to distribute the Continuing TERP Class A Shares to Holders of Allowed Second Lien Claims in accordance with this Plan, including the Rights Offering, free and clear of all Liens.

     **6.7**    **Administration of Repatriated Cash, Earnout Assets, and Residual Assets**.  Reorganized SUNE shall employ employees and maintain systems and back-office capabilities reasonably necessary to administer the Earnout Assets and the Residual Assets and to collect the Repatriated Cash, and shall use commercially reasonable efforts to (a) generate Earnout Proceeds and Residual Assets Proceeds therefrom and to maximize the recovery of Repatriated Cash and (b) to transfer such assets to Reorganized SUNE if not otherwise applied to the Reinstated Second Lien Claims.

     **6.8**    **Certain Transfers Between SUNE and Other Debtors**.  Following the Effective Date, the Reorganized Debtors may transfer in their sole discretion the right to receive any Earnout Proceeds, Residual Assets Proceeds, and the Repatriated Cash to Reorganized SUNE, free and clear of any Lien, except for the Liens securing the Reinstated Second Lien Claims.  The Confirmation Order shall authorize the Debtors to effectuate the transfer of the right to receive Earnout Proceeds, the Residual Assets Proceeds, and Repatriated Cash in accordance with the terms of the Plan as part of the settlements and compromises contained in the Plan.  All matters and transactions necessary to effectuate the transfer of the right to receive Earnout Proceeds, the Residual Assets Proceeds, or the Repatriated Cash, and any partnership, membership, or shareholder action required by the applicable Debtors in connection with such transfer will be deemed to have occurred and will be in effect, without any requirement of further action by those authorized to act on behalf of the applicable Debtors.  Upon entry of the Confirmation Order, subject to the terms of the Original DIP Facility and the Replacement DIP Facility, the appropriate officers or managing members of each Debtor shall be authorized and directed to issue, execute, deliver, file, and/or record any contracts, agreements, instruments, or other documents contemplated by, or necessary or desirable to effect, the transfer of the right to receive the Earnout Proceeds, the Residual Assets Proceeds, and the Repatriated Cash in accordance with the terms of the Plan, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the transfer of the right to receive the Earnout Proceeds, the Residual Assets Proceeds, and the Repatriated Cash, in each case in the name of and on behalf of the applicable Debtor.  The authorizations contained in this <u>Article 6.6</u> apply on a continuing basis to any Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash received by any Debtor (in such case, subject to the terms of the Original DIP Facility and the Replacement DIP Facility) or Reorganized Debtor following the entry of the Confirmation Order.

     **6.9**    **Authorization and Issuance of New SUNE Common Stock**.  On the Effective Date, Reorganized SUNE shall authorize and issue the New SUNE Common Stock.  Distribution of New SUNE Common Stock hereunder shall constitute issuance of 100% of such New SUNE Common Stock and in each case shall be deemed issued on the Effective Date.  The

issuance of New SUNE Common Stock by Reorganized SUNE is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the shares of New SUNE Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

**6.10    GUC/Litigation Trust Initial Funding**.  On the Effective Date, the GUC/Litigation Trust Initial Funding shall be $7.5 million, in accordance with the Committee/BOKF Plan Settlement Term Sheet.

**6.11    Exemptions from Securities Act Registration Requirements**.  Except as otherwise set forth in this Plan and consistent with the Jointly Supported Transaction Agreements (if applicable), the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein will be exempt from the registration requirements of Section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, Sections 4(a)(1) and 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving a public offering and Section 4(a)(1) exempts transactions by any person other than an issuer, underwriter, or dealer.  In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities (other than the Continuing TERP Class A Shares) issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to (1) the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, (2) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the GUC/Litigation Trust Agreement (if applicable), (3) any other applicable regulatory approval, and (4) the restrictions, if any, contained in the SUNE Certificate of Incorporation and Bylaws.  Except as otherwise set forth in this Plan, in reliance upon these exemptions, the offer, issuance, and distribution of Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder. Accordingly, the Securities may be subject to restrictions on transfer as set forth in the governing documents to such Securities.

**6.12    Cancellation of Old SUNE Securities and Agreements**.    On the Effective Date, except as otherwise specifically provided for herein (including with respect to the Reinstated Second Lien Claims), (a) the Old SUNE Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in SUNE (including the Indentures) shall be cancelled and (b) the obligations of, Claims against, and/or Interests in SUNE under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old SUNE Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of SUNE shall be released and discharged and cancelled; provided, however, that any agreement (including the Indentures) that governs the rights of a Holder of a

Claim that is otherwise released, discharged, and cancelled and that is administered by a Servicer shall continue in effect, notwithstanding anything to the contrary contained herein, solely for the purposes of (a) enabling Holders of Allowed Claims to receive distributions under the Plan and (b) allowing and preserving the rights of any Servicer to (i) make the distributions on account of such Claims under this Plan as provided for in <u>Articles 7.10</u>, <u>7.11</u>, and <u>10.5(c)</u> of this Plan, (ii) maintain and exercise any charging liens against any such distributions for the payment of fees and expenses and for indemnification under the applicable Indenture; (iii) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or in any other court; and (iv) enforce any obligation owed to such Servicer under the Plan; <u>provided</u>, <u>further</u>, that any indemnification and reimbursement obligations in respect of the Replacement DIP Facilities, the Existing DIP Facilities, the Prepetition Second Lien Credit Facility, the Prepetition Second Lien Notes, and/or the Prepetition First Lien Credit Facility (in each case as defined in the Replacement DIP Order) which are expressly stated to survive any repayment under, or termination of, such respective facilities shall survive any cancellation or discharge under this Plan in accordance with their respective terms, and any rights that the Agents (in each case as defined under the respective Replacement DIP Documents, Existing DIP Documents, the Prepetition Second Lien Credit Facility, the Prepetition Second Lien Notes, or the Prepetition First Lien Credit Facility (each as defined in the Replacement DIP Order)) may have under the agency provisions of such facilities shall survive any such cancellation or discharge. Notwithstanding the foregoing, in no event shall the 2020 Exchangeable Notes be cancelled with respect to any non-Debtor obligor thereof, nor shall any non-Debtor be released or discharged with respect to any obligation under the 2020 Exchangeable Notes or the 2020 Exchangeable Notes Indenture by any provision of this Plan.

   **6.13 Issuance and Distribution of New Securities; Execution of Plan Documents**.  Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan and shall amend the Second Lien Documents to implement the Reinstated Second Lien Claim Modification Terms, in form and substance reasonably satisfactory to the Supporting Second Lien Parties.

   **6.14 Continued Corporate Existence**.

    (a) Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation under applicable law in the jurisdiction in which each respective Debtor is incorporated and pursuant to its respective certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organization documents are amended and restated by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b)      Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in <u>Article 11.1</u> of this Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.

**6.15    Certificate of Incorporation and Bylaws**.    The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnership, or other forms of Entity) of the Debtors shall be amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (and which shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties) and the form and substance of which shall be included in the Plan Supplement.    After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnership, or other forms of Entity) as permitted by applicable state corporation law and their respective charters and bylaws or other organizational documents.

**6.16    Directors and Officers of Reorganized Debtors**.    Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors and each of the initial officers of the Reorganized Debtors (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing.    The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Supporting Second Lien Parties.

**6.17    Corporate Action**.    Each of the matters provided for under this Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of the Debtors or the Reorganized Debtors.    Such actions may include, (a) the adoption and filing of the SUNE Certificate of Incorporation and Bylaws, (b) the appointment of the New Boards, and (c) the issuance and distribution of New SUNE Common Stock and (d) the distribution of Continuing TERP Class A Shares.

**6.18    Effectuating Documents; Further Transactions**.    On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**6.19    Employment, Retirement, Indemnification and Other Agreements and Employee Compensation Programs**.

(a)    **Employment Agreements**.  To the extent that the Debtors intend for any employment, retirement, indemnification or other agreement with its respective directors, officers, managing members and employees to remain in place after the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, will list such agreement on the list of  "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan, and such agreement will be assumed as of the Effective Date.  If the Debtors do not list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1, such agreement shall be deemed rejected.  The Debtors, with the reasonable consent of the Supporting Second Lien Parties, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.

(b)    **Other Incentive Plans and Employee Benefits**.  Unless otherwise specified in this Plan, and except in connection and not inconsistent with Article 6.19(a), on and after the Effective Date, the Reorganized Debtors shall have the discretion, with the reasonable consent of the Supporting Second Lien Parties, to (a) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided herein, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including the Employee Compensation Plans, any incentive plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

**6.20    Preservation Of Causes Of Action**.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not (a) released pursuant to Article 11.5 of this Plan or an order of the Bankruptcy Court or (b) GUC/Litigation Trust Causes of Action, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.20, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all**

**available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for transfer to the GUC/Litigation Trust and later adjudication.

**6.21    Reservation of Rights**. With respect to Avoidance Actions that are transferred to the GUC/Litigation Trust in accordance with Article 7.5 of this Plan, the Debtors, the Reorganized Debtors, and the GUC/Litigation Trust as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the transferred Avoidance Actions as a basis to object to all or any part of a claim against any of the Estates asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**6.22    Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan, or any transaction entered into by the GUC/Litigation Trust, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.23    Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and, (b) solely for the portion of such Claim that is not paid by the applicable insurance policy, receive the treatment provided for in this Plan for Allowed General Unsecured Claims.

**6.24    Intercompany Account Settlement.** The Debtors and the Reorganized Debtors, and their respective Affiliates, with the reasonable consent of the Supporting Second Lien Parties, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. For the avoidance of doubt, because Intercompany Claims are the collateral of the Original DIP Facility, the Replacement DIP Facility, the Second Lien Loans, and the Second Lien Senior Notes, such transfers or settlements shall not affect distributions under the Plan.

**6.25    Private Company.** It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the SEC or list such equity on an exchange; provided, however, that, to the extent applicable, the Reorganized Debtors may (in the discretion of the New Boards) implement procedures to facilitate trading of such equity, *e.g.*, providing investors with access (on a secure

website) to current information concerning the Reorganized Debtors and their subsidiaries on a consolidated basis.

## ARTICLE VII

## GUC/LITIGATION TRUST

7.1    **GUC/Litigation Trust Agreement**.  The GUC/Litigation Trust shall be established on the Effective Date and shall be governed and administered in accordance with the GUC/Litigation Trust Agreement.  The GUC/Litigation Trust Agreement shall be drafted by the Creditors' Committee's Professionals and shall be in form and substance acceptable to the Creditors' Committee and reasonably acceptable to the Debtors.   Any provisions of the GUC/Litigation Trust Agreement that affect any rights of any holders of Class B GUC/Litigation Trust Interests shall be in form and substance acceptable to the Supporting Second Lien Parties (or their advisors).  The GUC/Litigation Trust Assets or such portion of the GUC/Litigation Trust Assets as determined by the Creditors' Committee/GUC/Litigation Trust Oversight Board shall be used to fund the activities of the GUC/Litigation Trust, including the prosecution of the GUC/Litigation Trust Causes of Action.  For the avoidance of doubt, the GUC/Litigation Trust Initial Funding shall be used to prosecute GUC/Litigation Trust Causes of Action and pay other expenses of the GUC/Litigation Trust prior to any excess being distributed to Holders of Allowed General Unsecured Claims.  The GUC/Litigation Trust Agreement shall provide for (i) distributions at least once per year; (ii) an initial distribution within thirty (30) days of the Effective Date (including deposits into the GUC Disputed Claims Reserve as provided in (iii) hereof) of no less than 50% of all Cash which is transferred to the GUC/Litigation Trust on the Effective Date subject to any holdback necessary to fund or maintain the GUC Disputed Claims Reserve; and (iii) mechanics for a GUC Disputed Claims Reserve sufficient to ensure that a holder of a Disputed General Unsecured Claim which becomes Allowed after the Effective Date receives aggregate distributions from the GUC/Litigation Trust equal to what such holder would have received had such Claims been Allowed on the Effective Date (net of any taxes imposed on, or with respect to, the GUC Disputed Claims Reserve as relates to such Claim, including in connection with such distributions).  The first $2 million of Cash to be distributed from the GUC/Litigation Trust shall be distributed to the Convertible Senior Notes Indenture Trustee as partial payment of its fees and expenses incurred in connection with these Chapter 11 Cases.

7.2    **Class A and Class B GUC/Litigation Trust Interests.**

(a)    Class A GUC/Litigation Trust Interests.   Holders of Class A GUC/Litigation Trust Interests shall be entitled to share in all of the GUC/Litigation Trust Assets.

(b)    Class B GUC/Litigation Trust Interests.   Holders of Class B GUC/Litigation Trust Interests shall only be entitled to the following:

(i)    forty-eight percent (48%) of the Additional Net Avoidance Action Proceeds; provided, that, the GUC/Litigation Trust Agreement shall provide that the GUC/Litigation Trust Agreement may not be amended to change the distributions set forth in this clause (i) without the consent of 75% of the holders (in amount of Class B GUC/Litigation

58

Trust Interests held, not number of holders) of the Class B GUC/Litigation Trust Interests in the GUC/Litigation Trust and the requisite consent of the holders of the Class A GUC/Litigation Trust Interests in the GUC/Litigation Trust in accordance with the GUC/Litigation Trust Agreement;

        (ii)    delivery of the GUC/Litigation Trust Reports;

        (iii)    following the filing of any Contingency Fee Advisor Retention Notice, at the request of any of the holders of Class B GUC/Litigation Trust Interests (or their advisor at the instruction of a holder) the GUC/Litigation Trust Trustee will provide additional information regarding the proposed contingency fee engagement (including the actual engagement letter on a confidential basis, if so requested). Holders of Class B GUC/Litigation Trust Interests (or their advisors at the instruction of a holder) shall have ten (10) Business Days from the date of the filing of the Contingency Fee Advisor Retention Notice to file with the Bankruptcy Court a pleading seeking to prohibit such retention on the grounds that such retention is not consistent with the purpose of the Committee/BOKF Plan Settlement Term Sheet because the engagement does not provide a sufficient incentive for such contingency fee advisor to procure Additional Net Avoidance Action Proceeds, and the GUC/Litigation Trust, GUC Litigation Trust Trustee, GUC Litigation Trust Oversight Board, or the Committee may oppose such pleading (but solely with respect to such issue), and the Bankruptcy Court shall retain jurisdiction to settle such dispute;

        (iv)    enforcement rights with regard to any and all of the above rights (and clause (v) below) (as well as the fiduciary duties owed to all holders of GUC/Litigation Trust Interests by the GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board as set forth below); and

        (v)    reasonable consent rights with regard to any modifications, amendments, or supplements of the GUC/Litigation Trust Agreement that affect (i) through (iv) above.

        (c)    The GUC/Litigation Trust Trustee shall provide GUC/Litigation Trust Reports to all Holders of GUC/Litigation Trust Interests.

        **7.3**    **GUC/Litigation Trust Governance**. The GUC/Litigation Trust Trustee, who shall administer the GUC/Litigation Trust, shall be selected by the Creditors' Committee. All GUC/Litigation Trust governance issues shall be determined by the Creditors' Committee including the composition of the GUC/Litigation Trust Oversight Board. The GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board shall owe fiduciary duties to all holders of GUC/Litigation Trust Interests. The GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board shall have the authority to retain any advisors for the purpose of carrying out their respective duties under the GUC/Litigation Trust Agreement. The GUC/Litigation Trust Trustee shall file a notice (summarizing the key terms of such retention, including the economic terms thereof) regarding the proposed retention of any such advisors on a contingency fee basis (other than the GUC/Litigation Trust Trustee) (each such notice, a "Contingency Fee Advisor Retention Notice") on the docket of the Bankruptcy Court.

**7.4    Tax Treatment.** It is intended that the GUC/Litigation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business. In furtherance of this objective, the GUC/Litigation Trust Trustee shall, in an expeditious but commercially reasonable manner and exercising its reasonable business judgment, liquidate and convert to cash the GUC/Litigation Trust Assets (which may include the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action) and not unduly prolong the existence of the GUC/Litigation Trust.    All assets held by the GUC/Litigation Trust on the Effective Date shall be treated for federal income tax purposes (i) to have been distributed (subject to any obligations relating to such assets) by the Debtors or Reorganized Debtors to the GUC/Litigation Trust Beneficiaries (other than the assets allocable to Disputed Claims) in satisfaction of Allowed General Unsecured Claims and in partial satisfaction of Allowed Second Lien Claims and (ii) immediately thereafter contributed by the holder of such Claims (thereafter, the GUC/Litigation Trust Beneficiaries) to the GUC/Litigation Trust in exchange for GUC/Litigation Trust Interests. The GUC/Litigation Trust Trustee shall in good faith value all of the GUC/Litigation Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the GUC/Litigation Trust (including, without limitation, the Debtors, the Reorganized Debtors, the GUC/Litigation Trust Trustee, and GUC/Litigation Trust Beneficiaries) for all federal income tax purposes.  The GUC/Litigation Trust Beneficiaries shall be treated for federal income tax purposes as the grantors and owners of their respective share of the GUC/Litigation Trust Assets (other than such GUC/Litigation Trust Assets as are allocable to Disputed Claims).  The GUC/Litigation Trustee shall file tax returns and other tax filings for the GUC/Litigation Trust treating the GUC/Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the GUC/Litigation Trust Trustee of a private letter ruling if the GUC/Litigation Trust Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC/Litigation Trust Trustee), the GUC/Litigation Trust Trustee may (A) timely elect to treat the GUC Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the GUC/Litigation Trust Trustee, the Debtors and the GUC/Litigation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

The GUC/Litigation Trust Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the GUC/Litigation Trust Beneficiaries or any amounts received or earned by the GUC/Litigation Trust treated as allocable to the GUC/Litigation Trust Beneficiaries.  All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such GUC/Litigation Trust Beneficiaries for all purposes of the GUC/Litigation Trust Agreement. The GUC/Litigation Trust Trustee shall be authorized to collect such tax information from the GUC/Litigation Trust Beneficiaries (including, without limitation, social security numbers or

other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the GUC/Litigation Trust Agreement. In order to receive distributions under the Plan, all GUC/Litigation Trust Beneficiaries will need to identify themselves to the GUC/Litigation Trust Trustee and provide tax information and the specifics of their holdings, to the extent the GUC/Litigation Trust Trustee deems appropriate. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The GUC/Litigation Trust Trustee may refuse to make a distribution to any GUC/Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a GUC/Litigation Trust Beneficiary, the GUC/Litigation Trust Trustee shall make such distribution to which the GUC/Litigation Trust Beneficiary is entitled, without interest; and, provided, further, that, if the GUC/Litigation Trust Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the GUC/Litigation Trust Trustee is later held liable for the amount of such withholding, such holder shall reimburse the GUC/Litigation Trust Trustee for such liability.

### 7.5    GUC/Litigation Trust Assets.

(a)    On the Effective Date, or on such other date as is set forth in the GUC/Litigation Trust Agreement, pursuant to section 1123(b)(3) of the Bankruptcy Code, the GUC/Litigation Trust Assets shall be transferred by the Debtors (and deemed transferred) to the GUC/Litigation Trust free and clear of all Claims, Liens, charges, encumbrances, rights, and interests, without the need for any Entity to take any further action or obtain any approval and the GUC/Litigation Trust shall be authorized as the representative of the Estates to pursue GUC/Litigation Trust Causes of Action.

(b)    For the avoidance of doubt, Causes of Action transferred, assigned, and delivered to the GUC/Litigation Trust shall not include any Causes of Action (i) against the YieldCos or otherwise released in the YieldCo Settlement Agreements, (ii) against any or all of the Prepetition Secured Parties in their capacities as such, (iii) against any of the DIP Secured Parties in their capacities as such (as such terms are defined in the Original DIP Facility Order), or (iv) against any of the Replacement DIP Secured Parties in their capacities as such (as such terms are defined in the Replacement DIP Facility Order). For the avoidance of doubt, the Second Lien Litigation will not be transferred to the GUC/Litigation Trust.

### 7.6    GUC/Litigation Trust Causes of Action.

(a)    GUC/Litigation Trust Causes of Action shall exclude any action released or settled by the Debtors pursuant to this Plan or an order of the Bankruptcy Court; provided, that with respect to any settlements or releases proposed by the Debtors after the Disclosure Statement Order is entered, such settlements or releases shall require the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

(b)    The GUC/Litigation Trust, with the consent of the Reorganized Debtors to the extent such GUC/Litigation Trust Causes of Action interfere with (i) the Reorganized Debtors' collection of Earnout Proceeds, Residual Assets Proceeds, or Repatriated Cash or (ii) the continuing operations of TERP, shall determine whether to bring, settle, release,

compromise, or enforce such GUC/Litigation Trust Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The GUC/Litigation Trust or any successors may pursue such litigation claims in accordance with the best interests of the GUC/Litigation Trust or any successor holding such rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any GUC/Litigation Trust Cause of Action against them as any indication that the GUC/Litigation Trust will not pursue any and all available GUC/Litigation Trust Causes of Action against them. The GUC/Litigation Trust expressly reserves all rights to prosecute any and all GUC/Litigation Trust Causes of Action against any Entity, except as otherwise provided in the Plan.** Unless any GUC/Litigation Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the GUC/Litigation Trust expressly reserves all GUC/Litigation Trust Causes of Action for later adjudication.

7.7    **Disputed Claims Reserve**. From and after the Effective Date, in accordance with the GUC/Litigation Trust Agreement, the GUC/Litigation Trust Trustee shall hold and maintain the GUC Disputed Claims Reserve for the benefit of the Holders of such Disputed General Unsecured Claims, including any amounts that would otherwise have been received by each such holder from the GUC/Litigation Trust had such Disputed Claim been an Allowed Claim on the Effective Date, determined based on (i) the asserted amount of such Disputed Claim, (ii) such other amount as may be agreed upon by the Holder of such Disputed Claim and the GUC/Litigation Trust Trustee or (iii) except with respect to any Disputed General Unsecured Claims asserted by Vivint Solar, Inc., such other amount as may be deemed appropriate by the GUC/Litigation Trust Trustee in accordance with the terms of the GUC/Litigation Trust Agreement (in each case, net of any taxes imposed on, or with respect to, the GUC Disputed Claims Reserve as relates to such Claim, including in connection with such distributions).

7.8    **Claims Objections and Transition Services.** The Debtors or the Reorganized Debtors, as the case may be, will cooperate with the Creditors' Committee and its Professionals in relation to the GUC/Litigation Trust's prosecution of Avoidance Actions and Claims objections, on the terms set forth on Annex 1 to the Committee/BOKF Plan Settlement Term Sheet. To that end, and consistent with Annex 1 to the Committee/BOKF Plan Settlement Term Sheet, on the Effective Date, the GUC/Litigation Trust and Reorganized SUNE will enter into an agreement (the "Transition Services Agreement") pursuant to which Reorganized SUNE will provide services, which may include personnel, systems, and access to books and records, to the GUC/Litigation Trust in connection with the administration of the GUC/Litigation Trust Assets, including claims administration and the prosecution of the GUC/Litigation Trust Causes of Action. The Transition Services Agreement shall include customary indemnification and limitations of liability to Reorganized SUNE and its representatives that provide services to the GUC/Litigation Trust; provided, however, that the indemnification shall exclude any liability of the GUC/Litigation Trust for any claims relating to the gross negligence or willful misconduct of Reorganized SUNE. A copy of the Transition Services Agreement will be filed with the Plan Supplement.

**7.9**      **Indemnification and Exculpation**.  The GUC/Litigation Trust Trustee or the individuals comprising the GUC/Litigation Trust Trustee, as the case may be, and the GUC/Litigation Trust Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the GUC/Litigation Trust Trustee, except those acts arising out of its or their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the GUC/Litigation Trust Trustee, except for any actions or inactions involving willful misconduct or gross negligence.    Any indemnification or reimbursement claim of the GUC/Litigation Trust Trustee (and the other parties entitled to indemnification or reimbursement under this subsection) shall be satisfied first from the GUC/Litigation Trust Initial Funding and, then, to the extent the GUC/Litigation Trust Initial Funding is exhausted, from other GUC/Litigation Trust Assets.  The GUC/Litigation Trust Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

**7.10**      **Preservation of Privilege and Defenses**.  No action taken by the Debtors or Reorganized Debtors in connection with this Plan, shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or Reorganized Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).    The Confirmation Order shall provide that notwithstanding the Reorganized Debtors' providing any privileged information (if any) to the GUC/Litigation Trust Trustee, the GUC/Litigation Trust, or any party or person associated with the GUC/Litigation Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estates and shall remain privileged.    The Confirmation Order shall provide that the GUC/Litigation Trust shall have no right to waive the attorney-client privilege, work product or other protection of any information received from the Reorganized Debtors.  The Debtors (or the Reorganized Debtors) retain the right to waive their own privileges.  The GUC/Litigation Trust shall have no right to any privileged information or analysis of the Debtors or the Reorganized Debtors.

**7.11**      **No Bonding of GUC/Litigation Trust Claims**.    There shall be no bonding of the GUC/Litigation Trust Trustee.

**7.12**      **Service of the Indenture Trustees**.  The applicable Indenture Trustees and their respective agents, successors and assigns, and the GUC/Litigation Trust Trustee shall facilitate the making of the Plan Distributions to the Holders of the Second Lien Senior Notes Claims and the Convertible Senior Notes Claims, to the extent applicable, in accordance with the Plan.  The GUC/Litigation Trust Trustee shall be obligated to calculate the distributions to be made on account of Class B GUC/Litigation Trust Interests and the distributions to be made to Holders of Allowed Convertible Senior Notes Claims, as applicable, and shall provide such distribution calculations and related information to the applicable Indenture Trustees at least five (5) business days in advance of the GUC/Litigation Trust Trustee making distributions on account of Class B GUC/Litigation Trust Interests or Convertible Senior Notes Claims, as applicable.    The applicable Indenture Trustees shall only be required to act and make distributions in accordance with the Plan, shall not be required to independently verify or review the calculations prepared by the GUC/Litigation Trust Trustee with respect to distributions to be made on account of Class B GUC/Litigation Trust Interests or made to Holders of Convertible

Senior Notes Claims, as applicable, and shall have no liability for actions taken in accordance with the Plan or in reliance upon distribution information and distribution calculations provided by the GUC/Litigation Trust Trustee, except solely for actions or omissions arising out of such Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct. Further, the Indenture Trustees shall have no obligation or liability for distributions under the Plan to any party who does not (i) hold a Claim against the Debtors as of the Distribution Record Date or (ii) otherwise comply with the terms of the Plan, except solely for actions or omissions arising out of such Indenture Trustee's intentional fraud, willful misconduct, gross negligence or criminal conduct.

7.13    **Delivery of Distributions on Account of Second Lien Senior Notes Claims and Convertible Senior Notes Claims**. Upon the occurrence of the Effective Date, the Claims of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee for the Second Lien Senior Notes Claims and the Convertible Senior Notes Claims, as applicable, shall be, for purposes under the Plan, including without limitation, the right to receive Plan distributions, substituted for all Claims of individual Holders of Allowed Second Lien Senior Notes Claims and Convertible Senior Notes Claims, as applicable; provided, however, that non-Cash consideration shall not be distributed in the name of the Second Lien Senior Notes Indenture Trustee or the Convertible Senior Notes Indenture Trustee. The Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Second Lien Senior Notes Claims and Convertible Senior Notes Claims, as applicable, in accordance with the Plan and the applicable Indenture. As soon as practicable in accordance with the requirements set forth in this Article VII, the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable, shall arrange to deliver such distributions to or on behalf of such Holders, subject to the charging liens of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable. If the Second Lien Senior Notes Indenture Trustee or the Convertible Senior Notes Indenture Trustee is unable to make, or consents to the GUC/Litigation Trust Trustee making, such distributions, the GUC/Litigation Trust Trustee, with the cooperation of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable, shall make such distributions to the extent practicable to do so, including by means of book-entry exchange through the facilities of DTC in accordance with DTC's customary practices (provided that until such distributions are made, the charging lien of the Second Lien Senior Notes Indenture Trustee and the Convertible Senior Notes Indenture Trustee, as applicable, shall attach to the property to be distributed in the same manner as if such distributions were made through the Second Lien Senior Notes Indenture Trustee or the Convertible Senior Notes Indenture Trustee, as applicable). For the avoidance of doubt, the Second Lien Senior Notes Indenture Trustee shall have no duty to make any distributions that are not DTC eligible.

7.14    **Tax Determination.** The GUC/Litigation Trustee may request an expedited determination of Taxes of the GUC/Litigation Trust (including with respect to the GUC Disputed Claims Reserve) under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the GUC/Litigation Trust (or the GUC Disputed Claims Reserve) for all taxable periods through the dissolution of the GUC/Litigation Trust.

## ARTICLE VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**8.1    Rejection of Executory Contracts and Unexpired Leases**.

(a)    **Automatic Rejection**.  Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan; (b) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim; or (e) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.

(b)    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**.  To the extent not inconsistent with the YieldCo Settlement Agreements, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary and to the extent consistent with the YieldCo Settlement Agreements, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

(c)    **Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases**.  Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection.  Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the

65

contrary.   All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)    **Reservation of Rights**.  Notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors (or the Reorganized Debtors), with the consent of the Supporting Second Lien Parties, amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

**8.2    Assumption of Executory Contracts and Unexpired Leases**.  Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease (other than Executory Contracts or Unexpired Leases that (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court or have been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date or (b) are the subject of a motion to reject pending as of the Effective Date) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in Exhibit 8.1 of the Plan shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  With respect to each such Executory Contract and Unexpired Lease, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(a)    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    **Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed**.  Any and all proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from

66

the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

        **8.3**     **Indemnification Obligations**.  From and after the Effective Date, but subject to the rest of this Article 8.3, the Reorganized Debtors will indemnify each Indemnitee to the same extent of any Indemnification Obligation in effect immediately prior to the Effective Date.  The Reorganized Debtors' Indemnification Obligations shall remain in full force and effect, shall not be modified, reduced, discharged under section 1141 of the Bankruptcy Code, impaired, or otherwise affected in any way, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, or after the Petition Date; provided, however, that the Reorganized Debtors shall have no Indemnification Obligations to an Indemnitee for any losses, liabilities, or expenses arising out of conduct determined by a Final Order to have constituted fraud, gross negligence, bad faith, or willful misconduct.  Except as expressly set forth in the proviso and, notwithstanding anything contained in any Assumed Executory Contracts and Unexpired Leases to the contrary, (i) the Reorganized Debtors' will have no indemnification liability under this Article 8.3 arising out of any losses, liabilities, or expenses relating to events that occurred prior to the Petition Date giving rise to Indemnification Obligations ("Prepetition Indemnification Obligations"), and (ii) any claims against the Debtors for any indemnification liability owed to any Indemnitee arising out of any losses, liabilities, or expenses relating to events that occurred prior to the Petition Date giving rise to Indemnification Obligations shall be treated as General Unsecured Claims; provided, however, that the Reorganized Debtors shall pay any Prepetition Indemnification Obligations of the Existing Directors at an amount to be set forth in the Plan Supplement (in an amount not less than $350,000 nor more than $1.3 million) (the "Plan Supplement Amount"), to be agreed to prior to the Effective Date by the Debtors and the Supporting Second Lien Parties acting reasonably and in good faith, for all Existing Directors and shall be for fees, costs or expenses (but not judgments, losses, liabilities, or settlements payable to third parties) not covered by D&O Insurance or the EPL Policy (including, without limitation, because either (x) they are not covered by such policies or (y) such policies have been exhausted) for all such Prepetition Indemnification Obligations.  The manner and terms of the Plan Supplement Amount shall be set forth in the Plan Supplement, it being agreed and acknowledged that the Plan Supplement Amount shall be payable by the Reorganized Debtors from time to time within five business days' notice provided by counsel to the Existing Directors, except to the extent that the Reorganized Debtors after making such payment would not have sufficient liquidity to fund ordinary course business operations for at least 90 days thereafter.  The treatment of Indemnification Obligations in this Article 8.3 shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation of the Debtors.  In accordance with the foregoing, the Debtors and the Reorganized Debtors shall cooperate with Indemnitees in relation to Indemnification Obligations, including, but not limited to, responding to reasonable requests for information and providing access to attorneys, financial advisors, accountants and other professionals with knowledge of matters relevant to any such claim covered by an Indemnification Obligation.  For the avoidance of doubt, and notwithstanding anything to the contrary in this Plan, or any prior order of the Bankruptcy Court regarding the retention of such professional, or otherwise, in no event will (a) the Debtors have any obligation to indemnify Debtor Professionals or any professional, consultant, representative, counsel or other advisor who served for the Debtors in such capacity at any time prior to the Effective Date for prepetition conduct (or Causes of Action stemming from prepetition conduct), although any

67

such indemnification obligation may give rise to a General Unsecured Claim, and (b) the Reorganized Debtors have any obligation to indemnify Debtor Professionals or any professional, consultant, representative, counsel or other advisor who served for the Debtors in such capacity at any time prior to the Effective Date for prepetition conduct (or Causes of Action stemming from such prepetition conduct).

### 8.4    **Insurance Policies**.

(a)    Notwithstanding anything to the contrary in the Disclosure Statement, the Disclosure Statement Order, the Plan, the Plan Transaction Documents, the Plan Supplement, the Confirmation Order, any prepetition or administrative claim bar date order (or notice) or claim objection order, including, without limitation, the Bar Date Orders and the Administrative Claims Bar Date, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that confers jurisdiction or purports to be preemptory or supervening or grants an injunction or release, including, but not limited to, the injunctions set forth in Article 11.9 of the Plan): (i) on the Effective Date, the Reorganized Debtors shall reject all insurance policies except for the D&O Insurance, the EPL Policy, and those specific insurance policies (and all agreements related thereto) that are set forth in the Plan Supplement, which shall be assumed in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code as such insurance policies and such agreements related thereto may be amended or modified (such assumed insurance policies and related agreements, collectively, the "Insurance Contracts"); (ii) nothing alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Contracts (including any and all letters of credit and other collateral and security provided in relation thereto) and all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) thereunder, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect; (iii) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Contracts (including, but not limited to, (A) any agreement to arbitrate disputes, (B) any provisions regarding the provision, maintenance, use, nature and priority of collateral/security, and (C) any provisions regarding the payment of amounts within any deductible by the insurers and the obligation of the Debtors (or, after the Effective Date, the Reorganized Debtors) to pay or reimburse the applicable insurer therefor and any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred; (iv) nothing alters or modifies the duty, if any, that the insurers and/or third party administrators have to pay claims covered by the Insurance Contracts and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor in accordance with the terms of the Insurance Contracts; and (v) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 11.9 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (A) claimants with valid claims covered by any of the Insurance Contracts, including, but not limited to, valid workers' compensations claims or direct action claims against an insurer under applicable non-bankruptcy law (the "Insured Claims") to proceed with their claims, in each case against the applicable insurer, or, to the extent required by applicable law, nominally

68

against any of the Debtors (or after the Effective Date, the Reorganized Debtors); (B) insurers and/or third party administrators to administer, handle, defend, settle, and/or pay, in the ordinary course of business and subject to the terms of the Insurance Contracts, without further order of the Bankruptcy Court, (I) all Insured Claims, and (II) all costs in relation to each of the foregoing; (C) insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Contracts, in such order as the applicable insurer may determine; and (D) the insurers and/or third party administrators to (I) cancel any policies under the Insurance Contracts, and (II) take other actions relating thereto, in each case to the extent permissible under applicable non-bankruptcy law, each in accordance with the terms of the Insurance Contracts.  For the avoidance of doubt, the Debtors or Reorganized Debtors, as applicable, shall retain the right, if any, to challenge any amounts owed under the Insurance Contracts in accordance with their terms; provided, however, that nothing in this Article 8.4(a) or any other provision of the Plan shall permit a challenge by the Debtors, Reorganized Debtors, or any other Person to rights of TERP, GLBL and their directors and officers to access coverage under the Insurance Contracts pursuant to the SunEdison/YieldCos Settlement Agreement unless and until such time as the Bankruptcy Court denies a motion to approve such agreement.

(b)    The Debtors or the Reorganized Debtors, as the case may be, shall maintain D&O Insurance and the EPL Policy providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors; provided, however, that nothing in the Plan or the Confirmation Order alters the terms and conditions of the D&O Insurance.

(c)    Notwithstanding anything to the contrary contained herein, but subject to the terms and conditions of the D&O Insurance, which policies shall be assumed pursuant to this Plan, the Existing Directors shall be deemed to be the independent directors of the Reorganized Debtors solely with respect to the D&O Insurance, including, but not limited to, with respect to the rights referred to in Endorsement 12 of ACE American Insurance Company's ACE Advantage Management Protection Policy Number DON G23652389009 (the "ACE Policy") and any other provision in the D&O Insurance that permits independent directors to direct an insurer to delay any payment of Loss (as defined in the ACE Policy) otherwise due and owing to or on behalf of the Company (as defined in the ACE Policy); provided, however, that with respect to the D&O Insurance, the Existing Directors shall continue to be bound by the terms and conditions set forth in the SunEdison/YieldCos Settlement Agreement, unless and until such time as the Bankruptcy Court denies a motion to approve such agreement. Notwithstanding anything to the contrary herein or contained in any organizational or governance document of the Reorganized Debtors, the New Board shall have no rights to terminate, reduce or otherwise impair the D&O Insurance or the EPL Policy and any of the rights of the Existing Directors thereunder that existed immediately before the Effective Date, including, but not limited to, by retracting any notice sent pursuant to Endorsement 12 of the

ACE Policy or any similar provision of any other D&O Insurance policy, and any such attempt by the New Board to do so shall be deemed void *ab initio*.

**8.5** **Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases**.    With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors, with the reasonable consent of the Supporting Second Lien Parties, shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure.    Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties, with the reasonable consent of the Supporting Second Lien Parties, to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.    Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.    The Debtors shall serve a counterparty to an Executory Contract or Unexpired Lease to be assumed hereunder with evidence of adequate assurance upon such counterparty's written request to the Debtors' counsel.

If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, with the reasonable consent of the Supporting Second Lien Parties, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.    The Debtors, with the reasonable consent of the Supporting Second Lien Parties, or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(a)    **Cure Notices**.    No later than seven (7) days prior to the Confirmation Hearing, and pursuant to the Assumption and Rejection Procedures, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (i) list the applicable Cure, if any, (ii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iii) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (iv) explain the

70

process by which related disputes will be resolved by the Bankruptcy Court. If no objection is timely received, the non-Debtor party to the Assumed Contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease.

(b)    **Cure Objections**. If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or Reorganized Debtors and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served so that they are actually received by the Cure Objection Deadline.

(c)    **Hearing with Respect to Objections**. If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Article 8.5(b), and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors. Objections to the proposed Cure Amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(d)    **Reservation of Rights**. Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice, subject to the Assumption and Rejection Procedures, and shall serve such notice on the applicable counterparty; provided, that notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved with respect to any such amended decision or notice. In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure Objection which has not been resolved prior to the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties, may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

8.6    **Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date**. Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms of such Executory Contract or Unexpired Lease.

8.7    **General Reservation of Rights**. Neither the exclusion nor inclusion of any contract or lease on Exhibit 8.1 of the Plan, in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of its Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease

71

is or was executory or unexpired at the time of assumption, the Debtors (with the reasonable consent of the Supporting Second Lien Parties) or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

### 8.8    Surety Bonds.

(a)    Notwithstanding anything in the Plan Transaction Documents to the contrary, nothing in the Plan Transaction Documents shall discharge, release, impair or otherwise diminish any Surety's valid rights to (1) subrogation under the applicable surety bond or indenture agreement or under applicable law or (2) setoff or recoupment to the extent permitted under applicable law.  To the extent that a Surety pays, has paid or otherwise discharges a bonded obligation, in part or in full, a Claim against any of the Debtors  which also relates to the applicable surety bond or indenture agreement, such Claim shall not be reduced by any amount paid by such Surety and such Surety's subrogation rights shall remain.  Any party to whose rights a Surety may or has become subrogated, shall also retain their set-off and recoupment rights to the extent permitted under applicable law and any such party's Claim shall not be reduced by the amount of any corresponding loss of the Surety.

(b)    Nothing in the Plan Transaction Documents shall impair a Surety's rights with respect to any and all letters of credit, proceeds drawn or to be drawn from letters of credit, other collateral of a Surety as security for bonded obligations under an existing or new Surety Bond, or any security or trust interest of any Surety or any party whose rights a Surety may become subrogated.

(c)    Notwithstanding anything in the Plan Transaction Documents to the contrary, including Section 11.14 of the Plan, to the extent the Bankruptcy Court disallows a Claim for reimbursement or contribution, all rights of a Surety under section 502(j) of the Bankruptcy Code are preserved.

(d)    Notwithstanding any provision of the Plan Transaction Documents to the contrary, any and all rights delineated for XL contained in that certain Notice of Rejection, filed with the Bankruptcy Court on October 21, 2016 (Docket No. 1457), shall not be abrogated in any manner by the Plan Transaction Documents.

### ARTICLE IX

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

9.1    **Determination Of Claims and Interests**.  After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article 6.20, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the

Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this Article 9.1 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

**9.2**     **Claims Administration Responsibility**.  Except as otherwise specifically provided for in the Plan or the Committee/BOKF Plan Settlement Term Sheet, including with respect to the administration of and making distributions with respect to General Unsecured Claims in accordance with Article VII, after the Effective Date, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors, including, without limitations, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (b) making distributions (if any) with respect to all Claims and Interests.

**9.3**     **Objections to Claims**.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors, or the GUC/Litigation Trust Trustee, as applicable, without further notice to parties-in-interest).    Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

**9.4**     **Disallowance of Claims**.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC/Litigation Trust Trustee

after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**9.5    Estimation of Claims**.  Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable (but solely with the consent of the Supporting Second Lien Parties and the Creditor's Committee, such consent not to be unreasonably withheld), and, after the Effective Date, the GUC/Litigation Trust Trustee, may (but is not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection, but without prejudice to the Holder of such Claim's right to (i) object to appropriateness of estimating such Claim (or the requested purpose of such estimation) under section 502(c) of the Bankruptcy Code or (ii) request that any such estimation should be for the purpose of determining the Allowed amount of such Claim.  In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), , and the Reorganized Debtors (or, in the case of General Unsecured Claims, the GUC/Litigation Trust Trustee) may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**9.6    No Interest on Disputed Claims**.  Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**9.7    Amendments to Claims**.

(a)    On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)    Notwithstanding anything to the contrary contained in this Plan, the SEC may amend any timely filed claim within 120 days following the Effective Date to the extent permitted under applicable law without the need to seek prior authorization of the Bankruptcy Court, the Debtors, or the Reorganized Debtors.  After such date, the provisions of Article 9.7(a) shall apply to the SEC's Claims.  For the avoidance of doubt, nothing in the immediately preceding sentence shall waive, release, modify or abrogate the Debtors' rights to object to the allowance of any Claim filed by the SEC or any amendment of any Claim filed by the SEC on any grounds under applicable law.

## ARTICLE X

## PROVISIONS GOVERNING DISTRIBUTIONS

**10.1    Distributions of GUC/Litigation Trust Interests to Holders of Second Lien Claims and General Unsecured Claims**.  The provisions of this Article X shall not apply to distributions from the GUC/Litigation Trust to Holders of Second Lien Claims and General Unsecured Claims.  Distributions from the GUC/Litigation Trust to Holders of such Allowed Claims shall be administered in accordance with and subject to, as applicable, the terms of the GUC/Litigation Trust Agreement and Article IV and Article VII of this Plan.

**10.2    Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on the later of (a) the Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; provided, however, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date.

**10.3    Distribution Agent**.  The Distribution Agent shall make all distributions required under this Plan except (a) as set forth in Article 10.5 below and (b) with respect to any Holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer, as applicable, who shall deliver such distributions to the Holders of Claims in accordance with the provisions of this Plan and the terms of any governing agreement.

**10.4    Currency**.  Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

**10.5    Distributions on Account of Claims Allowed as of the Effective Date**.

(a)    **Delivery of Distributions in General**.    Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Initial Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; provided, however, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(c) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

(b)    **Delivery of Distributions to Servicers**.    In the case of a Holder of Claims whose Claims are governed by an agreement and administered by a Servicer, the respective Servicer shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder; provided, however, that non-Cash consideration shall not be distributed in the name of a Servicer.  The Distribution Agent shall make all distributions on account of such Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion.  The Servicers shall hold or direct such distributions for the benefit of Holders of such Allowed Claims, as applicable; provided, however, that the Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to Claim Holders (including the right to deliver distributions subject to any charging lien under such agreement); and provided further, however, that the Debtors' obligations to make distributions in accordance with Article X shall be deemed satisfied upon delivery of distributions to each Servicer or the entity or entities designated by the Servicers.  Nothing in the Plan shall be deemed to impair, waive, or extinguish any right of any Servicer with respect to its Charging Lien against applicable Plan Distributions. For the avoidance of doubt, the Second Lien Senior Notes Indenture Trustee shall have no duty to make any distributions that are not DTC eligible.

(c)    **Fees and Expenses of Servicers**.    The Reorganized Debtors shall reimburse in Cash any Servicer for reasonable and necessary services that the Reorganized Debtors expressly request such Servicer to perform (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under this Plan to Holders of Allowed Claims or the Servicer's further performance of its duties under the Indentures until all such Allowed Claims are paid in full and a Final Decree is entered, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties shall report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses.  Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.  For the avoidance of doubt, the disallowance of any disputed

fees or expenses of any Servicer shall not affect or modify in any way such Servicer's charging lien or other rights to recover such fees and expenses pursuant to its respective agreement.

**10.6    Distributions on Account of Claims Allowed After the Effective Date**.

(a)    **No Distributions Pending Allowance**.    No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)    **Distributions After Allowance**.    Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such Holder of a Claim.  On the first Periodic Distribution Date that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

(c)    **Special Rules for Distributions to Holders of Disputed Claims**.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or this Plan.

**10.7    Delivery Of Distributions**.

(a)    **Record Date for Distributions**.  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest is transferred

less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)    **Allowed Claims**.  Distributions to Holders of Allowed Claims shall be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)    **Undeliverable Distributions**.  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or the appropriate Servicer is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.

(d)    **Reversion**.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors free of any restrictions thereon, and to the extent such Unclaimed Distribution is New SUNE Common Stock, shall be deemed cancelled.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(e)    **De Minimis Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $1,000,000; <u>provided</u> that the Reorganized Debtors shall make, or cause

78

to be made, a distribution on a Periodic Distribution Date of less than $1,000,000 if the Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

(f)    **Fractional Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make partial distributions or distributions of fractional shares of New SUNE Common Stock, Continuing TERP Class A Shares, or distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fractional share of New SUNE Common Stock or Continuing TERP Class A Shares under the Plan would otherwise be called for, such fraction shall be deemed zero.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**10.8    Accrual of Dividends and Other Rights**.  For purposes of determining the accrual of dividends or other rights after the Effective Date, New SUNE Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New SUNE Common Stock actually take place.

**10.9    Surrender of Securities or Instruments**.  As soon as practicable after the Effective Date, each Second Lien Senior Noteholder and Convertible Senior Noteholder shall surrender its note(s) to the relevant Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, The Depository Trust Company, the Reorganized Debtors shall seek the cooperation of The Depository Trust Company to provide appropriate instructions to the Indenture Trustees.  No distributions under the Plan shall be made for or on behalf of such Holder unless and until  such note(s) is received by the Indenture Trustees or the loss, theft or destruction of such note(s) is established to the reasonable satisfaction of the applicable Indenture Trustee, which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Indenture Trustees, harmless in respect of such note and distributions made thereof.  Upon compliance with this Article 10.9 by a Second Lien Senior Noteholder or Convertible Senior Noteholder, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such Claim.  Any Holder that fails to surrender such Second Lien Senior Note or Convertible Senior Note or satisfactorily explain its non-availability to the applicable Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property), or the Indenture Trustees in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the applicable Indenture Trustee, and any such security shall be cancelled.  Notwithstanding the foregoing, if the record Holder of a Second Lien Senior Noteholder or a Convertible Senior Noteholder is DTC or its nominee or such other securities depository or custodian thereof, or if a Second Lien Senior Notes Claim or a Convertible Senior Notes Claim is held in book-entry or electronic form pursuant to a global security held by DTC or such other

securities depository or custodian thereof, then the beneficial Holder of such an Allowed Second Lien Senior Notes Claim or Allowed Convertible Senior Notes Claim shall be deemed to have surrendered such Holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.  Notwithstanding the foregoing, the Holders of the 2020 Exchangeable Notes shall not be required to surrender such 2020 Exchangeable Notes.

**10.10  Compliance Matters**.  In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

For the avoidance of doubt, the Debtors and Reorganized Debtors shall comply with applicable non-bankruptcy law relating to document preservation obligations in connection with ongoing litigation.

**10.11  Claims Paid or Payable by Third Parties**.

(a)    **Claims Paid by Third Parties**.   The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)    **Claims Payable by Insurers**.   No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim or otherwise settle an insured Claim, then immediately upon such insurers' payment, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Contracts**.    Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts.    Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any of the Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**10.12    Setoffs**.    Except as otherwise expressly provided for in the Plan and except with respect to any Original DIP Facility Claims, Replacement DIP Facility Claims, Second Lien Claim, Convertible Senior Notes Claim, and any distribution on account thereof, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder.    In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**10.13    Allocation of Plan Distributions Between Principal and Interest**.    To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE XI

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**11.1    Vesting of Assets**.    Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Causes of Action, but excluding the GUC/Litigation Trust Assets and property that has been abandoned pursuant to an order of the Bankruptcy Court) shall vest in the Reorganized Debtors which, unless otherwise indicated in the Plan, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.    As of and following the Effective Date, the Reorganized Debtors may operate its business and use, acquire,

and dispose of property (subject to applicable law) and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**11.2    Discharge of the Debtors.  Except as otherwise specifically provided in section 1141(d) of the Bankruptcy Code, this Plan or the Confirmation Order, and effective as of the Confirmation Date: (a) the distributions and rights that are provided in this Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted this Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.**

**11.3    Discharge of Liabilities Related to General Unsecured Claims and Convertible Senior Notes Claims.**    The transfer to, vesting in, and assumption by the GUC/Litigation Trust of the GUC/Litigation Trust Assets as contemplated by this Plan, among other things, shall discharge the Debtors, the Reorganized Debtors, and their representatives for and in respect of all General Unsecured Claims and Convertible Senior Notes Claims.

**11.4    Compromises and Settlements**.  This Plan is intended to incorporate the agreements reached in the GUC/Litigation Trust Agreement and the settlement regarding the UCC Challenge Litigation and the BOKF Objection as set forth in the Committee/BOKF Plan Settlement Term Sheet.  In accordance with Article 9.2 of this Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to and including the Effective Date. After the Effective Date, any such right shall pass to the Reorganized Debtors and/or the GUC/Litigation Trust, pursuant to the terms of the GUC/Litigation Trust Agreement, and as

contemplated in <u>Article 11.1</u> of this Plan, without the need for further approval of the Bankruptcy Court. Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, its Estate, and Holders of Claims and Interests, and is fair, equitable, and reasonable.

**11.5    <u>Release by Debtors</u>.  Pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, the Debtors and their Estates, the Reorganized Debtors, and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted on behalf of the Debtors), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Original DIP Facility, the Replacement DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering, the GUC/Litigation Trust Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above (t) does not release the Debtor Professionals to the extent that claims against such parties are identified as GUC/Litigation Trust Causes of Action, with the identification of such claims to be reasonably agreed to by the Debtors (after consulting with the Supporting Second Lien Parties) and the Creditors' Committee; provided, that any disagreement regarding whether a particular claim should be identified as a GUC/Litigation Trust Cause of Action shall be decided by the Bankruptcy Court, (u) does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (v) does not release, waive, address, or otherwise impact the (i) releases given as contemplated in the D&O Settlement Agreement or (ii) the various matters that are carved-out and preserved in the D&O Settlement Agreement, (w) shall not impair any defenses the Debtors may have with regard to any**

alleged indemnification obligation that the Debtors may have to any party, (x) shall not release any claims by any non-Debtor Affiliate of the Debtors arising in the ordinary course of business (i.e., ordinary course trade claims), (y) shall not release any claims against any non-Debtor Affiliate of the Debtors held by the Debtors that is necessary to effectuate the transactions contemplated by this Plan (including, without limitation, any claims to collect proceeds from Earnout Assets, Repatriated Cash, Residual Assets, etc.), and (z) is subject to section 1125(e) of the Bankruptcy Code to the extent applicable.

11.6    **Release by Holders of Claims.**  As of the Effective Date, subject to **Article 11.8**, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Debtors, the Reorganized Debtors, their Estates, non-Debtor Affiliates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or capable of being asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Original DIP Facility, the Replacement DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, including (without limitation) any tender rights provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering, the GUC/Litigation Trust Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any cause of action held by a governmental entity against any non-Debtor existing as of the Effective Date based on Sections 1104-1109, 1161-1169, and 1342(d) of the Employee Retirement Income Security Act.  Notwithstanding the foregoing, nothing in this Plan shall release any claims against any non-Debtor Affiliate of the Debtors arising in the ordinary course of business (i.e., ordinary course trade claims).

11.7    **Exculpation and Limitation of Liability.**  To the extent permitted by section 1125(e) of the Bankruptcy Code, and subject to **Article 11.8** of this Plan, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; **provided**, **however**, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law.

**The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with regard to the distributions of the New SUNE Common Stock and Continuing TERP Class A Shares, as applicable, pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Notwithstanding anything to the contrary contained herein, subject to** Article 11.8 **of this Plan, the YieldCos and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after the Petition Date) shall neither have, nor incur any liability to any Entity for any Exculpated Claim;** provided, however, **that the foregoing exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law.**

**Nothing in this Article shall limit the liability of any Person or Entity (other than the Debtors) for any pre- or post-petition action taken or omitted to be taken by them as a fiduciary, co-fiduciary, party in interest or knowing participant in violation of ERISA with respect to any ERISA-covered employee benefit plan sponsored by the Debtors.**

**11.8    Exclusions and Limitations on Exculpation, Indemnification, and Releases.** Notwithstanding anything in this Plan to the contrary, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated hereunder or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability. In the event that any exculpation or release provision in this Plan conflicts with Section 4 of a YieldCo Settlement Agreements, Section 4 of such YieldCo Settlement Agreement shall govern with respect to the applicable YieldCo.

Notwithstanding any provision to the contrary, no provision of the Disclosure Statement, Plan, or Confirmation Order shall preclude the United States, its agencies, departments or agents (collectively, the "United States") from enforcing its police or regulatory powers.

Notwithstanding anything contained in this Plan, Disclosure Statement or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of the United States arising on or after the Effective Date; (3) any valid right of setoff or recoupment of the United States against any of the Debtors to the extent permitted under applicable law; or (4) any Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) from enforcing its police or regulatory powers against the Debtors or Reorganized Debtors, including as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Effective Date. Nor shall anything in this Confirmation Order or this Plan enjoin or otherwise bar the United States or any

Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any matters described in subsection (1) through (4) described in the preceding sentence.

Nothing in the Confirmation Order or the Plan shall release or exculpate any non-Debtor, including any Released Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, applicable environmental laws, or applicable criminal laws, or any legal action or claim brought by the SEC, nor shall anything in this Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceeding against any non-Debtor, including any Released Party for any liability whatsoever; provided, however, that the foregoing sentence shall not limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

In each case, except as permitted under sections 505, 1129(a)(9)(c), and 1146 of the Bankruptcy Code, nothing contained in the Plan or Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall the Plan or Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment.

**11.9    Injunction.    Subject to Article 11.8 of this Plan, the satisfaction, release, and discharge pursuant to this Article XI shall act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, including any Exculpated Claim, or discharged under this Plan or pursuant to the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

**11.10    Subordination Rights**.

(a)        Except as otherwise provided in the Plan, the allowance, classification and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual (including, without limitation, pursuant to the Replacement Intercreditor Annex (as defined in the Replacement DIP Facility Order)), legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise and all Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by

any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)     Except as otherwise provided in the Plan (including Plan Exhibits), the Confirmation Order or an order of the Bankruptcy Court, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination; provided, however, that the Debtors and the Reorganized Debtors shall not seek subordination of any Original DIP Facility Claim, Replacement DIP Facility Claim, or Second Lien Claim, and such Claims are Allowed in full and not subject to any subordination of any kind. Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this Article 11.10(b) unless ordered by the Bankruptcy Court.

(c)     This Plan shall be deemed compliant with all of the provisions of that certain Collateral Trust Agreement, dated January 11, 2016, between and among SunEdison, Inc., the guarantors and additional *pari passu* lien representatives from time to time party thereto, the Second Lien Administrative Agent, the Second Lien Senior Notes Indenture Trustee, and the Second Lien Collateral Trustee. Upon entry of the Confirmation Order, and provided that distributions under the Plan are made in accordance with the Plan and the Confirmation Order, no party shall have any further rights to enforce the Collateral Trust Agreement or the provisions thereof.

**11.11   Protection Against Discriminatory Treatment**. Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom such the Reorganized Debtors has been associated, solely because the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**11.12   Recoupment**. In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**11.13   Release of Liens**. Except as otherwise provided in the Plan (including with respect to the Reinstated Second Lien Claims) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such

mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

**11.14  Reimbursement or Contribution**.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

# ARTICLE XII

## CONDITIONS PRECEDENT

**12.1  Conditions to Confirmation**.  The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order;

(b)    in the TERP Share Election Alternative, the Bankruptcy Court shall have entered an Order, in form and substance reasonably satisfactory to the Supporting Second Lien Parties, approving the Debtors' entry into the Equity Commitment Agreement;

(c)    the Confirmation Order shall have been entered; and

(d)    the YieldCos shall have withdrawn all General Unsecured Claims against the Debtors, subject to the right of TERP to assert up to one-half of the actual amount the YieldCos ultimately are required to pay (and therefore have the right to assert as a General Unsecured Claim) in connection with the Preserved DE Shaw Unsecured Claim (as defined in the YieldCo Settlement Motion), capped at one-half of $231 million, plus fees and interest.

**12.2  Conditions to the Effective Date of the Plan**.  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

(c)    all Plan Transaction Documents shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties and the Creditors' Committee (as applicable);

(d)    in the TERP Share Election Alternative, the Rights Offering (and the Equity Commitment Agreement) shall have been consummated on terms and conditions reasonably satisfactory to the Supporting Second Lien Parties;

(e)    the Jointly Supported Transactions shall have closed, the terms and conditions of which Jointly Supported Transactions (including, without limitation, purchase price) shall be reasonably satisfactory to the Supporting Second Lien Parties; provided, that the Jointly Supported Transactions embodied by the YieldCo Settlement Agreements, Voting and Support Agreements, and Merger Agreements (in the forms required to be supported by the Supporting Second Lien Parties) are deemed to be reasonably satisfactory to the Supporting Second Lien Parties;

(f)    the organizational documents of the Reorganized Debtors as contemplated herein shall be in form and substance reasonably satisfactory to the Supporting Second Lien Parties, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

(g)    all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless (i) the Supporting Second Lien Parties and, to the extent the Creditors' Committee or Holders of General Unsecured Claims are affected, the Creditors' Committee, consent to such failure (such consent not to be unreasonably withheld) and (ii) such failure will not have a material adverse effect on the Reorganized Debtors;

(h)    each of Reorganized SUNE and the GUC/Litigation Trust shall have been established in a manner consistent with this Plan and the Committee/BOKF Plan Settlement Term Sheet and on terms and conditions reasonably satisfactory to the Supporting Second Lien Parties and, with respect to the GUC/Litigation Trust, the Creditors' Committee;

(i)    the New Boards and senior management shall have been selected as contemplated by this Plan;

(j)    all other documents and agreements necessary to implement the Plan on the Effective Date shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred in form and substance and in a manner reasonably satisfactory to the Supporting Second Lien Parties and the Creditors' Committee (as applicable);

(k)    the amount of the Voluntary Professional Fee Reduction shall be equal to at least $5 million; and

(l)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

**12.3    Waiver of Conditions Precedent**. The conditions set forth in Articles 12.1 and 12.2 may be waived, in whole or in part, by agreement of (a) the Debtors and (b) the

Supporting Second Lien Parties and (c) solely to the extent the Creditors' Committee has a consent right with respect to the conditions set forth in Articles 12.2(c) and 12.2(g), the Creditors' Committee, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

   **12.4** **Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 12.2 of this Plan have been satisfied or waived pursuant to Article 12.3 of this Plan.

   **12.5** **Effect of Non-Occurrence of Conditions to Consummation**.  If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

**ARTICLE XIII**

**<u>RETENTION OF JURISDICTION</u>**

   Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

   (a) resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

   (b) adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

   (c) adjudicate any and all adversary proceedings and contested matters that may be commenced and maintained by the GUC/Litigation Trust or any other matters concerning administration of the GUC/Litigation Trust or any actions taken or contemplated to be taken by the GUC/Litigation Trust;

(d)       ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)       allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(f)       hear and determine or resolve any and all matters related to Causes of Action;

(g)       enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(h)       issue and implement orders in aid of execution, implementation, or consummation of this Plan;

(i)       consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)       hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(k)       determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(l)       adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(m)      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(n)       hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(o)       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, with respect to requests under section 505(b) of the Bankruptcy Code with respect to Tax Returns filed by, or on behalf of, the GUC/Litigation Trust, or any reserve for or

other amounts allocable to Disputed Claims, for all taxable periods through the dissolution of the GUC/Litigation Trust);

        (p)      resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

        (q)      hear any other matter not inconsistent with the Bankruptcy Code;

        (r)      hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

        (s)      enter a Final Decree closing the Chapter 11 Cases;

        (t)      enforce all orders previously entered by the Bankruptcy Court;

        (u)      hear and determine all matters relating to any Bankruptcy Code section 510(b) Claims;

        (v)      hear and determine all disputes and issues arising from the GUC/Litigation Trust, the GUC/Litigation Trust Agreement, the assets and Causes of Action granted and/or assigned to the GUC/Litigation Trust, and any other related matters in connection therewith (including any items set forth in the Committee/BOKF Plan Settlement Term Sheet);

        (w)      hear and determine all disputes regarding the out-of-pocket costs and expenses of the Debtors and Reorganized Debtors in connection with cooperating with the GUC/Litigation Trust Trustee with respect to GUC/Litigation Trust Causes of Actions.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of this Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement. Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

     **14.1**    **Binding Effect**. Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

     **14.2**    **Payment of Statutory Fees**. All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The

Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree.

   **14.3 Payment of Certain Additional Professional Fees**.  To the extent not paid prior to the Effective Date, on the Effective Date, subject to the Voluntary Professional Fee Reduction, the Reorganized Debtors shall pay all obligations required to be paid under paragraph 2(a) of the Original DIP Facility Order or under paragraph 2(a) of the Replacement DIP Facility Order, in each case, in Cash until such obligations are satisfied in full.

   **14.4 Payment of Fees of Second Lien Senior Notes Indenture Trustee and Second Lien Collateral Trustee**.  To the extent not paid prior to the Effective Date, on the Effective Date, subject to the Voluntary Professional Fee Reduction, the Reorganized Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Second Lien Senior Notes Indenture Trustee and the Second Lien Collateral Trustee and its advisors, including counsel, without application to or approval of the Bankruptcy Court.

   **14.5 Modification and Amendments**.  The Debtors, with the consent of (x) the Supporting Second Lien Parties and, (y) with respect to those portions of the Plan that affect the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee (in each case, such consent not to be unreasonably withheld or delayed), may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, with the consent of (a) the Supporting Second Lien Parties and, (b) with respect to those portions of the Plan that affect the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee (in each case, such consent not to be unreasonably withheld or delayed), under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.  For the avoidance of doubt, nothing in this Plan is intended to negate or override any consent requirements (including any applicable consent thresholds) set forth in the Replacement DIP Credit Agreement or the Replacement DIP Facility Order or the Committee/BOKF Plan Settlement Term Sheet.

   **14.6 Confirmation of the Plan**.  The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan, with the reasonable consent of the Supporting Second Lien Parties and, with respect to those portions of the Plan that affect the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee, to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

   **14.7 Additional Documents**.  On or before the Effective Date, the Debtors, with the reasonable consent of the Supporting Second Lien Parties and, to the extent affecting the Creditors' Committee or any Holder of General Unsecured Claims, the Creditors' Committee, may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors

(with the reasonable consent of the Supporting Second Lien Parties and, to the extent affecting the Creditors' Committee or any Holders of General Unsecured Claims, the Creditors' Committee) or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

14.8    **Dissolution of Creditors' Committee**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, and the members thereof (solely in their capacities as Creditors' Committee members) shall be released, exculpated and discharged from all their duties relating to the Chapter 11 Cases in accordance with Article 11 hereof; provided, however, that the Creditors' Committee shall continue to exist and its Professionals shall continue to be retained and entitled to reasonable compensation, without further order of the Court, with respect to: (1) the preparation and prosecution of any final fee applications of the Creditors' Committee's Court approved Professionals and (2) all final fee applications filed with the Bankruptcy Court.

14.9    **Revocation, Withdrawal, or Non-Consummation**.

(a)    **Right to Revoke or Withdraw**.  The Debtors reserve the right (such right, following Confirmation, subject to the reasonable consent of the Supporting Second Lien Parties and the Creditors' Committee) to revoke or withdraw this Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    **Effect of Withdrawal, Revocation, or Non-Consummation**.  If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, the Committee/BOKF Plan Settlement, including with regard to the Investigation/Prosecution Cap, the settlement of the BOKF Objection, the settlement of the UCC Challenge Litigation, and any settlement or compromise approved as part of this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, or the Committee/BOKF Plan Settlement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Creditors' Committee, BOKF, or any other Entity.

14.10    **Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**If to the Debtors:**

c/o SunEdison, Inc.
13736 Riverport Dr.
Maryland Heights, MO 63043
Attn.: Martin H. Truong (mtruong@sunedison.com)
Senior Vice President, General Counsel and Secretary

with a copy to:

Skadden, Arps, Slate, Meagher &
   Flom LLP
Four Times Square
New York, New York 10036
Att'n:  Jay M. Goffman
        J. Eric Ivester

– and –

Skadden, Arps, Slate, Meagher &
   Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
Att'n:  James J. Mazza, Jr.
        Louis S. Chiappetta

– and –

Skadden, Arps, Slate, Meagher &
   Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
Att'n:  Anthony W. Clark


**If to the Replacement DIP Agent or Original DIP Agent:**

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Att'n:  Scott Greissman
        Elizabeth Feld

**If to the Tranche B Lenders/Steering Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
Att'n:  Arik Preis
          Yochun Katie Lee

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of New York
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York   10014
Att'n:  Paul Schwartzberg

**If to the Creditors' Committee:**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Att'n:  Matt Barr
          Jill Frizzley

– and –

Morrison & Foerester LLP
250 West 55th Street
New York, New York 10019
Att'n:  Elizabeth Sluder


**14.11   Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**14.12   Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation of the Reorganized Debtors.

14.13  **Entire Agreement**.  Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

14.14  **Severability**.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

14.15  **No Waiver or Estoppel**.  Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

14.16  **Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern.  In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

**ARTICLE XV**

**SECOND LIEN LITIGATION**

Notwithstanding anything to the contrary that may be set forth (or may be construed or argued to be set forth) in this Plan, the Disclosure Statement, or the Confirmation Order, including, without limitation, in Articles 1, 4.1, 6.12, 10.9, 11.2, 11.4, 11.5, 11.6, and 11.7 of this Plan:

(a)      The term "Second Lien Litigation" shall mean any and all direct (i.e., not derivative) Causes of Action held by the Holders of Second Lien Claims (or Tranche B Roll Up Loan Claims, if applicable), or their respective successors or assigns, against any non-debtor, third party (including without limitation, any directors and officers of the Debtors and any party that is not a "Released Party" under the Plan as set forth in clause (f) below) involved in, implicated by, or related to the entry into the documents or transactions giving rise to the Second Lien Loans and Second Lien Senior Notes.  The Second Lien Litigation is being or, with

regard to certain potential defendants, will be prosecuted by, Kasowitz Benson Torres LLP (or any successor law firm).

(b)    Subject to clause (d) below, nothing in the Plan, Disclosure Statement or Confirmation Order shall prevent the Second Lien Lenders and the Second Lien Noteholders from asserting against (or collecting from) third parties in the Second Lien Litigation the full amount of any of their Tranche B Roll-Up Claims or Second Lien Claims, to the extent that such Claims do not receive a full recovery under this Plan.

(c)    None of the Second Lien Creditors shall provide a release under the Plan or otherwise to any current or potential defendants to the Second Lien Litigation (which includes, without limitation, the arrangers, agents, bookrunners, syndication agents, and underwriters of the Second Lien Loans and Second Lien Senior Notes, any of the Debtors' current and former principals, employees, agents, affiliates, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals) under this Plan, the Confirmation Order, or the Disclosure Statement for purposes of the Second Lien Litigation.

(d)    Nothing in the Plan, Disclosure Statement or Confirmation Order shall impair any defenses, claims, counterclaims, or rights that any third parties (which, for the avoidance of doubt, also includes the Holders of Second Lien Claims or Tranche B Roll-Up Loan Claims, if applicable) may have, and such defenses, claims, counterclaims, or rights (including, without limitation, any rights to seek indemnity, and any rights to seek setoff or recoupment, under any contract or agreement, or under applicable law or equity) with respect to the Second Lien Litigation (and any defenses thereto) are preserved and not impaired.

(e)    For the avoidance of doubt, the exculpatory and limitation of liability provisions set forth in Article 11.7 of this Plan shall not apply to the Second Lien Litigation.

(f)    None of the current or potential defendants (which includes, without limitation, the arrangers, agents, bookrunners, syndication agents, and underwriters of the Second Lien Loans and Second Lien Senior Notes, any of the Debtors' current and former principals, employees, agents, affiliates, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals) to the Second Lien Litigation shall be deemed "Released Parties" under Article 11.6 of this Plan or the Disclosure Statement for purposes of the Second Lien Litigation.  For the avoidance of doubt, (x) nothing in this Article XV shall limit, impair, abridge, or otherwise affect Article 11.5 of this Plan (Release by Debtors) and (y) the Second Lien Senior Notes Indenture Trustee and the Second Lien Collateral Trustee shall not be defendants to the Second Lien Litigation.

Dated: June 12, 2017

Respectfully submitted,

SUNEDISON, INC. AND ITS AFFILIATE
DEBTORS


By:   /s/ *John S. Dubel*
Name:  John S. Dubel
Title:  Chief Executive Officer of
SunEdison, Inc. and Chief Restructuring
Officer of all Debtors

1375848-NYCSR03A - MSW

**Exhibit 6.1**
**UCC/BOKF Plan Settlement Term Sheet**

**TERM SHEET FOR SETTLEMENT AMONG DEBTORS, TRANCHE B
ROLL UP LENDERS/STEERING COMMITTEE OF PREPETITION SECOND
LIEN LENDERS AND NOTEHOLDERS (THE "AD HOC GROUP"), THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE"), AND BANK OF
OKLAHOMA, N.A. ("BOKF")**

**THIS TERM SHEET SETS FORTH THE MATERIAL TERMS OF THE SETTLEMENT
RESULTING FROM MEDIATION IN THE CHAPTER 11 CASES OF SUNEDISON, INC. AND
CERTAIN OF ITS AFFILIATES AS DEBTORS AND DEBTORS IN POSSESSION AND IS
SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF
THE CHAPTER 11 PLAN AND RELATED DOCUMENTS CONSISTENT WITH THE TERMS
HEREOF AND, AS TO THE DEBTORS, APPROVAL OF THE COURT.  TO THE MAXIMUM
EXTENT PERMITTED UNDER APPLICABLE LAW, THIS TERM SHEET IS INTENDED TO
BE ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE FEDERAL RULES OF
EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING
THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION
EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS, INCLUDING
MEDIATION PRIVILEGE.  FURTHER, NOTHING IN THIS TERM SHEET SHALL BE AN
ADMISSION OF FACT OR LIABILITY BY THE DEBTORS, THE AD HOC GROUP, THE
COMMITTEE, ANY INDIVIDUAL MEMBER OF THE COMMITTEE, OR BOKF. THIS TERM
SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES.
ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE
SECURITIES LAWS.**

| | |
|---|---|
| **Parties** | **Debtors**:  SunEdison, Inc. ("SUNE"); SunEdison DG, LLC; SUNE Wind Holdings, Inc.; SUNE Hawaii Solar Holdings, LLC; First Wind Solar Portfolio, LLC; First Wind California Holdings, LLC; SunEdison Holdings Corporation; SunEdison Utility Holdings, Inc.; SunEdison International, Inc.; SUNE ML 1, LLC; MEMC Pasadena, Inc.; Solaicx; SunEdison Contracting, LLC; NVT, LLC; NVT Licenses, LLC; Team-Solar, Inc.; SunEdison Canada, LLC (6287); Enflex Corporation; Fotowatio Renewable Ventures, Inc.; Silver Ridge Power Holdings, LLC; SunEdison International, LLC; Sun Edison LLC; SunEdison Products Singapore Pte. Ltd.; SunEdison Residential Services, LLC; PVT Solar, Inc.; SEV Merger Sub Inc.; Sunflower Renewable Holdings 1, LLC; Blue Sky West Capital, LLC; First Wind Oakfield Portfolio, LLC; First Wind Panhandle Holdings III, LLC; DSP Renewables, LLC; Hancock Renewables Holdings, LLC; EverStream HoldCo Fund I, LLC; Buckthorn Renewables Holdings, LLC; Greenmountain Wind Holdings, LLC; Rattlesnake Flat Holdings, LLC; Somerset Wind Holdings, LLC; SunE Waiawa Holdings, LLC; SunE MN Development, LLC; SunE MN Development Holdings, LLC; SunE Minnesota Holdings, LLC; TerraForm Private Holdings, LLC; SunEdison Products, LLC; Hudson Energy Solar Corporation; SunE REIT-D PR, LLC; First Wind Energy, LLC; First Wind Holdings, LLC; Vaughn Wind, LLC; Maine Wind Holdings, LLC; SunEdison |

|  | International Construction, LLC; and EchoFirst Finance Co., LLC (collectively, the "**Debtors**")[1] as debtors in possession in the cases filed under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). |
|  | **Ad Hoc Group**:  The Tranche B Roll Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders (the "**Ad Hoc Group**")[2]. |
|  | **Committee**:  The Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "**Committee**").[3] |
|  | **BOKF**:  Bank of Oklahoma, N.A., in its capacity as indenture trustee for the Debtors' Convertible Senior Notes pursuant to the Convertible Senior Notes Indenture, and not in its capacity as a member of the Committee. |
| **Plan/ Disclosure Statement** | As soon as reasonably practicable, the Debtors shall file an amended Plan (in such form, the "**Amended Plan**")[4] and amended Disclosure Statement (the "**Amended Disclosure Statement**") (both in form and substance acceptable to the Ad Hoc Group and the Committee) consistent with the terms of this Term Sheet and any additional definitive documentation to effectuate the transactions contemplated by this settlement including, without limitation, the GUC/Litigation Trust Agreement (the "**Definitive Documentation**").  In the event of any inconsistency between the terms of the Amended Plan and/or the Amended Disclosure Statement and this Term Sheet, the terms of this Term Sheet shall govern.  The Amended Plan shall serve as the Debtors' motion to approve the settlement contained in this Term Sheet. |
|  | The Amended Plan shall include, among other things, removing unsecured creditors' right to share in, participate in or receive (in any form or manner) (a) the Rights Offering, (b) TERP Stock, (c) Reinstated Second Lien Claims, and (d) Equity in Reorganized SunEdison. |
|  | The Amended Disclosure Statement shall include the Committee's support for the Amended Plan, in a form and manner to be agreed by the Committee, the Debtors, and the Ad Hoc Group. |
|  | The Amended Plan shall provide for a single class of general unsecured creditors.[5]  The Amended Plan shall provide for distributions from the |

---

[1] If any entities become Debtors after May 16, 2017, they shall be deemed to be part of this settlement as part of the defined term "Debtors".

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the *Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates* [D.I. 3218] (the "**Plan**").

[3] For the avoidance of doubt, the terms of this agreement shall apply solely to the Committee in its capacity as such, and, with the exception of BOKF's obligations hereunder, shall not apply to any member of the Committee in its individual capacity.

[4] Those portions of the Amended Plan that affect the Committee or any general unsecured creditors shall not be further amended or supplemented without the Committee's reasonable consent.  If the Amended Plan is further amended or supplemented with the Committee's consent, such plan shall also constitute an "Amended Plan" under this Term Sheet.

[5] The deficiency claim held by the Second Lien Lenders and Noteholders shall not be part of the class of general unsecured creditors, and holders of such deficiency claims shall not be entitled to receive any interests in the

| | |
|---|---|
| | GUC/Litigation Trust to general unsecured creditors on a Pro Rata basis without regard to Debtors.  In other words, "Pro Rata" (for these purposes) shall be determined with the denominator equal to all allowed unsecured claims against all Debtors (other than the deficiency claim held by the Second Lien Lenders and Noteholders) and the numerator equal to the amount of a particular unsecured creditor's claim (other than the deficiency claim held by the Second Lien Lenders and Noteholders); provided, however, the Debtors reserve all rights to direct the voting agent under the Amended Plan to process and tabulate ballots for general unsecured creditors on a Debtor-by-Debtor (i.e., sub-Class by sub-Class) basis or on an aggregate basis in their discretion, in consultation with the Ad Hoc Group and the Committee. |
| **General Support Obligations/ Pending Litigation/ Future Litigation** | Pending litigation (Committee and BOKF): All pending litigation that has been commenced by the Committee or BOKF (i.e., the First and Second Lien Litigation Adversary Proceeding, the OID Claim Objection, and the objections to the YieldCo 9019 Settlement and the Allocation contained therein)[6] shall be held in abeyance, and no further work (i.e., discovery, pleadings, etc.) shall be done on any such litigation, pending approval of the settlement contained herein (the "Settlement") and the Plan.  If the Settlement is not approved or the Amended Plan is not confirmed and the transactions contemplated therein are not consummated, all parties will revert to the status quo ante (except with regard to the YieldCo 9019 Settlement solely to the extent as set forth herein). If the Settlement is approved, the Amended Plan is confirmed, and the Amended Plan becomes effective, all pending litigation will be deemed withdrawn with prejudice (and, if necessary, parties will file with the Court any necessary withdrawal notices). |
| | Future/Threatened Litigation (Committee): The Committee will not take any actions or file any pleadings inconsistent with this Term Sheet or that would have the effect of modifying the Settlement, and so long as the Amended Plan (including any amendments or supplements thereto) and the other Definitive Documentation reflects the Settlement, the Committee will support the Amended Disclosure Statement and the Amended Plan[7]. |
| | Committee Support: With regard to the Committee's support of the Chapter 11 Cases and the Amended Plan, subject to the Committee's fiduciary duties[8], the |

GUC/Litigation Trust on account of such deficiency claims other than the Class B Interests on the Effective Date of the Plan.

[6] Further explanation regarding the objections of the Committee and BOKF to the Yieldco 9019 Settlement and the Allocation contained therein are addressed below under the section entitled "Relation to Pending Motions: Equity Commitment Agreement and YieldCo Settlement".

[7] For the avoidance of doubt, this Settlement settles any and all issues that may be in dispute (either currently or pending or that could be commenced in the future) regarding Annex II of the Replacement DIP Facility Order (Docket No. 2880).

[8] For the avoidance of doubt, if, prior to the Confirmation Date, the Committee, in the good faith exercise of its fiduciary duties (as advised by counsel), no longer supports this Settlement or breaches any of its support or other obligations contained herein, all other parties may terminate their obligations hereunder.  If the Ad Hoc Group or the Debtors breach any of their support or obligations contained herein, the Committee may terminate its obligations hereunder.

3

| | |
|---|---|
| | Committee will (a) support the Debtors in the prosecution of all pending and future motions filed by the Debtors to implement the Amended Plan and this Term Sheet and (b) actively support (which may include making filings in support of the Amended Plan and the Amended Disclosure Statement (and any item that is included in such Amended Plan or Amended Disclosure Statement, including the Rights Offering, the Equity Commitment Agreement, and the Treatment/Allowance of the Roll-Up Loans). Subsequent to the Confirmation Date, the Debtors shall meet and confer with the Committee with respect to actions that affect the amount of General Unsecured Claims and/or the assets that are to be transferred to the GUC/Litigation Trust. Prior to the Confirmation Date, the Committee reserves the right to object to such actions. Prior to the Effective Date, the Debtors shall not prosecute any objections to General Unsecured Claims without the consent of the Committee, which consent shall not be unreasonably withheld.[9] After the Effective Date, the GUC/Litigation Trust Trustee shall have the sole discretion to object to proofs of claim and to prosecute claims objections. |
| | BOKF Agreement Not to Object: So long as the Committee supports the Amended Plan and Amended Disclosure Statement (and any item that is included in such Amended Plan or Amended Disclosure Statement, including the Rights Offering, the Equity Commitment Agreement, and the Treatment/Allowance of the Roll-Up Loans), BOKF will not object to the Amended Plan or Amended Disclosure Statement (and any item that is included in such Amended Plan or Amended Disclosure Statement, including the Rights Offering, the Equity Commitment Agreement, and the Treatment/Allowance of the Roll-Up Loans). |
| **Relation to Pending Motions: Equity Commitment Agreement and YieldCo Settlement** | The hearing with regard to the Debtors' *Motion for Entry of an Order Authorizing and Approving (I)(A) Entry Into the Backstop Commitment Letter, (B) Equity Commitment Agreement, (C) Payment of Fees and Expenses and (II) The Rights Offering Procedures and Related Forms* (Dkt. No. 2857] (the "**ECA Motion**") shall occur on May 19, 2017 (as currently scheduled). The Committee shall support the ECA Motion and BOKF, as part of its agreement not to object to the Amended Plan, shall not object to the ECA Motion. |
| | The hearing with regard to the Debtors' *Motion to Authorize Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105, 362, 363(b), And 365(a), Bankruptcy Rules 6004, 6006, And 9019, And Local Bankruptcy Rule 6006-1 Authorizing And Approving Certain Settlement Agreements Among The Debtors And The YieldCos* [Dkt. No. 2570] (the "**YieldCo Settlement Motion**") shall occur on June 12, 2017 (as currently scheduled) or earlier, to the extent agreed to by the Court. The YieldCo Settlement Motion shall include the YieldCo Avoidance Allocation set forth below in the section entitled "GUC/Litigation Trust Assets"; the Committee shall support the YieldCo Settlement Motion (and the YieldCo Avoidance Allocation set forth below) and, as part of its agreement not to object to the Amended Plan, BOKF |

---

[9] For the avoidance of doubt, the Committee's consent at all points herein is subject to the Committee's fiduciary duties in these cases.

4

| | |
|---|---|
| | shall not oppose the YieldCo Settlement Motion (and the YieldCo Avoidance Allocation set forth below).[10] |
| | The orders (to the extent entered by the Bankruptcy Court) approving the ECA Motion and the Yieldco Settlement Motion shall both include a provision stating that to the extent the Settlement set forth in this Term Sheet (and/or the Amended Plan) is not approved (or confirmed), such orders are vacated (but solely, as it relates to the Yieldco Settlement Motion, with regard to the Allocation set forth therein) and all parties revert to the status quo ante with regard to both the ECA Motion and the Yieldco Settlement Motion (but solely, as it relates to the Yieldco Settlement Motion, with regard to the Allocation set forth therein). |
| **GUC/Litigation Trust** | The GUC/Litigation Trust shall be established on the Effective Date, and the GUC/Litigation Trust Assets or such portion of the GUC/Litigation Trust Assets as determined by the Committee/GUC/Litigation Trust Oversight Board shall be used to fund the activities of the GUC/Litigation Trust, including the prosecution of the GUC/Litigation Trust Causes of Action. For the avoidance of doubt, the GUC/Litigation Trust Initial Funding (other than the $2 million paid to BOKF as set forth herein in the section entitled "Committee Professional Fees Subject to Investigation / Prosecution Cap / BOKF Fees and Expenses") shall be used to prosecute GUC/Litigation Trust Causes of Action and pay other expenses of the GUC/Litigation Trust; only after such expenses are paid in full may any excess be distributed to Holders of Class A Interests in the GUC/Litigation Trust. |
| | A GUC/Litigation Trust Trustee will be selected by the Committee to administer the GUC/Litigation Trust. All GUC/Litigation Trust governance issues shall be determined by the Committee including the composition of the GUC/Litigation Trust Oversight Board, and the GUC/Litigation Trust Agreement shall be included in the Plan Supplement to be filed in advance of the Confirmation Hearing. |
| | The GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board shall have the authority to retain any advisors for the purpose of carrying out their respective duties under the GUC/Litigation Trust Agreement. The GUC/Litigation Trust Trustee shall file a notice (summarizing the key terms of such retention, including the economic terms thereof) regarding the proposed retention of any such advisors on a contingency fee basis (other than the GUC/Litigation Trust Trustee) (each such notice, a "**Contingency Fee Advisor Retention Notice**") on the docket of the Bankruptcy Court. |
| | Class A Interests in the GUC/Litigation Trust shall be distributed to Holders of Allowed General Unsecured Claims, on a pro rata basis and Class B Interests in the GUC/Litigation Trust shall be distributed to Holders of Second Lien Claims on a pro rata basis, pursuant to the terms of this Settlement. |

---

[10] All references herein to the Committee's support of the Yieldco Settlement Motion (and BOKF's agreement not to object to such motion) shall apply, *mutatis mutandis*, to the *Debtors' Motion for Orders Approving the Debtors' Performance Under TERP VSA, the TERP IDR Transfer Agreement, and the GLBL VSA in Connection with the Yieldco Merger* [Dkt. No. 2580].

5

Holders of Class B Interests in the GUC/Litigation Trust shall only be entitled to the following:

(a) forty-eight percent (48%) of the Additional Net Avoidance Action Proceeds (as defined below); provided, that, the GUC/Litigation Trust Agreement shall provide that the GUC/Litigation Trust Agreement may not be amended to change the distributions set forth in this clause (a) without the consent of 75% of the Holders (in amount of Class B Interests held, not number of Holders) of the Class B Interests in the GUC/Litigation Trust and the requisite consent of the Holders of the Class A Interests in the GUC/Litigation Trust in accordance with the GUC/Litigation Trust Agreement;

(b) delivery of the GUC Litigation Trust Reports (as defined below);

(c) following the filing of any Contingency Fee Advisor Retention Notice, at the request of any of the holders of Class B Interests (or their advisor at the instruction of a holder) the GUC/Litigation Trust Trustee will provide additional information regarding the proposed contingency fee engagement (including the actual engagement letter on a confidential basis, if so requested). Holders of Class B Interests (or their advisors at the instruction of a holder) shall have ten (10) Business Days from the date of the filing of the Contingency Fee Advisor Retention Notice to file with the Bankruptcy Court a pleading seeking to prohibit such retention on the grounds that such retention is not consistent with the purpose of this Settlement Agreement because the engagement does not provide a sufficient incentive for such contingency fee advisor to procure Additional Net Avoidance Action Proceeds, and the GUC/Litigation Trust, GUC Litigation Trust Trustee, GUC Litigation Trust Oversight Board, or the Committee may oppose such pleading (but solely with respect to such issue), and the Bankruptcy Court shall retain jurisdiction to settle such dispute.

(d) enforcement rights with regard to any and all of the above rights (and clause (e) below) (as well as the fiduciary duties owed to all holders of GUC/Litigation Trust Interests by the GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board as set forth below); and

(e) reasonable consent rights with regard to any modifications, amendments, or supplements of the GUC/Litigation Trust Agreement that affect (a) through (d) above.

The GUC/Litigation Trust Agreement shall be drafted by the Committee's Professionals and shall be in form and substance acceptable to the Committee and reasonably acceptable to the Debtors. Any provisions of the GUC/Litigation Trust Agreement relating to (a) through (e) above shall be in form and substance reasonably acceptable to the Ad Hoc Group (or its attorneys).

The GUC/Litigation Trust Trustee and the GUC/Litigation Trust Oversight Board shall owe fiduciary duties to all holders of Class A and Class B Interests in the GUC/Litigation Trust.

The Debtors or the Reorganized Debtors, as the case may be, will cooperate with the Committee and its Professionals in relation to the GUC/Litigation

| | |
|---|---|
| | Trust's prosecution of Avoidance Actions and claims objections, on the terms set forth on **Annex 1** hereto.  To that end, and consistent with Annex 1, on the Effective Date, the GUC/Litigation Trust and Reorganized SunEdison will enter into an agreement (the "**Transition Services Agreement**") pursuant to which Reorganized SunEdison will provide services, which may include personnel, systems, and access to books and records, to the GUC/Litigation Trust in connection with the administration of the GUC/Litigation Trust Assets, including claims administration and the prosecution of the GUC/Litigation Trust Causes of Action.  The Transition Services Agreement shall include customary indemnification and limitations of liability to Reorganized SunEdison and its representatives that provide services to the GUC/Litigation Trust, provided, however, that the indemnification shall exclude any liability of the GUC/Litigation Trust for any claims relating to the gross negligence or willful misconduct of Reorganized SunEdison. |
| **GUC/Litigation Trust Assets** | On the date the Amended Plan becomes effective (the "**Effective Date**"), the Debtors shall transfer to the GUC/Litigation trust (the "**GUC/Litigation Trust**") for the benefit the Holders of General Unsecured Claims (except as set forth herein under the heading "Avoidance Action Proceeds"), certain assets free and clear of any liens, claims or interests, including: <br><br> • $7.5 million in Cash on account of the initial funding for the GUC/Litigation Trust as contemplated by the Committee Settlement annexed to the Original DIP Facility Order and the Replacement DIP Facility Order (the "**GUC/Litigation Trust Initial Funding**"); <br><br> • all proceeds realized from the settlement on account of proceeds allocable from the D&O Insurance to certain estate Causes of Action against the Debtors' current or former directors or officers, which are expected to be $32 million in Cash (the "**D&O Insurance Proceeds**"); <br><br> • $18.0 million in Cash on account of the settlement of certain Avoidance Actions in connection with the YieldCo Settlement Motion (the "**YieldCo Avoidance Allocation**"); <br><br> • At least $5.0 million in Cash on account of Professional Fee Reductions (as explained below in the section entitled "Voluntary Professional Fee Reductions") (the "**Voluntary Professional Fee Reduction Amount**"), as well as all additional Voluntary Professional Fee Reductions that exceed the Voluntary Professional Fee Reduction Amount; and <br><br> • all Causes of Action, including all estate Avoidance Actions (other than Avoidance Actions against the Yieldcos, the Prepetition First Lien Lenders, and the Second Lien Lenders (solely in their capacity as lenders) and Noteholders), to the extent such Causes of Action are not released, or settled with the consent of the Committee, pursuant to Article 11.5 of the Plan or released or settled pursuant to an order of the Bankruptcy Court (collectively, the "**GUC/Litigation Trust Causes of Action**", and together with the GUC/Litigation Trust Initial Funding, the D&O Insurance Proceeds, the YieldCo Avoidance Allocation, and all Voluntary Professional Fee Reductions, the "**GUC/Litigation Trust Assets**"), subject to a sharing mechanism |

7

| | |
|---|---|
| | with respect to Avoidance Actions set forth in the section below entitled "Avoidance Actions Proceeds". |
| **Avoidance Actions Proceeds** | With respect to any proceeds recovered by the GUC/Litigation Trust (or for the benefit of unsecured creditors) on account of Avoidance Actions, net of fees and expenses expended to prosecute such Avoidance Actions (including fees paid on a contingency arrangement, any expenses of prosecuting the GUC/Litigation Trust Causes of Action or administering the GUC/Litigation Trust, including, without limitation, the costs associated with preparation of the GUC/Litigation Trust Reports, all of which shall be deducted prior to any distribution of Net Avoidance Action Proceeds), other than proceeds from those Avoidance Actions against the YieldCos that are settled in connection with the YieldCo Avoidance Allocation (the "**Net Avoidance Actions Proceeds**"), whether such Net Avoidance Actions Proceeds are recovered pursuant to the successful prosecution or settlement of such Avoidance Actions: |
| | • (i) The initial $63.0 million of Net Avoidance Action Proceeds recovered shall be distributed on a consolidated basis to Holders of Allowed General Unsecured Claims, other than the Holders of Second Lien Claims, on a *pro rata* basis; and |
| | • (ii) Any Net Avoidance Actions Proceeds recovered that exceed $63.0 million in the aggregate (the "**Additional Net Avoidance Action Proceeds**") shall be distributed (a) fifty-two percent (52%) on a consolidated basis to Holders of Allowed General Unsecured Claims other than Second Lien Claims (i.e., to holders of Class A Interests in the GUC/Litigation Trust), on a *pro rata* basis and (b) forty-eight percent (48%) to Holders of Second Lien Claims or their representatives (i.e., to holders of the Class B Interests in the GUC/Litigation Trust) on a *pro rata* basis.  Holders of Class B interests in the GUC/Litigation Trust (i.e., Holders of Second Lien Loans and Second Lien Senior Notes claims) shall have a "silent" interest in the GUC/Litigation Trust solely to the extent of the Additional Net Avoidance Action Proceeds and the other rights set forth in clauses (b) through (e) of the section above entitled "GUC/Litigation Trust" (i.e., they shall not, among other things, appoint the GUC/Litigation Trust Trustee or the GUC/Litigation Trust Oversight Board). |
| | The GUC/Litigation Trust Trustee shall provide semi-annual reports (the "**GUC/Litigation Trust Reports**") to all holders of interests in the GUC/Litigation Trust.  The GUC/Litigation Trust Reports shall include, among other things, descriptions in reasonable detail of all Net Avoidance Actions Proceeds collected during the relevant quarter and all fees and expenses expended in connection therewith.  The Bankruptcy Court shall retain jurisdiction to determine any disputes with respect to the GUC/Litigation Trust (including the Net Avoidance Actions Proceeds), including with respect to the distributions thereof as contemplated by this section. |

| | |
|---|---|
| **Second Lien Claims' Rights Against D&O Insurance Proceeds** | Other than with respect to distributions on account of their Class B Interests in the GUC/Litigation Trust in connection with Net Avoidance Action Proceeds, on the Effective Date, the Second Lien Lenders and Noteholders shall be deemed to have waived all rights to any distribution of the GUC/Litigation Trust Assets. |
| | For the avoidance of doubt, this waiver shall also extend to any and all rights of the Tranche B Roll-Up Lenders, the Second Lien Lenders or the Second Lien Noteholders against the D&O Insurance Proceeds (as defined in the section entitled "GUC/Litigation Trust Assets"); this waiver does not include any waiver of any rights of the Second Lien Lenders and Noteholders with regard to any director and officer insurance proceeds that Second Lien Lenders and Noteholders may receive on account of their direct claims against the Debtors' current and former directors and officers, or any waiver of any rights of the Second Lien Lenders and Noteholders with regard to the Second Lien Litigation. |
| **Tranche B Roll Up Lender Rights With Regard to D&O Insurance Proceeds** | Notwithstanding any terms of the Original DIP Facility Order or the Replacement DIP Facility Order, on the Effective Date, the Tranche B Roll Up Lenders shall be deemed to have agreed to release any liens, claims or interests in all assets transferred to the GUC/Litigation Trust in accordance with this settlement, including the D&O Insurance Proceeds, and such assets shall not secure the Tranche B Roll-Up Loans (as defined in the DIP Credit Agreement). |
| | The D&O Proceeds shall not constitute adequate protection for the benefit of the Existing DIP Lenders, the Replacement DIP Lenders or the Prepetition Secured Parties. |
| **Voluntary Professional Fee Reductions** | Every Entity (collectively, the "**Affected Professionals**") (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) or 506(b) of the Bankruptcy Code; or (c) awarded compensation and reimbursement pursuant to the Original DIP Facility Order or the Replacement DIP Facility Order, will be asked to voluntarily reduce the aggregate amount of its Professional Claims earned during the course of the chapter 11 cases in order to assist in the funding of this settlement (the "**Voluntary Professional Fee Reductions**").  It is a condition to the effectiveness of this settlement that the Voluntary Professionals Fee Reductions equal at least $5.0 million. |
| | The Ad Hoc Group will support the Debtors' efforts to obtain Voluntary Professional Fee Reductions from the Affected Professionals. |
| | Prior to June 6, 2017, the Debtors shall establish a schedule (with the consent of the Committee and the Ad Hoc Group, but which schedule shall be kept confidential among the advisors to the Ad Hoc Group, the advisors to the Committee and the members of the Committee) listing each Affected Professional and the amount of its agreed-to Voluntary Professional Fee Reduction, which shall have been agreed to by such Affected Professional as of such date. |
| | In the event an Affected Professional does not agree to a Voluntary Professional Fee Reduction, such Affected Professional's fees and expenses will be subject to review and objection by a fee examiner to be appointed in |

9

| | |
|---|---|
| | these cases (the "**Fee Examiner**"), whose fees and expenses will be deducted from the savings realized by the Fee Examiner. For the avoidance of doubt, the Fee Examiner may only receive compensation from any savings it realizes, and in no event will the Debtors, the Debtors' estates, the Reorganized Debtors, the Second Lien Lenders or Second Lien Noteholders, or any other party incur any fees, costs, or expenses relating to the Fee Examiner or its work. If, as a result of the Fee Examiner's recommendation, any fees are disallowed or reduced by the Court or fee reductions are agreed to by any Affected Professional per the Fee Examiner's recommendation, then such amounts shall be transferred to the GUC/Litigation Trust for the Holders of General Unsecured Claims. The Fee Examiner will only be permitted to examine the fees of an Affected Professional who does not agree to a Voluntary Professional Fee Reduction. |
| | In the event the fees and expenses of an Affected Professional that has agreed to a Voluntary Professional Fee Reduction is subject to objection, any requested amounts that are disallowed shall be deemed credited to the Voluntary Reduction so that the Affected Professional will not receive a reduction of the amount payable to it unless the disallowed amount exceeds the Voluntary Professional Fee Reduction agreed to by such Affected Professional. |
| | The Voluntary Professional Fee Reduction Amount shall be funded into the GUC/Litigation Trust on the Effective Date. The Distribution Agent shall distribute to the GUC/Litigation Trust for the Holders of General Unsecured Claims, the aggregate amount of the Voluntary Professional Fee Reductions. |
| **Committee Professional Fees Subject to Investigation/ Prosecution Cap / BOKF Fees** | The Investigation/Prosecution Cap described in the Original DIP Facility Order (and the Replacement DIP Facility Order) shall be deemed increased from $175,000 to $2.25 million and the Investigation/Prosecution Cap shall be revised to expressly provide that such cap shall apply to both the investigation and prosecution of claims against the Prepetition Secured Parties. For the avoidance of doubt, the amount set forth in this paragraph shall be paid by the Debtors' estates and shall not reduce the amounts to be paid into the GUC/Litigation Trust in accordance with this Term Sheet. |
| | The Committee agrees that the first $2 million of cash to be distributed from the GUC/Litigation Trust shall be distributed to BOKF as partial payment of its fees and expenses incurred in connection with these Chapter 11 Cases. |
| | Subject to the other provisions of this Term Sheet, the Committee Professionals reserve any and all rights to seek allowance and payment of any fees and expenses in connection with matters other than (a) fees and expenses subject to the Investigation/Prosecution Cap and (b) other than as already paid, fees and expenses related to GUC/Litigation Trust Causes of Action. |

10

| | |
|---|---|
| **Dissolution of Committee** | The Amended Plan shall provide that the Committee shall be dissolved on the Effective Date, and the members thereof (solely in their capacities as Committee members) shall be released and discharged from all rights and duties arising from, relating to, the Chapter 11 Cases, as well as exculpated (solely in their capacities as Committee members) from any liability, claims or causes of action in connection with these Chapter 11 Cases; <u>provided, however</u>, that the Committee shall exist and it professionals shall continue to be retained and entitled to reasonable compensation, without further order of the Court, with respect to: (1) the preparation and prosecution of any final fee applications of the Committee's Court approved professionals and (2) all final fee applications filed with the Bankruptcy Court. |
| **Good Faith Attempts to Reduce Costs** | All professionals in the chapter 11 cases agree in good faith to minimize work going forward to reduce costs to estate, to the extent practicable.  All parties agree in good faith to work to confirm the Amended Plan (including the Settlement) as soon as reasonably practicable. |
| **Contribution of 2L Roll-Up Lenders And Contribution of Prepetition 1L Lenders To the Settlement** | Zero (other than (a) the Voluntary Professional Fee Reductions, set forth above, and (b) the agreement regarding D&O Proceeds, as set forth above). |
| **Reduction of TERP/GLBL Claims** | The YieldCos shall withdraw all general unsecured claims against the Debtors, subject to the right of TERP to assert up to one-half of the actual amount the YieldCos ultimately are required to pay (and therefore have the right to assert as a General Unsecured Claim) in connection with the Preserved DE Shaw Unsecured Claim (as defined in the YieldCo Settlement Motion), capped at one-half of $231 million, plus fees and interest. |

11

Agreed and Accepted:

WEIL, GOTSHAL & MANGES LLP

By: _____

Matthew S. Barr
David J. Lender
Jacqueline Marcus

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Official Committee of Unsecured Creditors*

12

KOBRE & KIM LLP

By:

Michael S. Kim
Jeremy C. Hollembeak
Benjamin J.A. Sauter
Joseph W. Slaughter

800 Third Avenue
New York, New York 10022
Telephone (212) 488-1200

*Special Counsel to Official Committee of Unsecured
Creditors*

13

WHITE & CASE LLP

By: _____
    J. Christopher Shore
    Harrison L. Denman
    Michele J. Meises
    Colin T. West
    1221 Avenue of the Americas
    New York, NY 10020
    Telephone: (212) 819-8200
    Facsimile: (212) 354-8113

    Thomas E Lauria
    WHITE & CASE LLP
    Southeast Financial Center, Suite 4900
    200 South Biscayne Blvd. Miami, FL 33131
    Telephone: (305) 371-2700
    Facsimile: (305) 358-5744

*Attorneys for BOKF, N.A.,*
*as Convertible Notes Trustee*


FOLEY & LARDNER LLP

By: _____
    Harold L. Kaplan
    321 North Clark St., Suite 2800
    Chicago, IL  60654
    Telephone: (312) 832-4393
    Facsimile: (312) 832-4700

*Attorneys for BOKF, N.A.,*
*as Convertible Notes Trustee*

14

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____

Daniel H. Golden
Erik Preis
Deborah J. Newman
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
dgolden@akingump.com
apreis@akingump.com
djnewman@akingump.com

*Counsel to the Tranche B Roll-Up Lenders /
Steering Committee of Prepetition Second Lien
Lenders and Noteholders*

15

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____

Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

-and-

Anthony W. Clark (admitted *pro hac vice*)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone:  (302) 651-3000
Fax:  (302) 651-3001

*Counsel to the Debtors and Debtors-in-Possession*

16

**<u>Annex 1</u>**

**Cooperation Terms**

Prior to the Effective Date, the Debtors shall use commercially reasonable efforts to cooperate with the Creditors' Committee in connection with due diligence regarding the potential prosecution of GUC/Litigation Trust Causes of Action.  As used herein, commercially reasonable efforts by the Debtors will include efforts by the Debtors and their advisors to:  1) continue to analyze potential ordinary course defenses for those vendors receiving payments within the 90 day period leading up to the filing date including analyzing historical accounts payable trends and payments made to material vendors during the one year period prior to the filing date; 2) continue work to identify additional potential avoidance actions; and 3) prepare a "datapack" with respect to this data and other data related to preferences that can be transitioned to the Committee / Liquidating Trust professionals. The fees and expenses incurred by the Committee's professionals from June 1, 2017 through the Plan Effective Date  in connection with due diligence regarding the potential prosecution of GUC/Litigation Trust Causes of Action shall not exceed $350,000.

Prior to the Effective Date, the Debtors shall use commercially reasonable efforts to prosecute customary objections to claims, including, without limitation, objections to late-filed claims, duplicative claims, amended or superseded claims or claims filed in the wrong case (the "Claims Reconciliation Process").  On the Effective Date, the GUC/Litigation Trust shall assume responsibility for the Claims Reconciliation Process, including with respect to the initiation or continuance of Claims Objection prosecution.  Copies of the Debtors' books and records that relate to claims objections shall be made available to the GUC/Litigation Trust promptly following the Effective Date.

Following the Effective Date, the Reorganized Debtors shall use commercially reasonable efforts to cooperate with the GUC/Litigation Trust in connection with due diligence and other reasonable assistance regarding the prosecution of Claims Reconciliation Process and the GUC/Litigation Trust Causes of Action as may be reasonably requested by the GUC/Litigation Trust, including with respect to providing documents, evidence, and information.  Following the Effective Date, if the actual, reasonable, and documented out-of-pocket costs and expenses of the Reorganized Debtors  (including fees and expenses of outside third-parties and/or firms; but not including charges for salaried employees of the Reorganized Debtors) exceed $250,000 in the aggregate (the "Excess Expenses"), the GUC/Litigation Trust shall promptly reimburse the Reorganized Debtors for the Excess Expenses.  The parties shall agree in writing to the scope of work and expected charges regarding requests by the GUC/Litigation Trust that are expected to result in the incurrence of out-of-pocket costs prior to the Reorganized Debtors' performance of such tasks or incurrence of such costs and expenses.  The GUC Litigation Trust Trustee and/or the GUC/Litigation Trust Oversight Board shall raise any disputes relating to a reimbursement request within thirty (30) days of receipt thereof, and the Bankruptcy Court shall resolve any such disputes that are not resolved among the parties.

The GUC/Litigation Trust Trustee will seek to preserve and protect all applicable privileges and work-product relating to the Claims Reconciliation Process and the GUC/Litigation Trust Causes of Action, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).  The GUC/Litigation

18

Trust Trustee's receipt of such information shall not waive any privileges and all such privileges are preserved.  Material that is not directly related to the Claims Reconciliation Process or the GUC/Litigation Trust Causes of Action will be redacted and/or not disclosed to the GUC/Litigation Trust.

19

## EXHIBIT B

**Financial Projections**

**CONSOLIDATED FINANCIAL PROJECTIONS OF DEBTORS AND NON-DEBTOR
SUBSIDIARIES**

As further discussed in Article VII of this Disclosure Statement, the Debtors (together with their non-Debtor affiliates, the "Company") believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management with the assistance of their advisors, have, through the development of consolidated financial projections for the Debtors and non-Debtor subsidiaries for the period covering the fourth quarter of 2017 through and including 2020 (such projections, the "Financial Projections" and, such period, the "Projection Period") as attached hereto as Exhibit B, analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. In general, as illustrated by the Financial Projections, the Debtors believe that the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

**Scope of Projections**

The Financial Projections assume that the Plan will be consummated in accordance with its terms by the assumed Effective Date, September 30, 2017, except to the extent a later date is forecasted as set forth in these Financial Projections. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk in its ability to meet cash receipt forecasts and higher reorganization expenses. Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as general business, economic, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual results will be different from those contained in the Financial Projections and such differences may be material. No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. As described in the Disclosure Statement and below, a variety of risk factors could affect the Reorganized Debtors' financial results and must be considered. The Financial Projections should be read in conjunction with a review of the risk factors and the assumptions and qualifications set forth herein, including all relevant footnotes.

The Financial Projections reflect the consolidated cash flow projections of SunEdison, Inc. (the "Cash Flow Projections"). The Financial Projections were not prepared with a view toward compliance with the published rules of the Securities and Exchange Commission or in Accordance with Generally Accepted Accounting Principles. In addition, the Financial Projections do not reflect the application of fresh start accounting. Any formal fresh start reporting adjustments that may be required in accordance with Accounting Standards Codification Topic 852 Reorganizations by Entities in Reorganization under the Bankruptcy Code will be made after the Debtors emerge from bankruptcy.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. No representations or warranties, express or implied, are made as to the accuracy or reasonableness of any assumptions, estimates, projections or other forward-looking statements that have been based on any of the financial information, data, results and calculations referred to above. No representations or warranties, express or implied, are made as to information of a general economic nature or general industry nature.

Factors that could cause actual results to differ materially include, but are not limited to, the following risks:

- Third party risk, including, but not limited to, the risk related to government/regulatory actions that may impact the ability to transfer assets, or the value of asset purchase agreements or power purchase agreements;

- Delay of or inability to obtain public utility commission approval, necessary for certain power purchase agreements for certain projects;

- Changes to regulations and policies governing the electric utility industry, which may adversely affect the value of certain projects

- Reduction or elimination in the availability and / or size of government economic incentives for the solar industry;

- Legal, political, operational and other risks that could negatively affect project sales and cash repatriation in foreign jurisdictions where the Company maintains operations;

- Material events that impact the ability or willingness of buyers to close certain asset sale transactions or perform in accordance with associated purchase and sale agreements or other agreements;

- The development or performance of assets do not meet expected criteria; i.e., projected milestones are not achieved as forecasted adversely affecting the Company's ability to collect on associated milestone payments;

- Inability to maintain or obtain trade terms from vendors and suppliers, which could lead to increased costs or increased working capital requirements;

- Credit risk of asset purchasers that negatively impact the financing required by such parties to close on projected asset sale transactions;

- Final tax refund calculations or timing of such refunds may vary from estimates contained in the Financial Projections;

- Unforeseen procedural issues preventing the Company from repatriating cash from foreign jurisdictions on the timeline originally projected;

- Transition Services Agreements between the Company and third parties related to the support for Yieldco entities may be modified if operational support levels requested by third parties vary from current assumptions;

- Extensive post-emergence litigation related to prepetition Claims and/or Plan implementation resulting in increased professional fees;

- Cost and timing of winding down legal entities differs from current assumptions; and

- The Plan may not be confirmed or may not be confirmed within the timeframe contemplated.

## KEY ASSUMPTIONS TO FINANCIAL PROJECTIONS

### Methodology

The Reorganized Debtors prepared the Financial Projections of the Reorganized Debtors, including all segments related to the operations of the non-Debtor Affiliates. The Financial Projections assume the successful implementation of the Plan for the Reorganized Debtors. The Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors and their non-Debtor affiliates, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors. Therefore, although the Financial Projections are presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results, and such variances may be material.

2

The Financial Projections incorporate assumptions related to certain economic and business conditions for the Projection Period, including geopolitical and macroeconomic assumptions for jurisdictions in which the Reorganized Debtors and non-Debtor Affiliates operate.[1]

Reorganized SUNE will emerge as an operating entity that will employ personnel and maintain systems and back-office capabilities reasonably necessary to administer and consummate assets held for sale, collect payment reimbursements from various entities after the sale, collect other receivables, collect earnouts associated with project milestones, and maximize recovery of Repatriated Cash and receivables. The Financial Projections contemplate that upon emergence, the Reorganized Debtors and their non-Debtor affiliates will retain the rights to receive earnouts, proceeds from asset sales, proceeds from other opportunities, and Repatriated Cash, and that the net proceeds of such assets will ultimately be transferred to Reorganized SUNE. The Debtors' will retain the rights and interest in various assets at emergence. The Debtors believe that there is a degree of uncertainty in its ability to achieve the milestones for certain earnouts, collect on past due receivables, and monetize other assets. As result, the Debtors have estimated that the net cash flows from the assets that will be held by the Reorganized Debtors will approximate $84.2 million. The below schedule is a description of the assets that will be held by the Reorganized Debtors at its emergence from chapter 11.

**Assets held by Reorganized Debtors:**

| |
|---|
| Accounts Receivable - Residential |
| Asia – Asset Sales & Earnouts |
| International Tax Refunds |
| LATAM Asset Sales & Earnouts |
| Minority Equity Investments |
| North America C&I Earnouts |
| North America Utility Earnouts |
| Solar Materials Earnouts |

In addition, Reorganized SUNE will maintain the obligations for accrued administrative expenses, general operating expenses, and equity financing. Reorganized SUNE is expected to be managed by a chief executive officer, supported by a limited staff of full-time employees and professional advisors, and governed by a Board of Directors. Reorganized SUNE will also provide the necessary corporate functions to support any ongoing activity of its Affiliates and to wind down business units, as necessary. These functions include accounting, tax, legal, and finance functions. The Financial Projections reflect the consummated sale of the Solar Materials platform, the Commercial and Industrial platform and various portfolios, various North American utility assets, the Latin America platform, the Global Asset Management ("GAM") business unit, and the ongoing wind-down of the remaining business units. In addition, the Financial Projections reflect the consummation of (i) the Jointly Supported Transactions resulting in the cash sale of Terraform Global ("GLBL") and the sponsorship of TerraForm Power, Inc. ("TERP") by Brookfield Asset Management, Inc., as announced on March 7, 2017 and (ii) the Rights Offering. Reorganized SUNE anticipates having certain transition service agreements with TERP and GLBL: (1) pursuant to a letter agreement, SUNE will provide for the orderly transition of employees who provide asset management and operating and maintenance services from the Company to TERP as well as the transition of service responsibilities performed by such employees; and (2) under a corporate transition services agreement, SUNE will provide TERP and GLBL with certain requested corporate and administrative services (as requested by Brookfield) for the

---

[1] The GUC/Litigation Trust will be established pursuant to the Plan for the benefit of Holders of General Unsecured Claims and seeded with $7.5 million. The GUC/Litigation Trust is not reflected in the Financial Projections. However, Reorganized SUNE anticipates having a transition service agreement with GUC/Litigation Trust under which Reorganized SUNE will provide ad hoc services as requested, which may include personnel, systems, and access to books and records. The Debtors are in discussions with the Creditors' Committee regarding how the Reorganized Debtors will be reimbursed for costs associated with services that may be required from Reorganized SUNE by the GUC/Litigation Trust in connection with the prosecution of Avoidance Actions and claims administration, among other services.

transition period provided thereunder, including information technology services, tax transition services, and human resources services.

The Financial Projections assume that the Reorganized Debtors will raise emergence financing via (1) a new money rights offering (the "Rights Offering") and (2) a direct purchase of New SUNE Common Stock and Continuing TERP Class A Shares (the "Direct Equity Commitment") by certain parties that have committed to backstopping the Rights Offering. (the "Backstop Purchasers")

Proceeds from the Rights Offering and the Direct Equity Commitment, assumed in these Financial Projections to be $285 million, will be used to (i) repay the outstanding balance of the Replacement DIP Facility, (ii) provide at least $5 million of liquidity pre-funding for Reorganized SUNE, (iii) pay administrative claims and (iv) pay certain priority, avoidance and allowed secured claims, as described in the Plan and Backstop Motion.

**Financial Projection Assumptions**

1. Capital Structure

   • The Financial Projections assume that (A) the Reorganized Debtors will conduct a new money Rights Offering for $213.75 million available to the Rights Holders and (B) the Backstop Purchasers will make the Direct Equity Commitment for $71.25 million.

   • The Financial Projections contemplate Reinstated Second Lien Claims upon Emergence in an amount equal to the approximate value of the Earnout Assets, Repatriated Cash, Residual Assets, and any other of the debtors' assets as of the Effective Date.  As set forth in the terms and conditions attached as Exhibit 6.5 of the Plan, the Reinstated Second Lien Claims that are outstanding on the third anniversary of the Effective Date are mandatorily convertible into a maximum of fifty percent (50%) of New SUNE Common Stock (on a fully diluted basis).

2. Cash

   • Cash reflected in the Cash Flow Projections is defined as unrestricted cash located in the United States.

   • The initial cash amount of $5 million on the Cash Flow Projections is expected to be sufficient to fund general working capital for Reorganized SunEdison, Inc. post-emergence.

   • Cash balances in the Financial Projections do not include ring-fenced cash, or other balances segregated for project-level purposes that cannot be commingled with funds used for general corporate purposes.

3. Cash held overseas

   • Cash held overseas is the projected amount of cash that will be held in foreign jurisdictions at emergence.

   • This amount is increased or decreased based on the Reorganized Debtors' completion of asset sale transactions in foreign jurisdictions, ability to repatriate, and use of cash held overseas to pay foreign costs. This is reflected in the "Net Change in Foreign Cash" line of the Cash Flow Projections.

4. Escrow releases

   • Escrow releases are releases of proceeds related to asset sales that are not contingent on performance or achievement of a milestone.

   • Escrow Releases, in the Cash Flow Projections, are reflected as "asset sales" under "operating cash receipts" at the undiscounted expected future value of Net Proceeds.

5. Earnouts

   • Earnouts are contractual obligations for buyers to provide incremental consideration to the company after the original asset sale closing based on the achievement of certain project milestones, such as obtaining formal notice to proceed (NTP) or reaching the commercial operations date (COD).

- On the Cash Flow Projections, these are reflected under "operating cash receipts" at the undiscounted expected future value of Net Proceeds.

6. Opportunities

- Opportunities consist of cash inflows that are unrelated to prior or future asset sales. These include tax refunds and various reimbursements.

- In the Cash Flow Projections, these are reflected under "operating cash receipts" at the undiscounted expected future value of Net Proceeds.

7. Net change in foreign cash

- Net change in foreign cash is the overall increase or reduction in the cash held in foreign jurisdictions. This is portion of proceeds from asset sales, earnouts, or opportunities during a specific period that are trapped in foreign jurisdictions, less cash that is recovered or proceeds that are used to pay foreign expenses in the same jurisdiction.

- In the Cash Flow Projections, these are reflected under "operating cash receipts" at the undiscounted expected future value of Net Proceeds at time of cash inflow and expected recovery timeline.

8. Personnel payments

- Personnel payments are the projected payroll and benefits for the operations, legal, controllership, FP&A, IT, tax, HR, and administrative personnel that will be required to maintain the day-to-day operations for the reorganized company.

- In the Cash Flow Projections, these are reflected under "operating cash disbursements" at the undiscounted expected future amount at the time of payment.

9. Professional fees

- Professional fees include payments for the chief executive officer, quarterly board fees, legal and advisory services, and accounting and tax professionals.

- In the Cash Flow Projections, these are reflected under "operating cash disbursements" at the undiscounted expected future amount at the time of payment.

10. Facilities payments

- Facilities payments are for the remaining temporary office spaces that will be necessary for the Reorganized Debtor to conduct its business.

- In the Cash Flow Projections, these are reflected under "operating cash disbursements" at the undiscounted expected future amount at the time of payment.

11. Other payments

- Other payments consist of general non-payroll overhead for the Reorganized Debtor, including insurance, severance, purchased services, and other expenses required to support the ongoing operations.

- In the Cash Flow Projections, these are reflected under "operating cash disbursements" at the undiscounted expected future amount at the time of payment.

12. Taxes

- The Financial Projections assume that the Reorganized Debtors' will retain a portion of their accumulated net operating losses.  Any such losses may be severely limited.  However, the Company does not anticipate any material income or gain from the disposition of remaining assets.

- Other taxes, such as payroll, property, transaction/transfer, and certain foreign tax obligations, are assumed to be paid in the normal course of operations or as required as part of asset sale transactions.

Cash flow forecast
($ in USD millions)

**SunEdison, Inc.**

| | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Q2'18 | Q3'18 | Q4'18 | Q1'19 | Q2'19 | Q3'19 | Q4'19 | Q1'20 | Q2'20 | Q3'20 | Q4'20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening free cash** | $5.0 | $4.9 | $14.5 | $38.0 | $36.6 | $37.6 | $43.9 | $65.1 | $62.8 | $63.3 | $63.2 | $63.0 | $62.9 | $67.7 | $67.6 | $67.5 | $67.4 |
| **Cash flow projection** | | | | | | | | | | | | | | | | | |
| Operating cash receipts | | | | | | | | | | | | | | | | | |
| Asset sales | 0.8 | 6.4 | 1.1 | - | - | (1.4) | - | - | - | - | - | - | - | - | - | - | - |
| Earnouts | - | - | 6.2 | - | 2.6 | 2.7 | 25.0 | - | 3.6 | - | - | - | - | - | - | - | - |
| Opportunities | - | 4.8 | 18.9 | - | - | 5.3 | 0.7 | - | 8.3 | - | - | - | 5.0 | - | - | - | 5.0 |
| Net change in cash held overseas | 1.1 | 0.3 | (1.0) | 0.0 | (0.2) | 1.1 | (1.4) | - | (10.1) | - | - | - | - | - | - | - | - |
| **Net operating cash receipts** | 1.8 | 11.5 | 25.1 | 0.0 | 2.4 | 7.6 | 24.3 | - | 1.7 | - | - | - | 5.0 | - | - | - | 5.0 |
| | | | | | | | | | | | | | | | | | |
| Operating cash disbursements | | | | | | | | | | | | | | | | | |
| Personnel | (0.6) | (0.5) | (0.5) | (0.4) | (0.4) | (0.4) | (0.9) | (0.5) | (0.2) | - | - | - | - | - | - | - | - |
| Professional fees | (0.9) | (0.8) | (0.6) | (0.6) | (0.5) | (0.5) | (1.4) | (1.1) | (0.8) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| Facilities payments | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | - | - | - | - | - | - | - | - |
| Other payments | (0.5) | (0.4) | (0.4) | (0.4) | (0.5) | (0.3) | (0.7) | (0.6) | (0.1) | - | - | - | - | - | - | - | - |
| **Net operating cash disbursements** | (2.0) | (1.8) | (1.6) | (1.4) | (1.4) | (1.4) | (3.1) | (2.3) | (1.2) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) |
| | | | | | | | | | | | | | | | | | |
| **Net cash flow** | (0.1) | 9.7 | 23.5 | (1.4) | 1.0 | 6.2 | 21.1 | (2.3) | 0.5 | (0.1) | (0.1) | (0.1) | 4.8 | (0.1) | (0.1) | (0.1) | 4.8 |
| | | | | | | | | | | | | | | | | | |
| **Ending free cash** | $4.9 | $14.5 | $38.0 | $36.6 | $37.6 | $43.9 | $65.1 | $62.8 | $63.3 | $63.2 | $63.0 | $62.9 | $67.7 | $67.6 | $67.5 | $67.4 | $72.2 |

| | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Q2'18 | Q3'18 | Q4'18 | Q1'19 | Q2'19 | Q3'19 | Q4'19 | Q1'20 | Q2'20 | Q3'20 | Q4'20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash held overseas | | | | | | | | | | | | | | | | | |
| Beginning cash held overseas | $25.6 | $24.6 | $24.3 | $25.3 | $25.3 | $25.5 | $24.4 | $25.9 | $25.9 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 |
| Less: Net change in cash held overseas | (1.1) | (0.3) | 1.0 | (0.0) | 0.2 | (1.1) | 1.4 | - | 10.1 | - | - | - | - | - | - | - | - |
| **Ending cash held overseas** | $24.6 | $24.3 | $25.3 | $25.3 | $25.5 | $24.4 | $25.9 | $25.9 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 | $36.0 |

**<u>EXHIBIT C</u>**

**Liquidation Analyses**

**EXHIBIT C**

**Liquidation Analysis**

## Liquidation Analysis

### A.    Introduction

This liquidation analysis (the "<u>Liquidation Analysis</u>") [1] was prepared by PricewaterhouseCoopers LLP ("<u>PwC</u>") [2] with the assistance of the Debtors and their professionals, and estimates potential cash distributions to holders of allowed claims and interests in a hypothetical chapter 7 liquidation of all of the Debtors' assets.

The "best interests" test in section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds that a chapter 7 trustee would generate if each Debtors' Chapter 11 Cases were converted to chapter 7 cases and the assets of such Debtors' estates were liquidated as of the Effective Date; (2) determine the distribution that each non-accepting holder of a Claim or Interest would receive from the net proceeds available for distribution under the priority scheme dictated in chapter 7; and (3) compare each holder's estimated recovery under liquidation to the distribution under the Plan (the "<u>Plan Recovery</u>") that such Holder would receive if the Plan were confirmed and consummated.[3]

Based on the following hypothetical Liquidation Analysis, the Debtors (also referred to herein collectively as the "<u>Company</u>") submit that because of, among other things, discounts to asset values and the incurrence of additional priority claims in chapter 7 if these cases were converted, holders of Impaired Claims will receive more value under the proposed Plan than in a liquidation scenario.  The Plan thus satisfies the best interests test under section 1129(a)(7) of the Bankruptcy Code.   The Debtors caution that many assumptions used herein are conservative and actual recoveries in a chapter 7 liquidation could be substantially less than recoveries set forth in this Liquidation Analysis.

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' disclosure statement, as modified or amended (the "<u>Disclosure Statement</u>").

[2]    PwC's Business Recovery Services practice has extensive experience performing liquidation analyses in connection with Chapter 11 and Chapter 7 cases.

[3]    Contemporaneously herewith, the Debtors filed their First Amended Joint Plan of Reorganization  (as amended, the "<u>Plan</u>"), which among other things, reflects the proposed global settlement, the material terms of which were announced on the record before the Court on May 16, 2017 (as documented by the final term sheet to be agreed to by the parties thereto, the "<u>Global Settlement</u>"), among the Debtors, the Committee, the Tranche B Roll Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders, and BOKF N.A ("<u>BOKF</u>").  The Plan Recovery is based on the various agreements contained in the Global Settlement.

### B.      Liquidation Analysis Overview – High Scenario and Low Scenario

The hypothetical Liquidation Analysis assumes conversion of each of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on July 31, 2017 (the "Conversion Date") and presents a recovery scenario on a debtor-by-debtor basis as set forth on Exhibit 1.  On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the bankruptcy estates of the Debtors (the "Estates").[4]  The Liquidation Analysis is based on estimates of the Debtors' assets and liabilities derived from the Debtors' periodic financial reports and budgets, which are routinely provided to the Debtors' constituents.  While the Liquidation Analysis assumes a July 31, 2017 Conversion Date, estimated recoveries in a hypothetical chapter 7 liquidation are estimated as of the Effective Date, as required by the Bankruptcy Code, so that they can be compared to the projected recoveries under the Debtors' proposed plan.[5]

The Liquidation Analysis is comprised of two alternative hypothetical scenarios: (a) the High Scenario (Transaction Approach), under which the Trustee pursues the value of the transactions between the YieldCos and Brookfield (the "YieldCo/Brookfield Transactions"), as well as the Debtors' related settlements with the YieldCos; and (b) the Low Scenario (Litigation Approach), under which the Trustee pursues litigation against the YieldCos in lieu of pursuing the YieldCo/Brookfield Transactions and maintaining the YieldCo Settlement Agreements.  These alternative scenarios demonstrate that projected recoveries under the proposed Plan meet or exceed those projected in a hypothetical chapter 7 liquidation under either scenario.[6]

Under both the High and Low Scenario, the Liquidation Analysis assumes that the Trustee will have access to approximately $7 million in funds escrowed for the benefit of unsecured creditors to administer the chapter 7 estates and to investigate and prosecute actions on behalf of the chapter 7 estates.[7]  In addition, the Liquidation Analysis assumes that

---

[4]    Although the Liquidation Analysis assumes the appointment of a single Trustee, there is a possibility that more than one chapter 7 trustee is appointed given the various Debtor entities in these cases.  Such additional trustees would likely increase chapter 7 costs and thus likely result in lower recoveries than those contained in this Liquidation Analysis.  *See, e.g. In re Adelphia Communications Corp.*, 368 B.R. 140, 254 (Bankr. S.D.N.Y. 2007) ("If multiple trustees were appointed, for each of the affected Debtor groups, each would have to have its own counsel, with the associated costs.").

[5]    *See* 11 U.S.C. § 1129(a)(7).

[6]    Holders of Interests will receive no distributions under either the High or Low Scenario.

[7]    Pursuant to Annex II to the original order approving the Debtors' debtor-in-possession financing facility [Docket No. 523] (the "Original DIP Financing Order") and reaffirmed in the new debtor-in-possession financing facility [Docket No. 2880] (the "New DIP Financing Order"), the Trustee would have access to approximately $6.7 million of Litigation Trust Funds that the Debtors have placed in escrow.  The Trustee would also have access to the $250,000 set aside for administration of the chapter 7 estates.  New DIP Financing Order ¶ 10(i).  Under the New DIP Financing Order, General Unsecured Creditors would have the right to receive 10 percent  of the aggregate net proceeds from any sale(s) of  Non-Prepetition 1L/2L Obligors' (as defined in the New DIP Financing Order) assets in excess of $175 million (such 10 percent, the "Non-Prepetition 1L/2L Obligor Carve-Out").  For the purposes of this Liquidation Analysis, the

the Debtors' operations would cease immediately on the Conversion Date and that the Trustee would only have use of cash collateral in order to monetize residual encumbered assets, assuming an agreed to cash collateral budget by the secured lenders.[8] All cash on hand, less any agreed carve-out pursuant to a cash collateral budget, would be swept and used to pay down a portion of the Debtors' replacement debtor-in-possession financing facility (the "<u>DIP Financing Facility</u>"). In the event that the Trustee does not receive use of cash collateral to liquidate remaining encumbered assets, the recoveries as estimated herein would be subject to further material discounts.

## <u>High Scenario – Transaction Approach Assumptions</u>

Under the High Scenario, the Liquidation Analysis assumes that the YieldCo/Brookfield Transactions will be consummated by the Trustee 90 days after the Conversion Date. Additionally, under the High Scenario, the Debtors assume that the YieldCo Settlement Agreements remain intact, including the Debtors' allocation of proceeds from the YieldCo/Brookfield Transactions to any potential avoidance actions that may be asserted against the YieldCos. The Global Settlement contemplates that the parties shall return to the *status quo* as existed prior to the settlement if the Global Settlement is not ultimately approved. Thus, the Liquidation Analysis contemplates recoveries based on the positions formerly asserted by the parties to the Global Settlement.[9] Accordingly, the value ascribed to the YieldCo avoidance actions in the High Scenario is net of all incremental costs associated with their prosecution and settlement resulting in $16.1 million attributed to recoveries on account of such avoidance.[10]

The High Scenario also assumes certain reductions in other asset values based on a number of factors, including: the Trustee's lack of familiarity with the cases and the Debtors' assets; lower recoveries on account of third-party avoidance claims (that would be lower due to, among other things, a loss on institutional knowledge and lack of funding, which would require such avoidance claims to be prosecuted on a contingent fee basis); accrual of additional administrative costs and priority claims during the course of the chapter 7 cases; unpaid priority claims from the chapter 11 cases; loss of value from remaining sales in the pipeline caused by business discontinuity and loss of employee knowledge; and decreased ability to close certain pending and pipeline transactions and collection of earn-out

---

Debtors assume that there is no recovery on account of the Non-Prepetition 1L/2L Obligor Carve-Out under either the High or Low Scenario.

[8] There is no requirement that the secured lenders must consent to such use of cash collateral.

[9] While the Liquidation Analysis does not discount the value of the YieldCo/Brookfield Transactions under the High Scenario, the Trustee will likely have difficulties in preserving the full amount of consideration to be received under the YieldCo/Brookfield Transactions and YieldCo Settlement Agreements given termination rights thereunder upon conversion to chapter 7 liquidation. *See* YieldCo Settlement Agreements, Exhibit B, § 8(vii); Exhibit C, § 8(vii), which, if terminated, would prevent consummation of the YieldCo/Brookfield Transactions.

[10] Under the Global Settlement, recoveries for the YieldCo avoidance actions total $18 million.

4

proceeds.[11]  Moreover, holders of Second Lien Stub Claims (as defined below) will assert unsecured deficiency claims against each guarantor of the Second Lien Claims for the full balance of the Second Lien Stub Claims.  Based on these reductions to value, recoveries under the High Scenario are less than recoveries under the Plan.

**Low Scenario – Litigation Approach Assumptions**

The Low Scenario assumes that the pending YieldCo/Brookfield Transactions will be terminated upon conversion to a chapter 7 liquidation leaving the Trustee to pursue litigation against the YieldCos versus a negotiated transactional solution.  Under these circumstances, the Debtors believe there would be a severe deterioration in the value of the Estates' equity interests in the YieldCos given the overhang of this litigation and unwillingness of buyers to acquire equity in the YieldCos without a global settlement with the YieldCos.[12]  Accordingly, for the purposes of the Low Scenario, in evaluating its YieldCo equity interests, the Debtors have used the June 16, 2016 closing price of the TERP stock ($7.44 per share) and May 11, 2016 closing price of the GLBL stock ($2.57), each of which represents the low postpetition share price for each respective YieldCo stock since the commencement of the Chapter 11 Cases.[13]  Given the uncertainty into which the Estates will again plunge, it is reasonable to assume a trading price that reflects a similar postpetition uncertainty that the YieldCos faced without a defined sponsor immediately following the Petition Date.

In addition, each YieldCo would be required to pay a break-up fee in connection with the termination of its respective Merger Agreement. While the Debtors will not be required themselves to pay any break-up fee, the YieldCos' payment of their respective break-up fees would result in a significant reduction in value of the Debtors' equity interests in the YieldCos.[14]  For purposes of the Low Scenario, the Liquidation Analysis assumes that the

---

[11]  *See, e.g. In re Adelphia Communications Corp.*, 368 B.R. at 254–255 (considering, *inter alia*, the administrative costs of a chapter 7 trustee, the familiarity of the plan administrator with the debtor's business, assets and/or liabilities in applying the best interest of the creditors test, and the likelihood that an independent trustee would adopt the underlying settlement).

[12]  *See* Declaration of Homer Parkhill in support of the YieldCo Settlement Agreements [Docket No. 2572] (the "Parkhill YieldCo Declaration").

[13]  The market price for the YiedCo shares did not substantially increase postpetition until Brookfield was rumored (and eventually announced) its investment in the YieldCos.  For example, on June 29, 2016, Brookfield filed a B-Form 13-D, revealing a substantial investment in TERP.  The price of TERP jumped from $8.75 per share (June 28, 2016 closing price) to $10.34 per share (June 29, 2016 closing price).

[14]  If the YieldCo/Brookfield Transactions fail to consummate, a minimum break-up fee of $8 million will be due from GLBL and up to $17 million in expense reimbursement will be due from TERP. The amount of such break-up fees may increase if certain conditions are met – notably whether TERP or GLBL's board has exercised its right in accordance with its fiduciary duties to change its recommendation to shareholders regarding the Proposed Merger, or whether an alternative transaction has been proposed prior to the event providing the termination right and a transaction occurs during a 12-month tail period. In such event, the break-up fees may reach up to $50 million for TERP and $30 million for GLBL, which equates to approximately 2.9% of the TERP equity value and 3.8% of the GLBL equity value.

discount to the Estates' equity interests in the YieldCos to be approximately $342 million less than that to be realized from the YieldCo/Brookfield Transactions.[15]

Based on the reduction in value of the estates' equity interests in the YieldCos, the Low Scenario further assumes that the Trustee abandons the estates' equity interests in the YieldCos to the DIP Lenders, who then dispose of these assets at the aforementioned discount. As a result, the Tranche B Roll-Up Loan Claims are impaired under the Low Scenario and collect from D/O Insurance Proceeds that otherwise would be available to general unsecured creditors absent impairment of such Tranche B Roll-Up Loan Claims.[16] Moreover, with the Tranche B Roll-Up Loan Claims impaired, holders of Second Lien Stub Claims (as defined below) will assert unsecured deficiency claims against each guarantor of the Second Lien Claims for the full balance of the Second Lien Stub Claims.[17]

The Low Scenario also assumes that the Trustee would pursue litigation against the YieldCos on account of the avoidance actions,[18] which are then assumed to settle in approximately nine months. The Low Scenario assumes that such settlement would result in the waiver of all YieldCo general unsecured and administrative claims[19] and the recovery of avoidance actions against the YieldCos is $49.1 million.[20] These recoveries are based on the allocation analysis[21] previously submitted by the Debtors in support of the YieldCo

---

[15]    Indeed, a chapter 7 conversion may result in even lower value of the Debtors' equity interests in the YieldCos given buyers' lack of interest in purchasing the Debtors' YieldCo stock with the overhang of estate litigation against the YieldCos that was clearly articulated during the YieldCo joint marketing protocol. *See* Parkhill YieldCo Declaration ¶ 11.

[16]    New DIP Financing Order, Annex II.

[17]    As stated above, the Liquidation Analysis assumes the parties return to their positions as they existed prior to the Global Settlement. Based upon those positions, the Second Lien Stub Claims face pending challenges seeking, among other things, disallowance of original issue discount ("OID") and avoidance of liens and subsidiary guarantees. Other than disallowance of a portion of OID, the Debtors have attributed a very low likelihood of success with respect to this litigation. Accordingly, this Liquidation Analysis assumes that approximately $18 million of the Second Lien Stub Claims related to OID would be disallowed under both the High and Low Scenario.

[18]    The Liquidation Analysis assumes that the Trustee would not have sufficient funds to pursue full litigation of the YieldCo Avoidance Actions and any litigation would need to be pursued on a contingency fee basis, which would further erode recoveries. Given that such litigation would be against well-funded defendants, it is unclear whether any attorney would accept such an engagement on a contingency fee basis.

[19]    The YieldCos have asserted approximately $3.0 billion of unsecured claims and $90 million of administrative claims (as of June 30, 2016). In the Low Scenario, if the YieldCos succeed in allowance of such claims, recoveries by holders of General Unsecured Claims will be significantly reduced. As described above, as a conservative assumption, the Debtors have excluded any recoveries to the YieldCos on account of such claims for purpose of this Liquidation Analysis.

[20]    The Low Scenario's recovery assumes that there is a significant risk that GLBL would file for chapter 11 protection to avoid the downside risk on the avoidance actions. If GLBL filed for chapter 11 protection the Estates' ability to receive a recovery on account of their interest in GLBL equity would be impaired.

[21]    *See* Docket No. 2732.

Settlement Agreements, adjusted for administrative expenses and other factors, such as litigation expenses. The Debtors used the same gross number analysis that resulted in a net recovery of $16.1 million to the Estates on account of the YieldCo avoidance actions in the positions asserted prior to the Global Settlement (*i.e.*, the assumptions included in the High Scenario). However, in the Low Scenario the estimated value of $49.1 million is a gross number and must be further reduced by other chapter 7 administration costs reflected elsewhere in the Liquidation Analysis in order to compare it to the recovery in the High Scenario.

Consistent with the High Scenario, the Low Scenario assumes additional discounts in non-YieldCo asset sale proceeds and accrual of additional priority claims based on the factors noted above. Based on these factors, recoveries are significantly less under the Low Scenario than recoveries under the Plan.

### Plan Recoveries are Superior to Both the High Scenario and the Low Scenario

The Liquidation Analysis was performed on a debtor-by-debtor basis and as set forth on Exhibit 1, the Liquidation Analysis shows that each holder of a Claim or Interest in each Impaired Class will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code under either the High or Low Scenario. The Exhibit 1 summary shows (i) what each Debtor listed as number 1 through number 10 is projected to recover under the Plan and/or either the High or Low Scenario, (ii) each Debtor listed as number 11 through number 13 is projected to have no recovery under the Plan and/or either the High or Low Scenario because there are no general unsecured claims asserted against these entities, and (iii) each Debtor listed as number 14 through number 51 is projected to have no recovery under either the High or Low Scenario because such entities do not have any unencumbered assets. For illustrative purposes only, below is as an overall summary of recoveries under the Plan, the High Scenario, and the Low Scenario.

| Recovery Summary | | POR | | Low | | High | |
|---|---|---|---|---|---|---|---|
| *$ millions* | *$ Claim* | $ | % | $ | % | $ | % |
| DIP Term Loan | 530 | 530 | 100.0% | 530 | 100.0% | 530 | 100.0% |
| Tranche B Roll Up | 335 | 335 | 100.0% | 85 | 25.4% | 335 | 100.0% |
| 2L Stub* | 607 - 625 | 34 | 5.4% | 4 | 0.7% | 10 | 1.6% |
| Allowed Secured | 3 | 3 | 100.0% | 3 | 100.0% | 3 | 100.0% |
| Priority Claims | 6 | 6 | 100.0% | 6 | 92.1% | 6 | 92.7% |
| GUCs** | 4,692 | 131 | 2.8% | 22 | 0.5% | 31 | 0.7% |
| **Total Recovery** | | **1,040** | | **651** | | **915** | |

*2L Stub recoveries in the low scenario are solely on account of associated deficiency claims.
**Total GUC Pool amounts in this table do not include Intercompany Claims; however, the table assumes that recoveries on account of Intercompany Claims are paid *pari passu* with General Unsecured Claims at each Debtor entity. See Section C.

7

**C.      Claims**

The Liquidation Analysis is presented in terms of claims and assets recoveries. A summary of the Debtors' claims and assets is described below.  Where differing assumptions apply to claims and/or assets in the High or Low Scenario, it is noted; otherwise, assumptions in both scenarios are the same.

1.  DIP Carve Out Claims

The highest priority claims in the Liquidation Analysis are carve out claims (the "Carve Out Claims") under the New DIP Financing Order, which include (i) all Bankruptcy Court and U.S. Trustee fees, (ii) a $250,000 cap for the Trustee to administer the chapter 7 cases, (iii) the Litigation Trust Funds,[22] and (iv) all Professional Fees that have been accrued and unpaid prior to the Conversion Date *plus* $3,000,000 for any fees incurred after the Conversion Date.  The Liquidation Analysis assumes that these claims remain the same under either the High or Low Scenario.

2.  YieldCo Carve-Out Claims

Pursuant to the New DIP Financing Order, to the extent that YieldCos can satisfy the requirements of section 503 of the Bankruptcy Code, up to $20 million of administrative claims has been carved out under the New DIP Financing Order (the "YieldCo Carve Out Claims").  The YieldCo Carve Out Claims are based on the Debtors' alleged breach of support under the Master Services Agreement, including, but not limited to, logistical and employee support as well as support of GAM services.  This Liquidation Analysis assumes that any YieldCo administrative claims will be waived under the High Scenario as result of the YieldCo/Brookfield Transactions being kept intact, and waived under the Low Scenario as a result of an ultimate settlement of any litigation between the Trustee and the YieldCos.[23]

3.  DIP Financing Facility Claims

The claims underlying the New Money Loan and Tranche B Roll-Up Loans (the "DIP Financing Facility Claims") total approximately $865 million.  The DIP Financing Facility Claims are secured by substantially all of the Debtors' assets (excluding Avoidance Actions).  Furthermore, the Tranche B Roll-Up Loans have a security interest in the D/O Insurance Proceeds and can collect from such proceeds in the event that other assets are not sufficient to satisfy the Tranche B Roll-Up Loans, which is the case under the Low Scenario.

---

[22]    Under the Original DIP Financing Order, $10 million was allocated to the Litigation Trust Funds, which would be reduced by funds expended by the Committee investigating or prosecuting estate claims.  As of March 31, 2017, the Litigation Trust Funds are estimated to be approximately $6.7 million, which could further decrease on account of fees incurred, but not yet submitted, by Committee professionals on account of investigating or prosecuting estate claims.

[23]    In the event that the YieldCos assert valid and unwaived administrative claims, such claims may have a material impact to recoveries under the Liquidation Analysis.

4. Secured Claims

The Debtors' Secured Claims, which include the non-rolled up portion of the Second Lien Claims ("Second Lien Stub Claims")[24] are secured by a second lien on essentially all of the Debtors' assets (excluding Avoidance Actions and D/O Insurance Proceeds), including security interests in all Intercompany Claims.[25]   In addition, the Liquidation Analysis contemplates additional secured claims that have been asserted at certain Debtors on account of tax liens and are expected to be allowed.

5. Other Chapter 11 Priority Claims

The Debtors' Other Chapter 11 Priority Claims include tax claims and other claims entitled to priority under section 507 of the Bankruptcy Code.

6. Chapter 7 Administrative Claims and Wind-Down Costs

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses associated with selling the Debtors' assets, would be entitled to payment in full prior to any distributions to chapter 11 Administrative Claims and Other Priority Claims.  The estimates used in the Liquidation Analysis for these expenses include estimates for operational expenses and certain legal, accounting and other professionals, as well as an assumed 3% fee payable to the Trustee based on the amount of distributed assets except for cash.  It is assumed that chapter 7 administrative and priority claims, including but not limited to professional fees, and chapter 7 trustee fees are entitled to payment in full prior to any distribution to holders of junior claims and will be charged on a pro rata basis[26] to encumbered and unencumbered assets.

7. Other Chapter 11 Administrative Claims

The Other Chapter 11 Administrative Claims represent accrued but unpaid administrative expenses from the Chapter 11 bankruptcy (other than Chapter 11 Professional Fees, which, as described above, are entitled to a higher priority under the "Carve-Out" to the New DIP Financing Order) and are primarily comprised of employee and other general

---

[24]   As noted above, the Liquidation Analysis assumes that approximately $18 million of the Second Lien Stub Claims related to OID would be disallowed under both the High and Low Scenario.

[25]   To the extent that the Second Lien Claims  cannot be satisfied by the collateral securing such claims, the secured lenders holding such claims would be entitled to a general unsecured deficiency claim, which would increase under both the High and Low Scenario.

[26]   For example, if the Trustee liquidates an asset whose proceeds would be distributed 70% on behalf of secured creditors and 30% on behalf of unsecured creditors, then the fees and expenses incurred by the Trustee would be deducted 70% from encumbered assets and 30% from unencumbered assets.  Given that the High Scenario assumes that the YieldCo transactions close within 90 days of the Conversion Date, only those Chapter 7 administrative expenses expected to be incurred in the first 90 days post conversion are allocated pro rata to the proceeds from the YieldCo transactions.

operating expenses, including any amounts earned and unpaid pursuant to any approved employee incentive plans.

8. General Unsecured Claims

The General Unsecured Claims pool (the "GUC Pool") is estimated to total in the aggregate $4.7 billion, excluding any deficiency and Intercompany Claims. The Liquidation Analysis assumes that recoveries on account of Intercompany Claims are paid *pari passu* with General Unsecured Claims at each Debtor. Under a Plan scenario, the Prepetition Second Lien Deficiency Claims are estimated at $506 million and would increase to $603 million under the High Scenario. Under the Low Scenario, the Debtors estimate the Second Lien Deficiency Claims would increase to approximately $607 million, the Tranche B Roll-Up Loan Claims would have a deficiency claim of $259 million. In aggregate, general unsecured claims would total up to $5.6 billion under the Low Scenario including deficiency claims and excluding intercompany claims.

9. Interests

As the Bankruptcy Court noted in its decision denying the appointment of an official equity committee,[27] the Debtors are "hopelessly insolvent."[28] Therefore, Holders of Interests are not projected to have any recovery under the Plan or either the High or Low Scenario.

**D.    Debtors' Assets**

The Liquidation Analysis assumes a liquidation of all of the Debtors' assets. As described in more detail below, the analysis segregates the Debtors' assets into nine major categories: (1) Cash and Cash Equivalents; (2) Intercompany Receivables; (3) Contingent Proceeds from Asset Sales; (4) Assets Held for Sale; (5) Investments in Subsidiaries; (6) Dividend Receipts; (7) Other Encumbered Assets; (8) Avoidance Actions; and (9) Other Unencumbered Assets.

**Encumbered Assets**

Substantially all of the estates' assets (other than Avoidance Actions and D/O Insurance Proceeds to the extent the Tranche B Roll-Up Loan Claims are otherwise fully paid) are subject to liens from the DIP Financing Facility and/or the Second Lien Claims and are therefore encumbered (the "Encumbered Assets"). In addition, any allowed, secured tax claims are projected to be satisfied out of the proceeds from Encumbered Assets at the respective Debtor.

---

[27]    *See* Docket No. 975.

[28]    *See* Docket No. 975 at p. 14.

1. Cash and Cash Equivalents

Cash and Cash Equivalents are based on the projected cash balance on the Debtors' cash flow projections, adjusted to reflect the impacts of a conversion of these cases to a Chapter 7 on the Conversion Date. For the purposes of the Liquidation Analysis, it is assumed that excess cash on hand is swept at the Conversion Date, and the DIP balance will be proportionately lower, dollar for dollar, such that the available proceeds for secured lenders, other than the DIP lenders, remains unchanged. The Liquidation Analysis assumes a 100% recovery rate for Cash based on the liquidity of such assets and that the Trustee does not earn any fees for distribution of cash on hand.

2. Intercompany Receivables

Intercompany Receivables includes estimated proceeds from (i) the recovery to intercompany balances owed by foreign affiliates on account of existing cash on hand at the Effective Date and future proceeds collected from foreign asset sales, earn-outs, etc., and (ii) the pro rata recovery to intercompany claims from distributions to general unsecured creditors on account of unencumbered assets. Because the DIP Financing Facility Claims and Second Lien Claims have a security interest in all Intercompany Receivables, any value that would come into the Estates from these receivables would flow to the Holders of DIP Financing Facility Claims and Second Lien Claims on account of their liens. The Liquidation Analysis assumes a discount in collection from Intercompany Receivables under both the High and Low Scenario because of the risk of foreign insolvencies precipitated by a chapter 7 conversion and would result in lower recoveries than projected in the proposed Plan.

3. Contingent Proceeds from Asset Sales

Contingent Proceeds includes domestic earn-outs, escrow balances and other completed asset sale proceeds not yet collected based on the amounts reported in the cash flow projections, and risk adjusted where necessary based on discussions with management to ascertain the estimated collectability of each proceed under a chapter 7 liquidation. The Liquidation Analysis includes an asset-by-asset review of such proceeds and places a discount where appropriate based on potential challenges to collectability.

4. Assets Held for Sale

Assets Held for Sale includes projects, platforms and other domestic assets held for sale based on the amounts reported in the cash budget, risk adjusted by asset for timing and collectability where necessary, based on discussions with management.

5. Investments in Subsidiaries

Investments in Subsidiaries represents the value of SunEdison's equity interest in the YieldCos. The value estimate is based on the current terms of the pending YieldCo/Brookfield Transactions whereby SunEdison will (i) sell a portion of its equity

11

interest in TERP, (ii) retain its remaining equity interest in TERP and (iii) sell its entire equity interest in GLBL subject to the terms of the YieldCo Settlement Agreements. Thus, the Liquidation Analysis assumes that the value received from the YieldCo/Brookfield Transactions is unaffected by the conversion to a chapter 7 in the High Scenario.[29] Meanwhile, under the Low Scenario, as noted above, the Debtors believe that conversion to a chapter 7 liquidation without the YieldCo/Brookfield Transactions having been consummated would result in severe degradation of value in the Debtors' equity interests in the YieldCos.

6. <u>Dividend Receipts</u>

Dividend receipts represent proceeds whereby, after the satisfaction in full of general unsecured claims at a respective Debtor entity, excess unencumbered value remains available for distribution to parent entities that hold equity in such subsidiaries. The equity distributions represented in the Liquidation Analysis will, directly or indirectly, be distributed to a domestic Loan Party(ies) (as defined in the DIP Financing Facility) that is a secured guarantor to the DIP Financing Facility.  Thus, this Liquidation Analysis assumes that upon distribution to a Loan Party, a lien attaches to the proceeds and becomes value available for distribution to secured creditors.

7. <u>Other Encumbered Assets</u>

Other Encumbered Assets include the $32 million of estimated proceeds to be received on account of director and officer liability insurance policies.  This $32 million would be available to general unsecured creditors under the Plan and the High Scenario, although such proceeds are subject to liens of the Tranche B Roll-Up Loans. Because the Tranche B Roll-Up Loans would be significantly impaired under the Low Scenario, the general unsecured creditors would not have access to such proceeds under the Low Scenario.

**Unencumbered Assets**

Unencumbered Assets are not encumbered by the liens supporting the debt under the DIP Financing Facility or the Second Lien Claims.

8. <u>Avoidance Actions</u>[30]

Avoidance Action proceeds include any proceeds not yet collected based on potential Avoidance Actions that the Debtors may bring against third parties, and risk adjusted where

---

[29]    As described above, although the High Scenario applies no discount to the YieldCo consideration, the Trustee will likely have difficulties in preserving the full amount of consideration to be received under the YieldCo/Brookfield Transactions.

[30]    Although the Avoidance Actions are unencumbered, to the extent that there are no general unsecured claims asserted against an entity entitled to recover on account of Avoidance Actions, any value recovered by such entity would be captured on account of Intercompany Claims.

necessary based on discussions with management to ascertain the estimated collectability of each Avoidance Action under a chapter 7 liquidation. The Debtors believe that the conversion of these cases to chapter 7 would materially impact the ability to collect proceeds on account of Avoidance Actions, substantially reducing the recoveries for all creditors because of a loss of employees, institutional knowledge, and adequate funding. The Debtors submit that prosecution of the Avoidance Actions will necessitate the retention of key personal in both the High and Low Scenario, which would be exceedingly difficult and therefore result in a severe loss in value under either scenario as compared with the Plan.

9. Other Unencumbered Assets

Other Unencumbered Assets providing value available for distribution to general unsecured creditors under the High Scenario includes: the $16.1 million allocation of YieldCo sale proceeds on account of avoidance claims that the Debtors released against the YieldCos and Litigation Trust Funds; and the assets available for distribution at SunEdison Products Singapore PTE Ltd ("SPS").[31] Under the Low Scenario, the Other Unencumbered Assets include: the recovery of avoidance actions against the YieldCos ($49.1 million), the Litigation Trust Funds; and the assets available for distribution at SPS.

**E.    Liquidation Costs**

Liquidation Costs primarily consist of: (i) the regularly occurring general and administrative costs required to operate the Debtors' businesses during the liquidation process (the "Wind-Down Expenses"); (ii) the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys and other advisors (the "Professional Fees"); and (iii) the Trustee's Fees (collectively, the "Liquidation Costs").

1. Wind-Down Expenses

The Wind-Down Expenses represent the anticipated operating costs to be incurred by the Trustee necessary to liquidate the Debtors' remaining assets and are primarily comprised of employee-related costs, including a retention bonus, adequate protection payments, rent and other overhead expenses. All Wind-Down Expenses are applied to both encumbered and unencumbered proceeds on a pro rata basis based upon gross proceeds from the liquidation. Employee costs are based on bottoms-up headcount forecast assuming 33 employees for the first six months and 18 for the next six months, resulting in a monthly run-rate of $0.4 million and $0.2 million for the respective periods. The Liquidation Analysis further contemplates a total retention bonus of 100% of an

---

[31]    Because there are no direct secured claims at SPS, all assets recovered by SPS would be distributed on a pro rata basis among the general unsecured creditors of SPS. Intercompany payables at SPS owing to domestic DIP and Second Lien Secured Guarantors make up 63% of SPS's total general unsecured claims pool. Because the holders of Second Lien Claims have an unchallenged security interest in the SPS Intercompany Payables, the Liquidation Analysis assumes that 63% of any proceeds distributable to the general unsecured creditors of SPS will flow to these secured creditors on account of these intercompany payables.

employee's annual compensation in order to incentivize the employee to return. In addition, any amounts owing to these 33 employees under chapter 11 approved incentive plans are assumed to be paid. These costs are reflected in the Chapter 11 Administrative Expenses line item. There is a risk that the Trustee may not be able to retain the employees required to assist the Trustee in its efforts to liquidate the Debtors. As a result, the Trustee would be required to hire contractors or incur additional professional fees, and such costs could be materially greater than the employee costs contained in the Liquidation Analysis.

2.  Chapter 7 Trustee Fees

Compensation for the Trustee would be limited to fee guidelines in section 326(a) of the Bankruptcy Code. The Liquidation Analysis assumes that the Trustee would incur higher fees in the first three months following the Conversion Date with a graduating decrease in fees through months six, nine, and twelve. The Debtors have assumed trustee fees of 3% of the gross proceeds from the liquidation (excluding cash). Under the High Scenario, the Liquidation Analysis assumes that the Trustee would be entitled to this 3% fee with respect to the Estates' interest in the YieldCos. Whereas under the Low Scenario, the Liquidation Analysis assumes the Trustee would not be entitled to a 3% fee with respect to the Estates' interest in the YieldCos because under the Low Scenario, the Trustee would have abandoned the assets to the secured creditors.

3.  Liquidation Professional Fees

The Liquidation Analysis estimates the Trustee's professional fees (legal and financial) during the liquidation process. This estimate is primarily based on PwC's (a) knowledge of the case, (b) prior experiences, particularly the administration of a chapter 7 liquidation on behalf of a chapter 7 trustee, and (c) consultation with the Debtors and its advisors. The Chapter 11 Cases were the largest (based on claims and assets) and among the most complex restructurings filed in 2016. The Trustee has the option to supplement or replace the existing professionals, which would require that the new team of professionals would incur time necessary to understand the complexity and status of the Chapter 11 Cases and assist in the liquidation of the Estates' assets. The Liquidation Professional Fees include costs cover legal, financial, tax / accounting, and other general advisory services that would be incurred during the liquidation process. This Liquidation Analysis assumes that fees would be higher immediately following the Conversion Date, resulting in a monthly run-rate of $5.6 million, $3.4 million, $1.8 million, and $1.0 million for the first, second, third, and fourth quarters during the first twelve months, and $2.5 million per year for years two and three of the three year estimated liquidation period. These fees are in addition to any commissions payable to the Trustee.

F.    **Disclaimer**

The Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court and holders of Impaired Claims or Interests in making this determination, and should not

be used for any other purpose. The determination of the hypothetical proceeds, and costs of the liquidation of the Debtors' assets, is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by PwC, are inherently subject to significant business and economic uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results. PwC prepared the Liquidation Analysis for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code after conversion of the chapter 11 case. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis.

**ACCORDINGLY, WHILE DEEMED REASONABLE BASED ON THE FACTS CURRENTLY AVAILABLE, NEITHER THE DEBTORS NOR THEIR PROFESSIONALS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.**

In preparing the Liquidation Analysis, PwC estimated Allowed Claims based upon a review of Claims listed on the Debtors' statements of assets and liabilities as well as various other financial reports, including but not limited to the Monthly Operating Reports (the "Financial Reports") and Proofs of Claim filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Case or currently contingent, but which could be asserted and Allowed in a chapter 7 liquidation, including but not limited to Administrative Claims, claims arising in connection with the rejection of real property leases, employee-related obligations, Liquidation Costs (as defined herein), trustee fees, tax liabilities and other Allowed Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis. For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims contained in the Liquidation Analysis reference specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests. Therefore, PwC's estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

**NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

In addition, the following are some, but not all, of the considered factors that could negatively impact the recoveries estimated: (a) turnover of key personnel; (b) complications with the repatriation of cash held in foreign subsidiaries; (c) disruption to in-process transactions; and (d) delays in the liquidation process. These factors may limit the amount of the proceeds generated by the liquidation of the Debtors' assets. For example, it is possible that the liquidation would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Case and the Debtors' businesses and operations. This delay could materially reduce the value, on a "present value" basis, of the liquidation proceeds, the effect of which has not been contemplated in this analysis.

It is assumed that as a result of the conversion of these cases to a chapter 7, Company's foreign debtor and non-debtor affiliates (collectively, the "Foreign Affiliates") may pursue local insolvency proceedings as a means of winding down any remaining operations, which may result in increased difficulty repatriating assets and incremental local professional fees. Additionally, if commenced, local insolvency proceedings at the Company's Foreign Affiliates would likely result in additional claims against the Debtors. Any such potential additional clams have not been contemplated in the Liquidation Analysis. As a result, we have factored in a substantial reduction with respect to the recovery of foreign assets to account for these risks, in comparison with a chapter 11 recovery.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. These types of administrative and priority claims have not been accounted for in the Liquidation Analysis. However, it is important to note these will need to be paid in full before any balance of liquidation proceeds would be available to pay general unsecured creditors.

Examples of these kinds of Claims include various potential employee claims (for such items as severance and potential WARN Act liabilities), tax liabilities, claims related to the rejection of unexpired leases and executory contracts, and other potential Allowed Claims. These additional claims could be significant; some may be administrative expenses, others may be entitled to priority in payment over General Unsecured Claims.

SunEdison Inc., et al.
Recovery Summary by Debtor

Best Interest of Creditors Test: | Pass | Fail

### Recovery Summary by Debtor*

| $ millions | $ Claim** | POR % Recovery | General Unsecured Claims — Low $ Rec. | % | General Unsecured Claims — High $ Rec. | % | Variance % Recovery Low | High |
|---|---|---|---|---|---|---|---|---|
| 1) SunEdison Inc*** | 4,108.6 | 2.8% | 16.5 | 0.4% | 24.6 | 0.6% | (2.4%) | (2.2%) |
| 2) SunEdison Products Singapore PTE Ltd | 226.3 | 2.8% | 5.4 | 2.4% | 5.8 | 2.5% | (0.4%) | (0.2%) |
| 3) NVT LLC | 83.6 | 2.8% | 0.1 | 0.1% | 0.1 | 0.1% | (2.6%) | (2.7%) |
| 4) NVT Licenses, LLC | 61.7 | 2.8% | 0.04 | 0.1% | 0.1 | 0.1% | (2.7%) | (2.7%) |
| 5) SunEdison LLC | 198.6 | 2.8% | 0.04 | 0.02% | 0.1 | 0.03% | (2.8%) | (2.8%) |
| 6) Team Solar Inc | 32.2 | 2.8% | 0.01 | 0.02% | 0.01 | 0.03% | (2.8%) | (2.8%) |
| 7) MEMC Pasadena Inc | 47.2 | 2.8% | - | - | - | - | (2.8%) | (2.8%) |
| 8) PVT Solar Inc | 11.3 | 2.8% | - | - | - | - | (2.8%) | (2.8%) |
| 9) Solaicx | 4.2 | 2.8% | - | - | - | - | (2.8%) | (2.8%) |
| 10) First Wind Energy, LLC | 30.0 | 2.8% | 0.01 | 0.04% | 0.01 | 0.02% | (2.8%) | (2.8%) |
| 11) Blue Sky West Capital, LLC | - | – | - | - | - | - | – | – |
| 12) First Wind Oakfield Portfolio, LLC | - | – | - | - | - | - | – | – |
| 13) First Wind Panhandle Holdings III, LLC | - | – | - | - | - | - | – | – |
| 14) SEV Merger Sub Inc | 400.0 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 15) SUNE Wind Holdings, Inc. | 233.3 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 16) SUNE Hawaii Solar Holdings, LLC | 231.0 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 17) First Wind Solar Portfolio, LLC | 231.1 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 18) SunEdison Products LLC | 70.0 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 19) SE Utility Holdings, Inc. | 50.9 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 20) SunEdison Holdings Corporation | 41.0 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 21) Fotowatio Renewable Ventures Inc | 11.2 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 22) SunEdison Residential Services, LLC | 10.8 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 23) SunEdison International LLC | 4.9 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 24) EverStream HoldCo Fund I, LLC | 4.5 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 25) SunEdison DG, LLC | 0.8 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 26) SunEdison Canada LLC | 0.3 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 27) First Wind California Holdings, LLC | 0.2 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 28) Enflex Corporation | 0.03 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 29) Silver Ridge Power Holdings, LLC | 0.02 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 30) SunEdison Contracting LLC | 0.00004 | 2.8% | - | – | - | – | (2.8%) | (2.8%) |
| 31) SunEdison International Inc | - | – | - | - | - | - | – | – |
| 32) SUNE ML 1, LLC | - | – | - | - | - | - | – | – |
| 33) SUNE MN Development, LLC | - | – | - | - | - | - | – | – |
| 34) SUNE Minnesota Holdings LLC | - | – | - | - | - | - | – | – |
| 35) Sunflower Renewable Holdings 1, LLC | - | – | - | - | - | - | – | – |
| 36) DSP Renewables, LLC | - | – | - | - | - | - | – | – |
| 37) Hancock Renewables Holdings, LLC | - | – | - | - | - | - | – | – |
| 38) Greenmountain Wind Holdings, LLC | - | – | - | - | - | - | – | – |
| 39) Rattlesnake Flat Holdings, LLC | - | – | - | - | - | - | – | – |
| 40) Somerset Wind Holdings, LLC | - | – | - | - | - | - | – | – |
| 41) SunE Waiawa Holdings, LLC | - | – | - | - | - | - | – | – |
| 42) SunE MN Development Holdings, LLC | - | – | - | - | - | - | – | – |
| 43) Buckthorn Renewables Holdings, LLC | - | – | - | - | - | - | – | – |
| 44) TerraForm Private Holdings, LLC | - | – | - | - | - | - | – | – |
| 45) Hudson Energy Solar Corporation | - | – | - | - | - | - | – | – |
| 46) SunE REIT-D PR, LLC | - | – | - | - | - | - | – | – |
| 47) SunEdison International Construction LLC | - | – | - | - | - | - | – | – |
| 48) Vaughn Wind, LLC | - | – | - | - | - | - | – | – |
| 49) Maine Wind Holdings, LLC | - | – | - | - | - | - | – | – |
| 50) First Wind Holdings, LLC | - | – | - | - | - | - | – | – |
| 51) Echofirst Finance Co, LLC | - | – | - | - | - | - | – | – |
| **Total** | | | **22.1** | | **30.5** | | | |

Notes:
*Recovery analyses have been included as part of Exhibit 1 for i) Debtors #1 - #10 listed above, which are projected to have recoveries either under the POR and / or liquidation scenario and ii) Debtors #11 - #13 listed above that have distributable unencumbered value but reflect no recoveries above as there have been no general unsecured claims asserted at these entities. Debtors #14 - #51 are not expected to have any unencumbered assets under the liquidation scenarios and hence, no recoveries. As a result, we have not included recovery analyses for these Debtors.
**The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.
***For presentation purposes, all encumbered assets have been included within the Debtor SunEdison Inc.'s recovery analysis.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | 55.9 | 55.9 | 100.0% | 55.9 | 100.0% |
| Intercompany Receivables | 7,140.2 | 56.1 | 0.8% | 56.1 | 0.8% |
| Contingent Proceeds from Asset Sales | 42.4 | 29.6 | 69.7% | 29.6 | 69.7% |
| Assets Held for Sale | 33.9 | 6.3 | 18.5% | 6.3 | 18.5% |
| Investments in Subsidiaries | 835.3 | 493.7 | 59.1% | 835.3 | 100.0% |
| Dividend Receipts | n/a | - | n/a | 3.3 | n/a |
| Other Encumbered Assets | 32.0 | 32.0 | 100.0% | 32.0 | 100.0% |
| **Gross Liquidation Proceeds** | **8,139.7** | **672.5** | **8.3%** | **1,018.6** | **12.5%** |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | (6.0) | | (6.1) | |
| Ch. 7 Trustee Fees | | (3.7) | | (27.9) | |
| Ch. 7 Professional Fees | | (21.6) | | (26.2) | |
| **Total Liquidation Costs** | | **(31.3)** | | **(60.2)** | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | (16.1) | |
| GLBL Litigation Exposure | | - | | (5.6) | |
| **Total Other Costs** | | **-** | | **(21.7)** | |
| **Net Proceeds Available for Distribution** | | **641.2** | | **936.7** | |
| Ch. 11 Administrative Claims [Secured Carve Out] | 31.2 | 31.2 | 100.0% | 31.2 | 100.0% |
| Secured Tax Claims | 3.5 | 3.5 | 100.0% | 3.5 | 100.0% |
| **Net Proceeds Available for Distribution** | | **606.5** | | **902.1** | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | **606.5** | | **902.1** | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | 530.4 | 100.0% | 530.4 | 100.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | 76.2 | 22.7% | 335.2 | 100.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **36.4** | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | (32.0) | |
| **Net Proceeds Available for Distribution** | | **-** | | **4.4** | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | 2.4 | 0.7% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | 1.2 | 0.7% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | 0.8 | 0.7% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 68.0 | 5.1 | 7.5% | 5.1 | 7.5% |
| Other Unencumbered Assets | n/a | 36.1 | n/a | 47.4 | n/a |
| **Proceeds from Unencumbered Assets** | **68.0** | **41.2** | **60.7%** | **52.5** | **77.3%** |
| Less: Ch. 7 Liquidation Costs | | (10.5) | | (10.8) | |
| **Remaining Proceeds Available for Distribution** | | **30.7** | | **41.7** | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 5 - 7 | 5.5 | 100.0% | 7.0 | 100.0% |
| Ch. 11 Other Priority Claims | 2.6 | 2.6 | 100.0% | 2.6 | 100.0% |
| **Remaining Proceeds Available for Distribution** | | **22.6** | | **32.1** | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 1.0 | 0.4% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | 2.4 | 0.4% | 3.6 | 0.6% |
| Other Unsecured Funded Debt | 2,213.9 | 8.9 | 0.4% | 13.2 | 0.6% |
| Other General Unsecured Claims | 1,894.7 | 7.6 | 0.4% | 11.3 | 0.6% |
| Intercompany Claims | 656.8 | 2.6 | 0.4% | 3.9 | 0.6% |
| **Proceeds Available for Equity Distribution** | | **-** | | **-** | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | | SunEdison LLC | | | |
|---|---|---|---|---|---|---|
| | | Low | | High | | |
| | | $ | % | $ | % | |
| **Encumbered Assets\*** | | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% | |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% | |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% | |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% | |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% | |
| Dividend Receipts | n/a | - | n/a | - | n/a | |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% | |
| **Gross Liquidation Proceeds** | **-** | **-** | **0.0%** | **-** | **0.0%** | |
| **Ch. 7 Liquidation Costs** | | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | | |
| Ch. 7 Trustee Fees | | - | | - | | |
| Ch. 7 Professional Fees | | - | | - | | |
| **Total Liquidation Costs** | | **-** | | **-** | | |
| **Other Costs** | | | | | | |
| YieldCo Avoidance Actions | | - | | - | | |
| GLBL Litigation Exposure | | - | | - | | |
| **Total Other Costs** | | **-** | | **-** | | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% | |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 5.0 | 0.4 | 7.5% | 0.4 | 7.5% |
| Other Unencumbered Assets | n/a | - | n/a | - | n/a |
| **Proceeds from Unencumbered Assets** | **5.0** | **0.4** | **7.5%** | **0.4** | **7.5%** |
| Less: Ch. 7 Liquidation Costs | | (0.1) | | (0.1) | |
| **Remaining Proceeds Available for Distribution** | | **0.3** | | **0.3** | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.1 | 100.0% | 0.0 | 100.0% |
| Ch. 11 Other Priority Claims | 0.0 | 0.0 | 100.0% | 0.0 | 100.0% |
| **Remaining Proceeds Available for Distribution** | | **0.2** | | **0.2** | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 0.1 | 0.0% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | 0.1 | 0.0% | 0.2 | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 198.6 | 0.0 | 0.0% | 0.1 | 0.0% |
| Intercompany Claims | 90.6 | 0.0 | 0.0% | 0.0 | 0.0% |
| **Proceeds Available for Equity Distribution** | | **-** | | **-** | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| | | NVT LLC | | | |
| **Encumbered Assets*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | **-** | **-** | **0.0%** | **-** | **0.0%** |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | **-** | | **-** | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | **-** | | **-** | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 52.9 | 4.0 | 7.5% | 4.0 | 7.5% |
| Other Unencumbered Assets | n/a | 5.4 | n/a | 2.0 | n/a |
| **Proceeds from Unencumbered Assets** | **52.9** | **9.4** | **17.7%** | **5.9** | **11.2%** |
| Less: Ch. 7 Liquidation Costs | | (2.4) | | (1.2) | |
| **Remaining Proceeds Available for Distribution** | | **7.0** | | **4.8** | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 1 - 1 | 1.2 | 100.0% | 0.8 | 100.0% |
| Ch. 11 Other Priority Claims | 2.4 | 2.4 | 100.0% | 2.4 | 100.0% |
| **Remaining Proceeds Available for Distribution** | | **3.3** | | **1.5** | |
| **General Unsecured Claims**** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 0.4 | 0.1% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | 0.9 | 0.1% | 0.5 | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 83.6 | 0.1 | 0.1% | 0.1 | 0.1% |
| Intercompany Claims | 1,322.9 | 1.9 | 0.1% | 1.0 | 0.1% |
| **Proceeds Available for Equity Distribution** | | **-** | | **-** | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |

*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
**The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| | | NVT Licenses, LLC | | | |
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | **-** | **-** | **0.0%** | **-** | **0.0%** |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | **-** | | **-** | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | **-** | | **-** | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 17.2 | 1.3 | 7.5% | 1.3 | 7.5% |
| Other Unencumbered Assets | n/a | - | n/a | - | n/a |
| **Proceeds from Unencumbered Assets** | **17.2** | **1.3** | **7.5%** | **1.3** | **7.5%** |
| Less: Ch. 7 Liquidation Costs | | (0.3) | | (0.3) | |
| **Remaining Proceeds Available for Distribution** | | **1.0** | | **1.0** | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.2 | 100.0% | 0.2 | 100.0% |
| Ch. 11 Other Priority Claims | 0.0 | 0.0 | 100.0% | 0.0 | 100.0% |
| **Remaining Proceeds Available for Distribution** | | **0.8** | | **0.8** | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 0.2 | 0.1% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | 0.4 | 0.1% | 0.5 | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 61.7 | 0.0 | 0.1% | 0.1 | 0.1% |
| Intercompany Claims | 283.4 | 0.2 | 0.1% | 0.3 | 0.1% |
| **Proceeds Available for Equity Distribution** | | **-** | | **-** | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | SunEdison Products Singapore PTE Ltd | | | |
| --- | --- | --- | --- | --- | --- |
| | | Low | | High | |
| | | $ | % | $ | % |
| **Encumbered Assets*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | - | - | 0.0% | - | 0.0% |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | - | | - | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |

| | Claim Amount | Estimated Recovery | | | |
| --- | --- | --- | --- | --- | --- |
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | - | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | - | | - | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 164.1 | 29.1 | 17.7% | 29.1 | 17.7% |
| Other Unencumbered Assets | n/a | 9.4 | n/a | 9.0 | n/a |
| **Proceeds from Unencumbered Assets** | 164.1 | 38.4 | 23.4% | 38.1 | 23.2% |
| Less: Ch. 7 Liquidation Costs | | (9.8) | | (8.0) | |
| **Remaining Proceeds Available for Distribution** | | 28.6 | | 30.1 | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 5 - 5 | 5.1 | 100.0% | 5.0 | 100.0% |
| Ch. 11 Other Priority Claims | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | 23.5 | | 25.0 | |
| **General Unsecured Claims**** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | - | - | 0.0% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 226.3 | 5.4 | 2.4% | 5.8 | 2.5% |
| Intercompany Claims | 755.4 | 18.1 | 2.4% | 19.3 | 2.5% |
| **Proceeds Available for Equity Distribution** | | - | | - | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | - | | - | |

*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
**The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | - | - | 0.0% | - | 0.0% |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | - | | - | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | - | | - | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 4.6 | 0.3 | 7.5% | 0.3 | 7.5% |
| Other Unencumbered Assets | n/a | - | n/a | - | n/a |
| **Proceeds from Unencumbered Assets** | 4.6 | 0.3 | 7.5% | 0.3 | 7.5% |
| Less: Ch. 7 Liquidation Costs | | (0.1) | | (0.1) | |
| **Remaining Proceeds Available for Distribution** | | 0.3 | | 0.3 | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.0 | 100.0% | 0.0 | 100.0% |
| Ch. 11 Other Priority Claims | 0.5 | 0.2 | 40.6% | 0.2 | 43.6% |
| **Remaining Proceeds Available for Distribution** | | - | | - | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | - | 0.0% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | - | 0.0% | - | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 47.2 | - | 0.0% | - | 0.0% |
| Intercompany Claims | 58.1 | - | 0.0% | - | 0.0% |
| **Proceeds Available for Equity Distribution** | | - | | - | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | - | | - | |

Table header for the first table: **MEMC Pasadena Inc** spanning Low ($ / %) and High ($ / %).

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | **-** | **-** | **0.0%** | **-** | **0.0%** |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | **-** | | **-** | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | **-** | | **-** | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 0.7 | 0.1 | 7.5% | 0.1 | 7.5% |
| Other Unencumbered Assets | n/a | - | n/a | - | n/a |
| **Proceeds from Unencumbered Assets** | **0.7** | **0.1** | **7.5%** | **0.1** | **7.5%** |
| Less: Ch. 7 Liquidation Costs | | (0.0) | | (0.0) | |
| **Remaining Proceeds Available for Distribution** | | **0.0** | | **0.0** | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.0 | 100.0% | 0.0 | 100.0% |
| Ch. 11 Other Priority Claims | 0.1 | 0.0 | 62.5% | 0.0 | 67.2% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | - | 0.0% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | - | 0.0% | - | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 4.2 | - | 0.0% | - | 0.0% |
| Intercompany Claims | 181.9 | - | 0.0% | - | 0.0% |
| **Proceeds Available for Equity Distribution** | | **-** | | **-** | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., _et al_.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | **-** | **-** | **0.0%** | **-** | **0.0%** |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | **-** | | **-** | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | **-** | | **-** | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 4.4 | 0.3 | 7.5% | 0.3 | 7.5% |
| Other Unencumbered Assets | n/a | - | n/a | - | n/a |
| **Proceeds from Unencumbered Assets** | **4.4** | **0.3** | **7.5%** | **0.3** | **7.5%** |
| Less: Ch. 7 Liquidation Costs | | (0.1) | | (0.1) | |
| **Remaining Proceeds Available for Distribution** | | **0.2** | | **0.3** | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.0 | 100.0% | 0.0 | 100.0% |
| Ch. 11 Other Priority Claims | 0.0 | 0.0 | 100.0% | 0.0 | 100.0% |
| **Remaining Proceeds Available for Distribution** | | **0.2** | | **0.2** | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 0.1 | 0.0% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | 0.1 | 0.0% | 0.2 | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 32.2 | 0.0 | 0.0% | 0.0 | 0.0% |
| Intercompany Claims | 34.1 | 0.0 | 0.0% | 0.0 | 0.0% |
| **Proceeds Available for Equity Distribution** | | **-** | | **-** | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| **Encumbered Assets*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | - | - | 0.0% | - | 0.0% |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | - | | - | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |

Header for top table:

| | | PVT Solar Inc | | | |
|---|---|---|---|---|---|
| | Carrying | Low | | High | |
| ($ in millions) | Value | $ | % | $ | % |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | - | | - | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | 5.5 | 0.4 | 7.5% | 0.4 | 7.5% |
| Other Unencumbered Assets | n/a | - | n/a | - | n/a |
| **Proceeds from Unencumbered Assets** | 5.5 | 0.4 | 7.5% | 0.4 | 7.5% |
| Less: Ch. 7 Liquidation Costs | | (0.1) | | (0.1) | |
| **Remaining Proceeds Available for Distribution** | | 0.3 | | 0.3 | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.1 | 100.0% | 0.1 | 100.0% |
| Ch. 11 Other Priority Claims | 0.4 | 0.3 | 63.8% | 0.3 | 68.5% |
| **Remaining Proceeds Available for Distribution** | | - | | - | |
| **General Unsecured Claims**** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | - | 0.0% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 11.3 | - | 0.0% | - | 0.0% |
| Intercompany Claims | 197.7 | - | 0.0% | - | 0.0% |
| **Proceeds Available for Equity Distribution** | | - | | - | |
| (-) Equity Distribution | | - | | - | |
| **Remaining Proceeds Available for Distribution** | | - | | - | |

*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
**The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., _et al_.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Blue Sky West Capital, LLC Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | **-** | **-** | **0.0%** | **-** | **0.0%** |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | **-** | | **-** | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | **-** | | **-** | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | **-** | | **-** | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | - | - | 0.0% | - | 0.0% |
| Other Unencumbered Assets | n/a | 5.1 | n/a | 2.1 | n/a |
| **Proceeds from Unencumbered Assets** | **-** | **5.1** | **0.0%** | **2.1** | **0.0%** |
| Less: Ch. 7 Liquidation Costs | | (1.3) | | (0.4) | |
| **Remaining Proceeds Available for Distribution** | | **3.8** | | **1.7** | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 1 - 0 | 0.7 | 100.0% | 0.3 | 100.0% |
| Ch. 11 Other Priority Claims | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | **3.1** | | **1.4** | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 3.1 | 1.2% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | - | - | 0.0% | - | 0.0% |
| Intercompany Claims | - | - | 0.0% | - | 0.0% |
| **Proceeds Available for Equity Distribution** | | **-** | | **1.4** | |
| (-) Equity Distribution | | - | | (1.4) | |
| **Remaining Proceeds Available for Distribution** | | **-** | | **-** | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., _et al_.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| | | First Wind Oakfield Portfolio, LLC | | | |
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | - | - | 0.0% | - | 0.0% |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | - | | - | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | - | | - | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | - | - | 0.0% | - | 0.0% |
| Other Unencumbered Assets | n/a | 3.6 | n/a | 1.5 | n/a |
| **Proceeds from Unencumbered Assets** | - | 3.6 | 0.0% | 1.5 | 0.0% |
| Less: Ch. 7 Liquidation Costs | | (0.9) | | (0.3) | |
| **Remaining Proceeds Available for Distribution** | | 2.7 | | 1.2 | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.5 | 100.0% | 0.2 | 100.0% |
| Ch. 11 Other Priority Claims | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | 2.2 | | 1.0 | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 2.2 | 0.9% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | - | - | 0.0% | - | 0.0% |
| Intercompany Claims | - | - | 0.0% | - | 0.0% |
| **Proceeds Available for Equity Distribution** | | - | | 1.0 | |
| (-) Equity Distribution | | - | | (1.0) | |
| **Remaining Proceeds Available for Distribution** | | - | | - | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

| ($ in millions) | Carrying Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| | | First Wind Panhandle Holdings III, LLC | | | |
| **Encumbered Assets\*** | | | | | |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | - | - | 0.0% | - | 0.0% |
| **Ch. 7 Liquidation Costs** | | | | | |
| Ch. 7 Wind-Down Expenses | | - | | - | |
| Ch. 7 Trustee Fees | | - | | - | |
| Ch. 7 Professional Fees | | - | | - | |
| **Total Liquidation Costs** | | - | | - | |
| **Other Costs** | | | | | |
| YieldCo Avoidance Actions | | - | | - | |
| GLBL Litigation Exposure | | - | | - | |
| **Total Other Costs** | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |

| | Claim Amount | Estimated Recovery | | | |
|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Secured Claims** | | | | | |
| **Priority 1 Claims** | | | | | |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** | | | | | |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** | | - | | - | |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) | | - | | - | |
| **Net Proceeds Available for Distribution** | | - | | - | |
| **Priority 3 Claims** | | | | | |
| A1 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | - | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | - | | - | |
| **Unencumbered Assets** | | | | | |
| 3rd Party Avoidance Actions | - | - | 0.0% | - | 0.0% |
| Other Unencumbered Assets | n/a | 3.2 | n/a | 1.3 | n/a |
| **Proceeds from Unencumbered Assets** | - | 3.2 | 0.0% | 1.3 | 0.0% |
| Less: Ch. 7 Liquidation Costs | | (0.8) | | (0.2) | |
| **Remaining Proceeds Available for Distribution** | | 2.3 | | 1.1 | |
| **Priority Claims** | | | | | |
| Ch. 11 Administrative Claims | 0 - 0 | 0.4 | 100.0% | 0.2 | 100.0% |
| Ch. 11 Other Priority Claims | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** | | 1.9 | | 0.9 | |
| **General Unsecured Claims\*\*** | | | | | |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 1.9 | 0.7% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | - | - | 0.0% | - | 0.0% |
| Intercompany Claims | - | - | 0.0% | - | 0.0% |
| **Proceeds Available for Equity Distribution** | | - | | 0.9 | |
| (-) Equity Distribution | | - | | (0.9) | |
| **Remaining Proceeds Available for Distribution** | | - | | - | |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

**SunEdison Inc., et al.**
**Liquidation Analysis**

|  |  | First Wind Energy, LLC | | | |
| --- | --- | --- | --- | --- | --- |
|  | Carrying | Low | | High | |
| ($ in millions) | Value | $ | % | $ | % |
| **Encumbered Assets\*** |  |  |  |  |  |
| Cash & Cash Equivalents | - | - | 0.0% | - | 0.0% |
| Intercompany Receivables | - | - | 0.0% | - | 0.0% |
| Contingent Proceeds from Asset Sales | - | - | 0.0% | - | 0.0% |
| Assets Held for Sale | - | - | 0.0% | - | 0.0% |
| Investments in Subsidiaries | - | - | 0.0% | - | 0.0% |
| Dividend Receipts | n/a | - | n/a | - | n/a |
| Other Encumbered Assets | - | - | 0.0% | - | 0.0% |
| **Gross Liquidation Proceeds** | **-** | **-** | **0.0%** | **-** | **0.0%** |
| **Ch. 7 Liquidation Costs** |  |  |  |  |  |
| Ch. 7 Wind-Down Expenses |  | - |  | - |  |
| Ch. 7 Trustee Fees |  | - |  | - |  |
| Ch. 7 Professional Fees |  | - |  | - |  |
| **Total Liquidation Costs** |  | **-** |  | **-** |  |
| **Other Costs** |  |  |  |  |  |
| YieldCo Avoidance Actions |  | - |  | - |  |
| GLBL Litigation Exposure |  | - |  | - |  |
| **Total Other Costs** |  | **-** |  | **-** |  |
| **Net Proceeds Available for Distribution** |  | **-** |  | **-** |  |
| Ch. 11 Administrative Claims [Secured Carve Out] | - | - | 0.0% | - | 0.0% |
| Secured Tax Claims | - | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** |  | **-** |  | **-** |  |

|  | Claim |  | | | |
| --- | --- | --- | --- | --- | --- |
|  | Amount | Estimated Recovery | | | |
| **Net Proceeds Available for Distribution** |  | **-** |  | **-** |  |
| **Secured Claims** |  |  |  |  |  |
| **Priority 1 Claims** |  |  |  |  |  |
| DIP Term Loan | 530.4 | - | 0.0% | - | 0.0% |
| **Priority 2 Claims** |  |  |  |  |  |
| Tranche B Roll-Up | 335.2 | - | 0.0% | - | 0.0% |
| **Net Proceeds Available for Distribution** |  | **-** |  | **-** |  |
| D&O Proceeds in Excess of Roll-Up (Capped @ $32m) |  | - |  | - |  |
| **Net Proceeds Available for Distribution** |  | **-** |  | **-** |  |
| **Priority 3 Claims** |  |  |  |  |  |
| A1 Tranche 2L Term Loan | 331.2 | - | 0.0% | - | 0.0% |
| A2 Tranche 2L Term Loan | 169.3 | - | 0.0% | - | 0.0% |
| A3 Tranche 2L Senior Notes | 107.0 | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** |  | **-** |  | **-** |  |
| **Unencumbered Assets** |  |  |  |  |  |
| 3rd Party Avoidance Actions | - | - | 0.0% | - | 0.0% |
| Other Unencumbered Assets | n/a | 0.7 | n/a | 0.3 | n/a |
| **Proceeds from Unencumbered Assets** | **-** | **0.7** | **0.0%** | **0.3** | **0.0%** |
| Less: Ch. 7 Liquidation Costs |  | (0.2) |  | (0.1) |  |
| **Remaining Proceeds Available for Distribution** |  | **0.5** |  | **0.2** |  |
| **Priority Claims** |  |  |  |  |  |
| Ch. 11 Administrative Claims | 0 - 0 | 0.1 | 100.0% | 0.0 | 100.0% |
| Ch. 11 Other Priority Claims | - | - | 0.0% | - | 0.0% |
| **Remaining Proceeds Available for Distribution** |  | **0.4** |  | **0.2** |  |
| **General Unsecured Claims\*\*** |  |  |  |  |  |
| DIP Term Loan Deficiency Claim | - | - | 0.0% | - | 0.0% |
| Tranche B Roll-Up Deficiency Claim | 259 - 0 | 0.1 | 0.0% | - | 0.0% |
| 2nd Lien Stub Deficiency Claim | 607 - 603 | 0.2 | 0.0% | 0.1 | 0.0% |
| Other Unsecured Funded Debt | - | - | 0.0% | - | 0.0% |
| Other General Unsecured Claims | 30.0 | 0.0 | 0.0% | 0.0 | 0.0% |
| Intercompany Claims | 216.3 | 0.1 | 0.0% | 0.1 | 0.0% |
| **Proceeds Available for Equity Distribution** |  | **-** |  | **-** |  |
| (-) Equity Distribution |  | - |  | - |  |
| **Remaining Proceeds Available for Distribution** |  | **-** |  | **-** |  |

\*For presentation purposes, all encumbered assets have been included within the Debtor
SunEdison Inc.'s recovery analysis
\*\*The estimated general unsecured claims pool by debtor includes multi-debtor claims, which are
eliminated in the illustrative aggregate claims pool included in the narrative of Exhibit C.

## EXHIBIT D

### Capital Analysis

# SunEdison, Inc. Capital Analysis

*(Summary Output, see following pages for additional detail)*

## SunEdison, Inc.[1] Jan-2013 through Sep-2015 Capital Activity

**($ in billions)**

⊗ See following pages for additional details



Source: SEC filings

(1) Analysis is presented on a consolidated basis for SunEdison, Inc. including Terraform Power, Inc. ("TERP"), Terraform Global, Inc. ("Global") and other consolidated subsidiaries.  Beginning cash balance is for consolidated SunEdison, Inc. and excludes restricted cash and cash committed for construction projects which are not available for general corporate purposes.

(2) Other committed capital includes gross undrawn / non-cash amounts under credit facilities, LC facilities, warehouse financing arrangements, and other committed financings arranged from Jan-13 through Sep-15 which were generally subject to restricted use provisions and other limitations and not available for general corporate purposes.  Amount includes $650m related to the JPM warehouse which was disclosed as of Sep-15, but did not close until Oct-15. See the final page of this exhibit for additional detail.

(3) Capital commitments were generally either non-cash in nature (i.e. letter of credit facilities) or subject to restricted use provisions and other limitations and not available for general corporate purposes.

(4) Includes cash used for construction of renewable energy systems.

(5) Includes the acquisition of ownership interests in First Wind Holdings, LLC, Atlantic Power Transmission, Inc., Silver Ridge Power, LLC, and other project and company acquisitions.

(6) Includes other financing cash outflows ($.4b) and other investing cash outflows ($.9b) and the cumulative impact of changes in foreign exchange rates and discontinued operations ($.1b).

(7) Represents consolidated ending cash balance as of September 30, 2015.  Included in the $2.4b ending cash balance is $1.7b of total cash on hand held by SunEdison's consolidated subsidiaries TERP and Global.  Ending cash excludes restricted cash and cash committed for construction projects which are not available for general corporate purposes.

Indicates Non-cash activity or commitments

**SunEdison** ®

# Capital Analysis Detail

## Cash Flow Summary

| ($ in millions) | Mar-13 | Jun-13 | Sep-13 | Dec-13 | Mar-14 | Jun-14 | Sep-14 | Dec-14 | Mar-15 | Jun-15 | Sep-15 | 2013 | 2014 | Sep-15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ⓐ Beginning Cash (1/1/13)** | | | | | | | | | | | | | | | 573 |
| *Financing Cash Flows* | | | | | | | | | | | | | | | |
| **Ⓑ Debt Financing Proceeds** | **99** | **232** | **296** | **2,150** | **462** | **1,387** | **719** | **1,507** | **2,386** | **2,877** | **2,043** | **2,776** | **4,075** | **7,306** | **14,157** |
| Equity Financing Proceeds - YieldCo | - | - | - | - | - | - | 592 | 337 | 391 | 667 | 657 | - | 929 | 1,715 | 2,644 |
| Equity Financing Proceeds - Other | - | - | 240 | - | - | 185 | - | 16 | - | - | 626 | 240 | 201 | 626 | 1,066 |
| **Ⓒ Total Equity Financing Proceeds** | **-** | **-** | **240** | **-** | **-** | **185** | **592** | **353** | **391** | **667** | **1,283** | **240** | **1,130** | **2,341** | **3,710** |
| **Ⓓ Other Financing Proceeds** | **0** | **11** | **14** | **14** | **10** | **14** | **9** | **182** | **4** | **665** | **100** | **40** | **215** | **769** | **1,024** |
| **Ⓖ Debt Repayments** | **(21)** | **(55)** | **(16)** | **(1,290)** | **(53)** | **(312)** | **(589)** | **(625)** | **(724)** | **(1,153)** | **(968)** | **(1,381)** | **(1,579)** | **(2,845)** | **(5,805)** |
| *Operating Activities* | | | | | | | | | | | | | | | |
| **Ⓗ Cash Used in Operations** | **(119)** | **(86)** | **(103)** | **(399)** | **(215)** | **(79)** | **(276)** | **(200)** | **(308)** | **(621)** | **(207)** | **(707)** | **(770)** | **(1,136)** | **(2,613)** |
| *Investing Activities* | | | | | | | | | | | | | | | |
| Capital Expenditures - Other | (31) | (39) | (32) | (32) | (20) | (75) | (87) | (48) | (62) | (65) | (66) | (133) | (230) | (193) | (556) |
| Capital Expenditures - Construction of Systems | (47) | (75) | (139) | (204) | (326) | (325) | (377) | (483) | (344) | (525) | (750) | (465) | (1,511) | (1,619) | (3,595) |
| **Ⓘ Total Capital Expenditures** | **(78)** | **(114)** | **(170)** | **(236)** | **(347)** | **(400)** | **(463)** | **(531)** | **(406)** | **(590)** | **(816)** | **(598)** | **(1,741)** | **(1,812)** | **(4,151)** |
| **Ⓙ Cash Paid for Acquisitions** | **-** | **-** | **(7)** | **-** | **(14)** | **(242)** | **(159)** | **(304)** | **(1,530)** | **(651)** | **(175)** | **(7)** | **(719)** | **(2,356)** | **(3,082)** |
| *Other* | | | | | | | | | | | | | | | |
| **Other Outflows** | | | | | | | | | | | | | | | |
| Other Investing Outflows | (1) | (42) | (72) | (141) | 48 | (62) | 65 | (232) | 174 | (667) | 29 | (255) | (180) | (464) | (899) |
| Other Financing Outflows | (27) | (1) | (26) | (26) | - | (3) | - | (35) | (77) | (21) | (185) | (80) | (38) | (283) | (401) |
| Other [1] | - | - | - | - | - | - | - | - | - | - | (119) | - | - | (119) | (119) |
| **Ⓚ Total Other Outflows** | **(29)** | **(43)** | **(97)** | **(167)** | **48** | **(65)** | **65** | **(267)** | **97** | **(688)** | **(275)** | **(335)** | **(218)** | **(866)** | **(1,419)** |
| **Ⓛ Ending Cash (9/30/15)** | | | | | | | | | | | | | | | 2,393 |

Period Ending:

◄see next page for details

Note, see page 4 for Ⓑ and Ⓕ

Source: SEC filings
(1) Includes the cumulative impact of changes in foreign exchange rates and discontinued operations.



# Debt Financing Proceeds Detail

## Debt Financing Proceeds Detail

| ($ in millions) | Mar-13 | Jun-13 | Sep-13 | Dec-13 | Mar-14 | Jun-14 | Sep-14 | Dec-14 | Mar-15 | Jun-15 | Sep-15 | Period Ending 2013 | 2014 | Sep-15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Senior Notes** | | | | | | | | | | | | | | | |
| 2018 Convertible Senior Notes | - | - | - | 600 | - | - | - | - | - | - | - | 600 | - | - | 600 |
| 2021 Convertible Senior Notes | - | - | - | 600 | - | - | - | - | - | - | - | 600 | - | - | 600 |
| 2020 Convertible Senior Notes | - | - | - | - | - | 600 | - | - | - | - | - | - | 600 | - | 600 |
| 2022 Convertible Senior Notes | - | - | - | - | - | - | - | - | 460 | - | - | - | - | 460 | 460 |
| 2023 Convertible Senior Notes | - | - | - | - | - | - | - | - | - | 450 | - | - | - | 450 | 450 |
| 2025 Convertible Senior Notes | - | - | - | - | - | - | - | - | - | 450 | - | - | - | 450 | 450 |
| 2020 Exchangeable Senior Notes | - | - | - | - | - | - | - | - | 337 | - | - | - | - | 337 | 337 |
| TERP 2023 Senior Notes | - | - | - | - | - | - | - | - | 800 | 150 | - | - | - | 950 | 950 |
| TERP 2025 Senior Notes | - | - | - | - | - | - | - | - | - | - | 300 | - | - | 300 | 300 |
| Global 2022 Senior Notes | - | - | - | - | - | - | - | - | - | 810 | - | - | - | 810 | 810 |
| **Loans / Credit Facilities and Warehouses** | | | | | | | | | | | | | | | |
| Margin Loan (Due 2017) | - | - | - | - | - | - | - | - | 410 | - | - | - | - | 410 | 410 |
| EM Yieldco Acquisition Facility | - | - | - | - | - | - | - | 150 | - | - | - | - | 150 | - | 150 |
| OCBC Credit Facility | - | - | - | - | - | - | - | 119 | - | - | - | - | 119 | - | 119 |
| TERP Term Loan | - | - | - | - | - | - | 300 | 274 | - | - | - | - | 574 | - | 574 |
| 2016 2nd Lien Term Loan | - | - | - | - | - | - | - | - | - | - | 169 | - | - | 169 | 169 |
| SMP Ltd. Credit Facilities | - | - | - | - | - | - | - | 432 | - | - | - | - | 432 | - | 432 |
| First Reserve Warehouse Term Loan | - | - | - | - | - | - | - | - | - | 466 | - | - | - | 466 | 466 |
| TerraForm Private Term Loan | - | - | - | - | - | - | - | - | - | 280 | - | - | - | 280 | 280 |
| System and Capital Lease Proceeds | - | - | - | - | 212 | 478 | 718 | - | - | 278 | - | - | 1,408 | 278 | 1,686 |
| Acquisition Facility Term Loan | - | - | - | - | 250 | 150 | - | - | - | - | - | - | 400 | - | 400 |
| SSL Term Loan | - | - | - | - | - | 210 | - | - | - | - | - | - | 210 | - | 210 |
| Global Acquisition Facility | - | - | - | - | - | - | - | - | - | 460 | - | - | - | 460 | 460 |
| **Subtotal** | **-** | **-** | **-** | **1,200** | **462** | **1,438** | **1,018** | **975** | **2,007** | **2,534** | **1,279** | **1,200** | **3,892** | **5,820** | **10,912** |
| Other Debt Financing Proceeds | 99 | 232 | 296 | 950 | 0 | 123 | (299) | 532 | 380 | 343 | 764 | 1,576 | 182 | 1,487 | 3,245 |
| **Total Debt Financing Proceeds** | **99** | **232** | **296** | **2,150** | **462** | **1,561** | **719** | **1,507** | **2,386** | **2,877** | **2,043** | **2,776** | **4,075** | **7,306** | **14,157** |

Source: SEC filings



# Other Committed Capital Detail

| Other Committed Capital Detail | | | | | | | | | | | | Period Ending | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | Mar-13 | Jun-13 | Sep-13 | Dec-13 | Mar-14 | Jun-14 | Sep-14 | Dec-14 | Mar-15 | Jun-15 | Sep-15 | 2013 | 2014 | Sep-15 | Total |
| **Other Committed Capital** | | | | | | | | | | | | | | | |
| LC Credit Facility | - | - | - | - | - | - | - | 815 | - | - | - | - | 815 | - | 815 |
| Project Construction Facilities | - | - | - | - | 150 | - | 135 | - | - | - | - | - | 285 | - | 285 |
| Renewable Energy Letter of Credit Facility | - | - | - | - | 265 | 50 | - | 225 | 25 | 125 | 60 | - | 540 | 210 | 750 |
| SMP Ltd. Credit Facilities | - | - | - | - | - | - | - | - | - | - | 64 | - | - | 64 | 64 |
| TERP Revolver | - | - | - | - | - | - | 140 | 75 | 335 | 100 | 75 | - | 215 | 510 | 725 |
| SSL Revolving Facility | - | - | - | - | - | 47 | - | - | - | - | - | - | 47 | - | 47 |
| First Reserve Warehouse Revolver | - | - | - | - | - | - | - | - | - | 550 | - | - | - | 550 | 550 |
| West Street Infrastructure Partners Warehouse | - | - | - | - | - | - | - | - | - | - | 1,000 | - | - | 1,000 | 1,000 |
| JPM Warehouse [(1)] | - | - | - | - | - | - | - | - | - | - | 650 | - | - | 650 | 650 |
| **Total Other Committed Capital** | **-** | **-** | **-** | **-** | **415** | **97** | **275** | **1,115** | **360** | **775** | **1,849** | **-** | **1,902** | **2,984** | **4,886** |

Source: SEC filings
(1) Represents equity commitment of $650m pledged by an affiliate of J.P. Morgan.  The commitment did not close until October 26, 2015, but was disclosed in the September 30, 2015 SunEdison, Inc. quarterly report on Form 10Q so has been included in this analysis as a component of other committed capital.

