SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC., *et al.*,** | : | **Case No. 16-10992 (SMB)** |
| | : | |
| **Debtors.[1]** | : | **(Jointly Administered)** |
| | : | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607).  The address of the Debtors' corporate headquarters is Two CityPlace Drive, 2nd floor, St. Louis, MO 63141.

**NOTICE OF FILING DECLARATION OF JOHN S. DUBEL IN SUPPORT OF
CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION
OF SUNEDISON, INC. AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE** that on June 12, 2017, SunEdison, Inc. and certain of

its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") filed the Amended *Notice Of Filing Of Solicitation Version of First Amended*

*Disclosure Statement for First Amended Joint Plan Of Reorganization Of SunEdison, Inc. And*

*Its Debtor Affiliates* (Docket No. 3314), which attached as Exhibit A thereto the First Amended

Joint Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates (the "Plan").

**PLEASE TAKE FURTHER NOTICE** that on July 6, 2017, the Debtors filed

the *Notice Of Filing Of Plan Supplement Documents* (Docket No. 3522).

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as Exhibit A is the

declaration of John S. Dubel in support of confirmation of the Plan.

Dated: July 7, 2017
     New York, New York

                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                     By:  */s/ J. Eric Ivester*
                           Jay M. Goffman
                           J. Eric Ivester
                           Four Times Square
                           New York, New York 10036-6522
                           Telephone: (212) 735-3000
                           Fax: (212) 735-2000

                           -and-

                           James J. Mazza, Jr. (admitted *pro hac vice*)
                           Louis S. Chiappetta (admitted *pro hac vice*)
                           155 N. Wacker Dr.
                           Chicago, Illinois 60606-1720
                           Telephone: (312) 407-0700
                           Fax: (312) 407-0411

                           *Counsel for Debtors and Debtors in Possession*

2

## EXHIBIT A

**Dubel Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | :    Chapter 11 |
| | : |
| **SUNEDISON, INC.,** *et al.*, | :    **Case No. 16-10992 (SMB)** |
| | : |
| Debtors.[1] | :    (Jointly Administered) |
| | : |
| | : |

**DECLARATION OF JOHN S. DUBEL IN SUPPORT OF CONFIRMATION OF THE**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF**
**SUNEDISON, INC. AND ITS DEBTOR AFFILIATES**

I, John S. Dubel, being duly sworn, deposes, and says:

                1.      I am the Chief Executive Officer ("CEO") and Chief Restructuring Officer

("CRO") of SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607). The address of the Debtors' corporate headquarters is Two CityPlace Drive, 2nd floor, St. Louis, MO 63141.

possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "SunEdison" or the "Company").[2]

2.      I have over thirty years of experience in the restructuring space and have worked on many chapter 11 restructurings, advising both debtors and creditors in various cases – including large chapter 11 cases with complex settlements – and have substantial experience working with companies in distressed situations. My recent management experience includes serving as Chairman and Chief Executive Officer of Financial Guaranty Insurance Company, Chairman of the Official Creditors Committee of Residential Capital, Chief Executive Officer of Cable & Wireless Americas, President and Chief Operating Officer of RCN Corporation, Chief Financial Officer of WorldCom, Inc., Chief Restructuring Officer of Acterna Corporation, and Chief Restructuring Officer of Anchor Glass Container Corporations. I have also been a partner in a distressed investment fund.

3.      I submit this declaration (this "Declaration") in support of Confirmation of the First Amended Joint Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Plan").[3] In my role as CEO and CRO of SUNE, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records, as well as the contents of the Plan. I directed the formulation of the Debtors' business plan that forms the foundation of the Plan and was intimately involved in key discussions and negotiations with various stakeholders in connection with the formulation of the Plan.

---

[2]    For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc. and Terraform Global, Inc. (collectively, the "YieldCos"), and each of their respective direct and indirect subsidiaries, unless otherwise provided.

[3]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

4.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge, my discussions with others at SunEdison, its advisors, and other representatives of the Company.  If called as a witness, I would testify competently to the facts set forth herein.

**I.    Business Plan And Plan Of Reorganization Development.**

5.      Prior to the commencement of these Chapter 11 Cases, the Debtors' business operations included the development, construction, and management of renewable energy projects around the world.  This business model was highly capital intensive and relied on access to the capital markets to raise funds necessary to fund projects.  Following the Debtors' chapter 11 filing, the Company's management and professional advisors considered all alternatives to maximize value for the estates, including through a reorganization of its operating development business.  However, over time it became apparent that the Company would not be able to regain access to sufficient capital to fund its development business on the worldwide scale that was conducted prior to bankruptcy.  In this regard, the Debtors' Original DIP Facility, approved by the Court on a final basis in June 2016, provided enough liquidity to allow the Company to explore its options to find a financing solution to continue its development business on a long-term basis.  Ultimately, there were no viable options available to the Debtors that would permit them to continue their development business on a scale similar to that pursued prior to the Petition Date.  After entering chapter 11, in addition to these liquidity constraints, the Debtors faced operational obstacles, as third parties necessary to the development business would not continue to work with the Debtors.  Thus, other than the projects in process that were specifically identified for completion, salvaging the development business turned out not to be feasible in the chapter 11 environment.

3

6.      In June 2016, I was appointed CEO of SUNE, while already serving in my capacity as CRO (to which I was appointed by SUNE's Board of Directors and such appointment was a requirement under the Original DIP Facility),[4] and assumed the responsibilities of reporting directly to the full Board of Directors, overseeing the day-to-day operations of the Debtors, maximizing the value of the estates, and leading the Debtors and their senior management in the development of the Company's business plan, among other tasks.  Given the aforementioned financial and operational constraints on the Debtors' development business, over the course of the Chapter 11 Cases the Debtors, at my direction, have turned the focus of their business efforts to executing numerous transactions to maximize the value of their existing renewable energy development projects, their business platforms – i.e., the Solar Materials, C&I, and RSC business units – and their interests in the YieldCos.  The Debtors also explored the possibility of selling the whole Company to a third party to continue the development business. Despite a robust sale and marketing process that was launched in early May 2016 and led by the Debtors' investment banker, Rothschild, only one bidder indicated an interest in purchasing the whole Company, submitting a non-binding offer that, at the time, was less than the aggregation of various other bids for the Company's assets (in addition to other negating factors relating to distributions to creditors).  The party that bid on the whole Company ultimately walked away, and the Debtors continued their ongoing asset sale efforts with respect to project, platform, and business unit transactions.

7.      As a result of the foregoing, the Debtors, at my direction and reporting to the Board of Directors, and in consultation with their advisors and certain key constituents,

---

[4]      On June 8, 2016, the Court approved my appointment as CRO of the Debtors, *nunc pro tunc* to April 29, 2016, [Docket No. 512].

ultimately developed a business plan that disposes of their remaining development assets,

collects on future earnouts, and repatriates cash from foreign jurisdictions.  Continuation of the

Debtors' capital-intensive renewable project development business is not contemplated under the

Plan based on the Debtors' inability to access the capital markets.  Consistent with the Financial

Projections, the Plan provides that Reorganized SUNE will distribute the proceeds from ongoing

asset sales, earnout collections, and cash repatriation efforts to pay down Reinstated Second Lien

Debt or otherwise make equity distributions to holders of New SUNE Common Stock.  In my

opinion, as a result of the Debtors' negotiations with key stakeholders (as set forth below) the

Reinstated Second Lien Debt and issuance of New SUNE Common Stock are key components of

the package that was negotiated with certain of the Second Lien Creditors, and thus are essential

elements of the Plan (and the settlements embodied therein) and are in the best interests of the

Debtors' estates.

　　　　　8.　　　In conjunction with the formulation of the Company's business plan, I

have also led the Debtors' negotiation of and entry into the Equity Commitment Agreement –

which, among other things, provides the Debtors with the additional capital necessary to pay off

Replacement DIP Facility Claims and Administrative Claims, and allows the Debtors to emerge

with an appropriate capital structure to manage their business post-emergence with sufficient

liquidity – as well as the execution of the key global settlements (namely, the YieldCo

Settlement Agreements, the Committee/BOKF Plan Settlement, and the D&O Settlements (as

defined below)) that serve as the backbone of the Plan.  These pivotal components of the Plan are

the product of extensive good-faith, arm's-length negotiations with the Debtors' key

stakeholders, who are sophisticated parties that were represented by separate counsel.

Specifically, the key pillars of the plan are as follows:

- **Equity Commitment Agreement -** The Debtors worked diligently with their advisors to survey the market with respect to potential exit financing sources, and, in particular, engaged in negotiations with a group of certain parties that hold non-rolled up second lien debt (collectively, the "<u>Backstop Purchasers</u>") that culminated in the following deal: (a) a $213.75 million (subject to increase to $225 million) rights offering (the "<u>Rights Offering</u>") of (i) New SUNE Common Stock, (ii) Continuing TERP Class A Shares, and (iii) receipt of a portion of the reinstated second lien claims in the same proportion as they will hold New SUNE Common Stock; (b) a $71.25 million (subject to increase to $75 million) opportunity for the Backstop Purchasers to purchase additional shares of New SUNE Common Stock and New TERP Class A Shares; and (c) the Backstop Purchasers' commitment to fully backstop the Rights Offering. After continued deliberations, the group of Backstop Purchasers expanded to include certain other holders of Second Lien Claims that had previously objected to the motion seeking approval of the Equity Commitment Agreement. On June 6, 2017, the Court entered an order approving the Debtors' entry into the Equity Commitment Agreement and backstop commitment letter [Docket No. 3283]; then on June 8, 2017, the Debtors amended and restated the original Equity Commitment Agreement in order to facilitate the joinder of the additional Backstop Purchasers [Docket No. 3304].

- **YieldCo Settlements and Mergers –** The Debtors worked with their advisors to analyze their claims and defenses against the YieldCos (and vice versa), and engaged in extensive settlement negotiations with the Yielcos and certain of the Debtors' creditor constituents that culminated in comprehensive global settlement agreements with the YieldCos (entered into as of March 6, 2017) to resolve such claims and facilitate the YieldCos' merger transactions with Brookfield Asset Management, Inc. ("<u>Brookfield</u>") (which include the sale of the Debtors' interests in the YieldCos), through which the Debtors' estates stand to realize over $800 million in cash and equity value. On June 7, 2017, the Court entered an order approving the Debtors' entry into the YieldCo Settlement Agreements [Docket No. 3292].

- **Committee/BOKF Plan Settlement –** After engaging in Court-ordered mediation before Chief Judge Cecelia Morris of the Bankruptcy Court for the Southern District of New York, the Debtors, the Tranche B Roll Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders (the "<u>Ad Hoc Group</u>"), the Creditors' Committee, and BOKF N.A. (as Convertible Senior Notes Indenture Trustee) ("<u>BOKF</u>") reached the Committee/BOKF Plan Settlement, which, among other things: (i) settles all pending litigation that has been commenced by the Creditors' Committee or BOKF (<u>i.e.</u>, the UCC Challenge Litigation, BOKF Objection, and objections to the YieldCo Settlements, including the YieldCo Avoidance Allocation); (ii) delineates the assets the Debtors shall transfer under the Plan to the GUC/Litigation Trust for the benefit of Holders of General Unsecured Claims (<u>i.e.</u>, the $7.5 million of GUC/Litigation Trust Initial Funding, $32 million of D&O Insurance Proceeds pursuant to the D&O Settlements, the $18 million on account of the YieldCo Avoidance Allocation, at least $5 million on account of the Voluntary Professional Fee Reductions, and the GUC/Litigation Trust Causes of

6

Action); and (iii) provides that, subject to the terms thereof, the Committee shall support, and BOKF will not object to, the Plan and the Debtors' disclosure statement.[5]

9.    Furthermore, as noted above, the Committee/BOKF Plan Settlement incorporates a principal term of the settlements relating to the Debtors' D&O Insurance and certain actions and claims alleged against certain of the Debtors' directors and officers (the "D&O Settlements") that were recently approved by the Court – the cash transfer of $32 million in D&O Insurance Proceeds to the GUC/Litigation Trust for the benefit of Holders of General Unsecured Claims.  The D&O Settlements arose from the Creditors' Committee's efforts to bring estate claims against certain of the Debtors' directors and officers (the "D&O Actions"); specifically, the Creditors' Committee: (i) moved for derivative standing to pursue the D&O Actions (the "D&O Standing Motion")[6] and (ii) filed an adversary proceeding seeking to stay all litigation against certain of the Debtors' directors and officers pending in the MDL Litigation[7] (the "D&O Litigation Stay Motion").[8]  After Court-ordered mediation and extensive good faith, arm's-length negotiations, the Debtors, Creditors' Committee, YieldCos, and other relevant parties (as applicable), reached the following agreements (collectively, the "D&O Agreements"): (i) the D&O Mediation Settlement Agreement between the Debtors, the Creditors' Committee, and certain current and former directors and officers of SunEdison and the YieldCos, which

---

[5]    On June 9, 2017, the parties executed definitive documentation memorializing the Committee/BOKF Plan Settlement [Docket No. 3306].

[6]    Docket No. 1550.

[7]    Dozens of lawsuits involving direct and derivative claims by shareholders or investors against the Company, the YieldCos, their respective present and former directors and officers, underwriters and accountants, many of which are arguably covered by the Company's insurance policies (the "MDL Litigation") were transferred pursuant to multi-district litigation procedures to the United States District Court for the Southern District of New York.

[8]    Ad. Pro. Case No. 16-01257, Docket No. 2.

settles all of the claims set forth in the Committee's proposed adversary complaint against

current and former directors and officers of SunEdison (and the YieldCos) for $32 million

payable from the shared liability insurance policies under which SunEdison, the YieldCos and

their respective directors/officers are insured; and (ii) the D&O Insurance Cooperation

Agreement (as amended) between the Debtors, the YieldCos, and certain of their insured

directors and officers, which provides for, among other things, the YieldCos to consent to the

D&O Mediation Settlement Agreement and funding it with the $32 million of proceeds from the

D&O insurance policies they share with SunEdison.

       10.     On June 29, 2017, the Court entered an order approving the Debtors' entry

into the D&O Agreements [Docket No. 3453], which resolve the D&O Standing and Litigation

Stay Motions, achieve a significant recovery for the Debtors' estates, effectuate valuable

releases, and avoid potentially costly and protracted litigation that would risk exhausting the

Debtors' D&O insurance proceeds before any final judgments could be reached.  As such, I

believe the D&O Settlements – together with the broader Committee/BOKF Plan Settlement –

are in the best interests of the Debtors' estates and further reflect the considerable effort the

Debtors expended over the course of these Chapter 11 Cases to bring parties together and

preserve value to the benefit of the Debtors' estates and creditors, and the success of that effort.

       11.     With the aforementioned settlements, the Brookfield transactions, and the

Equity Commitment Agreement in place and embodied in the Plan, I believe the Plan best

positions the Debtors to successfully emerge from chapter 11.  Thus, in light of the foregoing and

as discussed herein, I believe that the prompt confirmation and consummation of the Plan is in

the best interest of the Debtors, their creditors and all other parties in interest.

**The Plan**

8

12.    It is my understanding, through my review of the Plan and related materials and in consultation with the Debtors' advisors, that the Plan: (a) complies, or will comply, with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123(a)(1) of the Bankruptcy Code; (b) satisfies the six other mandatory requirements of section 1123(a) of the Bankruptcy Code (namely, section 1123(a)(2)-(7)); and (c) is consistent with section 1123(b) of the Bankruptcy Code.

## II.   The Plan Complies With The Applicable Provisions Of The Bankruptcy Code: Section 1129(a)(1).

### A.   Classification of Claims and Interests Under Section 1122 and 1123(a)(1)

13.     It is my understanding that the Plan complies with section 1129(a)(1) of the Bankruptcy Code, which requires the Plan to comply with sections 1122 and 1123 in all respects.  Article III of the Plan complies with the claim classification and designation requirements of sections 1122 and 1123(a)(1) by expressly classifying all Claims and Interests, other than Administrative Claims, Professional Claims, Original DIP Facility Claims (in the event such amounts are owed and not disputed as of the Effective Date), Replacement DIP Facility Claims, and Priority Tax Claims.[9]  I believe that each Class is comprised of substantially similar Claims or Interests, and each instance of separate classifications of similar Claims and Interests was based on valid business, factual, and legal reasons.

14.     For administrative purposes, the Plan organizes the Debtors into Debtor Groups and assigns a letter to each Debtor and a number to each class of Claims or Interests within each Debtor Group.  The classification of Claims and Interests (as applicable) under the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1A and 1B | Second Lien Claims | Impaired | Entitled to Vote |
| 2A-2E | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3A-3E | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4A-4E | General Unsecured Claims and Convertible Senior Notes Claims | Impaired | Entitled to Vote |
| 5A-5E | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 6A-6E | Other Subordinated Claims | Impaired | Deemed to Reject |

---

[9]   See Article II of the Plan.

| 7B-7E | Interests in Debtor Subsidiaries | Impaired or Unimpaired | | Deemed to Reject or Presumed to Accept |
|---|---|---|---|---|
| 8A | Interests in SUNE | Impaired | | Deemed to Reject |

15.    Under this classification scheme, no dissimilar Claims are classified together, and, to the extent similar Claims are classified separately, the Debtors have legitimate reasons for the separate classifications.  Class 1A and 1B (Second Lien Claims) and Class 2A - 2E (Other Secured Claims) are all secured claims, but are separately classified based upon the different rights and different collateral (or priority with respect to common collateral) securing such Claims.  Class 3A - 3E (Other Priority Claims) are separately classified based on the specific priority provided to such Claims under the Bankruptcy Code.  Class 4A - 4E (General Unsecured Claims) are all general unsecured claims that do not fall into any of the other specified categories.  Class 5A - 5E (Intercompany Claims) are Claims or Causes of Action by SUNE or any direct or indirect subsidiary of SUNE against SUNE or any direct or indirect subsidiary of SUNE, other than certain Claims or Causes of Action specified in the Plan.  Class 6A - 6E (Other Subordinated Claims) are Claims that are subject to subordination under section 510(b) or (c) of the Bankruptcy Code.  Class 7B - 7E (Interests in Debtor Subsidiaries) and Class 8A (Interests in SUNE) represent equity interests and are therefore classified separately from Classes 1 through 6.

**B.    Section 1123(a)(2) and 1123(a)(3)**

16.    I believe that the Plan satisfies sections 1123(a)(2) and (a)(3) of the Bankruptcy Code.  I have been advised that Articles III and IV of the Plan specify that (i) Classes 2A - 2E and 3A - 3E are, and certain Claims within Classes 5A - 5E and 7B - 7E could be, Unimpaired, as required by section 1123(a)(2); and (ii) Classes 1A - 1B, 4A - 4E, 6A - 6E, and 8A are, and certain Claims within Classes 5A-5E and 7B-7E could be, Impaired, and

11

specifies the treatment of such Impaired Claims and Interests in those Classes, as required by

section 1123(a)(3).

### C.    Section 1123(a)(4)

17.    I believe that the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

To that end, Articles III and IV of the Plan provide the same treatment for each Claim or Interest

in each respective Class, unless the Holder of a Claim or Interest agrees to less favorable

treatment on account of its Claim or Interest.

### D.    Section 1123(a)(5)

18.    I believe that section 1123(a)(5) of the Bankruptcy Code has been satisfied

by Article VI (and various other provisions) of the Plan, which provide adequate means for the

Plan's implementation.[10]   The provisions of Article VI of the Plan relate to, among other things:

(a) the general settlement of Claims and Interests; (b) the authorization to enter into

Restructuring Transactions; (c) the sources of Cash required for payments to be made under the

Plan on the Effective Date, including Cash on hand, proceeds of the Jointly Supported

Transactions, and the Rights Offering; (d) the reinstatement and modification of the Reinstated

Second Lien Claims; (e) the conversion and distribution of the Debtors' interests in TERP (in

accordance with the Jointly Supported Transactions); (f) the collection of Repatriated Cash and

the administration of Earnout Assets and Residual Assets, as well as the allowance of certain

transfers of the same between SUNE and other Debtors; (g) the authorization and issuance of

New SUNE Common Stock; (h) the initial funding requirements of the GUC/Litigation Trust in

---

[10]    11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: (i) retention by the debtor of all or part of its property; (ii) the transfer of property of the estate to one or more entities; (iii) cancellation or modification of any indenture; (iv) curing or waiving of any default; (v) amendment of the debtor's charter; or (vi) issuance of securities for cash, for property, for existing securities, in exchange for Claims or interests, or for any other appropriate purpose.

accordance with the Committee/BOKF Plan Settlement, and the implementation of such

settlement; (i) the exemption from Securities Act Registration Requirements for the offering,

issuance, and distribution of any Securities pursuant to the Plan; (j) the cancellation of Old

SUNE Securities and other documents evidencing Claims or Interests, and the release and

discharge of all obligations thereunder or in any way related thereto (subject to certain

exceptions as set forth in the Plan); (k) the amendment of the certificates of incorporation and

bylaws of the Debtors as required to be consistent with the provisions of the Plan and the

Bankruptcy Code; (l) the process for selecting the initial directors and officers of the

Reorganized Debtors; (m) the vesting of the Debtors' assets in the Reorganized Debtors; and (n)

the preservation of certain of the Debtors' Causes of Action.

          **E.**        **Section 1123(a)(6)**

          19.      I believe that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code,

which requires that a plan prohibit the issuance of nonvoting equity securities. Article 6.15 of

the Plan provides that Certificates of Incorporation and Bylaws shall be amended as may be

required so that they are consistent with the Bankruptcy Code; these organizational documents

will be filed in the Plan Supplement. Accordingly, I have been advised that the organizational

documents of the Reorganized Debtors will be amended, as necessary, to prohibit the issuance of

nonvoting equity securities.

          **F.**        **Section 1123(a)(7)**

          20.      I believe that the Plan satisfies section 1123(a)(7) of the Bankruptcy Code,

by properly and adequately disclosing (or otherwise identifying) the procedures for determining

the identity and affiliations of the individuals proposed to serve on or after the Effective Date as

officers of and members of the board of directors of the Reorganized Debtors. Specifically,

Articles 6.16 and 6.19 of the Plan set forth the manner of selection of the directors and officers of

the Reorganized Debtors.  I understand that the Debtors will file a notice identifying the directors

and officers of the Reorganized Debtors in advance of the Confirmation Hearing.

### G.    Section 1123(b) of the Bankruptcy Code and the Plan's Discretionary Provisions

21.    I understand the Plan incorporates various provisions in accordance with

Bankruptcy Code section 1123(b)'s discretionary authority.  For example, Articles III and IV of

the Plan render certain Classes of Claims and Interests Impaired, while leaving others

Unimpaired.[11]  The Plan also proposes treatment for executory contracts and unexpired leases,

and implements various settlements, releases, exculpations, and injunctions.[12]  I believe the

Plan's discretionary provisions, certain of which are discussed below, are the product of arm's-

length negotiations, are fair and equitable, are given for valuable consideration, and are in the

best interests of the Debtors' estates.

22.    ***Executory Contracts and Unexpired Leases***.  Article XIII of the Plan

pertains to the assumption and rejection of the Debtors' Executory Contracts and Unexpired

Leases.  Specifically, Article 8.1 of the Plan provides that, expect as otherwise provided under

the Plan, each Executory Contract and Unexpired Lease of the Debtors shall be deemed

automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the

Effective Date (subject to certain exceptions, including those contracts that are expressly

assumed pursuant to Article 8.2 of the Plan, were previously assumed by the Debtors, are the

subject of a motion to assume or reject pending as of the Effective Date, or relate to any

Intercompany Claim).  The Debtors have worked with their advisors to conduct a thorough

---

[11]    The following Classes are Impaired: 1A – 1B, 4A – 4E, 6A – 6E, and 8A. The following Classes are
Unimpaired: 2A – 2E and 3A – 3E.  The following Classes will either be Impaired or Unimpaired: 5A – 5E and
7B – 7E.

[12]    See, respectively, Plan Art. VIII (Executory Contracts and Unexpired Leases), Arts. 11.5, 11.6, 11.7, and 11.9
(Releases by Debtors, Release by Holders of Claims, Exculpation and Limitation of Liability, and Injunction).

review of their contracts and leases, and will continue to do so, in order to determine which

contracts should be assumed pursuant to Article 8.2 of the Plan and thereby vest in, and be

enforceable by, the Reorganized Debtors.  As a result of such analysis to date, as well as the

change in scope of the Debtors' business operations, I believe it is within the Debtors' reasonable

business judgment to effectuate the automatic rejection provisions with respect to Executory

Contracts and Unexpired Leases, and to select and assume only those contracts and leases that

will be of value to the Reorganized Debtors.

23.      Further, as a result of such analysis, I also believe that the Debtors will

have sufficient liquidity to make required payments with respect to any Executory Contracts

assumed pursuant to Article 8.2 of the Plan, both immediately after the Effective Date and going

forward.  Accordingly, I believe that the Debtors will be in a position to provide adequate

assurance of future performance with respect to any Executory Contracts that may be assumed

pursuant to the Plan.

24.      ***The Debtors' Release of Claims.***  It is my understanding that, under

Article 11.5 of the Plan, the Debtors propose to release certain parties – the Released Parties[13] –

---

[13]   Under Article 1.194 of the Plan, the Released Parties are as follows: "collectively, in each case, solely in their
respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current
financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals
(collectively, the 'Debtor Professionals'); (2) current employees, consultants, Affiliates, officers and directors,
including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; and (3) Existing
Directors, (b) the Original DIP Agents, (c) the Original DIP Lenders and all other Original DIP Secured Parties,
(d) the Replacement DIP Agents, (e) the Replacement DIP Lenders, (f) the Supporting Second Lien Parties, (g)
all Professionals (to the extent not duplicative of the Entities covered by clauses (a) and (m) of this definition),
(h) the Creditors' Committee and each of its members, solely in their capacity as such, (i) the Indenture
Trustees, (j) the Second Lien Collateral Trustee, (k) the Second Lien Agents, (l) any underwriters, arrangers, or
placement agents in respect of the Second Lien Senior Notes, (m) the Prepetition First Lien Secured Parties, (n)
the Prepetition First Lien Agents, (o) the Applicable Issuers, and (p) with respect to each of the above-named
Entities described in subsections (b) through (o), such Entity's current and former affiliates, subsidiaries,
advisors, principals, partners, managers, members, employees, officers, directors, representatives, financial
advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and
professionals, in each case to the extent a claim arises from actions taken or omissions by any such person in its
capacity as a related person of one of the parties listed in clauses (b) through (o) and is released as against such
party."

15

from Claims or Causes of Action that the Estates may have (the "Debtors Releases") in

accordance with the terms and exclusions therein.  The Debtors Releases will be granted in

exchange for, among other things, the integral role the Released Parties played in the Chapter 11

Cases, the development of the Plan, and the implementation of the restructuring contemplated by

the Plan.  The Released Parties expected a release in exchange for their contributions to the

Debtors' estates, and such releases have been an integral component of the Plan support that the

Debtors have been able to garner to date.

        25.     Further, I believe that the Debtors are receiving substantial consideration

in exchange for the Debtors Releases on account of, among other things, their compromise of

certain Claims and Causes of Action, the support of the Released Parties, and the contributions

made by the Released Parties under the Plan.  The Released Parties include parties whose

economic contributions, cooperation, and efforts have been integral to the Plan and the Debtors'

restructuring efforts over the course of these Chapter 11 Cases.  Notably, the Debtors Releases

include express carve-outs under Article 11.5 of the Plan that provide reasonable limitations on

the scope of such releases, including, without limitation, those relating to post-Effective Date

Obligations of any party under the Plan, non-Debtor Affiliates, and claims against Debtor

Professionals that are GUC/Litigation Trust Causes of Action.[14]  Additionally, I believe that the

---

[14]    Article 11.5 of the Plan provides, in part: "Notwithstanding anything to the contrary in the foregoing, the release
set forth above (t) does not release the Debtor Professionals to the extent that claims against such parties are
identified as GUC/Litigation Trust Causes of Action, with the identification of such claims to be reasonably
agreed to by the Debtors (after consulting with the Supporting Second Lien Parties) and the Creditors'
Committee; provided, that any disagreement regarding whether a particular claim should be identified as a
GUC/Litigation Trust Cause of Action shall be decided by the Bankruptcy Court, (u) does not release any post-
Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including
those set forth in the Plan Supplement) executed to implement the Plan, (v) does not release, waive, address, or
otherwise impact the (i) releases given as contemplated in the D&O Settlement Agreement or (ii) the various
matters that are carved-out and preserved in the D&O Settlement Agreement, (w) shall not impair any defenses
the Debtors may have with regard to any alleged indemnification obligation that the Debtors may have to any
party, (x) shall not release any claims by any non-Debtor Affiliate of the Debtors arising in the ordinary course
of business (i.e., ordinary course trade claims), (y) shall not release any claims against any non-Debtor Affiliate
*(cont'd)*

Debtors Releases are essential to the Plan, and that circumstances exist in these Chapter 11 Cases

that warrant the approval of the Debtors Releases and the Third-Party Releases (as defined

below).  Without the provision of such releases, it is unlikely that the Released Parties would

have consensually participated in these Chapter 11 Cases or would proceed to consummate the

transactions contemplated by the Plan.

26.    Accordingly, I believe the Debtors Releases are reasonable, represent an

appropriate exercise of the Debtors' business judgment, and satisfy the standard, as explained to

me, that courts generally apply when reviewing settlements under Bankruptcy Rule 9019 (i.e.,

the "best interest of the estate" standard).  I believe that pursuing the released Claims and Causes

of Action against the Released Parties would not be in the best interest of the Debtor's various

stakeholders because, even if Claims or Causes of Action were arguably available against the

Released Parties, the litigation costs, and the likelihood of recovery would outweigh any

potential benefit.  Moreover, the Debtors Releases carve out claims related to acts or omissions

that constitute fraud, willful misconduct, or gross negligence.  I believe that the Debtors Releases

are reasonable and represent a valid settlement of whatever Claims or Causes of Action the

Debtors may have against the Released Parties and, for these reasons, should be approved.

27.    ***Consensual Non-Debtor Releases of Third Parties.***  I also understand that

Article 11.6 of the Plan provides a similar release (the "Third Party Releases") from Claims or

Causes of Action by certain non-Debtor third parties and Holders of Claims entitled to vote for

_____

*(cont'd from previous page)*

of the Debtors held by the Debtors that is necessary to effectuate the transactions contemplated by this Plan
(including, without limitation, any claims to collect proceeds from Earnout Assets, Repatriated Cash, Residual
Assets, etc.), and (z) is subject to section 1125(e) of the Bankruptcy Code to the extent applicable."

or against the Plan who do not vote to reject the Plan.[15]  The Third Party Releases are

consensual, as they apply only to a Holder of a Claim voting to accept the Plan or a Holder of a

Claim that had the opportunity to vote but choose not to do so.  The non-Debtor parties that will

be released under the Debtors Releases and Third Party Releases (such as the Original DIP

Lenders, Replacement DIP Lenders, Creditors' Committee, Debtor Professionals, and the

Debtors' current employees, directors and officers, among others) have made contributions to the

Debtors' overall restructuring and the formulation of the Plan that justify such releases.

Moreover, like the Debtors Releases, the Third Party Releases: only apply to Claims, Interests,

and Obligations that have a connection to the Debtors or the Chapter 11 Cases; and include

express carve-outs under the Plan that provide reasonable limitations on the scope of such

releases, including, without limitation, those relating to post-Effective Date Obligations of any

party under the Plan and certain ERISA causes of action held by a governmental entity against

any non-Debtor.[16]

---

[15]  Under Article 1.195 of the Plan, the non-Debtor Releasing Parties are as follows: "collectively, in each case, in their respective capacities as such, (a) the Original DIP Lenders, (b) the Original DIP Agent, (c) the Replacement DIP Lenders, (d) the Replacement DIP Agent, (e) the Holders of Convertible Senior Notes Claims who vote to accept the Plan, (f) the Holders of Second Lien Senior Notes Claims who vote to accept the Plan, (g) the Holders of Second Lien Loan Claims who vote to accept the Plan, (h) the Creditors' Committee and each of its members, solely in their capacity as such, (i) the Indenture Trustees, (j) the Second Lien Administrative Agent, (k) to the fullest extent permitted by law, all Holders of Claims entitled to vote for or against the Plan that do not vote to reject the Plan, and (l) with respect to each of the foregoing clauses (a) through (k), to the fullest extent permitted by law, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.  For the avoidance of doubt, in the event an Entity who is a Releasing Party also holds a Claim or Interest in a non-voting Class under the Plan, such entity will not be a Releasing Party with respect to its Claim or Interest in such non-voting Class."

[16]  Article 11.6 of the Plan provides, in part: "Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any cause of action held by a governmental entity against any non-Debtor existing as of the Effective Date based on Sections 1104-1109, 1161-1169, and 1342(d) of the Employee Retirement Income Security Act.  Notwithstanding the foregoing, nothing in this Plan shall release any claims against any non-Debtor Affiliate of the Debtors arising in the ordinary course of business (i.e., ordinary course trade claims)."

28.    In addition, I believe that the scope of the Third Party Releases is reasonable given that they are commensurate with the contributions made by the Released Parties to bring these Chapter 11 Cases to confirmation.  Without such contributions, the Debtors would not be able to effectuate the key settlements and transactions contemplated under the Plan and could compromise estate value if left susceptible to such causes of action despite confirmation of the Plan.  Accordingly, the Third Party Releases bring much needed finality to the Debtors' restructuring.

29.    Further, I understand that the Debtors' Disclosure Statement, and the solicitation materials related thereto that were provided to Holders of Claims entitled to vote on the Plan, have contained clear and conspicuous disclaimers advising parties that at the confirmation hearing the Debtors intend to request that any party entitled to vote for or against the Plan that does not vote to reject the Plan will be deemed to consent to the releases set forth in Article XI of the Plan.

30.    For the reasons set forth above, I believe that the Third Party Releases are reasonable and satisfy the standard, as explained to me, that courts generally apply when reviewing such third-party releases, and thus should be approved.

31.    ***Exculpation.***  I understand that Article 11.7 of the Plan provides an exculpation and limitation of liability for the Exculpated Parties[17] such that parties that have

---

[17]    Under Article 1.97 of the Plan, the Exculpated Parties include: "collectively, each of the following solely in their respective capacities as such: (a) the Debtors, and each of their successors and assigns, (b) the Reorganized Debtors, (c) the Rights Offering Backstop Purchasers, (d) the Supporting Second Lien Parties, (e) the Original DIP Lenders and all other Original DIP Secured Parties, (f) the Original DIP Agents, (g) the Replacement DIP Lenders, (h) the Replacement DIP Agents, (i) the Creditors' Committee and each of its members, solely in their capacity as such, (j) the Prepetition First Lien Secured Parties, (k) the Prepetition First Lien Agents, (l) the Indenture Trustees, (m) the Second Lien Agents, (n) any underwriters, arrangers, or placement agents in respect of the Second Lien Senior Notes, (o) the Second Lien Collateral Trustee, (p) TERP Inc., TERP LLC, and their respective former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who served in such roles after April 21, 2016), (q) GLBL Inc., GLBL LLC, and their respective

*(cont'd)*

19

participated in good faith in formulating and negotiating the Plan are not liable for their efforts in

connection therewith (to the extent permitted by section 1125(e) of the Bankruptcy Code and

subject to the limitations of Article 11.8 of the Plan), except to the extent such efforts constitute

gross negligence, willful misconduct, or intentional fraud.  To that end, I have been advised that

the exculpation provisions set a standard of care of gross negligence, willful misconduct, or

intentional fraud in future litigation by a non-releasing party against an "Exculpated Party" for

acts arising out of the Debtors' restructuring.

32.    As set forth below, the Debtors formulated the Plan after negotiating

extensively with numerous parties in good faith.  The exculpation provisions were specifically

negotiated among the Exculpated Parties as part of the Plan process.  I believe negotiation and

compromise were crucial to the formulation of a feasible Plan and could not have occurred

without the protection from liability that the exculpation provisions provide Exculpated Parties.

In light of the circumstances, I believe the exculpation provisions contained in the Plan are

necessary to the Debtors' reorganization and should be approved.

33.    *Injunction.*  I also understand that Article 11.9 of the Plan sets forth the

Plan's injunction provisions (the "Injunction").  I believe the Injunction is necessary to preserve

and enforce the Debtors Releases, the Third Party Releases, and the exculpation provisions, and

is narrowly tailored to achieve that purpose.  Therefore, for the reasons stated above with respect

_____

*(cont'd from previous page)*

former and current partners, agents, officers, directors, employees, representatives, attorneys and advisors (who
served in such roles after April 21, 2016), (r) the Applicable Issuers, and (s) with respect to each of the
foregoing parties in clauses (a) through (r), such parties' subsidiaries, Affiliates, officers, directors, principals,
members, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers,
consultants, representatives, and other representatives and professionals (but solely in their capacities related to
the functions that such primary exculpated party is receiving exculpation for in clauses (a) through (r));
provided, that, solely with respect to the Debtors' directors and officers, this clause (s) shall apply only to (i) the
Existing Directors (and their counsel) and (ii) the Debtors' officers who continued to serve in such roles as of
March, 28, 2017 (the initial filing of this Plan)."

20

to the necessity of the releases and exculpations, I believe that the Injunction is a key component

of the Debtors' ultimate reorganization and the success thereof.

**III.    The Plan Satisfies The Other Confirmation Requirements Found In Section 1129(a) of the Bankruptcy Code.**[18]

   **A.    Section 1129(a)(2)**

34.    I have been advised that the principal purpose of section 1129(a)(2) of the

Bankruptcy Code is to ensure that a plan proponent has complied with sections 1125

(postpetition disclosure and solicitation) and 1126 (acceptance of plan) of the Bankruptcy Code.

To that end, I understand that pursuant to the Disclosure Statement Order[19] entered on June 13,

2017, the Court approved, among other things: (a) the Debtors' Disclosure Statement as

containing adequate information within the meaning of section 1125 of the Bankruptcy Code; (b)

the other solicitation materials transmitted to creditors entitled to vote on the Plan; (c) the timing

and method of delivery of such materials; and (d) the process and timeline for soliciting and

tabulating votes on the Plan and for filing objections to the Plan.

35.    Consistent with the Court's Disclosure Statement Order, it is my

understanding that the Debtors, with the assistance of Prime Clerk LLC ("Prime Clerk"), the

Debtors' claims and noticing agent, distributed Solicitation Packages (as defined in the

---

[18]    Certain of the plan confirmation requirements under section 1129(a) of the Bankruptcy Code are not addressed herein but are addressed in other declarations in support of confirmation of the Plan, such as section 1129(a)(7) (best interests requirement, as addressed in the declaration of Steven Fleming, on behalf of PricewaterhouseCoopers LLP).  Sections 1129(a)(8) and 1129(a)(10) are not addressed herein since the Debtors' voting and solicitation process remains ongoing as the voting deadline is July 13, 2017.  Other subsections of section 1129(a) that are not addressed herein are either not applicable (i.e., sections 1129(a)(6), 1129(a)(13)-(16)), have been addressed in the Plan as appropriate without the need for further support by way of this Declaration, or will be addressed in other declarations to be filed.

[19]    See Order (A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Proposed Plan; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto [Docket No. 3319] (the "Disclosure Statement Order").

21

Solicitation Procedures attached as Exhibit 5 to the Disclosure Statement Order (the "Solicitation

Procedures") to approximately 5,620 creditors holding Claims in their respective voting classes

(Classes 1A – 1B and 4A – 4E).  I further understand that a printed copy of the Confirmation

Hearing Notice (as defined in the Solicitation Procedures) was mailed to approximately 175,804

parties in interest, which included registered and beneficial shareholders, the creditor matrix, the

Core/2002 service list, and the mailing agents and nominees for all bond and equity holders.

Furthermore, I understand the Confirmation Hearing Notice was published in: the national

edition of *The New York Times*, *San Francisco Chronicle*, *Houston Chronicle*, and the

*Oregonian* on June 16, 2017, and (i) the global edition of *The Wall Street Journal*, *San Matea*

*Daily Journal*, and *St. Louis Post-Dispatch* on June 19, 2017, as evidenced by the affidavit of

publication filed by Prime Clerk on June 22, 2017 [Docket No. 3415].[20]

## B. Section 1129(a)(3)

36.      I believe that – as I have been advised is required under section 1129(a)(3)

of the Bankruptcy Code – the Plan has been proposed in good faith, with the legitimate and

honest purpose of reorganizing the Debtors' remaining businesses, and maximizing the value of

the Estates and the recovery to the Estates' constituents.  Moreover, the Plan, as filed and

disseminated with the Disclosure Statement, reflects numerous comments and compromises by

various creditor constituencies and other parties in interest.  As has been well-chronicled in my

quarterly CRO reports[21] and the Debtors' motions to extend the exclusivity periods,[22] and as is

---

[20]    As set forth in the Solicitation Procedures, Prime Clerk will file a voting report in advance of the Confirmation
        Hearing that includes the voting results and information related thereto, such as irregular ballots (and the
        treatment thereof) and any voting deadline extensions.

[21]    My quarterly reports were submitted on August 17, 2016 [Docket No. 1021], December 22, 2016 [Docket No.
        1979], March 31, 2017 [Docket No. 2711], and June 13, 2017 [Docket No. 3322].

[22]    Docket Nos. 826, 1492, 2152, and 2455.

detailed herein and in the Disclosure Statement, the Plan is the product of extensive negotiations

with key parties in interest and is the result of extensive good-faith efforts to reorganize.

37.    I believe that the significant settlements and agreements that are embodied

in the Plan (including, without limitation, the YieldCo Settlement Agreements, the

Committee/BOKF Plan Settlement, and the D&O Settlements) and the resulting support that has

been garnered to date from the YieldCos, the Ad Hoc Group, and the Creditors' Committee,

among others, are a testament to the overall fairness of the Plan and the acknowledgement that

the Plan has been proposed in good faith and for proper purposes.  Moreover, it is important to

reiterate, as noted above, that these key settlements and definitive agreements would not have

materialized without the extensive negotiations that were conducted in good faith and at arm's-

length by sophisticated parties represented by separate counsel, and they reflect the considerable

effort the Debtors expended over the course of these Chapter 11 Cases to successfully bring

parties together and preserve value to the benefit of the Debtors' estates and creditors.

38.    As such, for the reasons set forth herein, I believe it is within the Debtors'

reasonable business judgment to effectuate these key settlements and agreements through which

the Debtors' estates stand to realize tangible and significant value to the benefit of the Debtors'

stakeholders.

39.    Accordingly, I believe that the Plan is proposed by the Debtors in good

faith, and in the best interests of all creditors and should be confirmed.

C.    **Section 1129(a)(4)**

40.    I understand that section 1129(a)(4) of the Bankruptcy Code requires that

any and all fees promised or received from the debtor's estate in connection with or in

contemplation of a chapter 11 case, including with respect to professional fees, must be disclosed

and subject to the Court's review and approval.  It is my understanding that all payments made or

23

to be made by the Debtors for services, costs, or expenses in connection with the Chapter 11

Cases, including all Professional Claims, have been approved by, or are subject to the approval

of, the Court as reasonable.  Further, pursuant to Article 2.3(a), the Plan provides that

professionals retained by the Debtors and the estates in these Chapter 11 Cases are required to

file final fee applications with the Court no later than sixty (60) days after the Effective Date.

Subparagraph (j) of Article XIII of the Plan provides that the Court will retain jurisdiction to hear

all applications for allowance of compensation or reimbursement of expenses of professionals.

41.    Accordingly, it is my understanding that the Plan fully complies with the

requirements of section 1129(a)(4) of the Bankruptcy Code.

**D.    Section 1129(a)(5)**

42.    I understand that section 1129(a)(5) of the Bankruptcy Code requires that

a plan may be confirmed only if the proponent discloses the identity of those individuals who

will serve as management of the reorganized debtor, the identity of any insider to be employed or

retained by the reorganized debtor and the nature of any compensation to be paid to such insider,

and the appointment of, or continuation in office of, existing management must be consistent

with the interests of creditors, equity security holders, and public policy.  The Debtors will

disclose any known directors and officers, member candidates, or future board members prior to

the Confirmation Hearing, or upon designation as a director or officer if designated as such prior

to the Effective Date, and that (as set forth above with respect to the requirements of section

1123(a)(7) of the Bankruptcy Code) the Debtors have disclosed the manner in which such

officers and directors will be selected.

**E.    Section 1129(a)(9)**

43.    I have been advised that section 1129(a)(9) of the Bankruptcy Code

requires that persons holding claims entitled to priority under section 507(a) of the Bankruptcy

24

Code receive specified cash payments under the plan of reorganization. It is my understanding that the Plan satisfies these requirements. Subject to the terms of Article II of the Plan:

- Each holder of an Allowed Administrative Claim will be paid in full in Cash on (i) the Effective Date, (ii) such other date as may be agreed upon between the holder of such allowed Administrative Claim and the Debtors or the Reorganized Debtors, or (iii) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, then in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim;

- Each holder of an Allowed Priority Tax Claim will receive (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim to be paid by the Effective Date, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder to be paid by the Effective Date or a later date agreed upon by the parties, or (c) Cash in the aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at a rate determined under applicable non-bankruptcy law, payable in installment payments over a period of not more than five (5) years after the Petition Date; and

- Each holder of an Allowed Other Priority Claim (that is due and payable on or before the Effective Date) will receive Cash in an amount equal to the amount of such Allowed Other Priority Claim to be paid on the Effective Date or such later date agreed upon by the Holder of such claim and the Debtors or the Reorganized Debtors.

44.     Accordingly, I believe the Plan complies with the mandatory treatments of certain specified priority claims under a plan of reorganization as required under section 1129(a)(9).

F.     **Section 1129(a)(12)**

45.     I have been advised that, as required by section 1129(a)(12) of the Bankruptcy Code, Article 14.2 of the Plan expressly provides that all statutory fees payable pursuant to 28 U.S.C. § 1930 (as determined by the Court at the Confirmation Hearing on the Plan) will be paid by the Debtors on the Effective Date, or thereafter will be paid by the Reorganized Debtors until the Chapter 11 Cases are closed by Final Decree. Further, it is my understanding that the Debtors have paid all Chapter 11 statutory and operating fees in the ordinary course as required to be paid during the Chapter 11 Cases.

25

**CONCLUSION**

46.    As evidenced by the foregoing, I believe that the Plan and the settlements, comprises, agreements embodied therein have been structured to accomplish the Debtor's goal of maximizing the estates' value.  I believe that the significant settlements achieved, as set forth herein, as well as the support of certain of the Debtors' key creditor constituencies (including the Creditors' Committee) further reflects the overall fairness and reasonableness of the Plan and that the Plan has been proposed in good faith and for proper purposes.  As a result, I believe that the Plan will position the Reorganized Debtors to successfully emerge from chapter 11 and continue to maximize value for stakeholders.

47.    I hereby reserve my right to amend the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

26

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 7, 2017

/s/ *John S. Dubel*
John S. Dubel
Chief Executive Officer and
Chief Restructuring Officer

27