```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                                                     :    Chapter 11
                                                           :    Case No. 16-10992 (SMB)
SUNEDISON, INC., et al.,                                   :    (Jointly Administered)
                                                           :
                                                           :
                  Debtors.                                 :
-----------------------------------------------------------X
```

## MEMORANDUM DECISION AND ORDER
## OVERRULING SHAREHOLDER OBJECTIONS
## TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

**A P P E A R A N C E S:**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

> Anthony W. Clark, Esq.
> Jay M. Goffman, Esq.
> J. Eric Ivester, Esq.
> James J. Mazza, Jr., Esq.
> Louis S. Chiappetta, Esq.
>     Of Counsel

*Attorneys for the Debtors*

MICHAEL SKLORENKO
5276 Summerlin Commons Way
Suite 703
Fort Myers, Florida 33907

JORDAN DANELZ
2240 Oliver Avenue
Memphis, Tennessee 38104

Shareholders *Pro se*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

   The Court confirmed the *Second Amended Joint Plan of Reorganization of*

*SunEdison, Inc. and Its Debtor Affiliates*, dated July 20, 2017 (the "*Plan*") by order

dated July 28, 2017. (*See* ECF Doc. # 3735.)[1] The *Plan* did not provide for any distribution to Class 8A, the equity in publically-traded SunEdison, Inc. ("SUNE"), and cancelled their interests. Michael Sklorenko and Jordan Danelz (together, the "Shareholders"), members of Class 8A, objected to the *Plan*, (*see Corrected Objection of the Shareholders Michael Sklorenko and Jordan Danelz to Confirmation of the First Amended Joint Plan of Reorganization of SunEdison Inc. and Its Debtor Affiliates*, dated July 12, 2017 (the "*Objection*") (ECF Doc. # 3624)), and the Court also received numerous emails from other shareholders during the fifteen months since SUNE has been in bankruptcy raising many of the same issues as well as others.

The objections generally involved two related questions: (1) what was the current value of SUNE and its debtor and non-debtor affiliates that is available for distribution, and (2) assuming that the Debtors currently have approximately $1 billion for distribution, as they claim, what happened to the roughly $24 billion that SUNE raised between 2013 and 2015. Additional arguments concerned the Debtors' inability to produce audited financial statements; the last *unaudited* financial statements covered the third quarter of 2015. Many of these objections concerned disclosure rather than confirmation issues, and the Court overruled the confirmation objections following the conclusion of the confirmation hearing. This memorandum and order explains why.

---

[1] "ECF Doc. #" refers to documents filed on the electronic docket of this case. A copy of the confirmed *Plan* is attached to the July 28, 2017 order confirming the *Plan*.

## BACKGROUND

At all relevant times, SUNE and its subsidiaries were engaged in the business of developing renewable-energy projects, primarily involving solar energy, throughout the world. (*See First Amended Disclosure Statement for the First Amended Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated June 12, 2017 ("*Disclosure Statement*"), at 14 (ECF Doc. # 3314).)[2] SUNE contributed the completed projects to TerraForm Power, Inc. ("TERP") and TerraForm Global, Inc. ("Global," and together with TERP, the "YieldCos"), two publically-traded non-debtor subsidiaries. (*Id.* at 14-15.) In exchange, SUNE received substantial stakes in the YieldCos at the time of their IPOs. (*Id.* at 14-15.)

Creating the YieldCos required intensive capital to build their portfolios prior to their IPOs, and to grow them thereafter. (*Id.* at 15.) Between March 2013 and September 2015, SUNE raised approximately $24 billion in debt and equity. Schedule D to the *Disclosure Statement*, entitled "SunEdison, Inc. Capital Analysis," provides some detail regarding the sources and uses of these funds. A substantial portion of the proceeds, $5.8 billion, was used to repay existing debt. Other significant categories or buckets of expenditures included "Cash Used in Operations" ($2.613 billion), "Total Capital Expenditures" ($4.151 billion), and "Cash Paid for Acquisitions" ($3.082 billion). By the end of September 30, 2015, the Debtors were reporting $2.393 billion in cash and $4.504 billion in shareholder equity.

---

[2] The *Disclosure Statement* was received in evidence as Debtors' Exhibit ("DX") 2 at the confirmation hearing. Subsequent citations to "DX" refer to a Debtors' exhibit received in evidence at that hearing.

The reliability of the Debtors' financial information was open to question. During March 2016 and the early part of April 2016, SUNE issued several Forms 8-K which disclosed, among other things:

> (1) SUNE's auditors were unable to finalize their audit for the calendar year 2015 "due to the identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems,"
>
> (2) SUNE's audit committee (the "Audit Committee") had not completed its investigation of SUNE's previously disclosed financial condition,
>
> (3) SUNE had received a subpoena from the United States Department of Justice relating to SUNE's financing activities concerning its proposed acquisition, subsequently terminated, of Vivint Solar, Inc., the alleged wrongdoing of a former employee in connection with the Vivint termination negotiations, investigations by the Audit Committee, intercompany transactions between SUNE and the YieldCos and the financing of projects in Uruguay,
>
> (4) SUNE had received an informal, nonpublic inquiry from the Securities and Exchange Commission ("SEC") covering similar areas, and
>
> (5) the Audit Committee had completed its investigation, had not identified material misstatements in SUNE's historical financial statements or substantial evidence of willful misconduct of management (other than the conduct of one former employee with respect to the Vivint negotiations), but did identify several specific issues regarding SUNE's cash forecasting and liquidity management practices, including, among other things, that cash forecasting efforts lacked sufficient controls and processes, the cash forecasts were overly optimistic and SUNE lacked sufficient controls and processes to manage cash flows, including the extension of accounts payable and the use of cash committed to projects.

*In re SunEdison, Inc.*, 556 B.R. 94, 98-99 (Bankr. S.D.N.Y. 2016).

On April 21, 2016, SUNE and numerous affiliates filed chapter 11 cases in this Court.[3] The Debtors reported that as of the petition date, they owed $3.832 billion in

---

[3] Additional affiliated debtors subsequently filed chapter 11 cases.

funded debt and another $4.904 billion in trade and non-recourse debt.  (*Declaration of Patrick M. Cook Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Pleadings*, dated Apr. 21, 2016, at 16 (ECF Doc. # 4).)  Repeating the information in the financial statements filed with the SEC as of the end of the third quarter of 2015, SUNE continued to report shareholder equity in excess of $4 billion.

After the filing, the Court received numerous emails and letters from shareholders requesting the appointment of an official equity committee.  Many shareholders had invested in SUNE stock based on the optimistic outlook expressed by SUNE and the financial community as a whole, and could not understand what had happened to all the money that had been raised or the reason for the bankruptcy of a company that was reporting over $4 billion in equity.  As a result, the Court issued an order to show cause scheduling a hearing to determine whether to appoint an official equity committee.

The Court subsequently conducted an evidentiary hearing at which two *ad hoc* groups of shareholders were represented by different counsel.  The testimonial and documentary evidence showed that despite the values reflected in the unaudited financial statements, the Debtors would probably realize no more than $1.5 billion from the orderly liquidation of their assets, well shy of the $4.2 billion in secured and unsecured debt disclosed by the evidence.  *SunEdison*, 556 B.R. at 101, 104.  Accordingly, the Court declined to appoint an official equity committee because SUNE appeared to be hopelessly insolvent and equity's interests were adequately represented by the Official Committee of Unsecured Creditors (the "Committee").  *Id.* at 106.  The

Court stated that the shareholders remained free to participate in the case and form *ad hoc* committees, and apply for compensation and expense reimbursement if they made a substantial contribution to the case, but the shareholders would have to bear that expense in the first instance; it could not be foisted on the creditors. *Id.* at 105. The Court also left open the possibility that the shareholders could renew the application to appoint an official equity committee if the circumstances changed. *Id.* at 107.

Notwithstanding the Court's findings, the Debtors monthly operating reports ("MOR") continued to report substantial equity, now approximately $6 billion on a "combined" basis. (*E.g.*, ECF Doc. # 1549, at 28; ECF Doc. # 1695, at 28; ECF Doc. # 2136, at 28.) The MORs prompted questions by shareholders and renewed requests for the appointment of an official equity committee. As a result of these requests, the Court conducted an evidentiary hearing on January 12, 2017, at which it heard the testimony of Homer Parkhill, the Debtors' financial advisor, and Salvatore LoBiondo, Jr., the Debtors' controller. Several shareholders participated directly and cross-examined the witnesses, while others listened in over the telephone.

Mr. Parkhill explained that SUNE was a development company whose assets consisted primarily of projects that had not reached completion and required significant capital to complete. (Transcript of 1/12/17 H'rg ("Tr."), at 45:11-25 (ECF Doc. # 2271).) In addition, the projects had to be completed by certain deadlines, and in light of the capital restraints, the Debtors unable to complete these projects. (Tr. at 46:14-47:11.) Lacking capital and time, the Debtors embarked on a program to sell the unfinished projects. (Tr. at 47:6-15.) He also opined that the current market price for the YieldCos' shares, the Debtors' main asset, already reflected the Debtors' control premium because

the market was aware that the YieldCos were in play, and had factored in that premium. (Tr. at 49:7-22; 50:12-21.) Substantially reiterating the value evidence he gave at the first hearing to appoint an official equity committee, he estimated that the total amount available for distribution after repayment of $251 million in debtor in possession financing was $1.216 billion, (*Declaration of Homer Parkhill in Response to Certain Requests to Appoint an Official Committee of Equity Security Holders*, dated Jan. 11, 2017, at ¶ 4 (ECF Doc. # 2216)), and confirmed this amount included the value attributable to all debtor and non-debtor subsidiaries. (Tr. at 51:6-23.)

Mr. LoBiondo's testimony explained why the MORs showed significant shareholder equity. The MORs (like the financial statements) were based on recorded book values. The assets were inflated because they combined the Debtors' financial information rather than consolidate it. (Tr. at 70:13-72:11.) By combining the Debtors' financial information, the MORs double-counted and sometimes triple-counted the same investment. (Tr. at 72:12-25.)

He also explained the reason for the Debtors' decision to forego the preparation of audited financial statements, an issue often raised by shareholders. The Debtors would have had to prepare the books and records for an audit, the auditors would take as much as nine months to complete the audit, and the audit could cost "maybe five, ten million dollars." (Tr. at 74:21-75:4.) It was a waste of time and money to go through the process of auditing the Debtors' financial statements and revaluing their assets on a project-by-project basis because the Debtors were liquidating their assets, and the sale prices would reflect the fair market value of those assets. (Tr. at 76:21-77:6.)

There were additional reasons to forego an expensive, time-consuming audit. The Debtors were already disclosing financial information in the MORs, and the financial information relating to the non-debtor affiliates (not including the YieldCos) was disclosed in the reports filed pursuant to Federal Bankruptcy Rule 2015.3.[4] (Tr. at 75:6-12.) Furthermore, it was unlikely that the Debtors would emerge from chapter 11 as a public company, and if they emerged as a private company, they would no longer have to file Form 10-K with the SEC. (Tr. at 75:19-76:3.) Moreover, upon emergence, they would have to revalue their remaining assets under principles of fresh start accounting. (Tr. at 76:4-11.) As the Debtors' financial picture of hopeless insolvency had not changed, the Court again saw no reason to appoint an official equity committee.

The Debtors provided more information regarding the value available for distribution to their stakeholders at the confirmation hearing. Mr. Parkhill testified that the Debtors' distributable assets totaled $1.044 billion. (*See Declaration of Homer Parkhill in Support of Debtors' First Amended Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated July 8, 2017 ("*Parkhill Declaration*"), at ¶ 6 (DX 8) (ECF Doc. # 3533).) The largest bucket of value was attributable to their interests in the YieldCos, worth $835 million. (*Id.* at ¶ 9.) He forecasted that the present value of the Debtors' post-emergence cash flows, based on earn outs and future

---

[4]  Federal Bankruptcy Rule 2015.3(a) provides:

(a) REPORTING REQUIREMENT. In a chapter 11 case, the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest. The reports shall be prepared as prescribed by the appropriate Official Form, and shall be based upon the most recent information reasonably available to the trustee or debtor in possession.

- 8 -

sales of Debtor and non-Debtor assets, would be $64 million. (*Id.* at ¶ 10.) In addition, the Debtors had $82 million in cash. (*Id.* at ¶ 11.) Other categories of assets included D&O insurance proceeds ($32 million), the initial funding for the GUC/Litigation Trust ($8 million), the allocation from the YieldCo avoidance action settlement ($18 million) and the voluntary professional fee reduction ($5 million), all of which would be paid to the unsecured creditors pursuant to their settlement with the Debtors and other parties. (*See id.*) Other proof showed that the Debtors valued future avoidance recoveries in the approximate amount of $82 million to be divided between the unsecured creditors and the second lien lenders in accordance with the global settlement reached in the case. (*Supplemental Declaration of John S. Dubel in Support of Confirmation of the First Amended Joint Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated July 18, 2017, at ¶¶ 28-30 (DX 5) ("*Supplemental Dubel Declaration*") (ECF Doc. # 3646).)

In contrast, the Debtors owed their DIP lenders and their other administrative, priority, secured and unsecured creditors $6.2235 billion. (*Parkhill Declaration* at ¶ 13.) After satisfying the DIP lenders and administrative and priority creditors, the balance to be divided between the unsecured creditors and the second lien class was roughly $170 million. The second lien creditors and the Committee had fought over the rights to the remaining value but reached agreement through a global settlement. As a result of the global settlement, the unsecured creditor class will receive $136.6 million on unsecured claims aggregating $4.692 billion, or a distribution of approximately 2.9% on their claims. (*Supplemental Dubel Declaration*, Ex. 1.) The second lien class will

receive $34 million on claims aggregating $ 625.2 million, reflecting a 5.4% distribution. (*Id.* at ¶ 33 & Ex. 1.)

**The Shareholders' Objection**

The Shareholders filed the *Objection* prior to the confirmation hearing. They asserted that the *Plan* was not fair and equitable to the equity holders under section 1129(b) of the Bankruptcy Code and was not proposed in good faith in violation of section 1129(a)(3) of the Bankruptcy Code. (*Objection* at ¶¶ 7-16.) In particular, they pointed to the "massive difference between the book value of the Debtors' assets as of their April 21, 2016 petition date – over $10.5 Billion when excluding Goodwill, and assets of the [non-debtor YieldCos] – and the distributable assets values, now supposedly only $1.044 Billion." (*Id.* at ¶ 8.) The Shareholders also argued that the Debtors failed to provide adequate information regarding the value of their assets and stymied the equity holders' efforts to obtain such information. (*Id.* at ¶¶ 12-16; 22.)

Other SUNE shareholders sent emails to the Court emails, before and after the confirmation hearing and the entry of the order confirming the *Plan*, requesting similar as well as other relief. Virtually all sought more time and money to conduct an investigation into possible value and to explain the shortfall between book value (and reported shareholder equity) and the fair market value as reflected in the evidence received by the Court at the initial hearing to appoint an official equity committee, the renewed hearing to appoint an official equity committee and the confirmation hearing. They also urged the Court to require the Debtors to file audited financial statements.

## DISCUSSION

Section 1129(b) allows the bankruptcy court to confirm a plan over a dissenting class of claims or interests if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired, and has not accepted, the plan," and the requirements of 1129(a) (other than subsection (a)(8)) are satisfied. 11 U.S.C. § 1129(b)(1). The process of confirming a plan over a dissenting class is called a "cram down." *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999). Class 8A, SUNE's interest holders, did not receive or retain any property under the *Plan,* and was deemed to have rejected it. Accordingly, the Debtors had to satisfy the requirements of § 1129(b) as to that class. 11 U.S.C. § 1126(g).

The Bankruptcy Code does not define unfair discrimination, but it is designed to protect against horizontal discrimination in the same way that the absolute priority rule prevents against nonconsensual vertical discrimination. In other words, the unfair discrimination test assures fair treatment among classes of the same priority level while the fair and equitable requirement ensures fair treatment among classes of different priority levels. Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 227, 227-28 (Spring 1998); *accord In re ICL Holding Co.*, 802 F.3d 547, 552 n. 4 (3d Cir. 2015) (Ambro, J.). In this case, no class has the same priority as Class 8A, and hence, the *Plan* does not unfairly discriminate against the class of SUNE shareholders.

The *Plan* must also be fair and equitable to Class 8A. A plan is "fair and equitable" with respect to a class of dissenting equity interest holders if it includes the following requirements:

> (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
>
> (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C). Subsection (ii) sets forth the absolute priority rule under which junior classes, absent consent, may not receive property unless all senior classes are paid in full. *DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 88 (2d Cir. 2011). An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims. *SunEdison*, 556 B.R. at 102 (quotation omitted); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)). If the estate proves to be solvent, the shareholders are entitled to the surplus. But just as the shareholders do not share their profits with the creditors, they do not share their losses either.

The Debtors demonstrated that the *Plan* was fair and equitable to Class 8A, and thus, satisfied their burden of cramming down the plan over the "deemed rejection" by the class. The unrefuted evidence received by the Court on three occasions, including the confirmation hearing, showed that the Debtors are hopelessly insolvent. They have approximately $1 billion in assets and over $6 billion in debt. They would have to come

up with $5 billion more in assets before equity would be entitled to a share. Furthermore, there is no junior class below Class 8A, and consequently, no junior class is receiving or retaining any value. Some shareholders have complained that wiping out their shares is unfair and unethical, (*e.g.*, ECF Doc. # 3694), but the Bankruptcy Code commands this result, and a court is not free to ignore the law and substitute its own notions of fairness.

Many shareholders have speculated, some with more certainty than others, that there is substantial additional value to recover and distribute. This belief is due, in large part, to the gross disparity between the recorded equity on SUNE's books and records (and MORs) and the value evidence described above as well as the failure to explain to the satisfaction of the shareholders the uses of the $24 billion that the Debtors raised. They argue for further investigation and explanation.

Despite the passage of fifteen months, no one has discovered sufficient additional value to bridge the $5 billion gap between solvency and insolvency, even though the creditors, like the shareholders, had great incentive to do so. The Debtors appeared to be hopelessly insolvent from the inception of the cases but investigations to date have not turned up evidence to support claims to recover material assets. In late 2015, the Audit Committee launched an investigation tied to allegations made by former executives. (*Disclosure Statement* at 35.) The Audit Committee retained Paul Hastings LLP and FTI Consulting as their independent counsel and financial consultants, respectively, to assist in performing the investigation. (*Id.*) On April 13, 2016, the Audit Committee concluded its investigation finding no material misstatements in SUNE's historical financial statements, and no substantial evidence supporting fraudulent or

- 13 -

willful misconduct by management with the exception of one non-executive employee. (*Id.*)

Post-petition, the Committee conducted an investigation into potential estate claims, brought litigation to preserve the D&O insurance and sought authority to assert claims against several of SUNE's current and former officers and directors for waste, mismanagement and breach of fiduciary duty. (*Id.* at 43-44.) These efforts ultimately led to a settlement among the Debtors, the Committee, and the proposed director/officer defendants under which the estates received $32 million from the D&O insurance. (*Id.* at 44-45.)

In December 2016, the Debtors retained Brown Rudnick LLP to investigate the estates' potential claims against the YieldCos, (*id.* at 36.), and the Committee requested standing to sue the YieldCos to avoid and recover pre-petition transfers. (*Id.* at 48.) Working closely with PricewaterhouseCoopers, Brown Rudnick's investigation entailed (a) reviewing hundreds of thousands of pages relating to the initial public offerings of the YieldCos, and other financing, sponsorship, and M&A transactions between SUNE and the YieldCos, (b) interviewing current and former members of SUNE's senior management, and (c) researching potential claims against the YieldCos. (*Id.*) Ultimately, the Debtors determined that the estates' claims against the YieldCos were worth between $9.4 million and $22.9 million, (*id.* at 51), and as part of another settlement, the Debtors' estates received $18 million on account of their potential claims against the YieldCos. (*Id.* at 52.)

Finally, the Committee commenced an adversary proceeding challenging the validity of the first and second lien debt, and along with BOKF, N.A. (the indenture trustee for convertible unsecured notes issued by SUNE), sought to disallow some $200 million of the debt as unmatured interest arising from original issue discount ("OID"). (*Id.* at 45-46.) The defendants moved to dismiss the complaint, the Court heard the motion (as well as the motion to disallow the OID), but the issues were ultimately resolved as part of a global settlement. (*Id.* at 46.) Each of the settlements was approved by the Court after notice and a hearing, and in some cases over a creditor's objection, pursuant to the criteria set forth in *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 461-62 (2d Cir. 2007).

Following these efforts, the overwhelming majority of creditors agreed to support a plan that pays materially lower distributions than the amount they would be entitled to from a solvent estate. The unsecured creditors are accepting less than 3% on their claims, and the second lien lenders, who invested over $700 million of fresh cash as late as January 2016, are accepting slightly more than 5% on their deficiency claims. The willingness to accept this treatment implies that those who are "in the money" have concluded that it is not cost-effective to spend any more of it in search of additional value. At the confirmation hearing, Mr. Sklorenko alluded to additional, unspecified value but this is not a substitute for evidence, and the evidence showed that the Debtors are more than $5 billion in the red. Emails that I have received from some shareholders also hint at a nefarious conspiracy involving the Debtors, creditors, lenders and others, or that the shareholders are the victims of theft and robbery, (*e.g.*, ECF Doc. ## 1108,

2323, 3723), but no probative evidence of any post-petition wrongdoing has been presented to the Court.[5]

It is all well and good for the shareholders to request or demand a further investigation, or the appointment of an official equity committee to undertake it, but somebody has to pay for it, and the creditors are unwilling to spend the funds in the estate for that purpose. The shareholders have been free, individually or through *ad hoc* committees, to investigate claims or discover additional value, but as explained in the decision declining to appoint an equity committee, they had to front that cost, and assert claims for their substantial contribution thereafter. *SunEdison*, 556 B.R. at 105.

This does not answer the question posed by many shareholders: what happened to the equity reflected on the books and records and the money they invested? Along the same lines, many shareholders have questioned why the Debtors have not been compelled to supply audited financial statements. The *Disclosure Statement* provided some information regarding how the Debtors used the money they raised, but the short answer is that audited financial statements and what amounts to a forensic accounting analysis of the Debtors' books and records do not answer the central question in these cases: what is the value available for distribution? Financial statements reflect book value, which does not ordinarily equate to market value. *SunEdison*, 556 B.R. at 104. Moreover, as Mr. LoBiondo testified, audits are time consuming and very expensive. And although the auditing process would require the Debtors to write down their assets

---

[5] As noted earlier, certain of the Debtors' pre-petition activities have been under investigation by the Department of Justice and the SEC for over one year.

to fair market value through an appraisal process, the best evidence of fair market value comes from the arms-length sales that the Court has approved in the course of these cases. Any remaining assets will be valued as part of the fresh start accounting required by GAAP. Finally, the Debtors are emerging from bankruptcy as a non-public company, and will not need to comply with the requirements for financial disclosure that public companies must satisfy.

At bottom, these numerous investigations and lawsuits have failed to uncover any claims of sufficient value to cover the $5 billion shortfall, and no one has provided evidence that something was missed. Accordingly, the *Objection* is overruled and the request to appoint an official equity committee is denied for the same reason that the Court denied the first request, except that the Debtors do not just appear to be hopelessly insolvent, they are hopelessly insolvent. To the extent that the Court has not specifically discussed an issue raised by the Shareholders or in the shareholder emails, the Court concludes that they lack merit.

So ordered.

Dated: New York, New York
August 7, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Court