WACHTELL, LIPTON, ROSEN & KATZ
Bradley R. Wilson
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Fax: (212) 403-2000

*Counsel for Peter Blackmore, Christopher
Compton and Jack F. Stark*

WILMER CUTLER PICKERING HALE AND
DORR LLP
Timothy J. Perla
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

*Counsel for Hanif Dahya*

SULLIVAN & CROMWELL LLP
Andrew G. Dietderich
John L. Hardiman
Veronica W. Ip
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

*Counsel for TerraForm Global, Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| | ) Chapter 11 |
| In re: | ) |
| SUNEDISON, INC., *et al.*,[1] | ) Case No. 16-10992 (SMB) |
| Debtors. | ) |
| | ) Jointly Administered |

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); and TerraForm Private Holdings, LLC (5993). The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

**JOINT MOTION OF TERRAFORM GLOBAL, INC. AND
THE ALDRIDGE DEFENDANTS FOR AN ORDER GRANTING
LIMITED RELIEF FROM THE AUTOMATIC STAY**

TerraForm Global, Inc. ("Global"), along with Peter Blackmore ("Blackmore"),
Christopher Compton ("Compton"), Jack F. Stark ("Stark") and Hanif Dahya ("Dahya" and
together with Blackmore, Compton and Stark, the "Aldridge Defendants"), hereby submit this
joint motion (the "Motion") for entry of an order, substantially in the form attached hereto as
Exhibit A (the "Proposed Order"), for limited relief from the automatic stay, to the extent
applicable, to permit the D&O Insurers (as defined below) to pay $1.625 million (the
"Incremental Settlement Amount") from the ABC Tower (as defined below) in connection with
the settlement of the action captioned *Aldridge* v. *Blackmore, et al.*, C.A. No. 12196-CB (Del.
Ch.) (the "Aldridge Lawsuit").

In support of the Motion, Global and the Aldridge Defendants rely upon and incorporate
by reference the Declaration of Timothy J. Perla, partner with the law firm Wilmer Cutler
Pickering Hale and Dorr LLP (the "Perla Declaration"), filed concurrently herewith.  In further
support of this Motion, Global and the Aldridge Defendants, by and through their undersigned
counsel, respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.    On June 29, 2017, this Court issued an "Order Granting Debtor's Motion for
Order Pursuant to Bankruptcy Code Sections 105 and 363(B), and Bankruptcy Rules 6004 and
9019, Authorizing and Approving D&O Mediation Settlement Agreement and D&O Insurance
Cooperation Agreement" [Docket No. 3453] (the "Second Reimbursement Order").  The Second
Reimbursement Order modified the automatic stay, to the extent applicable, to permit the
payment and/or reimbursement by the D&O Insurers of any settlements of certain Specified
Claims (as defined below) brought against Global and/or TerraForm Power, Inc. ("TERP" and

-2-

together with Global, the "Yieldcos") up to an aggregate amount of $32 million (the "Second Interim Cap Amount"). The Yieldcos have since reached agreement to settle two of the Specified Claims, subject to insurance funding.

2.    The first of these, reflected in a Memorandum of Understanding dated June 28, 2017 and reached after a full day of mediation in which the D&O Insurers participated, was for *Chamblee* v. *TerraForm Power, Inc. et al.*, No. 16-cv-08039 PKC (S.D.N.Y.) (the "Chamblee Lawsuit"). That settlement is in the amount of $14.75 million (the "Chamblee Settlement"), with $1.125 million being paid by TERP and the remainder ($13.625 million) coming from the ABC Tower. The $13.625 million to be paid by the D&O Insurers for the Chamblee Settlement falls squarely within the $32 million in authority already granted under the Second Reimbursement Order. Additional factual background information regarding the Chamblee Lawsuit and Chamblee Settlement is set forth in detail in the Perla Declaration.

3.    The second settlement, also negotiated with the assistance and consent of the D&O Insurers, is for *Aldridge* v. *Blackmore, et al.*, C.A. No. 12196-CB (Del. Ch.), in which a Memorandum of Understanding was executed by the parties on July 14, 2017. That settlement is in the amount of $20 million (the "Aldridge Settlement"). The Second Reimbursement Order entered by this Court already authorized payment by the D&O Insurers under the ABC Tower of up to $18.375 million of the $20 million required for the Aldridge Settlement. However, because the total of the Chamblee Settlement and the Aldridge Settlement exceeds $32 million, the Aldridge Settlement requires an additional $1.625 million in insurance from the D&O Insurers beyond the $32 million previously authorized by the Second Reimbursement Order. Importantly, the Second Reimbursement Order was expressly without prejudice to the right of TERP or Global to make a further motion to the Court for additional insurance funding. The

Second Reimbursement Order permits payment and/or reimbursement of any settlements "without prejudice to the rights of any party to seek further relief from the Court with respect to the Specified Claims or otherwise on or after the Confidential Amended Deadline" (Second Reimbursement Order, para. 14).

4.      Considering that the insurance funds are the property of Global and the Aldridge Defendants (as additional insureds under the policies) as well as of the Debtors, relief from the stay to access this Incremental Settlement Amount may not be required.  However, to the extent the Court believes relief from the stay is required, payment of the Incremental Settlement Amount to resolve the Aldridge Lawsuit is justified and beneficial to the Debtors' estate because the Aldridge Settlement fulfills a condition to the closing of the Brookfield Asset Management, Inc. ("Brookfield") merger with Global, a transaction that is critical to providing the Debtors with valuable liquidity and enabling the Debtors to emerge from bankruptcy.  Moreover, absent closing of the Brookfield transaction, a condition to the settlement agreement reached between Global and the Debtors, which provides releases to the Debtors from a variety of substantial claims by Global, will not be satisfied.

5.      Removing the $1.625 million Incremental Settlement Amount from available insurance proceeds will not materially reduce the remaining limits of the ABC Tower, which will be approximately $56.8 million after all defense costs submitted to the D&O Insurers as of August 18, 2017 have been paid.  In addition, the Debtors' directors and officers have available to them an additional $50 million under SunEdison's Side A Difference in Conditions Policies (the "Side A DIC Policies" and together with the ABC Tower, the "D&O Policies").  Plus, the Aldridge Settlement will effectively reduce the ABC Tower limits by only $4-$5 million because Global already committed to use the net proceeds obtained from the Aldridge Settlement

(estimated to be approximately $15-$16 million after payment of attorneys' fees) to resolve the

remaining claims brought against Global.  Doing so will thus free up $15-$16 million in ABC

Tower limits that would otherwise be needed for settlement of these other covered claims.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction to consider and determine this matter

pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief

requested herein are Sections 105(a) and 362(d)(1) of Title 11 of the United States Code (the

"Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rule 4001-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court

for the Southern District of New York.

## FACTUAL BACKGROUND

**The D&O Policies**

7.     SunEdison, TERP and Global, as well as their respective directors and officers,

are all insureds under shared D&O policies providing coverage for loss incurred by directors and

officers that is not indemnified by the company they serve ("Side A"); coverage of a company's

obligation to indemnify its officers and directors ("Side B"); and coverage for securities claims

against the company itself ("Side C") (and, together with Side A and Side B, the "ABC Tower").

As described in the Perla Declaration, this shared ABC Tower provided $150 million in

aggregate coverage to each of SunEdison, Global and TERP, approximately $58.4 million of

which remains as of August 18, 2017 after taking account of the $32 million this Court has

already authorized under the Second Reimbursement Order for the Chamblee and Aldridge

settlements.  In addition, SunEdison has $50 million in Side A DIC Policies which provide coverage for unindemnified directors and officers of SunEdison.

8.      The Proposed Order sought will enable the D&O Insurers to provide a further $1.625 million to settle the Aldridge Lawsuit.  Following these settlements, there will be approximately $56.8 million remaining under the ABC Tower plus the additional $50 million in Side A DIC Policies available to SunEdison's directors and officers.

**This Court's Previous Orders Granting Disbursement of Funds Under the ABC Tower**

9.      On May 20, 2016, this Court entered two "Order[s] Granting Debtors' Motions for Order[s] Pursuant to Bankruptcy Code Sections 105 and 362, Bankruptcy Rule 4001, and Local Bankruptcy Rule 4001-1 Authorizing Modification of the Automatic Stay, to the Extent Applicable, to Allow for Reimbursement and/or Payment of Defense Costs Under Directors' and Officers' Insurance Policies" [Docket Nos. 367 and 368] (the "First Reimbursement Orders"), which modified the automatic stay to permit Berkley Insurance Company, Berkshire Hathaway Insurance Company, Aspen American Insurance Company, Freedom Specialty Insurance Company and Continental Casualty Company (collectively, the "D&O Insurers") to reimburse up to $12 million in defense costs collectively incurred by the Yieldcos (and their directors and officers) and up to $8 million in defense costs incurred by SunEdison (and its directors and officers).[2]

10.      On June 7, 2017, the Debtors moved this Court to permit the D&O Insurers to make $64 million in payments to resolve pending litigation, with $32 million provided to the Debtors to resolve claims brought by the Unsecured Creditors Committee (the "UCC"), and $32

---

[2]      This Order also provided for subsequent increases in defense cost payments under the ABC Tower upon agreement of various parties to the SunEdison bankruptcy.

million provided to the Yieldcos to settle certain claims made against them and their respective directors and officers (the "Specified Claims"). Given the Yieldcos' shared interest in the ABC Tower, the Yieldcos conditioned consent to the funds being made available from the ABC Tower for the UCC settlement on at least an equal amount being made available to resolve the Specified Claims. This compromise was memorialized in the SunEdison/Yieldcos UCC Settlement Amended Agreement (the "D&O Insurance Cooperation Agreement"), which was attached as Exhibit 2 to the Debtors' June 7 motion authorizing the D&O Insurers to make aggregate payments of $32 million to settle one or more Specified Claims against the Yieldcos [Docket No. 3296].

11.     Notice of the Debtors' June 7 motion was duly provided to all interested parties, and following a hearing on June 28, 2017, this Court entered the Second Reimbursement Order on June 29, 2017, granting Debtors' motion and approving the D&O Insurance Cooperation Agreement.

12.     With respect to the $32 million in payments authorized to resolve claims against the Yieldcos, the Second Reimbursement Order modified the automatic stay, to the extent applicable, "to permit payment and/or reimbursement of any settlements . . . of the Specified Claims (as defined in the D&O Insurance Cooperation Agreement) . . . up to an aggregate amount of $32 million . . . " (Second Reimbursement Order, para. 14). Both the Aldridge and Chamblee Lawsuits are among the Specified Claims, as defined by the D&O Insurance Cooperation Agreement.[3] The D&O Insurance Cooperation Agreement further mandates that SunEdison, the Yieldcos and the Yieldcos' current directors and officers "agree to work with the

---

[3]     *See* Ex. 2 to "Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b), and Bankruptcy Rules 6004 and 9019, Authorizing and Approving D&O Mediation Settlement Agreement and D&O Insurance Cooperation Agreement" [Docket No. 3296].

Mediator to reach settlement agreements as to the claims against all defendants asserted in the

causes of action enumerated in the . . . Specified Claims" (D&O Insurance Cooperation

Agreement, para. 2). The Second Reimbursement Order does not require (nor did any of the

parties to the D&O Mediation Settlement Agreement or the Yieldcos anticipate) that $32 million

would be sufficient to resolve all of the Specified Claims. The Second Reimbursement Order is

expressly without prejudice to the right of any party, including TERP and Global, to seek further

relief from the Court with respect to the Specified Claims or otherwise (Second Reimbursement

Order, para. 14).

**The Chamblee Lawsuit**

13.    The Second Reimbursement Order thus left TERP and Global with $32 million to

divide to settle Specified Claims. The Chamblee Lawsuit was the only Specified Claim

implicating TERP. The Chamblee Lawsuit was a securities fraud class action in which plaintiffs

asserted that TERP and its officers and directors violated Section 10(b) of the Securities

Exchange Act of 1934 in multiple respects. The putative class period ran from July 18, 2014 to

March 15, 2016, and encompassed numerous allegedly misleading statements. TERP's share

price declined $4.66/share over the class period, as described in the Perla Declaration.

14.    The parties worked to reach a settlement of the Chamblee Lawsuit through

participation in a multi-party mediation presided over by former federal judge and highly

experienced mediator, Layn R. Phillips, and his organization, Phillips ADR (the "Mediation").

On June 28, 2017, the parties executed a Memorandum of Understanding, supported by the D&O

Insurers, to resolve the Chamblee Lawsuit for $14.75 million but with only $13.625 million of

the $14.75 million settlement amount to come out of the ABC Tower. (TERP agreed to pay the

remaining $1.125 million out-of-pocket.) Thus, TERP settled for less than half of the $32

million of insurance collectively allocated to TERP and Global under the Second Reimbursement
Order.

15.     A review of settlements of similar cases by the defendants' expert in Chamblee
resulted in a broad spectrum of potential settlement values, with a midpoint at $14 million—very
close to the proposed Chamblee Settlement amount and above the amount of insurance funds to
be tapped for the settlement.  Of course, the potential costs of not settling are high.  If any part of
the Chamblee complaint were to survive a motion to dismiss, the automatic discovery stay
imposed by the Private Securities Litigation Reform Act would end and discovery would begin.
TERP anticipated that discovery would be extensive and complicated, requiring review and
production of a large number of documents, as well as many depositions.  Costs and attorneys'
fees for completing discovery would run into the millions of dollars.  Moreover, given the
"plaintiff-style" damages ranges suggested by class action counsel in the Chamblee Lawsuit, any
potential damages judgment would likely be far in excess of the proposed settlement.
Defendants' damage expert calculated such damage claims to be in the range of $303.8 million
to $321.8 million.  Considering these factors, the Chamblee Settlement is clearly reasonable.

**The Aldridge Lawsuit**

16.     The Aldridge Lawsuit is a derivative action brought on behalf of Global against
four members of Global's board of directors, including the three directors who were members of
the Global board's Corporate Governance and Conflicts Committee (the "Conflicts Committee")
at the relevant time.  The Conflicts Committee is responsible for, among other things, reviewing
transactions between Global and SunEdison.  The Aldridge Lawsuit arose out of Global's
purchase from SunEdison of certain unfinished renewable energy projects in India in late 2015 in
exchange for a two-part "prepayment" of $231 million (the "India Transaction").  These energy

projects were supposed to be delivered to Global beginning in the first quarter of 2016.  Soon

after the India Transaction closed, however, it became apparent that as a result of SunEdison's

ongoing financial distress, the India projects were substantially underfunded and significantly

behind schedule.  It later became clear that the projects would never be delivered to Global

unless Global agreed to provide more funding to bring the projects to completion and transfer

them from SunEdison.  Ultimately, SunEdison failed to transfer even one of the India projects to

Global.  Global eventually consented to a sale of its interests in the unfinished India projects to

various third parties for a total of $6.7 million, a loss of over $224 million.

17.      On April 12, 2016, Jason Aldridge, a stockholder of Global, filed a derivative

complaint in the Delaware Court of Chancery on behalf of nominal defendant Global against the

three members of the Conflicts Committee (at the time) and a fourth independent director on

Global's board alleging that these defendants breached their fiduciary duties to Global by

approving the India Transaction in bad faith and without regard to whether or not the transaction

was in Global's best interest.

18.      The members of the Conflicts Committee answered the complaint, while the

fourth director filed a motion to dismiss.  The court denied that motion in a bench ruling issued

on December 8, 2016.  The court remarked that the circumstances that preceded the approval of

the India Transaction were "about as unusual . . . as you will ever see in corporate governance"

(Hr'g Tr. at 48, Dec. 8, 2016), and found that it was reasonably conceivable that the plaintiff could

eventually prove that the defendants had approved the India Transaction "to bail out SunEdison

rather than to advance the best interest of Global's stockholders" (*id.* at 65).

19.      Between January and June 2017, the parties to the Aldridge Lawsuit participated

in mediation, which included two rounds of mediation statements, two in-person mediation

sessions, and dozens of calls with the mediator's staff, as well as numerous direct calls between counsel for the parties.  Document discovery in the Aldridge Lawsuit proceeded in parallel following the expiration of this Court's stay order on March 31, 2017.  On July 14, 2017, the parties entered a Memorandum of Understanding to settle the Aldridge Lawsuit based upon a payment of $20 million from the ABC Tower to Global (less the amount of any future award of attorneys' fees by the Delaware court).  The settlement was subsequently memorialized in a Stipulation of Settlement dated July 21, 2017.  A notice to the shareholders of the settlement was distributed on July 25, 2017.  The Aldridge Settlement is subject to approval by the Delaware court, and that court has scheduled a hearing to consider the matter for October 10, 2017.

20.     The Aldridge Settlement is reasonable under the *Iridium* factors, which are used to determine whether a proposed settlement or compromise is in the best interests of a debtor's estate.  These factors include the support of parties in interest to the settlement, the extent to which the settlement was truly the product of an arm's-length bargaining, the risks and expenses of protracted litigation, and the benefits of the proposed settlement.  *Motorola Inc.* v. *Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).  The Aldridge Settlement clearly satisfies the first two factors, as all parties in interest to the Aldridge Lawsuit support the settlement, which was the result of a lengthy and hard-fought negotiation.

21.     The risks and costs of not resolving the Aldridge Lawsuit are substantial. Although defendants were prepared to mount a vigorous defense on the merits, it was clear from the Delaware court's remarks at a motion to dismiss hearing that the court had serious questions about the process that preceded the approval of the India Transaction.  And defendants' personal exposure, had they been held liable at the conclusion of a trial, was potentially significant:  in

-11-

that scenario, no indemnification from Global would be permitted under Delaware law. *See* Del.

Code. Ann. tit. viii, § 145(b) (permitting indemnification of expenses "incurred by the person in

connection with the defense or settlement of [derivative suits]" but not authorizing

indemnification of judgments or amounts paid in settlement in derivative suits); *In re Massey*

*Energy Co. Deriv. & Class Action Litig.*, 2011 WL 2176479, at *16 n.123 (Del. Ch. 2011)

(noting that corporations may not indemnify directors against amounts paid in settlements in

derivative suits); *Paolino* v. *Mace Sec. Int'l, Inc.*, 985 A.2d 392, 406 (Del. Ch. 2009) (stating that

in derivative lawsuits, "[s]ection 145(b) . . . prevent[s] a corporation from indemnifying a

covered person for judgments recovered by the corporation"). And finally, settling the Aldridge

Lawsuit now, rather than later, will save what would likely have amounted to millions of dollars

in additional defense costs.

22.    As to the final *Iridium* factor, the benefits of the Aldridge Settlement are

enormous. Because the Aldridge Lawsuit is a derivative action, the settlement funds will go to

Global less the amount the court determines should be paid to the plaintiff's attorneys as fees (an

amount currently estimated to be between $4 and $5 million). Global has committed to the D&O

Insurers to apply the funds it receives from the settlement toward the resolution of other Global-

related lawsuits that are covered by the ABC Tower. Thus, the settlement only removes $4 to $5

million from the proceeds available to settle outstanding litigation.

23.    Critically, under Section 7.2(c) of the Brookfield Merger Agreement, resolution

of the Aldridge Lawsuit is a prerequisite to the closing of the transaction. Therefore, resolving

the Aldridge Lawsuit will pave the way for the closing of Global's merger with Brookfield,

which is critical to the success of the Debtors' plan of reorganization. The closing of the merger

will benefit both Global and the Debtors, as SunEdison is Global's largest shareholder and will

-12-

therefore receive a significant share of the merger proceeds.  Moreover, the successful closing of

the Brookfield transaction is a condition to Global's settlement with SunEdison and the releases

provided by Global to SunEdison thereunder.

## RELIEF REQUESTED

24.    By this Motion, Global and the Aldridge Defendants seek entry of the Proposed

Order modifying the automatic stay, to the extent applicable, for the purposes of allowing the

D&O Insurers to pay and/or reimburse the Incremental Settlement Amount under the terms of

the ABC Tower, waiving the requirements of Bankruptcy Rule 4001(a)(3) and directing that the

Proposed Order granting the requested relief be effective immediately.

## BASIS FOR RELIEF

25.    Under the shared ABC Tower, Global's directors and officers have rights to coverage that

are equal to, and independent from, SunEdison's rights to coverage because the proceeds of the

ABC Tower belong to all insureds to whom coverage is owed, not just SunEdison.  Therefore,

the Proposed Order authorizing the Incremental Settlement Amount to be paid on behalf of

Global's directors and officers relates to property of those officers and directors and should be

entered.  *See*, *e.g.*, *In re SportStuff, Inc.*, 430 B.R. 170, 177-78 (B.A.P. 8th Cir. 2010) (holding

that because the non-debtor insured had an "independent right to be indemnified and defended"

by the insurers, the court "did not have the jurisdiction or authority to impair or extinguish these

independent contractual rights"); *In re Petters Co., Inc.*, 419 B.R. 369, 376 (Bankr. D. Minn.

2009) (finding that "case law recognizes that any individual insured has a contractually distinct

status that runs directly between itself and the insurer.  This makes the right to receive payment

on a covered claim the property of the insured itself."); *Landry* v. *Exxon Pipeline Co.*, 260 B.R.

769, 799-800 (Bankr. M.D. La. 2001) (finding that proceeds of liability insurance are not

property of the estate because "by paying a premium for insurance, the insured owns a policy, but does not thereby obtain any legal or equitable interest in the proceeds or funds to be used to pay any claims covered under the policy"); *In re Wiesner*, 267 B.R. 32, 35 (Bankr. D. Mass. 2001) (noting that "[a] bankruptcy estate can have no greater claim to the proceeds of property of the estate than the debtor would have had outside of bankruptcy").

26.    Indeed, the right of Global and its directors and officers to coverage under the ABC Tower has already been recognized by this Court, which has permitted the Yieldcos to access proceeds under the ABC Tower on two separate occasions with the First Reimbursement Orders and the Second Reimbursement Order.  The Incremental Settlement Amount, which the D&O Insurers have already agreed to fund, constitutes only a small amount above that which has been previously authorized.

27.    Even if the Court were to conclude that the automatic stay applied to the Incremental Settlement Amount, cause exists to permit the D&O Insurers to make this payment.[4] Granting the Proposed Order causes no harm to the Debtors' estate.  To the contrary, granting the Proposed Order provides significant benefit to the Debtors by fulfilling a condition to the Brookfield transaction (the resolution of the Aldridge Lawsuit) that is critical to the Debtors' reorganization plan.  Resolving this condition for a mere additional $1.625 million is well worth it.

28.    Moreover, an additional benefit of approving the Proposed Order is that it provides approximately $15 to $16 million to Global (as a net benefit from the settlement of the

---

[4]    As with the prior reimbursement orders entered by this Court, Global is not at this time requesting a determination on the merits of whether the proceeds of the ABC Tower are property of the estate and, instead submits that the Court has the authority to grant the relief requested under either alternative argument set forth in this Motion.  *See MF Global*, 469 B.R. at 187 ("Because the Court concludes that reasonable defense costs should be paid on behalf of the Individual Insureds whether or not the policy proceeds are property of the estates, the Court need not resolve at this time the issue whether policy proceeds are property of the estates.").

Aldridge derivative action) which Global has agreed to use toward settlements of other covered

claims against it, thereby decreasing the amount of money needed from the remaining ABC

Tower.

29.     Finally, SunEdison and its directors and officers will still have shared access to

more than $56 million under the shared ABC Tower, in addition to SunEdison's directors' and

officers' access to the $50 million in Side A DIC coverage.  Given the amount of coverage

remaining, the deduction of the Incremental Settlement Amount will have no material impact on

the ability of SunEdison or its officers and directors to resolve any remaining lawsuits.

30.     Courts routinely grant limited relief from the stay in chapter 11 cases to permit individual

insureds to access insurance proceeds available to both a debtor and individual insureds.  *See,*

*e.g.*, *In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 197 (Bankr. S.D.N.Y. 2012), *subsequently*

*dismissed sub nom. Sapere Wealth Mgt. LLC* v. *MF Glob. Holdings Ltd.*, 566 F. App'x 81 (2d

Cir. 2014) (granting limited relief from the stay to permit D&O insurers to advance defense costs

to individual insured, even where policy included entity coverage); *Adelphia Commc'ns Corp.* v.

*Assoc. Ins. Serv., Ltd. (In re Adelphia Commc'ns Corp.)*, 285 B.R. 580, 598-99 (Bankr. S.D.N.Y.

2002), *vacated on other grounds*, 298 B.R. 49 (S.D.N.Y. 2003) (granting relief from stay in

order to permit primary insurer to advance defense costs); s*ee also In re Downey Fin. Corp.*, 428

B.R. 595, 609-11 (Bankr. D. Del. 2010) (granting relief from stay for cause in order to permit

use of D&O policy proceeds for payment of defense costs); *In re Enron Corp.*, No. 01-16034

(AJG), 2002 WL 1008240, at *2 (Bankr. S.D.N.Y. May 17, 2002) (granting relief from stay, to

the extent applicable, for payment of defense costs); *In re CyberMedica, Inc.*, 280 B.R. 12, 18-19

(Bankr. D. Mass. 2002) (granting relief from stay for cause because directors and officers would

suffer irreparable harm if prevented from exercising their rights to defense payments under D&O

policy).  There is no reason for this Court to depart from that precedent here.

## NO PRIOR REQUEST

No prior motion for the relief requested herein has been made to this or any other Court.

*[Intentionally Left Blank]*

WHEREFORE, Global and the Aldridge Defendants respectfully request that the Court

grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: August 22, 2017
       New York, New York

WACHTELL, LIPTON, ROSEN & KATZ

By:    /s/ Bradley R. Wilson
       Bradley R. Wilson
       51 West 52nd Street
       New York, New York  10019
       Telephone:  (212) 403-1000
       Fax:  (212) 403-2000

       *Counsel for Peter Blackmore, Christopher Compton
       and Jack F. Stark*

WILMER CUTLER PICKERING HALE AND DORR
LLP

By:    /s/ Timothy J. Perla
       Timothy J. Perla
       60 State Street
       Boston, Massachusetts  02109
       Telephone:  (617) 526-6000
       Fax:  (617) 526-5000

       *Counsel for Hanif Dahya*

SULLIVAN & CROMWELL LLP

By:    /s/ Andrew G. Dietderich
       Andrew G. Dietderich
       John L. Hardiman
       Veronica W. Ip
       125 Broad Street
       New York, New York  10004
       Telephone:  (212) 558-4000
       Fax:  (212) 558-3588

       *Counsel for TerraForm Global, Inc.*

## **EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SUNEDISON, INC., *et al.*, | ) Case No. 16-10992 (SMB) |
|  | ) |
|          Debtors. | ) (Jointly Administered) |
|  | ) |

### [PROPOSED] ORDER GRANTING
### LIMITED RELIEF FROM THE AUTOMATIC STAY

WHEREAS, on May 20, 2016, this Court entered two "Order Granting Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 362, Bankruptcy Rule 4001, and Local Bankruptcy Rule 4001-1 Authorizing Modification of the Automatic Stay, to the Extent Applicable, to Allow for Reimbursement and/or Payment of Defense Costs Under Directors' and Officers' Insurance Policies" [Docket Nos. 367 and 368] (the "First Reimbursement Orders");

WHEREAS, on June 29, 2017, this Court entered the "Order Granting Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363(B), and Bankruptcy Rules 6004 and 9019, Authorizing and Approving D&O Mediation Settlement Agreement and D&O Insurance Cooperation Agreement" [Docket No. 3453] (the "Second Reimbursement Order" and together with the First Reimbursement Order, the "Reimbursement Orders");

WHEREAS, the Second Reimbursement Order modified the automatic stay, to the extent applicable, to permit the D&O Insurers[1] to pay and/or reimburse any settlements by TerraForm Power, Inc. ("TERP") and TerraForm Global, Inc. ("Global") from insurance in

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Second Reimbursement Order or the Joint Motion of TerraForm Global, Inc. and the Aldridge Defendants for an Order Granting Limited Relief from the Automatic Stay.

-1-

connection with some or all of the Specified Claims (as defined in the D&O Insurance

Cooperation Agreement), including the Chamblee and Aldridge Settlements (as defined below),

up to an aggregate amount of $32 million, without prejudice to the rights of any party to seek

further relief from the Court with respect to the Specified Claims;

WHEREAS, on June 29, 2017, TERP and certain of its former officers and

directors, along with plaintiff John Chamblee (individually and on behalf of all others similarly

situated), entered into a Memorandum of Understanding to resolve the action captioned

*Chamblee* v. *TerraForm Power, Inc. et al.*, No. 16-cv-08039 PKC (S.D.N.Y.) (the "Chamblee

Settlement"), which is pending in the United States District Court for the Southern District of

New York, for $14.75 million (the "Chamblee Settlement Amount"), of which $13.625 million is

to be paid by the D&O Insurers;

WHEREAS, on July 15, 2017, Global, individual defendants Peter Blackmore

("Blackmore"), Christopher Compton ("Compton"), Jack F. Stark ("Stark") and Hanif Dahya

("Dahya" and together with Blackmore, Compton and Stark, the "Aldridge Defendants"), and

plaintiff Jason Aldridge (derivatively on behalf of Global) entered into a Stipulation of

Settlement and Compromise to resolve the action captioned *Aldridge* v. *Blackmore, et al.*, C.A.

No. 12196-CB (Del. Ch.) (the "Aldridge Settlement"), which is pending in the Court of

Chancery of the State of Delaware, for $20 million (the "Aldridge Settlement Amount");

WHEREAS, the D&O Insurers have acted in good faith, with respect to other

insureds having an interest in the proceeds of the ABC Tower, in negotiating the Chamblee and

Aldridge Settlements;

-2-

WHEREAS, the Second Reimbursement Order entered by this Court has already authorized payment by the D&O Insurers under the ABC Tower of the $13.625 million required from them for the Chamblee Settlement;

WHEREAS, the Second Reimbursement Order entered by this Court has already authorized payment by the D&O Insurers under the ABC Tower of up to $18.375 million of the $20 million required for the Aldridge Settlement;

WHEREAS, the Second Reimbursement Order permits any party to seek further relief from the Court with respect to the Specified Claims, including the Aldridge Lawsuit; and

WHEREAS, the Court finds that payment by the D&O Insurers under the ABC Tower of the remaining $1.625 million required for the Aldridge Settlement is appropriate.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that:

1.      In addition to the prior $32 million previously authorized by this Court under the Second Reimbursement Order to be paid by the D&O Insurers from the ABC Tower for settlement of *Chamblee* and *Aldridge*, the Court hereby authorizes payment by the D&O Insurers from the ABC Tower of the additional $1.625 million needed for settlement of *Aldridge*.  The automatic stay imposed by Bankruptcy Code section 362, to the extent applicable, is hereby modified to permit this payment by the D&O Insurers.

2.      Any D&O Insurer providing funds under the ABC Tower for settlement of *Chamblee* and *Aldridge* pursuant to the terms of this Order and the Second Reimbursement Order is acting in good faith with respect to all the insureds under the ABC Tower and no insured or other party may bring an action against any such D&O Insurer asserting that such payment or the negotiation of the settlements of *Chamblee* or *Aldridge* was in bad faith or does

not reduce the limits of the ABC Tower by the amount of the payment made by the D&O Insurer

towards these settlements.

    3.      This Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation or enforcement of this Stipulation and Order.


Dated: _____, 2017
      New York, New York      _____

                                        Stuart M. Bernstein
                                        United States Bankruptcy Judge