UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                      :      Chapter 11
                                                            :      Case No. 16-10992 (SMB)
SUNEDISON, INC., *et al.*,                                  :      (Jointly Administered)
                                                            :
                                                            :
                    Debtors.                                :
------------------------------------------------------------x

# MEMORANDUM DECISION AND ORDER
# REGARDING THIRD-PARTY RELEASES
# UNDER THE DEBTORS' JOINT PLAN

**A P P E A R A N C E S:**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

> Anthony W. Clark, Esq.
> Jay M. Goffman, Esq.
> J. Eric Ivester, Esq.
> James J. Mazza, Jr., Esq.
> Louis S. Chiappetta, Esq.
>     Of Counsel

*Attorneys for the Debtors*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

On July 28, 2017, the Court confirmed the Debtors' Second Amended Joint Plan of Reorganization, dated July 20, 2017 (the "*Plan*").[1] The *Plan* contains a broad third-party release (the "Release") in favor of numerous non-debtors, and the Releasing Parties, as defined in § 1.196 of the *Plan*, include "all Holders of Claims entitled to vote for or against the Plan that do not vote to reject the Plan," hereinafter, the "Non-Voting Releasors." Although no Non-Voting Releasor objected to the Release, the Court *sua*

---

[1] A copy of the *Plan* is annexed to the *Findings of Fact, Conclusions of Law and Order Confirming Second Amended Plan Of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated July 28, 2017 (the "*Confirmation Order*") (ECF Doc. # 3735).)

*sponte* raised whether it can and should be approved, and reserved decision on the issue. (*Confirmation Order* at ¶ HH.)

The Debtors subsequently filed a supplemental memorandum of law. (*Debtors' Memorandum of Law in Support of Approval of Certain Non-Debtor Releases Contained in the Second Amended Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates*, dated Aug. 3, 2017 ("*Debtors Memo*") (ECF Doc. # 3793).) After considering their arguments and the applicable law, the Court concludes that the Debtors have failed to demonstrate that Non-Voting Releasors impliedly consented to the Release, that the Court has jurisdiction to release the Non-Voting Releasors' third party claims to the extent set forth in the Release, or that approval of the non-consensual Release is appropriate under the standards enunciated in *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005) ("*Metromedia*").

## BACKGROUND

The background to these cases is described in *In re SunEdison, Inc.*, 556 B.R. 94, 98-99 (Bankr. S.D.N.Y. 2016), and the Court limits the discussion to the facts relevant to the issue before it. The *Plan* that was ultimately confirmed included a broad third-party release. Section 11.6 of the *Plan*, entitled "Release by Holders of Claims," stated in relevant part:[2]

> As of the Effective Date, subject to Article 11.8, the Releasing Parties shall be deemed to have conclusively . . . released . . . the . . . non-Debtor Affiliates, and the Released Parties from any and all Claims . . . that such Entity would have been legally entitled to assert . . . based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors,

---

[2] For the sake of brevity, the Court has stripped out unnecessary adjectives, adverbs and synonyms.

> the Debtors' restructuring, the Chapter 11 Cases, the Original DIP Facility, the Replacement DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors . . . or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering, the GUC/Litigation Trust Agreement, or related agreements, instruments, or other documents, upon any other act or omission . . . taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence.
>
> The *Plan* includes an equally broad group of parties receiving the Release:
>
> "Released Parties" means, collectively, in each case, solely in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals (collectively, the "Debtor Professionals"); (2) current employees, consultants, Affiliates, officers and directors, . . . ; and (3) Existing Directors, (b) the Original DIP Agents, (c) the Original DIP Lenders and all other Original DIP Secured Parties, (d) the Replacement DIP Agents, (e) the Replacement DIP Lenders, (f) the Supporting Second Lien Parties, (g) all Professionals (to the extent not duplicative of the Entities covered by clauses (a) and (m) of this definition), (h) the Creditors' Committee and each of its members, solely in their capacity as such, (i) the Indenture Trustees, (j) the Second Lien Collateral Trustee, (k) the Second Lien Agents, (l) any underwriters, arrangers, or placement agents in respect of the Second Lien Senior Notes, (m) the Prepetition First Lien Secured Parties, (n) the Prepetition First Lien Agents, (o) the Applicable Issuers, and (p) with respect to each of the above-named Entities described in subsections (b) through (o), such Entity's current and former affiliates, subsidiaries, advisors, principals, partners, managers, members, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals, in each case to the extent a claim arises from actions taken or omissions by any such person in its capacity as a related person of one of the parties listed in clauses (b) through (o) and is released as against such party.

(*Plan* at § 1.195.)  Recognizing that these clauses are hard to digest in one sitting, I will return to them later.

Finally, the definition of "Releasing Parties" was very comprehensive, and included not just the holders of claims that voted to accept the *Plan*, but also "to the fullest extent permitted by law, all Holders of Claims entitled to vote for or against the Plan that do not vote to reject the Plan." (*Plan* at § 1.196.)  In short, the Non-Voting Releasors would release a largely unidentifiable group of non-debtors from liability based on pre-petition, post-petition and post-confirmation (*i.e.*, future) conduct occurring through the *Plan*'s future Effective Date[3] that related in any way to their claims or these bankruptcy cases subject to the usual exceptions for fraud, willful misconduct, or gross negligence.  In addition, the *Plan* included a corresponding injunction that barred the pursuit of any released claim.  (*Plan* at § 11.9.)

The Court expressed concern regarding its authority to bind non-voting creditors (who were entitled to vote) to the Release.[4]  Rather than decide the issue at the disclosure statement stage when the Release first came to the Court's attention, the Court deferred it to the confirmation hearing.  Accordingly, the Court directed the Debtors to modify the Disclosure Statement and ballots to make clear in conspicuous language that the Debtors intended to ask the Court, at the confirmation hearing, to deem the failure to vote by parties entitled to vote as consent to the Release.  (*First Amended Disclosure Statement for the First Amended Joint Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates*, dated June 12, 2017 ("Disclosure Statement"),

---

[3]  The Effective Date has not yet occurred.

[4]  Non-voting classes deemed to reject the *Plan* under 11 U.S.C. § 1126(g) could not be bound by the Release.  Such a provision would violate the best interest test under 11 U.S.C. § 1129(a)(7)(A)(ii) and render the *Plan* unconfirmable.  While the class would not receive a distribution in either chapter 11 or chapter 7, the class members would retain their third party claims in a chapter 7.

4

at vii (ECF Doc. # 3313); *Order (A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Approving Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Joint Proposed Plan; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates With Respect Thereto*, dated June 13, 2017, at ¶ 34 (ECF Doc. # 3319).)

The Court heard the confirmation application on July 25, 2017, and entered the *Confirmation Order* three days later. Although no party objected to the Release, the Court nonetheless had the independent obligation to consider whether it had subject matter jurisdiction to approve it. *Quigley Co., Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co., Inc.*), 676 F.3d 45, 50 (2d Cir. 2012) ("*Quigley*"), *cert. denied*, 133 S. Ct. 2849 (2013). In addition, the Court was concerned that the Release did not satisfy the requirements of *Metromedia*.[5]

The Debtors were anxious to confirm the *Plan* despite the unresolved issue. In addition, counsel to the independent directors, the only potential beneficiaries of the Release that spoke up, did not object to the immediate confirmation of the *Plan*, and accepted the risk that the Court would ultimately rule that the Release did not bind the Non-Voting Releasors. (Transcript of 7/25/17 H'rg at 111:19-112:14 (ECF Doc. # 3725).) As a result, the Court confirmed the *Plan*, and reserved decision on the issue of the Non-

---

[5] The Court expressed a third concern: did *Stern v. Marshall*, 564 U.S. 462 (2011) prohibit the Court from entering a final judgment approving the non-consensual Release? The Second Circuit has interpreted *Stern* narrowly and limited the ruling to its facts. *See Quigley*, 676 F.3d at 52. Under similar circumstances, the bankruptcy court in *In re Millennium Lab Holdings II, LLC*, Case No. 15-12284 (LSS), 2017 WL 4417562, at *1 (Bankr. D. Del. Oct. 3, 2017), concluded that it had the authority to enter a final judgment enjoining the assertion of a third party claim by a non-consenting creditor. Since I am not approving the Release, I do not resolve the question.

Voting Releasors in the *Confirmation Order*, which the latter defined as the "Reserved Issue."[6]

## DISCUSSION

### A. Consent

The first question is whether the Non-Voting Releasors should be deemed to have consented to the Release. The Debtors contend that the conspicuous warning in the Disclosure Statement and the ballots regarding the possible effect of the Release on non-voting creditors was sufficient to find that the Non-Voting Releasors should be deemed to have consented. (*Debtors Memo* at ¶¶ 7-11.)

Courts generally apply contract principles in deciding whether a creditor consents to a third-party release. *See, e.g., In re Neogenix Oncology, Inc.*, Case No. 12–23557–TJC, 2015 WL 5786345, at *5 (Bankr. D. Md. Oct. 1, 2015); *In re Washington Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011). Consent may be express or manifested by conduct. RESTATEMENT (SECOND) OF CONTRACTS § 19 (1981) ("RESTATEMENT"). Courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to the release. *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y.), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544

---

[6] The *Confirmation Order* contained numerous findings relating to the Release, including that it was negotiated in good faith, was supported by consideration, and was fair, equitable, essential and in the best interests of the estate. It provided, however, that "nothing herein shall be construed as a determination, finding of fact, conclusion of law or decree by the Court with respect to the Reserved Issue." (*Confirmation Order* at ¶ HH.)

F.3d 420 (2d Cir. 2008); *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 144 (Bankr. D. Del. 2010), *appeal dismissed*, Civil Nos. 10-369, 10-385 (RBK), 2011 WL 3420441 (D. Del. Aug. 4, 2011); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999).

Consent through silence or inaction – "deemed consent" – raises a more difficult question. Absent a duty to speak, silence does not constitute consent.[7] "An offeror has no power to transform an offeree's silence into acceptance when the offeree does not intend to accept the offer[.]" *Karlin v. Avis,* 457 F.2d 57, 62 (2d Cir.), *cert. denied*, 409 U.S. 849 (1972). Thus, the offeror cannot ordinarily force the other party into a contract by saying, "If I do not hear from you by next Tuesday, I shall assume you accept." JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 2–18, at 83 (3d ed. 1987); *accord Bronner v. Park Place Entm't Corp.,* 137 F. Supp. 2d 306, 312 (S.D.N.Y. 2001) ("[A]bsent a duty to speak, a party's silence cannot be translated into an acceptance of an offer to contract."); *Albrecht Chem. Co. v. Anderson Trading Corp.*, 84 N.E.2d 625, 626 (N.Y. 1949) ("[W]here the recipient of an offer is under no duty to speak, silence, when not misleading, may not be translated into acceptance merely because the offer purports to attach that effect to it."); RESTATEMENT § 69, cmt. a ("Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance.").

Courts have recognized three exceptions to this rule recently summarized by the District Court in *Weiss v. Macy's Retail Holdings Inc.*, No. 16 Civ. 7660 (AKH), 2017

---

[7] The construction and implementation of the *Plan* is governed by New York law unless a different rule is prescribed by federal law. (*Plan* at § 14.12.) The ensuing discussion therefore relies on New York law which is consistent with the RESTATEMENT.

WL 2992502, at *4 (S.D.N.Y. July 14, 2017), *appeal docketed*, No. 17-2219 (2d Cir. July 19, 2017). Assent by silence will arise where (1) it is supported by the parties' ongoing course of conduct, RESTATEMENT § 69(1), (2) the offeree accepts the benefits of the offer despite a reasonable opportunity to reject them, and understands that the offeror expects compensation, *id.*, or (3) the offeror has given the offeree reason to understand that silence will constitute acceptance and the offeree in remaining silent intends to accept the offer. *Id.* Under the last exception, silence operates as assent because the silence is misleading, and the exception does not apply absent some element of deception or dishonesty. *Weiss*, 2017 WL 2992502, at *4. As explained by the New York Court of Appeals:

> Silence operates as an assent, and creates an estoppel, only when it has the effect to mislead. * * * When a party is under a duty to speak, or when his failure to speak is inconsistent with honest dealings, and misleads another, then his silence may be deemed to be acquiescence. * * * And it may be added that a person is under no obligation to do or say anything concerning a proposition which he does not choose to accept. * * * There must be actual acceptance, or there is no contract.

*Tanenbaum Textile Co. v. Schlanger*, 40 N.E.2d 225, 227 (N.Y. 1942) (ellipses in original) (quoting *More v. New York Bowery Fire Ins. Co.*, 29 N.E. 757, 758-59 (N.Y. 1892)); *accord Brennan v. Nat'l Equitable Inv. Co.*, 160 N.E. 924, 925 (N.Y. 1928) ("A duty to speak is imperative as matter of law where conduct, accompanied by silence, would be deceptive and beguiling.") (citation omitted); *Russell v. Raynes Assocs. Ltd. P'ship*, 569 N.Y.S.2d 409, 414 (N.Y. App. Div. 1991) (same).

The Debtors point to several decisions in which courts have ruled that non-voting creditors were deemed to consent to a third party release. *See, e.g., In re Indianapolis Downs, LLC,* 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("As for those impaired creditors

8

who abstained from voting on the Plan . . . the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *Spansion*, 426 B.R. at 144 (overruling U.S. Trustee's objection to deemed consent to third party release by non-voting, unimpaired class where no member of the class objected); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (creditors entitled to vote who abstained and chose not to opt out deemed to consent to the third party releases based on explicit notice that the failure to vote and opt out would constitute consent to the releases) (citing confirmation order in *In re Calpine Corp.*, No. 05–60200 (BRL), 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. 2007)), *aff'd*, Nos. 09 Civ. 10156, 09 Civ. 10372, 09 Civ. 10373(LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part on other grounds*, 634 F.3d 79 (2d Cir. 2011).[8] The Court has found several cases that have reached the opposite conclusion. *See, e.g., Chassix*, 533 B.R. at 81 ("Charging all inactive creditors with full knowledge of the scope and implications of the proposed

---

[8] The Debtors also cite *In re Conseco, Inc.*, 301 B.R. 525 (Bankr. N.D. Ill. 2003). There, the court refused to confirm an earlier plan that included a third party release binding all creditors that accepted a distribution regardless of whether the creditor voted to accept the plan. *Id.* at 527. The court ruled, *inter alia*, that it would not approve a third party release by creditors who did not accept the plan, and "mere acceptance of a distribution under the plan cannot be construed as a voluntary consent to the release." *Id.* at 528. The debtors redrafted the plan to include a modified third party release that bound creditors either (i) that voted in favor of the plan or (ii) that failed to opt out of the non-debtor releases. *Id.* at 528. The *Conseco* Court ruled that creditors falling into either category consented to the non-debtor releases. *Id.* The Debtors also referred me to a bench decision, *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y.), in which the Court approved a similar third party release. (*Debtors Memo* at ¶¶ 16-17 & n. 18.)

Although the Debtors imply that the redrafted plan in *Conseco* (and the plan in *BCBG*) is analogous to their *Plan*, the earlier plan rejected by the *Conseco* court is a closer fit. The difference between the two *Conseco* plans was the presence of the creditors' consent to the third party release in the later plan. The *Conseco* court rejected the earlier plan because it bound creditors that did not accept the plan and did not voluntarily consent to the third party release. This is the precise problem with Release in the *Plan*. While one may question the curative effect of an opt-out provision, the *Plan* does not allow creditors to opt out of the Release.

third party releases, and implying a "consent" to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point); *Washington Mut.*, 442 B.R. at 355 ("Failing to return a ballot is not a sufficient manifestation of consent to a third party release. [Citation omitted]. Therefore, the Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases."); *Zenith Elec.,* 241 B.R. at 111 ("This is a release of third party claims against LGE. This cannot be accomplished without the affirmative agreement of the creditor affected."); *In re Digital Impact, Inc.*, 223 B.R. 1, 14-15 (Bankr. N.D. Okla. 1998) ("[T]he court must ascertain whether the creditor unambiguously manifested assent to the release of the nondebtor from liability on its debt.") (quoting *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D. N.J. 1997)).

  The Debtors' argument that the Non-Voting Releasors' silence should be deemed their consent to the Release is not persuasive because the Debtors have not identified the source of their duty to speak. The Debtors do not contend that an ongoing course of conduct with their creditors gave rise to a duty to speak. Furthermore, the Debtors do not argue that creditors understood that if they accepted a distribution under the *Plan* they were duty-bound to object or accept the Release. This was the plan the *Conseco* court refused to confirm. Moreover, the creditors received the same percentage distribution whether they accepted the *Plan*, rejected the *Plan* or did not vote.

  Instead, the Debtors essentially contend that the warning in the Disclosure Statement and the ballots regarding the potential effect of silence gave rise to a duty to

speak, and the Non-Voting Releasors' failure to object to or reject the *Plan* should be treated as their deemed consent to the Release. Indeed, this appears to be the unspoken rationale of the authorities cited by the Debtors. The Debtors have failed, however, to show that the Non-Voting Releasors' silence was misleading or that it signified their consent to the Release. There are other plausible inferences that support the opposite inference. For example, the meager recoveries (here, less than 3% for the unsecured creditors) may explain their inaction without regard to the Release. Or the creditor could have failed to return a ballot because it supported the *Plan* but did not want to give the Release. The admonition of the *Chassix* court is worth repeating:

> Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a "consent" to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point.

*Chassix*, 533 B.R. at 81.[9]

Accordingly, the Court concludes that the Non-Voting Releasors did not consent to the Release. The Court next turns to the related issues of whether the Court has jurisdiction to approve the release of the Non-Voting Releasors' third party claims without their consent, and if it does, whether it is appropriate to do so.

---

[9] In an effort to distinguish *Chassix*, the Debtors contend, among other things, that "here creditors are receiving meaningful recoveries." (*Debtors Memo* at ¶ 17 n. 19.) The projected recovery for unsecured creditors (aside from possible future litigation) is only 2.8%. One can question whether a hypothetical, non-voting unsecured creditor, particularly one with a small claim, would find a 2.8% recovery "meaningful."

**B.     Jurisdiction and *Metromedia***

In assessing a court's jurisdiction to enjoin a third party dispute under a plan, the question is not whether the court has jurisdiction over the settlement that incorporates the third party release, but whether it has jurisdiction over the attempts to enjoin the creditors' unasserted claims against the third party. *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*), 517 F.3d 52, 65 (2d Cir. 2008), *vacated & remanded on other grounds,* 557 U.S. 137 (2009), *aff'g in part & rev'g in part,* 600 F.3d 135 (2d Cir.), *cert. denied*, 562 U.S. 1082 (2010); *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 755 (5th Cir. 1995); *see Shearson Lehman Bros., Inc. v. Munford, Inc.* (*In re Munford, Inc.*), 97 F.3d 449, 454 (11th Cir. 1996) ("It is not the language of the settlement agreement that confers subject matter jurisdiction in this case. Rather, it is the 'nexus' of those claims to the settlement agreement . . . that the bankruptcy court must approve . . . ."). "[T]he touchstone for bankruptcy jurisdiction [over a non-debtor's claim] remains whether its outcome might have any 'conceivable effect' on the bankruptcy estate." *Marshall v. Picard* (*In re Bernard L. Madoff Inv. Sec. LLC*), 740 F.3d 81, 88 (2d Cir. 2014) (quoting *Quigley*, 676 F.3d at 57). Importantly, a financial contribution to the estate by the releasee, without more, does not confer subject matter jurisdiction to enjoin claims against the releasee. *Manville*, 517 F.3d at 66. Finally, the party asserting that the Court has subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists. *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)*.*

Even where the Court has jurisdiction, third party releases are proper only in rare and unique circumstances. In *Metromedia*, the Second Circuit identified two reasons why. First, the Bankruptcy Code does not expressly authorize third party releases except under 11 U.S.C. § 524(g). *Metromedia*, 416 F.3d at 142. Second, a third party release is a "device that lends itself to abuse" because it effectively operates as a bankruptcy discharge without the necessity to file a bankruptcy. *Id.* In deciding whether a third party release is appropriate, courts may consider whether the estate has received a substantial contribution, whether the enjoined claims are channeled to a settlement fund rather than extinguished, whether the enjoined claims would indirectly impact the debtor's reorganization through claims of indemnity or contribution, whether the plan otherwise provides for payment in full of the enjoined claims and whether the creditor has consented. *Id.* Nevertheless, the test is not "a matter of factors and prongs," and a third party release will not be tolerated "absent findings of circumstances that may be characterized as unique." *Id.*

The Debtors invoke the jurisdiction of the Court to approve the non-consensual Release citing the indemnification obligations it may owe to the Released Parties. Specifically, they contend that they owe indemnification obligations to their existing directors under their respective charters and to their officers, employees and agents under related indemnification agreements. (*Debtors Memo* at ¶ 23 & n. 21.) They also maintain that they owe indemnification obligations to certain parties under the debtor in possession ("DIP") financing agreements. (*Id.* at ¶ 23 & n. 23.) The DIP financing order granted limited rights of indemnity to the "Prepetition Secured Parties, the Existing DIP Secured Parties, and the DIP Secured Parties" with respect to any claim or

13

liability relating to "negotiating, implementing, documenting or obtaining requisite approvals of the Replacement DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens (defined below) and the Adequate Protection Liens, and any of the other rights, remedies, privileges, benefits and protections granted hereunder or pursuant to any other Replacement DIP Document, any challenges or objections to the Replacement DIP Facilities or the use of Cash Collateral." (*Order (I) Authorizing Debtors to (A) Obtain Senior Secured, Superpriority, Replacement Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, (II) Authorizing Use of Proceeds to Repay Existing Senior Secured Superpriority, Postpetition Financing, and (III) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363 and 364*, dated May 1, 2017, at ¶ G(iii), at 20 (ECF Doc. # 2880).)[10]

Where a third party claim may give rise to a potential indemnification or contribution claim against the estate, the third party claim will have a conceivable effect on the estate, and accordingly, the Court has the jurisdiction to enjoin it. *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 290 (Bankr. S.D.N.Y. 2016), *appeal dismissed*, 16 Civ. 6054 (LAP), 2017 WL 477780 (S.D.N.Y. Feb. 3, 2017); *In re Residential Capital, LLC*, 508 B.R. 838,

---

[10] An earlier financing order included a similar indemnity provision. (*Final Order (I) Authorizing Debtors to (A) Obtain Senior Secured, Superpriority, Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363, and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to Bankruptcy Code Sections 361, 362, 363 and 364*, dated June 9, 2017, at ¶ G(iii), at 24 (ECF Doc. # 523).)

848–49 (Bankr. S.D.N.Y. 2014).  But the Release is much broader than the indemnification obligations the Debtors contend support it.  For example, the indemnification obligations under DIP financing orders relate solely to post-petition acts, but the Release enjoins third party claims relating in any manner or way to "the Debtors, . . . or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases,  . . . or . . . upon any other act or omission . . . taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence." (*Plan* at § 11.6.)  Thus, except for acts of fraud, willful misconduct or gross negligence, the Release extinguishes claims that relate in any way to the Debtors or their bankruptcy cases and that arose from the beginning of time to an unspecified date in the *future* when the Effective Date occurs.

Nor is the Release limited to the potential indemnified parties listed by the Debtors.  For example, the Released Parties include the professionals retained by the Debtors in these cases as well as the creditors' committee and its members solely in that capacity.  In addition, the Release extends beyond these parties and the pre and post-petition lenders, to any underwriters, arrangers, or placement agents in respect of the Second Lien Senior Notes.  Finally, the Release extends beyond the identified released entities to their "*current and former affiliates, subsidiaries, advisors, principals, partners, managers, members, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals, in each case to the extent a claim arises*

15

*from actions taken or omissions by any such person in its capacity as a related person of one of the parties listed in clauses (b) through (o) and is released as against such party.*" (*Plan* at § 1.195 (emphasis added).)  Yet the Debtors have not pointed to any indemnification obligation running in favor of these unidentifiable Released Parties.

In short, the Debtors have failed to sustain their burden of proving that the Court has subject matter jurisdiction to approve the Release in its current form.  The reference to certain indemnity obligations owed to a few parties does not prove that the outcome of the universe of claims the Debtors seek to enjoin will have a conceivable effect on the estate.  Similarly, the Debtors have failed to demonstrate that the third party releases are appropriate under *Metromedia*.  The Non-Voting Releasors did not consent to the Release.  The creditors are not being paid in full, and their third party claims will be extinguished rather than channeled to a fund that will pay them.  Furthermore, as noted, the Debtors have not identified which third party claims will directly impact their reorganization, and given the broad scope of the Release, it is likely that many will not.  Finally, while some of the proposed releasees undoubtedly made contributions for which they are not otherwise compensated, or compromised their rights as part of the global settlement that made confirmation possible, the broad definition of Released Parties includes persons that added nothing to the cases.

In conclusion, although some form of a third party release may appropriately bind the Non-Voting Releasors, the Release in its present form will not.  The Debtors are granted leave to propose a modified form of release that will bind the Non-Voting Releasors within thirty days of this order.  In the event the Debtors choose to do so, they must specify the releasee by name or readily identifiable group and the claims to be

16

released, demonstrate how the outcome of the claims to be released might have a conceivable effect on the Debtors' estates and show that this is one of the rare cases involving unique circumstances in which the release of the claims is appropriate under *Metromedia*.

So ordered.

Dated: New York, New York
November 8, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge