UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| SUNEDISON, INC., *et al.*, | Case No. 16-10992 (SMB) |
| Debtors.[1] | (Jointly Administered) |

**STATUS REPORT BY JOHN S. DUBEL,
CHIEF EXECUTIVE OFFICER AND CHIEF RESTRUCTURING OFFICER**

1.  I, John S. Dubel, in my role as Chief Executive Officer and Chief Restructuring Officer of SunEdison, Inc. ("SUNE") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates (excluding the YieldCos, as defined herein), "SunEdison" or the "Company"), submit this sixth and final status report (the "Sixth CRO Report") for the period

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607). The address of the Debtors' corporate headquarters is Two CityPlace Drive, 2nd floor, St. Louis, MO 63141.

October 20, 2017 through December 29, 2017. As of the Effective Date of the Plan,[2] I will no longer be CEO or CRO of SunEdison. Thus, regardless of whether this report is filed before or after occurrence of the Plan Effective Date, the representations, statements, analysis and/or projections contained herein should be deemed to be made immediately prior to the occurrence of the Plan Effective Date, regardless of when this report is filed.

2. As outlined in my prior CRO reports,[3] since the commencement of these Chapter 11 Cases, the Company has made substantial progress toward its goal of maximizing the value of its assets for the benefit of all stakeholders. I am pleased to report that the Debtors have satisfied all of the conditions precedent to the Effective Date of the Plan and emerged from Chapter 11 on December 29, 2017. Since the submission of my last CRO report, the Company's value-maximizing efforts that culminated in emergence have included the following notable achievements:

- Completing various tasks required for the Plan to go effective, including drafting and negotiating a transition services agreement with the GUC/Litigation Trust, negotiating and executing various governance and organizational documents for Reorganized SunEdison, and assisting the New Board and the GUC/Litigation Trust with transition matters;

- Working closely with GLBL, Brookfield Asset Management, Inc. ("Brookfield"), and various other parties to assist in the closing of the GLBL merger with Brookfield (the "GLBL Merger"), which included extensive multi-party negotiation and mediation efforts to satisfy certain litigation conditions that were conditions precedent to the closing of the GLBL Merger;

- Closing the Rights Offering and Direct Equity Offering (as defined in the Equity Commitment Agreement) whereby the Debtors obtained sufficient

---

[2] Capitalized terms used but not otherwise defined herein are defined in the Second Amended Joint Plan Of Reorganization of SunEdison, Inc. And Its Debtor Affiliates (the "Plan") [Docket No. 3735].

[3] My first CRO report was submitted on August 17, 2016 [Docket No. 1021], my second CRO report was submitted on December 22, 2016 [Docket No. 1979], my third CRO report was submitted on March 31, 2017 [Docket No. 2711], my fourth CRO report was submitted on June 13, 2017 [Docket No. 3322], and my fifth CRO report was submitted on October 20, 2017 [Docket No. 4177].

2

funding to pay off their debtor-in-possession financing and other obligations under the Plan;

- Continuing value-generating sale efforts by (i) executing and closing new asset sale transactions that generated approximately $59 million in net sale proceeds, and (ii) fully consummating asset sales that were executed in prior reporting periods but ultimately closed during this reporting period (or sales that previously closed but generated residual value during this reporting period), including, for example, closing the sale of real property located in Sherman, Texas that brought in approximately $20 million for the Debtors' estates; and

- Completing significant claims administration tasks, including filing five omnibus claim objections (for a total of 30 in the aggregate) and collecting a $4.5 million receivable pursuant to a stipulation with Woongjin.

3.      While these and other recent accomplishments have certainly set the ground work to best position the Reorganized Debtors post-emergence, getting to this point required the Debtors and their advisors to work tirelessly for over a year and a half with a diverse, and often contentious, constituent pool. Indeed, the Debtors had to overcome countless challenges in order to get to the point of emergence from chapter 11. When these Chapter 11 Cases were first filed, the Debtors (i) had virtually no available capital to support their operations or development business; (ii) were cut off from the equity and debt markets, that prevented them from raising any additional capital outside of chapter 11; (iii) had scores of undeveloped or partially developed renewable energy projects around the world which would require hundreds of millions of dollars to maintain and complete; (iv) were at odds with their affiliates – the YieldCos – who had asserted control over their most valuable assets; and (v) were beset by allegations and innuendo regarding the rapid decline of the Company's fortunes in the second half of 2015. These impediments were further compounded by the sheer size and complexity of the Company's operations and corporate and capital structure at the time of filing – approximately 1,500 legal entities, approximately $8.2 billion of debt (including pre-construction, construction, and term debt relating to certain projects and excluding the YieldCos'

3

debt), complex project finance and development structures, and far-flung project development activities spanning six continents.

4.    In overcoming these challenges, the Debtors were able to use the chapter 11 process to maximize the value of their estates for the benefit of all stakeholders. To that end, over the course of these Chapter 11 Cases, the Debtors have maintained active global marketing processes for their assets, executing more than 40 asset sales across the globe which generated over approximately $2.3 billion gross proceeds (inclusive of the YieldCo mergers with Brookfield), including going-concern sales of their solar materials, residential, and commercial and industrial businesses, thus preserving scores of jobs.

5.    During the Chapter 11 Cases, the Debtors also negotiated key global settlements that unlocked substantial value to be delivered under the Plan. In particular, the Debtors entered into (a) the Yieldco Settlement Agreements, the source of approximately $825 million in value available for distribution under the Plan through the sale of SunEdison's stake in the YieldCos (including $18 million for the benefit of unsecured creditors); (b) the Committee/BOKF Plan Settlement pursuant to which unsecured creditors will benefit from the estates' conveyance of causes of action to the GUC/Litigation Trust, seed funding of $7.5 million, $18 million on account of the Yieldco Avoidance Allocation, $32 million of D&O Insurance Proceeds, and $5 million on account of the Voluntary Professional Fee Reductions; and (c) the D&O Settlement Agreement – together with the D&O Insurance Cooperation Agreement and D&O Insurance Allocation Agreement – which collectively facilitate the settlement of outstanding litigation against certain current and former directors and officers of SunEdison and the YieldCos, allocate certain joint insurance proceeds among SunEdison and the YieldCos, and achieve the $32 million recovery for the benefit of general unsecured creditors (in

D&O Insurance Proceeds) on account of estate causes of action. The foregoing settlements were cornerstones of the Plan and a by-product of extensive good faith, arm's-length negotiations with many of the Debtors' key stakeholders.

6. The accomplishments and efforts detailed herein and my other CRO reports allowed the Debtors to garner widespread support for their value-maximizing Plan. The Plan was overwhelmingly accepted – a testament to the consensus that the Debtors worked so hard to build in these Chapter 11 Cases. On a consolidated basis, almost $3 billion in unsecured claims (81.6% in amount and 77.7% in number) held against the 51 Debtors that are proponents of the Plan, voted to accept. With broad stakeholder support and a well-balanced capital structure, the Reorganized Debtors are poised to continue to maximize value for all their constituents.

**Activities And Accomplishments During The Reporting Period**

**I.     CONFIRMATION OF THE PLAN AND EMERGENCE FROM CHAPTER 11**

   **A.     Plan Confirmation**

7. As set forth in my previous CRO report, the Plan was overwhelmingly accepted by holders of claims entitled to vote and ultimately confirmed on July 25, 2017.[4] At the Confirmation Hearing, the Court *sua sponte* raised an issue as to whether a certain subset of the parties included in the Plan's third-party release provision should be approved and reserved decision on the issue (the "Reserved Issue").[5] In the Confirmation Order, the Debtors carved out

---

[4] July 25, 2017 Hr'g Tr. 90:15-17. On July 28, 2017, the Court entered the Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates [Docket No. 3735] (the "Confirmation Order").

[5] July 25, 2017 Hr'g Tr. 91:4-10.

5

the Reserved Issue for a subsequent determination by the Court,[6] and then subsequently filed a memorandum of law in support of the Plan's release provision.[7]

8. Since my last CRO report, on November 8, 2017, the Court ruled on the Reserved Issue and issued a Memorandum Decision and Order Regarding Third-Party Releases under the Debtors' Joint Plan.[8] The Court held that Holders of Claims entitled to vote for or against the Plan that did not vote to reject the Plan cannot be included as Releasing Parties.[9]

9. As discussed in my prior CRO report, in connection with confirmation of the Plan, the Court overruled objections by (i) two affiliated unsecured noteholders of SUNE, CNH Capital Partners, LLC and AQR Capital Management LLC (the "AQR Objectors") – affiliates of AQR DELTA Master Account, L.P., the co-chair of the Committee (the "AQR Objection") – and by (ii) two equity shareholders (the "Shareholder Objectors").[10] The AQR Objectors appealed confirmation of the Plan (the "Confirmation Appeal").[11] By order of the United States District Court for the Southern District of New York (the "District Court"), the briefing was combined on the Confirmation Appeal and the Backstop/Rights Offering Appeal (as discussed and defined below). The AQR Objectors and Debtors completed briefing on October

---

[6] Confirmation Order, ¶ HH ("[P]rovided, however, that whether Holders of Claims entitled to vote to accept or reject the Plan that did not in fact vote either to accept or reject the Plan are included as Releasing Parties (defined at Article 1.195 of the Plan) and therefore subject to the releases contemplated in Article 11.6 of the Plan, is reserved by the Court for subsequent determination . . . .").

[7] Docket No. 3793.

[8] Docket No. 4253.

[9] Id. at 16.

[10] July 25, 2017 Hr'g Tr. 88:4, 74:9-10. On August 8, 2017, the Court issued a Memorandum Decision and Order Overruling Shareholder Objections to Confirmation of the Debtors' Joint Plan, which noted that any issue raised by the Shareholder Objectors that was not expressly addressed in the Court's decision "lack[ed] merit." [Docket No. 3804].

[11] Notice of Appeal [Docket No. 3764].

6

16, 2017 with respect to both appeals and are awaiting a decision from the District Court.

### B.    Emergence From Chapter 11

10.    At the commencement of this reporting period, the Debtors were focused on working with their advisors, constituents, and other parties to address the remaining conditions precedent required to go effective under the Plan, as well as the various work-streams that were critical to the Company's post-emergence operations, financing, budgets, and governance matters.  The Debtors are pleased to report that the conditions precedent to the occurrence of the Effective Date of the Plan have occurred, and on December 29, 2017, the Debtors emerged from chapter 11.  To get to this point, the Debtors expended considerable effort addressing the remaining items necessary to go effective and ensure a smooth transition out of bankruptcy, including but not limited to, (i) drafting and executing a transition services agreement with the GUC/Litigation Trust (the "GUC Transition Services Agreement") and working closely with the advisors to the GUC/Litigation Trust; (ii) negotiating and executing definitive documentation related to the "Reinstated Second Lien Debt" (i.e., the debt on account of certain of the Reinstated Second Lien Claims); (iii) closing the Rights Offering (as detailed below) and distributing the Continuing TERP Class A Shares; (iv) closing the GLBL Merger  (as detailed below); (v) preparing and executing various governance and organizational documents for the Reorganized Debtors; and (vi) addressing numerous transition matters with the GUC/Litigation Trust, Supporting Second Lien Parties' counsel, the new board of directors of the Reorganized Debtors (the "New Board"), and Richard Katz, the newly appointed CEO of the Reorganized Debtors, and the respective advisors of each of the foregoing.

11.    Throughout this reporting period, the Debtors worked with the Committee and Drivetrain, LLC, the proposed liquidating trustee of the GUC/Litigation Trust (the

7

"Liquidation Trustee"), and their advisors on various administrative and transition-related matters. In particular, the Debtors helped facilitate the Liquidation Trustee and Committee's claims administration process and ultimate prosecution of certain causes of action, in accordance with the Plan and Committee/BOKF Plan Settlement. Recently, the Debtors and the GUC/Litigation Trust executed the GUC Transition Services Agreement, pursuant to which Reorganized SUNE will provide the GUC/Litigation Trust with certain administrative services and access to books and records. Under this agreement, and subject to the terms thereof, Reorganized SUNE will provide the GUC/Litigation Trust with all documents, evidence, and information relevant to the Claims Reconciliation Process and the Litigation Trust Causes of Action (each as defined in the GUC Transitions Services Agreement). Reorganized SUNE and the GUC/Litigation Trust further agreed to cooperate in all matters relating to the provision and receipt of the transition services and perform all obligations under the GUC Transition Services Agreement in good faith and in accordance with principles of fair dealing.

12. As evidenced by the content of this report and prior CRO reports, the Debtors and their advisors, including myself and Philip Gund (the Debtors' Chief Financial Officer), worked extensively and cooperatively with a myriad of parties to facilitate the Debtors' emergence from chapter 11 as expeditiously as possible, while laying the foundation to best position the Reorganized Debtors to succeed post-emergence. I held or otherwise participated in numerous telephonic conferences and in-person meetings, and regularly corresponded with the pertinent parties, including the Committee, the Liquidation Trustee, counsel to the Supporting Second Lien Parties, the New Board, Mr. Katz, and all their respective advisors to discuss an assortment of emergence related-issues and transition matters. Throughout this reporting period,

8

Mr. Gund and I worked closely and often with Mr. Katz to get him up to speed on various matters needing to be addressed by the Reorganized Debtors upon emergence.

## II. YIELDCO MERGER TRANSACTIONS

13.  While each of the aforementioned efforts and accomplishments was necessary to go effective under the terms of the Plan, one of the most significant items to occur during this reporting period was the closing of the GLBL Merger. Specifically, one of the conditions to the Plan going effective was the closing of the Jointly Supported Transactions.[12] As detailed in my prior CRO reports, the YieldCos entered into the Jointly Supported Transactions pursuant to which Brookfield would acquire 51% of TERP's outstanding stock in a sponsorship merger transaction and 100% of GLBL's outstanding stock in a whole company cash merger.[13] The TERP merger with Brookfield (the "TERP Merger") – one of the Jointly Supported Transactions – closed and became effective on October 16, 2017. As a result of the TERP Merger and the Company electing to retain 100% of its shares of TERP stock, the Company received cash equal to $300,657,250 in the aggregate (comprised of $106,107,939 received through the special dividend contemplated by the merger agreement for the TERP Merger, and $194,549,311 received in the TERP Merger) and retained 34,258,962 TERP shares.

14.  Since the last reporting period, the Debtors continued to consult with counsel to the YieldCos, Brookfield, and certain of the Debtors' constituents to resolve issues necessary to effectuate and realize the full benefit of the GLBL Merger and settlement and assist

---

[12] Plan, Article 12.2(e).

[13] In connection with these transactions, the Debtors and the YieldCos, and certain of their respective affiliates, entered into two settlement agreements, as of March 6, 2017 (the "YieldCo Settlement Agreements"), pursuant to which the Debtors' estates stand to realize more than $800 million in cash and TERP equity upon the consummation of the Brookfield transactions. On June 7, 2017, the Court entered an order approving the YieldCo Settlement Agreements [Docket No. 3292], as well as orders approving the voting and support agreements with TERP and GLBL and IDR transfer agreement with TERP that also facilitate the Brookfield transactions [Docket Nos. 3293, 3294].

with various regulatory and disclosure requirements related thereto. On November 13, 2017, GLBL held a special meeting of its shareholders to vote on the GLBL Merger. At that meeting, GLBL's shareholders approved the GLBL Merger. As required by the "majority of the minority" condition in the GLBL Merger Agreement, the adoption of the GLBL Merger Agreement was also approved by a majority of GLBL's Class A stockholders, excluding Brookfield, SUNE, and their respective affiliates.

15. As a condition to closing, the GLBL Merger Agreement required certain securities litigation matters to which GLBL or its affiliates were a party to be dismissed with prejudice or settled.[14] The pertinent securities cases against GLBL are currently coordinated in multi-district litigation in the District Court in a case captioned *In re SunEdison, Inc. Securities Litigation*,[15] which includes class action claims relating to GLBL's initial public offering (the "Class Action Litigation") and claims brought by plaintiffs in connection with GLBL's private placement offerings (the "Private Securities Litigation"). After working diligently and cooperatively over the last few months with SUNE, GLBL settled the Class Action Litigation, *In re TerraForm Global, Inc. Securities Litigation*, after a lengthy private mediation session. On November 1, 2017, the lead plaintiffs in the Class Action Litigation announced a mediated resolution of these class-action claims for $57 million, which is to be funded through a combination of proceeds from existing insurance and litigation settlement proceeds available to GLBL.

16. On December 14, 2017, the parties entered into a definitive stipulation and settlement agreement with respect to the Class Action Litigation, and then filed pleadings

---

[14] On December 5, 2017, GLBL announced that it exercised its right to extend the termination date under the GLBL Merger Agreement from December 6, 2017 to March 6, 2018.

[15] See In re SunEdison, Inc. Securities Litigation, MDL No. 2742, 16-md-2742 (PKC) (AJP) (S.D.N.Y.).

10

seeking the District Court's approval thereof on December 15, 2017.[16]  On December 20, 2017, the District Court entered an order preliminarily approving the class action settlement.[17]  The Private Securities Litigation pending against GLBL was also resolved and dismissed.

17. With the settlement of these securities cases, the GLBL Merger was able to close on December 28, 2017, which also marked the effective date of the GLBL Settlement Agreement.  As a result, the Company received cash equal to approximately $198 million in the aggregate.

### III. RIGHTS OFFERING AND EQUITY COMMITMENT AGREEMENT

18. By way of background (as detailed in my previous CRO reports), on April 27, 2017, the Debtors filed a motion seeking approval to enter into the Rights Offering Commitment Letter and Equity Commitment Agreement (the "Backstop Approval Motion").[18]  On May 19, 2017, the Debtors and Backstop Purchasers executed and filed the Equity Commitment Agreement.[19]  On June 6, 2017, the Court entered an order approving the Backstop Approval Motion (the "Rights Offering/Backstop Order").[20]  The AQR Objectors filed a notice of appeal of the Backstop/Rights Offering Order (the "Backstop/Rights Offering Appeal") on June 20, 2017.[21]  On October 16, 2017, the parties completed briefing and are awaiting a decision from the District Court.

---

[16] In re SunEdison, Inc. Securities Litigation, MDL No. 2742, 16-md-2742, Docket Nos. 265 266, 267, 268.

[17] In re SunEdison, Inc. Securities Litigation, MDL No. 2742, 16-md-2742, Docket No. 269.

[18] Docket No. 2857.

[19] Docket No. 3173.  The Debtors filed further amendments and/or restatements to the Equity Commitment Agreement on June 9, 2017 and July 14, 2017.  Docket Nos. 3304 and 3620.

[20] Docket No. 3283.

[21] Docket No. 3396.

19. In accordance with the terms of the Court-approved Rights Offering Procedures, the Debtors filed multiple notices extending the date by which the Rights Offering participants were required to submit funds to the Escrow Agent (the "Rights Offering Expiration Date"), which was ultimately extended to November 22, 2017.[22]

20. As discussed in my last status report, on October 12, 2017, the Debtors entered into a letter agreement (the "ECA Letter Agreement") with the Backstop Purchasers. Under that agreement, if the number of the Company's excess shares is not *de minimis*, the Company and the Backstop Purchasers would negotiate in good faith on terms to offer such excess shares as part of the Rights Offering and Direct Equity Offering. Pursuant to the ECA Letter Agreement, on November 29, 2017, the Company delivered an offer notice to the Backstop Purchasers of its intent to sell 100% of the Excess New TERP Class A Shares to one or more third parties. During the Offer Period (as defined in the ECA Letter Agreement), the Company received from the Backstop Purchasers offer responses to acquire 100% of the Excess New TERP Class A Shares the Company intends to sell (the "Offer Shares"). The Company and the Backstop Purchasers agreed that the Excess New TERP Class A Shares constituted more than a *de minimis* amount. Accordingly, the Offer Shares were offered as part of the Rights Offering and Direct Equity Offering at a purchase price of $9.52, on the same ratios as contemplated under the Equity Commitment Agreement.

21. Following the Rights Offering Expiration Date and as required by the Equity Commitment Agreement, the Debtors provided the Backstop Purchasers with (1) a Prefunding Certificate (as defined in the Equity Commitment Agreement) indicating that the

---

[22] Docket Nos. 4206, 4237, 4250, & 4287. The Rights Offering Procedures and the subsequent amendments thereto were provided to the Rights Offering participants and made publicly available under the "Rights Offering" link on the webpage maintained for the Chapter 11 Cases by Prime Clerk LLC, the Debtors' claims and administrative agent.

12

Debtors reasonably believed that the conditions to the obligations of the Backstop Purchasers and the Company would be satisfied and (2) Commitment Notices (as defined in the Equity Commitment Agreement) setting forth the respective funding amount applicable to each of the Backstop Purchasers.  As set forth therein, the Commitment Notices set a deadline of December 12, 2017 to fund the Backstop Purchasers' commitments under the Rights Offering and Excess New TERP Class A Shares.  The Backstop Purchasers thereafter funded 100% of their commitments into the Debtors' designated escrow account.

22. In addition to closing the funding under the Equity Commitment Agreement during this reporting period, the Debtors also resolved further litigation initiated by the AQR Objectors over the Equity Commitment Agreement.  On October 19, 2017, the AQR Objectors filed a motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Rule 2004 Motion") to obtain documents allegedly enabling them to make a superior financing proposal.[23]  In their objection to the Rule 2004 Motion, filed on November 8, 2017,[24] the Debtors argued, among other things, that the AQR Objectors already had all the information they requested, and to the extent they did not, the Debtors would provide such information upon execution of a standard nondisclosure agreement ("NDA").  At the hearing on the Rule 2004 Motion on November 9, 2017, the Court denied the Rule 2004 Motion,[25] and found that the AQR

---

[23] Docket No. 4173.  On October 24, 2017, the AQR Objectors filed an amended version of their Rule 2004 Motion.  [Docket No. 4199].

[24] Docket No. 4256.

[25] Nov. 9, 2017 Hr'g Tr. 27:20-21 (Court: "I'll resolve the 2004 motion right now.  I'm going to deny it.").  On November 13, 2017, the Court entered an order denying the Rule 2004 Motion.  [Docket No. 4275].

Objectors were bidders and that their Bankruptcy Rule 2004 request "has nothing to do with [their] status as a creditor."[26]

## IV.     DOMESTIC AND FOREIGN ASSET SALES – PROJECTS AND BUSINESS SEGMENTS

23.     Despite reaching the final stages of these Chapter 11 Cases, the Company has continued to execute various asset sale transactions to maximize the value of their estates and generate proceeds for the benefit of all stakeholders.

24.     In particular, the Debtors and their advisors spent significant time during this reporting period on closing an asset sale of real property located in Sherman, Texas (the "Texas Property"). Prior to the reporting period, on October 5, 2017, the Court approved the Debtors' motion for bidding procedures and break-up fees and expense reimbursement in connection with the proposed sale of the Texas Property to Corning Research & Development Corporation (the "Stalking Horse Purchaser").[27] After ongoing negotiations over environmental remediation issues related to the property, the Stalking Horse Purchaser and the Debtors were unable to reach a resolution and the Stalking Horse Purchaser ultimately informed the Debtors it would not participate in the scheduled auction. Because there were other active bidders that remained interested in the Texas Property at that time, the Debtors nonetheless decided to move forward with the auction. Ultimately, the Debtors received two bids and determined, after extensive diligence and analysis of the bids, that one of the bids was unacceptable because it, among other things, raised serious concerns as to whether the bidder could close the

---

[26]   Nov. 9, 2017 Hr'g Tr. 27:21-25; see also July 25, 2017 H'rg Tr. 78:2-6 (Court: "[The AQR Objectors are] motivated . . . by [their] inability to participate in the ECA and thereby garner a benefit not available to any other unsecured creditors.").

[27]   Docket No. 4111.

transaction.[28] After Finisar Corporation ("Finisar") agreed to the increase its bid to $20 million, the Debtors cancelled the auction[29] and declared Finisar the winning bidder. On October 24, 2017, the Court entered an order approving the sale of the Texas Property.[30]

25. In addition to closing the Texas Property sale, the Company also entered into several definitive asset purchase agreements during the reporting period for the sale of projects and project-related assets,[31] largely pursuant to the *de minimis* asset sale procedures previously approved by the Court. For example, the Debtors recently obtained Court approval for the sale of certain assets and assignment of contracts related to their residential solar business to Kismet LLC.[32] Under the terms of this transaction, Kismet LLC will pay the Debtors $491,000 and relieve the Debtors of their obligations under more than 300 residential service contracts.

26. In total, during the reporting period, the Debtors entered into asset purchase agreements that generated in excess of approximately $59 million in net sale proceeds. The Debtors also continued their efforts relating to asset sales that closed prior to this reporting period and which generated substantial value – totaling in excess of $305 million in net cash sale proceeds (exclusive of other value generated, such as the TERP shares in connection with the closing of the TERP Merger) – for the Debtors' estates through the collection of cash and

---

[28] See Declaration of John S. Dubel In Support Of Entry Of Order Approving Sale Of Debtors' Property In Sherman, Texas [Docket No. 4189].

[29] Docket No. 4179.

[30] Docket No. 4197.

[31] See Docket Nos. 4178, 4301 & 4387.

[32] Docket No. 4387.

15

previously negotiated earnouts and the release of guaranty, escrow, letter of credit, and loan amounts.

## V.    CASE ADMINISTRATION AND CORPORATE OPERATIONS

27.    As the Debtors pushed towards emergence, the Company has completed significant administrative and operational tasks during this reporting period, especially with respect to the claims administration process. Since my last CRO report, the Debtors filed motions seeking to reclassify certain claims,[33] rejecting certain executory contracts,[34] and entered into numerous stipulations with various claimants resolving outstanding claims issues.[35] The Debtors also filed five omnibus claim objections (for a total of 30 over the course of these Chapter 11 Cases) seeking the Court to expunge and disallow certain claims on a variety of grounds, including but not limited to, certain of the claims were subsequently amended, duplicative, against non-Debtor entities, and against a Debtor with no liability.[36]

28.    Further, the Debtors also collected on a sizable receivable during this reporting period. Pursuant to a Stipulation and Agreed Order previously approved by the Court on July 20, 2017,[37] the Debtors resolved the claim of Woongjin Energy Co. Ltd ("Woongjin").[38] With Woongjin's assistance and as contemplated under that stipulation, on December 4, 2017, the Debtors received a $2.1 million payment (out of a $4.5 million receivable) that was subject to

---

[33]   Docket No. 4217, 4306, 4307, 4308, 4309, 4310, 4312, 4313, 4314, 4315, 4317, 4318, 4319, 4320, 4321, 4322, 4323, 4324, 4378, & 4379.

[34]   Docket No. 4216.

[35]   See 4202, 4303, & 4344.

[36]   See Docket Nos. 4175, 4347, 4352, 4353 & 4383.

[37]   Docket No. 3677.

[38]   Proof of Claim No. 6113.

16

an attachment proceeding in Korea, and received the remaining $2.4 million receivable payment on or around December 20, 2017. Such claims resolution efforts by the Debtors and their advisors have resulted in material recoveries for the Debtors' estates.

## VI. INVESTIGATIONS

29. Moreover, while the Debtors were handling these complex restructuring issues and driving towards confirmation and consummation of the Plan, they were also expending significant time and effort working with the Department of Justice (the "DOJ") and the Securities and Exchange Commission ("SEC"). The Company cooperated extensively with the ongoing investigations by the DOJ and SEC throughout the Chapter 11 Cases. Under my direction and the Company's in-house counsel, the Company responded to document and information requests from the DOJ and SEC and collected and preserved documents and data relevant to their investigations. Notably, the Company and its outside special counsel (i) collected forensic images of laptop computers; smart phones, and other mobile devices; (ii) implemented comprehensive litigation holds; (iii) prepared substantial briefing materials for the DOJ and SEC; (iv) prepared presentations for numerous in-person meetings that took place before the DOJ; and (v) produced in excess of 1.2 million pages of documents responsive to the DOJ's and SEC's subpoenas.

## VII. UPDATED FINANCIAL PROJECTIONS

30. In my last CRO report filed on October 20, 2017, the Company disclosed revised consolidated financial information that included cash projections that assumed that the Debtors would emerge from chapter 11 on November 15, 2017. Accordingly, attached hereto at Exhibit A is further revised consolidated financial information (on a post-emergence basis) that is based on emergence on December 29, 2017.

Dated: December 29, 2017

      */s/ John S. Dubel*
By:    John S. Dubel
       Chief Executive Officer and
       Chief Restructuring Officer

**<u>Exhibit A</u>**

**SunEdison**
Summary Cash Flows - Reorganized SUNE                                                                    ($ in USD millions)

| SunEdison, Inc. | Jan-18 | Feb-18 | Mar-18 | Q2'18 | Q3'18 | Q4'18 | Q1'19 | Q2'19 | Q3'19 | Q4'19 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Opening free cash** | $10.0 | $13.0 | $14.9 | $34.4 | $55.8 | $59.9 | $79.2 | $78.1 | $77.0 | $75.9 |
| **Cash flow projection** | | | | | | | | | | |
| Operating cash receipts | | | | | | | | | | |
| Asset Sales[1] | 5.7 | 4.3 | 12.4 | 0.7 | 1.7 | 6.6 | - | - | - | 0.3 |
| Earnouts[1] | 1.0 | 2.2 | 7.6 | 24.9 | 4.1 | 24.5 | - | - | - | - |
| Net change in cash held overseas[2] | (0.2) | (1.6) | 2.9 | (0.5) | 0.7 | (9.4) | - | - | - | - |
| **Net operating cash receipts** | 6.5 | 4.9 | 22.9 | 25.1 | 6.5 | 21.7 | - | - | - | 0.3 |
| Operating cash disbursements | | | | | | | | | | |
| Personnel | (1.6) | (1.4) | (2.1) | (1.3) | (0.8) | (1.2) | - | - | - | - |
| Professional fees | (0.8) | (0.7) | (0.7) | (1.6) | (1.2) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Operating Costs[3] | (1.1) | (0.9) | (0.6) | (0.8) | (0.4) | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) |
| **Net operating cash disbursements** | (3.5) | (3.0) | (3.4) | (3.7) | (2.4) | (2.4) | (1.1) | (1.1) | (1.1) | (1.1) |
| **Net cash flow** | 3.0 | 1.9 | 19.5 | 21.4 | 4.1 | 19.3 | (1.1) | (1.1) | (1.1) | (0.8) |
| **Ending free cash** | $13.0 | $14.9 | $34.4 | $55.8 | $59.9 | $79.2 | $78.1 | $77.0 | $75.9 | $75.1 |
| **Cash held overseas** | | | | | | | | | | |
| Beginning cash held overseas | $21.4 | $21.6 | $23.2 | $20.3 | $20.8 | $20.1 | $29.5 | $29.5 | $29.5 | $29.5 |
| Less: Net change in cash held overseas | 0.2 | 1.6 | (2.9) | 0.5 | (0.7) | 9.4 | - | - | - | - |
| **Ending cash held overseas** | $21.6 | $23.2 | $20.3 | $20.8 | $20.1 | $29.5 | $29.5 | $29.5 | $29.5 | $29.5 |

**Footnotes**

(1) Proceeds from Asset Sales and Earnouts includes management's current estimate of proceeds from the disposition of the remaining assets held by Reorganized SunEdison.

(2) Net Change in International Funds includes proceeds from International assets sales, collection of other assets from foreign subsidiaries or disbursements made in foreign jurisdictions that are reflected in the US budget. The ability to repatriate foreign cash is dependent on several factors, including among others, the payment of third party liabilities, taxes, local laws, the wind down of legal entities. The amounts that are included above are management's current estimates of cash that will be repatriated to the US. The actual amount of cash that ultimately is repatriated to the US may be materially different than the amounts reflected above.

(3) Operating Costs include non-personnel related expenses, third party contractors, rent, insurance and various expenses to operate the entity.

(4) In the most recent CRO Report filed October 20, 2017, the ending free cash amount was $81.5 million based upon a projected emergence date of November 15, 2017 versus $75.1 million ending free cash based upon the actual emergence date of December 29, 2017 as shown in this report. The variance is mainly due to the Company's delay with its emergence from chapter 11 for these additional 43 days that enabled the Company to collect projected December receipts along with improved net cash receipts in the post emergence period.