**Hearing Date: March 27, 2018 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: March 20, 2018 at 4:00 p.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **SUNEDISON, INC., *et al.*,** | : | **Case No. 16-10992 (SMB)** |
|  | : |  |
| **Reorganized Debtors.[1]** | : | **Jointly Administered** |
|  | : |  |
|  | : |  |

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607). The address of the Reorganized Debtors' corporate headquarters is Two CityPlace Drive, 2nd floor, St. Louis, MO 63141.

**FIFTH INTERIM AND FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS FOR, (I) THE FIFTH INTERIM PERIOD FROM SEPTEMBER 1, 2017 THROUGH AND INCLUDING DECEMBER 29, 2017, AND (II) THE FINAL PERIOD FROM APRIL 21, 2016 <u>THROUGH AND INCLUDING AUGUST 31, 2017</u>**

| *General Information* | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Services to: | SunEdison, Inc., *et al.* |
| Petition Date: | April 21, 2016 |
| Date of Retention: | *Nunc pro tunc* to April 21, 2016 |

| *Summary of Fees and Expenses Sought in the Application for the Fifth Application Period* | |
|---|---|
| This is a/an: | __ monthly application<br> _x_ interim application<br> __ final application |
| Period for Which Compensation and Expense Reimbursement is Sought: | September 1, 2017 through and including December 29, 2017 |
| Amount of Actual, Reasonable and Necessary Compensation Attributable to the Fifth Application Period: | $4,479,501.51[2] |
| Amount of Expense Reimbursement Requested as Actual, Reasonable and Necessary in the Fifth Application Period: | $98,308.88 |
| Voluntary Fee Waiver and Expense Reduction in the Fifth Application Period: | $688,492.56[3] |

---

[2]  This amount includes the 20% holdback for the Fifth Application Period.

[3]  Skadden voluntarily reduced its fees and expenses in the Fifth Application Period by the following amounts: (i) $679,638.62 for fee reductions applied prior to the filing of the applicable monthly statement and (ii) $8,853.94 for expense reductions applied prior to the filing of the applicable monthly statement.  Consequently, Skadden does not seek payment of these fees and expenses in this Application. In accordance with the Fee Guidelines (as defined below), these voluntary reductions include waiving: (i) certain fees on account of non-working travel time; (ii) certain fees on account of preparing invoices; (iii) fees for professionals billing less than 5.0 hours total in a given month; and (vi) certain overtime meal and travel expenses.

A-2

| | |
|---|---|
| Total Compensation and Expense Reimbursement attributable to the Fifth Application Period: | $4,577,810.39[4] |
| Compensation Sought in this Application for the Fifth Application Period Already Paid Pursuant to the Interim Compensation Procedures Order but Not Yet Allowed: | $3,583,601.21[5] |
| Expenses Sought in this Application for the Fifth Application Period Already Paid Pursuant to the Interim Compensation Procedures Order but Not Yet Allowed: | $98,308.88 |

### *Summary of Fees and Expenses Sought in the Application for the Entire Case Period*

| | |
|---|---|
| This is a/an: | __ monthly application __ interim application _x_ final application |
| Period for Which Compensation and Expense Reimbursement is Sought: | April 21, 2016 through and including December 29, 2017 |
| Amount of Actual, Reasonable and Necessary Compensation Attributable to the Entire Case Period: | $73,919,381.99[6] |
| Amount of Expense Reimbursement Requested as Actual, Reasonable and Necessary in the Entire Case Period: | $1,795,661.97 |
| Voluntary Fee Waiver and Expense Reduction | $7,363,803.72[7] |

---

[4]    Skadden submitted monthly fee statements for the months covered by this Fifth Application Period on various dates through January 12, 2018.  This amount includes payments Skadden has received to date on account of those monthly fee statements.  This amount also includes the 20% holdback for the Fifth Application Period.

[5]    Pursuant to the Interim Compensation Procedures Order, Skadden has already received payments for compensation and expenses totaling $3,681,910.09 for the Fifth Application Period.

[6]    This amount includes holdbacks applicable for the Entire Case Period (as defined herein).

[7]    Skadden voluntarily reduced its fees and expenses in the Entire Case Period by the following amounts: (i) $6,718,963.58 for fee reductions applied prior to the filing of the applicable monthly statement, (ii) $150,880.50 for fee reductions applied after the filing of the applicable monthly statement, (iii) $474,666.10 for expense reductions applied prior to the filing of the applicable monthly statement, and (iv) $19,293.54 for expense reductions applied after the filing of the applicable monthly statement.  Consequently, Skadden does not seek payment of these fees and expenses in this Application.  Such fee waiver and expense reduction does not include Skadden's contribution to the Voluntary Professional Fee Reduction (as defined in the Plan and as discussed further herein).

in the Entire Case Period:

| | |
|---|---|
| Total Compensation and Expense Reimbursement attributable to the Entire Case Period: | $75,715,043.96[8] |
| Compensation Sought in this Application for the Entire Case Period Already Paid Pursuant to the Interim Compensation Procedures Order but Not Yet Allowed on a Final Basis: | $66,079,493.66 |
| Expenses Sought in this Application for the Entire Case Period Already Paid Pursuant to the Interim Compensation Procedures Order but Not Yet Allowed: | $1,777,626.84[9] |
| Total Outstanding Holdback (10% from each of the First, Second, Third, and Fourth Application Periods, and 20% from the Fifth Application Period) | $7,839,888.34[10] |

### Summary of Fees, Professionals, Rates and Budget for the Fifth Application Period

| | |
|---|---|
| Blended Rate in this Application for All Attorneys during the Fifth Application Period: | $951.67 |
| Blended Rate in this Application for All Timekeepers during the Fifth Application | $907.53 |

---

[8]     Skadden submitted monthly fee statements for the months covered by the Entire Case Period on various dates through January 12, 2018. This amount includes payments Skadden has received to date on account of those monthly fee statements. This amount also includes the 20% holdback for the Entire Case Period, of which 10% from each of the First, Second, Third, and Fourth Application Periods was already paid.

[9]     Pursuant to Article 2.3(b) of the Plan, Skadden was required to provide the Debtors with an estimate of fees due to Skadden for periods that had not been billed as of December 29, 2017. Skadden provided the Debtors with a fee estimate of $870,000.00 for fees generated during December 2017, and on the Effective Date, the Debtors paid Skadden $696,000.00 (representing 80% of the fee estimate provided by Skadden) and transferred $174,000.00 to the Holdback Escrow Account (as defined in the Plan) on account of Skadden's fee estimate. Skadden has not yet been paid the difference between the fee estimate and the amounts requested in its monthly fee statement for December 2017 ($781,611.57, representing 80% of fees and 100% of expenses), which included $18,035.13 in expense reimbursements that has not yet been paid.

[10]    Pursuant to the Plan, Skadden agreed to reduce the fees payable to it by $1.43 million, as Skadden's contribution to the aggregate Voluntary Professional Fee Reduction. Accordingly, on the Effective Date, the portion of the funds deposited in the Holdback Escrow Account (as defined in the Plan) on Skadden's behalf was reduced by this amount and such funds were transferred to the GUC/Litigation Trust (as defined in the Plan). Though Skadden is seeking full allowance of all fees generated during the Chapter 11 Cases, Skadden will only be paid $6,409,888.34 from the Holdback Escrow Account to account for this contribution to the Voluntary Professional Fee Reduction.

Period:

| | |
|---|---|
| Number of Professionals and Paraprofessionals Included in this Application for the Fifth Application Period: | 86 |
| Number of Professionals and Paraprofessionals Billing Fewer than 15 Hours to these Cases during the Fifth Application Period: | 33[11] |
| Increase in Rates: | Effective September 1, 2017, Skadden implemented firm-wide step increases to reflect class on class progression and promotions of certain Skadden professionals. These increases constituted annual "step increases," as defined in section B.2.d of the U.S. Trustee Guidelines (defined below), determined by Skadden in the ordinary course regarding attorneys and other billers throughout the firm due to advancing seniority and promotion. Pursuant to the U.S. Trustee Guidelines, such "step increases" do not constitute "rate increases." |

### *Summary of Fees, Professionals, Rates and Budget for the Entire Case Period*

| | |
|---|---|
| Blended Rate in this Application for All Attorneys during the Entire Case Period: | $891.35 |
| Blended Rate in this Application for All Timekeepers during the Entire Case Period: | $848.66 |
| Number of Professionals and Paraprofessionals Included in this Application for the Entire Case Period: | 372 |

---

[11]    In addition, during the Fifth Application Period Skadden voluntarily reduced its requested fees by $77,685.59 by writing off time for partners and counsel who billed fewer than one hour and associates who billed fewer than five hours in any given month, corresponding to 129.1 hours and 80 timekeeper write-offs.

| | |
|---|---|
| Number of Professionals and Paraprofessionals Billing Fewer than 15 Hours to these Cases during the Entire Case Period: | 147[12] |
| Increase in Rates: | Effective both September 1, 2016 and September 1, 2017, Skadden implemented firm-wide step increases to reflect class on class progression and promotions of certain Skadden professionals. These increases constituted annual "step increases," as defined in section B.2.d of the U.S. Trustee Guidelines (defined below), determined by Skadden in the ordinary course regarding attorneys and other billers throughout the firm due to advancing seniority and promotion. Pursuant to the U.S. Trustee Guidelines, such "step increases" do not constitute "rate increases." |
| | On January 1, 2017, Skadden implemented firm-wide rate increases applicable generally to clients in both bankruptcy and non-bankruptcy matters. Pursuant to paragraph 4 of the Order Authorizing and Approving the Skadden Retention Application [Docket No. 260], on December 22, 2016, Skadden, prior to applying any increases in its hourly rates beyond the rates set forth in the Skadden Retention Application, provided ten days' notice of its intended revised rates, effective January 1, 2017, to the Debtors, the United States Trustee, the Official Committee of Unsecured Creditors, counsel to the Tranche B Roll-Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders (the "Tranche B Lenders/Steering Committee"), and counsel to the administrative agent under the original debtor-in-possession financing facility, and to date no objection has been received. Additionally, pursuant to the SunEdison Global Outside Counsel Policy attached as Annex A-2 to Skadden's engagement letter filed with the Skadden Retention Application, |

---

[12]    In addition, during the Entire Case Period, Skadden voluntarily reduced its requested fees by $338,358.39 by writing off time for partners and counsel who billed fewer than one hour and associates who billed fewer than five hours in any given month, corresponding to 493.5 hours and 299 timekeeper write-offs.

Skadden also informed the Debtors of the January 1, 2017, rate increases prior to implementing these new rates, and they have not raised an objection. Consistent with paragraph 23 of the Skadden Retention Application, notice of these rate increases was provided to the Court and other parties in interest in the January 2017 monthly fee statement [Docket No. 2529].

## PRIOR FEE STATEMENTS/APPLICATIONS OF
## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

| DATE FILED | DOCKET NO. | PERIOD COVERED | FEES REQUESTED[13] | EXPENSES REQUESTED | FEES AUTHORIZED[14] | EXPENSES AUTHORIZED |
|---|---|---|---|---|---|---|
| 5/27/2016 | 415 | 4/21/2016-4/30/2016* | $1,687,083.26 (80% of $2,108,854.07) | $82,003.49 | $1,886,673.66 (90% of $2,096,304.07) | $79,553.49 |
| 6/30/2016 | 678 | 5/1/2016-5/31/2016* | $5,881,516.15 (80% of $7,351,895.19) | $153,389.61 | $6,569,229.79 (90% of $7,299,144.21) | $139,570.59 |
| 8/2/2016 | 899 | 6/1/2016-6/30/2016* | $4,932,535.15 (80% of $6,165,668.94) | $95,021.08 | $5,526,714.55 (90% of $6,140,793.94) | $95,021.08 |
| 9/2/2016 | 1111 | 7/1/2016-7/31/2016* | $4,331,599.30 (80% of $5,414,499.12) | $93,775.45 | $4,840,829.66 (90% of $5,378,699.62) | $93,295.45 |
| 10/5/2016 | 1330 | 8/1/2016-8/31/2016* | $4,426,927.76 (80% of $5,533,659.70) | $160,912.43[15] | $4,967,636.13 (90% of $5,519,595.70) | $158,367.91 |
| 11/2/2016 | 1522 | 9/1/2016-9/30/2016** | $3,657,063.65 (80% of $4,571,329.56) | $179,942.95 | $4,104,007.70 (90% of $4,560,008.56) | $179,942.95 |
| 12/2/2016 | 1742 | 10/1/2016-10/31/2016** | $2,998,594.30 (80% of $3,748,242.88) | $53,917.97 | $3,373,418.59 (90% of $3,748,242.88) | $53,917.97 |
| 1/4/2017 | 2108 | 11/1/2016-11/30/2016** | $3,268,150.94 (80% of $4,085,188.67) | $51,677.36 | $3,676,669.80 (90% of $4,085,188.67) | $51,677.36 |

---

[13]    These amounts are the fees and expenses requested in the monthly statements as filed.  After the submission of certain of the monthly statements, Skadden received informal comments from the United Stated Trustee.  In response to the comments from the United States Trustee, Skadden agreed to further fee and expense reductions in the applicable periods, which included the following: (i) a reduction of $12,550.00 in fees and $2,450.00 in expenses for April 2016, (ii) a reduction of $52,750.98 in fees and $13,819.02 in expenses for May 2016, (iii) a reduction of $24,875.00 in fees for June 2016, (iv) a reduction of $35,799.50 in fees and $480.00 in expenses for July 2016, (v) a reduction of $14,064.00 in fees and $1,173.22 in expenses for August 2016, and (vi) a reduction of $11,321.00 in fees for September 2016.

[14]    At the hearings to consider approval of the fees and expenses sought in the Second Application Period, Third Application Period, and Fourth Application Period (each as defined below and, together with the First Application Period, the "Prior Application Periods"), this Court approved the allowance and payment of half of the 20% holdback for each of the Prior Application Periods.  Accordingly, fees authorized for each of the Prior Application Periods are 90% of the fees requested in the applicable monthly fee statements.

[15]    Post-filing, Skadden voluntarily agreed to reduce its expenses by an additional $1,371.30 to adjust for a non-reimbursable expense.

| DATE FILED | DOCKET NO. | PERIOD COVERED | FEES REQUESTED[13] | EXPENSES REQUESTED | FEES AUTHORIZED[14] | EXPENSES AUTHORIZED |
|---|---|---|---|---|---|---|
| 2/1/2017 | 2373 | 12/1/2016-12/31/2016** | $3,153,955.47 (80% of $3,942,444.34) | $76,011.98 | $3,548,199.91 (90% of $3,942,444.34) | $76,011.98 |
| 3/2/2017 | 2529 | 1/1/2017-1/31/2017*** | $3,287,696.42 (80% of $4,109,620.53) | $82,393.70 | $3,698,658.48 (90% of $4,109,620.53) | $82,393.70 |
| 4/4/2017 | 2726 | 2/1/2017-2/28/2017*** | $2,772,453.69 (80% of $3,465,567.11) | $42,431.93 | $3,119,010.40 (90% of $3,465,567.11) | $42,431.93 |
| 5/2/2017 | 2885 | 3/1/2017-3/31/2017*** | $3,498,542.00 (80% of $4,373,177.50) | $64,312.37 | $3,935,859.75 (90% of $4,373,177.50) | $64,312.37 |
| 6/1/2017 | 3242 | 4/1/2017-4/30/2017*** | $3,026,144.02 (80% of $3,782,680.03) | $118,105.15 | $3,404,412.03 (90% of $3,782,680.03) | $118,105.15 |
| 7/5/2017 | 3509 | 5/1/2017-5/31/2017**** | $2,548,922.66 (80% of $3,186,153.33) | $49,428.09 | $2,867,538.00 (90% of $3,186,153.33) | $49,428.09 |
| 8/2/2017 | 3785 | 6/1/2017-6/30/2017**** | $2,135,831.38 (80% of $2,669,789.22) | $131,001.33 | $2,402,810.30 (90% of $2,669,789.22) | $131,001.33 |
| 8/31/2017 | 3975 | 7/1/2017-7/31/2017**** | $2,530,332.42 (80% of $3,162,915.53) | $246,625.35 | $2,846,623.98 (90% of $3,162,915.53) | $246,625.35 |
| 10/3/2017 | 4098 | 8/1/2017-8/31/2017**** | $1,535,644.19 (80% of $1,919,555.24) | $35,696.39 | $1,727,599.72 (90% of $1,919,555.24) | $35,696.39 |
| 11/1/2017 | 4235 | 9/1/2017-9/30/2017 | $899,213.40 (80% of $1,124,016.75) | $43,919.59 | $899,213.40 (80% of $1,124,016.75) | $43,919.59 |
| 11/29/2017 | 4373 | 10/1/2017-10/31/2017 | $1,116,613.76 (80% of $1,395,767.20) | $27,967.78 | $1,116,613.76 (80% of $1,395,767.20) | $27,967.78 |
| 12/13/2017 | 4424 | 11/1/2017-11/30/2017 | $804,197.61 (80% of $1,005,247.01) | $8,386.38 | $804,197.61 (80% of $1,005,247.01) | $8,386.38 |
| 1/12/2018 | 4541 | 12/1/2017-12/29/2017 | $763,576.44 (80% of $954,470.55) | $18,035.13 | $763,576.44 (80% of $954,470.55) | $18,035.13 |

* Skadden previously filed its first interim fee application pertaining to these monthly fee periods [Docket No. 1419], which was approved by the Court [Docket No. 1711], subject to continued 20% holdbacks. Those holdbacks were subsequently reduced to 10% holdbacks by order of the Court on August 15, 2017 [Docket No. 3873].

** Skadden previously filed its second interim fee application pertaining to these monthly fee periods [Docket No. 2468], which was approved by the Court on March 28, 2017 [Docket No. 2663], subject to continued 10% holdbacks.

*** Skadden previously filed its third interim fee application pertaining to these monthly fee periods [Docket No. 3341], which was approved by the Court [Docket No. 3873], subject to continued 10% holdbacks.

**** Skadden previously filed its fourth interim fee application pertaining to these monthly fee periods [Docket No. 4152], which was approved by the Court [Docket No. 4343], subject to continued 10% holdbacks.

**TIME SUMMARY TO FIFTH INTERIM FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR THE FIFTH APPLICATION PERIOD FROM SEPTEMBER 1, 2017 – DECEMBER 29, 2017**

| NAME | YEAR OF ADMISSION | RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Anthony W. Clark | 1979 | $667.50 * | 14.8 | $9,879.00 |
| | | $1,335.00 | 355.1 | $474,058.50 |
| Karen L. Corman | 1988 | $1,335.00 | 9.8 | $13,083.00 |
| Michael H. Gruenglas | 1991 | $1,410.00 | 26.1 | $36,801.00 |
| J. Eric Ivester | 1985 | $1,335.00 | 350.9 | $468,451.50 |
| Neil M. Leff | 1981 | $1,335.00 | 2.2 | $2,937.00 |
| Jeremy D. London | 1997 | $1,335.00 | 43.2 | $57,672.00 |
| Christopher P. Malloy | 1994 | $1,410.00 | 38.4 | $54,144.00 |
| James J. Mazza, Jr. | 2001 | $1,090.00 | 29.3 | $31,937.00 |
| Scott D. Musoff | 1995 | $1,410.00 | 8.4 | $11,844.00 |
| Andrea L. Nicolas | 1999 | $1,335.00 | 6.7 | $8,944.50 |
| Eric C. Otness | 2002 | $1,250.00 | 26.3 | $32,875.00 |
| Sean Shimamoto | 1997 | $1,410.00 | 6.6 | $9,306.00 |
| Sarah M. Ward | 1987 | $1,495.00 | 28.0 | $41,860.00 |
| **Partner Total** | | | **945.8** | **$1,253,792.50** |
| **COUNSELS** | | | | |
| Michael R. Bergmann | 1993 | $1,090.00 | 6.5 | $7,085.00 |
| Henry C. Eisenberg | 1985 | $1,090.00 | 12.2 | $13,298.00 |
| George C. Fatheree, III | 2008 | $1,045.00 | 16.6 | $17,347.00 |
| Michael J. Hong | 2008 | $1,015.00 | 24.3 | $24,664.50 |
| Jorge H. Kamine | 1999 | $926.50 ** | 42.0 | $38,913.00 |
| | | $1,090.00 | 47.3 | $51,557.00 |
| Josh LaGrange | 2000 | $1,090.00 | 3.0 | $3,270.00 |
| Thomas D. Logan | 1989 | $1,090.00 | 6.5 | $7,085.00 |
| Peter Luneau | 2004 | $1,090.00 | 62.4 | $68,016.00 |
| Aryan Moniri | 2008 | $970.00 | 137.7 | $133,569.00 |
| Richard L. Oliver | 2007 | $522.50 * | 24.0 | $12,540.00 |
| | | $1,045.00 | 214.4 | $224,048.00 |
| Risa M. Salins | 2002 | $1,090.00 | 5.8 | $6,322.00 |
| Melissa M. Tiarks | 2009 | $970.00 | 7.0 | $6,790.00 |
| Robert A. Weber | 1991 | $545.00 * | 3.0 | $1,635.00 |
| | | $1,090.00 | 66.2 | $72,158.00 |
| Andrew D. Woodard | 2004 | $1,090.00 | 32.6 | $35,534.00 |
| **Total Counsel** | | | **711.5** | **$723,831.50** |

| NAME | YEAR OF ADMISSION | RATE | HOURS | AMOUNT |
|------|------------------|------|-------|--------|
| **ASSOCIATES** | | | | |
| Christopher F. Baeza | 2016 | $965.00 | 44.6 | $43,039.00 |
| Matthew D. Beebe | 2014 | $860.00 | 158.6 | $136,396.00 |
| Amanda M. Bradley | N/A | $415.00 | 8.7 | $3,610.50 |
| Brittany Brody | N/A | $415.00 | 7.7 | $3,195.50 |
| Louis S. Chiappetta | 2009 | $482.50 * | 26.0 | $12,545.00 |
| | | $965.00 | 310.8 | $299,922.00 |
| Ben Clapp | 2008 | $965.00 | 30.1 | $29,046.50 |
| Catie L. English | N/A | $415.00 | 20.2 | $8,383.00 |
| Cameron M. Fee | 2008 | $815.00 | 73.1 | $59,576.50 |
| Ebba Gebisa | 2008 | $965.00 | 352.3 | $339,969.50 |
| Benjamin S. Goldberg | 2015 | $710.00 | 30.6 | $21,726.00 |
| Joshua K. Goldman | 2014 | $860.00 | 9.2 | $7,912.00 |
| Paige W. Griffiths | 2016 | $297.50 * | 0.9 | $267.75 |
| | | $595.00 | 314.0 | $186,830.00 |
| Evan A. Hill | 2012 | $786.25 ** | 2.4 | $1,887.01 |
| | | $925.00 | 291.6 | $269,730.00 |
| Gregory D. Howling | 2012 | $895.00 | 1.9 | $1,700.50 |
| Ariel Hsiung | 2016 | $710.00 | 17.2 | $12,212.00 |
| Allie M. Keefe | 2015 | $710.00 | 100.8 | $71,568.00 |
| Jason N. Kestecher | 2015 | $815.00 | 66.8 | $54,442.00 |
| Sheila A. Kilkelly | 2013 | $860.00 | 19.2 | $16,512.00 |
| Hung A. Kim | 2017 | $595.00 | 59.5 | $35,402.50 |
| Daniel J. Knudsen | 2015 | $815.00 | 153.8 | $125,347.00 |
| Niqui Kohli | 2014 | $815.00 | 15.4 | $12,551.00 |
| Jennifer Madden | 2010 | $965.00 | 141.9 | $136,933.50 |
| Edward P. Mahaney-Walter | 2013 | $895.00 | 20.2 | $18,079.00 |
| Rebekah J. Mott | 2012 | $895.00 | 32.0 | $28,640.00 |
| Kirsten E. Newman | 2013 | $895.00 | 1.6 | $1,432.00 |
| Lisa P. Ogust | 2016 | $710.00 | 27.9 | $19,809.00 |
| Jared A. Petermeyer | 2017 | $415.00 | 15.2 | $6,308.00 |
| Mark A. Schlackman | 2011 | $895.00 | 2.0 | $1,790.00 |
| Jackie N. Schruhl | 2017 | $595.00 | 8.0 | $4,760.00 |
| Erin A. Simmons | 2010 | $965.00 | 21.1 | $20,361.50 |
| Matthew Stein | 2006 | $965.00 | 7.7 | $7,430.50 |
| Mari C. Stonebraker | 2014 | $860.00 | 24.8 | $21,328.00 |
| Bram A. Strochlic | 2015 | $815.00 | 102.3 | $83,374.50 |
| Kenneth M. Thomas | 2016 | $595.00 | 135.6 | $80,682.00 |
| Michael Tomczyk | 2014 | $815.00 | 5.8 | $4,727.00 |

| NAME | YEAR OF ADMISSION | RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| Matthew G. Vitorla | 2016 | $595.00 | 27.1 | $16,124.50 |
| Steve Walsh | N/A | $415.00 | 18.6 | $7,719.00 |
| Tereza Widmar | 2015 | $603.50 ** | 45.5 | $27,459.25 |
| | | $710.00 | 32.5 | $23,075.00 |
| Justin M. Winerman | 2009 | $965.00 | 0.6 | $579.00 |
| Jacob D. Wolf | 2013 | $447.50 * | 8.0 | $3,580.00 |
| | | $895.00 | 131.5 | $117,692.50 |
| Stephanie Yesnik | 2014 | $815.00 | 15.7 | $12,795.50 |
| **Associate Total** | | | **2,941.0** | **$2,398,451.01** |
| **CLIENT SPECIALISTS** | | | | |
| Maribel Perez | | $450.00 | 9.7 | $4,365.00 |
| Jerry L. Pfeffer | | $925.00 | 6.5 | $6,012.50 |
| **Client Specialist Total** | | | **16.2** | **$10,377.50** |
| **PARAPROFESSIONALS** | | | | |
| Karl Bostroem | | $385.00 | 5.1 | $1,963.50 |
| Andrea T. Chouprouta | | $385.00 | 14.1 | $5,428.50 |
| Melissa Eng | | $330.00 | 9.0 | $2,970.00 |
| John D. Foley | | $300.00 | 62.6 | $18,780.00 |
| Brian E. Keating | | $95.00 | 1.6 | $152.00 |
| Wendy K. LaManna | | $385.00 | 15.6 | $6,006.00 |
| Tracey L. Lewis | | $345.00 | 1.0 | $345.00 |
| Ann Link | | $330.00 | 6.5 | $2,145.00 |
| Dawn A. MacFarline | | $335.00 | 21.1 | $7,068.50 |
| Catherine A. Mejia | | $300.00 | 4.7 | $1,410.00 |
| Daniel S. Morse | | $385.00 | 5.7 | $2,194.50 |
| William Rivera | | $95.00 | 2.0 | $190.00 |
| Pablo Salguero | | $300.00 | 72.6 | $21,780.00 |
| Jessica H. Sherwood-Noguchi | | $330.00 | 6.0 | $1,980.00 |
| Lindsay Spellman | | $220.00 | 71.0 | $15,620.00 |
| Erin M. Sullivan | | $220.00 | 22.8 | $5,016.00 |
| **Paraprofessional Total** | | | **321.4** | **$93,049.00** |
| **Total Attorney Fees** | | | **4,598.3** | **$4,376,075.01** |
| **Attorney Blended Rate** | | | | **$951.67** |
| **Grand Total for All Timekeepers** | | | **4,935.9** | **$4,479,501.51** |

| NAME | YEAR OF ADMISSION | RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| **Blended Rate for All Timekeepers** | | | | **$907.53**[16] |

\* Nonworking Travel Time billed with a 50% rate discount.
\*\* Certain matters billed with a 15% rate discount per the Engagement Agreement.

---

[16] For further information, see <u>Exhibit C</u> ("Rate Disclosures"), which sets forth a summary of blended hourly rates for Skadden timekeepers who billed to (i) non-bankruptcy matters and (ii) the Debtors. Skadden calculated the blended rate for timekeepers who billed to the Debtors by dividing the total dollar amount billed by such timekeepers during the Fifth Application Period by the total number of hours billed by such timekeepers during the Fifth Application Period. Furthermore, during the Fifth Application Period, Skadden voluntarily reduced its fees requested by $679,638.62 (13.2%) and its expenses requested by $8,853.94 (8.3%), for a total of $688,492.56 (13.1%), and its hours billed from a base of 5,702.1 to 4,935.9 (13.4%). Although not directly comparable to the calculation set forth above, the total Debtor blended hourly rate based on the amount billed divided by actual hours worked (including non-billed hours), was $785.59.

**SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP DURING THE FIFTH
APPLICATION PERIOD FROM SEPTEMBER 1, 2017 – DECEMBER 29, 2017**

| MATTERS | HOURS | NET AMOUNT |
|---|---|---|
| AQR Appeal | 602.7 | $529,779.00 |
| Asset Dispositions (General) | 19.8 | $18,264.50 |
| Asset Dispositions (Real Property) | 140.3 | $152,274.50 |
| Automatic Stay (Relief Actions) | 3.1 | $2,526.50 |
| Backstop Commitment/Rights Offering | 139.6 | $128,664.50 |
| Business Operations / Strategic Planning | 32.2 | $34,793.00 |
| C&I Platform | 7.7 | $6,622.00 |
| Case Administration | 207.3 | $127,370.50 |
| Claims Admin. (General) | 81.2 | $78,014.00 |
| Creditor Meetings / Statutory Committees | 42.7 | $44,530.50 |
| Employee Matters (General) | 90.4 | $82,827.00 |
| Executory Contracts (Personalty) | 36.7 | $29,497.00 |
| Financing (DIP and Emergence) | 202.6 | $167,831.00 |
| First Light | 4.7 | $3,830.50 |
| Foreign Affiliates | 0.7 | $763.00 |
| GAM Sale | 120.9 | $113,402.50 |
| General Corporate Advice | 9.9 | $13,216.50 |
| GSSG | 7.9 | $8,226.00 |
| Honduras* | 1.0 | $926.50 |
| Insurance | 52.8 | $51,449.50 |
| JPM Warehouse | 0.1 | $97.00 |

| MATTERS | HOURS | NET AMOUNT |
|---|---|---|
| Jupiter | 3.0 | $2,805.00 |
| Latin America General* | 88.9 | $67,332.76 |
| Latin America Portfolio Sale | 80.5 | $62,772.50 |
| Litigation (General) | 223.5 | $219,216.00 |
| Milford | 262.4 | $228,993.00 |
| MultiDistrict Mediation | 57.4 | $54,065.00 |
| Nonworking Travel Time | 78.8 | $41,696.25 |
| North American Utility and C&I Assets | 4.5 | $4,177.50 |
| Post-Closing Solar Materials Sale Matters | 12.3 | $13,287.00 |
| Regulatory and SEC Matters | 11.0 | $12,020.00 |
| Reorganization Plan / Plan Sponsors | 418.6 | $409,740.50 |
| Reports and Schedules | 155.6 | $135,713.50 |
| Retention / Fee Matters (SASM&F) | 156.8 | $135,011.50 |
| Retention / Fee Matters / Objections (Others) | 45.5 | $36,046.00 |
| SLB Projects | 605.2 | $402,965.00 |
| Solar Materials Sale | 0.2 | $194.00 |
| Solar Materials Sale Objections Litigation | 7.8 | $8,502.00 |
| Tax Matters | 10.1 | $12,460.00 |
| TERP/GLBL | 118.5 | $104,284.00 |
| TERP/GLBL Sale | 789.6 | $932,173.50 |
| Vendor Matters | 1.4 | $1,141.00 |
| **Total** | **4,935.9** | **$4,479,501.51** |

* Certain matters billed with a 15% rate discount per the Engagement Agreement.

A-16

**SUMMARY OF EXPENSES INCURRED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP DURING THE FIFTH
APPLICATION PERIOD FROM SEPTEMBER 1, 2017 – DECEMBER 29, 2017**

| CHARGES AND DISBURSEMENTS | AMOUNT |
|---|---|
| Computer Legal Research | $13,096.93 |
| Long Distance Telephone | $2,522.89 |
| In-House Reproduction (at $0.10 per page) | $11.90 |
| Reproduction-color (at $0.10 per page) | $98.20 |
| Outside Reproduction | $47,240.95 |
| Outside Research | $1,458.61 |
| Filing/Court Fees | $5,153.53 |
| Court Reporting | $3,933.65 |
| Local Travel | $2,058.97 |
| Out-Of-Town Travel | $13,047.91 |
| Business Meals | $3,376.94 |
| Courier & Express Carriers (e.g., Federal Express) | $475.75 |
| Postage | $30.38 |
| Professional Fees[17] | $930.78 |
| Electronic Document Management | $2,656.66 |
| Other[18] | $2,214.83 |
| **TOTAL** | **$98,308.88** |

---

[17]  These represent fees generated by vendors and other professionals that do not bill the Debtors directly and which provided support services to Skadden during the course of its representation of the Debtors.

[18]  This category includes $1,171.00 in UCC filings and searches, $37.50 in support staff time, $281.79 in attorney work meals, $719.54 in small computer hardware and software, and $5.00 in word processing.

**TIME SUMMARY TO FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR THE ENTIRE CASE PERIOD FROM APRIL 21, 2016 – DECEMBER 29, 2017**

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|------|------|------|------|------|
| **PARTNERS** | | | | |
| David P. Armstrong | 2000 | $1,200.00 | 1.6 | $1,920.00 |
| | | $1,020.00 * | 149.6 | $152,592.00 |
| | | $1,250.00 | 9.2 | $11,500.00 |
| David S. Clancy | 1996 | $1,275.00 | 12.7 | $16,192.50 |
| Anthony W. Clark | 1979 | $1,275.00 | 1,365.6 | $1,741,140.00 |
| | | $637.50 *** | 72.9 | $46,473.75 |
| | | $1,335.00 | 1,772.6 | $2,366,421.00 |
| | | $667.50 *** | 140.9 | $94,050.75 |
| | | $350.00 ** | 0.5 | $175.00 |
| William B. Conway Jr. | 1982 | $1,200.00 | 33.3 | $39,960.00 |
| | | $1,250.00 | 2.9 | $3,625.00 |
| Karen L. Corman | 1988 | $1,275.00 | 3.1 | $3,952.50 |
| | | $1,335.00 | 30.6 | $40,851.00 |
| Mark L. Darley | 1986 | $1,351.00 | 1.3 | $1,756.88 |
| Linda Davies | 1989 | $992.00 | 0.5 | $495.88 |
| Daniel Dusek | 2001 | $1,275.00 | 8.6 | $10,965.00 |
| Shana A. Elberg | 2002 | $1,040.00 | 601.8 | $625,872.00 |
| Gregory A. Fernicola | 1986 | $1,425.00 | 5.1 | $7,267.50 |
| Stuart M. Finkelstein | 1986 | $1,425.00 | 5.7 | $8,122.50 |
| | | $1,495.00 | 3.0 | $4,485.00 |
| John P. Furfaro | 1981 | $1,275.00 | 329.2 | $419,730.00 |
| | | $1,335.00 | 60.3 | $80,500.50 |
| Jay M. Goffman | 1984 | $1,425.00 | 749.4 | $1,067,895.00 |
| | | $712.50 *** | 3.0 | $2,137.50 |
| Armando Gomez | 1994 | $1,350.00 | 7.2 | $9,720.00 |
| Michael H. Gruenglas | 1991 | $1,350.00 | 1,352.7 | $1,826,145.00 |
| | | $675.00 *** | 1.5 | $1,012.50 |
| | | $1,410.00 | 996.7 | $1,405,347.00 |
| Christopher J. Gunther | 1992 | $1,335.00 | 106.6 | $142,311.00 |

---

[19]    As noted above, during the Entire Case Period, Skadden raised its rates three times, two of which were "step increases" that do not constitute "rate increases" pursuant to the U.S. Trustee Guidelines.  Accordingly, depending on when the applicable professional and paraprofessional rendered services on behalf of the Debtors, such professional or paraprofessional may have billed at one of three different rates, not including the additional rate distinctions that are marked on this table with asterisks and described in further detail below.

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $667.50 *** | 16.8 | $11,214.00 |
| Ann A. Hawkins | 1994 | $1,100.00 | 22.8 | $25,080.00 |
| | | $1,200.00 | 107.7 | $129,240.00 |
| | | $1,250.00 | 185.5 | $231,875.00 |
| Albert L. Hogan III | 1997 | $1,275.00 | 17.6 | $22,440.00 |
| J. Eric Ivester | 1985 | $1,275.00 | 1,550.7 | $1,977,142.50 |
| | | $637.50 *** | 26.9 | $17,148.75 |
| | | $1,335.00 | 1,838.3 | $2,454,130.50 |
| | | $667.50 *** | 4.0 | $2,670.00 |
| Alex Jupp | 2005 | £695.00 | 0.3 | $299.67 |
| | | £591.00 | 1.5 | $1,278.31 |
| Paul S. Kraske | 1997 | $1,020.00 | 5.8 | $5,916.00 |
| | | $1,200.00 | 318.7 | $382,440.00 |
| | | $600.00 *** | 11.0 | $6,600.00 |
| | | $1,250.00 | 40.3 | $50,375.00 |
| Allison L. Land | 1993 | $1,275.00 | 6.4 | $8,160.00 |
| | | $1,083.75 * | 7.9 | $8,561.64 |
| Neil M. Leff | 1981 | $1,275.00 | 6.1 | $7,777.50 |
| | | $1,335.00 | 2.2 | $2,937.00 |
| Jeremy D. London | 1997 | $1,275.00 | 584.5 | $745,237.50 |
| | | $637.50 *** | 16.5 | $10,518.75 |
| | | $1,335.00 | 266.4 | $355,644.00 |
| | | $667.50 *** | 4.5 | $3,003.75 |
| Christopher P. Malloy | 1994 | $1,410.00 | 38.4 | $54,144.00 |
| James J. Mazza, Jr. | 2001 | $1,090.00 | 672.6 | $733,134.00 |
| | | $545.00 *** | 82.0 | $44,690.00 |
| Dominic McCahill | 1991 | £850.00 | 570.4 | $668,586.75 |
| | | £722.50 | 0.8 | $755.43 |
| | | £425.00 | 19.0 | $10,532.15 |
| | | £930.00 | 36.4 | $42,818.18 |
| Gregory G.H. Miao | 1988 | $1,275.00 | 1.5 | $1,912.50 |
| Scott D. Musoff | 1995 | $1,410.00 | 8.4 | $11,844.00 |
| Douglas R. Nemec | 1997 | $1,275.00 | 5.5 | $7,012.50 |
| | | $1,335.00 | 133.5 | $178,222.50 |
| Andrea L. Nicolas | 1999 | $1,275.00 | 490.6 | $625,515.00 |
| | | $1,335.00 | 151.6 | $202,386.00 |
| Gregg A. Noel | 1982 | $1,425.00 | 7.2 | $10,260.00 |
| Eric C. Otness | 2002 | $990.00 | 31.0 | $30,690.00 |
| | | $1,100.00 | 121.1 | $133,210.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $1,150.00 | 211.9 | $243,685.00 |
| | | $1,250.00 | 26.3 | $32,875.00 |
| Thomas Perrot | 2002 | €1,010.00 | 1.8 | $2,136.40 |
| Timothy G. Reynolds | 1981 | $1,275.00 | 497.3 | $634,057.50 |
| Ivan A. Schlager | 1990 | $1,275.00 | 3.0 | $3,825.00 |
| Erica Schohn | 2004 | $1,200.00 | 5.1 | $6,120.00 |
| Ethan M. Schultz | 2005 | $935.00 | 3.8 | $3,553.00 |
| Sean Shimamoto | 1997 | $1,275.00 | 73.8 | $94,095.00 |
| | | $1,083.75 * | 15.0 | $16,256.27 |
| | | $1,350.00 | 66.2 | $89,370.00 |
| | | $1,147.50 * | 1.0 | $1,147.50 |
| | | $1,410.00 | 153.7 | $216,717.00 |
| | | $1,198.50 * | 1.2 | $1,438.20 |
| Lawrence S. Spiegel | 1991 | $1,275.00 | 4.5 | $5,737.50 |
| | | $1,335.00 | 1.3 | $1,735.50 |
| Sarah M. Ward | 1987 | $1,425.00 | 507.2 | $722,760.00 |
| | | $1,495.00 | 301.8 | $451,191.00 |
| George A. Zimmerman | 1980 | $1,425.00 | 175.8 | $250,515.00 |
| | | $1,495.00 | 18.3 | $27,358.50 |
| Matthew B. Zisk | 1998 | $1,275.00 | 116.5 | $148,537.50 |
| | | $1,083.75 * | 4.8 | $5,202.00 |
| | | $1,335.00 | 50.6 | $67,551.00 |
| **Partner Total** | | | **17,481.4** | **$22,373,883.51** |
| **OF COUNSELS** | | | | |
| Andrew J. Brady | 1996 | $1,150.00 | 7.1 | $8,165.00 |
| Helena J. Derbyshire | 1993 | £630.00 | 58.9 | $47,853.47 |
| | | £685.00 | 2.2 | $1,898.80 |
| **Of Counsel Total** | | | **68.2** | **$57,917.27** |
| **COUNSELS** | | | | |
| Valentin Autret | 2005 | €785.00 | 5.5 | $4,966.49 |
| Michael R. Bergmann | 1993 | $1,040.00 | 15.8 | $16,432.00 |
| | | $1,090.00 | 10.1 | $11,009.00 |
| Nathaniel Bolin | 2003 | $1,000.00 | 11.8 | $11,800.00 |
| | | $1,045.00 | 3.2 | $3,344.00 |
| James W. Brown | 1993 | $1,040.00 | 659.8 | $686,192.00 |
| | | $1,090.00 | 218.1 | $237,729.00 |
| Ronald N. Brown, III | 2006 | $925.00 | 20.1 | $18,592.50 |
| | | $970.00 | 7.4 | $7,178.00 |
| | | $1,015.00 | 19.4 | $19,691.00 |
| David E. Carney | 1999 | $1,040.00 | 6.7 | $6,968.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $884.00 * | 3.5 | $3,094.00 |
| Adam B. Cheng | 2002 | $1,040.00 | 5.0 | $5,200.00 |
| Stacey L. Cohen | 2004 | $350.00 | 17.0 | $5,950.00 |
| J. Alexander Cooke | 2006 | $1,040.00 | 11.0 | $11,440.00 |
| Catherine E. Danz | 2001 | $1,000.00 | 15.8 | $15,800.00 |
| | | $850.00 * | 2.4 | $2,040.00 |
| | | $1,040.00 | 2.2 | $2,288.00 |
| | | $1,090.00 | 21.0 | $22,890.00 |
| Henry C. Eisenberg | 1985 | $1,040.00 | 28.2 | $29,328.00 |
| | | $1,090.00 | 25.2 | $27,468.00 |
| Carl R. Erdmann | 1996 | $1,040.00 | 5.9 | $6,136.00 |
| | | $1,090.00 | 9.8 | $10,682.00 |
| George C. Fatheree, III | 2008 | $1,045.00 | 16.6 | $17,347.00 |
| Berit R. Freeman | 1991 | $1,090.00 | 1.5 | $1,635.00 |
| Jonathan M. Gafni | 1988 | $970.00 | 16.2 | $15,714.00 |
| | | $1,000.00 | 74.1 | $74,100.00 |
| | | $1,045.00 | 4.4 | $4,598.00 |
| Michael J. Hong | 2008 | $925.00 | 96.3 | $89,077.50 |
| | | $970.00 | 23.8 | $23,086.00 |
| | | $1,015.00 | 24.3 | $24,664.50 |
| Marti A. Johnson | 2003 | $350.00 ** | 4.9 | $1,715.00 |
| Jorge H. Kamine | 1999 | $1,040.00 | 1,048.0 | $1,089,920.00 |
| | | $884.00 * | 682.3 | $603,153.20 |
| | | $520.00 *** | 35.0 | $18,200.00 |
| | | $1,090.00 | 746.2 | $813,358.00 |
| | | $926.50 * | 78.6 | $72,822.90 |
| Richard W. Kidd | 1999 | $1,040.00 | 136.4 | $141,856.00 |
| Josh LaGrange | 2000 | $1,090.00 | 4.4 | $4,796.00 |
| Nicholas A. Lawn | 2005 | £685.00 | 6.5 | $5,054.03 |
| Thomas D. Logan | 1989 | $1,040.00 | 27.7 | $28,808.00 |
| | | $1,090.00 | 6.5 | $7,085.00 |
| Peter Luneau | 2004 | $1,040.00 | 52.9 | $55,016.00 |
| | | $1,090.00 | 234.8 | $255,932.00 |
| Joy E. Maddox | 1988 | $884.00 | 5.5 | $4,862.00 |
| James J. Mazza, Jr. | 2001 | $1,040.00 | 1,512.1 | $1,572,584.00 |
| | | $884.00 * | 24.9 | $22,011.60 |
| | | $520.00 *** | 125.1 | $65,052.00 |
| | | $1,090.00 | 562.0 | $612,580.00 |
| | | $926.50 * | 1.0 | $926.50 |

A-21

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $545.00 *** | 68.1 | $37,114.50 |
| Brian C. Mohr | 1980 | $1,040.00 | 155.3 | $161,512.00 |
| | | $1,090.00 | 35.9 | $39,131.00 |
| Aryan Moniri | 2008 | $970.00 | 301.2 | $292,164.00 |
| Timothy F. Nelson | 1997 | $1,040.00 | 14.7 | $15,288.00 |
| Richard L. Oliver | 2007 | $925.00 | 595.8 | $551,115.00 |
| | | $462.50 *** | 15.4 | $7,122.50 |
| | | $970.00 | 191.4 | $185,658.00 |
| | | $485.00 *** | 11.2 | $5,432.00 |
| | | $1,015.00 | 601.6 | $610,624.00 |
| | | $507.50 *** | 44.8 | $22,736.00 |
| | | $1,045.00 | 214.4 | $224,048.00 |
| | | $522.50 *** | 24.0 | $12,540.00 |
| Nike O. Opadiran | 2008 | $925.00 | 218.1 | $201,742.50 |
| | | $786.50 * | 238.1 | $187,206.51 |
| | | $970.00 | 121.8 | $118,146.00 |
| | | $824.50 * | 292.3 | $241,001.35 |
| | | $1,015.00 | 11.6 | $11,774.00 |
| Jenness E. Parker | 2005 | $1,090.00 | 1.2 | $1,308.00 |
| Sarah E. Pierce | 2005 | $1,000.00 | 222.0 | $222,000.00 |
| | | $500.00 *** | 4.3 | $2,150.00 |
| | | $1,040.00 | 83.0 | $86,320.00 |
| | | $520.00 *** | 3.2 | $1,664.00 |
| Mark P. Ramsey | 1998 | $1,040.00 | 1.3 | $1,352.00 |
| Risa M. Salins | 2002 | $1,090.00 | 5.8 | $6,322.00 |
| Frank C. Shaw | 1989 | $1,040.00 | 168.8 | $175,552.00 |
| | | $884.00 * | 6.8 | $6,011.20 |
| Giyoung Song | 2003 | $925.00 | 17.1 | $15,817.50 |
| MaryAnn J. Sung | 2004 | $1,090.00 | 143.7 | $156,633.00 |
| James S. Talbot | 1999 | $1,090.00 | 7.2 | $7,848.00 |
| Melissa M. Tiarks | 2009 | $970.00 | 20.7 | $20,079.00 |
| Robert W. Warnement | 1995 | $1,040.00 | 10.2 | $10,608.00 |
| | | $1,090.00 | 35.3 | $38,477.00 |
| Robert A. Weber | 1991 | $1,040.00 | 361.7 | $376,168.00 |
| | | $520.00 *** | 6.9 | $3,588.00 |
| | | $1,090.00 | 847.8 | $924,102.00 |
| | | $545.00 *** | 24.5 | $13,352.50 |
| | | $350.00 ** | 1.6 | $560.00 |
| Richard H. West | 2000 | $925.00 | 11.5 | $10,637.50 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| Andrew D. Woodard | 2004 | $1,090.00 | 64.9 | $70,741.00 |
| Sooryun Youn | 1994 | $1,040.00 | 2.6 | $2,704.00 |
| | | $884.00 * | 1.1 | $972.40 |
| **Total Counsel** | | | **11,885.8** | **$11,871,494.68** |
| **ASSOCIATES** | | | | |
| Steven D. Adler | 2016 | $390.00 | 7.4 | $2,886.00 |
| | | $495.00 | 48.8 | $24,156.00 |
| Esther Adzhiashvili | 2015 | $565.00 | 409.3 | $231,254.50 |
| | | $282.50 *** | 3.3 | $932.25 |
| | | $675.00 | 198.7 | $134,122.50 |
| | | $710.00 | 77.9 | $55,309.00 |
| Jonathan I. Akinluyi | 2015 | £350.00 | 478.0 | $234,413.80 |
| | | £420.00 | 124.3 | $67,138.05 |
| | | £460.00 | 29.2 | $16,827.66 |
| Steven Albertson | 2004 | $920.00 | 19.3 | $17,756.00 |
| Elsa Andrianifahanana | 2013 | $675.00 | 36.4 | $24,570.00 |
| Christopher F. Baeza | 2011 | $920.00 | 134.2 | $123,464.00 |
| | | $965.00 | 293.1 | $282,841.50 |
| Sarah Baugh | 2017 | $350.00 ** | 27.8 | $9,730.00 |
| Andrew R. Beatty | 2016 | $595.00 | 12.8 | $7,616.00 |
| Matthew D. Beebe | 2014 | $675.00 | 76.5 | $51,637.50 |
| | | $780.00 | 37.9 | $29,562.00 |
| | | $815.00 | 290.6 | $236,839.00 |
| | | $860.00 | 158.6 | $136,396.00 |
| Matthew E. Berry | 2011 | $780.00 | 10.9 | $8,502.00 |
| AZ Biazar | 2015 | $595.00 | 97.7 | $58,131.50 |
| Rebecca S. Blake | 2015 | $710.00 | 92.0 | $65,320.00 |
| David P. Borden | 2013 | $780.00 | 17.8 | $13,884.00 |
| Michelle Bosworth | 2008 | $920.00 | 9.7 | $8,924.00 |
| Amanda M. Bradley | Not Admitted | $415.00 | 8.7 | $3,610.50 |
| Brittany Brody | 2018 | $415.00 | 7.7 | $3,195.50 |
| Yilan Bryant | 2015 | $565.00 | 6.6 | $3,729.00 |
| | | $595.00 | 99.6 | $59,262.00 |
| Meghan Byrnes | 2015 | $480.00 | 1.5 | $720.38 |
| | | $565.00 | 540.2 | $305,213.00 |
| | | $675.00 | 235.3 | $158,827.50 |
| | | $710.00 | 141.5 | $100,465.00 |
| Andres M. Caicedo | Not Admitted | $415.00 | 5.2 | $2,158.00 |
| Leah B. Chacon | 2014 | $780.00 | 535.5 | $417,690.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $663.00 * | 273.8 | $181,529.40 |
| | | $820.00 | 12.4 | $10,168.00 |
| | | $697.00 * | 516.9 | $360,279.30 |
| | | $731.00 * | 19.2 | $14,035.20 |
| Aretha Chakraborti | 2015 | $565.00 | 171.0 | $96,615.00 |
| | | $480.25 * | 22.8 | $10,949.74 |
| | | $675.00 | 76.8 | $51,840.00 |
| | | $573.75 * | 266.9 | $153,134.04 |
| | | $337.50 *** | 3.7 | $1,248.75 |
| | | $710.00 | 168.9 | $119,919.00 |
| Mina Chang | 2017 | $390.00 | 26.0 | $10,140.00 |
| | | $415.00 | 56.9 | $23,613.50 |
| Jini Chatterjee | 2016 | $470.00 | 88.0 | $41,360.00 |
| Ben A. Cheatham | 2015 | $470.00 | 52.5 | $24,675.00 |
| | | $565.00 | 41.6 | $23,504.00 |
| | | $595.00 | 38.0 | $22,610.00 |
| Louis S. Chiappetta | 2009 | $920.00 | 1,603.8 | $1,475,496.00 |
| | | $460.00 *** | 149.2 | $68,632.00 |
| | | $965.00 | 1,697.9 | $1,638,473.50 |
| | | $482.50 *** | 141.9 | $68,466.75 |
| Jisun Choi | 2011 | £442.00 | 8.6 | $5,497.72 |
| Ben Clapp | 2008 | $965.00 | 30.1 | $29,046.50 |
| Donald E. Cooley | 2016 | $470.00 | 101.9 | $47,893.00 |
| | | $565.00 | 11.1 | $6,271.50 |
| | | $595.00 | 5.4 | $3,213.00 |
| Michelle R. Coquelin | 2016 | $595.00 | 49.7 | $29,571.50 |
| Annalisa L. Cravens | 2014 | $565.00 | 21.1 | $11,921.50 |
| Tanisha A. Creed | 2011 | $850.00 | 72.3 | $61,455.00 |
| Rebecca E. Cress | 2016 | $595.00 | 134.1 | $79,789.50 |
| Maria da Silva | 2017 | $415.00 | 23.1 | $9,586.50 |
| Ashly Nikkole Davis | 2014 | $675.00 | 7.6 | $5,130.00 |
| Martin de Jong | 2016 | $495.00 | 5.7 | $2,821.50 |
| Marc-Anthony Delgado | 2016 | $495.00 | 25.5 | $12,622.50 |
| Stephen J. Della Penna | 2015 | $565.00 | 19.2 | $10,848.00 |
| Leslie A. Demers | 2014 | $780.00 | 6.0 | $4,680.00 |
| | | $815.00 | 89.0 | $72,535.00 |
| | | $350.00 ** | 38.4 | $13,440.00 |
| Jonathan A. Dhanawade | 2016 | $470.00 | 68.7 | $32,289.00 |
| | | $565.00 | 76.9 | $43,448.50 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|------|------|------|------|------|
| | | $595.00 | 77.0 | $45,815.00 |
| Catie L. English | 2017 | $415.00 | 20.2 | $8,383.00 |
| Cameron M. Fee | 2011 | $675.00 | 356.6 | $240,705.00 |
| | | $710.00 | 611.0 | $433,810.00 |
| | | $815.00 | 73.1 | $59,576.50 |
| Breanna E. Fields | 2015 | $710.00 | 137.5 | $97,625.00 |
| Catherine Fisher | 2012 | $780.00 | 29.0 | $22,620.00 |
| | | $820.00 | 13.0 | $10,660.00 |
| Jonathan G. Fombonne | 2014 | $780.00 | 13.2 | $10,296.00 |
| Rachel M. Frankeny | 2012 | $780.00 | 11.2 | $8,736.00 |
| Ebba Gebisa | 2008 | $920.00 | 1,690.1 | $1,554,892.00 |
| | | $782.00 * | 2.4 | $1,876.80 |
| | | $460.00 *** | 69.6 | $32,016.00 |
| | | $965.00 | 1,813.4 | $1,749,931.00 |
| | | $482.50 *** | 33.5 | $16,163.75 |
| Indraneel Ghosh | 2012 | $780.00 | 68.4 | $53,352.00 |
| | | $663.00 * | 15.9 | $10,541.70 |
| | | $820.00 | 39.2 | $32,144.00 |
| Claire R. Glasspiegel | 2016 | $470.00 | 43.7 | $20,539.00 |
| | | $565.00 | 21.8 | $12,317.00 |
| | | $595.00 | 29.8 | $17,731.00 |
| Benjamin S. Goldberg | 2015 | $710.00 | 30.6 | $21,726.00 |
| Jeffrey Goldenhersh | Not Admitted | $390.00 | 26.4 | $10,296.00 |
| Joshua K. Goldman | 2014 | $675.00 | 100.1 | $67,567.50 |
| | | $573.75 * | 257.2 | $147,568.64 |
| | | $780.00 | 162.3 | $126,594.00 |
| | | $663.00 * | 7.7 | $5,105.10 |
| | | $815.00 | 365.0 | $297,475.00 |
| | | $693.00 * | 9.2 | $6,373.33 |
| | | $860.00 | 9.2 | $7,912.00 |
| Paige W. Griffiths | 2016 | $331.50 * | 56.1 | $18,597.15 |
| | | $399.50 * | 191.9 | $76,664.05 |
| | | $495.00 | 802.5 | $397,237.50 |
| | | $420.75 * | 14.8 | $6,227.11 |
| | | $595.00 | 314.0 | $186,830.00 |
| | | $297.50 *** | 0.9 | $267.75 |
| Joshua F. Gruenspecht | 2011 | $850.00 | 1.3 | $1,105.00 |
| | | $885.00 | 30.6 | $27,081.00 |
| Dillon Guthrie | 2014 | $675.00 | 23.7 | $15,997.50 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| John C. Hamlett | 2016 | $390.00 | 7.0 | $2,730.00 |
| Clinton D. Hannah | 2017 | $390.00 | 23.2 | $9,048.00 |
| | | $495.00 | 34.1 | $16,879.50 |
| Evan A. Hill | 2012 | $820.00 | 924.0 | $757,680.00 |
| | | $697.00 * | 1.7 | $1,184.90 |
| | | $410.00 *** | 10.8 | $4,428.00 |
| | | $850.00 | 729.0 | $619,650.00 |
| | | $722.50 * | 13.0 | $9,392.50 |
| | | $425.00 *** | 1.5 | $637.50 |
| | | $895.00 | 1,382.2 | $1,237,069.00 |
| | | $925.00 | 291.6 | $269,730.00 |
| | | $786.25 * | 2.4 | $1,887.01 |
| Michael J. Hong | 2008 | $920.00 | 59.9 | $55,108.00 |
| Gregory D. Howling | 2012 | $780.00 | 376.1 | $293,358.00 |
| | | $820.00 | 224.1 | $183,762.00 |
| | | $895.00 | 1.9 | $1,700.50 |
| Ariel Hsiung | 2016 | $595.00 | 26.2 | $15,589.00 |
| | | $710.00 | 17.2 | $12,212.00 |
| Eleanor Hughes | 2010 | $920.00 | 5.1 | $4,692.00 |
| Tabitha B. Humphries | 2010 | $850.00 | 492.2 | $418,370.00 |
| | | $925.00 | 113.7 | $105,172.50 |
| Ana Lucia Hurtado | 2014 | $780.00 | 95.8 | $74,724.00 |
| Nicholas A. Ickovic | 2016 | $390.00 | 50.7 | $19,773.00 |
| | | $470.00 | 35.7 | $16,779.00 |
| | | $565.00 | 11.6 | $6,554.00 |
| | | $595.00 | 118.0 | $70,210.00 |
| Jessica M. Jones | 2016 | $390.00 | 10.2 | $3,978.00 |
| | | $470.00 | 24.4 | $11,468.00 |
| | | $565.00 | 21.1 | $11,921.50 |
| Sofiya Kachan | 2013 | €565.00 | 13.0 | $8,155.90 |
| Allie M. Keefe | 2015 | $595.00 | 172.3 | $102,518.50 |
| | | $710.00 | 100.8 | $71,568.00 |
| Elena O. Keil | 2011 | $675.00 | 196.8 | $132,840.00 |
| Jason N. Kestecher | 2015 | $565.00 | 475.0 | $268,375.00 |
| | | $675.00 | 500.0 | $337,500.00 |
| | | $710.00 | 830.1 | $589,371.00 |
| | | $355.00 *** | 1.0 | $355.00 |
| | | $815.00 | 66.8 | $54,442.00 |
| Shaivlini Khemka | 2016 | $390.00 | 6.1 | $2,379.00 |

A-26

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|------|-------------------|----------|-------|--------|
| Sheila A. Kilkelly | 2013 | $675.00 | 102.0 | $68,850.00 |
| | | $573.75 * | 22.1 | $12,679.92 |
| | | $780.00 | 173.2 | $135,096.00 |
| | | $815.00 | 99.0 | $80,685.00 |
| | | $860.00 | 19.2 | $16,512.00 |
| Hung A. Kim | 2017 | $415.00 | 137.4 | $57,021.00 |
| | | $495.00 | 72.7 | $35,986.50 |
| | | $595.00 | 59.5 | $35,402.50 |
| Daniel J. Knudsen | 2015 | $565.00 | 36.7 | $20,735.50 |
| | | $480.25 * | 127.7 | $61,328.23 |
| | | $675.00 | 280.1 | $189,067.50 |
| | | $573.75 * | 19.0 | $10,901.28 |
| | | $710.00 | 40.0 | $28,400.00 |
| | | $603.50 * | 7.6 | $4,586.60 |
| | | $815.00 | 153.8 | $125,347.00 |
| Niqui Kohli | 2014 | $675.00 | 20.8 | $14,040.00 |
| | | $710.00 | 107.5 | $76,325.00 |
| | | $815.00 | 15.4 | $12,551.00 |
| Candice Korkis | 2009 | $885.00 | 36.1 | $31,948.50 |
| Roy Leaf | 2016 | $390.00 | 44.7 | $17,433.00 |
| | | $470.00 | 12.9 | $6,063.00 |
| Annie Z. Li | 2010 | $850.00 | 469.5 | $399,075.00 |
| | | $425.00 *** | 83.3 | $35,402.50 |
| | | $885.00 | 212.2 | $187,797.00 |
| | | $442.50 *** | 8.0 | $3,540.00 |
| | | $925.00 | 32.6 | $30,155.00 |
| Deni Li | 2014 | $675.00 | 195.0 | $131,625.00 |
| | | $815.00 | 6.4 | $5,216.00 |
| Brittany E. Libson | 2016 | $595.00 | 64.5 | $38,377.50 |
| Yiming Liu | 2014 | $780.00 | 5.0 | $3,900.00 |
| Sandra Lou | 2015 | £220.00 | 267.2 | $81,974.26 |
| Flora Lu | 2008 | $780.00 | 17.0 | $13,260.00 |
| | | $860.00 | 23.0 | $19,780.00 |
| Daniel L. Luks | 2016 | $470.00 | 144.8 | $68,056.00 |
| | | $565.00 | 202.8 | $114,582.00 |
| | | $595.00 | 26.8 | $15,946.00 |
| Deborah Machalow | 2016 | $595.00 | 38.4 | $22,848.00 |
| Jennifer Madden | 2010 | $850.00 | 859.6 | $730,660.00 |
| | | $722.50 * | 2.1 | $1,517.25 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|------|------|------|------|------|
| | | $425.00 *** | 19.5 | $8,287.50 |
| | | $925.00 | 1,191.2 | $1,101,860.00 |
| | | $462.50 *** | 31.7 | $14,661.25 |
| | | $965.00 | 141.9 | $136,933.50 |
| Edward P. Mahaney-Walter | 2013 | $780.00 | 70.5 | $54,990.00 |
| | | $820.00 | 43.5 | $35,670.00 |
| | | $860.00 | 114.5 | $98,470.00 |
| | | $895.00 | 20.2 | $18,079.00 |
| Cort B. Malmberg | 2014 | $470.00 | 15.0 | $7,050.00 |
| Brian T. Mammarella | 2017 | $595.00 | 128.0 | $76,160.00 |
| Alyssa McAnney | 2016 | $470.00 | 345.8 | $162,526.00 |
| | | $565.00 | 5.6 | $3,164.00 |
| Luke W. Meyers | Not Admitted | $390.00 | 11.1 | $4,329.00 |
| Sonya P. Mitchell | 2016 | $470.00 | 13.8 | $6,486.00 |
| Aryan Moniri | 2008 | $920.00 | 663.9 | $610,788.00 |
| | | $782.00 * | 57.7 | $45,121.40 |
| | | $460.00 *** | 7.2 | $3,312.00 |
| | | $965.00 | 397.2 | $383,298.00 |
| | | $482.50 *** | 57.6 | $27,792.00 |
| | | $350.00 ** | 0.4 | $140.00 |
| Rebekah J. Mott | 2012 | $860.00 | 33.2 | $28,552.00 |
| | | $895.00 | 32.0 | $28,640.00 |
| John Moynihan | 2015 | $470.00 | 20.7 | $9,729.00 |
| Kartik Naram | Not Admitted | $390.00 | 28.8 | $11,232.00 |
| Kirsten E. Newman | 2013 | $780.00 | 318.0 | $248,040.00 |
| | | $663.00 * | 89.4 | $59,272.20 |
| | | $820.00 | 139.5 | $114,390.00 |
| | | $895.00 | 1.6 | $1,432.00 |
| Corinne Noel | 1996 | £580.00 | 5.6 | $4,279.58 |
| Aviva B. Nusbaum | 2015 | $710.00 | 5.2 | $3,692.00 |
| Lisa P. Ogust | 2016 | $595.00 | 161.8 | $96,271.00 |
| | | $710.00 | 27.9 | $19,809.00 |
| Juliana Ong | 2012 | $780.00 | 205.2 | $160,056.00 |
| | | $663.00 * | 2.9 | $1,922.70 |
| Timothy W. Ormsby | 2013 | $675.00 | 130.5 | $88,087.50 |
| Pete Osornio | 2014 | $675.00 | 22.3 | $15,052.50 |
| | | $710.00 | 11.9 | $8,449.00 |
| Dennis M. Owrutsky | Not Admitted | $390.00 | 272.7 | $106,353.00 |
| | | $470.00 | 127.7 | $60,019.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| Peter Pang | 2006 | $820.00 | 13.6 | $11,152.00 |
| Thomas A. Parnham | 2010 | $920.00 | 0.8 | $736.00 |
| David J. Passarelli | 2008 | $850.00 | 148.1 | $125,885.00 |
| | | $722.50 * | 32.6 | $23,553.50 |
| | | $425.00 *** | 6.0 | $2,550.00 |
| | | $885.00 | 666.3 | $589,675.50 |
| | | $443.00 *** | 50.8 | $22,479.00 |
| | | $925.00 | 202.4 | $187,220.00 |
| David S. Passes | 2014 | $675.00 | 257.5 | $173,812.50 |
| | | $780.00 | 67.2 | $52,416.00 |
| | | $815.00 | 29.6 | $24,124.00 |
| Christopher B. Pavlacka | 2015 | $565.00 | 41.5 | $23,447.50 |
| | | $710.00 | 10.4 | $7,384.00 |
| Iricel E. Payano | 2017 | $495.00 | 58.5 | $28,957.50 |
| Jared A. Petermeyer | 2017 | $415.00 | 15.2 | $6,308.00 |
| Michael L. Pomeranz | 2015 | $710.00 | 10.7 | $7,597.00 |
| Michael M. Powell | 2014 | $675.00 | 31.9 | $21,532.50 |
| Tyler J. Quanbeck | 2016 | $470.00 | 12.4 | $5,828.00 |
| Zahir R. Rahman | 2015 | $400.00 | 14.7 | $5,872.65 |
| | | $470.00 | 347.3 | $163,231.00 |
| | | $565.00 | 116.2 | $65,653.00 |
| | | $595.00 | 9.6 | $5,712.00 |
| Rebekah D. Reneau | 2013 | $780.00 | 44.4 | $34,632.00 |
| | | $815.00 | 13.1 | $10,676.50 |
| Michael W. Restey | 2013 | $780.00 | 8.0 | $6,240.00 |
| Anya Richter | 2016 | $470.00 | 136.9 | $64,343.00 |
| Alicia M. Rodriguez | 2016 | $595.00 | 85.6 | $50,932.00 |
| Alex Rogan | 2007 | £580.00 | 431.9 | $348,890.58 |
| | | £640.00 | 12.7 | $10,069.22 |
| Collin A. Rose | Not Admitted | $390.00 | 38.4 | $14,976.00 |
| | | $470.00 | 21.1 | $9,917.00 |
| | | $565.00 | 120.2 | $67,913.00 |
| | | $595.00 | 251.1 | $149,404.50 |
| Sarah L. Rosenbluth | 2013 | $565.00 | 9.5 | $5,367.50 |
| Polina S. Ross | 2012 | $675.00 | 4.8 | $3,240.00 |
| John D. Saathoff | 2016 | $470.00 | 5.2 | $2,444.00 |
| Erik Sarkisyan | 2016 | $470.00 | 214.3 | $100,721.00 |
| Mark A. Schlackman | 2011 | $780.00 | 562.3 | $438,594.00 |
| | | $820.00 | 82.2 | $67,404.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $895.00 | 2.0 | $1,790.00 |
| Jackie N. Schruhl | 2017 | $595.00 | 8.0 | $4,760.00 |
| James G. Sheridan | 2017 | $390.00 | 12.5 | $4,875.00 |
| | | $495.00 | 26.6 | $13,167.00 |
| Jack R. Shirley | 2016 | $470.00 | 44.1 | $20,727.00 |
| | | $565.00 | 173.1 | $97,801.50 |
| | | $595.00 | 41.8 | $24,871.00 |
| Erin A. Simmons | 2010 | $850.00 | 270.4 | $229,840.00 |
| | | $885.00 | 203.3 | $179,920.50 |
| | | $925.00 | 623.2 | $576,460.00 |
| | | $965.00 | 21.1 | $20,361.50 |
| | | $350.00 ** | 19.8 | $6,930.00 |
| Jenna Skoller Cantor | 2016 | $565.00 | 22.1 | $12,486.50 |
| | | $595.00 | 44.1 | $26,239.50 |
| Tom Southwell | 2007 | £580.00 | 10.8 | $8,208.16 |
| Matthew Stein | 2006 | $920.00 | 18.4 | $16,928.00 |
| | | $965.00 | 7.7 | $7,430.50 |
| Evan L. Steinberg | 2016 | $470.00 | 5.3 | $2,491.00 |
| John R. Stewart | 2015 | $565.00 | 111.2 | $62,828.00 |
| | | $675.00 | 5.0 | $3,375.00 |
| Mari C. Stonebraker | 2014 | $675.00 | 100.4 | $67,770.00 |
| | | $573.75 * | 2.4 | $1,377.00 |
| | | $780.00 | 103.3 | $80,574.00 |
| | | $815.00 | 46.9 | $38,223.50 |
| | | $860.00 | 24.8 | $21,328.00 |
| Bram A. Strochlic | 2015 | $480.00 | 3.5 | $1,680.89 |
| | | $565.00 | 407.7 | $230,350.50 |
| | | $282.50 *** | 1.7 | $480.25 |
| | | $675.00 | 195.0 | $131,625.00 |
| | | $710.00 | 634.30 | $450,353.00 |
| | | $603.50 *** | 1.1 | $663.85 |
| | | $815.00 | 102.3 | $83,374.50 |
| Mallory B. Suede | 2017 | $495.00 | 19.8 | $9,801.00 |
| Laura Sullivan | 2016 | $400.00 | 56.4 | $22,531.80 |
| | | $470.00 | 436.0 | $204,920.00 |
| | | $480.00 | 32.4 | $15,560.17 |
| | | $565.00 | 216.2 | $122,153.00 |
| | | $282.50 *** | 7.4 | $2,090.50 |
| | | $595.00 | 103.4 | $61,523.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $505.75 *** | 12.8 | $6,473.63 |
| Matthew B. Sumner | Not Admitted | $350.00 ** | 22.1 | $7,735.00 |
| | | $390.00 | 20.0 | $7,800.00 |
| Shaud G. Tavakoli | 2012 | $895.00 | 21.0 | $18,795.00 |
| Kenneth M. Thomas | 2016 | $390.00 | 158.6 | $61,854.00 |
| | | $470.00 | 116.8 | $54,896.00 |
| | | $495.00 | 717.9 | $355,360.50 |
| | | $595.00 | 135.6 | $80,682.00 |
| Melissa M. Tiarks | 2009 | $920.00 | 869.5 | $799,940.00 |
| | | $965.00 | 396.4 | $382,526.00 |
| Cristina Tomassini | 2012 | $608.00 | 8.5 | $5,170.47 |
| Michael Tomczyk | 2014 | $565.00 | 269.6 | $152,324.00 |
| | | $675.00 | 20.6 | $13,905.00 |
| | | $710.00 | 243.0 | $172,530.00 |
| | | $815.00 | 5.8 | $4,727.00 |
| Misha Tsukerman | 2017 | $390.00 | 30.4 | $11,856.00 |
| | | $495.00 | 48.4 | $23,958.00 |
| Edward L. Tulin | 2007 | $350.00 ** | 7.0 | $2,450.00 |
| Brianna M. van Kan | 2016 | $565.00 | 4.6 | $2,599.00 |
| Meg Vasu | 2016 | $595.00 | 54.1 | $32,189.50 |
| Matthew G. Vitorla | 2016 | $390.00 | 111.1 | $43,329.00 |
| | | $331.50 * | 3.2 | $1,060.80 |
| | | $495.00 | 280.8 | $138,996.00 |
| | | $595.00 | 27.1 | $16,124.50 |
| Steve Walsh | Not Admitted | $415.00 | 18.6 | $7,719.00 |
| Sebastian Way | 2011 | £495.00 | 54.0 | $38,582.69 |
| | | £520.00 | 14.8 | $9,628.46 |
| Sarah R. Weiner | 2016 | $470.00 | 39.4 | $18,518.00 |
| | | $565.00 | 155.8 | $88,027.00 |
| | | $282.50 *** | 3.5 | $988.75 |
| | | $595.00 | 89.4 | $53,193.00 |
| Tereza Widmar | 2015 | $400.00 | 103.5 | $41,348.25 |
| | | $470.00 | 240.4 | $112,988.00 |
| | | $235.00 *** | 4.3 | $1,010.50 |
| | | $480.00 | 363.8 | $174,715.11 |
| | | $565.00 | 136.6 | $77,179.00 |
| | | $282.50 *** | 9.4 | $2,655.50 |
| | | $595.00 | 551.8 | $328,321.00 |
| | | $505.75 * | 17.1 | $8,648.36 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| | | $710.00 | 32.5 | $23,075.00 |
| | | $603.50 * | 45.5 | $27,459.25 |
| Justin M. Winerman | 2009 | $920.00 | 1,134.1 | $1,043,372.00 |
| | | $782.00 * | 125.8 | $98,375.60 |
| | | $460.00 *** | 18.0 | $8,280.00 |
| | | $965.00 | 29.1 | $28,081.50 |
| Austin R. Winniford | 2010 | $675.00 | 6.2 | $4,185.00 |
| Jahi A. Wise | 2017 | $390.00 | 8.9 | $3,471.00 |
| | | $331.50 *** | 128.4 | $42,564.60 |
| | | $415.00 | 33.0 | $13,695.00 |
| | | $595.00 | 58.9 | $35,045.50 |
| Jacob D. Wolf | 2013 | $780.00 | 18.0 | $14,040.00 |
| | | $820.00 | 16.5 | $13,530.00 |
| | | $860.00 | 548.9 | $472,054.00 |
| | | $895.00 | 131.5 | $117,692.50 |
| | | $448.00 *** | 8.0 | $3,580.00 |
| Vivian Wong | 2012 | $780.00 | 410.6 | $320,268.00 |
| | | $663.00 * | 17.6 | $11,668.80 |
| | | $820.00 | 107.8 | $88,396.00 |
| Clark L. Xue | 2016 | $595.00 | 65.0 | $38,675.00 |
| Stephanie Yesnik | 2014 | $480.00 | 8.5 | $4,082.13 |
| | | $565.00 | 8.8 | $4,972.00 |
| | | $710.00 | 7.0 | $4,970.00 |
| | | $815.00 | 15.7 | $12,795.50 |
| Michael Zhou | 2015 | $470.00 | 29.3 | $13,771.00 |
| | | $565.00 | 15.6 | $8,814.00 |
| **Associate Total** | | | **51,521.8** | **$37,874,926.87** |
| **STAFF ATTORNEYS** | | | | |
| John J. Battaglia | 1996 | $425.00 | 10.8 | $4,590.00 |
| | | $595.00 | 1.2 | $714.00 |
| **Staff Attorney Total** | | | **12.0** | **$5,304.00** |
| **INTERNATIONAL ASSOCIATES** | | | | |
| Vivian Wong | 2012 | $820.00 | 142.1 | $116,522.00 |
| | | $860.00 | 37.1 | $31,906.00 |
| **International Associate Total** | | | **179.2** | **$148,428.00** |
| **CLIENT SPECIALISTS** | | | | |
| Michael B. Finesilver | | $430.00 | 1.4 | $602.00 |
| Robert Hochberg | | $450.00 | 38.5 | $17,325.00 |
| Cynthia A. Lewis | | $480.00 | 5.3 | $2,544.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| Maribel Perez | | $430.00 | 183.4 | $78,862.00 |
| | | $450.00 | 274.6 | $123,570.00 |
| Jerry L. Pfeffer | | $925.00 | 6.5 | $6,012.50 |
| Steven Shankroff | | $535.00 | 26.8 | $14,338.00 |
| **Client Specialist Total** | | | **536.5** | **$243,253.50** |
| **PARAPROFESSIONALS** | | | | |
| Vivian A. Alvarado | | $179.00 | 9.7 | $1,731.45 |
| | | $220.00 | 7.2 | $1,584.00 |
| Kelsey E. Anspach | | $290.00 | 7.9 | $2,291.00 |
| Tracy S. Baker | | $335.00 | 6.0 | $2,010.00 |
| Christie N. Baugher | | $268.00 | 2.5 | $669.38 |
| | | $315.00 | 6.7 | $2,110.50 |
| John Beaulieu | | $315.00 | 1.8 | $567.00 |
| Alexa Bieler | | $72.00 | 53.3 | $3,850.95 |
| | | $85.00 | 2.7 | $229.50 |
| Emily P. Blanco | | $365.00 | 70.8 | $25,842.00 |
| | | $385.00 | 17.8 | $6,853.00 |
| Brett T. Bolton | | $330.00 | 7.2 | $2,376.00 |
| Karl Bostroem | | $365.00 | 22.3 | $8,139.50 |
| | | $385.00 | 5.1 | $1,963.50 |
| Buzz Bovshow | | $315.00 | 8.0 | $2,520.00 |
| | | $330.00 | 10.2 | $3,366.00 |
| Lisa M. Brown | | $140.00 | 6.1 | $854.00 |
| Nicholas Burman | | $317.00 | 5.0 | $1,586.84 |
| Mark D. Campana | | $365.00 | 92.1 | $33,616.50 |
| Richard S. Cekovsky | | $315.00 | 9.8 | $3,087.00 |
| | | $330.00 | 5.9 | $1,947.00 |
| Karla N. Chee-a-tow | | $315.00 | 8.7 | $2,740.50 |
| Matthew A. Chesmore | | $315.00 | 6.3 | $1,984.50 |
| | | $330.00 | 6.7 | $2,211.00 |
| Andrea T. Chouprouta | | $385.00 | 14.1 | $5,428.50 |
| David J. Coletti | | $220.00 | 85.5 | $18,810.00 |
| Cecilia Curran | | $365.00 | 3.50 | $1,277.50 |
| Christopher E. D'Aliso | | $95.00 | 8.9 | $845.50 |
| Shelley E. Dague | | $330.00 | 5.0 | $1,650.00 |
| Gloria J. Davis | | $315.00 | 12.5 | $3,937.50 |
| Martha F. Ellerson | | $385.00 | 9.6 | $3,696.00 |
| Melissa Eng | | $315.00 | 24.1 | $7,591.50 |
| | | $330.00 | 14.7 | $4,851.00 |
| Tiffany N. Escandar | | $300.00 | 18.0 | $5,400.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| Janet Esnes | | $310.00 | 6.5 | $2,016.64 |
| | | $365.00 | 167.6 | $61,174.00 |
| | | $385.00 | 179.9 | $69,261.50 |
| Andrew Esposito | | $247.00 | 7.5 | $1,848.75 |
| Damion Fallon | | $268.00 | 6.5 | $1,740.38 |
| | | $315.00 | 2.2 | $693.00 |
| Thomas A. Figueroa | | $210.00 | 6.6 | $1,386.00 |
| John D. Foley | | $210.00 | 7.2 | $1,512.00 |
| | | $220.00 | 94.3 | $20,746.00 |
| | | $300.00 | 62.6 | $18,780.00 |
| Elizabeth Gall | | $210.00 | 6.3 | $1,323.00 |
| Richard L. Gallagher | | $315.00 | 5.7 | $1,795.50 |
| David B. Gautschy | | $268.00 | 5.2 | $1,392.30 |
| | | $330.00 | 5.4 | $1,782.00 |
| Angeline Girard | | $268.00 | 7.5 | $2,008.13 |
| | | $315.00 | 12.4 | $3,906.00 |
| Mary C. Goggins | | $330.00 | 16.5 | $5,445.00 |
| David M. Goldman | | $365.00 | 0.5 | $182.50 |
| Bridget M. Greene | | $210.00 | 1.7 | $357.00 |
| | | $220.00 | 96.9 | $21,318.00 |
| Christopher M. Heaney | | $365.00 | 48.9 | $17,848.50 |
| Sophie Hine | | $291.00 | 0.5 | $145.48 |
| Tiffany Idoko | | $315.00 | 23.5 | $7,402.50 |
| Norman K. Isaksson | | $268.00 | 7.0 | $1,874.25 |
| | | $315.00 | 10.4 | $3,276.00 |
| C. James Jahn | | $315.00 | 19.4 | $6,111.00 |
| Garrett James | | $365.00 | 88.2 | $32,193.00 |
| Sefia Jivraj | | $316.00 | 25.1 | $7,931.67 |
| | | $317.00 | 7.0 | $2,221.81 |
| | | $318.00 | 4.6 | $1,462.65 |
| | | $319.00 | 6.9 | $2,201.50 |
| | | $320.00 | 0.2 | $64.09 |
| | | $321.00 | 12.1 | $3,880.03 |
| | | $322.00 | 3.6 | $1,159.25 |
| Ken Kaissar | | $315.00 | 10.3 | $3,244.50 |
| Gary M. Kalas | | $65.00 | 6.0 | $390.00 |
| Brian E. Keating | | $95.00 | 32.5 | $3,087.50 |
| Mary E. Keogh | | $365.00 | 8.2 | $2,993.00 |
| Matthew R. Koenig | | $95.00 | 5.4 | $513.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| Joseph R. Kolbow | | $315.00 | 10.4 | $3,276.00 |
| | | $330.00 | 11.8 | $3,894.00 |
| Roy M. Koshy | | $315.00 | 6.1 | $1,921.50 |
| Mikhail I. Koulikov | | $365.00 | 0.8 | $292.00 |
| Wendy K. LaManna | | $310.00 | 1.0 | $310.26 |
| | | $365.00 | 173.2 | $63,218.00 |
| | | $385.00 | 110.4 | $42,504.00 |
| Catherine D. Ledyard | | $430.00 | 1.5 | $645.00 |
| Joseph K. Leung | | $365.00 | 98.0 | $35,770.00 |
| | | $385.00 | 8.5 | $3,272.50 |
| Tracey L. Lewis | | $295.00 | 23.3 | $6,873.50 |
| | | $345.00 | 15.1 | $5,209.50 |
| Ann Link | | $315.00 | 18.3 | $5,764.50 |
| | | $330.00 | 12.6 | $4,158.00 |
| Wandy Liu | | $150.00 | 48.4 | $7,260.00 |
| Muriel A. Logan | | $65.00 | 6.0 | $390.00 |
| Richard Low | | $285.00 | 0.4 | $114.00 |
| | | $289.00 | 10.3 | $2,975.79 |
| | | $290.00 | 6.8 | $1,972.09 |
| | | $291.00 | 21.7 | $6,322.54 |
| Kevin W. Lustik | | $119.00 | 6.0 | $714.00 |
| Heather L. MacDonald | | $315.00 | 9.0 | $2,835.00 |
| Dawn A. MacFarline | | $320.00 | 0.3 | $96.00 |
| | | $335.00 | 28.4 | $9,514.00 |
| David Martinez | | $150.00 | 15.0 | $2,250.00 |
| Sarahelena Martinez-Sosa | | $220.00 | 40.1 | $8,822.00 |
| Joshua K. Mathew | | $179.00 | 1.4 | $249.90 |
| | | $210.00 | 66.2 | $13,902.00 |
| | | $290.00 | 55.0 | $15,950.00 |
| | | $300.00 | 35.2 | $10,560.00 |
| Aaron Matteson | | $315.00 | 2.3 | $724.50 |
| | | $330.00 | 6.4 | $2,112.00 |
| Shannon McDonough | | $210.00 | 5.4 | $1,134.00 |
| Priscilla McEver | | $315.00 | 14.6 | $4,599.00 |
| Catherine B. McEvily | | $365.00 | 2.5 | $912.50 |
| Catherine A. Mejia | | $210.00 | 34.9 | $7,329.00 |
| | | $220.00 | 97.5 | $21,450.00 |
| | | $300.00 | 4.7 | $1,410.00 |
| Shauna Miles | | $315.00 | 8.6 | $2,709.00 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| Christine Morong | | $365.00 | 12.2 | $4,453.00 |
| Daniel S. Morse | | $365.00 | 36.7 | $13,395.50 |
| | | $385.00 | 18.5 | $7,122.50 |
| Paul Munsell | | $385.00 | 26.4 | $10,164.00 |
| Mary E. Murphy | | $365.00 | 0.3 | $109.50 |
| Rachel M. Naaman | | $315.00 | 8.0 | $2,520.00 |
| Megan Negron | | $210.00 | 311.4 | $65,394.00 |
| | | $220.00 | 560.8 | $123,376.00 |
| John J. O'Connor, Jr. | | $330.00 | 6.8 | $2,244.00 |
| Timi Onafowokan | | $300.00 | 7.1 | $2,130.00 |
| Angela M. Owens | | $365.00 | 0.9 | $328.50 |
| Nicolle C. Perry | | $330.00 | 230.0 | $75,900.00 |
| Thomas A. Pirraglia | | $95.00 | 2.0 | $190.00 |
| Tara Quintuna | | $165.00 | 6.0 | $990.00 |
| Allen E. Read, Jr. | | $315.00 | 5.5 | $1,732.50 |
| Deborah M. Reusch | | $365.00 | 3.3 | $1,204.50 |
| Monique L. Ribando | | $450.00 | 13.3 | $5,985.00 |
| William Rivera | | $95.00 | 2.0 | $190.00 |
| Pablo Salguero | | $210.00 | 491.6 | $103,236.00 |
| | | $220.00 | 550.7 | $121,154.00 |
| | | $300.00 | 72.6 | $21,780.00 |
| Ana Maria Sanchez Pearce | | $345.00 | 11.0 | $3,795.00 |
| Maria Santiago | | $95.00 | 33.5 | $3,182.50 |
| Gregory Sargeant | | $365.00 | 2.0 | $730.00 |
| Evy Scheff | | $315.00 | 15.9 | $5,008.50 |
| Connie Seebach | | $315.00 | 14.3 | $4,504.50 |
| Jessica H. Sherwood-Noguchi | | $330.00 | 6.0 | $1,980.00 |
| Cecilia A. Skakel | | $220.00 | 64.9 | $14,278.00 |
| Jason Skorupka | | $95.00 | 5.0 | $475.00 |
| Lindsay Spellman | | $220.00 | 166.3 | $36,586.00 |
| Colleen S. Stack | | $220.00 | 24.3 | $5,346.00 |
| Jeri L. Staley | | $210.00 | 7.4 | $1,554.00 |
| Kerry A. Stinson | | $268.00 | 5.0 | $1,338.75 |
| | | $330.00 | 6.5 | $2,145.00 |
| Erin M. Sullivan | | $220.00 | 125.1 | $27,522.00 |
| Sherlyn M. Takacs | | $365.00 | 0.7 | $255.50 |
| Lei Tan | | $365.00 | 8.0 | $2,920.00 |
| Elizabeth H. Terhune | | $315.00 | 4.0 | $1,260.00 |
| Richard D. Thomas | | $85.00 | 5.1 | $433.50 |

| NAME | YEAR OF ADMISSION | RATE[19] | HOURS | AMOUNT |
|---|---|---|---|---|
| Joan D. Timmins | | $210.00 | 6.0 | $1,260.00 |
| Joshua D. Tobin | | $315.00 | 4.3 | $1,354.50 |
| Brigitte S. Travaglini | | $365.00 | 0.8 | $292.00 |
| Olga Tsoy | | $287.00 | 7.5 | $2,155.23 |
| | | $288.00 | 5.4 | $1,557.71 |
| | | $289.00 | 5.6 | $1,617.35 |
| | | $290.00 | 2.7 | $782.27 |
| | | $291.00 | 13.0 | $3,788.71 |
| | | $319.00 | 4.3 | $1,371.97 |
| | | $320.00 | 1.5 | $480.64 |
| | | $321.00 | 1.9 | $610.38 |
| Rafael F. Valdez | | $95.00 | 2.0 | $190.00 |
| Brian Wallace | | $315.00 | 7.5 | $2,362.50 |
| Jess Watkins | | $315.00 | 7.8 | $2,457.00 |
| Duncan H. Weals | | $210.00 | 8.6 | $1,806.00 |
| Samuel S. Weiss | | $210.00 | 9.1 | $1,911.00 |
| Jinai D. Williams | | $330.00 | 6.6 | $2,178.00 |
| Allyson G. Wolff | | $330.00 | 6.8 | $2,244.00 |
| Patrick L. Woodall | | $210.00 | 5.0 | $1,050.00 |
| Devin T. Wright | | $290.00 | 5.0 | $1,450.00 |
| **Paraprofessional Total** | | | **5,595.1** | **$1,495,534.64** |
| **Total Attorney Fees** | | | **81,148.4** | **$72,331,954.33** |
| **Attorney Blended Rate** | | | | **$891.35** |
| **Total for All Timekeepers (Before Post-Filing Adjustments)** | | | **87,280.0** | **$74,070,742.47** |
| **Blended Rate for All Timekeepers (Before Post-Filing Adjustments)** | | | | **$848.66** [20] |
| **Post-Filing Adjustments** | | | | **$151,360.48** |
| **Grand Total (After Post-Filing Adjustments)** | | | | **$73,919,381.99** |
| **Blended Rate for All Timekeepers (After Post-Filing Adjustments)** | | | | **$846.92** |

\* Per our engagement letter certain matters receive 15% discount on fees.
\*\* Per agreement, attorney rates are billed at $350 for the "Solar Materials Sale – Document Review" matter.
\*\*\* Nonworking Travel Time billed with a 50% rate discount.

---

[20]    For further information, see <u>Exhibit C</u> ("Rate Disclosures"), which sets forth a summary of blended hourly rates for Skadden timekeepers who billed to (i) non-bankruptcy matters and (ii) the Debtors. Skadden calculated the blended rate for timekeepers who billed to the Debtors by dividing the total dollar amount billed by such timekeepers during the Entire Case Period by the total number of hours billed by such timekeepers during the Entire Case Period. Furthermore, during the Entire Case Period, Skadden voluntarily reduced its fees requested by $6,870,324.06 (8.5%) and its expenses requested by $493,959.64 (21.6%), for a total of $7,364,283.70 (8.9%), and its hours billed from a base of 94,483.0 to 87,280.0 (7.6%). Although not directly comparable to the calculation set forth above, the total Debtor blended hourly rate based on the amount billed divided by actual hours worked (including non-billed hours), was $782.36.

**SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP DURING THE ENTIRE CASE
PERIOD FROM APRIL 21, 2016 – DECEMBER 29, 2017**

| MATTERS[21] | HOURS | NET AMOUNT |
|---|---|---|
| Affiliate Filings | 164.4 | $124,446.50 |
| AP Warehouse Sale | 1,590.5 | $1,272,593.50 |
| AQR Appeal | 1,096.7 | $929,937.00 |
| Asia Sales | 96.9 | $79,909.50 |
| Asset Analysis and Recovery | 124.4 | $127,725.54 |
| Asset Dispositions (General) | 3,795.7 | $2,979,018.98 |
| Asset Dispositions (Inventory) | 7.4 | $9,435.00 |
| Asset Dispositions (Real Property) | 140.3 | $152,274.50 |
| Automatic Stay (Relief Actions) | 254.7 | $177,915.00 |
| Backstop Commitment/Rights Offering | 1,223.3 | $1,101,185.50 |
| Bangladesh Sale | 6.0 | $4,667.00 |
| Business Operations / Strategic Planning | 745.1 | $815,757.62 |
| C&I Platform | 1,007.0 | $800,845.50 |
| Case Administration | 5,062.9 | $3,365,780.64 |
| Castle Gap | 50.7 | $34,716.00 |
| Claims Admin. (General) | 398.7 | $347,498.50 |
| Creditor Meetings / Statutory Committees | 3,023.0 | $2,627,710.50 |
| Crucero Sale | 3.5 | $3,395.00 |
| Disclosure Statement / Voting Issues | 2,096.1 | $1,899,877.50 |

---

[21]    See Exhibit B for a complete list of matters and matter numbers, including those not used during the Entire Case Period.

| MATTERS[21] | HOURS | NET AMOUNT |
|---|---|---|
| EMEA Sales | 966.1 | $777,070.31 |
| Employee Matters (General) | 2,066.7 | $1,890,514.63 |
| Employee Matters (Labor Unions) | 30.4 | $25,495.50 |
| Environmental Matters | 38.0 | $36,652.50 |
| EPC Platform Sale | 434.4 | $344,015.50 |
| Everstream | 1.5 | $1,065.00 |
| Executory Contracts (Personalty) | 181.2 | $136,728.99 |
| Financing (DIP and Emergence) | 8,188.9 | $6,971,142.75 |
| First Light | 8.1 | $6,448.00 |
| Foreign Affiliates | 1,369.7 | $1,085,273.25 |
| GAM Sale | 2,310.9 | $2,137,759.59 |
| General Corporate Advice | 1,117.8 | $1,242,976.00 |
| Gotham | 633.1 | $474,001.00 |
| Government Affairs | 4.8 | $5,554.50 |
| GSSG | 13.9 | $11,796.00 |
| Honduras* | 2,390.1 | $1,492,789.33 |
| India Projects | 360.2 | $353,629.50 |
| Insurance | 1,047.4 | $1,127,430.00 |
| Investigations and Reviews | 1,059.8 | $648,246.31 |
| Jordan | 760.1 | $490,287.54 |
| JPM Warehouse | 31.7 | $30,439.00 |
| Jupiter | 2,230.4 | $1,667,785.00 |
| Latin America General* | 110.7 | $85,214.91 |
| Latin America Portfolio Sale | 2,832.3 | $2,305,914.54 |

| MATTERS[21] | HOURS | NET AMOUNT |
|---|---|---|
| Leases (Real Property) | 172.3 | $117,508.16 |
| Litigation (General) | 4,799.9 | $4,681,681.00 |
| Malaysia Sale | 27.2 | $24,957.00 |
| Milford | 373.3 | $322,820.00 |
| MN C&I Sale | 984.2 | $965,852.90 |
| Mt. Signal | 194.5 | $156,908.50 |
| MultiDistrict Mediation | 555.6 | $646,625.50 |
| NA CI East/West Assets | 127.8 | $103,146.50 |
| Nonworking Travel Time | 1,521.8 | $798,162.90 |
| North American Utility and C&I Assets | 2,992.1 | $2,407,900.40 |
| Philippines Sale | 12.1 | $10,712.50 |
| Post-Closing Solar Materials Sale Matters | 103.5 | $112,842.00 |
| Real Estate (Owned) | 0.3 | $382.50 |
| Regulatory and SEC Matters | 196.5 | $170,549.50 |
| Reorganization Plan / Plan Sponsors | 4,598.0 | $4,149,419.50 |
| Reports and Schedules | 326.3 | $293,859.50 |
| Retention / Fee Matters (SASM&F) | 1,499.0 | $1,138,519.15 |
| Retention / Fee Matters / Objections (Others) | 595.8 | $465,897.49 |
| Rock Springs | 377.2 | $287,256.00 |
| Sao Pedro | 112.2 | $95,696.00 |
| Secured Claims | 223.7 | $238,201.00 |
| Senate Inquiry | 31.7 | $29,436.00 |
| SLB Projects | 2,791.4 | $2,004,096.00 |
| Solar Materials Sale | 2,016.9 | $1,687,084.23 |

| MATTERS[21] | HOURS | NET AMOUNT |
|---|---|---|
| Solar Materials Sale – Document Review | 173.1 | $63,500.50 |
| Solar Materials Sale Objections Litigation | 1,533.6 | $1,537,048.50 |
| Tax Matters | 282.5 | $303,747.50 |
| TERP/DE Shaw Claims | 45.9 | $57,387.50 |
| TERP/GLBL | 3,536.9 | $3,527,586.50 |
| TERP/GLBL Sale | 2,323.0 | $2,565,368.00 |
| Turbine Sales | 525.0 | $401,221.00 |
| U.S. Trustee Matters | 8.8 | $5,461.50 |
| UCC Claims Challenge Litigation | 153.6 | $143,205.50 |
| UCC Estate Claims Investigation | 988.1 | $959,600.50 |
| Uruguay | 529.7 | $459,753.50 |
| Utilities | 2.0 | $1,840.00 |
| Vendor Matters | 166.2 | $137,874.50 |
| Warehouse* | 1,357.9 | $982,727.31 |
| Yieldco Settlement Motion | 1,944.9 | $1,811,987.00 |
| **Total Before Post-Filing Adjustments** | **87,280.0** | **$74,070,742.47** |
| **Post-Filing Adjustments** | | **$151,360.48** |
| **Total Incorporating Post-Filing Adjustments** | | **$73,919,381.99** |

\* Certain matters billed with a 15% rate discount per the Engagement Agreement.

**SUMMARY OF EXPENSES INCURRED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP DURING THE ENTIRE CASE
PERIOD FROM APRIL 21, 2016 – DECEMBER 29, 2017**

| CHARGES AND DISBURSEMENTS | AMOUNT |
|---|---|
| Computer Legal Research | $331,148.14 |
| Long Distance Telephone | $55,224.11 |
| Outside Telephone | $114.67 |
| In-House Reproduction (at $0.10 per page) | $11,929.15 |
| Reproduction-color (at $0.10 per page) | $22,055.80 |
| Outside Reproduction | $435,426.41 |
| Outside Research | $39,831.80 |
| Filing/Court Fees | $242,808.55 |
| Court Reporting | $40,247.44 |
| Word Processing | $14,025.00 |
| Local Travel | $40,366.47 |
| Out-Of-Town Travel | $338,372.80 |
| Business Meals | $68,416.42 |
| Courier & Express Carriers (e.g., Federal Express) | $8,719.04 |
| Postage | $117.71 |
| Professional Fees | $18,277.43[22] |
| Electronic Document Management | $48,710.15 |
| Other[23] | $99,164.42 |

---

[22]    These represent fees generated by vendors and other professionals that do not bill the Debtors directly and which provided support services to Skadden during the course of its representation of the Debtors.

[23]    This category includes $79,893.16 in UCC filings and searches, $779.80 in in-house reproduction, $37.50 in support staff time, $1,349.72 in attorney work meals, $507.24 in licenses and permits, $934.68 in internal catering, $14,276.07 in other outside general services, and $1,386.25 in small computer hardware and software.

| | |
|---|---|
| **TOTAL BEFORE POST-FILING ADJUSTMENTS** | **$1,814,955.51** |
| **POST-FILING ADJUSTMENTS** | **$19,293.54** |
| **TOTAL INCORPORATING POST-FILING ADJUSTMENTS** | **$1,795,661.97** |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC.,** *et al.,* | : | **Case No. 16-10992 (SMB)** |
| | : | |
| Reorganized Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |

### FIFTH INTERIM AND FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS FOR (I) THE FIFTH INTERIM PERIOD FROM SEPTEMBER 1, 2017 THROUGH AND INCLUDING DECEMBER 29, 2017, AND (II) THE FINAL PERIOD FROM APRIL 21, 2016 THROUGH AND INCLUDING AUGUST 31, 2017

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for the above-captioned reorganized debtors (collectively, the "Reorganized Debtors," and before the Effective Date of the Plan (each as defined below), the "Debtors" and, together with their non-Debtor affiliates, "SunEdison" or the "Company"),[24] submits this fifth interim and final application (the "Application") seeking allowance and payment of compensation and reimbursement of expenses pursuant to sections 330 and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2016-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York (June 17, 2013) promulgated pursuant to Local Bankruptcy Rule 2016-1(a)

---

[24] For purposes herein, the definition of "SunEdison" and "Company" does not include Terraform Power, Inc. ("TERP") and Terraform Global, Inc. ("GLBL" and together with TERP, the "Yieldcos"), and each of their respective direct and indirect subsidiaries, unless otherwise provided.

(the "Local Guidelines"), and the United States Trustee's Guidelines for Reviewing Applications

for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 for Attorneys in

Larger Chapter 11 Cases effective as of November 1, 2013 (the "U.S. Trustee Guidelines," and

together with the Local Guidelines, the "Fee Guidelines"), (i) on an interim basis, for the period

from September 1, 2017 through and including December 29, 2017 (the "Fifth Application

Period"), and (ii) on a final basis, for the period from April 21, 2016 through and including

December 29, 2017 (the "Entire Case Period").  In support of this Application, Skadden submits

the declaration of J. Eric Ivester, a partner at Skadden (the "Ivester Declaration"), which is

attached hereto as Exhibit A and incorporated by reference.  In further support of this

Application, Skadden represents as follows:

### JURISDICTION

1.      This Court has jurisdiction to consider this Application under 28 U.S.C. §§

157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this

Application in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are Bankruptcy Code

sections 330 and 331, Bankruptcy Rule 2016 and Local Bankruptcy Rule 2016-1.

### BACKGROUND

**A.      The Chapter 11 Cases**

3.      On April 21, 2016,[25] twenty-six of the Debtors filed petitions for relief

under chapter 11 of the Bankruptcy Code in this Court, with additional Debtors filing voluntary

petitions on June 1, July 20, August 9, August 10, December 16, 2016, and April 7, 2017

---

[25]    Except as otherwise indicated, references herein to the "Petition Date" shall mean April 21, 2016.

(collectively, the "Chapter 11 Cases").  The Chapter 11 Cases have been consolidated for
procedural purposes only and are being jointly administered.

4.      The Debtors continued to operate their businesses and manage their
properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a)
and 1108.

5.      On April 29, 2016, the Office of the United States Trustee for the
Southern District of New York (the "United States Trustee") appointed an Official Committee of
Unsecured Creditors (the "Committee").  To date, no trustee or examiner has been appointed in
the Debtors' Chapter 11 Cases.

6.      On July 28, 2017 (the "Confirmation Date"), the Court entered an order
confirming the Second Amended Plan of Reorganization of SunEdison, Inc. and its Debtor
Affiliates [Docket No. 3735] (as may be amended, modified, or supplemented from time to time
and including all exhibits and supplements thereto, the "Plan," and the order confirming the Plan,
the "Confirmation Order").

7.      On December 29, 2017 (the "Effective Date"), the Plan became effective.

8.      As of the Petition Date, SunEdison was one of the world's leading
developers of renewable-energy solutions.  In addition to its development business, SunEdison
owned, operated, and/or provided maintenance services for clean power generation assets.
SunEdison's businesses are global enterprises with substantial development activities on six
continents at the time of filing.

9.      Additional factual background information regarding the Debtors when
these cases were commenced, including their business operations, their corporate and capital
structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the

Declaration of Patrick M. Cook, Vice-President – Capital Markets And Corporate Finance of

SunEdison, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day

Declaration") [Docket No. 4], filed on April 21, 2016.

## PRELIMINARY STATEMENT

10.     As SunEdison's lead restructuring counsel, Skadden has played a critical

role in the success of these Chapter 11 Cases.  As has been well-chronicled and as this Court is

aware, the Debtors had to overcome countless challenges in order to emerge from chapter 11.

11.     When these Chapter 11 Cases commenced on April 21, 2016, the Debtors:

(i) had virtually no available capital to support their operations or development business; (ii)

were cut off from the equity and debt markets, preventing them from raising any additional

capital outside of chapter 11; (iii) had scores of undeveloped or partially developed renewable

energy projects around the world which would require hundreds of millions of dollars to

maintain and complete; (iv) were at odds with their publicly traded affiliates – the Yieldcos –

their most valuable assets; and (v) were beset by allegations and innuendo regarding the rapid

decline of the Company's fortunes in the second half of 2015.  These impediments were further

compounded by the sheer size and complexity of the Company's operations, corporate

organization, and capital structure at the time of filing – approximately 1,500 legal entities,

approximately $8.2 billion of debt (including pre-construction, construction, and term debt

relating to certain projects and excluding the Yieldcos' debt), complex project finance and

development structures, and far-flung project development activities spanning six continents.

12.     Ultimately, SunEdison was able to chart a course through this quagmire

and successfully emerge from chapter 11.  As this Court remarked at the Confirmation Hearing,

this was a remarkable feat given the "wars and skirmishes" that dogged these cases from the

outset.  July 25, 2017 Bankr. Hr'g Tr. at 80 [A6700].  To achieve the successful result in these

cases, the Debtors brought together a highly skilled and resourceful team of restructuring professionals and advisors.  At the core of that team effort was Skadden's dedication, diligence, and leadership.

13.    While Skadden was involved in almost all of the Debtors' restructuring efforts, its work on behalf of the Debtors can be summarized in four main initiatives:

- **Asset Sales.**  Skadden assisted the Debtors with more than 40 significant asset sales across the globe, including going-concern sales of the Debtors' solar materials, residential, and commercial and industrial businesses.  Almost all of these transactions were highly complex and involved multiple parties, multiple jurisdictions and regulatory considerations.  These sales were made even more complicated because of the extra layers of scrutiny separately applied by the Debtors' warring factions, including the Committee, BOKF, N.A. ("BOKF"), the DIP Lenders (as defined below) and the Debtors' prepetition second lien lenders (the "Second Lien Lenders").  As a result of these efforts, the Debtors generated in excess of $1.2 billion in gross sale proceeds.[26]

- **TERP/GLBL.** Skadden devoted significant time to deal with the myriad of issues related to the Yieldcos.  The Yieldcos were created by SunEdison prior to the Petition Date and, as stated, were the Debtors' most valuable assets.  Soon after Skadden's engagement, it became apparent that the SunEdison/Yieldco relationship was fractured beyond repair.  Rather than exerting the type of control that had been the source of contention in the past, Skadden guided the Debtors down a path of conciliation with the Yieldcos as the best way to maximize value from SunEdison's interest in them.  This strategy led to the joint marketing process with the Yieldcos and marathon negotiations among SunEdison, the Yieldcos, and their respective advisors in order to resolve the multitude of issues that bedeviled the relationships between the parties.  These efforts culminated in comprehensive settlements with the Yieldcos and agreements whereby Brookfield Asset Management, Inc. ("Brookfield") acquired (i) 51% of TERP's outstanding stock in a sponsorship transaction and (ii) 100% of GLBL's outstanding stock in a whole company cash merger.  As a consequence of the Brookfield merger transactions (and the Yieldco settlements upon which they were based),

---

[26]    These sales include, without limitation:  North American Utility and C&I Assets (sales of certain utility projects and C&I assets); Latin America Portfolio Sale; GAM Sale; SLB Projects (sale of the Debtors' sale leaseback project portfolio); Solar Materials Sale; Jupiter (private sale of the Company's global channel business and Australian business); Honduras (sale of SunEdison's Honduras portfolio of solar projects); AP Warehouse Sale; MN C&I Sale; C&I Platform (sale of the Debtors' C&I platform as a going concern); and EMEA Sales (sales of equity or membership interests held by project companies in Israel, the United Kingdom, Turkey, and Greece).

SunEdison realized in excess of $800 million of additional consideration in the form of cash and TERP equity.

▪ **Resolution of Complex Litigation.**  Much of Skadden's effort in these cases was spent dealing with a plethora of litigations.  Skadden devised and implemented a strategy that ultimately led to consensual resolution of many of these claims.

At the start of these Chapter 11 Cases, dozens of lawsuits were pending in various courts around the country in which the plaintiffs alleged numerous claims and theories of liability against SunEdison, the Yieldco, their respective present and former directors and officers (the "D&Os"), underwriters for various securities transactions, and SunEdison's independent auditors (the "D&O Litigations").  After the Petition Date, the Committee sought to stay litigation that would impact the Debtors' D&O insurance and sought standing to commence actions against (i) the D&Os for alleged breaches of fiduciary duty ("Fiduciary Duty Claims") and (ii) the Yieldcos on various avoidance action theories (the "Yieldco Avoidance Claims"). Additionally, the Committee and BOKF commenced litigation against the DIP Lenders and the Second Lien Lenders seeking to disallow their claims and/or avoid liens (the "Claim/Lien Litigation").

With Skadden's assistance, the Debtors and the D&Os were successful in getting the vast majority of the D&O Litigations transferred to the United States District Court for the Southern District of New York (the "District Court").  Thereafter, at Skadden's request on behalf of the Debtors, both the District Court and this Court ordered mediation of the disputes that were covered by the D&O insurance, including the D&O Litigations and the Fiduciary Duty Claims.  As a result of these efforts, the Fiduciary Duty Claims were settled and $32 million of the D&O insurance proceeds were paid to the estates and ultimately distributed to the GUC/Litigation Trust (as defined in the Plan) for the benefit of unsecured creditors.

The Debtors and the Yieldcos were jointly covered by the D&O insurance policies.  With Skadden's guidance, the Debtors negotiated complicated cooperation and sharing agreements with the Yieldcos both with respect to the D&O insurance policies and the proceeds thereof.  These agreements paved the way for settlements of many of the D&O Litigations; several of these resolutions were conditions precedent to closing of one of the Yieldco/Brookfield transactions.

Lastly, at Skadden's request on behalf of the Debtors, this Court ordered mediation of the Claim/Lien Litigation, allocation issues related to the Debtors' settlements with the Yieldcos and the Yieldco Avoidance Claims, and plan issues among the Debtors' major parties in interest.  With the help of Chief Judge Cecilia Morris, these efforts were successful and paved the way

for confirmation of a plan of reorganization that was largely consensual and overwhelmingly supported by the Debtors' secured and unsecured creditors.

- **Financing Efforts.**  The successes in these Chapter 11 Cases would not have been possible without financing.  Thus, at the outset of the cases, Skadden assisted the Debtors in obtaining $300 million debtor-in-possession new money term loans from first and second lien prepetition secured parties (the "Original DIP Facility").  The Original DIP Facility also included a "roll-up" of the Debtors' prepetition first lien facility and a portion of the prepetition second lien facility.  The various provisions of the Original DIP Facility also served to resolve intercreditor disputes between the Debtors' secured lenders.  Because of the nature of the Debtors' businesses – primarily selling assets (the timing and amount of which were difficult to predict), numerous amendments (17 to be exact) to the Original DIP Facility were required during its one year term.  Because of the numerous warring factions in these Chapter 11 Cases, each of these amendments to the Original DIP Facility was difficult to negotiate and obtain.

  The term of the Original DIP Facility matured during the pendency of the Chapter 11 Cases.  Thus, Skadden assisted the Debtors in obtaining a replacement financing facility in the amount of $640 million (the "Replacement DIP Facility").  This facility repaid the new money portion of the Original DIP Facility and the portion of the prepetition first lien facility that had been "rolled-up" into the Original DIP Facility.  The "roll-up" of the prepetition second lien facility was included in the Replacement DIP Facility.  The Replacement DIP Facility was approved over the objection of the Committee.

  Because a portion of the consideration received by SunEdison in the TERP/Brookfield transaction were TERP shares, SunEdison did not have sufficient liquidity from other sources (e.g., cash on hand from asset sales) to emerge from chapter 11.  Thus, as a part of the Plan, the Debtors offered to its fulcrum debt – the Second Lien Lenders – the right to purchase TERP shares received by the Debtors as part of the TERP/Brookfield transaction.  This rights offering was backstopped by certain of the Second Lien Lenders.  Proceeds from the rights offering augmented the Debtors' other sources of cash, which enabled them to emerge from chapter 11 on December 29, 2017.  Skadden also has led the Debtors' defense of objections, discovery and appeals prosecuted by one of the unsecured creditors – the co-chair of the Committee – in opposition to the rights offering and backstop thereof.

14.    Given the foregoing efforts and accomplishments, Skadden respectfully submits that the compensation and expense reimbursement sought herein reflect the necessary and beneficial professional services that Skadden provided to the Debtors during the Fifth

Application Period and over the Entire Case Period.  Such compensation and expense

reimbursement is reasonable, appropriate, and commensurate with the size, nature, and

complexity of these Chapter 11 Cases.

**THE DEBTORS' RETENTION OF SKADDEN**

15.    On April 26, 2016, the Debtors applied to the Court for an order

authorizing them to retain Skadden [Docket No. 100] (the "Retention Application") pursuant to

an engagement letter dated April 2, 2016 (the "Engagement Agreement") as their restructuring

counsel, effective *nunc pro tunc* to the Petition Date.  On May 12, 2013, the Court entered an

order [Docket No. 260] (the "Retention Order") authorizing the Debtors to employ Skadden as

their counsel, effective as of the Petition Date, in accordance with the provisions of the Retention

Order and Engagement Agreement.[27]

16.    The Retention Order authorizes the Debtors to compensate and reimburse

Skadden in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local

Bankruptcy Rules.  The Retention Order also authorizes the Debtors to compensate Skadden at

its hourly rates charged for services of the type rendered in these Chapter 11 Cases and to

reimburse Skadden for its actual and necessary out-of-pocket expenses incurred, subject to

application to this Court.  The particular terms of Skadden's engagement are detailed in the

Engagement Agreement, a copy of which is attached to the Retention Application.

17.    The Retention Order authorizes Skadden to provide the following

services:

---

[27]    In further support of its Retention Application, Skadden has filed two supplemental declarations by Jay M. Goffman [Docket Nos. 400 and 1441] and four supplemental declarations by J. Eric Ivester [Docket Nos. 1862, 2736, 3386, and 3593] pursuant to Bankruptcy Rules 2014 and 2016 and Local Bankruptcy Rules 2014-1 and 2016-1.

8

(a)    advise the Debtors with respect to their powers and duties as debtors and debtors in possession in the continued management and operation of their businesses and properties;

(b)    attend meetings and negotiate with representatives of creditors and other parties in interest and advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11;

(c)    take all necessary actions to protect and preserve the Debtors' estates, including the prosecution of actions on the Debtors' behalf, the defense of actions commenced against the Debtors' estates, negotiations concerning litigation in which the Debtors may be involved, and objections to claims filed against the Debtors' estates;

(d)    prepare on behalf of the Debtors all motions, applications, answers, orders, reports, and papers necessary to the administration of the estates;

(e)    negotiate and prepare on the Debtors' behalf plan(s) of reorganization, disclosure statement(s), and all related agreements and/or documents, and take any necessary action on behalf of the Debtors to obtain confirmation of such plan(s);

(f)    advise the Debtors in connection with any sale of assets;

(g)    appear before this Court, any appellate courts, and the United States Trustee, and protect the interests of the Debtors' estates before such courts and the United States Trustee; and

(h)    perform all other necessary legal services and provide all other necessary legal advice to the Debtors in connection with these Chapter 11 Cases.

18.    Other than between Skadden and its affiliated law practices and their members, no agreement or understanding exists between Skadden and any other person or persons for the sharing of compensation received or to be received for professional services rendered in or in connection with these cases, nor will any be made except as permitted pursuant to Bankruptcy Code section 504(b)(1).

## FEE PROCEDURES AND MONTHLY FEE STATEMENTS

19.    On May 12, 2016, the Court entered an Order Pursuant to Bankruptcy Code Sections 105(a) and 331, Bankruptcy Rule 2016, and Local Bankruptcy Rule 2016-1 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 258] (the "Interim Compensation Procedures Order"), which sets forth the procedures for interim compensation and reimbursement of expenses for all professionals in these cases.

20.    In accordance with the Interim Compensation Procedures Order, on October 17, 2016, Skadden filed its First Interim Fee Application for Compensation for Services Rendered and Reimbursement of Expenses as Counsel [Docket No. 1419] (the "First Interim Skadden Fee Application") for the months of April[28], May, June, July, and August 2016 (the "First Application Period").  An order allowing 80% of the fees and 100% of the expenses sought in the First Interim Skadden Fee Application was entered on December 1, 2016 [Docket No. 1711].  With respect to the 20% holdback for the First Application Period, which totaled $5,286,907.50, the Court reserved determination regarding allowance and provided that Skadden could seek allowance and payment at a later date.

21.    In accordance with the Interim Compensation Procedures Order, on February 14, 2017, Skadden filed its Second Interim Fee Application for Compensation for Services Rendered and Reimbursement of Expenses as Counsel [Docket No. 2468] (the "Second Interim Skadden Fee Application") for the months of September, October, November, and December 2016 (the "Second Application Period").  An order allowing (i) 80% of the fees and 100% of the expenses sought in the Second Interim Skadden Fee Application, and (ii) half of the

---

[28]    References to "April 2016" in the context of the First Interim Skadden Fee Application refer to the stub period from the Petition Date (April 21, 2016) through the end of the month.

20% holdback from the Second Application Period, was entered on March 28, 2017 [Docket No. 2663]. With respect to the remaining 10% holdback, which totaled $1,633,588.44, the Court reserved determination regarding allowance and provided that Skadden could seek allowance and payment at a later date.

22. In accordance with the Interim Compensation Procedures Order, on June 14, 2017, Skadden filed its Third Interim Fee Application for Compensation for Services Rendered and Reimbursement of Expenses as Counsel [Docket No. 3341] (the "Third Interim Skadden Fee Application") for the months of January, February, March, and April 2017 (the "Third Application Period"). An order allowing (i) 80% of the fees and 100% of the expenses sought in the Third Interim Skadden Fee Application, (ii) half of the 20% holdback from the First Application Period, and (iii) half of the 20% holdback from the Third Application Period was entered on August 14, 2017 [Docket No. 3873]. With respect to the remaining 10% holdbacks from both the First Application Period and the Third Application Period, which totaled $2,643,453.75 and $1,573,104.52, respectively, the Court reserved determination regarding allowance and provided that Skadden could seek allowance and payment at a later date.

23. In accordance with the Interim Compensation Procedures Order, on October 16, 2017, Skadden filed its Fourth Interim Fee Application for Compensation for Services Rendered and Reimbursement of Expenses as Counsel [Docket No. 4152] (the "Fourth Interim Skadden Fee Application") for the months of May, June, July, and August 2017 (the "Fourth Application Period"). An order allowing (i) 80% of the fees and 100% of the expenses sought in the Fourth Interim Skadden Fee Application, and (ii) half of the 20% holdback from the Fourth Application Period, was entered on November 17, 2017 [Docket No. 4343]. With

11

respect to the remaining 10% holdback, which totaled $1,093,841.33, the Court reserved

determination regarding allowance and provided that Skadden could seek allowance and

payment at a later date.

   24.  Following the Confirmation Date and the close of the Fourth Application

Period, Skadden continued to file monthly fee statements for the months of September, October,

November, and December 2017 (the "Fifth Application Period"). Pursuant to the Interim

Compensation Procedures Order, Skadden has received payment of 80% of the fees and 100% of

the expenses requested in such monthly fee statements. In accordance with the Interim

Compensation Procedures Order, Skadden now seeks interim approval of 80% of the fees and

100% of the expenses requested in the monthly fee statements filed for the months comprising

the Fifth Application Period, as shown below, and final approval of the full amount of fees and

expenses requested for the Entire Case Period, and authorization for the Reorganized Debtors to

pay the corresponding amounts to the extent not previously paid.[29] A narrative statement of the

services rendered in each key category during the Entire Case Period, including descriptions of

work-streams that were active during the Fifth Application Period where applicable, is set forth

herein.

| FIFTH APPLICATION PERIOD | | | | | | |
|---|---|---|---|---|---|---|
| Date Filed | Docket Number | Period Covered | Fees Requested | Expenses Requested | Fees Authorized | Expenses Authorized |
| 11/1/2017 | 4235 | 9/1/2017-9/30/2017 | $899,213.40 (80% of $1,124,016.75) | $43,919.59 | $899,213.40 (80% of $1,124,016.75) | $43,919.59 |
| 11/29/2017 | 4373 | 10/1/2017-10/31/2017 | $1,116,613.76 (80% of $1,395,767.20) | $27,967.78 | $1,116,613.76 (80% of $1,395,767.20) | $27,967.78 |

---

[29] The Debtors have been provided with an opportunity to review all amounts requested in the Application and have approved the amounts requested herein.

| 12/13/2017 | 4424 | 11/1/2017-11/30/2017 | $804,197.61 (80% of $1,005,247.01) | $8,386.38 | $804,197.61 (80% of $1,005,247.01) | $8,386.38 |
| 1/12/2018 | 4541 | 12/1/2017-12/29/2017 | $763,576.44 (80% of $954,470.55) | $18,035.13 | $763,576.44 (80% of $954,470.55) | $18,035.13 |

25.    Further, Article 2.3(a) of the Plan provides that all final requests for payment of professional fee claims must be filed no later than sixty (60) days after the Effective Date.  Additionally, the Plan provides that from and after the Confirmation Date, any requirement that professionals comply with sections 327 through 31 of the Bankruptcy Code shall terminate.

26.    Notwithstanding the Plan providing that professionals do not have to comply with sections 327-331 of the Bankruptcy Code following the Confirmation Date, Skadden and other professionals continued to file monthly fee statements for the months between the Confirmation Date and the Effective Date (comprised of September through December 2017), and, accordingly, Skadden is also seeking final allowance and payment of all fees and expenses incurred through the Effective Date, including the release of the 10% holdback amounts from each of the First Application Period, Second Application Period, Third Application Period, and Fourth Application Period, and the release of the 20% holdback from the Fifth Application Period, which is equal to $895,900.30.  Pursuant to the Plan, however, Skadden agreed to a $1.43 million Voluntary Professional Fee Reduction (as defined in the Plan), which is described in further detail below.

## RELIEF REQUESTED

27.    In accordance with the Interim Compensation Procedures and the Plan, Skadden now submits this Application covering the Fifth Application Period for interim approval

13

and the Entire Case Period for final approval.  During the Fifth Application Period, attorneys, client specialists, and paraprofessionals of Skadden devoted a total of 4,935.9 hours to representation of the Debtors in their Chapter 11 Cases.[30]  Of the aggregate time expended during the Fifth Application Period, 945.8 hours were spent by partners, 711.5 hours were spent by counsel, 2,941.0 hours were spent by associates, and 337.6 hours were spent by client specialists and paraprofessionals.

28.    During the Entire Case Period, attorneys, client specialists, and paraprofessionals of Skadden devoted a total of 87,280.0 hours to representation of the Debtors in their Chapter 11 Cases.[31]  Of the aggregate time expended during the Entire Case Period, 17,481.4 hours were spent by partners, 68.2 hours were spent by of counsel, 11,885.8 hours were spent by counsel, 51,701.0 hours were spent by associates, 12.0 hours were spent by staff attorneys, and 6,131.6 hours were spent by client specialists and paraprofessionals.   For both the Fifth Application Period and the Entire Case Period, schedules showing the name and position of each such partner, of counsel, counsel, associate, client specialist, and paraprofessional, hours worked, and hourly billing rate are provided at the front of this Application.  Excluding paraprofessionals, Skadden's blended hourly rate was $951.67 for the Fifth Application Period and $891.35 for the Entire Case Period.

29.    As set forth above, Skadden, as the Debtors' lead restructuring counsel, has played an integral role in assisting the Debtors in their restructuring efforts that ultimately led to confirmation and consummation of the Plan.  As a result, in connection with its efforts

---

[30]    This reflects hours billed during the Fifth Application Period. Total hours worked, before voluntary reductions, were 5,702.1.

[31]    This reflects hours billed during the Entire Case Period. Total hours worked, before voluntary reductions, were 94,483.0.

during the Fifth Application Period and the Entire Case Period, Skadden now seeks allowance of (a) (i) $3,583,601.21 (80% of $4,479,501.51) in fees calculated at the applicable guideline hourly billing rates of the firm's personnel who have worked on these Chapter 11 Cases during the Fifth Application Period, and (ii) $98,308.88 in charges and disbursements actually and necessarily incurred by Skadden while providing services to the Debtors during the Fifth Application Period, and (b) (i) $73,919,381.99 in fees calculated at the applicable guideline hourly billing rates of the firm's personnel who have worked on these Chapter 11 Cases during the Entire Case Period, and (ii) $1,795,661.97 in charges and disbursements actually and necessarily incurred by Skadden while providing services to the Debtors during the Entire Case Period.

30.    This Application reflects prior voluntary fee reductions by Skadden during the Fifth Application Period in the aggregate amounts of $679,638.62 for fee reductions applied prior to the filing of the applicable monthly statement, which constitutes a 13.2% reduction of gross fees that were billable.  This Application also reflects prior voluntary expense reductions by Skadden during the Fifth Application Period in the aggregate amounts of $8,853.94 for expense reductions applied prior to the filing of the applicable monthly statement, which constitutes 8.3% of its gross expenses billed.  Combined, these voluntary fee and expense reductions total $688,492.56 (a 13.1% reduction).  The aforesaid fee reductions include, but are not limited to, (i) 50% of non-working travel time expended during the Fifth Application Period ($49,048.25, which includes additional write offs to this matter), (ii) the write off of associate timekeepers who recorded fewer than five hours in the aggregate on all matters in any monthly period as set forth in the monthly fee statements ($77,685.59), and (iii) the elimination of partner and counsel timekeepers who recorded fewer than one hour in the aggregate on all matters in any monthly period ($9,929.11).

31.    This Application also reflects prior voluntary fee reductions by Skadden

during the Entire Case Period in the aggregate amounts of $6,870,324.06 for fee reductions

applied both prior to and after the filing of the applicable monthly statement, which constitutes a

8.5% reduction of gross fees that were billable.  This Application also reflects prior voluntary

expense reductions by Skadden during the Entire Case Period in the aggregate amounts of

$493,959.64 for expense reductions applied both prior to and after the filing of the applicable

monthly statement, which constitutes 21.6% of its gross expenses billed.  Combined, these

voluntary fee and expense reductions total $7,364,283.70 (a 8.9% reduction).  The aforesaid fee

reductions include, but are not limited to, (i) 50% of non-working travel time expended during

the Entire Case Period ($915,276.65, which includes additional write offs to this matter), (ii) the

write off of associate timekeepers who recorded fewer than five hours in the aggregate on all

matters in any monthly period as set forth in the monthly fee statements ($455,124.10), and (iii)

the elimination of partner and counsel timekeepers who recorded fewer than one hour in the

aggregate on all matters in any monthly period ($71,331.10).

32.    The Interim Compensation Procedures Order provides that when seeking

interim compensation, professionals must submit monthly fee statements to certain notice

parties.  Each person receiving a statement has fifteen (15) days after its receipt to review.  If no

objection to a monthly fee statement is made, the Debtors are authorized to pay 80% of the fees

requested (with the remaining 20% of the fees requested referred to herein as the "Holdback")

and 100% of the charges and disbursements requested.[32]  As described above, Skadden has

---

[32]    The Court approved all fees and expenses sought in connection with the First through Fourth Interim Skadden
Fee Applications as set forth in the Omnibus Order Granting Applications For Allowance and Payment of
Interim Compensation for Services Rendered and Reimbursement of Expenses Incurred from April 21, 2016
through and including August 31, 2016 [Docket No. 1711] (the "First Fee Order"), the Omnibus Order Granting
Applications For Allowance and Payment of Interim Compensation for Services Rendered and Reimbursement
of Expenses Incurred from September 1, 2016 through and including December 31, 2016 [Docket No. 2663]

*(cont'd)*

submitted monthly fee statements for each of the months covered by the Fifth Application

Period.  The aggregate Holdback amount for the Fifth Application Period is $895,900.30.  The

objection deadline for the fee statement corresponding to the final month of the Fifth Application

Period (December 2017) passed on January 29, 2018, and Skadden has received no objections

with regard to it.

    33. Pursuant to the Plan, the Debtors funded $17,239,751.05 in the aggregate

into the Holdback Escrow Account (as defined in the Plan) for all outstanding fees and expenses

incurred by all applicable professionals during the Entire Case Period, less amounts attributable

to the Voluntary Professional Fee Reduction (as defined in the Plan and described in more detail

below).  Skadden is now seeking allowance and payment of the outstanding 10% holdbacks from

each of the First Application Period ($2,643,453.75)[33], Second Application Period

($1,633,588.44), Third Application Period ($1,573,104.52), and Fourth Application Period

($1,093,841.33), as well as the outstanding 20% holdback from the Fifth Application Period

($895,900.30).  Combined, such outstanding holdback amounts equal $7,839,888.34.  However,

pursuant to Article 2.3(d) of the Plan, every professional has agreed to a Voluntary Professional

Fee Reduction, which, in the aggregate, must equal at least $5 million and was contributed to the

GUC/Litigation Trust.  After negotiating with the various professionals, the Debtors and the

---

*(cont'd from previous page)*

  (the "Second Fee Order"), the Omnibus Order Granting Applications For Allowance and Payment of Interim Compensation for Services Rendered and Reimbursement of Expenses Incurred from January 1, 2017 through and including April 30, 2017 [Docket No. 3873] (the "Third Fee Order"), and the Omnibus Order Granting Applications For Allowance and Payment of Interim Compensation for Services Rendered and Reimbursement of Expenses Incurred from May 1, 2017 through and including August 31, 2017 [Docket No. 4343] (the "Fourth Fee Order").

[33] In the orders approving the Third Interim Skadden Fee Application and the Fourth Interim Skadden Fee Application, the aggregate outstanding 10% holdback from the First Application Period was listed as $2,643,501.76, rather than $2,643,021.7.  This minor discrepancy arose due to applying the post-filing expense reduction of $480 from July 2016 to both fees and expenses from that month, rather than solely expenses. Accordingly, Skadden is seeking a slightly reduced 10% holdback amount from the First Application Period in order to reconcile this discrepancy.

respective professionals agreed to an aggregate Voluntary Professional Fee Reduction of $5.06 million.  Specifically, Skadden has agreed to reduce its request for payment of the aggregate outstanding holdback amounts by $1.43 million with respect to Skadden's portion of the Voluntary Professional Fee Reduction, which amount has already been paid to the GUC/Litigation Trust.[34]

34.      Consistent with its normal practice, Skadden achieved cost efficiencies throughout the Entire Case Period by employing a streamlined case management structure. Instead of assigning various attorneys to the many tasks that arose during these Chapter 11 Cases, Skadden designated a core group of attorneys who were assigned responsibility for specific matters and types of matters.  This streamlined case management structure (i) allowed some attorneys to work almost exclusively on discrete matters in the Chapter 11 Cases, (ii) permitted the cases to be staffed with the appropriate personnel, and (iii) enabled Skadden professionals to avoid performing duplicative or unnecessary work.  As described in detail herein, Skadden believes that the requests made in this Application comply with this Court's standards in the context of the unique circumstances surrounding these complex Chapter 11 Cases.

35.      As disclosed in the Retention Application that this Court approved, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases.  The charges and disbursements charged to clients include, inter alia, charges for photocopying, electronic document management

---

[34]    Accordingly, though Skadden is seeking full allowance of all fees generated during the Chapter 11 Cases, Skadden will only be paid $6,409,888.34 from the Holdback Escrow Account to account for this contribution to the Voluntary Professional Fee Reduction.

services, travel, travel-related expenses including business meals, computerized research,

messengers, postage, and fees related to trials and hearings.

36.     Skadden has attempted to minimize the charges and disbursements

associated with the Chapter 11 Cases.  During the Entire Case Period, Skadden incurred the

following sums for actual and necessary charges and disbursements in the rendition of

professional services in the Chapter 11 Cases and requests that it be reimbursed therefor:

| | |
|---|---|
| Computer Legal Research | $331,148.14 |
| Long Distance Telephone | $55,224.11 |
| Outside Telephone | $114.67 |
| In-House Reproduction (at $0.10 per page) | $11,929.15 |
| Reproduction-color (at $0.10 per page) | $22,055.80 |
| Outside Reproduction | $435,426.41 |
| Outside Research | $39,831.80 |
| Filing/Court Fees | $242,808.55 |
| Court Reporting | $40,247.44 |
| Word Processing | $14,025.00 |
| Local Travel | $40,366.47 |
| Out-Of-Town Travel | $338,372.80 |
| Business Meals | $68,416.42 |
| Courier & Express Carriers (e.g., Federal Express) | $8,719.04 |
| Postage | $117.71 |
| Professional Fees | $18,277.43 |
| Electronic Document Management | $48,710.15 |
| Other[35] | $99,164.42 |
| **TOTAL BEFORE POST-FILING ADJUSTMENTS** | **$1,814,955.51** |
| **POST-FILING ADJUSTMENTS** | **$19,293.54** |
| **TOTAL INCORPORATING POST-FILING ADJUSTMENTS** | **$1,795,661.97** |

---

[35]   This category includes $79,893.16 in UCC filings and searches, $779.80 in in-house reproduction, $37.50 in
support staff time, $1,349.72 in attorney work meals, $507.24 in licenses and permits, $934.68 in internal
catering, $14,276.07 in other outside general services, and $1,386.25 in small computer hardware and software.

37.     Skadden submits that the above fees, charges, and disbursements are reasonable given the size and complexity of these Chapter 11 Cases, and are consistent with those incurred by other bankruptcy practitioners in other large, complex chapter 11 reorganization cases in this and other districts.

## DESCRIPTION OF SERVICES RENDERED

38.     Throughout the Entire Case Period, Skadden worked closely with the Debtors and their other advisors during the chapter 11 restructuring process.  The services described in this Application have been directed toward those tasks necessary to fulfill the Debtors' fiduciary and statutory duties and to achieve the Debtors' business and legal objectives.  To meet the Debtors' needs, Skadden provided multi-disciplinary services.  Throughout this process, certain of the principal Skadden attorneys working on the Chapter 11 Cases were required to devote the vast majority of their time to this matter, and, in some instances, to the exclusion of other clients.

39.     Over the course of the Chapter 11 Cases, Skadden created 89 different matter numbers or subject-matter categories to which its professionals assigned the time billed by them, all of which are related to the tasks performed by Skadden on behalf of the Debtors.[36]  Skadden has kept contemporaneous records of the time spent rendering such services and separated tasks in billing increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in nature and necessary and appropriate for the effective administration of the Chapter 11 Cases.

40.     Skadden devoted approximately 47% of its time to the following ten most significant matters during the Entire Case Period (with fees for each matter set forth in

---

[36]     Exhibit B contains a table of all matter numbers used by Skadden in these Chapter 11 Cases.

parentheses): Financing (DIP and Emergence) ($6,971,142.75), Litigation (General)

($4,681,681.00), Reorganization Plan/Plan Sponsors ($4,149,419.50), TERP/GLBL

($3,527,586.50), Case Administration ($3,365,780.64), Asset Dispositions (General)

($2,979,018.98), Creditor Meetings/Statutory Committees ($2,627,710.50), TERP/GLBL Sale

($2,565,368.00), North American Utility and C&I Assets ($2,407,900.40), and Latin America

Portfolio Sale ($2,305,914.54).

## MOST SIGNIFICANT KEY MATTERS

41.    Following below is a narrative summary of the work performed by

Skadden during the Entire Case Period in connection with each of the key matters to which

Skadden professionals devoted significant time (listed in descending order based on amount of

fees sought):[37]

### A.    Financing (DIP and Emergence)
### Hours: 8,188.9, Fees: $6,971,142.75

42.    During the Entire Case Period, Skadden professionals devoted a

significant amount of time to assisting the Debtors in their efforts to negotiate with their secured

lenders concerning consensual use of cash collateral and other matters related to the Original DIP

Facility, Replacement DIP Facility, and Exit Facility (defined below).  The Skadden team

provided extensive advice and services in connection with negotiating, drafting, and revising

related documents and interim and final orders related to cash collateral, the Original DIP

Facility, and the Replacement DIP Facility.

---

[37]    The matters summarized herein are based on total time spent by Skadden professionals over the Entire Case
Period. Accordingly, while the aggregate time for the matters described herein was significant on an entire-case
basis, certain matters were concentrated in some (but not all) Application Periods.  The individual matter
summaries note the Application Period(s) during which each matter was most active.

43.     After extensive negotiations, during the First Application Period Skadden professionals filed, on behalf of the Debtors, a motion to approve the Original DIP Facility (as described above).  Throughout the First, Second, and Third Application Periods, Skadden professionals provided advice and services in connection with negotiating and drafting 17 amendments to and waivers under the Original DIP Facility agreement, which, among other things, extended certain milestones, modified certain reporting requirements, amended parameters for certain intercompany transactions (including applicable subordination terms), addressed collateral and guaranty matters, revised the process for the Debtors' use of proceeds from the Original DIP Facility and certain asset sales with respect to certain blocked accounts, and provided various covenant relief.  During such time, Skadden professionals continued to advise the Debtors regarding their compliance and reporting requirements under the Original DIP Facility.

44.     During the Third Application Period, after extensive, multi-party negotiations, Skadden professionals filed, on behalf of the Debtors, a motion to approve the Replacement DIP Facility (as described above) to replace the Original DIP Facility.  In connection with the Replacement DIP Facility, Skadden professionals, among other things, negotiated its terms, addressed domestic and foreign collateral issues, negotiated the cash collateralization of the Debtors' outstanding letters of credit with the Original DIP Facility letter of credit issuers, and drafted documentation and pleadings related to the foregoing and obtaining the Court's approval of the Replacement DIP Facility.  Skadden professionals also responded to an objection asserted by the Committee regarding the Replacement DIP Facility.

45.     During the Fifth Application Period, Skadden professionals assisted with the Debtors' entry into a $150 million term loan exit facility (the "Exit Facility") which

reinstated certain second lien claims.  In connection with the Exit Facility, Skadden

professionals, among other things, negotiated its terms, addressed collateral and guaranty matters

and drafted various related documents. Skadden professionals also negotiated and assisted with

the payoff of the Replacement DIP Facility.

46.    During the Entire Case Period, Skadden professionals regularly conducted

transaction-specific analyses of various asset sales, intercompany transactions, and other third-

party transactions potentially requiring approval under the Original DIP Facility and

Replacement DIP Facility, negotiated approvals for certain transactions, and coordinated the

provision of information required or requested pursuant to the Original DIP Facility and the

Replacement DIP Facility agreements and related Court orders.  Skadden professionals have

helped facilitate the Debtors' compliance with various specific reporting and notice

requirements, including reporting relating to proposed asset sales, notices of receipt of asset sale

proceeds, updates to organizational charts and notices of certain material events.

47.    In addition, Skadden professionals further assisted the Debtors with

diligence and analysis regarding the joinder of various U.S. and foreign subsidiaries as

guarantors of the Original DIP Facility and Replacement DIP Facility and potential collateral

exclusions, the drafting and execution of guaranties and security documents, preparation and

updating of collateral schedules and compliance with other collateral-related covenants,

including delivery of possessory collateral, negotiation of bank account control agreements, and

delivery of various certifications relating to exceptions from the guaranty and collateral

requirements under the Original DIP Facility agreement.  During the Entire Case Period,

Skadden professionals performed diligence on over 300 entities to potentially join as DIP

guarantors, approximately 175 of which ultimately joined as guarantors under the Original DIP

Facility and Replacement DIP Facility.

48.     Skadden professionals also periodically advised the Debtors with respect

to financing issues related to certain of the Company's non-Debtor subsidiaries.  Given the

global scope of the Debtors' business operations and related financing, Skadden professionals

throughout Skadden's worldwide network devoted time to advising the Debtors regarding these

matters.

**B.     Litigation (General)
         Hours: 4,799.9, Fees: $4,681,681.00**

49.     During the Entire Case Period, Skadden professionals spent considerable

time preparing materials for pending litigation matters and responding to numerous discovery

requests filed by various parties-in-interest.  Beyond these standard tasks, Skadden advised the

Debtors in other ongoing and threatened litigation matters.  In particular, the Company and its

affiliates faced dozens of lawsuits arising from a variety of prepetition actions and transactions,

including, but not limited to, the Yieldco initial public offering transactions.

50.     Many of these lawsuits asserted overlapping direct and derivative claims

by shareholders against the Company, the Yieldcos, the D&Os, and related third parties, and

many of such claims were arguably covered by the Company's D&O insurance policies.  Most of

these lawsuits were transferred pursuant to multi-district litigation procedures to the District

Court, Hon. P. Kevin Castel in December 2016 and January 2017.  At the end of the Second

Application Period, at the status conference held in the District Court on December 19, 2016,

Judge Castel ordered a limited stay of the D&O actions pending in the District Court through

March 31, 2017, and directed all parties in such D&O actions to participate in mediation sessions

– the MDL Mediation, as defined below – before retired United States District Court Judge

24

Layne Phillips and Greg Lindstrom.  Similarly, on December 28, 2016, this Court entered an order requiring the Debtors, the Committee, and the parties to the pending D&O actions not pending in the District Court to also participate in the Mediation, and staying those litigation proceedings through March 31, 2017.  In connection with the MDL Mediation, Skadden professionals advised the Debtors and negotiated with other parties to promote a global settlement between all interested parties.  During the Entire Case Period, Skadden professionals also advised the Debtors regarding threatened and pending litigation outside the scope of the MDL Mediation.

51.    During the Entire Case Period, Skadden professionals also advised the Debtors in connection with various adversary proceedings and creditor constituent objections to certain of the Debtors' motions filed in this Court.  Specifically, Skadden professionals advised the Debtors in connection with expedited discovery requests from creditor constituents and coordination of data transfer to certain stakeholders.  Skadden professionals advised the Debtors with respect to data collection and preservation, data review, and data production in response to creditor constituent discovery requests.  Skadden professionals also prepared and defended witnesses in depositions related to creditor constituent objections and other matters.

52.    During the Entire Case Period, Skadden professionals also continued to assist the Debtors with complex data collection and retention issues particularly as related to the transfer and destruction of data.  Skadden professionals also continued to advise the Debtors regarding compliance with third-party subpoena requests.  Skadden professionals negotiated to limit the scope of third-party discovery and managed document review and productions in response to third-party requests.  Skadden professionals further assisted the Debtors with non-disclosure agreements to protect confidentiality of proprietary and sensitive information.

53.     Because of the overlapping nature of litigation matters (with respect to other matter categories), to the extent time spent on litigation-related issues was not billed to this matter, time spent on such matters was billed to the specific matter that was the subject of the litigation, such as Creditor Meetings/Statutory Committees, TERP/GLBL, Financing (DIP and Emergence), Employee Matters (General), Multidistrict Mediation, Yieldco Settlement Motion, Insurance, and others as applicable.

### C.    Reorganization Plan/Plan Sponsors
Hours: 4,598.0, Fees: $4,149,419.50

54.     During the First and Second Application Periods, Skadden professionals advised the Debtors in connection with the development and drafting of the Plan.  In particular, Skadden professionals (a) participated in multiple conferences with the Debtors' management and other professionals regarding considerations for the development of the Plan, (b) reviewed materials concerning Plan-related issues, including liquidation and valuation analyses, (c) conducted research and analyzed various issues related to the development of the Plan, (d) coordinated with the Debtors and their professionals to develop and maintain a timeline for drafting the Plan, (e) held meetings and conference calls with creditor constituents regarding potential contents of a Plan, and (f) began to draft the Debtors' Plan.  Such efforts culminated during the Third Application Period when the Debtors filed the Plan.

55.     During the Third Application Period, Skadden and the Debtors continued such efforts and prepared and revised numerous drafts of the Plan, which reflected the fluid nature of plan discussions and various potential alternatives to fund the Debtors' emergence from the Chapter 11 Cases.  Skadden professionals discussed with the Debtors various issues and strategy approaches and continued to analyze legal and business issues related to plan structure, the classification and treatment of claims and interests, and distribution and implementation

26

considerations.  Skadden professionals also advised the Debtors with respect to settlement

negotiations among the Debtors' secured and unsecured creditors regarding the foregoing issues

and attended numerous meetings, conference calls, and presentations in connection with the

same.  These efforts entailed considerable work preparing, reviewing, and evaluating different

strategic alternatives and plan term sheets in consultation with the Debtors' other advisors and

management.

56.    In particular, during the Third Application Period, Skadden professionals

advised the Debtors in negotiations with their primary creditor constituents, which ultimately

facilitated the Debtors' entry into the Yieldco Settlement (as defined below) and the Debtors'

support of the proposed mergers of TERP and GLBL with Brookfield, which formed the

cornerstone of the Plan.

57.    During the Fourth Application Period, Skadden professionals advised the

Debtors with respect to, and participated in, ongoing Plan-related negotiations with the Debtors'

primary creditor constituents, including the Committee.  To that end, Skadden professionals

spent considerable time in and preparing for ongoing mediation sessions with respect to a broad

range of Plan-related issues (the "Mediation") before the Honorable Cecelia G. Morris with the

Debtors' prepetition secured lenders, the Committee, and other constituents.  During the Fourth

Application Period and in connection with progress made during the Mediation, Skadden

professionals continued to work with the Debtors and their other advisors to revise the proposed

Plan, and engaged in meetings and conference calls with the Debtors' and the Debtors' other

professionals regarding such modifications.  Ultimately, the Debtors' efforts in the Mediation

bore fruit, resulting in a settlement between all of the Debtors' major creditor constituents,

including the Committee (the "Plan Settlement").

58.     As a result of the Plan Settlement, the Debtors successfully obtained near unanimous support from the holders of Second Lien Claims (as defined in the Plan) and overwhelming support from its unsecured creditors, who, on a consolidated basis, voted to accept the Plan.  The overwhelming support the Debtors received for the Plan is, in part, attributable to Skadden's concerted efforts to address the over one dozen formal objections to the Plan and numerous informal objections received from creditors.

59.     Despite such support, the Debtors nonetheless faced a contested confirmation hearing with two formal Plan objections outstanding: (i) one by two affiliated unsecured noteholders of SUNE, CNH Capital Partners, LLC and AQR Capital Management LLC (collectively, "AQR") – affiliates of AQR DELTA Master Account, L.P., the co-chair of the Committee (the "AQR Objection"); and another (ii) by two equity shareholders.  In connection with the AQR Objection, Skadden and the Debtors responded to numerous discovery requests, producing thousands of documents.  In connection with the AQR Objection, Skadden professionals also defended the deposition of the Debtors' Chief Executive Officer on an expedited time frame.  Furthermore, Skadden professionals drafted and filed briefs in support of confirmation of the Plan, as well as replies and supplemental briefs responding to the objections to the Plan.[38]

60.     Ultimately, after nearly two full days of evidentiary confirmation hearings at the end of July 2017, the Court entered an order (during the Fourth Application Period) on July 28, 2017 confirming the Plan [Docket No. 3735], recognizing the intensive efforts that the Debtors and their advisors and creditor constituents had put forth in reaching this milestone.

---

[38]   Skadden also opened a separate matter number during the Fourth Application Period for work relating to the appeals filed by AQR ("AQR Appeal"), which is described below at Section CC.

61.     During the Fifth Application Period, Skadden professionals focused on working with the Debtors, their other advisors, constituents, and other parties to address the remaining conditions precedent required to go effective under the Plan, various requirements under the Plan, and the myriad work-streams that were critical to the Reorganized Debtors' post-emergence operations, financing, budgets, and governance matters.  To that end, Skadden professionals assisted with various tasks required for the Plan to go effective, including (without limitation) drafting and negotiating a transition services agreement with the GUC/Litigation Trust (the "GUC Transition Services Agreement"), negotiating and executing various governance and organizational documents for the Reorganized Debtors, and assisting the new board of the Reorganized Debtors, Richard Katz, the newly appointed CEO of the Reorganized Debtors, and the GUC/Litigation Trust with transition matters.

62.     Additionally, throughout the Fifth Application Period, Skadden also worked with the Committee and Drivetrain, LLC, the liquidating trustee of the GUC/Litigation Trust (the "Liquidation Trustee"), and their advisors on various administrative and transition-related matters. In particular, Skadden helped facilitate the Liquidation Trustee and Committee's claims administration process and ultimate prosecution of certain causes of action, in accordance with the Plan and Committee/BOKF Plan Settlement (as defined in the Plan).

**D.     TERP/GLBL**
**Hours: 3,536.9, Fees: $3,527,586.50**

63.     During the Entire Case Period, Skadden professionals spent considerable time analyzing and advising the Debtors on a range of complex issues related to the Debtors' relationship with their non-Debtor affiliates, TERP and GLBL.  In the first few months of these Chapter 11 Cases, among other things, Skadden professionals advised the Debtors on contractual issues arising from their various intercompany agreements with the Yieldcos (and payments

29

related thereto), issues regarding certain prepetition intercompany and third-party sales involving

the Yieldcos, issues related to certain consent solicitations, and issues regarding potential

TERP/GLBL claims and settlements. Skadden professionals also analyzed the impact of asset

transfers conducted by TERP/GLBL on unsecured claims.

   64. Additionally, during the Entire Case Period, Skadden professionals

responded to information requests from the Yieldcos, analyzed issues regarding cash

distributions from the Yieldcos under their respective organizational agreements and outstanding

debt instruments, prepared presentations for the Debtors' board of directors regarding the

Yieldcos, analyzed issues relating to specific sales and their effects on the Yieldcos and the

Debtors, including in respect of the filing obligations of the Debtors under the Securities

Exchange Act of 1934, drafted various nondisclosure agreements, tracked the progress on

outstanding open issues impacting the Yieldcos, performed diligence of various agreements with

the Yieldcos, and worked on drafting various responses to formal and informal objections filed

by the Yieldcos, among other tasks.

   65. During both the Third and Fourth Application Periods, Skadden

professionals also advised the Debtors regarding: potential claims and defenses by and among

the Debtors and the Yieldcos and a global settlement related thereto (the "Yieldco Settlement");

issues regarding pending or threatened litigation matters involving the Yieldcos; settlements of

certain litigation involving the Yieldcos and certain of their directors and officers (and insurance

matters related thereto); issues relating to specific pending and consummated sales and their

effects on the Yieldcos and the Debtors; and regulatory and disclosure matters related to the

Yieldco Settlement and the merger transactions with Brookfield (including reviewing and

commenting on the Yieldcos' proposed proxy filings). Additionally, Skadden professionals

addressed matters that related to and were integral to fully effectuating the Yieldco Settlement. To that end, Skadden professionals spent considerable time drafting and negotiating a transition services agreement with TERP related to the Debtors' GAM business that was approved by the Court on June 20, 2017 [Docket No. 3395], as well as corporate services transition services agreements (the "Yieldco Corporate Services TSAs") with each of TERP and GLBL.

66.     During the Fifth Application Period, Skadden professionals continued to work closely with the Debtors and the Yieldcos' advisors to negotiate and finalize the Yieldco Corporate Services TSAs.  On September 7, 2017, Skadden filed a motion on behalf of the Debtors seeking approval of the Yieldco Corporate Services TSAs; then, after Skadden and the Debtors were able to resolve an objection thereto by Oracle, the Yieldco Corporate Services TSAs were approved by the Court on September 28, 2017 [Docket No. 4076].  In addition, Skadden continued to advise the Debtors on various Yieldco matters, including issues regarding: the assumption and assignment of contracts implicating the Yieldcos; certain restricted stock units; an amendment to the Yieldco Corporate Services TSAs; resolving any outstanding settlement matters and fully effectuating the Yieldco Settlement Agreements; and concerns related to confidentiality protections between SunEdison and the Yieldcos (which resulted in the negotiation and execution of a common interest agreement with the Yieldcos).

67.     Further, during the Entire Case Period, Skadden worked closely with other professionals (including the Yieldcos' advisors) and participated on numerous internal update calls and calls with other professionals to discuss and analyze the foregoing issues.

E.     **Case Administration**
       **Hours: 5,062.9, Fees: $3,365,780.64**

68.     During the Entire Case Period, Skadden professionals devoted substantial resources to case administration matters and working with the Debtors' management and

31

professionals to ensure that the Debtors conducted their postpetition operations in accordance with the Bankruptcy Code and applicable non-bankruptcy law.  Moreover, Skadden professionals held regular teleconferences, both internally and with the Debtors' management and other advisors, in order to keep the various teams apprised of case developments and reduce expenses by ensuring that professional efforts were not duplicated.

69.    Time billed to this matter also includes preparation for and attendance at (either in person or telephonically) the 59 omnibus and off-omnibus hearings that occurred during the Entire Case Period, including the hearings on the Disclosure Statement (as defined below), the Backstop Commitment and Rights Offering (as defined below), and the confirmation hearings.  Specifically, Skadden professionals prepared for, participated in, and represented the Debtors at such hearings, each of which involved multiple complex issues.  Prior to certain hearings, Skadden professionals interviewed witnesses, prepared witness proffers and examination outlines, drafted and filed hearing agendas detailing the matters to be heard during each hearing, and prepared hearing binders for use by the Court at such hearings.  Skadden professionals also devoted time to coordinate required notices and mailings, reviewing and responding to creditor and other interested party case inquiries, preparing case calendars and task lists, conducting conferences with the Debtors' management, advisors, and certain parties in interest, and monitoring the Court's docket.

**F.    Asset Dispositions (General)**
**Hours: 3,795.7, Fees: $2,979,018.98**

70.    During the Entire Case Period, Skadden professionals expended significant time and energy on advising the Debtors in connection with various matters related to the disposition of assets in compliance with the Bankruptcy Code and, as applicable, the *de minimis* sale order entered by the Court on July 14, 2016 (the "De Minimis Sale Order") [Docket

No. 781]. During the First Application Period, Skadden professionals also spent significant time preparing for two hearings on the De Minimis Sale Order and extensively negotiated with constituents regarding the procedures set forth therein, including working to resolve numerous informal and formal objections. During the Entire Case Period, Skadden professionals filed sale notices for 14 *de minimis* sales.

71.     Early in the Chapter 11 Cases, once it became apparent that numerous sales were in the offing, Skadden set up individual matter numbers for each of the major transactions. However, during the first two to three months of these Chapter 11 Cases, much of the sale activity was charged to this matter number. In addition, although Skadden has created separate matter numbers for many asset sales and related processes to enhance expediency and streamline case administration during the course of the Entire Case Period, this matter includes time that was spent by Skadden professionals on researching and supporting the various sale processes generally, preparing certain form documents to be used as templates when drafting documents for other sales, or advising on certain specific *de minimis* sales that have not been assigned a separate matter number. In connection with the foregoing, Skadden professionals researched the legal implications of certain asset sales, reviewed, negotiated, and discussed solicitation efforts and proposed sale terms, and participated in regular update calls, both internally and with the Debtors' various deal teams and other advisors, to discuss sale progress and outstanding issues.

### G.     Creditor Meetings/Statutory Committees
###         Hours: 3,023.0, Fees: $2,627,710.50

72.     On April 20, 2016, the United States Trustee filed a Notice of Appointment of the Unsecured Creditors' Committee [Docket No. 148]. During the Entire Case

Period, Skadden professionals worked with Committee professionals to negotiate and ultimately come to agreement on many issues in the cases as described herein.

73.    During the First Application Period, Skadden prepared for and represented the Debtors at both formal and informal meetings with the Committee and its advisors, including organizational and section 341 meetings.  At the request of the Committee, Skadden participated in update calls at least twice per week with the Committee's professionals.  Skadden professionals reviewed Committee comments to drafts of documents and negotiated provisions of various final orders entered in connection with the Debtor's first and second day relief.

74.    Moreover, during the First Application Period (and in subsequent Application Periods), Skadden professionals were nearly in daily contact with the Committee's advisors, frequently responding to e-mails and participating in additional calls to provide real-time updates regarding the Debtors' case developments.  Additionally, during the First Application Period, Skadden professionals worked to respond to numerous Committee requests for corporate diligence, and to negotiate confidentiality agreements with creditor constituencies to allow for the sharing of diligence materials and also protect sensitive matters in the event of third-party litigation.

75.    The Second Application Period involved extensive litigation between the Debtors and the Committee, as the Committee filed various complaints, proposed complaints, and motions.  On October 20, 2016, the Committee filed its lien challenge complaint against the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders [Docket No. 1454]. Skadden professionals assisted the Debtors with this litigation by evaluating and responding to numerous inquiries from various parties, facilitating discovery requests, and negotiating to resolve the issues raised in the complaint.

34

76.    On November 2, 2016, the Committee filed the D&O Adversary Proceeding against all of the plaintiffs in the multi-district litigation pending in the United States District Court for the Southern District of New York (the "MDL Litigation") as well as other plaintiffs not part of the MDL Litigation [Adv. Proc. No. 16-01257] (the "D&O Adversary Proceeding").  Two days later, the Committee filed a motion for derivative standing to bring claims belonging to the Debtors' estates against certain of the Debtors' directors and officers (the "D&O Standing Motion") [Docket. No. 1550].  Following extensive negotiations, the Debtors consensually resolved the D&O Standing Motion, which required Skadden to coordinate among more than a dozen different law firms and two different courts.

77.    On November 7, 2016, the Committee then filed a motion seeking standing to assert avoidance actions against the Yieldcos [Docket No. 1557] (the "Yieldco Standing Motion").  In connection with the Yieldco Standing Motion, Skadden spent considerable time drafting responses, researching, communicating with parties in interest, responding to numerous Committee discovery requests, preparing and defending key deponents, preparing for and attending an evidentiary hearing, and negotiating a Yieldco-related claims settlement protocol with the Committee.

78.    Additionally, as further described herein, during the Third Application Period Skadden professionals represented the Debtors in the Court-ordered MDL Mediation (as defined below in Section II) before retired United States District Court Judge Layne Phillips and Greg Lindstrom with respect to certain claims against SunEdison, the Yieldcos, and certain of their respective directors and officers, underwriters, and auditors.

79.    Aside from matters pertaining to the Committee, time billed to this matter also includes time spent by Skadden professionals (i) researching and drafting a response to an

35

order to show cause why the Court should not direct the United States Trustee to appoint an

official committee of equity security holders in the Chapter 11 Cases [Docket No. 356], which

was prompted by several letters filed on the docket by equity holders, and (ii) preparing for two

hearings opposing the appointment of an official equity committee in the Chapter 11 Cases.  This

included drafting and filing several pleadings, preparing witnesses, and attending the hearings

regarding the potential appointment of an official equity committee on July 14, 2016 and January

12, 2017.

     **H.**     **TERP/GLBL Sale**
                  **Hours: 2,323.0, Fees: $2,565,368.00**

        80.     During the Entire Case Period, Skadden professionals advised the Debtors

with respect to the potential marketing and sale of their ownership stakes in the Yieldcos, the

Debtors' most valuable assets, which included assessing and advising the Debtors of potential

strategic alternatives to a sale, related nondisclosure agreement issues, and other strategies to

maximize the value of the Debtors' stakes in the Yieldcos.

        81.     In connection with the sale process, Skadden professionals spent

considerable time drafting and negotiating definitive sale documents and ancillary agreements,

and analyzing the implications of the proposed sale on the various intercompany agreements and

claims among the Debtors and the Yieldcos.  This complex sale process culminated in March

2017 with the execution and delivery of definitive transaction documents among the Debtors, the

Yieldcos and Brookfield that effectuated the sale of GLBL and the sale of a majority stake in

TERP to Brookfield and settled various outstanding claims between the Debtors and the

Yieldcos.

        82.     In connection with the sale to Brookfield, Skadden professionals spent

considerable time during the Fourth Application Period drafting and negotiating ancillary sale

documents, analyzing domestic and global regulatory matters related to the sale, reviewing and commenting on disclosure documents related to the sale, and analyzing the implications of the proposed sale on the Debtors' emergence from bankruptcy.

83.     During the Fifth Application Period, Skadden assisted the Debtors with satisfying the conditions precedent to closing the TERP merger with Brookfield (the "<u>TERP Merger</u>"), which closed and became effective on October 16, 2017.  As a result of the TERP Merger and the Debtors electing to retain 100% of its shares of TERP stock, the Debtors received cash equal to $300,657,250 in the aggregate (comprised of $106,107,939 received through the special dividend contemplated by the merger agreement for the TERP Merger, and $194,549,311 received in the TERP Merger) and retained 34,258,962 TERP shares.

84.     Also during the Fifth Application Period, Skadden professionals worked closely with GLBL, Brookfield, and various other parties to assist in the closing of the GLBL merger with Brookfield (the "<u>GLBL Merger</u>"), which included extensive multi-party negotiation and mediation efforts to resolve certain litigations as a condition precedent to the closing of the GLBL Merger.  To that end, Skadden professionals spent considerable time working diligently with the Debtors, GLBL, and certain securities litigation plaintiffs to reach key settlements with respect to certain securities class action claims (relating to GLBL's initial public offering) and certain claims brought by individual plaintiffs in connection with GLBL's private placement offerings.

**I.     North American Utility and C&I Assets**
     **Hours: 2,992.1, Fees: $2,407,900.40**

85.     During the First and Second Application Periods, Skadden professionals advised the Debtors in connection with the sale of equity interests in the Debtors' utility scale projects.  In particular, Skadden professionals advised the Debtors in the sale of its equity

interests in numerous solar and wind utility scale projects to NRG Renew LLC [Docket No. 942] for an aggregate purchase price of approximately $144 million (plus the potential to receive additional post-closing earnout payments depending on the future performance of the transferred projects). The sale included three "packages" of energy projects – namely, the Utah projects, the Hawaii projects and certain development projects, and the Buckthorn project located in Texas (collectively, the "NA Utility Projects"). The sales were governed by a Purchase and Sale Agreement dated August 8, 2016, that contemplated a competitive bidding and auction process for the assets. The bidding procedures were approved by the Court on August 19, 2016 [Docket No. 1032], and the sale was approved by the Court on September 16, 2016. [Docket No. 1204].

86.    During the First Application Period, Skadden professionals negotiated, drafted, and revised the purchase and sale agreement, proposed bidding procedures, and other related sale documents filed with the Court. Skadden professionals also responded to informal and formal objections to the notice of sale, and reviewed and analyzed potential litigation issues, bond replacement issues, disclosure restrictions, tax implications, and potential related contract rejection issues, among other tasks. Skadden also assisted the Debtors to form new entities and complete a pre-closing internal restructuring to facilitate the execution of the transaction.

87.    Skadden professionals spent considerable time assisting the Debtors with closing the sales of the NA Utility Projects. Certain closing issues resulted in an amendment to the Purchase and Sale Agreement that Skadden negotiated and prepared. Skadden has also assisted the Debtors with respect to the assumption and assignment of various contracts in connection with the utility sales.

88.    During the First and Second Application Periods, Skadden professionals also advised the Debtors in connection with the sale of equity interests in the Debtors'

38

commercial and industrial ("C&I") projects.  Specifically, on August 8, 2016, certain of the

Debtors subsidiaries entered into a purchase and sale agreement to sell approximately 25 C&I

project entities to NRG Renew LLC for an aggregate purchase price of approximately $70

million.  Skadden professionals negotiated, drafted, and revised the purchase and sale agreement

and other related sale documents.  Skadden also assisted the Debtors with forming new entities

and complete a pre-closing internal restructuring to facilitate the execution of the transaction.

The sale of the C&I projects to NRG Renew LLC closed in the first week of October 2016, and

Skadden subsequently addressed post-closing and other sale-related issues.

### J.    Latin America Portfolio Sale
Hours: 2,832.3, Fees: $2,305,914.54

89.    During the Entire Case Period, Skadden professionals advised the Debtors

in connection with the sale by non-Debtor affiliates of their equity interests in certain project

companies owning projects in Brazil, Mexico, and Chile.  Due to its complexity and geographic

scope, the sale was originally effectuated pursuant to three purchase and sale agreements that

were executed on October 4, 2016.

90.    During the First Application Period, Skadden professionals assisted with

the negotiation of a non-binding term sheet and prepared the initial drafts of the purchase and

sale agreements.  Skadden also: prepared drafts of releases, terminations, and other exhibits to

the purchase and sale agreement; reviewed and provided comments on escrow agreements and

other exhibits; and worked with the Company's local and in-house counsel to revise the

schedules to the three purchase and sale agreements.

91.    During the Second and Third Application Periods, following the execution

of the purchase and sale agreements, Skadden professionals assisted the Company in preparing

closing documentation and worked with local counsel in the three jurisdictions to effect the

completion of conditions precedent to the closing of the transactions in the purchase and sale agreements.  In addition, due to changes in circumstances since the execution date that affected the commercial structure of the deal, during the Third Application Period, Skadden professionals worked on an amended and restated purchase and sale agreement covering the Chilean projects, the negotiation of which required additional time from Skadden professionals that was not foreseen at the time of execution.  The amended and restated purchase and sale agreement for the Chilean projects was completed and executed in the last week of February 2017 concurrently with the closing under the purchase and sale agreement for the two Mexican projects and the initial closing under the amended and restated purchase and sale agreement for the Chilean projects (covering one construction-stage project and four projects in early stages of development).

92.     After the initial closings on February 24, 2017, Skadden professionals worked on satisfying the conditions precedent to closing on the remaining projects in Chile as well as the Brazilian projects.  The closing of the sale of the second operating project in Chile required further negotiation of subcontractor releases, lender approvals, and interim period expenses.

93.     Between the February closings and the end of the Third Application Period, Skadden professionals continued to negotiate documentation in connection with the sale of the Brazilian projects.  Skadden professionals drafted and continued to revise an amended and restated purchase and sale agreement in conjunction with the drafting of a new purchase and sale agreement for two development stage projects, the Sao Pedro projects.[39]

---

[39]  The commercial deal originally contemplated the Sao Pedro transaction occurring on a later, separate trajectory but as the negotiations developed, the two became linked.  The separate billing matter for the "Sao Pedro" sale

*(cont'd)*

40

94.     During the Fourth Application Period, Skadden professionals worked with local counsel on satisfying the conditions precedent to closing on the second operating project in Chile as well as the Brazilian projects.  The closing of the sale of the second operating project in Chile, which occurred in May 2017, required further negotiation of subcontractor releases, lender approvals, and interim period expenses.

95.     In connection with the sale of the Brazilian projects, Skadden professionals negotiated and worked with local counsel and the buyer's counsel to: (i) draft the amended and restated purchase and sale agreement for the Brazilian projects and the new purchase and sale agreement for the Sao Pedro projects (along with their respective schedules); (ii) draft a new transition services agreement; and (iii) draft exhibits outlining the complicated allocation of interim period expenses between the Debtors' affiliates and the buyer.  The signing and closing of the amended and restated Brazilian purchase agreement and the signing of the Sao Pedro purchase agreement occurred in the last week of May 2017.

96.     The satisfaction of conditions precedent to the closing of the Sao Pedro sale required further negotiations and collaboration with local counsel due to a number of complicated local regulatory and tax law issues.  The closing, which occurred in July 2017 (during the Fourth Application Period), required Skadden professionals to work closely with local counsel in the applicable jurisdictions to draft additional documentation, including an amended purchase price allocation, amended schedules to the purchase and sale agreement, officer's certificates, release agreements, authorizing resolutions, and transfer documentation. Finally, Skadden professionals also negotiated the mechanics for the return to the Debtors of

---

*(cont'd from previous page)*
(matter 70) was used less frequently through the Third Application Period as the two transactions became tied together and work by Skadden professionals increasingly applied to both sales.

substantial cash deposits that had been placed with a Brazilian energy regulator and continued to monitor such return after the Fourth Application Period.

97.    During the Fifth Application Period, Skadden professionals worked with local counsel on satisfying the conditions precedent to closing on the third operating project in Chile.  This closing, which occurred in October 2017, required the negotiation of a settlement agreement and release with respect to a dispute with the project's power off-taker, as well as a consent to the transaction from the off-taker and a waiver of a condition precedent, each of which required coordination between Skadden professionals and local counsel.

98.    In general, the sale transactions described above benefited the Debtors' estates because they resulted in (a) the settlement, termination, and release of a significant number of third-party contractual claims against certain Debtors and their affiliates for breaches of performance obligations under various project contracts between those affiliates and the companies being sold, which were also guaranteed by certain Debtors, (b) the termination and release of various guarantees and undertakings of support made by certain Debtors to the lenders to the companies being indirectly sold, and (c) the release of millions of dollars of bank guarantees, letters of credit, and cash collateral provided by certain Debtors and their subsidiaries to third parties in support of obligations of the projects and project companies sold, which were substituted or replaced by the buyer.

**K.    GAM Sale**
**Hours: 2,310.9, Fees: $2,137,759.59**

99.    During the First and Second Application Periods, in connection with a marketing process coordinated by Rothschild Inc., Skadden professionals began to diligence and draft purchase agreements for the potential sale of SunEdison's global asset management ("GAM") business.  Skadden professionals across offices conducted diligence with respect to

42

hundreds of contracts for operating and maintenance services, as well as asset management services, that SunEdison provided in connection with renewable-energy projects in more than fifteen countries around the world.

100.    Because contracts associated with the GAM business directly implicated SunEdison's relationship with the Yieldcos, Skadden professionals also evaluated the impact of any potential GAM sale on the Company's relationship with the Yieldcos.  Additionally, Skadden professionals assisted the Debtors' management in determining which employees might need to be transitioned in connection with such a sale and drafted applicable supporting documentation.  Further, Skadden professionals assisted the Company with the potential transfer of assets to the Yieldcos and the drafting of transition services agreements relating to the services needed on an interim basis.

101.    Skadden professionals also advised the Company on the potential sale process, including assisting the Debtors' management in evaluating and responding to third-party bidder proposals, reviewing and commenting on drafts of purchase and sale agreements received from such third parties, and working closely with employees of the Debtor and local legal counsel in the various jurisdictions covered by the GAM business (in particular with respect to the potential sale of the GAM business in Malaysia and China).

102.    During the Third Application Period, the Company determined to enter into a transition services agreement with TERP regarding (i) the transition of certain employees to TERP, (ii) certain transitionary GAM business services from SunEdison and certain of its affiliates to TERP and certain of its affiliates, and (iii) the waiver of certain claims arising under the operation and maintenance and management services agreements between GAM entities and TERP and certain of its affiliates.  Skadden professionals assisted the Debtors in negotiating and

drafting a letter agreement between the Company and TERP that governed the terms of this transition, as well as drafted applicable supporting documentation.

103.    During the Fourth Application Period, Skadden professionals continued to negotiate and draft purchase agreements and other supporting documentation for the potential sale of SunEdison's GAM business and related management and operational matters. This included assisting the Debtors' management in evaluating and responding to a proposal from Longroad Energy Services, LLC ("Longroad"), performing due diligence, preparing disclosure schedules, and reviewing and commenting on drafts of a purchase and sale agreement and related ancillary documents.

104.    With respect to the GAM sale process, Skadden professionals assisted the Debtors with completing the sale, pursuant to the Court-approved *de minimis* asset sale procedures in these cases, of the Debtors' remaining U.S. GAM business to Longroad [Docket No. 3780]. Earlier on in the GAM sale process, the Yieldcos' termination of their relationships with the GAM business significantly impacted the Debtors' efforts to market and sell the GAM business as a whole and resulted in the Debtors and their advisors pursuing a two-party bidding process with respect to the remaining U.S. GAM business assets. The GAM sale was approved by the Court on August 24, 2017.[40] Skadden professionals spent time drafting and negotiating the asset purchase agreement, transition services agreements, forms of new operations and maintenance and asset management agreements, and various ancillary documents and schedules to facilitate the closing of the GAM sale.

105.    During the Fifth Application Period, Skadden professionals continued to assist and advise the Debtors on matters related to the GAM business, including with respect to

---

[40]    Docket No. 3942. An amended order approving the GAM sale was entered, for administrative purposes, on August 25, 2017 [Docket No. 3953].

addressing closing conditions and required consents for the GAM sale (and other post-closing matters), drafting or revising certain amendments and schedules related to the GAM transactions, and handling various contract assumption and assignment issues. Further, Skadden professionals advised the Debtors on a potential transition services agreement with GLBL (that was not ultimately executed during the Fifth Application Period), and drafted and revised documentation relating thereto.

**L.      SLB Projects**
**Hours: 2,791.4, Fees: $2,004,096.00**

106.    During the Second, Third, Fourth, and Fifth Application Periods, Skadden professionals assisted the Debtors with planning, structuring, and drafting transaction documents relating to the Debtors' sale of their sale leaseback ("SLB") portfolio of projects. This included work on four separate sales of SLB projects to three different buyers. The SLB portfolio provides over 373 megawatts spread across approximately 491 projects. Approximately 80 of the projects, accounting for approximately 67 megawatts of generating capacity, would be sold to the first buyer. A second buyer purchased (via two separate purchase agreements): (i) a portfolio of approximately 352 projects, consisting of (x) SLB projects that are leased from six tax equity investors and have a total power generating capacity of approximately 270 megawatts, and (y) projects that are subject to a partnership flip structure involving a single tax equity investor that have a total power generating capacity of approximately 23.88 megawatts, and (ii) a portfolio of approximately 45 SLB projects accounting for approximately 24.37 megawatts of generating capacity. A third buyer purchased a fourth portfolio of approximately 14 projects with a total generating capacity of 11.18 megawatts.

107.    Skadden professionals spent time performing extensive due diligence with respect to the SLB portfolio. Such due diligence has included, without limitation, the review of:

(i) project contracts for the hundreds of projects that comprise the SLB portfolio; (ii) financing documents pursuant to which sale-leaseback and other financing was provided to the projects that comprise the SLB portfolio; (iii) contracts for the purchase of solar renewable energy credits from the underlying projects that comprise the SLB portfolio; and (iv) corporate and organizational documents governing the project companies that are lessees of the projects that comprise the SLB portfolio.  In addition, Skadden professionals spent time revising corporate governance documents on an as-needed basis to authorize the various sales.  The diligence process required significant work by Skadden professionals determining the contractual rights and obligations under the contracts for the SLB portfolio, especially following the departure of key Company personnel who had the necessary institutional knowledge regarding such contracts.

108.    During the Entire Case Period, Skadden professionals spent time negotiating and drafting four purchase and sale agreements with the three buyers of the SLB projects.  As part of this process, Skadden coordinated the review and comment by the Debtors' constituents and their advisors, including the Debtors' lenders, and the Committee.  Additionally, Skadden professionals negotiated and drafted all additional transaction documents and ancillary documents (including signing-date deliverables) that were entered into in connection with the purchase and sale agreements.  Two of the purchase and sale agreements were executed during the Third Application Period on April 27, 2017.  The third and fourth purchase and sale agreements were executed during the Fifth Application Period on October 12, 2017 and October 20, 2017, respectively.

109.    During both the Fourth and Fifth Application Periods, Skadden professionals assisted the Debtors with their efforts to satisfy closing conditions under each of the purchase and sale agreements, including coordinating with the Debtors, the purchasers of the

SLB portfolio and applicable third parties in order to obtain required third party consents.  As part of this process, Skadden professionals also advised the Debtors with respect to certain defaults and potential defaults that the Debtors and their affiliates received notice of under certain contracts.  In certain circumstances, Skadden professionals assisted the Debtors with curing defaults, including assisting the Debtors with the cash management protocol under the Debtors' Replacement DIP Facility.  In other circumstances, Skadden professionals negotiated settlement agreements with contract counterparties.  Skadden professionals also spent time reviewing and revising consent documentation regarding lessor consents and project document counterparty consents.  Skadden professionals spent significant time assisting the Debtors with settlement negotiations with contractual counterparties whose consent was required in order to consummate the closing under the applicable purchase and sale agreements.  Such contractual counterparties held claims against non-Debtor project lessees and/or consent rights with respect to non-Debtor sales and therefore the Bankruptcy Court processes were not available to facilitate the settlement process.  Such settlement negotiations included lengthy discussions with various power off-takers of the SLB projects who asserted claims under the applicable power purchase agreement (and would not consent to the applicable sale prior to satisfaction of such claims) or objected to the purchaser of the applicable SLB project (and thus required additional contractual accommodations prior to consenting to such sale).  Three of the sales closed in the Fifth Application Period, on September 20, 2017 and October 16, 2017 for the first sale (this sale was split into two closings), October 26, 2017 for the second sale, and November 29, 2017 for the third sale.

110.    Additionally, during both the Fourth and Fifth Application Periods, Skadden professionals assisted the Debtors with designing a structure to assign solar renewable-

47

energy credit purchase contracts to the buyers of the SLB projects, including both Debtor and non-Debtor contracts.  This process required extensive due diligence by Skadden professionals in order to evaluate SunEdison's contractual structure for the purchase and sale of solar renewable energy credits from the SLB projects, and the findings of such due diligence were made available to the buyers for purposes of their own evaluation of the SLB assets.  This diligence process was complicated by the departure of key personnel at the Company who understood the contractual structure. Skadden professionals also drafted assignment and transfer documentation required in order to implement the aforementioned structure, and assisted the Debtors with forming new special purpose vehicles for purposes of implementing such structure.  Finally, Skadden professionals also advised the Debtors, and coordinated the process with the Bankruptcy Court, in cases where implementation of such a structure required an assignment and assumption of a solar renewable-energy contract to which a Debtor is a party.

**M.      Disclosure Statement/Voting Issues
Hours: 2,096.1, Fees: $1,899,877.50**

111.    During the Third Application Period, Skadden filed the Debtors' Disclosure Statement for the Debtors' Plan of Reorganization [Docket No. 2672] (as amended, modified, and revised from time to time, the "Disclosure Statement").  Leading up to and after such filing, Skadden professionals drafted, revised, reviewed, and considered comments from various parties in interest to the Disclosure Statement and related materials.  Additionally, Skadden professionals reviewed and analyzed materials prepared by the Debtors' other advisors in connection with the Disclosure Statement, including the Debtors' financial projections and liquidation analysis.  Skadden professionals participated in numerous meetings and teleconferences internally, with the Debtors, and with advisors to the Tranche B

48

Lenders/Steering Committee regarding the contents of and issues related to the Disclosure

Statement and related materials.

112.    During the Third Application Period, certain parties in interest provided

the Debtors with comments to the Disclosure Statement and filed objections and reservations of

rights to the Disclosure Statement.  Skadden professionals reviewed and considered comments

and objections to the Disclosure Statement, and worked with the Debtors and such parties in

interest to address outstanding issues leading up to the hearings on the Disclosure Statement.  In

connection therewith, Skadden professionals reviewed, revised, and drafted modifications to the

Disclosure Statement to address the informal and formal comments and objections received.  In

addition, Skadden professionals updated the Disclosure Statement to reflect case developments

since its initial filing.  Skadden professionals assisted the Debtors with filing modifications to the

Disclosure Statement on the docket leading up to entry of the Disclosure Statement Order (as

defined below) [Docket Nos. 3217, 3266, 3290, and 3309].  Subsequently, Skadden professionals

assisted the Debtors with filing the "solicitation version" of the Disclosure Statement on June 12,

2017 [Docket No. 3314] (the "Solicitation Disclosure Statement").

113.    During the Third and Fourth Application Periods, Skadden professionals

worked with the Debtors' other advisors to prepare the Debtors' financial projections and

liquidation analysis that were incorporated into the Disclosure Statement.  Skadden professionals

participated in numerous meetings and teleconferences internally, with the Debtors, and with

advisors to the Tranche B Lenders/Steering Committee regarding the contents of and issues

related to these materials.  The Debtors filed the liquidation analysis and financial projections on

May 26, 2017 [Docket Nos. 3219 and 3220].  Thereafter, Skadden professionals and the Debtors'

other professionals continued to revise and update these materials for inclusion in the Solicitation Disclosure Statement.

114.    During the Fourth Application Period, Skadden professionals attended three hearings on the Disclosure Statement on May 19, June 1, and June 6, 2017.  Despite the Debtors' efforts to address the various objections, the Debtors faced a contested Disclosure Statement hearing with objections outstanding from (i) an ad hoc shareholder committee and (ii) AQR.  Ultimately, after oral arguments on June 1 and June 6, 2017, the Court approved the adequacy of the Debtors' Disclosure Statement and related voting materials.  Thereafter, Skadden professionals worked with various parties in interest, including AQR, to finalize the form of order approving the Disclosure Statement.  The Court entered an order on June 13, 2017 [Docket No. 3319] the "Disclosure Statement Order") approving the Disclosure Statement and related materials.  Following entry of the Disclosure Statement Order, Skadden professionals conferred with the Debtors' solicitation agent, Prime Clerk LLC, regarding balloting on the Debtors' Plan and reviewed balloting reports. Skadden and the Debtors' other advisors also worked with Prime Clerk to review and analyze the final voting results.

115.    In addition, throughout the Chapter 11 Cases, Skadden professionals worked with Togut Segal & Segal LLP, PricewaterhouseCoopers LLP, and the Debtors to assess the validity of, and prepare objections, to claims.  Skadden professionals negotiated with various of these claimants to enter into voting stipulations pursuant to Bankruptcy Rule 3018 in advance of the voting deadline.  Skadden professionals also prepared related pleadings and materials in support of entry of the voting stipulations by the Court.

**N.      Employee Matters (General)**
**Hours: 2,066.7, Fees: $1,890,514.63**

116.    As of the Petition Date, the Debtors employed over approximately 1,600

employees in the United States and Singapore.  During the Entire Case Period, Skadden has

generally provided the Debtors with legal services and advice in connection with the various

employee issues that have arisen during the course of these Chapter 11 Cases, starting with filing

a motion on the Petition Date seeking to pay certain prepetition employee wage and benefit

obligations and to continue certain employee benefit programs in the ordinary course [Docket

No. 8].

117.    During the First Application Period, Skadden also assisted the Debtors and

their management in developing and drafting employee incentive and retention programs.

Skadden professionals engaged in extensive discussions and negotiations with key creditor

constituents regarding the design and terms of the Debtors' Key Employee Incentive Plan

("KEIP"), the Key Employee Retention Plan ("KERP"), and certain deal-based incentive plans

designed to incentivize employees who were responsible for driving the sales of certain of the

Debtors' business units and projects (collectively, the "Employee Programs").  With respect to

obtaining Court approval of the Employee Programs: on July 7, 2016, Skadden filed a motion

seeking to implement the KERP and two deal-based incentive plans, the utility project incentive

plan and the solar materials incentive plan (the "KERP Motion") [Docket No. 729]; on July 29,

2016, Skadden filed a motion seeking to implement a deal-based incentive plan relating to the

sale of C&I projects (pursuant to certain C&I portfolio sales) [Docket No. 883]; and on August

23, 2016, Skadden filed a motion seeking to implement the KEIP and residential and small

commercial deal plan [Docket No. 1043].

118.    Skadden professionals worked closely with the Debtors and their other advisors in connection with seeking Court approval of, and the Debtors' subsequent implementation of, the Employee Programs. This included filing various replies and supplemental declarations, some of which were filed under seal due to the highly confidential commercial information contained in such pleadings. Skadden professionals also spent considerable time engaging the Debtors' creditor constituents and the United States Trustee in an effort to garner their support of the programs and address any formal and informal objections related thereto. Skadden professionals also advised the Debtors with respect to the administration, implementation, and renewal of various employee benefit policies and programs, as well as other employee-related matters arising in the ordinary course of the Debtors' business.

119.    Over the course of these Chapter 11 Cases, Skadden professionals continued to provide the Debtors with legal services and advice in connection with various employee-related issues. This included time spent analyzing and advising the Debtors on employee compensation and benefit matters relating to domestic and foreign employees. Over the course of the Chapter 11 Cases, the Debtors continued to make significant workforce reductions that Skadden professionals advised on, including through providing advice on and drafting documentation related to the transfer of employees in connection with various sale transactions. Additionally, Skadden professionals analyzed and provided advice regarding alleged and/or potential claims of former employees of the Debtors, as well as other employee-related matters arising in the ordinary course of the Debtors' business.

120.    During the Fifth Application Period, Skadden professionals continued to advise the Debtors on employee-related issues as they prepared for emergence, including issues

52

related to the transition among senior management of the Company and the remaining
workforce.

**O.  Yieldco Settlement Motion**
       **Hours: 1,944.9, Fees: $1,811,987.00**

121.  During the Third Application Period, Skadden professionals drafted
various pleadings in connection with seeking this Court's approval of the comprehensive
settlements between the Debtors and the Yieldcos and other documentation relating to the sale of
the Debtors' ownership interests in the Yieldcos, including a motion to approve the settlements
(the "Yieldco Settlement Motion") filed on March 10, 2017 [Docket No. 2570], as supplemented
on March 23, 2017 [Docket No. 2641].  In connection with the Yieldco Settlement Motion,
Skadden professionals spent a considerable amount of time conferring with the Debtors, their
constituents, the Yieldcos, and the parties' respective advisors, and advising on a number of
settlement-related issues, including the definitive settlement documentation, the proposed order,
the avoidance action allocation, ongoing claims analysis, and Plan-related implications.

122.  After filing the Yieldco Settlement Motion and related pleadings, during
both the Third and Fourth Application Periods, Skadden professionals spent considerable time on
various tasks related thereto, including preparing for and attending status conferences, addressing
discovery issues, and responding to Committee discovery requests related to the Yieldco
Settlements.  Skadden professionals also spent time negotiating and drafting the scheduling order
with the Committee, and preparing for and participating in the Mediation with the Honorable
Cecelia G. Morris (which is further addressed in Section C above) that covered issues relating to
the specific allocation of the transaction consideration received by SunEdison pursuant to the
transactions with Brookfield attributable to potential avoidance actions claimed by the Debtors

against the Yieldcos.  The Court ultimately approved the Yieldco Settlement Motion on June 7, 2017 [Docket No. 3292].

**P.    Solar Materials Sale**
     **Hours: 2,016.9, Fees: $1,687,084.23**

123.    During the Entire Case Period, Skadden professionals advised the Debtors in connection with the sale of the Debtors' solar materials business unit (the "<u>Solar Materials Business</u>") to stalking horse bidder GCL-Poly Energy Holdings Limited (the "<u>Solar Materials Purchaser</u>") pursuant to an asset purchase agreement dated August 26, 2016 [Docket No. 1072] (the "<u>Solar Materials Sale</u>").  During the First Application Period, Skadden professionals negotiated, drafted, and revised the asset purchase agreement, proposed bidding procedures, and other related sale documents filed with the Court.  Skadden professionals also reviewed, analyzed, and responded to informal and formal objections to the Solar Materials Sale and contract cure amounts, and analyzed equipment intellectual property issues, among other tasks.

124.    During the Second Application Period, on September 16, 2016, the Court approved the Debtors' proposed bidding procedures for the Solar Materials Sale and scheduled the sale hearing for October 20, 2016 [Docket No. 1206]. Skadden's efforts during these months involved the settlement and/or reservation of several objections to the sale in the sale order, as well as analyzing contracts for assumption and assignment to the buyer.[41]  During the Second Application Period, Skadden also drafted and revised sale documentation, exhibits, and schedules, performed contract review and noticing, and performed diligence regarding disclosure issues and redaction of contracts.  Additionally, Skadden professionals prepared and submitted

---

[41]    Over the course of the Chapter 11 Cases, Skadden created four additional matters, "Solar Materials Sale – Document Review," "Solaria Litigation," "Solar Materials Sale Objections Litigation," and "Post-Closing Solar Materials Sale Matters" to account for the significant time spent by Skadden professionals responding to issues relating to objections to the Solar Materials Sale.

various regulatory filings in connection with the Solar Materials Sale, including as required for certain antitrust and Committee on Foreign Investment in the United States approvals.

125.     During the Third Application Period, Skadden professionals devoted significant time to preparing for the closing of the Solar Materials Sale, which occurred on March 31, 2017.  Such efforts involved, among other things, participation in extensive meetings and negotiations with the Solar Materials Purchaser in anticipation of closing, providing further information and diligence concerning the Solar Materials Business requested by the Solar Materials Purchaser, obtaining federal regulatory approval of the Solar Materials Sale, and negotiating a transition services agreement and other closing documentation, as well as coordination and participation in pre-closing meetings of teams of Solar Materials Purchaser and Debtor personnel in both the United States and China, plant visitations, and employee meetings. Skadden also represented the Debtors in negotiations with contract counterparties concerning the assumption and assignment of contracts to the Solar Materials Purchaser.  During the Third Application Period, Skadden also drafted and revised sale documentation, exhibits, and schedules, performed contract review and noticing, and performed diligence regarding disclosure issues and redaction of contracts.

126.     During the Fourth Application Period, Skadden professionals advised the Debtors with respect to post-closing matters regarding the Solar Materials Sale.  Such efforts included negotiation, execution, and performance of a settlement agreement with respect to the Debtors' contractual right to receive up to $50 million in contingent consideration in connection with the Solar Materials Purchaser's construction of a plant for the use of the purchased intellectual property.  In the aggregate, the Debtors received approximately $127.5 million in net cash proceeds from the Solar Materials Sale, consisting of $100 million in cash paid at closing

and $27.5 million under the settlement agreement.  The Debtors contributed $2.5 million to a settlement to resolve SMP, Ltd.'s sale objection.

Q.    **Jupiter**
      **Hours: 2,230.4, Fees: $1,667,785.00**

127.    During the First and Second Application Periods, Skadden professionals performed diligence and negotiated and drafted sale documentation for a private sale of the Company's global channel business and Australian business to Flextronics International USA, Inc. ("Flextronics").  This sale, the structure of which evolved significantly, required substantial assistance from the Skadden professionals involved, particularly with respect to the heavily negotiated asset purchase agreement.  Beginning in the First Application Period, Skadden professionals also assisted the Company in navigating a complex closing process that involved coordinating detailed purchase price adjustments, asset and liability schedules, third party consents, and other closing documents in the United States, Australia, and other jurisdictions.

128.    Skadden professionals provided extensive advice to the Company in order to divide what was an integrated residential solar business into three to four business lines that could be sold to different buyers.  Additionally, Skadden professionals worked with certain of the Debtors' constituents to resolve a number of formal and informal objections prior to entry of the order approving the sale on August 16, 2016 [Docket No. 1002].  Skadden professionals also negotiated and drafted a closing agreement setting forth closing and cure mechanics, as well as a transition services and license agreement, and have continued to provide post-closing assistance during the course of the Chapter 11 Cases.

129.    During the Second Application Period, following the closing, Skadden professionals continued to assist and advise the Company with regards to a variety of post-closing matters, including the assignment and novation of contracts, warranties, and other related

matters.  Skadden professionals also assisted the Company in ongoing negotiations with

Flextronics and other relevant counterparties with regards to post-closing matters.  At the

Company's request, Skadden professionals also prepared supplements to the sale agreement and

continued to advise the Company with regards to issues involving transition services and other

transitional issues.

R.    **Solar Materials Sale Objections Litigation**
      **Hours: 1,533.6, Fees: $1,537,048.50**

130.    Beginning in the Third Application Period, Skadden professionals advised

the Debtors with respect to objections to the Solar Materials Sale (as defined above) filed by

SMP, Ltd. ("SMP"), a Korean non-Debtor subsidiary of the Debtors, objecting to the termination

of certain license agreements, and the Solaria Corporation ("Solaria", and the objections filed by

SMP and Solaria, the "Solar Materials Sale Objections").  Skadden spent significant time

analyzing the Solar Materials Sale Objections and conducting diligence regarding the underlying

facts and circumstances.  In order to further assess such objections and any responses or defenses

thereto, Skadden professionals prepared and served outbound discovery requests on these parties

and devoted significant amounts of time to the preparation and negotiation of a confidentiality

protective order to govern the production and disclosure of confidential and highly confidential

documents in such discovery and in related court proceedings.

131.    During the Third Application Period, Skadden also reviewed inbound

document requests and interrogatories propounded by SMP, and worked with the Debtors to

evaluate and respond to the same.  In addition, Skadden professionals evaluated the factual

assertions underlying the objectors' claims, including by reviewing and analyzing various

intellectual property licenses and sale agreements and documents from the Debtors' books and

records.

132.    In connection with the Solar Materials Sale Objection filed by SMP, Skadden devoted significant resources during the Third Application Period to the litigation of the resulting contested matter, culminating in the Debtors' filing of a motion for summary judgment, an objection thereto by SMP, and the Debtors' reply brief.  At the same time, Skadden represented the Debtors in negotiations with SMP and the Solar Materials Purchaser (as defined above) to resolve SMP's objection, including in a multi-day mediation in New York before the Honorable Sean H. Lane.  The mediation was ultimately successful in achieving a resolution of SMP's objection and establishing a framework for the future determination of certain unresolved issues, such as the propriety of the termination of certain license agreements and the consequences and terms of a possible future rejection of such agreements.  Accordingly, Skadden professionals spent time negotiating and documenting the settlement and obtaining court approval of the same pursuant to an order entered on March 28, 2017 [Docket No. 2657].

133.    During the Fourth Application Period, Skadden professionals continued to advise the Debtors with respect to objections to the Solar Materials Sale filed by both SMP, objecting to the termination of certain license agreements, and Solaria.  Additionally, during the Fourth Application Period, Skadden professionals advised the Debtors with respect to certain transactions proposed by Solaria.  In connection therewith, Skadden professionals analyzed and researched the legality of such transactions and their compliance with the Bankruptcy Code.  Finally, Skadden professionals also coordinated with the Debtors' local counsel in Korea to determine the impact of foreign proceedings on potential asset sales related to the Solar Materials Business.

S.    **Honduras**
      **Hours: 2,390.1, Fees: $1,492,789.33**

134.    During the first three Application Periods, Skadden professionals performed diligence and negotiated and drafted amendments to sale documentation with the buyer and project lenders of SunEdison's Honduras portfolio, which includes four special purpose vehicles that collectively own three solar projects.  The amendments to the sale documentation also provided the buyer of the Honduras portfolio with an option to purchase eight special purpose vehicles in SunEdison's Panamanian portfolio.

135.    During the First and Second Application Periods, in connection with the Honduras portfolio, Skadden professionals spent months negotiating and finalizing documents relating to the (a) restructuring of the existing project financing, including various consents, waivers, and amendments to the financing documentation, and amendments and terminations of other project documents, in each case with both the project lenders and the buyer, and (b) restructuring of the VAT loan with the VAT lender.  Skadden professionals also worked with other advisors and local counsel to analyze and prepare documentation relating to the assignment and settlement of various intercompany payables prior to the closing of the sale.

136.    The amendment to the sale documentation, along with the primary document setting forth the terms of the restructuring of the existing project financing, were executed on October 28, 2016, and the transaction closed (including the execution of the remaining documentation) on December 16, 2016.  Skadden also worked with the Committee, the lenders under the Original DIP Facility, and their respective advisors to ensure that all parties were comfortable with payment mechanics.

137.    Skadden's work on this matter was complicated by several developments over the course of the First and Second Application Periods, including: (i) the departure of

59

various SunEdison personnel, which required Skadden professionals to serve a larger role in matters that would be customarily handled in-house, (ii) the parties' desire to define allocation of risk in connection with certain contingencies that may impact deal value, which led to extensive negotiations of complicated earnout, delayed payment, and adjustment mechanics, and (iii) parallel issues relating to subcontractor payment and settlement of outstanding debts.

138.    During the Third Application Period, Skadden professionals worked with the Company to analyze and track any contingent earnout that could become due to the Debtors pursuant to the sale documentation, as well as to analyze and monitor the status and settlement of outstanding obligations relating to Debtor SunEdison International Construction LLC, the sole SunEdison entity operating in Honduras that was not sold with the Honduras portfolio.

139.    In addition to the foregoing activities, Skadden professionals engaged in negotiations relating to the sale of the Company's Panamanian portfolio in connection with the exercise of an option to purchase eight special purpose vehicles in SunEdison's Panamanian portfolio that had been provided to the buyer of the Honduran portfolio pursuant to certain amendments to the sale documentation.

140.    In general, the sale described above benefited the Debtors' estates because it resulted in (a) the settlement, termination, and release of a significant number of third-party contractual claims against certain Debtors and their affiliates for breaches of performance obligations under various project contracts between those affiliates and the companies being sold, which were also guaranteed by certain Debtors, including the settlement of a $20 million dollar VAT loan that had been obtained from an Honduran bank by a certain Debtor, (b) the termination and release of various guarantees and undertakings of support made by certain Debtors to lenders to the companies being indirectly sold, and (c) the release of bank guarantees

provided by certain Debtors and their subsidiaries to third parties in support of obligations of the
project companies sold, which were substituted or replaced by the buyer.

**T.    AP Warehouse Sale
Hours: 1,590.5, Fees: $1,272,593.50**

141.    During the first four Application Periods, Skadden professionals advised
the Debtors in connection with a potential sale of equity interests in TerraForm Private, LLC (the
"Atlantic Power Warehouse Sale").

142.    Specifically, Skadden professionals negotiated, drafted, and revised a draft
membership interest purchase agreement, a sale motion and order, and other related sale
documents that were filed with the Court on December 16, 2016 [Docket No. 1908].  Skadden
professionals also analyzed and discussed the consents and approvals that would be required in
connection with the Atlantic Power Warehouse Sale, performed diligence on project documents
regarding change of control requirements and exclusivity provisions, analyzed and researched
potential claims and causes of action related to the Atlantic Power Warehouse Sale, and analyzed
and drafted documentation regarding the requisite consents in connection with this sale.
Skadden professionals also analyzed the implications of certain releases in connection with the
transaction.

143.    The Court entered an order approving the sale in the Third Application
Period, on January 17, 2017 [Docket No. 2270].  Thereafter, Skadden professionals began the
process of obtaining the consents and approvals that would be required in connection with the
Atlantic Power Warehouse Sale so that such transaction could reach closing, which ultimately
occurred in June 2017 (during the Fourth Application Period).  The consents and approvals
required in order to permit the sale and satisfy closing conditions were numerous, as the portfolio

included fifteen projects, each of which required one or more consents in order to be transferred and had a unique set of documentation that required analysis.

144.    During the Fourth Application Period, Skadden professionals also advised the Debtors in connection with the drafting and negotiation of various amendments and ancillary documents that were delivered at the closing of the Atlantic Power Warehouse Sale.  The Atlantic Power Warehouse Sale closed on June 21, 2017, and the Debtors received $41,500,000. An additional $1,000,000 remains in escrow and may be returned to the Debtors at a later date if certain conditions are satisfied.

**U.    General Corporate Advice
Hours: 1,117.8, Fees: $1,242,976.00**

145.    During the Entire Case Period, Skadden professionals assisted and advised the Debtors with respect to various corporate governance and securities matters.  This included advising on issues relating to the Plan and Disclosure Statement, SEC filings and related disclosure requirements, audit reports, warrant transfer issues, litigation settlements, the board compositions of TERP and GLBL, employee stock transfer restrictions, compensation and indemnification of D&Os, and transactions involving TERP and GLBL.  Additionally, Skadden professionals regularly prepared materials such as presentation decks and memoranda to present to the Debtors' management team, board of directors, and the board's restructuring subcommittee to provide updates on the status of these Chapter 11 Cases and also regularly attended in-person and telephonic board meetings.

**V.    Retention/Fee Matters (SASM&F)
Hours: 1,499.0, Fees: $1,138,519.15**

146.    During the Entire Case Period, Skadden prepared and filed numerous monthly and interim fee applications pursuant to the terms of the Interim Compensation Procedures Order.

147.    During the First Application Period, Skadden prepared and filed monthly fee applications and related materials for April 2016 [Docket No. 415], May 2016 [Docket No. 678], June 2016 [Docket No. 899], July 2016 [Docket No. 1111], and August 2016 [Docket No. 1330].

148.    During the Second Application Period, Skadden prepared and filed monthly fee statements and related materials for September 2016 [Docket No. 1522], October 2016 [Docket No. 1742], November 2016 [Docket No. 2108], and December 2016 [Docket No. 2373].  During the Second Application Period, Skadden professionals also worked on and filed the First Interim Skadden Fee Application [Docket No. 1419], as amended by the supplement to the First Interim Skadden Fee Application [Docket No. 1516], and appeared at a hearing relating to the approval thereof on November 17, 2016.

149.    During the Third Application Period, Skadden prepared and filed monthly fee statements and related materials for January 2017 [Docket No. 2529], February 2017 [Docket No. 2726], March 2017 [Docket No. 2885], and April 2017 [Docket No. 3242].  During the Third Application Period, Skadden professionals also worked on and filed the Second Interim Skadden Fee Application [Docket No. 2468], and appeared at a hearing relating to the approval thereof on March 23, 2017.

150.    During the Fourth Application Period, Skadden prepared and filed monthly fee statements and related materials for April 2017 [Docket No. 3242], May 2017 [Docket No. 3509], June 2017 [Docket No. 3785], and July 2017 [Docket No. 3975].  During the Fourth Application Period, Skadden professionals also worked on and filed the Third Interim Skadden Fee Application [Docket No. 3341], and appeared at a hearing relating to the approval thereof on August 3, 2017.

151.    During the Fifth Application Period, Skadden prepared and filed monthly fee statements and related materials for August 2017 [Docket No. 4098], September 2017 [Docket No. 4235], October 2017 [Docket No. 4373], November 2017 [Docket No. 4424], and December 2017 (through December 29, 2017) [Docket No. 4541].  During the Fifth Application Period, Skadden professionals also worked on and filed the Fourth Interim Skadden Fee Application [Docket No. 4152], and appeared at a hearing relating to the approval thereof on November 16, 2017.

152.    Given the high volume of work completed by Skadden professionals across numerous departments, the foregoing monthly fee statements and interim fee applications required significant time from certain Skadden professionals in order to ensure that the filings were complete and accurate while not disclosing confidential or privileged information.

153.    Skadden also maintained and coordinated updates to a list of parties in interest (the "Interested Parties List") in the Chapter 11 Cases throughout the Entire Case Period to comply with the ongoing disclosure requirements of the Bankruptcy Code and the Bankruptcy Rules.  Skadden professionals conducted further queries of Skadden's client databases during the Entire Case Period to identify relevant relationships to the Debtors, their affiliates, and other parties in interest.  Skadden drafted and filed two supplemental declarations by Jay M. Goffman [Docket Nos. 400 and 1441] and four supplemental declarations by J. Eric Ivester [Docket Nos. 1862, 2736, 3386, and 3593] to supplement disclosure to the Court regarding such newly identified relationships.

**W.    Insurance**
    **Hours: 1,047.4, Fees: $1,127,430.00**

154.    During the Entire Case Period, Skadden professionals assisted the Debtors with respect to various issues with maintaining and updating the requisite insurance coverage.

64

Skadden professionals worked with the Debtors to update the Debtors' insurance schedules,

provided the United States Trustee with periodic insurance coverage updates, and provided the

Yieldcos, the Committee, and the lenders under the Original DIP Facility and Replacement DIP

Facility (collectively, the "DIP Lenders") with monthly expenditure reports in connection to the

Debtors' D&O policies.  Skadden professionals also worked with such parties to increase caps

on expenditures under the Debtors' D&O policies.  In addition, Skadden professionals advised

the Debtors regarding their whistleblower and employment practices liability coverage.

155.    During the First Application Period, such insurance-related tasks included

drafting the Debtors' first day motion to maintain and pay obligations under existing insurance

policies, renew and enter into new insurance policies, and enter into premium financing

agreements [Docket No. 15].  Additionally, Skadden professionals advised the Debtors in

conjunction with the renewal of the Contractor's Professional and Pollution Liability Insurance

Policy ("CPPL Policy").  Specifically, Skadden professionals negotiated certain accommodations

between Debtors and XL Catlin Insurance Company that were a condition to the renewal of the

CPPL Policy, and drafted and filed a motion to the Court requesting approval of such

accommodations [Docket No. 1067].

156.    During the Second Application Period, Skadden professionals also advised

the Debtors regarding the effect of ongoing litigation on disbursements under the Debtors' D&O

insurance coverage.  In addition, Skadden professionals analyzed issues regarding the Debtors'

shared D&O policies with the Yieldcos and coordinated with professionals for the Yieldcos

regarding allocation and use of insurance proceeds for certain defense costs.  Moreover, Skadden

professionals addressed concerns from the Committee regarding use of the Debtors' insurance

proceeds.

157.    During the Third Application Period, Skadden professionals also advised the Debtors regarding the effect of ongoing litigation and the MDL Mediation efforts with the Committee and MDL Litigation plaintiffs on disbursements under the Debtors' D&O and other insurance policies.  Specifically, Skadden professionals met with the Debtors' D&O insurers regarding D&O insurance proceeds ("D&O Proceeds") and the Debtors' litigation and mediation strategy.  In addition, Skadden professionals analyzed issues regarding the Debtors' shared D&O policies with the Yieldcos and coordinated with advisors for the Yieldcos regarding allocation and use of insurance proceeds for defense costs.  Such efforts, together with the broader MDL Mediation process (as described herein), culminated in a settlement memorialized in two interrelated agreements — the D&O Mediation Settlement Agreement and the D&O Insurance Cooperation Agreement, both of which were approved by the Court on June 29, 2017 [Docket No. 3453].

158.    Throughout the Fourth Application Period, Skadden professionals advised the Debtors regarding changes in certain insurance policy premiums, and conducted research and analyzed issues related to such changes.  Skadden professionals also represented the Debtors in negotiating an agreement to allocate remaining D&O insurance to facilitate settlement of the various litigations that draw from the D&O insurance taking place in the MDL Litigation and elsewhere across the country.  That representation included communicating with the Debtors and various other parties in preparation for the negotiations, reviewing relevant insurance documents and correspondence, analyzing related issues, and preparing for and attending the MDL Mediation sessions with the Yieldcos and other relevant parties.  Such efforts, together with the broader MDL Mediation process, resulted in the D&O Insurance Allocation Agreement [Docket. No. 3979], which Skadden professionals worked to execute and obtain Court approval.

**X.    Backstop Commitment/Rights Offering
Hours: 1,223.3, Fees: $1,101,185.50**

159.    Starting in the Third Application Period, Skadden professionals advised the Debtors on, and negotiated and prepared, a backstop commitment letter, a term sheet for the proposed rights offering (the "Rights Offering"), rights offering procedures (the "Rights Offering Procedures"), and an equity commitment agreement (the "Equity Commitment Agreement" or "ECA").  In connection with the Rights Offering and backstop commitment (the "Backstop Commitment"), Skadden professionals conducted formal and informal meetings with the parties who provided the Backstop Commitment (the "Backstop Purchasers"), among others.  During the negotiations, Skadden professionals spent considerable time communicating with parties in interest, responding to numerous requests from the Backstop Purchasers, responding to corporate diligence requests, and coordinating with the parties' respective financial advisors.  In addition to negotiating the terms of the Rights Offering and Backstop Commitment, Skadden professionals also drafted and filed a motion and related pleadings seeking approval of the Backstop Commitment and Rights Offering and related documents [Docket No. 2857].

160.    During the Fourth Application Period, Skadden professionals assisted the Debtors with subsequently amending the Rights Offering Procedures as a result of ongoing negotiations and case developments [Docket No. 3175].  AQR also objected to the Backstop Motion [Docket No. 3133], and in response, Skadden assisted the Debtors in preparing a supplemental declaration and reply in support of the Backstop Motion [Docket No. 3152].

161.    Skadden professionals prepared for the contested hearing on the Backstop Motion, which was held during the Fourth Application Period on May 19, 2017 (the "Backstop Hearing"), by interviewing witnesses, preparing witness proffers and examination outlines, and preparing hearing binders for use by the Court.  At the Backstop Hearing, the Court overruled

67

objections to the Backstop Motion and declined the objectors' adjournment request.  On June 6,

2017, the Court entered an order approving the Debtors' entry into the Backstop Commitment

and the Rights Offering [Docket No. 3283] (the "Backstop Order"), which AQR subsequently

appealed.  On June 8, 2017, Skadden professionals amended the ECA to include additional

Backstop Purchasers after conducting further negotiations between the parties.  On July 14,

2017, Skadden professionals also assisted the Debtors and the Backstop Purchasers with

amending the Rights Offering Procedures (and seeking Court approval thereof out of an

abundance of caution) so that, consistent with further amendments to the ECA, the Debtors could

(among other things) extend the timing of the Rights Offering expiration date for participants

[Docket No. 3622].

162.    After AQR objected to amending the Rights Offering Procedures [Docket

No. 3743], Skadden prepared a reply in support of the requested amendments to the Rights

Offering Procedures [Docket No. 3783].  During the Fourth Application Period, Skadden

professionals devoted significant time to identifying legal arguments, researching, and drafting a

memorandum of law in support of a motion to dismiss AQR's appeal of the Backstop Order.

Skadden professionals also reviewed the relevant portions of the record in these Chapter 11

Cases and prepared the counter-designation of items for inclusion on the record in the appeal of

the Backstop Order filed on July 19, 2017 [Docket No. 3663].

163.    During the Fifth Application Period, Skadden professionals continued

such efforts related to the ECA and Rights Offering and negotiated and advised the Debtors on

their entry into a letter agreement, dated October 12, 2017 (the "ECA Letter Agreement"), with

the Backstop Purchasers.  Pursuant to the ECA Letter Agreement, on November 29, 2017,

Skadden assisted the Debtors with the drafting and delivery of an offer notice to the Backstop

Purchasers of its intent to sell 100% of the Excess New TERP Class A Shares (as defined in the ECA Letter Agreement) to one or more third parties.  During the Offer Period (as defined in the ECA Letter Agreement), the Company received from the Backstop Purchasers offer responses to acquire 100% of the Excess New TERP Class A Shares that the Company intended to sell. Skadden also assisted the Debtors with the negotiation and drafting of certain deliverables required by the date by which the Rights Offering participants were required to submit funds to the Escrow Agent (as defined in the Equity Commitment Agreement) (the "Rights Offering Expiration Date"), which was ultimately extended to November 22, 2017.  Specifically, following the Rights Offering Expiration Date and as required by the Equity Commitment Agreement, Skadden assisted the Debtors with drafting (1) a Prefunding Certificate, and (2) Commitment Notices (each as defined in the Equity Commitment Agreement).

164.    During the Fifth Application Period, Skadden also assisted the Debtors with resolving further litigation initiated by AQR over the Equity Commitment Agreement. Specifically, on October 19, 2017, AQR filed a motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "AQR Rule 2004 Motion") to obtain documents allegedly enabling them to make a superior financing proposal.  Skadden professionals advised and assisted the Debtors in drafting an objection to the AQR Rule 2004 Motion, which was ultimately denied by the Court.

**Y.    Foreign Affiliates**
**Hours: 1,369.7, Fees: $1,085,273.25**

165.    During the Entire Case Period, Skadden professionals analyzed and addressed issues relating to the foreign operations of the Debtors and their non-Debtor affiliates. This matter includes time spent by Skadden professionals advising the Debtors on all non-U.S. operations and sales of foreign assets that were not broken out into a separate matter number.

Specifically, Skadden professionals advised the Debtors on the impact of chapter 11 bankruptcy proceedings on global subsidiaries and non-Debtor affiliates, analyzed foreign insolvency issues, liaised with foreign counsel, and handled various foreign asset sales, regulatory issues, and related claims, among other tasks.  During the First and Second Application Periods, Skadden also provided advice to certain Debtors, including NVT Licenses, LLC, regarding various claims and disputes with contractual counterparties in connection with the performance of NVT Licenses, LLC's obligations under various engineering, procurement, and construction ("EPC") contracts.

Z.    **Warehouse**
      **Hours: 1,357.9, Fees: $982,727.31**

166.    During the First, Second, and Third Application Periods, Skadden professionals assisted with the consummation of a private sale of equity interests held by a non-Debtor project company and a complete unwinding from the affiliated warehouse entity.  By unwinding its position in the warehouse, the Debtors settled outstanding potential claims and liabilities under the warehouse equity documents.  In connection with this sale, during the First Application Period, Skadden professionals completed a diligence review of existing organizational documents and drafted and revised the transfer and settlement agreement and related ancillary transactional documents.  Additionally, Skadden professionals negotiated ancillary documentation relating to the assignment of EPC rights held by the project company to another SunEdison entity.  Skadden professionals also worked on settling certain liabilities owed by the Company under the warehouse and addressing post-closing issues regarding the reimbursement of certain subcontractor payments.

167.    During the Second Application Period, Skadden professionals assisted the Debtors with the resolution of outstanding issues under a bond with a construction subcontractor

70

by updating a draft default notice prepared in connection with the closing of the transfer and

settlement agreement relating to the warehouse sale.  During the Third Application Period,

Skadden professionals addressed other post-closing issues involving the termination of a master

purchase and sale agreement and certain proposed releases in connection with the same.

Specifically, Skadden professionals completed diligence, negotiated modifications to the

termination, and discussed potential bankruptcy implications, both internally and with the

Debtors.

**AA.    MN C&I Sale**
     **Hours: 984.2, Fees: $965,852.90**

168.    Throughout the Entire Case Period, Skadden assisted the Debtors with

several related sales of the Debtors' Minnesota C&I projects.  During the First Application

Period, Skadden professionals advised the Debtors in connection with the sale of equity in 22

C&I segment projects under development in the State of Minnesota to stalking horse bidder

SoCore MN Acquisition LLC [Docket No. 961].  The sale was executed pursuant to a purchase

and sale agreement dated August 10, 2016, and the Court approved the sale on September 26,

2016 [Docket No. 1267].  In particular, Skadden professionals researched the legal implications

of certain asset sale transactions and reviewed the proposed sale terms and stalking horse

agreement.  Skadden also drafted and revised the accompanying sale documents and declarations

filed with the Court.  Skadden assisted with the approval of the related settlement agreement

entered into with co-developer Ecoplexus, Inc. ("Ecoplexus") which resolved certain claims

related to an older purchase and sale agreement of certain Minnesota projects.  In addition,

Skadden professionals analyzed and responded to third-party objections to the sale.

169.    During the Second and Third Application Periods, when it became

apparent that SoCore MN Acquisition LLC would not close on all the projects, Skadden

71

professionals assisted with the remarketing of certain projects, and their eventual sale to

Ecoplexus.  Accordingly, Skadden professionals advised the Debtors in connection with the

negotiation and approval of the sale of seven Minnesota commercial & industrial project

companies to Ecoplexus.  Specifically, the Debtors held a de facto auction after Ecoplexus

objected to the sale of the Minnesota projects to an earlier proposed buyer.  Skadden

professionals advised in connection with all aspects of the sale and marketing process, which led

to the selection of Ecoplexus as the winning bidder.  During the Third Application Period, the

Court approved such sale on February 1, 2017 [Docket No. 2372].

> 170.    After the Court's approval of the sale of the remaining projects, Ecoplexus

refused to comply with its obligations to fund an escrow account, which funding was required by

the sale agreement.  In connection with such refusal, Skadden professionals advised the Debtors

with respect to compelling such payment.  Specifically, Skadden professionals drafted and filed a

motion to compel on March 15, 2017 [Docket No. 2583].  Prior to the hearing on such motion,

Ecoplexus agreed to voluntarily comply with its obligations without Court intervention.

> 171.    During the Fourth Application Period, Skadden professionals advised the

Debtors in connection with the negotiation and approval of the sale of two Minnesota C&I

project companies to Nordic Solar, LLC.  The Court approved the sale on March 28, 2017

[Docket No. 2664], and it closed on August 11, 2017.

**BB.    UCC Estate Claims Investigation**
      **Hours: 988.1, Fees: $959,600.50**

> 172.    During the First, Second, and Third Application Periods, Skadden

professionals conferred with counsel to the Committee and investigated certain claims that the

Committee believed the Debtors could assert, including various avoidance actions.  Significant

time was spent by Skadden professionals reviewing documents requested by the Committee and responding to various discovery requests from the Committee.

173.    Over the course of the Second Application Period, the Debtors produced to the Committee approximately 260,000 pages of relevant documents, including board minutes and presentations and written materials provided to SUNE's board of directors concerning transactions involving the Yieldcos and related asset transfers, and worked to help facilitate the production of several hundred pages of responsive documents and information to the Committee by the Yieldcos.  Accordingly, significant time was spent by Skadden professionals reviewing documents requested by the Committee and  responding to various discovery requests from the Committee.

### CC.    AQR Appeal
### Hours: 1,096.7, Fees: $929,937.00

174.    As noted above in Section X, during the Fourth Application Period, Skadden spent significant time on work streams relating to AQR's Backstop Order appeal.[42]  In addition to the work described above, Skadden professionals filed pleadings and prepared for oral arguments regarding AQR's position that the declarations of Homer Parkhill (the "Parkhill Declarations") were not admitted into evidence at the May 19, 2017 hearing on the Backstop Motion.  Pursuant to the order entered on July 21, 2017, the Court unequivocally held that, for the reasons started on the record at the July 20, 2017 hearing, the Parkhill Declarations were admitted into evidence at the May 19, 2017 hearing, were included in the record of the May 19, 2017 hearing and were included in the record on appeal.  Skadden professionals also researched available arguments for inclusion in a letter sent to the District Court on July 10, 2017, pursuant

---

[42]    In August 2017, Skadden created this "AQR Appeal" matter for time relating to both the Backstop Order appeal and the Confirmation Appeal.

to the District Court's Individual Practice Rules, to set forth anticipated arguments in the

Debtors' motion to dismiss the Backstop Order appeal and arrange a corresponding pre-motion

conference.

175.    During the Fourth Application Period, Skadden professionals also devoted

significant amounts of time to briefing related to AQR's appeal of the Confirmation Order (the

"Confirmation Appeal") filed on August 1, 2017 [Docket No. 3764].  In connection with the

Confirmation Appeal, Skadden professionals reviewed the extensive record in these Chapter 11

Cases to compile the counter-designation of items for inclusion on the record in the Confirmation

Appeal filed on August 21, 2017 [Docket No. 3663].

176.    During the Fifth Application Period, by order of the District Court, the

briefing was combined on the appeals of the Confirmation and Backstop Orders.  After AQR

filed its opening appeal brief on August 25, 2017 (at the end of the Fourth Application Period),

Skadden professionals continued their efforts related to researching, drafting, and revising the

Debtors' combined reply brief and motion to dismiss the appeals of the Confirmation and

Backstop Orders.  AQR and the Debtors completed initial briefing on October 16, 2017 with

respect to both appeals.  When the Plan went effective on December 28, 2017, Skadden

professionals submitted a pre-motion letter (required by the District Court's rules) to seek

dismissal of both appeals on the ground that they are equitably moot.  Additionally, during the

Fifth Application Period Skadden professionals began preparing the *Memorandum of Law In

Support of Appellee's Motion to Dismiss Appeals as Equitably Moot,* 17-cv-04778 (ALC),

(S.D.N.Y. 2017) ECF. No. 45, 17-cv-06745(ALC), (S.D.N.Y. 2017) ECF. No. 12, which was

filed on February 23, 2018.

### DD.    Business Operations/Strategic Planning
### Hours: 745.1, Fees: $815,757.62

177.    During the Entire Case Period, Skadden professionals participated in

regular legal update calls (with the Debtors' in-house counsel and their restructuring co-counsel),

update calls with the Debtors' Chief Executive Officer, Chief Restructuring Officer, and certain

other officers (including the Chief Financial Officer and General Counsel), and update calls with

the Debtors' management as needed to keep the Debtors and other professionals apprised of case

developments and to develop case strategies.

178.    This matter also reflects work from the First Application Period relating to

the development of various iterations of the Debtors' business plan as required under the

Original DIP Facility.  Specifically, Skadden assisted the Debtors with responses to various

diligence requests from the Debtors' key constituents regarding the Debtors' business plan and

business operations, and tracked ongoing strategy matters to coordinate next steps with the

Debtors and their advisors.

179.    This matter also reflects work on drafting petitions and supporting

documentation for additional Debtor entities that filed a chapter 11 petition following the

Petition Date.  However, during the Third Application Period, Skadden opened a separate

"Affiliate Filings" matter and all future time related to additional Debtor filings was billed to this

separate matter number.

### EE.    C&I Platform
### Hours: 1,007.0, Fees: $800,845.50

180.    During the First, Second, and Third Application Periods, Skadden

professionals analyzed and researched multiple operational and legal issues relating to the sale of

the Debtors' C&I platform as a going concern, including intellectual property, key employees,

pipeline projects, and other key assets.  The sale transaction involved the formation and transfer

of a new holding company, as well as the negotiation of a transition services agreement and a

management services agreement.

181.    In connection with the C&I platform sale, Skadden professionals

participated in multiple drafting and negotiation sessions with the buyer and its counsel and

drafted several iterations of key transaction documents prior to filing a motion to approve the

private sale on January 5, 2017 [Docket No. 2114].

182.    Following the filing of the motion to approve the private sale, Skadden

professionals prepared to close the transaction and finalized closing deliverables, including

disclosure schedules, a transition services agreement, and other ancillary documents; in

connection with the same, Skadden professionals also negotiated and documented escrow

arrangements with various third parties.  In addition, Skadden professionals participated in

diligence sessions with the advisors to the DIP Lenders and the Committee's advisors to discuss

the proposed transaction.  Skadden professionals worked with the Debtors and other advisors to

prepare for the sale hearing on January 24, 2017, and ultimately obtained approval from the

Court of the private sale pursuant to the sale order entered on January 26, 2017 [Docket No.

2338].  This sale has resulted in net proceeds of approximately $9.7 million to date,

approximately $7.2 million of which was received in January 2017.

**FF.    Nonworking Travel Time**
       **Hours 1,521.8, Fees: $798,162.90**

183.    The Debtors have retained a senior engagement team of Skadden attorneys

residing in New York, Chicago, Delaware, Washington D.C., London, and California.  This

senior engagement team draws on the experience and talent of a number of professionals from its

worldwide organization in representing the Debtors across a broad range of matters in these

complex Chapter 11 Cases.  During the Entire Case Period, Skadden professionals traveled as

76

necessary to attend Court hearings and to meet with the Debtors, certain of the Debtors' other

professionals, certain of the Debtors' current and former employees, and certain creditor

constituencies.  Skadden professionals who spent time traveling, but not otherwise working,

allocated their time to this billing category, which was billed at 50% of standard hourly rates.

### GG.    EMEA Sales
   **Hours: 966.1, Fees: $777,070.31**

184.    This matter includes time spent by Skadden professionals during the First,

Second, and Third Application Periods working on several sale processes and other transactions

involving assets located in Europe, the Middle East, and Africa ("EMEA").  The EMEA

transactions were comprised of sales of certain equity or membership interests held by project

companies based in Israel (the "Ashalim Sale"), the United Kingdom (each of the "Troughton

Sale," the "Waycock Sale," and the "Stokes Marsh Sale"), Turkey (the "Agora Sales"), and

Greece (the "Greece Sale").  Given the international scope of these transactions, professionals in

the London and various U.S. offices of Skadden devoted time to advising the Debtors regarding

these matters.  Each of the EMEA transactions involved Skadden professionals (a) participating

in various meetings/teleconferences, both internally and with the Debtors and their other

advisors, (b) reviewing and commenting on transaction term sheets and other sale

documentation; and (c) analyzing, and advising the Debtors regarding, diligence requests and

various contract and financing matters.

185.    The Ashalim Sale and Waycock Sale were both structured as *de minimis*

asset sales, and Skadden professionals worked to draft the notices of the sales and orders on

presentment and handled related contract assumption tasks.  The Troughton Sale was structured

as a private sale that included a settlement of intercompany claims and the assumption of a

critical EPC contract, both of which were key value drivers with respect to the Troughton Sale.

The Stokes Marsh Sale was structured as a private sale to the joint venture partner of SunEdison

Holdings Corporation that included the release of all claims arising in connection with the

project by the parties to the sale and their affiliates.  Finally, the Agora Sales were comprised of

several transactions involving the sales of interests in non-Debtor assets.  During the First,

Second, and Third Application Periods, Skadden professionals worked on the foregoing

transactions, each of which progressed on a separate timetable, while also negotiating and

drafting supporting documentation for proposed sales of other assets located in South Africa and

the United Kingdom.

186.    The Greece Sale involved the sale of approximately 20 non-Debtor

subsidiaries of the Company incorporated in Greece.  In connection with the Greece Sale,

Skadden professionals reviewed, drafted, and revised the accompanying purchase and sale

agreement.  Skadden professionals also prepared the court pleadings necessary to seek and obtain

Court approval for a portion of the Greece Sale that involved a settlement of Debtor claims

[Docket No. 2856].  The Court approved the settlement on May 17, 2017 [Docket No. 3147].

## HH.    Investigations and Reviews
   ### Hours: 1,059.8, Fees: $648,246.31

187.    During the Fourth Application Period, Skadden professionals assisted the

Debtors with various investigative matters.  To that end, Skadden professionals investigated

alleged issues concerning certain of the Debtors' former employees with information technology

responsibilities who were based in Madrid, Spain (the "Former Employee Investigation").  The

Skadden team provided a range of advice and services related to the Former Employee

Investigation, including a review of materials related to the alleged issues, interviews of relevant

personnel, and advice on the outcomes of such work.

188.    Skadden professionals received, organized, and reviewed a substantial

volume of approximately 15,000 electronic communications.  Those communications were

collected from the Debtors' current and former employees.  A sizeable subset was produced in

non-English languages, requiring the rapid implementation of cost-effective translation and

further document review.  Skadden also conducted both in-person and teleconference meetings

with the individuals who were central to the Former Employee Investigation.  Time billed to this

matter includes preparation for and follow-up work related to such meetings, as well as

coordination with the Debtors' in-house counsel and senior management.

189.    Additionally, Skadden professionals also spent time during the Fourth

Application Period coordinating with a forensic consulting firm that was engaged by the Debtors

to perform a technical analysis related to certain websites, data hosting services, and computer

code that were relevant to the Former Employee Investigation.  Skadden professionals provided

further advice in connection with giving notifications to the Yieldcos regarding the status of the

Former Employee Investigation and providing the Yieldcos with information and documents

relating to the Former Employee Investigation.  Based on the investigative work of Skadden and

the forensic consulting firm, Skadden professionals shared with the Debtors' internal counsel the

principal factual findings, conclusions, and possible next steps to take in relation to the former

employees for the Debtors' consideration.

## II.    Multidistrict Mediation
### Hours: 555.6, Fees: $646,625.50

190.    During the Third Application Period, Skadden professionals opened a

separate matter for time spent on work related to the mediation before retired United States

District Court Judge Layne Phillips and Greg Lindstrom (the "MDL Mediation"), which was

ordered by this Court and the District Court, with respect to the Committee's D&O Adversary

Proceeding, the MDL Litigation, and certain other pending D&O litigations.

191.    Specifically, Skadden devoted substantial time and effort mediating the

D&O Adversary Proceeding and pending MDL Litigation, wherein both the Committee and

various plaintiffs in the MDL Litigation alleged numerous claims primarily against former

directors and officers of SunEdison and the Yieldcos.  Among other tasks, Skadden professionals

assisted in selecting a mediator, analyzed mediation strategy and related ongoing issues with

respect to shared D&O policies with the Yieldcos and lien challenges, drafted and responded to

mediation statements, and ultimately, participated in the MDL Mediation over several days.

192.    During the Fourth Application Period, (i) the Debtors, the Committee, and

certain individual defendants entered into a settlement agreement, dated June 7, 2017 (the "D&O

Mediation Settlement Agreement"), to settle the Debtors' alleged claims that the Committee

sought standing to bring against certain current and former D&Os of SUNE for $32 million

payable from the shared liability insurance policies under which SUNE, the Yieldcos, and their

respective D&Os are insured (the "D&O Insurance Policies"); and (ii) the Debtors, the Yieldcos,

and certain of their insured D&Os entered into an insurance cooperation agreement (as amended

on June 6, 2017, the "D&O Insurance Cooperation Agreement"), which provided for (A) the

Yieldcos to consent to the D&O Mediation Settlement Agreement and to funding it with $32

million of proceeds from the D&O Insurance Policies they share with SUNE and (B) SUNE to

consent to funding possible settlements of other MDL Litigation actions and similar claims

against the Yieldcos and their D&Os with up to $32 million of proceeds from the D&O

Insurance Policies.

193.    During the Fourth Application Period, Skadden professionals continued to spend considerable time preparing for and actively participating in the MDL Mediation, and consulting with and advising the Debtors regarding the same.  Skadden professionals also spent substantial time negotiating, executing, drafting pleadings related to, and resolving objections to the D&O Mediation Settlement Agreement and D&O Insurance Cooperation Agreement, which were ultimately approved by the Court on June 29, 2017 [Docket No. 3453].

194.    Throughout this process, Skadden professionals communicated with the Debtors and other advisors to the Debtors, analyzed and researched issues related to the negotiations and the objections, and engaged with the D&O insurers, the Yieldcos, and other advisors to the Debtors on various insurance and settlement matters.

195.    Moreover, in connection with the MDL Mediation, Skadden professionals spent time analyzing how to best divide up the remaining insurance proceeds to settle any outstanding litigation, as discussed further in Section W above.[43]  During the MDL Mediation, Skadden professionals reviewed and analyzed mediation issues and the D&O insurance policies, communicated with the Debtors and various mediation parties, and researched the applicability of particular sections of the D&O insurance policies.  These efforts culminated in Skadden professionals finalizing and executing a settlement agreement allocating the remaining D&O insurance to encourage settlement of the cases comprising the MDL Litigation and any other cases that seek payment from the D&O insurance policies (the "D&O Insurance Allocation Agreement").  During the Fourth Application Period, Skadden professionals drafted the motion seeking Court approval of the D&O Insurance Allocation Agreement, which was filed on August 31, 2017 [Docket No. 3979] and approved by the Court on October 3, 2017 [Docket No. 4096].

---

[43]    As described above in the summary for the Insurance matter, there is some overlap between Skadden's work that was billed to this matter and the general Insurance matter.

## REASONABLENESS OF FEES AND DISBURSEMENTS

196.     Bankruptcy Code section 330 authorizes the Court to award "reasonable compensation for actual, necessary services rendered by the . . . professional person . . . ." 11 U.S.C. § 330.  In order to evaluate a request for allowance of fees by a professional person, a court must determine whether the services rendered were actual and necessary and the fees requested are reasonable.  Skadden respectfully submits that its requests for an interim award of compensation for the Fifth Application Period and a final award of compensation for the Entire Case Period satisfy that standard.

197.     In accordance with the factors enumerated in 11 U.S.C. § 330, the amount requested herein by Skadden is fair and reasonable in light of (a) the nature and complexity of the Chapter 11 Cases, (b) the time and labor required to effectively represent the Debtors, (c) the nature and extent of the services rendered, (d) Skadden's experience, reputation, and ability, (e) the value of Skadden's services, and (f) the cost of comparable services other than in cases under the Bankruptcy Code.

### JJ.     Nature, Complexity, and Duration of the Chapter 11 Cases

198.     As should be evident from the summary of Skadden's services as described above in this Application, the Chapter 11 Cases were large and complex and presented a particularly unique set of circumstances.  The nature and complexity of the Chapter 11 Cases required Skadden to develop case management and staffing solutions to enhance efficiency. Skadden assisted the Debtors by employing a streamlined case management structure that generally consisted of relatively small, core teams and assigned various attorneys to other discrete tasks to avoid the performance of duplicative or unnecessary work.

199.     Given the size of these Chapter 11 Cases, the number of seemingly insurmountable obstacles that had to be overcome during the Entire Case Period, including

82

confirmation and consummation of the largely consensual Plan, and the number of matters that needed to be addressed simultaneously, there were several occasions during the Entire Case Period when a number of Skadden attorneys were required to be present and participate in the discussions and negotiations, especially during hearings, team meetings, and certain conference calls. Skadden believes that it has, through the summaries contained in this Application and the time entries attached to the monthly fee statements, articulated specific reasons for attendance and participation by multiple attorneys on such occasions.

## KK.    Experience of Skadden

200.    The experience of Skadden also benefited the Debtors' estates. Skadden is among the largest firms and has one of the most experienced restructuring groups in the world. As set forth more fully in the Retention Application, Skadden's restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the fast-paced needs of similar chapter 11 cases. Accordingly, Skadden's depth of experience in chapter 11 matters ensured that pressing matters were addressed promptly.

## LL.    Comparable Services

201.    An award of compensation also must be based on the cost of comparable services other than in a bankruptcy case. Skadden's rates are consistent with rate structures charged to other clients in bankruptcy and non-bankruptcy matters. Moreover, its rate structure was disclosed clearly in its Retention Application, which this Court approved. The amounts sought by Skadden are consistent with the fees, charges and disbursements incurred in other chapter 11 cases of similar size, complexity, and duration by Skadden and its peer firms. Accordingly, the cost of comparable services supports the Application, and the services performed during the Entire Case Period warrants the allowance of compensation, particularly in view of the results achieved, as reflected herein.

202.     As noted above, in addition to the typical legal services required by debtors' counsel in cases of similar size and scope, there has been a uniquely high demand for Skadden's legal services in these Chapter 11 Cases, due in large part to the significant transaction volume inherent in the Debtors' operations as a renewable-energy project developer, as well as other circumstances arising from the complexity and length of these Chapter 11 Cases. In connection thereto, Skadden professionals have worked diligently and efficiently with the Debtors and their other advisors to maximize the value of the Debtors' estates.

203.     Based on the foregoing, Skadden respectfully submits that approval of the compensation sought herein is warranted and should be approved.

## MM.   Reservation of Rights

204.     Skadden reserves the right to supplement this Application to seek amounts for work performed or expenses incurred during the Entire Case Period but not yet reflected in Skadden's time records or to amend the amounts listed herein and in the monthly fee statements to correct any bookkeeping errors.  Skadden has attempted to include in the monthly fee statements and, by extension, this Application, all time and expenses relating to the Entire Case Period.  Delays in processing such time and receiving invoices for certain expenses do occur, however.  In the event that a subsequent review reveals that additional professional services have been rendered or expenses have been incurred on behalf of the Debtors during the Entire Case Period, which were not processed by Skadden's accounting system before the time of this Application, Skadden reserves the right to seek such additional fees and expenses by subsequent application to the Court.  Skadden does not waive, and expressly reserves, its right to respond to any objections regarding this Application and the amounts sought for Skadden's services in the Chapter 11 Cases.  In the event that any objections to this Application are filed, Skadden reserves the right to seek payment for all or any part of its write-offs.

84

## COMPLIANCE WITH GUIDELINES

205.    Skadden believes that this Application, together with the attachments hereto, substantially complies in all material respects with the Fee Guidelines.  To the extent this Application does not comply in every respect with the requirements of such Fee Guidelines, Skadden respectfully requests a waiver for any such technical non-compliance.

## NO PRIOR REQUEST

206.    No previous request for the relief sought herein has been made to this Court or any other court.

## NOTICE

207.    Notice of this Application shall be given to (i) counsel to the Tranche B Lenders/Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Arik Preis and Zach Lanier; (ii) counsel to the Replacement DIP Agent or Original DIP Agent, White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036, Attn: Scott Greissman and Elizabeth Feld; (iii) the office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Paul Schwartzberg, Esq. (paul.schwartzberg@usdoj.gov); (iv) counsel to the Committee, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Matthew S. Barr and Jill Frizzley; and (v) any such other party entitled to notice pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules (collectively, the "Notice Parties").  The Reorganized Debtors submit that no other or further notice need be provided.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing interim compensation of $3,583,601.21 (80% of $4,479,501.51) to Skadden for professional services rendered as counsel for the Debtors during the Fifth Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $98,308.88, (b) enter an order allowing final compensation of $73,919,381.99 to Skadden for professional services rendered as counsel for the Debtors during the Entire Case Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $1,795,661.97, (c) release and allow the payment of all outstanding Holdback amounts, including the outstanding 10% Holdbacks from each of the First Application Period ($2,643,453.75), Second Application Period ($1,633,588.44), Third Application Period ($1,573,104.52), and Fourth Application Period ($1,093,841.33), as well as the outstanding 20% holdback from the Fifth Application Period ($895,900.30), the aggregate sum of which is $7,839,888.34, and (d) grant such other and further relief as is just and proper.

Dated:  New York, New York
       February 27, 2017

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:    */s/ J. Eric Ivester*
       Jay M. Goffman
       J. Eric Ivester
       Four Times Square
       New York, New York 10036-6522
       Telephone: (212) 735-3000
       Fax: (212) 735-2000

       -and-

       James J. Mazza, Jr. (admitted *pro hac vice*)
       Louis S. Chiappetta (admitted *pro hac vice*)
       155 N. Wacker Dr.
       Chicago, Illinois 60606-1720
       Telephone: (312) 407-0700
       Fax: (312) 407-0411

*Counsel for Reorganized Debtors*

86

## Exhibit A

**Ivester Declaration**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
J. Eric Ivester
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

James J. Mazza, Jr. (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | **Chapter 11** |
| | : | |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10992 (SMB)** |
| | : | |
| **Reorganized Debtors.**[1] | : | **Jointly Administered** |
| | : | |
| | : | |

---

[1]    The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); Everstream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607).  The address of the Reorganized Debtors' corporate headquarters is Two CityPlace Drive, 2nd floor, St. Louis, MO 63141.

**CERTIFICATION OF J. ERIC IVESTER IN SUPPORT OF FIFTH INTERIM AND
FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
EXPENSES AS COUNSEL TO THE DEBTORS FOR, (I) THE FIFTH INTERIM
PERIOD FROM SEPTEMBER 1, 2017 THROUGH AND INCLUDING DECEMBER 29,
2017, AND (II) THE FINAL PERIOD FROM APRIL 21, 2016 THROUGH AND
INCLUDING AUGUST 31, 2017**

I, J. Eric Ivester, pursuant to 28 U.S.C. § 1746, hereby declare that the following

is true to the best of my knowledge, information, and belief:

1.      I am a partner in the firm of Skadden, Arps, Slate, Meagher & Flom LLP

("Skadden" or the "Firm"), which maintains offices for the practice of law at, among other

locations, Four Times Square, New York, New York 10036-6522.  I am admitted in, practicing

in, and a member in good standing of the bar of the State of New York and the bar of the United

States District Court for the Southern District of New York.

2.      This certification is made in connection with Skadden's Application, dated

February 27, 2018 (the "Application"),[2] (i) for interim compensation and reimbursement of

expenses for the period from September 1, 2017 through and including December 29, 2017 (the

"Fifth Application Period"), and (ii) for final compensation and reimbursement of expenses for

the period from April 21, 2016 through and including December 29, 2017 (the "Entire Case

Period").

3.      I have read the Application and to the best of my knowledge, information, and

belief the statements contained in the Application are true and correct.  In addition, after

reasonable inquiry, I believe that the Application substantially complies in all material respects

with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Application.

of New York (June 17, 2013) promulgated pursuant to Local Bankruptcy Rule 2016-1(a) (the

"Local Guidelines"), and the United States Trustee's Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 for Attorneys in

Larger Chapter 11 Cases effective as of November 1, 2013 (the "U.S. Trustee Guidelines" and,

collectively, the "Fee Guidelines").

      4.     With respect to section C.5 of the U.S. Trustee Guidelines, I certify the following:

**Question**:  A. Did you agree to any variations from, or alternatives to, your standard or customary billing rates, fees or terms for services pertaining to this engagement that were provided during the application period? If so, please explain.

Response:  No.  The fees and disbursements sought are billed at rates in accordance with those customarily charged by Skadden and generally accepted by Skadden's clients, except for the matters that have been discounted as set forth in the Application and as further explained in letters directed to the United States Trustee's office not long after the commencement of these Chapter 11 Cases.

**Question**:  B. If the fees sought in this fee application as compared to the fees budgeted for the time period covered by this fee application are higher by 10% or more, did you discuss the reasons for the variation with the client?

Response:  Yes.

**Question**:  C. Have any of the professionals included in this fee application varied their hourly rate based on the geographic location of the bankruptcy case?

Response:  No.

**Question**:  D. Does the fee application include time or fees related to reviewing or revising time records or preparing, reviewing, or revising invoices? (This is limited to work involved in preparing and editing billing records that would not be compensable outside of bankruptcy and does not include reasonable fees for preparing a fee application.). If so, please quantify by hours and fees.

Response:  Except as set forth below, the Application does not include any fees dedicated to revising time records or preparing and revising invoices that would not normally be compensable outside of bankruptcy. For the Fifth Application Period, the Application includes approximately 156.8 hours, totaling $135,011.50 (approximately 3.0% of the total fees sought in the Application for the Fifth Application Period), for Skadden retention and fee matters.  For the Entire Case Period, the Application includes approximately

3

1,499.0 hours, totaling $1,138,519.15 (approximately 1.5% of the total fees sought in the Application for the Entire Case Period), for Skadden retention and fee matters.  In both the Fifth Application Period and the Entire Case Period, such work included time spent to (i) ensure that time entries comply with the Fee Guidelines and do not disclose privileged or confidential information, (ii) prepare monthly fee statements and the corresponding interim fee applications, and (iii) ensure the adequacy of disclosure regarding activities included in the Application.  Additionally, these amounts include time spent on retention and on review of conflicts checks for parties in interest in these Chapter 11 Cases.  All of these services, including review and revisions of fee statements and applications, were necessary components of Skadden's fee and retention activities.

**Question**:  E. Does this fee application include time or fees for reviewing time records to redact any privileged or other confidential information? If so, please quantify by hours and fees.

Response:  See response above.

**Question**:  F. If the fee application includes any rate increases since retention:

      i. Did your client review and approve those rate increases in advance?

      ii. Did your client agree when retaining the law firm to accept all future rate increases? If not, did you inform your client that they need not agree to modified rates or terms in order to have you continue the representation, consistent with ABA Formal Ethics Opinion 11–458?

Response:  Skadden did not increase hourly rates during the Fifth Application Period, though Skadden's hourly rates did increase during the Entire Case Period.

Effective both September 1, 2016 and September 1, 2017, Skadden implemented firm-wide step increases to reflect class on class progression and promotions of certain Skadden professionals. These increases constituted annual "step increases," as defined in section B.2.d of the U.S. Trustee Guidelines (defined above), determined by Skadden in the ordinary course regarding attorneys and other billers throughout the firm due to advancing seniority and promotion. Pursuant to the U.S. Trustee Guidelines, such "step increases" do not constitute "rate increases."

On January 1, 2017, Skadden implemented firm-wide rate increases applicable generally to clients in both bankruptcy and non-bankruptcy matters. Pursuant to paragraph 4 of the Order Authorizing and Approving the Skadden Retention Application [Docket No. 260], on December 22, 2016, Skadden, prior to applying any increases in its hourly rates beyond the rates set forth in the Skadden Retention Application, provided ten days' notice of its intended revised rates, effective January 1, 2017, to the Debtors, the United States Trustee, the Official Committee of Unsecured Creditors,

4

counsel to the Tranche B Roll-Up Lenders/Steering Committee of Prepetition Second Lien Lenders and Noteholders (the "Tranche B Lenders/Steering Committee"), and counsel to the administrative agent under the original debtor-in-possession financing facility, and no objection has been received. Additionally, pursuant to the SunEdison Global Outside Counsel Policy attached as Annex A-2 to Skadden's engagement letter filed with the Skadden Retention Application, Skadden also informed the Debtors of the January 1, 2017, rate increases prior to implementing these new rates, and no objection was raised. Consistent with paragraph 23 of the Skadden Retention Application, notice of these rate increases was provided to the Court and other parties in interest in the January 2017 monthly fee statement [Docket No. 2529].

5.    With respect to section B.1 of the Local Guidelines, I certify the following:

   (a)    I have read the Application;

   (b)    to the best of my knowledge, information, and belief, formed after reasonable inquiry, the fees and disbursements sought in the Application are permissible under the relevant rules, court orders, and Bankruptcy Code provisions, and fall within the Local Guidelines;

   (c)    except to the extent that fees and disbursements are prohibited by the Local Guidelines, the fees and disbursements sought are billed at rates and in accordance with practices customarily employed by Skadden and generally accepted by Skadden's clients; and

   (d)    in providing a reimbursable expense, Skadden does not make a profit on that expense, whether the service is performed by Skadden in-house or through a third party.

6.    With respect to section B.2 of the Local Guidelines, I certify that the Debtors have been provided on a monthly basis during the Fifth Application Period and the Entire Case Period with statements of fees and out-of-pocket expenses, containing lists of professionals and paraprofessionals providing services, their respective billing rates, the work hours expended by each individual, a general description of services rendered, a reasonably detailed breakdown of out-of-pocket expenses incurred, and an explanation of billing practices.

7.    With respect to section B.3 of the Local Guidelines, I certify that this Application will be served on the following parties: (i) the Reorganized Debtors; (ii) counsel to the Tranche

B Lenders/Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New

York, NY 10036, Attn: Arik Preis and Zach Lanier; (iii) counsel to the Replacement DIP Agent

or Original DIP Agent, White & Case LLP, 1155 Avenue of the Americas, New York, NY

10036, Attn: Scott Greissman and Elizabeth Feld; (iv) the office of the United States Trustee,

U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Paul

Schwartzberg, Esq. (paul.schwartzberg@usdoj.gov); (v) counsel to the Committee, Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Matthew S. Barr and

Jill Frizzley; and (vi) any such other party entitled to notice pursuant to Local Bankruptcy Rule

9013-1(b).

       8.      In accordance with Bankruptcy Rule 2016(a) and Bankruptcy Code section § 504,

I certify that no agreement or understanding exists between Skadden and any other entity for the

sharing of compensation received or to be received for services rendered in or in connection with

the above cases except as authorized pursuant to the Bankruptcy Code, the Bankruptcy Rules,

and the Local Bankruptcy Rules.  All services for which compensation is sought were

professional services on behalf of the Debtors and not on behalf of any other person.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated:    New York, New York
          February 27, 2018

                              SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP


                                 */s/ J. Eric Ivester*
                                 J. Eric Ivester
                                 Four Times Square
                                 New York, New York 10036
                                 Telephone: (212) 735-3000
                                 Facsimile: (212) 735-2000
                                 Eric.Ivester@skadden.com

## **Exhibit B**

**Matter Numbers**

| MATTER #[1] | MATTER NAME |
|---|---|
| 1 | General Corporate Advice |
| 2 | Asset Analysis and Recovery |
| 3 | Asset Dispositions (General) |
| 4 | Asset Dispositions (Inventory) |
| 5 | Asset Dispositions (Real Property) |
| 6 | Automatic Stay (Relief Actions) |
| 7 | Business Operations / Strategic Planning |
| 8 | Case Administration |
| 9 | Claims Admin. (General) |
| 13 | Creditor Meetings/Statutory Committees |
| 14 | Disclosure Statement/Voting Issues |
| 15 | Employee Matters (General) |
| 16 | Employee Matters (Labor Unions) |
| 17 | Environmental Matters |
| 18 | Executory Contracts (Personalty) |
| 19 | Financing (DIP and Emergence) |
| 20 | Government Affairs |
| 21 | Insurance |
| 22 | Intellectual Property |
| 23 | Investigations and Reviews |
| 24 | Leases (Real Property) |

---

[1]    Matter numbers run from 1 through 91, but matter numbers 10 through 12 and 42 are closed and were not billed to during the Entire Case Period.

| 25 | Litigation (General) |
| 26 | Litigation (Insurance Recovery) |
| 27 | Liquidation / Feasibility |
| 28 | Nonworking Travel Time |
| 29 | Real Estate (Owned) |
| 30 | Regulatory and SEC Matters |
| 31 | Reorganization Plan/Plan Sponsors |
| 32 | Reports and Schedules |
| 33 | Retention/Fee Matters (SASM&F) |
| 34 | Retention/Fee Matters/Objections (Others) |
| 35 | Secured Claims |
| 36 | Tax Matters |
| 37 | U.S. Trustee Matters |
| 38 | Utilities |
| 39 | Vendor Matters |
| 40 | Foreign Affiliates |
| 41 | Disbursement |
| 43 | Jordan |
| 44 | Gotham |
| 45 | Honduras |
| 46 | Warehouse |
| 47 | Jupiter |
| 48 | TERP/GLBL |
| 49 | India Projects |
| 50 | Uruguay |

| 51 | Castle Gap |
|---|---|
| 52 | North American Utility and C&I Assets |
| 53 | Solar Materials Sale |
| 54 | Latin America General |
| 55 | Latin America Portfolio Sale |
| 56 | UCC Estate Claims Investigation |
| 57 | Political Law Advice |
| 58 | C&I Platform |
| 59 | Rock Springs |
| 60 | Turbine Sales |
| 61 | AP Warehouse Sale |
| 62 | Mt. Signal |
| 63 | EPC Platform Sale |
| 64 | EMEA Sales |
| 65 | GAM Sale |
| 66 | TERP/GLBL Sale |
| 67 | MN C&I Sale |
| 68 | NA CI East/West Assets |
| 69 | Senate Inquiry |
| 70 | Sao Pedro |
| 71 | Solar Materials Sale Objections Litigation |
| 72 | SLB Projects |
| 73 | UCC Claims Challenge Litigation |
| 74 | Malaysia Sale |
| 75 | Bangladesh Sale |

| 76 | Philippines Sale |
|----|------------------|
| 77 | Asia Sales |
| 78 | Milford |
| 79 | Solar Materials Sale – Document Review |
| 80 | Affiliate Filings |
| 81 | Everstream |
| 82 | GSSG |
| 83 | JPM Warehouse |
| 84 | Deepwater |
| 85 | Silicon Genesis |
| 86 | TERP/DE Shaw Claims |
| 87 | MultiDistrict Mediation |
| 88 | Post-Closing Solar Materials Sale Matters |
| 89 | Yieldco Settlement Motion |
| 90 | First Light |
| 91 | Backstop Commitment/Rights Offering |
| 92 | Crucero Sale |
| 93 | AQR Appeal |

## Exhibit C-1

## Rate Disclosures – Fifth Application Period

The blended hourly rate for all U.S.-based Skadden timekeepers (including both professionals and paraprofessionals), excluding all bankruptcy and pro bono engagements and all data from timekeepers practicing primarily in Skadden's Corporate Restructuring Group, during the twelve-month period beginning on January 1, 2017 and ending on December 31, 2017 was, in the aggregate, approximately $772.34 per hour (the "Non-Bankruptcy Blended Hourly Rate").[1]

The blended hourly rate for all Skadden timekeepers who billed to the Debtors during the Fifth Application Period was approximately $907.53 per hour (the "Debtor Blended Hourly Rate").[2]

A detailed comparison of these rates follows:

| Position | Debtor Blended Hourly Rate (Hours Billed) ($) | Debtor Blended Hourly Rate (Hours Worked) ($) | Non-Bankruptcy Blended Hourly Rate ($) |
|---|---|---|---|
| Partners / Of Counsel | 1,325.64 | 1,189.90 | 1,257.54 |
| Special Counsel / Counsel | 1,017.33 | 966.66 | 961.00 |
| Associates | 815.52 | 696.74 | 673.08 |
| Legal Assistants | 291.73 | 221.75 | 295.81 |
| All Others[3] | 468.13 | 262.68 | 306.78 |
| **Total** | **907.53** | **785.59** | **772.34** |

---

[1]    Skadden calculates the Non-Bankruptcy Blended Hourly Rate by dividing the dollar value of hours billed by the number of hours billed. Skadden tracks, as bankruptcy engagements, debtor-in-possession ("DIP") and chapter 11 trustee clients.

[2]    Skadden calculated the Debtor Blended Hourly Rate by dividing the total dollar amount billed by such timekeepers during the Fifth Application Period by the total number of hours billed by such timekeepers during the Fifth Application Period.  Furthermore, during the Fifth Application Period, Skadden voluntarily reduced its fees requested by $679,638.62 (13.2%) and its expenses requested by $8,853.94 (8.3%), for a total of $688,492.56 (13.1%), and its hours billed from a base of 5,702.1 to 4,935.9 (13.4%).  Although not directly comparable to the other calculations, an alternative calculation of the Debtor Blended Hourly Rate dividing the dollar value of hours billed by the number of hours worked (instead of the number of hours billed), would demonstrate a lower effective hourly rate, and, to demonstrate, Skadden is providing an additional column with such a calculation in the table above.

[3]    The non-bankruptcy rate for this category includes timekeepers such as contract attorneys and other miscellaneous legal support who bill at relatively low rates and are generally neither used nor billed in chapter 11 cases, whereas the Debtor rates are comprised of client specialist (e.g., legal technology project management) time that is billed at higher than average rates for this category of other professionals and paraprofessionals generally.  During the Fifth Application Period, such client specialists coordinated regularly with Skadden attorneys and outside vendors in order to manage and process various electronic document production databases that were required in connection with securities and litigation matters, including those relating to the "Litigation (General)" and "Regulatory and SEC Matters."

**Exhibit C-2**

**Rate Disclosures – Entire Case Period**

The blended hourly rate for all U.S.-based Skadden timekeepers (including both professionals and paraprofessionals), excluding all bankruptcy and pro bono engagements and all data from timekeepers practicing primarily in Skadden's Corporate Restructuring Group, during the 21-month period beginning on April 1, 2016 and ending on December 31, 2017 was, in the aggregate, approximately $748.50 per hour (the "<u>Non-Bankruptcy Blended Hourly Rate</u>").[4]

The blended hourly rate for all Skadden timekeepers who billed to the Debtors during the Entire Case Period was approximately $848.66 per hour (the "<u>Debtor Blended Hourly Rate</u>").[5]

A detailed comparison of these rates follows:

| Position | Debtor Blended Hourly Rate (Hours Billed) ($) | Debtor Blended Hourly Rate (Hours Worked) ($) | Non-Bankruptcy Blended Hourly Rate ($) |
|---|---|---|---|
| Partners / Of Counsel | 1,278.19 | 1,200.95 | 1,237.35 |
| Special Counsel / Counsel | 998.80 | 966.09 | 938.74 |
| Associates | 735.45 | 680.84 | 659.67 |
| Legal Assistants | 284.50 | 234.41 | 287.35 |
| All Others | 277.67 | 173.42 | 263.78 |
| **Total** | **848.66** | **783.96** | **748.50** |

---

[4]    Skadden calculates the Non-Bankruptcy Blended Hourly Rate by dividing the dollar value of hours billed by the number of hours billed. Skadden tracks, as bankruptcy engagements, debtor-in-possession ("<u>DIP</u>") and chapter 11 trustee clients.

[5]    Skadden calculated the Debtor Blended Hourly Rate by dividing the total dollar amount billed by such timekeepers during the Entire Case Period by the total number of hours billed by such timekeepers during the Entire Case Period. Furthermore, during the Entire Case Period, Skadden voluntarily reduced its fees requested by $6,870,324.06 (8.5%) and its expenses requested by $493,959.64 (21.6%), for a total of $7,364,283.70 (8.9%), and its hours billed from a base of 94,483.0 to 87,280.0 (7.6%). Although not directly comparable to the other calculations, an alternative calculation of the Debtor Blended Hourly Rate dividing the dollar value of hours billed by the number of hours worked (instead of the number of hours billed), would demonstrate a lower effective hourly rate, and, to demonstrate, Skadden is providing an additional column with such a calculation in the table above.

2

**Exhibit D**

**Staffing Plan**

The complexities involved in the Chapter 11 Cases have required the use of more-senior professionals at each level (partner, counsel, associate, and legal assistant), with correspondingly higher billing rates, than in a typical representation, due to the complexity and volume of the services required of Skadden.  Specifically, during the Fifth Application Period, Skadden professionals worked diligently with the Debtors, their other advisors, constituents, and other parties in interest to address the remaining conditions precedent required to go effective under the Plan, various requirements under the Plan, and the myriad work-streams that were critical to the Reorganized Debtors' post-emergence operations, financing, budgets, and governance matters.  More broadly, over the Entire Case Period, Skadden professionals worked on four primary work streams (asset sales, work relating to TERP/GLBL, resolution of complex litigation, and financing efforts), each of which progressed in tandem throughout the Chapter 11 Cases and independently demanded significant time and effort from Skadden professionals across practice areas and across domestic and foreign offices, thus driving the high utilization of more senior Skadden professionals during the Entire Case Period.

In spite of the complexities of the Chapter 11 Cases, Skadden prioritized maximizing cost efficiencies during the Entire Case Period by employing a streamlined case management structure involving core groups of attorneys who were assigned responsibility for specific matters and types of matters.  This streamlined case management structure (i) allowed some attorneys to work almost exclusively on discrete matters in the Chapter 11 Cases, (ii) permitted the cases to be staffed with the appropriate personnel, including the use of more junior associates in lieu of senior associates or counsel where appropriate, and (iii) enabled Skadden professionals to avoid performing duplicative or unnecessary work.

Staffing of Skadden attorneys for the various matters in the Chapter 11 Cases typically involved a senior and a junior restructuring team member and specialists from Skadden's other practice groups as appropriate. A core team of five senior restructuring attorneys oversaw the primary, ongoing multidisciplinary work streams in the Chapter 11 Cases as well as day-to-day case management of the entirety of the Chapter 11 Cases, including providing updates to the client and creditor constituencies.  For sale and transactional matters in particular, depending on the complexity of the particular transaction, Skadden typically staffed matters with one to two senior corporate attorneys and one to two junior corporate attorneys to handle corporate documentation (e.g., asset or membership purchase agreements and schedules) and restructuring attorneys to handle bankruptcy related matters (e.g., bid procedures and creditor discussions).  In addition, two to four Skadden litigation partners oversaw the various litigation matters in the Chapter 11 Cases and directed junior attorneys in connection with drafting pleadings and discovery matters. Given Skadden's historical relationship with the Debtors, Skadden generally staffed matters with attorneys familiar with the Debtors to minimize time spent getting up to speed on the various matters.  While Skadden did not have a fixed staffing plan for each matter given the fluidity and exigencies of the Chapter 11 Cases, Skadden had frequent interactions with the client regarding staffing needs for the Chapter 11 Cases throughout the Entire Case Period.

## Exhibit E

## Monthly Budget and Compensation Summaries by Matter – Fifth Application Period[1]

### Exhibit E-1 – September 2017

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|--------------|---------------------------|-------------------------|
| 1 | General Corporate Advice | 2.5 | 10,000.00 | 3,337.50 |
| 2 | Asset Analysis and Recovery | — | 5,000.00 | — |
| 3 | Asset Dispositions (General) | 1.0 | 5,000.00 | 965.00 |
| 4 | Asset Dispositions (Inventory) | — | — | — |
| 5 | Asset Dispositions (Real Property) | 7.7 | — | 8,096.50 |
| 6 | Automatic Stay (Relief Actions) | — | 40,000.00 | — |
| 7 | Business Operations / Strategic Planning | 6.8 | 40,000.00 | 7,598.00 |
| 8 | Case Administration | 80.0 | 65,000.00 | 43,212.00 |
| 9 | Claims Admin. (General) | 9.3 | 15,000.00 | 9,603.50 |
| 13 | Creditor Meetings/Statutory Committees | 2.8 | 5,000.00 | 3,125.50 |
| 14 | Disclosure Statement/Voting Issues | — | — | — |
| 15 | Employee Matters (General) | 2.2 | 4,500.00 | 2,937.00 |
| 16 | Employee Matters (Labor Unions) | — | — | — |
| 17 | Environmental Matters | — | — | — |
| 18 | Executory Contracts (Personalty) | 1.3 | 1,000.00 | 1,279.50 |
| 19 | Financing (DIP and Emergence) | 9.5 | 10,000.00 | 7,725.50 |
| 20 | Government Affairs | — | — | — |
| 21 | Insurance | 5.0 | 32,000.00 | 4,825.00 |
| 22 | Intellectual Property | — | — | — |
| 23 | Investigations and Reviews | — | 100,000.00 | — |
| 24 | Leases (Real Property) | — | — | — |
| 25 | Litigation (General) | 27.8 | 100,000.00 | 28,151.00 |
| 26 | Litigation (Insurance Recovery) | — | — | — |
| 27 | Liquidation / Feasibility | — | — | — |
| 28 | Nonworking Travel Time | 39.5 | 10,000.00 | 21,038.75 |
| 29 | Real Estate (Owned) | — | — | — |
| 30 | Regulatory and SEC Matters | 11.0 | 5,000.00 | 12,020.00 |
| 31 | Reorganization Plan/Plan Sponsors | 14.2 | 100,000.00 | 17,164.00 |
| 32 | Reports and Schedules | 36.9 | — | 32,548.50 |
| 33 | Retention/Fee Matters (SASM&F) | 47.5 | 40,000.00 | 42,204.00 |
| 34 | Retention/Fee Matters/Objections (Others) | 26.6 | 7,500.00 | 19,148.00 |
| 35 | Secured Claims | — | 5,000.00 | — |
| 36 | Tax Matters | 1.1 | 3,000.00 | 1,551.00 |
| 37 | U.S. Trustee Matters | — | — | — |
| 38 | Utilities | — | — | — |
| 39 | Vendor Matters | 1.4 | — | 1,141.00 |
| 40 | Foreign Affiliates | 0.7 | 4,000.00 | 763.00 |
| 41 | Disbursement | — | — | — |

---

[1]    When preparing the budgets for the months covered by the Fifth Application Period, Skadden anticipated that the Debtors would emerge from chapter 11 in the month of November 2017.  Accordingly, Skadden did not prepare a monthly budget for December 2017.

2

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|-------------|--------------------------|------------------------|
| 43 | Jordan | — | — | — |
| 44 | Gotham | — | — | — |
| 45 | Honduras | 1.0 | 2,500.00 | 926.50 |
| 46 | Warehouse | — | 2,500.00 | — |
| 47 | Jupiter | — | 2,500.00 | — |
| 48 | TERP/GLBL | 56.0 | 5,000.00 | 50,786.50 |
| 49 | India Projects | — | — | — |
| 50 | Uruguay | — | 2,500.00 | — |
| 51 | Castle Gap | — | — | — |
| 52 | North American Utility and C&I Assets | 0.6 | — | 627.00 |
| 53 | Solar Materials Sale | 0.2 | 4,825.00 | 194.00 |
| 54 | Latin America General | — | 5,450.00 | — |
| 55 | Latin America Portfolio Sale | 7.3 | 144,600.00 | 6,026.50 |
| 56 | UCC Estate Claims Investigation | — | — | — |
| 57 | Political Law Advice | — | — | — |
| 58 | C&I Platform | — | — | — |
| 59 | Rock Springs | — | — | — |
| 60 | Turbine Sales | — | — | — |
| 61 | AP Warehouse Sale | — | 4,375.00 | — |
| 62 | Mt. Signal | — | — | — |
| 63 | EPC Platform Sale | — | — | — |
| 64 | EMEA Sales | — | 5,000.00 | — |
| 65 | GAM Sale | 69.8 | 36,745.00 | 69,943.00 |
| 66 | TERP/GLBL Sale | 86.6 | 70,000.00 | 104,591.00 |
| 67 | MN C&I Sale | — | 37,500.00 | — |
| 68 | NA CI East/West Assets | — | — | — |
| 69 | Senate Inquiry | — | — | — |
| 70 | Sao Pedro | — | — | — |
| 71 | Solar Materials Sale Objections Litigation | 0.5 | 38,150.00 | 545.00 |
| 72 | SLB Projects | 286.3 | 56,500.00 | 185,752.50 |
| 73 | UCC Claims Challenge Litigation | — | — | — |
| 74 | Malaysia Sale | — | — | — |
| 75 | Bangladesh Sale | — | — | — |
| 76 | Philippines Sale | — | — | — |
| 77 | Asia Sales | — | 5,000.00 | — |
| 78 | Milford | 75.0 | 46,500.00 | 63,808.50 |
| 79 | Solar Materials Sale - Document Review | — | — | — |
| 80 | Affiliate Filings | — | — | — |
| 81 | Everstream | — | — | — |
| 82 | GSSG | — | — | — |
| 83 | JPM Warehouse | 0.1 | 1,000.00 | 97.00 |
| 84 | Deepwater | — | — | — |
| 85 | Silicon Genesis | — | — | — |
| 86 | TERP/DE Shaw Claims | — | — | — |
| 87 | Multidistrict Mediation | 57.4 | 5,000.00 | 54,065.00 |
| 88 | Post-Closing Solar Materials Sale Matters | 5.2 | 15,000.00 | 5,668.00 |
| 89 | Yieldco Settlement Motion | — | — | — |
| 90 | First Light | 1.3 | — | 1,059.50 |
| 91 | Backstop Commitment/Rights Offering | 13.0 | 23,500.00 | 14,671.00 |
| 92 | Crucero Sale | — | — | — |
| 93 | AQR Appeal | 321.5 | 325,000.00 | 296,821.50 |
| | **Total** | **1,316.6** | **1,446,145.00** | **1,124,016.75** |

3

**Exhibit E-2 – October 2017**

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|--------------|---------------------------|-------------------------|
| 1 | General Corporate Advice | 3.0 | 10,000.00 | 4,005.00 |
| 2 | Asset Analysis and Recovery | — | — | — |
| 3 | Asset Dispositions (General) | — | 15,000.00 | — |
| 4 | Asset Dispositions (Inventory) | 101.4 | — | 112,995.00 |
| 5 | Asset Dispositions (Real Property) | — | — | — |
| 6 | Automatic Stay (Relief Actions) | — | 40,000.00 | — |
| 7 | Business Operations / Strategic Planning | 10.3 | 7,500.00 | 11,339.50 |
| 8 | Case Administration | 47.3 | 50,000.00 | 32,629.50 |
| 9 | Claims Admin. (General) | 28.1 | 10,000.00 | 29,104.00 |
| 13 | Creditor Meetings/Statutory Committees | 1.8 | 5,000.00 | 1,828.00 |
| 14 | Disclosure Statement/Voting Issues | — | — | — |
| 15 | Employee Matters (General) | 28.7 | 4,500.00 | 20,963.00 |
| 16 | Employee Matters (Labor Unions) | — | — | — |
| 17 | Environmental Matters | — | — | — |
| 18 | Executory Contracts (Personalty) | 2.8 | — | 2,469.00 |
| 19 | Financing (DIP and Emergence) | 14.7 | 10,000.00 | 10,627.50 |
| 20 | Government Affairs | — | — | — |
| 21 | Insurance | 41.9 | 30,000.00 | 40,993.00 |
| 22 | Intellectual Property | — | — | — |
| 23 | Investigations and Reviews | — | — | — |
| 24 | Leases (Real Property) | — | — | — |
| 25 | Litigation (General) | 115.0 | 75,000.00 | 108,520.50 |
| 26 | Litigation (Insurance Recovery) | — | — | — |
| 27 | Liquidation / Feasibility | — | — | — |
| 28 | Nonworking Travel Time | 4.6 | 10,000.00 | 3,070.50 |
| 29 | Real Estate (Owned) | — | — | — |
| 30 | Regulatory and SEC Matters | — | 2,000.00 | — |
| 31 | Reorganization Plan/Plan Sponsors | 18.4 | 50,000.00 | 20,648.50 |
| 32 | Reports and Schedules | 55.5 | — | 47,865.00 |
| 33 | Retention/Fee Matters (SASM&F) | 76.4 | 25,000.00 | 70,134.00 |
| 34 | Retention/Fee Matters/Objections (Others) | 3.7 | 7,500.00 | 2,758.00 |
| 35 | Secured Claims | — | — | — |
| 36 | Tax Matters | 2.5 | 3,000.00 | 2,991.00 |
| 37 | U.S. Trustee Matters | — | — | — |
| 38 | Utilities | — | — | — |
| 39 | Vendor Matters | — | — | — |
| 40 | Foreign Affiliates | — | 4,000.00 | — |
| 41 | Disbursement | — | — | — |
| 43 | Jordan | — | — | — |
| 44 | Gotham | — | — | — |
| 45 | Honduras | — | 2,500.00 | — |
| 46 | Warehouse | — | — | — |
| 47 | Jupiter | — | 2,500.00 | — |
| 48 | TERP/GLBL | 55.7 | — | 47,749.50 |
| 49 | India Projects | — | — | — |
| 50 | Uruguay | — | 2,500.00 | — |
| 51 | Castle Gap | — | — | — |
| 52 | North American Utility and C&I Assets | — | — | — |
| 53 | Solar Materials Sale | — | 1,000.00 | — |

4

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|---|---|---|---|
| 54 | Latin America General | 1.8 | 1,000.00 | 1,667.70 |
| 55 | Latin America Portfolio Sale | 72.4 | 10,000.00 | 56,178.00 |
| 56 | UCC Estate Claims Investigation | — | — | — |
| 57 | Political Law Advice | — | — | — |
| 58 | C&I Platform | — | — | — |
| 59 | Rock Springs | — | — | — |
| 60 | Turbine Sales | — | — | — |
| 61 | AP Warehouse Sale | — | — | — |
| 62 | Mt. Signal | — | — | — |
| 63 | EPC Platform Sale | — | — | — |
| 64 | EMEA Sales | — | — | — |
| 65 | GAM Sale | 49.2 | — | 41,084.50 |
| 66 | TERP/GLBL Sale | 235.8 | 125,000.00 | 270,360.00 |
| 67 | MN C&I Sale | — | — | — |
| 68 | NA CI East/West Assets | — | — | — |
| 69 | Senate Inquiry | — | — | — |
| 70 | Sao Pedro | — | — | — |
| 71 | Solar Materials Sale Objections Litigation | 1.8 | — | 1,962.00 |
| 72 | SLB Projects | 231.2 | — | 156,079.00 |
| 73 | UCC Claims Challenge Litigation | — | — | — |
| 74 | Malaysia Sale | — | — | — |
| 75 | Bangladesh Sale | — | — | — |
| 76 | Philippines Sale | — | — | — |
| 77 | Asia Sales | — | — | — |
| 78 | Milford | 77.0 | 40,000.00 | 69,283.00 |
| 79 | Solar Materials Sale - Document Review | — | — | — |
| 80 | Affiliate Filings | — | — | — |
| 81 | Everstream | — | — | — |
| 82 | GSSG | — | — | — |
| 83 | JPM Warehouse | — | 1,000.00 | — |
| 84 | Deepwater | — | — | — |
| 85 | Silicon Genesis | — | — | — |
| 86 | TERP/DE Shaw Claims | — | — | — |
| 87 | Multidistrict Mediation | — | — | — |
| 88 | Post-Closing Solar Materials Sale Matters | 4.4 | 15,000.00 | 4,796.00 |
| 89 | Yieldco Settlement Motion | — | — | — |
| 90 | First Light | 3.4 | — | 2,771.00 |
| 91 | Backstop Commitment/Rights Offering | 43.6 | 25,000.00 | 42,727.00 |
| 92 | Crucero Sale | — | — | — |
| 93 | AQR Appeal | 220.3 | 250,000.00 | 178,168.50 |
| | **Total** | **1,552.7** | **834,000.00** | **1,395,767.20** |

5

### Exhibit E-3 – November 2017

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|--------------|---------------------------|-------------------------|
| 1 | General Corporate Advice | 2.7 | 10,000.00 | 3,604.50 |
| 2 | Asset Analysis and Recovery | — | — | — |
| 3 | Asset Dispositions (General) | 7.1 | 10,000.00 | 6,853.00 |
| 4 | Asset Dispositions (Inventory) | — | — | — |
| 5 | Asset Dispositions (Real Property) | 31.2 | — | 31,183.00 |
| 6 | Automatic Stay (Relief Actions) | 3.1 | 10,000.00 | 2,526.50 |
| 7 | Business Operations / Strategic Planning | 8.8 | 7,500.00 | 9,454.00 |
| 8 | Case Administration | 65.3 | 50,000.00 | 37,708.00 |
| 9 | Claims Admin. (General) | 38.0 | 10,000.00 | 33,709.50 |
| 13 | Creditor Meetings/Statutory Committees | 2.6 | 5,000.00 | 2,509.00 |
| 14 | Disclosure Statement/Voting Issues | — | — | — |
| 15 | Employee Matters (General) | 31.5 | 4,500.00 | 30,045.00 |
| 16 | Employee Matters (Labor Unions) | — | — | — |
| 17 | Environmental Matters | — | — | — |
| 18 | Executory Contracts (Personalty) | 22.7 | — | 16,167.00 |
| 19 | Financing (DIP and Emergence) | 27.7 | 10,000.00 | 19,414.00 |
| 20 | Government Affairs | — | — | — |
| 21 | Insurance | 4.6 | 15,000.00 | 4,214.50 |
| 22 | Intellectual Property | — | — | — |
| 23 | Investigations and Reviews | — | — | — |
| 24 | Leases (Real Property) | — | — | — |
| 25 | Litigation (General) | 69.8 | 50,000.00 | 71,781.00 |
| 26 | Litigation (Insurance Recovery) | — | — | — |
| 27 | Liquidation / Feasibility | — | — | — |
| 28 | Nonworking Travel Time | 34.7 | 10,000.00 | 17,587.00 |
| 29 | Real Estate (Owned) | — | — | — |
| 30 | Regulatory and SEC Matters | — | 2,000.00 | — |
| 31 | Reorganization Plan/Plan Sponsors | 45.4 | 250,000.00 | 44,780.00 |
| 32 | Reports and Schedules | 23.4 | — | 19,941.00 |
| 33 | Retention/Fee Matters (SASM&F) | 23.2 | 40,000.00 | 14,241.50 |
| 34 | Retention/Fee Matters/Objections (Others) | 15.2 | 25,000.00 | 14,140.00 |
| 35 | Secured Claims | — | — | — |
| 36 | Tax Matters | 2.6 | 3,000.00 | 2,419.00 |
| 37 | U.S. Trustee Matters | — | — | — |
| 38 | Utilities | — | — | — |
| 39 | Vendor Matters | — | — | — |
| 40 | Foreign Affiliates | — | 4,000.00 | — |
| 41 | Disbursement | — | — | — |
| 43 | Jordan | — | — | — |
| 44 | Gotham | — | — | — |
| 45 | Honduras | — | 2,500.00 | — |
| 46 | Warehouse | — | — | — |
| 47 | Jupiter | 3.0 | 2,500.00 | 2,805.00 |
| 48 | TERP/GLBL | — | — | — |
| 49 | India Projects | — | — | — |
| 50 | Uruguay | — | 2,500.00 | — |
| 51 | Castle Gap | — | — | — |
| 52 | North American Utility and C&I Assets | 3.5 | — | 3,132.50 |
| 53 | Solar Materials Sale | — | 1,000.00 | — |

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|---|---|---|---|
| 54 | Latin America General | 66.4 | 1,000.00 | 48,586.01 |
| 55 | Latin America Portfolio Sale | 0.7 | 10,000.00 | 497.00 |
| 56 | UCC Estate Claims Investigation | — | — | — |
| 57 | Political Law Advice | — | — | — |
| 58 | C&I Platform | 5.3 | — | 4,558.00 |
| 59 | Rock Springs | — | — | — |
| 60 | Turbine Sales | — | — | — |
| 61 | AP Warehouse Sale | — | — | — |
| 62 | Mt. Signal | — | — | — |
| 63 | EPC Platform Sale | — | — | — |
| 64 | EMEA Sales | — | — | — |
| 65 | GAM Sale | — | — | — |
| 66 | TERP/GLBL Sale | 335.0 | 100,000.00 | 402,541.00 |
| 67 | MN C&I Sale | — | — | — |
| 68 | NA CI East/West Assets | — | — | — |
| 69 | Senate Inquiry | — | — | — |
| 70 | Sao Pedro | — | — | — |
| 71 | Solar Materials Sale Objections Litigation | 3.0 | — | 3,270.00 |
| 72 | SLB Projects | 71.7 | — | 51,613.50 |
| 73 | UCC Claims Challenge Litigation | — | — | — |
| 74 | Malaysia Sale | — | — | — |
| 75 | Bangladesh Sale | — | — | — |
| 76 | Philippines Sale | — | — | — |
| 77 | Asia Sales | — | — | — |
| 78 | Milford | 90.4 | 25,000.00 | 77,589.50 |
| 79 | Solar Materials Sale - Document Review | — | — | — |
| 80 | Affiliate Filings | — | — | — |
| 81 | Everstream | — | — | — |
| 82 | GSSG | 3.4 | — | 3,706.00 |
| 83 | JPM Warehouse | — | 1,000.00 | — |
| 84 | Deepwater | — | — | — |
| 85 | Silicon Genesis | — | — | — |
| 86 | TERP/DE Shaw Claims | — | — | — |
| 87 | Multidistrict Mediation | — | — | — |
| 88 | Post-Closing Solar Materials Sale Matters | 1.9 | 15,000.00 | 1,951.00 |
| 89 | Yieldco Settlement Motion | — | — | — |
| 90 | First Light | — | — | — |
| 91 | Backstop Commitment/Rights Offering | 29.5 | 25,000.00 | 22,720.00 |
| 92 | Crucero Sale | — | — | — |
| 93 | AQR Appeal | — | 250,000.00 | — |
| | **Total** | **1,073.4** | **951,500.00** | **1,005,247.01** |

## Exhibit E-4 – Global Notes to Budgets for Fifth Application Period

In the ordinary course of these Chapter 11 Cases, Skadden provided the Debtors with frequent updates to apprise the Debtors of actual fee accruals and trends for specific matter numbers. As set forth in the above tables for the Fifth Application Period, due to the size, complexity, and worldwide geographic scope of these Chapter 11 Cases and the Debtors' renewable-energy operations, Skadden's actual monthly fees exceeded budgeted fee projections by more than 10% in some instances during the Fifth Application Period on either an aggregate monthly basis (i.e., October and November 2017) or a matter-by-matter basis. Variances between budgeted and billed fees during the Fifth Application Period primarily resulted from the following, both in terms of the primary variances by dollar amount on a matter-by-matter basis, and in terms of driving overall October and November variances:

- One of the primary drivers of fees during the Fifth Application Period resulted from the work performed by Skadden professionals related to emergence from chapter 11 and closing the merger transactions with TERP and GLBL.  Though Skadden anticipated that work relating to the Plan going effective would be substantial during the Fifth Application Period, Skadden budgeted such amounts primarily in the "Reorganization Plan/Plan Sponsors" matter, rather than the "TERP/GLBL" and "TERP/GLBL Sale" matters where significant time was eventually billed.  As set forth in more detail in the Application, work relating to closing the transaction with GLBL was also more complicated than initially anticipated, as Skadden spent substantial time working diligently with the Debtors, GLBL, and certain securities litigation plaintiffs to reach key settlements with respect to certain securities class action claims (relating to GLBL's initial public offering) and certain claims brought by plaintiffs in connection with GLBL's private placement offerings.  Accordingly, while Skadden only budgeted $70,000.00, $125,000.00, and 100,000.00 for the "TERP/GLBL Sale" matter in the months of September, October, and November, actual fees for this matter were $104,591.00, $270,360.00, and $402,541.00, respectively.  Time billed to the general "TERP/GLBL" matter included other sales, litigation matters, and contract issues, among other things, that implicated the Yieldcos and required more time from Skadden professionals than anticipated. Accordingly, though Skadden only budgeted $5,000.00 for the "TERP/GLBL" matter for September and did not budget any amounts for October, actual fees generated for such months were $50,786.50 and $47,749.50, respectively.

- Another driver of fees during the Fifth Application Period was the work performed by Skadden professionals relating to several unforeseen issues that arose in connection with certain asset sales, such as those associated with the "GAM Sale," "SLB Projects," and "Milford" matters.  With respect to the "GAM Sale," when preparing the budgets Skadden was not able to predict several post-execution issues that arose during the Fifth Application Period, such as work relating to certain transition services agreements. Accordingly, while Skadden only budgeted $36,745.00 for this matter in September and did not budget any amount for October, actual fees generated were $69,943.00 and $41,084.50, respectively. Similarly, when preparing the budgets for the Fifth Application Period, Skadden did not anticipate the scope of the diligence, negotiations, and drafting that would continue to be required in connection with several post-execution issues that

arose in the "SLB Projects" matter, which ultimately required four asset purchase agreements with three separate buyers.  Accordingly, while Skadden only budgeted $56,500.00 for this matter in September and did not budget any amounts for this matter in October or November, actual fees generated for such months were $185,752.50, $156,079.00, and $51,613.50, respectively. With regard to the "Milford" matter, Skadden did not anticipate the breadth of the work that would be required in connection with addressing certain closing issues, among other things.  Accordingly, while Skadden budgeted $46,500.00, $40,000.00, and $25,000.00 for the months of September, October, and November, respectively, actual fees generated in connection with the "Milford" matter in such months were $63,808.50, $69,283.00, and $77,589.50, respectively.

- Though total fees for the "Reports and Schedules" matter were not substantial on an overall case-wide basis, when preparing the budgets Skadden also did not anticipate the timing of the drafting of the status report that was filed by the Debtors' chief restructuring officer during the Fifth Application Period.  Accordingly, while Skadden did not budget any amounts for the "Reports and Schedules" matter, actual fees generated during the months of September, October, and November were $32,548.50, $47,865.00, and $19,941.00, respectively.

- Skadden also did not anticipate work relating to a certain sale of real property (the "Sherman Sale"), as strategy discussions regarding such sale began after Skadden had drafted the budgets for the Fifth Application Period.  Work relating to the Sherman Sale was primarily billed to the "Asset Dispositions (Real Property)" matter. Though Skadden did not budget any amounts to such matter, actual fees generated were $8,096.50, $112,995.00, and $31,183.00 for the months of September, October, and November, respectively.

- Skadden budgeted fees for the "Litigation (General)" matter forecasting a higher frontloading of time for the Fifth Application Period.  However actual fees were for September ($28,151.00) were significantly less than budgeted fees ($100,000.00), while actual fees in October and November ($108,520.50 and $71,781.00, respectively) exceeded budgeted amounts for such months ($75,000.00 and $50,000.00, respectively).

## Exhibit F

## Cumulative Budget and Compensation Summaries by Matter – Entire Case Period[2]

## Exhibit F-1 – Cumulative Budget for Second Application Period
### (Excluding September 2016)

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|-------------:|--------------------------:|------------------------:|
| 1 | General Corporate Advice | 96.0 | 130,000.00 | 116,202.50 |
| 2 | Asset Analysis and Recovery | 4.0 | 3,000.00 | 4,160.00 |
| 3 | Asset Dispositions (General) | 135.9 | 130,000.00 | 99,122.00 |
| 4 | Asset Dispositions (Inventory) | — | 6,000.00 | |
| 5 | Asset Dispositions (Real Property) | — | — | — |
| 6 | Automatic Stay (Relief Actions) | 4.7 | 25,000.00 | 3,589.00 |
| 7 | Business Operations / Strategic Planning | 83.0 | 175,000.00 | 85,520.00 |
| 8 | Case Administration | 714.9 | 575,000.00 | 397,282.50 |
| 9 | Claims Admin. (General) | 31.3 | 130,000.00 | 27,648.00 |
| 13 | Creditor Meetings/Statutory Committees | 1861.5 | 575,000.00 | 1,496,523.50 |
| 14 | Disclosure Statement/Voting Issues | 148.6 | — | 112,408.00 |
| 15 | Employee Matters (General) | 174.7 | 155,000.00 | 164,796.50 |
| 16 | Employee Matters (Labor Unions) | — | — | — |
| 17 | Environmental Matters | 7.9 | — | 8,216.00 |
| 18 | Executory Contracts (Personalty) | 15.5 | 12,000.00 | 13,232.00 |
| 19 | Financing (DIP and Emergence) | 481.2 | 650,000.00 | 444,827.98 |
| 20 | Government Affairs | — | 15,000.00 | — |
| 21 | Insurance | 210.0 | 490,000.00 | 250,658.00 |
| 22 | Intellectual Property | — | 14,000.00 | |
| 23 | Investigations and Reviews | — | 14,000.00 | — |
| 24 | Leases (Real Property) | 34.5 | 16,000.00 | 21,968.00 |
| 25 | Litigation (General) | 608.2 | 925,000.00 | 711,053.00 |
| 26 | Litigation (Insurance Recovery) | — | — | — |
| 27 | Liquidation / Feasibility | — | — | — |
| 28 | Nonworking Travel Time | 257.6 | 215,000.00 | 133,576.25 |
| 29 | Real Estate (Owned) | 0.3 | — | 382.50 |
| 30 | Regulatory and SEC Matters | 15.1 | 55,000.00 | 11,762.00 |
| 31 | Reorganization Plan/Plan Sponsors | 376.4 | 490,000.00 | 319,352.50 |
| 32 | Reports and Schedules | 46.5 | 22,000.00 | 46,551.50 |
| 33 | Retention/Fee Matters (SASM&F) | 389.2 | 535,000.00 | 300,916.00 |
| 34 | Retention/Fee Matters/Objections (Others) | 26.1 | 41,000.00 | 21,110.00 |
| 35 | Secured Claims | 25.9 | 85,000.00 | 31,523.50 |
| 36 | Tax Matters | 87.9 | 220,000.00 | 87,314.00 |
| 37 | U.S. Trustee Matters | — | — | — |

[2]   As noted in the exhibits to the First Interim Skadden Fee Application and Second Interim Skadden Fee Application, Skadden began preparing monthly budgets starting in October 2016, and therefore did not prepare matter-by-matter budgets for the months covered by the First Application Period or the first month of the Second Application Period (September 2016). Further, as noted above, Skadden anticipated that the Debtors would emerge from chapter 11 in November, and thus did not prepare a budget for December 2017. Accordingly, the cumulative budgets in these exhibits omit the months for which Skadden did not prepare monthly budgets (which are comprised of April 2016 through September 2016, and December 2017).

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|---|---|---|---|
| 38 | Utilities | — | | — |
| 39 | Vendor Matters | 17.6 | 27,500.00 | 13,820.00 |
| 40 | Foreign Affiliates | 100.8 | 75,000.00 | 69,583.70 |
| 41 | Disbursement | — | | — |
| 43 | Jordan | 531.4 | 280,000.00 | 322,431.89 |
| 44 | Gotham | 21.3 | 7,500.00 | 15,057.50 |
| 45 | Honduras | 1,288.0 | 550,000.00 | 789,021.63 |
| 46 | Warehouse | 6.3 | 5,000.00 | 4,250.43 |
| 47 | Jupiter | 39.4 | 32,500.00 | 25,224.50 |
| 48 | TERP/GLBL | 1,036.2 | 565,000.00 | 967,473.00 |
| 49 | India Projects | 8.1 | 37,000.00 | 6,238.00 |
| 50 | Uruguay | 478.6 | 255,000.00 | 410,729.50 |
| 51 | Castle Gap | — | | — |
| 52 | North American Utility and C&I Assets | 411.1 | 330,000.00 | 330,378.00 |
| 53 | Solar Materials Sale | 692.3 | 950,000.00 | 602,829.50 |
| 54 | Latin America General | 9.4 | 14,500.00 | 8,078.00 |
| 55 | Latin America Portfolio Sale | 466.5 | 425,000.00 | 385,409.00 |
| 56 | UCC Estate Claims Investigation | 181.2 | 275,000.00 | 200,303.00 |
| 57 | Political Law Advice | — | 6,000.00 | — |
| 58 | C&I Platform | 479.9 | 230,000.00 | 387,618.50 |
| 59 | Rock Springs | 102.4 | 47,500.00 | 75,392.50 |
| 60 | Turbine Sales | 307.8 | 225,000.00 | 227,778.50 |
| 61 | AP Warehouse Sale | 415.5 | 230,000.00 | 326,857.00 |
| 62 | Mt. Signal | 9.3 | 10,000.00 | 8,080.50 |
| 63 | EPC Platform Sale | 275.1 | 55,000.00 | 214,964.50 |
| 64 | EMEA Sales | 152.7 | 119,000.00 | 131,266.64 |
| 65 | GAM Sale | 432.5 | 305,000.00 | 400,351.37 |
| 66 | TERP/GLBL Sale | 286.8 | 675,000.00 | 331,432.00 |
| 67 | MN C&I Sale | 53.7 | 55,000.00 | 43,736.50 |
| 68 | NA CI East/West Assets | 42.1 | 20,000.00 | 31,474.50 |
| 69 | Senate Inquiry | 13.6 | 30,000.00 | 12,832.00 |
| 70 | Sao Pedro | 4.7 | 40,000.00 | 3,273.00 |
| 71 | Solaria Litigation | 473.4 | — | 430,914.00 |
| 72 | SLB Projects | 56.8 | — | 49,757.00 |
| 74 | Malaysia Sale | 24.8 | — | 22,809.00 |
| 76 | Philippines Sale | 2.6 | — | 2,210.00 |
| 77 | Asia Sales | 1.1 | — | 935.00 |
| 78 | Milford | 1.8 | — | 1,600.00 |
| 79 | Solar Materials Sale - Document Review | 28.3 | — | 12,070.50 |
| | **Total** | **14,290.0** | **11,579,500.00** | **11,775,875.89** |

| Month | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) | Variance ($) | Variance (%) |
|---|---|---|---|---|---|
| October | 4,550.5 | 3,869,500 | 3,748,242.88 | -121,257.12 | -3.1% |
| November | 4,876.5 | 4,171,000 | 4,085,188.67 | -85,811.33 | -2.1% |
| December | 4,863.0 | 3,539,000 | 3,942,444.34 | 403,444.34 | 11.4% |
| **Total** | **14,290.0** | **11,579,500.00** | **11,775,875.89** | **196,375.89** | **1.7%** |

## **Exhibit F-2 – Cumulative Budget for Third Application Period**

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|-------------|---------------------------|-------------------------|
| 1 | General Corporate Advice | 215.3 | 150,000.00 | 250,886.00 |
| 2 | Asset Analysis and Recovery | 41 | — | 41,086.50 |
| 3 | Asset Dispositions (General) | 25.3 | 100,000.00 | 23,610.50 |
| 4 | Asset Dispositions (Inventory) | — | — | — |
| 5 | Asset Dispositions (Real Property) | — | — | — |
| 6 | Automatic Stay (Relief Actions) | 3.9 | 15,000.00 | 3,083.50 |
| 7 | Business Operations / Strategic Planning | 87.2 | 100,000.00 | 90,823.50 |
| 8 | Case Administration | 698.6 | 1,000,000.00 | 394,307.50 |
| 9 | Claims Admin. (General) | 70.1 | 180,000.00 | 52,225.00 |
| 13 | Creditor Meetings/Statutory Committees | 370.8 | 700,000.00 | 354,917.00 |
| 14 | Disclosure Statement/Voting Issues | 599.9 | 1,400,000.00 | 529,806.00 |
| 15 | Employee Matters (General) | 57.2 | 80,000.00 | 62,192.50 |
| 16 | Employee Matters (Labor Unions) | — | — | — |
| 17 | Environmental Matters | 0.3 | — | 327.00 |
| 18 | Executory Contracts (Personalty) | 0.6 | — | 537.00 |
| 19 | Financing (DIP and Emergence) | 2,249.7 | 975,000.00 | 2,072,645.00 |
| 20 | Government Affairs | 1.1 | — | 1,468.50 |
| 21 | Insurance | 127.7 | 700,000.00 | 144,979.50 |
| 22 | Intellectual Property | — | — | — |
| 23 | Investigations and Reviews | 13.2 | — | 6,534.00 |
| 24 | Leases (Real Property) | 4.2 | — | 3,514.00 |
| 25 | Litigation (General) | 705.8 | 1,500,000.00 | 583,319.50 |
| 26 | Litigation (Insurance Recovery) | — | — | — |
| 27 | Liquidation / Feasibility | — | — | — |
| 28 | Nonworking Travel Time | 370.2 | 312,000.00 | 208,339.00 |
| 29 | Real Estate (Owned) | — | — | — |
| 30 | Regulatory and SEC Matters | 7.9 | 80,000.00 | 9,618.50 |
| 31 | Reorganization Plan/Plan Sponsors | 621.9 | 2,700,000.00 | 625,027.00 |
| 32 | Reports and Schedules | 56.7 | — | 56,867.50 |
| 33 | Retention/Fee Matters (SASM&F) | 309.2 | 525,000.00 | 234,749.65 |
| 34 | Retention/Fee Matters/Objections (Others) | 41 | 100,000.00 | 28,041.00 |
| 35 | Secured Claims | 95.6 | 120,000.00 | 102,199.00 |
| 36 | Tax Matters | 77.2 | 150,000.00 | 87,459.00 |
| 37 | U.S. Trustee Matters | — | — | — |
| 38 | Utilities | — | — | — |
| 39 | Vendor Matters | 1 | 20,000.00 | 925.00 |
| 40 | Foreign Affiliates | 17.2 | 100,000.00 | 11,246.79 |
| 41 | Disbursement | — | — | — |
| 43 | Jordan | — | — | — |
| 44 | Gotham | — | — | — |
| 45 | Honduras | 59.6 | 17,500.00 | 37,914.72 |
| 46 | Warehouse | 38.2 | — | 30,431.73 |
| 47 | Jupiter | 9.9 | — | 6,039.00 |
| 48 | TERP/GLBL | 1,020.4 | 875,000.00 | 1,017,420.00 |
| 49 | India Projects | 14.3 | — | 12,798.50 |
| 50 | Uruguay | 6.1 | — | 4,553.50 |
| 51 | Castle Gap | — | — | — |
| 52 | North American Utility and C&I Assets | 12.7 | 50,000.00 | 5,986.50 |

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|---|---|---|---|
| 53 | Solar Materials Sale | 376 | 300,000.00 | 310,898.00 |
| 54 | Latin America General | 5.6 | — | 4,059.60 |
| 55 | Latin America Portfolio Sale | 783.7 | 80,000.00 | 601,775.50 |
| 56 | UCC Estate Claims Investigation | 16.7 | — | 19,376.50 |
| 57 | Political Law Advice | — | — | — |
| 58 | C&I Platform | 272 | 100,000.00 | 198,124.00 |
| 59 | Rock Springs | 40.5 | — | 28,585.00 |
| 60 | Turbine Sales | 8.2 | — | 6,584.50 |
| 61 | AP Warehouse Sale | 625.2 | 150,000.00 | 507,714.50 |
| 62 | Mt. Signal | — | — | — |
| 63 | EPC Platform Sale | 132.4 | 50,000.00 | 102,056.50 |
| 64 | EMEA Sales | 174.6 | 25,000.00 | 140,863.62 |
| 65 | GAM Sale | 593.5 | 375,000.00 | 610,903.06 |
| 66 | TERP/GLBL Sale | 887.1 | 1,600,000.00 | 916,235.00 |
| 67 | MN C&I Sale | 616.1 | — | 645,603.00 |
| 68 | NA CI East/West Assets | 3.9 | 25,000.00 | 3,607.50 |
| 69 | Senate Inquiry | — | — | — |
| 70 | Sao Pedro | 107.5 | — | 92,423.00 |
| 71 | Solar Materials Sale Objections Litigation | 978.6 | 15,000.00 | 1,027,025.00 |
| 72 | SLB Projects | 1,115.6 | 500,000.00 | 837,239.50 |
| 73 | UCC Claims Challenge Litigation | 150.6 | — | 138,975.50 |
| 74 | Malaysia Sale | — | — | — |
| 75 | Bangladesh Sale | 2.5 | — | 1,775.00 |
| 76 | Philippines Sale | 6.4 | — | 5,728.00 |
| 77 | Asia Sales | 95.8 | — | 78,974.50 |
| 78 | Milford | 56.4 | — | 46,656.50 |
| 79 | Solar Materials Sale - Document Review | 144.8 | — | 51,430.00 |
| 80 | Affiliate Filings | 158.7 | — | 119,345.00 |
| 81 | Everstream | — | — | — |
| 82 | GSSG | 6 | — | 3,570.00 |
| 83 | Nauto | 3.3 | — | 2,953.50 |
| 84 | Deepwater | — | — | — |
| 85 | Silicon Genesis | — | — | — |
| 86 | TERP/DE Shaw Claims | 41.9 | — | 52,047.50 |
| 87 | Multidistrict Mediation | 227.9 | — | 287,902.00 |
| 88 | Post-Closing Solar Materials Sale Matters | — | — | — |
| 89 | Yieldco Settlement Motion | 1,714.4 | — | 1,532,486.00 |
| 90 | First Light | — | — | — |
| 91 | Backstop Commitment/Rights Offering | 289.4 | — | 260,249.00 |
| | **Total** | **17,666.3** | **15,169,500.00** | **15,731,045.17** |

| Month | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) | Variance ($) | Variance (%) |
|---|---|---|---|---|---|
| January | 4,610.9 | 4,635,500.00 | 4,109,620.53 | -525,879.47 | -12.8 |
| February | 3,781.7 | 3,953,000.00 | 3,465,567.11 | -487,432.89 | -14.1 |
| March | 4,779.0 | 3,428,000.00 | 4,373,177.50 | 945,177.50 | 21.6 |
| April | 4,494.7 | 3,153,000.00 | 3,782,680.03 | 629,680.03 | 16.6 |
| **Total** | **17,666.3** | **15,169,500.00** | **15,731,045.17** | **561,545.17** | **3.6** |

13

## Exhibit F-3 – Cumulative Budgets for Fourth Interim Period

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|-------------|---------------------------|-------------------------|
| 1 | General Corporate Advice | 23.1 | 165,000.00 | 30,716.00 |
| 2 | Asset Analysis and Recovery | — | 30,000.00 | — |
| 3 | Asset Dispositions (General) | 57.9 | 20,000.00 | 48,986.50 |
| 4 | Asset Dispositions (Inventory) | — | — | — |
| 5 | Asset Dispositions (Real Property) | — | — | — |
| 6 | Automatic Stay (Relief Actions) | 2.0 | 4,000.00 | 1,420.00 |
| 7 | Business Operations / Strategic Planning | 72.2 | 40,000.00 | 76,707.00 |
| 8 | Case Administration | 642.1 | 400,000.00 | 308,906.00 |
| 9 | Claims Admin. (General) | 34.9 | 145,000.00 | 33,759.00 |
| 13 | Creditor Meetings/Statutory Committees | 25.0 | 160,000.00 | 23,887.00 |
| 14 | Disclosure Statement/Voting Issues | 1,347.2 | 378,000.00 | 1,257,247.50 |
| 15 | Employee Matters (General) | 55.9 | 70,000.00 | 56,510.00 |
| 16 | Employee Matters (Labor Unions) | — | — | — |
| 17 | Environmental Matters | — | — | — |
| 18 | Executory Contracts (Personalty) | 6.3 | — | 5,629.50 |
| 19 | Financing (DIP and Emergence) | 315.6 | 469,075.00 | 222,603.50 |
| 20 | Government Affairs | — | — | — |
| 21 | Insurance | 71.0 | 45,000.00 | 62,202.00 |
| 22 | Intellectual Property | — | — | — |
| 23 | Investigations and Reviews | 1,035.6 | 7,000.00 | 627,933.31 |
| 24 | Leases (Real Property) | — | — | — |
| 25 | Litigation (General) | 543.6 | 800,000.00 | 478,003.00 |
| 26 | Litigation (Insurance Recovery) | — | — | — |
| 27 | Liquidation / Feasibility | — | — | — |
| 28 | Nonworking Travel Time | 249.7 | 198,000.00 | 136,752.25 |
| 29 | Real Estate (Owned) | — | — | — |
| 30 | Regulatory and SEC Matters | 21.8 | 45,000.00 | 29,103.00 |
| 31 | Reorganization Plan/Plan Sponsors | 3,126.1 | 2,750,000.00 | 2,747,269.50 |
| 32 | Reports and Schedules | 41.7 | 25,000.00 | 32,208.00 |
| 33 | Retention/Fee Matters (SASM&F) | 236.4 | 405,000.00 | 188,967.50 |
| 34 | Retention/Fee Matters/Objections (Others) | 87.2 | 47,500.00 | 73,562.50 |
| 35 | Secured Claims | 1.1 | 75,000.00 | 1,281.00 |
| 36 | Tax Matters | 52.4 | 65,000.00 | 66,589.00 |
| 37 | U.S. Trustee Matters | — | — | — |
| 38 | Utilities | — | — | — |
| 39 | Vendor Matters | — | 5,000.00 | — |
| 40 | Foreign Affiliates | 27.6 | 50,000.00 | 27,346.65 |
| 41 | Disbursement | — | — | — |
| 43 | Jordan | — | — | — |
| 44 | Gotham | — | — | — |
| 45 | Honduras | 2.5 | 49,050.00 | 2,316.25 |
| 46 | Warehouse | 14.2 | 7,500.00 | 8,097.13 |
| 47 | Jupiter | — | — | — |
| 48 | TERP/GLBL | 208.7 | 210,000.00 | 201,717.50 |
| 49 | India Projects | 7.4 | 10,000.00 | 6,623.00 |
| 50 | Uruguay | 2.5 | — | 1,487.50 |
| 51 | Castle Gap | — | — | — |
| 52 | North American Utility and C&I Assets | 9.7 | — | 7,898.00 |
| 53 | Solar Materials Sale | 35.2 | 14,475.00 | 29,539.00 |

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|-------------|---------------------------|-------------------------|
| 54 | Latin America General | 0.5 | 16,350.00 | 463.25 |
| 55 | Latin America Portfolio Sale | 567.6 | 487,500.00 | 425,614.50 |
| 56 | UCC Estate Claims Investigation | — | — | — |
| 57 | Political Law Advice | — | — | — |
| 58 | C&I Platform | — | — | — |
| 59 | Rock Springs | 1.1 | — | 781.00 |
| 60 | Turbine Sales | — | — | — |
| 61 | AP Warehouse Sale | 219.0 | 166,810.00 | 177,187.00 |
| 62 | Mt. Signal | 0.3 | — | 304.50 |
| 63 | EPC Platform Sale | 3.2 | — | 2,241.50 |
| 64 | EMEA Sales | 6.0 | 60,000.00 | 5,370.00 |
| 65 | GAM Sale | 557.6 | 270,235.00 | 557,923.48 |
| 66 | TERP/GLBL Sale | 220.5 | 668,000.00 | 220,437.00 |
| 67 | MN C&I Sale | 62.4 | 112,500.00 | 64,079.00 |
| 68 | NA CI East/West Assets | 5.5 | — | 5,335.00 |
| 69 | Senate Inquiry | — | — | — |
| 70 | Sao Pedro | — | — | — |
| 71 | Solar Materials Sale Objections Litigation | 73.8 | 114,450.00 | 70,607.50 |
| 72 | SLB Projects | 1,013.8 | 183,050.00 | 714,134.50 |
| 73 | UCC Claims Challenge Litigation | 3.0 | — | 4,230.00 |
| 74 | Malaysia Sale | 2.4 | — | 2,148.00 |
| 75 | Bangladesh Sale | 3.5 | — | 2,892.00 |
| 76 | Philippines Sale | 3.1 | — | 2,774.50 |
| 77 | Asia Sales | — | 35,000.00 | — |
| 78 | Milford | 52.7 | 211,250.00 | 45,570.50 |
| 79 | Solar Materials Sale - Document Review | — | — | — |
| 80 | Affiliate Filings | 5.7 | — | 5,101.50 |
| 81 | Everstream | 1.5 | — | 1,065.00 |
| 82 | GSSG | — | — | — |
| 83 | JPM Warehouse | 28.3 | — | 27,388.50 |
| 84 | Deepwater | — | — | — |
| 85 | Silicon Genesis | — | — | — |
| 86 | TERP/DE Shaw Claims | 4.0 | 7,500.00 | 5,340.00 |
| 87 | Multidistrict Mediation | 270.3 | 35,000.00 | 304,658.50 |
| 88 | Post-Closing Solar Materials Sale Matters | 91.2 | 43,600.00 | 99,555.00 |
| 89 | Yieldco Settlement Motion | 230.5 | 200,000.00 | 279,501.00 |
| 90 | First Light | 3.4 | — | 2,617.50 |
| 91 | Backstop Commitment/Rights Offering | 794.3 | 82,500.00 | 712,272.00 |
| 92 | Crucero Sale | 3.5 | 111,875.00 | 3,395.00 |
| 93 | AQR Appeal | 494 | — | 400,158.00 |
| | **Total** | **13,079.3** | **9,495,220.00** | **10,938,413.32** |

| Month | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) | Variance ($) | Variance (%) |
|-------|-------------|---------------------------|-------------------------|--------------|--------------|
| May | 3,575.9 | 2,453,000.00 | 3,186,153.33 | 733,153.33 | 23.0 |
| June | 3,116.7 | 3,182,830.00 | 2,669,789.22 | -513,040.78 | -19.2 |
| July | 3,761.7 | 2,578,795.00 | 3,162,915.53 | 584,120.53 | 18.5 |
| August | 2,625.0 | 1,280,595.00 | 1,919,555.24 | 638,960.24 | 33.3 |
| **Total** | **13,079.3** | **9,495,220.00** | **10,938,413.32** | **1,443,193.32** | **13.2%** |

**Exhibit F-4 – Cumulative Budgets for Fifth Application Period
(Excluding December 2017)**

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|-------------|--------------------------|-------------------------|
| 1 | General Corporate Advice | 8.2 | 30,000.00 | 10,947.00 |
| 2 | Asset Analysis and Recovery | — | 5,000.00 | — |
| 3 | Asset Dispositions (General) | 109.5 | 30,000.00 | 120,813.00 |
| 4 | Asset Dispositions (Inventory) | — | — | — |
| 5 | Asset Dispositions (Real Property) | 38.9 | — | 39,279.50 |
| 6 | Automatic Stay (Relief Actions) | 3.1 | 90,000.00 | 2,526.50 |
| 7 | Business Operations / Strategic Planning | 25.9 | 55,000.00 | 28,391.50 |
| 8 | Case Administration | 192.6 | 165,000.00 | 113,549.50 |
| 9 | Claims Admin. (General) | 75.4 | 35,000.00 | 72,417.00 |
| 13 | Creditor Meetings/Statutory Committees | 7.2 | 15,000.00 | 7,462.50 |
| 14 | Disclosure Statement/Voting Issues | — | — | — |
| 15 | Employee Matters (General) | 62.4 | 13,500.00 | 53,945.00 |
| 16 | Employee Matters (Labor Unions) | — | — | — |
| 17 | Environmental Matters | — | — | — |
| 18 | Executory Contracts (Personalty) | 26.8 | 1,000.00 | 19,915.50 |
| 19 | Financing (DIP and Emergence) | 51.9 | 30,000.00 | 37,767.00 |
| 20 | Government Affairs | — | — | — |
| 21 | Insurance | 51.5 | 77,000.00 | 50,032.50 |
| 22 | Intellectual Property | — | — | — |
| 23 | Investigations and Reviews | — | 100,000.00 | — |
| 24 | Leases (Real Property) | — | — | — |
| 25 | Litigation (General) | 212.6 | 225,000.00 | 208,452.50 |
| 26 | Litigation (Insurance Recovery) | — | — | — |
| 27 | Liquidation / Feasibility | — | — | — |
| 28 | Nonworking Travel Time | 78.8 | 30,000.00 | 41,696.25 |
| 29 | Real Estate (Owned) | — | — | — |
| 30 | Regulatory and SEC Matters | 11.0 | 9,000.00 | 12,020.00 |
| 31 | Reorganization Plan/Plan Sponsors | 78.0 | 400,000.00 | 82,592.50 |
| 32 | Reports and Schedules | 115.8 | — | 100,354.50 |
| 33 | Retention/Fee Matters (SASM&F) | 147.1 | 105,000.00 | 126,579.50 |
| 34 | Retention/Fee Matters/Objections (Others) | 45.5 | 40,000.00 | 36,046.00 |
| 35 | Secured Claims | — | 5,000.00 | — |
| 36 | Tax Matters | 6.2 | 9,000.00 | 6,961.00 |
| 37 | U.S. Trustee Matters | — | — | — |
| 38 | Utilities | — | — | — |
| 39 | Vendor Matters | 1.4 | — | 1,141.00 |
| 40 | Foreign Affiliates | 0.7 | 12,000.00 | 763.00 |
| 41 | Disbursement | — | — | — |
| 43 | Jordan | — | — | — |
| 44 | Gotham | — | — | — |
| 45 | Honduras | 1.0 | 7,500.00 | 926.50 |
| 46 | Warehouse | — | 2,500.00 | — |
| 47 | Jupiter | 3.0 | 7,500.00 | 2,805.00 |
| 48 | TERP/GLBL | 111.7 | 5,000.00 | 98,536.00 |
| 49 | India Projects | — | — | — |
| 50 | Uruguay | — | 7,500.00 | — |
| 51 | Castle Gap | — | — | — |
| 52 | North American Utility and C&I Assets | 4.1 | — | 3,759.50 |

16

| # | Matter | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) |
|---|--------|-------------|--------------------------|-------------------------|
| 53 | Solar Materials Sale | 0.2 | 6,825.00 | 194.00 |
| 54 | Latin America General | 68.2 | 7,450.00 | 50,253.71 |
| 55 | Latin America Portfolio Sale | 80.4 | 164,600.00 | 62,701.50 |
| 56 | UCC Estate Claims Investigation | — | — | — |
| 57 | Political Law Advice | — | — | — |
| 58 | C&I Platform | 5.3 | — | 4,558.00 |
| 59 | Rock Springs | — | — | — |
| 60 | Turbine Sales | — | — | — |
| 61 | AP Warehouse Sale | — | 4,375.00 | — |
| 62 | Mt. Signal | — | — | — |
| 63 | EPC Platform Sale | — | — | — |
| 64 | EMEA Sales | — | 5,000.00 | — |
| 65 | GAM Sale | 119.0 | 36,745.00 | 111,027.50 |
| 66 | TERP/GLBL Sale | 657.4 | 295,000.00 | 777,492.00 |
| 67 | MN C&I Sale | — | 37,500.00 | — |
| 68 | NA CI East/West Assets | — | — | — |
| 69 | Senate Inquiry | — | — | — |
| 70 | Sao Pedro | — | — | — |
| 71 | Solar Materials Sale Objections Litigation | 5.3 | 38,150.00 | 5,777.00 |
| 72 | SLB Projects | 589.2 | 56,500.00 | 393,445.00 |
| 73 | UCC Claims Challenge Litigation | — | — | — |
| 74 | Malaysia Sale | — | — | — |
| 75 | Bangladesh Sale | — | — | — |
| 76 | Philippines Sale | — | — | — |
| 77 | Asia Sales | — | 5,000.00 | — |
| 78 | Milford | 242.4 | 111,500.00 | 210,681.00 |
| 79 | Solar Materials Sale - Document Review | — | — | — |
| 80 | Affiliate Filings | — | — | — |
| 81 | Everstream | — | — | — |
| 82 | GSSG | 3.4 | — | 3,706.00 |
| 83 | JPM Warehouse | 0.1 | 3,000.00 | 97.00 |
| 84 | Deepwater | — | — | — |
| 85 | Silicon Genesis | — | — | — |
| 86 | TERP/DE Shaw Claims | — | — | — |
| 87 | Multidistrict Mediation | 57.4 | 5,000.00 | 54,065.00 |
| 88 | Post-Closing Solar Materials Sale Matters | 11.5 | 45,000.00 | 12,415.00 |
| 89 | Yieldco Settlement Motion | — | — | — |
| 90 | First Light | 4.7 | — | 3,830.50 |
| 91 | Backstop Commitment/Rights Offering | 86.1 | 73,500.00 | 80,118.00 |
| 92 | Crucero Sale | — | — | — |
| 93 | AQR Appeal | 541.8 | 825,000.00 | 474,990.00 |
|  | **Total** | **3,942.70** | **3,231,645.00** | **3,525,030.96** |

| Month | Hours Billed | Budgeted Compensation ($) | Billed Compensation ($) | Variance ($) | Variance (%) |
|-------|-------------|--------------------------|-------------------------|--------------|--------------|
| September | 1,316.6 | 1,446,145.00 | 1,124,016.75 | -322,128.25 | -28.7% |
| October | 1,552.7 | 834,000.00 | 1,395,767.20 | 561,767.20 | 40.2% |
| November | 1,073.4 | 951,500.00 | 1,005,247.01 | 53,747.01 | 5.3% |
| **Total** | **3,942.7** | **3,231,645.00** | **3,525,030.96** | **293,385.96** | **8.3%** |