TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Brian F. Moore
Kyle J. Ortiz

*Co-Counsel for Debtors*
 *and Debtors in Possession*

| | |
|---|---|
| **HEARING DATE:** | 3/27/2018 at 10:00 A.M. |
| **OBJECTION DEADLINE:** | 3/20/2018 at 4:00 P.M. |
| **5th Interim Fees Sought:** | $1,066,321.50 |
| **5th Interim Expenses Sought:** | $10,230.77 |
| **5th Interim Aggregate Fees & Expenses Sought:** | $1,076,552.27 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| SUNEDISON, INC., *et al.*, | : Case No. 16-10992 (SMB) |
| | : |
| Debtors.[1] | : (Jointly Administered) |
| | : |

## SUMMARY SHEET PURSUANT TO
## UNITED STATES TRUSTEE GUIDELINES (M-447)

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); SunEdison Products, LLC (3557); Hudson Energy Solar Corporation (1344); SunE REIT-D PR, LLC (2171); First Wind Energy, LLC (5519); First Wind Holdings, LLC (4445); Vaughn Wind, LLC (9605); Maine Wind Holdings, LLC (4825); SunEdison International Construction, LLC (6257); and EchoFirst Finance Co., LLC (1607). The address of the Debtors' corporate headquarters is Two City Place Drive, 2nd floor, St. Louis, MO 63141.

**FIFTH INTERIM AND FINAL APPLICATION OF TOGUT, SEGAL & SEGAL LLP, AS CO-COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION, FOR (I) THE ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FOR THE PERIOD SEPTEMBER 1, 2017 THROUGH DECEMBER 29, 2017 (THE EFFECTIVE DATE); AND (II) FINAL ALLOWANCE OF ALL PRE-EFFECTIVE DATE COMPENSATION AND EXPENSES**

| | |
|---|---|
| Name of Applicant: | Togut, Segal & Segal LLP |
| Authorized to provide professional services to: | Debtors and Debtors in Possession |
| Date of Retention: | June 8, 2016, *Nunc Pro Tunc* to the Petition Date [Docket No. 511] |
| Period for which compensation and reimbursement are sought: | September 1, 2017 through December 29, 2017 |
| Fifth Interim Fees Requested: | $1,066,321.50 |
| Holdback (20%): | $213,264.30 |
| Total Fees for 5th Interim Fee Period (80%): | $853,057.20 |
| Fifth Interim Expenses Requested: | $10,230.77 |
| Total 5th Interim Amount Requested (Fees & Expenses): | $1,076,552.27 |
| Total Fees Sought (All Fee Periods): | $6,583,649.00 |
| Total Expenses Sought (All Fee Periods): | $59,533.92 |
| Total Fees and Expenses Sought (All Fee Periods): | $6,643,182.92 |
| Amount of Holdbacks (Prior Fee Periods (First, Second, Third and Fourth) | $551,732.75 |
| Amount of Holdbacks (All Fee Periods): | $764,997.05 |

This is an:    ___ Monthly    ____ Interim   _X_ Final application.

### SUMMARY MONTHLY FEE STATEMENTS (Current Fee Period)

| Date & Docket No.# | Fee Period | Requested Fees | Requested Expenses | Allowed Fees (80%) | Allowed Expenses (100%) | Holdbacks (20%) |
|---|---|---|---|---|---|---|
| 10/25/2017 Dkt No. 4204 | 9/1/2017 through 9/31/2017 | $186,853.00 | $1,594.87 | $149,482.40 | $1,594.87 | $37,370.60 |
| 11/28/2017 Dkt No. 4371 | 10/1/2017 through 10/31/2017 | $259,356.00 | $3,042.82 | $207,484.80 | $3,042.82 | $51,871.20 |
| 12/18/2017 Dkt. No. 4445 | 11/1/2017 through 11/30/2017 | $280,641.50 | $2,824.70 | $224,513.20 | $2,824.70 | $56,128.30 |
| 1/19/2018 Dkt No. 4581 | 12/1/2017 through 12/31/2017 | $339,471.00 | $2,768.38 | $271,576.80 | $2,768.38 | $67,894.20 |
| **TOTALS:** | | **$1,066,321.50** | **$10,230.77** | **$853,057.20** | **$10,230.77** | **$213,264.30** |

### PRIOR FEE APPLICATIONS (ALL FEE PERIODS FILED)

| Date & Docket No.# | Fee Period | Requested Fees | Requested Expenses | Allowed Fees | Allowed Expenses (100%) | Net Balance due on Prior Holdbacks* |
|---|---|---|---|---|---|---|
| 10/17/2016 Dkt No. 1411 | 4/21/2016 thru 8/31, 2016 (First Interim) | $1,700,540.00 | $9,311.76 | $1,360,432.00 | $9,311.76 | $170,054.00 |
| 2/14/2017 Dkt No. 2460 | 9/1/2016 thru 12/31/2016 (Second Interim) | $1,476,434.50 | $13,188.51 | $1,328,791.05 | $13,188.51 | $147,643.45 |
| 6/14/2017 Dkt. No. 3347 | 1/1/2017 thru 4/30/2017 (Third Interim) | $1,015,041.50 | $11,932.34 | $812,033.20 | $11,923.34 | $101,504.15 |

| 11/17/2017 Dkt. No. 4343 | 5/1/2017 thru 8/31/2017 (Fourth Interim) | $1,325,311,50 | $14,879.54 | $1,192,780.35 | $14,879.54 | $132,531.15 |
|---|---|---|---|---|---|---|
| **TOTALS:** | | **$5,517,327.50** | **$49,303.15** | **$4,694,036.60** | **$49,303.15** | **$551,732.75\*** |

- *The Togut Firm received payments on account of the released holdbacks from the prior fee periods per Orders of the Court. The net balance due takes into account the additional payments received to date.*

### SCHEDULE OF FEES
#### Fee Summary for the Period
#### September 1, 2017 through and including December 31, 2017

*By Timekeeper*

| Name of Professional | Year of Admission | Year Fee Incurred | Hourly Rate(s) | Hours Engaged | Total Value(s) |
|---|---|---|---|---|---|
| **Partners:** | | | | | |
| Frank A. Oswald | 1985 | 2017 | $875 | 296.9 | $259,787.50 |
| Scott E. Ratner | 1987 | 2017 | $865 | 53.5 | 46,277.50 |
| ***Partner Subtotals:*** | | | | *350.4* | *$306,065.00* |
| **Counsel:** | | | | | |
| Brian F. Moore | 1998 | 2017 | $730 | 33.3 | $24,309.00 |
| Patrick Marecki | 2005 | 2017 | $630 | 137.6 | 86,688.00 |
| ***Counsel Subtotals:*** | | | | *170.9* | *$110,997.00* |
| **Associates:** | | | | | |
| Lauren L. Peacock | 2005 | 2017 | $570 | 144.3 | $82,251.00 |
| Kyle J. Ortiz | 2009 | 2017 | $470 | 88.0 | 41,360.00 |
| Minta J. Nester | 2010 | 2017 | $470 | 112.8 | 53,016.00 |
| Luke Thara | 2011 | 2017 | $460 | 118.3 | 54,418.00 |
| Anthony P. DeLeo | 2013 | 2017 | $400 | 494.9 | 197,960.00 |
| Jacob Herz | 2014 | 2017 | $320 | 73.9 | 23,648.00 |
| Maximilian Ferullo | 2015 | 2017 | $320 | 28.8 | 9,216.00 |
| Gregory M. Juell | 2015 | 2017 | $320 | 249.0 | 79,680.00 |
| ***Associate Subtotals:*** | | | | *1,310.0* | *$541,549.00* |
| **Paralegals:** | | | | | |
| Dawn Person | N/A | 2017 | $335 | 179.7 | $60,199.50 |
| Denise Cahir | N/A | 2017 | $280 | .9 | 252.00 |
| Alexandra Deering | N/A | 2017 | $205 | 178.5 | 36,592.50 |
| ***Paralegal Subtotals:*** | | | | *359.1* | *$97,044.00* |

| **Law Clerk** | | | | | |
|---|---|---|---|---|---|
| Katherine Scott | N/A | 2017 | $195 | 54.7 | $10,666.50 |
| ***Law Clerk Subtotals:*** | | | | ***54.7*** | ***$10,666.50*** |
| | | | Totals: | 2,245.1 | $1,066,321.50 |

---

1    The rates charged herein are the same rates charged in all other cases on which this firm is engaged.

2    Time records are being furnished as a Supplement to the Application.

3    The blended hourly rate for the Fifth Interim Fee Period (excluding paralegals/law clerks) is $523.46. The blended hourly rate for the Fifth Interim Fee Period (including paralegals/law clerks) is $474.96

4    Number of Attorneys Included in this Application: 12

# TABLE OF CONTENTS

**PAGE NO.**

PRELIMINARY STATEMENT ...................................................................................................2

I.     JURISDICTION ...........................................................................................................4

II.    FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT .............................4

A. Fifth Interim Period ...............................................................................................5

B.  Prior Interim Fee Applications and Awards ..........................................................7

C. Final Allowance of Compensation and Expenses...................................................9

III.    BACKGROUND .........................................................................................................9

IV.    RETENTION OF THE TOGUT FIRM .......................................................................11

IV.    SUMMARY OF LEGAL SERVICES RENDERED .....................................................14

A.    *De Minimis* Asset Sales ......................................................................................14

B.    Sherman, Texas Property Sale..............................................................................16

C.    Executory Contract Issues ...................................................................................19

D.    Debtors' Monthly Operating Reports ...................................................................19

E.    Professional Retentions ........................................................................................19

F.    Surety Issues ........................................................................................................20

G.    Claims Reconciliation and Objections ..................................................................20

H.    Account Receivable Collection Matters..................................................................22

I.    Case Status and Strategy ......................................................................................23

J.    Stewart Appeal ....................................................................................................23

K.    Other Matters Tasked to the Togut Firm ..............................................................24

(i) The C&I Litigation ..................................................................................24

(ii) The Avkem Litigation .............................................................................25

(iii) Nauto, Inc................................................................................................25

(iv) Residential Receivables Matters............................................................................26

(v) EverStream Solar Infrastructure Fund L.P..........................................................26

V.      COMPENSATION REQUESTED ........................................................................26

VI.     DISBURSEMENTS ................................................................................................ 31

VII.    ATTORNEY STATEMENT PURSUANT TO APPENDIX B GUIDELINES................ 33

VIII.   CONCLUSION........................................................................................................ 34

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Kyle J. Ortiz
Brian F. Moore

*Co-Counsel for Post-Confirmation Debtors*

HEARING DATE:        3/27/2018 at 10:00 AM
OBJECTION DEADLINE:  3/20/2018 at 4:00 PM

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | : Chapter 11 |
| | : |
| SUNEDISON, INC., *et al.*, | : Case No. 16-10992 (SMB) |
| | : |
| Reorganized Debtors. | : (Jointly Administered) |
| | : |
| | : (Post Confirmation) |

**FIFTH INTERIM AND FINAL APPLICATION OF TOGUT, SEGAL & SEGAL LLP, AS CO-COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION, FOR (I) THE ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED FOR THE PERIOD SEPTEMBER 1, 2017 THROUGH DECEMBER 29, 2017 (THE EFFECTIVE DATE); AND (II) FINAL ALLOWANCE OF ALL PRE-EFFECTIVE DATE COMPENSATION AND EXPENSES**

TO THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE:

Togut, Segal & Segal LLP (the "Togut Firm" or "Applicant") hereby

makes this application (the "Application") for the allowance and award of (a) fifth

interim (i) compensation for professional services rendered and (ii) reimbursement for

actual and necessary expenses incurred in connection with such services for the period

(the "Fifth Interim Period") September 1, 2017 through the Effective Date of the

Debtors' Plan, December 29, 2017 (the "Effective Date"), and (b) final allowance of all

pre-Effective Date (the "Fee Application Period") compensation and expenses,

including the award and release of net holdbacks for previously allowed fees from prior

interim applications.  In support of this Application, the Togut Firm respectfully

represents:

## PRELIMINARY STATEMENT

SunEdison, Inc. ("SUNE") and certain of its affiliates, the Reorganized

Debtors (as defined in the confirmed *Second Amended Joint Plan of Reorganization of*

*SunEdison, Inc. and its Debtor Affiliates* [Dkt. No. 3735]) (collectively, the "Debtors")[1]

confirmed their Chapter 11 Plan by Order dated July 28, 2017, a remarkable

achievement by any measure.  The Plan (as defined below) went effective on December

29, 2017.  *See* Dkt. No. 4495.

The Debtors employed the Togut Firm at the outset of these cases

consistent with Part F of the *Appendix B Guidelines for Reviewing Applications for*

*Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in*

*Larger Chapter 11 Cases* (the "Appendix B Guidelines") as the Debtors' co-counsel both:

(i) to handle matters that are not appropriately handled by the Debtors' general

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE MN Development, LLC (8669); SunE MN Development Holdings, LLC (5388); SunE Minnesota Holdings, LLC (8926); Terraform Private Holdings, LLC (5993); SunEdison Products, LLC (3557); Hudson Energy Solar Corporation (1344); SunE REIT-D PR, LLC (2171); First Wind Energy, LLC (5519); First Wind Holdings, LLC (4445); Vaughn Wind, LLC (9605); Maine Wind Holdings, LLC (4825); SunEdison International Construction, LLC (6257); and EchoFirst Finance Co., LLC (1607). The address of the Debtors' corporate headquarters is Two City Place Drive, 2nd Floor, St. Louis, MO 63141.

restructuring counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), due to a potential or actual conflict of interest with certain creditors of the Debtors or other parties-in-interest (the "Conflict Matters"), and (ii) to perform such other discrete duties as assigned by the Debtors, in consultation with Skadden and the Togut Firm, to take advantage of the Togut Firm's efficiencies and hourly rates (the "Assigned Matters").

Under the Appendix B Guidelines, the United States Trustee encourages debtors to retain co-counsel to perform such services.  The Togut Firm has worked hard to develop and perfect the co-counsel business model so that it best serves the interests of the Debtors' estates.

The Togut Firm was instrumental to the efficient administration of the Debtors' estates throughout the Fee Application Period.  Indeed, the Togut Firm's handling of various discrete matters permitted the Debtors' other professionals (Skadden in particular) to focus on the larger aspects of the Debtors' restructuring.  The combined efforts of the Debtors' various professionals throughout the Fee Application Period ensured the success of the Debtors' cases and the Debtors' ultimate emergence from bankruptcy on the Effective Date.

During the Fifth Interim Period, the Togut Firm provided services to the Debtors in respect of numerous discrete tasks,  including, among many others:  (i) reconciling, reviewing, drafting and prosecuting objections to claims;  (ii) assisting the Debtors in evaluating claims and inquiries from the Debtors' surety bond providers;  (iii) obtaining Court approval for the retention of estate professionals and assisting such professionals with the submission of their fee statements;  (iv) assisting the Debtors with obtaining approval of multiple *de minimis* asset sales;  (v) assisting the Debtors with the disposition of certain executory contracts;  and (vi) assisting the Debtors with their compliance as to various reporting requirements imposed by the United States Trustee

and title 11 of the United States Code (the "Bankruptcy Code").  By rendering the

foregoing services, among many others, the Togut Firm has helped reduce the costs of

administering these estates while providing the highest quality service, which

ultimately led to the Debtors' successful exit from bankruptcy following the Effective

Date.

The Togut Firm respectfully requests that the Court allow and award the

compensation and expense reimbursement requested in this Application for the Fifth

Interim Period and the entire post-petition Fee Application Period.

## JURISDICTION

1.      The Court has jurisdiction over this Application pursuant to

28 U.S.C. §§ 157 and 1334.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and

1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A)

and (O).

## FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT

3.      This Application is made pursuant to, and in compliance with,

sections 330 and 331 of the Bankruptcy Code, Rule 2016(a) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2016-1 of the Local Rules for the

United States Bankruptcy Court for the Southern District of New York (the "Local

Rules"), Administrative Order M-447, Amended Guidelines for Fees and

Disbursements for Professionals in Southern District of New York Bankruptcy Cases

(the "Local Guidelines"), the United States Trustee Guidelines for Reviewing

Applications for Compensation and Reimbursement of Expenses (the "UST Guidelines"

and, together with the Local Guidelines, the "Guidelines"), and the *Order Granting*

*Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 331, Bankruptcy*

4

*Rule 2016, and Local Bankruptcy Rule 2016-1 Establishing Procedures for Interim*

*Compensation and Reimbursement of Expenses of Professionals,* dated May 12, 2016 [Dkt. No.

258] (the "Interim Compensation Order").

## A.    Fifth Interim Period.

4.    Specifically, this Application seeks the allowance and award of

(i) compensation for services rendered to the Debtors during the Fifth Interim Period in

the aggregate amount of $1,066,321.50 and (ii) reimbursement of actual and reasonable

expenses in the amount of $10,230.77 incurred in connection with the rendition of such

services.

5.    During the Fifth Interim Period, the Togut Firm's attorneys and

paraprofessionals expended a total of 2,245.1 hours for which compensation is

requested.  The blended hourly rate for the Togut Firm during the Fifth Interim Period

was $474.96 for all professionals and $523.46 for attorneys.[2]

6.    A schedule setting forth the number of hours expended by the

partners, associates, and paraprofessionals of the Togut Firm, their respective hourly

rates, and the year in which each attorney was admitted to practice is attached hereto as

Exhibit "1."  A schedule specifying the type of expenses for which the Togut Firm is

seeking reimbursement and the total amount for each such category is attached hereto

as Exhibit "2."

7.    The Togut Firm maintains computerized records of the daily time

entries completed by all the Togut Firm attorneys and paraprofessionals.  Preceding the

time entries is a chart listing the names, billing rates, and time spent by each of the

---

[2]    As noted below, the Togut Firm's Comparable and Customary Compensation Disclosures, attached
hereto  as Exhibit "4", compares the Togut Firm's blended rate in these cases with the Togut Firm's
blended rate in non-estate retained bankruptcy matters during the Fifth Interim Period.

attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support

of the Application and consistent with the Interim Compensation Order, copies of these

computerized records, together with a computer generated detailed itemization of the

expenses incurred by the Togut Firm for which reimbursement is sought, have been

furnished to the Court and the United States Trustee (and copies have been filed

publicly on the docket with the Monthly Fee Statements (as defined below)).

8.      Pursuant to the terms of the Interim Compensation Order, the

Togut Firm submitted three monthly invoices during the Fifth Interim Period

(collectively, the "Monthly Fee Statements), as follows:  (i) for the period September 1,

2017 through September 30, 2017 in the amount of $186,853 for fees and $1,594.87 for

expenses (the "September Fee Statement");  (ii) for the period October 1, 2017 through

October 31, 2017 in the amount of $259,356 for fees and $3,042.82 for expenses (the

"October Fee Statement"); (iii) for the period November 1, 2017 through November 30,

2017 in the amount of $280,641.50 for fees and $2,824.70 for expenses (the "November

Fee Statement");  and (iv) for the period December 1, 2017 through December 29, 2017

in the amount of $339,471 for fees and $2,768.38 for expenses (the "December Fee

Statement").  Thus, during the Fifth Interim Period, the Togut Firm submitted Monthly

Fee Statements for fees aggregating $1,066,321.50 and actual and necessary and

expenses totaling $10,230.77.[3]

9.      Pursuant to the terms of the Interim Compensation Order, each

month the Togut Firm served a copy of its Monthly Fee Statement, supported by time

and disbursement records along with a summary of services rendered and expenses

---

[3]     To the extent that time for services rendered or disbursements were incurred related to the Fifth
        Interim Period that was not processed prior to the preparation of this Application, the Togut Firm
        reserves the right to request compensation for such services and reimbursement of such expenses in a
        future fee application.

incurred, on each of the Notice Parties (as defined in the Interim Compensation Order) in the format specified by the Guidelines, allowing each of the Notice Parties an opportunity to review and object to the Monthly Fee Statements.[4]

        10.    In accordance with the Interim Compensation Order, the Togut Firm sought and was paid 80% of the fees and 100% of the expenses covered by each Monthly Fee Statement.  With respect to the September Fee Statement, the Togut Firm received a payment of $151,077.27, representing 80% of the compensation requested (or $149,482.40) and 100% of the expense reimbursement sought (or $1,594.87).  With respect to the October Fee Statement, the Togut Firm received a payment of $210,527.62, representing 80% of the compensation requested (or $207,484.80) and 100% of the expense reimbursement sought (or $3,042.82).  With respect to the November Fee Statement, the Togut Firm received a payment of $227,339.90 representing 80% of the compensation requested (or $224,513.20) and 100% of the expense reimbursement sought (or $2,824.70). To date, the Togut Firm has not received payment on account of its December 2017 Fee Statement

**B.**    **Prior Interim Fee Applications and Awards.**

        11.    On October 17, 2016, the Togut Firm filed its First Application for Allowance of Interim Compensation [Dkt. No. 1411] (the "First Application") for the period April 21, 2016 through August 31, 2016 (the "First Interim Period"), requesting fees in the amount of $1,700,540.00 and expense reimbursement in the amount of $9,311.75.  The First Application was approved by the Court, subject to a twenty (20%) percent holdback as to fees in the amount of $340,108 (the "First Interim Holdback"),

---

[4]    To date, the Togut Firm has not received any objections to its Monthly Fee Statements.

pursuant to the Order dated December 1, 2016 [Dkt. No. 1711] (the "First Interim Fee Order").

12.     On February 14, 2017, the Togut Firm filed its Second Application for Allowance of Interim Compensation [Dkt. No. 2460] (the "Second Application") for the period September 1, 2016 through December 31, 2016 (the "Second Interim Period"), requesting fees in the amount of $1,476,434.50 and expense reimbursement in the amount of $13,188.51. The Second Application was approved by the Court, subject to a twenty-percent (20%) holdback as to fees in the amount of $147,643.45 (the "Second Interim Holdback"), pursuant to the Order dated March 28, 2017 [Dkt. No. 2663] (the "Second Interim Fee Order").

13.     On June 14, 2017, the Togut Firm filed its Third Application for Allowance of Interim Compensation [Dkt. No. 3347] (the "Third Application") for the period January 1, 2017 through April 30, 2017 (the "Third Interim Period"), requesting fees in the amount of $1,015,041.50 and expense reimbursement in the amount of $11,923.34. The Third Application was approved by the Court, subject to a twenty (20) percent holdback as to fees in the amount of $203,008.30 (the "Third Interim Holdback"), pursuant to the Order dated August 14, 2017 [Dkt. No. 3873] (the "Third Interim Fee Order").

14.     On October 16, 2017, the Togut Firm filed its Fourth Application for Allowance of Interim Compensation [Dkt. No. 4156] (the "Fourth Application") for the period May 1, 2017 through August 31, 2017 (the "Fourth Interim Period"), requesting fees in the amount of $1,325,311.50 and expense reimbursement in the amount of $14,879.54. The Fourth Application was approved by the Court, subject to a twenty (20) percent holdback as to fees in the amount of $132,531.15 (the "Fourth Interim Holdback" and, together with the First Interim Holdback, the Second Interim Holdback

8

and the Third Interim Holdback, the "Holdbacks"), pursuant to the Order dated November 17, 2017 [Dkt. No. 4343] (the "Fourth Interim Fee Order" and, together with the First Interim Fee Order, the Second Interim Fee Order and the Third Interim Fee Order, the "Prior Interim Fee Orders").

15.     As set forth in the Certification of Frank A. Oswald, a member of the Togut Firm, attached hereto as Exhibit "3," all of the services rendered during the Fifth Interim Period for which interim compensation is sought herein were rendered for, and on behalf of, the Debtors in connection with these Chapter 11 cases.

## C.     Final Allowance of Compensation and Expenses.

16.     In addition to seeking approval of the compensation earned and expenses incurred during the Fifth Interim Period, the Togut Firm seeks final allowance of all compensation and reimbursement of expenses previously awarded by this Court pursuant to the Prior Interim Fee Orders aggregating $5,516,327.50 in fees and $49,303.15 in expenses.  The unpaid Holdbacks aggregate $764,997.05,  (the "Unpaid Holdbacks").  At the Debtors' request, in aid of facilitating a plan settlement with the Official Committee of Unsecured Creditors, the Togut Firm voluntarily agreed to reduce its Unpaid Holdbacks by $100,000 (such reduced amount, the "Net Unpaid Holdbacks").

## BACKGROUND

17.     Beginning on April 21, 2016 (the "Initial Petition Date"),[5] SUNE and twenty-five affiliated entities commenced voluntary cases under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of

---

[5] Capitalized terms not otherwise defined herein shall have the meaning set forth in the *Declaration of Patrick M. Cook, Vice President – Capital Markets and Corporate Finance of SunEdison, Inc., and its affiliated Debtors, In Support of Chapter 11 Petitions and First Day Pleadings*, filed on the Initial Petition Date [Dkt. No. 4, Case No. 16-10992 (SMB)] (the "First Day Declaration").

New York (the "Bankruptcy Court").  Since the Initial Petition Date, twenty-five (25)

additional Debtors have filed voluntary petitions on various dates (together with the

Initial Petition Date, the "Petition Dates").

18.    The Debtors continue to operate their businesses and manage their

properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.  The Debtors' cases (collectively, the "Chapter 11 Cases") have

been consolidated for procedural purposes only and are being jointly administered

under case number 16-10992 (SMB).

19.    On April 29, 2016, the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Committee").  To date, no trustee or examiner

has been appointed in the Debtors' Chapter 11 Cases.

20.    On March 28, 2017, the Debtors filed their *Joint Plan of

Reorganization of SunEdison, Inc. and its Debtor Affiliates* [Dkt. No. 2671] (as amended, the

"Plan") and corresponding disclosure statement [Dkt. No. 2672] (the "Disclosure

Statement"), each of which has been amended.  Pursuant to an Order of this Court

dated June 13, 2017 [Dkt. No. 3319], the Debtors' Amended Disclosure Statement dated

as of June 12, 2017 was approved [Dkt. No. 3314].  The Plan was confirmed by Order of

this Court dated July 28, 2017 [Dkt. No. 3735].  The Plan's Effective Date occurred on

December 29, 2017.  *See* Dkt. No. 4495.

21.    Additional factual background and information regarding the

Debtors, including their business operations, their corporate and capital structures, the

events leading to these Chapter 11 Cases and the Plan, is set forth in the First Day

Declaration and the Disclosure Statement.

10

## RETENTION OF THE TOGUT FIRM

22.     Pursuant to an Order dated June 8, 2016 [Docket. No. 551], the

Togut Firm was authorized to serve as co-counsel to the Debtors, *nunc pro tunc* to the

Initial Petition Date.

23.     In considering this Application, it should be noted that the Togut

Firm is a highly specialized "boutique"; its practice is limited, almost exclusively, to

insolvency and bankruptcy matters pending in this Court.  The Togut Firm has

considerable experience in representing debtors in Chapter 11 cases and has likewise

acted in a professional capacity in hundreds of cases representing the interests of

trustees, debtors, creditors' committees and secured creditors.

24.     For thirty-seven years, the Togut Firm has been actively involved in

numerous major Chapter 11 cases, and has represented debtors and official committees

in many cases, including, without limitation:  *In re Pacific Drilling S.A.*, Case No. 17-

13193 (MEW);  *In re Westinghouse Electric Company, LLC*, Case No. 17-10751 (MEW);  *In

re Toisa Limited*, Case No. 17-10184 (SCC);  *In re Aèropostale, Inc.*, Case No. 16-11275

(SHL);  *In re Relativity Fashion LLC*, Case No. 15-11989 (MEW);  *In re Dewey & LeBoeuf,

LLP*, Case No. 12-12321 (MG);  *In re AMR Corp.*, Case No. 11-15463 (SHL);  *In re Eastman

Kodak Company, et al*, Case No. 12-10202 (ALG);  *In re Grubb & Ellis Company, et al.*, Case

No. 12-10685 (MG);  *In re The Great Atlantic & Pacific Tea Company, Inc. (A&P), et al.*, Case

No. 10-24549 (RDD);  *In re Loehmann's Holdings, Inc., et al.*, Case No. 10-16077 (REG);  *In

re GSC Group, Inc., et al.*, Case No. 10-14653 (AJG);  *In re AbitibiBowater Inc., et al.*, Case

No. 09-11296 (KJC);  *In re Neff Corp., et al.*, Case No. 10-12610 (SCC);  *In re Motors

Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG);  *In

re Charter Communications, Inc., et al.*, Case No. 09-11435 (JMP);  *In re Frontier Airlines

Holdings, Inc., et al.*, Case No. 08-11298 (RDD);  *In re Old Carco LLC (f/k/a Chrysler LLC), et

11

*al.*, Case No. 09-50002 (AJG); *In re Tronox Incorporated, et al.*, Case No. 09-10156 (ALG);

*In re Cabrini Medical Center*, Case No. 09-14398 (ALG); *In re FFJS (f/k/a Fortunoff Fine*

*Jewelry and Silverware, LLC)*, Case No. 08-10353 (JMP); *In re DJK Residential LLC*, Case

No. 08- 10375 (JMP); *In re Our Lady of Mercy Medical Center*, Case No. 07-10609 (REG);

*In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC); *In re Satélites Mexicanos*

*S.A. de C.V.*, Case No. 06-11866 (RDD); *In re Saint Vincent's Catholic Medical Centers of*

*New York*, Case No. 05-14945 (CMG); *In re Delphi Corp.*, Case No. 05-44481 (RDD); *In re*

*Tower Automotive, Inc.*, Case No. 05-10578 (ALG); *In re Enron Corp., et al.*, Case No. 01-

16034 (ALG); *In re Golden Books Family Entertainment, Inc.*, Case No. 01-1920 (ALG); *In*

*re Allegiance Telecom, Inc.*, Case No. 03-13057 (RDD); *In re Ames Department Stores*, Case

No. 01-42217 (REG); *In re Loews Cineplex Entertainment Corp.*, Case No. 01-40346 (ALG);

*In re Onsite Access, Inc.*, Case No. 01-12879 (RDD); *In re Daewoo International (America)*

*Corp.*, Case No. 00-11050 (BRL); *In re Contifinancial Corp.*, Case No. 00-12184 (AJG); *In re*

*Lois/USA, Inc.*, Case No. 99-45910 (REG); *In re Acme Metals Incorporated*, Case No. 98-

2179 (MFW); and *In re Rockefeller Center Properties*, Case No. 95-420789 (PCB).

25.     Albert Togut, the senior and founding member of the Togut Firm,

who has overseen the services required by the Debtors, has concentrated in bankruptcy

law for approximately 40 years.  Mr. Togut has written and lectured on many topics

under the former Bankruptcy Act and the Bankruptcy Code.  He is a Fellow of the

American College of Bankruptcy, a member of the International Insolvency Institute,

and an officer of the American Bankruptcy Institute ("ABI").  He co-chaired ABI's

Chapter 11 reform commission in its three-year study of the Bankruptcy Code.

26.     Frank A. Oswald, a member of the Togut Firm who has supervised

the day-to-day services required by the Debtors, has been with the Togut Firm since

1986.  Mr. Oswald received his J.D. from New York Law School, where he was an editor

of the Journal of International and Comparative Law.  Mr. Oswald interned with the Honorable Conrad B. Duberstein, Chief Bankruptcy Judge for the Eastern District of New York, and for the Honorable Cecilia H. Goetz, also a bankruptcy judge in that Court.  Mr. Oswald is a member of ABI, the Turnaround Management Association, the Association of Insolvency and Restructuring Advisors, and the New York Institute for Credit, as well as the American and New York State Bar Associations.

27.    Scott E. Ratner has been with the Togut Firm since 1996 and is a member.  Mr. Ratner received his J.D. from the University of Pennsylvania Law School, where he was an editor of the Law Review.

28.    Certain of the Togut Firm's associates have clerked for judges, and all of them are members in good standing of the bar.  The paraprofessionals employed by the Togut Firm are all college graduates.  Paraprofessionals are billed based upon their experience;  recent graduates are billed at lower hourly rates than those with more experience.

29.    Most of the professional services rendered by the Togut Firm for the Debtors during the Fifth Interim Period were rendered by Messrs. Oswald, Ratner and Brian Moore, a senior counsel at the Togut Firm, along with Anthony De Leo, an associate at the Togut Firm.  Given the speed and complexity of these Chapter 11 Cases, more senior and experienced attorneys, out of necessity, had to be involved during the early phases of these cases.  In connection with its claims and *de minimis* asset sales work, the Togut Firm was able to use mid-level and junior associates.

30.    To the extent that less complicated work requiring a lesser degree of experience and expertise had to be performed, such services were rendered by junior associates and/or paraprofessionals employed by the Togut Firm.

13

31.     It is believed that the work encompassed by this Application for which compensation is sought was performed efficiently.  All of the tasks summarized in this Application were performed in such a manner as to avoid unnecessary duplication of services in an effort to keep the administration expenses to these estates to a minimum.

## SUMMARY OF LEGAL SERVICES RENDERED

32.     The following is a summary description of the primary services rendered by the Togut Firm during the Fifth Interim Period that highlights the benefits conferred upon the Debtors and their respective estates and creditors.  All of the professional services rendered by the Togut Firm are set forth in the computerized time records maintained by the Togut Firm and annexed to the Monthly Fee Statements, and the Court is respectfully referred to those records for the detail of all work performed by the Applicant on behalf of the Debtors during the Fifth Interim Period.

33.     The Togut Firm has rendered extensive professional services on behalf of the Debtors during the Fifth Interim Period covering a myriad of matters. These Chapter 11 Cases have required thoughtful effort by the attorneys and paraprofessionals of the Togut Firm, as the Debtors have encountered numerous legal and logistical challenges.  Whenever possible, as demonstrated in the summary of services below, potential disputes have been resolved without judicial intervention.

34.     During the Fifth Interim Period, the Togut Firm devoted a substantial amount of time rendering legal services to the Debtors regarding multiple Assigned Matters, a sampling of which are described below.

**A.     *De Minimis* Asset Sales:**

35.     During the Fifth Interim Period, the Togut Firm continued to assist the Debtors as needed in connection with the sale of certain *de minimis* assets in

accordance with the *Order Pursuant To Bankruptcy Code Sections 105(a), 363(b), And 541(a)(1) And Bankruptcy Rules 2002, 6004, And 9006 Authorizing And Approving Procedures For (A) The Sale Or Transfer Of De Minimis Assets; And (B) Taking Corporate Action In Connection Therewith* [Dkt. No. 781] previously entered by the Court.

36.     The Togut Firm assisted the Debtors in connection with their entry into a Bill of Sale and Assignment Agreement (the "Bill of Sale") with Kismet Consulting LLC ("Kismet"), pursuant to which the Debtors sold certain residential solar equipment and assigned related customer contracts to Kismet for $491,000.  Roof RX, Inc., a competing bidder for the assets set forth in the Bill of Sale ("RoofRX") filed an objection [Dkt. No. 4184] (the "RRx Objection") to the proposed transaction with Kismet, on grounds that the sale process improperly favored Kismet.  Additionally, RoofRX indicated to the Debtors that it might be willing to make a higher offer for the assets sought in the Bill of Sale.  With assistance from the Togut Firm, the Debtors prepared and filed the supplemental declaration of David Ringhofer in support of the sale process and the Debtors' decision to select Kismet as the successful bidder.  *See* Dkt. No. 4356.  Ultimately, RoofRX could not demonstrate its financial wherewithal to close on its higher offer, and the Debtors continued their efforts to seek approval of the transaction with Kismet.  An Order authorizing the Debtors to enter into the Bill of Sale with Kismet over the RRx Objection was entered on December 1, 2017.  *See* Dkt. No. 4387.

37.     The Togut Firm also assisted the Debtors in connection with their entry into Amendment No. 1 (the "Amendment") to the asset purchase agreement with Complete Solar, Inc. ("Complete Solar"), including the Debtors' efforts to obtain Bankruptcy Court approval of same.  Pursuant to the Amendment the Debtors agreed to sell certain residential solar units and assign the relevant customer contracts to

Complete Solar in exchange for $177,574.  On December 21, 2017, LA Solar Group, Inc.

("LA Solar") objected to the Debtors' assignment of thirteen (13) customer contracts,

which LA Solar believes it owns (the "Disputed Contracts").  On January 16, 2018, the

Court entered an Order [Dkt. No. 4552] authorizing the Debtors to enter into the

Amendment with Complete Solar, except as to the Disputed Contracts.  The Togut Firm

has been advising the Debtors in connection with LA Solar's objection and resolution of

the dispute among the parties with respect to the Disputed Contracts.

38.     The Togut Firm also counseled the Debtors in connection with

(i) share purchase agreements to transfer Indian subsidiary to third parties and wind

down Indian operations and (ii) sale of certain *de minimis* assets in connection with the

closing of the Debtors' Pasadena, Texas polysilicon plant.

**B.     Sherman, Texas Property Sale:**

39.     The Togut Firm assisted the Debtors in connection with the

negotiation of a Purchase and Sale Agreement by and between SUNE and Corning

Research & Development Corporation ("Corning"), subject to higher and better offers

and certain other contingencies, pursuant to which SUNE agreed to sell Corning certain

real property situated in the City of Sherman, Grayson County, Texas (the "Texas

Property") for $21 million.  The Togut Firm also prepared and filed motion papers

seeking the Bankruptcy Court's approval of bidding procedures in connection with the

sale of the Texas Property, as well as the Court's ultimate approval of the sale.   The

Bankruptcy Court entered an Order approving bidding procedures in connection with

the sale on October 5, 2017 [Docket No. 4111] (the "Texas Property Bidding Procedures

Order").  On the same day, Corning provided the Debtors with the results of its Phase II

environmental assessment with respect to the Texas Property (the "Phase II

Assessment"), which Corning asserted constituted grounds to terminate the purchase

16

and sale agreement.  The Debtors shared the Phase II Assessment with other active

bidders for the Texas Property, with Corning's permission.  Corning formally delivered

a letter to the Debtors terminating the agreement on October 17, 2017.

40.    Although the Debtors did not concede that a termination event

with respect to their agreement with Corning occurred, the Debtors, in consultation

with the Togut Firm, determined to proceed with the auction process without Corning

in light of the presence of multiple active bidders who continued to express interest in

the Texas Property after having received copies of the Phase II Assessment.  Ultimately,

two parties submitted bids for the Texas Property:  (i) Finisar Corporation ("Finisar");

and (ii) Juvat, LLC ("Juvat").  Finisar's bid for the Texas Property complied with the

Texas Property Bidding Procedures Order in all respects, except that its bid was for $18

million, $3 million less than the purchase price in the Debtors' agreement with Corning.

Juvat's bid failed to comply with the bid procedures approved in the Texas Property

Bidding Procedures Order in a number of respects, specifically:  (i) the bid was not

accompanied by a deposit, and Juvat unilaterally stated it intended to remit a deposit of

half of what was required under the bidding procedures ($250,000 versus $500,000);

and (ii) the bid was not accompanied by sufficient documentation to assess Juvat's

financial wherewithal to close on the sale of the Texas Property or even the identity of

Juvat's principals.  As such, the Debtors had serious concerns regarding Juvat's ability

to consummate and close on a sale of the Texas Property.

41.    In light of the Debtors' concerns regarding Juvat's ability to close,

the Debtors, in consultation with the Togut Firm, approached Finisar indicating that it

might be willing to cancel the auction and declare Finisar the winning bidder for the

Texas Property if Finisar agreed to sufficiently increase its bid.  Finisar agreed to raise

its bid to $20 million, and the Debtors elected to cancel the auction and declare Finisar the successful bidder for the Texas Property.

42.    The Debtors promptly notified Juvat that the auction had been cancelled, but nevertheless, Juvat submitted a package of documents in support of an increased $24 million bid on October 23, 2017 (the "October 23 Submission").  However, the October 23 Submission did little to assuage the Debtors' concerns regarding Juvat's ability to close.  As such, the Debtors, in their business judgment, decided to accept Finisar's $20 million bid for the Texas Property.

43.    On October 23, 2017, Juvat filed an objection to the sale of the Texas Property [Docket No. 4188] (the "Juvat Objection").  The Togut Firm counseled the Debtors with respect to responding to the Juvat Objection and obtaining the Bankruptcy Court's approval of the sale of the Texas Property to Finisar over same.  Specifically, the Togut Firm worked with Skadden and the Debtors' other professionals (particularly, Matthew Bordwin of Keen-Summit Capital Partners LLC, a real estate broker for the Debtors) to assist the Debtors in the preparation and filing of two declarations in support of the sale to Finisar:  (i) the declaration of John S. Dubel, the Debtors' Chief Restructuring Officer [Docket No. 4189];  and (ii) the declaration of Matthew Bordwin, the Debtors' real estate broker [Docket No. 4190], each of which were dated October 23, 2017.  Additionally, the Togut Firm supported Skadden at the October 24, 2017 hearing to approve the sale of the Texas Property to Finisar, at which hearing the Juvat Objection was overruled and the sale to Finisar was approved.  The sale of the Texas Property to Finisar closed in or around November 2017.

**C.    Executory Contract Issues:**

44.    During the Fifth Interim Period, the Togut Firm also provided counsel to the Debtors with regard to a number of disputes arising from the Debtors' executory contracts.

45.    The Togut Firm also assisted the Debtors in the identification of executory contracts for rejection and prepared and filed omnibus notices of contract rejection.  The Togut Firm responded to contract counterparty inquiries as received.

**D.    The Debtors' Monthly Operating Reports:**

46.    The Togut Firm, together with the Debtors' financial advisors, PricewaterhouseCoopers, LLP ("PwC"), counseled and assisted the Debtors concerning the preparation and filing of the Debtors' Monthly Operating Reports.

47.    Also during the Fifth Interim Fee Period, the Togut Firm communicated regularly with the office of the United States Trustee regarding modifications to, and the timing of the filing of, the Monthly Operating Reports and, as a result of such coordination, obtained modifications to certain of the filing requirements as needed by the Debtors.

**E.    Professional Retentions:**

48.    During the Fifth Interim Period, the Togut Firm reviewed, coordinated and obtained authorization for amended engagements for Eversheds Sutherland as special U.K. counsel, which were approved by Order dated December 11, 2017 [Docket No. 4421].

49.    The Togut Firm also assisted the Debtors with their review of the various fee statements and interim fee applications filed by the Debtors' other professionals, as well as those retained by the Committee, to ensure that administrative expenses are reasonable and kept to a minimum.

19

**F.     Surety Issues:**

50.     The Togut Firm was assigned the task of reviewing, analyzing and investigating claims asserted by, as well as inquiries from, the Debtors' existing surety bond providers and contract counterparties in connection with the Debtors' numerous bonded projects.  During the Fifth Interim Period, the Togut Firm addressed numerous surety related matters, assisting the Debtors in reviewing contractor and surety claims involving applicable non-bankruptcy lien law, as well as negotiating with the underlying sureties in connection with certain claims asserted against them.

**G.     Claims Reconciliation and Objections:**

51.     The lion's share of the Togut Firm's work during the Fifth Interim Period was in connection with the review of administrative, secured and priority claims filed against the Debtors.

52.     The Togut Firm worked tirelessly with PwC and the Debtors' in-house personnel to evaluate many of the more than 6,000 claims in these Chapter 11 Cases.  These efforts included:

- o Counseling, advising and assisting the Debtors in settlement negotiations concerning alleged *ad valorem* or other priority/secured tax claims, including but not limited to tax claims asserted by Harris County and Grayson County, Texas.

- o Assisting PwC in identifying collateral securing purported secured claims, as well as the validity of asserted secured interests.

- o Coordinating with PwC to analyze various high-priority claims (administrative, secured, 503(b)(9) and tax claims) identified by PwC, including grounds for objection.

- o Assisting the Debtors in negotiating a settlement in principal regarding the $28 million administrative expense claim asserted by Newmark Grubb Knight Frank ("Newmark") in connection with certain alleged finder's fees for large-scale solar projects.

- o Prosecuting omnibus objections to certain amended or duplicative claims, claims rightly asserted against a non-Debtor entity and claims for which

there is no supporting documentation, as well as certain objectionable claims identified by PwC and the Debtors as high priority.

o   Prosecuting motions to reclassify certain claims wrongly asserting priority status, as well as claims based on the purchase or sale of the Debtors' or their affiliates' securities, which are subject to mandatory subordination under the Bankruptcy Code.

o   Assisting PwC and the Debtors' tax professionals in reviewing, reconciling and objecting to tax claims on various grounds (*e.g.*, the company is not liable to the applicable taxing authority for unpaid taxes, or the tax obligations are rightly asserted against a non-debtor entity).

o   Assisting PwC in reviewing, reconciling and objecting to claims asserted by current and former employees, including but not limited to claims asserted by certain C&I employees for commissions allegedly due and owing under sales commission plans that are the subject of the C&I Litigation (defined and discussed below), certain former First Wind executives for payments allegedly due and owing under Corporate Bonus Plan, and Senior Management Incentive Plan.

o   Assisting PwC and the Debtors' customs professionals in reviewing, reconciling and objecting to claims for allegedly unpaid United States Customs duties, which were filed by the United States Customs and Border Protection, as well as the Debtors' customs agent.

o   Prosecuting motions to reclassify certain claims as Intercompany Claims under the Debtors' Chapter 11 Plan.

o   Prosecuting objections to certain claims that have been paid in the ordinary course of business or pursuant to an Order of the Bankruptcy Court.

53.    During the Fifth Interim Period, the Togut Firm, with assistance

from PwC, prepared and filed sixteen (16) omnibus objections to:  (i) amended claims;

(ii) duplicate claims;  (iii) claims rightly asserted against non-debtor entities;  (iv) late-

filed claims;  (v) claims that were asserted in excess of the maximum priority amounts

set forth in section 507 of the Bankruptcy Code;  (vi) claims that were satisfied in the

ordinary course of the Debtors' business or pursuant to an Order of the Bankruptcy

Court;  and (vii) claims that were inadvertently listed on the Debtors' Schedules of

Assets and Liabilities.

54.    In addition, during the Fifth Interim Period, the Togut Firm, with assistance from PwC, prepared and filed twenty-four (24) motions to reclassify claims based on the following:  (i) the claims improperly asserted priority amounts under sections 503 and/or 507 of the Bankruptcy Code;  (ii) the claims were subject to mandatory subordination and/or reclassification under section 510(b) of the Bankruptcy Code;  (iii) the claims were rightly asserted as Intercompany Claims under the Debtors' chapter 11 plan;  and (iv) the claims improperly asserted secured status.

55.    Finally, during the Fifth Interim Period, the Togut Firm, with assistance from PwC, prepared and filed thirteen (13) objections to individual tax, employee, and vendor claims, as well as claims asserted by United States Customs and Border Protection and the Debtors' customs broker, Avalon Risk Management.

56.    The Togut Firm's and PwC's efforts to date with respect to the claims reconciliation and objection process has resulted in the disallowance and expungement or reclassification of thousands of claims asserted against the Debtors, and has reduced the claims pool by hundreds of millions of dollars.

**H.    Accounts Receivable Collection Matters:**

57.    During the Fifth Interim Period, the Togut Firm assisted the Debtors in collecting various outstanding accounts receivable, including advising and assisting the Debtors with collection issues concerning Shinsung Solar Energy Co., Ltd. ("Shinsung") and Woongjin Energy Co., Ltd. ("Woongjin"). During the Fifth Interim Period, the Togut Firm continued discussions with counsel for Woongjin to resolve certain issues regarding an Order of Attachment entered in the Seoul Central District Court in Korea, which enjoined Shinsung from paying approximately $4.5 million in outstanding receivables owed to the Debtors (the "Receivable").  Those issues have

since been resolved, and Shinsung paid the balance of the Receivable to the Debtors in December 2017.

## I.      Case Status/Strategy:

58.      Critical to the efficient performance of its role as bankruptcy co-counsel, the Togut Firm was in regular communications with the Debtors and their other legal and financial advisors, the attorneys and financial advisors for each of the DIP Lenders and the Committee, and representatives of the United States Trustee's Office, so that the Togut Firm's attorneys remained familiar with the status of the Chapter 11 Cases and, in particular, the Assigned Matters.  The Togut Firm also continued to keep the Debtors and their other professionals, as well as those of other parties-in-interest, informed regarding the status of the Assigned Matters.

## J.      Stewart Appeal:

59.      On May 4, 2017, Kenneth R. Stewart filed notice of an appeal from the Court's *Order Denying Motions of Kenneth R. Stewart to be a Secured Creditor with Prejudice,* dated April 25, 2017 [Dkt. No. 2842].  Mr. Stewart did not seek a stay pending appeal.  Mr. Stewart filed his appellant's brief in the District Court on August 24, 2017.  In essence, Mr. Stewart asserted that the Court had denied him due process by failing to consider evidence he presented concerning his status as a secured creditor of the Debtors

60.      Mr. Stewart failed to submit a designation of the record as required by Bankruptcy Rule 8009, and as such, the Togut Firm undertook to submit a thorough counter designation of materials in the record related to Mr. Stewart's appeal.

61.      The Togut Firm prepared and filed the Debtors' appellate brief on September 25, 2017.  In connection therewith, the Togut Firm communicated with counsel to the lenders and filed multiple letters with the District Court.  On October 10,

2017, Mr. Stewart filed his reply brief.  On December 21, 2017, the District Court entered

an Order based on the briefing, affirming the Bankruptcy Court's ruling.  Mr. Stewart

did not take a further appeal.

**K.**    **Other Matters Tasked to the Togut Firm:**

(i)    The C&I Litigation.

62.    On May 5, 2017, four former employees of the Debtors filed a

breach of contract action in the Superior Court of the State of California, San Francisco

County, styled as *Sam Youneszadeh et al. v. SunEdison, Inc. et al.,* case number CGC 17-

558686 (the "C&I Litigation").  Specifically, in the C&I Litigation, plaintiffs allege that

they are owed commissions pursuant to an agreement with Defendants SunEdison, Inc.

and NVT, LLC related to solar sales.  The plaintiffs claim that the defendants breached

these agreements and breached the covenant of good faith and fair dealing.  The

plaintiffs further claim that their consent and participation was necessary for the sale

and transfer of their unit during the bankruptcy process, and that the pending sales

subject to the alleged contract were funded and approved by the Court.  The Debtors

dispute these contentions.

63.    During the Fifth Interim Period, the Togut Firm coordinated with

the Debtors' California counsel, to prepare and filed a motion to remove the

Commission Litigation to the United States District Court for the Northern District of

California on the basis of federal question jurisdiction.

64.    On September 18, 2017, the Debtors filed a motion to transfer venue

to the United States Bankruptcy Court for the Southern District of New York.  A hearing

has been set for October 26, 2017.  The plaintiffs' opposition was due on October 2, 2017;

they failed to timely file any opposition.  On October 18, 2017, the United States District

Court for the Northern District of California granted the Debtors' motion;  the matter

24

was removed and venue was transferred to the United States Bankruptcy Court for the Southern District of New York.

65.    Throughout this time, the Togut Firm, together with the Debtors' California counsel, have engaged plaintiffs and their counsel in settlement discussions to try to resolve the dispute.  As of the Effective Date, this matter was and remains pending.

(ii)    <u>The Avkem Litigation</u>.

66.    On June 14, 2017, Avkem International, LLC ("<u>Avkem</u>") filed a complaint against Debtor MEMC Pasadena, Inc. ("<u>MEMC</u>") in this Court.  The complaint asserts a cause of action for constructive trust related to an alleged inadvertent overpayment of approximately $175,000 by Avkem to MEMC that occurred prior to the Initial Petition Date.  During the Fifth Interim Period, following its diligence with the Debtors, the Togut Firm took the laboring oar on researching and drafting a motion to dismiss the complaint, which was filed on August 28, 2017.  The Togut Firm engaged in discussions with plaintiff's counsel and reached a favorable settlement of same, subject to Bankruptcy Court approval.

(iii)    <u>Nauto, Inc</u>.

67.    During the Fifth Interim Period, the Togut Firm conducted diligence concerning the Debtors' equity interest in Nauto, Inc. ("<u>Nauto</u>") and potential dilution of that interest due to Nauto's recapitalization.  As part of this undertaking, the Togut Firm communicated with representatives of Nauto concerning information requests through which the Debtors seek information that would enable them (a) to evaluate their position in the capital table and assess the current value of their interest in Nauto;  and (b) to ascertain whether any wrongdoing occurred in connection with Nauto's Series B financing.

25

    (iv)    <u>Residential Receivable Matters</u>.

68.    During the Fifth Interim Period, the Togut Firm has assisted the Debtors with collecting various accounts receivable, including advising and assisting the Debtors with collection issues concerning customers whose accounts receivable were no longer subject to collection by Flextronics International USA, Inc. pursuant to the September 6, 2016 Transitional Services Agreement.  Following the preparation and mailing of dozens of demand letters, the Togut Firm has engaged in ongoing discussions with parties and counsel for certain of the demand letter recipients concerning outstanding balances as reflected in the Debtors' books and records.

    (v)    <u>EverStream Solar Infrastructure Fund I LP</u>.

69.    During the Fifth Interim Period, the Togut Firm continued to conduct diligence concerning the Debtors' interest in EverStream Solar Infrastructure Fund I LP  (the "<u>EverStream Fund</u>").  In this connection, the Togut Firm completed their review of the documents produced by the EverStream Fund, EverStream Solar Infrastructure Fund I, G.P. LP, and EverStream Energy Capital Management LLC (together, "<u>Everstream</u>") pursuant to Bankruptcy Rule 2004.  During this time, the Togut Firm communicated regularly with Debtors and conducted related legal research. The Togut Firm also prepared a memorandum analyzing potential claims against EverStream and defenses thereto in light of the EverStream document production.

## COMPENSATION REQUESTED

70.    There are numerous factors to be considered by the Court in determining allowances of compensation.  *See, e.g., In re First Colonial Corp. of Am.*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *In re Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991).  *See also In re Nine Assocs., Inc.*, 76 B.R. 943 (S.D.N.Y. 1987);  *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

71.    The perspective from which an application for an allowance of compensation should be viewed in a bankruptcy case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11.    Contrary language in the Senate report accompanying S.2266 is rejected, and Massachusetts Mutual Life Insurance Company v. Brock, 405 F.2d 429, 432 (5th Cir. 1968) is overruled.  Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 CONG. REC. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re McCombs*, 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991) (*"Drexel Burnham"*);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Pub. Serv. Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

72.    In awarding compensation pursuant to section 330 of the Bankruptcy Code to professional persons employed under section 327 of the Bankruptcy Code, the Court must take into account, among other factors, the cost of comparable non-bankruptcy services.  Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

> (A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person;  and

27

(B)    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

73.    As the court in *Drexel Burnham* stated:

> With due recognition of the historical position of Bankruptcy
> Courts in compensation matters, we recognize that creditors
> have agreed to pay rates for retained counsel of their choice
> because of the needs of the particular case.  One could posit
> other situations or cases where a presumption of prior
> informed judgment might not be as strong.  Here, however, we
> have a multi-debtor, multi-committee case involving
> sophisticated creditors who have determined that the rates
> charged and tasks undertaken by attorneys are appropriate.
> We should not, and will not, second guess the determination of
> those parties, who are directed by Congress, under the
> Bankruptcy Code, to shape and resolve the case, and who are
> in fact bearing the cost.  To do so, of course, would be to
> continue what Congress specifically intended to stop in 1978:
> Courts, instead of markets, setting rates, with the inevitable
> consequence that all the legal specialists required by the debtor
> or official committees would demur to participate.

*Drexel Burnham*, 133 B.R. at 20-21.

74.    The professional services rendered by the Togut Firm have

required substantial time and effort.  Time and labor devoted is only one of the many

factors to be considered in awarding attorney compensation.  The number of hours

expended must be considered in light of:  (i) the amount of work involved and the

results achieved to date;  (ii) the novelty and difficulty of the questions presented;

(iii) the skill requisite to properly perform the legal services;  (iv) the preclusion of other

employment on behalf of other clients;  (v) the customary fee charged to a private client

for the services rendered;  (vi) awards in similar cases;  (vii) time constraints required

by the exigencies of the case, including the frequency and amount of time required to be

devoted other than during regular business hours;  (viii) the experience, reputation, and

ability of the attorneys rendering services;  and (ix) the nature and length of the

professional relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia*

28

*Highway Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys' fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp. of Am.*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

75.      The majority of the Johnson Factors are codified in section 330(a) of the Bankruptcy Code, and have been applied by various courts in making determinations that requested attorneys' fees constitute reasonable compensation.  It is well settled that the "lodestar method,"[6] as opposed to an application solely of the Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[7] The Supreme Court, however, has clearly articulated that the "lodestar method" is presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy Code.  *Delaware Valley I*, 478 U.S. at 563;  *Cena's Fine Furniture*, 109 B.R. at 581.

76.      The Togut Firm respectfully submits that application of the foregoing criteria more than justifies the compensation requested in this Application . As described above, throughout the Fifth Interim Period and the entire Fee Application Period, the Togut Firm provided extensive services to the Debtors on numerous matters in a highly efficient manner.  Not only was the Togut Firm able to use its extensive

---

[6]    Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *Shaw v. Travelers Indem. Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained.  *In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

[7]    *See e.g., Pennsylvania v. Del. Valley Citizens' Counsel for Clean Air*, 483 U.S. 711 ("*Delaware Valley II*"), on remand, 826 F.2d 238 (3d Cir. 1987);  *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*");  *United States Football League v. Nat'l Football League*, 887 F.2d 408, 413 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990);  *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3d Cir. 1976);  *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990);  *In re Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

bankruptcy expertise to resolve matters at relatively lower hourly rates, but it also enabled the professionals at Skadden to focus on more substantive matters, such as the sale of substantial assets of the Debtors.

77.    The professional services rendered here have been performed by attorneys with broad expertise and high levels of skill in their practice areas or specialty.  This highly professional group of attorneys, working together with Skadden and the Debtors' other professionals, has ensured that these Chapter 11 Cases have progressed in an efficient manner.

78.    Throughout the Fifth Interim Period and the entire Fee Application Period, the Togut Firm has been required to furnish extensive services that have often fully occupied the time of its attorneys.  If this were not a case under the Bankruptcy Code, the Togut Firm would charge the Debtors and expect to receive on a current basis, an amount at least equal to the amounts requested herein for the professionals services rendered.  Consistent with *Appendix B Guidelines for Reviewing Applications in Larger Chapter 11 Cases*, the Togut Firm has provided the Togut Firm's Comparable and Customary Compensation Disclosures at Exhibit "4" and a budget broken down by project category showing a breakdown of the Togut Firm's budgeted expenses for the Fifth Interim Period versus the actual expenses incurred is attached as Exhibit "5."

79.    Pursuant to the criteria normally examined in bankruptcy cases, and based upon the factors to be considered in accordance with section 330 of the Bankruptcy Code, the results that have been achieved throughout the Fifth Interim Period and the entire Fee Application Period, and the Debtors' Chapter 11 Cases more than support compensation in the amounts requested herein.  The services that the Togut Firm has rendered have produced results that have inured to the benefit of the Debtors and their respective estates and creditors, whether by preserving estate assets

by enforcing the automatic stay addressing surety claims, selling *de minimis* assets or retaining professionals necessary to administer these estates. Moreover, the Togut Firm will be required to continue to provide additional services post-Effective Date in connection with the Assigned Matters, and any Conflict Matters that may arise.

80.    In view of the foregoing, the Togut Firm respectfully requests that it be allowed compensation in the amount of $1,066,321.50 for services rendered during the Fifth Interim Period, as well as final allowance of $6,583,649 for services rendered during the entire post-petition Fee Application Period.

81.    In view of the policy underlying sections 330 and 331 of the Bankruptcy Code that attorneys in bankruptcy cases be compensated on parity with attorneys practicing in other fields, it is respectfully submitted that interim compensation should be allowed as requested.

## DISBURSEMENTS

82.    As set forth in Exhibit "2" hereto, the Togut Firm incurred $10,230.77 in expenses in providing professional services during the Fifth Interim Period.

83.    With respect to photocopying expenses, the Togut Firm charges all of its clients $0.10 per page. With respect to facsimile expenses, the Togut Firm excludes charges for incoming facsimile transmissions, and includes charges for long distance outgoing facsimiles at $1.25 per page (there are no local fax charges included in the Togut Firm's disbursements). These charges are intended to cover the Togut Firm's direct operating costs for photocopying and facsimile facilities, which costs are not incorporated into the Togut Firm hourly billing rates. Only clients who actually use photocopying, facsimile, and other office services of the types set forth in Exhibit "2" are separately charged for such service.

31

84.     The effect of including such expenses as part of the hourly billing rates would impose that cost upon clients who do not require extensive photocopying, facsimile, and document production facilities and services.  The amount of the standard photocopying and facsimile charge is intended to allow the Togut Firm to cover the related expenses of its photocopying and telecopying service.  A determination of the actual expenses per page for photocopying and telecopying, however, is dependent on both the volume of copies and the total expenses attributable to photocopying and telecopying on an annual basis.

85.     The time constraints frequently imposed by the circumstances of these cases have required the Togut Firm's attorneys and other employees at times to devote substantial amounts of time during the evenings and on weekends to the performance of legal services on behalf of the Debtors.

86.     Moreover, consistent with firm policy, attorneys and other employees of the Togut Firm who worked late into the evenings were reimbursed for their reasonable meal costs (no more than $20 per dinner) and their cost for transportation home.  The Togut Firm's regular practice is to not include components for those charges in overhead when establishing billing rates and to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of the rendition of services.

87.     These disbursements are not included in the Togut Firm's overhead for the purpose of setting billing rates.  The Togut Firm has made every effort to minimize its disbursements in these cases.  The actual expenses incurred in providing professional services were absolutely necessary, reasonable, and justified under the circumstances to serve the needs of the Debtors, their respective estates and creditors.

32

88.    None of the expenses of the Togut Firm attorneys included herein were for first-class airfare, luxury accommodations, or deluxe meals.

## ATTORNEY STATEMENT PURSUANT TO APPENDIX B GUIDELINES

89.    The following is provided in response to the request for additional information set forth in Paragraph C.5 of the Appendix B Guidelines.

Question:    Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement that were provided during the application period?

Response:    No.

Question:    If the fees sought in this fee application as compared to the fees budgeted for the time period covered by this fee application are higher by 10% or more, did you discuss the reasons for the variation with the client?

Response:    Not applicable.

Question:    Have any of the professionals included in this fee application varied their hourly rate based on the geographic location of the bankruptcy case?

Response:    No.

Question:    Does the fee application include time or fees related to reviewing or revising time records or preparing, reviewing, or revising invoices? (This is limited to work involved in preparing and editing billing records that would not be compensable outside of bankruptcy and does not include reasonable fees for preparing a fee application)  If so, please quantify by hours and fees.

Response:    Although the application includes time for preparing the monthly fee statements the Togut Firm is required to prepare and send the Debtors and other parties-in-interest, the detailed interim narrative describing the Togut Firm's

33

work are also used in preparing the Togut Firm's fee applications, which are publicly

filed documents that are required of estate professionals.  During the Fifth Interim

Period, the time dedicated solely to preparing monthly fee statements was

approximately 6.3 hours, aggregating to $2,838 in fees dedicated to preparing client

monthly fee statements.

Question:    Does this fee application include time or fees for reviewing

time records to redact any privileged or other confidential information? If so, please

quantify by hours and fees.

Response:    No.

Question:    Does the fee application include any rate increases since

retention:

Response:    Yes.  Effective February 1, 2017, the Togut Firm increased its

annual rates.

Question:    Did your client review and approve those rate increases in

advance?

Response:    Yes.

Question:    Did your client agree when retaining the law firm to accept

all future rate increases? If not, did you inform your client that they need not agree to

modified rates or terms in order to have you continue the representation, consistent

with ABA Formal Ethics Opinion 11–458?

Response:    Yes.

## **CONCLUSION**

90.    The legal services summarized by this Application and rendered by

the Togut Firm to the Debtors during the entire Fee Application Period (including the

Fifth Interim Period) were substantial, professional, and beneficial to the Debtors'

estates and creditors.  They were reasonable and necessary to the preservation and maximization of the Debtors' estates.

91.    As demonstrated throughout this Application, the other factors typically considered in determining compensation -- including complexity, results achieved, special expertise, magnitude of the matter, and professional standing -- all militate toward the conclusion that the amount of compensation requested by the Togut Firm is necessary, fair and reasonable.

92.    In light of:  (a) the complexity and exigencies of these Chapter 11 Cases;  (b) the results achieved to date;  (c) the significant contributions made and time devoted, often under severe time constraints and to the preclusion of other matters;  (d) awards of compensation in similar cases;  and (e) other factors pertinent to the allowance of compensation, the Togut Firm believes that the compensation sought herein is fair and reasonable and is authorized under the relevant provisions of the Bankruptcy Code.

93.    All services for which compensation is sought were performed for, and on behalf of, the Debtors and their estates, and not on behalf of any other creditor or party in interest.  The Togut Firm is charging its standard hourly rate for professionals performing services.  The Togut Firm has not entered into any agreement, express or implied, with any other party in interest for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these Chapter 11 Cases.

*[continued on the following page]*

    **WHEREFORE**, the Togut Firm respectfully requests that this Court enter

an order:  (a) awarding the Togut Firm (i) fifth interim compensation and

reimbursement of expenses for the Fifth Interim Period in the amounts of $1,066,321.50

and $10,230.77, respectively;  (b) allowing, on a final basis, compensation in the

aggregate amount of $6,583,649 in compensation of legal fees and $59,533.92 for

reimbursement of expenses, incurred during the entire post-petition Fee Application

Period, including those previously paid to the Togut Firm pursuant to prior Orders of

this Court;  (c) releasing and directing the Debtors to pay all amounts not previously

paid, including the Net Unpaid Holdbacks;  and (d) granting such other and further

relief as this Court deems just and proper.


DATED:  New York, New York
        February 27, 2018

                              TOGUT, SEGAL & SEGAL LLP
                              *Co-Counsel for the Post Confirmation Debtors*
                              By:


                              */s/Frank A. Oswald*
                              FRANK A. OSWALD
                              KYLE J. ORTIZ
                              BRIAN F. MOORE
                              One Penn Plaza, Suite 3335
                              New York, New York 10119
                              (212) 594-5000