UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                   :

In re:                         :          Chapter 11
                                   :

SUNEDISON, INC. *et al.*,       :          Case No. 16-10992 (SMB)
                                   :

       Reorganized Debtors.     :          (Jointly Administered)

------------------------------------------------------X

# MEMORANDUM DECISION AND ORDER REGARDING STANDING OF MAR-BOW VALUE PARTNERS, LLC TO SEEK RELIEF FROM ORDERS BASED ON FRAUD ON THE COURT UNDER RULE 60(d)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE

## A P P E A R A N C E S :

DIAMOND McCARTHY LLP
295 Madison Avenue, 27th Floor
New York, NY 10017

      Allan B. Diamond, Esq.
      Sheryl P. Giugliano, Esq.
      Charles M. Rubio, Esq.
          Of Counsel

STEVEN RHODES CONSULTING, LLC
1610 Arborview Boulevard
Ann Arbor, MI 48103

      Steven Rhodes, Esq.
          Of Counsel

LAW OFFICE OF SHELDON S. TOLL, PLLC
29580 Northwestern Highway, Suite 1000
Southfield, MI 48034

      Sheldon S. Toll, Esq.
          Of Counsel

*Attorneys for Mar-Bow Value Partners, LLC*

SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104

Faith E. Gay, Esq.
Maria Ginzburg, Esq.
David S. Flugman, Esq.
Of Counsel

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

M. Natasha Labovitz, Esq.
Erica Weisgerber, Esq.
Of Counsel

*Attorneys for McKinsey Recovery & Transformation
Services U.S., LLC*

## STUART M. BERNSTEIN
## United States Bankruptcy Judge

Mar-Bow Value Partners, LLC ("Mar-Bow") has moved for relief from Court

orders approving the retention of, and allowing the payment of fees and expenses to,

McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") — the

Debtors' restructuring advisor — under Rule 60(d)(3) of the Federal Rules of Civil

Procedure made applicable to this matter pursuant to Rule 9024 of the Federal Rules of

Bankruptcy Procedure. (*See Motion of Mar-Bow Value Partners, LLC, a Creditor, for

Relief from Orders Under Bankruptcy Rule 9024 and Civil Rule 60(d)(3)*, dated Jan.

22, 2019 ("*Motion*") (ECF Doc. # 5751).)[1]  Mar-Bow alleges that McKinsey RTS

committed a fraud on the court by failing to disclose disqualifying connections to the

Debtors and their estates.  As part of its objection to the *Motion*, (*see McKinsey

Recovery & Transformation Services U.S., LLC's Objection to Mar-Bow Value

Partners, LLC's Motion for Relief from Orders Under Bankruptcy Rule 9024 and Civil

Rule 60(d)(3)*, dated Feb. 21, 2019 ("*Objection*") (ECF Doc. # 5815), McKinsey RTS

---

[1]       "ECF Doc. # _" refers to documents filed on the electronic docket of *In re SunEdison, Inc.*, Case
No. 16-10992 (SMB).

asserts that Mar-Bow lacked standing.  (*See Objection*, Part I.)  The Court carved-out this gating issue for preliminary consideration.

For the reasons that follow, the Court concludes that Mar-Bow lacks standing to prosecute a claim of fraud on the court, and although the Court may nevertheless examine the allegations *sua sponte* and order such relief as it deems appropriate, it declines in the exercise of its discretion to conduct its own investigation and leaves the question of whether and how to investigate Mar-Bow's allegations to the Department of Justice.[2]

## BACKGROUND

Because the merits of the *Motion* are not at issue, the Court focuses on the facts pertaining to Mar-Bow's standing.

### A.    Approval of McKinsey RTS' Retention and Professional Fees

SunEdison, Inc. and certain of its affiliates (collectively, the "Debtors" or "SunEdison") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on April 21, 2016.  *In re SunEdison, Inc.*, 556 B.R. 94, 98 (Bankr. S.D.N.Y. 2016). On May 5, 2016, the Debtors filed an application to employ McKinsey RTS as their restructuring advisor.  The application annexed the *Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of*

---

[2]    This is not a referral under 18 U.S.C. § 3057.

*McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date*, dated May 5, 2016 ("*First Hojnacki Declaration*") (ECF Doc. # 202, Ex. B).)  The declaration was submitted to comply with Federal Bankruptcy Rule 2014(a) which requires that a professional retention application "be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."

The *First Hojnacki Declaration* was unsatisfactory.  In some cases, it identified potentially conflicting connections to a "confidential client" but declined to identify the client.  (*First Hojnacki Declaration* ¶¶ 32, 34, 53, 54.)  It also stated that McKinsey RTS serves clients across and within a broad range of industries in a manner that protects their confidentiality, and thus, "certain of its affiliates may have in the past provided services for, may presently be providing services for, and may in the future provide services for entities that are determined to be creditors, lenders, shareholders, insurers, customers, competitors, vendors, contract counterparties in each case of the Debtors or otherwise Interested Parties named on the Interested Parties List" but to the best of Hojnacki's knowledge, and subject to the disclosures in the declaration, "such services do not focus on direct commercial relationships or transactions between such companies and the Debtors."  (*Id.* ¶ 55.)  In addition, "McKinsey RTS and its affiliates may have business associations with certain of the Debtors' creditors, professionals, service providers, or other Interested Parties, or interests adverse to such creditors, professionals, service providers, or Interested Parties herein, which associations to the

best of my knowledge and information have no connection with these proceedings." (*Id.* ¶ 56.)

The United States Trustee objected to the adequacy of the disclosures.[3]  In response, McKinsey RTS submitted an amended, red-lined declaration that attempted to resolve the United States Trustee's objections.[4]  The *Amended Hojnacki Declaration* identified the names of the "confidential clients" and included other, additional disclosures.  Among other things, McKinsey RTS disclosed that two independently managed affiliates, MIO Partners, Inc. and MIO Partners, (EU), provide services, including investments products, to McKinsey's pension plans, partners, and former partners primarily using third-party managers "essentially on a 'blind trust' basis." (*Amended Hojnacki Declaration* ¶ 67.)  It also revealed that McKinsey & Company, Inc. had refunded fees received from the Debtors within ninety days of the Petition Date and rebilled and collected those fees from non-debtor affiliates.  (*Id.* ¶¶ 22-24.)  Hojnacki subsequently submitted another brief, supplemental declaration that amplified the disclosure of the preference period transactions.[5]

---

[3]      *Objection of the United States Trustee to Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b), and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors Nunc Pro Tunc to the Petition Date*, dated May 12, 2016 (ECF Doc. # 265).

[4]      *Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date*, dated June 6, 2016 ("*Amended Hojnacki Declaration*") (ECF Doc. # 484) (footnote in title omitted).

[5]      *Supplement to Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment*

On June 23, 2016, the Court approved McKinsey RTS' retention.[6] After entry of the *Retention Order*, Hojnacki filed a second supplement to his amended declaration on December 21, 2016[7] and a third supplement on March 20, 2017.[8] Each provided additional disclosures.

On April 11, 2018, the Court entered an order authorizing the Debtors to pay McKinsey RTS $15,023,689.31 as its final and total compensation for professional fees and reimbursement of expenses. (*Omnibus Order Granting Applications for Allowance and Payment of (A) Interim Compensation for Services Rendered During the Fifth Interim Fee Period [and] (B) Final Compensation for Services Rendered During the Entire Case Period*, dated April 11, 2018, sched. B ("*Fee Order*") (ECF Doc. # 5043).)

---

*and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date*, dated June 14, 2016 (ECF Doc. # 586).

[6]        *Order Approving the Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331 and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date,* dated June 23, 2016 ("*Retention Order*") (ECF Doc. # 639).

[7]        *Second Supplement to Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date*, dated Dec. 21, 2016 (ECF Doc. # 1958).

[8]        *Third Supplement to Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date*, dated Mar. 20, 2017 (ECF Doc. # 2614).

### B.    The SunEdison Plan

The Court confirmed the Debtors' *Second Amended Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated July 20, 2017 (the "*Plan*") on July 28, 2017. (*See Findings of Fact, Conclusions of Law and Order Confirming Second Amended Plan of Reorganization of SunEdison, Inc. and Its Debtor Affiliates*, dated July 28, 2017 ("*Confirmation Order*") (ECF Doc. # 3735).) The *Plan*[9] was the product of give and take. The unsecured creditors committee and other unsecured creditors, ostensibly out of the money, had objected to the second lien lenders' claims and sued the second lien lenders. The *Plan* embodied a settlement among the second lien lenders (holding an aggregate $625.2 million in claims) and the unsecured creditors (holding an aggregate $4.692 billion in claims) that divided the roughly $170 million remaining after satisfying the claims of the DIP lenders and administrative and priority creditors. *In re SunEdison, Inc.*, 575 B.R. 220, 225 (Bankr. S.D.N.Y. 2017). Under the settlement, the second lien lenders received an approximate 5.4% distribution and the unsecured creditors received a distribution worth approximately 2.9%. *Id.*

The unsecured creditors did not receive a distribution directly from the Debtors. Instead, the Debtors distributed the value to the GUC/Litigation Trust ("Trust") created under the *Plan*, and the unsecured creditors received *pro rata* interests in the Trust. (*Plan* § 4.4(c).) The assets transferred to the Trust included the estates' causes of action against, *inter alia*, McKinsey RTS. (*Plan*, Ex. 7.6-3, ECF p. 280 of 342).)[10] Except as

---

[9]    A copy of the *Plan* is annexed to the *Confirmation Order* as Exhibit A.

[10]    "ECF p. _" refers to the page number imprinted on the top of the page by the Court's electronic filing system.

otherwise provided in the *Plan*, the balance of the property of the estate vested in the

Reorganized Debtors.  (*Plan* § 11.1; *Confirmation Order* ¶ 4; *see* 11 U.S.C. § 1141(b).)

Finally, the *Plan* cancelled the interests in the ultimate SunEdison parent ("SUNE"), and

the participants in the Debtors' Rights Offering acquired the new common stock of

reorganized SUNE.  (*See Plan* § 6.4.)

The *Plan* became effective on December 29, 2017.  (*Notice of Effective Date of

Confirmed Second Amended Joint Plan of Reorganization of SunEdison, Inc. and Its

Debtor Affiliates*, dated Dec. 29, 2017 (ECF Doc. # 4495).)  As a result, the Debtors

became the Reorganized Debtors, all unsecured claims against the Debtors were

discharged, (*Plan* § 11.2; *Confirmation Order* ¶ HH; *see* 11 U.S.C. § 1141(d)(1)), and the

unsecured creditors holding allowed claims received their *pro rata* interests in the

Trust.

## C.    Mar-Bow

According to Mar-Bow, it acquired four unsecured claims (*see Motion* at p. 1, n.

2) in December 2018.  (*See* Hr'g Tr. 10:4-7, Apr. 2, 2019 ("Tr.") (ECF Doc. # 5887).)[11]

Early in the case and well before Mar-Bow acquired these rights, its attorney, Sheldon S.

Toll PLLC, filed a notice of appearance on behalf of Mar-Bow on May 9, 2016, (*see Entry

of Appearance and Demand for Service of Pleadings and Other Papers* (ECF Doc. #

230)), only four days after the Debtors had filed their application to retain McKinsey

RTS.  According to the receipts generated by the Court's CM/ECF system, Toll is a

---

[11]    Mar-Bow has not provided evidence of its interests and could not have acquired any claims.  By
December 2018, the unsecured claims had been discharged.  I assume Mar-Bow means it acquired its
assignors' interests in the Trust.  At most, therefore, Mar-Bow owns an interest in the Trust.  This
distinction does not affect the analysis.

registered user that received notices of filing and links to all subsequently filed documents.  Hence, Toll received in real time the amended and supplemental disclosures filed by McKinsey RTS, the *Retention Order*, McKinsey RTS' fee applications and the *Fee Order*.

Although Mar-Bow has not explained the reason for Toll's premature notice of appearance on its behalf, I assume it related to Mar-Bow's long-running dispute with McKinsey.  Jay Alix, a present or former competitor of McKinsey RTS in the bankruptcy restructuring field and principal owner of Mar-Bow, contends that McKinsey RTS failed to disclose its connections in at least three cases in which it was retained or seeks to be retained.  In addition to the *SunEdison* cases, they include *In re Alpha Natural Resources, Inc., et al.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.) ("*Alpha*" or "*ANR*") and *In re Westmoreland Coal Company, et al.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.) ("*Westmoreland*").  Mar-Bow has challenged McKinsey RTS' disclosures in those cases and seeks various forms of relief.  In addition, Alix commenced a RICO action, *Alix v. McKinsey & Co., Inc., et al.*, 18-cv-04141 (JMF) (S.D.N.Y.), alleging that "Defendants' racketeering activity was calculated to harm [AlixPartners LLP] by depriving it of valuable consultancy assignments," (Amended Complaint ¶ 4, *Alix v. McKinsey & Co., Inc., et al.*, 18-cv-04141 (JMF) (S.D.N.Y. dated Sept. 4, 2018), ECF Doc. # 73), based, among other things, on the disclosure deficiencies in *Alpha*, *SunEdison* and other bankruptcy cases.  (*See id.* ¶¶ 203-44 (describing disclosure deficiencies in *SunEdison*).)

### D.    The Settlements

The *Westmoreland* Court appointed United States Bankruptcy Judge Marvin Isgur to mediate the outstanding disputes in that case between McKinsey RTS and certain affiliates (collectively, "McKinsey") on the one hand and the United States Trustee Program ("USTP") and Mar-Bow on the other.  Shortly thereafter, all parties agreed to add the *Alpha* and *SunEdison* cases to the mediation.  The *Mediator's Notice to Court*, dated Feb. 19, 2019 (ECF Doc. # 5802), reported that McKinsey and the USTP had reached a settlement, but McKinsey and Mar-Bow had not.  Under the settlement with the USTP, McKinsey agreed to pay $5 million to each of the reorganized debtors in *SunEdison* and *ANR* and the bankruptcy estate in *Westmoreland*, or a total of $15 million, to be "distributed in accordance with the terms of the confirmed plans in those cases or other applicable law."  (*Id.* at ECF p. 4 of 8.)  The settlement provided further that if any of the settlement funds were distributed to McKinsey (because it had acquired an interest in any of the reorganized debtors) it would refund the payment.  Mar-Bow objected to the settlement.

The hearing to approve the settlement was conducted with the participation of the three Courts through videoconferencing.  Mar-Bow withdrew its objections and all three Courts signed the same order approving the settlement.  (*Corrected Order Approving Settlement Agreement Between United States Trustee Program and McKinsey & Company, Inc. and Certain of Its Affiliates*, filed Apr. 19, 2019 (ECF Doc. # 5924).)  The amount of the settlement remained the same, but the distribution provision now said that the settlement proceeds "will be distributed in accordance with terms of the confirmed plans *or further order* in accordance with applicable law."  (*Id.* ¶ 3

(emphasis added).)  The USTP released McKinsey from any liability or further litigation in the three cases as well as several others in which McKinsey RTS had been retained based on the failure to make complete disclosure or fully comply with Rule 2014.  The release did not extend to any claims that McKinsey committed fraud or made a material misrepresentation or a material omission that would have rendered it not "disinterested" or that would have otherwise disqualified it from retention.  (*Id.* ¶ 6.)  Nor did the release affect the claims or rights of any non-party.  (*Id.* ¶ 15.)

Separately, McKinsey reached a settlement with the Trust[12] pursuant to which McKinsey and/or McKinsey RTS agreed to pay the Trust $17.5 million.  (*Trust Settlement* ¶ 1.)  In exchange, the Trust released its causes of action against McKinsey and McKinsey RTS as well as other McKinsey-related parties.  (*Trust Settlement* ¶ 5.)  The *Plan* did not require the Court to approve the settlement and the actual settlement was not disclosed publicly until the April 2, 2019 hearing relating to Mar-Bow's standing.  Based on the two settlements, McKinsey has paid a total of $22.5 million to the Trust and the Reorganized Debtors, or $7.5 million more than the amount of fees it earned in the *SunEdison* cases.

---

[12]    *Stipulation by and Among the SunEdison Litigation Trust and McKinsey & Company, Inc., Certain Subsidiaries and McKinsey Recovery & Transformation Services U.S., LLC Compromising Claims and Causes of Action*, dated Dec. 27, 2018, filed Apr. 4, 2019 ("*Trust Settlement*") (ECF Doc. # 5884).

## DISCUSSION

The *Motion* seeks to vacate the *Retention Order* and the *Fee Order* pursuant to Rule 60(d)(3) of the Federal Rules of Civil Procedure based on fraud on the court.[13]  The *Motion* also seeks to compel McKinsey RTS to disgorge its fees, hold McKinsey liable to the Debtors' estates in the amount of $22,255,246.76 for fraudulent pre-petition billing and collections, order McKinsey RTS to comply with Rule 2014, permit Mar-Bow to take discovery and impose additional remedies that the Court deems appropriate.  (*Motion* ¶ 92.)  As a threshold matter, McKinsey argues that Mar-Bow lacks standing to seek this relief.

Standing is a threshold issue in every federal litigation.  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *accord Allen v. Wright*, 468 U.S. 737, 750-51 (1984).  Constitutional, or Article III standing, "imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."  *Warth v. Seldin*, 422 U.S. at 498.  To establish Article III standing, a party must show (1) an injury in fact that is both concrete and particularized and actual or imminent, rather than conjectural or hypothetical, (2) the injury is "fairly traceable" to the conduct complained of, and (3) it is likely, as opposed to speculative, that the injury

---

[13]     Rule 60(b)(3) provides grounds to vacate a final judgment or order based on fraud, misrepresentation, or misconduct by an opposing party, but requires the motion to be made within one year after the entry of the judgment or order or the date of the proceeding.  Fed. R. Civ. P. 60(c)(1).  Rule 60(d)(3) provides that Rule 60 "does not limit a court's power to . . . set aside a judgment for fraud on the court."

will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *accord Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).  A theory of standing that "relies on a highly attenuated chain of possibilities" does not satisfy constitutional requirements.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *accord St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 696 (2d Cir. 1989) ("[R]elief from [the alleged] injury must be likely to follow from an adjudication favorable to the plaintiff.").  If the plaintiff's injury is not redressable, that is, if he will not obtain any relief from the successful prosecution of the claim, he lacks Article III standing.  *See Golden Pac. Bancorp. v. F.D.I.C.*, 375 F.3d 196, 205 (2d Cir. 2004), *cert. denied*, 126 S. Ct. 621 (2005).

Prudential standing refers to the requirement that even "[w]hen the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . .  the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. at 499. If the plaintiff lacks prudential standing, the Court need not consider Constitutional standing.  *Gache v. Hill Realty Assocs., LLC,* No. 13–CV–1650 (CS), 2014 WL 5048336, at *5 (S.D.N.Y. Sept. 22, 2014), *appeal dismissed*, No. 14-4308 (2d Cir. Mar. 4, 2015); *see United States v. Suarez*, 791 F.3d 363, 366-67 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 800 (2016); *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 48 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1399 (2015).  The party seeking relief bears the burden of proving both Constitutional and prudential standing.  *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 84 (2d Cir. 2014).

In addition, section 1109(b) of the Bankruptcy Code, which applies in chapter 11 cases, provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." The Bankruptcy Code does not define "party in interest," *Krys v. Official Comm. of Unsecured Creditors of Refco, Inc.* (*In re Refco, Inc.*), 505 F.3d 109, 117 (2d Cir. 2007); *Roslyn Savs. Bank v. Comcoach Corp.* (*In re Comcoach Corp.*), 698 F.2d 571, 573 (2d Cir. 1983), and the phrase has been interpreted to mean "that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains . . . ." *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) (Posner, J.). As with prudential standing, a person's status as a creditor does not mean that person has the right to assert someone else's rights. "[P]arty in interest standing under § 1109(b) does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding." *Refco*, 505 F.3d at 117 n. 10. "To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else." *Refco*, 505 F.3d at 117. Party-in-interest standing is a separate requirement, and thus, the party seeking relief in a chapter 11 case must establish constitutional standing, prudential standing and party-in-interest standing under section 1109(b). *See Scott v. Residential Capital, LLC* (*In re Residential Capital, LLC*); No. 14 Civ. 761(ER), 2015 WL 629416, at *3 (S.D.N.Y. Feb. 13, 2015) ("To have standing in bankruptcy court, a party must meet three requirements: (1) Article III's constitutional requirements; (2) federal court prudential standing requirements; and (3) the "party in interest" requirements under Section 1109(b) of the Bankruptcy Code."); *In*

*re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013); *cf. Savage & Assocs., P.C. v. K & L Gates LLP* (*In re Teligent, Inc.*), 640 F.3d 53, 60 n. 3 (2d Cir. 2011) ("Because we agree that K & L Gates was not a 'party in interest,' we do not reach the constitutional or prudential questions.")

Mar-Bow, like any other creditor or successor to a creditor, is not a party in interest and lacks prudential standing to assert derivative claims arising from injuries to the debtor or its estate, including claims based on fraud on the court. A derivative claim is based on "a secondary effect from harm done to [the debtor]," while a direct claim involves a particularized injury that can be "directly traced to [the third party's] conduct." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d at 704; *accord Tronox, Inc. v. Kerr-McGee Corp.* (*In re Tronox, Inc.*), 855 F.3d 84, 100 (2d Cir. 2017); *Marshall v. Picard* (*In re Bernard L. Madoff Inv. Secs. LLC*), 740 F.3d 81, 89 (2d Cir. 2014). If the claim is a general one with no particularized injury, and any creditor could bring the same claim, the trustee (here, the Trust) is the proper person to assert it. *Tronox*, 855 F.3d at 100; *St. Paul*, 884 F.2d at 701.

The *Motion* ignores these limitations. It seeks in the main to vacate the *Retention Order* and the *Fee Order*, compel McKinsey RTS to disgorge the approximate $15 million in fees and expenses it received, pay sanctions and "hold McKinsey RTS liable to the Debtors' estates in the amount of $22,255,246.76 for its prepetition fraudulent billing and collection scheme." (*Motion* ¶ 92.) The prepetition payment of fraudulent bills, if true, harmed the Debtor. McKinsey RTS's alleged representation of conflicting interests while acting as the Debtors' financial advisor, including the payment of its fees and expenses, harmed the estates. Mar-Bow has not identified a

particularized injury that it suffered distinct from the injuries, if any, that all unsecured creditors suffered[14] and it lacks standing to assert a fraud on the court claim based on a secondary effect of an injury to the Debtors (pre-petition) or their estates (post-petition). *See Gache v. Hill Realty Assocs. LLC*, 2014 WL 5048336, at *6 (chapter 7 debtor lacked standing to assert claim of fraud on the court in connection with a collusive bankruptcy sale because the claim belonged to his estate). Moreover, the Trust, which acquired those claims under the *Plan*, settled with and released McKinsey RTS. The Trust cannot recover anything more from McKinsey and Mar-Bow cannot recover anything more, even indirectly, through its interest in the Trust.

Mar-Bow nevertheless speculates that the Court could award it some form of relief. (*Reply* ¶ 21 ("[T]o find a pecuniary interest for standing purposes, it is sufficient that a monetary distribution to Mar-Bow is a colorably arguable consequence of McKinsey's frauds on the Court . . . ."); *see id.* ¶ 24 ("[A]t the appropriate time, Mar-Bow will assert that the distribution of any monetary sanctions that the Court imposes on McKinsey RTS for its abuses of the judicial process is entirely in the Court's discretion . . . . Mar-Bow will then further assert that because McKinsey RTS's frauds primarily harmed unsecured creditors like Mar-Bow's transferors, the Court should exercise its discretion to order that all monetary sanctions be distributed broadly to those unsecured creditors on a *pro-rata* basis.")

---

[14]     Mar-Bow's *Reply* argued that the fraud on the court claim "is *not* the Debtors' claim, as McKinsey asserts. That claim is *Mar-Bow's* claim, as the transferee of the prepetition claims from four unsecured creditors in these cases." (*Reply* ¶ 3(b) (emphasis in original).) At oral argument, however, it characterized this language as "inexact" and apologized for its use. (Tr. at 20:19-21:13.)

This argument suffers from several deficiencies.  First, it is based on the erroneous assumption that "McKinsey RTS's frauds primarily harmed unsecured creditors."  In fact, the unsecured creditors were out of the money and received a tip from the second lien lenders to settle their claims against the second lien lenders and confirm the *Plan*.  There was approximately $170 million to distribute, and the second lien lenders claims, aggregating $625 million, were secured by that $170 million.  The second lien lenders, the fulcrum class below which value did not fall, received an approximate 5.4% distribution.  The second lien lenders' cash collateral funded McKinsey's fees and expenses, and any harm caused by McKinsey's alleged fraud fell on them.

Second, "colorably arguable" relief based on a non-particularized injury is pure conjecture that does not satisfy the requirement for Article III standing.  It depends on a claim of speculative possibilities (*i.e.*, the Court will order sanctions or disgorgement and order distribution to the Trust which has already settled with and released McKinsey and McKinsey RTS).  This is precisely the type of standing argument rejected by the Supreme Court.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. at 410.

 Third, Mar-Bow's speculative distribution scheme ignores the *Confirmation Order*.  As noted, the *Plan* distributed certain assets to the Trust and the second lien lenders and the balance of the estates' rights vested in the Reorganized Debtors.  The *Confirmation Order* is a final judgment, and "any attempt by the parties or those in privity with them to relitigate any of the matters that were raised *or could have been raised therein* is barred under the doctrine [of] *res judicata*."  *Sure–Snap Corp. v. State St. Bank & Tr. Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (emphasis in original).  If any

additional assets are realized from McKinsey RTS, they will be distributed in accordance

with the *Plan*, presumably to the Reorganized Debtors. *See In re Old ANR, LLC*, Case

No. 19-00302-KRH, 2019 WL 2179717, at *5-6 (Bankr. E.D. Va. May 17, 2019)

(concluding in similar circumstances that any additional money received from McKinsey

RTS based on its fraud on the court would be distributed in accordance with the terms

of the confirmed plan). In short, Mar-Bow will not recover anything and lacks standing

to assert a claim of fraud on the court. *Herring v. F.D.I.C.*, 82 F.3d 282, 284 (9th Cir.

1995), *cert. denied*, 117 S. Ct. 581 (1996); *see Golden Pac. Bancorp*, 375 F.3d at 205

(adopting *Herring's* reasoning in connection with a claim of corporate waste); *Old ANR*,

2019 WL 2179717, at *6-7 (party asserting fraud on the court must demonstrate

standing).[15]

      Mar-Bow's standing argument confuses the Court's inherent authority — what the

Court can do — with its own standing — what Mar-Bow can do. The Court has the

inherent authority to remedy a fraud on the Court, *Chambers v. NASCO, Inc.*, 501 U.S.

32, 44 (1991); *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580-81

(1946); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944), and

even one who lacks standing to prosecute may bring it to the Court's attention and

*suggest* that it vacate a prior judgment based on fraud on the Court. *Kupferman v.*

---

[15]    Mar-Bow also asserts that it has standing because it is bound by the *Retention Order* and the *Fee
Order* which it is seeking to vacate. (Tr. 12:8-25; 18:4-11.) Mar-Bow has failed to show a concrete injury
resulting from the mere binding nature of the orders that can be redressed by an order that vacates those
prior orders. If Mar-Bow had standing to seek monetary sanctions or disgorgement, the binding nature of
these orders would not preclude that relief. *See In re Granite Partners, L.P.*, 219 B.R. 22, 40-42 (Bankr.
S.D.N.Y. 1998). Nor is there any reason to grant Mar-Bow's demand to compel McKinsey, three years
later, to comply with Rule 2014 (assuming it did not). The Debtors are not seeking to retain McKinsey
RTS and further disclosure under Rule 2014 would serve no purpose at this point and lead to protracted
and unnecessary litigation.

*Consol. Research & Mfg. Corp.*, 459 F.2d 1072, 1074 n. 1 (2d Cir. 1972) (Friendly, C.J.). But this does not mean that any creditor or every creditor has the right to litigate the same claim of fraud on the court even though it has not suffered a particularized injury.

The cases cited by Mar-Bow that permit a non-party to vacate a judgment based on fraud on the court, (*see Reply* ¶¶ 15-16), do not support its position.  A non-party can seek to vacate an earlier judgment based on fraud on the court only if the non-party's interests are significantly affected.  *Lawrence v. Wink* (*In re Lawrence*), 293 F.3d 615, 627 n. 11 (2d Cir. 2002) (non-party has standing to bring a Rule 60(b) motion, including one based on fraud on the court, "when its interest are strongly affected"); *Eyak Native Village v. Exxon Corp.*, 25 F.3d 773, 777 (9th Cir. 1994) ("[A] nonparty may seek relief from a judgment procured by fraud if the nonparty's interests are directly affected."), *cert. denied*, 513 U.S. 943 (1994); *Kem v. Mfg. Corp. v. Wilder*, 817 F.2d 1517, 1521 (11th Cir. 1987) (barring extraordinary circumstances, a non-party lacks standing to assert a claim for fraud on the court if its rights are not directly compromised by the final judgment); *Southerland v. Irons*, 628 F.2d 978, 979-80 (6th Cir. 1980) (non-party lienor had standing to seek to vacate court-approved settlement based on fraud on the court where plaintiff's attorney fraudulently represented that he would satisfy the lien out of his contingent fee); *Marshall v. Gurley*, No. 4:17-cv-405, 2018 WL 4762858, at *4 (E.D. Tex. Sept. 30, 2018) ("[C]ourts have recognized that nonparties may seek relief pursuant to Rule 60 when the nonparty is in some form of privity or when the nonparty's interests are directly or strongly affected by the judgment."), *appeal docketed*, No. 18-41024 (5th Cir. Oct. 30, 2018); *see Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1052 (2d Cir. 1982) (non-party plaintiffs had standing to invoke

Rule 60(b)(6) to amend a federal judgment, where they were "sufficiently connected and identified" with the earlier suit). Mar-Bow has no rights that are affected much less "significantly affected" by McKinsey RTS's alleged fraud on the court.

The only case Mar-Bow cites that appears at first glance to support its standing argument is *Denison v. Marina Mile Shipyard, Inc.*, Nos. 10–62522–Civ, 11–61389–Civ, 2012 WL 75768 (S.D. Fla. Jan. 10, 2012), *aff'd*, 497 F. App'x 882 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 2834 (2013). There, the Bankruptcy Court authorized the debtor to retain Marine Realty, Inc., and its principal, Denison (collectively, the "Brokers") as its real estate agent to sell its marina. *Id.* at *1. Denison submitted a declaration stating that neither he nor his company held or represented an adverse interest, and both were disinterested. *Id.* In fact, the Brokers had possibly acquired an undisclosed interest prior to the closing. *Id.*

When the Bankruptcy Court learned this, it issued an order *sua sponte* directing the Brokers to show cause why they should not be required to disgorge their $490,000 commission, but the hearing was adjourned at Denison's request. *Id.* at *2. In the meantime, Marine Mile Shipyard, Inc. ("MMS"), the largest unsecured creditor, filed its own motion to compel the Brokers to disgorge their commission to the chapter 11 plan administrator. *Id.* The Brokers contended, among other things, that MMS lacked standing to pursue disgorgement, but the Court disagreed. The MMS disgorgement motion was ancillary to the fee review initiated by the Bankruptcy Court which has inherent authority to review professional compensation and order disgorgement if it finds that the professional held interests adverse to the estate. *Id.* at *3. Furthermore, even if the plan delegated the prosecution of claims against third parties to the plan

- 20 -

administrator, the Bankruptcy Court had the authority to order disgorgement, and how it was brought to the Court's attention was inconsequential.  *Id.* at \*5.

*Denison* does not support the argument that Mar-Bow has the standing to prosecute this claim.  The Trust, the equivalent of the plan administrator in *Denison*, did not delegate its authority to Mar-Bow; instead, it settled directly with McKinsey.  And while the Court could, in the exercise of its discretion, authorize a person who otherwise lacks standing (*e.g.,* Mar-Bow) to prosecute the fraud on the court claim, it does not follow that Mar-Bow has standing, in its own right, to prosecute the claim.

The last point, covered in supplemental briefing by the parties,[16] relates to the significance of the Supreme Court's recent decision in *Mission Prods. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019).  Mar-Bow argues that it supports its standing argument, but I disagree.  In that case, the chapter 11 debtor licensed a trademark to Mission Product Holdings, Inc. ("Mission").   The debtor rejected the license agreement and sought a declaratory judgment that the rejection extinguished Mission's rights under the license agreement, including the right to use the trademark.  By then, the license agreement was set to expire in less than one year.  *Id.* at 1658.  The Bankruptcy Court agreed with the debtor (that the rejection had terminated Mission's rights under the license agreement), the Bankruptcy Appellate Panel reversed, and the First Circuit Court of Appeals reversed the Bankruptcy Appellate Panel and reinstated the

---

[16]     *Supplemental Brief on Mission Product Holdings, Inc. v. Tempnology, LLC Submitted by Mar-Bow Value Partners, LLC*, dated May 31, 2019 ("*Mar-Bow Supplement*") (ECF Doc. # 5973); *McKinsey Recovery & Transformation Services U.S., LLC's Post-Hearing Brief in Opposition to Mar-Bow Value Partners, LLC's Motion for Relief from Orders Under Bankruptcy Rule 9024 and Civil Rule 60(d)(3)*, dated May 31, 2019 (ECF Doc. # 5974).

Bankruptcy Court's judgment.  *Id.* at 1659-60.

Before addressing the merits, the Supreme Court considered the debtor's argument that the case was moot because the license agreement had expired.  According to the Court, "'[u]nder settled law, we may dismiss the case for that reason only if 'it is impossible for a court to grant any effectual relief whatever' to Mission assuming it prevails."  *Id.* at 1660 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks omitted)).  The debtor, however, failed to meet this "demanding standard" because Mission was seeking lost profits between the time of rejection and the license agreement's scheduled expiration date, and the controversy remained live regardless of the merits or the collectability of lost profits.  *Id.*  In language that Mar-Bow quotes, (*see Mar-Bow Supplement* ¶ 5), the Court explained:

> Mission has presented a claim for money damages—essentially lost profits—arising from its inability to use the Coolcore trademarks between the time Tempnology rejected the licensing agreement and its scheduled expiration date.  See Reply Brief 22, and n. 8.  Such claims, if at all plausible, ensure a live controversy.  See *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 8–9, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978).  For better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents. See 13C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3, p. 2 (3d ed. 2008) (Wright & Miller) ("[A] case is not moot so long as a claim for monetary relief survives").  Ultimate recovery on that demand may be uncertain or even unlikely for any number of reasons, in this case as in others.  But that is of no moment. If there is any chance of money changing hands, Mission's suit remains live.  See *Chafin*, 568 U. S. at 172, 133 S. Ct. 1017.

139 S. Ct. at 1660.  Although *Mission Products* addressed mootness rather than standing, Mar-Bow reasons that both concepts have their roots in Article III's "case or controversy" requirement, (*Mar-Bow Supplement* ¶¶ 8-10), *Mission Products*' "holding" on "what constitutes a 'case' or 'controversy' under Article III" applies to Mar-Bow's motion, (*id.* ¶ 11), and because there is a chance that the

Court could in the exercise of its discretion impose a monetary sanction against

McKinsey that would redound to Mar-Bow's benefit, Mar-Bow has standing.  (*Id.*

¶¶ 12-13.)[17]

The argument lacks merit.  Although the limiting concepts of mootness and

standing have their roots in Article III's "case or controversy" requirement, they are

distinct.  *See Klein v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018) ("The case-or-

controversy limitation on our jurisdiction, and its focus on parties' stakes in the action,

manifests in three distinct legal inquiries: standing, mootness, and ripeness."), *cert.*

*dismissed*, 139 S. Ct. 1406 (2019).  "Standing doctrine functions to ensure, among other

things, that the scarce resources of the federal courts are devoted to those disputes in

which the parties have a concrete stake.  In contrast, by the time mootness is an issue,

the case has been brought and litigated . . . ."  *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).  Thus, standing requires the Court to

determine whether the plaintiff has the right to assert the claim in the first instance

whereas mootness requires the Court to determine "when the issues presented are no

longer live."  *Chafin v. Chafin*, 568 U.S. at 172 (internal quotations omitted).

In *Mission Product,* Mission had Article III standing because it was a party to a

rejected contract with a concrete and particularized claim for lost profits that could be

redressed by an award.  The Supreme Court did not discuss Mission's standing or cite to

any of its many standing decisions.  Instead, it concluded that the controversy was *still*

live.  By conflating mootness with standing, Mar-Bow's argument comes down to the

---

[17]    This sounds like the "colorably arguable" right to relief that the Court discussed and
rejected earlier.

proposition that if a party with standing could still recover damages, any stranger can assert that claim in a federal court. In addition to its incorrect view of Article III standing, this argument ignores the further requirements of prudential and party-in-interest standing which Mar-Bow lacks for the reasons stated.

Having brought its allegations to the Court, Mar-Bow concedes that how the Court chooses to deal with the claim of fraud on the court is committed to its sole discretion. (Tr. at 7:14-16; 13:18-22).) Thus, the only question is what the Court should do. It could appoint Mar-Bow to investigate and prosecute the claim on the Court's behalf and Mar-Bow would no doubt willingly absorb the cost.[18] This, however, is no solution. Mar-Bow is not neutral, and it appears that it has already determined what the outcome of the investigation will show. The Court could also appoint an examiner or other independent investigator to examine the claim but declines to do so.

The preferable approach is the path taken by Judge Huennekens in *ANR.* He concluded that the Department of Justice is the appropriate entity to conduct such an investigation, if warranted. As he observed in response to identical claims made by Mar-Bow against McKinsey RTS in *ANR*, the settlement between the USTP and McKinsey carved out fraud claims from the release and the United States Trustee remains free to pursue those claims. *ANR*, 2019 WL 2179717, at *6 n. 22. Furthermore, the United States Attorney retains the ability to prosecute any crimes under title 18. *Id.* According to Mar-Bow, McKinsey's non-disclosures have affected numerous bankruptcy cases and a single approach rather than a case-by-case approach is the most efficient

---

[18]    It is also requesting the right to take discovery in the *Motion*.

way to deal with this issue.  In addition, Mar-Bow is pursuing direct claims under RICO against McKinsey RTS and others in the United States District Court where it can conduct its own investigation into the same allegations it raises in this Court.

Accordingly, the *Motion* is denied based on Mar-Bow's lack of standing.

So ordered.

Dated:  New York, New York
        June 21, 2019


                                /s/ *Stuart M. Bernstein*
                                STUART M. BERNSTEIN
                                United States Bankruptcy Judge